

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
CASE NO. 6:17-CV-00184-DLB


The Estate of JESSIE J. MILLS, ex. Rel.
Personal Representative, PEARLIE SUE GAMBREL,

                                          PLAINTIFFS

VS.

KNOX COUNTY, Knox County Sheriff's Department Officer in
his individual capacity, MIKEY ASHURST,
Knox County Constable BRANDON BOLTON, in his individual
capacity,                                 DEFENDANTS


Video Deposition of:

PEARLIE SUE GAMBREL


     The deposition of Pearlie Sue Gambrel was taken before
Karen G. Bailey, Court Reporter and Notary Public in
and for the Commonwealth of Kentucky at Large, on
December 18, 2018, commencing at the approximate hour of
10:02 a.m., at the offices of Williams and Towe Law Group,
303 South Main Street, London, Kentucky.  Said deposition
was taken pursuant to Notice and is to be used for all
purposes consistent with the Federal Rules of Civil
Procedure.


* * * *                                   * * * *

---

**SOUTHEASTERN COURT REPORTING SERVICE**

Freelance Court Reporting and Videography
Post Office Box 863
London, KY 40743-0863
Telephone/Fax: (606) 864-5070
**Karen G. Bailey, Certified Court Reporter**

VIDEO DEPOSITON OF:      Pearlie Sue Gambrel
December 18, 2018 — 10:02 a.m.


## INDEX

Examination by Hon. Jason E. Williams.........................  3 - 111
Certificate of Court Reporter  ....................................................  - 112

## A P P E A R A N C E S

HON. JASON E. WILLIAMS
PO Box 3199
London, Kentucky   40743-3199

HON. AMY ROBINSON STAPLES
311 N. Aberdeen, 3rd Floor
Chicago, Illinois   60607


Also Present:

Jimmer Dudley

Misty Watkins, Video Technician

1  <u>M. WATKINS, VIDEO TECH</u>:        My name is Misty

2  Watkins, certified legal videographer.  Our court

3  reporter today is Karen Bailey.  Today's date is

4  December the 18th, 2018 and the time is now 10:02 a.m.

5  We are here today at Williams & Towe Law Group, 303

6  South Main Street, London, Kentucky to take the video

7  deposition of Pearlie Sue Gambrel.  This video is

8  being taken pursuant to notice in the United States

9  District Court, Eastern District of Kentucky, Southern

10 Division at London, Case No. 6:17-CV-00184 DLB, styled

11 *The Estate of Jessie J. Mills, by and through personal*

12 *representative, Pearlie Sue Gambrel, versus Knox*

13 *County, Knox County Sheriff's Department Officer, in*

14 *his individual capacity, Mikey Ashurst, Knox County*

15 *Constable Brandon Bolton, in his individual capacity.*

16 At this time, counsel will introduce themselves and

17 whom they represent and the court reporter will then

18 swear in the witness.

19 <u>MS. ROBINSON-STAPLES</u>:        Amy Robinson-

20 Staples for the plaintiff.

21 <u>MR. WILLIAMS</u>:        I'm Jason Williams

22 on behalf of the defendants.

23 <u>KAREN BAILEY, CCR</u>:        Again, Ms. Gambrel,

24 I'm Karen Bailey.  I'm a court reporter.  Would you

25 raise your right hand, please?  Do you solemnly swear

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   the testimony you're about to give will be the truth,

2   the whole truth, nothing but the truth, so help you

3   God?

4   MS. GAMBREL:                              Yes, ma'am.

5   KAREN BAILEY, CCR:                        You're under oath,

6   ma'am.

7                                    *

8                                    *

9                                    *

10          The witness, PEARLIE SUE GAMBREL, being

11  lawful age, after being first duly sworn, did hereby

12  testify as follows:

13  EXAMINATION BY HON. JASON E. WILLIAMS:

14  Q       Ms. Gambrel, my name is Jason Williams.  I

15  represent the defendants in this lawsuit that you've

16  filed.  Have you ever given a deposition for anything

17  before?

18  A       No.

19  Q       Okay.  Could you tell us your full name for

20  the record, please, before we get started?

21  A       My name is Pearlie Sue Gambrel.

22  Q       And do you go by Pearlie?

23  A       Most people call me Sue.

24  Q       Sue, okay.  Well, I'm going to call you Ms.

25  Gambrel today if that's okay.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A          That's fine.

2    Q          Let me just briefly go over a few rules of

3    giving a deposition.  I'm sure your attorney has

4    spoken with you about it, but I'm basically going to

5    be asking you some questions today.  If I ask you a

6    question that you can't hear or you if don't

7    understand, just ask me to repeat it, okay?

8    A          Okay.

9    Q          Of course, we're taking this by video and

10   taking your testimony down to prepare a transcript, so

11   it's important for you to answer verbally as opposed

12   to using head shakes and doing "uh-huhs" and "huh-

13   uhs," okay?

14   A          Yes, sir.  I understand.

15   Q          All right.  If you would, please let me get

16   my entire question out before you begin to answer and

17   I'll try to wait for you to get your whole answer out

18   before I ask you another question.  Let's try it out

19   here.  So you'll need to answer verbally when I ask

20   you a question, okay?

21   A          Yes.

22   Q          Okay.  Thank you.  The last thing I would

23   say is, if you need to take a break at any time, just

24   let us know.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A       Okay.

2    Q       All right.  We won't know if you need a

3    break unless you tell us.

4    A       Yes.

5    Q       Okay.  All right.  So you already gave me

6    your full name.  Ma'am, have you ever gone by any

7    other name ---

8    A       Mills.

9    Q       --- other than Pearlie or Sue?

10   A       Mills.

11   Q       Mills.  And what is your age?

12   A       Fifty-seven (57).

13   Q       Are you currently married?

14   A       No, I'm widowed.

15   Q       How many times have you been married?

16   A       Three times.

17   Q       All right.  Starting with the first marriage

18   that you had, who were you married to?

19   A       Marvin Roark.

20           KAREN BAILEY, CCR:      I'm sorry, what was

21   the last name?

22           MS. GAMBREL:            Marvin Roark.

23           KAREN BAILEY, CCR:      Roark?  Thank you.

24   Q       Is Mr. Roark still living?

25   A       Yes.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   Q      Do you know where he lives?

2   A      He lives in Rogue Fork.

3   Q      I'm sorry?

4   A      Rogue Fork.

5   Q      Rogue Fork?

6   A      Uh-huh (affirmative response).

7   Q      Where's that at, ma'am?

8   A      It's at Stinking Creek.

9   Q      In Knox County?

10  A      Yes.

11  Q      You don't happen to know Mr. Roark's

12  address, do you?

13  A      No, sir.

14  Q      During what time period were you and Mr.

15  Roark married?

16  A      I was 19, so that's, what, 40 some years

17  ago.

18  Q      How long were you all married?

19  A      Two years.

20  Q      Any children born of that marriage?

21  A      No.

22  Q      Were you all divorced in Knox County?

23  A      Yes.

24  Q      Who were you married to after Mr. Roark?

25  A      Larry Mills.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        And during what time period were you and Mr.

2    Mills married?

3    A        '81.

4    Q        Until when?

5    A        Until '86.

6    Q        Were there any children born of that

7    marriage?

8    A        Yes.

9    Q        Okay.  How many?

10   A        One.

11   Q        One.  And what was that child's name?

12   A        Jessie.

13   Q        Did you live with Mr. Mills in Knox County?

14   A        Yes.

15   Q        And is he now deceased?

16   A        Yes.

17   Q        All right.  Now after Mr. Mills, who were

18   you married to?

19   A        Lonnie Gambrel.

20   Q        Lonnie Gambrel.  And are you and Mr. Gambrel

21   divorced?

22   A        Yes.

23   Q        What time period were you married to Mr.

24   Gambrel?

25   A        From '90 to '98.

Pearlie Sue Gambrel – Hon. Jason E. Williams

| 1 | Q | Any children born of that marriage? |
| 2 | A | Two. |
| 3 | Q | What are their names? |
| 4 | A | Nikki and Justin. |
| 5 | Q | Is Nikki a girl or a boy? |
| 6 | A | A girl. |
| 7 | Q | How old is Nikki now? |
| 8 | A | Twenty-six (26). |
| 9 | Q | How old is Justin now? |
| 10 | A | Twenty-five (25). |
| 11 | Q | Does Nikki live in Knox County? |
| 12 | A | Yes. |
| 13 | Q | Does she live with you? |
| 14 | A | No. |
| 15 | Q | Is she married? |
| 16 | A | Yes. |
| 17 | Q | What's her husband's name? |
| 18 | A | Casey. |
| 19 | Q | Do they have any children over 18? |
| 20 | A | No. |
| 21 | Q | All right.  How old is -- I'm sorry.  You |
| 22 | | told me how old Justin was.  Is Justin married? |
| 23 | A | Yes. |
| 24 | Q | What's Justin's wife's name? |
| 25 | A | Brittany. |

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q      Do they live in Knox County?

2    A      Yes.

3    Q      Do they live with you?

4    A      No.

5    Q      Have we covered all of your children?

6    A      I've got two more kids.

7    Q      Okay.  Let's talk about them then.  What's

8    the first one's name?

9    A      Michelle.

10   Q      How old is Michelle?

11   A      Thirty-nine (39).

12   Q      Okay.  What's Michelle's last name?

13   A      Brown.

14   Q      Is that her married name?

15   A      Yes.

16   Q      Who is Michelle's father?

17   A      Howard Hubbard.

18   Q      Is Mr. Hubbard still living?

19   A      Yes.

20   Q      Does he live in Knox County?

21   A      Yes.

22   Q      Is Michelle married?

23   A      Yes.

24   Q      What's Michelle's husband's name?

25   A      Steven.

Pearlie Sue Gambrel – Hon. Jason E. Williams

| | | |
|---|---|---|
| 1 | Q | Steven Brown? |
| 2 | A | Yes. |
| 3 | Q | Do they have any children together? |
| 4 | A | Three -- four. |
| 5 | Q | Are any of those children over 18? |
| 6 | A | Yes. |
| 7 | Q | How many of them are over --- |
| 8 | A | One. |
| 9 | Q | One.  What's that child's name? |
| 10 | A | Courtney. |
| 11 | Q | What's Courtney's last name? |
| 12 | A | Broughton. |
| 13 | Q | Broughton? |
| 14 | A | Uh-huh (affirmative response). |
| 15 | Q | Does Courtney live in Knox County? |
| 16 | A | Yes. |
| 17 | Q | All right.  You said you have one other |
| 18 | | child? |
| 19 | A | Yes. |
| 20 | Q | What's that child's name? |
| 21 | A | Wyoma. |
| 22 | Q | I'm sorry? |
| 23 | A | Wyoma, W-y-o-m-a. |
| 24 | Q | Wyoma, okay.  And I apologize, is that a boy |
| 25 | | or a girl? |

Pearlie Sue Gambrel – Hon. Jason E. Williams

| | | |
|---|---|---|
| 1 | A | That's a girl. |
| 2 | Q | Okay.  I thought so.  Does Wyoma live in |
| 3 | | Knox County? |
| 4 | A | Yes. |
| 5 | Q | And how old is Wyoma? |
| 6 | A | Thirty (30). |
| 7 | Q | Is Mr. Hubbard also her father? |
| 8 | A | No. |
| 9 | Q | Okay.  Who's Wyoma's father? |
| 10 | A | Mike. |
| 11 | Q | I'm sorry, Mike -- last name? |
| 12 | A | Brown. |
| 13 | Q | Brown.  Have we covered all of your |
| 14 | | children? |
| 15 | A | Yes. |
| 16 | Q | And none of them live with you, correct? |
| 17 | A | No. |
| 18 | Q | All right.  What is your address? |
| 19 | A | My address? |
| 20 | Q | Uh-huh (affirmative response). |
| 21 | A | 54 Cheyenne Holler.  (Redacted from Original |
| 22 | | Transcript) |
| 23 | | MS. ROBINSON-STAPLES:   Jason, I'd like to |
| 24 | | have that redacted from --- |
| 25 | | MR. WILLIAMS:        Sure. |

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    MS. ROBINSON=STAPLES:    -- the record,

2    please.

3    KAREN BAILEY, CCR:    Sure.

4    MS. ROBINSON-STAPLES:  Thank you.

5    Q        Where is Cheyenne Holler at, ma'am?  What

6    part of the county?  (Redacted from Original

7    Transcript)

8    A        It's up Stinking Creek close to Dewitt.

9    Q        And how long have you lived at that address?

10   A        Almost four years.

11   Q        Does anyone live there with you?

12   A        No.

13   Q        Do you own your home there?

14   A        Yes.

15   Q        Okay.  It's in your name?

16   A        Yes.

17   Q        Before you lived at 54 Cheyenne Holler,

18   where did you live?  (Redacted from Original

19   Transcript)

20   A        I was incarcerated.

21   Q        Okay.  Where were you incarcerated at?

22   A        KCIW.

23   Q        KCIW.  What does that stand for?

24   A        Kentucky Correctional Institution for Women.

25   Q        And where was that at, ma'am?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Pewee Valley.

2    Q        Is that up towards Louisville?

3    A        Yes.

4    Q        During what time period were you

5    incarcerated?

