The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

106

```
1        Q      He was armed with a Glock, though?

2        A      Yes, sir.

3        Q      And did he -- if you know, did he receive

4   training to use a Glock from Knox County Sheriff Police?

5        A      Yes.

6        Q      Yes, he has been trained?

7        A      Yes, sir.

8        Q      All right.  And in Knox County Sheriff's

9   Department, do you drive -- at that point in time, could

10  he drive a vehicle, marked vehicle, by himself?

11       A      Not from the sheriff's office, no.

12       Q      From any other office that you're aware of?

13       A      No, sir.

14       Q      You know why?

15       A      Because he's not employed by the sheriff's

16  office.  He's an elected official just like the sheriff.

17       Q      Well, I didn't know that.

18       A      Yes, sir.

19       Q      He's elected?

20       A      Yes, sir.  He's elected just like the

21  sheriff's elected in the county.

22       Q      How many constables were there in the county

23  about the time of the shooting?

24       A      I'm not sure how many we have.

25       Q      About how many?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

107

```
1        A    Five or six.

2        Q    And what's your understanding of their duties?

3             MR. WILLIAMS:  Same continuing objection, but

4        you may answer.

5             MR. LOEVY:  His understanding, that's all I'm

6        asking.

7    BY MR. LOEVY:

8        Q    Go ahead.

9        A    They are law enforcement officers just as I'm

10   a law enforcement officer.  They're just not academy

11   trained.  They can answer complaints.  They can serve

12   papers.  They can assist other police agencies on

13   complaints.

14       Q    They can't drive a police vehicle by

15   themselves?

16       A    If it's another person along in the police

17   vehicle.

18       Q    How long had you known Constable Bowen?

19       A    Since high school.

20       Q    Oh, old friends?

21       A    Old friends.

22       Q    All right, and who makes the determination --

23   who made the determination in 2016 on June 29 that the

24   two of you would be riding together?

25       A    I had asked him if he wanted to work that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

108

1   night.

2        Q     If he wanted to go with you?

3        A     Yes, sir.

4        Q     And do you know if he's paid by the hour for

5   going with someone?

6        A     He's not paid by the hour.

7        Q     Is he paid at all?

8        A     Only to serve papers.

9        Q     I'm sorry.  Only?

10       A     Only to serve papers is his only income as

11   constable.

12       Q     And when did you ask him to ride with you

13   relative to that day, before you got to work after you

14   got the work?

15       A     Before.  We had an understanding that if he

16   wanted to ride in the week, he would just let me know.

17       Q     When was it that you asked him directly?

18       A     I don't recall when I asked him to ride that

19   night.

20       Q     On the 29th?

21       A     Correct.

22       Q     Where were you when you asked him?

23       A     Like I said, we had an understanding that if

24   he wanted a ride, he would text me and say, "Hey, I'll

25   ride tonight."  That's pretty much it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

109

1    Q    So the first that you knew he was going to

2  ride with you is when you went to the station on the

3  29th?

4    A    No, sir.  I knew he was going to ride with me,

5  so I picked him up.

6    Q    You picked him up at his house?

7    A    Yes, sir.

8    Q    How did you know he was going to be there if

9  you hadn't -- didn't have a pre-agreement?

10    A    I just told you I had a pre-agreement.  I

11  think you misunderstood me.

12    Q    You had a -- anytime, just for that night, or

13  for any night?

14    A    Let's slow down.

15    Q    Yes, let's start all over.

16    A    Let's start over.  We got confused.

17    Q    When did you make the agreement with

18  Constable Bolton that he would ride with you that night?

19    A    The day before.

20    Q    Okay.  On the 28th?

21    A    Correct.

22    Q    Were you on duty when you made that agreement?

23    A    Yes, sir.

24    Q    How did you make that agreement, by phone, or

25  did you see him?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

110

| | | |
|---|---|---|
| 1 | A | He was with me. |
| 2 | Q | You went off duty on the morning of the 29th; |
| 3 | | is that correct? |
| 4 | A | Correct. |
| 5 | Q | What did you do after you went off duty? |
| 6 | A | I go straight to sleep in the mornings. |
| 7 | Q | Okay.  What time did you wake up? |
| 8 | A | I don't recall. |
| 9 | Q | About what time? |
| 10 | A | I don't recall. |
| 11 | Q | You might have slept all morning?  Can't -- |
| 12 | | don't have any recollection of that? |
| 13 | A | No, sir. |
| 14 | Q | All right.  What did you do all day after you |
| 15 | | woke up before you went on duty? |
| 16 | A | I don't recall what I done that day. |
| 17 | Q | You don't have any memory of what you did? You |
| 18 | | don't remember if you went drinking or not? |
| 19 | A | No, sir.  I did not consume any alcohol that |
| 20 | | day. |
| 21 | Q | You remember some things you didn't do? |
| 22 | A | Correct. |
| 23 | Q | What do you remember not doing? |
| 24 | A | Drinking alcohol. |
| 25 | Q | Okay.  What else? |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    I don't recall what I done that day.

2      Q    Okay.

3      A    I probably went to the gym.

4      Q    Since working at the Knox County Sheriff's

5  Office, have you ever had a second job?

6      A    Yes, sir.

7      Q    Have you ever had more than one second job?

8      A    No, sir.

9      Q    What second job, if any, have you had?

10      A    I worked in a parts store part time last year.

11      Q    What kind of store?

12      A    A parts store.

13      Q    All right, and as of June 2016, did you have a

14  second job in a parts store?

15      A    No, sir.

16      Q    What years or months did you work part time at

17  a parts store?

18      A    Last year.  I don't know the month.

19      Q    Can't remember.  What's the name of the port

20  store?

21      A    Auto Zone.

22      Q    Where is it located?

23      A    Corbin, Kentucky.

24      Q    How far is Corbin from where you live?

25      A    Same town.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

112

1    Q    Do you ever work jobs for the Knox County

2   Sheriff's Police, their extra assignments?  By that, I

3   mean it could be for a parade or an event kind of job.

4    A    Sometimes.

5    Q    Did you work any event jobs in June of 2019

6   [sic]?

7    A    2019?

8    Q    2016, thank you.

9    A    I don't recall that I did.

10   Q    You worked an event job on June 18, 2016?

11   A    I don't recall.

12   Q    You may have worked an event job?

13   A    On the 18th of June?

14   Q    Yeah, the day before the shooting.

15       MR. WILLIAMS:  I think that would've been about

16   ten days before the shooting.

17   Q    Oh, I'm sorry.  28th, thank you, and, again, I

18   apologize for using the wrong date.  On the 28th of

19   June, the day before the shooting.

20   A    No, sir.

21   Q    And if I was -- made a mistake and asked you

22   the wrong date, can we find anything you did on the

23   28th of June?

24   A    Nothing with the sheriff's office that you

25   stated just now.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
113

1    Q    Do you recall anything you did?

2    A    No, sir.

3    Q    Recall what time you woke up on the 28th of

4  June?

5    A    I don't.

6    Q    Do you recall whether you went to the gym on

7  the 28th?

8    A    I don't.

9    Q    May have, you may not have?

10   A    May have; may have not.

11   Q    Do you ever take any training in boxing,

12  wrestling, karate, anything in self-defense?

13   A    No, sir.

14   Q    I had asked you some questions earlier about

15  the vehicle.

16   A    Yes, sir.

17   Q    Is there a radio in the vehicle?

18   A    Yes, sir.

19   Q    Did you receive any communications from that

20  radio that we had discussed earlier, as opposed to on

21  your -- the radio that you wear on your person?

22        MR. WILLIAMS:  Are you asking -- on what date,

23     sir?

24   Q    Where did you receive the information?  Did

25  you receive the information from the radio inside the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  police vehicle or from the vehicle you were -- or from

2  the radio you were wearing on your person?

3          MR. WILLIAMS:  On the night of the 29th?

4          MR. LOEVY:  Yeah.

5          MR. WILLIAMS:  Okay.  You understand the

6      question?

7      A    Yes.  When we are in our vehicle, we use our

8  mobile inside the car.  When we're outside, we use our

9  handheld that's on my person.

10 BY MR. LOEVY:

11     Q    Right.  I'm asking:  Where did you receive the

12 information, from your radio in the vehicle, or the

13 radio that you were carrying on your person?

14     A    The vehicle.

15     Q    Pardon?

16     A    Vehicle.

17     Q    And have you now testified as to that all the

18 information received, either from the radio in the

19 vehicle or the radio on your person, prior to the time

20 you arrived at the scene on the 29th?

21     A    Yes, sir.

22     Q    Did you receive any other communications

23 concerning anything else on the 29th, other than that

24 which you've testified to, any other police calls, any

25 personal matters?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      No, sir.

2      Q      What is in the -- if anything, is -- do you

3  carry in the trunk of your vehicle?

4      A      A rifle.

5      Q      Okay.  Describe the rifle for us.

6      A      It's an AR-15.

7      Q      Loaded?

8      A      Loaded.  Not one in the chamber, no.

9      Q      What other equipment, if any, is carried in

10  the vehicle, either in the trunk or any other part?

11     A      A filing box with forms and paperwork in it.

12  Disinfectant spray, paper towels, extra pair of boots.

13     Q      Anything else?

14     A      Measuring stick and spray paint.  That's all I

15  can recall.

16     Q      Am I correct in saying you were in your

17  vehicle when you received the call about Mr. Mills?

18     A      Yes, sir.

19     Q      And am I correct in saying that the constable

20  was in the vehicle with you?

21     A      Yes, sir.

22     Q      He was sitting, you were driving, I assume?

23     A      Yes, sir.

24     Q      He was sitting in the front seat with you; is

25  that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes, sir.

2    Q    After receiving the first call, not the

3    updates that you testified to, what, if anything, did

4    you say to the constable?  What, if anything, did he say

5    to you?

6    A    I don't recall anything.

7    Q    Is it that you can't recall what was said, or

8    you can't recall if you said anything?

9    A    I can't recall what was said.

10   Q    Was it an unusual call for you to receive?

11   A    No, sir.

12   Q    Have you received a lot of calls like that, as

13   a Knox County Sheriff's Deputy?

14   A    I receive all kinds of different calls.

15   Q    Including calls like this?

16   A    Yes, sir.

17   Q    So you didn't think it was anything unusual?

18   A    Whether it was unusual?

19   Q    Well, it was unusual enough for you to

20   activate all of your emergency equipment, right?

21   A    Yes, sir.

22   Q    Did you give the constable any instructions on

23   what you should do when you got there?

24   A    No, sir.

25   Q    In retrospect, do you think you should have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  given him some instructions in light of the fact that

2  he's never graduated from the academy?

3       A    No, sir.

4       Q    Do you know what training he, being the

5  constable, has received in how to handle a potentially

6  dangerous situation?

7       A    No, sir.

8       Q    Did you view the situation, based on the

9  information you received on the radio, as potentially

10  dangerous to any person?

11      A    Yes, sir.

12      Q    Did you convey that information to the

13  constable?

14      A    No.

15      Q    So I think you said roughly 20 minutes it took

16  you to get to the scene?

17      A    Yes, sir.

18      Q    You didn't say anything to him, he didn't say

19  anything to you?

20          MR. WILLIAMS:  That's not his testimony.  I

21      think his testimony was he couldn't recall what was

22      said.

