# ARDENFORENSICS

**Jonathan L. Arden, MD**
President

Arden Forensics, PC
1390 Chain Bridge Road #105
McLean, VA 22101

703.749.0227 Office
703.563.6059 Fax
jlardenmd@ardenforensics.com
www.ardenforensics.com

25 July 2019

Elliot Slosar, Esq.
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607

**Report of Consultation**
**Re: Estate of Jessie J. Mills and Pearlie Sue Gambrel v. Knox County, et al.**
**(US District Court, Eastern District of Kentucky, London Division, No. 17-CV-184)**

Dear Mr. Slosar:

**Introduction**
I have prepared this expert witness report in accordance with the Federal Rules of Civil Procedure, Rule 26(a)(2)(B).

You have asked me to provide consultation in the field of forensic pathology, which I have practiced for approximately 35 years. After receiving my MD degree from the University of Michigan in 1980, I completed training in anatomic pathology at the New York University Medical Center (1980-1983) and in forensic pathology at the Office of the Chief Medical Examiner for the State of Maryland (1983-1984). I have been certified in both anatomic and forensic pathology by the American Board of Pathology since 1985. I am currently licensed to practice medicine in four states. I spent most of my career as a government-employed medical examiner, including nine years with the Office of Chief Medical Examiner for the City of New York where I finished as First Deputy Chief Medical Examiner, and more than five years as the Chief Medical Examiner of Washington, DC. I am currently President of Arden Forensics, PC, a consulting practice in forensic pathology and medicine, and I hold a part-time appointment as a Forensic Pathologist in the Office of the Chief Medical Examiner for the State of West Virginia. My full *curriculum vitae*, including list of publications, is attached.

I have testified as an expert witness in various state and federal courts, as well as in grand juries and depositions, a total of more than 900 times. A log of my testimonial appearances for the past four years is attached.

My fees are $550.00 per hour for review of materials and consultation, and $5,500.00 per day for court testimony. My full fee schedule is attached. My fees are not contingent upon the outcome of any case in which I consult.





Re: Gambrel (Estate of Jessie Mills) v. Knox Co., et al., Report of Dr. Arden, 7/25/2019

**Materials Reviewed**
I have reviewed the following materials regarding the above-captioned case:
- Kentucky State Police ("KSP") Investigative File, Incident No. KY 10-16-0509 (included within are the autopsy report and toxicology report for Jessie Mills);
- KSP witness interviews;
- KSP crime scene and autopsy photographs;
- Autopsy photographs of Jessie Mills from the medical examiner;
- Postmortem radiographs ("X-rays") of Jessie Mills from the medical examiner;
- Additional interviews and statements, of Ricky Hobbs and Melinda Smith;
- Transcript of Deposition of John Michael Ashurst, with video;
- Transcript of Deposition of Brandon Bolton, with video;
- Transcript of Deposition of Ricky Hobbs, with video;
- Transcript of Deposition of James Helton;
- Transcript of Deposition of Keith Barrett;
- Transcript of Deposition of Melinda Smith;
- Transcript of Deposition of Meredith Frame;
- Transcript of Deposition of Randy Surber;
- Transcript of Deposition of Steve Owens;
- Photographs of the officers; and
- First Amended Complaint.

I have also relied upon my education, training, knowledge and experience as a physician, forensic pathologist and a medical examiner.

