**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

| | | |
|---|---|---|
| The Estate of JESSIE MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-CV-184 |
| | ) | |
| v. | ) | Hon.  ROBERT E. WIER |
| | ) | |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

# EXHIBIT 6



LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO. 6:17-CV-00184-REW**

# THE ESTATE OF JESSIE J. MILLS, EX. REL.

# PERSONAL REPRESENTATIVE, PEARLIE SUE GAMBREL

# V.

# KNOX COUNTY, ET AL.

# DEPONENT:

# GENEVA HELTON

# DATE:

# June 21, 2019



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF KENTUCKY

3               SOUTHERN DIVISION AT LONDON

4               CASE NO: 6:17-CV-00184-REW

5

6       THE ESTATE OF JESSIE J. MILLS, EX. REL.

7            PERSONAL REPRESENTATIVE,

8             PEARLIE SUE GAMBREL,

9                PLAINTIFFS

10

11                     V.

12

13           KNOX COUNTY, KNOX COUNTY

14        SHERIFF'S DEPARTMENT OFFICER IN HIS

15       INDIVIDUAL CAPACITY, MIKEY ASHURST,

16      KNOX COUNTY CONSTABLE BRANDON BOLTON,

17         IN HIS INDIVIDUAL CAPACITY,

18              DEFENDANTS

19

20

21

22

23 DEPONENT: GENEVA HELTON

24 DATE:      JUNE 21, 2019

25 REPORTER: HANNAH DAUGHERTY

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

1
2
3   ON BEHALF OF THE PLAINTIFFS, THE ESTATE OF
4   JESSIE J. MILLS, EX. REL. PERSONAL RESPRESENTATIVE,
5   PEARLIE SUE GAMBREL:
6   AMY ROBINSON-STAPLES
7   LOEVY & LOEVY
8   311 NORTH ABERDEEN STREET
9   THIRD FLOOR
10  CHICAGO, ILLINOIS 60607
11  TELEPHONE NO.: (312) 243-5900
12  E-MAIL: AMY@LOEVY.COM
13
14  ON BEHALF OF THE DEFENDANTS, KNOX COUNTY, KNOX COUNTY
15  SHERIFF'S DEPARTMENT OFFICER IN HIS INDIVIDUAL CAPACITY,
16  MIKEY ASHURST, KNOX COUNTY CONSTABLE BRANDON BOLTON, IN
17  HIS INDIVIDUAL CAPACITY:
18  JOHN KELLEY
19  WILLIAMS FARMER & TOWE
20  303 SOUTH MAIN STREET
21  LONDON, KENTUCKY 40741
22  TELEPHONE NO.: (606) 877-5291
23  E-MAIL: JOHN@WFTLAW.COM
24
25  ALSO PRESENT: STEPHANIE NALLEY, VIDEOGRAPHER

Page 3

INDEX

1
2                                                   Page
3   PROCEEDINGS                                       5
4   DIRECT EXAMINATION BY MR. KELLEY                  6
5   CROSS EXAMINATION BY MS. ROBINSON-STAPLES        54
6
7                       EXHIBITS
8                                                   Page
9   1  CUSTODY ORDER INVOLVING WITNESS              12
10  2  LATER CUSTODY ORDER INVOLVING WITNESS        16
11  3  GOOGLE EARTH PHOTO OF MOORES CREEK RD        40
12  4  PETITION ON BEHALF OF THE ESTATE OF
13     JESSIE MILLS                                 50
14  5  SUBPEONA FOR APPEARANCE                      53
15
16
17
18
19
20
21
22
23
24
25

Page 4

STIPULATION

1
2
3   The VIDEO deposition of GENEVA HELTON taken at WILLIAMS
4   & TOWE LAW GROUP, PLLC, 303 SOUTH MAIN STREET, LONDON,
5   KENTUCKY 40741 on FRIDAY, the 21st day of JUNE 2019 at
6   approximately 10:02 a.m.; said VIDEO deposition was
7   taken pursuant to the FEDERAL Rules of Civil Procedure.
8
9   It is agreed that HANNAH DAUGHERTY, being a Notary
10  Public and Court Reporter for the State of KENTUCKY, may
11  swear the witness.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

PROCEEDINGS

1
2
3       VIDEOGRAPHER:  My name is Stephanie Nalley.
4   I'm the videographer today, and Hannah Daugherty is
5   the court reporter.  Today is the 21st day of June
6   2019. The time is now 10:01 a.m. We're at the
7   offices of Williams & Towel Law Group, PLLC, to take
8   the deposition of Geneva Helton in the matter of
9   Pearlie Sue Gambrel as administrator of the estate
10  of Jessie Mills versus Knox County et al.  Pending
11  in the United States District Court, case number
12  617-CV-00184.  Will counsel please identify
13  themselves for the record?
14      MR. KELLEY:  My name is John Kelley.  I'm here
15  on behalf of Deputy Mikey Ashurst, Constable Brandon
16  Bolton, and Knox County, all of whom are defendants
17  in this lawsuit.
18      MS. ROBINSON-STAPLES:  Amy Robinson-Staples for
19  the plaintiff, Pearlie Sue Gambrel.
20      VIDEOGRAPHER:  Okay.  Ms. Helton, would you
21  please raise your right hand to be sworn in by the
22  reporter?
23      COURT REPORTER:  Do you solemnly swear or
24  affirm that the testimony you're about to give will
25  be the truth, the whole truth, and nothing but the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1    truth?
2        THE WITNESS:  I do.
3        COURT REPORTER:  Thank you.
4              DIRECT EXAMINATION
5    BY MR. KELLEY:
6    Q    Would you state your name, please?
7    A    Geneva Helton.
8    Q    All right.  Ms. Helton we met briefly before
9    this deposition.  We talked on the phone as well.  But
10   my purpose today is to take your deposition.  That's a
11   fancy way of saying that we -- I wanted to preserve your
12   testimony under oath concerning an incident that
13   occurred way back in June 2016.  But before I get
14   started, I'm assuming that you've never had to give a
15   deposition before.
16   A    No.
17   Q    Okay.  For the attorneys here, it's, like, on,
18   off the wall.  It gets pretty easy.  But I know this
19   can be pretty intimidating.  Please relax.  Nobody is
20   here to give you the third degree or anything like that.
21   But there are a few rules I think we both should follow.
22   First of all, if I ask you a question either you didn't
23   hear me or I've just totally garbled the question and
24   you don't understand what I'm asking, please stop me and
25   tell me I -- give me a better question than that.  And

Page 7

1    another thing that's important, though the deposition is
2    being videotaped it's important that I have a good
3    written record.  So, if you can give me some kind of
4    verbal answer, yes, no, I don't know.  Try to avoid
5    nodding your head.  I do it, too, so -- but I may --
6    A    Yep.
7    Q    -- what -- if I ask you to repeat an answer,
8    it's for that reason.  I'm not here to -- another thing
9    that's -- people do all the time is say uh-huh and
10   uh-uh.  And I'll probably ask you to say whether that was
11   a yes or no.
12   A    Okay.
13   Q    And then lastly, and you're doing pretty good.
14   If you'll let me finish my question before you answer.
15   I hopefully will show you the same courtesy and let you
16   finish your answer before I ask you another question.
17   Now, Ms. Staples is here representing Mr. Mill's estate.
18   She may have objections to some of my questions.  Let
19   her go ahead and state her objection.  And probably I'll
20   ask you to continue with your answer nevertheless, but
21   she just wants to preserve that objection for later if
22   it comes up in court, okay?  So, all those rules okay
23   with you?
24   A    Fine with me.
25   Q    All right.  Now, where do you presently live?

Page 8

1    A    3582 Moores Creek Road.
2    Q    All right.  How long have you lived there?
3    Your husband --
4    A    About 45, 50 years.
5    Q    That's what's your husband said, so -- we --
6    your husband is James Helton; is that correct?
7    A    Yes, sir.
8    Q    And I think you probably know that he's
9    already given a deposition in this case?
10   A    Yes, sir.
11   Q    Okay.  Now, who presently lives at your house?
12   And we're going to talk about your grandchildren, but
13   when we put it in the record or use it, abbreviate it as
14   an initial, okay?
15   A    Okay.
16   Q    So go ahead and talk freely and name your
17   childrenbut realize that the written record won't
18   contain that.
19   A    Okay.  It's myself, my husband, the four
20   kids -- five kids.  And that's it.
21   Q    Okay.  Let me back up.  I meant to ask you
22   this before.  You and your husband have children; is
23   that correct?
24   A    Yes.
25   Q    I'm talking about not only grandchildren but

Page 9

1    children, right?
2    A    Yes, sir.
3    Q    Okay.  How many children do you have?
4    A    Four.
5    Q    All right.  Can you give me their names?
6    A    Kristy, James Allen, Amanda, and Whitney.
7    Q    Okay.  Now, are your children all grown?
8    A    Yes, sir.
9    Q    All right.  Do any of them live at your house?
10   A    No, sir.
11   Q    All right.  We're going to be talking about an
12   incident that occurred in June of 2016.  I assume that
13   you and your grandchildren were living -- living there
14   then; is that right?
15   A    Yes, sir.
16   Q    Okay.  And of course your husband?
17   A    Yes, sir.
18   Q    All right.  Was anybody else living there
19   besides --
20   A    No, sir.
21   Q    Okay.  In other words, all your children had
22   left the house -- home by then; is that right?
23   A    Yes, sir.
24   Q    All right.  I'm particularly interested in --
25   you have a daughter named Whitney; is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    A    Yes, sir.
2    Q    All right.  And it's my understanding that the
3   grandchildren that live at your house or at least four
4   of them are her children; is that right?
5    A    Yes, sir.
6    Q    All right.  Was Whitney with her children as
7   far back as 2016 when this incident happened?
8    A    No, sir.
9    Q    Okay.  All right.  I will ask you questions in
10  a minute about who had custody of the children in just a
11  second.
12   A    Okay, sir.
13   Q    All right.  Can you tell me your -- the
14  grandchildren that live at your house now, what are
15  their names and ages?
16   A    J.M., he's 11.  R.M., she's 8.  C.M., he's
17  seven.  M.M., she's 5.  And T.L., he's 18 months.
18   Q    Okay.  T. is not a child -- who is the father
19  of the children you've mentioned?
20   A    The four, oldest ones J., R., C., and M.,
21  they're Jessie Mills'.  T. belongs to someone else.
22   Q    Okay.  I assume Timothy had not been born back
23  then?
24   A    No, he hadn't.
25   Q    Okay.  Now are you the custodian -- do have

Page 11

1   custody of Whitney and Jessie's kids?
2    A    Yes, sir.
3    Q    All right.  I meant to ask, was -- was Whitney
4   married to -- to Jessie?
5    A    Yes, sir.
6    Q    All right.  And can you tell me -- would you
7   remember when they were married?  What year?
8    A    No, I don't remember.
9    Q    Have they --
10   A    Maybe 2007.
11   Q    Okay.  Were they still married up in -- to
12  June of 2016?
13   A    Yes, sir.
14   Q    Okay.  So, they were -- they were never
15  divorced?
16   A    No, sir.
17   Q    Okay.  At -- at the time of Jessie James' --
18  Jessie James Mills, at the time of his death in June of
19  2016, were they still married?
20   A    Yes, sir.
21   Q    How did you come to be the custody --
22  custodian of the children?  I'm not asking legally.  I'm
23  asking what happened to their marriage that you came to
24  have the children or what happened to them?
25   A    Well, neither parent was taking care of the

Page 12

1   kids.  They were on dope.
2    Q    Okay.
3    A    And now, my grandkids, I wouldn't let them go
4   through that.  So, I called a social worker, turned them
5   in.
6    Q    Okay.  And approximately, when did that --
7   when did they start having trouble?  What year; do you
8   remember?
9    A    I want to say it was -- let's see.  Maybe
10  around 2009.
11   Q    All right.  Did you ultimately hire an
12  attorney?
13   A    Yes, sir.
14   Q    To help you with getting custody of these
15  children?
16   A    Yes, sir.
17   Q    And who was that attorney?
18   A    David Mills.
19   Q    Okay.  He's an attorney in Barbourville?
20   A    Yes, sir.
21   Q    Okay.  Let me show you -- and this is what I'm
22  going to have admitted.  It is one that blacks out the
23  children's names.  But we'll make that Exhibit 1 to the
24  deposition.  What I'm showing has -- did -- with the
25  help of your attorney, Mr. Mills, did you file a custody

