**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

| | | |
|---|---|---|
| The Estate of JESSIE MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-CV-184 |
| | ) | |
| v. | ) | Hon.  ROBERT E. WIER |
| | ) | |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

# EXHIBIT 15

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 6:17-CV-00184

## PEARLIE SUE GAMBREL, AS

## ADMINISTRATOR OF THE ESTATE OF JESSIE J. MILLS,

## V.

## KNOX COUNTY, ET AL.

## DEPONENT:

## MEREDITH FRAME

## DATE:

## April 25, 2018



✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1        IN THE UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF KENTUCKY

3            SOUTHERN DIVISION

4              AT LONDON

5         CASE NO.: 6:17-CV-00184

6

7

8          PEARLIE SUE GAMBREL, AS

9    ADMINISTRATOR OF THE ESTATE OF JESSIE J. MILLS,

10             PLAINTIFF

11

12               V.

13

14         KNOX COUNTY, ET AL.,

15           DEFENDANTS

16

17

18

19

20

21

22

23  DEPONENT:  MEREDITH FRAME

24  DATE:      APRIL 25, 2018

25  REPORTER:  LACEE TOWNSEND

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

1
2
3  ON BEHALF OF THE PLAINTIFF, PEARLIE SUE GAMBREL, AS
4  ADMINISTRATOR OF THE ESTATE OF JESSIE J. MILLS:
5  AMY ROBINSON-STAPLES
6  LOEVY & LOEVY
7  311 NORTH ABERDEEN STREET
8  THIRD FLOOR
9  CHICAGO, ILLINOIS 60607
10  TELEPHONE NO.: (312) 243-5900
11  E-MAIL: AMY@LOEVY.COM
12
13  ON BEHALF OF THE DEFENDANTS, KNOX COUNTY, JOHN MICHAEL
14  ASHURST, AND BRANDON BOLTON:
15  JOHN KELLEY
16  WILLIAMS FARMER & TOWE
17  303 SOUTH MAIN STREET
18  LONDON, KENTUCKY 40741
19  TELEPHONE NO.: (606) 877-5291
20  E-MAIL: JOHN@WFTLAW.COM
21
22  ALSO PRESENT: NATALIA BASHAM, VIDEOGRAPHER
23
24
25

Page 3

INDEX

| | | Page |
|---|---|---|
| 3 | DIRECT EXAMINATION BY MS. ROBINSON-STAPLES | 7 |
| 4 | CROSS EXAMINATION BY MR. KELLEY | 78 |
| 5 | REDIRECT EXAMINATION: BY MS. ROBINSON-STAPLES | 120 |
| 6 | RECROSS EXAMINATION BY MR. KELLEY | 121 |

7
8
9                    EXHIBITS
10                                                    Page
11  1 - NOTICE                                         5
12  2 - AUTOPSY REPORT - PL 737 - PL 739               9
13  3 - AUTOPSY REPORT- PL 740 - PL 746                9
14  4 - COLLECTIVE PHOTOS - PL 200 - PL 248            10
15  5 - AIT REPORT - PL 728 - PL 729                   65
16  6 - AIT REPORT - PL 730 - PL 731                   65
17
18
19
20
21
22
23
24
25

Page 4

STIPULATION

1
2
3  The VIDEO deposition of MEREDITH FRAME taken at THE
4  OFFICES OF THE COMMONWEALTH OF KENTUCKY MEDICAL
5  EXAMINER, 100 SOWER BOULEVARD, FRANKFORT, KENTUCKY 40601
6  on THURSDAY, the 25TH day of APRIL 2019 at approximately
7  10:00 a.m.; said VIDEO deposition was taken pursuant to
8  the FEDERAL Rules of Civil Procedure. It is agreed that
9  LACEE TOWNSEND, being a Notary Public and Court Reporter
10  for the State of INDIANA, may swear the witness.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

PROCEEDINGS

1
2
3      VIDEOGRAPHER: On record.
4      MR. KELLEY: My name is John Kelley, I'm here
5  on behalf of the defendants, Knox County, Deputy
6  Mike Ashurst and Constable Brandon Bolton. I'm
7  here today appearing in response to the third
8  notice of deposition scheduling Dr. Frame's
9  deposition. And I'd like to make this Exhibit 1, a
10  copy of the notice I've received. In talking to
11  counsel, she's indicated to me that this deposition
12  may or will be used for proof at trial. It is
13  being taken by videotape, and I suspect that will
14  be the case. I am objecting under Rule 26 of the
15  Federal Rules of Civil procedure, under what would
16  be (a)(2) - which deals with the Disclosure of
17  Expert Testimony and in particular subsection (C)
18  which deals with witnesses who do not provide a
19  written report. Of course, Dr. Frame is a Medical
20  Examiner who performed an autopsy relevant to
21  Jessie Mills. I have seen the autopsy report, I am
22  aware of her opinions concerning cause of death.
23  And to that extent, we want to object to
24  representative's proof. However, I also think that
25  the doctor will be asked opinions concerning the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1  toxicology report that was done and other matters
2  concerning the severity of the wounds, etcetera, to
3  which I don't know her opinions yet, and that's why
4  I came up here to conduct a discovery deposition.
5  Also, I would note that if it is a deposition being
6  taken for proof, my approach on -- during my
7  opportunity to examine the doctor will be much
8  different.  I intend to proceed as if I'm taking
9  her in a discovery deposition to find out more
10 specifically what her opinions are.
11          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
12          (OFF THE RECORD)
13     VIDEOGRAPHER:  We are now on record.  My name
14 is Natalia Basham, I'm the videographer and Lacee
15 Townsend is the court reporter.  Today is the 25th
16 day of April, 2019 and the time is 10:02 a.m.
17 We're at the offices of the Associate Chief Medical
18 Examiner, located at 100 Sower Boulevard,
19 Frankfort, Kentucky 40601 to take the deposition of
20 Meredith Frame in the matter of Pearlie Sue Gambrel
21 as Administrator of the Estate of Jessie J. Mills
22 v. Knox County, et. al.
23     pending in the United States District Court,
24 Eastern District of Kentucky, Southern Division at
25 London, number 6:17-CV-00184.  Will Counsel please

Page 7

1      introduce themselves for the record?
2          MS. ROBINSON-STAPLES:  Any Robinson-Staples
3  for the Plaintiff.
4          MR. KELLEY:  My name is John Kelley.  I'm here
5  on behalf of Knox County, as well as Deputy Sheriff
6  Mikey Ashurst and Constable Brandon Bolton, all of
7  whom are defendants in this lawsuit.
8          VIDEOGRAPHER:  Thank you.  Ma'am, will you
9  please raise your right hand to be sworn in by the
10 reporter?
11         COURT REPORTER:  Do you solemnly swear or
12 affirm the testimony you're about to give will be
13 the truth, the whole truth and nothing the truth?
14         THE WITNESS:  I do.
15         COURT REPORTER:  Thank you.
16              DIRECT EXAMINATION
17 BY MS. ROBINSON-STAPLES:
18     Q    Good morning, Dr. Frame.
19     A    Morning.
20     Q    Ma'am, have you ever given a deposition
21 before?
22     A    Yes.
23     Q    How many depositions do you think you've
24 given?
25     A    Probably, at least, a dozen.

Page 8

1      Q    Okay.  When was the last time that you were
2  given -- that you gave a deposition?
3      A    Probably sometime earlier this year?
4      Q    Okay.  Have you testified in court with some
5  regularity?
6      A    Yes.
7      Q    How many times do you think that you've had to
8  testify?
9      A    I usually testify one to two times a month.
10     Q    Okay.  So I'm sure that you're somewhat aware
11 of the rules, but let me just go over a couple of them.
12 Most importantly, if I ask you a question that you don't
13 understand, please don't hesitate to let me know that so
14 that I can rephrase the question correctly in a clear
15 way.  If you need a break for any reason, obviously
16 we're happy to take those breaks, just let us know.  And
17 because of the recording and the court reporter, if you
18 can give audible answers to the questions, that's going
19 to make things a lot easier for them to pick those up
20 correctly, okay?
21     A    Yes.
22     Q    All right.  Ma'am, what did you do to prepare
23 for today's deposition?
24     A    I reviewed the report -- my -- my autopsy
25 report, as well as the report from the coroner,

Page 9

1  toxicology report and photographs that I took at
2  autopsy.
3      Q    Okay.  I'm going to go ahead and pull some of
4  those reports.  I don't know if these two documents were
5  initially two separate documents, but we're going to
6  mark them as two separate documents, because that's how
7  we have them.  I'll give you first what's marked as PL
8  737 as Exhibit 1 -- that is the Final Diagnosis --
9  Exhibit 2, sorry, and PL 740, which is the postmortem
10 examination as Exhibit 3.  Ma'am do you recognize these
11 --
12         MR. KELLEY:  I'm sorry.
13         MS. ROBINSON-STAPLES:  I'm sorry.  I'm sorry,
14 John.  Here you go.
15         MR. KELLEY:  Thank you.
16         MS. ROBINSON-STAPLES:  I'm not used to you
17 being so far away.
18         MR. KELLEY:  Okay.  So 1 and 2, okay.  Got it.
19 BY MS. ROBINSON-STAPLES:
20     Q    Okay.  Ma'am, do you recognize these
21 documents?
22         (EXHIBIT 2 MARKED FOR IDENTIFICATION)
23         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
24     A    Yes, this is my autopsy report.  The first
25 Exhibit 2 is just the first three pages, and Exhibit 3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

```
 1  is -- is our pages 4 through 10.
 2     Q    Okay.  So originally, that was one document?
 3     A    Yes.
 4     Q    Okay.  My apologies for separating that out.
 5  But it might make it easier for us to discuss later on,
 6  anyway.  So is that your signature on the second page
 7  --
 8     A    Yes.
 9     Q    -- of Exhibit 2?  And then are those your
10  initials on the bottom of each page of Exhibit 3?
11     A    Yes.
12     Q    Okay.  And you said you also reviewed some
13  photographs that you took?
14     A    Yes.
15     Q    Go ahead and give those to you as well.
16          MS. ROBINSON-STAPLES:  We'll mark this as
17     Exhibit --
18          COURT REPORTER:  4
19          MS. ROBINSON-STAPLES:  -- 4?
20              (EXHIBIT 4 MARKED FOR IDENTIFICATION)
21     A    Thank you.  Actually, these look like covers,
22  maybe the detective took them.
23  BY MS. ROBINSON-STAPLES:
24     Q    These are not photos that you had taken?
25     A    No.
```

Page 11

```
 1     Q    Okay.  Were there --
 2     A    They're -- they're during the autopsy, they're
 3  probably taken by the police.
 4     Q    Okay.
 5     A    Though --
 6     Q    I'm sorry.
 7     A    It'll work.
 8     Q    Okay.  Perfect.  Yeah, I looked through --
 9  there were several different photographs that we were
10  provided.  Several of them were clearly from the scene.
11  These appear to be the ones that were taken from
12  autopsies.
13     A    No problem.
14     Q    So even though you did not take these
15  photos, you agree that those are photographs that were
16  taken during your examination?
17     A    Yes.
18     Q    Okay.  Did you review any other photographs
19  provided by law enforcement from the scene itself?
20     A    I have not.
21     Q    Okay.
22     A    I believe I did at the time of autopsy, I
23  can't recall, but I did not for -- in preparation for
24  this.
25     Q    Okay.  In preparation for today's deposition,
```

Page 12

```
 1  did you review any police reports?
 2     A    No.
 3     Q    Okay.  In preparation for this deposition and
 4  reviewing your report, did you notice anything that you
 5  thought was a mistake or error?
 6     A    No.
 7     Q    At the end of page 2 of the Final Diagnosis,
 8  you gave an opinion in this case; is that correct?
 9     A    Yes.
10     Q    And in reviewing your documents, did that
11  opinion change?
12     A    No.
13     Q    Okay.  And when you made that opinion in this
14  case, was it based upon your skill, education, and
15  training?
16     A    Yes.
17     Q    Was it made to a reasonable degree of
18  scientific certainty?
19     A    Yes.
20     Q    Did you speak with anyone in preparation for
21  today's deposition?
22     A    No.
23     Q    All right.  Ma'am, if you could briefly
24  describe your educational background for us.
25     A    Yes.  As a medical examiner in the state of
```

Page 13

```
 1  Kentucky, I'm a forensic pathologist, which means that
 2  after four years of college in which I got a Bachelor's
 3  degrees in Biology and Pre-medicine, I went to four
 4  years of medical school for my medical degree.  Graduated
 5  from Southern Illinois University Medical School in
 6  2008, whereupon I joined a residency program, which is
 7  additional training, specific to the field of pathology,
 8  which is the study of disease.  And I completed that
 9  training in 2012 at the University of Kentucky.  After
10  that, I did a one year fellowship program specifically
11  in forensic pathology, which is the use of pathology to
12  answer legal questions.  And I completed that training
13  at the Medical University of South Carolina in the
14  summer of 2013, whereupon after that I joined the
15  Kentucky State Medical Examiner's office.
16     Q    So you have a medical doctorate, plus a lot
17  more training; is that correct?
18     A    Yes, that's correct.
19     Q    Okay.  And am I correct that you said that you
20  joined the Kentucky Medical Examiner's office in the
21  summer of 2013?
22     A    Yes, in July.
23     Q    And -- okay.  What's your official title,
24  ma'am?
25     A    I'm a State Medical Examiner.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    Q    Are you Board certified?
2    A    Yes.  I'm triple-boarded in anatomic clinical
3  and forensic pathology.
4    Q    Okay.  So you have not been employed in this
5  field in any other examiner's office; is that correct?
6    A    Correct.  Only in training.
7    Q    Okay.  And where did you work in training?
8    A    In training -- pathology training as a
9  resident, University of Kentucky, Forensic Fellowship
10  training at Medical University of South Carolina.  Here
11  in Kentucky, I've worked in the Louisville office and
12  then the Frankfort office.
13    Q    And you're currently stationed in the
14  Frankfort office; is that correct?
15    A    Yes.
16    Q    And when did you move to that office?
17    A    November of 2013.
18    Q    So in all of the training that you've
19  received, did you receive specific training on how to
20  examine wounds?
21    A    Yes.
22    Q    And how to determine the cause of death?
23    A    Yes.
24    Q    How to determine the manner of death?
25    A    Yes.

Page 15

1    Q    So as a State Medical Examiner, what are the
2  duties that you're tasked with?
3    A    My main duty as -- as a Medical Examiner in
4  Kentucky is to assist the county coroners in determining
5  cause and manner of death.  Cause of death being how did
6  that person die?  Manner of death being, based on
7  historical information, scene investigation, as well as,
8  the autopsy, determining whether or not it was at the
9  hand or another -- homicide, by one's own hand --
10  suicide.  And natural death, an accidental death, like a
11  drug overdose or a car wreck, or something -- when we
12  cannot determine, we call it undetermined.
13    Q    Okay.  And can you remember what you
14  determined the manner of death was in this case?
15    A    The manner of death is homicide.
16    Q    Ma'am, have you ever testified as an expert in
17  a case?
18    A    Yes.
19    Q    How many cases have you testified as an
20  expert?
21    A    I can't recall, but every time I get called to
22  court, it's as an expert witness, so, you know, at least
23  probably ten to twelve times a year.
24    Q    And then -- typically what types of cases are
25  you called to testify in court?

Page 16

1    A    Anything in which I performed an autopsy.  So
2  it could be a variety of things from drug overdoses to
3  motor vehicle accidents to homicides to, you know, even
4  natural deaths.
5    Q    Have you ever testified in an
6  officer-involved shooting death?
7    A    I can't recall if I've actually been called to
8  court specifically, but I've certainly performed these
9  autopsies before.
10    Q    How many autopsies do you think you have
11  performed on officer-involved shootings?
12    A    I couldn't give a number.  They're not that
13  common, no more than -- more than a handful, but I
14  wouldn't be able to give a specific -- as far as gunshot
15  wounds, you know, hundreds.
16    Q    Okay.  I was going to ask you that question.
17  Generally, how many autopsies would you say you perform
18  per week?
19    A    It's incredibly variable, and in general, it -
20  - probably, eight to ten a week.  It just depends.  I
21  got help now, before I was the only one here, so I've
22  probably performed over 2000 autopsies since joining the
23  office.  Last year, I believe I performed -- I was on
24  maternity leave part of that year, but it was somewhere
25  around 300 and something.  That's kind of the average.

Page 17

1    Q    Okay.  Do you measure a level of -- as State
2  Medical Examiner, how closely do you work with officers
3  or employees of the Kentucky state police?
4    A    They're here pretty frequently observing
5  autopsies and taking photographs.  I often communicate
6  results of autopsies to them and ask for help with maybe
7  getting records if the coroners aren't able to, or
8  photographs from the scenes from them.  So there's
9  generally someone here, probably, several times a week.
10    Q    In this case, I believe -- and we'll talk
11  about it more later, but I believe there was a detective
12  Bryan Johnson and Lieutenant Randy Surber who attended
13  the autopsy.  Do you know those two individuals?
14    A    I've met them and they were at the autopsy.  I
15  probably couldn't pick them out in a line up.
16    Q    So they aren't people that you communicate
17  with regularly in your duties?
18    A    I don't -- I mean, yeah.  I mean, if -- if I -
19  - it's not somebody that's here a whole -- maybe that I
20  would recall on a -- there's only a handful of people
21  that have been here for many, many times where I know
22  them more and, you know, maybe communicate more
23  frequently with them on certain cases, --
24    Q    Okay.
25    A    -- just by chance.  It all just depends on



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-15   Filed: 02/10/20   Page: 8 of 53 - Page ID#:
4813
The Deposition of MEREDITH FRAMPTON, taken on April 25, 2018

18..21

Page 18

1  what case I do that day, who I should speak with.
2      Q    So it looks as though the office of the
3  Associate Chief Medical Examiner or the State Medical
4  Examiner is a part of Justice and Safety -- Justice and
5  Public Safety Cabinet; is that correct?
6      A    Yes.
7      Q    Okay.  And the Kentucky State Police are part
8  of that cabinet, as well, correct?
9      A    They are.
10     Q    Okay.  So from whom do you take your direction
11  regarding your work?
12     A    I respond to my Chief Medical Examiner, Dr.
13  Bill Ralston, and he's stationed primarily in the
14  Louisville office, but he works at all the offices.  He
15  is my direct supervisor, and then above him would be
16  Tilley -- Director Tilley.
17     Q    Okay.  And Director Tilley is the head of the
18  Justice and Public Safety Cabinet under which --
19     A    He's secretary, yes.
20     Q    Okay.  So do you take any direction from the
21  Kentucky State Police?
22     A    No.
23     Q    When you are conducting officer-involved
24  shooting autopsies, do you generally speak with officers
25  from the Kentucky State Police before performing your

Page 19

1  autopsy?
2      A    It depends.  Occasionally, they might call to
3  ask what time the autopsy is going to be so they know
4  when to be here.  But oftentimes, I'm just getting a
5  call from the coroner that they're bringing a decedent.
6  And they ask -- they usually ask us what time so they
7  can let the police know.
8      Q    Okay.  Do you speak with the coroner before
9  conducting your autopsies, generally?
10     A    If they call us, in general, yes.
11     Q    And when you speak with the coroner, do they
12  give a narrative of what occurred?
13     A    Yes.  And depending on the time of night, it
14  might be very brief.  If it's during the day, they might
15  be able to tell us a little more information.  Sometimes
16  they call us on the way to a scene, so they may have
17  very little information.  So sometimes, it can be as
18  brief as, "Hey, I have somebody who's been shot, and I'm
19  going to be bringing them to you, what time are you
20  going to perform an autopsy?"  But generally, it's just
21  more of a scheduling, and then if they have more
22  information, they'll provide or I can ask questions, at
23  that time.  But they also have to fill out an
24  authorization form on which they put a narrative on
25  there.

Page 20

1      Q    Okay.  And do you review that authorization
2  form prior to conducting your autopsy?
3      A    Yes.
4      Q    Was an authorization form done in this case,
5  specifically?
6      A    Yes, we cannot perform an autopsy without the
7  authorization from the coroner.
8      Q    And did you review that form prior to your
9  deposition today?
10     A    Yes.
11     Q    And do you have that with you, ma'am?
12     A    Yes.
13     Q    Okay.  So can you just walk me through what
14  your general practice is when you're processing a body
15  prior to conducting the autopsy --
16     A    Yes.
17     Q    -- specifically involving gunshot wounds?
18     A    Yes.  So once we've reviewed the paperwork
19  from the coroner that has provided a signature
20  authorizing us to perform an autopsy, we confirm that we
21  have the correct decedent by checking the tags on the
22  bag, as well as the decedent, making sure that the names
23  all match up to the paperwork.  And then if we see
24  gunshot wounds, then we want to x-ray the body so we can
25  look to see if there are any projectiles still in the

Page 21

1  body so that we know where they might be when we're
2  doing the autopsy procedure.  And that way, we can keep
3  an eye out, it gives us an idea of where we're going to
4  be looking.
5      Q    Okay.
6      A    So we'll take photographs of the body before
7  we do anything, and then we'll x-ray.  After doing that,
8  then we start what's called an external examination
9  looking at the body, and it can be just simple things,
10  like hair color, eye color, height.  Looking at any
11  identifying features.  Sometimes people that come here
12  don't have identification, so we don't know who they
13  are, we need to look for tattoos, scars, things that
14  might be helpful in identifying them.  And then the
15  second part of that external examination is to look for
16  any injuries or any evidence of -- of any sort of
17  disease process, anything like that.
18     Q    Okay.  Do you take photos of the individual
19  -- if they come in clothed, do you take photos of the
20  individual with their clothing on?
21     A    Correct.  So we take what we call "as is
22  photos."  So once we open the bag, we take photos of how
23  they come to us, whether they're clothed, whether
24  they're not clothed, what position they've been put into
25  the bag by the coroner and -- and whatever things

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-15   Filed: 02/10/20   Page: 9 of 53 - Page ID#:
4814
The Deposition of MEREDITH FRAMPY, taken on April 25, 2018   22..25

Page 22

```
 1   they've come with.  So sometimes, there are other things
 2   in the body bag.  They might have personal effects on
 3   them, we take pictures of those.  And we document all of
 4   that before we start removing anything.
 5       Q   Okay.  Do you do anything different in
 6   officer-involved shootings than -- that you would do in
 7   other cases just involving non-officer-involved gunshot
 8   wounds?
 9       A   No, we do the exact same thing.
10       Q   Okay.  And we're going to go through what you
11   did specifically in this case, but would this be the
12   general process that you would have followed when you
13   were examining Mr. Mills in this case?
14       A   Yes.
15       Q   I think you've stated earlier that both
16   Detective Bryan Johnson and Randy Surber were present
17   during the autopsy of Mr. Mills; is that correct?
18       A   Yes.
19       Q   According to your report, Exhibit 3, it says
20   that the attendant was a Mr. Steven Hunt.  I'm assuming
21   that means he was also present?
22       A   Yes, that's my autopsy -- who -- he was my
23   autopsy technician that day.  He was assisting me in
24   moving the body and helping me remove organs.
25       Q   Okay.  And that's what I was going to ask,
```

Page 23

```
 1   what his role was.  So his role is to help you move the
 2   body?
 3       A   And -- and remove organs, to collect tissues,
 4   that kind of thing.  He -- he -- the exact title is a
 5   Forensic Autopsy Technician.
 6       Q   And if I've asked you this question already,
 7   my apologies, but can you recall if you spoke with
 8   Detective Johnson and Lieutenant Surber prior to
 9   beginning the autopsy about what had occurred that
10   night?
11       A   I don't recall specifics of the conversation,
12   but it wouldn't be unusual to ask their -- for their
13   narrative.
14       Q   Can you recall whatsoever what information you
15   had prior to beginning your examination?
16       A   Yes, actually, down in case history is the
17   information that I'd been provided by the coroner and
18   -- that the decedent was a 30-year-old white male who'd
19   been in an altercation, which -- with the sheriff's
20   deputy, he was tased twice and shot.  And I had his time
21   that he was pronounced on June 29th.
22       Q   Would you have written down every detail that
23   you were given that night in this case history?
24       A   Anything that would be pertinent.  This is
25   based off of the coroner authorization narrative.  And
```

Page 24

```
 1   since I had no additional information, then that leads
 2   me to believe that I didn't have additional information
 3   from anyone else.
 4       Q   Okay.
 5       A   I don't really need any additional information
 6   than that.
 7       Q   Okay.
 8       A   Uh-huh.
 9       Q   So other than the narrative and the
10   authorization form, can you recall reading any other
11   reports whatsoever?
12       A   No.  Well, actually, let me just check.  I
13   don't think that he went to a hospital, but that would
14   be the only other thing.  Sometimes if people go, you
15   know, have emergency, you know, EMS or something, then
16   sometimes I get those records occasionally, an EMS
17   record.  I don't recall one though.  No.
18       Q   Ma'am, do you typically take notes prior to
19   beginning your examination?
20       A   Other than the diagrams that I draw during
21   autopsy, no.
22       Q   Okay.  And just so I'm clear, if you had
23   received any information from the officers who were
24   present during the autopsy, that would have made its way
25   into this case history?
```

Page 25

```
 1       A   If it was anything different than the
 2   information I received.  Sometimes I get a preliminary
 3   narrative from the coroner that -- describing one
 4   situation, and then as the night goes on, and maybe
 5   they've already filled out the paperwork, they don't add
 6   to it, there might be some different information that
 7   might come up with the investigation, "Oh, maybe they
 8   weren't shot, but it was actually a stab wound," or
 9   something like that.  And so, if that information
10   changes, I'll say, you know, "And then from the police
11   or from the investigators I have, you know, this
12   history," but most of the time it's really the same
13   information.
14       Q   Okay.  Can you recall if the officers asked
15   you to, like, look for anything specifically when you
16   were performing your examination?
17       A   Like on the body?
18       Q   Uh-huh.
19       A   I mean, other than wanting to recover
20   projectiles, they mentioned that they thought the taser
21   probes were still in the body bag or -- that's about all
22   I recall.
23       Q   Okay.  So just speaking generally, does the
24   narrative that you're provided on the authorization form
25   affect the way you perform your examination in any way?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1    A    It depends.  If I need to look specifically
2  for certain things, like, in this instance, I was told
3  there's gunshot wounds, so I will do x-rays.  I don't do
4  x-rays in every case.  So in that -- in that way, yes.
5  But for the most part, autopsies are pretty much the
6  same no matter what.  You might just have to do a few
7  additional tests depending on what you're looking for.
8  So if it was something that came in as a drug overdose,
9  obviously, I might want to do additional testing beyond,
10  or if somebody's looking for a particular drug, we might
11  do additional testing, but the autopsy itself is pretty
12  much the same no matter what you're looking for.  We may
13  do a limited autopsy if we're -- it looks like a motor
14  vehicle accident, we would obviously have external
15  injuries that are lethal, so we may not open a body.  So
16  we might, you know, do a shorter examination, but for a
17  gunshot wound case, we're -- it doesn't matter if the
18  person, you know, shot themselves or got shot by
19  another, that, you know, that piece of information is
20  helpful for determining manner of death, but for the
21  autopsy itself, we do the exact same thing every time.
22    Q    Okay.  Do you do or order toxicology tests in
23  every case?
24    A    Yes, we routinely do -- we did go through a
25  period of time where we had a budget cut and could not

Page 27

1  order it in every case, but we ordered it in most of our
2  cases.  Certainly all of our homicides, and we're always
3  doing toxicology.
4    Q    Okay.  If we can just go through your report.
5    A    Uh-huh.
6    Q    When was it that Mr. Mills was pronounced
7  dead?
8    A    On June 29, 2016, and we performed the autopsy
9  the following morning on June 30th.
10    Q    Okay.  And it looks like he was pronounced
11  dead at 11:58 p.m.; is that correct?
12    A    Yes.
13    Q    And then you performed the autopsy at
14  10:00 a.m. the next morning?
15    A    Yes.
16    Q    So around -- less than 12 hours later,
17  correct?
18    A    Yes.
19    Q    Ma'am, do you have a copy of the authorization
20  form that the coroner provided to you with you?
21    A    Yes, I have one here.  Here.
22    Q    Uh-huh.  Just a second, please.  Okay.
23        MS. ROBINSON-STAPLES:  John, would you like to
24  see it?
25        MR. KELLEY:  If I can, just to look at it,

Page 28

1  thank you.
2        MS. ROBINSON-STAPLES:  Yup.
3        MR. KELLEY:  Okay.
4  BY MS. ROBINSON-STAPLES:
5    Q    Ma'am, if you would just explain to us or go
6  over what is on that form, please.
7    A    Sure.  So this form has the name of the
8  decedent, the age, the sex of the decedent, the race,
9  where the decedent was found, when they were pronounced
10  by the coroner, and then we have a spot for, like, a
11  narrative -- a history where they tell us what happened
12  --
13    Q    Okay.
14    A    -- and that's basically the gist of it.  The
15  important thing is that we have the decedent's
16  information, what they think might have happened, and
17  the signature.  We have to have the signature of the
18  coroner or the deputy coroner, in this case, in order to
19  perform the autopsy.
20    Q    And you said it was the deputy coroner --
21    A    Yes.
22    Q    -- in this case that provided the signature.
23  And who was that, ma'am?
24    A    Floyd Blevins.
25    Q    Okay.  And what is the narrative that Mr.