6    A        1999.

7    Q        From 1999 until four years ago?

8    A        Yes, until September 1st of '15.

9    Q        Of 2015, okay.  All right.  Before your

10   incarceration at Pewee Valley, where were you living?

11   A        I was at another facility, but that's where

12   I began at.

13   Q        Okay.  One of the ---

14   A        I was still incarcerated, but I was at

15   Western Kentucky.

16   Q        Okay.  Just so I'm clear, did your

17   incarceration begin in 1999?

18   A        Yes.

19   Q        But at a different facility?

20   A        Yeah.  I switched locations, different

21   locations.

22   Q        Okay.  If you would, just take me through

23   the other facilities that you've been at then.

24   A        Okay.  I went to Western Kentucky and Otter

25   Creek.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Otter Creek.  How long were you there?

2    A        Five years.

3    Q        Okay.  And then anywhere else?

4    A        Five years at Western.

5    Q        Five years at Western and Otter Creek?

6             MS. ROBINSON-STAPLES:  They're two separate

7             facilities.

8    Q        And then another facility called Western.

9    Is that correct?

10   A        Yes.

11   Q        Okay.  Where was the other facility at?

12   A        That was KCIW.

13   Q        Okay.  And KCIW is at Pewee Valley, right?

14   A        Yes.

15   Q        So you've been at two different places,

16   Otter Creek and Pewee Valley, or is there one other

17   that I haven't covered?

18   A        Western, that's the -- Western.

19   Q        Okay.  And where is it at?

20   A        That's in -- close to Paducah.

21   Q        Paducah, all right.  Before being

22   incarcerated, what was your address?

23   A        It was Scalf.

24   Q        At Scalf, Kentucky?

25   A        Yes.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q      Do you remember what your actual address

2    was?

3    A      It was just post office box 28.

4    Q      And during what time period did you live

5    there?

6    A      That was in the '90s.

7    Q      Do you remember how many total years you

8    lived at that address?

9    A      Ten.

10   Q      Do you remember any of your other addresses

11   before that?

12   A      No, that's where I lived.

13   Q      Were you born and raised in Knox County?

14   A      Yes.

15   Q      Ever lived outside of Knox County?

16   A      No.

17   Q      What education level do you have, please?

18   A      Eighth grade.

19   Q      Can you read and write okay?

20   A      Okay.

21   Q      Where did you attend school last?

22   A      In the prison.

23   Q      Okay.

24   A      Western Kentucky.

25   Q      They have like a GED program there?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Yes.

2    Q        Before that, where was the last place you

3    had attended school?

4    A        Dewitt Elementary.

5    Q        Did they have like through eighth grade at

6    Dewitt?

7    A        Yes.

8    Q        Have you ever been employed?

9    A        Yes.

10   Q        Are you employed currently?

11   A        No.

12   Q        Okay.  Tell me when you were last employed.

13   A        Forty (40) years ago.

14   Q        Okay.  Do you remember where?

15   A        Traveler's Inn.

16   Q        Traveler's Inn.  Where was that at?

17   A        It's in Knox County.

18   Q        What did you do there?

19   A        Waitress.

20   Q        Do you remember how long you worked at that?

21   A        Five years.

22   Q        Do you remember any employment before that?

23   A        I worked partially at a sewing place at the

24   KEOC.

25   Q        Any other place you can recall working at?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        No.

2    Q            Do you currently have any -- and I think we

3    covered one, but do you just have one grandchild over

4    18 years old?

5    A        Yes.

6    Q            Okay.  Have you ever been in the military,

7    ma'am?

8    A        No.

9    Q        Have you ever received SSI?

10   A        I do now.

11   Q        How much do you get per month?

12   A        $750.

13   Q        Do you get any social security disability or

14   just SSI?

15   A        SSI.

16   Q        What is the nature of your disability that

17   you receive SSI for?

18   A        I'm partially deaf.

19   Q        And when were you diagnosed with that

20   condition?

21   A        Well, it was 2000 and -- it started in '04 -

22   - 2004.

23   Q        Did you have an attorney help you get SSI?

24   A        Yes.

25   Q        Who helped you get SSI?

1    A       Paul Baker.

2    Q       Any other conditions you're disabled from?

3    A       Diabetic, high blood pressure, cholesterol.

4    Q       Other than this lawsuit we're here on today,

5    have you ever been a party to any other lawsuits?

6    A       No.

7    Q       You haven't sued anybody else and nobody's

8    sued you?

9    A       No.

10   Q       You've been a party to some divorce actions

11   though, correct?

12   A       Yes.

13   Q       How about any custody issues where you ---

14   A       No.

15   Q       --- or your husbands or ex-husbands were

16   fighting over custody of children, anything like that?

17   A       No.

18   Q       Have you ever filed for bankruptcy?

19   A       No.

20   Q       How about a worker's compensation claim, any

21   of those where you were hurt on the job and filed a

22   claim?

23   A       No.

24   Q       Okay.  Do you currently attend church?

25   A       Yes.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      Q        Where do you attend church at?

2      A        Well, I go to the Faith Baptist Holiness

3    Church.

4      Q        What community is that in?

5      A        It's in Knox County.

6      Q        Is it like in Dewitt or Stinking Creek or --

7      A        It's in Stinking Creek.

8      Q        Who's the pastor there?

9      A        Bill Collins.

10     Q        How long have you attended there?

11     A        For four years.

12     Q        Any other churches you've attended or been a

13   member of?

14     A        I go to Free Spirit Holiness.  It's in

15   Stinking Creek, too.

16     Q        Okay.  Any others?

17     A        The pastor is Stony Brown.

18     Q        Say that again for me.

19     A        The pastor is Stony Brown.

20     Q        Okay.  Thank you.

21     A        You're welcome.

22     Q        All right.  Any other churches you attend?

23     A        No.

24     Q        How about any clubs?  Do you belong to any

25   clubs in Knox County or that area?

Pearlie Sue Gambrel — Hon. Jason E. Williams

1   A        No.

2   Q        Okay.  Are you currently involved in any

3   kind of businesses?

4   A        No.

5   Q        Have you ever been in the past?

6   A        No.

7   Q        Have you ever had any husbands that ran a

8   business in Knox County at any time?

9   A        No.

10  Q        Okay.  And you touched upon it earlier, but

11  you've had -- you've got a prior criminal conviction,

12  correct?

13  A        Yes.

14  Q        And you can correct me if I'm wrong, but as

15  I understand it, did you have a conviction for

16  manslaughter second?

17  A        Yes.

18  Q        And one for arson?

19  A        Yes.

20  Q        Okay.  Are there any other convictions other

21  than those two convictions?

22  A        No.

23           MS. ROBINSON-STAPLES:   And Jason, just for

24           the record, I'd like to note that those

25           convictions were both pardoned by the

Pearlie Sue Gambrel – Hon. Jason E. Williams

1          governor.

2          MR. WILLIAMS:              Okay.

3     Q    When were your convictions pardoned, ma'am?

4     A    In 2015.

5     Q    2015.  Did you have an attorney or somebody

6     helping you get the pardon?

7     A    Yes.

8     Q    Okay.  Who helped you get the pardon?

9     A    Amy.

10    Q    Amy?

11    A    Uh-huh (affirmative response).

12    Q    Any other arrests that we haven't talked

13    about of you?

14    A    No.

15    Q    Now you were appointed the administrator or

16    Jessie's estate.  Is that correct?

17    A    Yes.

18    Q    Do you remember when that was?

19    A    July 2016.

20    Q    Almost then immediately after his death or

21    soon after his death?

22    A    Soon after his death.

23    Q    Did you have any attorneys help you get

24    appointed administrator?

25    A    No.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        You did that on your own?

2    A        Yes.

3    Q        Have you had to file any reports in the

4    probate court?

5    A        No.

6    Q        Did you have to appear in court at any time?

7    A        No.

8    Q        Other than yourself, who would be part of

9    Jessie's estate?

10   A        His children.

11   Q        All right.  Let me ask you some questions

12   then about Jessie, if I can, please, okay?

13   A        Okay.

14   Q        All right.  What was his full name?

15   A        Jessie James Mills.

16   Q        And how old was he at the time of his

17   passing?

18   A        Thirty (30).

19   Q        Did he ever go by any other names?

20   A        No.

21   Q        Did he go by Jessie or James or what did he

22   go by?

23   A        Jessie.  Most of the people knew him as

24   Uncle Jessie.

25   Q        Uncle Jessie.  To your knowledge, why did

Pearlie Sue Gambrel – Hon. Jason E. Williams

1          they call him Uncle Jessie?

2     A          All the kids called him that.

3     Q          And the kids being who?

4     A          His nieces, nephews and even grownups called

5     him that, so ---

6     Q          When Jessie was growing up, where did he

7     live?

8     A          He lived in Stinking Creek.

9     Q          And who did he live with?

10    A          Me.

11    Q          He lived with you?

12    A          Yes.

13    Q          Okay.  And anybody else?

14    A          Lonnie.

15    Q          Lonnie.  You all were married at that time?

16    A          Yes.

17    Q          Did he live with you up and until the time

18    he was 18?

19    A          No, he lived with me until 13.

20    Q          Until 13, okay.  And at age 13, where did he

21    live?

22    A          He lived with my brother, Jack.

23    Q          Do you have a lot of brothers and sisters?

24    A          I have two sisters and one brother.

25    Q          Okay.  What is your sisters' names?

Pearlie Sue Gambrel – Hon. Jason E. Williams

| | | |
|---|---|---|
| 1 | A | Margaret Hobbs. |
| 2 | Q | Does she live in Knox County? |
| 3 | A | Yes. |
| 4 | Q | All right.  And what's your other sister's |
| 5 | | name? |
| 6 | A | Norma Brannon. |
| 7 | Q | Norma.  Does Norma live in Knox County? |
| 8 | A | No, she lives in London. |
| 9 | Q | In London.  And then you said you have a |
| 10 | | brother? |
| 11 | A | Yes. |
| 12 | Q | And what's his name? |
| 13 | A | Jack Brown. |
| 14 | Q | Where does Jack live? |
| 15 | A | London. |
| 16 | Q | Do you have a lot of kinfolks in Knox |
| 17 | | County, like cousins, --- |
| 18 | A | Yes. |
| 19 | Q | --- uncles, stuff like that?  I won't ask |
| 20 | | you to go through all those today, but at some point |
| 21 | | before trial, could you provide those names to your |
| 22 | | counsel so that we could know your relatives in that |
| 23 | | area? |
| 24 | A | Yes. |
| 25 | Q | Okay.  Thank you.  So at 13, Jessie went to |

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    live with your brother Jack.

2    A        Yes.

3    Q        And was that because you were incarcerated

4    at that time?

5    A        Yes.

6    Q        During the time period that Jessie was

7    growing up, did you and your husband -- were you

8    having a lot of trouble in the home?

9    A        No.

10   Q        Okay.  The events that led up to his death,

11   was that just kind of an out of the blue type of thing

12   or ---

13   A        Jessie was ten months old.

14   Q        Ten months old at that time?

15   A        At the death of his father.

16   Q        Okay.  So was it just a long period of time

17   between when your husband's death occurred and that

18   you actually became incarcerated?

19   A        It was a 12-year period.

20   Q        Okay.  After your arrest on that charge, did

21   you remain out on bond until a later trial?

22   A        I stayed out for one year.

23   Q        Okay.  You were charged and then stayed out

24   a year?

25   A        Yeah.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1     Q         And then convicted and went to prison?

2     A         In '99.

3     Q         In 1999.  And Jessie was how old at the time

4     of the death?

5     A         He was 13 then.

6     Q         Thirteen (13) at the time of the death?

7     A         That I went to — no, he was ten months old

8     at the death of his father.

9     Q         Uh-huh (affirmative response).  How was

10    Jessie's home life up and until the time he was 13?

11    A         Good.

12    Q         He didn't have any problems or any issues?

13    A         No.

14    Q         Was he good in school?

15    A         Yeah.

16    Q         Where did he go to school at?

17    A         Dewitt.

18    Q         No issues with grades or anything?

19    A         No.

20    Q         How was his health up and until that point?

21    A         He was good.

22    Q         Good health.  So Jessie lived with your

23    brother then for what time period?

24    A         Up until he was almost 18.

25    Q         From age 13 until 18?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   A       Yes.

2   Q       Did he have any problems that you're aware

3   of between ages 13 and 18?

4   A       Not that I know of.

5   Q       No health problems that you're aware of?

6   A       No.

7   Q       No psychological problems?

8   A       No.

9   Q       No problems with the law that you're aware

10  of?

11  A       No, not that I'm aware of.

12  Q       Okay.  No juvenile arrests as far as you

13  know?

14  A       No.

15  Q       All right.  At age 18, where did Jessie go

16  to live?

17  A       He lived with Michelle, his sister.

18  Q       Was that in Knox County?

19  A       Yes.

20  Q       And how long did he live with Michelle?

21  A       I don't know.

22  Q       You're not sure.  When you were

23  incarcerated, did Jessie come to visit you?

24  A       Yeah.

25  Q       How often did he come to visit?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Maybe twice a year.

2    Q        Did Michelle bring him or did he come by

3    himself?