23  BY MR. LOEVY:

24      Q    Well, I think my question is a little bit

25  different.  Is it that you don't recall what was said,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

118

1  or you don't recall saying anything?

2      A    I don't recall what was said.

3      Q    Okay.  You did have some conversation?

4      A    Yes, sir.

5      Q    But you can't recall whether you gave him any

6  instruction as to how to handle himself at the scene?

7      A    Correct.

8      Q    You didn't -- did you tell him, "Let me take

9  charge of the situation"?

10     A    Yes, sir.  I advised that, "Let me make

11  contact first."

12     Q    You -- that's something you do remember?

13     A    Yes, sir.

14     Q    What else -- does that help refresh your

15  memory as to anything else you might have told the

16  constable?

17     A    No.

18     Q    When you arrived at the scene, did you leave

19  all of your emergency equipment on?

20     A    Everything but the siren.

21     Q    Okay.  So that would include the --

22     A    All the blue lights.

23     Q    That would include the blue light and the

24  flip flops?

25     A    Yeah.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
119

1    Q    Okay.  What's the first thing you saw from
2  inside the vehicle when you arrived?
3    A    A vehicle parked in the roadway with a male
4  subject standing beside it flashing a flashlight trying
5  to stop traffic.
6    Q    And who was that?  Do you know who that was?
7    A    I don't know.
8    Q    Even now you don't know who that was?
9    A    I don't know.
10    Q    Can you describe that person?
11    A    I can't.
12    Q    Was that person who was waving the flashlight,
13  in your professional judgment, reasonably successful in
14  keeping traffic away?
15    A    Yes, sir.
16    Q    Okay.  What else did you see from inside the
17  vehicle?
18    A    A male subject walking on the double yellow
19  line carrying a small child.
20    Q    Okay.  You were able to see the child from
21  inside the vehicle, correct?
22    A    Yes, sir.
23    Q    Did he have his back to you, or was he
24  walking -- strike that, please.  Was the person walking?
25    A    The person I saw?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

120

1     Q    Yes.

2     A    Yes, sir.

3     Q    Was he walking towards you or away from you?

4     A    Away.

5     Q    And was he running away from you or walking

6 away from you?

7     A    Walking.

8     Q    At a normal pace?

9     A    No, sir.

10    Q    Quick pace?

11    A    Yes, sir.

12    Q    And describe for us how he was holding the

13 baby that you saw from inside the vehicle.

14    A    He had the baby in his left arm.  She was

15 looking over his shoulder.  She was screaming and

16 crying, and he was walking with his fist, doing this

17 right here.

18    Q    Okay.  And I was going to ask you to

19 demonstrate the fist gesture, and it was in a circular

20 motion?  Can you just describe that?

21    A    Yes, sir.  It was like this.

22    Q    Okay.  Thank you.

23    A    You're welcome.

24    Q    Was it with his right hand?

25    A    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And even though his back was to you, how

2  many -- well, strike that.  How many feet away was he

3  when you first saw him?

4    A    I can't -- I don't know.

5    Q    You can't estimate?

6    A    I can't estimate.

7    Q    Nothing in your police training dealt with

8  making estimates at distances, correct?  You were never

9  trained as a police officer to make an estimate?

10   A    An approximate estimate.

11   Q    Well, give us an approximate estimate then.

12 How many -- what is your approximate estimate of how

13 many feet he was away from you?

14   A    I'm going to say 50 yards or less by the time

15 I pulled over my car and he continued to walk.

16   Q    And the state police, in their interview with

17 you, never asked you what you first saw when you pulled

18 up?

19   A    They did.

20   Q    They did.  And what did -- you told them the

21 same thing that you just told me?

22   A    Yes, sir.

23   Q    Did they ask you what the distance was?

24   A    No, sir.

25   Q    At this point, have you -- before leaving the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

122

1   vehicle, have you now testified as to everything you

2   told the constable, who was with you?

3        A    Yes, sir.

4        Q    Did you report back to dispatch anything at

5   all up to the point that you had arrived?

6        A    I advised them that I was on scene and

7   observed a male subject walking on a double yellow line

8   carrying the child.

9        Q    And you told dispatch you had arrived?

10       A    Yes, sir.

11       Q    Is that the point -- at that point, did you

12  exit your vehicle?

13       A    Yes, sir.

14       Q    Did you turn the engine off first, or did you

15  leave it running?

16       A    Left it running.

17       Q    And you exited the vehicle from the driver's

18  side?

19       A    Yes, sir.

20       Q    What's the next thing that you saw, heard, or

21  did after exiting your vehicle?

22       A    I began yelling commands at Mr. Mills to stop.

23       Q    Okay.  You knew his name at that point?

24       A    No, sir.

25       Q    You didn't yell, "Mr. Mills"?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
123

```
 1        A     No, sir.

 2        Q     You yelled to the person you now know to be

 3   Mr. Mills?

 4        A     Correct.

 5        Q     Did you do that while you were still inside of

 6   the vehicle -- your own vehicle?

 7        A     Did I yell at him from inside my car?

 8        Q     Yeah.

 9        A     No, sir.

10        Q     Okay.  Well, how far did you advance before

11   you started yelling?

12        A     Immediately as soon as I exited my car, I

13   began giving commands to stop.

14        Q     Do you have any way to amplify your voice from

15   any equipment for that?

16        A     No, sir.

17        Q     Okay.  And how far away were you from him when

18   you made that statement to him?

19        A     I never quit giving commands until I got all

20   the way to him.

21        Q     And you said the same thing over and over, or

22   did you change your command?

23        A     Changed my commands.

24        Q     Can you tell us how you changed your command?

25        A     Sheriff's office, stop.  Stop, talk to me.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

124

1   Let's figure this out.   Stop.   Sheriff's office.

2        Q    You had your baseball cap on?

3        A    I did.

4        Q    Okay.   And what's the next thing that happened

5   or you heard?

6        A    He disobeyed my commands and never...

7        Q    Kept walking?

8        A    Kept walking.

9        Q    Did he increase the speed, decrease the speed?

10       A    Still at that same fast pace.

11       Q    Okay.   And were you walking towards him,

12   trying?   What was your pace?

13       A    Faster than his to gain -- close that gap.

14       Q    Were you in a trot?

15       A    You could say a trot.

16       Q    Why could I say a trot?

17       A    Because that would be a fast paced walk like a

18   horse, I assume.

19       Q    Okay.   So where was the constable while you

20   were at that pace following him?

21       A    He was beside me.   He was following me.

22       Q    He was following you, or he was beside you?

23       A    At an angled stance.

24       Q    Okay.

25       A    A little bit behind me.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
125

1       Q     And as you were at that pace, did it ever

2   develop into a run from you?

3       A     I don't recall.

4       Q     May have -- you may have been running, but

5   just can't remember?

6       A     Correct.

7       Q     Did the state police ask you if you were

8   running or not?

9       A     I don't recall.

10      Q     Can't remember that either?

11      A     I don't remember.

12      Q     Okay.  Your whole statement with the state

13  police, was it all -- strike that, please.  Where did

14  that conversation take place?

15      A     Kentucky State Police Post 10, Harlan,

16  Kentucky.

17      Q     Right.  And was it in a room?

18      A     Yes, sir.

19      Q     Did you ever talk to any officer outside of

20  the room?

21      A     No, sir.

22      Q     When you came into the room, can you describe

23  the room for us, please?

24      A     It's a small room, probably a eight by 12

25  room, two desks.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

126

1  Q  How many people were present?

2  A  Myself and two others.

3  Q  Two others?

4  A  Yes, sir.

5  Q  Was there a video camera in that room?

6  A  I don't recall a video camera.

7  Q  Did you look around to see if there was one or

8  not?

9  A  I wasn't looking for one.

10  Q  Was there a recording machine in the room?

11  A  Yes, sir.

12  Q  Describe the recording machine.

13  A  A little bit fancier than this one.  Two of

14  them.

15  Q  About that size?  Okay.

16  A  Two recording devices.

17  Q  And how could you tell if the recording

18  machine was on or off?

19  A  I could tell by the red light that it was

20  recording.

21  Q  Let's see, is that your personal one?

22  A  No.

23  MR. WILLIAMS:  No, that's the one the court

24  reporter's using.

25  Q  That's the court reporter's.  Thank you. Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

127

1  So I see a red light, and that's what indicated to you

2  that it was on?

3       A     Yes, sir.

4       Q     Okay.  They you gave you a seat?

5       A     Yes, sir.

6       Q     Introduced himself?

7       A     Yes, sir.

8       Q     Was the red light on from the moment you

9  walked in the room?

10      A     I don't recall.

11      Q     May have been on, or it may not have been on?

12      A     I don't recall.

13      Q     Did they ever tell you, "Now, starting now

14  you're going to be recorded"?

15      A     We started the interview the same way we

16  started the interview in here.

17      Q     How long were you sitting in the room before

18  the interview started?

19      A     Just a couple of minutes.

20      Q     And what was discussed in that couple of

21  minutes?

22      A     I don't recall.

23      Q     Any time that the tape recorder went off

24  before the interview was over?

25      A     No, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     That was about 20 minutes, wasn't it?   About

2   20, 25 minutes?

3      A     I'm not sure.   I didn't look at the exact time

4   on it.

5      Q     Were you in the room for the entire time that

6   the interview took place, or were there any breaks,

7   breaks similar to what we --

8      A     No, sir.

9      Q     No breaks --

10      A     No, sir.

11      Q     -- correct?   Did you go to the interview with

12   Mr. Bolton?

13      A     To the what?

14      Q     Did you go to the interview with

15   Constable Bolton?

16      A     Yes, sir.

17      Q     And did you pick him up, or did he pick you

18   up?

19      A     I picked him up.

20      Q     And how did you know that he was going to be

21   interviewed that day?

22      A     State police told us.

23      Q     Who told you?

24      A     State police.

25      Q     So when you talked to the state police, he

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

129

1     said, "I'm going to interview you and Bolton, same day,

2     same time."

3          A     Not the same time.

4          Q     Same day?

5          A     Yes, sir.

6          Q     And how did you know that you would be first,

7     and he would be second?

8          A     They advised me of my time.

9          Q     In that same conversation you testified to

10    earlier?

11         A     Yes, sir.

12         Q     And on the way, how long did it take you to

13    get to the state police headquarters?

14         A     Hour and 20 minutes.

15         Q     Excuse me?

16         A     One hour and 20 minutes.

17         Q     Okay.  And what did you guys talk about, if

18    anything, for an hour and 20 minutes driving to the

19    state police headquarters?

20         A     I don't recall what we talked about.

21         Q     Can't recall anything you talked about?

22         A     No.

23         Q     Did you talk about the shooting of Mr. Mills?

24         A     I don't recall.

25         Q     Did you talk about the incident that occurred

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

130

1  with Mr. Mills?

2      A    I don't recall.

3      Q    You can't recall what you said, or you can't

4  recall if you spoke about the incident?

5      A    I can't recall what was discussed.

6      Q    Did anyone from the Knox County Sheriff's

7  Department or the state police tell you not to talk to

8  Mr. Bolton about the incident before you were

9  interviewed by the state police?

10     A    I don't recall.

11     Q    You don't remember if they told you whether to

12 talk to him or not to talk to him; is that correct,

13 about the incident?

14     A    Correct.

15     Q    Okay.  Would it be fair to say to you that if

16 a state policeman, who you knew was investigating a

17 shooting, told you, "Don't speak to Mr. Bolton about

18 what happened," that that's something you would

19 remember?

20     A    Yes, sir.

21     Q    But you can't remember that being told to you?

22     A    I don't.

23     Q    What about the sheriff, when you talked to

24 him, did he say, "Don't talk to Mr. Bolton about what

25 happened"?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    I don't recall.

2      Q    You can't remember anybody ever telling you,

3  "Don't speak to him about what happened"?

4      A    I don't recall.  I'm saying I don't remember,

5  because I don't recall that being said.

6      Q    As you sit here now under oath, you cannot

7  remember anyone saying to you, "Don't speak to

8  Mr. Bolton about the incident until you are interviewed

9  by the state police"; is that correct?

10     A    I don't recall.

11     Q    I'm asking you a question.  Is what I just

12  said correct?

13     A    I don't recall if that's correct or not.

14     Q    You don't recall my question?

15     A    I understand your question, but I don't recall

16  if I was told that or not.

17     Q    Let me say it again.  As you sit here now, am

18  I correct in saying you do not remember any member of

19  the Knox County Sheriff's Police or the state police

20  telling you not to talk about the incident and

21  interaction with Mr. Mills until you had been

22  interviewed by the Kentucky State Police.  Is that a

23  correct statement?

24     A    I don't remember.

25     Q    Pardon?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

1    A    It's correct if you're saying I do not

2  remember at the first of your question.

3    Q    Well, then is that what I just said?

4    A    Correct.

5    Q    Okay.  Anything else about that night you

6  don't remember, other than that which you've already

7  testified to you that you don't remember?

8        MR. WILLIAMS:  Objection to form.  You're

9    asking him to recount things he doesn't remember.

10   Q    Yeah, anything else?  You might not remember

11 the shooting, the kicking, you might not remember

12 anything.  Anything else that you don't remember?

13   A    Nothing that stands out.

14       MR. WILLIAMS:  Object to the form of the

15   question.

16   Q    You remember the shooting, right?

17   A    Correct.

18   Q    And you remember the kicking and the hitting,

19 correct?

20   A    I remember the force used to effect an arrest.

21   Q    That included hitting with an ASP and hitting

22 with a baton.  You remember all that?

23   A    Correct.

24   Q    And you remember feeling threatened by

25 Mr. Mills.  You remember all that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes, sir.

2    Q    Okay.  So you're out of your vehicle -- by the

3  way, when you shot Mr. Mills, was the baby in any danger

4  at that time?

5    A    No, sir.

6        MR. WILLIAMS:  Requires him to speculate.

7    Q    I'm sorry?

8        MR. WILLIAMS:  You can answer.

9    A    No, sir.

10    Q    Okay.  When you first struck Mr. Mills, was

11  the baby in any danger?

12        MR. WILLIAMS:  Requires to speculate.

13    Q    If you remember?

14        MR. WILLIAMS:  Object to the form, but you may

15    answer.

16    Q    Yeah, you struck Mr. Mills; is that correct?

17    A    First initial contact was with the taser

18  strike.

19    Q    Okay.  So -- but you also hit Mr. Mills,

20  correct?

21    A    To use force to effect the arrest of him --

22    Q    I'm not asking if it was reasonable or not.

23  Did you ever hit Mr. Mills?

24    A    Yes, sir.

25    Q    Okay.  Was the baby present when you first hit

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

134