**Synopsis of Pertinent Facts**
Jessie Mills was a 30-year-old man who was shot and killed in an encounter with law enforcement in Knox County, KY, on 6/29/2016. Mr. Mills had come to the home of James Helton and his wife, who had custody of their grandchildren, who were the children of Mr. Mills and the Heltons' daughter. Reportedly, Mr. Mills took one of the children and drove off in his vehicle, with Mr. Helton in pursuit. A short distance down the road, Mr. Mills's vehicle stopped (apparently having run out of gas); Mr. Mills asked for assistance from Ricky Hobbs, who was also a friend of Mr. Helton. Then, Mr. Mills began to walk down the road carrying the child; Mr. Hobbs walked with him. Mr. Hobbs later recounted to the police that he believed that Mr. Mills was under the influence of methamphetamine (and law enforcement later was concerned that he may have been under the influence of one of the newer synthetic stimulant drugs). Various descriptions were offered of Mr. Mills appearing to be incoherent or irrational. Law enforcement responded to investigate, in the persons of Knox County Sheriff's Deputy John Ashurst and Constable Brandon Bolton. The officers attempted to intervene to take custody of the child. The accounts of that encounter differ.

The officers' accounts centered on Mr. Mills not complying with their commands to stop and surrender the child, nor to permit the officers to detain and handcuff Mr. Mills. They described that after initiating contact with Mr. Mills, they were able to remove the child from his grip, and return the child to the waiting Mr. Helton, who was nearby to the scene. They further described that when they attempted to take Mr. Mills into custody, he resisted their efforts, including that he would not turn onto his front while on the ground and put his hands behind his back to be handcuffed. They said that he struggled and fought them, including throwing punches, kicking at them, and even biting one on the boot. They employed strikes with their fists, flashlights and ASP batons. Mr. Ashurst discharged his Taser on Mr. Mills, and later Mr. Ashurst and Mr. Bolton each said they used the same Taser in drive stun mode on Mr. Mills. By their accounts,

2

Re: Gambrel (Estate of Jessie Mills) v. Knox Co., et al., Report of Dr. Arden, 7/25/2019

Mr. Ashurst drew his pistol on Mr. Mills once, but holstered it and they tried again to control him with strikes and physical restraint, unsuccessfully. Finally, Mr. Mills got to his feet, and Mr. Ashurst again drew his weapon, and informed Mr. Mills that if he did not comply, he would shoot him. Reportedly, Mr. Mills advanced (sometimes described as running) directly at Mr. Ashurst, who was backpedaling to maintain a distance between them. When Mr. Mills allegedly came too close, Mr. Ashurst shot him twice. In his deposition, Mr. Ashurst indicated that Mr. Mills was either "just a few feet" (Tr., at p. 181) or within 3 to 4 feet (Tr., at p. 190) when he fired. Mr. Ashurst demonstrated in the video of his deposition that he used a shooting stance with the gun in both hands with the arms extended forward, slightly below the level of his shoulders. Mr. Bolton characterized the distance between Mr. Ashurst and Mr. Mills as "maybe 4 feet" (Tr., at p. 49) when the shots were fired.

Mr. Hobbs described a different scenario of the events surrounding the shooting. He indicated that as the officers were walking behind Mr. Mills catching up to him at the beginning of the encounter, Mr. Ashurst swung his flashlight and struck Mr. Mills hard in the back of the head, causing him to fall to the ground. Mr. Bolton was able to catch the child before hitting the ground, and carried the child back to Mr. Helton. Mr. Hobbs recounted that the two officers proceeded to strike and kick Mr. Mills, including use of batons and flashlights, repeatedly while he was on the ground. He said that Mr. Mills only made one slight attempt to kick at the officers, but otherwise gave no resistance or fought back. He recounted that when Mr. Mills stood up, he was not advancing on the officer, but Mr. Ashurst shot him once lower in the body (Mr. Hobbs thought in his leg) such that Mr. Mills stooped over, and when he raised back up again, Mr. Ashurst shot him again, at which time Mr. Mills fell to the ground and died. He was pronounced dead on the scene at 11:58 PM, 6/29/2016.