Page 13

1   action in the Knox Circuit Court?
2        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
3    A    Yes, sir.
4    Q    All right.  What I'm asking you to look at as
5   Exhibit 1 is an order entered in a loss -- in a custody
6   action brought by Geneva and James Helton versus
7   Whitney Mills and Jessie James Mills; is that correct?
8    A    Yes, sir.
9    Q    Okay.  And it mentions the three minor
10  children at that time.  At least this order does.  In
11  particular J., R. and C.  Are you familiar -- were you
12  aware of this order being entered?
13   A    Yes, sir.
14   Q    Okay.  Have you seen this order before?
15   A    Yeah.  I think I have.  I think I got one like
16  it.
17   Q    Okay.  Look at paragraph number 2.  It talks
18  about the respondent parents and by that, it means
19  Whitney and Jessie James Mills.  Says they were served
20  with summons.  That tells them that they were notified
21  of the lawsuit.  And they failed to respond in default
22  in these proceedings.  So, in other words, it looks like
23  the action was filed in 2012, and the order in front of
24  you is July of 2013.  Did -- were you aware of Jessie
25  and Whitney -- did they ever talk to you about this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 14

1  lawsuit or come --
2      A    Yes.
3      Q    Okay.  Would it -- what were their concerns
4  back then or did they -- what did they say back then?
5      A    They just wouldn't go.
6      Q    Okay.  All right.  When you say "go," where
7  were they supposed to go?
8      A    They wouldn't -- when I went to court, they
9  wouldn't go to court.
10     Q    Okay.  Did they tell you why?
11     A    No.
12     Q    Okay.  Look over on the next page if you
13  would.  It says -- if you look at paragraph number 4, it
14  says, "Petitioners are hereby declared defacto
15  custodians of the minor children."  Defacto is a legal
16  term meaning that you're the actual ones -- the one that
17  actually day to day taking care of these kids; is that
18  true?
19     A    Yes, sir.
20     Q    And it extends back at least to 2012; is that
21  right?
22     A    Yes, sir.
23     Q    Probably beyond that?
24     A    Yes, sir.
25     Q    All right.  This order says in the next

Page 15

1  paragraph number 5 that you are "awarded sole care,
2  custody, and control of the minor children" in
3  particular -- and then it names the three that were
4  involved.  J., R.  and C.  and that "awarding you sole
5  custody was in the best interests of the children."  Is
6  that what you understood happened?
7      A    Yes, sir.
8      Q    Okay.  In paragraph 6, it says, "The parents"
9  -- that is Jessie and Whitney -- "are not fit and proper
10  persons to be awarded custody of the children due to a
11  history of domestic violence and substance abuse"; is
12  that true?
13     A    Yes, sir.
14     Q    Okay.  And that "the respondents were unable
15  to provide a safe and proper home."  Do you agree with
16  that as well?
17     A    Yes, sir.
18     Q    All right.  Now, paragraph 7 talks about, "The
19  respondents" -- meaning Jessie and Whitney -- "shall
20  have no visitation until such time as they attend the
21  divorce education class as required by local rule.  And
22  only upon proper motion approval and order of the
23  court."  Do you know whether Jessie or Whitney ever took
24  steps to take that class?
25     A    No.  They didn't.

Page 16

1      Q    Okay.  And likewise, do you know -- did they
2  ever get an attorney or otherwise try to follow -- ask
3  the court to have their custody rights restored?
4      A    Can you repeat that now?
5      Q    Yeah.  Did Jessie and Whitney to your
6  knowledge ever take any steps to -- to be restored as
7  far as their -- have their custody rights restored?  In
8  other words, they become the custodian?
9      A    No.
10     Q    Okay.  It talks about the next paragraph that
11  each both Jessie and Whitney were to pay child support.
12  Have you ever received any child support?
13     A    No.
14     Q    Okay.  Do you know whether they were paying
15  into the state child support --
16     A    No.  They wasn't, no.
17     Q    Okay.  Let me show you another order.  We'll
18  mark it as Exhibit 2.This is another order.  It's later
19  in time.  It looks like it was entered about two years
20  later.  It involves M.  -- or M.  Excuse me, I
21  mispronounced that.  I beg your pardon.  What were the
22  circumstances that this order was entered in 2015?  Do
23  you remember?
24          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
25     A    No.

Page 17

1      Q    Did you always have custody of M.?
2      A    Yes.
3      Q    Okay.  When was M.  born?  What year; do you
4  know?
5      A    July 17th of 2013.
6      Q    Okay.  So, she was actually born after or she
7  was born the day of the entry of this other order.  Okay.
8  How long had M.  had been with you before this order was
9  entered in August of 2015?
10     A    I've had her -- I've got her out of hospital.
11     Q    Okay.
12     A    Ever since she's been born.
13     Q    So you raised her from an infant?
14     A    Right.
15     Q    First newborn.
16     A    As I did R.  and -- I mean, as I did C.
17     Q    Okay.  And again, it's your understanding that
18  you two are -- were you M.'s custodian?
19     A    Yes.
20     Q    Okay.  You had full custody over her?
21     A    Yes.
22     Q    And again, this order requires both Jessie and
23  Whitney to pay child support.  Do you know of any steps
24  they took to try and get their custody restored as far
25  as M.  Did they ever do anything to do that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

```
 1      A    No.
 2      Q    Okay.  After these orders were entered, while
 3  they may not have taken steps to get custody, did they
 4  see their children?
 5      A    Yes.  I let them see them.
 6      Q    Okay.  How often did Whitney come by?  Let me
 7  ask it a different way.  Did they have regular
 8  visitations where they'd come every other weekend or
 9  any --
10      A    Well, no.  When Whitney and Jessie was
11  together before they split, maybe weekend they would --
12  I would let them come up as long as they were straight.
13  I would let them visit.
14      Q    Okay.  How long were they together then I
15  guess?  How long did that arrangement go?
16      A    Honestly, I can't remember.  But it wasn't
17  long they split.
18      Q    Let me go backwards.  This incident happened
19  in June of 2016.  Were they living together then still?
20      A    When -- when he got killed?
21      Q    Yes.
22      A    No.
23      Q    Okay.  Do you know how long they had been
24  separated by then?
25      A    Oh gosh.  Not really.  I don't.
```

Page 19

```
 1      Q    Okay.
 2      A    Quite a while, though.
 3      Q    Was it a year?
 4      A    Yeah.
 5      Q    Okay.  When they separated, did that change
 6  your arrangements or their visitation?
 7      A    Well, yeah.  They didn't come up -- they
 8  didn't see the kids that much.
 9      Q    Okay.  When you say "not much," would they --
10  would it be once a month or?
11      A    Whitney, maybe once a month, once every two,
12  three months.  Jessie, he was -- well, I guess maybe --
13  he could -- I'm going to say on Jessie maybe once a
14  month.
15      Q    Okay.  Now, when they come to visit with the
16  children, I assume they come to your house; is that
17  fair?
18      A    Yes, sir.
19      Q    All right.  Would you let them go out with the
20  children?
21      A    Take them anywhere you mean?
22      Q    That's right.
23      A    No.
24      Q    Okay.  Why?
25      A    Because they wasn't allowed to.
```

Page 20

```
 1      Q    Okay.
 2      A    And I didn't trust them.
 3      Q    Okay.  Why didn't you trust them?
 4      A    Because honestly, I'm going to tell you.  You
 5  don't trust a dope addict.
 6      Q    Okay.  How long would their visits last when
 7  they came?
 8      A    Well, sometimes couple hours, sometimes
 9  let -- sometimes I let them stay all night with them.
10      Q    In your house?
11      A    In my house.
12      Q    Okay.  How often was that?
13      A    Maybe -- maybe once a month.  Well, no.  Let
14  me go back now on that.  When they were together, maybe
15  a couple, two or three times.  But when they was apart,
16  I wouldn't let them stay.
17      Q    After they were separated, after Jessie and
18  Whitney separated, did Jessie ever stay in your house
19  overnight --
20      A    No.
21      Q    -- to be with the kids?  And likewise, had he
22  ever taken them out of the house --
23      A    No.
24      Q    -- after they were separated?
25      A    No.
```