Page 29

1  Blevins provided to you on that form?
2    A    Sure.  So type of death that is suspected, he
3  put gunshot wound.  History/what happened, "Got into an
4  altercation with sheriff deputy.  The deputy tased him
5  twice and then he shot him."
6    Q    Okay.  And is there any more in the narrative
7  section?
8    A    There's some additional information unrelated
9  to his cause of death, but I think I don't recall the
10  specifics, but I think the first responder was exposed
11  to the decedent's blood.  So they were asking for our
12  help to see if this decedent had hepatitis C or HIV so
13  that they knew whether or not they needed to take some
14  prophylactic medication.  And then -- also an -- an
15  indicator for us for toxicology testing they asked, he
16  said that the suspected drug that the decedent might
17  have been using was Flakka.
18    Q    Okay.  And can you -- do you recall if you
19  tested for hepatitis or HIV?
20    A    I do have a record, it looks like across the
21  hall and they were able to do a little bit of
22  preliminary testing.  We use the Department of Public
23  Health when there's a needle stick exposure.  And it
24  looks like they were able to do HIV testing, hepatitis B
25  testing, and some preliminary hepatitis C testing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1    Q    And what were the results of that, ma'am?

2    A    The hepatitis B was non-reactive, HIV was
3 non-reactive, hepatitis C was reactive, but because of
4 the only available samples, meaning we were only able to
5 often get whole blood not serum, and because of that,
6 they can't do additional testing to see the -- what we
7 call "the viral load" to see how much hepatitis C is in
8 there -- confirmatory testing, basically.  So it's
9 preliminary.

10    Q    Okay.  So just to make sure that I understand
11 that hepatitis B and HIV were non-reactive, meaning
12 what?

13    A    They mean that they're negative.

14    Q    Okay.  And the hepatitis C was reactive --

15    A    Was reactive, but we couldn't do confirmatory
16 testing.

17    Q    Okay.  So can you say based on that report
18 whether or not he had hepatitis C?

19    A    It's highly suggestive that he -- he might be
20 positive for hepatitis C.  Not really an autopsy issue,
21 just public health.

22    Q    Yes, ma'am.  Okay, ma'am, if we can begin by
23 looking at your report, Exhibit number 3, Exterior of
24 the Body.  Can you just take me through that first
25 paragraph?

Page 31

1    A    Sure.  So he was received in a sealed body
2 bag, meaning there was, like, a zip tie through the body
3 bag.  The Coroner identification tags were on that as
4 well as his toe.  And he was wearing a sleeveless shirt,
5 blue jeans, he had a brown boot on his left foot.  He
6 also had another boot in the body bag.  And he had some
7 items in his pants pockets, something that looked like
8 ginseng root, some kind of plastic piece, a penny, and a
9 card that was labeled Kentucky Court System.  We took
10 photographs of him and we took some x- rays of his chest
11 and abdomen.

12    Q    Okay.  And would you have noted everything
13 that was found on or about his body in this section of
14 your report?

15    A    It depends.  Sometimes things might end up in
16 -- in other areas.  I think in this case, I think, I put
17 the taser probes that were found in there.  And I say
18 "taser," but I don't even know if it was the brand
19 TASER. it's kind of like Kleenex.  I just forget the
20 long name of what device is called, so it's just easier
21 to say taser.  I think I noted that with the marks on
22 the body.

23    Q    Okay.  Other than the taser, can you recall
24 finding anything but the items that you listed here in
25 this paragraph?

Page 32

1    A    No, and I'll just double check by looking at
2 the list of the items that I submitted to the police
3 that I gave them of the personal effects.

4    Q    Okay.

5    A    So, yup --

6    Q    And is that found on the last page of your
7 report, ma'am?

8    A    Yes, page 9 and 10 list out the clothing, his
9 pocket contents, which were those items I mentioned,
10 hair that we pulled off of him for a DNA standard, a
11 blood spot card from him, which we -- is a DNA standard,
12 the taser probes and the cable that it's attached to,
13 and then the two projectiles recovered at autopsy.

14    Q    Okay.  And moving to the second paragraph of
15 that section, can you just go over that quickly with us,
16 please?

17    A    Sure.  This is just describing that he is a
18 normally developed, adequately nourished adult white
19 male.  He is consistent with his stated age of 30 years.
20 He's approximately 70-and-a-half inches tall and about
21 210 pounds.  Now, again, those are estimates on the 210
22 pounds.  This is based on -- when they are brought into
23 our morgue, they are measured on a cart.  We have a ramp
24 with a scale and then they just subtract the weight of
25 the cart.  So it's not a super -- it's within, probably,

Page 33

1 five to ten pounds of accuracy.

2    Q    How accurate is the measurement in length?

3    A    We measure that with a measuring tape.

4    Q    So that is accurate?

5    A    Yes.  Now, again, depending on the position of
6 the body, we might be a half-an-inch or two off because
7 they might, you know, not have their legs completely
8 stretched out as best as we can, but we try to get a
9 very accurate measurement.

10    Q    Within half an inch or an inch?  And by my
11 calculations, 70 and-a-half inches in length equates to
12 about 5'8"; is that correct.

13    A    5'10".

14    MR. KELLEY:  5'10".

15    Q    5'10".

16    MR. KELLEY: 5'10"

17    A    5'10" and-a-half.  5'10" - 5'11", somewhere in
18 there.

19    Q    Okay.  And then if you can go on talking about
20 the --

21    A    Sure.

22    Q    -- preservation?

23    A    And then the next thing is to just note rigor
24 mortis, which is the stiffening of the muscles that
25 happens after death.  And livor mortis, which is the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

1   blood pooling that occurs after death.  In this case,
2   his rigor mortis is what we call partially fixed,
3   meaning I was to -- to break it -- move his arms and
4   legs with relative ease, not -- pretty typical for this
5   12-24 hour time period since death.  And the lividity
6   was on the back, which is not unusual -- it's
7   consistent.  Once this happened, they would have rolled
8   him over, put him in a body bag, and it's consistent
9   with his position within that body bag.
10       Q   Okay.  And then onto the third paragraph.
11       A   This is just describing his, you know, hair
12   color, eye color.  He had brown hair, he had a beard
13   that was similar color, he had brown eyes.  He didn't
14   really have much going on in the eyes other than a
15   little bit of drying artifact, which is normal.
16   Sometimes the eyes aren't closed completely, so you get
17   a little drying artifact -- as they're in the cooler.
18   You know, nothing out of the ordinary, as far as, you
19   know, the shapes of ears, nose and lips are all normally
20   developed, had teeth in fair condition.  He had what we
21   call slightly barrel chest, meaning his chest kind of
22   stuck out a little bit.  He may have been a smoker,
23   sometimes smokers have that chest that sticks out.
24   Really nothing else unusual about -- he was a normally
25   developed adult male.

Page 35

1       Q   Okay.  And then you note some identifying
2   tattoos; is that correct?
3       A   Yes.
4       Q   Okay.  You didn't find any evidence of any
5   previous medical treatment; is that correct?
6       A   Yes, if they had put EHT bags or something on
7   them, they were -- they weren't there when -- and they
8   may not have.
9       Q   Okay.
10       A   But sometimes those get removed.
11       Q   Okay.  So you note that there were two gunshot
12   wounds, correct?
13       A   Yes.
14       Q   Let's talk first about the gunshot wound to
15   the chest.  Can you explain what the -- what you found
16   in that first paragraph?
17       A   Sure.  So this entrance wound is round,
18   approximately, one-half inch by one-half inch.  It was
19   located on the left side of the chest, just slightly
20   left of the midline -- about three fourths of an inch
21   left of the midline.  It had what's called an "abrasion
22   border," which is as the projectile is entering the skin
23   and tissue, it burrows out an area on the tissue.  In
24   this case, it was at the 9:00 to 3:00 aspect of the
25   wound.  So if you think of the wound like a clock, it

Page 36

1   was from 9:00 to 3:00.  So it's telling me that the
2   projectile is probably going downward.  It's really just
3   a hint on the direction.  It's helpful.
4       Q   Okay.
5       A   And I did not see any soot or stippling, so
6   it's what we call "indeterminate range," meaning --
7   soot, meaning the gunpowder of the discharge from the
8   weapon, we would see that for most -- it depends on the
9   weapon, but for most handguns, that's going to be either
10   contact or very close range.  So if it's contact, it's
11   going to sear the skin and leave soot around the edges
12   of the wound.  As you get a little bit further -- a
13   couple of inches away, it's good you're going to see the
14   soot on the outside and around the edges of the skin
15   around the wound.  Stippling is the unburned gunpowder
16   that comes out, hits the skin and causes what's called
17   "powder tattooing."  Leaves little red abrasion marks on
18   the skin.  And that's something that occurs for most
19   handguns at several inches away.  So it can be sort of in
20   that near to intermediate distance.  The further you get
21   away you're not going to see either.  Not seeing either
22   doesn't really tell me anything, because you could have
23   things that might interfere, clothing.  It could be
24   through some sort of intermediary objects, if somebody's
25   being shot through a window or a door.  And then

Page 37

1   sometimes, just depending on the -- the weapon, maybe
2   it's a weapon that doesn't leave soot or stippling and,
3   you know, as well, is how I'll put it.  So not being
4   there just tells me, I don't know the distance between
5   who fired, you know, who shot him and the decedent.  I
6   can't -- I can't tell you anything about that distance.
7       Q   So certain types of weapons have a propensity
8   to leave soot or stippling or not, depending on how
9   close you are; is that correct?
10       A   It depends on how close -- well, every weapon
11   is going to leave soot or stippling at different
12   distances.
13       Q   Okay.
14       A   Something -- sometimes what can happen is if
15   you have a very high powered weapon and somebody has a
16   contact wound, you might not see any soot on the edges,
17   but it's all inside the wound tract.  It just blows it
18   all in.  So it's really -- you know, it's dependent, but
19   a general guideline for handguns is that soot, after a
20   couple of inches, you're not really probably going to
21   see it.  And then when you start to get, you know, in
22   that more than 30 inches away from the surface, you're
23   probably not going to see stippling either.  Those are -
24   -
25       Q   More than 30 inches?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-15   Filed: 02/10/20   Page: 13 of 53 - Page
ID#: 4818
The Deposition of MEREDITH FRAMPTON, taken on April 9, 2018
38..41

Page 38

1    A    Yeah, I mean, those are just rough estimates.
2 So it's not really that far away.
3    Q    Sure.
4    A    Think about it.  That's not -- 30 inches is
5 not much.
6    Q    Okay.  So it's -- you're not able to determine
7 how far away someone was when they were shot?
8    A    Correct.
9    Q    Okay.  Ma'am, if you don't mind, can you find
10 a picture of this gunshot wound that we are talking,
11 just so we can all make sure that we are on the same --
12    A    Sure.
13    Q    -- page?
14    A    I think it's PL 207 shows an overall of his
15 chest, and you can see the wound just left of midline
16 there.  Actually, 208 shows them both.
17    Q    Okay.
18    A    So that is probably more --
19    Q    Perfect.  And so the one that we're speaking
20 about right now is the one at the top of the chest?
21    A    Yes.
22    Q    Across from the tattoo that says, "Whitney,"
23 correct?
24    A    Yes.
25    Q    Okay.  Okay.  I think that your next

Page 39

1 paragraphs discusses the organs that the projective
2 perforated.
3    A    Yes.  So as -- the projectile perforated
4 through the skin and underlying soft tissue and the
5 muscle of the chest, went through the rib cage, and that
6 went through ribs on the left side.  Went through what's
7 called the pericardial sac, that's the sac that's
8 surrounds your heart -- encases your heart.  Went through
9 the heart and that's the -- I've listed out specifically
10 where on the heart, but really the gist of it is on the
11 heart, back through the sac surrounding the heart.  So
12 it goes back through the sac, down through the diaphragm
13 -- that's the muscle that separates your chest and your
14 abdominal organs -- through the stomach, through part of
15 the liver, the spleen, tissues around the pancreas,
16 these are all in this region of the upper abdomen in the
17 posterior aspect, and as it traveled back ended up in
18 the soft tissues of the back.
19    Q    Okay.  Does the path of that wound then allow
20 you to develop information about the trajectory of the
21 projectile?
22    A    Yes.  So I based my pathway on what we call,
23 "standard anatomical position."  Now, most people are
24 not standing in standard anatomical position, which is
25 standing straight up with their arms turned out, like,

Page 40

1 on my -- in my diagrams.  But that's the only way we can
2 really give an interpretation of how it's traveling
3 through the body.  So with him standing, like, straight
4 up, arms out -- I'll show you.
5    Q    Yes, please.
6    A    Like this (indicating).  All right?  With
7 standard anatomical position, that projectile was going
8 down -- was going back -- front to back.  And it went a
9 little to the left.
10    Q    Okay.
11    A    Actually, more than a little.  About eight
12 inches to the left.
13    Q    And based on that information, do you have any
14 idea as to how far away the officer was when he shot
15 that projectile?
16    A    No.  So as I said, with no soot or stippling
17 being there, it's what we call an indeterminate range.  I
18 don't know how far away he was.
19    Q    Okay.  Okay, let's talk about the gunshot
20 wound to the abdomen.
21    A    Okay.
22    Q    Could you just explain --
23    A    Sure.
24    Q    -- that to us, please?
25    A    Sure.  So this was also a gunshot entrance

Page 41

1 wound at the abdomen.  It's in the left upper quadrant.
2 It was about five-eighths by five-eighths inches.  And
3 it was about two-and-a-quarter inches to the left of
4 midline, so again, sort of just slightly left of
5 midline.  This one had what we call a circumferential
6 abrasion order, meaning that -- here's the wound, and as
7 the projectile went in, it was probably hitting it
8 pretty relatively head on, perpendicular and has a nice
9 round abrasion border consistent with an entrance wound.
10 Again, on this wound, no soot or stippling was
11 identified, so it's what we call indeterminate gunshot
12 wound.  This -- this entered and -- and went through the
13 skin and underlying soft tissue and muscle of the
14 abdomen, through what's called the peritoneum, that's
15 the lining of your abdominal cavity, went through small
16 and large bowel.  A muscle called the left iliopsoas
17 muscle, which is down near your pelvis.  And it went
18 through that muscle and entered, actually, into the
19 pelvic bone.
20    Q    And what was the projectile or the pathway of
21 that projectile?
22    A    This one was predominantly backward and to the
23 left.
24    Q    Is there any way for you to determine which
25 gunshot wound Mr. Mills suffered first?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1    A    No, there's no way.
2    Q    Okay.  So the wound that you were just
3 describing is the one that's at the bottom of his body
4 on this picture of 208, correct?
5    A    Correct.
6    Q    Okay.  So let's turn to the other injuries
7 that you noted in your report.  You begin by noting
8 injuries to his head and neck, correct?
9    A    Yes.  So sometimes for organizational
10 purposes, I just put in the different regions of the
11 body, and that way I can organize injuries and make it a
12 little bit easier to review.
13   Q    That makes sense.  Before you explain to us
14 the injuries that you found on his head and neck, can
15 you find a picture in this exhibit that we can look at
16 while you're describing them, please?
17   A    Sure.  Should be able to.  Let's see.  So a
18 lot of times, people will have just kind of
19 non-specific scrapes, which are called abrasions, and
20 bruises, which are called contusions.  So some of those,
21 like on 216, which show some of these abrasions that I
22 mentioned on the side of his face, you can see those in
23 216.  I'm going to see if they have any of him cleaned
24 up.  Usually, the photos after we've washed him are
25 better for showing --

Page 43

1    Q    Yes, ma'am, and I think those are towards the
2 back of the packet.
3    A    Okay.  And they may not have every wound, but
4 I have at least those with a name ones.  All right.  So
5 245 is showing the back of his head.  This is that
6 slightly Y-shaped laceration that I mentioned.
7    Q    Okay, so let's --
8    A    We've shaved his hair, so that -- obviously,
9 that wasn't like that.
10   Q    So let's talk about that abrasion.  Where is
11 that in this report?
12   A    Let's see.  Under head and neck.  It looks
13 like the second sentence, "A slightly Y-shaped
14 laceration," meaning a tear in the skin, is at the right
15 posterior primal scalp.  And that's just showing --
16   Q    And what --
17   A    -- the picture of that.
18   Q    What does the phrase mean, "With underlying
19 subscapular hemorrhage"?
20   A    Meaning that when we reflected back his scalp
21 upon internal examination that there was a little bit of
22 blood underneath --
23   Q    Okay.
24   A    -- that -- that -- that wound.
25   Q    Is there any way to tell what type of object

Page 44

1 would have caused such an injury?
2    A    So this is considered a non-specific blunt
3 force injury.
4    Q    And what does that mean?
5    A    Meaning that some sort of blunt force -- I
6 don't know if it was an object.  Could have been when he
7 fell on the ground, I don't know.
8    Q    So he could have received an injury like that
9 just by falling on the ground?
10   A    It's possible.  People can fall and slit their
11 scalp.
12   Q    Is it also possible that he could have
13 received that injury by being hit in the back of the
14 head with a mag flashlight?
15        MR. KELLEY:  Note objection.  Go ahead.
16   A    Yes, it's possible.
17   Q    Or with a baton?
18        MR. KELLEY:  Same objection.
19   A    It's possible.  Like I said, it's non-
20 specific.  I don't know what caused it.
21   Q    Okay.  But is it also possible that it could
22 have been caused by being hit in the head with
23 somebody's fist?
24   A    Potentially, I suppose.
25   Q    What about being kicked in the head.  Would

Page 45

1 that have caused such an injury.
2        MR. KELLEY:  Note objection.
3    A    I suppose it could.  You might expect to maybe
4 see something else, but, again, like I said, it's non-
5 specific, so I don't know what caused it.
6    Q    Okay.
7    A    The next page shows the -- first sentence
8 -- the other laceration -- the other tear in his scalp,
9 again, non-specific.  I don't know how he got it.
10   Q    And how big is that laceration according to
11 your report?
12   A    It's about an inch in length.
13   Q    Okay.  And where is -- oh, that is the first
14 sentence in your report?
15   A    Yes.
16   Q    Okay.
17   A    And actually, 247 has a nice cleaned up
18 showing those scrapes on the side of his face, and then
19 that laceration as well.
20   Q    So going back to the laceration, you say that
21 it also has underlying subscapular soft tissue
22 hemorrhage, as well as focal hemorrhage of the left
23 temporalis muscle.
24   A    So right underneath here (indicating), you
25 have your scalp.  And then underneath that, in this



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1  location, you have a muscle called the temporalis
2  muscle. It's one of your face muscles kind of thing. So
3  anyway, there's a little bit of hemorrhage on that. Not
4  atypical considering this location, but -- to be
5  abnormal, but if you have a wound here, you're going to
6  have some hemorrhage underneath that and probably on the
7  muscle underneath that.
8      Q   And how deep is that wound?
9      A   It looks like it's about a quarter-inch.
10     Q   Okay. And, again, you can't state with
11 specificity what may have caused that type of wound?
12     A   Right. It's a non-specific blunt force
13 injury.
14     Q   Would you expect to see such a wound by
15 falling on the ground?
16     A   I have, but it's not necessarily.
17     Q   Okay. So it could also be from the use of a
18 flashlight --
19     A   It could be.
20         MR. KELLEY: Note objection.
21     Q   -- or a baton?
22         MR. KELLEY: Note objection.
23     A   It could be.
24     Q   Okay. And you said that this picture also
25 shows us some of the abrasions that you speak of?

Page 47

1      A   Yes.
2      Q   Okay.
3      A   I described some abrasions on the left
4  periorbital region, which means around the eye and the
5  cheek.
6      Q   Okay.
7      A   Again, non-specific. Could be if his face was
8  on the ground, could be from inflicted trauma, no way to
9  tell.
10     Q   And, ma'am, you note that there are red
11 abrasions. Does the color have any significance?
12     A   Sometimes we will see things that have a
13 little bit more yellow to them. And oftentimes, that
14 yellowish color -- the yellowish hue is what we call,
15 sort of, a lack of what we term "vital reaction,"
16 meaning that they might have occurred right around the
17 time of death or shortly after time of death --
18 postmortem abrasions. These are kind of dried in
19 appearance, so when I describe it as a dried, red look
20 to it. Probably in or around the time of death he
21 received those, but it's not a very specific thing,
22 because scabs can look like that too, but these aren't
23 scabs.
24     Q   Okay. So on or about the time of death, you
25 believe?

Page 48

1      A   Yeah, so we just describe the color because
2  that's just -- you know, we're pathologists. We like to
3  give a color to everything, but sometimes things that
4  are more yellow might be things that might be more
5  postmortem injuries.
6      Q   So you don't believe that these abrasions are
7  abrasions that were received postmortem, correct?
8      A   Right. I mean, they could have been right
9  around the time of his death. I guess he collapsed and
10 fell -- it could have been around that time, but they're
11 not things that happened, you know. When we're talking
12 about those, we're all going to, you know -- somebody
13 that's been down a period of time --
14     Q   Okay.
15     A   -- we're trying to determine if something is
16 significant.
17     And as we talked about earlier, the coroner
18 had noted that Mr. Mills had been in an altercation
19 before his death. So it's possible that he received
20 these abrasions in that altercation --
21     A   Yes.
22     Q   -- is that correct? Okay. Is there anything
23 else about his head or neck that you noted that we have
24 not discussed?
25     A   I don't -- I think there might have been

Page 49

1  another really small laceration on his left cheek, but I
2  don't -- it's hard to see it on this picture. It might
3  be what's above this big abrasion, but I can't really
4  tell. Let me see if I can -- looking at somebody else's
5  photos, sometimes it's hard to figure out what they were
6  taking a picture of.
7      Q   My apologies, ma'am.
8      A   That's okay.
9      Q   I tried.
10     A   I think it's in that -- I think it's in that
11 area. Just because I'm describing left upper cheek, so
12 I -- I'm pretty sure that looks like a laceration to me.
13     Q   Okay.
14     A   It's just a little far away, but you can see
15 it's just like a small, little one-quarter-inch
16 laceration.
17     Q   Okay.
18     A   And he had a -- I think another scrape on his
19 chin -- another abrasion on his chin. Another
20 non-specific --
21     Q   All right. And turning to his trunk --
22     A   Uh-huh.
23     Q   -- you note some brown, yellow contusions on
24 the shoulder area. Do you see a picture that we can
25 look at for that?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-15  Filed: 02/10/20  Page: 16 of 53 - Page
ID#: 4821
The Deposition of MEREDITH FRAMPT, taken on April 10, 2019

50..53

Page 50

1     A   I don't, but my description of them suggests
2 that -- well, maybe this is a -- 230, I think that's his
3 -- yeah, it looks like his armpit. Just a couple of
4 brownish, yellow bruises had probably been there.
5     Q   And you were talking about the bruise that is
6 right above his armpit?
7     A   Yeah, here's his armpit, and it's right here
8 (indicating).
9     Q   Okay.
10     A   So it looks like I've described them as the
11 right shoulder axillary region -- that's being your
12 axilla here -- your armpit, just a nice way of saying
13 armpit. He's got two -- two bruises there.
14     Q   Okay. And what is the significance of the
15 color of that contusion or bruise?
16     A   So you can't really date or time a contusion.
17 I know, people -- pathologists will tell you they can,
18 but you really can't. So what your mom taught you is,
19 usually, pretty reasonable for adults. So bruises,
20 usually, start out as kind of blue-purple, then they
21 move to a sort of green-yellow-brownish color as time
22 -- as they -- as they heal. So most likely he -- he's
23 had those --
24     Q   And meaning that you don't think that he
25 received those bruises a short time before his death?