4    A        They would bring him.

5    Q        All right.  Do you know how long Jessie

6    lived with Michelle?

7    A        I don't know.

8    Q        Okay.  After he lived with Michelle, where

9    did he live, if you know?

10   A        He got married.

11   Q        Who did he get married to?

12   A        He married Cleo Mills.

13   Q        Cleo Mills?

14   A        Yes.

15   Q        Is Ms. Mills still living?

16   A        Yes.

17   Q        Where does she live?

18   A        Knox County.

19   Q        Do you have a relationship with Ms. Mills?

20   A        I speak to her if I see her, but not on a

21   daily basis.

22   Q        Does she come to your house or vice versa?

23   A        No.

24   Q        Do you know how long Jessie was married to

25   Ms. Mills?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        I don't know.

2    Q        Did they have any children together?

3    A        No.

4    Q        And Jessie lived with her during their

5    marriage?

6    A        Yes.

7    Q        And did they live in Knox County during

8    their marriage?

9    A        They lived in Knox County.

10   Q        Who was Jessie married to after Ms. Mills?

11   A        Whitney Mills.

12   Q        I'm sorry?

13   A        Whitney Mills.

14   Q        Whitney Mills.  Are Whitney and Cleo related

15   to each other?

16   A        No.

17   Q        Okay.  There's a lot of Mills in Knox

18   County, isn't there?

19   A        Yes.

20   Q        How long were Whitney and Jessie married?

21   A        I don't know.

22   Q        Any children born of that marriage?

23   A        They have four children.

24   Q        Four children.

25        MS. ROBINSON-STAPLES:    And Jason, for

Pearlie Sue Gambrel – Hon. Jason E. Williams

| | | |
|---|---|---|
| 1 | | clarification, I believe that Mills is their |
| 2 | | married name after they married Jessie. |
| 3 | | **MR. WILLIAMS:**              Okay.   Thank you. |
| 4 | Q | Four children of that marriage? |
| 5 | A | Yes. |
| 6 | Q | Okay.  Can you give me those kids' names, |
| 7 | | please? |
| 8 | A | Jessie Mills, Reagan, --- |
| 9 | Q | Age please? |
| 10 | A | Reagan Mills. |
| 11 | Q | What's Jessie's age? |
| 12 | A | Ten, sorry. |
| 13 | Q | Reagan? |
| 14 | A | Uh-huh (affirmative response). |
| 15 | Q | And Reagan's age? |
| 16 | A | Eight. |
| 17 | Q | And then the others? |
| 18 | A | Colton Mills. |
| 19 | Q | Colton? |
| 20 | A | Uh-huh (affirmative response). |
| 21 | Q | Age? |
| 22 | A | Seven. |
| 23 | Q | Okay. |
| 24 | A | Mia. |
| 25 | Q | Mia.  And Mia's age? |

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Five.

2    Q        Who are the -- who are the children living

3    with currently, if you know?

4    A        James Helton and Susie Helton, their

5    grandparents.

6    Q        Do you know where Whitney is living

7    currently?

8    A        No.

9    Q        Do you know if she's incarcerated?

10   A        I don't know.

11   Q        Do you know if she's been incarcerated in

12   the past?

13   A        Yes.

14   Q        Do you know what she was incarcerated for?

15   A        Meth.

16   Q        What was Jessie's education level?

17   A        He went to the 11th grade.

18   Q        Was he able to read and write to your

19   knowledge?

20   A        Yes.

21   Q        Did he attend any college?

22   A        No, not that I'm aware of.

23   Q        Did Jessie work at any jobs before he was

24   18?

25   A        No, after.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1  Q     Okay.  After he became, what jobs did ---

2  A     He was a logger.

3  Q     A logger.  How often would he work?

4  A     Every day.

5  Q     Every day.  Now you got out of prison in

6  2015, right?

7  A     Yes.

8  Q     So the information you're giving me about

9  Jessie's employment is what you learned after you got

10 out of prison.  Is that fair?

11 A     Yes.

12 Q     Okay.  So after you got out in 2015, to your

13 knowledge, he worked in the log business?

14 A     Yes.

15 Q     Was there anyone in particular that he

16 worked for?

17 A     He worked for a lot of people.  He worked

18 for Brown's Logging.

19 Q     Brown's Logging.  Can you tell me who Brown

20 is?

21 A     General Brown's grandson.

22 Q     General Brown's grandson?

23 A     Yes.

24 Q     You don't know his name?

25 A     Dylan.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Dylan Brown.  What did he do, if you know,

2    working in the logs?

3    A        He sawed the trees down.  He cut all the

4    logs.

5    Q        Do you happen to know whether he got a

6    paycheck with taxes taken out or did he get paid in

7    cash?

8    A        Yes, he got taxes.

9    Q        Okay.  Since you became administrator of

10   Jessie's estate, have you seen any of his old tax

11   returns?

12   A        I have one and it's 2015.

13   Q        Okay.  And I know you don't have that in

14   front of you now, but do you have any recollection of

15   what he would've made in 2015 working in the logs?

16   A        It was -- on the tax return, it was like

17   $5,000 something.  I'm not sure of the over, but it

18   was ---

19   Q        Okay.  Other than working as a logger, did

20   Jessie have any other employment that you're aware of?

21   A        No.

22   Q        And you think Dylan Brown probably would've

23   been his supervisor?

24   A        Yes.

25   Q        Was Jessie ever in the military?

1    A        No.

2    Q        Do you know if he ever received social

3    security disability or SSI?

4    A        No.

5    Q        Did he have any injuries on the job that

6    you're aware of?

7    A        No.

8    Q        After becoming an adult, did Jessie have any

9    health issues that you're aware of?

10   A        Not that I was aware of.

11   Q        Okay.  Nothing that bothered him that he

12   would talk to you about?

13   A        No.

14   Q        Did he have any kind of psychological or

15   developmental problems that you're aware of?

16   A        Not that I know of.

17   Q        Okay.  Was he ever hospitalized that you

18   know?

19   A        Not that I'm aware of.

20   Q        Did he have a family doctor that he saw as a

21   child?

22   A        Access Clinic.

23   Q        Access Clinic.  And after he became an

24   adult, did he have a doctor that he would see?

25   A        I'm not aware of his doctors.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Okay.  Was he ever involved in any accidents

2    that you're aware of, automobile accidents or anything

3    like that?

4    A        No.

5    Q        To your knowledge, had Jessie ever filed any

6    lawsuits?

7    A        No.

8    Q        Do you know if anybody had ever sued Jessie?

9    A        No.

10   Q        Had he ever filed for bankruptcy as far as

11   you know?

12   A        No, not that I know of.

13   Q        Had he ever filed for workers compensation

14   as far as you know?

15   A        I'm not aware of it if he did.

16   Q        Okay.  When Jessie was living, did he attend

17   any churches?

18   A        Yeah, he went to the Faith Holiness Church.

19   Q        And is that in Stinking Creek?

20   A        Yes.

21   Q        Anyplace else that he attended?

22   A        He went to the Free Spirit.

23   Q        Okay.  Did he belong to any clubs that

24   you're aware of?

25   A        Not that I'm aware of.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   Q        And did he ever own any businesses that

2   you're aware of?

3   A        No.

4   Q        Before June of 2016, are you aware of any

5   legal problems that Jessie was in, any arrests he had

6   had?

7   A        Well, I had heard that -- you know, I was

8   there when he got arrested in January 16th.

9   Q        In January of 2016?

10  A        Yeah.

11  Q        Okay.  Tell me what you can recall about

12  that arrest.

13  A        Well, I just heard he was arrested on

14  driving suspended license.

15  Q        Okay.  You said you were there when that

16  happened?

17  A        Yes.

18  Q        You mean in the car?

19  A        No, I was at home.

20  Q        Okay.  Well, tell me what you remember

21  hearing about it.

22  A        I was just told that Mikey Ahurst [sic] is

23  the one who arrested him ---

24  Q        Okay.

25  A        --- January the 1st.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        All right.  Did you go to court or anything

2    on that?

3    A        I went down to the jail.

4    Q        Do you remember anything that was said at

5    that time?

6    A        No.

7    Q        Did you bail him out?

8    A        Yes.

9    Q        Okay.  You don't recall any conversations

10   you had with anybody at that time?

11   A        No.

12   Q        Now your -- was your contact with Jessie

13   before you got out in 2015 limited to a couple of

14   visits per year?

15   A        Yeah.  I'd write him letters.

16   Q        Okay.  Did you maintain copies of any of

17   those letters?

18   A        I don't know if I have them or not.  I

19   discarded all papers and stuff that I had.

20   Q        Okay.  After you became Jessie

21   administrator, have you located any of his personal

22   effects?

23   A        No.

24   Q        You don't have any letters that he may have

25   received from you while you were in prison?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   A       I don't know if I have or not.

2   Q       Okay.  Could you, when you have an

3   opportunity, take a look and see if any of those

4   letters are still around?

5   A       I will.

6   Q       Do you recall in any of those letters that

7   you exchanged with Jessie whether or not he discussed

8   with you any kind of problems he was having with

9   drugs?

10  A       I'm not aware of him ever doing drugs.

11  Q       Okay.  Well, that was going to lead to my

12  next question.  Were you aware of Jessie having any

13  kind of problem with drugs?

14  A       No.

15  Q       All right.  After you got out of prison in

16  2015 and up until the time of Jessie's death, how

17  often did you have occasion to see him?

18  A       I seen him every other day.

19  Q       Every other day.  And how often did you have

20  occasion to see his wife?

21  A       He wasn't -- he'd been separated from her

22  for two years.

23  Q       Okay.

24  A       I didn't see Whitney at all.

25  Q       What led to their separation, if you know?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        I have no idea.

2    Q        He never discussed that with you?

3    A        No.

4    Q        At some point, he lost custody of his

5    children, correct?

6    A        I don't know when any of that happened.

7    Q        So he didn't discuss with you any issues he

8    was having involving the custody of his children?

9    A        No.

10   Q        You didn't attend any court hearings

11   relating to custody?

12   A        No.

13   Q        Nor did you try to seek custody of any of

14   his children?

15   A        No.

16   Q        And is that true up and until today as we

17   sit here?

18   A        No, I tried to see -- I visit with them.

19   Q        Okay.

20   A        I visit the children.  But at that time,

21   when I come home, she wasn't letting him visit the

22   kids.

23   Q        Okay.  After you -- well, when you came back

24   home in 2015, up and until the time of Jessie's death,

25   how often did you get to see his children?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   A        I saw them twice.

2   Q        Two times only?

3   A        Yes.

4   Q        Do you remember the occasions you saw the

5   children?

6   A        I saw them on birthdays.

7   Q        And where did you see them at?

8   A        Once at his -- once at my house and once at

9   my daughter's.

10  Q        Okay.  Which daughter?

11  A        Tasha's.  That's Wyoma.

12  Q        So up and until the time of his death, even

13  though Jessie was seeing you every other day or so, he

14  never discussed with you any marital problems he was

15  having with his wife?

16  A        No.  He just told me that he wasn't taking

17  her back.  That's all he said.

18  Q        And he didn't discuss any custody issues

19  that he was having with his wife?

20  A        No.

21  Q        And Jessie didn't discuss any legal actions

22  that had been taken relating to the children, such as

23  emergency protective orders or domestic violence

24  orders being issued?

25  A        No.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q         And you weren't asked ---

2    A         He just wanted to be with his children.

3    That's the only thing he would tell me.  He wanted to

4    be with his children and visit and she didn't allow

5    it, so I don't know, you know, what led up to it or

6    anything.

7    Q         All right.  So up and until June 29th, 2016,

8    you weren't aware that Jessie had used any kind of

9    drugs?

10   A         No.

11   Q         Since his death, have you -- have you

12   learned that he did take drugs?

13   A         No.  I was told that he didn't have no drugs

14   in him, you know, because I'd seeked another attorney

15   and he said he was clean, so I have no idea about

16   drugs.

17   Q         Okay.  Well, what do you that mean you

18   sought another attorney and found out he was clean

19   with drugs?

20   A         Well, before I got Amy, I'd sought another

21   attorney to help me.

22   Q         Okay.  Who did you seek to help you?

23   A         Josh McWilliams.

24   Q         Josh McWilliam.  And where was Mr.

25   McWilliams out of?

1    A       I don't even really know his location.

2    Q       Did you just meet with him in Knox County?

3    A       A friend introduced him to me.

4    Q       I'm sorry?

5    A       A friend introduced him to me and then he

6    didn't contact me and then he just said he dismissed -

7    - that he wasn't going to help me, so I just -- you

8    know, that's all I knew him by.

9    Q       Well, what was the friend that introduced

10   you to Mr. McWilliams?

11   A       He was my attorney.

12   Q       And who was that, ma'am?

13   A       Dennis Burke.

14   Q       Okay.  So how long after Jessie's death did

15   you seek legal counsel?

16           MS. ROBINSON-STAPLES:     And let me

17           interrupt for just a minute.  I just want to

18           make sure that we don't get into any

19           privileged communication.