```
 1   Mr. Mills?
 2        A    No, sir.
 3        Q    Okay.  You hit Mr. Mills with an ASP; is that
 4   correct?
 5        A    Yes, sir.
 6        Q    Was the baby present when you hit Mr. Mills
 7   with an ASP?
 8        A    No, sir.
 9        Q    You hit Mr. Mills with a flashlight; is that
10   correct?
11        A    Yes, sir.
12        Q    Was the baby present when you hit Mr. Mills
13   with a flashlight?
14        A    No, sir.
15        Q    Who tasered Mr. Mills?
16        A    Myself.
17        Q    You tasered him?
18        A    Yes, sir.
19        Q    What was the first weapon that you took from
20   your belt?  Was it the Glock, pepper spray, the ASP, the
21   flashlight?  What was the first weapon you removed?
22        A    Taser.
23        Q    Okay.  And how far away were you from
24   Mr. Mills when you removed the taser?
25        A    Six to eight feet.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

135

1      Q      Okay.  But you were catching up with him?

2      A      Yes, sir.

3      Q      Was there any time that he reduced his fast

4  walking pace?

5      A      At the first point of contact, when I first

6  spoke with him.

7      Q      Okay.  I'm sorry, I didn't -- we left off

8  there when you were moving.  I called it a trot, but at

9  a fast pace.  He was still walking at fast pace?

10     A      Yes, sir.

11     Q      You were calling instructions?

12     A      Yes, sir.

13     Q      He was carrying the baby?

14     A      Yes, sir.

15     Q      Correct?  And was there a time that he slowed

16  up?

17     A      Yes, sir.

18     Q      About how long was it?  How much time had

19  lapsed that you -- from the time you first got out of

20  the car until his pace slowed up?

21     A      Less than two minutes.

22     Q      Okay.  Did he come to a full stop?

23     A      I got him to come to a full stop.

24     Q      How did you get him to come to a full stop?

25     A      After he disobeyed my commands, I ran up, and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   just slapped him on the elbows like, hey, stop and turn

2   around, let's talk about this, and the baby was

3   hysterical.  I told him we needed to calm the baby down.

4   We were concerned about the child.

5        Q    Okay.  And he stopped at that point, so were

6   you in front of him or to his side?

7        A    He had turned towards me.

8        Q    Face-to-face?

9        A    Yes, sir.

10       Q    So the baby was still facing behind him?

11       A    She was looking at me now.

12       Q    She was looking at you?

13       A    Yes, sir.

14       Q    Okay.  And what did you say to Mr. Mills, and

15   what, if anything, did he say to you?

16       A    I advised Mr. Mills that, "Let's talk about

17   this, let's try to resolve it.  Let's put the baby down,

18   she's scared, she's screaming and crying."  He's just

19   looking at me with -- he's just looking dead through me

20   with no emotion.  He made a statement, "The only way

21   you'll get this baby is if you pry her out of my cold,

22   dead hands," and then he turned and took off walking at

23   a fast pace again.

24       Q    Okay.  And that's something you told the state

25   police as well --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A   Yes.

2   Q   -- in your interview?

3   A   Yes, sir.

4   Q   All right.  And then that he turned around?

5   A   And began to walk off again.

6   Q   Okay.  Did you try to restrain him from

7   walking off?

8   A   I told him to stop.  He continued to walk.

9   Q   Did you have your taser out at that point in

10  time?

11  A   No, sir.

12  Q   How far away did he get before you took out

13  your taser?

14  A   Probably the six to eight feet, like I just

15  described.

16  Q   Okay.  And describe the taser for us.

17  A   What the taser looks like?

18  Q   Yes.

19  A   It's probably about this long.  It takes a

20  single cartridge.  It's probably that long.  It's the

21  shaped of a box, goes in the end of the taser.  It's got

22  a safety selector switch on it.  You flip it up to fire.

23  Q   And how many ways are there to use a taser?

24  A   Two different ways.  You can shoot the

25  cartridge, which is in the box I explained, shoots the



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  prongs into the suspect, or you can take that box off

2  and just kind of drive stun, where you stick the taser

3  to them.

4       Q    Right.  And you made a decision to use the

5  prongs as opposed to a drive stun?

6       A    Yes, sir.

7       Q    That's correct?

8       A    Correct.

9       Q    And your taser was fully charged, or do you

10 know?

11      A    I don't know.

12      Q    Where did you get the taser from that day?  At

13 the station?

14      A    It's my personal taser through the sheriff's

15 office that I keep on my person at all times.

16      Q    How do you recharge it?

17      A    They run off batteries.  It's got a battery

18 indicator on it.

19      Q    How do you know if it's fully charged?

20      A    They don't run off fully charge.  They run off

21 just a percentage of the battery.

22      Q    So you have the personal responsibility, it's

23 not the department's responsibility, to seeing that the

24 taser is fully charged; is that fair?

25           MR. WILLIAMS:  Object to the form.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

139

| | | |
|---|---|---|
| 1 | A | It doesn't have to be fully charged to |
| 2 | function correctly. | |
| 3 | Q | Well, did you check the taser every day? |
| 4 | A | Yes. |
| 5 | Q | Every day you're on duty? |
| 6 | A | Yes, sir. |
| 7 | Q | And what do you check it for? |
| 8 | A | To make sure the -- that it turns on and |
| 9 | works. | |
| 10 | Q | And that it's fully charged? |
| 11 | A | No, because the taser doesn't have to work on |
| 12 | a fully charged battery. | |
| 13 | Q | That it's charged to -- |
| 14 | A | Enough to work sufficiently. |
| 15 | Q | Thank you.  And you did that before you began |
| 16 | your shift on the 29th or after? | |
| 17 | A | I don't recall that night if I spot tested it. |
| 18 | Q | But your usual process would be to check the |
| 19 | taser? | |
| 20 | A | Yes. |
| 21 | Q | When you went on duty? |
| 22 | A | Yes, sir. |
| 23 | Q | It's an important part of your -- |
| 24 | A | Just to flip it up to see if it comes on. |
| 25 | Q | Okay.  And you would do that every night you |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  were on duty?

2      A    Yes.

3      Q    Correct?

4      A    Correct.

5      Q    You kept it in your home, though?

6      A    Yes, sir.

7      Q    Or did you keep it -- at the Knox County

8  Sheriff, do you drive the police vehicle's home, or do

9  you pick them up at the station?

10      A    Take home.

11      Q    Okay.  So do you keep your vehicle in --

12  strike that.  Do you keep the taser in your vehicle, or

13  do you keep it in your house?

14      A    In my house.

15      Q    Okay.  I think you said you were six to eight

16  feet away when you shot the prongs?

17      A    Yes, sir.

18      Q    And what was Mr. Mills wearing?

19      A    I don't recall.  I can't remember.

20      Q    Wearing a T-shirt?

21      A    I don't remember.

22      Q    Was he wearing -- do you remember him wearing

23  anything that gave you some hesitation as to whether the

24  prongs would be effective?

25      A    Only thing I remember him wearing was a pair



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  of boots.  I can't remember what shirt he was wearing.

2      Q    Of if he was wearing a bulky jacket, for

3  example, wouldn't that give you some hesitation as to

4  whether to use the taser or not?

5      A    It'll still penetrate.

6      Q    Okay.  Even a very bulky jacket?

7      A    Not a very, very bulky jacket, but it will

8  still penetrate a jacket.

9      Q    What was the weather like that day?

10      A    I was wearing short sleeves, so I assume it

11  was warm outside.

12      Q    Do you recall the weather?

13      A    I don't.  It wasn't raining.  It was clear.

14      Q    It was light enough, either artificially or

15  otherwise, for you to have a clear shot at his back?

16      A    Yes, sir.

17      Q    Did the prongs -- could you tell if they both

18  worked?

19      A    Yes, they both worked on that initial taser

20  hit.

21      Q    And he went down face first?

22      A    Yes, sir.

23      Q    How long after the prongs hit him did he go

24  down face first?