An autopsy was performed on Mr. Mills on 6/30/2016 by the KY state medical examiner's office. The autopsy demonstrated that Mr. Mills had two gunshot wounds, multiple other blunt impact injuries to various parts of his body, and two Taser probes in his back; these various injuries were described in the autopsy report and depicted in the autopsy photographs and radiographs. He had a gunshot wound to the chest, just left of the midline (i.e., vertical line in the center) that entered the body, damaged the heart, stomach, liver, spleen and pancreas; the bullet was recovered from the left side of the back. The wound trajectory was described as downward, backward and to the left. The other gunshot wound was to the left upper abdomen, which entered the body and injured intestines, the left psoas muscle (that runs adjacent to the lower spinal column and into the pelvis) and the left side of the pelvis; this bullet was described as being recovered in the "left hip." Its trajectory was described as "predominantly backward and to the left." No gunpowder residues (i.e., soot or stippling) were found on the skin surfaces associated with the entrance wounds, nor was any described on the overlying clothing. The autopsy also documented numerous areas of abrasions, lacerations and contusions of the body (discussed in greater detail below). Taser probes with their wires were embedded in the middle and upper back, with underlying soft tissue hemorrhage at those sites; no other burns consistent with the application of the Taser were found. On postmortem toxicological analysis, an autopsy sample of blood from Mr. Mills contained no alcohol and no drugs; testing for amphetamines, cocaine, phencyclidine and "stimulants" were all negative. His urine did contain methamphetamine, a benzodiazepine sedative, and a marijuana metabolite, but no cocaine or phencyclidine. The cause of death of Mr. Mills was certified as "gunshot wounds of the chest and abdomen (2)" and the manner of death as homicide.

**Analysis and Opinions**
I shall address the autopsy, injuries, toxicology analysis, and certification of the cause and manner of death of Mr. Mills. I shall concentrate primarily on the injuries to Mr. Mills, in

3

Re: Gambrel (Estate of Jessie Mills) v. Knox Co., et al., Report of Dr. Arden, 7/25/2019

particular their consistency (or lack thereof) with the various accounts of the encounter between Mr. Mills and law enforcement.

Mr. Mills had multiple patterned contusions, especially on his extremities, either parallel lines of bruising (that sometimes converged at the ends) with a spared (i.e., uninjured) area between the lines, or elongated linear bruises. These patterns are indicative of strikes with an elongated cylindrical object; examples include a baton and a flashlight. These injuries are highly consistent with the accounts that Mr. Mills was struck by such objects. In addition, Mr. Hobbs described that the officers punched and kicked Mr. Mills, and he did also have nondescript (i.e., not patterned) injuries, as well, also consistent with being punched or kicked. He had a laceration to his left temple, which would be accessible to being kicked if he were lying face-up on the ground, as was one of the things described by Mr. Hobbs. I also note that Mr. Mills had a laceration across the back of his head, which corresponds to the account offered by Mr. Hobbs, that the encounter began when the officer struck Mr. Mills forcefully in the back of the head from behind with his flashlight.

Another theme in the accounts of these events was that the behavior of Mr. Mills was thought to represent his intoxication by methamphetamine, or possibly some other stimulant drug. However, his autopsy blood contained no amphetamines, nor any other stimulant drugs, so he was not under the influence of those drugs at the time he was shot. (The blood testing for "stimulant drugs" likely would have detected the synthetic drug that law enforcement also suspected. Although the KSP reports indicated that they were informed by the toxicology laboratory that such testing would require a separate request, the medical examiner testified at deposition that those drugs would have been detected by the test panels requested for this autopsy.) The autopsy urine specimen did contain methamphetamine and other drugs, but drugs found in urine have already been excreted, and therefore only represent something that was previously in the blood, but cannot be construed to indicate that a person was under the influence of those drugs at the time of death (absent also finding them in the blood).

A Taser was deployed on Mr. Mills. The prongs struck him and embedded, leaving characteristic injuries. Both Mr. Ashurst and Mr. Bolton said that they each subsequently used that same Taser on Mr. Mills in the drive stun mode, in which the cartridge is removed and the underlying electrodes are applied directly to the skin. Drive stun application typically causes small, patterned burns in the configuration of the electrodes, which were not present on Mr. Mills, so that part of the accounts of the officers is not corroborated by the evidence.