Page 21

```
 1      Q    Okay.  Would they come to holidays such as
 2  Christmas, Thanksgiving, that kind of thing?
 3      A    Sometimes Jessie would.
 4      Q    Okay.  Sometimes.
 5      A    Sometimes.
 6           MS. ROBINSON-STAPLES:  I'm sorry.  What was
 7      that answer?
 8           THE WITNESS:  Sometimes.
 9           MS. ROBINSON-STAPLES:  He would or --
10           THE WITNESS:  He would sometimes.
11           MS. ROBINSON-STAPLES:  Okay, sorry.  I couldn't
12      hear you.
13  BY MR. KELLEY:
14      Q    And likewise, the children's birthdays.  Did
15  they come for the children's birthdays?
16      A    Yes.  He -- he would -- well, now I would
17  let -- one time I took him up to his mother's.  Jessie
18  always bought them a cake.
19      Q    Okay.
20      A    For their birthdays.
21      Q    All right.
22      A    His kids, he always bought them a cake.  Well,
23  especially the oldest one.
24      Q    That would have been J.?
25      A    Yeah.
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-6  Filed: 02/10/20  Page: 9 of 27 - Page ID#:
4556
The Deposition of GENEVA HELTON, taken on June 27, 2017

22...25

Page 22

1  Q   Okay.  What about M.?
2  A   I'm sorry?
3  Q   Would he buy -- would he follow the same rule
4  for M. as well?
5  A   Not as I can remember.  He never did buy her.
6  Q   Okay.  When Jessie did visit, did he pay
7  attention to one child as opposed to the others?
8  A   Well, no.  J., the -- the son J., I call him
9  Bubby (phonetic).
10  Q   Uh-huh.
11  A   He will pay a lot attention to him.  He got a
12  lot of attention.  But he paid some attention to the
13  other ones, but --
14  Q   J. was his son, firstborn.
15  A   Yeah, firstborn.
16  Q   Okay.  Did Whitney ever complain to you about
17  that they weren't given enough visitation or that you
18  weren't being fair to them?
19  A   No.
20  Q   All right.  Likewise, did Jessie make any
21  complaints or make any objections?
22  A   No.  Until the day that -- that we -- the
23  judge gave me custody of the three, then I came in and
24  told my daughter that me and James had custody, I
25  believe.  And he got a little PO'd at me over that.

Page 23

1  Q   But that would have been back in 2013?
2  A   Yes.
3  Q   Okay.
4  A   Yeah.  Whitney and him was together then.
5  Q   Okay.  Obviously, we're here today because
6  Jessie died in June 2016.  Did he ever complain to you,
7  say, during the year previous to his death about
8  visitation wasn't fair?
9  A   No.
10  Q   Was he maintained the same schedule during
11  that last year 2015, 2016?  Washis visits as frequent as
12  they had been?
13  A   No.
14  Q   Okay.  Can you give me some idea as to how it
15  changed?
16  A   Well, he -- he was with someone else and --
17  Q   Meaning girlfriends?
18  A   Yeah.
19  Q   Okay.  Go ahead.
20  A   And Bubby -- J. the son didn't like her too
21  good so -- because it wasn't his mother.  And he would
22  get mad if I let him come up.  But I did let him come up
23  a couple times then.
24  Q   Okay.  So, during the year before he died, he
25  may have come up a couple of times?

Page 24

1  A   Let me think of that now.
2  Q   I know I'm asking you about things that
3  happened three, four years ago.
4  A   Yeah.
5  Q   I appreciate that.
6  A   It was more than a couple times.  He'd come up
7  while him and Whitney split I'm going to say four or
8  five times.  It wasn't that much.
9  Q   Okay.  All right.  In the past when he visit,
10  would he come the day or night or when would he usually
11  come?
12  A   Well, usually in the day, but knowing Jessie,
13  just about any time because he was just that type of
14  person.  I guess he -- it wasn't nothing I didn't think
15  he'd do.  Put it that way.
16  Q   Okay.  Would he call you in advance to tell
17  you he's coming up?
18  A   No.
19  Q   He'd just show up?
20  A   Just show up.
21  Q   When he came to see the kids, how'd he act,
22  usually?
23  A   He would play with his kids.
24  Q   Uh-huh.
25  A   He was -- he was pretty straight, you know,

Page 25

1  because like I said, if he'd have been doped out, it was
2  real bad because I know exactly what a dope addict looks
3  like.  My daughter's one.
4  Q   Uh-huh.
5  A   I wouldn't let him around them.  But he was
6  pretty straight.  You know, you couldn't tell if he was
7  on nothing.  He would play with his children for a
8  couple hours maybe.
9  Q   Okay.  All right.  We're going to talk a
10  minute about June 29th I believe is the date.  Latter
11  part of June.  Do you know when Jessie last visited --
12  come to your house to visit prior to this occasion?
13  A   No.  To be honest, I don't.
14  Q   Do you know whether he had seen the kids
15  during the month of June before this evening?
16  A   No.  I -- I don't remember.
17  Q   All right.  There are few holidays, and
18  everybody would come by on Memorial Day, for example.
19  Do you remember doing that?
20  A   No.
21  Q   Okay.  Did he come -- Easter usually falls --
22  Mother's Day falls within there.  Did he come by on
23  Mother's Day?
24  A   I -- I don't remember.
25  Q   All right.  Let me -- and quite frankly,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1  Father's Day would fall in June.  Did you remember him
2  coming for Father's Day before?
3       A    No.  I don't remember him coming.
4       Q    Okay.  All right.  Let's go ahead and talk
5  about June 29, 2016.  Do you have a recollection of that
6  day?
7       A    Yes, sir.
8       Q    Okay.  Some people have remembered it to be a
9  Wednesday.  Does that sound right to you or do you know?
10      A    No.  I don't know what day of the week it was.
11      Q    Okay.  Do you have any particular -- do you
12  remember what you have been doing that day?
13      A    No.  I don't.
14      Q    Okay.  Of course, it would have been in
15  summer.  I would assume there's no school then; is that
16  right?
17      A    Yes.
18      Q    When your kids were that age -- when your
19  grandchildren back in 2016, did you have any kind of, I
20  don't want to say curfew, but time that they all went to
21  bed?
22      A    Yeah.  We -- we go to bed around 8:00 or 9:00.
23      Q    Okay.
24      A    Because they don't get no sleep, you --
25  they're real grouchy, so you've got to get them enough

Page 27

1  sleep.
2       Q    All right.  Would that have been true on
3  June 29th?
4       A    Yeah.
5       Q    Okay.  So, they would have been in bed at that
6  time.  Do you think -- would Jessie have known that by
7  virtue of --
8       A    Yeah.
9       Q    Okay.  It was enough of a habit that --
10      A    Yeah.  He -- he knew.
11      Q    Okay.  I would assume then you went to bed
12  about 8:00 or 9:00 that evening.
13      A    Yes.
14      Q    Was there anything unusual about that evening
15  that you might have stayed up?
16      A    No.
17      Q    Okay.  Can you tell me what happened after you
18  went to bed?
19      A    We went to bed.  M.  was the baby.  I got her
20  to sleep.  R.  fell asleep.  And about 10:00, I -- I
21  think it was about 10:00, I heard knock on the door.  And
22  I asked him who was it, and I don't even recall him
23  telling me who he was.  But I looked and I had a -- got
24  a peephole in my window.  I got a little window.  And I
25  noticed Jessie, so I opened the door and let him in.  He

Page 28

1  came in, he went straight to my refrigerator and I
2  didn't have no pop or nothing in there.  I had cold
3  tomato juice.  He -- he drank down out of the jug and
4  drank tomato juice.  Then he went to the back -- the
5  back bedroom and got R.  and J.  up.  Then he went in
6  the closet and got J.  some clothes.  He come back to
7  the kitchen, tried to put them on J.  And he couldn't
8  get nothing on him.  So, he just throwed them down the
9  floor and walked away from J. and R.  About that time,
10  he had come -- M.  come out of the bedroom and she was
11  crying because she missed me on the bed.  And Jessie
12  came over to her and picked her up because he always --
13  when she cried, he'd always pick her up and walk her
14  around.  And I thought he's walking her around.  You
15  know, just walking around because she was crying.  Then
16  I went out on the porch and he was walking around.  Then
17  I hear his vehicle started.  And I don't remember if I
18  hollered at him or what.  And I know I ran in there to
19  wake James up and we had run to -- Jessie was backing
20  out of the driveway.  Me and James got in the road,
21  tried to block him, and he tried to run over us.  Went
22  on out of there and then James followed him.
23      Q    Okay.  Let me back up a little bit and try to
24  understand the layout of your house.  Do you have a
25  two-story house?

Page 29

1       A    No.  We -- we -- it's a mobile home.
2       Q    Okay.
3       A    Okay.  Let's see.  Three bedrooms are in
4  the -- two -- yeah, three bedrooms are in the back.  And
5  then the kitchen and the living room.  Then it's another
6  bedroom on the end.  So I -- I kept the girls with me.
7  James had the boys.
8       Q    When you say "kept," they -- you-all sleep in
9  the same bed?
10      A    Yeah, me and the girls.
11      Q    Okay.  So M. and --
12      A    R.
13      Q    -- would have been with you and I assume
14  J. and C.  would've been with your husband?
15      A    Yes.
16      Q    Where would the doorway be -- the outside
17  doorway be in relationship to the expanded rooms?
18      A    Well, the -- the outside door is right next to
19  my bedroom and it goes into the living room.  Here's the
20  living room.
21      Q    I was going to say.  As you come in the front
22  door --
23      A    Come in the front door, my bedroom is right
24  here.  The living room, the kitchen, then three bedrooms
25  in the back.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-6   Filed: 02/10/20   Page: 11 of 27 - Page ID#:
4558
The Deposition of GENEVA MELTON, taken on June 21, 2019
30..33

Page 30

1  Q   Okay.  When he knocked on the door, was it a
2  loud knock or was it --
3  A   Pretty loud.
4  Q   Okay.
5  A   It woke me up.
6  Q   Was he banging on the door?
7  A   It was a loud knock.
8  Q   All right.  And you came into the
9  living room; is that correct?
10  A   Yeah.  Well, as you come out of the bedroom,
11  you come into the living room.
12  Q   Okay.  So, you were coming -- I assume the
13  door was locked?
14  A   Yes.
15  Q   Okay.  Were there lights on in your -- in the
16  home?
17  A   No.
18  Q   Okay.  Would you have an -- do you have an
19  outside light?  One that shines where the doorway is?
20  A   No.
21  Q   No?  Okay.  So, you open up the door, there's
22  Jessie.  Could you -- had you turned on the lights by
23  then?
24  A   No.
25  Q   Okay.  So, you open up, it's still dark.

Page 31

1  A   It wasn't that dark.  You could tell who it
2  was.
3  Q   All right.  Did you look at the clock or watch
4  as you went to the door?
5  A   As I got up -- when I got up, I keep a clock
6  at the side of my bed because getting up for the kids,
7  you know, for spilling everything, so I just -- my
8  clock's beside my bed.
9  Q   Okay.  Do you remember what time it was?
10  A   It was around 10:00.
11  Q   Okay.