Page 51

1     A   Yeah, I mean, they -- they suggest that it
2 probably happened at some other point. Now, I don't
3 know. Hours, days, what, but it's, you know --
4     Q   Well, if you were doing the examination twelve
5 hours or so after he was deceased --
6     MR. KELLEY: Ten hours -- ten hours to be
7 exact.
8     Q   Okay. Ten hours after he was deceased. Is it
9 possible that those bruises were obtained in that short
10 a window?
11     A   He's deceased, so, no, they're not going to
12 change.
13     Q   Well -- okay. So what about twelve hours
14 prior to when he was deceased?
15     A   So I'm -- what I'm saying is is that however
16 he was when he died, that's how they're doing to look,
17 pretty well.
18     Q   Okay.
19     A   Sometimes bruises will be a more apparent as
20 we do the autopsy and drained the body of blood, but
21 they're not going to more from looking red-purple to
22 looking brown-yellow.
23     Q   Okay. Thank you.
24     A   Uh-huh.
25     Q   You answered the question that I did not ask

Page 52

1 in a very --
2     A   No problem.
3     Q   -- good way. Okay. Then you also note a
4 red-purple contusion on the left shoulder region.
5     A   Yes, an approximately one half-inch bruise.
6 Again, these are non-specific, no way to know, you know,
7 how they got there.
8     Q   If they were red and purple, does that
9 indicate that those bruises were more fresh?
10     A   As compared to the brown-yellow, but in terms
11 of did it happen right before he died or did it happen
12 earlier that day, or did it happen even the day -- I
13 don't know.
14     Q   Okay. And do you see a picture that shows
15 those bruises?
16     A   I don't think so. Most of these, it looks
17 like he was standing on -- the right side of him. But
18 you can just imagine a very, you know, a relatively
19 small one half-inch bruise.
20     Q   Okay. So ma'am, it had always been my
21 understanding that a bruise that resulted as a result of
22 some forceful trauma might be delayed in appearing on
23 your skin; is that an accurate --
24     A   It can be, like, when you, you know, run into
25 the table and it might take a couple of hours for

Page 53

1 something to form, but -- but in some people, you know,
2 it doesn't take that long, necessarily. Some of us are
3 easy bruisers and -- and in turn -- it does require that
4 there is some bleeding into the tissues, and it can be
5 from a very minor trauma even to get -- to get that.
6 But, you know, it may not be an instant mark, but it
7 might be something that happens within 15 minutes -- 30
8 minutes. Even less time, just depends on the person.
9     Q   But if the individual passes away prior to the
10 bruise showing itself, then it's not going to appear at
11 all?
12     A   Well, if there's been injury to the tissue and
13 the blood has, you know, seeped out. Like I mentioned,
14 sometimes when we let them sit and even times if we
15 remove organs -- specifically, I'm thinking of cases
16 like child abuse -- put them back in the fridge, we
17 might, actually, be able to see what is there, it just
18 shows up better as the blood pools.
19     Q   Okay.
20     A   If it's already pooling, but you can't see it,
21 and if you give it a little time to settle -- gravity,
22 you'll be able to see it better.
23     Q   Okay. So do you know if that occurred in this
24 case?
25     A   It's possible that being in the cooler that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1    time might have made some of these a little bit easier
2    to see -- that maybe they couldn't see, you know, the
3    day before, maybe, sitting -- sitting and letting that
4    blood pool made it easier to see, or it could just be
5    that, you know, he had some of these.  I don't know when
6    he got some of these bruises.  The more non- specific
7    ones it's hard to say because, you know, sometimes even
8    pulling the body, you know, but you might leave marks on
9    the body.  Not a bruise, but it's hard to know a
10   specific timeframe.
11        Q    And the bruises you're speaking of are the
12   smaller bruises --
13        A    Right.
14        Q    -- correct --
15        A    Yes.
16        Q    -- that were found on his body?
17        A    Yes.
18        Q    But you did find some larger bruises; is that
19   correct?
20        A    That's correct.
21        Q    Okay.
22        A    Yes.
23        Q    And where were those found?
24        A    So on his right arm, left arm and left
25   forearm.  And I'm trying to find pictures, but I don't

Page 55

1    see them -- oh, wait, here.  229 shows that -- he's not
2    cleaned up, but you can see what I'm talking about on
3    the right arm.  Beneath that tattoo, you see this
4    parallel contusion.  All right, so this is what we call
5    a pattern injury.  This is something that is a little
6    bit more specific than just those little round bruises
7    we've been talking about.  This is a parallel contusion
8    and there's a little bit of what we call central pallor,
9    meaning it's white in the middle of it.  So you have
10   bruising, almost like a track, and then it's pale in the
11   middle.  And that --
12        Q    The bruises that you're talking about right
13   now are the purple -- the purple lines, ma'am?
14        A    Right.
15        Q    Okay.
16        A    Yes.
17        Q    And I'm sorry to interrupt you.
18        A    No, you're fine.  And so what that -- what
19   that parallel injury with the pallor in the middle, that
20   usually tells us that it's probably like a cylindrical
21   object that's -- that struck that.  So that's a little
22   bit more helpful in determining what may cause a wound
23   like that.
24        Q    So, like, a flashlight or like a --
25        MR. KELLEY:  Note objection.

Page 56

1        A    That --
2        Q    -- a baton?
3        A    Could be that.  So the things that are
4    cylindrical like that.  So, yes, flashlight, a handle, a
5    baton, you know.  I think the classic picture in our
6    books is, like, broom handles and things like that -- so
7    something cylindrical would create that because it's
8    going to impact -- and because it's rounded it leaves
9    that pattern in the middle.
10        Q    Okay.
11        A    A close up on it on 230 shows you what we're
12   talking about a little bit better.  Let me see if I can
13   find any other -- again, those are what we call
14   patterned injury.
15        Q    Ma'am, if you will, would you look at page 2
16   of 5 --
17        A    Uh-huh.  Yes.
18        Q    -- so let's --
19        A    Oh, okay.  Yes.
20        Q    It looks like to me there are three -- at
21   least three of those patterned contusions that you're
22   speaking of; is that accurate?
23        MR. KELLEY:  Note objection.
24        A    Let's see.  Yes, it looks like -- that tattoo
25   is kind of in my way, but I -- I'd have to look at a

Page 57

1    closer up of that middle one, but the other two
2    definitely have the central pallor.
3        Q    206 may help you, ma'am.
4        A    Okay.  It's -- it's likely.  It's hard to say,
5    it's not as -- it's not as perfect -- not as good of a
6    pattern as the other two, but it also has that linear
7    look to it.  And I think, maybe, a closer up would -- I
8    think that might make it clearer, but -- but definitely
9    the same thing we're talking about.  You've got that
10   parallel contusion -- bruising with a central pallor --
11        Q    Right.
12        A    -- consistent with cylindrical object.
13        Q    Okay.  On Page 2 of 6, at the top of his
14   shoulder there appears to be something there.  Can you
15   tell what that is?
16        A    It just looks like a scrape -- abrasion. Let's
17   see.  I don't think it's anything.  Actually, that might
18   be -- I think that might be a big bruise.  It's hard to
19   tell if it's a bruise or abrasion in the - - in this
20   picture because it's at an angle, but it's either a
21   scrape or a bruise, one of the two or a combination.
22   I'm describing a bruise up there, so that could be it.
23   It's a little hard to tell.
24        Q    Okay.
25        A    It looks like I grouped -- he had several non-

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRAMPTON, taken on April 16, 2019                58..61

Page 58

1  specific bruises on that left arm and I grouped them
2  together so, yeah, it might be one of those.
3      Q     Okay.  And that is where you -- under the
4  upper extremities; is that correct?
5      A     That's correct.
6      Q     Okay.  So can you just --
7      A     Okay.
8      Q     -- tell us quickly what all you found on his
9  upper extremities?
10     A     Okay.  Sure.  So we've mentioned these
11  parallel linear contusions that are on his right arm,
12  his left arm, his left forearm.  He also had a
13  green-yellow bruise on his left arm and he had some red
14  purple bruises scattered about on that -- on the front
15  aspect of his left arm.  His left hand cubital fossa,
16  which is this location, had some bruising.  And he had a
17  scrape on his left elbow and a laceration on the back of
18  his left hand.
19     Q     So he had those pattern contusions on both
20  arms?
21     A     Yes.
22     Q     Okay.  And page 2 --
23         MR. KELLEY:  Note objection.
24     Q     Page 240.
25     A     Okay.

Page 59

1      Q     Would that be a picture of the elbow injury
2  --
3      A     Yes.
4      Q     -- that you're speaking of?
5         MR. KELLEY:  Objection.
6      A     Yes.  Yes, a little scrape -- the tissue is
7  -- you can see the superficial part of his tissue is
8  scraped off.
9      Q     And then what type of injury did he have to
10  his left hand?
11     A     Looks like a small laceration about one
12  quarter inch in greatest diameter -- it was only one
13  sixteenth-inch deep, so very superficial.
14     Q     Okay.
15     A     And it could be from anything -- just a
16  non-specific blunt force injury.
17     Q     Let's see.  So moving back to the trunk for a
18  moment, ma'am, --
19     A     Uh-huh.
20     Q     -- that's where you talk about the taser
21  probes, --
22     A     Yes.
23     Q     -- can you go over that with us, please?
24     A     Sure.  Picture 244 is actually a nice cleaned
25  up photo showing these little puncture marks.  It's

Page 60

1  really the best way to describe them.  I think there
2  might be a picture showing them in place.  Let me just
3  double check.  Well, you can see them in the body bag on
4  203, but they're attached.  Let's see.  I describe them
5  as being in the mid and lower back.  And then I just
6  gave orientation that can help where they're at, so one
7  was about three-and-a-half inches right in the midline
8  and the other was about one-and-a-half inches to the
9  right of the midline, so one was a little more to the
10  right than the other.  Not really important other than
11  just describing where they're at.  We took them off at
12  the time of autopsy and I did what is called a posterior
13  Y.  So just like we do a Y on the front, I did a Y on
14  the back just to look underneath to see, you know, just
15  to document, "Okay, the probes are -- here's where the
16  probes were and there was a little bit of soft tissue
17  hemorrhage underneath where they were at."
18     Q     Okay.
19     A     Just documentation.
20     Q     And just to make sure we're clear that the
21  injuries on page 244 are where you found the location of
22  the probes in the body, correct?
23     A     Correct.
24     Q     Ma'am, were you able to determine whether or
25  not Mr. Mills had been tased with, like, a drive stun or

Page 61

1  a dry stun without the probes?
2         MR. KELLEY:  Note objection.
3      A     I did not see any -- like I said, any specific
4  marks.  Like, in here, I could tell these were
5  specifically from where those taser probes were at.  The
6  other wound -- many of his other injuries are non-
7  specific injuries with the exception of what I described
8  as, you know, being something cylindrical.  Other than
9  those patterned contusions and other than his gunshot
10  wounds he had non-specific injuries.
11     Q     Okay.  Generally speaking, when someone is
12  tased with the taser against their body, are you able to
13  see marks from that taser?
14         MR. KELLEY:  Note objection.
15     A     I don't know how often they leave marks.  I
16  can say that I have not seen such a mark on a person,
17  but it does not mean that they don't leave marks --
18     Q     Okay.
19     A     -- it just means that I haven't seen them.
20     Q     Okay.
21     A     I would imagine that there are a lot of
22  variables including clothing that might factor into
23  that.
24     Q     Okay.  Okay.  So anything else on the trunk of
25  the body that we have not discussed, yet?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Page 62**

1    A    I don't think so.  I think there's a -- a
2  bruise on the chest, as well -- a non-specific bruise.
3    Q    Okay.  And we've talked about some of the
4  injuries to the upper extremities.  Is there anything
5  else that we haven't addressed there?
6    A    No.
7    Q    Okay.  And so walk us through the lower
8  extremities, please?
9    A    Okay.  And here's where I describe a dried
10 yellow abrasion on his hip.  So it's probably a post
11 mortem scrape -- probably it's either, you know,
12 probably moving the body or something like that.  He has
13 some smaller punctate scrapes on his left knee.  I do
14 think I saw a picture of that somewhere.
15   Q    And what's punctate mean?
16   A    Just the size, there's -- real small.  Let's
17 see.  No, maybe not.  He had about a one inch bruise on
18 his right leg and he had another dried, sort of, brown
19 scrape on his right leg.  And, I think, one of his toes
20 had a little abrasion on it, as well.
21   Q    Okay.
22   A    Non-specific and insignificant abrasions.
23   Q    There's a picture of his legs on 234-235, I
24 don't know if --
25   A    Okay.  Yeah, let's see.  How did I describe

**Page 63**

1  it?  The right leg, yeah, so probably like a little kind
2  of scab at the bottom there and a little scrape.
3    Q    Right.
4    A    I think that bruise is probably what's on his
5  shin.
6    Q    The bruises on his shin?
7    A    Yeah --
8    Q    Okay.
9    A    -- just the bruise on his shin, right there.
10   Q    Okay.
11   A    It's a little hard to tell from that angle,
12 but I -- I think that's probably what it is -- just
13 judging from the location.
14        MS. ROBINSON-STAPLES:  Okay.  Ma'am, before we
15 go further can we take a small break, please?
16        THE WITNESS:  Sure.
17        (OFF THE RECORD)
18 BY MS. ROBINSON-STAPLES:
19   Q    Okay, ma'am.  I think we have talked about all
20 the injuries that you found externally; is that correct?
21   A    Yes.
22   Q    Okay.  Let's talk a little bit then, just real
23 generally, about your internal exam of Mr. Mills.  Did
24 you note any internal injuries?
25   A    Yes and those are the ones I described back

**Page 64**

1  when we discussed the gunshot wounds and I mentioned,
2  sometimes some underlying soft tissue hemorrhage.  I
3  just lumped them all into the injury location.  This
4  interior part of the -- of the report is just going
5  through the other examination -- the other part of the
6  examination which is just to do organ by organ --
7  examine the organs and look for any signs of natural
8  disease, as well.
9    Q    And did you find any signs of natural disease
10 in any of his organs?
11   A    He has a -- a slightly enlarged heart.  It's
12 450 grams -- the average adult male is really less --
13 it's usually 350 to 400 grams.  His heart was what we
14 call "thick."  He probably had some, what we call,
15 hypertrophy, meaning that his enlarged muscle could be
16 from several things, most likely some elevated blood
17 pressures long term.
18   Q    And what -- is that something that Mr. Mills
19 would notice in his day to day life?
20   A    Probably not.
21   Q    Okay.  So based on your internal examination
22 of his organs, is it safe to say that he was a
23 relatively healthy 30-year-old man?
24   A    He was a healthy 30-year-old man.
25   Q    Okay, ma'am, I'm going to hand you what we'll

**Page 65**

1  mark as Exhibit 5 and 6.  Usually, I can keep up with
2  these, but --
3        (EXHIBIT 5 MARKED FOR IDENTIFICATION)
4        (EXHIBIT 6 MARKED FOR IDENTIFICATION)
5    A    Thank you.
6        MR. KELLEY:  Thank you.
7    Q    Okay, ma'am.  We discussed a little bit
8  earlier that your normal practice in homicide
9  investigations is to order a toxicology screen; is that
10 correct?
11   A    Yes, it's routine in all our autopsies, I just
12 mentioned we had a few situations in which we did not do
13 it in the past, but I believe, at this time, we just
14 tested everybody.
15   Q    Okay.  And what type of toxicology screen was
16 ordered in Mr. Mills' case?
17   A    So what we do in every case is what we call
18 the "drugs of abuse panel."  The laboratory that we use
19 -- now it's called Access, but this -- AIT Laboratories
20 in 2016 is what it -- the name was.  It's a lab in
21 Indianapolis that does forensic toxicology testing.  And
22 we send our samples in a sealed kit to them.  They have
23 what's called a drug of abuse panel.  It's a basic
24 panel, it includes all the things listed here in Exhibit
25 5, including amphetamines, barbiturates,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

1  benzodiazepines, cannabinoids, cocaine, Fentanyl,
2  methadone, other opiates.  Specifically, they also -- I
3  don't know why they don't list out oxycodone and other
4  opiates, but -- and then some other things including
5  ethanol, other stimulant drugs.  That's where those, you
6  know, a lot of the bath salts fit into that --
7  anticonvulsants and then tramadol.
8      Q    In the narrative, the coroner had mentioned
9  the drug Flakka is -- what --
10     A    It would be listed under stimulant.
11     Q    -- drug would be found under -- stimulant?
12     A    Yes.  Now, there is a caveat to this testing.
13 With drugs like Flakka which are synthetic drugs,
14 meaning that they're, you know, manufactured illicitly
15 and there a variety of -- of, you know, types of them.
16 AIT is only able to test for -- for certain ones.  They
17 -- they aren't necessarily able to test for everything.
18 Because what happens with drugs like that is that the
19 people making them are constantly changing the formulas
20 on them to try and avoid -- trying to get around the law
21 to sell them.  So there's, you know, many, many
22 configurations.  So Flakka as it's known chemically to
23 those toxicologists is included in that stimulants panel
24 along with a couple of other bath salts.  But it's not
25 to say that if he was something kind of like Flakka, but

Page 67

1  not, you know, that exact chemical, it may not be picked
2  up.  So -- and -- and -- and you can be on some other
3  type of drug that may not be picked up on this.  So it's
4  -- while it is pretty broad testing, there's always the
5  possibility of missing something.
6      Q    Okay.  And let me go back to what you said
7  that the people who are making it try to find ways to
8  get around the law, but what did you mean by that?
9      A    So some of these substances are being selled -
10 - sold in, like, head -- you know, like gas stations,
11 you know, head shops, that kind of thing.  And they're
12 labeled, "Not for human consumption" but, obviously,
13 that's what they're for.  But to avoid -- so what's
14 happening is in different countries and states are
15 putting laws into effect to outlaw those substances from
16 being sold.  Well, if you change the chemical structure,
17 you've made it a different substance that you can label
18 "not for human consumption" and try to sell.  So that's
19 my understanding from discussing it with the DEA in past
20 about these synthetic drugs is that it's constantly
21 changing and so there are lots and lots of different
22 varieties.  And, unfortunately, we just can't test for
23 all of those varieties, we just have to -- we are
24 relying on Access or AIT at this time to try and pick up
25 the more common ones and -- test for those.

Page 68

1      Q    So just generally speaking, if someone tested
2  positive under a stimulant -- so you have no way of
3  knowing what form of the drug they were using?
4      A    Well, they'll usually give me the chemical
5  compound --
6      Q    Okay
7      A    -- of whatever it is that's being tested for.
8  It's usually some long name that can't be pronounced and
9  then I ask, "Is this the street name, Flakka?" or
10 whatever other street name, and the -- the toxicologist
11 would be able to help dumb it down for me --
12     Q    Okay.
13     A    -- to tell me what compound that is -- what
14 street name it is.  And so most of -- so these compounds
15 are all sort of within the same group, but they alter --
16 so they all have, sort of, slightly different names, but
17 they're kind of from the same drug family, if that makes
18 sense.
19     Q    Okay.
20     A    Just like Xanax had -- is called alprazolam
21 -- generic.  We've lorazepam, diazepam, all those
22 different varieties -- they're all within the family of
23 benzyl diazepam, same thing for -- for these types of
24 drugs.
25     Q    Okay.  So let's look at Exhibit number 5.  It

Page 69

1  says that the subject's name is Jessie Mills, correct?
2      A    Yes.
3      Q    And it's been reported to the State Medical
4          Examiner's Office, attention: pathologist;
5          would that be you?
6      A    Yes.
7      Q    Okay.  Do you remember receiving this lab
8  report from AIT?
9      A    Yes.  It -- it looks like it came across as a
10 fax as it typically does -- this one actually -- oh, I -
11 - I bet this was -- you guys probably got this from the
12 coroner, that's why it has their name at the top.  So
13 what they'll do is they will fax a copy to me and
14 they'll fax a copy to the coroner.
15     Q    Okay.
16     A    So we each get a copy, and then whoever pulls
17 it off the fax machine puts in in my mailbox to -- so
18 that I pick it up and input it with my report once I
19 review it.  We just keep this in the case file.  I also
20 report it in my report at the end.  I will put any
21 ancillary additional testing that I do -- I put those
22 results in.  So what I do is I look at this and I -- I
23 see what's either positive or negative and I put that in
24 my report so that I don't have to constantly refer to a
25 separate report.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    Q    That makes sense.  And I remember seeing that
2  on your report.
3    A    Yes.
4    Q    So Exhibit 5, as you discussed, is a drugs of
5  abuse panel.  And what was being tested in this test?
6    A    So all those things that I mentioned.  So the
7  amphetamines, barbiturates, benzodiazepines, all the
8  things listed there on the left.
9    Q    Okay.  And this was a test that was blood; is
10  that correct?
11    A    Yes.
12    Q    Okay.  And the results of the testing of his
13  blood all came back negative for this drug abuse panel;
14  is that correct?
15    A    Yes.
16    Q    Okay.  Turning to Exhibit 6, what was being
17  tested here?
18    A    So at the top, it'll tell you -- underneath
19  the specimen number, this is a urine sample.  So this
20  was urine collected from his bladder at the time of
21  autopsy.  And in his urine, he had methamphetamine in
22  his urine.  You can ignore the numbers -- they actually
23  quit reporting those numbers because that doesn't really
24  mean anything in the urine.  All this tells me is that
25  his body has metabolized whatever drugs and he's

Page 71

1  excreting it in his urine.
2    Q    Okay.
3    A    So the levels don't mean anything.
4    Q    And that was going to be one of my questions
5  to you.
6        MR. KELLEY:  Note objection.
7    Q    Can you tell by looking at this report when
8  these drugs for which he's tested positive were
9  ingested?
10    A    No, unfortunately, the metabolizing and the
11  screening is -- is somewhat dependent on the person for
12  some of these drugs, specifically, looking at the THC
13  metabolite -- the marijuana metabolite, the THC COH.
14  Things like that, it really depends on how much they
15  used it, how often they used it.  Because it might stick
16  around longer.  Some of these other drugs --
17    Q    Meaning, they may have ingested it at an
18  earlier time and it remained in the urine?
19    A    Right.  Right.  So drugs like that, it's hard
20  to know -- it's hard to pinpoint exactly.  You know, for
21  a lot of these, it could be, you know, within -- they
22  might metabolize through it within 24 hours and start
23  clearing it in their urine, but all of the would be --
24  if they're drug dependent, the drugs like THC -- you
25  really can't figure out when they took it because it's

Page 72

1  dependent on how often they were using it and how much
2  they used.  So sometimes that'll show up in the blood,
3  even though they didn't take it that day because it just
4  lasts longer for people that are habitual users of the -
5  - of THC.  Now the other drugs, you know, I'd have to
6  look up, specifically, how long they typically stay in
7  the system, but, basically what I'm saying is that
8  they're not in the blood.  So they're not active in his
9  body, but that they have been there.  He has metabolized
10  them and now he's excreting -- his body's getting rid of
11  them.
12    Q    So is --
13    A    So this could be, you know, things that he
14  might have used a day prior.  And, you know, are still
15  showing up.  And that's just a rough -- yes.  Now, it
16  would depend on -- each of these, again, you'd have to
17  talk to the toxicologist to determine how long most
18  people keep these things in their system, but these are
19  basically your body is just ridding of -- ridding the
20  body, at this point.  So they're just -- that's why they
21  don't report the numbers anymore, because it doesn't
22  mean anything.  It just means he's excreting them.
23    Q    Okay.  If -- I think that you answered this
24  question, but just to -- just so we're clear, why is it
25  that these drugs would show up positive in his urine

Page 73

1  sample but show up negative in his blood?
2    A    It's just --
3        MR. KELLEY:  Note objection.  Go ahead.
4    A    Yes.  It's just means that his body has
5  metabolized the drugs and he is excreting the drugs.
6    Q    And the rate in which your body metabolizes
7  drugs differs based on the drug?
8    A    It depends on the type of drug.  It depends on
9  the person, as well.  You know, he's a healthy
10  30-year-old male, so his kidneys and liver are probably
11  functioning pretty well.  So he would be -- he would be
12  someone that would be more able to metabolize drugs than
13  say a 95-year-old woman with -- who's on dialysis, to
14  give an example.  But each drug goes through the body at
15  different rates.  So when -- that's not on here, but one
16  that does metabolize very quickly, heroin, goes through
17  the body really fast -- starts breaking down.  We don't
18  actually see heroin at all.  Somebody could take heroin
19  and die and we test their blood, and it -- you don't
20  look for heroin.  You're not going to see it.  It's
21  already broken down into its metabolites within like ten
22  minutes.  Cocaine's very similar, breaks down really
23  quickly.  And, like I said, sticking around in the urine
24  can go on for -- for some drugs for, you know, a couple
25  of days, even.  And then things like marijuana can last

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    even longer depending on how often you used it.  So it
2    just tells me that his body's excreting these drugs and
3    -- meaning that he's metabolized them -- he's broken
4    them down, but I can't really pinpoint, you know,
5    exactly when he took these.
6        Q    Okay.  So you can't pinpoint when he took
7    them, which would always seem -- it would also seem you
8    can't give an estimation of the effect that it may have
9    had on him at any certain times?
10           MR. KELLEY:  Note an objection to the
11   question, too.
12       A    Yes, you know, I can tell you that -- what the
13   typical side effects of these drugs are within -- now,
14   it's hard to know how long they're going to exhibit
15   those effects.
16       Q    Right.
17       A    He's got -- I can say, he has both things that
18   are considered stimulants, as well as what are
19   considered depressants in his system -- that he had
20   processed through his system.
21       Q    Uh-huh.
22       A    That's not to say they cancel each other out
23   and he has -- they have no effect.  It's just saying
24   that he's got a variety of drugs that he had processed.
25       Q    Okay.