20           MR. WILLIAMS:           Sure.

21   Q       I don't  want you to tell me anything you

22   and your attorney discussed.  I'm just trying to find

23   out when you decided to get an attorney.

24   A       Well, it was right after it, because, you

25   know, my son, I just -- I didn't want to lose my son,

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    so I had to do something as a mother.

2    Q        So was it within a week of his death or ---

3    A        No, it wasn't a week.  It was sometime in

4    July.  I don't remember the date, so I'm not going to

5    tell you something that I don't remember.

6    Q        That's fine.  I don't want you to.

7    A        Because I mean I'm still shocked from it, --

8    Q        Yes, ma'am.

9    A        --- losing my son.

10   Q        But sometime in July of 2016?  Do you need

11   to take a break, ma'am?

12   A        No, I'm okay.

13   Q        You're okay and want to go on?

14   A        Yeah, I'll be okay.  Yes.

15   Q        All right.  All right.  Well, again, if at

16   any time you need to take a break, let me know, okay?

17   A        Okay.

18   Q        I know some of this will be hard to talk

19   about.  All right.  So ---

20           MS. ROBINSON-STAPLES:    Jason, do you have

21           any tissues by chance?

22           MR. WILLIAMS:           I don't, but let's

23           stop a minute so we can get her some.

24           MS. ROBINSON-STAPLES:   Okay.

25           M. WATKINS, VIDEO TECH: The time is now

Pearlie Sue Gambrel – Hon. Jason E. Williams

1          10:48 and we'll go off the record.

2                              *

3                   *** OFF THE RECORD ***

4                              *

5          M. WATKINS, VIDEO TECH:  The time is now

6          10:57 and we'll resume with disc two of the

7          video record.

8                              *

9     Q          All right, ma'am.  Are you ready to get back

10    started?

11    A          Yes.

12    Q          Okay.  Thank you.  So just so I'm clear,

13    after you got back from your incarceration and up and

14    until the time of Jessie's passing, you would see him

15    -- did you say a couple of times a week?

16    A          Every other day.

17    Q          Every other day.  So he came by your place a

18    lot?

19    A          Yes.

20    Q          Or did you go by his place?

21    A          No, he come by my place.

22    Q          Okay.  And just in general, how long would

23    he visit with you?

24    A          He stayed five or six hours.

25    Q          He stayed a good long time?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   A       Yeah.

2   Q       Anybody there with you all when he visited?

3   A       He had a girlfriend.

4   Q       And who was his girlfriend at the time?

5   A       Rosalene Jones.

6   Q       Rosalene?

7   A       Yeah.

8   Q       Does she still live in Knox County?

9   A       No, she's from London.

10  Q       Okay.  Have you seen her since he passed

11  away?

12  A       She come a week later after he passed away

13  and then I never did see her no more.

14  Q       Okay.  But they'd come by your house and

15  stay for quite some time?

16  A       Yes.

17  Q       And during that time, did Jessie indicate to

18  you that he was having any kind of problems?

19  A       No.

20  Q       And just so I understand your testimony,

21  you've never seen him intoxicated?

22  A       Never.

23  Q       Okay.  You never seen him even take the

24  first drink?

25  A       No.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   Q      Or use the first pill?

2   A      No.

3   Q      Or act in any way that you would ---

4   A      No.

5   Q      --- feel like he might be intoxicated?

6   A      No.

7   Q      Okay.  How about his girlfriend?  Did she --

8   A      No.

9   Q      --- always seem sober?

10  A      She didn't do it either.

11  Q      Okay.  And at this time, he was continuing

12  to work in the log woods to your knowledge?

13  A      Yes.

14  Q      Do you know about how much he worked?

15  A      He'd work every day.

16  Q      Okay.

17  A      Unless it rained.  They can't work when it

18  rained, but other than that, he worked.

19  Q      Other than his girlfriend that you

20  mentioned, what friends did Jessie have?  Who did he

21  hang out with?

22  A      He hung out with like people around the

23  neighborhood.  I mean he didn't have outside friends,

24  just friends there in Knox County.

25  Q      And who were his buddies that he would do

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    things with?

2    A         He hung out with Jonathan Brown, ---

3    Q         Uh-huh (affirmative response).

4    A         --- Dylan, that guy he worked with.

5    Q         Dylan Brown?

6    A         General Brown.

7    Q         General?

8    A         Uh-huh (affirmative response).  It's big

9    general and little general, so it's several generals.

10   Q         Okay.  Big and little, huh?  Anybody else

11   that he was friends with?

12   A         No, that's the only people, you know, and

13   then the people in the neighborhood.  I mean that's --

14   like when I was home, that's the only people I knowed

15   him to be around.

16   Q         When was the last time you'd seen Jessie

17   before June 29th, 2016?

18   A         On that Sunday before it happened.

19   Q         Do you remember what day of the week it

20   happened?

21   A         His death was on the 29th.  It was on a

22   Wednesday, so I saw him that Sunday before then.  I

23   had a doctor's appointment for Monday and he come over

24   after church, so actually, it would be Monday, because

25   he stayed up until 2:00 o'clock that morning.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        He did, okay.  And was his girlfriend with

2    him at that time?

3    A        Yes.

4    Q        Anybody else visiting at your home during

5    that time period he was visiting with you?

6    A        No.

7    Q        Did anybody come and go while they were

8    there?

9    A        No.

10   Q        So it was just the three of you all?

11   A        Yes.

12   Q        Okay.  And how was his -- how was he doing

13   at that time?

14   A        He was fine.

15   Q        He didn't seem to be ---

16   A        No.

17   Q        --- intoxicated or anything like that?

18   A        No.  He ate and drank coffee and just went

19   home.

20   Q        2:00 o'clock in the morning seems kind of

21   late.  Did he do that often?

22   A        No.  We didn't get out of church until like

23   11:00 ---

24   Q        I see.

25   A        --- and he was waiting until I got out of

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    church.

2    Q        Okay.

3    A        Because I go to a holiness church.

4    Q        I see.  All right.  So he left your house

5    then at approximately 2:00 in the morning?

6    A        Yes.

7    Q        Okay.  And you didn't see him again until

8    after hearing about -- or you didn't see him again

9    after that?

10   A        No.

11   Q        Okay.  Now to your knowledge, he passed on

12   June the 29th, correct?

13   A        Yes.

14   Q        Of 2016.  And how did you learn of his

15   passing?

16   A        My son and the son-in-law and Jonathan.

17   Q        Okay.  Which son told you?

18   A        Justin.

19   Q        Justin.  And you said your son-in-law?

20   A        Yes.

21   Q        Who was that?

22   A        James Welch.

23   Q        And then Jonathan was there as well?

24   A        And Jonathan Brown.

25   Q        Did those three come to your house together?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      A         Yes.

2      Q         Okay.  Do you recall what they told you when

3   they got there?

4      A         Well, they woke me up.  I was asleep.  They

5   didn't come until that morning and I said, "Just a

6   minute, I've got to get dressed."  And then my son

7   just got me in his arms and said, "Somebody has killed

8   Bub."

9      Q         Okay.  You all called him Bub?

10     A         Yeah.  He calls him Bub.

11     Q         Did -- was he able to give you any details

12  about what he understood?

13     A         No, nobody didn't tell him.  I don't know

14  how he found out.

15     Q         You're not sure how he found out.  And did

16  James tell you anything detail wise about what had

17  happened?

18     A         No.  They were just with Justin.

19     Q         And did Jonathan say anything?

20     A         No.

21     Q         So Justin, your son, was the one who spoke

22  to you about Jessie's passing?

23     A         Yes.

24     Q         And your recollection is he said someone had

25  killed Bub?

Pearlie Sue Gambrel — Hon. Jason E. Williams

1    A        Yeah.

2    Q        And that's all the details he was able to

3    give you?

4    A        That's all he said, yeah.

5    Q        Okay.  The reason I ask these questions,

6    ma'am, is this is my one chance to find out what you

7    heard and what you know, okay?

8    A        That's okay.

9    Q        So is there anything else you can recall

10   Justin telling you that night?

11   A        No.  I just passed out.

12   Q        Okay.

13   A        No.

14   Q        Did you go to the hospital yourself?

15   A        No, I just fell in the floor and he picked

16   me up, my son did.

17   Q        And just so I'm clear, you can't recall

18   anything that James would've said that night?

19   A        No.

20            MS. ROBINSON-STAPLES:    Objection, asked

21            and answered.

22   Q        Or Jonathan?

23   A        No.

24            MS. ROBINSON-STAPLES:    Objection, asked

25            and answered.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q          Okay.  Did any police officers visit you

2    that night?

3    A          No.

4    Q          All right.  When was the next time after

5    they came that you heard anything about your son's

6    death?

7    A          Three to four days later, my daughter's

8    mother-in-law works at a store and somebody on her

9    back road -- I don't even know the guy's name -- he

10   just said, "Have you all went over there?  Has any

11   police went over to her house to tell her?" and she

12   said, "No" and then Mike Smith went to my daughter's

13   porch about three or four days later.

14   Q          All right.  So your daughter's mother-in-law

15   ---

16   A          Yes.

17   Q          --- said something?

18   A          Well, some guy, I don't know who the guy

19   was.

20   Q          Who's your daughter's mother-in-law?  What's

21   her name?

22   A          Barbara Brown.

23   Q          Barbara Brown.  You heard through her

24   daughter that she had some information?

25   A          No, that — she just asked the question,

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      had a cop been over to my house to tell me anything.

2      Q        Where did you run into your daughter's

3      mother-in-law at, Ms. Brown?

4      A        I wasn't there.

5      Q        Okay.  So was it your daughter who said the

6      mother-in-law had asked about ---

7      A        No, some guy had said it down there at the

8      store where she works at.

9      Q        Somebody had come into ---

10     A        To the grocery, yeah.

11     Q        --- the store where the mother-in-law works?

12     A        Just made that comment in front of her.

13     Q        Saying had anybody been out to your house?

14     A        Yeah.

15     Q        But you don't know who that person was that

16     said that?

17     A        No.

18     Q        And Ms. Brown just relayed what this person

19     said?

20     A        Yes, that's all.

21     Q        Okay.  And then you said Mike Smith had come

22     out to your daughter's home?

23     A        Yes.

24     Q        Okay.

25     A        That was three or four days later.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        All right.  So approximately July 2nd or 3rd

2    or somewhere in there?

3    A        Somewhere in there.

4    Q        And were you present when Mike Smith came to

5    the house?

6    A        Yes, I was sitting over in a chair.

7    Q        And that was at your daughter's home?

8    A        Yes.

9    Q        Okay.  Can you remember what Mr. Smith said

10   that day?

11   A        I couldn't tell you nothing he said.  I

12   don't remember it.

13   Q        Has your daughter since disclosed to you

14   what he said?

15   A        No.

16   Q        All right.  So if I asked you, you wouldn't

17   know what he said that day?

18   A        No.

19   Q        Okay.  Do you know how long he stayed?

20   A        He wasn't there but just a few minutes.

21   Q        All right.  After that, when was the next

22   time that you had heard anything about your son's

23   death?

24   A        I went to the state post and I can't tell

25   you the day I went up there.  They had called my sons

Pearlie Sue Gambrel – Hon. Jason E. Williams

1     for me to come over there and I went over there and

2     then he just -- Lieutenant Surber ---

3     Q        Lieutenant Surber?

4     A        Yeah.

5     Q        Okay.  Who went to the KSP post with you?

6     A        Justin, Michelle and me.

7     Q        Anyone else?

8     A        No, just me.

9     Q        You met with Lieutenant Surber?

10    A        Yes.

11    Q        Did you meet with anyone else from the KSP?

12    A        There was another trooper there, but I don't

13    know his name.

14    Q        Do you remember what he looked like?

15    A        Well, I just asked him -- he just told me,

16    because Jessie's van, they had hauled his van off that

17    night and he had called me to tell me that I could --

18    it could be released to me.

19    Q        Jessie had a van?

20    A        Yes.

21    Q        What kind of van did he have?

22    A        It's an old model.  I don't really even know

23    the date on it.

24    Q        Did you take custody of it?

25    A        Yes.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Do you still have it?

2    A        Yes.

3    Q        Is -- was that van in Jessie's name to your

4    knowledge?

5    A        Not that I know of.

6    Q        Do you know how he acquired the vehicle?

7    A        I don't even have -- I don't have no title

8    to it.

9    Q        No title.  Do you have any registration

10   documents on the vehicle?

11   A        I didn't see none in the van.

12   Q        Was it a vehicle that Jessie drove often?

13   A        Yeah, he had just trade for it.

14   Q        Do you know who he traded with?

15   A        No.

16   Q        So you think you went to the KSP post on

17   what day?

18   A        That's all I discussed with them.

19   Q        Do you remember what day you went to the KSP

20   post?

21   A        No, I don't remember the date.

22   Q        Was it within a week of Jessie's passing?

23   A        It was probably within a week to two weeks.

24   I can't be for sure about those dates.

25   Q        Did you go to the post in Harlan?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Yes.

2    Q        Is that the only time you went to the post

3    in Harlan?

4    A        Yes.

5    Q        Do you remember anything that Lieutenant

6    Surber said to you on that occasion?

7    A        Well, I asked him, I said, "I heard that

8    Mikey had arrested him" and he said, "No."  He said he

9    never knew him.  That's all he said.