25      A    Almost immediately.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
142

1     Q    Could you see from your perspective whether or

2  not he was able to break his fall?

3     A    If I was able to break his fall?

4     Q    Whether he was able to break his fall.

5     A    I couldn't see from my angle.

6     Q    Okay.  But you saw him go down?

7     A    Yes, sir.

8     Q    And were the prongs still attached, at that

9  point in time, to your taser?

10     A    Yes, sir.

11     Q    Meaning you could reactivate it whenever you

12  wanted, correct?

13     A    Yes, sir.

14     Q    To inflict an additional charge?

15     A    Yes, sir.

16     Q    And is it your understanding tasers are pain

17  compliance, correct?

18     A    Yes, sir.

19     Q    And it hurts?

20     A    It hurts.

21     Q    So someone is more likely to comply if they

22  are receiving pain?

23     A    Correct.

24     Q    After --

25         MR. WILLIAMS:  Requires some speculating.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
143

1     Q     After -- Now that's just -- go ahead.  After

2  he goes down face first, what is the next thing you do?

3     A     The baby is took out of his arms by

4  Constable Bolton.

5     Q     First thing you do is you approached him,

6  correct?

7     A     Correct.

8     Q     With the taser gun still in your hand?

9     A     Yes.  The taser socket was still activated.

10    Q     It was still activated?  Are you right-handed?

11    A     I am.

12    Q     So is it -- am I correct in saying it was in

13  your right hand?

14    A     Yes, sir.

15    Q     So you go -- did the baby hit the ground, or

16  did his body soften the fall?

17    A     His body softened the fall, based on the angle

18  I could see.

19    Q     Baby is still crying?

20    A     Baby is still crying.

21    Q     What did you do as you approached him?

22    A     I still had him with the taser.  Constable

23  Bolton reached down and grabbed the baby almost at the

24  exact time that he was making contact with the ground.

25  Constable Bolton grabbed the baby out from under him.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

144

1      Q      Almost at the same time?

2      A      Yes, sir.

3      Q      He didn't go straight down then and as soon as

4   you activated the taser, or Officer Bolton was...

5      A      As he's falling, Constable Bolton was going

6   towards the baby.  As soon as he was going to make

7   contact with the ground, Constable Bolton was there and

8   grabbed the baby.

9      Q      Okay.  You observed Officer Bolton take the

10  baby?

11     A      Yes, sir.

12     Q      What's the next thing that you saw or did or

13  heard?

14     A      I began, once again, giving numerous strong

15  commands to rollover, put your hands behind your back.

16     Q      He's still face down?

17     A      He's rolled over at this point.

18     Q      Okay.  When he rolled over, rolled over on his

19  back?

20     A      He was over on his side coming over onto his

21  back.

22     Q      That would be his left side, or you are just

23  demonstrating it?

24     A      I'm just -- my body is just moving as I'm

25  talking.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Sure.  Which side did he roll over on?

2    A    I can't recall which side it was.

3    Q    At that point, were you able to observe what

4  he was wearing?

5    A    I just can't sit and tell you right now what

6  he was wearing.

7    Q    Okay.  What's the next thing after he rolled

8  over on his side?  Tasers were still in his back,

9  correct?

10    A    Correct.

11    Q    Did you activate your tasers again while he

12  was still on the ground?

13    A    After numerous commands and him disobeying my

14  commands to put his hands behind his back.

15    Q    When you say "numerous times," can you give us

16  an estimate of how many times you told him to -- you

17  wanted him to roll over on his stomach, correct?

18    A    I wanted him to get on his stomach again.

19    Q    Is that what you said to him, "Roll over on

20  your stomach"?

21    A    Yes, "Get on your stomach, quit resisting, put

22  your hands behind your back."

23    Q    How was he resisting?

24    A    Because I had already gave him numerous

25  commands.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

146

1      Q      But how was he resisting is my question?

2      A      He was resisting arrest, because I had to

3  deploy a taser.

4      Q      Okay.  So he's on his side.  He was resisting

5  while he was on his side?

6      A      Resisting arrest can still be while you are on

7  your side and disobeying my commands.

8      Q      So his resistance is failure to obey your

9  command?

10     A      Yes.

11     Q      Okay.  So how many times did you tell him,

12 roll over on your stomach from your side?

13     A      I can't remember the exact amount of times I

14 told him.

15     Q      Approximate for us.

16     A      I never stopped saying it.

17     Q      All right.  Always the same thing, roll over,

18 roll over?

19     A      "Roll over, put your hands behind your back,

20 get on your stomach, quit resisting."

21     Q      And what, if anything, did he say at that

22 point in time?

23     A      Never said nothing.

24     Q      Is that when you reactivated your taser?

25     A      Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
147

1    Q    And what is your understanding of such a
2  reaction -- reactivation do?
3    A    It doesn't faze him.
4    Q    No, what is your understanding of what it's
5  supposed to do?
6    A    It's supposed to lock the subject back up,
7  where we can gain control of him.
8    Q    Okay.  Supposed to hurt him again?
9    A    Yes, sir.
10    Q    And how do you reactivate the taser after the
11  plungers are in?
12    A    Just by pulling the trigger.
13    Q    Okay.  How many times did you pull the trigger
14  while he was on the ground on his side?
15    A    Just that time.
16    Q    Just one time?
17    A    Just that cycle.
18    Q    And you saw no reaction?
19    A    No reaction.
20    Q    Okay.  What's the next thing you did?  Were
21  you -- excuse me, were you standing when you reactivated
22  the taser?
23    A    Yes, sir.
24    Q    And he still stayed on his side?
25    A    He's on his backside.  He's on his back at

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   this point.

2       Q   All right.  When you reactivated, he was on

3   his back?

4       A   Correct.

5       Q   Okay.  And after you reactivated, what's the

6   next thing that happened or was said?

7       A   I went down in an attempt to go hands-on while

8   I still had the taser in hand.  He began to start

9   kicking and punching.

10      Q   Okay.  You went down on one knee or two knees,

11  or did you just bend over?

12      A   I was just bending over to see if I could get

13  close to put hands on him.

14      Q   You bend over, you had one hand free, and the

15  other hand holding the taser?

16      A   Correct.

17      Q   Did you try to reactivate the taser another

18  time while he was still down?

19      A   A few seconds after that, after Constable

20  Bolton got over to help me go hands-on with him, to get

21  his hands behind his back.

22      Q   You reactivated another time?

23      A   Yes, but it was unsuccessful.

24      Q   So that was the third time, but the second

25  reactivation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

149

1    A    Correct.

2    Q    Okay.  Any other times that you reactivated?

3    A    Only on a drive stun phase without a --

4    Q    I mean, just on the prong phase.

5    A    No, sir.

6    Q    So three times?

7    A    Correct.

8    Q    So he's still on his back when Constable

9  joined you?

10   A    Yes, sir.

11   Q    And you're not on your knees when he gets

12 there?

13   A    No, sir.  Correct.

14   Q    You have one hand free, one hand holding the

15 taser, right?  What part of your body are you in

16 relation to Mr. Mills at this point in time?

17   A    What do you mean?

18   Q    Are you near his chest, his head, his feet,

19 when you bend over?

20   A    I'm over top of his feet, his torso area.

21   Q    You are over his face?

22   A    No, his feet.  I'm leaned over his waist and

23 his feet.  I'm at his feet.

24   Q    So are you at his side?

25   A    No, if he was lying on his back, I'm looking

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

150

1    down at him.

2         Q    Are you straddling him?

3         A    No, I'm standing at his feet.

4         Q    You are standing at his feet?  Maybe I'm just

5    not -- I don't -

6         A    I'm standing right here.

7         Q    Yeah.

8         A    If I was standing right here where I am at, he

9    would be laying on his back right here with his feet

10   right here, where he could kick at me like that.

11        Q    Okay.  Why would you stand at his feet?

12        A    Because that's the way that he'd spun around.

13   This isn't a slow motion process.

14        Q    Did you move so you could be at his shoulders

15   and his face?

16        A    No, I didn't.

17        Q    You just stood there where his feet could kick

18   you?

19        A    No.  I tried to move around where I could go

20   hands-on.

21        Q    Okay.  How long was it before you could not be

22   standing right in front of his feet?

23        A    A few seconds.

24        Q    Okay.  So his feet were -- did it look like

25   that he was -- flat on his belly, flat on his face,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
151

1  right?

2      A    No.  He was on his back.

3      Q    On his back, okay.  And was -- feet were

4  kicking from the knees for a couple of seconds?

5      A    Yes, sir.

6      Q    Did it look like it was voluntary kicks, in

7  your opinion, or involuntary kicks?

8          MR. WILLIAMS:  Requires him to speculate.

9      Q    Okay.  You can speculate for us.

10     A    That means he was kicking in an attempt to get

11 me away from him.

12     Q    Okay.  So naturally, you didn't stand in front

13 of his feet for very long, right, just a couple of

14 seconds?

15     A    Correct.

16     Q    All right.  And did any of those feet kicks

17 make contact with you?

18     A    Yes, sir.

19     Q    What part of your body did it make contact

20 with?

21     A    Just below my knees.

22     Q    Okay.  Bruise it?  Did you ever get bruised

23 from those kicks?

24     A    I can't recall if I had a bruise or not.

25     Q    Okay.  You never took -- did you ever take any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

152

1   pictures of the bruising?

2       A    There was photographs took of me on scene.

3       Q    You were photographed?

4       A    Yes, sir.

5       Q    Including for potential bruises?

6       A    And injuries, yes.

7       Q    Who took the photographs?

8       A    State police detective.

9       Q    At the time of your interviewing on the 6th or

10  the night of the incident?

11      A    The night of the incident.

12      Q    Okay.  Did you pull up your pants legs so they

13  can take your picture of your knees, or did they ask you

14  to take your pants off so they could photograph?

15      A    I don't recall.  I just remember the

16  photographs.

17      Q    Okay.  At any rate, after the knee hits, you

18  reposition yourself?

19      A    Correct.

20      Q    Where do you reposition yourself to?

21      A    Kind of bladed at a angle toward him.

22      Q    Okay.  And where is the constable at that

23  point in time?

24      A    On the other side of him.

25      Q    So you're -- are you in a standing position,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

153

1   or you are crouched over?

2        A    Standing crouched.  I mean, we're moving this

3   whole time.  We're not ever at a stand-still.

4        Q    Was Mills a big guy?  Were you at his center?

5        A    Yes, sir.

6        Q    Bigger than you?

7        A    Yes, sir.

8        Q    All right.  So what's the next thing that you

9   did?  You activated your taser at that point three

10  times?  Still on his back?

11       A    Correct.

12       Q    Flat on his back.  What's the next thing that

13  happens?

14       A    Constable Bolton reached down to try to grab

15  ahold of him, and he rolled over and grabbed Constable

16  Bolton -- grabbed ahold of Constable Bolton --

17       Q    Tries to grab a hold of him how, reaches out

18  for his hand?

19       A    He grabbed Constable Bolton up around the legs

20  and tried to bite him in the leg.

21       Q    I thought you said that Officer Bolton tried

22  to get ahold of him?

23       A    He tried to reach down and grab ahold of his

24  hand.