I shall now discuss the gunshot wounds to Mr. Mills. He had two gunshot wounds to the front of his torso, one in the chest and one in the abdomen. The officers described that Mr. Mills advanced rapidly on foot at Mr. Ashurst, and when he closed to within about four feet, Mr. Ashurst shot twice. Mr. Ashurst specified in his deposition that Mr. Mills was facing him when approaching him and when he fired. Mr. Hobbs placed the distance between the two men at the time of the shots as either a couple of feet, or 6-8 feet. In any case, most accounts have the distance at four feet or greater, which is consistent with the absence of deposition of gunpowder residues on the clothing or the skin surfaces. The absence of soot or stippling indicates that Mr. Mills was not in close proximity, i.e., within about two feet, so he was not within arm's reach of Mr. Ashurst when he was shot.

The trajectories of the two gunshot wounds were distinctly different from one another. Therefore, since the trajectory of a gunshot wound is the direction of the path of the bullet in the body, the orientation, or relative positioning, between the gun and the body had to be different for the two shots. The trajectory of the gunshot wound is determined by the relative positioning

4

Re: Gambrel (Estate of Jessie Mills) v. Knox Co., et al., Report of Dr. Arden, 7/25/2019

between the gun and the body. The gun must be aimed at the entrance wound location, and angled such that a straight-line path from the muzzle to the entrance wound continues internally along the known path and direction of the wound. (Wound trajectories are, by convention, described relative to the body in "normal anatomical position," which is imagining the body standing upright, facing the observer, with the arms at the sides and the palms facing forward. In this context, all directions – forward, backward, left and right - are those of the decedent's body; up is toward the head, and down is toward the feet.) In fact, the trajectories of these gunshot wounds are not consistent with the account of the shooting given by Mr. Ashurst. Mr. Ashurst demonstrated at deposition that he assumed a shooting stance with his gun slightly below his shoulder height, aimed forward, away from him. He further said that Mr. Mills was coming at him, facing him. With those relative positions, the gunshot wound to the abdomen would have a downward component to its trajectory (from almost at Mr. Ashurst's shoulders, to Mr. Mills's abdomen, assuming both were standing upright, as Mr. Ashurst described) but the autopsy showed that this bullet traveled backward and to the left, with no appreciable downward (or upward) component described in the autopsy report, or demonstrated by photographs or radiographs. Therefore, this wound trajectory is not consistent with the account offered by Mr. Ashurst. The gunshot wound to the chest had a distinctly different trajectory, in that although it proceeded backward and downward (which components could be consistent with his account), it also traveled sharply to his left, to involve his stomach, spleen and pancreas, coming to rest in the left side of his back, as described in the autopsy report, or demonstrated by photographs or radiographs. The marked leftward component of this wound trajectory is inconsistent with Mr. Mills facing Mr. Ashurst at the time of the shot, so it is also inconsistent with the account offered by the officers. The leftward component of the trajectories, especially the more sharply leftward direction of the gunshot wound to the chest, indicate that the gun had to be positioned to the right side of the front of Mr. Mills when he was shot; this could be accomplished either by the shooter standing to his right, or by him turning to his left, but either scenario is inconsistent with Mr. Mills directly facing and advancing on Mr. Ashurst when he was shot. The account of the shooting offered by Mr. Hobbs is not very detailed, but it does include Mr. Mills stooping down after the first shot, and then being shot again after raising up. Although this description does not include the precise relative positionings of the two men, it does insert an element of movement between shots, which, in generality presents a condition that may explain the different trajectories between the two wounds.

All opinions are expressed with reasonable medical certainty. I reserve the right to amend any statements or opinions if presented with additional significant information, as well as the right to rebut opinions expressed within my areas of expertise.

Yours truly,
Arden Forensics, PC

*[signature]*

By: Jonathan L. Arden, MD, F-NAME, FCAP
    President