12  A   I don't know.  That just stuck in my mind
13  around 10:00.
14  Q   Okay.  That's fine.  And as you opened the
15  door, I assume you spoke to him or did you?
16  MS. ROBINSON-STAPLES:  Objection to form.
17  Q   Did you say anything when you opened the door
18  and saw Jessie?
19  A   I don't remember if I did OR not.
20  Q   All right.  I appreciate that.  Did he say
21  anything to you, or do you remember?
22  A   No.  He did not say nothing to me.
23  Q   All right.  I think you said he came in and
24  went to the kitchen first?
25  A   Went through straight to my refrigerator, yes.

Page 32

1  Q   All right.  And you mentioned before he took
2  something out of --
3  A   He got some tomato juice out of the
4  refrigerator.
5  Q   All right.  You mentioned it was in a jug?
6  A   It was in a -- like, a plastic jug.
7  Q   Okay.
8  A   And he drank -- he drank it and put it back in
9  the refrigerator.
10  Q   All right.  As he went to do that, did he talk
11  to you about anything?
12  A   No.  Never said a word.
13  Q   All right.  During the entire time he was
14  there, did he speak?
15  A   He never said a word.
16  Q   Okay.  Where was J. -- excuse me.  Where was
17  his sons?
18  A   They were in the back bedroom with James.
19  Q   Okay.  Is that farther back than the kitchen?
20  A   Yes.
21  Q   And had they -- had they heard the -- well, I
22  know you don't know what they heard, but had -- were
23  they awake?
24  A   No.  They wasn't awake.
25  Q   He was still sleeping?

Page 33

1  A   Yeah.  They were still sleeping.
2  Q   Okay.  Is it -- I may have got the sequence
3  wrong.  Did he go back to the bedroom first or go to the
4  closet first?
5  A   He got -- he got the kids up first.
6  Q   Okay.
7  A   Then he went to the back bedroom and got J.
8  the -- some of his clothes.  Some pants.  But
9  he didn't get R.  nothing.
10  Q   I guess it's similar.  Were all the kids
11  awake?
12  A   Well, R.  -- R.  had woken up because she had
13  come out of the bedroom.  And he had R.  and C.  -- and
14  J. standing in the kitchen.  And when he went to the
15  closet and got J.  the clothes, he tried to put them on
16  him and couldn't get on.  Couldn't get nothing on him,
17  because Jessie's a big boy.  I mean, a big boy.  And he
18  couldn't get nothing on him because he was still --
19  J. was still half asleep.
20  Q   How old was J.  then?  In 2016.
21  A   He's -- he was 9, but he weighed around
22  207 pounds at that age.
23  Q   Good size.
24  A   He's a good-sized kid.
25  Q   Okay.  Likewise, you think R. was there as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  well? How --

2      A   R. had come out of my bedroom. She might have

3  followed me now. And seemed like she did follow me.

4      Q   Okay. How old's R. at that time?

5      A   R. was -- let's see. She's 8 -- she was

6  around 6, I guess.

7      Q   Okay. Did C. come out?

8      A   No.

9      Q   He remained in bed?

10     A   C. was asleep.

11     Q   Did he remain asleep or do you know?

12     A   Yeah.

13     Q   Okay. How about your husband?

14     A   No. He was still asleep.

15     Q   Okay. You had to go -- eventually, you had to

16 wake him up?

17     A   I had to go wake him up.

18     Q   Okay. Did you wake him up after Jessie had

19 left the house? Or before?

20     A   As Jessie was backing out of the driveway.

21 When I've noticed that he had M. And I hollered at him

22 I do believe. I believe I had -- hollered him and asked

23 him, Jessie, what are you trying to do?

24     Q   Let me ask you about M. How old was M. then?

25     A   M. was -- she was 2. She was getting ready to

Page 35

1  turn 3.

2      Q   Okay. Walking, I would assume?

3      A   Yes.

4      Q   Okay. She was asleep -- had she awakened when

5  you woke up?

6      A   Not that -- at first.

7      Q   Okay.

8      A   But she had missed me out of the bed because

9  she -- she laid right next to me. And she come through

10 the house crying and she stood at the end of the couch,

11 her crying. Because I was watching him and when I

12 turned around, I seen M. coming through. She was

13 standing at the edge of the couch.

14     Q   Okay. Was she upset?

15     A   Yeah. She -- no. She was just crying because

16 she missed me out of the bed.

17     Q   Okay.

18     A   She is a baby, and we babied her. She -- she

19 was a little spoiled brat.

20     Q   At any point, did you turn the lights on?

21     A   I -- yeah. I believe I did. The

22 kitchen light, I believe I did.

23     Q   Could you actually see Jessie's face?

24     A   I really didn't pay any attention to him to be

25 honest with you.

Page 36

1      Q   You say he didn't say anything during the

2  entire time he was in the house?

3      A   No. Not a word to me.

4      Q   All right. Otherwise, was he acting normally

5  or?

6      A   To be honest, no. It wasn't normal for

7  Jessie.

8      Q   Okay.

9      A   I mean, just to come in and go to my

10 refrigerator and not say nothing, go get the kids up.

11     Q   All right. Did you think he was sober or?

12     A   No. I did not.

13         MS. ROBINSON-STAPLES: Objection to form.

14     Q   Okay. Do you think he was --

15     A   I knew he's on something because that -- it

16 wasn't like Jessie.

17     Q   Okay.

18     A   And I mean, not to just come in and act like,

19 you know. Jessie was kind of bully a little bit. But I

20 mean, him and I had words before --

21     Q   Okay.

22     A   -- and he knew I wasn't no pushover.

23     Q   Okay.

24     A   So he wouldn't -- Jessie wouldn't just done

25 that to be mean.

Page 37

1      Q   All right. What were you saying during the

2  time he was in the house?

3      A   Well, mostly just watching him, watching what

4  he was doing. Because I didn't understand what he was

5  trying to do.

6      Q   Okay. All right. Now, how does he -- are you

7  in there when M. --

8      A   Yeah. I'm --

9      Q   -- when he's holding M.?

10     A   Well, he -- I was still sitting at the couch.

11 M. was right next to me. He came through and he picked

12 her up and walked her out on the porch.

13     Q   Okay.

14     A   Okay. I believe I got a cigarette. I believe

15 I got me a cigarette and I went outside because I didn't

16 hear M. whining anymore. And that's when I noticed he

17 got in his -- the thing he was driving.

18     Q   Do you remember what kind of vehicle he was

19 driving?

20     A   No.

21     Q   Okay. The period he's in your house, did you

22 ever intend for him to leave with M.?

23     A   No.

24     Q   Do you know -- could you tell -- did he have a

25 car seat? Where was M. -- did you see M. in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  vehicle I guess is what I'm getting at.
2      A    No.
3      Q    You couldn't?  Okay.  Tell me what your
4  reaction was at that point?
5      A    Well, it scared the tar right out of me.
6      Q    Did you consider your daughter --
7  granddaughter to be in danger?
8      A    Yeah.
9      Q    Okay.
10     A    I mean, somebody take her knowing -- to know
11 their -- to know his history.  How -- how would you know
12 what -- what was going -- going to happen?
13     Q    Okay.
14     A    Because when you're on dope, you -- you don't
15 care.
16     Q    I think you've said before that you woke your
17 husband up.  I assume that's when you woke your husband
18 up?
19         MS. ROBINSON-STAPLES:  Objection to form.
20     A    When I went to -- when Jessie wouldn't answer
21 me, I believe I hollered and asked him what he was
22 doing, and he didn't answer.  I hear him start up
23 the -- the -- whatever he's in, his car, truck or
24 whatever. When I hear him start it up, I went in there
25 and woke James up, and then that's when me and James --

Page 39

1  the other kids had done went back to bed.  That's when
2  me and James went out in the road.  James got on one
3  side and I go on the other.  We were going trying to
4  block him, but he gave it the gas.
5      Q    All right.  So, were you actually in the road?
6      A    Yeah.
7      Q    All right.  And you were trying to stop the
8  vehicle?
9      A    Yeah.
10     Q    Did he have his headlights off?
11     A    Yeah.
12     Q    All right.  I assume -- how were you trying to
13 stop the vehicle I guess is the best way.
14     A    Well, I figured he'd stop with us in the road.
15     Q    All right.  Did you raise your hands or --
16     A    Yeah.  I -- I was hollering and screaming at
17 him.
18     Q    Okay.  At any point, did he -- did the vehicle
19 slow or stop?
20     A    No.
21     Q    How close did he come to you?
22     A    Close enough we had to jump out of the road.
23 The good Lord was with us.
24     Q    Okay.  As he approached you, did he go faster
25 or remain the same speed or?

Page 40

1      A    Same speed.  He -- he just didn't want to slow
2  up.
3      Q    Okay.  Now, could you tell which way he was --
4  is there more than one way he would have to head after --
5      A    Yeah.  He was going back out of the Moores
6  Creek going towards what would have been the main road.
7      Q    Okay.  Let me hand you a map.  It's a pretty
8  bad one, but we'll give it a try.  Exhibit number I
9  guess --
10         COURT REPORTER:  3.
11     Q    -- 3.  This is off of Google Maps.  And am I
12 correct?  You lived at 3582 Moores Creek Road at that
13 time?
14         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
15     A    Yes.
16     Q    All right.  That's there.  And so he would
17 have been heading up --
18     A    He would've been going back out, going back
19 towards the other way.
20     Q    All right.  Am I right?  Would the school have
21 been somewhere around in here?
22     A    Yeah.  Right up here.  At Dewitt school.
23     Q    You were telling me your -- the kids go to
24 Dewitt; is that right?
25     A    Yeah.

Page 41

1      Q    Approximately, how far is it from your house?
2      A    Oh my god.  I don't know but I know it's three
3  mile and seven-tenths to our house from the main road.
4      Q    Okay.  So, he's gone at least three miles
5  before he would reach the Dewitt school?
6      A    Yeah.  He had to go back out of Moores Creek.
7  So that was -- it's about three miles seven-tenths to my
8  house.
9      Q    And did you have any idea where he was headed
10 when you left your house?
11     A    No.
12     Q    Do you know of any -- do you know where he was
13 living at that time?
14     A    He was living at his -- some of his daddy's,
15 mommy's property or something.  I don't know.
16     Q    All right.  Can you tell me where that is in
17 relationship to the Dewitt school?
18     A    I don't know.  All I know I heard about --
19 something about Beech Branch Road.
20     Q    Okay.  Do you know where Beech Branch Road is
21 in relationship to that school?
22     A    No.
23     Q    Do you know whether he was heading towards in
24 that direction at the time?
25         MS. ROBINSON-STAPLES:  Objection to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of GENEVA TELFORD, taken on June 21, 2018

42..45

Page 42

1    A    No.

2    Q    Okay.  Now, I think you already said that your