Page 75

1        A    And I will also add that on this panel, as
2    well, just like with the blood panel, this panel is
3    limited -- the urine testing is limited and is only
4    testing for those items that are on the left, and would
5    not necessarily be testing for some of these other
6    things, including those stimulants that we talked about,
7    like Flakka.  It's not included in this -- that's not
8    available in the urine.
9        Q    Okay.  But it did test negative in the blood
10   for --
11       A    Yes.
12       Q    -- for tests.
13       A    For -- for what they're able to test for, it
14   was negative in the blood.
15       Q    Okay.  So ma'am, considering all the
16   observations that we've discussed today that you made
17   during the examination of Mr. Mills, what did you --
18   what injury did you determine caused his death?
19       A    He died of gunshot wounds of the chest and
20   abdomen.
21       Q    Okay.  Can you give an opinion as to how much
22   time would have elapsed between the time that he
23   received those gunshot wounds and the time that he
24   passed away?
25           MR. KELLEY:  Objection.

Page 76

1        A    There's no way to specifically say.  I can say
2    that both of those wounds are potentially lethal wounds
3    -- one of which went through his heart.  So it would
4    suggest that it would be a relatively quick death for
5    most people, meaning probably within minutes.
6        Q    How many minutes?
7        A    I don't think I can put an estimate on it.  It
8    just depends, but probably --
9        Q    But not instantaneous?
10       A    So the -- really, the -- the -- really, the
11   only instant death is if someone gets their brain stem
12   severed, meaning their and lungs instantly stop.  Even
13   though you have traumatic injury to the heart, you still
14   have some blood flow that's -- that's going on, so you
15   might live for another 60 seconds, you know, or maybe
16   have a little bit of time there.  But if you sever
17   someone's brain stem, that's instant.  Everything else,
18   you know, somebody might collapse and become
19   unresponsive, but there might be a sort of heartbeat, a
20   sort of pulse for another minute or so.
21       Q    Can you state whether it would have made any
22   difference if Mr. Mills had received any medical
23   treatment immediately after receiving these gunshot
24   wounds?
25           MR. KELLEY:  Objection.

Page 77

1        A    Considering the pathway of that -- of that
2    bullet, going through the heart, unlikely that there
3    would have been anything to do short of having it happen
4    inside of OR.  And even that, I don't think -- it would
5    be pretty difficult to control that bleeding fast
6    enough.
7        Q    And based on the type of injuries that Mr.
8    Mills sustained, are you able to determine the level of
9    pain or what type of pain he may have experienced prior
10   to passing?
11           MR. KELLEY:  Objection.
12       A    So there's no way for us to know what -- what
13   people are feeling.  Certainly, there's probably an
14   element of shock and -- and if so, if someone is even
15   conscious, and that's a big if with the significance of
16   these injuries, a lot of times people just -- that we
17   know that we can talk to that are going through an
18   injury, they may or may not feel pain depending on that.
19   So there's really no way for us to know.
20       Q    Okay, ma'am.  Just for the sake of the record,
21   I think you heard that opposing counsel objected to you
22   giving an opinion --
23           MR. KELLEY:  No.  No, I object to failing to
24           disclose so.  If this is a discovery deposition, I
25           have no problem.  That's the difference.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-15   Filed: 02/10/20   Page: 23 of 53 - Page
ID#: 4828
The Deposition of MEREDITH FRAME, Taken on April 12, 2018                     78..81

Page 78

BY MS. ROBINSON-STAPLES:

Q    The opinions that you gave today were based on
your training and education; is that correct?

A    Yes.

Q    And they were based on the observations that
you made during your examination of Mr. Mills, correct?

A    Yes.

Q    And you gave those with a reasonable degree of
scientific certainty, correct?

A    Yes.

Q    Okay.  If you'll just give me -- just a
second.  Let me make sure --

MR. KELLEY:  I could probably use a break now,
if that's okay?

MS. ROBINSON-STAPLES:  Of course.

(OFF THE RECORD)

CROSS EXAMINATION

BY MR. KELLEY:

Q    Dr. Frame, again, my name is John Kelley.  And
I'm here today representing Knox County.  I also involve
the officers -- I also represent the officers involved
in the altercation with Mr. Mills.  They're Mikey
Ashurst and Brandon Bolton.  One was a constable, Mr.
Bolton, and one was a deputy sheriff with Knox County
Sheriff's Department.  I too am going to probably follow

Page 79

along -- don't have that many questions, but I do want
to follow along with the same pattern that Ms. Staples
used.  First of all, with regard to qualifications.
Obviously, you're well qualified as a medical examiner,
that's obvious.  My question has to do with toxicology.
First of all, could you explain what the word
"toxicology" or the science involves?

A    Sure.  So toxicology is the -- is studying how
certain chemicals effect the body.

Q    Okay.  In particular, how they might influence
or affect behavior at a certain point; is that correct?

A    That's a component of it, as well as just how
long -- how the body breaks them down, how the body
excretes them.  There's -- there's lots of different
aspects to toxicology.  That many of which overlap with
physiology, that being the study of body processes.

Q    And sometimes a toxicologist can -- based upon
the level of a drug found in the blood or in the urine
can make -- can extrapolate and tell you something about
how that person was acting within a certain timeframe;
is that fair?

MS. ROBINSON-STAPLES:  Objection to form.

A    So we can say that when we see the presence of
certain drugs in somebody's blood, that the common side
effects of those drugs might include certain behaviors.

Page 80

Obviously, every drug affects every person slightly
differently.  But certainly certain classes of drugs
like stimulants have certain effects -- certain classes
of drugs that fit into the more depressant category have
common effects that would be likely exhibited by
somebody with those in their system.

Q    Okay.  Obviously, as a medical examiner, you
are concerned about drugs that are present in the blood
and urine and how they may have contributed to the
death, I assume; is that fair?

A    Right.  So in this situation, we have an
obvious cause of death.  So this is just more routine
testing that is performed -- and quite honestly,
whatever is in the toxicology report doesn't impact the
cause of death for me.

Q    Right.  Are you a toxicologist?

A    I am not a toxicologist.

Q    Okay.  And in particular, are you offering
opinions as to what frame of mind or what -- whether or
not Mr. Mills was under the influence at the time the
altercation or shooting occurred, are you offering
opinions as to that?

A    The only thing I can say is the results of the
testing, meaning that I don't see anything that we were
able to test for in his blood sample, but he does have

Page 81

the presence of drugs in his urine.  Beyond that, I'm
not offering any opinion.

Q    Okay.  You would leave that to a toxicologist,
I take it?

A    Well, or and I would also say that -- like I
said before, we can give -- I can give you
generalizations of how -- how these -- of how certain
classes of drugs affect the body.  I certainly have
plenty of training in that.  But I would not be able to
say specifically what occurred in this case.

Q    Well, let's talk about that then with regard
to the findings in Mr. Mills' case.  Obviously, I'm
concerned about what was found in his urine.  First of
all, as I understand it, both the blood -- that you
actually collected both the blood and the urine for
these samples; is that correct?

A    Correct.  Both of these samples were collected
at the time of autopsy as part of our autopsy procedure.

Q    All right.  And this would have been about
10:00 the next morning, so approximately ten hours after
his -- after his death; is that correct?

A    Approximately, yes.

Q    Now, death is determined by a coroner; is that
correct -- the time of death, at least?

A    In this situation, yes.  When people die in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  hospital, it would be by a physician.
2      Q    Okay.  And so it requires that the coroner get
3  there -- to the scene sometimes, for making that call;
4  is that correct?
5      A    That is correct.
6      Q    So what would -- probably, in this instance, I
7  know you probably don't know the specifics, but it's
8  probably an area rather than a specific time that he
9  died?
10     A    Correct.
11         MS. ROBINSON-STAPLES:  Objection to form.
12     A    Correct.  We here are looking at the time
13 pronounced.  When I gave a time, it's not necessarily
14 the time he died, because the coroner wasn't there at
15 the scene, but a time pronounced.
16     Q    Okay.  Does time make a difference as far as -
17 - well, what happens to the body after death, as far as,
18 does it continue to metabolize drugs?
19     A    So the -- the decedent isn't metabolizing
20 drugs anymore, but there are things like bacteria in the
21 body that can break down some drugs.  We put the blood
22 into a certain type of tube that has a chemical called
23 sodium chloride potassium oxalate.  That chemical helps
24 preserve it, but it's not perfect.  You're  still going
25 to have decomposition.  No matter what you do,

Page 83

1  decomposition occurs.  But it's very helpful in
2  preserving that specimen.  For the most part, whatever
3  was in the system, is going to still be in the system
4  when they test that -- that blood.  The reason for
5  putting that chemical in there is mainly because of a
6  drug like cocaine, which bacteria can break down very
7  easily.  And so it's hard to test for cocaine, anyway, I
8  described how fast your body metabolizes it, that can
9  make it harder.  So that's why we put in a preservative.
10 So with the preservative we get a very decent sample
11 from that time of autopsy, though.  So there has --
12     Q    And one thing the coroner does do; is that
13 correct?  He does something to cool the body, so that,
14 you know -- so to preserve it; is that fair?
15     A    Yes, to aid in slowing that process, by having
16 a lower temperature we're hoping to slow decomposition.
17     Q    I've never figured out, how exactly does he do
18 that when he's putting somebody in a body bag or --
19     A    So he would store them in a cooler, like we do
20 here.
21     Q    Okay.
22     A    Not every county has a cooler.  And I don't
23 remember if they brought him that night.  Sometimes
24 they'll just go ahead and bring the bodies here and use
25 our cooler if they don't have a cooler available to

Page 84

1  them.  But oftentimes, especially coroners that are
2  associated with funeral homes or have a hospital that's
3  agreeable, they have a cooler available to them.
4      Q    Looking at, I think, at Exhibit 2, your
5  postmortem examination on the front page.  About the
6  fourth paragraph down where you're describing -- where
7  you're giving specifics about the body, you say at the
8  end the body is cool subsequent to refrigeration.  So
9  that probably happened to Mister --
10     A    And certainly he was in our cooler --
11     Q    -- Mills, as this the case?
12     A    -- as well.
13     Q    Okay.
14     A    I don't know specifically when he was brought
15 to our cooler, but certainly he was in our cooler as
16 well.
17     Q    Okay.
18     A    Unless he was brought right before 10 a.m.
19     Q    Right.  Do you happen to know --
20     A    Sometimes they just --
21     Q    -- when the body arrived at the medical
22 examiner's office?
23     A    There would be documentation -- we'd have to
24 pull a log -- a written log from 2016 that could tell us
25 when they signed the body in here.

Page 85

1      Q    Is it typical for a  coroner, once he's
2  pronounced death, somehow notified you or the medical
3  examiner's office to just get up here as soon as you
4  can, or --
5      A    It's completely variable depending on county,
6  depending on the coroner's availability of the --
7  sometimes they come themselves, sometimes they have to
8  send transporters.  It's completely dependent on the
9  situation.  So, like I said, I don't know if --
10 sometimes they'll come up that morning and then they'll
11 wait around, if they're going to be taking the body
12 back, because that's a pretty big trip from Knox County.
13 But if somebody else is coming to pick them up, they
14 might just have dropped him off.  I don't know.
15     Q    And, likewise, do you know a pattern of
16 practice that's associated with the Knox County
17 Coroner's office?
18     A    It's -- it's variable.  They do both.
19 Sometimes they drop off, sometimes they -- they come up
20 that morning.
21     Q    All right.  So it's possible that the body
22 could have been in the bag and remaining with the
23 coroner, maybe even unrefrigerated for a number of hours
24 before it actually got to the medical examiner's office?
25     A    Well, at least for the trip from Knox County.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    Q    Yup.  Okay.  And, of course, they would have
2  brought them to the front, correct?
3    A    Yes.
4    Q    Okay.  All right.  As far as -- lawyers read
5  too much on the Internet, but is it more difficult to
6  get blood than urine from a body that's warm?
7    A    No, I think it's completely dependent on the
8  condition of the body, how long it's been since they
9  passed, it's dependent on maybe any injuries that might
10  make it more difficult.  Meaning that if you have
11  somebody that's been in a car wreck and they have lots
12  of things that are broken, they're going to have a lot
13  of bleeding and it might be hard to get blood out of the
14  vessel because most of it's in their head or their chest
15  or wherever.  And they have damage to their -- their
16  bladder based on injury, which might make it difficult
17  to get urine.  But in general, we attempt to -- to try
18  and always get blood, urine, in vitreous -- vitreous
19  being fluid from the eyes in everybody.
20    Q    In this case, we talk about -- vitreous fluid,
21  in this case, you chose not to pull a vitreous sample;
22  is that correct?
23    A    No, we sent it.
24    Q    Oh, was it -- was it tested?
25    A    They only test the vitreous.  It's mainly to

Page 87

1  be testing for alcohols.  If the blood alcohols are
2  negative they don't test the vitreous.
3    Q    Okay.  Likewise, what size sample do you
4  usually try to draw?
5    A    I'd have to refer -- we usually -- we try to
6  send them the gray-topped tubes that I'm talking about
7  that have this preservative in them.  We usually try to
8  send them one to two of those, if that's available, or a
9  bigger container.  Trying to send somewhere between five
10  and ten mils, at least, of blood.  And that's so that
11  they have enough -- usually, five mils they can do this
12  panel, but if we want to do some additional testing,
13  it's always good to just go ahead and try to send them
14  the additional blood, if it's available.  And vitreous,
15  you know, we usually send somewhere between two and four
16  milliliters.  Urine, if they, you know, we try to get --
17  take -- the container they have for urine is 60 mils,
18  but oftentimes, they can test even on a mil or two.
19    Q    If there were a problem as far as the amount
20  of the sample, would that be noted in the laboratory
21  results?
22    A    Absolutely, they will say, "insufficient
23  quantity to test."
24    Q    Okay.  So in this case, that was not true,
25  they found sufficient quantities?

Page 88

1    A    Uh-huh.  Yes.
2    Q    Okay.  What is the chain of custody, as far as
3  the samples -- where -- once you draw them, where do
4  they go -- who transports them?
5    A    So these go in a sealed kit, we box -- each
6  -- each set has its own kit.  So every decedent --
7  everything is completely separate from every other
8  decedent.  They have their own box.  That box gets
9  sealed and my initials are on it, the time and the date
10  that it's sealed.  It goes with FedEx overnight delivery
11  to Indianapolis.  Now, as far as, their chain of
12  custody, I think they have a documentation of, you know,
13  as it goes from whoever does the paperwork to
14  processing.  And at AIT, now Access Laboratories, would
15  have that.  But on our end, it's a sealed box going into
16  a sealed FedEx overnight.  With the exception that we
17  only have pick up on Monday, Wednesday, Friday, but it's
18  a sealed box that we keep in our locked autopsy suite --
19    Q    But this is done separately --
20    A    -- in our refrigerator.
21    Q    Excuse me.  This is -- would be done separate
22  from the KS -- the Kentucky State Police investigation;
23  is that correct?
24    A    Oh, it has nothing to do with them.  Yeah.
25    Q    Right.

Page 89

1    A    Yeah.  This is the -- this is the -- the
2  Kentucky State Medical Examiners have a -- an agreement
3  with this laboratory to use for our testing.  So we have
4  a contract with them.
5    Q    Sure.
6    A    So this is the lab that we use.  Now,
7  sometimes, they have to send things from their lab to
8  other labs that they use to do extra testing they don't
9  have onsite.  But this is -- our contract is with them,
10  and it's exclusive to our office.  Now, I don't know if
11  they ever use that lab, they might, I have no idea, but
12  this is the lab we use.
13    Q    Oftentimes, I've heard of the Kentucky State
14  Police Laboratories being involved in DUI cases. That's
15  not the laboratory you use, correct?
16    A    That's correct.
17    Q    Right.  Okay.  Comparing the 5 and 6, are the
18  Exhibit numbers, I think.  The fact that there was no
19  signs of drugs in the blood, I would assume that if you
20  compared the two -- urine and blood, that means, at some
21  time, all the drugs that were noted in the urine test
22  had been in the blood, at some point?
23    A    Correct.
24    Q    Okay.  Can you tell when they last were
25  present in the blood?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

```
 1      A    I can't.  As I explained before, each drug has
 2  certain times that they're going to -- a certain
 3  timeframe for the average person to break them down
 4  specific to that drug.  But things like marijuana, for
 5  example, THC, COH is a metabolite breakdown product to
 6  marijuana.  It -- it's very much influenced by how much
 7  the person uses and how often.  You know, I think, with
 8  it -- with it not being in here, it tells us, you know,
 9  that it could have been day abuse.  You know, used a day
10  ago, sure, can I give you an exact hours -- it could
11  have been 12 hours before, well, I'm not sure about
12  that.  I'd have to look up each of these drugs and see
13  what the range would be for -- for breaking them down.
14  And, like I said, some of the drugs -- it really depends
15  on how much and how often they use them, how long it
16  stays.
17      Q    Can some of the drugs break down in ten hours?
18      A    So I -- I don't know specifically off the top
19  of my head.  Clearing through the blood that quickly, I
20  would have to look it up --
21      Q    Okay.
22      A    -- to go through each one.
23      Q    Again, is that something a toxicologist would
24  have to do?
25      A    They could probably do it off the top of their
```

Page 91

```
 1  head.  I'd have to look it up.
 2      Q    Okay.
 3      A    We're both trained to do it, but I'd have to
 4  look it up.
 5      Q    All right.  Can I ask you about some of the
 6  drugs?  First one, the category of amphetamines, there's
 7  a mark for positive.  I assume that the amphetamine that
 8  was found in his system is listed below the
 9  methamphetamine; is that correct?
10      A    That's correct.
11      Q    What -- is that commonly known as meth?
12      A    That is correct.
13      Q    Okay.  What are some of the -- it's a
14  stimulant, correct?
15      A    That's correct, it's a stimulant, meaning it
16  has what we call a stimulation effect on the body.  A
17  physiological effect on the body, meaning it increases
18  heart rate, can increase people's blood pressure, they
19  may have what's -- like a rapid heartbeat.  It gives
20  them some level of excitement and that's the high, that
21  is associated with it.  And so it's -- well, you can
22  certainly get an upper.
23      Q    Okay.  Is it a controlled substance?
24      A    It is an illegal substance.
25      Q    Okay.
```

Page 92

```
 1      A    Now, there are some variations of amphetamines
 2  that are used to treat things like attention deficit,
 3  hyperactivity disorder, and weight loss drugs that are
 4  similar in -- in structure, but the methamphetamine
 5  that's been reported is an illicit substance.
 6      Q    Okay.  So in other words the drug ---
 7      A    In general.
 8      Q    -- that was found in his body,
 9  methamphetamine, is an illegal drug?
10      A    Yes.
11      Q    Okay.
12      A    Yes.  And that --
13      Q    He couldn't get it from a doctor?
14      A    There -- unlikely.  Like I said, there are
15  some variations of weight loss medications and -- that
16  might show up in that category, but it -- it seems
17  unlikely that he would get that, being that he's not
18  morbidly obese.
19      Q    Okay.  When the person's under the influence
20  of methamphetamine, are they aggressive?
21          MS. ROBINSON-STAPLES:  Objection.
22      A    It depends on the person.
23      Q    Okay.  Does it make them feel like they're
24  superhuman?
25          MS. ROBINSON-STAPLES:  Objection to form.
```