10   Q        So we've covered everything that you can

11   recall Lieutenant Surber saying?

12   A        Yes.

13   Q        Okay.  He didn't give you any details of the

14   investigation?

15   A        No.  I asked him if -- I asked him could I

16   have Jessie's clothes.  I wanted to see his clothes,

17   what he had on, as a mother would do ---

18   Q        Uh-huh (affirmative response).

19   A        --- and he said, "You'll get all that

20   later."  That's all he said.

21   Q        Okay.  Anything else you can recall him

22   talking about?

23   A        No.

24   Q        Did the other trooper say anything to you?

25   A        No.  He didn't say anything.

Pearlie Sue Gambrel — Hon. Jason E. Williams

1    Q        You mentioned that you asked Lieutenant

2    Surber about whether Mikey had arrested Jessie.

3    A        Yes.

4    Q        Are you talking about on a prior occasion?

5    A        Yeah, the occasion in 2016, January the 1st.

6    Q        Okay.  And you mentioned telling Lieutenant

7    Surber you had heard that Mikey ---

8    A        Yes.

9    Q        Where had you heard that from?

10   A        Huh?  In the neighborhood.

11   Q        In the neighborhood?

12   A        Uh-huh (affirmative response).

13   Q        Do you know the names of any persons that

14   would've -- you would've heard that from?

15   A        Well, Rosalene told me.  The girlfriend had

16   told me, too, that he was the one.

17   Q        Rosalene?

18   A        Rosalene Jones.

19   Q        Okay.  She's a friend of yours?

20   A        No.  She was Jessie's girlfriend.

21   Q        I'm sorry.  When had she told you that?

22   A        She told me that after that happened to

23   Jessie.

24   Q        Okay.  So you spoke with Rosalene at some

25   time after Jessie's passing?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Two or three days after that.

2    Q        Tell me what you all talked about.

3    A        That's all she said, that he — he was the

4    one arrested him, because Lieutenant Surber gave me

5    another name, but I can't remember the name that he

6    gave me.

7    Q        Did Rosalene come by your house or ---

8    A        Yeah.

9    Q        But she said -- the only thing you can

10   recall her saying was that Ashurst had arrested Jessie

11   before?

12   A        Yeah.  She had told me that he had come to

13   the house where her and Jessie was living.

14   Q        Did she tell you anything else?

15   A        She just told me that he -- she told me that

16   he tried to put Jessie on the floor and told him that

17   -- he went there to arrest him for Jessie Hobbs and

18   she said Jessie told him that -- he said, "I'm Jessie

19   Mills".  And they'd been home all night, she said, and

20   they hadn't been nowhere.  That's all she said.

21   Q        But did she say he was arrested at that

22   time?

23   A        Yeah.  He had that -- he run something and

24   found something there that I didn't know anything

25   about.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   Q       And where was that to have occurred?

2   A       That was on January the 1st, 2016.

3   Q       At whose home, ma'am?

4   A       He was at his home.

5   Q       Jessie was at his home?

6   A       Yes.

7   Q       With his girlfriend?

8   A       Yes.

9   Q       Anybody else there to your knowledge?

10  A       I wasn't there, so I don't know.

11  Q       Okay.  Anything else you can recall her

12  saying?

13  A       No.  That's all she said.

14  Q       Is that the one and only time she stopped by

15  your house?

16  A       Yes.  I've never seen her no more.

17  Q       Okay.  All right.  So you all went by the

18  post.  And then did you hear from KSP at any point

19  again after that?

20  A       No.  I think Lieutenant Surber might've

21  called my son.

22  Q       And do you know when that was?

23  A       It was sometime right after it happened.

24  Q       Okay.  Did your son share with you what they

25  talked about?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   A        Well, he told him to make sure that I was

2   the first one that got to see Jessie, because Jessie's

3   hat was laying way down the road and I wanted to pick

4   it up and they wouldn't let me pick it up.

5   Q        Who's "they"?

6   A        The cops that was there that night ---

7   Q        Uh-huh (affirmative response).

8   A        --- and Lieutenant Surber said he wanted to

9   make sure I got to see him first.

10  Q        Are you saying like at the funeral home?

11  A        At the funeral home ---

12  Q        Okay.

13  A        --- when he got back.

14  Q        Okay.  And where did you all have the

15  funeral at?

16  A        At Affordables.

17           KAREN BAILEY, CCR:  I'm sorry, where?

18           MS. GAMBREL:        Affordables.

19           KAREN BAILEY, CCR:  Thank you.

20  Q        Do you remember how much the cost of the

21  funeral was?

22  A        It was $4,000.

23  Q        Has that been paid?

24  A        Yes.

25  Q        Did Jessie have any life insurance that you

Pearlie Sue Gambrel — Hon. Jason E. Williams

1    know of?

2    A        No.

3    Q        Who paid his funeral expenses?

4    A        Me and the kids, his brothers and sisters.

5    Q        So other than that phone call from

6    Lieutenant Surber to your son, you're not aware of any

7    other contact by KSP with your family?

8    A        No.

9    Q        Okay.  Did you ever travel to the scene of

10   the incident?

11   A        Yeah.  They got me up.  It was about 2:00 in

12   the morning and they were still down there.  And I

13   went and that's when I tried to retrieve his hat,

14   because ---

15   Q        Was that on the morning of the 30th?

16   A        Yeah.

17   Q        Okay.  You went down to the scene at about

18   2:00 a.m..  Who went to the scene with you?

19   A        My son.

20   Q        Anyone else?

21   A        No.

22   Q        And KSP was still there at that time?

23   A        Yeah.

24   Q        Did you ever go back to the scene after

25   that?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      A        I go all the time.

2      Q        You have to travel by there.  Is that

3      correct?

4      A        Yes.

5      Q        Other than going out there and looking

6      around on the 30th, did you spend any time at the scene

7      after that?

8      A        Yeah, I stayed there a long time period in

9      the morning, ---

10     Q        Okay.

11     A        --- because I couldn't get my son up out of

12     the road.

13     Q        Has anyone come to your house or called you

14     or contacted you saying that they witnessed what

15     occurred that night?

16     A        No.  Just one person spoke to me about three

17     weeks ago at the store.

18     Q        Okay.  Who was that?

19     A        Ricky Hobbs.

20     Q        Ricky Hobbs, okay.  Now did you know Ricky

21     Hobbs before your son's passing?

22     A        Yes.

23     Q        How did you know him?

24     A        He lived up the holler where my sister

25     lives.  I knew where he was raised at.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q     Was he a family friend?

2    A     No.

3    Q     Okay.  He has given a couple of statements

4   in this case.  And I'm paraphrasing, but in one of the

5   statements, I recall him saying that your son might

6   have been living with him.  Do you know anything about

7   that?

8    A     Not that I'm aware of.

9    Q     Living there with his girlfriend at some

10   time?

11    A     Not -- not during my time while I'm at home.

12    Q     Are you aware of what relationship your son

13   had with Mr. Hobbs?

14    A     No.

15    Q     Do you know if they were friends or anything

16   like that?

17    A     No.  I don't know that.

18    Q     You don't know whether your son ever hung

19   out with Ricky Hobbs ---

20    A     No.

21    Q     --- for lack of a better way to put it?

22    A     Yeah.  No.

23    Q     Okay.  How old of a guy is Ricky Hobbs?

24    A     I don't like guessing people's ages, so I

25   don't ---

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Well, your son -- did you say your son was

2    30 at his passing?

3    A        He was 30, yeah.

4    Q        Is Mr. Hobbs older or younger than 30?

5    A        I'd say he's older.

6    Q        Okay.  Do you think he's older than 50?

7    A        I'd say he is.

8    Q        Okay.  So we can probably say Ricky and

9    Jessie didn't go to school together, right?

10    A       No.

11    Q       Okay.  Did they live in the same community?

12    A       Yeah, they live in the same community.

13    Q       When Jessie was living, how far away did he

14    live from Ricky Hobbs?

15    A       I'd say they was probably about a mile, mile

16    and a half or something, I mean from -- talking about

17    my house in general where I raised Jessie at, right,

18    up until he was 13?

19    Q       Yeah.

20    A       Okay.  That's what I started to say.  From

21    there, I'd say, yeah, about a mile.

22    Q       When Jessie would come and visit with you,

23    did he ever talk about Ricky Hobbs?

24    A       No.

25    Q       You never did see them together before his

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   passing?

2   A        No.

3   Q        So you saw Ricky about three weeks ago,

4   right?

5   A        Yeah.

6   Q        And what did he say to you at that time?

7   A        He approached me, because I don't -- I don't

8   interact with him, and he approached me and he said,

9   "They wouldn't have killed Jessie night if somebody

10  hadn't hollered out, 'He's got hepatitis C'. And I

11  was just like -- it just blowed my mind, because I

12  didn't know anything and I just left him standing and

13  went right on out the door.

14  Q        So you saw him at the store. What store did

15  you see him at?

16  A        At Buford Bingham's.

17  Q        And he just approached you and said if

18  somebody hadn't hollered out that he had hepatitis C,

19  they wouldn't have shot him. Is that right?

20  A        That's what he said.

21  Q        Did he provide any explanation for his

22  statement?

23  A        No. He didn't say anything, because I just

24  walked off, because it breaks me down just to think

25  about it or to -- you know, because I wasn't there, so

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    I don't know.

2    Q        Do you know one way or the other whether

3    Jessie had Hepatitis C?

4    A        I was never aware of it and nobody's ever

5    said anything to me about it, so ---

6    Q        Have you spoken with anyone since your son's

7    passing who have indicated that they were there that

8    night and saw some of what happened?

9    A        Ricky approached me there at the store and

10   then I was in Walmart and a schoolteacher approached

11   me.  Her name was Delia Mills.

12   Q        Give me that first name again.

13   A        Delia Mills.

14   Q        Dillie?

15   A        Yeah.

16   Q        Dillie Mills.  The Walmart in Barbourville?

17   A        Yes.

18   Q        What did Ms. Mills say to you?

19   A        She just approached me and said, "They

20   didn't kill your son there.  They killed him

21   somewhere" -- she said, "That's not the scene where

22   they killed your son, where he was."  That's all she

23   said.

24   Q        She didn't say where it was they were ---

25   A        No.  She didn't say anything ---

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q    --- supposed to have killed him?

2    A    --- and then I broke down.  I broke down.

3    Q    Did she -- I'm sorry.  Did she indicate how

4 she knew this information or why she was telling you

5 this?

6    A    She didn't -- she didn't give me no details.

7 She's not seen me since I come home and she said --

8 she just approached me.

9    Q    Did you know Ms. Mills before that?

10    A    She was a schoolteacher at Dewitt when I

11 went to school ---

12    Q    Oh, she ---

13    A    --- years ago, so ---

14    Q    So she's getting up there in age, right?

15    A    Yeah.  She's retired now.

16    Q    Did she -- but she didn't say she had

17 witnessed it or how she got the information?

18    A    No.  She didn't say anything like that.

19 That's the only person I spoke with.

20    Q    Okay.  So you've spoken with Ricky Hobbs,

21 correct?

22    A    He -- yes.

23    Q    About three weeks ago and then Dillie Mills

24 at Walmart?

25    A    Yes.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   Q        How long ago was that?

2   A        That was back then, so that was about

3   probably three or four months after that had happened.

4   Q        Okay.  Three or four months afterwards?

5   A        Yeah, 2016.

6   Q        Anyone else that you've personally spoken

7   with ---

8   A        No.

9   Q        --- about that?  Your son's girlfriend came

10  by one time, right?

11  A        Yeah.

12  Q        Okay.  Have we covered everybody that has

13  spoken to you personally about ---

14  A        Yes.

15  Q        --- your son's passing?

16  A        Yes.

17  Q        Okay.  How about any of your kids?  Have

18  they come to the house or spoken with you on the

19  telephone and said, "Oh, I heard from so and so this

20  happened or that happened"?

21  A        No.

22  Q        Okay.

23  A        They just cry, like I do.

24  Q        Okay.  So the information that you have has

25  come from Mr. Hobbs, correct?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Yes.

2    Q        And Ms. Mills?

3    A        Yes.

4    Q        Your son's former girlfriend and Lieutenant

5    Surber?

6    A        Yes.

7    Q        You didn't speak with the sheriff when he

8    came out to the house?

9    A        No.

10   Q        Have you spoken with anyone else from the

11   Knox County ---

12   A        No.

13   Q        --- Sheriff's Department?  Have you ever

14   spoken with Mr. Ashurst?

15   A        I don't even know him.

16   Q        Okay.  Have you ever spoken with Mr. Bolton?

17   A        No.

18   Q        Any other officer from the Knox County

19   Sheriff's Department?

20   A        No.

21   Q        How about from the Knox County government,

22   the fiscal court or the county judge executive's

23   office?

24   A        No.

25   Q        Have you spoken with anyone from those

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    offices?

2    A        No.

3    Q        Were you ever interviewed by the Kentucky

4    State Police?

5    A        No.

6    Q        Have you seen the Kentucky State Police's

7    report in this case?