25       Q    His hands?  By the wrist, by the elbow?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
154

```
 1        A    I can't tell that.
 2        Q    You couldn't tell that, okay.  What were you
 3   doing at that point?
 4        A    I've got the taser and I'm giving him a drive-
 5   stun.
 6        Q    How many drive-stuns did you give him?
 7        A    I don't recall at that point.
 8        Q    More than -- did you ever see the record of
 9   how many drive-stuns?
10        A    I went over the record, but I don't remember
11   how many taser pulls it was.
12        Q    Okay.  Where was the drive-stun placed on
13   Mr. Mills when you applied the drive-stun?
14        A    I don't recall.
15        Q    So you don't remember where you drive-stunned?
16   What were you -- where were you -- is that correct?  You
17   don't remember where -- what part of him?
18        A    Not the exact location now sitting here.  No,
19   I don't recall.
20        Q    Where were you trained to apply the
21   drive-stun?  Where you got your certification.
22        A    I believe they explained where to administer a
23   drive-stun.
24        Q    So you have no idea where you drive-stunned;
25   is that correct?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

155

1        A    I don't remember where I drive-stunned him at

2   that point, because he was all over the ground.  It was

3   nowhere in the face area, I know.

4        Q    On his neck?

5        A    I don't recall.

6        Q    At his heart?

7        A    I don't recall.

8        Q    How many times -- and you don't remember where

9   you drive-stunned him nor how many times; is that

10  correct?

11       A    Correct.

12       Q    In any of your interactions with the state

13  police, did they ask you how many times you

14  drive-stunned?

15       A    I don't remember.

16       Q    At any time in your interactions with the

17  state police, did they ask you where you drive-stunned

18  him?

19       A    I don't remember.

20       Q    Do you have any reason to believe the

21  drive-stun application of your taser gun was not

22  working?

23       A    No, sir.

24       Q    Did it make a sound?

25       A    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q       Describe for us the sound.

2       A       Like electricity popping.

3       Q       Yeah.   That's the sound you heard?

4       A       Yes, sir.

5       Q       Okay.   And that's the sound of an effective

6   taser?

7       A       Yes, sir.

8       Q       What's the next thing that happened, after you

9   applied the taser to some part of his body, that you can

10  remember?

11      A       He got Constable Bolton's legs wrapped up,

12  trying to bite him at the leg.

13      Q       You saw Officer Bolton doing that.   What did

14  you do?

15      A       While Mr. Mills is trying to bite Constable

16  Bolton and pull him to the ground, I'm drive-stunning

17  him with a taser to try to get him off Constable Bolton.

18      Q       But he wasn't on top of you.   He was still

19  flat on his back?

20      A       He had rolled over and grabbed Constable

21  Bolton around the legs, trying to bite him in the leg.

22      Q       Now he's on his side.   "He," meaning Mills,

23  right?

24      A       Correct.

25      Q       Was on his side?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Correct.

2    Q    You're drive-stunning him.  What's the next

3    thing he did?

4    A    That I done or he did?

5    Q    What did you do?

6    A    Are you asking me what I done next?

7    Q    Yes.  I'm asking you.

8    A    I just stated that I was drive-stunning him in

9    an attempt to get him free of Mr. Bolton's legs.

10    Q    And then I'm asking you:  What's the next

11    thing you did after drive-stunning him a number of times

12    you can't remember to the part of the body you can't

13    remember?

14    A    He came --

15    Q    What's the next thing you did?

16    A    He became free, swung fist like this, hit me

17    in the hand, hit the taser, and knocked the taser free

18    on the roadway.

19    Q    Okay.  And what's the next thing you did?  Was

20    he still on his side at that point?

21    A    He's still fighting on his -- on the ground.

22    Q    He isn't -- I'm asking what he was doing in

23    reference -- was he fighting you?

24    A    He was --

25    Q    He was doing --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

158

1      A    -- engaging with Constable Bolton --

2      Q    Engaging with Bolton.

3      A    -- and I just freed him from Constable Bolton.

4  Now he's back engaging me.

5      Q    How did you go about freeing him from

6  Officer Bolton?

7      A    With the drive-stun taser.

8      Q    He reacted to the drive-stun then?

9      A    Correct.  He spun around, knocking it out of

10  my hand.

11      Q    I see.  So it was a reaction to the drive-

12  stun.  Was it a deliberate act?

13      A    I don't know.

14      Q    All right.  Okay.  I didn't understand that.

15  So you drive-stun him a number of times.  After the

16  drive-stun, he reaches, his arm goes off in some kind

17  of -- we don't know either voluntarily or involuntary,

18  correct?  You don't know.

19      A    It looked like a swinging fist to me.

20      Q    Okay.  And to you, it was.  In your

21  certification with tasers, you know that it can force

22  involuntary reactions as well?

23      A    Correct.

24      Q    All right.  So he knocks it out of your hand

25  with -- was it his right hand or his left hand?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
159

1    A    I don't know.

2    Q    But it was your right hand?

3    A    It was my right hand.

4    Q    You're still standing but crouched, though?

5    A    Correct.

6    Q    What's the next thing you do?

7    A    Taser goes out on the roadway.

8    Q    Make you mad?

9    A    No, it didn't make me mad.  I was just trying

10   to effect the arrest.

11   Q    Okay.  You're still calm?

12   A    I'm still calm.

13   Q    Okay.  What's the next thing that happens?

14   A    I'm still giving verbal -- strong verbal

15   commands, "Stop fighting us, stop fighting us, get on

16   your stomach, put your hands behind your back."

17   Q    What's the next thing you do?

18   A    I pull my flashlight out.

19   Q    So after your flashlight -- the next item you

20   took out was your flash light?

21   A    Yes, sir.

22   Q    Am I correct in saying you took it out because

23   you intended to use it as a weapon?

24   A    Yes, sir.

25   Q    And that was consistent with your training as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
160

1    you understood it?

2         A    Yes, sir.

3         Q    And you -- that's the flashlight you said you

4    lost?

5         A    Yes, sir.

6         Q    Does the department have any record that your

7    aware of, other than your testimony, as to what that

8    flashlight was that you were carrying?

9         A    Like, do they have a paper record of it?

10        Q    Yeah.

11        A    No.

12        Q    So I'm I correct in saying -- well, is there

13   anybody else that -- in your department that ever saw

14   you use that flashlight?

15        A    Yes, sir.

16        Q    Who else saw you use the flashlight?

17        A    Any unit that was out with me at nighttime.

18        Q    Yeah?

19        A    Uh-huh.

20        Q    So other people saw you use that flash light?

21        A    To illuminate the darkness at nighttime, yes.

22        Q    And who could we contact in the department who

23   could describe that flashlight to us, other than perhaps

24   Constable Bolton?

25        A    Any unit that ever worked with me at night.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     And you don't remember where you bought it?

2      A     It was at a police store that sells MagLites.

It could have been --

4      Q     Again, there's different kinds of MagLites.

5 There's MagLites that are that long, MagLites that are

6 this long.

7      A     This is a standard LED police MagLite.

8      Q     All right.

9      Q     How long ago did you buy it?

10     A     I don't recall.

11     Q     Within a year of the incident?

12     A     I don't recall.  Like I said, I've had it for

13 a while.

14     Q     All right.  So you took out the flashlight

15 with the purpose of using it as a weapon?

16     A     Yes, sir.

17     Q     Correct?  Did you turn it on, or is it just

18 off the whole time?

19     A     It's illuminated.

20     Q     Automatically illuminated?  You don't have

21 to --

22     A     Pressure switch.

23     Q     Did you illuminate it?

24     A     I remember it being illuminated.

25     Q     I'm sorry, I don't understand.  Took the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
162

1   flashlight out.  Was it shinning when you took it out?

2       A    It's by muscle memory.  When that light comes

3   out, it's triggered -- triggers switch to illuminate.

4       Q    Automatically?

5       A    By pressure.

6       Q    Okay.  Did you put that pressure on it to

7   cause illumination?

8       A    I remember it being illuminated.

9       Q    Okay.  So you took it out with your right

10  hand, correct?

11      A    (No verbal response.)

12      Q    Well, which side of your belt do you carry the

13  flashlight on?

14      A    In the middle of my back in a loop.

15      Q    It could've been either?

16      A    Could have been either hand.

17      Q    You don't remember which hand?

18      A    (No verbal response.)

19      Q    And what did you do with the flashlight when

20  you picked it up -- when you took it out?

21      A    When Mr. Mills wouldn't let me get in a close

22  proximity of him to go hands-on, I administered two

23  strikes to his upper shoulder blade area in an attempt

24  to get him to stop.

25      Q    Was he on his side?  Was he -- which -- strike



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
163

1   that, please.  Which shoulder blade did you hit?

2        A    I don't recall which shoulder blade.

3        Q    Okay.  Did you have a clear shot of the

4   shoulder blade?

5        A    He was moving all over.

6        Q    Okay.  He wasn't on his back, otherwise you

7   couldn't hit his shoulder blade?

8        A    Correct.

9        Q    So he's either on his side or his stomach at

10  that point?

11       A    He was never on his stomach.

12       Q    He wasn't on his stomach?

13       A    No.

14       Q    Okay.  But you had a clear shot at the

15  shoulder blade?

16       A    Right in this area, yes.

17       Q    Oh, that's not the shoulder blade.  That's the

18  front shoulder.  Shoulder blade is in the back, right?

19       A    Well, this area right here if we are going to

20  be specific.

21       Q    Okay.  How many times did you hit him in his

22  shoulder blade?

23       A    I'm not sure.

24       Q    Can you approximate for us how many times you

25  used the flashlight to hit him in the shoulder blade?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
164

1    A    I know two strikes at that point.

2    Q    Where else did you hit him with the flashlight

3  at that point in time, other than in his shoulder blade?

4    A    I don't recall.

5    Q    And the reason you can't recall is because you

6  were so emotional that you don't have any memory of it?

7    A    No, I have memory of it.

8    Q    How many other times have you been involved in

9  striking people with your flashlight in the course of

10  your career, so many times that it just never makes a

11  reaction on you anymore?

12        MR. WILLIAMS:  Objection.  Argumentative.  You

13    can ask him all the questions you want to about when

14    he used his flashlight, but there's no sense to

15    argue with him about it.

16        MR. LOEVY:  I'll withdraw that question.

17  BY MR. LOEVY:

18    Q    How many times have you been involved in a

19  shooting where you killed somebody?

20    A    None, sir.

21        MR. WILLIAMS:  Object to the form.

22    Q    Just one.  Just this incident, correct?

23    A    Yes, sir.

24    Q    Okay.  And does that help your memory in terms

25  of how many times you hit him with the flashlight?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

165

1    A    During this altercation, I didn't count my
2  MagLite strikes.

3    Q    I didn't ask you if you counted.  I asked you
4  if it helped your memory as to how many times you struck
5  him with the flashlight, at this point in time.

6    A    No.  That doesn't help my memory.

7    Q    Okay.  So if witnesses said that he struck --
8  meaning you struck Mr. Mills with his flashlight ten
9  times, you couldn't disagree with that, because you have
10  no memory of it; is that correct?

11       MR. WILLIAMS:  Objection.  Facts not in
12    evidence, requires him to speculate.

13    Q    Could you disagree with any witness who
14  identified the number of times you used your flashlight
15  to strike Mr. Mills?

16    A    That's their testimony.

17    Q    Yeah, okay.  So at this point in time, he's on
18  his side, you're striking him with a flashlight.  What's
19  the next thing that happened?

20    A    He grabbed me around the legs and tried to
21  pull me on top of him.

22    Q    Was he still on his side when he grabbed you
23  by the waist?

24    A    He didn't grab me by the waist.  He grabbed me
25  around the legs.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

166

1    Q    Around the leg.  What portion of your legs did

2  he grab?

3    A    From the knee down.

4    Q    Okay.  And am I correct in saying he grabbed

5  you around the legs after you started hitting him with

6  the flashlight?

7    A    Yes, sir.

8    Q    Okay.  Did you think maybe it was a reaction

9  to my hitting him with my flashlight that he was

10  grabbing my legs?

11    A    No, sir.

12    Q    Okay.  So did he grab both legs or one leg?

13    A    My left leg.

14    Q    Okay.  Your left leg.  Was that with his right

15  arm or with his left arm?

16    A    I don't recall.  It could have been both arms.

17    Q    Grabbed you -- what portion of the legs did he

18  grab?

19    A    From the knee down.

20    Q    And did he pull you to the ground?

21    A    He attempted to pull me on top of him.

22    Q    My question -- I'm going to ask you again: Did

23  he pull you to the ground?

24    A    Down to where my other knee touched almost.

25    Q    Did he pull you to the ground?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
167

1    A    Not on top of him.

2    Q    He pulled you to his -- on top of him?

3    A    Not on top of him.  He attempted to pull me on

4  top of him.

5    Q    Now, let's take the question --

6    A    He bent my left knee down to where it was

7  bent.

8    Q    Okay.

9    A    I didn't fall or anything.

10    Q    That's understandable.

11    A    Okay.

12    Q    So he didn't pull you into the ground, and he

13  didn't pull you on top of him?

14    A    Correct.

15    Q    He pulled you to the extent that it bent your

16  knee?

17    A    Correct.

18    Q    What did you do then?

19    A    I began administering knee strikes to him to

20  get him to free my leg.

21    Q    What is a knee strike?

22    A    A knee strike is taught in PPCT Defensive

23  Tactics Training that you administer to a subject by

24  throwing your knee at him with the hard portion of your

25  knee.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

168

1    Q    Was it the knee that he was holding or the

2  other knee?

3    A    It was my right leg that I was throwing knees

4  with.

5    Q    Okay.  To what part of his body did you apply

6  the knee strike?

7    A    To the face and the head.

8    Q    Okay.  How many knee strikes did you apply to

9  the face and head?

10   A    Once again, I didn't count them.  Just until I

11 was free.

12   Q    Okay.  And were you able to make contact with

13 your knee?

14   A    Yes, sir.

15   Q    And that was consistent with your training?

16   A    Yes, sir.

17   Q    Okay.  Did you hit him in the nose, the eyes?

18   A    I don't recall.

19   Q    Do he make any sound when you hit him?

20   A    No, sir.

21   Q    Okay.  Hitting him three times with your knee

22 strike to her face or head, was it the front of his face

23 that you hit?

24   A    He had his face --

25        MR. WILLIAMS:  Object to the form of the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

169

1    question.

2        A    He had his face --

3            MR. LOEVY:  I'll withdraw it.  I'll withdraw

4    it.

5        Q    You said knee -- or face.  If it was face,

6    face includes eyes, nose, mouth; is that correct?

7        A    Correct.

8        Q    Okay.  So did that cause him to release your

9    knee?

10       A    Yes.

11       Q    So what happens -- happened after you struck

12   him with your knee three times in the face?

13           MR. WILLIAMS:  Object to the form.

14       Q    What's the next thing that happened?

15           MR. WILLIAMS:  You can answer.

16       A    He releases me, and I get -- I gain a little

17   bit of distance, where he can't grab ahold of me.  As

18   I'm coming up he knocked my MagLite out of my hand, or

19   my MagLite slid out of my hand, so I don't have that

20   anymore either.

21       Q    So he was within -- you got two, three feet

22   away, but he could reach you; is that correct, when he

23   knocked the MagLite out?

24       A    No, as I'm coming up getting free from him, my

25   MagLite came out of my hand.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  The same MagLite you'd been hitting him

2  with?

3    A    Yes.

4    Q    And what -- did he slap your hand?

5    A    I don't remember.  I just remember my MagLite

6  coming free during me trying to get up off of him.

7    Q    So that was the second weapon that he had

8  knocked away from you?

9    A    Yes, sir.

10    Q    Okay.  Was he still on his back or on his

11  side?

12    A    When the MagLite came free?

13    Q    Yes, sir.

14    A    When I get back up, he lays back on his back

15  with his legs up in the air.

16    Q    He wasn't kicking you any more, though?

17    A    He was attempting to, but when I gained

18  distance, he didn't.

19    Q    Yes, but the only kicks that happened were the

20  ones you already testified to at this point in time,

21  correct?

22    A    He never quit kicking or punching, but from

23  what I've testified to so far, yes.

24    Q    Okay.  He never actually kicked you, at this

25  point in time, other than the kicks that you first just

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

171

1 testified to?

2      A    He never quit kicking.

3      Q    That's not what I asked you.  He kicked you.

4 You -- was it you who he kicked?  The only kicks that

5 you received were the ones you already testified to.  I

6 understand you testified he was still kicking.

7      A    Correct.

8      Q    But he never hit you, other than those?

9      A    It was a close proximity fight, so body parts

10 were touching body parts.

11      Q    Did he hit you with his fists, up to this

12 point in time?

13      A    Not since he had knocked my taser out of my

14 hand by punching me in the hand.

15      Q    I know.  You testified to that.  Did he hit

16 you with his fist?

17      A    No.

18      Q    Okay.  Other than with the kicks that you've

19 already testified to, did he kick you up to this point?

20      A    I don't recall.

21      Q    Okay.  So now we're at the point that he

22 knocks the flashlight from your hand, correct?

23      A    Correct.

24      Q    What's the next thing that happens?

25      A    I pull my ASP out.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

172

1     Q     Okay.  Your ASP, does it take a mechanical

2  effort to extend it?

3     A     Yes, it does.

4     Q     Did you do that?

5     A     Yes, sir.

6     Q     Was that the first thing you did when you

7  pulled out the ASP?

8     A     Yes, sir.

9     Q     And can you tell us how long it would take

10  to -- strike that, please.  Do you know the make and

11  model of the ASP?

12     A     I don't.

13     Q     Still have it?

14     A     I do.

15     Q     Okay.  Would you show it at some point to your

16  counsel, please?

17     A     Sure.

18     Q     Okay.  How long was the ASP when you extended

19  it?

20          MR. WILLIAMS:  Are you asking for length of

21     time or length of the device?

22     Q     Oh, thank you.  Length of the ASP itself?

23     A     It's one of the shorter models.  It's probably

24  two-and-a-half feet, if that.

25     Q     All metal?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

173

1        A      Yes, sir.

2        Q      Is there any flexibility to the metal?

3        A      No, sir.

4        Q      And is that something you purchased on your

5    own or something that was purchased for you by the

6    Knox County Sheriff Police?

7        A      Issued by the department.

8        Q      Oh, it was an issue, unlike the flashlight?

9        A      Correct.

10       Q      Okay.  Thank you.  And was the Glock an issue,

11   too?

12       A      Issue.

13       Q      Thank you.

14              MR. WILLIAMS:  Counsel, would this be a good

15       place to take a brief lunch break?

16              MR. LOEVY:  If you don't mind, can you give me

17       another five or ten minutes just for continuity

18       purposes?

19              MR. WILLIAMS:  Sure.  No problem.

20              MR. LOEVY:  Thank you.  I appreciate it.

21   BY MR. LOEVY:

22       Q      So you were standing when you take --

23   activated the ASP --

24       A      Correct.

25       Q      -- correct?  He's still on his side?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

174