3  husband got in his car and was following him, correct?

4    A    Yes.

5    Q    Now, as far as the incident occurs later that
6  night, the officer-involved shooting that we're here
7  today about, I take it you were not there?

8    A    No.

9    Q    The Information you would receive concerning
10  that came from -- well, did your husband talk about it?

11    A    Not much, but he had called me from -- from
12  Ricky's cell phone.

13    Q    Okay.  You're talking about Ricky Hobbs?

14    A    Ricky Hobbs' cell phone.  And I'd heard -- I
15  heard some shots over the phone.

16    Q    Okay.  Could you tell anything else going on?

17    A    No.

18    Q    All right.

19    A    All I was worried about was M.  Really, I
20  didn't -- I didn't care.

21    Q    People that you -- are the people that you
22  talked to told you what happened?

23    A    Not really.

24    Q    Didn't talk to Ricky Hobbs?

25    A    No.

Page 43

1    Q    Okay.  Have you ever talked to police?

2    A    No.

3    Q    In other words, have any law enforcement been
4  out to see you about what you --

5    A    No.

6    Q    -- remember happening that night?  Have any
7  investigators been by to talk to you?

8    A    No.

9    Q    Does M. remember?

10    A    Yeah.  She still remembers.  Because she --
11  when her and her sisters and brothers play, when they
12  play, sometimes she'll say, let's play cops and robbers.
13  Then she'll tell them, put your hands behind your back
14  like my daddy did.

15    Q    Okay.  That's what she told you?

16    A    That's what she tells them.

17    Q    All right.  Since this accident, what has been
18  your relationship with Whitney?

19    A    Well, I don't -- I haven't seen her much since
20  the accident.

21    Q    I meant to say incident.  Since this incident.

22    A    I don't see much of her because she's been in
23  jail and all that.

24    Q    You told me before we started the deposition
25  she's in rehab now?

Page 44

1    A    Yeah.  She's in rehab.

2    Q    And that's a good thing now.  Does she see her
3  children now?  As part of the rehab?

4    A    No.  I don't take them to see her.

5    Q    Okay.  Do you know who Pearlie Sue Gambrel is?

6    A    Yes.  I do.

7    Q    And how often do you see her?

8    A    I really don't see her.

9    Q    Okay.  Had -- I know Ms. Gambrel, she'd been
10  incarcerated for a while.  I think was out in 2015.  Did
11  you remember her coming to see the children, say, the
12  year before this incident?

13    A    No.  She never did come to the house.  I took
14  them up there.

15    Q    Okay.  How often?

16    A    Well, let's see.  I took Bubby up there for
17  the birthday.  I think just one, maybe twice.  I just
18  remember once.

19    Q    Did you ever take -- when you went, did you
20  take M. and everybody else with you?

21    A    Yeah.

22    Q    Okay.  Since this incident, have you come back
23  to see her or been invited up there?

24    A    No.  I let the kids go.

25    Q    Who comes to get the kids?

Page 45

1    A    James takes them, or I let his -- Jessie's
2  sister.  She comes and gets them sometimes.

3    Q    How often has that been since --

4    A    Maybe once or twice a month

5    Q    Okay.  Is that still true?

6    A    Yeah.  M.'s with her right now.

7    Q    Have you talked directly with Ms. Gambrel
8  yourself?

9    A    No.

10    Q    Do you know whether your husband has spoken to
11  her other than to drop the kids off?

12    A    No.  No.

13    Q    Okay.  Does she call to tell you when she
14  wants to --

15    A    The kids call her.

16    Q    Okay.  So you've not had any contact with her
17  at all?

18    A    No.  No.

19        MR. KELLEY:  Okay.  Need to go off record for a
20  second.  I'll be right back.

21        VIDEOGRAPHER:  Time is 10:53.  We are off the
22  record.

23              (OFF THE RECORD)

24        VIDEOGRAPHER:  The time is 11:02.  We are on
25  the record.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  BY MR. KELLEY:
2      Q    I'm sorry it took so long.
3      A    It's okay.
4      Q    But in any event, I want to go -- again, go
5  back to the night that this incident happened.  After
6  your husband left to go after Jessie, what did you do?
7      A    I -- I called the police.
8      Q    Okay.  Let me play something for you and ask
9  you if you recognize it.
10               (MEDIA PLAYED)
11     A    I guess --
12     Q    Let me before I ask you questions -- I meant
13  to do this before I played the tape, but this is in
14  the -- the tape is identified in Plaintiff's 26
15  disclosures as PL01, track number 1.  Okay.  Did you --
16  do you recognize the person that's --
17     A    I guess that was me.
18     Q    That was the call you made to 9-1-1?
19     A    (No verbal response.)
20     Q    All right.  You sound like you're out of
21  breath.  Is that --
22     A    That's when I'd been running after we tried to
23  stop him.
24     Q    Okay.  Officer asked you if you -- if he's on
25  drugs.  How did you respond?  Do you remember how you

Page 47

1  responded?
2      A    Yeah.  Well, to me he'd never done that if he
3  hadn't have.
4      Q    All right.  Did you feel your daughter -- your
5  granddaughter was in danger?
6      A    Yeah.  Because you don't -- I've seen how dope
7  addicts do.  You don't -- you can think they're anybody
8  or you get delusional or somebody trying to hurt you.
9  You never know what he could have done to her.
10     Q    Okay.  Why'd you call the police?
11     A    Because I was afraid he'd hurt her.
12     Q    You wanted the police intervene?  I would
13  assume you wanted them to come and --
14     A    Yeah.  And give my baby back.
15         MS. ROBINSON-STAPLES:  Objection to form.
16     Q    We'll play one more.  Did your husband
17  continue to -- or did you remain in contact with your
18  husband?
19     A    Not until he got -- until the police got to
20  where Jessie was, and he called me from Ricky Hobbs'
21  phone.
22     Q    Okay.  Your husband had not taken his phone as
23  I understand it?
24     A    No.
25     Q    Okay.  And do you remember how many times you

Page 48

1  had talked to your husband?
2      A    I don't remember.  Two, maybe.
3      Q    Were you -- once he got a hold of you, did you
4  stay on the phone the whole time or did you talk and get
5  off?
6      A    No.  I talked to him and Ricky had not turned
7  off his phone.  He kept it in his back pocket, but I
8  could still hear.
9      Q    Okay.  This is identified as Plaintiff's 75.
10               (MEDIA PLAYED)
11         MR. KELLEY:  Let's go off the record.  I've got
12  the wrong one.
13         VIDEOGRAPHER:  The time is 11:08.  We are off
14  the record.
15               (OFF THE RECORD)
16         VIDEOGRAPHER:  The time is 11:12.  We are on
17  the record.
18  BY MR. KELLEY:
19     Q    So, you can tell I am pretty technically
20  challenged, but I'm going to try again and play another
21  dispatching if you could listen and tell me who this is.
22         MS. ROBINSON-STAPLES:  Which number is this,
23  John?
24         MR. KELLEY:  Oh, I'm sorry.  It's PL15.  Not
25  75.

Page 49

1               (MEDIA PLAYED)
2  BY MR. KELLEY:
3      Q    How did you get that information?  Well, first
4  of all, is that you on --
5      A    That's me.  Yeah.
6      Q    How'd you get that information; do you
7  remember?
8      A    From -- well, James had to tell me because I
9  wouldn't have known.
10     Q    In particular, they say he's on meth.  Where
11  did that come from?
12     A    Because that's the drug of their choice.
13     Q    Do you know whether your son-in-law took
14  methamphetamines?  Meth?
15     A    Well, I never did see him do it, but I've
16  heard him when he talk about doing it.
17     Q    Okay.  Has he ever told you that he took meth
18  during that period of time?
19     A    Not as I can remember.
20     Q    How much have you or your husband talked about
21  that evening?
22         MS. ROBINSON-STAPLES:  Objection to form.
23     A    Not that much because the kids is always
24  around -- always around.  And I'm afraid that -- I don't
25  want to bring up --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    Q    Bring it up?
2    A    -- those memories around them.
3    Q    Let me show you what I'm marking as Exhibit 4
4 to your deposition. Take a look at that. Ms. Helton,
5 I'd ask you to assume that this is a copy of the
6 petition in the order filed in the Knox District Court
7 on behalf of the estate of Jessie James Mills is one
8 where -- it's one before they filed by Pearlie Sue
9 Gambrel seeking to set up the estate as his mother. Have
10 you ever been told about her appointment as an
11 administrator for the --
12         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
13   A    No.
14   Q    All right. Has she ever contacted you
15 concerning bringing an action on behalf of the heirs?
16 That being his wife and children?
17   A    No.
18   Q    All right. I know that your husband
19 previously testified in this lawsuit. When did you
20 become aware of this lawsuit?
21   A    The one -- the guy that brought me the paper.
22   Q    All right. Your husband testified earlier,
23 and he appeared pursuant to a subpoena. Was that the
24 first you heard of this lawsuit or had you heard of it
25 from --

Page 51

1    A    No. I -- yeah. That's the first I heard of
2 it.
3    Q    Okay.
4    A    When he got the subpoena.
5    Q    One of the things I want to show you, I don't
6 know if it should be an exhibit. But this is a docket
7 for the custody action. Over on the second page, it
8 says -- and I don't have a copy of it. I just pulled
9 this up this morning, but it says the parties were added
10 on May 1st of 2019 to this -- to the -- and this has to
11 do with custody action. See that at the bottom? Very
12 bottom.
13   A    Right here?
14   Q    May 1, '19. Do you know anything about an
15 order being entered in your custody action? In your
16 custody order?
17   A    No.
18   Q    Okay. In fact, have you had any -- I'll be
19 quite frank. I don't know either. It may have
20 something to do with the State, but as far as you know,
21 you don't know what that's referring to?
22   A    No.
23   Q    Okay. Ms. Helton, are you originally from
24 Knox County?
25   A    Yes.

Page 52

1    Q    What was your maiden name?
2    A    Messer (phonetic).
3    Q    Okay. Well, there are some Messers in
4 Knox County, too. I assume you have lots of relatives
5 in Knox County; is that fair?
6    A    Yes.
7    Q    Okay. Did you have any -- well, do you have
8 any relatives that work for the Sheriff's Department?
9    A    Not as I know of. No.
10   Q    Any of your family hold a political office in
11 Knox County?
12   A    No. Not now.
13   Q    Okay. Were they -- you said "not now." Have
14 they held office? You had relatives that held political
15 office in Knox County?
16   A    I had a brother that was a constable in
17 Corbin.
18   Q    Okay. What was his name?
19   A    David Scout (phonetic).
20   Q    Okay. Any others?
21   A    No.
22   Q    Do you know the present sheriff Mike Smith?
23   A    Know of him. I don't know him.
24   Q    Okay. Likewise, do you know of