Page 93

```
 1      A    Again, I -- I wouldn't know.  It can have that
 2  effect on people, but it may not necessarily.
 3      Q    Okay.  The next category is benzodiazepam --
 4  pine, excuse me.  And I assume that the drug that they
 5  detected was -- oh, oh, oxazepam?
 6      A    Oxazepam.
 7      Q    Yeah.  What is that?
 8      A    So oxazepam is a type of drug.  It is a drug
 9  on it -- of its own, but it's also a breakdown product
10  of things like diazepam, like valium.  So it's hard to
11  know if it was taken in that form or if it was taken as
12  diazepam and it's just a breakdown product of that and
13  it's one of the residual breakdown products that's still
14  in the urine.  It -- it acts on the body just like the
15  other drugs in that category, like, Xanax -- you might
16  be more familiar with.  It's what -- it can have more
17  sedative effects.  It's something to treat anxiety.  So
18  it's used for a lot of different things, but that's one
19  of the reasons -- one of the main reasons is to treat
20  anxiety, has a very similar mechanism of action to
21  alcohol, actually.
22      Q    Okay.  Is it a schedule drug?
23      A    Yes.
24      Q    What -- do you know what category it is?
25      A    I don't know off hand.
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1    Q    Okay.  Schedule drug meaning that it's
2  regulated by a government, federal-run, state-run; is
3  that correct?
4    A    That's correct.
5    Q    Okay.  And that you would have to have a
6  prescription to be prescribed those -- to have it?
7    A    That's correct.
8    Q    Okay.  At least we do, correct?
9    A    Correct.
10   Q    Okay.  Oh, brother.
11   A    I hate saying this one, so I'll help you out.
12 The brand name of that is Suboxone.
13   Q    Yeah, that's what I --
14   A    So buprenorphine -- and I struggle to say that
15 word, so I'm just going to call it Suboxone, because
16 that's the most common brand name.  So that drug and the
17 nor version of that is the breakdown product of that.
18 So that's the metabolite.  So the parent drug, the
19 buprenorphine and the norbuprenorphine are present in
20 the urine, and that's what most of us refer to as
21 Suboxone.
22   Q    Okay.  Am I correct that it is akin to a
23 morphine like product; is that fair?
24        A-Right.  So it's what's -- it's -- it's an
25 opiate-like drug.  It's much like methadone, in that

Page 95

1  sense.  So the purpose of Suboxone is to treat opiate
2  addition.  That being said, it does have some abuse
3  potential.  We certainly have seen while it's -- it's
4  manufactured in the hopes that it wouldn't.  Some people
5  do take it illicitly.  Whether it is to achieve a high
6  or to balance out or to help them with withdrawal, I
7  don't know.  I mean, but I do know that it is not always
8  prescribed.
9    Q    Okay.
10   A    Is it supposed to be scheduled, but it -- you
11 know, certainly, I am aware it being sold on the street.
12   Q    Okay.  But again, am I correct -- it is a
13 schedule drug, as you just told me?
14   A    Yes.
15   Q    And, likewise, if you're going to possess it
16 legally, you have to have a prescription; is that fair?
17   A    Yes, or you would go to, like, a Suboxone
18 clinic, much like the methadone clinics of the past.
19   Q    Okay.  How can -- can any of these drugs that
20 we talked about be taken intravenously?
21   A    Sure.  You could certainly -- some people take
22 meth intravenously, some people will crush the
23 benzodiazepines up and -- and you can inject that.
24 Suboxone, I suppose you could probably crush it up and
25 melt it and inject it and we've certainly seen people

Page 96

1  that would do things like that with other drugs.  So
2  these are all possibilities.
3    Q    I raised that because you indicated earlier
4  that there had been a concern as to whether or not Mr.
5  Mills had hepatitis C and, as I think you described it,
6  the sample that was sent to the lab was reactive, but
7  you couldn't make a definite diagnosis; is that fair?
8    A    Correct.  It certainly -- it's -- we would go
9  ahead and -- and say, you know, "treat that person, keep
10 an eye on them, prophylactically," as treating it like a
11 true positive even though it's not confirmed.  Definitely
12 a reactive result is -- is, you know, likely positive,
13 we just can't tell you how much of the virus is in his
14 system.
15   Q    Well, I was going to say, I thought you used
16 the word "Highly likely that he had it" --
17   A    Yes.
18   Q    -- it's just you couldn't tell to the degree
19 to which he suffered from it.
20   A    Correct.  So some people test positive -- and
21 there are some reasons why people might test positive
22 and it be a false positive, but they're pretty rare.  But
23 you test positive, but you may not have a lot of virus
24 in your system.  So you may not be very infective, if
25 that makes sense.

Page 97

1    Q    Uh-huh.
2    A    But in order to get that viral load, we really
3  need to have a particular sample that's very difficult
4  to obtain postmortem.
5    Q    Can you tell us what is hepatitis C -- what is
6  --
7    A    It's a virus.  It's a virus, and when -- the
8  word hepatitis means it causes an inflammation in the
9  liver.  And that's basically the gist of it.  The
10 problem with hepatitis C is that it's a chronic issue
11 so, until recently, you were never cleared of the virus.
12 Now there are some drugs out there that are showing that
13 people can be treated, but, ultimately, if people live
14 with it, some of them will develop in-stage liver
15 disease, they will need liver transplants, they're at
16 higher risk for liver cancer.  Those are all the down
17 sides to hepatitis C.  Now, not everybody that has
18 hepatitis C is going to end up that way, but that is the
19 risk.
20   Q    Okay.  What are root causes -- how can you
21 contract hepatitis C?
22   A    Hepatitis C is transferred mainly by blood.  So
23 it's what we consider a blood-born pathogen, meaning
24 that somebody is exposed to it.  The reason why we are
25 having such an issue in Kentucky with it is because of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 98

1  intravenous drug use.
2      Q    Okay.  In other words, somebody who uses
3  hypodermic needles that aren't clean?
4      A    Exactly, that's -- that's one of the biggest
5  issues with the epidemic here.
6      Q    All right.  Did you see any evidence of Mr.
7  Mills engaging in -- in intravenous drug?
8      A    I did not see any specific, what we call track
9  marks for, you know, obvious raised scars from where
10  people are injecting.  He did have a bruise in this area
11  -- doesn't necessarily mean that he was injecting there,
12  but sometimes we see that.  I can't exclude that he
13  didn't.  Some people use very small needles, but they're
14  very small, and I won't see a puncture.  So I certainly
15  can't say that he didn't, but I didn't see any of those
16  tells -- those specific signs like track marks.
17      Q    Other than this bruising, which was right in
18  the crook of the elbow?
19      A    Right.  And, again, that may not be specific
20  to -- to anything.  So I -- it isn't specific to
21  anything, so I can't say that that's related to that,
22  but sometimes we will see that.
23      Q    Okay.
24      A    In known users, I should say.
25      Q    Okay.  I'm sorry.  Could you go back to number

Page 99

1  6 again?
2      A    Yes.
3      Q    I forgot to ask you a question.  I know you
4  say you kind of have to throw out the concentrations --
5      A    Yes.
6      Q    -- in this instance.  Is it nevertheless
7  significant that the amphetamines was markedly higher
8  than the other drugs, as far as nanograms per
9  milliliter?
10      A    Not necessarily, it might just mean that, you
11  know, he took more meth than he did these others.  Or
12  maybe he took the meth more recently than the others.  I
13  don't know, you know, it's hard to say.  It -- again,
14  the levels in the urine we don't really look at, they
15  just -- in fact, the lab doesn't report them anymore.
16      Q    Okay.  I wanted to go back and ask you
17  particularly concerning the lacerations you found to his
18  head.
19      A    Yes.
20      Q    And one was on the -- looked like the temple
21  and one was right at my bald spot; is that fair?
22      A    He had one here, right on the -- sort of, just
23  -- just right posterior parietal, which is -- yeah, up
24  here (indicating).  And then the other one was left
25  temporal, which is on the side.

Page 100

1      Q    Okay.  And you described it before.  But am I
2  also correct that in your postmortem examination, you
3  did do further exam of the head, and in particular, the
4  skull; is that fair?
5      A    That is correct.
6      Q    And is that on page 9 of the -- of your
7  report?
8      A    Yes.
9      Q    Okay.  Maybe if you could walk through that,
10  and if you could explain them -- the calvarium is intact
11  and displays no abnormality.  The dura is of normal
12  tenseness.  And it says, "The superior sagittal sinuses
13  patent and in the midline."  And I'm not even going to
14  try for what, "The meninges" --
15      A    Yup.
16      Q    -- "are glistening and translucent.  The brain
17  is normal convulsional pattern and weighs 1500 grams."
18  What in heck did I just say?
19      A    It's just a fancy way of saying that the skull
20  is intact, that the dura, which is the material that
21  holds your brain in place inside your skull is normal --
22  its' intact -- it's not unremarkable, and that the brain
23  itself is normal.
24      Q    All right.  Did you find any evidence of a
25  brain injury in Mr. Mills?

Page 101

1      A    So I did not see any obvious contusion or any
2  bleeding on the brain.  That's not to say that there
3  would be something -- what is considered, like, a --
4  like, when you fall and you have a concussive injury --
5  when you fall and hit your head and you have concussive
6  injury or you hit your head onto something or you're in
7  a wreck or whatever.  You can't see concussive injuries.
8  So that's something I can't exclude that there might
9  have been any degree of that, but certainly there's
10  nothing -- what we consider nothing that is linked to
11  trauma.
12      Q    We talk about closed head injuries sometimes
13  as a term.  I don't know if that's a medical term or
14  not.
15      A    We do use that term sometimes, meaning that
16  -- that there's not an open fracture on the head, but
17  there's injury underneath.  Meaning there's bleeding
18  underneath from blunt force injury, usually.  So there's
19  no signs of that.
20      Q    Okay.  There's no evidence of hemorrhaging in
21  the brain then?
22      A    Exactly.
23      Q    Okay.  It says that the examination of the
24  arteries at the base of the brain reveals him to be of
25  normal distribution and dimension.  Where are the



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRAMPTON, taken on April 24, 2018    102..105

---

Page 102

1  arteries that you're talking about -- are they in the
2  neck, is that where it is?
3      A   It's coming up from the neck and from the back
4  of the neck and then your carotid arteries that
5  everybody's familiar with -- you can feel your pulse in
6  your neck -- that's your carotids, those go up.  And
7  what I may talk about, I'm looking -- I have the brain
8  out and I'm looking at the surface that's right here --
9  that's sitting in between your face and your brain, that
10 area that -- that side of it.  So the inferior aspect --
11 we're looking at it.  There's the vessels that are
12 coming up from the neck that are in there, the vessels
13 coming up the back of your neck that are there, and then
14 they -- they branch out to supply the rest of your
15 brain.  Those can be important if you're wanting to look
16 for any disease, if you think somebody's had a stroke or
17 somebody's had an aneurism.  Those would be areas that
18 we might see that aneurism.  So that's why we examine it
19 every time.
20     Q   Let me back you up a little bit.  An aneurism,
21 what is that?
22     A   It's a dilation -- it's an abnormal blood
23 vessel.  So that it enlarges and it can rupture.  And
24 that could be a reason why somebody might pass.  And so
25 this is -- these are -- we're commenting on all the

---

Page 103

1  typical things that we would comment on anybody that we
2  autopsy.  Obviously, I'm not expecting to find anything
3  there, but we look for any -- so he, you know, yes, he
4  died of gunshot wounds, but he might have a brain tumor
5  or he might have something that he died with that didn't
6  cause his death, but might be important for family to
7  know about if it's something that could be genetic.
8      Q   But nothing to indicate that there was a
9  rupture or a hemorrhage associated with the vessels
10 feeding the brain?
11     A   That's correct.
12     Q   Okay.  You looked at the front of the brain
13 and actually, you actually take it out of the skull; is
14 that fair?
15     A   That's correct.  We take it out and we section
16 it.
17     Q   Okay.  And why -- what are you looking for?
18     A   Those things that I mentioned.  You know, if -
19 - if say a bullet went through that area, we would be
20 tracking the pathway of that bullet to show what areas
21 might have been injured.  Or if there's trauma looking
22 for bruises on the brain, like, you know, from injury.
23 But, again, we're still looking for natural disease as
24 well.  So we would be looking for signs of old -- an old
25 stroke, a tumor, an irregular shaped blood vessel that

---

Page 104

1  could potentially have been a cause of death in a
2  different situation than this.  So we're looking for all
3  those things as we're looking through each piece of the
4  brain.
5      Q   Okay.  In particular, what would -- as you're
6  looking through these sections -- first of all, is it
7  done microscopically at some point?
8      A   Not necessarily.  In this -- in this case, no.
9  No microscopic intersections were taken.  We have a
10 cause of death, but if we have a case where we don't
11 have a cause of death when we're done with autopsy, we
12 would usually take a representative section of some of
13 the more major organs, and that can include sections of
14 the brain -- just to rule out anything microscopically
15 that could cause death, like a viral encephalitis, like
16 an inflammation of the brain.  Without having that
17 history, that's a really rare thing, but that might be a
18 reason to do it.
19     Q   Okay.  Would you -- also, one of the things
20 that you might be looking for is hemorrhaging in those
21 sections of the brain?
22     A   Well, we're going to see most of that grossly.
23 You know, you're going to see -- you're going to see a
24 subdural, which is blood between the brain and the dura
25 underneath.  You can see an epidural, which is on top

---

Page 105

1  underneath the skull, you could see what's called
2  subarachnoid hemorrhage, which is throughout the brain
3  on those left meninges that you mentioned, you're going
4  to see that.  Contusions, you can see them.  You can see
5  them if they're, you know, they've been there if -- the
6  only thing you really can't see and you would not
7  necessarily going to see it under a microscope either
8  is, like, an acute stroke.  Meaning that they have --
9  they've collapsed and it's only been a few hours.
10 You're probably not -- it's just like a heart attack,
11 you're not going to see that under -- you're not going
12 to see that grossly.
13     Q   Okay.
14     A   Unless it's from bleeding, that kind of
15 stroke.
16     Q   All right.
17     A   But the kind of strokes we usually see are
18 ones from people with bad artery disease.
19     Q   But in Mr. Mills' case, there was no sign of
20 these -- hemorrhaging?
21     A   No, he has a normal healthy looking brain
22 that's consistent with his age.
23     Q   All right.  And then you describe in the next
24 paragraph various areas of the brain, the cerebellum,
25 the pons and medulla, those are all things that run from

---



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 106

1 the back of the brain; is that fair?

2    A    Right.  Back of the -- posterior parts -- the
3 more primitive parts of that.  So the pons and the
4 medulla are that brain stem that I was talking about.  So
5 those are very -- those are the most vital to our heart
6 and lung regulation.  They're very primitive.  We call
7 them primitive areas, meaning that the higher
8 functioning part of your brain is the other part.  That's
9 the part that keeps us alive.

10    Q    Okay.  You're -- you say they're without focal
11 abnormal markings.  What does that mean?

12    A    Meaning we don't see any lesions.

13    Q    Okay.

14    A    No -- no tumors, no bleeding, nothing out of
15 the ordinary.

16    Q    Okay.  Then you actually examine the skull
17 itself.  And I guess that's better than an x-ray of the
18 skull.  You actually can look at it.

19    A    Much better.

20        MS. ROBINSON-STAPLES:  Objection to form.

21    A    Yes.  So we remove the dura.  After we remove
22 the brain, which is peeling off the material, and then
23 we look at the base of the skull as well to compare and
24 look for any fractures.  I didn't have a high suspicion
25 for any fractures at the base of his skull, just because

Page 107

1 he doesn't have some of the things that we look for
2 externally, like, bleeding out of the ears, and bruising
3 around the eyes and behind the ear.  Those are very
4 typical when we talk about fractures in this location we
5 might see those things.  But we do it on every case just
6 to make sure we don't miss anything.

7    Q    Okay.  We're talking about the -- disposition
8 of evidence is the next section of that report.  And,
9 changing topics on you a little bit, but you obviously
10 took photographs.  I know that the photographs we've
11 been looking at were the ones taken by the officers that
12 came from Kentucky State Police; is that correct?

13    A    Yes, I believe that's -- that's -- their set
14 of photographs.  Mine have a little ME number --
15 sticker.

16    Q    How can we get copies of your photographs?

17    A    Just send something on letterhead -- a request
18 on letterhead with which case it's regarding, who you
19 are, and who you're representing.  And you don't have to
20 attention it to anybody, our records custodian can get
21 that.  Just mail a blank disc with it.

22    Q    Okay.  The diagrams in documentation, you were
23 talking about it and stood up and talked -- showing us,
24 you know, how --

25    A    Yes.

Page 108

1    Q    -- the document on a -- just a form, it looks
2 like a body.

3    A    Yes.

4    Q    And that's what you're talking about here?

5    A    Yes.

6    Q    So I can get that the same way?

7    A    Yes.

8    Q    Okay.  The DNA standard card, why do you take
9 DNA from them?

10    A    We save a DNA sample on everybody.  Usually,
11 it's not necessary for us to do anything with it
12 other than just keep it forever, but the times that we
13 are asked to use it are often, like, issues of
14 paternity, things like that.  It's just so that we have
15 a sample available because the person is no longer
16 living and we don't know if they're going to get
17 cremated.

18    Q    Okay.  You keep tissue for stock.  I'm not
19 sure what that means.

20    A    So we keep little pieces of each of the organs
21 that we examine.  We save it in jars with a
22 preservative.  And we save those for a year.  In this
23 situation, it's not necessary to go back to them, but in
24 some situations we might want to look at something under
25 the microscope if we've, you know, if we've take random

Page 109

1 sections, find something, maybe, like a tumor, and we
2 want to go back and get more tissue, then it's available
3 to us for that year.

4    Q    Okay.  And, finally, you talked about,
5 peripheral blood for short term storage.  Maybe I should
6 ask first how long do you store blood?

7    A    Approximately three months.

8    Q    Okay.

9    A    If we've sent toxicology, the lab will keep it
10 for a year in Indianapolis.  So they'll keep whatever's
11 left over for a year.  So if we've sent it, we only keep
12 ours for about three months, just because we would run
13 out of room.  If for some reason it gets held, then we
14 keep ours for a year.

15    Q    Okay.

16    A    But short-term suggests we kept it for three
17 months.

18    Q    In other words, in Mr. Mills' case, the
19 blood's probably been destroyed?

20    A    The blood's discarded, yes.

21    Q    Okay.  The sum up is I understood where you
22 found other evidence of injury.  Obviously there was a
23 lot of internal injury caused by the bolts.  And they
24 affected various body organs which you described.  I'm
25 more interested in the ones outside.  There was two

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of MEREDITH FRAMPF, Taken on April 19, 2018

110..113

Page 110

1  lacerations that you actually cleaned up and shaved
2  around; is that correct?
3      A    Yes.
4      Q    All right.  Did you check for other
5  lacerations about the head?
6      A    Yes.
7      Q    Okay.  Did you find any others?
8      A    Other than that small one on the cheek, those
9  were the only -- they're the ones described there,
10 nothing else.  So part of the procedure to get the brain
11 out, you actually reflect the scalp back, and so that
12 gives you a chance to look again for anything that you
13 might have missed as well.
14     Q    Okay.  And so you would have done that in Mr.
15 Mills' case?  So in other words, you're pretty confident
16 those were the only wounds to his head?
17     A    Yes.
18     Q    All right.  You describe the one that's --
19 been an inch in length and, I'm sorry, I guess I better
20 look.
21     A    I've got to look -- on page 6.
22     Q    Uh-huh.
23     A    The wound on the left temporal scalp is about
24 an inch in length.  It was, probably, about quarter-
25 inch in depth and in the other one on the back of his

Page 111

1  head that was a little more Y-shaped, it is about three
2  fourth inches in greatest dimension and about one
3  eighths inch in depth.
4      Q    Uh-huh.  Once that -- probably, if he had gone
5  to the hospital, I mean, if that had been the only wound
6  he had, he would have probably had to require stitches?
7      A    Probably, just because of the location and
8  your scalp is -- its' hard to -- you bleed a lot from
9  your scalp.  So it's good to suture those up to keep