8    A        No.

9    Q        You haven't reviewed that?

10   A        No.

11   Q        Okay.  Have you listened to the recordings

12   of any of the statements of any of the witnesses?

13   A        No.

14   Q        Your attorneys have filed a first amended

15   complaint in this case.  Have you ever seen that

16   before?  I'm going to ---

17            MR. WILLIAMS:        There's a copy for you.

18   Q        Here's a copy of it for you, ma'am.  I'm

19   going to ask you some questions about that -- sorry --

20   can you reach it?  So take as long as you need to

21   review it, but when you're ready to answer some

22   questions about it, let me know, okay?

23   A        Okay.

24   Q        We can go off the record while you look at

25   it, okay?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   M. WATKINS, VIDEO TECH:   The time is

2   now 11:25 and we'll go off the record.

3                        *

4              *** OFF THE RECORD ***

5                        *

6   Q       All right.  Ma'am, we've taken a break so

7   you could look over the amended complaint that's been

8   filed in this case.  You've had time you look it over?

9   A       Yeah.

10  Q       Okay.  Before today, had you ever looked

11  over the ---

12  A       I glanced at it, but ---

13  Q       --- amended complaint?

14  A       I glanced at it, but it's so painful for me

15  to really read it and I just tucked it in my closet.

16  Q       Okay.  There's a couple of paragraphs in it

17  that I wanted to ask you about.  You've got some

18  reading glasses with you?

19  A       Yeah.  That's the reason I got them out.

20  Q       Okay.

21  A       So ---

22  Q       If you would turn to page 8, have you got

23  that there?

24  A       Yes.

25  Q       Paragraph 55 says, and I'll just read from

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   the amended complaint, "Investigators who looked into

2   the shooting to determine whether Defendants Ashurst

3   and Bolton should be criminally charged did not

4   conduct an adequate or proper investigation."  Do you

5   have any information about that?  Do you believe the

6   state police did not conduct an adequate or proper

7   investigation?

8   A        Well, I know within a week's time, they had

9   already had it in the paper and I didn't get the

10  paper, but my sister had called me and said they'd

11  been dismissed of all the charges, so ---

12  Q        You're saying within a week of your son's

13  shooting?

14  A        A week or two weeks, yes.

15  Q        That who had what paper, ma'am?

16  A        My sister had called me and told that it was

17  an article in the paper that they'd been determined no

18  wrongdoing.

19  Q        This -- which sister called you?

20  A        Margaret Hobbs.

21  Q        And what did she tell you?

22  A        She just told me that they said they was

23  acquitted of any wrongdoing.

24  Q        Okay.  She said she had read something in

25  the newspaper?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        Yeah.

2    Q        Other than what your sister told you on the

3    telephone, do you have any knowledge or information to

4    establish that the KSP did not conduct an adequate or

5    proper investigation?

6    A        Do I have any knowledge of it?

7    Q        Yes, ma'am.

8    A        I don't know what they did, because they

9    didn't tell me anything.  They didn't discuss it with

10   me.

11   Q        So as we sit here today, you can't say what

12   it is you're alleging that the KSP did that was

13   inadequate?

14            MS. ROBINSON-STAPLES:  Objection, asked and

15            answered.

16   Q        Is that correct?

17   A        I think somebody needs to pay for what they

18   did to my son.

19   Q        I understand your position, ma'am, but what

20   I'm trying to determine is, do you have any knowledge

21   about the investigation that KSP conducted?

22   A        They didn't give me no report.

23   Q        So you don't know what they did or didn't do

24   ---

25   A        No.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   Q        --- to investigate your son's death.   Is

2   that correct?

3   A        Yes.

4   Q        And given that, you can't say whether or not

5   the investigation was inadequate or not, can you?

6            MS. ROBINSON-STAPLES:  Objection, calls for

7            a legal conclusion and she has already

8            answered this question.

9   Q        Just to follow up, ma'am, given the fact

10  that you haven't reviewed the KSP's investigation, you

11  can't say whether or not it was inadequate or not, can

12  you?

13           MS. ROBINSON-STAPLES:  Same objection.

14  A        Objection.

15           MS. ROBINSON-STAPLES:  You can answer.

16  Q        Your attorney can make an objection for you,

17  ---

18  A        Oh, okay.

19  Q        --- but you have to answer my question,

20  ma'am, unless she tells you not to.

21  A        Well, I just know my son was killed.  That's

22  all I know.

23  Q        All right.  But in answer to my question

24  about whether the investigation was inadequate or not,

25  you can't say whether or not it was?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A         I don't know how to answer you on that one.

2    Q         Well, do you have any information about what

3    the KSP did to investigate your son's death?

4              MS. ROBINSON-STAPLES:    Objection, asked

5              and answered.

6    A         They didn't give me no information.

7    Q         So you can't say whether they did something

8    wrong or not, can you?

9    A         Well, I know ---

10             MS. ROBINSON-STAPLES:    Jason, let me note

11             that she ---

12             MR. WILLIAMS:         If she would answer

13             my question, ---

14             MS. ROBINSON-STAPLES:    Well, she ---

15             MR. WILLIAMS:         --- I could

16             understand your objection, but she still

17             hasn't answered my question.

18             MS. ROBINSON-STAPLES:    She has answered

19             the question.  I think she's told you

20             several times that they did not tell her

21             what they did, so she has told you she

22             cannot answer that question.

23   Q         Are you saying you can't say whether they

24   did an inadequate investigation or not?

25             MS. ROBINSON-STAPLES:    That was not her

Pearlie Sue Gambrel – Hon. Jason E. Williams

1           testimony.  She said they did not tell her

2           what she did -- or what they did in the

3           investigation.

4      Q         Okay.  Well, let me clear it up a little

5   bit, ma'am.

6      A         They didn't tell me, so I don't know what

7   they did.  I mean I know what they did when I scanned

8   over the papers reading it, but I can't tell you what

9   the KSP did.  They didn't give me no report.

10     Q         Okay.

11     A         Because we kept waiting for a report and I

12  never got a report.

13     Q         So they didn't tell you anything about their

14  investigation, correct?

15     A         No.

16     Q         And you haven't reviewed their report,

17  correct?

18     A         No.

19     Q         So you can't say whether or not it was a

20  proper investigation or not, right?

21     A         Yes.

22     Q         You can say whether it was proper or not or

23  you can't?

24     A         I don't know.  I didn't get anything to

25  review, sir.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q         Okay.  All right.  Going on to the next

2    paragraph, your amended complaint alleges that,

3    "Instead, investigators from Kentucky State Police

4    contaminated the entire process in order to allow

5    Defendants Ashurst and Bolton the opportunity to

6    concoct a sequence of events that would make it seem

7    as if their unjustified use of force, including deadly

8    force, was actually justified."  Do you see that in

9    paragraph 56?  Do you see that paragraph, ma'am?  What

10   information do you have, if any, that the Kentucky

11   State Police contaminated the entire process?

12   A         Well, my belief is, why would you shoot an -

13   - somebody with no weapon or anything.  I thought, you

14   know, the state of Kentucky and -- and you should --

15   you shouldn't be able to do that.  I never knew it to

16   take place in that area.  I was raised there and I

17   mean he didn't have anything on him even to protect

18   his self.

19   Q         Do you need to take a break, ma'am?

20   A         No, I'm fine, but it just -- it's always

21   going to -- I'm going to live with this for the rest

22   of my life, ---

23   Q         I understand, ma'am.

24   A         --- losing my child.

25   Q         I understand that you may have very strong

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    feelings about what happened.  That's completely

2    understandable.

3    A       Yes, I do.

4    Q       What I'm trying to determine though is, what

5    information do you have, if any, that the Kentucky

6    State Police contaminated the entire investigation

7    process?

8    A       Well, I can go on telling you that I know my

9    son was killed and that shouldn't have happened.  And

10    like I could go back to the same thing.  They never

11    gave me no report.

12    Q       Do you have any knowledge that the Kentucky

13    State Police did something wrong in their

14    investigation?

15           MS. ROBINSON-STAPLES:   Objection, asked

16           and answered.

17    A       Like I said, they -- I never got a report.

18    Q       You weren't involved in any way in the

19    investigation directly, were you?

20    A       No.

21    Q       You didn't witness what happened ---

22    A       I wasn't there.

23    Q       --- to your son, correct?

24    A       No.  I wasn't there.

25    Q       Do you have any information that the

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      Kentucky State Police contaminated the investigation

2      process?

3              MS. ROBINSON-STAPLES:    Objection, asked

4              and answered.  You can continue stating your

5              answer.

6      A      Yeah.  I'm just -- I just wasn't aware of

7      anything, so -- I didn't get the report.  I didn't get

8      a report.  I mean I didn't get a report, so I don't

9      know what they did and what they didn't do.

10     Q      What does the word "contaminated" mean to

11     you?

12     A      It means you've tampered with something.

13     Q      Okay.  Do you have any knowledge or

14     information that the Kentucky State Police tampered

15     with the investigation of your son's death?

16             MS. ROBINSON-STAPLES:    Objection, asked

17             and answered.

18     A      I'm not aware of anything.

19     Q      Let's go ahead and make the first amended

20     complaint an exhibit to your deposition, ma'am.  Now

21     if we can kind of turn back to the time period near

22     your son's passing, his -- who was it that had custody

23     of his children at that time?

24     A      Susie Helton and James Helton, Whitney's

25     parents.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        That was his ex-wife's parents?

2    A        Yes.

3    Q        Were they divorced at the time of his death?

4    A        No.  He's not divorced.

5    Q        He was still married to Whitney at the time

6    of his death?

7    A        Yes.

8    Q        And when had they received custody to your

9    knowledge?

10   A        I'm not aware of when they got custody of

11   his children.

12   Q        Okay.  When -- you said that you had many

13   occasions to see Jessie prior to his death.

14   A        Yes.

15   Q        Did he ever go and visit his children?

16   A        He visited his children, yeah, but she

17   wouldn't let him take them anywhere and he was wanting

18   them to come to my house since I was home.

19   Q        Okay.  Had he ever visited his children in

20   your home?

21   A        Once.

22   Q        One time?

23   A        That was the two times that I seen them.

24   They come once to my house and once to my daughter's,

25   but they was supervised by Susie.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q         Did he ever -- did Jessie ever discuss with

2    you that he felt that the custody arrangements that

3    his in-laws had were wrong or that he didn't them?

4    A         Yes.  He told me he didn't give his rights

5    away to his children.  That's the only thing he said

6    to me and he said, "I want my children over here every

7    weekend with you" and him, because he had planned on

8    spending the weekends with them over there, but they

9    didn't allow him to get them.

10   Q         Have you reviewed any of the custody

11   documents involving your son's children?

12   A         I seen one paper of -- of the children, one

13   paper.  It was on -- they had a copy of it on --

14   somebody had -- I don't know if it was my youngest

15   daughter when I first came home gave me that paper

16   where they'd filed the taxes.  That was all I seen,

17   just a paper with the kids' name on it.

18   Q         Are you aware that neither he nor the mother

19   showed up for the custody hearing?

20   A         I didn't know how it happened or anything,

21   because I wasn't aware of it.

22   Q         Do you know why they didn't show up for the

23   custody hearing?

24   A         I have no idea.

25   Q         During the time period where — after you

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    had been released from custody and were living at

2    home, did you ever go over to the Helton's home?

3    A      I went over there twice. That's when she

4    let them come over there to my house.

5    Q      Okay. Did you have a good relationship with

6    them?

7    A      No. She's too manipulated for me, because

8    I'm a Christian woman and I live honest and open. She

9    tells you one thing and does something else and I'm

10    straightforward.

11    Q      Okay. So you see Ms. Helton as someone who

12    is dishonest?

13    A      Well, she's deceptive, very much.

14    Q      Okay. What has she done that's deceptive in

15    your opinion?

16    A      Okay. Because she called every week,

17    because I liked three days having ten months with my

18    son, and she'd say, "Call every weekend to get the

19    kids" and I called every Friday, and then she never

20    would let them come.

21    Q      Okay. Do you know why?

22    A      She wouldn't say.

23    Q      Do you know whether it was related to your

24    son's drug use?

25    A      I don't know. She wouldn't say anything,

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    because I knew he wasn't on drugs around me at all.  I

2    wasn't aware of no drugs, period.

3    Q        Okay.

4    A        Because I don't stand for that.

5    Q        Okay.  Has his girlfriend, former

6    girlfriend, ever discussed his drug use around you?

7    A        No.  She never said anything to me about

8    drugs, because if she had've, I wouldn't allowed her

9    in my home.

10   Q        If she had mentioned to you that Jessie was

11   using drugs, you wouldn't have allowed her in your

12   home?

13   A        I wouldn't have no one in my home with

14   drugs, no.

15   Q        What if they're just telling you about drug

16   use?

17   A        I don't want no part of it.

18   Q        Okay.

19   A        Because I suffered from the violent hand of

20   domestic violence myself when I was younger, so I

21   don't -- I don't tolerate it.

22   Q        Okay.  So you had been to the Heltons on a

23   couple of occasions?

24   A        Yes.

25   Q        When had you last been there before June

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      29th, 2016?