```
1       A    He's on his back at this point.

2       Q    "He," meaning Mills?

3       A    He's on his back.

4       Q    Okay.  What's the next thing that happens?

5       A    I'm still giving commands, "Stop.  Get on your

6   stomach, get on your stomach.  I will strike you with

7   this ASP.  Get on your stomach.  Put your hands behind

8   your back."

9       Q    And he doesn't do that?

10      A    No, sir.

11      Q    Still lies on his side?

12      A    On his back staring at me.

13      Q    Okay.  He's on his back staring at you.  What's

14  the next thing that happens?

15      A    He got his legs, kind of in a triangle

16  position, with his feet flat on the roadway, leaned up,

17  staring at me.

18      Q    Okay.  I'm sorry, but at this time, he's not

19  on his side anymore.  Now he's face down?

20      A    No, sir.  He's not face down, no.

21      Q    He's face up?  I understand.  That's my fault.

22  At this point in time he's flat on his back?

23      A    He's got his head -- or his head is off the

24  blacktop.  His back is on the pavement, and he has got

25  his legs at a triangle angle, where his feet are flat on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
175

1    the ground.

2         Q    Okay.  Thank you.  And I'm sorry.  I didn't

3    mean to --

4         A    That's fine.

5         Q    -- mislead you.  That was my mistake.  So he

6    is flat on his back in the way you just described?

7         A    Correct.

8         Q    What do you do?

9         A    I advised him that I will strike him with the

10   ASP if he doesn't roll over and put his hands behind his

11   back.

12        Q    And?

13        A    He disobeys.

14        Q    And what does he do?  Does he do anything?

15        A    He is still staring at me, just with his

16   fist -- fist clenched and just...

17        Q    You're not staring down at you, staring up at

18   you?

19        A    He's staring dead through me.

20        Q    Okay.

21        A    I strike him with the ASP in the common

22   peroneal area, which we're taught, which is the upper

23   thigh area.

24        Q    Do you recall, did you strike him in the upper

25   right thigh or upper left thigh?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

176

1      A      I don't recall which thigh it was.

2      Q      Okay.  And describe the gesture for us by

3    which you applied the ASP to him.  How do you do it?  Do

4    you do it like this?  Do you do it like that?   Show us

5    how you applied the ASP.

6      A      It would be in a motion of bringing it back

7    and throwing it down.

8      Q      Okay.  Hard as you can?

9      A      To stop -- as much force as you need to stop

10   the suspect.

11     Q      And that's as much as you had in you, right?

12     A      I don't want to say that.  It was enough force

13   that I thought was necessary to attempt to stop him.

14     Q      And that's really what I am asking.  Stopping

15   him from -- how much force are you going to use with

16   your arm?  Did you give it a full swing?

17     A      He got a full swing, yes, sir.

18     Q      Okay.  And what you were stopping him from is

19   resisting, getting over on his belly, and putting his

20   arms behind his back?

21     A      Yes, sir.

22     Q      Okay.  Did you strike any part of his body

23   other than his thigh?

24     A      Throughout the --

25     Q      With the ASP, at that point in time?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

177

| | | |
|---|---|---|
| 1 | A | During the altercation, he'd rolled over. |
| 2 | Q | After -- |
| 3 | A | Once again, moving around, and I had struck |

4  him again with the ASP.

5      Q    He starts moving around after the first ASP

6  hit?

7      A    Yes, when I start getting closer to him, he

8  starts kicking and trying to grab ahold of me again.