25 Deputy Mikey Ashurst?

Page 53

1    A    No.
2    Q    Okay. Have you ever -- do you know a
3 constable named Brandon Bolton?
4    A    No.
5    Q    Okay. Do you know anybody that presently
6 serves as a deputy or in any capacity for Knox County
7 Sheriff's Department?
8    A    No.
9    Q    Have you-all ever had any run-ins or disputes
10 with the Sheriff's Department or any of the deputies or?
11   A    No.
12   Q    Okay. Now, Let me hand you one last exhibit.
13 I promise this is the last one. This is number --
14         COURT REPORTER:  5.
15   Q    Five. This is what something -- probably was
16 handed to you by a fellow named Shawn Hensley who's an
17 investigator working for me.
18         (EXHIBIT 5 MARKED FOR IDENTIFICATION)
19   A    Yeah.
20   Q    Okay. He came out and told you, you had to be
21 here today to give a deposition?
22   A    Yes.
23   Q    And he served you with a subpoena; is that
24 right?
25   A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1    Q    And that's why you came.  It's not that you
2  have -- you're siding with one side or another in this
3  lawsuit.
4    A    No.
5    Q    Okay.
6         MR. KELLEY:  So that's all I have.  Thank you.
7                    CROSS EXAMINATION
8  BY MS. ROBINSON-STAPLES:
9    Q    Ma'am, I have just a few questions for you.
10 The night that Jessie came to your home, am I correct
11 that you stated that you unlocked the door and let him
12 in?
13   A    Yeah.
14   Q    He didn't bust in the door, did he?
15   A    No.
16   Q    Okay.  And he didn't push his way in the door,
17 did he?
18   A    No.
19   Q    Did you ever tell them that you didn't want
20 him to come into the home?
21   A    No.
22   Q    Okay.  When your husband testified, he stated
23 that Jessie came to see the kids every two to three
24 weeks.  Think that's accurate?
25   A    Yeah.  Twice a month.  Somewhere in there,

Page 55

1  maybe.
2    Q    Okay.  So. one to two times a month, you
3  think?
4    A    Sometimes.
5    Q    And he stated that a lot of times, he would
6  come after he got off work.  And he didn't get off work
7  until late.  Does that refresh your recollection as to
8  when Jessie might come see the kids?
9    A    Well, maybe once or twice.  Not that often.
10 Not after he got off work.  Mostly on the weekend.
11   Q    Mostly on the weekend?  But he had been there
12 before after work?
13   A    Honestly, I don't remember.
14   Q    You don't remember if he had been or not?
15   A    Because I have to work.
16   Q    Okay.  Another thing that James said during
17 his deposition is that -- the question was asked of him:
18 Did Jessie saying anything to you when he arrived at
19 your house that night?  And he said, he talked to my
20 wife.  I don't know what he told her.
21   A    No.  No.  He probably didn't -- I might have
22 told him he said something.  I don't know.  But Jessie
23 didn't say a word.  Not a word.
24   Q    Did he talk to the kids?
25   A    I don't even believe he said a word to the

Page 56

1  kids.
2    Q    Okay.  Because that's something else that
3  James said.  He said I heard him talk to little J.,
4  telling him to get ready to go home.
5    A    James was in the bedroom.  If he did, he might
6  have been when I had turned and talked to M. a minute.
7    Q    Okay.
8    A    If he did.
9    Q    How long do you think Jessie was at your home
10 that night?
11   A    Wasn't that long.  I'm going to say no more
12 than a half-hour.
13   Q    Okay.  And during that time, you don't recall
14 Jessie saying anything at all?
15   A    No.  No.  He didn't even speak to me.
16   Q    Did you hear him speak to anyone else?
17   A    No.
18   Q    You testified earlier, and I think you stated
19 as much to the dispatcher on the 9-1-1 call that you
20 thought he was going to his mother's that night; is that
21 correct?
22   A    Yeah.
23   Q    Why'd you think that?
24   A    Well, his mother hadn't been out of prison
25 long enough, and I figured that's where he would have

Page 57

1  taken M.
2    Q    Okay.
3    A    So his mother could watch her.
4    Q    And did you state that it wasn't abnormal for
5  Jessie to pick up M. if she was crying?
6    A    Yeah.  He -- he'd pick her up and pet her, you
7  know, baby her.
8    Q    Trying to comfort her?
9    A    Yeah.
10   Q    So it wasn't abnormal for him to pick her up
11 that night?
12   A    That's the reason I didn't think much of it to
13 begin with.
14   Q    Okay.  Okay.  You know, there's been all kinds
15 of talk about both Whitney and Jessie being on drugs.
16 And I understand your concern for the kids when they
17 were on drugs.  Do you think Jessie loved his kids?
18        MR. KELLEY:  Objection.
19   A    He did when he wasn't on the drugs.
20   Q    And how did he show that he loved the kids
21 when he wasn't on the drugs?
22   A    When he wasn't on real bad drugs, he would --
23 he would play with his kids.  Just like Whitney would
24 when she talked to her kids.  But when he was on drugs,
25 because I've seen him on drugs, he would -- they were



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of GENEVA HELTON, taken on June 21, 2018

58..61

Page 58

1  nothing to him.

2    Q    That night, he picked M. -- or yeah. M. up
3  to comfort her; correct?

4    A    He picked her up to leave with her. He had it
5  in his mind to leave with her because he took off with
6  her.

7    Q    Okay. Didn't you testify earlier that he
8  picked her up because she was crying?

9    A    And that's why I thought he picked her up
10 because she was crying. But apparently, he picked her
11 up to take off with her.

12   Q    Do you think that his kids loved him?

13      MR. KELLEY:  Objection.

14   A    Yes.  Yeah.  Of course, his kids loved him.
15 He's their daddy.

16   Q    Right.  I would think so, too.  So, I have to
17 admit to you -- well, let me say something first while
18 we're talking about that.  Like I said, there's been a
19 lot of talk about drugs in this case.  In fact, it seems
20 to be that there's quite a problem with drugs in this
21 area.  Would you agree with that?

22   A    Yeah.

23   Q    Would you agree that it affects all kinds of
24 people, even good people?

25   A    Oh, yeah.

Page 59

1    Q    So I have to admit to you, the first time that
2  I've ever heard about you also running out in the road
3  when Jessie was leaving was today.  And I may have --
4  maybe I'm misunderstanding what you were telling the
5  dispatcher when you called the first time.  But I heard
6  you saying that your husband had run out in the road.
7  Did you also tell them that you had?

8    A    I don't remember.

9    Q    Okay.  I didn't hear you saying that that --

10   A    But, we both were out in the road.  He was on
11 one side.  I was on the other.

12   Q    Do you remember talking to a Lieutenant Surber
13 in this case?  He apparently spoke with you via
14 telephone on July 29th at 9:28 p.m.  You don't remember
15 that?

16   A    No.

17   Q    He wrote a report.  And he said, "I spoke to
18 Geneva Helton via telephone about the incident that took
19 place on June 29, 2016.  Geneva was the first caller on
20 this incident.  She stated Jessie came to their house
21 and told the kids he was taking them with him, but the
22 two oldest kids didn't want to go with him."  Do you
23 remember talking to Lieutenant Surber?

24   A    No.

25   Q    Do you remember telling him that Jessie said

Page 60

1  he was going to take the kids?

2    A    No.

3    Q    It goes on to say, "while he was in the house,
4  the smallest child came into the living room.  He
5  grabbed her and went out the door with her.  Geneva
6  stated her husband James Helton tried to stop him but
7  wasn't able to do so.  She went on to say Jessie almost
8  ran over him as he left the driveway.  Geneva stated
9  Jessie would stop by to visit the kids, but he would
10 never attempt to take them in the past."  Does that
11 refresh your recollection?

12   A    No.  Some of that's true, but I don't remember
13 saying -- I could have said it.  I'm not saying I
14 didn't, but I don't remember.

15   Q    Okay.  And I mean, it's understandable.  It's
16 been quite a while ago.

17   A    But me and him both was in the road.

18   Q    Okay.  When James was questioned about that,
19 about trying to stop him, he also only mentioned that it
20 was him that went out in the road.  And I asked him
21 specifically if he felt as though Jessie was trying to
22 hit him, like, veer towards him.  And he said, "I don't
23 know.  I wasn't going to stand there and see.  The
24 road's narrow.  He was driving down the road and I got
25 out of it."  Would you agree with that?

Page 61

1    A    Yes.  But me and him both was still in the
2  road, though.

3    Q    Do you think that Jessie tried to veer to hit
4  you?

5    A    No.  I don't think he -- I just don't think
6  Jessie was -- didn't care if he hit us or not, long as
7  he could get away with M.

8    Q    Did you see him turn the wheel to try and come
9  towards you?

10   A    No.  No, I did not.

11   Q    And you said he didn't accelerate at speed,
12 correct?

13   A    No.

14   Q    All right.  In response to one of Mr. Kelly's
15 questions, you said that M. said -- you've heard M.
16 say, "Put your hands behind your back like my daddy
17 did"; is that correct?

18   A    Correct.

19   Q    You've heard her say that?

20   A    Yes.

21   Q    How often have you heard her say that?

22   A    It was when they play cops and robbers.

23   Q    And she said specifically what her daddy did?

24   A    Yes.  And then she starts crying.

25   Q    I don't think Mr. Kelley entered this as an



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  exhibit.  But this court document that notes some type
2  of order being entered in January of 2019 and then again
3  in May of 2019.
4       A   I don't know what that is.
5       Q   Do you have any idea what that is?  I don't
6  either.  Do you know if it could be in relation to the
7  youngest grandchild?  Is his name T.?
8       A   Let's see.  '19 -- No.  Because I got custody
9  of him right out of the hospital, too.  And that was
10  back in 2017.
11      Q   So I guess we're going to have to do some
12  investigating to figure out what that is.
13      A   I don't know what that is.
14          MS. ROBINSON-STAPLES:  Okay.  All right. That's
15  all the questions that I had for you.
16          MR. KELLEY:  Thank you, Ms. Helton. That's all
17  the question
18          THE WITNESS:  You're welcome.
19          VIDEOGRAPHER:  Okay.  The time is 11:31.  This
20  concludes the deposition.
21          (VIDEO DEPOSITION CONCLUDED AT 11:31 A.M.)
22
23
24
25

Page 63

1               CERTIFICATE OF REPORTER
2            COMMONWEALTH OF KENTUCKY AT LARGE
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Title page here of by me after
7   first being duly sworn to testify the truth, the whole
8   truth, and nothing but the truth; and that the said
9   matter was recorded stenographically and mechanically by
10  me and then reduced to type written form under my
11  direction, and constitutes a true record of the
12  transcript as taken, all to the best of my skill and
13  ability. I certify that I am not a relative or employee