10 them clean.
11     Q    But these are not mortal wounds?
12     A    No, not at all.
13     Q    Okay.  And clearly were not cause of death?
14     A    No.
15     Q    Okay.  And, as I understand it, the wound was
16 about an eighth of an inch deep; is that correct?  I
17 forgot.
18     A    Yes.
19     Q    All right.  When you say it subscapular --
20 when you're talking about subscapular bleeding, where is
21 that?
22     A    I mean, just underneath the skin of your
23 scalp.  So there's -- just like your skin everywhere
24 else, you've got layers.  And it's the same on your
25 scalp, you have layers, and it's just meaning it's

Page 112

1  underneath that surface.  You see a little bit of
2  bleeding into the tissue.  So just like you would have a
3  bruise on your skin surface here, and if you cut it you
4  would see the little bit of bleeding into the tissues
5  underneath, it's the same premise.
6      Q    But it's not indicative of any bleeding in the
7  brain?
8      A    No, it's -- it's not the brain itself.  It's
9  in that skin.
10     Q    Would you consider --
11     A    It's in the skin and soft tissue underneath
12 the skin.
13     Q    Would you consider it to be superficial?
14     A    Yes.
15          MS. ROBINSON-STAPLES:  Objection to form.
16     Q    Okay.  On the first page of your report --
17 well, let me ask you about the -- I meant to ask you
18 about the taser marks --
19     A    Yes.
20     Q    -- that you found.  They were on the back; is
21 that correct?
22     A    That's correct.
23     Q    And did they leave puncture marks?  Is that
24 how you found them or --
25     A    So they were actually still in him.

Page 113

1      Q    In there?  Okay.  That would be --
2      A    Sometimes -- sometimes they're there, and
3  sometimes they've been removed.  So in this case, they
4  were actually still there, which is fine, either way is
5  fine.  It's actually helpful that they're still there
6  because I can find them more easily.  His weren't too
7  hard to find, but sometimes they are.  And in the mid
8  and lower back is where they were located, and we took
9  them out and -- and, like I said, I did a dissection on
10 the back for -- I just looked underneath the skin
11 surface just to document that there was a little bit of
12 soft tissue hemorrhage into that underlying soft tissue
13 area.
14     Q    Would you expect to find burn marks with a
15 taser?
16     A    No, on this -- this is very much what I
17 expect, most of the time.  Sometimes they leave and just
18 look like two little puncture marks almost like a snake
19 bite.
20     Q    Okay.
21     A    It just depends on how far apart they are.
22     Q    Can you tell in any way how much voltage or
23 what electrical current he may have received?
24     A    No.
25     Q    Okay.  Likewise, was this a cause -- was it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1   mortal -- was it a cause of death?
2       A    No.
3       Q    Okay.  It was -- you found two tasers; is that
4   right?
5       A    Two marks.
6       Q    Two marks?  Okay.
7       A    Two what?
8       Q    Do you know whether that was from one shot, or
9   could you tell whether it was multiple shots?
10      A    I don't know, but oftentimes they'll be two
11  together.
12      Q    Yes.
13      A    Now I don't know the situation how it
14  happened, but that's commonly what I see is usually two.
15      Q    Okay.
16      A    I don't know, though.  The history I had was
17  that they attempted to tase him twice, but I'm not sure
18  what that -- what they mean by that.
19      Q    Okay.  On the front page, you describe -- in
20  describing his body, obviously, he's 30 years old as you
21  stated, and his body was typical.  You calculate his --
22  did you consider him muscular?
23      A    I mean, I think he was just pretty average.
24  You know, he looks relatively well developed.
25      Q    The calculated body mass index, does that give

Page 115

1   you any clue as to what he was muscle as opposed to --
2       A    So it's difficult.  A BMI, a body mass index -
3   - sometimes his, you know, his being a little bit
4   elevated might be more related to muscle than fat.  If
5   you look at him, he doesn't look -- you know, he doesn't
6   look overweight really, but -- and again, like I
7   mentioned, you're basing this weight -- it's a, you
8   know, it's a weight -- he's dressed, he's in a body bag,
9   he's on a cart.  They're subtracting the weight of the
10  cart.  It's not the, you know, it's --
11      Q    You weighed him at --
12      A    It's probably, you know, he could be anywhere
13  from 200 to 220 pounds, it's hard to, you know, roughly.
14  I mean, I don't trust our scale that much to be down to
15  the pound, but if you look at him, he looks like, he's,
16  you know, average height, average weight.  He doesn't --
17  he's not obese.
18      Q    Okay.  Would he -- would the fact that you saw
19  him ten hours after death, do people gain or lose weight
20  during that limited time period?
21      A    Probably not enough to be significant.
22  Obviously, there's always some fluid that can
23  accumulate.  When people are very decomposed, they lose
24  a lot of water, and so their weight will be less, but in
25  this situation, he's still in -- he's still very well

Page 116

1   preserved.  So it's probably pretty close to -- to his -
2   -
3       Q    Okay.
4       A    -- actual weight.
5       Q    All right.  As you mentioned before, you --
6   your office -- you're in the office of the Medical
7   Examiner.  Is this part of the Justice and Public Safety
8   Cabinet?  Is that fair?
9       A    That's correct.  We are a division within that
10  cabinet.
11      Q    As counsel noted that -- so the Kentucky State
12  Police is part of that; is that correct?
13      A    Right.  We being the State Medical Examiner's
14  Office are part of the office of the Secretary.
15      Q    Okay.  I think maybe not explicit a question,
16  but implicit.  I mean, do you do examinations
17  differently when state cops show up?
18           MS. ROBINSON-STAPLES:  Objection of form.
19      A    Not at all.  It -- actually, we -- like I
20  said, the typical autopsy procedure I outlined we do for
21  anyone that comes through our doors no matter who they
22  are, no matter who's present at our autopsy.  The only
23  thing we might do differently, if there are police
24  present, is to actually transfer clothing or something
25  to them instead of giving the clothing back with the

Page 117

1   body, if they want.  So, you know, if the police are
2   present, then we give them the evidence at that time.  If
3   not, so the police aren't present at all our cases, but
4   they might want certain things.  And they'll call and
5   let us know, and then they come and pick it up later.
6   And we keep it locked.  That's the only thing we do
7   differently.
8       Q    Do you remember discussing any of your
9   findings or any of your conclusions with the state
10  police officers that appeared?
11      A    I don't remember specifics about that day in
12  terms of my conversation with them, but it would have
13  been to explain where the wounds were, which ones were
14  entrances, what organs were injured, and then to recover
15  the projectiles, and I told them where they got them
16  from and, you know, transfer them over to them.
17      Q    Okay.  In other words --
18      A    It's the routine.
19      Q    -- I think they're part of these.  The actual
20  slugs that you -- you found two bullets; is that
21  correct?
22      A    That's correct.
23      Q    All right.  And those were handed over to the
24  state police officers?
25      A    Yes.  I photographed them and then handed them



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRAMPE, taken on April 16, 2018

118..121

**Page 118**

1  to them in a sealed envelope with an evidence transfer.
2      Q     Do you receive any instructions or get any --
3  or is it implied in any way that you're supposed to do
4  something differently when it's a police-involved
5  shooting, either from your boss, Dr. Ralston, or from
6  anybody in the cabinet?
7      A     No.  Not at all.
8      Q     Am I correct that yours is an independent
9  agency making their own findings as a doctor?
10     A     Absolutely.
11     Q     And, obviously, you are licensed to practice
12  in this state as any other doctor through the Kentucky
13  Board of Medical Licensure; is that fair?
14     A     Yes.
15     Q     Okay.
16     A     I have a full license, unrestricted.
17     Q     Okay.  You were talking just a bit out about,
18  you know, how you could not find any soot or stippling
19  associated with the wounds, and you talked about how one
20  was -- they were very close and might leave such
21  indications; is that correct?
22     A     That's correct.
23     Q     And you estimated that 30 inches is, you know
24  --
25     A     For stippling --

**Page 119**

1      Q     -- probably the difference is when -- within
2  30 inches may causes soot and stippling and such.
3      A     Well, soot doesn't travel that far for most
4  handguns.  Stippling can -- can travel up to that far.
5  It's a range, but, you know, more than that I wouldn't
6  expect to see either.  More than a few inches away, I
7  wouldn't expect to see soot.  And, again, there's
8  variables, so it depends on, you know, what they're
9  wearing, how many layers of clothing it's going through,
10  if there's anything in between the bullet and the
11  decedent, if they're being shot at through something.
12  So there's lots of variables, and so the absence of it
13  doesn't really help me determine the range.  It just
14  tell me that I don't know.
15     Q     Could you still be within a arm's reach and
16  still have the findings you have, as far as the
17  shooting?
18     A     There's certainly been instances where people
19  have been closer and not shown soot or stippling, but,
20  you know, I can't -- I can't make any assessment based
21  on what I see what would be the situation.  You know,
22  certainly those things I mentioned may be something
23  intervening, maybe a lot of heavy clothing, that sort of
24  thing might -- might be helpful.  And, you know, I don't
25  do an examination of the clothing in terms of testing it

**Page 120**

1  for chemicals and looking for bullet vibe or anything
2  like that.  So perhaps that might be useful information
3  from -- from the forensic folks.
4      Q     Got you.  All right.
5          MR. KELLEY:  Doctor, thank you for your
6  patience, I believe that's all I have.
7          REDIRECT EXAMINATION:
8  BY MS. ROBINSON-STAPLES:
9      Q     I just have a couple of really quick follow-
10  ups.  I just wanted to make sure that I'm understanding,
11  --
12     A     Sure.
13     Q     -- it's the concentration levels are no longer
14  reported in the urine drug reports; is that correct?
15     A     Yes.
16     Q     And that is why?
17     A     Well, we don't really use it -- we don't use
18  it to interpret anything.  Because whatever is there is
19  there because the body is excreting it, so the level
20  doesn't really mean anything to us.  Whereas a level in
21  the blood, you know, if somebody has a whole lot of
22  opioids in their system that they're prescribed, but
23  maybe they're not taking them appropriately and they
24  have very high levels, that might be more useful
25  information.  Whereas this just says, well, their body's

**Page 121**

1  broken it down and they're excreting it.  It doesn't
2  really help me to tell me how much they used -- doesn't
3  help me.
4      Q     Okay.
5      A     So they just don't use it.
6      Q     So you have no idea based on this report, how
7  much of the substance was used?
8      A     Correct.
9          MS. ROBINSON-STAPLES:  Okay.  Thank you,
10  ma'am.  That's the only follow-up that I have for
11  you.
12          RECROSS EXAMINATION
13  BY MR. KELLEY:
14     Q     Those opinions you gave both in answer to mine
15  and to Plaintiff's counsel, were they stated within
16  reasonable medical probability?
17     A     Yes.
18          MR. KELLEY:  Thank you very much.
19              (DEPOSITION CONCLUDED AT 12:35 P.M.)
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRAMPE, taken on April 29, 2019        122

Page 122

1    CERTIFICATE OF REPORTER

2    STATE OF INDIANA

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof by me after first

7    being duly sworn to testify the truth, the whole truth,

8    and nothing but the truth; and that the said matter was

9    recorded by me and then reduced to typewritten form

10   under my direction, and constitutes a true record of the

11   transcript as taken, all to the best of my skills and

12   ability. I certify that I am not a relative or employee

13   of either counsel, and that I am in no way interested

14   financially, directly or indirectly, in this action.

15

16

17

18

19

20

21

22   LACEE TOWNSEND,

23   COURT REPORTER / NOTARY

24   COMMISSION EXPIRES ON: 06/19/2024

25   SUBMITTED ON:  05/06/2019

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRAME, taken on April 25, 2018

123

**Exhibits**

**EXH 1** 5:9 6:11 9:8

**EXH 2** 9:9,22, 25 10:9 84:4

**EXH 3** 9:10,23, 25 10:10 22:19 30:23

**EXH 4** 10:20

**EXH 5** 65:1,3, 24,25 68:25 70:4

**EXH 6** 65:4 70:16

---

**(**

**(a)(2)** 5:16

**(C)** 5:17

---

**1**

**1** 5:9 6:11 9:8, 18

**10** 10:1 32:8 84:18

**100** 6:18

**10:00** 27:14 81:20

**10:02** 6:16

**11:58** 27:11

**12** 27:16 90:11

**12-24** 34:5

**12:35** 121:19

**15** 53:7

**1500** 100:17

---

**2**

**2** 9:9,18,22,25 10:9 12:7 56:15 57:13 58:22 84:4

**200** 115:13

**2000** 16:22

**2008** 13:6

**2012** 13:9

**2013** 13:14,21 14:17

**2016** 27:8 65:20 84:24

**2019** 6:16

**203** 60:4

**206** 57:3

**207** 38:14

**208** 38:16 42:4

**210** 32:21

**216** 42:21,23

**220** 115:13

**229** 55:1

**230** 50:2 56:11

**234-235** 62:23

**24** 71:22

**240** 58:24

**244** 59:24 60:21

**245** 43:5

**247** 45:17

**25th** 6:15

**26** 5:14

**29** 27:8

**29th** 23:21

---

**3**

**3** 9:10,23,25 10:10 22:19 30:23

**30** 32:19 37:22, 25 38:4 53:7 114:20 118:23 119:2

**30-year-old** 23:18 64:23,24

**73**:10

**300** 16:25

**30th** 27:9

**350** 64:13

**3:00** 35:24 36:1

---

**4**

**4** 10:1,18,19,20

**400** 64:13

**40601** 6:19

**450** 64:12

---

**5**

**5** 56:16 65:1,3, 25 68:25 70:4 89:17

**5'10"** 33:13,14, 15,16,17

**5'11"** 33:17

**5'8"** 33:12

---

**6**

**6** 57:13 65:1,4 70:16 89:17 99:1 110:21

**60** 76:15 87:17

**6:17-CV-00184** 6:25

---

**7**

**70** 33:11

**70-and-a-half** 32:20

**737** 9:8

**740** 9:9

---

**9**

**9** 32:8 100:6

**95-year-old** 73:13

**9:00** 35:24 36:1

---

**A**

**A-RIGHT** 94:24

**a.m.** 6:16 27:14 84:18

**abdomen** 31:11 39:16 40:20 41:1,14 75:20

**abdominal** 39:14 41:15

**abnormal** 46:5 102:22 106:11

**abnormality** 100:11

**abrasion** 35:21 36:17 41:6,9 43:10 49:3,19 57:16, 19 62:10,20

**abrasions** 42:19,21 46:25 47:3,11,18 48:6,7,20 62:22

**absence** 119:12

**Absolutely** 87:22 118:10

**abuse** 53:16 65:18,23 70:5, 13 90:9 95:2

**Access** 65:19 67:24 88:14

**accident** 26:14

**accidental** 15:10

**accidents** 16:3

**accumulate** 115:23

**accuracy** 33:1

**accurate** 33:2, 4,9 52:23 56:22

**achieve** 95:5

**acting** 79:20

**action** 93:20

**active** 72:8

**acts** 93:14

**actual** 116:4 117:19

**acute** 105:8

**add** 25:5 75:1

**addition** 95:2

**additional** 13:7 24:1,2,5 26:7,9,11 29:8 30:6 69:21 87:12,14

**addressed** 62:5

**adequately** 32:18

**Administrator** 6:21

**adult** 32:18 34:25 64:12

**adults** 50:19

**affect** 25:25 79:11 81:8

**affected** 109:24

**affects** 80:1

**affirm** 7:12

**age** 28:8 32:19 105:22

**agency** 118:9

**aggressive** 92:20

**agree** 11:15

**agreeable** 84:3

**agreement** 89:2

**ahead** 9:3 10:15 44:15 73:3 83:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

87:13 96:9

**aid** 83:15

**AIT** 65:19 66:16
67:24 69:8
88:14

**akin** 94:22

**alcohol** 93:21

**alcohols** 87:1

**alive** 106:9

**alprazolam**
68:20

**alter** 68:15

**altercation**
23:19 29:4
48:18,20 78:22
80:21

**amount** 87:19

**amphetamine**
91:7

**amphetamine
s** 65:25 70:7
91:6 92:1 99:7

**anatomic** 14:2

**anatomical**
39:23,24 40:7

**ancillary** 69:21

**and-a-half**
33:11,17

**aneurism**
102:17,18,20

**angle** 57:20
63:11

**answers** 8:18

**anticonvulsan
ts** 66:7

**anxiety** 93:17,
20

**anymore**
72:21 82:20
99:15

**apologies** 10:4
23:7 49:7

**apparent**
51:19

**appearance**
47:19

**appeared**
117:10

**appearing** 5:7
52:22

**appears** 57:14

**approach** 6:6

**appropriately**
120:23

**approximately**
32:20 35:18
52:5 81:20,22
109:7

**April** 6:16

**area** 35:23
49:11,24 82:8
98:10 102:10
103:19 113:13

**areas** 31:16
102:17 103:20
105:24 106:7

**arm** 54:24 55:3
58:1,11,12,13,
15

**arm's** 119:15

**armpit** 50:3,6,
7,12,13

**arms** 34:3
39:25 40:4
58:20

**arrived** 84:21

**arteries** 101:24
102:1,4

**artery** 105:18

**artifact** 34:15,
17

**Ashurst** 5:6
7:6 78:23

**aspect** 35:24
39:17 58:15
102:10

**aspects** 79:15

**assessment**
119:20

**assist** 15:4

**assisting**
22:23

**Associate**
6:17 18:3

**assume** 80:10
89:19 91:7 93:4

**assuming**
22:20

**attached** 32:12
60:4

**attack** 105:10

**attempt** 86:17

**attempted**
114:17

**attendant**
22:20

**attended** 17:12

**attention** 69:4
92:2 107:20

**atypical** 46:4

**audible** 8:18

**authorization**
19:24 20:1,4,7
23:25 24:10
25:24 27:19

**authorizing**
20:20

**autopsies**
11:12 16:9,10,
17,22 17:5,6
18:24 19:9 26:5
65:11

**autopsy** 5:20,
21 8:24 9:2,24
11:2,22 15:8
16:1 17:13,14
19:1,3,20 20:2,
6,15,20 21:2
22:17,22,23
23:5,9 24:21,24
26:11,13,21
27:8,13 28:19

30:20 32:13
51:20 60:12
70:21 81:18
83:11 88:18
103:2 104:11
116:20,22

**availability**
85:6

**average** 16:25
64:12 90:3
114:23 115:16

**avoid** 66:20
67:13

**aware** 5:22
8:10 95:11

**axilla** 50:12

**axillary** 50:11

___

**B**

___

**Bachelor's**
13:2

**back** 34:6
39:11,12,17,18
40:8 43:2,5,20
44:13 45:20
53:16 58:17
59:17 60:5,14
63:25 67:6
70:13 85:12
98:25 99:16
102:3,13,20
106:1,2 108:23
109:2 110:11,
25 112:20
113:8,10
116:25

**background**
12:24

**backward**
41:22

**bacteria** 82:20
83:6

**bad** 105:18

**bag** 20:22
21:22,25 22:2
25:21 31:2,3,6
34:8,9 60:3
83:18 85:22

115:8

**bags** 35:6

**balance** 95:6

**bald** 99:21

**barbiturates**
65:25 70:7

**barrel** 34:21

**base** 101:24
106:23,25

**based** 12:14
15:6 23:25
30:17 32:22
39:22 40:13
64:21 73:7 77:7
78:2,5 79:17
86:16 119:20
121:6

**Basham** 6:14

**basic** 65:23

**basically**
28:14 30:8
72:7,19 97:9

**basing** 115:7

**bath** 66:6,24

**baton** 44:17
46:21 56:2,5

**beard** 34:12

**begin** 30:22
42:7

**beginning**
23:9,15 24:19

**behalf** 5:5 7:5

**behavior**
79:11

**behaviors**
79:25

**Beneath** 55:3

**benzodiazepa
m** 93:3

**benzodiazepin
es** 66:1 70:7
95:23

**benzyl** 68:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

bet 69:11

big 45:10 49:3 57:18 77:15 85:12

bigger 87:9

biggest 98:4

Bill 18:13

Biology 13:3

bit 29:21 34:15, 22 36:12 42:12 43:21 46:3 47:13 54:1 55:6,8,22 56:12 60:16 63:22 65:7 76:16 102:20 107:9 112:1,4 113:11 115:3 118:17

bite 113:19

bladder 70:20 86:16

blank 107:21

bleed 111:8

bleeding 53:4 77:5 86:13 101:2,17 105:14 106:14 107:2 111:20 112:2,4,6

Blevins 28:24 29:1

blood 29:11 30:5 32:11 34:1 43:22 51:20 53:13,18 54:4 64:16 70:9,13 72:2,8 73:1,19 75:2,9,14 76:14 79:18,24 80:8, 25 81:14,15 82:21 83:4 86:6,13,18 87:1,10,14 89:19,20,22,25 90:19 91:18 97:22 102:22 103:25 104:24 109:5,6 120:21

blood's 109:19,20

blood-born 97:23

blows 37:17

blue 31:5

blue-purple 50:20

blunt 44:2,5 46:12 59:16 101:18

BMI 115:2

Board 14:1 118:13

bodies 83:24

body 20:14,24 21:1,6,9 22:2, 24 23:2 25:17, 21 26:15 30:24 31:1,2,6,13,22 33:6 34:8,9 40:3 42:3,11 51:20 54:8,9,16 60:3,22 61:12, 25 62:12 70:25 72:9,19,20 73:4,6,14,17 79:9,13,16 81:8 82:17,21 83:8, 13,18 84:7,8, 21,25 85:11,21 86:6,8 91:16,17 92:8 93:14 108:2 109:24 114:20,21,25 115:2,8 117:1 120:19

body's 72:10 74:2 120:25

Bolton 5:6 7:6 78:23,24

bolts 109:23

bone 41:19

books 56:6

boot 31:5,6

border 35:22 41:9

boss 118:5

bottom 10:10 42:3 63:2

Boulevard 6:18

bowel 41:16

box 88:5,8,15, 18

brain 76:11,17 100:16,21,22, 25 101:2,21,24 102:7,9,15 103:4,10,12,22 104:4,14,16,21, 24 105:2,21,24 106:1,4,8,22 110:10 112:7,8

branch 102:14

brand 31:18 94:12,16

Brandon 5:6 7:6 78:23

break 8:15 34:3 63:15 78:13 82:21 83:6 90:3,17

breakdown 90:5 93:9,12,13 94:17

breaking 73:17 90:13

breaks 8:16 73:22 79:13

briefly 12:23

bring 83:24

bringing 19:5, 19

broad 67:4

broken 73:21 74:3 86:12 121:1

broom 56:6

brother 94:10

brought 32:22 83:23 84:14,18

86:2

brown 31:5 34:12,13 49:23 62:18

brown-yellow 51:22 52:10

brownish 50:4

bruise 50:5,15 52:5,19,21 53:10 54:9 57:18,19,21,22 58:13 62:2,17 63:4,9 98:10 112:3

bruisers 53:3

bruises 42:20 50:4,13,19,25 51:9,19 52:9,15 54:6,11,12,18 55:6,12 58:1,14 63:6 103:22

bruising 55:10 57:10 58:16 98:17 107:2

Bryan 17:12 22:16

budget 26:25

bullet 77:2 103:19,20 119:10 120:1

bullets 117:20

buprenorphine 94:14,19

burn 113:14

burrows 35:23

___

C

cabinet 18:5,8, 18 116:8,10 118:6

cable 32:12

cage 39:5

calculate 114:21

calculated 114:25

calculations 33:11

call 15:12 19:2, 5,10,16 21:21 30:7 34:2,21 36:6 39:22 40:17 41:5,11 47:14 55:4,8 56:13 64:14 65:17 82:3 91:16 94:15 98:8 106:6 117:4

called 15:21,25 16:7 21:8 31:20 35:21 36:16 39:7 41:14,16 42:19,20 46:1 60:12 65:19,23 68:20 82:22 105:1

calvarium 100:10

cancel 74:22

cancer 97:16

cannabinoids 66:1

car 15:11 86:11

card 31:9 32:11 108:8

Carolina 13:13 14:10

carotid 102:4

carotids 102:6

cart 32:23,25 115:9,10

case 5:14 12:8, 14 15:14,17 17:10 18:1 20:4 22:11,13 23:16, 23 24:25 26:4, 17,23 27:1 28:18,22 31:16 34:1 35:24 53:24 65:16,17 69:19 81:10,12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

84:11 86:20,21
87:24 104:8,10
105:19 107:5,
18 109:18
110:15 113:3

**cases** 15:19,24
17:23 22:7 27:2
53:15 89:14
117:3

**category** 80:4
91:6 92:16
93:3,15,24

**caused** 44:1,
20,22 45:1,5
46:11 75:18
109:23

**caveat** 66:12

**cavity** 41:15

**central** 55:8
57:2,10

**cerebellum**
105:24

**certainty**
12:18 78:9

**certified** 14:1

**chain** 88:2,11

**chance** 17:25
110:12

**change** 12:11
51:12 67:16

**changing**
66:19 67:21
107:9

**check** 24:12
32:1 60:3 110:4

**checking**
20:21

**cheek** 47:5
49:1,11 110:8

**chemical** 67:1,
16 68:4 82:22,
23 83:5

**chemically**
66:22

**chemicals**
79:9 120:1

**chest** 31:10
34:21,23 35:15,
19 38:15,20
39:5,13 62:2
75:19 86:14