2      A        Oh, I didn't go to their house until after

3      that happened.

4      Q        Okay.

5      A        She just contacted me by phone.

6      Q        You visited the children at her house on a

7      couple of occasions after Jessie's passing?

8      A        Yes.  And then I just decided not to go back

9      up there, because I'd went to pick them up -- I went

10     to pick the kids up.  She had a niece that was in --

11     she had a niece that lives in Texas and I went at 6:00

12     o'clock, because I don't drive, and my daughter sat in

13     the car.  She don't like talking to her anyway and I

14     went to get the kids and she said, "They can't go.

15     We're leaving for the funeral."  On Sunday, when I

16     went to church, one of the church ladies knew her

17     niece and she said, "Why didn't you get the kids this

18     weekend?" and I said, "Well, the mother-in-law told me

19     they was on their way to the funeral home" and then

20     she says, "You mean to tell me they flew and went to

21     Texas?".  So right then, I knew she was lying, so --

22     and I just chose -- and it hurts me too bad over

23     Jessie to visit the house.  I can't -- I can't do it.

24     I'm not to that level.

25     Q        Okay.  So have you spoke with Mr. and Mrs.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      Helton at any time about what transpired or what

2      occurred on June 29th, 2016?

3      A        No.

4      Q        You never have spoken with them about that?

5      A        No.

6      Q        As we sit here today, do you know what

7      they've told the police about what happened that

8      night?

9      A        No.

10     Q        Okay.  Do you know whether or not on the

11     evening of June 29th, 2016, whether Jessie had gone to

12     their home and got one of his children?

13     A        I didn't know anything about it until later.

14     Q        Okay.  How did you find out later?

15     A        She told me.  She told my daughter.

16     Q        Okay.  You found out through your daughter?

17     A        She just said that Jessie came in the house

18     and picked up Mia.

19     Q        And when did she tell you that?

20     A        She didn't tell it to me.

21     Q        Your daughter didn't?

22     A        Yeah.

23     Q        Okay.  Which daughter?  And if you just have

24     one, I'm sorry.

25     A        Michelle.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q          Michelle.  And when did she tell you this?

2    A          She told me that about a couple weeks after

3    that, told Michelle.  She didn't tell it to me.  I

4    didn't talk to her.

5    Q          When you learned of your son's passing, I

6    guess on the early hours of the 30th, ---

7    A          Yeah.

8    Q          --- your son didn't tell you that Jessie had

9    taken one of the children from Mr. Helton's home?

10   A          No, he didn't tell me that.

11   Q          Okay.  You -- when did you become aware that

12   Jessie had taken one of the children?

13   A          Well, I just found it like days later, like

14   when Susie had mentioned it to my daughter.  She

15   didn't tell it to me.

16   Q          Had Jessie said anything prior to his death

17   about going over to the Heltons' home and getting one

18   of his kids?

19   A          No.

20   Q          Okay.  To your knowledge, did Jessie have

21   any legal right to remove children from the home of

22   the Heltons?

23   A          Oh, no.  He was crazy over them children.

24   Q          I'm not asking you whether he had affection

25   for his children, ma'am.  I'm asking you did he have

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    any legal right to your knowledge to remove children

2    from the home of the Heltons?

3              MS. ROBINSON-STAPLES:    Let me just note,

4              you can only answer what you know.  So he's

5              asking you if you know of the -- where

6              things stood legally with he and his

7              children?

8    A         No, I don't.  I don't know if he did or not.

9    Q         Jessie hadn't disclosed to you whether or

10   not he had custody of his children prior to this

11   death?

12   A         The only thing he told me, and he just

13   mentioned it one time, but he said, "I didn't give my

14   rights away to my kids."  That's all he said.

15   Q         Well, did he say then why he didn't have

16   them living in his home?

17   A         No, he didn't say.

18   Q         Do you know -- did you know where they were

19   living prior to his death?

20   A         Where Jessie was living or the kids?

21   Q         The kids.

22   A         They were at the Heltons.

23   Q         Did you understand why they were living at

24   the Heltons?

25   A         Well, nobody never told me.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q         Did you make an assumption about why they

2    were living there?

3    A         Well, I asked, but nobody -- like I said,

4    they didn't -- you know, they'd tell -- you know, they

5    don't tell you everything and they didn't tell me, so

6    I didn't know.  Jessie was just wanting them to be

7    over to my house every weekend and that's the only

8    thing I knew and then she had me in that communication

9    with her to deal with her.  Then on Fridays when I'd

10   call, she'd say, "Well, they can't come" and I'd ask

11   her why and then she'd say, "They don't want to come"

12   and then she never would let me talk to the kids.

13   Q         So you understood that the Heltons had

14   control over the children?

15   A         Yes.

16   Q         Okay.  Assuming for the purposes of my

17   question that a court had ordered that the Heltons had

18   custody of the children, would you agree that Jessie

19   removing a child from their home without permission

20   was a crime?

21             MS. ROBINSON-STAPLES:   Objection, calls

22             for a legal conclusion that she is not

23             experienced to -- to make.

24   Q         You can answer.

25   A         Well, she's his child.  I knew he wouldn't

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   hurt or anything and I mean I -- and me as a mother, I

2   wouldn't see anything wrong with it and they know him

3   well enough.  They knew him well enough.

4   Q       So it's your opinion that Jessie, despite

5   whatever court orders might've been in place, would've

6   been allowed to remove his children from that home at

7   any time?

8   A       No.  I'm not going to go over what the court

9   ordered.  I'm not going to go over that, because like

10  I said, I have no knowledge of it, but I'm just

11  thinking, you know, if it's your child and you know

12  it's your child and you've interacted with them, I'm

13  not going to say that, you know, because I don't know

14  -- I don't know what happened.  I don't know what

15  happened to Jessie.  I don't what, you know -- because

16  I came home and I was happy as happy could be.  I got

17  my children back.  That was my biggest thing, to have

18  my family and have that second chance.  And then out

19  of the blues, one of my blocks gets knocked down and

20  so -- and I know he loved his children more than

21  anything, but he never discussed it with me.  So I

22  can't tell you how he felt.

23  Q       Is it your opinion that it's a parent's love

24  of their children that controls whether or not they

25  have custody of those children or not?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        No, it's not based on that.

2    Q        It's based on what a court of law provides,

3    correct?

4    A        Yes.

5    Q        And if a court of law has prohibited from --

6    Jessie from removing his children from that home, he

7    should abide by that law, correct?

8    A        Yes.

9    Q        Now did you learn later that on the evening

10   of your son's death that he was walking down the

11   middle of a highway with the child?

12   A        Yes.  They told me about it.

13   Q        All right.  Would you agree with me that

14   walking in the middle of the road with a young child

15   is wanton and dangerous?

16          <u>MS. ROBINSON-STAPLES</u>:    Objection, again,

17          calls for a legal conclusion.

18   A        I don't -- like I said, I don't know how to

19   answer that, because she's his daughter and I don't

20   know what happened.  I don't know what happened to

21   Jessie.  I don't know what took place.

22   Q        Would you -- would you walk with a child

23   down the middle of the road?

24   A        Well, if I run out of gas, I wouldn't have

25   no other option, but I would hope that I wouldn't do

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    that.

2    Q        You would have the option of walking on the

3    side of the road, wouldn't you?

4    A        I'd go — yeah, I'd be on the side of the

5    road, I mean if I had to.  You don't know what ---

6    Q        You'd have the option -- I'm sorry, go

7    ahead.

8    A        You don't know what you would do until

9    you're put to the test, so I can't really say, you

10   know.

11   Q        It doesn't seem like a very good idea to

12   walk in the middle of the road with a child at night,

13   does it?

14   A        No.

15   Q        Do you agree that members of the public

16   should follow the lawful commands of police?

17   A        Yes.

18   Q        Now after the Kentucky State Police began

19   their investigation, did you meet with the Kentucky

20   State Police at their post?

21             MS. ROBINSON-STAPLES:     Objection, asked

22             and answered.

23   Q        Would that have occurred approximately July

24   8th, 2016?

25   A        I can't remember all those dates.  I don't

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    want to tell you a date, then it not be the for sure

2    thing, because I've been blank on those dates since

3    the morning they woke me up.

4    Q        Did the KSP ever come out to your house to

5    meet with you?

6    A        No.

7    Q        Okay.  Let me just ask you, do you recall on

8    Friday, July 8th, 2016 meeting with a Captain Burnett

9    from the Kentucky State Police?

10   A        No.

11   Q        Okay.  According to the Kentucky State

12   Police report, it says that you met with some folks,

13   Lieutenant Surber and Captain Burnett, Michelle Brown

14   was there, you were there and Lonnie Gambrel was

15   there.  Do you recall that meeting with Lieutenant

16   Surber?

17   A        That's the time when I talked to Lieutenant

18   Surber that one time.

19   Q        Captain Burnett could've been that other

20   trooper there?

21   A        It was a man in there, but I didn't know who

22   he was, didn't know his name.

23   Q        Okay.  And at that point, did they release

24   some personal items to you?

25   A        Yeah.  They gave me what — well, they gave

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    it to my son, what he had in his pocket.

2    Q         Okay.  And that -- was that a lighter and

3    some ginseng, I think?

4    A          It's never been opened.  I just stored it

5    up.

6    Q         Okay.  Did Lieutenant Surber inform you at

7    that time that the case would be presented to the

8    grand jury in Knox County?

9    A          Yeah, he said something like that.

10   Q          And did you ask him if they had talked to

11   all the witnesses that they needed to?

12   A          I can't exactly remember everything that was

13   said, because you know, he just said they were doing

14   an investigation and ---

15   Q          Okay.  According to this report, it says

16   that Susie Gambrel, that's you?

17   A          Sue, yeah.

18   Q          Okay.  Asked if you could get a copy of the

19   investigation.  Is that correct?

20   A          Yes, I did.

21   Q          And according to this report, he said he

22   explained the process of the open records request and

23   told her that you would be able to get one once his

24   case was closed?

25   A          Yeah, that's what he said.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q          Okay.

2         MS. ROBINSON-STAPLES:    Jason, can you tell

3    me where you're reading from?

4         MR. WILLIAMS:           Yeah.  It's marked

5    PL684 and 685.

6         MS. ROBINSON-STAPLES:    Thanks.

7    Q          During that conversation, did you express

8    that Jessie wanted to see his kids, but that James and

9    Geneva Helton would never agree to let him take the

10   kids anywhere or see them?

11   A          I don't know whether -- I don't remember

12   what all I said.  I just asked about the cop and

13   stuff, I remember.

14   Q          You asked about the cop?

15   A          Yeah.  I asked him about the cop that

16   arrested him when I was home, because that's all I

17   knew.  I didn't know nothing in the past or any of

18   that stuff.

19   Q          Did you or any other member of your family

20   express that you didn't think that he never got to see

21   them on Father's Day or Christmas?

22   A          Maybe my daughter said something.  I can't

23   recollect what they said.

24   Q          Did you or any member of your family express

25   that you felt Jessie had been killed just because he

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   wanted to spend time with his children?

2   A         I don't remember saying that or ---

3   Q         According to this report, on page PL685, it

4   indicates that you all went on to talk or he went on

5   to talk with the family about Jessie's drug problem.

6   Do you recall that?

7   A         I don't remember saying him nothing about a

8   drug problem.

9   Q         Did you say anything to the police at that

10  time about Jessie using Suboxone?

11  A         No.  I never said that he used Suboxone.

12  Q         Do you know any medications that Jessie was

13  on at the time of his death?

14  A         No.

15  Q         Do you know if any doctor had prescribed him

16  any medications at the time of his death?

17  A         He didn't take no medicine around me.

18  That's the reason I said I don't -- I don't know.

19  Q         Has any member of your family indicated to

20  you that they knew Jessie took Suboxone?

21  A         No, they ain't told me.

22  Q         During that meeting, did anyone relay to the

23  police that Jessie only took Suboxone and was not

24  violent when he took the drug?

25         MS. ROBINSON-STAPLES:     Objection, asked

Pearlie Sue Gambrel – Hon. Jason E. Williams

1        and answered.

2    Q        You can answer.  You have to answer

3    verbally, ma'am.

4    A        Now Jessie wasn't violent.

5    Q        Okay.  Did anyone in that meeting with

6    Lieutenant Surber mention that Jessie had been using

7    Meth for the past few days?

8            MS. ROBINSON-STAPLES:    Objection, asked

9            and answered.

10   Q        Do you recall anyone mentioning that, ma'am?

11   A        No.

12   Q        Now Jessie's sister was at that meeting,

13   correct?

14   A        Yes.

15   Q        Do you recall her stating that Rosalene

16   Jones, Jessie's girlfriend, had told her that Jessie

17   had been using Meth that had been cut with bath salts?

18           MS. ROBINSON-STAPLES:    Objection, asked

19           and answered.  She's testified several times

20           now that she knew nothing about any drug

21           use, nor had heard anything.

22           MR. WILLIAMS:          Well, I was hoping

23           that maybe going over this interview might

24           refresh her memory.

25   A        I didn't know a thing about drugs, period.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        You don't remember anyone in that meeting

2    with KSP saying anything about Jessie using Meth that

3    had been mixed with bath salts?