9      Q    Okay.  But he is still on his back?

10      A    He is still ground fighting.

11      Q    Okay.  How many times did you hit him with the

12  ASP?

13      A    I don't recall.

14      Q    More than six?

15      A    I don't recall.

16      Q    Could it have been more than six, but you just

17  can't remember?

18      A    Like I said, I didn't count.

19      Q    Well, maybe you didn't count, but you can't

20  even estimate the number of times?

21      A    More than three.

22      Q    More than three.  Less than ten?

23      A    More than three.

24      Q    Can't even say it was more than ten?

25      A    More than three is all I can say, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

178

1      Q     All right.  And always on the thigh or to

2  other parts of his body?

3      A     It did strike other parts of his body as we

4  were all moving around fighting.

5      Q     And what other parts of his body did you

6  strike, other than his thigh?

7      A     In the arm area.

8      Q     Any other parts of his body, other than the

9  thigh and upper arms?

10     A     I don't recall.

11     Q     What's the next thing that happened?

12     A     He is still not listening.  Commands are still

13  being given.

14     Q     He got on his knees?

15     A     No, I never said he was on his knees.

16     Q     I'm sorry.  I didn't hear you.  Say it again.

17     A     I said he is still not listening, verbal

18  commands are still being given.  He's still disobeying

19  all commands.

20     Q     Okay.

21     A     Everybody there is screaming at him to stop

22  fighting me.

23     Q     I'm asking what happened at this point?

24     A     I'm telling you what happened, I thought.

25     Q     Okay.  So everybody screaming.  He's not

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
179

1    responding?

2        A     Correct.

3        Q     **Then what happened?**

4        A     Then I stepped back, I stick my holst -- or my

5    baton into my pouch holder on my belt.  I pulled my gun

6    out and tell him to stop, roll over on your stomach,

7    quit fighting.  Everybody's screaming, telling him to

8    quit fighting, just listen to me.  At this point, I

9    re-holstered my gun.  I pulled my ASP back out.

10       Q     **When you say you re-holstered your gun,**

11   **when -- at what point did you take your gun out?  After**

12   **the ASP attack?**

13       A     Yes, sir.

14             MR. WILLIAMS:  Object to the form of question.

15             MR. LOEVY:  After -- and I withdraw.

16       Q     **Did you take your gun out after you hit him**

17   **with the ASP?**

18       A     Yes, sir.

19       Q     **Okay.  And what was your purpose in**

20   **removing -- that was a Glock?**

21       A     Correct.

22       Q     **What was your purpose in removing the Glock**

23   **while he was lying on the ground?**

24       A     Because I had been in a four minute or longer

25   altercation with this subject, and I already went



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

180

1   through my use of force continuum on all my intermediate

2   weapons, and that was my next weapon to use.

3       Q    Well, were you taught you should only remove

4   your weapon if you intend to use it?

5       A    No.

6       Q    Nobody taught you that.  Did you bring out

7   your weapon because you thought it would scare him?

8       A    It can be used as a verbal control -- by

9   visual control.

10      Q    How does the Glock -- the gun work as a verbal

11  control?

12      A    I meant visual.  I corrected myself after I

13  said verbal.

14      Q    Okay.  Did you tell him, "If you didn't stop

15  resisting, I'm going to shoot you"?

16      A    No, I never stated that at that point.

17      Q    Was that what you meant to convey, if you

18  don't stop resisting, I'm going to shoot you?

19      A    You could contend to it like that, yes.

20      Q    Okay.

21          MR. LOEVY:  Counsel, not the greatest time to

22      break, but I can do it.  If you'd like to break at

23      this time, that's fine, too.

24              (OFF THE RECORD)

25  BY MR. LOEVY:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

181

```
1        Q      So we're at a point in the dialogue when you

2   took out your gun.  You put the ASP back and took out

3   your gun.  Was in your right hand, I assume; is that

4   correct?

5        A      Correct.

6        Q      And did you point it at Mr. Mills?

7        A      I did.

8        Q      Okay.  How far away from him were you when you

9   pointed the gun?

10       A      Just a few feet.

11       Q      And did he see -- in your judgment, did he see

12  you pointing the gun at him?

13       A      Absolutely.  He was looking directly at me.

14       Q      So he would have seen the gun.  And what

15  words, if any, did you use when you pointed the gun at

16  him while he was on the ground?

17       A      "Please stop fighting, get on your stomach,

18  quit resisting, put your hands behind your back, stop."

19  Same commands I'd been giving the whole time we've been

20  fighting.

21       Q      And what, if anything, did he respond by words

22  at that point in time?

23       A      He just kept staring right through me.

24       Q      And did his actions -- physical actions

25  change?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

182

1    A    His demeanor was he was getting madder and

2  madder throughout the fight.

3    Q    Right.  Gun -- pointing the gun at him made

4  him madder?

5    A    He had just had a 1,000 yard stare.

6    Q    Yeah.  You said that a number of times to the

7  state police as well.  It's dark out, right?  Correct?

8    A    Correct.

9    Q    How many times in your life have you seen a

10  1,000 mile stare?

11    A    That's a word of saying here in East Kentucky.

12  It's not visually me looking 1,000 yards.

13    Q    Well, what did you mean by it when you told

14  the state police?

15    A    I meant he was staring directly through me,

16  like he was just looking somewhere else.

17    Q    Okay.  Not unusual, right, in Kentucky, to

18  have 1,000 mile stare?

19    A    Unusual to this -- yes, it's unusual.

20    Q    It is unusual?  Well, how many times have you

21  seen a person do this if it is unusual?

22    A    Intoxicated people I've dealt with on

23  complaints.

24    Q    Okay.  How long did you hold the gun on him

25  before you re-holstered?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

183

1      A      Just enough to -- I was winded.  Constable

2   Bolton was winded.  Probably 30 seconds, 45 seconds.

3      Q      And can you describe your physical symptoms of

4   being winded?

5      A      Just starting to get out of breath, fatigue.

6      Q      Sweating?

7      A      Sweating.

8      Q      Were you breathing heavy?

9      A      Not real heavy, no.

10     Q      Well, being winded, what would that prevent

11  you from doing?

12     A      Fatigue from being able to gain control of

13  somebody -- not having my energy.

14     Q      So did you catch your wind a little bit --

15     A      I did.

16     Q      -- after you pointed the gun?

17     A      I did.

18     Q      What's the next thing that happened?  He's

19  still on the ground, correct?

20     A      Correct.

21     Q      At the time you re-holster your weapon, is he

22  on his back, or is he on his side?

23     A      He's still in that stance that I described a

24  second ago.

25     Q      So he's on his side?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

184

1      A    He's on his back with his arched legs flat on

2  the ground.

3      Q    Okay.  So you must -- if you can see his

4  hair --

5      A    Had his head raised up like this staring at

6  me.

7      Q    If you could see his stare, you must have been

8  pretty darn close to him at night to see that?

9      A    The roadway was illuminated with several sets

10  of headlights.

11      Q    Okay.  But you could see that stare at that

12  point in time?

13      A    Yes.

14      Q    Even though he's on his -- strike that,

15  please.  Okay.  What's the next thing that happens?

16      A    I re-holster the gun.  I give him more

17  commands, "Get over on your stomach."

18      Q    He's non-responsive?

19      A    Non-responsive.  I strike him two more times

20  in the leg area.  He screamed.

21      Q    You say you -- using what?  What do you mean

22  you --

23      A    With my ASP.

24      Q    Okay.  I thought you put your ASP back?

25      A    When I re-holstered my gun, I pulled my ASP

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   back out.

2        Q    Okay.  So you re-holster, you take back your

3   ASP?

4        A    I step in.

5        Q    And how many times you hit him this time with

6   the ASP?

7        A    I struck him two times in the legs.

8        Q    Okay.  And that's to -- as a pain method to

9   get him to obey your --

10       A    Correct, which he is not feeling any pain.

11       Q    Okay.  And how does he react to being hit once

12  you hit three more times with the ASP in the leg?

13            MR. WILLIAMS:  Object to the form.  You can

14       answer.

15       A    He states, "When I get up from here, I'm going

16  to hurt you."

17       Q    That's the first time that he --

18       A    That's the first time he spoke.

19       Q    That's the first time he spoke, and that was

20  right after you hit him with the ASP in the leg, okay.

21  Did -- what else did he say?

22       A    That's it.  I stepped back, and he stands up.

23       Q    Okay.  And he stood up?

24       A    (No verbal response.)

25       Q    Okay.  At the time he then stands up, have you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

186

1  described all the efforts you have made, including pain

2  components, to get him to obey your instruction?

3      A    Yes, sir.

4      Q    All right.  He stands up, and is he facing you

5  when he stands up?

6      A    Facing me.

7      Q    Okay.  Where is the constable at the point he

8  stands up and faces you?

9      A    At a different angle facing him.

10     Q    I asked you before what kind of shirt he was

11  wearing.  What kind of pants was he wearing?

12     A    I don't recall.

13     Q    Okay.  You don't recall if he was wearing a

14  belt or had a belt?

15     A    I don't know.

16     Q    Recall if he had a waistband, an elastic

17  waistband?

18     A    I don't know.

19     Q    Were you looking to see if he had a weapon on

20  him?

21     A    Yes.

22     Q    Okay.  Where did you look?

23     A    Still watching his hands.

24     Q    Well, other than his hands, that's the only

25  place you looked was his hands?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
187

1    A    I'm still focusing on him.  I can visually
2  watch you up and down.

3    Q    Okay.  But you didn't look at his waist to see
4  if he had a gun there?

5    A    As I'm scanning him, I would have noticed a
6  gun sticking out, but I'm still focused on him, because
7  based on the way the fight is going --

8    Q    Question's a little bit different.  Did you
9  ever look at his waistband to see if he had a gun?

10   A    Yes.

11   Q    Okay.  And what did you see?

12   A    I don't remember seeing a gun.

13   Q    Okay.  Did his pants have pockets in them?

14   A    I don't know.

15   Q    Did you look to see if his pants had pockets?
16  I mean, even when you're hitting him with the ASP?

17   A    I don't remember paying attention to his
18  pockets as we're fighting.

19   Q    Did you check his pockets?

20   A    I don't recall.

21   Q    All right.  So what happens next?  He stands
22  up.  What's the next thing that happens?

23   A    I began to backpedal to get a distance between
24  me and him.

25   Q    You still have the ASP in your hand?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

188

1    A    I transitioned to my gun at this point.

2    Q    What point did you get -- that's the second

3    time you transitioned, correct?

4    A    Yes, sir.

5    Q    At what point did you do the transition to the

6    gun?

7    A    When he stood up.

8    Q    As soon as he stood up?

9    A    He made the statement, "When I get up I'm

10   going to hurt you."  When he started standing up, I

11   transitioned to my gun.

12   Q    After he stood up or as he was standing up?

13   A    As he's standing up, I'm transitioning.

14   Q    That meant putting your ASP in -- and tell me,

15   is your holster holding your Glock?

16   A    Correct, it is.

17   Q    Does the holster have a snap on it?

18   A    It's got retention.

19   Q    So you just pull it out.  You don't have to

20   snap...

21   A    You have to push a button and another button

22   it slides out.

23   Q    Two buttons to get it out.  At this time, when

24   you've reupholstered your weapon the first time, did it

25   reactivate that holster?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

189

```
 1      A    Yes.