14  of either counsel, and that I am in no way interested
15  financially, directly or indirectly, in this action.
16
17
18
19
20  *Hannah Daugherty*
21
22  HANNAH DAUGHERTY,
23  COURT REPORTER / NOTARY
24  MY COMMISSION EXPIRES ON: 03/22/2023
25  SUBMITTED ON: 07/09/2019

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

_____

**Exhibits**

_____

**EXH 1** 12:23
13:2,5

**EXH 2** 16:24

**EXH 3** 40:14

**EXH 4** 50:3,12

**EXH 5** 53:18

_____

**1**

_____

**1** 12:23 13:2,5
46:15 51:14

**10:00** 27:20,21
31:10,13

**10:01** 5:6

**10:53** 45:21

**11** 10:16

**11:02** 45:24

**11:08** 48:13

**11:12** 48:16

**11:31** 62:19,21

**17th** 17:5

**18** 10:17

**19** 51:14 62:8

**1st** 51:10

_____

**2**

_____

**2** 13:17 16:24
34:25

**2.this** 16:18

**2007** 11:10

**2009** 12:10

**2012** 13:23
14:20

**2013** 13:24
17:5 23:1

**2015** 16:22
17:9 23:11
44:10

**2016** 6:13 9:12
10:7 11:12,19
18:19 23:6,11
26:5,19 33:20
59:19

**2017** 62:10

**2019** 5:6 51:10
62:2,3

**207** 33:22

**21st** 5:5

**26** 46:14

**29** 26:5 59:19

**29th** 25:10 27:3
59:14

_____

**3**

_____

**3** 35:1 40:10,11,
14

**3582** 8:1 40:12

_____

**4**

_____

**4** 14:13 50:3,12

**45** 8:4

_____

**5**

_____

**5** 10:17 15:1
53:14,18

**50** 8:4

_____

**6**

_____

**6** 15:8 34:6

**617-CV-00184**
5:12

_____

**7**

_____

**7** 15:18

**75** 48:9,25

_____

**8**

_____

**8** 10:16 34:5

**8:00** 26:22
27:12

_____

**9**

_____

**9** 33:21

**9-1-1** 46:18
56:19

**9:00** 26:22
27:12

**9:28** 59:14

_____

**A**

_____

**a.m.** 5:6 62:21

**abbreviate**
8:13

**abnormal**
57:4,10

**abuse** 15:11

**accelerate**
61:11

**accident**
43:17,20

**accurate** 54:24

**act** 24:21 36:18

**acting** 36:4

**action** 13:1,6,
23 50:15 51:7,
11,15

**actual** 14:16

**added** 51:9

**addict** 20:5
25:2

**addicts** 47:7

**administrator**
5:9 50:11

**admit** 58:17
59:1

**admitted** 12:22

**advance** 24:16

**affects** 58:23

**affirm** 5:24

**afraid** 47:11
49:24

**age** 26:18
33:22

**ages** 10:15

**agree** 15:15
58:21,23 60:25

**ahead** 7:19
8:16 23:19 26:4

**Allen** 9:6

**allowed** 19:25

**Amanda** 9:6

**Amy** 5:18

**anymore**
37:16

**apparently**
58:10 59:13

**appeared**
50:23

**appointment**
50:10

**approached**
39:24

**approval**
15:22

**approximately**
12:6 41:1

**area** 58:21

**arrangement**
18:15

**arrangements**
19:6

**arrived** 55:18

**Ashurst** 5:15
52:25

**asleep** 27:20
33:19 34:10,11,
14 35:4

**assume** 9:12
10:22 19:16
26:15 27:11
29:13 30:12
31:15 35:2
38:17 39:12
47:13 50:5 52:4

**assuming** 6:14

**attempt** 60:10

**attend** 15:20

**attention** 22:7,
11,12 35:24

**attorney**
12:12,17,19,25
16:2

**attorneys** 6:17

**August** 17:9

**avoid** 7:4

**awake** 32:23,
24 33:11

**awakened**
35:4

**awarded** 15:1,
10

**awarding** 15:4

**aware** 13:12,24
50:20

_____

**B**

_____

**babied** 35:18

**baby** 27:19
35:18 47:14
57:7

**back** 6:13 8:21
10:7,22 14:4,20
20:14 23:1
26:19 28:4,5,6,
23 29:4,25
32:8,18,19
33:3,7 39:1
40:5,18 41:6
43:13 44:22
45:20 46:5
47:14 48:7
61:16 62:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

64

**backing** 28:19
34:20

**backwards**
18:18

**bad** 25:2 40:8
57:22

**banging** 30:6

**Barbourville**
12:19

**bed** 26:21,22
27:5,11,18,19
28:11 29:9
31:6,8 34:9
35:8,16 39:1

**bedroom** 28:5,
10 29:6,19,23
30:10 32:18
33:3,7,13 34:2
56:5

**bedrooms**
29:3,4,24

**Beech** 41:19,
20

**beg** 16:21

**begin** 57:13

**behalf** 5:15
50:7,15

**belongs** 10:21

**big** 33:17

**birthday** 44:17

**birthdays**
21:14,15,20

**bit** 28:23 36:19

**blacks** 12:22

**block** 28:21
39:4

**Bolton** 5:16
53:3

**born** 10:22
17:3,6,7,12

**bottom** 51:11,
12

**bought** 21:18,
22

**boy** 33:17

**boys** 29:7

**Branch** 41:19,
20

**Brandon** 5:15
53:3

**brat** 35:19

**breath** 46:21

**briefly** 6:8

**bring** 49:25
50:1

**bringing** 50:15

**brother** 52:16

**brothers** 43:11

**brought** 13:6
50:21

**Bubby** 22:9
23:20 44:16

**bully** 36:19

**bust** 54:14

**buy** 22:3,5

———

**C**

**C.M.** 10:16

**cake** 21:18,22

**call** 22:8 24:16
45:13,15 46:18
47:10 56:19

**called** 12:4
42:11 46:7
47:20 59:5

**caller** 59:19

**capacity** 53:6

**car** 37:25 38:23
42:3

**care** 11:25
14:17 15:1
38:15 42:20
61:6

**case** 5:11 8:9
58:19 59:13

**cell** 42:12,14

**challenged**
48:20

**change** 19:5

**changed** 23:15

**child** 10:18
16:11,12,15
17:23 22:7 60:4

**children** 8:22
9:1,3,7,21 10:4,
6,10,19 11:22,
24 12:15 13:10
14:15 15:2,5,10
18:4 19:16,20
25:7 44:3,11
50:16

**children's**
12:23 21:14,15

**childrenbut**
8:17

**choice** 49:12

**Christmas**
21:2

**cigarette**
37:14,15

**Circuit** 13:1

**circumstance
s** 16:22

**class** 15:21,24

**clock** 31:3,5

**clock's** 31:8

**close** 39:21,22

**closet** 28:6
33:4,15

**clothes** 28:6
33:8,15

**cold** 28:2

**comfort** 57:8
58:3

**complain**
22:16 23:6

**complaints**
22:21

**concern** 57:16

**concerns** 14:3

**CONCLUDED**
62:21

**concludes**
62:20

**constable** 5:15
52:16 53:3

**contact** 45:16
47:17

**contacted**
50:14

**continue** 7:20
47:17

**control** 15:2

**cops** 43:12
61:22

**copy** 50:5 51:8

**Corbin** 52:17

**correct** 8:6,23
9:25 13:7 30:9
40:12 42:3
54:10 56:21
58:3 61:12,17,
18

**couch** 35:10,
13 37:10

**counsel** 5:12

**County** 5:10,
16 51:24 52:4,
5,11,15 53:6

**couple** 20:8,15
23:23,25 24:6
25:8

**court** 5:5,11,23
6:3 7:22 13:1
14:8,9 15:23
16:3 40:10 50:6
53:14 62:1

**courtesy** 7:15

**Creek** 8:1 40:6,
12 41:6

**cried** 28:13

**CROSS** 54:7

**crying** 28:11,
15 35:10,11,15
57:5 58:8,10
61:24

**curfew** 26:20

**custodian**
10:25 11:22
16:8 17:18

**custodians**
14:15

**custody** 10:10
11:1,21 12:14,
25 13:5 15:2,5,
10 16:3,7 17:1,
20,24 18:3
22:23,24 51:7,
11,15,16 62:8

———

**D**

**daddy** 43:14
58:15 61:16,23

**daddy's** 41:14

**danger** 38:7
47:5

**dark** 30:25 31:1

**date** 25:10

**Daugherty** 5:4

**daughter** 9:25
22:24 38:6 47:4

**daughter's**
25:3

**David** 12:18
52:19

**day** 5:5 14:17
17:7 22:22
24:10,12 25:18,
22,23 26:1,2,6,
10,12

**death** 11:18
23:7

**declared** 14:14

**defacto** 14:14,
15

**default** 13:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

65

**defendants**
5:16

**degree** 6:20

**delusional**
47:8

**Department**
52:8 53:7,10

**deposition** 5:8
6:9,10,15 7:1
8:9 12:24 43:24
50:4 53:21
55:17 62:20,21

**deputies** 53:10

**deputy** 5:15
52:25 53:6

**Dewitt** 40:22,
24 41:5,17

**died** 23:6,24

**DIRECT** 6:4

**direction**
41:24

**directly** 45:7

**disclosures**
46:15

**dispatcher**
56:19 59:5

**dispatching**
48:21

**disputes** 53:9

**District** 5:11
50:6

**divorce** 15:21

**divorced**
11:15

**docket** 51:6

**document**
62:1

**domestic**
15:11

**door** 27:21,25
29:18,22,23
30:1,6,13,21
31:4,15,17
54:11,14,16

60:5

**doorway**
29:16,17 30:19

**dope** 12:1 20:5
25:2 38:14 47:6

**doped** 25:1

**drank** 28:3,4
32:8

**driveway**
28:20 34:20
60:8

**driving** 37:17,
19 60:24

**drop** 45:11

**drug** 49:12

**drugs** 46:25
57:15,17,19,21,
22,24,25 58:19,
20

**due** 15:10

———

**E**

———

**earlier** 50:22
56:18 58:7

**Easter** 25:21

**easy** 6:18

**edge** 35:13

**education**
15:21

**end** 29:6 35:10

**enforcement**
43:3

**entered** 13:5,
12 16:19,22
17:9 18:2 51:15
61:25 62:2

**entire** 32:13
36:2

**entry** 17:7

**estate** 5:9 7:17
50:7,9

**et al** 5:10

**evening** 25:15
27:12,14 49:21

**event** 46:4

**eventually**
34:15

**EXAMINATIO
N** 6:4 54:7

**excuse** 16:20
32:16

**exhibit** 12:23
13:2,5 16:18,24
40:8,14 50:3,12
51:6 53:12,18
62:1

**expanded**
29:17

**extends** 14:20

———

**F**

———

**face** 35:23

**fact** 51:18
58:19

**failed** 13:21

**fair** 19:17 22:18
23:8 52:5

**fall** 26:1

**falls** 25:21,22

**familiar** 13:11

**family** 52:10

**fancy** 6:11

**farther** 32:19

**faster** 39:24

**father** 10:18

**Father's** 26:1,2

**feel** 47:4

**fell** 27:20

**fellow** 53:16

**felt** 60:21

**figure** 62:12

**figured** 39:14
56:25

**file** 12:25

**filed** 13:23
50:6,8

**fine** 7:24 31:14

**finish** 7:14,16

**firstborn**
22:14,15

**fit** 15:9

**floor** 28:9

**follow** 6:21
16:2 22:3 34:3

**form** 31:16
36:13 38:19
41:25 47:15
49:22

**frank** 51:19

**frankly** 25:25

**freely** 8:16

**frequent** 23:11

**front** 13:23
29:21,23

**full** 17:20

———

**G**

———

**Gambrel** 5:9,
19 44:5,9 45:7
50:9

**garbled** 6:23

**gas** 39:4

**gave** 22:23
39:4

**Geneva** 5:8 6:7
13:6 59:18,19
60:5,8

**girlfriends**
23:17

**girls** 29:6,10

**give** 5:24 6:14,
20,25 7:3 9:5
23:14 40:8
47:14 53:21

**god** 41:2

**good** 7:2,13
23:21 33:23
39:23 44:2
58:24

**good-sized**
33:24

**Google** 40:11

**gosh** 18:25

**grabbed** 60:5

**grandchild**
62:7

**grandchildren**
8:12,25 9:13
10:3,14 26:19

**granddaughte
r** 38:7 47:5

**grandkids**
12:3

**grouchy** 26:25

**Group** 5:7

**grown** 9:7

**guess** 18:15
19:12 24:14
33:10 34:6 38:1
39:13 40:9
46:11,17 62:11

**guy** 50:21

———

**H**

———

**habit** 27:9

**half** 33:19

**half-hour**
56:12

**hand** 5:21 40:7
53:12

**handed** 53:16

**hands** 39:15
43:13 61:16

**Hannah** 5:4

**happen** 38:12

**happened**
10:7 11:23,24
15:6 18:18 24:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

27:17 42:22 46:5

**happening** 43:6

**head** 7:5 40:4

**headed** 41:9

**heading** 40:17 41:23

**headlights** 39:10

**hear** 6:23 21:12 28:17 37:16 38:22,24 48:8 56:16 59:9

**heard** 27:21 32:21,22 41:18 42:14,15 49:16 50:24 51:1 56:3 59:2,5 61:15, 19,21

**heirs** 50:15

**held** 52:14

**Helton** 5:8,20 6:7,8 8:6 13:6 50:4 51:23 59:18 60:6 62:16

**Hensley** 53:16

**hire** 12:11

**history** 15:11 38:11

**hit** 60:22 61:3,6

**Hobbs** 42:13, 24

**Hobbs'** 42:14 47:20

**hold** 48:3 52:10

**holding** 37:9

**holidays** 21:1 25:17

**hollered** 28:18 34:21,22 38:21

**hollering** 39:16

**home** 9:22 15:15 29:1 30:16 54:10,20 56:4,9

**honest** 25:13 35:25 36:6

**honestly** 18:16 20:4 55:13

**hospital** 17:10 62:9

**hours** 20:8 25:8

**house** 8:11 9:9,22 10:3,14 19:16 20:10,11, 18,22 25:12 28:24,25 34:19 35:10 36:2 37:2,21 41:1,3, 8,10 44:13 55:19 59:20 60:3

**how'd** 24:21 49:6

**hurt** 47:8,11

**husband** 8:3,5, 6,19,22 9:16 29:14 34:13 38:17 42:3,10 45:10 46:6 47:16,18,22 48:1 49:20 50:18,22 54:22 59:6 60:6

_____

**I**

**idea** 23:14 41:9 62:5

**IDENTIFICATI ON** 13:2 16:24 40:14 50:12 53:18

**identified** 46:14 48:9

**identify** 5:12

**important** 7:1, 2

**incarcerated** 44:10

**incident** 6:12 9:12 10:7 18:18 42:5 43:21 44:12,22 46:5 59:18,20

**infant** 17:13

**information** 42:9 49:3,6

**initial** 8:14

**intend** 37:22

**interested** 9:24

**interests** 15:5

**intervene** 47:12

**intimidating** 6:19

**investigating** 62:12

**investigator** 53:17

**investigators** 43:7

**invited** 44:23

**involved** 15:4

**involves** 16:20

_____

**J**

**J.M.** 10:16

**jail** 43:23

**James** 8:6 9:6 11:18 13:6,7,19 22:24 28:19,20, 22 29:7 32:18 38:25 39:2 45:1 49:8 50:7 55:16 56:3,5 60:6,18

**James'** 11:17

**January** 62:2

**Jessie** 5:10 10:21 11:4,17,

18 13:7,19,24 15:9,19,23 16:5,11 17:22 18:10 19:12,13 20:17,18 21:3, 17 22:6,20 23:6 24:12 25:11 27:6,25 28:11, 19 30:22 31:18 34:18,20,23 36:7,16,19,24 38:20 46:6 47:20 50:7 54:10,23 55:8, 18,22 56:9,14 57:5,15,17 59:3,20,25 60:7,9,21 61:3, 6