**Chief** 6:17
18:3,12

**child** 53:16

**chin** 49:19

**chloride** 82:23

**chose** 86:21

**chronic** 97:10

**circumferentia
l** 41:5

**Civil** 5:15

**classes** 80:2,3
81:8

**classic** 56:5

**clean** 98:3
111:10

**cleaned** 42:23
45:17 55:2
59:24 110:1

**clear** 8:14
24:22 60:20
72:24

**cleared** 97:11

**clearer** 57:8

**clearing** 71:23
90:19

**clinic** 95:18

**clinical** 14:2

**clinics** 95:18

**clock** 35:25

**close** 36:10
37:9,10 56:11
116:1 118:20

**closed** 34:16
101:12

**closely** 17:2

**closer** 57:1,7
119:19

**clothed** 21:19,
23,24

**clothing** 21:20
32:8 36:23
61:22 116:24,
25 119:9,23,25

**clue** 115:1

**cocaine** 66:1
83:6,7

**Cocaine's**
73:22

**COH** 71:13
90:5

**collapse** 76:18

**collapsed** 48:9
105:9

**collect** 23:3

**collected**
70:20 81:15,17

**college** 13:2

**color** 21:10
34:12,13 47:11,
14 48:1,3
50:15,21

**combination**
57:21

**comment**
103:1

**commenting**
102:25

**common** 16:13
67:25 79:24
80:5 94:16

**commonly**
91:11 114:14

**communicate**
17:5,16,22

**compare**
106:23

**compared**
52:10 89:20

**Comparing**
89:17

**completed**
13:8,12

**completely**
33:7 34:16
85:5,8 86:7
88:7

**component**
79:12

**compound**
68:5,13

**compounds**
68:14

**concentration**
120:13

**concentration
s** 99:4

**concern** 96:4

**concerned**
80:8 81:13

**CONCLUDED**
121:19

**conclusions**
117:9

**concussive**
101:4,5,7

**condition**
34:20 86:8

**conduct** 6:4

**conducting**
18:23 19:9
20:2,15

**confident**
110:15

**configurations**
66:22

**confirm** 20:20

**confirmatory**
30:8,15

**confirmed**
96:11

**conscious**
77:15

**considered**
44:2 74:18,19
101:3

**consistent**
32:19 34:7,8

**completely**
41:9 57:12
105:22

**constable** 5:6
7:6 78:23

**constantly**
66:19 67:20
69:24

**consumption**
67:12,18

**contact** 36:10
37:16

**container**
87:9,17

**contents** 32:9

**continue** 82:18

**contract** 89:4,
9 97:21

**contributed**
80:9

**control** 77:5

**controlled**
91:23

**contusion**
50:15,16 52:4
55:4,7 57:10
101:1

**contusions**
42:20 49:23
56:21 58:11,19
61:9 105:4

**conversation**
23:11 117:12

**convulsional**
100:17

**cool** 83:13 84:8

**cooler** 34:17
53:25 83:19,22,
25 84:3,10,15

**copies** 107:16

**cops** 116:17

**copy** 5:10
27:19 69:13,14,
16

**coroner** 8:25
19:5,8,11 20:7,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

19 21:25 23:17,
25 25:3 27:20
28:10,18,20
31:3 48:17 66:8
69:12,14 81:23
82:2,14 83:12
85:1,23

**coroner's**
85:6,17

**coroners** 15:4
17:7 84:1

**correct** 12:8
13:17,18,19
14:5,6,14 18:5,
8 20:21 21:21
22:17 27:11,17
33:12 35:2,5,12
37:9 38:8,23
42:4,5,8 48:7,
22 54:14,19,20
58:4,5 60:22,23
63:20 65:10
69:1 70:10,14
78:3,6,9 79:11
81:16,17,21,24
82:4,5,10,12
83:13 86:2,22
88:23 89:15,16,
23 91:9,10,12,
14,15 94:3,4,7,
8,9,22 95:12
96:8,20 100:2,5
103:11,15
107:12 110:2
111:16 112:21,
22 116:9,12
117:21,22
118:8,21,22
120:14 121:8

**correctly** 8:14,
20

**counsel** 5:11
6:25 77:21
116:11 121:15

**countries**
67:14

**county** 5:5
6:22 7:5 15:4
78:20,24 83:22
85:5,12,16,25

**couple** 8:11
36:13 37:20

50:3 52:25
66:24 73:24
120:9

**court** 6:15,23
7:11,15 8:4,17
10:18 15:22,25
16:8 31:9

**covers** 10:21

**create** 56:7

**cremated**
108:17

**crook** 98:18

**CROSS** 78:17

**crush** 95:22,24

**cubital** 58:15

**current** 113:23

**custodian**
107:20

**custody** 88:2,
12

**cut** 26:25 112:3

**cylindrical**
55:20 56:4,7
57:12 61:8

---

**D**

**damage** 86:15

**date** 50:16 88:9

**day** 6:16 18:1
19:14 22:23
52:12 54:3
64:19 72:3,14
90:9 117:11

**days** 51:3
73:25

**DEA** 67:19

**dead** 27:7,11

**deals** 5:16,18

**death** 5:22
14:22,24 15:5,
6,10,14,15 16:6
26:20 29:2,9
33:25 34:1,5

47:17,20,24
48:9,19 50:25
75:18 76:4,11
80:10,12,15
81:21,23,24
82:17 85:2
103:6 104:1,10,
11,15 111:13
114:1 115:19

**deaths** 16:4

**deceased**
51:5,8,11,14

**decedent** 19:5
20:21,22 23:18
28:8,9 29:12,16
37:5 82:19
88:6,8 119:11

**decedent's**
28:15 29:11

**decent** 83:10

**decomposed**
115:23

**decompositio
n** 82:25 83:1,16

**deep** 46:8
59:13 111:16

**defendants**
5:5 7:7

**deficit** 92:2

**definite** 96:7

**degree** 12:17
13:4 78:8 96:18
101:9

**degrees** 13:3

**delayed** 52:22

**delivery** 88:10

**Department**
29:22 78:25

**depend** 72:16

**dependent**
37:18 71:11,24
72:1 85:8 86:7,
9

**depending**
19:13 26:7 33:5
37:1,8 74:1

77:18 85:5,6

**depends** 16:20
17:25 19:2 26:1
31:15 36:8
37:10 53:8
71:14 73:8 76:8
90:14 92:22
113:21 119:8

**deposition**
5:8,9,11 6:4,5,
9,19 7:20 8:2,
23 11:25 12:3,
21 20:9 77:24
121:19

**depositions**
7:23

**depressant**
80:4

**depressants**
74:19

**depth** 110:25
111:3

**deputy** 5:5 7:5
23:20 28:18,20
29:4 78:24

**describe** 12:24
47:19 48:1
60:1,4 62:9,25
105:23 110:18
114:19

**describing**
25:3 32:17
34:11 42:3,16
49:11 57:22
60:11 84:6
114:20

**description**
50:1

**destroyed**
109:19

**detail** 23:22

**detected** 93:5

**detective**
10:22 17:11
22:16 23:8

**determine**
14:22,24 15:12
38:6 41:24

48:15 60:24
72:17 75:18
77:8 119:13

**determined**
15:14 81:23

**determining**
15:4,8 26:20
55:22

**develop** 39:20
97:14

**developed**
32:18 34:20,25
114:24

**device** 31:20

**diagnosis** 9:8
12:7 96:7

**diagrams**
24:20 40:1
107:22

**dialysis** 73:13

**diameter**
59:12

**diaphragm**
39:12

**diazepam**
68:21,23 93:10,
12

**die** 15:6 73:19
81:25

**died** 51:16
52:11 75:19
82:9,14 103:4,5

**difference**
76:22 77:25
82:16 119:1

**differently**
80:2 116:17,23
117:7 118:4

**differs** 73:7

**difficult** 77:5
86:5,10,16 97:3
115:2

**dilation** 102:22

**dimension**
101:25 111:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

direct 7:16
18:15

direction
18:10,20 36:3

Director 18:16,
17

disc 107:21

discarded
109:20

discharge
36:7

disclose 77:24

Disclosure
5:16

discovery 6:4,
9 77:24

discuss 10:5

discussed
48:24 61:25
64:1 65:7 70:4
75:16

discusses
39:1

discussing
67:19 117:8

disease 13:8
21:17 64:8,9
97:15 102:16
103:23 105:18

disorder 92:3

displays
100:11

disposition
107:7

dissection
113:9

distance 36:20
37:4,6

distances
37:12

distribution
101:25

District 6:23,
24

division 6:24
116:9

DNA 32:10,11
108:8,9,10

doctor 5:25 6:7
92:13 118:9,12
120:5

doctorate
13:16

document
10:2 22:3 60:15
108:1 113:11

documentatio
n 60:19 84:23
88:12 107:22

documents
9:4,5,6,21
12:10

door 36:25

doors 116:21

double 32:1
60:3

downward
36:2

dozen 7:25

drained 51:20

draw 24:20
87:4 88:3

dressed 115:8

dried 47:18,19
62:9,18

drive 60:25

drop 85:19

dropped 85:14

drug 15:11
16:2 26:8,10
29:16 65:23
66:9,11 67:3
68:3,17 70:13
71:24 73:7,8,14
79:18 80:1 83:6
90:1,4 92:6,9
93:4,8,22 94:1,
16,18,25 95:13
98:1,7 120:14

drugs 65:18
66:5,13,18
67:20 68:24
70:4,25 71:8,
12,16,19,24
72:5,25 73:5,7,
12,24 74:2,13,
24 79:24,25
80:2,4,8 81:1,8
82:18,20,21
89:19,21 90:12,
14,17 91:6 92:3
93:15 95:19
96:1 97:12 99:8

dry 61:1

drying 34:15,
17

DUI 89:14

dumb 68:11

dura 100:11,20
104:24 106:21

duties 15:2
17:17

duty 15:3

———————

E

———————

ear 107:3

earlier 8:3
22:15 48:17
52:12 65:8
71:18 96:3

ears 34:19
107:2

ease 34:4

easier 8:19
10:5 31:20
42:12 54:1,4

easily 83:7
113:6

Eastern 6:24

easy 53:3

edges 36:11,14
37:16

education
12:14 78:3

educational
12:24

effect 67:15
74:8,23 79:9
91:16,17 93:2

effects 22:2
32:3 74:13,15
79:25 80:3,5
93:17

EHT 35:6

eighth 111:16

eighths 111:3

elapsed 75:22

elbow 58:17
59:1 98:18

electrical
113:23

element 77:14

elevated 64:16
115:4

else's 49:4

emergency
24:15

employed 14:4

employees
17:3

EMS 24:15,16

encases 39:8

encephalitis
104:15

end 12:7 31:15
69:20 84:8
88:15 97:18

ended 39:17

enforcement
11:19

engaging 98:7

enlarged
64:11,15

enlarges
102:23

entered 41:12,
18

entering 35:22

entrance
35:17 40:25
41:9

entrances
117:14

envelope
118:1

epidemic 98:5

epidural
104:25

equates 33:11

error 12:5

Estate 6:21

estimate 76:7

estimated
118:23

estimates
32:21 38:1

estimation
74:8

etcetera 6:2

ethanol 66:5

everybody's
102:5

evidence
21:16 35:4 98:6
100:24 101:20
107:8 109:22
117:2 118:1

exact 22:9 23:4
26:21 51:7 67:1
90:10

exam 63:23
100:3

examination
7:16 9:10 11:16
21:8,15 23:15
24:19 25:16,25
26:16 43:21
51:4 64:5,6,21
75:17 78:6,17
84:5 100:2
101:23 119:25
120:7 121:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-15   Filed: 02/10/20   Page: 41 of 53 - Page
ID#: 4846
The Deposition of MEREDITH FRAME, taken on April 25, 2018

129

examinations
116:16

examine  6:7
14:20 64:7
102:18 106:16
108:21

examiner  5:20
6:18 12:25
13:25 15:1,3
17:2 18:3,4,12
79:4 80:7 116:7

examiner's
13:15,20 14:5
69:4 84:22
85:3,24 116:13

Examiners
89:2

examining
22:13

exception  61:7
88:16

excitement
91:20

exclude  98:12
101:8

exclusive
89:10

excretes  79:14

excreting  71:1
72:10,22 73:5
74:2 120:19
121:1

excuse  88:21
93:4

exhibit  5:9
6:11 9:8,9,10,
22,23,25 10:9,
10,17,20 22:19
30:23 42:15
65:1,3,4,24
68:25 70:4,16
74:14 84:4
89:18

exhibited  80:5

expect  45:3
46:14 113:14,
17 119:6,7

expecting
103:2

experienced
77:9

expert  5:17
15:16,20,22

explain  28:5
35:15 40:22
42:13 79:6
100:10 117:13

explained  90:1

explicit  116:15

exposed  29:10
97:24

exposure
29:23

extent  5:23

Exterior  30:23

external  21:8,
15 26:14

externally
63:20 107:2

extra  89:8

extrapolate
79:19

extremities
58:4,9 62:4,8

eye  21:3,10
34:12 47:4
96:10

eyes  34:13,14,
16 86:19 107:3

———

F

face  42:22
45:18 46:2 47:7
102:9

fact  89:18
99:15 115:18

factor  61:22

failing  77:23

fair  34:20 79:21
80:10 83:14

94:23 95:16
96:7 99:21
100:4 103:14
106:1 116:8
118:13

fall  44:10
101:4,5

falling  44:9
46:15

false  96:22

familiar  93:16
102:5

family  68:17,22
103:6

fancy  100:19

fast  73:17 77:5
83:8

fat  115:4

fax  69:10,13,
14,17

features  21:11

Federal  5:15

federal-run
94:2

Fedex  88:10,16

feeding  103:10

feel  77:18
92:23 102:5

feeling  77:13

fell  44:7 48:10

fellowship
13:10 14:9

Fentanyl  66:1

field  13:7 14:5

figure  49:5
71:25

figured  83:17

file  69:19

fill  19:23

filled  25:5

Final  9:8 12:7

finally  109:4

find  6:9 35:4
38:9 42:15
54:18,25 56:13
64:9 67:7
100:24 103:2
109:1 110:7
113:6,7,14
118:18

finding  31:24

findings  81:12
117:9 118:9
119:16

fine  55:18
113:4,5

fired  37:5

fist  44:23

fit  66:6 80:4

five-eighths
41:2

fixed  34:2

Flakka  29:17
66:9,13,22,25
68:9 75:7

flashlight
44:14 46:18
55:24 56:4

flow  76:14

Floyd  28:24

fluid  86:19,20
115:22

focal  45:22
106:10

folks  120:3

follow  78:25
79:2

follow-  120:9

follow-up
121:10

foot  31:5

force  44:3,5
46:12 59:16
101:18

forceful  52:22

forearm  54:25
58:12

forensic  13:1,
11 14:3,9 23:5
65:21 120:3

forever  108:12

forget  31:19

forgot  99:3
111:17

form  19:24
20:2,4,8 24:10
25:24 27:20
28:6,7 29:1
53:1 68:3 79:22
82:11 92:25
93:11 106:20
108:1 112:15
116:18

formulas
66:19

fossa  58:15

found  28:9
31:13,17 32:6
35:15 42:14
54:16,23 58:8
60:21 63:20
66:11 79:18
81:13 87:25
91:8 92:8 99:17
109:22 112:20,
24 114:3
117:20

fourth  84:6
111:2

fourths  35:20

fracture
101:16

fractures
106:24,25
107:4

frame  5:19
6:20 7:18 78:19
80:19

Frame's  5:8

Frankfort  6:19
14:12,14

frequently



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRAME, taken on April 25, 2018

130

17:4,23

**fresh** 52:9

**Friday** 88:17

**fridge** 53:16

**front** 40:8
58:14 60:13
84:5 86:2
103:12 114:19

**full** 118:16

**functioning**
73:11 106:8

**funeral** 84:2

--- G ---

**gain** 115:19

**Gambrel** 6:20

**gas** 67:10

**gave** 8:2 12:8
32:3 60:6 78:2,
8 82:13 121:14

**general** 16:19
19:10 20:14
22:12 37:19
86:17 92:7

**generalizations** 81:7

**generally**
16:17 17:9
18:24 19:9,20
25:23 61:11
63:23 68:1

**generic** 68:21

**genetic** 103:7

**ginseng** 31:8

**gist** 28:14
39:10 97:9

**give** 7:12 8:18
9:7 10:15
16:12,14 19:12
40:2 48:3 53:21
68:4 73:14 74:8
75:21 78:11
81:6 90:10
114:25 117:2

**giving** 77:22
84:7 116:25

**glistening**
100:16

**good** 7:18
36:13 52:3 57:5
87:13 111:9

**government**
94:2

**Graduated**
13:4

**grams** 64:12,
13 100:17

**gravity** 53:21

**gray-topped**
87:6

**greatest** 59:12
111:2

**green-yellow**
58:13

**green-yellow-brownish**
50:21

**grossly** 104:22
105:12

**ground** 44:7,9
46:15 47:8

**group** 68:15

**grouped** 57:25
58:1

**guess** 48:9
106:17 110:19

**guideline**
37:19

**gunpowder**
36:7,15

**gunshot** 16:14
20:17,24 22:7
26:3,17 29:3
35:11,14 38:10
40:19,25 41:11,
25 61:9 64:1
75:19,23 76:23
103:4

**guys** 69:11

--- H ---

**habitual** 72:4

**hair** 21:10
32:10 34:11,12
43:8

**half** 33:10

**half-an-inch**
33:6

**half-inch** 52:5,
19

**hall** 29:21

**hand** 7:9 15:9
58:15,18 59:10
64:25 93:25

**handed**
117:23,25

**handful** 16:13
17:20

**handguns**
36:9,19 37:19
119:4

**handle** 56:4

**handles** 56:6

**happen** 37:14
52:11,12 77:3
84:19

**happened**
28:11,16 29:3
34:7 48:11 51:2
84:9 114:14

**happening**
67:14

**happy** 8:16

**hard** 49:2,5
54:7,9 57:4,18,
23 63:11 71:19,
20 74:14 83:7
86:13 93:10
99:13 111:8
113:7 115:13

**harder** 83:9

**hate** 94:11

**head** 18:17
41:8 42:8,14

43:5,12 44:14,
22,25 48:23
67:10,11 86:14
90:19 91:1
99:18 100:3
101:5,6,12,16
110:5,16 111:1

**heal** 50:22

**health** 29:23
30:21

**healthy** 64:23,
24 73:9 105:21

**heard** 77:21
89:13

**heart** 39:8,9,
10,11 64:11,13
76:3,13 77:2
91:18 105:10
106:5

**heartbeat**
76:19 91:19

**heavy** 119:23

**heck** 100:18

**height** 21:10
115:16

**held** 109:13

**helpful** 21:14
26:20 36:3
55:22 83:1
113:5 119:24

**helping** 22:24

**helps** 82:23

**hemorrhage**
43:19 45:22
46:3,6 60:17
64:2 103:9
105:2 113:12

**hemorrhaging**
101:20 104:20
105:20

**hepatitis**
29:12,19,24,25
30:2,3,7,11,14,
18,20 96:5
97:5,8,10,17,
18,21,22

**heroin** 73:16,
18,20

**hesitate** 8:13

**Hey** 19:18

**high** 37:15
91:20 95:5
106:24 120:24

**higher** 97:16
99:7 106:7

**highly** 30:19
96:16

**hint** 36:3

**hip** 62:10

**historical** 15:7

**history** 23:16,
23 24:25 25:12
28:11 104:17
114:16

**History/what**
29:3

**hit** 44:13,22
101:5,6

**hits** 36:16

**hitting** 41:7

**HIV** 29:12,19,
24 30:2,11

**holds** 100:21

**homes** 84:2

**homicide** 15:9,
15 65:8

**homicides**
16:3 27:2

**honestly** 80:13

**hopes** 95:4

**hoping** 83:16

**hospital** 24:13
82:1 84:2 111:5

**hour** 34:5

**hours** 27:16
51:3,5,6,8,13
52:25 71:22
81:20 85:23
90:10,11,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of MEREDITH FRAME, taken on April 26, 2018

105:9 115:19

**hue** 47:14

**human** 67:12, 18

**hundreds** 16:15

**Hunt** 22:20

**hyperactivity** 92:3

**hypertrophy** 64:15

**hypodermic** 98:3

—————

**I**

**idea** 21:3 40:14 89:11 121:6

**identification** 6:11 9:22,23 10:20 21:12 31:3 65:3,4

**identified** 41:11

**identifying** 21:11,14 35:1

**ignore** 70:22

**iliopsoas** 41:16

**illegal** 91:24 92:9

**illicit** 92:5

**illicitly** 66:14 95:5

**Illinois** 13:5

**imagine** 52:18 61:21

**immediately** 76:23

**impact** 56:8 80:14

**implicit** 116:16

**implied** 118:3

**important** 28:15 60:10 102:15 103:6

**importantly** 8:12

**in-stage** 97:14

**inch** 33:10 35:18,20 45:12 59:12 62:17 110:19,24,25 111:3,16

**inches** 32:20 33:11 36:13,19 37:20,22,25 38:4 40:12 41:2,3 60:7,8 111:2 118:23 119:2,6

**include** 79:25 104:13

**included** 66:23 75:7

**includes** 65:24

**including** 61:22 65:25 66:4 75:6

**increase** 91:18

**increases** 91:17

**incredibly** 16:19

**independent** 118:8

**indeterminate** 36:6 40:17 41:11

**index** 114:25 115:2

**Indianapolis** 65:21 88:11 109:10

**indicating** 40:6 45:24 50:8 99:24

**indications** 118:21

**indicative** 112:6

**indicator** 29:15

**individual** 21:18,20 53:9

**individuals** 17:13

**infective** 96:24

**inferior** 102:10

**inflammation** 97:8 104:16

**inflicted** 47:8

**influence** 79:10 80:20 92:19

**influenced** 90:6

**information** 15:7 19:15,17, 22 23:14,17 24:1,2,5,23 25:2,6,9,13 26:19 28:16 29:8 39:20 40:13 120:2,25

**ingested** 71:9, 17

**initially** 9:5

**initials** 10:10 88:9

**inject** 95:23,25

**injecting** 98:10,11

**injured** 103:21 117:14

**injuries** 21:16 26:15 42:6,8, 11,14 48:5 60:21 61:6,7,10 62:4 63:20,24 77:7,16 86:9 101:7,12

**injury** 44:1,3,8, 13 45:1 46:13 53:12 55:5,19

56:14 59:1,9,16 64:3 75:18 76:13 77:18 86:16 100:25 101:4,6,17,18 103:22 109:22, 23

**input** 69:18

**inside** 37:17 77:4 100:21

**insignificant** 62:22

**instance** 26:2 82:6 99:6

**instances** 119:18

**instant** 53:6 76:11,17

**instantaneous** 76:9

**instantly** 76:12

**instructions** 118:2

**insufficient** 87:22

**intact** 100:10, 20,22

**intend** 6:8

**interested** 109:25

**interfere** 36:23

**interior** 64:4

**intermediary** 36:24

**intermediate** 36:20

**internal** 43:21 63:23,24 64:21 109:23

**Internet** 86:5

**interpret** 120:18

**interpretation** 40:2

**interrupt** 55:17

**intersections** 104:9

**intervening** 119:23

**intravenous** 98:1,7

**intravenously** 95:20,22

**introduce** 7:1

**investigation** 15:7 25:7 88:22

**investigations** 65:9

**investigators** 25:11

**involve** 78:20

**involved** 78:21 89:14

**involves** 79:7

**involving** 20:17 22:7

**irregular** 103:25

**issue** 30:20 97:10,25

**issues** 98:5 108:13

**items** 31:7,24 32:2,9 75:4

**its'** 100:22 111:8

—————

**J**

**jars** 108:21

**jeans** 31:5

**Jessie** 5:21 6:21 69:1

**John** 5:4 7:4 9:14 27:23 78:19

**Johnson** 17:12 22:16 23:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRANK, taken on April 25, 2018 132

**joined** 13:6,14, 20

**joining** 16:22

**judging** 63:13

**July** 13:22

**June** 23:21 27:8,9

**Justice** 18:4, 18 116:7

---

**K**

**Kelley** 5:4 7:4 9:12,15,18 27:25 28:3 33:14,16 44:15, 18 45:2 46:20, 22 51:6 55:25 56:23 58:23 59:5 61:2,14 65:6 71:6 73:3 74:10 75:25 76:25 77:11,23 78:13,18,19 120:5 121:13, 18

**Kentucky** 6:19,24 13:1,9, 15,20 14:9,11 15:4 17:3 18:7, 21,25 31:9 88:22 89:2,13 97:25 107:12 116:11 118:12

**kicked** 44:25

**kidneys** 73:10

**kind** 16:25 23:4 31:8,19 34:21 42:18 46:2 47:18 50:20 56:25 63:1 66:25 67:11 68:17 99:4 105:14,17

**kit** 65:22 88:5,6

**Kleenex** 31:19

**knee** 62:13

**knew** 29:13

**knowing** 68:3

**Knox** 5:5 6:22 7:5 78:20,24 85:12,16,25

**KS** 88:22

---

**L**

**lab** 65:20 69:7 89:6,7,11,12 96:6 99:15 109:9

**label** 67:17

**labeled** 31:9 67:12

**Laboratories** 65:19 88:14 89:14

**laboratory** 65:18 87:20 89:3,15

**labs** 89:8

**Lacee** 6:14

**laceration** 43:6,14 45:8, 10,19,20 49:1, 12,16 58:17 59:11

**lacerations** 99:17 110:1,5

**lack** 47:15

**large** 41:16

**larger** 54:18

**lasts** 72:4

**law** 11:19 66:20 67:8

**laws** 67:15

**lawsuit** 7:7

**lawyers** 86:4

**layers** 111:24, 25 119:9

**leads** 24:1

**leave** 16:24 36:11 37:2,8,11

**54:8** 61:15,17 81:3 112:23 113:17 118:20

**leaves** 36:17 56:8

**left** 31:5 35:19, 20,21 38:15 39:6 40:9,12 41:1,3,4,16,23 45:22 47:3 49:1,11 52:4 54:24 58:1,12, 13,15,17,18 59:10 62:13 70:8 75:4 99:24 105:3 109:11 110:23

**leg** 62:18,19 63:1

**legal** 13:12

**legally** 95:16

**legs** 33:7 34:4 62:23

**length** 33:2,11 45:12 110:19, 24

**lesions** 106:12

**lethal** 26:15 76:2

**letterhead** 107:17,18

**letting** 54:3

**level** 17:1 77:8 79:18 91:20 120:19,20

**levels** 71:3 99:14 120:13, 24

**license** 118:16

**licensed** 118:11

**Licensure** 118:13

**Lieutenant** 17:12 23:8

**life** 64:19

**likewise** 85:15 87:3 95:15 113:25

**limited** 26:13 75:3 115:20

**linear** 57:6 58:11

**lines** 55:13

**lining** 41:15

**linked** 101:10

**lips** 34:19

**list** 32:2,8 66:3

**listed** 31:24 39:9 65:24 66:10 70:8 91:8

**live** 76:15 97:13

**liver** 39:15 73:10 97:9,14, 15,16

**lividity** 34:5

**living** 108:16

**livor** 33:25

**load** 30:7 97:2

**located** 6:18 35:19 113:8

**location** 46:1,4 58:16 60:21 63:13 64:3 107:4 111:7

**locked** 88:18 117:6

**log** 84:24

**London** 6:25

**long** 31:20 53:2 64:17 68:8 72:6,17 74:14 79:13 86:8 90:15 109:6

**longer** 71:16 72:4 74:1 108:15 120:13

**looked** 11:8 31:7 99:20

**103:12** 113:10

**lorazepam** 68:21

**lose** 115:19,23

**loss** 92:3,15

**lot** 8:19 13:16 42:18 61:21 66:6 71:21 77:16 86:12 93:18 96:23 109:23 111:8 115:24 119:23 120:21

**lots** 67:21 79:14 86:11 119:12

**Louisville** 14:11 18:14

**lower** 60:5 62:7 83:16 113:8

**lumped** 64:3

**lung** 106:6

**lungs** 76:12

---

**M**

**machine** 69:17

**made** 12:13,17 24:24 54:1,4 67:17 75:16 76:21 78:6

**mag** 44:14

**mail** 107:21

**mailbox** 69:17

**main** 15:3 93:19

**major** 104:13

**make** 5:9 8:19 10:5 30:10 38:11 42:11 57:8 60:20 78:12 79:19 82:16 83:9 86:10,16 92:23 96:7 107:6 119:20 120:10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MEREDITH FRANK, taken on April 25, 2018

133

makes 42:13 68:17 70:1 96:25

making 20:22 66:19 67:7 82:3 118:9

male 23:18 32:19 34:25 64:12 73:10

man 64:23,24

manner 14:24 15:5,6,14,15 26:20

manufactured 66:14 95:4

marijuana 71:13 73:25 90:4,6

mark 9:6 10:16 53:6 61:16 65:1 91:7

marked 6:11 9:7,22,23 10:20 65:3,4

markedly 99:7

markings 106:11

marks 31:21 36:17 54:8 59:25 61:4,13, 15,17 98:9,16 112:18,23 113:14,18 114:5,6

mass 114:25 115:2

match 20:23

material 100:20 106:22

maternity 16:24

matter 6:20 26:6,12,17 82:25 116:21, 22

matters 6:1

meaning 30:4, 11 31:2 34:3,21 36:6,7 41:6 43:14,20 44:5 47:16 50:24 55:9 64:15 66:14 71:17 74:3 76:5,12 80:24 86:10 91:15,17 94:1 97:23 101:15, 17 105:8 106:7, 12 111:25

means 13:1 22:21 47:4 61:19 72:22 73:4 89:20 97:8 108:19

meant 112:17

measure 17:1 33:3

measured 32:23

measurement 33:2,9

measuring 33:3

mechanism 93:20

medical 5:19 6:17 12:25 13:4,5,13,15, 16,20,25 14:10 15:1,3 17:2 18:3,12 35:5 69:3 76:22 79:4 80:7 84:21 85:2,24 89:2 101:13 116:6, 13 118:13 121:16

medication 29:14

medications 92:15

medulla 105:25 106:4

melt 95:25

meninges 100:14 105:3

mentioned 25:20 32:9 42:22 43:6 53:13 58:10 64:1 65:12 66:8 70:6 103:18 105:3 115:7 116:5 119:22

Meredith 6:20

met 17:14

metabolite 71:13 90:5 94:18

metabolites 73:21

metabolize 71:22 73:12,16 82:18

metabolized 70:25 72:9 73:5 74:3

metabolizes 73:6 83:8

metabolizing 71:10 82:19

meth 91:11 95:22 99:11,12

methadone 66:2 94:25 95:18

methampheta mine 70:21 91:9 92:4,9,20

microscope 105:7 108:25

microscopic 104:9

microscopical ly 104:7,14

mid 60:5 113:7

middle 55:9, 11,19 56:9 57:1

midline 35:20, 21 38:15 41:4,5

60:7,9 100:13

Mike 5:6

Mikey 7:6 78:22

mil 87:18

milliliter 99:9

milliliters 87:16

Mills 5:21 6:21 22:13,17 27:6 41:25 48:18 60:25 63:23 64:18 69:1 75:17 76:22 77:8 78:6,22 80:20 84:11 96:5 98:7 100:25

Mills' 65:16 81:12 105:19 109:18 110:15

mils 87:10,11, 17

mind 38:9 80:19

mine 107:14 121:14

minor 53:5

minute 76:20

minutes 53:7,8 73:22 76:5,6

missed 110:13

missing 67:5

mistake 12:5

Mister 84:9

mom 50:18

moment 59:18

Monday 88:17

month 8:9

months 109:7, 12,17

morbidly 92:18

morgue 32:23

morning 7:18, 19 27:9,14 81:20 85:10,20

morphine 94:23

mortal 111:11 114:1

mortem 62:11

mortis 33:24, 25 34:2

motor 16:3 26:13