4    A        No.  I just went there to get his clothes.

5    I was just wanting to retrieve his clothes.

6    Q        Did -- now is Michelle one of your

7    daughters?

8    A        Yes.

9    Q        During that meeting, did Michelle say that

10   the past few days she had been scared to go around

11   him, Jessie I mean?

12   A        Oh, I didn't hear her say that.

13   Q        Okay.  According to this report, it says

14   that Susie stated that she had went to see Jessie the

15   day before the incident and that he was laying in bed

16   watching television and stated he had a strange look

17   in his eyes and didn't talk much.  Do you recall

18   telling the state police that?

19   A        No.

20   Q        Did you visit Jessie the day before his

21   death?

22   A        I seen him like on that Monday, that Sunday

23   to Monday when he come to my house.

24   Q        That was at your home?

25   A        Yeah, that was my house.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Did you ever visit him in his home the day

2    before?

3    A        I'd been up there, but it wasn't that --

4    during that week.

5    Q        Okay.  The last time you saw him, had he

6    been laying in bed watching television?

7    A        No.

8    Q        Did you ever see him with a strange look in

9    his eyes?

10   A        No.

11   Q        The report goes on to say that during the

12   conversation with Lieutenant Surber that the family

13   had informed that Bradley Price or a guy named Heidy

14   had told them that Deputy Ashurst and Jessie had got

15   into an altercation at a Mad Clown party in the past.

16   Do you recall that being said?

17   A        I don't even know anything about that.

18   Q        And just for reference, I'll make these two

19   pages an exhibit to your deposition, because where I

20   got that -- questions from.  All right, ma'am.  Your

21   attorneys have filed what's called "Rule 26

22   Disclosures" and I have some questions I want to ask

23   you about those.  So just let me know again when

24   you've had a chance to look that over, okay?  We can

25   go off while you look at it.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    M. WATKINS, VIDEO TECH:    The time is

2    now 12:07 and we'll go off the record.

3                    *

4            *** OFF THE RECORD ***

5                    *

6    M. WATKINS, VIDEO TECH:    The time is

7    now 12:13 and we'll resume with disc three

8    of the video record.

9                    *

10   Q       Ma'am, we took a break so you could look at

11   Plaintiff's Rule 26 Initial Disclosures.  Did you have

12   a chance to look those over?

13   A       Yeah.

14   Q       Have you seen that document before?

15   A       No.

16   Q       Okay.  There are some folks listed there on

17   pages 1 and 2, a lot of them Kentucky State Police

18   officers, at least they're identified as such.  You

19   see those names?

20   A       Yeah.

21   Q       And I understand that you spoke with Randy

22   Surber.  We've talked quite a bit about him, right?

23   A       Yeah, that's the one I talked to.

24   Q       Any of these folks listed on page 2 other

25   than Mr. Surber that you can recall speaking with?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        I don't know them.

2    Q        Okay.  How about if we turn to page 3?

3    There's another list of names.  It starts at the top

4    with Dr. Meredith Frame from the medical examiner's

5    office.  Have you spoken with him?

6    A        No.

7    Q        Have you spoken with anyone from the

8    Kentucky Medical Examiner's Office?

9    A        No.

10   Q        Have you reviewed your son's autopsy report?

11   A        No.

12   Q        Have you reviewed any of his toxicology

13   reports?

14   A        No.

15   Q        Okay.  If you would, take a look at those

16   names there at the top of the page starting with Dr.

17   Frame and ending with Mike Smith and see if you've

18   talked to any of those folks that you can recall.

19   A        No.

20   Q        Did you ever speak with Captain Everett

21   Johnson of the Knox County Sheriff's Department?

22   A        No.

23   Q        How about Coroner Mike Blevins?  Did you

24   speak with him?

25   A        No.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1   Q        Okay.  Bradley Trent or Mike Trent, have you

2   spoken with any of those folks?

3   A        No.

4   Q        Do you recall speaking with anyone from the

5   coroner's office?

6   A        No.

7   Q        Okay.  You mentioned Mike Smith came by the

8   house, correct?

9   A        To my daughter's.

10  Q        And I understood your testimony to be you

11  didn't speak with Mr. Smith directly.

12  A        No.

13  Q        Okay.  Have you spoken with Jackie Steele,

14  the Knox County Commonwealth Attorney?

15  A        No.  I don't even know him.

16  Q        Okay.  There's a witness there named Melinda

17  Smith.  Do you know Ms. Smith?

18  A        I know her mother; I don't know her.

19  Q        Okay.  Have you ever spoken with Ms. Smith -

20  ---

21  A        No.

22  Q        --- about this case?

23  A        No.

24  Q        Okay.  How about have you spoken with her

25  mother about the case?

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    A        No.

2    Q        Okay.  Daniel W. Smith is listed.  Do you

3    know Daniel W. Smith?

4    A        I don't know him neither.

5    Q        You've never spoken with him about this

6    case?

7    A        No.

8    Q        You wouldn't know what information he has

9    about the case?

10   A        No.  I don't know him either.

11   Q        The same question for Steven Broughton.

12   A        No.

13   Q        Do you know Mr. Broughton?

14   A        No.

15   Q        Do you know what information he might have

16   about the case?

17   A        I don't know any of it.

18   Q        Keith Barrett, do you know Keith Barrett?

19   A        I don't know him.

20   Q        Do you know what information he might have

21   about the case?

22   A        No.

23   Q        We talked a little bit earlier about Ricky

24   Hobbs, correct?

25   A        Yeah.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        You spoke with him one time a few weeks ago

2    ---

3    A        That one time.

4    Q        --- at the store?

5    A        Yeah.

6    Q        And you already told me what he told you?

7    A        Yes.

8    Q        James Helton, have you spoken with Mr.

9    Helton?

10   A        I know him, but I've not talked to him about

11   it.

12   Q        Do you know what information he would have?

13   A        No.

14   Q        How about Shannon Burdine?

15   A        I don't know her.

16   Q        Okay.  Do you know what information they may

17   have or Shannon may have about the case?

18   A        No.  I don't know her.

19   Q        How about Geneva Helton?

20   A        No.

21   Q        That's James' wife, right?

22   A        I know that's James' wife, Susie, but I

23   don't know her -- or you know, nothing -- she ain't

24   discussed nothing with me.

25   Q        Okay.  Lonnie Gambrel, you've talked to

Pearlie Sue Gambrel – Hon. Jason E. Williams

1      Lonnie I'm sure many times.

2      A       That's my son.

3      Q       Okay.  Has Lonnie ever discussed with you

4      any details he's learned about your son's death?

5      A       No.  He just said he wished somebody

6      would've helped him.  That's -- that's all he ever

7      says about it.

8      Q       He's -- in other words, Lonnie has never

9      disclosed to you, "I spoke with so and so" ---

10     A       No.

11     Q       --- "and they told me this"?

12     A       He don't talk to them either.

13     Q       So you haven't learned anything ---

14     A       I don't know anything that's in the reports

15     about him, what they've said, no.

16     Q       Okay.  Well, basically, what I'm just trying

17     to learn, ma'am, is if Lonnie has indicated that he's

18     spoken with witnesses and then relayed that

19     information to you.

20     A       No.  He hasn't said anything.

21     Q       Okay.  How about Michelle Brown, the same

22     question?  Has Michelle discussed with you ---

23     A       No.  She don't say anything.

24     Q       Okay.  Dr. George Behonick, have you ever

25     spoken with him?

1     A     No.

2     Q     Okay.

3     A     No.

4     Q     Bradley Price Heidy, have you ever spoken

5     with Mr. Heidy?

6     A     No.

7     Q     Do you know Bradley Price Heidy?

8     A     I know him, but I don't even know how they

9     got him on this.  I'd spoke that with Amy.  I don't

10    know how ---

11    Q     Was ---

12    A     I don't ---

13    Q     I'm sorry, was he friends with Jessie,

14    Heidi?

15    A     He's kin to Jessie.

16    Q     And how are they kin?

17    A     It's on my father's side, so I don't know

18    how, but it's kin on my side.

19    Q     Okay.  I mean did they ever hang out with

20    each other or visit with each other that you ---

21    A     Now I don't know about that.  I don't know

22    if they hung out.  I know they was, you know, kin.

23    Q     How about Susie Gambrel?

24    A     I  guess that -- I guess they're meaning me

25    and they got my name Susie.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Are you the only Susie?

2    A        I'm the only Sue, but Geneva ---

3    Q        You go by "Sue," right?

4    A        I'm Sue.  And Geneva, her other name, they

5    call her "Susie," so I don't if he's ---

6    Q        Geneva Helton?

7    A        Yeah.  Yeah, she's a Helton.  That's James'

8    wife.  I don't know if they've got that backwards or

9    what, but that's -- you know, if they had said me.

10   Q        You've never gone by Susie?

11   A        Yeah.  Or there may be something I don't

12   know.

13   Q        Right.  You've never gone by the name Susie?

14   A        No.  My middle name is Sue.

15   Q        You go by Sue?

16   A        Yeah.

17   Q        Okay.  And then Whitney Mills, do you know

18   what information Whitney may have?

19   A        That would be Susie and James' daughter.

20   Q        Okay.  Now you've already disclosed to me,

21   ma'am, the information you had about Mr. Ashurst in

22   the January arrest where you're saying he came to

23   Jessie's house, right?

24   A        Yeah.  That's what the girlfriend had spoke

25   to me and said.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Do you have -- you have no personal

2    information about that, correct?  You got that from

3    Jessie's girlfriend?

4    A        Yes.

5    Q        Okay.  Do you -- other than that

6    information, are you aware of any connection or

7    encounters between your son and Mr. Ashurst before his

8    death?

9    A        Not that I'm aware of.

10   Q        Okay.  The same question with Mr. Bolton.

11   A        No.

12   Q        Do you know whether Mr. Bolton and your son

13   had ever attended school together?

14   A        I'm not aware of it if they did.

15   Q        Okay.  You're not aware of them being like

16   buddies in high school?

17   A        No.  The only thing about Mr. Bolton I've

18   learned was Lieutenant Surber told me that they were

19   friends and he'd go by and pick him up on the weekends

20   and ride with him.  That's the only thing I know about

21   Mr. Bolton.

22   Q        And just so I understand your testimony,

23   you're saying that you learned that Mr. Ashurst and

24   Mr. Bolton were friends, correct?

25   A        That's what Lieutenant Surber told me.

Pearlie Sue Gambrel – Hon. Jason E. Williams

1    Q        Okay.

2    Q        Not that Jessie and Bolton were ---

3    A        No.  Huh-uh (negative response).

4    Q        Anything else that Lieutenant Surber told

5    you about Ashurst that we haven't already discussed?

6    A        No.

7    Q        Anything the lieutenant told you about

8    Bolton that we haven't already discussed?

9    A        No.

10   Q        Okay.  I don't really expect you to know

11   this, but it came up during the report, do you know --

12   did your son -- was he a fan of this group called Mad

13   Clowns?

14   A        I'm not aware of that.

15   Q        You hadn't heard anything about that, okay.

16   Ma'am, I want to take a short break and I think I may

17   be about done.  I just want to look at my notes and

18   take a few minutes.

19              MR. WILLIAMS:          So let's take about

20              a ten-minute break, okay?

21              M. WATKINS, VIDEO TECH:  The time is now

22              12:23 and we'll go off the record.

23                          *

24              *** OFF THE RECORD ***

25                          *

1        **M. WATKINS, VIDEO TECH:**        The time is

2        now 12:32 and we'll resume the record.

3                                        *

4    Q        Ma'am, thank you for answering some

5    questions about those Rule 26 disclosures.  I'm going

6    to make those the next exhibit to your deposition and

7    I'm going to keep my promise of being about done.  I

8    really just have one other question for you.  I think

9    I understand already, but you were appointed

10   administrator of your son's estate, correct?

11   A        Yes.

12   Q        To your knowledge, he did not pass with a

13   will, did he?

14   A        No.

15       **MR. WILLIAMS:**        Okay.  That's all

16       the questions I have.  Thank you.

17       **MS. GAMBREL:**        You're welcome.

18       **MS. ROBINSON-STAPLES:**   I have no

19       questions.

20       **M. WATKINS, VIDEO TECH:**  The time is now

21       12:32 and this concludes the deposition.

22

23

24

25                    [DEPOSITION CONCLUDED]

COMMONWEALTH OF KENTUCKY

COUNTY OF LAUREL

       I, Karen G. Bailey, the undersigned Certified Court Reporter and Notary Public in and for the Commonwealth of Kentucky at Large, whose commission as such will expire October 9, 2019, do hereby certify that the herein named witness was duly sworn by me prior to giving testimony; that the foregoing was taken at the time, place, and for the purpose and appearance set forth herein; that the same was taken by me and was thereafter transcribed personally by me or under my direct supervision.

       I further certify that no request was received by me that the witness herein either read or sign the foregoing transcript.

       IN TESTIMONY WHEREOF, I have hereunto set my hand this 25th day of January 2019.


KAREN G. BAILEY
CERTIFIED COURT REPORTER
CERTIFICATION NO. 20041004
NOTARY ID 452742
COMMONWEALTH-AT-LARGE