 2      Q    Okay.  So you take the holster out, you take

 3   the gun out, second time, and you point it at him?

 4      A    I do.

 5      Q    Can you show us -- show the camera how you

 6   pointed the gun at him?

 7      A    Just like that.

 8      Q    All right.  The way you were taught at the

 9   academy?

10      A    Yes, sir.

11      Q    What's the next thing that happened or was

12   said?

13      A    As he stands up, he had his fist clenched.

14   He's staring dead at me.  He begins to take a pace

15   toward me.  I'm backpedaling.  I'm giving him commands

16   the whole time.

17      Q    How many pedals -- backpedals did you make?

18      A    I don't know.

19      Q    Five or six?

20      A    I don't know.  I'm just backpedaling to keep

21   the distance between us.

22      Q    What is the constable doing at that point in

23   time?

24      A    Standing out of it, standing away.

25      Q    Okay.  So you're backpedaling, he's got his
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  fists clenched.  What's the next thing that happened?

2  A  Everybody's yelling at him telling him to

3  stop.  Telling him just listen to me, to get on the

4  ground.  Giving him commands, "Get on the ground, get on

5  the ground.  If you get close to me, I will shoot you."

6  He never listens.  He began to take a fast pace toward

7  me.  He closes in within three or four feet, and I fired

8  two rounds.

9  Q  When he first stood up with his fists

10 clenched, how many feet away from you was he?

11 A  He was close to me, until I began to get a gap

12 between us.

13 Q  How close was he to you?

14 A  A couple feet.  Enough to grab me.

15 Q  And at that time you shot him, how many feet

16 away was he from you?

17 A  Three or four.

18 Q  And how many feet did you retreat?

19 A  Once I fired?

20 Q  Before you fired?

21 A  Several feet.  I backpedaled.

22 Q  How many?

23 A  I can't estimate it.

24 Q  Two feet?

25 A  I was watching him.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
191

1      Q      You can gauge or not how far back?

2      A      I don't recall how far we walked with me

3   walking backwards.  I just remember watching the gap

4   between us.

5      Q      And can you again demonstrate the position you

6   held the gun when you actually shot him.  Was it the

7   same?

8      A      Still the same.

9      Q      What portion of his body were you aiming for?

10     A      Center mass, the torso area.

11     Q      Upper --

12     A      Upper.

13     Q      Upper body mass.  And pursuant to your

14   training, you shot him, am I correct in saying, with the

15   intention of killing him?

16     A      With the intent to stop the threat, not to

17   kill.

18        MR. LOEVY:  Okay.  We can stop at this point,

19     Counsel.

20        MR. WILLIAMS:  Thank you.

21        VIDEOGRAPHER:  Okay.  The time is 12:50.  We

22     are off the record.

23          (OFF THE RECORD)

24        VIDEOGRAPHER:  The time is 1:39.  We are on the

25     record.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

192

```
1    BY MR. LOEVY:
2         Q    Deputy, in your experience as a Knox County
3    deputy, have you ever had the opportunity to call for
4    backup?
5         A    Yes, sir.
6         Q    Is that a regular occurrence or an unusual
7    occurrence for you in your service?
8         A    Unusual.
9         Q    How do you go about calling for backup?
10        A    I get on my radio and ask dispatch to send me
11   another unit.
12        Q    And can you do that from your radio that you
13   carry on your person?
14        A    Yes, sir.
15        Q    At any time before the shooting, did you
16   request backup?
17        A    Yes, sir.
18        Q    At what point in time did you request backup?
19        A    As soon as the altercation began.
20        Q    And where did you -- tell us what department
21   you requested backup from.
22        A    I didn't request any department.  I just
23   advised to send me more units.
24        Q    And when was it you...
25        A    (Sneezes.)
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

193

1      Q      Bless you.

2      A      Thank you.

3      Q      Do you need a Kleenex?

4      A      No.  I got choked up.  I'm good.

5      Q      Okay.  At what part in the altercation or

6   before did you request back up?

7      A      I believe it was right after the initial taser

8   shock when the altercation began.

9      Q      At what point in the altercation?  Before --

10  as soon as you arrived, did you request for it?

11     A      No.

12     Q      Before striking the baton, did you...

13     A      Right after the first taser strike.

14     Q      After he went down with the first taser shot?

15     A      Yes.

16     Q      But before you tried to institute an arrest?

17     A      When the altercation first began, after the

18  first taser shock strike is when I yelled for backup

19  over the --

20     Q      And who did you -- what channel did you go on,

21  and what did you say, how'd you do that?

22     A      With everything going on, all I had time to do

23  was grab the mic and say, "Send me more back up," or,

24  "Send me another unit."

25     Q      Send me more backup?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



602.589.2273 Phone
602.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
194

1        A     Send me another unit.

2        Q     And -- did we have a record of that I didn't

3    see it in the CAD scan?  Is there a time after the shots

4    were fired you went on the radio again, correct?

5        A     Correct.

6        Q     And what did you say at that time?

7        A     "Shots fired, send EMS, there's one suspect

8    down."

9        Q     Okay.  And am I correct in saying that

10   Mr. Mills was still breathing after he was shot?

11            MR. WILLIAMS:  Let me just make an objection.

12       Q     Was it your observation?

13       A     Yes.

14       Q     Okay.  For how long was he breathing?  Could

15   you tell anything?

16       A     I can't determine that.

17       Q     For how long did you observe him breathing?

18       A     I can't give a time, because about that time,

19   all the other units were arriving, and people were

20   scattering around.

21       Q     Did you observe him breathing prior to the

22   time that the medical people arrived?

23       A     Yes.

24       Q     Okay.  And so, there was this brief period of

25   time, am I my correct in saying, that you observed him

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   breathing before the medical people arrived?

2       A    Yes.

3       Q    At any time, did you offer any medical

4   assistance?

5       A    No, sir.

6       Q    At any time, did you observe the constable

7   offer any medical assistance?

8       A    No, sir.

9       Q    For what reason, if any, was there for not

10  offering medical assistance after the shooting took

11  place?

12      A    Dispatch had asked me about the suspect.  I

13  advised them all the information about him, that there

14  was two gunshot wounds.  I gave them all the info to

15  give to EMS that was on their way, and based on all the

16  blood, there was nothing that -- and I didn't have any

17  quick -- quick clots, that we call them, in my cruiser

18  or anything like that.  We're not issued that stuff, so

19  I didn't have anything to intervene with.

20      Q    Was blood covering his entire body?

21      A    It was on him.

22      MR. LOEVY:  What -- do we have other copies of

23      this?

24      COURT REPORTER:  Yes.

25      MR. LOEVY:  Thank you.  Just got to work them

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

196

1    all the way over there.

2          COURT REPORTER:  Here's the exhibit in this

3    pile.  I'll stick it over there.

4          MR. LOEVY:  Let's mark it as Exhibit 1.

5          (EXHIBIT 1 MARKED FOR IDENTIFICATION)

6          MR. WILLIAMS:  Take as much time as you need to

7    look at that.

8  BY MR. LOEVY:

9      Q   And I'll give you plenty of time for specific

10  questions, Deputy, but have you ever seen this document

11  before?

12      A   I have.

13      Q   Have you ever seen, if not this specific

14  document, but this information, in a form like this

15  before?

16      A   A CAD sheet?

17      Q   Yes.

18      A   Yes, sir.

19      Q   That's in the course of your --

20      A   Yes, sir.

21      Q   -- duties as a deputy.  What does CAD stand

22  for?

23      A   I am not sure what it stands for.

24      Q   Okay.  And this is an incident detail,

25  correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018
197

1    A    Yes, sir.

2    Q    Who was James Helton, if you know?

3    A    I believe he was the caller.

4    Q    And in the second major area, the "Scanned

5 call times, custody dispute."  Do you see that?

6    A    I do.

7    Q    And in the second issue, it is remarks,

8 "Jessie Mills lives in Road 4, Blackberry Lane."  Do you

9 see that?

10   A    I do.

11   Q    And then in the bottom one, it's under

12 "Narratives."  Do you see that?

13   A    I do.

14   Q    Okay.  Is there a unit number?  I see 105

15 and -- well, 105.  Do you see that?

16   A    I do.

17   Q    Looks like 80105.  Can you tell us what that

18 means?  For example, were you unit 105?

19   A    It's SO105, Sheriff's Office 105.

20   Q    That's another name -- thank you.

21   A    Stands for Sheriff's office.

22   Q    And what was your call number that night?

23   A    105.

24   Q    What does the SO stand for?

25   A    The Sheriff's Office.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

198

```
 1      Q      Sheriff's Office 105.  And what does NR stand
 2  for?
 3      A      En route.
 4      Q      Okay.  So and just taking it across, it says,
 5  "CHENS."  Do you see that?
 6      A      Yes, sir.
 7      Q      What does that stand for?
 8      A      I think that's the dispatcher that was
 9  dispatching.
10      Q      Okay.  And to you also dispatching?
11      A      Yes, sir.
12      Q      And is it your understanding, if you have such
13  an understanding, that when we see SO105, this
14  represents not statements that you are receiving, but
15  statements that you are giving?
16      A      Correct.  That's him logging me into the
17  computer on however their policy is they do it.
18      Q      So this is information that you have logged
19  in?
20      A      That they've logged in.  I'm separate from
21  dispatch.
22      Q      You're sending to dispatch?
23      A      No.  Dispatch has their own building and their
24  own computers.  They are doing this their selves, not
25  me.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

199

1    Q    This is not you?

2    A    No.  That's my unit number.  Dispatch is

3  entering all this information.  I have nothing to do

4  with this information getting entered, unless I actually

5  tell them something to log on the CAD.

6    Q    Is it your understanding, if you have such an

7  understanding, that it's a reflection of what you are

8  saying on the radio?

9    A    Correct.  Correct.

10   Q    And I understand that you're not creating

11  it --

12   A    Correct.

13   Q    -- but it reflects what you're saying.  So on

14  102 log BPDENR, that's something that you have sent to

15  dispatch, at least that's your understanding; is that

16  correct?

17   A    What is it now?

18   Q    Where it says, "BPDENR."

19   A    No.  That's not me.  That's Barbourville City

20  Police Department.

21   Q    Okay.  Where it says, "Male restrained,"

22  because it's again after SO105, is that something that

23  you sent to dispatch, or is that independent of you as

24  well?

25   A    That's independent to me as well.  I tried to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN MICHAEL ASHURST, taken on December 11, 2018

200

1   listen on the recording to see where that came from, and
2   it just sounds blurred, the recording, whenever you
3   listen to it.
4       Q      And then similarly for, "Shots fired one
5   suspect down," is that a reflection of what you said on
6   the radio?
7       A      Correct.
8       Q      Yes?
9       A      Yes.
10      Q      And, "Male restrained," is that a reflection
11  of what you said on the radio?
12      A      I never --
13          MR. WILLIAMS:   Asked and answered.   You can
14      answer.
15      Q      You never said that?
16      A      I never said that.   I even listened to the
17  recordings to try to see what it said.
18      Q      Even though it says -- it has your unit number
19  on it?
20      A      Correct.
21      Q      And you know what BPD stands for?
22      A      Barbourville Police Department.
23          (OFF-THE-RECORD DISCUSSION)
24  BY MR. LOEVY:
25      Q      Is there anything on this document, based on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com