**Jessie's** 11:1 33:17 35:23 45:1

**John** 5:14 48:23

**judge** 22:23

**jug** 28:3 32:5,6

**juice** 28:3,4 32:3

**July** 13:24 17:5 59:14

**jump** 39:22

**June** 5:5 6:13 9:12 11:12,18 18:19 23:6 25:10,11,15 26:1,5 27:3 59:19

_____

**K**

**Kelley** 5:14 6:5 21:13 45:19 46:1 48:11,18, 24 49:2 54:6 57:18 58:13 61:25 62:16

**Kelly's** 61:14

**kid** 33:24

**kids** 8:20 11:1

12:1 14:17 19:8 20:21 21:22 24:21,23 25:14 26:18 31:6 33:5,10 36:10 39:1 40:23 44:24,25 45:11, 15 49:23 54:23 55:8,24 56:1 57:16,17,20,23, 24 58:12,14 59:21,22 60:1,9

**killed** 18:20

**kind** 7:3 21:2 26:19 36:19 37:18

**kinds** 57:14 58:23

**kitchen** 28:7 29:5,24 31:24 32:19 33:14 35:22

**knew** 27:10 36:15,22

**knock** 27:21 30:2,7

**knocked** 30:1

**knowing** 24:12 38:10

**knowledge** 16:6

**Knox** 5:10,16 13:1 50:6 51:24 52:4,5,11,15 53:6

**Kristy** 9:6

_____

**L**

**laid** 35:9

**lastly** 7:13

**late** 55:7

**law** 5:7 43:3

**lawsuit** 5:17 13:21 14:1 50:19,20,24 54:3



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

layout 28:24

leave 37:22
58:4,5

leaving 59:3

left 9:22 34:19
41:10 46:6 60:8

legal 14:15

legally 11:22

Lieutenant
59:12,23

light 30:19
35:22

lights 30:15,22
35:20

likewise 16:1
20:21 21:14
22:20 33:25
52:24

listen 48:21

live 7:25 9:9
10:3,14

lived 8:2 40:12

lives 8:11

living 9:13,18
18:19 29:5,19,
20,24 30:9,11
41:13,14 60:4

local 15:21

locked 30:13

long 8:2 17:8
18:12,14,15,17,
23 20:6 46:2
56:9,11,25 61:6

looked 27:23

Lord 39:23

loss 13:5

lot 22:11,12
55:5 58:19

lots 52:4

loud 30:2,3,7

loved 57:17,20
58:12,14

---

**M**

M.'s 17:18 45:6

M.M. 10:17

mad 23:22

made 46:18

maiden 52:1

main 40:6 41:3

maintained
23:10

make 12:23
22:20,21

map 40:7

Maps 40:11

mark 16:18

MARKED 13:2
16:24 40:14
50:12 53:18

marking 50:3

marriage
11:23

married 11:4,
7,11,19

matter 5:8

meaning 14:16
15:19 23:17

means 13:18

meant 8:21
11:3 43:21
46:12

MEDIA 46:10
48:10 49:1

Memorial
25:18

memories
50:2

mentioned
10:19 32:1,5
60:19

mentions 13:9

Messer 52:2

---

Messers 52:3

met 6:8

meth 49:10,14,
17

methampheta
mines 49:14

Mike 52:22

Mikey 5:15
52:25

mile 41:3

miles 41:4,7

Mill's 7:17

Mills 5:10
11:18 12:18,25
13:7,19 50:7

Mills' 10:21

mind 31:12
58:5

minor 13:9
14:15 15:2

minute 10:10
25:10 56:6

mispronounce
d 16:21

missed 28:11
35:8,16

misunderstan
ding 59:4

mobile 29:1

mommy's
41:15

month 19:10,
11,14 20:13
25:15 45:4
54:25 55:2

months 10:17
19:12

Moores 8:1
40:5,12 41:6

morning 51:9

mother 23:21
50:9 56:24 57:3

---

mother's
21:17 25:22,23
56:20

motion 15:22

---

**N**

Nalley 5:3

named 9:25
53:3,16

names 9:5
10:15 12:23
15:3

narrow 60:24

newborn 17:15

night 20:9
24:10 42:6 43:6
46:5 54:10
55:19 56:10,20
57:11 58:2

nodding 7:5

normal 36:6

notes 62:1

noticed 27:25
34:21 37:16

notified 13:20

number 5:11
13:17 14:13
15:1 40:8 46:15
48:22 53:13

---

**O**

oath 6:12

objection
7:19,21 31:16
36:13 38:19
41:25 47:15
49:22 57:18
58:13

objections
7:18 22:21

occasion
25:12

occurred 6:13
9:12

---

occurs 42:5

office 52:10,
14,15

Officer 46:24

officer-
involved 42:6

offices 5:7

old's 34:4

oldest 10:20
21:23 59:22

open 30:21,25

opened 27:25
31:14,17

opposed 22:7

order 13:5,10,
12,14,23 14:25
15:22 16:17,18,
22 17:7,8,22
50:6 51:15,16
62:2

orders 18:2

originally
51:23

overnight
20:19

---

**P**

p.m. 59:14

paid 22:12

pants 33:8

paper 50:21

paragraph
13:17 14:13
15:1,8,18 16:10

pardon 16:21

parent 11:25

parents 13:18
15:8

part 25:11 44:3

parties 51:9

past 24:9 60:10

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**pay** 16:11 17:23 22:6,11 35:24

**paying** 16:14

**Pearlie** 5:9,19 44:5 50:8

**peephole** 27:24

**Pending** 5:10

**people** 7:9 26:8 42:21 58:24

**period** 37:21 49:18

**person** 24:14 46:16

**persons** 15:10

**pet** 57:6

**petition** 50:6

**Petitioners** 14:14

**phone** 6:9 42:12,14,15 47:21,22 48:4,7

**phonetic** 22:9 52:2,19

**pick** 28:13 57:5,6,10

**picked** 28:12 37:11 58:2,4,8,9,10

**PL01** 46:15

**PL15** 48:24

**place** 59:19

**plaintiff** 5:19

**Plaintiff's** 46:14 48:9

**plastic** 32:6

**play** 24:23 25:7 43:11,12 46:8 47:16 48:20 57:23 61:22

**played** 46:10,13 48:10 49:1

**PLLC** 5:7

**PO'D** 22:25

**pocket** 48:7

**point** 35:20 38:4 39:18

**police** 43:1 46:7 47:10,12,19

**political** 52:10,14

**pop** 28:2

**porch** 28:16 37:12

**pounds** 33:22

**present** 52:22

**presently** 7:25 8:11 53:5

**preserve** 6:11 7:21

**pretty** 6:18,19 7:13 24:25 25:6 30:3 40:7 48:19

**previous** 23:7

**previously** 50:19

**prior** 25:12

**prison** 56:24

**problem** 58:20

**proceedings** 5:1 13:22

**promise** 53:13

**proper** 15:9,15,22

**property** 41:15

**provide** 15:15

**pulled** 51:8

**purpose** 6:10

**pursuant** 50:23

**push** 54:16

**pushover** 36:22

**put** 8:13 24:15 28:7 32:8 33:15 43:13 61:16

---

**Q**

**question** 6:22, 23,25 7:14,16 55:17 62:17

**questioned** 60:18

**questions** 7:18 10:9 46:12 54:9 61:15 62:15

---

**R**

**R.M.** 10:16

**raise** 5:21 39:15

**raised** 17:13

**ran** 28:18 60:8

**reach** 41:5

**reaction** 38:4

**ready** 34:25 56:4

**real** 25:2 26:25 57:22

**realize** 8:17

**reason** 7:8 57:12

**recall** 27:22 56:13

**receive** 42:9

**received** 16:12

**recognize** 46:9,16

**recollection** 26:5 55:7 60:11

**record** 5:13 7:3 8:13,17 45:19, 22,23,25 48:11, 14,15,17

**referring** 51:21

**refresh** 55:7 60:11

**refrigerator** 28:1 31:25 32:4,9 36:10

**regular** 18:7

**rehab** 43:25 44:1,3

**relation** 62:6

**relationship** 29:17 41:17,21 43:18

**relatives** 52:4, 8,14

**relax** 6:19

**remain** 34:11 39:25 47:17

**remained** 34:9

**remember** 11:7,8 12:8 16:23 18:16 22:5 25:16,19, 24 26:1,3,12 28:17 31:9,19, 21 37:18 43:6,9 44:11,18 46:25 47:25 48:2 49:7,19 55:13, 14 59:8,12,14, 23,25 60:12,14

**remembered** 26:8

**remembers** 43:10

**repeat** 7:7 16:4

**report** 59:17

**reporter** 5:5, 22,23 6:3 40:10 53:14

**representing** 7:17

**required** 15:21

**requires** 17:22

**respond** 13:21

46:25

**responded** 47:1

**respondent** 13:18

**respondents** 15:14,19

**response** 46:19 61:14

**restored** 16:3, 6,7 17:24

**Ricky** 42:13, 14,24 47:20 48:6

**Ricky's** 42:12

**rights** 16:3,7

**road** 8:1 28:20 39:2,5,14,22 40:6,12 41:3, 19,20 59:2,6,10 60:17,20,24 61:2

**road's** 60:24

**robbers** 43:12 61:22

**Robinson-staples** 5:18 21:6,9,11 31:16 36:13 38:19 41:25 47:15 48:22 49:22 54:8 62:14

**room** 29:5,19, 20,24 30:9,11 60:4

**rooms** 29:17

**rule** 15:21 22:3

**rules** 6:21 7:22

**run** 28:19,21 59:6

**run-ins** 53:9

**running** 46:22 59:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

**S**

safe 15:15

scared 38:5

schedule 23:10

school 26:15 40:20,22 41:5, 17,21

Scout 52:19

screaming 39:16

seat 37:25

seeking 50:9

separated 18:24 19:5 20:17,18,24

sequence 33:2

served 13:19 53:23

serves 53:6

set 50:9

seven-tenths 41:3,7

Shawn 53:16

she'd 44:9

she'll 43:12,13

sheriff 52:22

Sheriff's 52:8 53:7,10

shines 30:19

shooting 42:6

shots 42:15

show 7:15 12:21 16:17 24:19,20 50:3 51:5 57:20

showing 12:24

side 31:6 39:3 54:2 59:11

siding 54:2

similar 33:10

sir 8:7,10 9:2,8, 10,15,17,20,23 10:1,5,8,12 11:2,5,13,16,20 12:13,16,20 13:3,8,13 14:19,22,24 15:7,13,17 19:18 26:7

sister 45:2

sisters 43:11

sitting 37:10

size 33:23

sleep 26:24 27:1,20 29:8

sleeping 32:25 33:1

slow 39:19 40:1

smallest 60:4

Smith 52:22

sober 36:11

social 12:4

sole 15:1,4

solemnly 5:23

son 22:8,14 23:20

son-in-law 49:13

sons 32:17

sound 26:9 46:20

speak 32:14 56:15,16

specifically 60:21 61:23

speed 39:25 40:1 61:11

spilling 31:7

split 18:11,17 24:7

spoiled 35:19

spoke 31:15 59:13,17

spoken 45:10

stand 60:23

standing 33:14 35:13

Staples 7:17

start 12:7 38:22,24

started 6:14 28:17 43:24

starts 61:24

state 6:6 7:9 16:15 51:20 57:4

stated 54:11, 22 55:5 56:18 59:20 60:6,8

States 5:11

stay 20:9,16,18 48:4

stayed 27:15

Stephanie 5:3

steps 15:24 16:6 17:23 18:3

stood 35:10

stop 6:24 39:7, 13,14,19 46:23 60:6,9,19

straight 18:12 24:25 25:6 28:1 31:25

stuck 31:12

subpoena 50:23 51:4 53:23

substance 15:11

Sue 5:9,19 44:5 50:8

summer 26:15

summons 13:20

support 16:11, 12,15 17:23

supposed 14:7

Surber 59:12, 23

swear 5:23

sworn 5:21

**T**

T.L. 10:17

takes 45:1

taking 11:25 14:17 59:21

talk 8:12,16 13:25 25:9 26:4 32:10 42:10,24 43:7 48:4 49:16 55:24 56:3 57:15 58:19

talked 6:9 42:22 43:1 45:7 48:1,6 49:20 55:19 56:6 57:24

talking 8:25 9:11 42:13 58:18 59:12,23

talks 13:17 15:18 16:10

tape 46:13,14

tar 38:5

technically 48:19

telephone 59:14,18

telling 27:23 40:23 56:4 59:4,25

tells 13:20 43:16

term 14:16

testified 50:19, 22 54:22 56:18

testify 58:7

testimony 5:24 6:12

Thanksgiving 21:2

thing 7:1,8 21:2 37:17 44:2 55:16

things 24:2 51:5

thought 28:14 56:20 58:9

throwed 28:8

time 5:6 7:9 11:17,18 13:10 15:20 16:19 21:17 24:13 26:20 27:6 28:9 31:9 32:13 34:4 36:2 37:2 40:13 41:13,24 45:21, 24 48:4,13,16 49:18 56:13 59:1,5 62:19

times 20:15 23:23,25 24:6,8 47:25 55:2,5

Timothy 10:22

today 5:4,5 6:10 23:5 42:7 53:21 59:3

told 22:24 42:22 43:15,24 49:17 50:10 53:20 55:20,22 59:21

tomato 28:3,4 32:3

totally 6:23

Towel 5:7

track 46:15

trouble 12:7

truck 38:23

true 14:18 15:12 27:2 45:5 60:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

| | | | | |
|---|---|---|---|---|
| **trust** 20:2,3,5 | 13:6 | **Whitney** 9:6,25 10:6 11:1,3 13:7,19,25 15:9,19,23 16:5,11 17:23 18:6,10 19:11 20:18 22:16 23:4 24:7 43:18 57:15,23 | **youngest** 62:7 | |
| **truth** 5:25 6:1 | **VIDEO** 62:21 | | | |
| **turn** 35:1,20 61:8 | **violence** 15:11 | | | |
| **turned** 12:4 30:22 35:12 48:6 56:6 | **virtue** 27:7 | | | |
| | **visit** 18:13 19:15 22:6 24:9 25:12 60:9 | | | |
| **two-story** 28:25 | **visitation** 15:20 19:6 22:17 23:8 | **Why'd** 47:10 56:23 | | |
| **type** 24:13 62:1 | | **wife** 50:16 55:20 | | |
| **U** | **visitations** 18:8 | **Williams** 5:7 | | |
| | **visited** 25:11 | **window** 27:24 | | |
| **uh-huh** 7:9 22:10 24:24 25:4 | **visits** 20:6 23:11 | **woke** 30:5 35:5 38:16,17,25 | | |
| **uh-uh** 7:10 | **W** | **woken** 33:12 | | |
| **ultimately** 12:11 | | **word** 32:12,15 36:3 55:23,25 | | |
| **unable** 15:14 | **wake** 28:19 34:16,17,18 | **words** 9:21 13:22 16:8 36:20 43:3 | | |
| **understand** 6:24 28:24 37:4 47:23 57:16 | **walk** 28:13 | | | |
| | **walked** 28:9 37:12 | **work** 52:8 55:6, 10,12,15 | | |
| **understandable** 60:15 | **walking** 28:14, 15,16 35:2 | **worker** 12:4 | | |
| **understanding** 10:2 17:17 | **wall** 6:18 | **working** 53:17 | | |
| **understood** 15:6 | **wanted** 6:11 47:12,13 | **worried** 42:19 | | |
| | | **would've** 29:14 40:18 | | |
| **United** 5:11 | **Washis** 23:11 | **written** 7:3 8:17 | | |
| **unlocked** 54:11 | **watch** 31:3 57:3 | **wrong** 33:3 48:12 | | |
| **unusual** 27:14 | **watching** 35:11 37:3 | **wrote** 59:17 | | |
| **upset** 35:14 | **Wednesday** 26:9 | **Y** | | |
| **V** | **week** 26:10 | | | |
| | **weekend** 18:8, 11 55:10,11 | **year** 11:7 12:7 17:3 19:3 23:7, 11,24 44:12 | | |
| **veer** 60:22 61:3 | **weeks** 54:24 | **years** 8:4 16:19 24:3 | | |
| **vehicle** 28:17 37:18 38:1 39:8,13,18 | **weighed** 33:21 | | | |
| **verbal** 7:4 46:19 | **wheel** 61:8 | **you-all** 29:8 53:9 | | |
| **versus** 5:10 | **whining** 37:16 | | | |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com