move 14:16 23:1 34:3 50:21

moving 22:24 32:14 59:17 62:12

multiple 114:9

muscle 39:5, 13 41:13,16,17, 18 45:23 46:1, 2,7 64:15 115:1,4

muscles 33:24 46:2

muscular 114:22

---

N

names 20:22 68:16

nanograms 99:8

narrative 19:12,24 23:13, 25 24:9 25:3,24 28:11,25 29:6 66:8

Natalia 6:14

natural 15:10 16:4 64:7,9 103:23

necessarily 46:16 53:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

66:17 75:5
82:13 93:2
98:11 99:10
104:8 105:7

**neck** 42:8,14
43:12 48:23
102:2,3,4,6,12,
13

**needed** 29:13

**needle** 29:23

**needles** 98:3,
13

**negative** 30:13
69:23 70:13
73:1 75:9,14
87:2

**nice** 41:8 45:17
50:12 59:24

**night** 19:13
23:10,23 25:4
83:23

**non-** 44:19 45:4
54:6 57:25 61:6

**non-officer-
involved** 22:7

**non-reactive**
30:2,3,11

**non-specific**
42:19 44:2 45:9
46:12 47:7
49:20 52:6
59:16 61:10
62:2,22

**norbuprenorp
hine** 94:19

**normal** 34:15
65:8 100:11,17,
21,23 101:25
105:21

**nose** 34:19

**note** 6:5 33:23
35:1,11 44:15
45:2 46:20,22
47:10 49:23
52:3 55:25
56:23 58:23
61:2,14 63:24
71:6 73:3 74:10

**noted** 31:12,21
42:7 48:18,23
87:20 89:21
116:11

**notes** 24:18

**notice** 5:8,10
12:4 64:19

**notified** 85:2

**noting** 42:7

**nourished**
32:18

**November**
14:17

**number** 6:25
16:12 30:23
68:25 70:19
85:23 98:25
107:14

**numbers**
70:22,23 72:21
89:18

**O**

**obese** 92:18
115:17

**object** 5:23
43:25 44:6
55:21 57:12
77:23

**objected** 77:21

**objecting** 5:14

**objection**
44:15,18 45:2
46:20,22 55:25
56:23 58:23
59:5 61:2,14
71:6 73:3 74:10
75:25 76:25
77:11 79:22
82:11 92:21,25
106:20 112:15
116:18

**objects** 36:24

**observations**
75:16 78:5

**observing**

17:4

**obtain** 97:4

**obtained** 51:9

**obvious** 79:5
80:12 98:9
101:1

**occasionally**
19:2 24:16

**occurred**
19:12 23:9
47:16 53:22
80:21 81:10

**occurs** 34:1
36:18 83:1

**offering** 80:18,
21 81:2

**office** 13:15,20
14:5,11,12,14,
16 16:23 18:2,
14 69:4 84:22
85:3,17,24
89:10 116:6,14

**officer** 40:14

**officer-
involved** 16:6,
11 18:23 22:6

**officers** 17:2
18:24 24:23
25:14 78:21
107:11 117:10,
24

**offices** 6:17
18:14

**official** 13:23

**oftentimes**
19:4 47:13 84:1
87:18 89:13
114:10

**one's** 15:9

**one-and-a-half**
60:8

**one-half** 35:18

**one-quarter-
inch** 49:15

**onsite** 89:9

**open** 21:22
26:15 101:16

**opiate** 95:1

**opiate-like**
94:25

**opiates** 66:2,4

**opinion** 12:8,
11,13 75:21
77:22 81:2

**opinions** 5:22,
25 6:3,10 78:2
80:19,22
121:14

**opioids** 120:22

**opportunity**
6:7

**opposed** 115:1

**opposing**
77:21

**order** 26:22
27:1 28:18 41:6
65:9 97:2

**ordered** 27:1
65:16

**ordinary** 34:18
106:15

**organ** 64:6

**organizational**
42:9

**organize** 42:11

**organs** 22:24
23:3 39:1,14
53:15 64:7,10,
22 104:13
108:20 109:24
117:14

**orientation**
60:6

**originally** 10:2

**outlaw** 67:15

**outlined**
116:20

**overdose**
15:11 26:8

**overdoses**
16:2

**overlap** 79:15

**overnight**
88:10,16

**overweight**
115:6

**oxalate** 82:23

**oxazepam**
93:5,6,8

**oxycodone**
66:3

**P**

**p.m.** 27:11
121:19

**packet** 43:2

**pages** 9:25
10:1

**pain** 77:9,18

**pale** 55:10

**pallor** 55:8,19
57:2,10

**pancreas**
39:15

**panel** 65:18,23,
24 66:23 70:5,
13 75:1,2 87:12

**pants** 31:7

**paperwork**
20:18,23 25:5
88:13

**paragraph**
30:25 31:25
32:14 34:10
35:16 84:6
105:24

**paragraphs**
39:1

**parallel** 55:4,7,
19 57:10 58:11

**parent** 94:18

**parietal** 99:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**part** 16:24 18:4, 7 21:15 26:5 39:14 59:7 64:4,5 81:18 83:2 106:8,9 110:10 116:7, 12,14 117:19

**partially** 34:2

**parts** 106:2,3

**pass** 102:24

**passed** 75:24 86:9

**passes** 53:9

**passing** 77:10

**past** 65:13 67:19 95:18

**patent** 100:13

**paternity** 108:14

**path** 39:19

**pathogen** 97:23

**pathologist** 13:1 69:4

**pathologists** 48:2 50:17

**pathology** 13:7,11 14:3,8

**pathway** 39:22 41:20 77:1 103:20

**patience** 120:6

**pattern** 55:5 56:9 57:6 58:19 79:2 85:15 100:17

**patterned** 56:14,21 61:9

**Pearlie** 6:20

**peeling** 106:22

**pelvic** 41:19

**pelvis** 41:17

**pending** 6:23

**penny** 31:8

**people** 17:16, 20 21:11 24:14 39:23 42:18 44:10 50:17 53:1 66:19 67:7 72:4,18 76:5 77:13,16 81:25 93:2 95:4,21, 22,25 96:20,21 97:13 98:10,13 105:18 115:19, 23 119:18

**people's** 91:18

**perfect** 11:8 38:19 57:5 82:24

**perforated** 39:2,3

**perform** 16:17 19:20 20:6,20 25:25 28:19

**performed** 5:20 16:1,8,11, 22,23 27:8,13 80:13

**performing** 18:25 25:16

**pericardial** 39:7

**period** 26:25 34:5 48:13 115:20

**periorbital** 47:4

**peripheral** 109:5

**peritoneum** 41:14

**perpendicular** 41:8

**person** 15:6 26:18 53:8 61:16 71:11 73:9 79:20 80:1 90:3,7 92:22 96:9 108:15

**person's** 92:19

**personal** 22:2 32:3

**pertinent** 23:24

**photo** 59:25

**photographed** 117:25

**photographs** 9:1 10:13 11:9, 15,18 17:5,8 21:6 31:10 107:10,14,16

**photos** 10:24 11:15 21:18,19, 22 42:24 49:5

**phrase** 43:18

**physician** 82:1

**physiological** 91:17

**physiology** 79:16

**pick** 8:19 17:15 67:24 69:18 85:13 88:17 117:5

**picked** 67:1,3

**picture** 38:10 42:4,15 43:17 46:24 49:2,6,24 52:14 56:5 57:20 59:1,24 60:2 62:14,23

**pictures** 22:3 54:25

**piece** 26:19 31:8 104:3

**pieces** 108:20

**pine** 93:4

**pinpoint** 71:20 74:4,6

**PL** 9:7,9 38:14

**place** 60:2 100:21

**Plaintiff** 7:3

**Plaintiff's** 121:15

**plastic** 31:8

**plenty** 81:9

**pocket** 32:9

**pockets** 31:7

**point** 51:2 72:20 79:11 89:22 104:7

**police** 11:3 12:1 17:3 18:7, 21,25 19:7 25:10 32:2 88:22 89:14 107:12 116:12, 23 117:1,3,10, 24

**police-involved** 118:4

**pons** 105:25 106:3

**pool** 54:4

**pooling** 34:1 53:20

**pools** 53:18

**position** 21:24 33:5 34:9 39:23,24 40:7

**positive** 30:20 68:2 69:23 71:8 72:25 91:7 96:11,12,20,21, 22,23

**possess** 95:15

**possibilities** 96:2

**possibility** 67:5

**post** 62:10

**posterior** 39:17 43:15 60:12 99:23 106:2

**postmortem**

**9:9 47:18 48:5, 7 84:5 97:4 100:2

**potassium** 82:23

**potential** 95:3

**potentially** 44:24 76:2 104:1

**pound** 115:15

**pounds** 32:21, 22 33:1 115:13

**powder** 36:17

**powered** 37:15

**practice** 20:14 65:8 85:16 118:11

**Pre-medicine** 13:3

**predominantly** 41:22

**preliminary** 25:2 29:22,25 30:9

**premise** 112:5

**preparation** 11:23,25 12:3, 20

**prepare** 8:22

**prescribed** 94:6 95:8 120:22

**prescription** 94:6 95:16

**presence** 79:23 81:1

**present** 22:16, 21 24:24 80:8 89:25 94:19 116:22,24 117:2,3

**preservation** 33:22

**preservative** 83:9,10 87:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

108:22

**preserve**
82:24 83:14

**preserved**
116:1

**preserving**
83:2

**pressure**
91:18

**pressures**
64:17

**pretty** 17:4
26:5,11 34:4
41:8 49:12
50:19 51:17
67:4 73:11 77:5
85:12 96:22
110:15 114:23
116:1

**previous** 35:5

**primal** 43:15

**primarily**
18:13

**primitive**
106:3,6,7

**prior** 20:2,8,15
23:8,15 24:18
51:14 53:9
72:14 77:9

**probability**
121:16

**probes** 25:21
31:17 32:12
59:21 60:15,16,
22 61:1,5

**problem** 11:13
52:2 77:25
87:19 97:10

**procedure**
5:15 21:2 81:18
110:10 116:20

**proceed** 6:8

**PROCEEDING
S** 5:1

**process** 21:17
22:12 83:15

**processed**
74:20,24

**processes**
79:16

**processing**
20:14 88:14

**product** 90:5
93:9,12 94:17,
23

**products**
93:13

**program** 13:6,
10

**projectile**
35:22 36:2
39:3,21 40:7,15
41:7,20,21

**projectiles**
20:25 25:20
32:13 117:15

**projective**
39:1

**pronounced**
23:21 27:6,10
28:9 68:8
82:13,15 85:2

**proof** 5:12,24
6:6

**propensity**
37:7

**prophylactic**
29:14

**prophylactical
ly** 96:10

**provide** 5:18
19:22

**provided**
11:10,19 20:19
23:17 25:24
27:20 28:22
29:1

**public** 18:5,18
29:22 30:21
116:7

**pull** 9:3 84:24
86:21

**pulled** 32:10

**pulling** 54:8

**pulls** 69:16

**pulse** 76:20
102:5

**punctate**
62:13,15

**puncture**
59:25 98:14
112:23 113:18

**purple** 52:8
55:13 58:14

**purpose** 95:1

**purposes**
42:10

**put** 19:24 21:24
29:3 31:16 34:8
35:6 37:3 42:10
53:16 69:20,21,
23 76:7 82:21
83:9

**puts** 69:17

**putting** 67:15
83:5,18

---

**Q**

**quadrant** 41:1

**qualifications**
79:3

**qualified** 79:4

**quantities**
87:25

**quantity** 87:23

**quarter** 59:12

**quarter-**
110:24

**quarter-inch**
46:9

**question** 8:12,
14 16:16 23:6
51:25 72:24
74:11 79:5 99:3
116:15

**questions**
8:18 13:12
19:22 71:4 79:1

**quick** 76:4
120:9

**quickly** 32:15
58:8 73:16,23
90:19

**quit** 70:23

---

**R**

**race** 28:8

**raise** 7:9

**raised** 96:3
98:9

**Ralston** 18:13
118:5

**ramp** 32:23

**random** 108:25

**Randy** 17:12
22:16

**range** 36:6,10
40:17 90:13
119:5,13

**rapid** 91:19

**rare** 96:22
104:17

**rate** 73:6 91:18

**rates** 73:15

**rays** 31:10

**reach** 119:15

**reaction** 47:15

**reactive** 30:3,
14,15 96:6,12

**read** 86:4

**reading** 24:10

**real** 62:16
63:22

**reason** 8:15
83:4 97:24
102:24 104:18
109:13

**reasonable**
12:17 50:19
78:8 121:16

**reasons** 93:19
96:21

**recall** 11:23
15:21 16:7
17:20 23:7,11,
14 24:10,17
25:14,22 29:9,
18 31:23

**receive** 14:19
118:2

**received** 5:10
14:19 24:23
25:2 31:1 44:8,
13 47:21 48:7,
19 50:25 75:23
76:22 113:23

**receiving** 69:7
76:23

**recently** 97:11
99:12

**recognize**
9:10,20

**record** 5:3
6:12,13 7:1
24:17 29:20
63:17 77:20
78:16

**recording** 8:17

**records** 17:7
24:16 107:20

**recover** 25:19
117:14

**recovered**
32:13

**RECROSS**
121:12

**red** 36:17
47:10,19 52:8
58:13

**red-purple**
51:21 52:4

**REDIRECT**
120:7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

refer 69:24
87:5 94:20

reflect 110:11

reflected
43:20

refrigeration
84:8

refrigerator
88:20

regard 79:3
81:11

region 39:16
47:4 50:11 52:4

regions 42:10

regularity 8:5

regularly
17:17

regulated 94:2

regulation
106:6

related 98:21
115:4

relative 34:4

relevant 5:20

relying 67:24

remained
71:18

remaining
85:22

remember
15:13 69:7 70:1
83:23 117:8,11

remove 22:24
23:3 53:15
106:21

removed
35:10 113:3

removing 22:4

rephrase 8:14

report 5:19,21
6:1 8:24,25 9:1,
24 12:4 22:19
27:4 30:17,23
31:14 32:7 42:7

43:11 45:11,14
64:4 69:8,18,
20,24,25 70:2
71:7 72:21
80:14 99:15
100:7 107:8
112:16 121:6

reported 69:3
92:5 120:14

reporter 6:15
7:10,11,15 8:17
10:18

reporting
70:23

reports 9:4
12:1 24:11
120:14

represent
78:21

representative
104:12

representative
's 5:24

representing
78:20 107:19

request 107:17

require 53:3
111:6

requires 82:2

residency
13:6

resident 14:9

residual 93:13

respond 18:12

responder
29:10

response 5:7

rest 102:14

result 52:21
96:12

resulted 52:21

results 17:6
30:1 69:22
70:12 80:23
87:21

reveals 101:24

review 11:18
12:1 20:1,8
42:12 69:19

reviewed 8:24
10:12 20:18

reviewing
12:4,10

rib 39:5

ribs 39:6

rid 72:10

ridding 72:19

rigor 33:23
34:2

risk 97:16,19

Robinson-
staples 7:2,17
9:13,16,19
10:16,19,23
27:23 28:2,4
63:14,18 78:1,
15 79:22 82:11
92:21,25
106:20 112:15
116:18 120:8
121:9

role 23:1

rolled 34:7

room 109:13

root 31:8 97:20

rough 38:1
72:15

roughly 115:13

round 35:17
41:9 55:6

rounded 56:8

routine 65:11
80:12 117:18

routinely
26:24

rule 5:14
104:14

rules 5:15 8:11

run 52:24
105:25 109:12

rupture 102:23
103:9

—— S ——

sac 39:7,11,12

safe 64:22

Safety 18:4,5,
18 116:7

sagittal 100:12

sake 77:20

salts 66:6,24

sample 70:19
73:1 80:25
83:10 86:21
87:3,20 96:6
97:3 108:10,15

samples 30:4
65:22 81:16,17
88:3

save 108:10,
21,22

scab 63:2

scabs 47:22,23

scale 32:24
115:14

scalp 43:15,20
44:11 45:8,25
110:11,23
111:8,9,23,25

scars 21:13
98:9

scattered
58:14

scene 11:10,19
15:7 19:16
82:3,15

scenes 17:8

schedule
93:22 94:1
95:13

scheduled
95:10

scheduling
5:8 19:21

school 13:4,5

science 79:7

scientific
12:18 78:9

scrape 49:18
57:16,21 58:17
59:6 62:11,19
63:2

scraped 59:8

scrapes 42:19
45:18 62:13

screen 65:9,15

screening
71:11

sealed 31:1
65:22 88:5,9,
10,15,16,18
118:1

sear 36:11

seconds 76:15

secretary
18:19 116:14

section 29:7
31:13 32:15
103:15 104:12
107:8

sections
104:6,13,21
109:1

sedative 93:17

seeped 53:13

sell 66:21
67:18

selled 67:9

send 65:22
85:8 87:6,8,9,
13,15 89:7
107:17

sense 42:13
68:18 70:1 95:1
96:25

sentence
43:13 45:7,14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

separate 9:5,6
69:25 88:7,21

separately
88:19

separates
39:13

separating
10:4

serum 30:5

set 88:6 107:13

settle 53:21

sever 76:16

severed 76:12

severity 6:2

sex 28:8

shaped 103:25

shapes 34:19

shaved 43:8
110:1

sheriff 7:5 29:4
78:24

sheriff's 23:19
78:25

shin 63:5,6,9

shirt 31:4

shock 77:14

shooting 16:6
18:24 80:21
118:5 119:17

shootings
16:11 22:6

shops 67:11

short 50:25
51:9 77:3 109:5

short-term
109:16

shorter 26:16

shortly 47:17

shot 19:18
23:20 25:8
26:18 29:5
36:25 37:5 38:7

40:14 114:8
119:11

shots 114:9

shoulder
49:24 50:11
52:4 57:14

show 40:4
42:21 72:2,25
73:1 92:16
103:20 116:17

showing 42:25
43:5,15 45:18
53:10 59:25
60:2 72:15
97:12 107:23

shown 119:19

shows 38:14,
16 45:7 46:25
52:14 53:18
55:1 56:11

side 35:19 39:6
42:22 45:18
52:17 74:13
79:24 99:25
102:10

sides 97:17

sign 105:19

signature 10:6
20:19 28:17,22

signed 84:25

significance
47:11 50:14
77:15

significant
48:16 99:7
115:21

signs 64:7,9
89:19 98:16
101:19 103:24

similar 34:13
73:22 92:4
93:20

simple 21:9

sinuses
100:12

sit 53:14

sitting 54:3
102:9

situation 25:4
80:11 81:25
85:9 104:2
108:23 114:13
115:25 119:21

situations
65:12 108:24

sixteenth-inch
59:13

size 62:16 87:3

skill 12:14

skin 35:22
36:11,14,16,18
39:4 41:13
43:14 52:23
111:22,23
112:3,9,11,12
113:10

skull 100:4,19,
21 103:13
105:1 106:16,
18,23,25

sleeveless
31:4

slightly 34:21
35:19 41:4
43:6,13 64:11
68:16 80:1

slit 44:10

slow 83:16

slowing 83:15

slugs 117:20

small 41:15
49:1,15 52:19
59:11 62:16
63:15 98:13,14
110:8

smaller 54:12
62:13

smoker 34:22

smokers 34:23

snake 113:18

sodium 82:23

soft 39:4,18
41:13 45:21
60:16 64:2
112:11 113:12

sold 67:10,16
95:11

solemnly 7:11

somebody's
26:10 36:24
44:23 79:24
102:16,17

someone's
76:17

soot 36:5,7,11,
14 37:2,8,11,
16,19 40:16
41:10 118:18
119:2,3,7,19

sort 21:16
36:19,24 41:4
44:5 47:15
50:21 62:18
68:15,16 76:19,
20 99:22
119:23

South 13:13
14:10

Southern 6:24
13:5

Sower 6:18

speak 12:20
18:1,24 19:8,11
46:25

speaking
25:23 38:19
54:11 56:22
59:4 61:11 68:1

specific 13:7
14:19 16:14
44:20 45:5
47:21 54:6,10
55:6 58:1 61:3,
7 82:8 90:4
98:8,16,19,20

specifically
6:10 13:10 16:8
20:5,17 22:11
25:15 26:1 39:9
53:15 61:5 66:2

specificity
46:11

specifics
23:11 29:10
82:7 84:7
117:11

specimen
70:19 83:2

spleen 39:15

spoke 23:7

spot 28:10
32:11 99:21

stab 25:8

standard
32:10,11 39:23,
24 40:7 108:8

standing
39:24,25 40:3
52:17

Staples 79:2

start 21:8 22:4
37:21 50:20
71:22

starts 73:17

state 12:25
13:15,25 15:1
17:1,3 18:3,7,
21,25 46:10
69:3 76:21
88:22 89:2,13
107:12 116:11,
13,17 117:9,24
118:12

state-run 94:2

stated 22:15
32:19 114:21
121:15

states 6:23
67:14

stationed
14:13 18:13

stations 67:10

71:12 72:6 76:1
81:10 84:14
90:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

stay 72:6

stays 90:16

stem 76:11,17
106:4

Steven 22:20

stick 29:23
71:15

sticker 107:15

sticking 73:23

sticks 34:23

stiffening
33:24

stimulant
66:5,10,11 68:2
91:14,15

stimulants
66:23 74:18
75:6 80:3

stimulation
91:16

stippling 36:5,
15 37:2,8,11,23
40:16 41:10
118:18,25
119:2,4,19

stitches 111:6

stock 108:18

stomach 39:14

stood 107:23

stop 76:12

storage 109:5

store 83:19
109:6

straight 39:25
40:3

street 68:9,10,
14 95:11

stretched 33:8

stroke 102:16
103:25 105:8,
15

strokes 105:17

struck 55:21

structure
67:16 92:4

struggle 94:14

stuck 34:22

study 13:8
79:16

studying 79:8

stun 60:25 61:1

subarachnoid
105:2

subdural
104:24

subject's 69:1

submitted
32:2

Suboxone
94:12,15,21
95:1,17,24

subscapular
43:19 45:21
111:19,20

subsection
5:17

subsequent
84:8

substance
67:17 91:23,24
92:5 121:7

substances
67:9,15

subtract 32:24

subtracting
115:9

Sue 6:20

suffered 41:25
96:19

sufficient
87:25

suggest 51:1
76:4

suggestive
30:19

suggests 50:1
109:16

suicide 15:10

suite 88:18

sum 109:21

summer 13:14,
21

super 32:25

superficial
59:7,13 112:13

superhuman
92:24

superior
100:12

supervisor
18:15

supply 102:14

suppose 44:24
45:3 95:24

supposed
95:10 118:3

Surber 17:12
22:16 23:8

surface 37:22
102:8 112:1,3
113:11

surrounding
39:11

surrounds
39:8

suspect 5:13

suspected
29:2,16

suspicion
106:24

sustained 77:8

suture 111:9

swear 7:11

sworn 7:9

synthetic
66:13 67:20

system 31:9
72:7,18 74:19,

20 80:6 83:3
91:8 96:14,24
120:22

———— T ————

table 52:25

tags 20:21 31:3

taking 6:8 17:5
49:6 85:11
120:23

talk 17:10
35:14 40:19
43:10 59:20
63:22 72:17
77:17 81:11
86:20 101:12
102:7 107:4

talked 48:17
62:3 63:19 75:6
95:20 107:23
109:4 118:19

talking 5:10
33:19 38:10
48:11 50:5
55:2,7,12 56:12
57:9 87:6 102:1
106:4 107:7,23
108:4 111:20
118:17

tall 32:20

tape 33:3

tase 114:17

tased 23:20
29:4 60:25
61:12

taser 25:20
31:17,18,19,21,
23 32:12 59:20
61:5,12,13
112:18 113:15

tasers 114:3

tasked 15:2

tattoo 38:22
55:3 56:24

tattooing
36:17

tattoos 21:13
35:2

taught 50:18

tear 43:14 45:8

technician
22:23 23:5

teeth 34:20

telling 36:1

tells 37:4 55:20
70:24 74:2 90:8
98:16

temperature
83:16

temple 99:20

temporal
99:25 110:23

temporalis
45:23 46:1

ten 15:23 16:20
33:1 51:6,8
73:21 81:20
87:10 90:17
115:19

tenseness
100:12

term 47:15
64:17 101:13,
15 109:5

terms 52:10
117:12 119:25

test 66:16,17
67:22,25 70:5,9
73:19 75:9,13
80:25 83:4,7
86:25 87:2,18,
23 89:21 96:20,
21,23

tested 29:19
65:14 68:1,7
70:5,17 71:8
86:24

testified 8:4
15:16,19 16:5

testify 8:8,9
15:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**testimony** 5:17 7:12

**testing** 26:9,11 29:15,22,24,25 30:6,8,16 65:21 66:12 67:4 69:21 70:12 75:3,4,5 80:13, 24 87:1,12 89:3,8 119:25

**tests** 26:7,22 75:12

**that'll** 72:2

**THC** 71:12,13, 24 72:5 90:5

**thick** 64:14

**thing** 22:9 23:4 24:14 26:21 28:15 33:23 46:2 47:21 57:9 67:11 68:23 80:23 83:12 104:17 105:6 116:23 117:6 119:24

**things** 8:19 16:2 21:9,13,25 22:1 26:2 31:15 36:23 47:12 48:3,4,11 56:3, 6 64:16 65:24 66:4 70:6,8 71:14 72:13,18 73:25 74:17 75:6 82:20 86:12 89:7 90:4 92:2 93:10,18 96:1 103:1,18 104:3,19 105:25 107:1,5 108:14 117:4 119:22

**thinking** 53:15

**thought** 12:5 25:20 96:15

**three-and-a-half** 60:7

**throw** 99:4

**tie** 31:2

**Tilley** 18:16,17

**time** 6:16 8:1 11:22 15:21 19:3,6,13,19,23 23:20 25:12 26:21,25 34:5 47:17,20,24 48:9,10,13 50:16,21,25 53:8,21 54:1 60:12 65:13 67:24 70:20 71:18 75:22,23 76:16 80:20 81:18,24 82:8, 12,13,14,15,16 83:11 88:9 89:21 102:19 113:17 115:20 117:2

**timeframe** 54:10 79:20 90:3

**times** 8:7,9 15:23 17:9,21 42:18 53:14 74:9 77:16 90:2 108:12

**tissue** 35:23 39:4 41:13 45:21 53:12 59:6,7 60:16 64:2 108:18 109:2 112:2,11 113:12

**tissues** 23:3 39:15,18 53:4 112:4

**title** 13:23 23:4

**today** 5:7 6:15 20:9 75:16 78:2,20

**today's** 8:23 11:25 12:21

**toe** 31:4

**toes** 62:19

**told** 26:2 95:13 117:15

**top** 38:20 57:13

69:12 70:18 90:18,25 104:25

**topics** 107:9

**Townsend** 6:15

**toxicologist** 68:10 72:17 79:17 80:16,17 81:3 90:23

**toxicologists** 66:23

**toxicology** 6:1 9:1 26:22 27:3 29:15 65:9,15, 21 79:5,7,8,15 80:14 109:9

**track** 55:10 98:8,16

**tracking** 103:20

**tract** 37:17

**trained** 91:3

**training** 12:15 13:7,9,12,17 14:6,7,8,10,18, 19 78:3 81:9

**trajectory** 39:20

**tramadol** 66:7

**transfer** 116:24 117:16 118:1

**transferred** 97:22

**translucent** 100:16

**transplants** 97:15

**transporters** 85:8

**transports** 88:4

**trauma** 47:8 52:22 53:5 101:11 103:21

**traumatic** 76:13

**travel** 119:3,4

**traveled** 39:17

**traveling** 40:2

**treat** 92:2 93:17,19 95:1 96:9

**treated** 97:13

**treating** 96:10

**treatment** 35:5 76:23

**trial** 5:12

**trip** 85:12,25

**triple-boarded** 14:2

**true** 87:24 96:11

**trunk** 49:21 59:17 61:24

**trust** 115:14

**truth** 7:13

**tube** 82:22

**tubes** 87:6

**tumor** 103:4,25 109:1

**tumors** 106:14

**turn** 42:6 53:3

**turned** 39:25

**turning** 49:21 70:16

**twelve** 15:23 51:4,13

**two-and-a-quarter** 41:3

**type** 29:2 43:25 46:11 59:9 65:15 67:3 73:8 77:7,9 82:22 93:8

**types** 15:24 37:7 66:15 68:23

**typical** 34:4 74:13 85:1 103:1 107:4 114:21 116:20

**typically** 15:24 24:18 69:10 72:6

---

U

**Uh-huh** 24:8 25:18 27:5,22 49:22 51:24 56:17 59:19 74:21 88:1 97:1 110:22 111:4

**ultimately** 97:13

**unburned** 36:15

**underlying** 39:4 41:13 43:18 45:21 64:2 113:12

**underneath** 43:22 45:24,25 46:6,7 60:14,17 70:18 101:17, 18 104:25 105:1 111:22 112:1,5,11 113:10

**understand** 8:13 30:10 81:14 111:15

**understanding** 52:21 67:19 120:10

**understood** 109:21

**undetermined** 15:12

**United** 6:23

**University** 13:5,9,13 14:9, 10

**unrefrigerated** 85:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

unrelated 29:8

unremarkable 100:22

unresponsive 76:19

unrestricted 118:16

unusual 23:12 34:6,24

upper 39:16 41:1 49:11 58:4,9 62:4 91:22

ups 120:10

urine 70:19,20, 21,22,24 71:1, 18,23 72:25 73:23 75:3,8 79:18 80:9 81:1,13,15 86:6,17,18 87:16,17 89:20, 21 93:14 94:20 99:14 120:14

users 72:4 98:24

_____

**V**

valium 93:10

variable 16:19 85:5,18

variables 61:22 119:8,12

variations 92:1,15

varieties 67:22,23 68:22

variety 16:2 66:15 74:24

vehicle 16:3 26:14

version 94:17

vessel 86:14 102:23 103:25

vessels

102:11,12 103:9

vibe 120:1

videotape 5:13

viral 30:7 97:2 104:15

virus 96:13,23 97:7,11

vital 47:15 106:5

vitreous 86:18, 20,21,25 87:2, 14

voltage 113:22

_____

**W**

wait 55:1 85:11

walk 20:13 62:7 100:9

wanted 99:16 120:10

wanting 25:19 102:15

warm 86:6

washed 42:24

water 115:24

ways 67:7

weapon 36:8,9 37:1,2,10,15

weapons 37:7

wearing 31:4 119:9

Wednesday 88:17

week 16:18,20 17:9

weighed 115:11

weighs 100:17

weight 32:24 92:3,15 115:7, 8,9,16,19,24

116:4

whatever's 109:10

whatsoever 23:14 24:11

white 23:18 32:18 55:9

Whitney 38:22

who'd 23:18

window 36:25 51:10

withdrawal 95:6

witnesses 5:18

woman 73:13

word 79:6 94:15 96:16 97:8

words 92:6 98:2 109:18 110:15 117:17

work 11:7 14:7 17:2 18:11

worked 14:11

works 18:14

wound 25:8 26:17 29:3 35:14,17,25 36:12,15 37:16, 17 38:10,15 39:19 40:20 41:1,6,9,10,12, 25 42:2 43:3,24 46:5,8,11,14 55:22 61:6 110:23 111:5, 15

wounds 6:2 14:20 16:15 20:17,24 22:8 26:3 35:12 61:10 64:1 75:19,23 76:2, 24 103:4 110:16 111:11 117:13 118:19

wreck 15:11 86:11 101:7

written 5:19 23:22 84:24

_____

**X**

x- 31:10

x-ray 20:24 21:7 106:17

x-rays 26:3,4

Xanax 68:20 93:15

_____

**Y**

Y-SHAPED 43:6,13 111:1

year 8:3 13:10 15:23 16:23,24 108:22 109:3, 10,11,14

years 13:2,4 32:19 114:20

yellow 47:13 48:4 49:23 50:4 62:10

yellowish 47:14

yup 28:2 32:5 86:1 100:15

_____

**Z**

zip 31:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS