**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

| | | |
|---|---|---|
| The Estate of JESSIE MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-CV-184 |
| | ) | |
| v. | ) | Hon.  ROBERT E. WIER |
| | ) | |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

# EXHIBIT 17

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



KENTUCKIANA
— COURT REPORTERS —

NO. 6:17-CV-00184

PEARLIE SUE GAMBREL,

AS ADMINISTRATOR OF THE ESTATE OF

JESSIE J. MILLS,

V.

KNOX COUNTY, ET AL.

DEPONENT:

MIKE SMITH

DATE:

JULY 15, 2019



a courtroom
powerhouse

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273



www.kentuckianareporters.com

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                  EASTERN DISTRICT OF KENTUCKY

3                        SOUTHERN DIVISION

4                            AT LONDON

5                       NO. 6:17-CV-00184

6

7                    PEARLIE SUE GAMBREL, AS

8                ADMINISTRATOR OF THE ESTATE OF

9                      JESSIE J. MILLS,

10                          PLAINTIFF

11

12                             V.

13

14                   KNOX COUNTY, ET AL.,

15                         DEFENDANTS

16

17

18

19

20

21

22

23   DEPONENT:  MIKE SMITH

24   DATE:       JULY 15, 2019

25   REPORTER:  LACEE TOWNSEND



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
1                    APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF, PEARLIE SUE GAMBREL, AS
4   ADMINISTRATOR OF THE ESTATE OF JESSIE J. MILLS:
5   ELLIOT SLOSAR
6   AMY ROBINSON-STAPLES
7   LOEVY & LOEVY
8   311 NORTH ABERDEEN STREET
9   THIRD FLOOR
10  CHICAGO, ILLINOIS 60607
11  TELEPHONE NO.: (312) 243-5900
12  E-MAIL: ELLIOT@LOEVY.COM
13          AMY@LOEVY.COM
14
15  ON BEHALF OF THE DEFENDANTS, KNOX COUNTY, JOHN MICHAEL
16  ASHURST AND BRANDON BOLTON:
17  JOHN KELLEY
18  JASON WILLIAMS
19  WILLIAMS FARMER & TOWE
20  303 SOUTH MAIN STREET
21  P.O. BOX 3199
22  LONDON, KENTUCKY 40743
23  TELEPHONE NO.: (606) 877-5291
24  E-MAIL: JOHN@WFTLAW.COM
25          JASON@WFTLAW.COM
```

Page 4

```
1                    INDEX
2                                              Page
3   PROCEEDINGS                                  6
4   DIRECT EXAMINATION BY MR. SLOSAR             7
5   CROSS-EXAMINATION BY MR. KELLEY            216
6
7                    EXHIBITS
8                                              Page
9   1 30(b)6 NOTICE                             9
10  2 POLICY AND PROCEDURES MANUAL             79
11  3 KNOX COUNTY POLICIES AND PROCEDURES     117
12  4 ASHURST PERSONNEL FILE (REDACTED COPY)  162
13  5 ASHURST KNOX COUNTY PERSONNEL FILE      164
14  6 ASHURST HARLAN COUNTY PERSONNEL FILE    177
15  7 ASHURST LAUREL COUNTY PERSONNEL FILE    183
16  8 ASHURST FACEBOOK                        192
17  9 KSP APPLICATIONS                        206
18
19
20
21
22
23
24
25
```

Page 3

```
1                    APPEARANCES CONTINUED
2
3   ALSO PRESENT: STEPHANIE NALLEY, VIDEOGRAPHER
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                    STIPULATION
2
3   The VIDEO deposition of MIKE SMITH taken at HOLIDAY INN
4   EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY
5   40741 on MONDANY the 15TH day of JULY, 2019 at
6   approximately 11:12 a.m.; said deposition was taken
7   pursuant to the FEDERAL Rules of Civil Procedure.
8
9   It is agreed that LACEE TOWNSEND, being a Notary Public
10  and Court Reporter for the State of INDIANA, may swear
11  the witness.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
1                    PROCEEDINGS
2       VIDEOGRAPHER:  My name is Stephanie Nalley.
3  I'm the videographer today, and Lacee Townsend is
4  the court reporter.  Today is the 15th day of July,
5  2019.  The time is now 11:10 a.m.  We are at the
6  Holiday Inn Express & Suites in London, Kentucky to
7  take the deposition of Sheriff, Mike Smith in the
8  matter of Pearlie Sue Gambrel versus Knox County,
9  et al. pending in the United States District Court,
10 Case number 6:17-CV-00184.  Will counsel please
11 identify themselves for the record?
12      MR. SLOSAR:  Elliot Slosar for the plaintiff.
13      MS. STAPLES:  Amy Robinson-Staples for the
14 plaintiff.
15      MR. KELLEY.  John Kelley.  Jason Williams and
16 I are here on behalf of Deputy Mike Ashurst,
17 Constable Brandon Bolton, and Knox County, who are
18 defendants in this action.
19      VIDEOGRAPHER:  Okay.  Mr. Smith, would you
20 please raise your right hand to be sworn in by the
21 reporter?
22      COURT REPORTER:  Do you solemnly swear or
23 affirm that the testimony you're about to give will
24 be the truth, the whole truth, and nothing but the
25 truth?
```

Page 7

```
1       THE WITNESS:  I do.
2       COURT REPORTER:  Thank you.
3                    DIRECT EXAMINATION
4  BY MR. SLOSAR:
5    Q    Good morning, Sheriff.
6    A    Good morning.
7    Q    How are you doing today?
8    A    I'm doing good.
9    Q    Good.  It's good to see you again.  Before we
10 get started, I just wanted to briefly go over some of
11 the rules if that's okay.
12   A    Yes.
13   Q    If at any point today you want to take a break
14 and use the washroom or talk to your lawyers, get
15 something to eat, just let me know and I'd be happy to
16 take a break.  Okay.  The only thing I'm going to ask is
17 that if there's a question pending, if you could answer
18 the question first; is that fair?
19   A    Yeah.
20   Q    You may remember, although it was a very brief
21 deposition, that my questions aren't always perfect. And
22 so if there's a question I ask you, and you don't
23 understand it, I will be offended.  It happens
24 frequently.  Just let me know, I'll ask it a better way;
25 is that fair?
```

Page 8

```
1    A    That's fair.
2    Q    If you answer the question that I asked, I'm
3  going to assume that you understood what was being
4  asked; is that fair?
5    A    Uh-huh.
6    Q    Yes?
7    A    Yes.
8    Q    Okay.  I'm going to do my best today to make
9  sure that your answers are verbal.  Your counsel will,
10 as well.  But if you can continue just answering
11 verbally, it'll help the court reporter out as well.
12 Okay?
13   A    Yes, yes.
14   Q    Your attorneys may need some objections today
15 and that's their right.  On almost every occasion,
16 you're going to still answer the question.  Okay?
17   A    Okay.
18   Q    The only thing that I'd ask is if they're
19 making an objection, that you allow for them to make
20 that objection before you answer.  Okay?
21   A    Yes, yes.
22   Q    All right.  Now, today's going to be a little
23 bit boring because we're going to talk a lot about
24 policies and procedures.
25   A    Okay.
```

Page 9

```
1    Q    And before we get started with that, I want to
2  hand to you what I've already marked as Plaintiff's
3  Exhibit number 1.  This is the 30(b)6 Deposition Notice
4  that we sent to defendant Knox County a little while
5  back in this case.  Have you seen this document before
6  today, sir?
7       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
8    A    No.
9    Q    Okay.  Let's go through it.  I'm going to go
10 through each topic just to make sure that you understand
11 what you're here to testify to.  Okay?
12   A    Okay.
13   Q    All right.  So looking at the first topic, do
14 you understand that you are the person designated by the
15 defendant Knox County to provide binding testimony on
16 Knox County's behalf on the subjects of the county's
17 training of its law enforcement officers regarding the
18 policies, practices, and customs in effect from
19 2006 through 2016.
20      MR. WILLIAMS:  Well let me just --
21      MR. KELLEY:  We understood it to be during his
22 service as Sheriff in Knox County.
23 BY MR. SLOSAR:
24   Q    I think we have a ten years and most of these,
25 they specifically say ten years.  I have some questions
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1  that'll clear up what was going on under Mr. Pickard's
2  reign from before you took office in 2015, but our
3  30(b)6 notice does say those ten years.  And I have his
4  testimony from before.  I don't think it'll be an issue.
5  I'm going to be focusing on under your --
6      A   Right.
7      Q   -- command, but I am going to ask you some
8  questions about similar to what I asked you before about
9  when you because sheriff, your knowledge of what was
10  going on prior to you trying to change that department.
11     A   Okay.
12         MR. WILLIAMS:  He's prepared to testify to his
13     tenure as sheriff.
14         MR. KELLEY:  Yeah, obviously he had the
15     opportunity to in the other case.
16         MR. SLOSAR:  Sure.
17  BY MR. SLOSAR:
18     Q   Okay.  So we're going to work our way through
19  it but I'm going to still stick with the topics and you
20  let me know if you need to qualify it and say, you know,
21  based on the knowledge that you had prior to you taking
22  over, you can do that, but I'm going to ask you the
23  questions that are in the topics.  Okay?
24     A   Okay.
25     Q   Okay.  Do you feel you are in a position, have

Page 11

1  the knowledge and experience to provide testimony
2  relating to the policies, practices and customs in
3  effect beginning in 2015, when you became sheriff?
4      A   Yes.
5      Q   Okay.  Do you understand that you are the
6  person designated by defendant Knox County regarding the
7  policies, practices, and procedures the Knox County
8  Sheriff's Department relating to a) an internal
9  investigations and reviews based on allegations or
10  incidents of excessive force, including shootings of
11  civilians by Knox County officers,  b)  The discipline
12  of Knox County officers who use excessive force
13  including shootings of civilians, and c) whether such
14  investigatory or disciplinary policies, practices, and
15  procedures were followed in your respect to the incident
16  described in plaintiff's complaint.  This is topic
17  number one.
18     A   I do.
19     Q   Okay.  Do you feel you are in such a position
20  and have the knowledge and experience to provide such
21  testimony, Sheriff?
22     A   I do.
23     Q   Do you understand that you are the person
24  designated by defendant Knox County to provide binding
25  testimony on the county's behalf regarding the policies

Page 12

1  and practices relating to recognizing, interacting with,
2  and addressing citizens exhibiting signs of mental
3  health conditions, for example, citizens with mental
4  health issues, those suspected of ingesting drugs or
5  alcohol, and those experiencing excited delirium?
6      A   I do.
7      Q   Do you feel you are in a position, have the
8  knowledge and experience to provide such testimony?
9      A   I do.
10     Q   Do you understand that you are the person
11  designated by defendant Knox County to provide binding
12  testimony on the county's behalf on the subject of any
13  changes over the last ten years to the policies or
14  practices relating to recognizing, interacting with, and
15  addressing citizens signs of any mental health
16  conditions, for example, citizens with mental health
17  issues and those suspected of ingesting drugs or
18  alcohol, and the reason for each such change?
19         MR. KELLEY:  Let me note an objection simply
20     as to the time period, as to whether changes were
21     made during Sheriff Pickard's tenure.  I'm not sure
22     that he can answer that, but I think he would
23     answer concerning, first of all, the time relevant
24     to this incident, as well as this time since 2015
25     when he was elected.

Page 13

1  BY MR. SLOSAR:
2      Q   I understand the objection.  We're going to
3  ask you some questions based upon whatever knowledge you
4  have of how the department was operating prior to you
5  taking over.  But we will be focusing on what's happened
6  since 2015 as well.
7      A   Right, since 2015, correct?
8      Q   Yes.  Do you feel you're in a position, have
9  the knowledge and experience to provide in such binding
10  testimony?
11     A   I do.
12     Q   And to the extent that Sheriff Smith is unable
13  to testify as to the policies, procedures, and practices
14  that predate 2015, that qualification wasn't made when
15  we arranged the 30(b)6 deposition so we may need to
16  depose Sheriff Pickard about what was going on prior to
17  2015 based upon the testimony from Sheriff Smith.
18         MR. KELLEY:  Could we discuss that after the
19     deposition is over?
20         MR. WILLIAMS:  Yeah, we can discuss that
21     afterwards.
22         MR. KELLEY:  Yeah, I'm not saying no but I'm
23     not saying.
24         MR. SLOSAR:  I'd be happy to discuss it
25     afterward.  I just, I am literally sticking to the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 14**

1    topics that are laid out --
2         MR. KELLEY:  Sure.
3         MR. SLOSAR:  -- in our 30(b) 6 notice and when
4    we sent that, there wasn't any qualification by you
5    all and who you were going to present.  It was that
6    Sheriff Smith can testify to these topics.  And in
7    those topics, it does say the last ten years, which
8    would be before he took over.  So I understand the
9    concerns you all have, I just don't want to waive
10   our opportunity to question him.
11        MR. KELLEY:  Sure, I understand that and if
12   you think it necessary, I don't think we -- we'll
13   just have to discuss it.
14        MR. SLOSAR:  Yeah.
15        MR. WILLIAMS:  We'll discuss it.  We think
16   it's implicit that this case would involve after
17   Mr. Smith took over as Sheriff.  This is one of his
18   deputies involved policy that he brought in with
19   him as Sheriff. But certainly we'll be glad to talk
20   about it later.
21        MR. SLOSAR:  Okay.
22   BY MR. SLOSAR:
23        Q    Do you feel you are in a position, have the
24   knowledge and experience to provide such testimony, sir?
25        A    Yes.

**Page 15**

1         Q    Do you understand -- this is topic number
2    four.  Do you understand that you are the person
3    designated by defendant Knox County to provide binding
4    testimony on the county's behalf regarding the training
5    and supervision of Knox County Sheriff Department
6    officers relating to recognizing, interacting with, and
7    addressing citizens exhibiting signs of any mental
8    health conditions, for example, citizens with mental
9    health issues and those suspected of ingesting drugs or
10   alcohol over the last ten years?  And I understand the
11   qualification that you and your counsel have.  Are you
12   prepared to testify to this affect at least dating back
13   to January of 2015?
14        A    Yes.
15        Q    And do you feel that you are in a position and
16   have the knowledge and experience to provide such
17   testimony dating back to when you took over?
18        A    I do.
19        Q    Do you understand -- this is topic
20   number five.  Do you understand that you are the person
21   designated by defendant Knox County to provide binding
22   testimony on the county's behalf on the changes over the
23   last ten years to the training or supervision relating
24   to recognizing, interacting with, and addressing
25   citizens as exhibiting signs of any mental health

**Page 16**

1    conditions, for example, citizens with mental health
2    issues, and those suspected of ingesting drugs or
3    alcohol, and the reason for each such change?
4         A    I do.
5         Q    And do you feel you're in a position, have the
6    knowledge and experience, to provide such testimony?
7         A    Yes.
8         Q    Topic number six.
9         A    Uh-huh.
10        Q    Do you understand that you are the person
11   designated by the defendant Knox County to provide
12   binding testimony on the procedures, practice, and
13   should be the policies, practices and procedures and
14   systems in place to train and supervise Knox County
15   officers about the following use of force: subjects a,
16   the use of deadly force; b, drawing a handgun in the
17   line of duty; c, the use of taser weapons; and d, the
18   use of other non-lethal and less lethal weapons?
19        A    Yes.
20        Q    Do you feel you are in a position, have the
21   knowledge and experience to provide such testimony?
22        A    I do.
23        Q    Topic number seven.  Do you understand that
24   you are the person designated by Knox County to provide
25   binding testimony in the procedures, practices, and

**Page 17**

1    protocols implemented by the Knox County
2    Sheriff's Department following any other police shooting
3    of a civilian in the last ten years concerning the
4    supervision and discipline of Knox County officers who
5    have used or attempted to use lethal force against a
6    citizen in the line of duty?
7         A    Yes.
8         MR. WILLIAMS:  Let me just introduce a
9    continued objection to any other instances under
10   federal rule of evidence 404.  With that and go
11   forward through with that objection made.  He's
12   already answered the question.  Thank you.
13        MR. SLOSAR:  Sure.  I understand that.
14   Plaintiff's believe that this is relevant to our
15   monopoly, not that acts of individual officers but
16   BY MR. SLOSAR:
17        Q    Do you feel you are in a position, have the
18   knowledge and experience to provide such testimony,
19   Sheriff?
20        A    I do.
21        Q    Okay.  Last topic.  Do you understand that you
22   are the person designated by Knox County to provide
23   binding testimony on any training provided to
24   Knox County deputies following any other shooting of a
25   civilian in the last ten years.  I understand that your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 8 of 86 - Page ID#: 4867
The Deposition of MIKE SMITH, taken on July 31, 2019
18..21

Page 18

1  knowledge will mostly focus on since 2015, concerning
2  the use or attempted use of lethal force against a
3  civilian in the line of duty?
4      A   I do.
5      Q   Do you feel you are in a position and have the
6  knowledge and experience to provide such testimony?
7      A   Yes.
8      Q   Thank you, Sheriff.
9      A   Uh-huh.
10     Q   Sheriff, what have you done to prepare for
11 today's deposition?
12     A   I've reviewed notes concerning this --
13         MR. KELLEY:  Part of it, he's talked with me
14     but, of course, that remains confidential.
15         MR. SLOSAR:  Sure.
16 BY MR. SLOSAR:
17     Q   Let me do it a better way, okay.  This is
18 going to be one of those times when I can ask questions
19 better.
20     A   Uh-huh.
21     Q   Prior to today's deposition, did you have a
22 chance to meet with some lawyers who are representing
23 Knox County Sheriff's Department?
24     A   I did.
25     Q   Okay.  And I don't want to know any of the

Page 19

1  substance of your conversations --
2      A   Uh-huh.
3      Q   -- with your lawyers because it's protected,
4  but how many times did you meet with lawyers in
5  preparation for today?
6      A   Just once.
7      Q   Okay.  And who'd you meet with?  Mr. Kelley?
8      A   Mr. Kelley.
9      Q   Was Mr. Williams there, too?
10     A   No.
11     Q   And how long did you all meet?
12     A   Approximately an hour.
13     Q   And did you review any documents in that
14 meeting?
15     A   We -- we reviewed some documents.
16     Q   What documents did you review?
17         MR. KELLEY:  I object.  Don't answer the
18     question.
19         MR. SLOSAR:  What is the basis of the
20     objection, John?
21         MR. KELLEY:  Attorney client privilege and
22     that you're seeking confidential information
23     concerning our thoughts about, and strategies, and
24     anticipation of your strategies in answering
25     questions concerning this incident, as well as

Page 20

1  prior incidents, as well as the various things we
2  reviewed.
3  BY MR. SLOSAR:
4      Q   Your -- I just want to make sure I have this
5  right.  Let me ask you a couple questions before we get
6  back.  The documents that you reviewed, are you going to
7  rely upon the knowledge you got from those documents to
8  testify here today?
9      A   I rely on my knowledge based on -- on a
10 factual parts of -- of the incidents and not
11 necessarily.  I mean, I'll -- I reviewed them.
12     Q   Can't take that away from your memory,
13 correct?
14     A   Obviously, I reviewed them so it's my memory.
15 I mean --
16         MR. SLOSAR:  I think the documents reviewed in
17     anticipation of a deposition and prepare for a
18     deposition are not ordinarily privileged unless
19     they're some sort of legal memorandum that you've
20     created for Sheriff Smith to review.
21         MR. WILLIAMS:  Well, let me just say this.  If
22     you want to ask him if he reviewed his answers to
23     interrogatories or supplemental particular document
24     that's fine but I think that's where the
25     questioning should end.  Why you reviewed them, you

Page 21

1  know, what questions were asked by counsel when you
2  reviewed them, those type of things.
3         MR. SLOSAR:  Yeah, I haven't asked that.
4         MR. WILLIAMS:  They stray into that.  But if
5      you want to ask him in a particular question if
6      he's looking at something and give him a copy of it
7      to look at, talk about, we're not going to let you
8      do it through a lottery list of things that he and
9      counsel looked at.
10 BY MR. SLOSAR:
11     Q   I mean, sir --
12     A   Yes.
13     Q   -- sitting here today, do you recall the names
14 of, or do you recall the types of documents that you
15 reviewed last week to prepare for today's deposition?
16     A   I reviewed some basic documents.  I probably
17 can't remember them all, but I remember a few.
18     Q   What were the ones that you remember
19 reviewing?
20         MR. KELLEY:  Go ahead, answer.
21     A   I reviewed documentation regarding previous
22 employment of Deputy Ashurst mostly.
23     Q   And do your recall which departments
24 employment history you reviewed for Mr. Ashurst?
25     A   The Harlan review and Laurel County.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    Q    And sir, so you reviewed the personnel files
2    from Laurel County for Mr. Ashurst in preparing; is that
3    right?
4    A    I review -- yeah, I looked over those, yes.
5    Q    And you reviewed the personnel files relating
6    to Mr. Ashurst for Harlan County; is that right?
7    A    Yes.
8    Q    Did you review the personnel files for
9    Mr. Ashurst from the Danville Police Department?
10   A    Yes, I think so.  Yes.
11   Q    And did you review the personnel files or the
12   applications, the two applications, that related
13   documents from Mr. Ashurst for his attempt to be hired
14   at the Kentucky State Police?
15   A    No, I did not.
16   Q    To this day, have you ever reviewed those
17   files?
18   A    For the Kentucky --
19        MR. KELLEY:  Which files?
20   A    -- which files?
21   Q    The Kentucky State Police applications.
22   A    No, sir.
23   Q    Prior to today, were you ever aware that
24   Mr. Ashurst made two failed attempts to be hired at the
25   Kentucky --

Page 23

1    A    Yes.
2    Q    -- State Police?
3    A    Yes, I was aware of that.
4    Q    And how did you first become aware of that?
5    A    He -- he told me that he was applying for the
6    Kentucky State Police on both occasions.
7    Q    And on both occasions did he tell you that he
8    was not hired?
9    A    He did, yes.
10   Q    Now, sir, you said that you reviewed
11   Mr. Ashurst's personnel files from Laurel County,
12   Harlan County, and Danville Police Department, prior to
13   today's deposition; is that right?
14   A    Yes.
15   Q    Those files were never maintained at the
16   Knox County Sheriff's Department; is that right?
17   A    That's correct.
18   Q    Okay.  In fact, prior to Mr. Ashurst being
19   hired -- you hired Mr. Ashurst, correct?
20   A    Yes, I did.
21   Q    And you hired him, I believe, back in
22   April of 2015; is that right?
23   A    Uh-huh, correct.
24   Q    Prior to hiring Mr. Ashurst, you had never
25   reviewed the personnel file for him that was maintained

Page 24

1    at Laurel County; is that right?
2    A    I did.  I contacted Sheriff Root.
3    Q    My question to you is a little bit different.
4    Which is --
5    A    Uh-huh.
6    Q    -- prior to hiring Mr. Ashurst, did you ever
7    request to see his personnel file that was maintained
8    at --
9    A    Well, I'd contacted prior to hiring him.  I
10   contacted Sheriff Root to ascertain what type of deputy
11   he was and get his opinion on -- on a hiring.
12   Q    Yeah, and there's a, I know there's a note in
13   the file reflecting that.  Do you recall writing
14   anything in the Knox County file?
15   A    I'm pretty sure I did.  Basically, just to
16   have on file.
17   Q    And in that conversation with Sheriff Root,
18   did he tell you that he informed Mr. Ashurst that he was
19   either going to be fired or he needed to resign?
20   A    He did.
21   Q    Okay.  Now, in that conversation with
22   Sheriff Root, let me withdraw that question.  After
23   speaking to Sheriff Root, did you ever review
24   Mr. Ashurst personnel file at Laurel County?
25   A    While speaking with Sheriff Root, he -- he

Page 25

1    disclosed that information about Deputy Ashurst and
2    however then he said that he felt that he, you know,
3    couldn't work in Laurel County but he would recommend
4    him for hire in -- in Knox County.
5    Q    My question's a little bit different, Sheriff.
6    A    Okay.
7    Q    So let me ask it a better way.
8    A    Okay.
9    Q    I understand you had a conversation with
10   Sheriff Root.
11   A    Right.
12   Q    My question to you is, prior to hiring
13   Mikey Ashurst --
14   A    Uh-huh.
15   Q    -- did you ever specifically request to obtain
16   his personnel file from Laurel County Sheriff's
17   Department?
18   A    No, I didn't.
19   Q    Okay.  Prior to hiring Mr. Ashurst in
20   April of 2015, did you ever make any requests of
21   Harlan County to obtain Mr. Ashurst's personnel file?
22   A    I had my chief deputy at the time contact
23   Harlan and do a "background type investigation" on him
24   and -- and that was the extent of that.
25   Q    So let me ask you a better way.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 10 of 86 - Page
ID#: 4869
The Deposition of MIKEY ASHURST, taken on May 15, 2019
26..29

Page 26

1    A    Uh-huh.
2    Q    Prior to hiring Mr. Ashurst, did you make any
3  request to obtain his personnel file from the Harlan
4  Police Department?
5    A    No, not a personal request for the personnel
6  file, but we did check into the department as to his
7  employment history.
8    Q    And prior to making this decision to hire in,
9  was -- let me withdraw that question.  Was your chief
10 deputy, is his name --
11   A    Tackett.
12   Q    -- Larry -- what's the name?
13   A    Tackett Wilson.
14   Q    Tackett Wilson.
15   A    Uh-huh.
16   Q    Prior to hiring Mr. Ashurst in April 2015, did
17 you ever request that your chief deputy obtain
18 Mr. Ashurst personnel file from the
19 Harlan Police Department?
20   A    I just instructed him to contact them as to
21 his employment history there for knowledge, for our
22 knowledge.
23   Q    So you would agree that prior to hiring
24 Mr. Ashurst, you had never reviewed any documents from
25 Ashurst's personnel file from --

Page 27

1    A    No.
2    Q    -- the Harlan Police Department?
3    A    No, I personally did not, no.
4    Q    And to your knowledge, nobody under your
5  command reviewed Mr. Ashurst personnel file from Harlan?
6    A    I can't speak to that.  I assume Tackett
7  looked into it and talked to personnel there,
8  supervision personnel, as to his employment history
9  there.  And I relied on -- on his recommendation to me.
10   Q    You have no independent recollection of having
11 a conversation with Mr. Tackett?
12   A    I do, I mean, I spoke to him, yeah.  I mean,
13 I -- I talked to him and asked him about what he found
14 out and what he recommended for -- for employment.
15   Q    When did that conversation happen, sir?
16   A    Some period before we hired him.  I always do.
17   Q    And where did that conversation take place?
18   A    It would've been at the Knox County
19 Sheriff's Office.
20   Q    And what documentation did you make as a
21 result of that conversation with Mr. Tackett?
22   A    Just, I didn't probably put it in writing
23 and -- and put it in a file but I, you know, I always do
24 on all personnel hires.
25   Q    What documentation did Mr. Tackett give you,

Page 28

1  if any, in that conversation?
2    A    None that I'm aware of.
3    Q    And if he had given you any documentation
4  related to Mr. Ashurst you would've made that part of
5  Mr. Ashurst's personnel file, right?
6    A    Yes, we would put it in the file, yes.
7    Q    Whatever documents you received prior to
8  hiring Mr. Ashurst would've been maintained --
9    A    Yes.
10   Q    -- as part of his personnel file, correct?
11   A    Correct.
12   Q    Any information that you learned relating to
13 Mr. Ashurst in the process of hiring him, would've been
14 documented, correct?
15   A    Right, just per my conversation with
16 Sheriff Root.
17   Q    Yeah.  And that, the documentation of any
18 investigation that you did into Mr. Ashurst, prior to
19 his hiring in April of 2015, that would've been
20 maintained as part of the personnel file, correct?
21   A    Yes, yes.
22   Q    Okay.  So whatever is in Mikey Ashurst
23 personnel file relating to his hiring -- let me
24 withdraw.  That's a bad question.  Whatever
25 investigation, whatever documentation that your

Page 29

1  department received in the decision to hire
2  Mikey Ashurst, that would be maintained as part of
3  Mr. Ashurst's personnel file, correct?
4    A    Yeah --
5        MR. WILLIAMS:  Object to the form and the use
6    of the word information but you may answer.
7    Q    You can answer, sir.
8    A    -- the written documentation, but the verbal
9  documentation and the verbal, you know, the -- the
10 checking and so forth like that that we done, just by --
11 by telephone and -- and verbally, no.
12   Q    Well, you had an oral conversation with
13 Sheriff Root --
14   A    Uh-huh.
15   Q    -- do you remember that?
16   A    I do, somewhat, yeah.
17   Q    And you documented the information you learned
18 in that conversation?
19   A    If there would've been, yeah, if -- if there
20 would've been a recommendation negatively or anything, I
21 would've, yes, yes.
22   Q    Yeah.  And in fact, even if there, with a
23 positive recommendation from Sheriff Root, you would've
24 documented that too, right?
25   A    Right.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1    Q   Yeah.  And you would've made that part of the
2  personnel file, right?
3    A   Yes, probably.
4    Q   In fact, in this case, you did memorialize
5  your conversation with Sheriff Root, correct?
6    A   Uh-huh, correct.
7    Q   Okay.  And now again sir, prior to Mr. Ashurst
8  being hired at your department, you did not request
9  Mr. Ashurst personnel file from the Laurel County
10 Sheriff's Department, correct?
11   A   Correct.
12       MR. WILLIAMS:  He's answered that.
13   Q   You also did not review any documents of
14 Mr. Ashurst's personnel file from Laurel County before
15 hiring him, correct?
16   A   Personally, I did not.
17   Q   Okay.  And to your knowledge, you don't have
18 any direct knowledge of anybody under your command
19 personally reviewing any of the documents in
20 Mr. Ashurst's personnel file prior to you hiring him,
21 correct?
22   A   I'm not sure what he, you know, my chief
23 deputy, looked into but I just took his recommendation,
24 correct.
25   Q   All right.  Back on track, sorry.  So you

Page 31

1  reviewed, to prepare for today, you reviewed some of
2  Mr. Ashurst personnel files from different
3  law enforcement agencies; is that right, sir?
4    A   Yes.
5    Q   And last week would've been the first time
6  that you personally reviewed any of those personnel
7  files from Mikey Ashurst, correct?
8    A   Yes, correct.
9    Q   Aside from looking at Mr. Ashurst's personnel
10 files, what other documents did you review to prepare
11 for today's deposition?
12   A   As far as his personnel files?
13   Q   Just, what other -- so you've talked about
14 last week --
15   A   Uh-huh.
16   Q   -- you reviewed different personnel files from
17 Mr. Ashurst to prepare for today.  What other documents
18 do you recall reviewing?
19   A   Those are all I recall really.  Yeah.
20   Q   All right.  Let's, and I'm not sure, I
21 remember you at the last deposition was very quick.  I
22 can't promise you that this one will be as quick, but
23 we'll do the best we can.
24   A   Thank you.
25   Q   Can you give me some background on yourself?

Page 32

1  When did you become Knox County Sheriff?
2    A   Do you want me to give my law enforcement
3  experience or just the -- as sheriff?
4    Q   Let's start at the beginning.
5    A   Just at -- okay.  In 1988 I was hired by the
6  Kentucky State Police and graduated the academy and was
7  assigned to the Harlan State Police post as a road
8  trooper in Knox County.  Worked approximately six years
9  on the road, was promoted to detect -- was promoted to
10 sergeant, and became the detective Sergeant at
11 Harlan post, KSP post.
12   Q   Is that post ten?
13   A   It is.
14   Q   Okay.
15   A   Yes, post -- yes, post ten.
16   Q   Okay.
17   A   And --
18   Q   So around 1994, '95?
19   A   Yes, '95.
20   Q   Okay.
21   A   And in 1997 I was promoted to lieutenant and
22 became the investigative lieutenant at the
23 Kentucky State Police post ten in Harlan.  And at that
24 point, I -- I think worked at year as an investigative
25 lieutenant and was switched over to operations

Page 33

1  lieutenant, at my request.  I put a request in, and it
2  was granted.  I worked as operations lieutenant.  And I
3  also worked as Kentucky State Police commander of the
4  records section in Frankfort for approximately
5  two-and-a-half to three years.  Came back home in the
6  London area at KSP post ten 11.  Worked as the
7  operations lieutenant at KSP post 11 in London.  And
8  during the time I was at the London post, the captain
9  retired, Captain Gary Piercey retired.  And I was acting
10 post commander for approximately -- it was several
11 months, I -- I think three months, somewhere around
12 there.  I was acting commander here at the London post
13 in this area.  And then I'd applied for the -- a
14 commanders position within the Kentucky State Police
15 Laboratory System and was assigned as commander of the
16 Eastern Lab Raps for the -- for the eastern half of
17 state of the Kentucky, over three crime labs.  And then
18 I've served in that capacity for approximately eight
19 years and retired.
20   Q   And when did you retire from KSP, sir?
21   A   2012.  And then I was -- I decided to -- to
22 run for sheriff in Knox County.  And they was elected
23 sheriff and began serving as sheriff in January of 2015.
24   Q   When did you first run for sheriff?
25   A   Well, in the '15 election.  That was my first

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1 attempt.
2    Q    When you were retired as commander from KSP --
3    A    Yes.
4    Q    -- approximately how many years had you
5 served?
6    A    24.
7    Q    What made you want to run to be
8 Knox County Sheriff?
9    A    Well, law enforcement's in my -- in my blood
10 and I like law enforcement.  I felt I could still be
11 effective as -- as a law enforcement officer and would
12 like to do some good things for Knox County.  And I just
13 decided to run for Sheriff.
14    Q    When you were, you said you were running the
15 eastern lab as a commander --
16    A    It's the eastern half of the state.  It was
17 Ashland Laboratory, London Southeastern Laboratory, and
18 then Cold Springs around the northern Kentucky area.
19 Yeah.
20    Q    Between 2012 and 2015, did you take a little
21 break?
22    A    Yes, sir.  Yeah, I took a little break and I
23 then I started to -- I decided to run for sheriff and
24 just kind of started to -- my -- my bid for sheriff and
25 got, you know, started the campaign process somewhat.

Page 35

1    Q    And when you started to campaign, you said
2 your chief deputy is named Tackett?
3    A    He was, yes, at the time when I first got
4 elected it was Tackett Wilson.
5    Q    And how'd you first come to meet Mr. Tackett
6 Wilson?
7    A    Tackett is a -- he was with the
8 Kentucky State Police, as well.  He was a -- a Sergeant
9 in the Kentucky State Police and he -- he had retired, I
10 think maybe in 2013, from the state police.  And -- but
11 I -- I've known him throughout the -- my -- my career
12 with KSP and we worked around each other somewhat during
13 those -- those years I was with KSP.
14    Q    About how long -- do you consider Tackett a
15 friend of yours?
16    A    Yes, yeah, I would consider him a friend.
17    Q    Do you trust him?
18    A    I do.
19    Q    Yeah, and you certainly wouldn't make somebody
20 a chief deputy if you couldn't trust him, right?
21    A    Exactly, exactly.
22    Q    Now, how long do you recall working at KSP
23 with Tackett?
24    A    Many years, 15 or more probably.
25    Q    And how did you first learn that Mr. Ashurst

Page 36

1 was applying to the Knox County Sheriff's Department?
2    A    It was actually through Tackett.  He had told
3 me that -- that Mikey Ashurst has -- was -- was going to
4 apply with the Knox County Sheriff's Office.
5    Q    And did Tackett disclose to you, the nature of
6 his friendship with Mr. Ashurst?
7         MR. WILLIAMS:  Object to the form of the
8 question.
9    Q    You can answer.
10    A    He didn't, I mean, he didn't tell me they were
11 friends or anything.  He just told me that he had
12 applied with the Knox County Sheriff's Department.
13    Q    Did Tackett ever tell you whether he wrote a
14 letter of recommendation for Mr. Ashurst to be hired by
15 the Kentucky State Police?
16    A    He didn't tell me that.
17    Q    Did he ever tell you that he served as a
18 character reference for Mr. Ashurst to KSP?
19    A    No.  This, now Tackett didn't stay with me too
20 long.  He got -- he got hired as a teach in -- in
21 Corbin Independent School System teaching law
22 enforcement.
23    Q    Did Tackett ever tell you that he helped
24 Mikey Ashurst get his first job in law enforcement at
25 the Danville Police Department?

Page 37

1    A    I think he did mention that.  I think so.
2    Q    Did Tackett ever tell you that he was, prior
3 to Mr. Ashurst being hired, did Tackett Wilson ever
4 inform you that he was a long-term friend of
5 Mikey Ashurst and his family?
6    A    I'm trying to think.  I -- I don't think he
7 disclosed that he was a long-term friend of him.  I
8 don't -- I don't think he described any type friendship
9 with him.
10    Q    Is that something that you would've wanted to
11 know during the hiring process?
12    A    I, I mean, I -- I trusted Tackett's thinking
13 and his -- his recommendation.
14    Q    Now, you worked at Kentucky State Police for a
15 long time; is that right?
16    A    Yes, 24 years.
17    Q    Worked there almost your entire law
18 enforcement career before going into this elected
19 business that you're in now, right?
20    A    I did, yes.
21    Q    And do you recall going through the interview
22 process for the application process of the
23 Kentucky State Police?
24    A    Yeah, several years ago.
25    Q    And when you were at KSP, did you ever have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  the opportunity to be a part of the application process
2  from a different perspective?
3      A    The only -- as far as sworn personnel goes, it
4  was a -- it was a separate section from where I was.  I
5  mean, we didn't, as a lieutenant or Sergeant at the
6  post, we didn't hire them.  They were hired by a
7  recruitment section and -- and went through the academy
8  staff and so forth like that.  But now when I was
9  commander of the records section, as far as civilian
10  personnel, yes.  Yes, they would submit applications
11  and -- and as the commander, I would, you know, I would
12  hire.
13     Q    In any of the times, well, let's start with
14  your application process.  Did the Kentucky State
15  Police, after doing an investigation into your
16  background, ever refuse to hire you?
17     A    Yes, I was -- I'd applied twice to get hired
18  with Kentucky State Police.
19     Q    Did they give you any reasons for the first
20  time that --
21     A    No, sir.  No, I had -- I guess I didn't score
22  high enough on the -- on the oral interview.  I scored
23  like -- at back -- I think the rating system was up to
24  15 was the max and I think on the first time I applied,
25  I -- I may have scored a -- a 14 and there were several,

Page 39

1  several applicants and -- and I -- I guess I got vetted
2  out.
3      Q    But it was not, the Kentucky State Police
4  decision to not hire you, to your knowledge, was not
5  based on any improprieties on you, correct?
6      A    Correct, as far as background type --
7      Q    Yeah.
8      A    -- instances.  Is that what you're referring
9  to?
10     Q    Like you didn't withhold any information from
11  KSP that caused them --
12     A    No.
13     Q    -- any concerns, right?
14     A    No, I didn't.
15     Q    You didn't have any other potential issues in
16  your law enforcement career that would've caused them to
17  second guess whether you could be a candidate.
18     A    It -- I was straight out of college, so --
19     Q    Where'd you go to college at?
20     A    -- Eastern Kentucky University.  Got a -- a
21  bachelor's degree in law enforcement.
22     Q    All right.  Let's keep it going on.
23     A    Okay.
24     Q    So you become Sheriff January 2015; is that
25  right?

Page 40

1      A    That's correct.
2      Q    Okay.  And what's the first thing you do after
3  becoming sheriff?
4      A    Wow.  It was kind of like a whirlwind at that
5  point.  A lot of -- a lot of stuff hits you at once.  I
6  mean, that's a -- being a sheriff and -- is different
7  somewhat than KSP.  Obviously, you've got more duties
8  assigned to you as sheriff.  I had -- I had three
9  deputies at the time and -- and we've obviously, we were
10  trying to hire personnel, we were trying to, you know,
11  get the -- make sure we had bailiffs going in the court
12  system.  We had taxes.  You know, we were right in the
13  middle of a tax season.  January is tax collection time
14  and we were doing all that.  So a lot of different
15  things.  I -- I was -- I was doing a lot of different
16  things.
17     Q    Who were your chief deputies when you started?
18     A    I had hired, well, William Stewart, I -- I
19  brought him in as a type of a administrative assistant
20  at that point.  We -- he was -- he's a retired colonel
21  with the Kentucky State Police, an older gentleman,
22  knowledgeable about law enforcement, good guy.  So I
23  brought him on and at that point we were -- began
24  looking for my chief deputy captain type and -- and we
25  talked to -- to Tackett and he applied and -- and I -- I

Page 41

1  hired Tackett.
2      Q    Do you recall who else applied?
3      A    I really -- I really didn't have a -- it
4  wasn't a throwed out application process.  I mean, it
5  was -- he had -- he had retired from the KSP and --
6  and -- and I'd known him.  I knew he had extensive
7  experience in law enforcement, very varied background in
8  law enforcement, very knowledgeable, good guy, got along
9  with people good.  And I trusted him.
10     Q    And who, aside from Mr. Stewart and
11  Mr. Tackett who else did you bring on as part of the
12  Knox County Sheriff's Department?
13     A    At that point, I had -- there were three
14  deputies remaining from the current administration and
15  it was -- I brought -- I kept the -- the office staff
16  and brought my wife in as a -- someone I could trust
17  with the tax money and collections and so forth and had
18  her as a -- a bookkeeper.
19     Q    Who were the three deputies that remained on?
20     A    Claude Hudson, Deputy Claude Hudson, Deputy
21  Chad Wagner, and Deputy Andrew Wilson.
22     Q    And Claude Hudson recently resigned, right?
23     A    He did, yes.
24     Q    And why did he resign, sir?
25     A    There was --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

```
 1            MR. WILLIAMS:  Objection on grounds of
 2    relevance and other instances make it a continuing
 3    objection.  With that objection you may give him
 4    the answer.
 5            MR. SLOSAR:  You can answer.  Jason's being
 6    very efficient -- appreciate.
 7            THE WITNESS:  He is.
 8            MR. WILLIAMS:  That way I don't have to object
 9    every two minutes.
10            THE WITNESS:  Got you.  All right.
11            MR. SLOSAR:  Thank you, Jason.
12            THE WITNESS:  Yeah.  I was informed by the
13    Kentucky State Police that there was a criminal
14    investigation looking into an allegation on
15    Deputy Hudson.  And at that point, an emergency
16    protective order was -- was issued on
17    Deputy Hudson.  I was informed a short, very short
18    time after the emergency protective order was
19    issued, that there was a -- a violation of the
20    emergency protective order.  And he -- he was
21    banned from Knox County for approximately one year,
22    for 2019.
23    BY MR. SLOSAR:
24        Q    When you say banned from Knox County --
25        A    Well --
```

Page 43

```
 1        Q    -- what do you mean?
 2        A    -- the judge ordered him to stay out of
 3    Knox County.
 4        Q    Of the entire county?
 5        A    Yes.  And at that point, I mean, obviously he
 6    was not effective as -- for me as a deputy.  And since
 7    he couldn't work and he -- he chose to resign.
 8        Q    What was the nature of the criminal
 9    investigation of Mr. Hudson?
10        A    It was, the alleged complaint was a child
11    sexual assault.
12        Q    And in the alleged violation of protection
13    order, was in relation to that same --
14        A    Yes, sir.
15        Q    -- victim?
16        A    It was, well, the mother of the victim.  The
17    violation, the EPO violation or the EPO order included
18    the child as well as the mother.
19        Q    Now, when was the first time, as Sheriff, that
20    you learned of allegations of misconduct against
21    Deputy Hudson?
22        A    The first time as -- when I was sheriff --
23        Q    Yeah.
24        A    -- that I learned -- oh, okay.
25        Q    So after 2015 --
```

Page 44

```
 1        A    Uh-huh.
 2        Q    When was the first time that somebody came to
 3    you with allegations of police misconduct against
 4    Deputy Hudson?
 5        A    It would've been --
 6            MR. WILLIAMS:  Elliot, can we go off the
 7    record just a second?
 8            MR. SLOSAR:  Uh-huh.
 9            MR. WILLIAMS:  Thank you.
10            VIDEOGRAPHER:  The time is 11:56. We are off
11    the record.
12            (OFF THE RECORD)
13            VIDEOGRAPHER: The time is 11:57. We are on the
14    record.
15    BY MR. SLOSAR:
16        Q    All right.  So when was the first time that
17    you learned that there were allegations of misconduct?
18    It doesn't have to be necessarily with this allegation
19    that he ultimately resigned --
20        A    Uh-huh. Misconduct?
21        Q    -- from -- after 2015, did you ever -- when
22    was the first time you learned of any allegations
23    against Deputy Hudson?
24        A    It was this recent investigation by the KSP
25    looking into the -- the assault charge, alleged assault
```

Page 45

```
 1    charge.
 2        Q    Did anybody involved in that, so either the
 3    child or the mother, did any of those people come to the
 4    Knox County Sheriff's Department first to raise an
 5    allegation against Deputy Hudson?
 6        A    No.  No, it was -- it -- it was reported
 7    directly to the Kentucky State Police.  I was trying to
 8    think if she may have came to the office.  I was trying
 9    to think if she did.  I'm trying to -- to remember.
10    After -- after the -- the allegation was brought up, I
11    went to her parents' house which, who live in
12    Knox County, and she was there and I just was offering,
13    you know, anything that -- that we could assist with or
14    help with, you know, as far as her -- her perspective
15    goes, to not hesitate to contact us.  That, you know, we
16    would -- we would help them in any capacity just like we
17    would any citizen of Knox County.
18        Q    Sure.
19        A    So yeah.
20        Q    To date, has the Knox County Sheriff's
21    Department ever conducted an internal affairs
22    investigation or an internal investigation into any of
23    those allegations against Deputy Hudson?
24        A    It was -- it was Kentucky State Police
25    independent investigation.  They're thorough and
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  complete. I -- no, I relied on their investigation.
2     Q    And the Kentucky State Police investigation,
3  that was a criminal investigation, correct?
4     A    Correct, yes.
5     Q    That is, the Kentucky State Police at no time
6  conducted an investigation into Claude Hudson to
7  determine whether any actions he did conflicted with the
8  policies or procedures of the Knox County
9  Sheriff's Department, correct?
10    A    No, we -- he resigned at that point. I mean,
11 it was very, very quick. I mean, at -- as far as the
12 violation of the EPO, it happened pretty -- within days
13 at that point. So he resigned.
14    Q    Did you ask for Deputy Hudson to resign?
15    A    I just had Everett Johnson contact him, my
16 captain, and talk to him and say, you know, "We
17 understand this has happened." I contacted the court
18 system, got a copy of the emergency protective order and
19 reviewed it and just told him that he would be
20 ineffective as a -- as a deputy and -- and I was going
21 to call him in the office and -- while, at that point
22 during the conversation, Everett Johnson was having with
23 him on the phone, that I was needing to talk to him in
24 my office, he said, "I'm just going to go ahead and
25 resign."

Page 47

1     Q    And should Deputy Hudson's criminal
2  investigation conclude without the initiation of
3  charges, would you hire him back at the Knox County
4  Sheriff's Department?
5         MR. WILLIAMS:  Clear some speculate, with that
6         objection made you can answer.
7     A    I would have to -- I -- I would have to review
8  the whole case file, all that, from the Kentucky State
9  Police and I can't say what I would do here right now. I
10 would have to do my own investigation into it and look
11 into it further.
12    Q    Let's go back to 2015.
13    A    Okay.
14    Q    So you hire three deputies, or three deputy --
15    A    Retained.
16    Q    -- remained.
17    A    Uh-huh, yes.
18    Q    They were Claude Hudson, Mr. Wagner, and
19 Mr. Wilson; is that right?
20    A    Yes.
21    Q    Okay.
22    A    Yes.
23    Q    Now, when you take over, were you aware of any
24 policies or procedures that were in place at the
25 Knox County Sheriff's Department from the prior

Page 48

1  administration?
2     A    No, sir, I'm not made of aware of those. I
3  made -- I've -- Williams Steward, for one, the retired
4  colonel that I brought in, I instructed him to go ahead
5  and begin our own policies to go ahead and -- and create
6  those. Because I was, based on our background, I was
7  comfortable with those polices that we had worked with
8  and -- and I just -- I'd instructed him to go ahead
9  and -- and begin us a personnel or a policy and
10 procedure manual --
11    Q    Okay.
12    A    -- at that point.
13    Q    And when you were at the Kentucky State
14 Police, fair to say that they had, that agency has, an
15 extensive set of manuals relating to policies and
16 procedures?
17    A    Yes, sir. Administrative as well as
18 operational, yes.
19    Q    And your whole career you had operated under
20 these pretty rigid policies and procedures at the
21 Kentucky State Police; is that right?
22    A    Yes, for employment you have to. Yes.
23    Q    And for you, as a law enforcement officer with
24 the Kentucky State Police for 24 years, how did those
25 policies and procedures effect your daily routine?

Page 49

1     A    Well, I mean, obviously I tried to do the
2  right thing and anyway and -- and -- and work hard for
3  them. Hopefully I was a good employee for them. They
4  govern your -- your daily activities, yes. You have to
5  work within those policies and procedures if you want to
6  stay employed.
7     Q    So for instance if you were operating
8  laboratories as a commander --
9     A    Uh-huh.
10    Q    -- would you abiding by all of the evidence
11 retention policies and procedures of the KSP?
12    A    Yes, I would. I mean, I didn't, at that
13 point, I didn't investigate crimes. I was commander of
14 the -- of laboratory system which was consisted mainly
15 of -- of civilian personnel. I was a oversight in -- of
16 the analysts and administrative personnel of the
17 laboratories.
18    Q    You needed to make sure that everything was
19 operating --
20    A    Yes.
21    Q    -- properly, right?
22    A    Yes, yes.
23    Q    And when you were an investigating officer for
24 Kentucky State Police --
25    A    Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    Q    -- would you do your best to follow each of
2  the policies and procedures during a criminal
3  investigation?
4    A    Right.  You would, yes.
5    Q    And if you came into an altercation or some
6  sort of resistance with this citizen --
7    A    Uh-huh.
8    Q    -- did the Kentucky State Police have policies
9  and procedures that you would follow?
10   A    Sure, yes.
11   Q    Did you have training at the Kentucky State
12 Police on how to use force against citizens?
13   A    Right, we did.  As we -- at the academy, when
14 you're -- when you're first hired.  You go through
15 defensive tactics and -- and so forth.  You're training
16 in the academy as well as you have annual in services,
17 40 hours each -- each year.
18   Q    Did you go outside training on how to use
19 force when you were employed at the Kentucky State
20 Police?
21   A    No, sir.  No, sir.  Not that I can recall.  I
22 don't remember going outside the Kentucky State Police
23 for any training.  They pretty much trained in house.
24   Q    Did the Kentucky State Police, when you left
25 there, have policies and procedures in place on how to

Page 51

1  deescalate a hostile situation?
2    A    Well, it was a type of use -- use of force
3  continual type thing, verbal and then escalates from
4  there.
5    Q    And did they have policies and procedures that
6  discuss that?
7    A    Use of force policy and procedure.
8    Q    And did you receive training that discussed
9  the use of force continuum?
10   A    Yeah, we would have, at the range,
11 qualifications for firearms qualifications.  Each range
12 qualification course we would discuss the use of force.
13   Q    And when I'm talking about training on the use
14 of force continuum, I'm not referring to whether you're
15 an accurate marksman, but rather --
16   A    Right.
17   Q    -- training on --
18   A    I understand.
19   Q    -- not, hopefully not, having to use --
20   A    Using the --
21   Q    -- the weapon.
22   A    -- using the amount of force necessary to
23 effect the arrest --
24   Q    Yeah.
25   A    -- basically.  Yes.

Page 52

1    Q    And the key would be using only the amount of
2  force needed to effectuate an arrest, correct?
3    A    Well, obviously that's the objective and a lot
4  of times, it, you know, it unfortunately, it don't work
5  out that way but that's the -- the process, yes.
6    Q    Well, when you were trained, did somebody
7  train you that you should use a baton before a taser?
8    A    Well, it depends on the situation, the tactics
9  and each situation's different.  A lot of times if
10 you're in a fight, you get whatever you can get your
11 hands on to, you know, like a baton or a taser or
12 whatever you can reach quickly to -- to protect yourself
13 and if you're, you know, in fear of your life.  In -- in
14 a controlled setting, or perfect situation, yes, you
15 would like that continuum to go up but, you know, the --
16 a lot of times it's not like that.
17   Q    Well, you would agree that officers of the
18 Knox County Sheriff's Department in 2016 should not have
19 used deadly force through a firearm unless they were in
20 fear that they were going to lose their own life,
21 correct?
22   A    Right.  Yes, you have to, I mean, if you're in
23 fear of your life, whatever means necessary to effect
24 the arrest and protect yourself, as well as others,
25 individuals, yes.  I mean, that would be the -- the last

Page 53

1  step on the continuum.
2    Q    And if somebody does not have a weapon, would
3  you agree that an officer in 2016, at the Knox County
4  Sheriff's Department, could not have a reasonable fear
5  of their life?
6    A    I don't agree with that statement.  I don't --
7         MR. WILLIAMS:  Object to the form.
8    Q    Why not?
9         MR. WILLIAMS:  You can answer but there's
10        going to be an objection.
11   A    I -- it -- it -- if a person, I mean, if
12 you're in a fight for your life, it doesn't matter if
13 they're a weapon or not if it's -- if it's an individual
14 that you're unable to contain, there's a weapon involved
15 because we always carry weapons.  They could get your
16 weapon so whether or not -- there's always a weapon
17 involved, whether or not they have one or not because
18 it's on your hip.  And it's very possible that if they
19 overpower you and get your gun, you're in fear of your
20 life and they could use it on yourself.
21   Q    Would you agree that an officer at the
22 Knox County Sheriff's Department in 2016 -- well, under
23 your testimony, would you agree that the person would
24 have to be close to the officer without a weapon, like
25 if the officer has a weapon, the citizen would have to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of John R. Smith, Taken on July 13, 2017

54..57

Page 54

1  be close enough to take that weapon in order to put the
2  officer in reasonable fear of --
3      A     Well as far as proximity --
4          MR. KELLEY:  Objection to form.
5      A     -- as far as proximity goes, I mean, they
6  could charge you or rush you.  I mean, it -- it's -- no,
7  I don't agree with that statement.  But --
8      Q     How many --
9      A     -- I mean, it could be -- they could charge
10 you or rush you.
11     Q     -- how many times have you shot somebody as a
12 Kentucky State Police Officer?
13         MR. WILLIAMS:  Object to other instances.  And
14     with that objection made, you may answer the
15     question.  Continuing objection, please.
16     A     I haven't -- I haven't shot anyone.
17     Q     And you spent about 24 years at the
18 Kentucky State Police, right, sir?
19     A     Yes, sir.
20     Q     And you used your law enforcement experience
21 as a Kentucky State Police officer to assist in creating
22 the policies and procedures at the Knox County
23 Sheriff's Department once you were elected, correct?
24     A     I did but let me -- let me clarify that
25 statement somewhat because I was a supervisor for most

Page 55

1  of my career.  I wasn't on the road every day.  I was, a
2  lot of times, at post behind a desk or in the laboratory
3  system, you know.
4      Q     Well, at the end of your career, you were,
5  right?
6      A     Well, after six year, I mean, I was a road
7  trooper for approximately six years.  But after that I
8  was a detective, Sergeant, which mostly -- and a
9  lieutenant, mostly was at the post.  I mean, you'd --
10 you'd get out in -- in certain situations and some but
11 on a daily basis, no.
12     Q     When you were at KSP, how many officers under
13 your command used deadly force?
14     A     That's hard to say, sir.  I mean, it -- I know
15 several that -- that have used it.
16     Q     Can you give an approximate number in those
17 24 years?  18 --
18     A     Well, again let me say that I was with the
19 laboratory system my last eight so that would be no, I
20 mean, I was mostly -- matter of fact, pretty much all my
21 personnel were civilian personnel.  They didn't carry
22 weapons and were not in a law enforcement capacity, were
23 not sworn officers.  While I was at post, I -- you're
24 asking for approximate, is that what you're asking me
25 for?

Page 56

1      Q     Yeah.
2      A     I'm trying to count up.  Five or six.
3      Q     And on how many of those --
4      A     That's just a rough guesstimate, I -- right
5  off the top of my head.
6      Q     -- sure.  Fair enough.
7      A     Yeah.
8      Q     And approximately of those five or six
9  instances, how many officers under your supervision use
10 deadly force on a person who is not holding a weapon?
11     A     I really don't know the situations on all
12 those.  I really, honestly, I really can't say.  And --
13 and I would hate to say and be wrong.  I -- I -- I
14 didn't investigate.  I -- all those I did as a
15 lieutenant investigate a trooper involved shooting,
16 which involved two -- two deputies out of the
17 London State Police post and they were shot at and
18 returned fire.  And, you know, that's -- I did
19 investigate that one.
20     Q     Let me ask you some questions about 2015 when
21 you --
22     A     Uh-huh.
23     Q     -- came into the sheriff's position.  So you
24 testified a few minutes ago that when you became
25 sheriff, you and Mr. Stewart --

Page 57

1      A     Uh-huh.
2      Q     -- began creating some written policies and
3  procedures for Knox County Sheriff's Department,
4  correct?
5      A     Correct, yes.
6      Q     And at the time you took over, you were
7  unaware of any policies or procedures at the Knox County
8  Sheriff's Department being in place from the prior
9  administration; is that right?
10     A     Correct.
11     Q     And when you took over in January 2015, you
12 actually had never seen any written policies or
13 procedures from Sheriff Pickard's administration,
14 correct?
15     A     Correct.
16     Q     Is it fair to say that when you took over as
17 sheriff, you were unaware of any policies or procedures
18 in place at the Knox County Sheriff's Department
19 instructing officers not to use deadly force unless
20 their life was in danger?
21     A     Could you repeat that, sir?
22     Q     Sure.  So I'm going to ask you some questions
23 about 2015 and whether you were aware of any policies or
24 procedures being in place when you took over on certain
25 topics, okay?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Mike Smith, taken on July 13, 2018

58..61

Page 58

1    A    Okay.

2    Q    When you started as the Knox County Sheriff in
3  January 2015, is it fair to say that you were unaware of
4  any policies or procedures in place in Knox County that
5  gave guidance to officers on how to use force?

6    A    I agree.  I -- I didn't ask for any.  I didn't
7  ask to review them.  I came in, I had law enforcement
8  experience, so I wanted to develop my own, per se, with,
9  you know, looking at different policies from law
10 enforcement's agencies as well as KACO policies.  And we
11 wanted to adopt the, you know, get all the input from
12 everywhere to -- to make good policies, obviously.  But
13 I didn't ask for any when I came in.  I -- I didn't see
14 any.  I didn't -- you have to understand, too, I mean,
15 I'm -- I won the election, he was an incumbent, and I
16 won and there wasn't a whole lot of dialogue that went
17 on at that point.  We were cordial and -- but that's --
18 we -- I didn't ask him for anything.

19   Q    Fair enough.

20   A    Yeah, yeah.

21   Q    And I know you'd generally answer that you
22 didn't see any written policies and procedures --

23   A    I --

24   Q    -- I just need to ask you about specific
25 topics.  Okay?

Page 59

1    A    Sure, okay.

2    Q    To your knowledge, prior to you taking over in
3  January of 2015, did Knox County have any written
4  policies or procedures instructing officers not to use
5  deadly force unless their life was in danger?

6    A    I don't know prior to 2015, I -- I'm not aware
7  of any.

8    Q    When you started as Sheriff in 2015, to your
9  knowledge, did Knox County have any policies or
10 procedures that gave guidance to officers on the
11 continuum of use of force?

12   A    Not to my -- I -- to my knowledge, I didn't
13 see any.

14   Q    When you took over as sheriff in 2015, to your
15 knowledge, did Knox County have any policies or
16 procedures relating to de-escalation techniques with
17 citizens?

18   A    I didn't see any.  I didn't -- when I took
19 office, I didn't see any, sir.

20   Q    To your knowledge, when you took over as
21 sheriff in 2016, did Knox County have any --

22   A    '15 2015.

23   Q    -- 2015.

24   A    Yes.

25   Q    Apologize.

Page 60

1    A    That's all right.

2    Q    Did Knox County have any policies or
3  procedures regarding internal investigations into the
4  use of force?

5    A    Not to my knowledge.  I -- I mean, I didn't
6  see any.

7    Q    When you took over as sheriff in 2015,
8  January 2015, did Knox County have any policies or
9  procedures on how officers should interact with citizens
10 exhibiting times of mental health conditions?

11   A    I didn't see any.

12   Q    When you took over as sheriff in
13 January of 2015, were you aware of any unwritten
14 policies or procedures in place at the Knox County
15 Sheriff's Department that gave guidance to officers on
16 the use of force continuum?

17   A    I didn't see any.

18   Q    Were you aware of any unwritten policies or
19 procedures in place at Knox County Sheriff's Department
20 when you took over in January of 2015 that provided
21 guidance to officers on when it was appropriate to use
22 deadly force?

23   A    I didn't see or review any of those.

24   Q    When you took over as sheriff in
25 January of 2015, were you aware of, or did Knox County

Page 61

1  have any unwritten policies or procedures relating to
2  de-escalation techniques?

3    A    I --

4         MR. WILLIAMS:  Requiring to speculate as to as
5  to unwritten policies.  This individual has
6  testified on several questions now that he wasn't
7  aware or wasn't provided anything when he started
8  and as I understand it, didn't ask to be provided
9  anything.  So --

10        MR. SLOSAR:  Well, certainly --

11        MR. WILLIAMS:  -- I mean, why can't his
12 answer, as we started this litany of questions, be
13 in response to all of these?

14        MR. SLOSAR:  Because he, three deputies,
15 stayed over, it is absolutely plausible that the
16 sheriff could've learned of any unwritten policies
17 or procedures in place from those deputies who
18 stayed over under the new administration.  He's
19 still saying that he has, that based on what he
20 knew, there were no unwritten policies or
21 procedures.

22        MR. WILLIAMS:  Seems like that perhaps the way
23 to resolve this line of questioning would be, are
24 you aware of any written or unwritten policies from
25 the prior administration, as opposed to going

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 19 of 86 - Page
ID#: 4878
The Deposition of DAVID SMITH, taken on May 15, 2019
62..65

Page 62

1    through each topic and subtopic of the use of force
2    policy, but --
3          MR. SLOSAR:  I understand, Jason.  I'm not
4    going to keep us here all day, but I've got some
5    questions I'm going to ask.
6          MR. WILLIAMS:  Okay.  Well, I hope it doesn't
7    go on too long on this line of questioning but none
8    of the folks that you've identified, the Sheriff's
9    identified, here were involved in the incident
10   involved in this lawsuit but we'll proceed.
11         MR. SLOSAR:  Yeah.
12         MR. WILLIAMS:  Go ahead and ask your
13   questions.  We'll --
14         MR. SLOSAR:  I --
15         MR. WILLIAMS:  -- I've made my statements.
16         MR. SLOSAR:  -- we, you know, for us, this
17   absolutely relates for an opening.  I'm sure you
18   understand how we litigate those.
19   BY MR. SLOSAR:
20   Q    So, sir, are you aware of, based on your
21   knowledge, from when you took over as sheriff of
22   Knox County in 2015, were there any unwritten policies
23   or procedures in place relating to internal
24   investigations of the use of force?
25   A    I'm not aware of any, sir.

Page 63

1    Q    And when you took over as sheriff in 2015,
2    were you aware or did Knox County, to your knowledge,
3    have any unwritten policies or procedures on how to
4    interact with citizens exhibiting signs of mental health
5    conditions?
6    A    Not that I'm aware of.
7    Q    And when you took over as sheriff in
8    January of 2015, were you -- let me withdraw that
9    question. When you started as sheriff in January 2015,
10   did Knox County Sheriff's Department have any training
11   program that provided deputies with training on when to
12   use deadly force?
13   A    The only thing I'd be familiar with is,
14   each -- each sworn officer has 40 hours of in-service
15   training at Department of Criminal Justice Training and
16   I -- I would say at that point, I'm -- I'm just
17   speculating on that but I, we all have 40 hours of
18   in-service each year.
19   Q    That you have to do?
20   A    Yes.
21   Q    Okay.
22   A    Through -- through Department of Criminal
23   Justice Training, yes, to -- to remain a certified
24   police officer.
25   Q    Now, when you took over as sheriff in

Page 64

1    January of 2015, did the Knox County Sheriff's
2    Department have any in house training program providing
3    guidance to officers on when to use force?
4    A    I'm not familiar with -- with anything that
5    they might've had.
6    Q    And, in fact, even today, is that fair to say
7    that the Knox County Sheriff's Department does not have
8    any in house training program to officers on when it's
9    appropriate to use force?
10   A    We use, yes, we have, since 2015 we've had,
11   they call it a fast machine where you have simulated
12   scenarios through a TV screen and -- and -- I -- I had
13   them go through those --
14   Q    Okay.
15   A    -- through KACO.
16   Q    What kind of machines is that?
17   A    It's a -- it's a -- I'm trying to think.  It's
18   a simulated firearms reaction training system.  And it's
19   a -- it's a shoot, don't shoot, type scenario where
20   each -- I had each of my officers go in and -- and go
21   through a -- a series of -- of scenarios, probably four
22   or five, and it's simulated domestic type situation,
23   simulated shooting type situations.  And in addition to
24   that, you know, they've had their -- their annual
25   training at Department of Criminal Justice Training.

Page 65

1    And each -- each range that we have, I have them review
2    the use of force policy at each range.  And also some of
3    those trainings each year consist of firearms instructor
4    training in which Deputy Ashurst attended the and
5    successfully passed that course at -- to become a
6    firearms instructor, certified firearms instructor for
7    our department.
8    Q    When did he pass that?
9    A    Sir, it was prior to this incident, months
10   prior to it.
11   Q    And as part of that certified firearms
12   instructor course --
13   A    Uh-huh.
14   Q    -- what type of stuff --
15   A    Would they --
16   Q    -- would Deputy Ashurst have learned?
17   A    It would obviously be skills, firearms kills
18   would be part of it.  The other part --
19   Q    So like marksmanship?
20   A    -- marksmanship skills.  The other part would
21   be how to train personnel as far as marksmanship skills.
22   Would be KRS, Kentucky Revised Statute pertaining to the
23   use of force.  And, I guess, the policy assistance if
24   they needed help in departments as far as probably
25   developing policy.  They would -- they would probably

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

```
 1  assist them in that, as well.  It's a -- it's a two week
 2  course.
 3      Q    And where was that at?
 4      A    Department of Criminal Justice Training in
 5  Richmond, Kentucky.
 6      Q    Have you taken that course?
 7      A    No, sir.  I'm not a firearms instructor,
 8  certified.
 9      Q    Were you present when that course was taken?
10      A    No, sir.
11      Q    How do you know exactly what Mr. Ashurst
12  would've learned in that course?
13      A    Well, I just --
14          MR. WILLIAMS:  Objection.  He didn't testify
15  he knew exactly what occurred.
16          MR. SLOSAR:  Well, he testified pretty
17  specifically, Jason.
18          THE WITNESS:  Well, you asked me what I
19  would --
20          MR. SLOSAR:  Like --
21          THE WITNESS:  -- assume what would be in that
22  course and that's what I would assume that they
23  would go over.  Obviously, marksmanship skills for
24  a firearms instructor.  They have to -- they
25  have -- to pass the course, I know that you have to
```

Page 67

```
 1  qualify a certain level and otherwise -- yeah.
 2  BY MR. SLOSAR:
 3      Q    I understand --
 4      A    Yeah.
 5      Q    -- that marksmanship would be a part of it --
 6      A    Right.
 7      Q    -- but you also testified that it would've
 8  also involved policies and procedures --
 9      A    Uh-huh.
10      Q    -- from KSP on when to use it.
11      A    I didn't say KSP, did I?  If I did, I didn't
12  mean KSP.
13          MR. KELLEY:  I don't think you did.
14      A    Let me make sure I had what you testified to.
15      A    Okay, yeah.
16      Q    Okay.  So you testified that part of that
17  course would've required Deputy Ashurst to be tested on
18  his skills --
19      A    Uh-huh.
20      Q    -- relating to shooting skills, correct?
21      A    Right.  Yes, sir.  Yes.
22      Q    And another part of it you said that
23  Deputy Ashurst would've also learned to train people on
24  marksmanship, correct?
25      A    Because he would be training people from our
```

Page 68

```
 1  department and on the -- on the range.
 2      Q    I understand.
 3      A    So I would assume that they would have
 4  knowledge, give him knowledge to do that.
 5      Q    Now, what else did you believe was a part of
 6  that course?
 7      A    I would -- I would think that a part of that
 8  course would be the laws, KRS, Kentucky Revised Statute
 9  pertaining to use of force.
10      Q    That's Kentucky Revised Statutes?
11      A    Yes.
12      Q    Okay.  But you don't have any actual knowledge
13  and you don't have any direct knowledge that Mr. Ashurst
14  was training on KRS use of force statutes?
15      A    I -- I don't have direct knowledge of that,
16  no.
17      Q    Okay.
18      A    That would just be my --
19      Q    You're just guessing?
20      A    -- yeah, my guess as to -- as to what they
21  went over in the course.  I mean, you could probably get
22  a curriculum from Department of Criminal Justice
23  Training that would outline what they, kind of, go over.
24      Q    Prior to today, you've gotten that curriculum,
25  correct?
```

Page 69

```
 1      A    I haven't asked for it.  I, you know.
 2      Q    I know you could but I'm saying --
 3      A    Right, right.
 4      Q    -- I'm just asking specifically.
 5      A    No, I haven't.  I haven't.
 6      Q    All right.  Now, this simulated firearms
 7  training system --
 8      A    Uh-huh.
 9      Q    -- what year did you first start sending
10  people?
11      A    I think it was -- it was after I, obviously
12  after I got in as Sheriff.  I -- I would have -- I can't
13  say exactly.  I would have to get with KACO and -- and
14  see.  They brought the machine down to us.  They -- it's
15  a pretty expensive machine and they -- they go around to
16  law enforcements agencies and you can -- you can borrow
17  the -- the machine and I would have to check with their
18  records, sir.  And I -- I'm not sure.
19      Q    Okay.
20      A    Yeah.
21      Q    Nobody, I think your lawyers will tell you the
22  same thing.  Nobody wants you to guess today under oath.
23      A    No, no, no.  And I -- I mean, I'm telling you
24  as accurate as I can be.
25      Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    A    Yeah.
2    Q    And you don't have any documentation back that
3  the sheriff -- well, let me ask you a better way.  If
4  Deputy Ashurst went to the simulated firearms training
5  system --
6    A    Uh-huh.
7    Q    -- would that have been documented as part of
8  his personnel file at Knox County?
9    A    No, I -- I think my Sargent would've had
10 everybody come in.  It would -- I just told them to, you
11 know, contact the deputies and make sure they go through
12 the system and based on different scheduling shifts that
13 they work, we had it, I think, approximately a week set
14 up to where it would accommodate different schedules and
15 so forth.
16   Q    So we would have no way, sitting here today,
17 to know when exactly Mr. Ashurst took this, correct?
18   A    Not particularly him, we could -- I could
19 check with KACO and see when they brought the machine to
20 us, as far as when we had it and see if they had
21 documentation of that but as far as each individual
22 deputies going through the system, no.
23        MR. WILLIAMS:  Elliot, we've been going about
24 an hour-and-a-half, is this a good place to take a
25 break?

Page 71

1        MR. SLOSAR:  My goodness, has it been that
2  long already?  Of course.
3        THE WITNESS:  It seems like just a minute ago.
4        VIDEOGRAPHER:  The time is 12:29 and we are
5  off record.
6             (OFF THE RECORD)
7        VIDEOGRAPHER:  The time is 12:42.  We are on
8  the record.
9  BY MR. SLOSAR:
10   Q    Sir, sitting here today, it was your
11 recollection that Mr. Ashurst completed his certified
12 firearms instructor several months before the shooting
13 death that we're here to talk about today.
14   A    Yeah, I'm not sure the time frame before but
15 it was -- it was before.  I'm not exactly if it was
16 months, a month, two months, but it was prior, yes.
17   Q    And aside from Mr. Ashurst having learned
18 marksmanship in that course, it's to your understanding
19 that he also would've learned how to train others in
20 your department on how to be accurate shooters, correct?
21   A    Yes, I would assume that because it's a
22 firearms instructor course and he would have to come
23 back and train or certify other deputies.  So yes, I
24 would assume that.
25   Q    And I'll show you his personnel file later.

Page 72

1  But according to some documents we were produced, it
2  looks like Mr. Ashurst completed that course
3  May 6, 2016.  Does that seem right to you?
4    A    Yes, if that's on the documentation, yes.
5    Q    Now, if policies and procedures -- well, is it
6  fair to say that when you took over as sheriff, you
7  weren't comfortable with the standard of training that
8  was in place at the Knox County Sheriff's Department as
9  it relates to the use of force?
10   A    I'm not sure what --
11       MR. WILLIAMS:  Let me make a continuing
12 objection to the prior department and other
13 instances.  With that objection made, you can answer
14 it.  Thanks.
15       THE WITNESS:  I'm not sure what they had.  I
16 just wanted to implement ours at that time as a new
17 sheriff incoming.  I mean, I'm not sure what --
18 what they had prior, but I just wanted to implement
19 ours.
20 BY MR. SLOSAR:
21   Q    Would You agree with the proposition that the
22 use of deadly force is the most important decision a law
23 enforcement officer can make in their capacity?
24   A    Life is important, yes.
25   Q    There's nothing more important about the

Page 73

1  process that takes place before a law enforcement
2  officer decides to use a gun to shoot at someone.
3    A    That's extremely important, yes.  I would
4  agree it's extremely important, yes.
5    Q    And law enforcement officers are trained that
6  if they are going to fire a gun, that they better be
7  shooting to kill, correct?
8    A    They're trained in the use of firearms and
9  yes, to respect life.
10   Q    Because if you're not in fear of your own
11 life, you should not be firing a weapon to injure
12 someone, correct?
13   A    Well --
14       MR. WILLIAMS:  Object to the form of the
15 question.
16   A    -- according to state laws I think it's to
17 assist others, as well.  Not necessarily if someone is
18 attacking an individual with -- with, you know, blunt
19 force or weapon, you wouldn't obviously stand by and let
20 them -- let them do that.
21   Q    Sure.  But again, if here relating to the
22 shooting death of Jessie Mills, there's no allegation
23 that there was a third party that --
24   A    No.
25   Q    -- Deputy Ashurst was trying to protect --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    A    No.
2    Q    -- when he fired his weapon, correct?
3    A    He had -- they had a child, what my
4  understanding was they give the child -- got the child
5  to safety first and then was dealing with him, yes.
6    Q    So we're going to take the third party stuff
7  out of this.
8    A    Okay.  Right.
9    Q    All right.  Now --
10        MR. WILLIAMS:  And by third parties, do you
11        mean, not including Constable Bolton or --
12        MR. SLOSAR:  Sure.
13  BY MR. SLOSAR:
14    Q    Well, let's talk about Constable Bolton.
15    A    Uh-huh.
16    Q    Is Constable Bolton still employed at the Knox
17  County Sheriff's Department.
18    A    He never was employed.
19        MR. KELLEY:  Objection.
20    A    He never was employed with the Knox County
21  Sheriff's Department.  He was a -- a constitutionally
22  elected officer.
23    Q    In 2016, when you became Knox County Sheriff
24  in 2015, were there any policies or procedures that
25  you're aware of, that would provide guidance to

Page 75

1  Constable Bolton on when it was appropriate for him to
2  use force?
3        MR. KELLEY:  Objection.
4    Q    You can answer.
5    A    No, I -- I'm not familiar with any.  I mean,
6  it's not through the Sheriff's office.  It would be him
7  individually or it's a constable position, yeah.
8    Q    To this day, prior to the shooting death of
9  Jessie Mills in 2016, did you ever request that
10  Constable Bolton receive any training relating to the
11  use of force?
12    A    It was not my position to do that.  He was not
13  of my employee.
14    Q    I understand.  My question's --
15    A    Uh-huh.
16    Q    -- a little bit more specific.
17    A    Okay.
18    Q    I understand your position --
19    A    Yeah, right.
20    Q    -- is that it wasn't your responsibility.
21    A    Right.
22    Q    But I'm going to ask you a different question,
23  which is, prior to the shooting death of Jessie Mills in
24  2016, did you ever request that Constable Bolton receive
25  any training relating to the use of force?

Page 76

1    A    No, I didn't request it.
2    Q    Prior to the shooting death of Jessie Mills in
3  2016, had you ever provided Constable Bolton with any of
4  the written policies or procedures of the Knox County
5  Sheriff's Department?
6    A    Again, he was not my employee so he -- I
7  didn't provide him with policies and procedures that I
8  provided my deputies with.
9    Q    Provided -- let me withdraw that.  Prior to
10  the shooting death of Jessie Mills in 2016, did you ever
11  communicate any unwritten policies or procedures of the
12  Knox County Sheriff's Department to Constable Bolton
13  relating to the use of force?
14    A    No.
15    Q    Prior to the shooting death of Jessie Mills in
16  2016, did you ever communicate any practices relating to
17  the use of force with Constable Bolton?
18    A    No.
19    Q    Prior to the shooting death of Jessie Mills in
20  2016, is it fair to say that you did not have any
21  knowledge of any training that Constable Bolton received
22  relating to the use of force?
23    A    He's an elected -- elected constable.  I'm --
24  I don't think they require to have any type of prior
25  training.  I'm not positive on that but I don't think

Page 77

1  they are, but no.
2    Q    You are unaware of it, correct?
3    A    I'm unaware of any.
4    Q    But you were aware that Constable Bolton in
5  2016 carried a weapon on him, correct?
6    A    Yes.
7    Q    And by the time of the shooting death of
8  Jessie Mills, you were also aware that Constable Bolton
9  regularly engaged in ride-a-longs with deputies of the
10  Knox County Sheriff's Department, correct?
11    A    Correct.
12    Q    And in fact, prior to the shooting death of
13  Jessie Mills, you were aware that Constable Bolton
14  regularly did ride-a-longs with Deputy Mikey Ashurst,
15  correct?
16    A    Correct.
17    Q    Now, when was the last time that the written
18  policies and procedures of the Knox County Sheriff's
19  Department were updated?
20    A    Probably as recently as the last six months.
21    Q    And we don't have those, so do you recall
22  which written policies and procedures would've been
23  updated about six months ago?
24    A    We had, I guess it's just a added -- added
25  policy was a confidentiality type policy concerning



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  information that we, as officers, get on individuals.
2      Q    Okay.  So there were no policy revisions in
3  the last six months relating to use of force; is that
4  right?
5      A    No.
6      Q    And in the past six months there were also no
7  policies or procedure revisions relating to internal
8  investigations?
9      A    No.
10     Q    When was the last time that the written
11 policies or procedures of the Knox County Sheriff's
12 Department were changed relating to use of force?
13     A    I don't know that they were changed or
14 modified since the initial policy was adopted.
15     Q    And do you recall, I know that you testified
16 earlier in that yourself and Mr. Williams --
17     A    Stewart, William Stewart.
18     Q    -- William Stewart drafted the policies and
19 procedures of the Knox County Sheriff's Department after
20 you became sheriff; is that right?
21     A    Correct, correct, yes.
22     Q    And is it fair to say that that process took
23 about a year for yourself and Mr. Stewart to complete?
24     A    It was a process.  I'm not sure exactly how
25 long it took but obviously it was a process we started

Page 79

1  from, you know, drafting all these policies.
2      Q    I'm going to show you what we'll mark as
3  Exhibit number 2, sir.  These are not your written
4  policies and procedures, but these are some policies and
5  procedures that were handed over to us in a different
6  litigation, the Hoskins case, in which we have tendered
7  again in this case.  Sir, you testified in a different
8  deposition when you became sheriff, that you had
9  never seen the written policies and procedures that are
10 before you as Exhibit number 2; is that correct?
11          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
12     A    That's correct.
13     Q    Okay.  And I want to ask you some questions
14 about -- well, first of all, when you became Sheriff,
15 did the Knox County Sheriff's Department have personnel
16 files?
17     A    Yes.  Yes.  I think -- I'm not exactly sure
18 which ones, but yes.
19     Q    To this day, have you ever seen the personnel
20 file for Sheriff Pickard?
21     A    No, sir.
22     Q    Have you ever seen the personnel file for
23 Deputy Eubanks?
24     A    No, sir.
25     Q    Have you seen the personnel files for the

Page 80

1  three deputies that you testified to earlier that were
2  retained after you took over as sheriff?
3      A    I don't recall seeing those.  I know we
4  started some.  We started then when I got sheriff on
5  some on those individuals.
6      Q    Okay.
7      A    But I don't recall seeing those.
8      Q    Now, would you agree that it would be an
9  insufficient policy and procedure relating to use of
10 force where the policy and procedure says to its
11 officers: "use only force necessary to effect arrest as
12 trained?"
13          MR. WILLIAMS:  Let me make a continuing
14     objection to any questions about the prior
15     administration and the contents of those policies.
16     This individual is testifying in relation to the
17     Jessie Mills case and his administration and his
18     officers and what occurred in that case.  So I'm
19     not going to allow him to be used as a critique or
20     let him interpret or go over policies that he has
21     indicated that he has never read or didn't know
22     existed.  So I would direct him not to answer any
23     questions about policies from the prior
24     administration.
25          MR. SLOSAR:  Jason, that speaking objection is

Page 81

1  inappropriate and the direction to not -- to
2  instruct a 30(b)6 witness not to answer questions
3  about policies and procedures that were in effect
4  beginning in 2014 and carrying over until new
5  written policies and procedures were in effect, is
6  one inconsistent with the 30(b)6 notice and the
7  reason why we're here today, which is going back
8  ten years.  And two, this is obviously related to
9  our mono claims and the lack of training in place
10 of the Knox County Sheriff's Department.  So if you
11 want to instruct him not to answer it, that's fine.
12 I'll do a motion to compel and we'll be back here
13 in a couple of weeks when the Court overrules this
14 objection.
15          MR. WILLIAMS:  Well, let me say this.  There
16 is no requirement under Kentucky law for any
17 sheriff's department to have a policy manual --
18 policy that the training of deputy sheriffs in
19 Kentucky is controlled by statutes and that's done
20 by the Kentucky Department of Criminal Justice
21 Training in Richmond.  The officer in this case
22 went through and completed that training and has
23 completed the updates required by law.
24          MR. SLOSAR:  Jason, what is the basis of the
25 objection?  This is like -- I don't know what is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  going on right now.
2      MR. WILLIAMS:  I needed to respond to what you
3  just said and I'm doing so on record.
4      MR. SLOSAR:  You have a mono claim that says
5  there is a lack of supervision, training, policies
6  and procedures in Knox County that has occurred
7  over a period of years that directly led to the
8  constitutional tort that brings us in Federal
9  Court, which is the murder of my client and I am
10 questioning the sheriff who took over in 2015 who
11 you have produced as a 30(b)6 witness in response
12 to our notice.  So I don't -- I don't -- like I
13 understand that when you file a summary judgment
14 brief, you're going to say all the things you're
15 saying now.  But please give me a legitimate basis
16 for you to instruct this 30(b)6 witness not to
17 answer questions about policies and procedures that
18 were in effect a year before my client was shot and
19 killed.
20     MR. WILLIAMS:  Number one, these are policies
21 and procedures from a prior administration.  And
22 number two, this individual has testified that he
23 did not create, prepare, amend and I think said he
24 didn't review or ask to review those documents.
25 And I think in prior deposition and testimony today

Page 83

1  he has testified today that he hadn't seen those
2  when he became sheriff.  So for him to be asked to
3  testify about a policy that he is unaware of is
4  just not appropriate. And completely unrelated to
5  this case.
6  BY MR. SLOSAR:
7      Q    Sir, do you have the use of force policy in
8  front of you?
9      MR. WILLIAMS:  Are you talking about this --
10 these? Yes, I do.
11     Q    Please hand them -- please go there.
12     MR. WILLIAMS:  It's Section 6.
13     MR. SLOSAR:  Oh, yeah.  I'm sorry.
14     MR. WILLIAMS:  It's on page 6.
15     THE WITNESS: It's on page 6?
16     MR. WILLIAMS:  No, it's not on page 6.
17     MR. SLOSAR:  I don't have page numbers.
18     MR. WILLIAMS:  It's on the back here.
19     THE WITNESS:  Oh, okay.  On the back.  Okay,
20 got you.  Yes.  Okay.  I have it in front of me.
21 BY MR. SLOSAR:
22     Q    Do you have that policy and procedure in front
23 of you, sir?
24     A    I do.
25     Q    Okay.  In 2014, based on your 24 years of

Page 84

1  experience with the Kentucky State Police, would this
2  written policy and procedure leading to the use of force
3  have been sufficient guidance for officers of the
4  Knox County Sheriff's Department to understand when the
5  use of force was necessary?
6      MR. WILLIAMS:  Object to the form of the
7  question and based upon my prior objection, direct
8  the witness not to answer.
9      Q    Are you taking the advice of your counsel and
10 declining to answer this question, sir?
11     A    Yes, sir.
12     Q    Now, you know what, I actually think that
13 this -- I'd like to save us all some time from not
14 having to come back again.  I actually think that it's
15 appropriate to call the magistrate of the
16 District Court.
17     MR. WILLIAMS:  Okay.
18     MR. SLOSAR:  So let's go off the record and
19 get the phone.
20     MR. WILLIAMS:  Okay.
21     VIDEOGRAPHER:  Okay.  The time is 1:00 P.M.
22 We are off the record.
23          (OFF THE RECORD)
24     VIDEOGRAPHER:  Okay.  The time is 1:17.  We
25 are on the record.

Page 85

1  BY MR. SLOSAR:
2      Q    Sheriff, do you see the policy and procedure
3  in front of you?
4      A    Yes, I do.
5      Q    Okay.  If this policy and procedure was in
6  place when you took office, would it have sufficiently
7  provided guidance to Knox County deputies on when it was
8  appropriate to use force?
9      MR. WILLIAMS:  Previously, I directed the
10 witness not to answer this question.  Based upon
11 that prior objection and these discussions, I
12 preserve that objection, but you may answer the
13 question, Sheriff.
14     MR. SLOSAR:  Thank you.
15     MR. WILLIAMS:  As best you can.  Thank you.
16     THE WITNESS:  I would have added more.
17 BY MR. SLOSAR:
18     Q    And why would you have added more, sir?
19     A    That's -- I mean, each administrator is
20 different.  I mean, I would have -- I would have been a
21 little more detailed.
22     Q    Would you agree that this written policy and
23 procedure does not provide any guidance to Knox County
24 deputies on the use of force continuum?
25     MR. WILLIAMS:  Same continuing objection, but

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 25 of 86 - Page
ID#: 4884
The Deposition of JOSEPH PICKARD, taken on May 15, 2019

86..89

Page 86

1    you may answer.
2        A    I would have added more, yes.
3        Q    And in response to my question, do you agree
4    that there -- that this written policy and procedure
5    doesn't provide any guidance to Knox County deputies on
6    the use of force continuum?
7        A    I agree it's pretty basic and I would like to
8    have my deputies have a little more.
9        Q    Okay. And why -- why would you have wanted
10   your deputies to have more guidance on the use of force
11   than what this written policy and procedure provides?
12       A    I would say it's an extremely important issue
13   that we deal with, you know, a lot. And I would like to
14   have a little more detail, a little more guidance,
15   concerning that.
16       Q    But do you agree that in 2015 when you took
17   over as sheriff that law enforcement agencies such as
18   the Knox County Sheriff's Department needed to provide,
19   or have in place, some form of formal training for the
20   use of force for its deputies in place?
21       A    They -- when they go through the academy they
22   get that -- and department of criminal justice training.
23   And, you know, a lot of in-services cover that type
24   response to resistance type force.
25       Q    Prior to January of 2015, you have no direct

Page 87

1    knowledge as to whether any in-service training occurred
2    at the Knox County Sheriff's Department, correct?
3        A    No, sir. Correct.
4        Q    And the written policy and procedure in front
5    of you doesn't provide any meaningful guidance on -- to
6    Knox County deputies on when the use of force is
7    appropriate, correct?
8            MR. WILLIAMS: Object to the form.
9        A    Correct.
10       Q    In fact, the written policy and procedure
11   that's in front of you does not provide any guidance to
12   Knox County officers on when the use of deadly force is
13   appropriate, correct?
14           MR. WILLIAMS: Object to the form.
15       A    It says "Necessary to effect the arrest." I
16   would prefer more, but that's -- that's what it has.
17       Q    So if this written policy and procedure is
18   what a Knox County deputy was provided prior to using
19   deadly force, would you agree that this would not have
20   provided that deputy with proper guidance on when deadly
21   force was appropriate?
22           MR. WILLIAMS: Note an objection. Object to
23       the form.
24       A    It would depend on the deputy's interpretation
25   of it. Necessary force necessary to effect the arrest

Page 88

1    as trained. They would have to rely on their training.
2        Q    And sitting here today, in your 24 years of
3    experience with the Kentucky State Police, you were
4    getting annual training there, right?
5        A    Yes, sir. We received annual training. And
6    to my knowledge, deputies receive annual training prior
7    to their training as well.
8        Q    That annual training doesn't just relate to
9    use of force, does it?
10       A    No, sir. It's various topics, yeah. You
11   don't -- there's use -- there's use of force
12   in-services. There's school resource officer in -- it
13   varies. I could go on but there's just various topics
14   that they train on each year.
15       Q    Does the Knox County Sheriff's Department keep
16   track of which in-service trainings deputies go to?
17       A    Department of Criminal Justice Training does.
18       Q    And would they -- do you -- do you -- does the
19   Knox County Sheriff's Department, or you as sheriff, do
20   you ever receive annual updates on which training --
21       A    Yes.
22       Q    -- deputies go to on an annual basis?
23       A    We actually schedule deputies for their
24   training. They have a catalog of classes and we -- we
25   actually schedule those deputies for their training.

Page 89

1        Q    And is that -- are those documents maintained
2    as part of their personnel file?
3        A    It's a part -- it's in -- it's a database we
4    have. It's online through Department of Criminal
5    Justice Training. Our supervisors can get online and
6    see just -- put their deputy's name in and see which
7    trainings they've had. It's a database file.
8        Q    Prior to the shooting of Jessie Mills in 2016,
9    have you ever reviewed any of the databases to determine
10   which training Deputy Asher has received outside your
11   department?
12       A    No, but we had scheduled him that year for the
13   firearms instructors training course.
14       Q    And again, you testified earlier, that the
15   firearms instructor's course would have for sure tested
16   Mr. Asher's ability on how to shoot accurately, correct?
17       A    Yes.
18       Q    And would have also trained Mr. Ashurst on how
19   to train other deputies on how to shoot people
20   accurately, correct?
21       A    Well, have -- yeah. To maintain proficiency
22   with the firearm, yes.
23       Q    Yeah. Outside of Mr. Ashurst being able to
24   shoot accurately, you have no other direct knowledge of
25   anything else he learned in that course, correct?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 26 of 86 - Page
ID#: 4885
The Deposition of James Barth, Taken on July 13, 2018
90..93

Page 90

1    A    No, sir.  No, sir.  There's -- like I said,
2  there's curriculum.  I'm sure you could get -- obtain
3  that curriculum and verify it.
4    Q    Now, when people have -- talk about when
5  somebody is hired now.
6    A    Uh-huh.
7    Q    Tell me -- tell us what the hiring process is
8  like at the Knox County Sheriff's Department.
9    A    They would submit application.  Based on the
10  application, if we wanted to proceed with that
11  individual, we would conduct a background -- a
12  background check on them as far as any criminal charges
13  and so forth like that to ascertain that.  And we would
14  check with other references that they had listed and
15  other departments they had worked with.
16    Q    After somebody is -- well, who makes the
17  hiring decisions today?
18    A    In my department?
19    Q    Yeah.
20    A    Or my agency?  I do.
21    Q    And have you made the hiring decisions at the
22  Knox County Sheriff's Department since you took over in
23  January 2015?
24    A    Yes.
25    Q    Okay.  After somebody is hired at the

Page 91

1  Knox County Sheriff's Department today, what type of
2  training takes place?
3    A    I've always hired certified police officers in
4  the state of Kentucky, so they would have already been
5  through the academy and they -- based on if they had
6  been unemployed for a period of over a year or so, I
7  would contact Department of Criminal Justice Training to
8  get them back up to speed as far as their qualifications
9  for -- as far as participation in their in-services and
10  then qualification for being a certified police officer
11  and making -- and ensuring that process.
12    Q    If they had been employed within a year prior,
13  what type of training would the Knox County
14  Sheriff's Department provide those deputies then?
15    A    We would obviously give them a copy of our
16  personnel -- policy and personnel manual.  Make sure
17  they review that.  And I would, again, make sure that
18  they have had their current year annual training with
19  the Department of Criminal Justice Training.  And
20  typically we let them do a ride-along with another --
21  another deputy, preferably a supervisor or sergeant to
22  get the layout of the county if they're not familiar
23  with it and kind of the general practices of our agency.
24  Or office, I'm sorry.
25    Q    Is Deputy Ashurst a supervisor or sergeant at

Page 92

1  the Knox County Sheriff's Department?
2    A    No, sir.
3    Q    Why not?
4    A    It's a very small department and we only
5  have -- I have a Captain and one sergeant.  And he's
6  just -- I haven't promoted him.  Really, I mean, we're
7  just a very small department.  We've got to have some
8  Indians and not all chiefs, you know.  I mean, we got to
9  have -- have people working the road and so forth like
10  that, which our sergeants do, but it's just a very
11  department.  I mean, I would consider him.
12    Q    Has he ever asked to be promoted before?
13    A    Yes, I think when I made the sergeant
14  promotion to Carl Frith.  I think he -- he put his hat
15  in the ring and -- but Carl, I mean, he -- he had had as
16  much or more time on and I -- I promoted Carl.  He had
17  had a lot -- a lot more years of service on and so
18  forth.
19    Q    Can you describe in 2016 what the hierarchy of
20  the Knox County Sheriff's Department looked like?
21    A    In 2016, it would have been my captain,
22  Tackett Wilson, administrative assistant,
23  William Stewart, and myself the Sheriff.  I didn't have
24  a sergeant at that point.
25    Q    And about how many deputies were in place in

Page 93

1  2016?
2    A    I think -- I'm thinking five.  I would have to
3  review, but I'm thinking five.
4    Q    Okay.  So it was about a department of just
5  under ten people?  Does that sound right?
6    A    Yes.
7    Q    Okay.
8    A    Yes.  Very small.
9    Q    So if somebody was being hired today, they
10  would be given a copy of the policies and procedures
11  manual?  Would you give that to them?
12    A    I would probably have my captain give that to
13  them.
14    Q    Okay.  And back in 2016 if somebody was hired,
15  that would have been Captain Tackett, right?
16    A    Yes.  Tackett was.
17    Q    Now, are there -- is there any documentation
18  at the Knox County Sheriff's Department that people have
19  to sign off on after they read a manual?
20    A    We've recently had a review of it and I think
21  Captain Johnson had them sign off on it, yeah.
22    Q    And can you explain why it is important for
23  documentation reflecting that people have signed off as
24  having reviewed the policies and procedures?
25    A    Right.  To ensure that they've read it and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  reviewed it.
2       Q    I'm going to take a wild guess with this one.
3  Is that something that you learned when you were at the
4  Kentucky State Police?
5       A    Yes.
6       Q    Yeah.  At the Kentucky State Police, when
7  there were updates to the policies and procedures manual
8  during your 24 years there, do you recall signing
9  documents reflecting that you had reviewed those
10 updates?
11      A    On occasions, yes.
12      Q    And the Kentucky State Police, to your
13 knowledge, when you signed off as having reviewed the
14 policies and procedures manual, was that documentation
15 where you signed off on it, was that maintained as part
16 of your personnel file?
17      A    No, not in the personnel file.
18      Q    You know where that would have been
19 maintained?
20      A    It would have been in the manual itself.
21      Q    Okay.  So you would sign the manual itself?
22      A    Yes.
23      Q    Okay.  Now, what about the Knox County
24 Sheriff's Department?  What does this document look like
25 that people have to sign?

Page 95

1       A    It would be through a supervisor that they
2  just initialed or reviewed it.
3       Q    Okay.  And would that documentation go in the
4  personnel file?
5       A    No.
6       Q    Where would it go?
7       A    It would be in the supervisor's notes or the
8  supervisor's file.
9       Q    What is a supervisor's file?
10      A    Well, it would be in their -- I mean, in their
11 personal files I guess in their office or their
12 possession.
13      Q    What -- what sort of files are you referring
14 to?
15      A    Files is kind of a general term.  I'm just
16 saying it would be at the discretion of the supervisor
17 to -- however he wanted to keep that documentation.
18      Q    So there's no -- is it your testimony that
19 there is no formal mechanism in place at the Knox County
20 Sheriff's Department for assuring that deputy is -- have
21 reviewed policy and procedure updates?
22      A    No, just --
23           MR. WILLIAMS:  Object to the form.
24      A    Supervisors are responsible for ensuring that
25 those updates get to them and that they -- deputies

Page 96

1  review the policies.
2       Q    And as sheriff in 2019, do you have any idea
3  how those supervisors convey the updates of the policy
4  and procedure manual?
5       A    They do it personally.
6       Q    What do you mean by that, sir?
7       A    Well, they would hand them -- if a revision
8  was made, they would hand them the policy personally and
9  instruct them to put it in their manual.
10      Q    And when you say put it in their manual, who
11 are you referring to?
12      A    The deputies.
13      Q    Okay.  So it is your practice now at the
14 Knox County Sheriff's Department that each deputy have a
15 written copy of the policies and procedures manual?
16      A    Yes.
17      Q    And do the deputies have to sign any sort of
18 documentation when they first receive that policy and
19 procedure manual?
20      A    No, it's -- again, it's the supervisor
21 instructs them to.  Gives them the manual and instructs
22 them to review it.
23      Q    And is it fair to say that those deputies
24 would have first been provided with a policies and
25 procedure manual at the time of their hiring?

Page 97

1       A    Yes, yes.  At the time of their hiring.
2       Q    And then would -- is it the practice of the
3  Knox County Sheriff's Department that -- let me withdraw
4  that.  But to your knowledge, there's no documentation
5  where the deputies have to sign --
6       A    No.
7       Q    -- verifying that they actually reviewed the
8  written policies and procedures in place; is that right?
9       A    Right.  That's right.  I just have the
10 supervisor to -- I entrust them to do that with them.
11      Q    And who was Deputy Asher's supervisor in
12 June of 2016?
13      A    It would have been Edward Johnson.
14      Q    When did Mr. Johnson leave Knox County to go
15 work for KSP?
16      A    Mr. Johnson?
17      Q    Yeah.
18      A    He's still with me.
19      Q    Oh, he's still with you?
20      A    Uh-huh.
21      Q    Somebody said -- earlier, I thought that you
22 testified that Edward Johnson was involved in the
23 investigation into Claude Hudson?  Did I -- did I
24 misunderstand that?
25      A    No, sir.  No, that was Kentucky State Police



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1 doing all that.  The investigation.
2     Q    Okay.
3     A    I don't think we've mentioned Edward Johnson.
4         MR. WILLIAMS:  That wasn't even done.
5         THE WITNESS:  To my knowledge, this was the
6     first time we've mentioned him.
7         MR. WILLIAMS:  It wasn't a Knox County
8     investigation.
9 BY MR. SLOSAR:
10    Q    I know it wasn't.  Yeah, no -- I had
11 Everett Johnson written down but I forgot why you
12 brought him up earlier.
13    A    In my testimony?
14    Q    Yeah, he was mentioned.
15    A    Maybe I --
16        MR. WILLIAMS:  Was he one of the three that
17    was from the prior --
18    A    No, I brought him.
19        MS. STAPLES:  Mr. Johnson is the one who
20    called Hudson and that's when Hudson said he was
21    resigning.
22        THE WITNESS:  Oh, yeah.  Yes.
23        MS. STAPLES:  According to my notes.
24        THE WITNESS:  Yes.
25        MR. SLOSAR:  Okay.

Page 99

1         THE WITNESS:  That's accurate.  Yeah, it was
2     during this investigation into Mr. Hudson.  Yeah.
3 BY MR. SLOSAR:
4     Q    Okay.  I assumed that when you said that
5 Everett called Hudson that he was calling on behalf of
6 KSP.  I didn't realize he was --
7     A    No, no.  He was -- he was with -- he was with
8 my office.
9     Q    Sorry about that.
10    A    No, that's all right.
11    Q    So Everett Johnson would have been
12 Deputy Ashurst' supervisor in June of 2016 when the
13 shooting took place; is that right?
14    A    Yes.
15    Q    Okay.  Prior to June 29, 2016, did you ever
16 have any conversations with Everett Johnson about
17 whether Mr. Ashurst was provided with the written
18 policies or procedures of the Knox County Sheriff's
19 Department?
20    A    No, it would have been on his initial hiring.
21    Q    Okay.
22    A    And he -- Tackett was there then.  So --
23    Q    So the best you can recall, Mr. Ashurst would
24 have been provided with whatever policies or procedures
25 were in place in April 2015 when he was hired, correct?

Page 100

1     A    Right.  Correct.  And I would have to check
2 with Captain Johnson to see if he had any discussions or
3 any -- I don't know what this means.
4     Q    Prior to today, you haven't had any
5 conversations with Mr. Johnson about what -- which
6 policies or procedures Mr. Ashurst was provided prior to
7 the shooting of Jessie Mills in June 2016?
8     A    Prior?  No.  No.
9     Q    Prior to today, have you ever had any
10 conversations with Mr. Johnson about any of the training
11 that Deputy Ashurst received on the use of force prior
12 to June 29, 2016?
13    A    No, not that I can recall.
14    Q    And prior to June 29, 2016, did you ever have
15 any conversations with Mr. Johnson about Deputy Ashurst
16 knowledge of the policies and procedures in place at the
17 Knox County Sheriff's Department relating to the use of
18 force?
19        MR. WILLIAMS:  Object to the form.
20    Q    You can answer.
21    A    Yes, I have.
22    Q    No prior --
23    A    Oh, prior to -- prior to today?
24    Q    Prior to June 29, 2016?
25    A    No.  No, I'm sorry.  No.

Page 101

1     Q    Okay.  When -- how long was Everett Johnson a
2 supervisor of Deputy Ashurst?
3     A    I'm not sure when they brought Everett in.  It
4 was after Tackett left.  I'd have -- I'd have to go back
5 and check the records.
6     Q    Okay.
7     A    I'm sorry.
8     Q    No, that's okay.  But Mr. Tackett,
9 Captain Tackett, --
10        MR. WILLIAMS:  It's Wilson actually.
11    Tackett Wilson.
12    Q    Captain Wilson --
13    A    I know it sounds like two last names.
14    Q    Yeah.
15    A    It does.
16    Q    -- Captain Wilson would have been the
17 supervisor of Mr. Ashurst prior to Everett Johnson
18 coming on board and taking over; is that right?
19    A    Yes, sir.  Yes, sir.
20    Q    Okay.  And when -- prior to June 29, 2016, had
21 you had any conversations with Captain Wilson about
22 which or whether Mikey Ashurst was provided with any
23 policies or procedures at the time of this hiring in
24 April 2015?
25    A    No, I don't recall any.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI    Doc #: 108-17    Filed: 02/10/20    Page: 29 of 86 - Page
ID#: 4888
The Deposition of Mikey Hotit, Taken on July 18, 2019

102..105

Page 102

1    Q    Okay.  Prior to June 29, 2016, did you have
2  any conversations with Captain Wilson about any training
3  that Mr. Ashurst received on the use of force?
4    A    No, I just asked --
5        MR. WILLIAMS:  Let me just object to the
6    extent that the question may be interpreted or
7    implied that the Knox County Sheriff's Department
8    is required to do so.  With that objection made,
9    you may answer.
10   A    No, other than his -- his necessary training
11 to be a certified police officer through the Department
12 of Criminal Justice Training and I always make sure of
13 that.
14   Q    Sure.  So as Sheriff, fair to say that you
15 assume that if somebody went to basic training at EKU,
16 that they had sufficient training and knowledge of the
17 policies and procedures in place at the Knox County
18 Sheriff's Department?
19   A    Not through Department of Criminal Justice
20 Training, but through our department.  He would receive
21 a manual.  They would instruct him on, you know, the
22 basic skills that's needed to be a certified Kentucky
23 police officer.
24   Q    I see.  But the -- at DOCJCT?
25   A    Yeah, the Department of Criminal Justice

Page 103

1  Training.
2    Q    You would agree that law enforcement officers
3  getting training there would not be provided with any of
4  the policies or procedures that relate to their
5  individual departments, correct?
6    A    I agree.  I agree with that.
7    Q    I guess the one exception could be that
8  Kentucky State Police if they talked about that there,
9  but --
10   A    I'm not sure.
11   Q    Not sure of that.  All right.  So fair to say
12 that prior to the shooting of Jessie Mills on
13 June 29, 2016, you did not have any communication with
14 supervisors of Deputy Ashurst about whether he received
15 written policies or procedures of Knox County?
16   A    That's general practice when they're hired to
17 get a policy and procedure manual.  I'm sure he did.
18   Q    Okay.  But you didn't have any specific
19 conversations with his supervisors about that, right?
20   A    No, I didn't have any questions or, you know,
21 about it.
22   Q    You assumed it happened just like it would
23 with the other employees, correct?
24   A    Yes.
25   Q    Okay.  And you relied on your supervisors --

Page 104

1    A    Yes.
2    Q    -- to make sure that when Mr. Ashurst was
3  hired that he would have gotten that policy or procedure
4  manual, correct?
5    A    Yes, sir.
6    Q    And it's fair to say that Mr. Ashurst -- your
7  understanding that he would have received whatever
8  written policies or procedures were in place at the time
9  of his hiring, correct?
10   A    Correct.
11   Q    And prior to this June 29, 2016 shooting, you
12 do not recall having any conversations with supervisors
13 of Deputy Ashurst to ascertain what use of force
14 training he had received, correct?
15   A    Correct.
16   Q    Sheriff, when was the first time that you
17 learned that Deputy Ashurst applied to be a Knox County
18 Deputy under a different administration?
19   A    I had no knowledge of that.
20   Q    Prior to today, have you ever learned that
21 Deputy Ashurst applied to be a Knox County deputy under
22 Sheriff Eckert?
23   A    Only on our last deposition when you eluded to
24 that.  I -- other than that, I've never talked --
25 Mikey's never mentioned it to me.  I've never talked to

Page 105

1  Mikey about it.  And nobody has ever brought it to my
2  attention other than I think in the last deposition, you
3  eluded to it.
4    Q    Now, if somebody applies to be a law
5  enforcement officer at the Knox County
6  Sheriff's Department, is there a mechanism for keeping
7  track of those applications?
8    A    I -- I have a file when I took office in 2015.
9  I keep the applications in a file.  But prior to that, I
10 had no knowledge of who applied and, you know, who --
11 anything like that.
12   Q    Did you personally interview Deputy Ashurst
13 when he applied?
14   A    I did.
15   Q    And what was that interview process like?
16   A    It went good obviously.  We hired him.
17   Q    Well, did you interview him?
18   A    Yes, I did.  Yes, I'm sure I did.  I interview
19 all deputies.
20   Q    Do you have a specific, you know, again,
21 nobody wants you guessing, so let me ask it a little bit
22 more specifically.  Do you have a specific recollection
23 of interviewing Mr. Ashurst?
24   A    No, other than the fact that it was a good
25 interview and he was hired.  I really don't have any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1 specifics at that point.
2      Q     Now, you worked for the Kentucky State Police
3 for 24 consecutive years; is that right?
4      A     Yes.
5      Q     And you've been hiring people now at the
6 Knox County Sheriff's Department for about four and a
7 half years; is that right?
8      A     Yes.
9      Q     Yeah.  And prior to that, you were involved in
10 the hiring process at Kentucky State Police as well,
11 correct?
12      A     For civilian personnel, yes.
13      Q     Yeah.  And is it fair to say that by now you
14 are familiar with people who have some red flags in the
15 application process?
16           MR. WILLIAMS:  Object to the form of the
17      question.
18      A     Yeah, I've got personal opinions and so forth,
19 yes.
20      Q     Well, I mean, if law enforcement officer who
21 was applying to your agency had been at three different
22 law enforcement agencies within a three-year span prior
23 to that, does that raise any flags for you?
24      A     I mean, I would look into it yes.  But I mean,
25 in today's world, I mean, they transfer a lot.  We've

Page 107

1 had several that -- I mean, some just applied for KSP in
2 my department and didn't get accepted in addition to
3 Mikey and I mean it just -- they transfer around some.
4      Q     Yeah.  Would it be important for you to know
5 whether any of those other law enforcement agencies
6 represented in written form that they would not hire --
7      A     Yes, that --
8      Q     -- him again?
9      A     Yeah, I would -- yeah, I want to know that and
10 I mean, --
11           MR. WILLIAMS:  Did you say would or wouldn't
12      hire him?
13           MR. SLOSAR:  Would not.
14           THE WITNESS:  Oh, I'm sorry. What was the
15      question.
16           MR. SLOSAR:  Would not.  So if you were
17      reviewing personnel files from other law
18      enforcement agencies, right?  Well, let me go --
19      let me take it a step back.  Withdraw that
20      question.  Would you agree that it is a good
21      practice to receive as much documentation as
22      possible when you're determining whether a deputy
23      should be hired?
24           THE WITNESS:  Yeah, I mean, obviously you want
25      the information in hand and sometimes, you know,

Page 108

1 you learn things afterwards.
2 BY MR. SLOSAR:
3      Q     Sure.
4      A     Policy at the Sheriff's Departments is kind of
5 unique in fact that some people may have a situation
6 with a political party in one county but can work in
7 another county.  So yeah, I would look at the facts.  I
8 mean, not necessarily the fact that they worked at three
9 different agencies, but why, you know, they left and why
10 they're applying for you, you know.
11      Q     And prior to Mr. Ashurst being hired, you had
12 a conversation with Sheriff Root, correct?
13      A     I did.
14      Q     And in that conversation, Sheriff Root
15 provided some information to you that indicated that
16 Mr. Ashurst had violated some trust with the sheriff; is
17 that fair?
18      A     I don't know if it was violated trust, per
19 say, but they had incidents involving a family member.
20 You know, one of his family members, and that's why I
21 wanted to talk to him directly.
22      Q     And the allegation -- well, what do you recall
23 Sheriff Root telling you in relation to Deputy Ashurst?
24      A     I recall that he had had a relationship with
25 his daughter.

Page 109

1      Q     Did Sheriff Root inform you that his daughter
2 was married when the inappropriate relationship
3 happened?
4      A     Yes.
5      Q     And did Sheriff Root inform you that
6 Deputy Ashurst not only had an inappropriate
7 relationship with his daughter who was married, but that
8 he was friends with the daughter's husband?
9           MR. WILLIAMS:  Object to the form of the
10      question.
11      A     He didn't go into that detail.
12      Q     Did Sheriff Root inform you that the woman who
13 Deputy Ashurst cheated with that her husband was
14 actually the person who recommended that he be hired in
15 the first place?
16           MR. WILLIAMS:  Objection to the form of the
17      question.
18      A     He didn't tell me that.
19      Q     Sheriff Root didn't tell you that that woman's
20 husband assisted Mr. Ashurst at being hired at that
21 agency?
22      A     No.
23      Q     No?  Is that a no?
24      A     No.
25           MR. WILLIAMS:  Yeah.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1   A   I'm sorry.  I'm sorry.  I keep forgetting.
2   Q   And -- and when Sheriff Root informed you of
3  this information, did you consider it?
4   A   Oh, yeah.  I considered it.
5   Q   And would you agree that that information
6  bears upon the integrity of Deputy Ashurst?
7       MR. WILLIAMS:  Object to the form.
8   A   Yeah.  I didn't necessarily think it's -- I
9  mean, obviously you know, you wish it wouldn't happen or
10  it would have happened.  But I mean, as far as being a
11  law enforcement officer and me -- you know, that being a
12  point to knock him out of employment at that point, no,
13  I didn't.
14   Q   Well, should Knox County deputies have
15  integrity?
16   A   Yes.  Yes.
17   Q   Should they have values?
18   A   Yes.
19       MR. WILLIAMS:  Object to the form of the
20  question.
21   A   Morals and values and integrity.
22   Q   Yeah.
23   A   Just like we all should.
24   Q   Yeah.  Not just as human beings, but
25  especially law enforcement officers, right?

Page 111

1   A   Yes, sir.
2   Q   And prior to -- after Sheriff Root informed
3  you about Deputy Ashurst's transgressions.
4       MR. WILLIAMS:  Object to the form of the
5  question.
6   Q   What did you do in regards to the application
7  process?
8   A   What do you mean by his transgressions?
9   Q   Well, cheating with -- having -- let me put it
10  very bluntly.  Having a sexual relationship --
11   A   Extra-marital affair?
12   Q   -- with the Sheriff's daughter who was married
13  to the person who got Mr. Ashurst the job?
14   A   Right.  That's why I contacted Sheriff Root
15  and got his opinion.
16   Q   And after that conversation --
17   A   And his recommendation.
18   Q   -- after that conversation, what other
19  investigation, if any, did you do into Mr. Ashurst?
20   A   Like I said, as standard with everybody.  We
21  did a background investigation check as far as crimes
22  and anything like that.  We do reference checks and I
23  wanted to personally call Sheriff Root so I did.
24   Q   Okay.  You didn't personally talk to any of
25  the other members of any other law enforcement agency

Page 112

1  that Deputy Ashurst had worked at, correct?
2   A   No, sir.
3   Q   Now, when policies and procedures under your
4  administration are updated, is there any documentation
5  that takes place at the Knox County Sheriff's Department
6  that would indicate when revisions are provided to
7  deputies?
8   A   There would be a revision date at the top of
9  the policy for the general policy.
10   Q   And is there any documentation that would
11  reflect if deputies are actually provided with these
12  revisions?
13   A   Again, I would defer to my supervisors to
14  ensure that they get the updated policy out there and
15  ensure that the deputy has reviewed that policy, whether
16  it be a new policy or whether it be an updated policy.
17   Q   So you would -- you would rely upon your
18  supervisors to make sure that's done, correct?
19   A   Yes, sir.
20   Q   And you have no personal knowledge as to
21  whether Deputy Ashurst was ever provided with any other
22  revisions to the written policies and procedures,
23  correct?
24   A   Other than on initial employment, no.
25   Q   That was in 2015, right?

Page 113

1   A   Yes.
2   Q   Okay.  After that, you have no idea as to
3  whether Mr. Ashurst received any revisions to the
4  written policies or procedures in the Knox County
5  Sheriff's Department, correct?
6       MR. WILLIAMS:  Object to the form.
7   Q   You can answer.
8   A   I can't.  I mean, I don't -- I don't recall
9  any.  I mean, it's a possibility but I don't recall.
10   Q   I mean, you didn't personally give
11  Deputy Ashurst any of the written policy or procedure
12  revisions, correct?
13   A   No, sir.  Correct.
14   Q   Okay.  Along those lines, when Deputy Ashurst
15  was first hired, you also would not have been the person
16  to give him the written policies or procedures in place
17  of the time, correct?
18   A   Correct.
19   Q   Sir, is it fair to say that you're unaware of
20  any unwritten policies or procedures that were in place
21  in the Knox County Sheriff's Department in June of 2016?
22   A   That's correct.  I'm not aware of any of
23  those.
24   Q   Whatever policies or procedures you had in
25  place when it was written down, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

```
 1    A    Yes, sir.
 2    Q    Is it fair to say that whatever practices were
 3  in place in June 2016 that those would have been based
 4  upon whatever written policies or procedures were in
 5  effect?
 6    A    Yes, sir.
 7    Q    And again, you don't have any direct knowledge
 8  of any practices that Deputy Ashurst was using in
 9  June of 2016, correct?
10    A    Correct.
11    Q    You would have relied upon your supervisors to
12  keep track of whatever practices Deputy Ashurst was
13  using at the time?
14    A    Correct.
15    Q    And in June of 2016 was there any formal
16  mechanism for how those supervisors would convey
17  information to you about Deputy Ashurst understanding of
18  the written policies or procedures in place?
19         MR. WILLIAMS:  Object to the form.
20    A    I'm not -- not necessarily written policies
21  but they would just consult me.
22    Q    In June of 2016, or by June of 2016, have you
23  had -- do you recall having any conversations with
24  supervisors of Deputy Ashurst about his understanding of
25  the written policies or procedures in effect?
```

Page 115

```
 1    A    No.  Not that I can recall.
 2    Q    By June of 2016, do you recall having any
 3  conversations with supervisors of Mr. Ashurst about his
 4  training relating to the use of force?
 5         MR. WILLIAMS:  Are you asking this question in
 6    relation to our -- let me just clarify.  Are you
 7    asking this question by saying June 2016 are you
 8    referring to before the incident involving
 9    Mr. Mills?
10    Q    By June 29, 2016, do you recall having any
11  conversations with supervisors of Deputy Ashurst about
12  his practices with regard to the use of force?
13    A    No, I can't recall any specific instances, if
14  that's what you're asking me.  Generally, I can't
15  remember.  I really don't' -- I can't remember any
16  specific.
17    Q    Sheriff, after the Mills shooting, I'm sure
18  you had conversations with Deputy Ashurst --
19    A    Yes.
20    Q    -- supervisors, right?
21    A    Yes.
22    Q    Yeah.  Probably had some conversations with
23  Deputy Ashurst himself, right?
24    A    I did.
25    Q    Yeah.  We're going to get there in a little
```

Page 116

```
 1  bit.
 2    A    Okay.
 3    Q    But prior to the shooting, you don't recall
 4  having any conversations with supervisors of Mr. Ashurst
 5  relating to his use of force practices, correct?
 6    A    Correct.
 7    Q    And prior to June 29, 2016, is it fair to say
 8  that you don't recall having any conversations with
 9  Mr. Ashurst himself about his practices or training
10  relating to the use of force?
11    A    I don't recall any.
12    Q    You don't have any notes or anything at home
13  that would refresh your memory, right?
14    A    No.
15    Q    You don't have a little journal writing down
16  every conversation?
17    A    No.  I mean, if I -- I'm a busy man.
18    Q    Might be a long book?
19    A    Yeah.  Yeah, it would be a catalog.
20    Q    Now, I want to start off by going through the
21  different topics on our 30(b)6 notice.  In 2016, what --
22  let me hand you what we'll mark as
23  Exhibit number 2.
24         MS. STAPLES:  You mean 3?
25    Q    3, I'm sorry.  I'm sorry about that.  I'm
```

Page 117

```
 1  going to give you the single-sided one.  It will be a
 2  little bit easier for you.
 3         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
 4    A    Okay.
 5    Q    Sir, do you recognize this document?
 6    A    Yes.  Knox County Sheriff Department's policy
 7  and procedure manual.
 8    Q    When was this -- and are these the policies
 9  and procedures that you helped draft after you were made
10  Sheriff?
11    A    Yes.
12    Q    Okay.  And is it fair to say that these
13  policies and procedures were at least initially
14  effective on January 1, 2016?
15    A    Yes.
16    Q    Prior to that date, were these written
17  policies and procedures in effect?
18    A    Prior to --
19    Q    January 1, 2016.  And I know that some of
20  these were updated.  It looks like the last one --
21    A    Yeah, I'd have to go back through each
22  individual and see when they were drafted and when they
23  were revised.  But yes, I mean, we started immediately
24  as soon as I took office drafting them.
25    Q    From looking -- these are the only set of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Mike Smith, taken on May 15, 2019

                                                    118..121

Page 118

1  policies and procedures that have ever been produced in
2  our case.  Do you recall having a -- is it fair to say
3  that when you finalized your first set of policies and
4  procedures at that -- that the first one would have
5  included a mission statement?
6      A     Yes.
7      Q     Okay.  Would there have been any reason for
8  you to revise the mission statement of the Knox County
9  Sheriff's Department --
10     A     No.
11     Q     -- after initially forming it?
12     A     No, there wouldn't be.
13     Q     Okay.
14     A     I wouldn't --
15     Q     So given that, is it safe to assume that these
16 written policies and procedures would have been
17 completed in its initial form on January 1, 2016?
18     A     Yes.
19     Q     Okay.  So is it fair to say that any
20 Knox County deputy hired after January 1, 2016 would
21 have been provided with this set of written policies and
22 procedures that's before you as Exhibit 3?
23     A     Yes, it would.
24     Q     And with the exception being the case
25 ESO number 14 which looks to have been revised about a

Page 119

1  year later; is that fair?
2      A     Right.  Yes, it was.
3      Q     Okay.  But for the remaining policies and
4  procedures Exhibit 3 would have been the written set
5  provided to new deputies after their hiring, correct?
6      A     Yes.  Yes, sir.
7      Q     And that would have began January 1, 2016,
8  correct?
9      A     Correct.
10     Q     So any deputy hired at the Knox County
11 Sheriff's Department prior -- hired prior to
12 January 1, 2016 would not have been provided with these
13 written policies and procedures at the time of their
14 hiring, correct?
15     A     Yes.  When they were constructed and drafted
16 they would have been given the policy if they were hired
17 prior to that.  Each person when these were drafted and
18 made would -- as soon as they come out of the copier and
19 manuals were made would be given to the deputies.
20     Q     Did you personally do that?
21     A     No, but I -- I mean, I would have instructed
22 my supervisors to ensure that they did.
23     Q     Okay.
24     A     Yes.
25     Q     Sitting here today, you have -- there's no

Page 120

1  documentation that exists that actually would reflect
2  when Knox County deputies would receive these written
3  policies or procedures, correct?
4      A     Not -- not -- I wouldn't personally, but
5  again, the supervisor might have notes or something like
6  to that effect.
7      Q     And to your knowledge, none of that would be
8  maintained in the officer's personnel files?
9      A     No, sir.
10     Q     Is there a reason why not?
11     A     It just didn't require it.
12     Q     Now, I'm going to ask you a lot of questions
13 and I think that -- I want you to have these policies
14 and procedures in front of you.
15     A     Okay.
16     Q     Okay?  But a lot of my questions are not going
17 to be answered by the written policies and procedures.
18 You know them well, so I would encourage you to look at
19 them if you need to.
20     A     Okay.
21     Q     But I'm going to ask you a lot of questions
22 about the existence of written policies or procedures on
23 specific topics, okay?
24     A     Okay.
25     Q     In June of 2016, did the Knox County

Page 121

1  Sheriff's Department have any policies or procedures
2  relating to internal investigations or reviews on
3  allegations or incidents of excessive force?
4      A     That would be the response to resistance.
5      Q     And which policy is that, sir?
6      A     It would be KCSO12A.
7            MR. WILLIAMS:  Can you repeat that number
8  again, please?
9      Q     He said 12 --
10     A     12A.
11           MR. WILLIAMS:  12A?  Thank you.
12     Q     Sir, in 12A, can you please point me to
13 anywhere in this policy or procedure that relates to
14 internal investigations after the use of force by an
15 officer of the Knox County Sheriff's Department?
16     A     In -- on the first page there.  One, response
17 resistance notification.  Notify supervisor and the
18 supervisor look into the situation, interview all
19 witnesses, so forth.
20     Q     And all -- okay.  So you're looking at 1 --
21 1A?
22     A     Uh-huh.
23     Q     What in that written policy or procedure
24 relates to an internal investigation into the use of
25 force?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



The Deposition of Mike Smith, taken on May 15, 2019

122..125

Page 122

1    A    To notify a supervisor and then on the back,
2   the response to resistance documentation and supervisor
3   responsibility.
4    Q    So it's your testimony that this policy or
5   procedure -- well, was this policy and procedure in
6   place on January 1, 2016?
7    A    Yes.
8    Q    Okay.  And it's your testimony that this
9   policy or procedure would relate to an internal
10  investigation into Knox County deputies' use of force;
11  is that right?
12   A    Yes.
13   Q    Okay.  And according to this policy or
14  procedure, when force is used by a Knox County deputy
15  any time after January 1, 2016, what should take place?
16   A    They should immediately notify a supervisor,
17  sergeant or captain and then the supervisor does --
18  investigates into the matter.
19   Q    And according to page 2, is the deputy
20  involved or a designated deputy required to preserve the
21  scene?  I'm sorry.  You know what, let me withdraw that.
22  According to your testimony, is the investigating
23  supervisor or his or her designee, required to interview
24  all witnesses to the incident?
25   A    Yeah, the responding supervisor, yes.

Page 123

1    Q    Is the responding --
2    A    But he seems -- he determines pertinent to the
3   case, yes.
4    Q    Is the responding supervisor required to
5   interview the accused involved?
6    A    Yes.
7    Q    If able?
8    A    If able, yes.
9    Q    Is the requiring -- is the responding
10  supervisor required to interview other police officers
11  present?
12   A    Yes.
13   Q    Is the responding supervisor required to
14  interview medical personnel?
15   A    Yes.  If present, or if accused.
16   Q    If able?
17   A    Yes.
18   Q    Is the responding supervisor required to
19  interview EMS personnel?
20   A    Yes.  If -- like I say if they are utilized or
21  if EMS were called.
22   Q    And after conducting these interviews, what is
23  the investing -- investigating supervisor required to
24  do?
25   A    Notify me.

Page 124

1    Q    And in fact, according to the written policies
2   and procedure, the investigating supervisor is supposed
3   to provide a written response to the resistance
4   investigation and submit that to the sheriff, right?
5    A    Uh-huh.  Correct.
6    Q    And the policy further requires that those
7   records, those written records --
8    A    Uh-huh.
9    Q    -- must be retained for at least two years
10  from the date of the incident; is that right?
11   A    Correct.
12   Q    And again, this policy or procedure was in
13  effect in January of 2016; is that right?
14   A    Yes.
15   Q    And in June of 2016 who would have been the
16  supervisor of Mr. Ashurst?
17   A    Sergeant Carl Frith.
18   Q    Who?
19   A    Sergeant Carl Frith.
20   Q    How do you spell the last name?
21   A    F-R-I-T-H.
22   Q    And --
23   A    Or Everett Johnson.  He's the captain.
24   Q    Or Everett Johnson?  Okay.  After the shooting
25  death of Jessie Mills --

Page 125

1    A    Uh-huh.
2    Q    -- did Mr. Frith or Mr. Johnson ever provide
3   you any documentation relating to an investigation into
4   the use of force by Mr. Ashurst?
5    A    No.  At my -- at my direction, they were
6   notified to contact Kentucky State Police and do an
7   independent investigation into this matter at my
8   request.
9    Q    At any time did any officer for the
10  Knox County Sheriff's Department ever conduct an
11  internal investigation into the shooting death of
12  Jessie Mills?
13   A    No, sir.
14   Q    At any time did any officer at the Knox County
15  Sheriff's Department ever conduct an investigation into
16  the use of force against Jessie Mills?
17   A    No, sir.
18   Q    Whose decision was that?
19   A    Mine.
20   Q    Why?
21   A    Because I wanted an independent.  I didn't
22  want it to look skewed or that we were, you know, doing
23  an investigation on behalf of our deputy.  I wanted an
24  independent Kentucky State Police well-trained, very
25  respectful agency, to conduct the investigation and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

```
1   report -- report to me the exact facts and where it laid
2   at that point.
3       Q   Now, when did you first learn of the
4   Jessie Mills shooting?
5       A   It was right after the shooting.  The
6   dispatcher contacted me via telephone.
7       Q   Did you go to the scene?
8       A   I did.
9       Q   Do you recall approximately what time you
10  arrived at the scene?
11      A   I would have to get a CAD report.
12      Q   Were there other officers on scene?
13      A   Yes.  Yes.  Oh, yes.  I got there very shortly
14  after it happened.
15      Q   Was Deputy Ashurst still there?
16      A   Yeah, he was in the -- in the back of an
17  ambulance getting checked out.
18      Q   Did you see any visible injuries on
19  Deputy Ashurst?
20      A   Again, he was in the back of the ambulance.  I
21  really didn't -- I don't recall any serious injuries.
22  But he was scraped and bruises, I guess, is what he was
23  complaining of -- I really don't know, to be honest.
24      Q   Did you ever see them?  By "them", I mean any
25  scrapes or bruises?
```

Page 127

```
1       A   No.  The Sheriffs or the Kentucky State
2   Police, I'm sure, photographed them.
3       Q   I'm asking a different question.  Did you ever
4   see any scrapes or bruises on Mr. Ashurst?
5       A   Again, I didn't really -- I just briefly --
6   the scene was kind of chaotic and I was trying to get
7   with my guys and make sure the KSP was, you know,
8   securing the scene and all that stuff. So I just
9   barely -- briefly spoke to him.
10      Q   You briefly spoke to him?  Did you observe any
11  visible injuries?
12      A   No, but I really wasn't looking for that at
13  that time.  You know, just trying to gather the whole
14  scene in.
15      Q   How long do you recall speaking to Mr. Ashurst
16  when you saw him?
17      A   Seconds.
18      Q   And when you saw him, was it your
19  understanding that Mr. Ashurst had shot Jessie Mills?
20      A   Yes.
21      Q   Did you ask Mr. Ashurst any questions?
22      A   No.
23      Q   Why not?
24      A   Not at that point.  I mean, I -- like I say, I
25  didn't want to -- I knew KSP would be investigating it
```

Page 128

```
1   and talking to him and I didn't want to you know,
2   interfere with that.
3       Q   How did Mr. -- how did Mr. Ashurst seem when
4   you first saw him?
5       A   He was shaken.  Just I guess normally in a
6   situation like that, just shaken up.
7       Q   When did you first learn that Deputy Ashurst
8   had a prior altercation with Jessie Mills?
9       A   It was after --
10          MR. WILLIAMS:  Objection to the form.
11      Q   You can answer.
12      A   It was after this incident.
13      Q   How did you first learn that, sir?
14      A   An altercation -- you mean at that scene, that
15  incident at the time or what?
16          MR. WILLIAMS:  Objection to the form.
17      Q   That he had a prior run-in with Jessie Mills.
18          MR. WILLIAMS:  Objection to the form.
19      A   Prior arrest on a Clay County warrant.
20      Q   Are you -- I don't know if you're testifying
21  or if that's an objection.
22          MR. WILLIAMS:  That's an objection.
23          MR. SLOSAR:  Okay.
24          MR. WILLIAMS:  It was -- he misled him into
25  thinking there was a fight and there wasn't.
```

Page 129

```
1           THE WITNESS:  It was after this night.  I
2   mean, it was after this incident that I learned
3   that.
4   BY MR. SLOSAR:
5       Q   Do you recall how you first learned about that
6   prior incident?
7       A   I don't.
8           MR. WILLIAMS:  Incident is a good word.
9   Arrest.
10      Q   I mean, come on guys.  Like -- like we work
11  together a lot.  I appreciate that it's a lively
12  atmosphere, but we've got to keep it somewhat
13  rule-spaced.  So -- do you recall whether it was a
14  member of your agency who informed you about this?
15      A   I think it was. I'm not positive but I think
16  it was.
17      Q   Do you remember who that might have been?
18      A   No, sir.
19      Q   Okay.
20      A   Without speculation, I don't.
21      Q   So you get to this scene.  Your concern is
22  about making sure it's a controlled environment, right?
23      A   Right.  Right.
24      Q   Do you see Constable Bolton there?
25      A   Yes.  I think he was at the -- standing by the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 130

1  ambulance.
2      Q    And what -- did you have a conversation with
3  Constable Bolton?
4      A    No.
5      Q    Do you talk to him at all?
6      A    No.
7      Q    From what you observed of Constable Bolton,
8  did he have any physical injuries?
9      A    I didn't observe any.  But again, it was just
10  a brief encounter.
11      Q    So what do you do?  Tell us what else you did
12  after arriving at the scene?
13      A    I just made sure I stayed with KSP outside the
14  perimeter and just requested that they -- they work the
15  investigation.  I didn't interview or anything at the
16  scene. I didn't really talk to anybody, any witnesses or
17  anything like that.
18      Q    Prior to --
19      A    Again because I didn't want to interfere with
20  their investigation.
21      Q    -- now when there was a shooting death were
22  there any written policies or procedures of the
23  Knox County Sheriff's Department that require for the
24  shooting officer to go on any sort of leave while an
25  investigation took place?

Page 131

1      A    We did.  We put -- I put him on administrative
2  leave and well, I -- KSP got his weapon and I put him on
3  administrative leave.
4      Q    Now, were there any written policies or
5  procedures in place that required that or is that just
6  something you did?
7      A    That's just something that I did.
8      Q    How did Mr. Ashurst respond when you put him
9  on administrative leave?
10      A    Fine.
11      Q    He was still getting paid, right
12      A    Yes.
13      Q    Now, is it fair to say that your understanding
14  of the Kentucky State Police investigation was that they
15  were investigating to determine whether any criminal
16  charges should be brought against Mr. Ashurst for the
17  shooting death of Jessie Mills?
18      A    Yes, it was a thorough investigation into the
19  matter, yes.
20      Q    My question to you is a little bit different.
21      A    Yes. I --
22      Q    You understood that there --
23      A    -- that was my understanding.  Basically, it's
24  a criminal investigation, yes.
25      Q    Yes.  They were not conducting -- is it fair

Page 132

1  to say that the Kentucky State Police was not conducting
2  an investigation to determine whether Mr. Ashurst
3  violated any policies or procedures of the Knox County
4  Sheriff's Department.
5      A    Well, it -- very in depth report and we, you
6  know, based on their report, I could determine that.
7      Q    My -- my question to you is a little bit
8  different, sheriff.  Okay?
9      A    Yeah.
10      Q    Was it your understanding -- well, is it fair
11  to say that the Kentucky State Police was not conducting
12  an investigation to determine whether Mr. Ashurst
13  violated any policies or procedures?
14      A    Right.  That's my understanding, yes.
15      Q    Okay.  After Mr. Ashurst shot Mr. Mills on
16  June 29, 2016 he continued being employed by the
17  Knox County Sheriff's Department, correct?
18      A    Yes.
19      Q    And since then he has been involved in other
20  use of force incidents, correct?
21      A    Correct.
22      Q    How many?
23          MR. WILLIAMS:  Enter an objection.  Go ahead
24      and answer.  I'll object to the other incidents,
25      but you may answer.

Page 133

1      A    I really don't know without checking the --
2  you know, with my supervisors.  Use of Tasers.  He had
3  one instance of pursuit on the Kentucky 225 in Artemis
4  where a vehicle -- it was a pursuit crash and he fired
5  into a -- into a vehicle.
6      Q    Did he kill that person?
7      A    No.
8      Q    Any other use of force incidents relating to
9  Mr. Ashurst since June 2016 that involved a gun?
10      A    No, sir.  Other than that one.
11      Q    What about a Taser?
12      A    Yes, there's been a few Tasers.  I would say a
13  few.
14      Q    In the approximate four years that you've been
15  sheriff over Deputy Ashurst, do you recall a single
16  incident where Deputy Ashurst used force on somebody
17  through pepper spray?
18      A    I'm trying to think.  I know some has been
19  used but I can't remember if it was through him or
20  another deputy.  I don't recall.
21      Q    You would agree that in this case, that no
22  investigating supervisor from the Knox County Sheriff's
23  Department ever spoke to any witnesses relating to the
24  shooting death of Jessie Mills, correct?
25      A    Not to my knowledge.  Not as far as an



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Dwayne Gray, Taken on May 15, 2019

134..137

Page 134

1  official interview.

2      Q    Were any official interviews by the
3  Knox County Sheriff's Department ever conducted of
4  Deputy Ashurst or Constable Bolton?

5      A    With me?  With our department?

6      Q    Yes.

7      A    No.

8      Q    Today, you've never spoken to Deputy Ashurst
9  about the shooting death of Jessie Mills?

10     A    Oh, yes.  Yes.  I mean, yes.  We've talked and
11  yes.

12     Q    How many times have you spoken to
13  Deputy Ashurst about the shooting of Jessie Mills?

14     A    I know I spoke to him at least twice probably,
15  or more.  I mean --

16          MR. WILLIAMS:  I'm sorry.  When you say "spoke
17      to" are you asking interviewed and obtained his
18      account of the incident?

19     Q    Anything related to Jessie Mills.

20     A    I'm sure several and anything.

21     Q    When was the -- so the shooting happened
22  June 29, 2016.  How soon after the shooting did you
23  first speak to Deputy Ashurst about the --

24     A    It was while he was on administrative leave
25  while KSP was doing the investigation into the matter.

Page 135

1      Q    And who initiated that conversation?

2      A    I did.

3      Q    Why did you do that?

4      A    I was just checking on him to see what
5  happened and see how he was.

6      Q    Where did that conversation happen at?

7      A    It happened at the Sheriff's Department.

8      Q    Did you ask for Mr. Ashurst to come down?

9      A    Yes, I think so.

10     Q    Where did that conversation take place?

11     A    Probably in my office.

12     Q    Was anybody else present?

13     A    I don't remember if there was anybody there.  I
14  don't think so.  I think it was just me and him.

15     Q    And did Mr. Ashurst give you his version of
16  what took place with Jessie Mills?

17     A    Yes.

18     Q    What did he tell you?

19     A    Just that the guy had -- had the girl or the
20  baby walking down the road, pitch black dark, initiated
21  the encounter and strong -- he was very combative,
22  Mr. Mills, and they attempted to restrain, to arrest him
23  and just overwhelming physical force from him.  They
24  used Taser, the verbal skills Taser.  It sounded like he
25  used the force continuum and then he just had to -- he

Page 136

1  felt he was in danger for his life and had to utilize
2  lethal force.

3      Q    Did Deputy Ashurst explain to you why he had
4  to use lethal force against Jessie Mills?

5      A    Just he couldn't -- he couldn't control him.
6  He just -- he was in fear for his life and he was -- he
7  said he -- he thought he was going to get his gun and
8  kill him.  Mills would get Ashurst's gun.

9      Q    Did you ask Deputy Ashurst how far Mr. Mills
10  was from him when he decided to shoot him?

11     A    He said -- according to Ashurst it was, you
12  know, fairly close proximity and he had -- he had fought
13  and fought and he was tired and he was just trying to
14  gain distance and he just kept charging him.

15     Q    Did Mr. -- did Deputy Ashurst ever inform you
16  as to whether he believed Jessie Mills had a weapon?

17     A    He told me he didn't see one.

18     Q    Did -- did you ask Deputy Ashurst in this
19  conversation what steps he took on the use of force
20  continuum before he decided to use deadly force?

21     A    Yes.  And he told me just like I explained to
22  you just a second ago.  Tried to physically, you know,
23  restrain him, tase him, and the guy just kept -- he just
24  ramped up and just kept charging him.  Just kept
25  fighting him or charging him.  And he was -- Mikey said

Page 137

1  he was getting tired.  He just couldn't control him.

2      Q    Ashurst told you that he was getting tired?

3      A    Oh, yeah.  He just physically couldn't contain
4  him and he was -- I mean, the longer a fight goes on,
5  obviously, you tire out and --

6      Q    Did Deputy Ashurst talk to you at all about
7  Constable Bolton's involvement?

8      A    Yeah, he was -- he said he was trying to --
9  Constable Bolton, he is a very small-structured
10  individual as well, and he just said he -- he couldn't
11  help him.

12     Q    He said Bolton couldn't help him?

13     A    Well, just couldn't -- I mean, they just both
14  couldn't restrain him.

15     Q    In June 2016 did officers or deputies like
16  Mr. Ashurst have pepper spray issued to them by the
17  Knox County Sheriff's Department?

18     A    At first we had pepper spray.  I'm not sure if
19  they had it at that time or not, but initially they
20  were -- they were issued pepper spray.

21     Q    And would you agree that pepper spray is on
22  the use of force continuum?

23     A    I would say that use -- pepper spray -- I've
24  had individuals that it didn't affect and like I say,
25  it's -- I don't know that in all instances pepper spray



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1  would be appropriate.  It depends on the situation and a
2  lot of different things as well.
3      Q    But you agree that a reasonably trained police
4  officer in 2016 would know that pepper spray is a part
5  of the use of force continuum?
6          MR. WILLIAMS:  Object to the form of the
7  question.
8      Q    You can answer.
9      A    I would agree it's a tool on the belt.
10     Q    And tools on the belt in 2016, a reasonably
11 trained police officer would know to try to use as many
12 of those tools as possible before lethal force.
13     A    Theoretically, yes.  That would be ideal, yes.
14     Q    That's what you would have wanted out of your
15 deputies, right?
16     A    Right.  I mean, obviously lethal force is what
17 you -- you know, revert to last but you know, in
18 situations -- each situation is different.
19     Q    So Sheriff Smith, there was never an internal
20 investigation done into the use of force by
21 Deputy Ashurst against Jessie Mills, correct?
22     A    Correct.
23     Q    Since you have taken over as sheriff, has any
24 officer at the Knox County Sheriff's Department been
25 disciplined for the use of force?

Page 139

1      A    No.
2      Q    Are there any written policies or procedures
3  in place in 2016 at the Knox County Sheriff's Department
4  that relate to discipline of Knox County officers for
5  the use of excessive force?
6      A    Disciplinary manual policies?  It's not a
7  spelled out mission or policy and procedure.
8      Q    There was no written policy or procedure in
9  place in June of 2016, correct?
10     A    Correct.
11     Q    Is it fair to say that in June of 2016 there
12 were no written policies or procedures at the
13 Knox County Sheriff's Department relating to
14 recognizing, interacting with or addressing citizens
15 exhibiting signs of mental health conditions?
16         MR. WILLIAMS:  Object to the form.  You can
17 answer.
18     Q    You can answer.
19     A    No.
20     Q    There was also no training on that regard at
21 the Knox County Sheriff's Department prior to
22 June 29, 2016, correct?
23     A    Correct.  However, they received their annual
24 training and I'm not sure what DCJOT might have given
25 them in their annual training.

Page 140

1      Q    You have no idea what they were trained on?
2      A    Well, we pick -- yeah, I can tell you but I
3  mean, there's a catalog of classes.  But I mean, it
4  could have been addressed in one of those classes.
5      Q    You have no way of knowing right now, correct?
6      A    No.  Correct.  Correct.
7      Q    And prior to June 29, 2016 you weren't
8  actively keeping track of the outside training that
9  Deputy Ashurst was taking?
10     A    No, sir.
11     Q    Is that right?
12     A    Correct.
13     Q    Since you took over as Sheriff, there hasn't
14 been any in-house training for Knox County Sheriff's
15 Deputies on how to recognize, interact with or address
16 citizens exhibiting signs of mental health conditions,
17 correct?
18     A    Correct.
19     Q    Since you have taken over as Sheriff in
20 January 2015, there hasn't been any in-house training
21 that provided guidance to deputies on when to use force,
22 correct?
23     A    It's like I explained earlier, at the range
24 they go over the policy and procedure manual.  Each
25 range.

Page 141

1      Q    And when you're referring to the "range," what
2  are you referring to?
3      A    Response to resistance.
4      Q    And where is that at?
5      A    In the KRS pertaining to use of lethal force.
6      Q    And how often do deputies go to the range?
7      A    Once a year.
8      Q    Do you keep track of when they go to the
9  range?
10     A    Yes.
11     Q    Do you know how many times Deputy Ashurst went
12 to the range prior to killing Jessie Mills on
13 June 29, 2016?
14         MR. WILLIAMS:  Object to the form.
15     A    I'm not sure if we had range -- I don't
16 think we had had range in '16 yet, but I'm sure he would
17 have went in '15.
18     Q    Is there a certain like time of year that
19 deputies go to the range?
20     A    It's varied.
21     Q    Now, do you personally go to this annual range
22 training at the Knox County Sheriff's Department?
23     A    Yes.
24     Q    Were you there and did you conduct that
25 training in 2015?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI    Doc #: 108-17    Filed: 02/10/20    Page: 39 of 86 - Page
ID#: 4898
The Deposition of DOUG KERR, Taken on July 15, 2019

142..145

Page 142

1    A    Yeah.  The range instructor always -- we
2  all -- that's just kind of a rule we have.  They read
3  the KRS involving deadly force and policy concerning
4  that.
5    Q    My question to you is a little bit different.
6  Were you physically present at the 2015 training?
7    A    Yes.
8    Q    You were?  What month did that happen in?
9    A    I don't know.  I'd have to check.
10   Q    Sitting here today you don't know?
11   A    I don't know.
12   Q    Okay.  How long was the range training in
13 2015?
14   A    You have to do two volleys.  Probably an hour.
15   Q    And would all deputies have trained for about
16 an hour in 2015 at the range?
17   A    Yes.
18   Q    Okay.  Would they do it at the same time or
19 does it happen at different times?
20   A    Usually at the same time.
21   Q    I'm a novice.
22   A    Right.  I understand.
23   Q    Training with weapons.
24   A    It's at the same time.
25   Q    Okay.

Page 143

1    A    Occasionally, if they have court or something
2  else is going on, they'll have to come back and
3  individually get with the range instructor and do them
4  individually.  But we would like to have them all there
5  at the same time.
6    Q    Do you recall who would have been the
7  instructor in 2015?
8    A    I was trying to think when you mentioned that.
9  I'm not sure.
10   Q    And would you have been there for the entire
11 time or --
12   A    No.
13   Q    -- would you have showed up for just part of
14 it?
15   A    Probably part of it.
16   Q    Okay.
17   A    Yeah.
18   Q    Do you have a specific recollection of what
19 part of it you were there for?
20   A    No, sir.
21   Q    Do you have any independent like recollection
22 of being present at the 2015 range where KRS was read to
23 deputies?
24   A    It was either that one or '16, yes.  It's at
25 the very start of range.  It was either in 2015 or

Page 144

1  2016.  I'm not sure when we had the range in '16 so --
2    Q    And --
3    A    It may have been.
4    Q    -- how long -- how long would it have taken to
5  do that?
6    A    To review that policy?
7    Q    Yeah.
8    A    15 minutes.  Just a guesstimate.
9    Q    You don't have any specific independent
10 recollection of that, right?
11   A    No, sir.
12   Q    Outside of the range training that you just
13 testified to, is it fair to say that the Knox County
14 Sheriff's Department did not provide any -- any other
15 in-house training on the use of force to deputies prior
16 to June 29, 2016?
17        MR. WILLIAMS:  He testified earlier, Elliot,
18   that they used some kind of simulator, the firearms
19   simulator.
20   A    Yeah, firearms simulator.
21   Q    You weren't sure of what year though?
22   A    I'm not sure.  I'm not sure.
23   Q    Okay.  And sitting here today, you don't have
24 any documents that will refresh your memory, correct?
25   A    No, sir.  Correct.

Page 145

1    Q    And I'll represent to you that none of them
2  produced in this lawsuit that I'm aware of.
3    A    Okay.
4    Q    So outside the range and at some point this
5  simulator, prior to June 29, 2016, did the Knox County
6  Sheriff's Department provide any other training to
7  deputies on when it was appropriate to use force?
8    A    No, sir.
9    Q    Okay.  And it's -- it looks like at some point
10 after June 1, 2016 there were some written policies and
11 procedures in effect from your department on the use of
12 force; is that right?
13   A    Yes.
14   Q    And after -- aside from -- and you expected
15 supervisors under your command to give revised policies
16 and procedures to deputies at the Knox County Sheriff's
17 Department, correct?
18   A    Correct.
19   Q    But prior to June 29, 2016 is it fair to say
20 that there would not have been any in-house training on
21 the revised written policies and procedures of the
22 Knox County Sheriff's Department?
23   A    Correct.
24        MR. WILLIAMS:  Object to the form.  I'm not
25   sure -- what do you mean by revised policies and



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COLBY HALL, taken on May 15, 2019
146..149

Page 146

```
1    procedures?
2          MR. SLOSAR:  Well, we're -- the policies that
3    you created from the last administration.
4          MR. WILLIAMS:  Are you talking about the ones
5    that are -- have the revision stamp 1-1-2016,
6    Exhibit 3?
7          MR. SLOSAR:  Yes.
8          MR. WILLIAMS:  Okay.
9          MR. SLOSAR:  He has testified that these are
10   the ones -- he believes that these would have been
11   the first policies --
12         MR. WILLIAMS:  Correct.
13         MR. SLOSAR:  -- January 1, 2016.
14         MR. WILLIAMS;  I just -- when you say revised.
15         MR. SLOSAR:  I understand.  I could phrase it
16   a better way.  After you created these new written
17   policies and procedures at the Knox County
18   Sheriff's Department, there was no in-house
19   training on these new policies and procedures prior
20   to the June 29, 2016 incident, correct?
21         THE WITNESS:  Correct.
22   BY MR. SLOSAR:
23   Q    Okay.  I appreciate the revision thing.  I
24   tried to fix that.  And I just want to make sure this is
25   right, but your testimony today is that you had never
```

Page 147

```
1    seen the prior written policies or procedures that were
2    in place from the Pickard administration at the time
3    that you started in 2015, correct?
4    A    Correct.
5    Q    Okay.  The first time you saw those written
6    policies or procedures was at a deposition in a
7    different lawsuit; is that right?
8    A    Correct.
9    Q    I got to ask you these questions.  But to your
10   knowledge, were there any policies or procedures
11   implemented by the Knox County Sheriff's Department
12   following the shooting of a civilian in the last ten
13   years?
14   A    I'm sorry.  In the last --
15   Q    So after -- after there was the use of
16   force -- let's take it out of the shooting spectrum.
17   But let's start at 2015, okay?  When you became sheriff.
18   Since you have become sheriff, was there ever an
19   occasion where a deputy under your command used force
20   and because of that you implemented new policies,
21   procedures for training relating to the use of force?
22         MR. WILLIAMS:  Objection.
23   A    No, these were -- they were adopted and
24   written but not because of an instance.  If that's what
25   you're asking.
```

Page 148

```
1    Q    Yeah.  And so what I'm -- that is what I'm
2    asking and I'll ask it a better way which is that were
3    they -- were the policies and procedures ever revised as
4    a result of an officer's use of force?
5          MR. WILLIAMS:  Note an objection.  Go ahead
6    and answer.
7    A    No, not to my knowledge.  I don't recall if I
8    had.
9    Q    Since you've been sheriff, have any of the
10   deputies under your command been provided with any
11   additional training after the use of force by another
12   Knox County deputy?
13   A    No, other than the standard training through
14   DOCJT?
15   Q    And again, that occurs outside the Knox County
16   Sheriff's Department, correct?
17   A    Yes, correct.  Correct.
18   Q    And sitting here today, you have no way of
19   knowing what outside training deputies received,
20   correct?
21   A    Correct.
22         MR. WILLIAMS:  You had your -- you were
23   talking about outside of the discussion of what he
24   said occurs at the range, correct?
25   Q    Well, I'm talking about -- I consider that
```

Page 149

```
1    internal.  You saying that the range is internal range
2    training from Knox County, right?
3    A    Yes.
4    Q    Yeah.  So --
5          MR. WILLIAMS:  Maybe I misunderstood the
6    question.
7    Q    Outside agencies.
8          MR. WILLIAMS:  Sorry.
9          MR. SLOSAR:  Let's take a little bit of a
10   short break.
11         MR. WILLIAMS:  Yeah.  Good.
12         VIDEOGRAPHER:  The time is 2:39. We are off
13   the record.
14              (OFF THE RECORD)
15         VIDEOGRAPHER:  Okay. The time is 2:55.  We are
16   on the record.
17   BY MR. SLOSAR:
18   Q    Sir, I want to refer you to the actual policy
19   labeled "KCSO12.  The response to resistance."  If you
20   can turn there.   Is this one of the policies that you
21   drafted, sir?
22   A    Yes.
23   Q    Okay.  And at the time of the shooting, the
24   June 29,2016 shooting, you were the sheriff of
25   Knox County, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 41 of 86 - Page ID#: 4900
The Deposition of John H. Pickard, taken on May 13, 2019
150..153

Page 150

1    A    Correct.
2    Q    And prior to that time, you had been involved
3 in actually drafting the written policies and procedures
4 we're reviewing today, correct?
5    A    Correct.
6    Q    And at the time of the shooting incident,
7 would you have been the policy maker for the Knox County
8 Sheriff's Department?
9         MR. WILLIAMS:  Object to the form of the
10        question.  Legal connotation that may have.  With
11        that continuing objection made, you may answer the
12        question.
13    Q    You can answer.
14    A    Yes, I have -- my assistant he drafts
15 policies, I review them.  I request -- it depends on if
16 I like them or if I need something in there deleted or
17 whatever or added.  I have the final say over it, yes.
18    Q    And this policy that we're looking at is
19 titled, "Response resistance"; is that right?
20    A    It is.
21    Q    Okay.  And according to this -- well, where
22 did you get the statutory provisions that are included
23 in this policy, where did you pull that from?
24    A    The KRS policies?
25    Q    Yeah.

Page 151

1    A    Yeah.  It's on -- it just pertains to the
2 Kentucky Revised Statutes.
3    Q    Okay.  And I'm going to ask you some questions
4 that are going to be very easy, so that was one of the
5 easy ones.  I'm sorry about that.  It's just --
6    A    Okay.
7    Q    -- not everybody knows what KRS is --
8    A    Yeah.
9    Q    -- so we need it for the record.
10    A    Kentucky Revised Statutes.
11    Q    Okay.  And then you've got some definitions
12 after the KRS statutes, is that right?
13    A    Uh-huh.  I do.
14    Q    Okay.  And then after the definitions you have
15 a policy and procedure that relates to the use of
16 nondeadly and deadly force in response to resistance; is
17 that right?
18    A    Correct.
19    Q    Okay.  And under that, you have a number of
20 initials; is that right?
21    A    Correct.
22    Q    Okay.  And in the -- initial B it states
23 that an officer may use deadly force only when the
24 officer believes that the action in defense of human
25 life or in defense of any person in eminent danger of

Page 152

1 serious physical injury and/or under the circumstances
2 is justified in two different KRS statutes; is that
3 right, sir?
4    A    Yes.
5    Q    Okay.  Now, would you agree that this policy
6 and procedure relates to an understanding or
7 incorporates an understanding of the KRS statutes that
8 you cite to?
9    A    It does.
10    Q    Okay.  And would you agree that most deputies
11 at your agency aren't lawyers?
12    A    Yes.
13    Q    Yeah.
14    A    I'll agree to that.
15    Q    They're probably -- might be grateful and
16 maybe a little bit, you know, smarter for it not having
17 to be a lawyer but --
18        MS. ROBINSON-STAPLES:  Did you say your
19        grateful for that?
20    A    No.  I didn't say that.
21    Q    And prior to between the time these policies
22 and -- well, let me withdraw that.  It looks like the
23 next procedure says the specific use of nondeadly
24 physical force less lethal weapons and weaponless
25 techniques in overcoming resistance by an officer upon

Page 153

1 another person is justifiable in accordance with, and
2 then it cites to five different KRS statutes.  Do you
3 see that, sir?
4    A    Which page are you on?
5    Q    I'm on that same page.  Page 3, letter C.
6    A    Okay.
7    Q    Sorry about that.
8    A    C.  Okay.  Yes.  Yes.
9    Q    Okay.  And again, that refers to five KRS
10 statutes that are incorporated on the first two pages of
11 this policy and procedure; is that right, sir?
12    A    Correct.
13    Q    Okay.  Now, again, there wasn't any in-house
14 training on these specific policies and procedures after
15 their effective date of January 1, 2016 prior to
16 June 29, 2016; isn't that right?
17    A    Yes.
18        MR. WILLIAMS:  Okay.  Now, well, Elliot, let
19        me say this: Earlier, the sheriff testified that he
20        wasn't sure when the range training occurred or
21        when the simulator training occurred.
22        MR. SLOSAR:  I understand that.  Yes.
23        MR. WILLIAMS:  And because he can't
24        definitively say what dates those things occurred,
25        I just want his response to have that caveat.  I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 42 of 86 - Page
ID#: 4901
The Deposition of DAVID SMITH, taken on July 13, 2018
154..157

Page 154

1   mean I'll clarify it.
2       MR. SLOSAR:  You've certainly clarified it for
3   the record.  There is, just for the record, there's
4   no documentation has ever been produced in this
5   litigation response to plaintiff's discovery
6   request that would go to that.  So, obviously, or
7   after the conclusion of fact discovery with regard
8   to this deposition.  But I understand your point.
9   BY MR. SLOSAR:
10      Q   I've got a couple of little questions, okay,
11  about this use of force policy that I wanted to talk
12  to you about, Sheriff.
13      A   Uh-huh.
14      Q   What G refers to the use of legal intervention
15  technique by agency officer shall be pursuant to general
16  order OMB15A.  What is that?
17      MR. KELLEY:  We just talked about that.
18  That's -- that was a reference that he's used to
19  draft this policy and apparently left that in
20  there.
21      Q   Oh, and --
22      A   And we don't have an OMB15A.
23      Q   Is that in reference to a KSP policy and
24  procedure?
25      A   It is.

Page 155

1       MR. KELLEY:  Well --
2       A   That's probably a reference that he's used.
3       MR. KELLEY:  -- I don't want to answer for him
4   but we talked about it.  There's a legal --
5       A   Intervention.
6       MR. KELLEY:  -- intervention which involved --
7   legal intervention for their definition as motor
8   vehicles.
9       Q   Okay.  So that would not relate to the use of
10  force?
11      A   No.
12      MR. KELLEY:  No.
13      Q   Okay.
14      MR. KELLEY:  I mean a car could wind up being
15  use of deadly force, but...
16      Q   Now, there's a definition of less lethal
17  weapons or techniques at the very top; do you see that,
18  sir?
19      A   I do.
20      Q   Okay.  And in that definition, it lists a
21  number of nonlethal techniques that could be used in a
22  use of force situation; is that right?
23      A   Correct.
24      Q   Okay.  Would you agree that the written policy
25  or procedure that we're looking at doesn't provide any

Page 156

1   guidance to Knox County sheriff deputies on the use of
2   force continuum before using deadly force?
3       A   Not a one, two, three step process.  I agree.
4       Q   Okay.  And, again, to your knowledge, there
5   was not any internal training on that continuum after
6   you became sheriff in 2015 and prior to June 29, 2016?
7       A   Again, the farm simulator has a taser as well
8   and they can utilize based on the scenario which weapon
9   or which technique to use.
10      Q   Okay.  And you don't remember what year that
11  first started, correct?
12      A   Correct.
13      Q   Okay.  And even in that simulator, it would
14  not have given the officers the entire continuum with
15  regard to nonlethal force, correct?
16      A   Correct.
17      Q   Okay.  So prior to June 29, 2016 there were --
18  was neither training nor written policies or procedures
19  that gave guidance to Knox County deputies on the use of
20  force continuum, correct?
21      MR. KELLEY:  By Knox County.
22      A   By the Knox County Sheriff's Office
23  internally, however, I can't, you know, for DOCJT I'm
24  sure it's addressed in their academy and other --
25      Q   Let me ask it a better way.  I'm not trying to

Page 157

1   box out the basic academy that you're talking --
2       A   Right.
3       Q   -- about the training.  But prior to
4   June 29, 2016 after you became sheriff, is it fair to
5   say that there was neither training nor written policies
6   or procedures in place at the Knox County sheriff's
7   department that gave in-house guidance to deputies on
8   the use of force continuum prior to June 29, 2016?
9       MR. WILLIAMS:  I have the same -- he may
10  answer but I would have the same caveat regarding
11  the possibility of the simulator having occurred
12  prior to that date and/or --
13      A   Right.  And, again, I agree with -- I'm not
14  sure of the dates of the in-house farm's training,
15  screen training at that point.  I'm not sure.
16      Q   Sitting here today between January 1, 2016 and
17  June 29, 2016 you're unaware of any specific training
18  or -- well, let me -- let me withdraw the question and
19  ask it a different way.  Between the time that these
20  written policies and procedures came in effect
21  January 1, 2016 and the time of the Mills shooting on
22  June 29, 2016, is it fair to say that you're unaware of
23  any written policies or procedures that were in place at
24  the Knox County Sheriff's Department that would've given
25  guidance to deputies such as Mr. Ashurst on the use of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 158

1  force spectrum?
2      A    Correct.
3          MR. WILLIAMS:  I'll object to the form because
4  the spectrum may have different interpretations and
5  different definitions, and the use of force
6  spectrum has evolved over the years.
7      A    And let me say, too, that his farms instructor
8  training may have covered some of that.
9  BY MR. SLOSAR:
10     Q    But you have no direct knowledge of it.
11     A    I have no direct knowledge of it.
12     Q    And the outside firearms training by the DOCJT
13  would not have provided Mr. Ashurst with any guidance as
14  it relates to the Knox County's written policies and
15  procedures --
16     A    Correct.
17     Q    -- correct?
18     A    Correct.
19     Q    Okay.  And, again, there was no training that
20  took place at Knox County between January 1, 2016 and
21  June 29, 2016 that specifically went over the written
22  policies and procedures that were in effect as relates
23  to the use of force, correct?
24     A    Other than the manual being issued out to
25  them.

Page 159

1      Q    Okay.
2      A    No.
3      Q    Nothing other than that, right?
4      A    Correct.
5          MR. WILLIAMS:  Well, again, there was
6  testimony by the sheriff that at the range there
7  was a discussion of the policies --
8          MR. SLOSAR:  Well, at the range -- of the --
9          MR. WILLIAMS:  -- use of force policies.
10  BY MR. SLOSAR:
11     Q    No.  That's actually.  That misstates the
12  record that -- sir, your testimony earlier was that at
13  the range although you don't recall which year it was,
14  that there was a discussion of the KRS statutes,
15  correct?
16     A    Correct.
17     Q    Yeah.
18         MR. WILLIAMS:  Which is also specifically
19  mentioned in that policy?
20     A    Yes.
21         MR. SLOSAR:  Well, I understand that the KRS
22  statutes are mentioned in here.  But --
23         MR. WILLIAMS:  I'm not trying to nitpick.  I'm
24  really not.
25         MR. SLOSAR:  I feel like you're kind of trying

Page 160

1  to testify a little bit.
2          MR. WILLIAMS:  No.  I'm really not trying to
3  nitpick but you're asking him questions -- you're
4  asking him to testify to something differently than
5  he's already testified to.  And that was --
6          MR. SLOSAR:  No.  Jason -- Jason --
7          MR. WILLIAMS:  -- at the range the use of
8  force was discussed.
9          MR. SLOSAR:  The KRS statutes was discussed,
10  Jason.  What's goin on here is you're sort of
11  guiding a 30(b)6 witness to testify differently
12  than what he testified to before and I --
13         MR. WILLIAMS:  No.  I'm --
14         MR. SLOSAR:  -- I would ask you --
15         MR. WILLIAMS:  -- trying to recount what he
16  did testify to.
17         MR. SLOSAR:  I would ask you to make your
18  objections to form or whatever, other nature you
19  have in a nonspeaking way because, as you know, no
20  federal judge would allow for you to make these
21  types of objections in front of a jury and
22  depositions proceed as if we do at trial.  So I've
23  been very, very patient today.  I would ask you to
24  just make your objections in a nonspeaking manner.
25  Okay.

Page 161

1          MR. WILLIAMS:  It's the only way I know how to
2  make that objection by the form of the question
3  that you asked.
4          MR. SLOSAR:  Objection to form.  Foundation.
5          MR. WILLIAMS:  Is to recount what --
6          MR. SLOSAR:  What he didn't testify to.
7          MR. WILLIAMS:  We disagree about what he
8  testified to, but because we don't have a written
9  record at this time, I can't quarrel with you about
10  it.
11  BY MR. SLOSAR:
12     Q    Let's keep going okay, Sheriff.  We all want
13  you to get out of here at a reasonable hour.  I'm going
14  to provide you with some documents that you testified
15  that you reviewed prior to today's deposition relating
16  to Mr. Ashurst, okay?
17     A    Okay.
18         MR. SLOSAR:  And we're going to start -- what
19  I'd like to start with, actually, is Mr. Ashurst's
20  personnel file from -- bear with me one moment --
21  sorry about that.  It was labeled something
22  differently so we're going to mark this as
23  Exhibit number 4 and Lacee, there are parts of
24  these personnel files that we're going to need to
25  be redacted, okay.  There is some Social Security

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 6:17-cv-00184-REW-HAI    Doc #: 108-17    Filed: 02/10/20    Page: 44 of 86 - Page
ID#: 4903
The Deposition of JOHNNY PICKARD, taken July 19, 2019
162..165

**Page 162**

1    stuff.  So...
2            MR. KELLEY:  Yeah.  There are birthdays and
3    Social Security numbers, et cetera.
4            MR. SLOSAR:  We'll work with you-all to maybe
5    provide or replace it with a redacted version if
6    that's okay.
7            MR. KELLEY:  Sure.
8            MR. SLOSAR:  After the deposition?
9            MR. KELLEY:  Sure.  I mean stuff like income,
10   do you need to have that in there as well?
11           MR. SLOSAR:  No.  There's only a couple of
12   things I'm actually interested in, but I'm fine
13   with over-redacting.  There's some information
14   that's not in there.
15           MR. KELLEY:  Okay.
16           MR. SLOSAR:  We'll work with you-all on it.
17           (EXHIBIT 4 MARKED FOR IDENTIFICATION)
18   BY MR. SLOSAR:
19       Q    Sir, looking at this exhibit, number 4, is
20   this one of the exhibits that you reviewed prior to
21   coming in here today?
22       A    Is this the Danville?
23       Q    Yes.
24       A    Okay.  And take a moment to look through this
25   to make sure this is what -- one of the ones that you

**Page 163**

1    reviewed.  I'm going to ask you a few limited questions
2    about it.
3        Q    Okay.  You let me know when you're ready.
4        A    Yeah.  Go ahead.
5        Q    Okay.  Sir, you testified -- well, you
6    testified earlier that you did not personally receive
7    any of the personnel records from the
8    Danville Police Department prior to making the decision
9    to hire Mr. Ashurst; is that correct?
10       A    Correct.  I personally did not, but...
11       Q    Okay.  And to your knowledge, nobody under
12   your supervision personally received these records?
13       A    I can't speak for Tackett Wilson.  He may
14   have.
15       Q    Okay.  Well, if Tackett -- if Mr. Wilson had
16   received these records, they should've been made a part
17   of Mr. Ashurst's personnel file, correct?
18       A    Not necessarily but possibly.
19       Q    Well, wouldn't you agree that the Knox County
20   sheriff's department retained the application materials
21   from Mr. Ashurst and made it a part of the personnel
22   file?
23       A    We would retain the application.  Yes.
24       Q    Yeah.  And wouldn't you agree --
25       A    We wouldn't retain all the background that we

**Page 164**

1    had done.
2        Q    Well, when you conducted an investigation
3    prior to hiring Mr. Ashurst don't you recall retaining
4    that information as part of his personnel file?
5        A    I'm sorry.
6        Q    Let me show you Mr. Ashurst's personnel file.
7        A    All right.
8        Q    From your department.
9        A    Okay.
10       Q    I'll mark this as Exhibit number 5.  Here you
11   go, sir.
12           (EXHIBIT 5 MARKED FOR IDENTIFICATION)
13       A    Okay.
14       Q    Sir do you see these documents?
15       A    I do.
16       Q    Okay.  And from looking at these documents are
17   you able to determine whether this is the personnel file
18   for Mr. Ashurst?
19       A    Yes, sir.  It is.
20       Q    Okay.  And does this file include a memorandum
21   that you created during Mr. Ashurst's application
22   process?  There it is.
23       A    Yes.
24       Q    Okay.  Does it?
25       A    Yes.

**Page 165**

1        Q    Okay.  And that was a memorandum about the
2    phone conversation you discussed earlier with
3    Sheriff Root; is that right?
4        A    Correct.  Correct.
5        Q    Okay.  And you conducted that conversation
6    with Sheriff Root prior to Mr. Ashurst being hired,
7    correct?
8        A    I did.
9        Q    So your practice was to document any
10   information that you learned about Mr. Ashurst prior to
11   hiring him.
12       A    The reason why included this one is I
13   personally talked to Sheriff Root.
14       Q    Sure.
15       A    So I included it.
16       Q    And you would've expected officers under your
17   command to document any information that they learned
18   about Mr. Ashurst as well, right?
19       A    Somewhat, yes.
20       Q    Okay.  And they should have forwarded that
21   information onto you, correct?
22       A    He may have verbally talked to me about it.
23   I'm not sure.
24       Q    You have no recollection sitting here today,
25   correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1  A    Not on Danville.  Harlan and Laurel County,
2  yes.
3      Q    Now, would you agree looking through
4  Mr. Ashurst's personnel file that there's no documents
5  in this personnel file from the Danville Police
6  Department?
7      A    I agree.
8      Q    Okay.  There's, likewise, no documents in
9  Mr. Ashurst's personnel file from the Harlan County
10 Police Department?
11     A    Right.
12     Q    Okay.  And would you agree that there are also
13 no documents in Mr. Ashurst's personnel file from the
14 Laurel County Police Department?
15     A    Yes.  I agree.
16     Q    Okay.  And I'm not great --
17     A    Well, I have the written statement where I
18 talked to Sheriff Root.
19     Q    You're right.
20     A    Other than that --
21     Q    Yes.  And when I reference Laurel County would
22 you agree that there's also no documents from the
23 Laurel County Sheriff's Department other than the
24 memorandum you created?
25     A    Correct.

Page 167

1      Q    Okay.  I'm not the best with separating out
2  the police departments and sheriff's departments.  I
3  apologize for that.  So looking back at the Danville
4  personnel file, you would agree that none of this
5  documentation was -- well, let me withdraw that.  To
6  your knowledge, the documentation from Mr. Ashurst's
7  personnel file at the Danville Police Department was not
8  received prior to the hiring, correct?
9      A    Correct.
10     Q    And I'm going to refer you to some documents
11 in here, sir, Sheriff and we have numbers at the bottom
12 which is very helpful.  And we have numbers at the bottom
13 to turn to 1515.
14     A    Okay.
15     Q    Okay.  Prior to preparing for the deposition
16 last week, had you ever reviewed the performance
17 evaluation for Mr. Ashurst from his employment at the
18 Danville Police Department?
19     A    Prior to when?
20     Q    Prior to last week when you met with your --
21     A    No, no.
22     Q    Okay.  So this was not something that you
23 received nor reviewed prior to hiring Mr. Ashurst,
24 correct?
25     A    Correct.

Page 168

1      Q    Okay.  Now, do you see where the number 2 it
2  says, "Professional and interpersonal skills"?
3      A    I do.
4      Q    Do you see where it says, "At times,
5  Officer Ashurst needs to keep his emotions in check.
6  When he doesn't, Officer Ashurst can display a more
7  hostile attitude towards persons of the public"?
8      A    I do.
9      Q    Okay.  Did you ever have any conversations
10 with anybody at the Danville Police Department prior to
11 hiring Mr. Ashurst where you learned that he needs to
12 keep his emotions in check and at times has a more
13 hostile attitude towards persons of the public?
14     A    I personally didn't contact them.  Again, I'm
15 not sure if Tackett Wilson did or not.
16     Q    Did Mr. Wilson ever inform you any information
17 in this regard?
18     A    No, sir.
19     Q    Okay.  If he had informed you that Mr. Ashurst
20 had problems keeping his emotions in check, is that
21 something that you would've considered when hiring him?
22     A    I would consider.
23     Q    Yeah.  And what would you have done if you had
24 learned that?
25          MR. WILLIAMS:  Requires him to speculate.  You

Page 169

1  can answer.
2      A    It wouldn't have -- it wouldn't have swayed my
3  decision, my final decision.
4      Q    Okay.  So you would've still hired him if you
5  learned that, correct?
6      A    Correct.
7      Q    Now, the next section, it relates to
8  communications.  Do you see in this section where it
9  says, "Officer Ashurst completes reports that are well
10 written but at times requires more detail such as when
11 completing use of force paperwork"?
12     A    I do.
13     Q    Okay.  Did you ever learn that information
14 before making the decision to hire Mr. Ashurst?
15     A    No, sir.
16     Q    Okay.  Prior to hiring Mikey Ashurst, had you
17 ever sought out documentation from any law enforcement
18 agency in an effort to determine whether Mr. Ashurst had
19 ever used force prior to his application with you?
20     A    Again, no.  I personally did not.
21     Q    Do you have any independent recollection of
22 telling anybody under your supervision to investigate
23 use of force as it relates to Officer Ashurst at these
24 other law enforcement agencies?
25     A    Again, I had Tackett Wilson do the -- do the



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-17  Filed: 02/10/20  Page: 46 of 86 - Page
ID#: 4905
The Deposition of DAVID SMITH, taken on May 15, 2019
170..173

Page 170

1   background.  I didn't instruct him, you know, on how to
2   do his investigation.  I just told him to conduct one
3   and give me his -- his opinion.
4       Q    Did you give any guidance to Mr. Wilson on
5   what topics you wanted him to investigate?
6       A    Just thorough.  Just everything.  Nothing
7   specific.  Just do a background.
8       Q    Now, looking at the next one, do you see where
9   it says, "Officer safety"?
10      A    Yes.
11      Q    Do you see where it says, "I would like to see
12  Officer Ashurst improve on calls where less aggressive
13  approach could also be used to resolve conflicts"?
14      A    I see that.
15      Q    Okay.
16      A    He also -- is that a four out of five rating
17  he got on that one?
18      Q    It looks like it.
19      A    Yeah.  Okay.
20      Q    Did you ever learn prior to hiring
21  Deputy Ashurst that members of the Danville Police
22  Department wanted him to use a less aggressive approach
23  to resolve conflicts?
24      A    I didn't specifically know that, no.
25      Q    Is that something you would've taken into

Page 171

1   consideration --
2       A    Sure.  Sure.  I would've looked at it all.
3       Q    Would that have changed your opinion to hire
4   him at all?
5            MR. WILLIAMS:  Requires him to speculate.  You
6   can answer.
7            THE WITNESS:  I mean, I --
8            MR. KELLEY:  But also, I would object to --
9   the actual paragraph is lengthier and describes him
10  in different ways, but okay.
11      A    In policing, I mean, it's -- you would
12  occasionally run across situations and so forth where,
13  you know, you have to take control of the situation.  I'm
14  not sure exactly what that means, aggressive approach,
15  where he took control of the situation or whatever, but
16  yes, I would -- I would've took it into account.  Yes.
17  BY MR. SLOSAR:
18      Q    In your experience with the Kentucky State
19  Police for, you know, a quarter of a century, and in
20  that time did you come to see that some officers are
21  more aggressive in the tactics that they use during the
22  seizure of a person?
23      A    Occasionally, yes.  You run -- everybody's
24  different --
25           MR. WILLIAMS:  Object to the form of the

Page 172

1   question.
2       A    -- you know, just like attorneys, and doctors,
3   and everybody else.  Everybody individually does their
4   job, you know, differently sometimes.
5       Q    And would you agree that that's why it's
6   important for law enforcement agencies to have adequate
7   training --
8       A    Sure.
9       Q    -- on the use of force?
10      A    Sure.
11      Q    Would you agree that that's why it's important
12  for law enforcement agencies to have adequate training
13  on their written policies and procedures in place?
14      A    Uh-huh.
15      Q    Yes.
16      A    To review those policies, yes.
17      Q    Yeah.  And because if there's neither training
18  nor written policies or procedures, sometimes officers
19  might deviate in their own way?
20      A    It's certainly possible.
21           MR. WILLIAMS:  Objection to the form.  Requires
22  him to speculate.
23      Q    And that's something as a sheriff that you
24  don't want to have happen, correct?
25      A    No.  No.  I mean we want -- I mean we like to

Page 173

1   treat everybody as good as we can.
2       Q    And in 2016, you not only would want officers
3   under your command to treat everybody as good as they
4   can, but if officers receive training on the written
5   policies and procedures, Knox County deputies should
6   actually be handling situations in a similar way to
7   other officers on that staff, correct?
8            MR. WILLIAMS:  Object to the form.
9       A    It's a -- it's a guidance for all officers.
10      Q    Yeah.  Like if one officer is trained on the
11  use of force continuum, other officers on that use of
12  force continuum should have similar responses if they're
13  at the same scene?
14      A    Again, it's a -- it's a use of force
15  continuum.  It's subjective by the officer at that
16  situation with what's going on at the time.
17      Q    Wouldn't you agree that if those officers
18  received the same training and were following the same
19  policies or procedures one officer would not be at the
20  taser while another office is using deadly force?
21           MR. WILLIAMS:  Object to the form.
22      A    That wasn't my -- that was the constable,
23  correct?
24      Q    I'm giving you a hypothetical.
25      A    Right.  That's -- I mean I don't like to deal

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Mike Smith, Taken on May 15, 2019
174...177

Page 174

1  with hypotheticals, but I mean possibly.
2      Q    Well, in this case, Constable Bolton, to your
3  knowledge, didn't have any training on the use of force
4  by your department, correct?
5      A    Not by -- he wasn't my employee.
6      Q    Yeah.  But by June 29, 2016, you were aware
7  that Constable Bolton was regularly going on ride-alongs
8  with deputies under your command, correct?
9      A    Correct.  He's a law enforcement elected
10  officer so --
11      Q    You can't stop him?
12      A    Well, he was in there.
13      Q    Did you ever, you know, tell Constable Bolton
14  that you-all had range training going on annually?
15      A    I'm not sure if I did or not, sir.
16      Q    Do you recall ever personally or somebody
17  under your command handing Constable Bolton a written
18  copy of the policies and procedures of the Knox County
19  Sheriff's Department?
20      A    I didn't -- I don't recall if anybody -- any
21  supervisor did, or not.  I didn't.
22      Q    Constable Bolton just sort of did his own
23  thing, right?
24      A    Well, he's elected.  I mean I'm -- I'm not
25  really his boss, you know.

Page 175

1      Q    Does Constable Bolton have a boss to your
2  knowledge?
3      A    The people of the county, I guess.  It's a
4  constitutional office.
5      Q    All right.  Let's go to 1557, okay.
6      A    Okay.  Okay.
7      Q    Sir, do you see on this page where it says --
8  well, first of all, do you see a reference of Tackett,
9  Sergeant Tackett Wilson?
10      A    I do.
11      Q    Okay.  Were you aware that Sergeant Tackett
12  Wilson was a reference for Mr. Ashurst to the
13  Danville Police Department before you made the hiring
14  decision in 2015?
15      A    I don't think I was.
16      Q    Okay.  Now, according to Mr. Wilson,
17  Sergeant Wilson, Mikey Ashurst had two tattoos on his
18  arms that prevented him from successfully being employed
19  at the Kentucky State Police.  Have you ever seen those
20  two tattoos?
21      A    He had, during the application process, I
22  think he was having a process of -- he was taking them
23  off.
24      Q    Yeah.  So I know that recently when -- so this
25  -- so according to this, and I don't know what's true or

Page 176

1  what's not true, but according to this, Mr. Ashurst may
2  have applied to KSP, you know, by whenever this was
3  complete which would've been, I think, 2012 or 2013. But
4  I know more recently Mr. Ashurst had his tattoos
5  removed.  That's like 2016, 2017.
6      A    Right.
7      Q    Had prior to Mr. Ashurst having those tattoos
8  removed, have you ever seen them?
9      A    I think was one of them a tribal band or
10  something?  I think I did.
11      Q    Okay.
12      A    Yeah.
13      Q    Do you recall --
14      A    And there was one around his wrist.  Like
15  barbed wire or something maybe.  I don't know.
16      Q    All right.  I'm going to ask for you to turn
17  to the next page.  So this is 1558.  The interview with
18  John Ashurst.  And it's the fourth paragraph, I think.
19  Fifth paragraph, sorry.  It starts with, "Mr. Ashurst
20  also told Detective Peal (phonetic).
21      A    Okay.
22      Q    Prior to hiring Mr. Ashurst, did you ever
23  learn that he was involved in an incident with
24  Harlan City Police where he was charged with disorderly
25  conduct?

Page 177

1      A    No.  I would've reviewed his criminal history
2  but disorderly conduct, I mean, that's usually --
3          MR. KELLEY:  He was a juvenile at the time.
4      A    Yeah.  That's right.  He would've been -- it
5  wouldn't have been on there because he would've been a
6  juvenile.
7      Q    And, again, you haven't received any of these
8  documents or reviewed them prior to hiring Mr. Ashurst,
9  correct?
10      A    No, sir.  I haven't -- I didn't review --
11      Q    And Mr. Ashurst didn't volunteer any of this
12  information to you during the hiring process, right?
13      A    Not that I can recall.
14      Q    Okay.  Now --
15          MS. ROBINSON-STAPLES:  (Sneezes.)
16          MR. WILLIAMS:  Bless you.
17          MS. ROBINSON-STAPLES:  Excuse me.
18  BY MR. SLOSAR:
19      Q    I'm going to show you what we'll mark as
20  Exhibit number 6.
21          (EXHIBIT 6 MARKED FOR IDENTIFICATION)
22      A    Okay.
23      Q    This is a file from Harlan County.  And before
24  we get into this, sir, you know, earlier you had
25  testified that Constable Bolton regularly did

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-17   Filed: 02/10/20   Page: 48 of 86 - Page
ID#: 4907
The Deposition of KIM SMITH, taken on July 13, 2018
178..181

Page 178

1  ride-alongs with deputies of the Knox County Sheriff's
2  Department, correct?
3      A    Right.
4      Q    And you were aware of that prior to
5  June 29, 2016, right?
6      A    Yes.  Yes.
7      Q    And were you aware that Constable Bolton could
8  be in a position to serve as backup to officers under
9  your command?
10     A    Possibility, yes.
11     Q    Yeah.  Especially when officers didn't have
12  any other Knox County deputies with him in the car,
13  correct?
14     A    Correct.  Yes.
15     Q    So prior to June 29, 2016 you were aware that
16  there were situations where Constable Bolton was not
17  just doing ride-alongs with deputies under your
18  supervision but was actively serving as backup if the
19  situation required it, correct?
20     A    Correct.
21          MR. WILLIAMS:  Object to the form of the
22     question.  You can answer the question.
23     Q    Is that right?
24     A    Correct.
25     Q    Okay.  Now, looking at this personnel file, is

Page 179

1  this one of those other personnel files that you
2  reviewed in preparing for the deposition today, sir?
3      A    Uh-huh.
4      Q    Is that a "yes"?
5      A    Yes.  Yes.  I'm sorry.  Yes.
6      Q    No, you're great.  It's just hard for Lacee to
7  type it up.  So we all appreciate it.  All right.  And,
8  again, this is a personnel file that you did not review
9  and did not receive prior to hiring Mr. Ashurst,
10  correct?
11     A    Correct.  But I recall Tackett mentioning
12  Harlan -- that he'd worked for Harlan County.  He
13  checked into it.
14     Q    Okay.  Did Mr. Tackett ever inform you that
15  the chief of police wrote a memorandum on March 22, 2013
16  stating that he would not recommend Mr. Ashurst for
17  rehire?
18     A    Yes.  He did make me aware of that, however, I
19  don't know.  We discussed the situation and Tackett
20  looked into it and we had verbally agreed to, you know,
21  that it was there, and we could hire him.
22     Q    Did Mr. Tackett or did Mr. Wilson tell you
23  what investigation he did into Mikey Ashurst's
24  employment at the Harlan County?
25     A    He -- no.  He didn't go into any details on

Page 180

1  it with me.
2      Q    Did Mr. Wilson ever tell you that he did any
3  investigation into citizen complaints that were made
4  against Mr. Ashurst due to his attitude and behavior at
5  the Harlan County Police Department?
6      A    He may have.  He may have.  I don't recall.
7      Q    You don't have any recollection?
8      A    Yeah.
9      Q    Okay.  You don't have any notes or anything
10  that would refresh your memory, correct?
11     A    No, sir.
12     Q    But you definitely never saw any of
13  Mr. Ashurst's personnel file prior to hiring him,
14  correct?
15     A    Correct.
16     Q    Okay.  And you're the one that makes the
17  decision, not --
18     A    Yes.  It was.
19          MR. WILLIAMS:  Just for clarification of the
20     record, you mean the Harlan County personnel file.
21          MR. SLOSAR:  Well, I appreciate that.
22  BY MR. SLOSAR:
23     Q    You never received the personnel files for
24  Mikey Ashurst from any law enforcement agency prior to
25  hiring him, correct?

Page 181

1      A    No.  I just instructed Tackett to look into
2  it.
3      Q    Okay.  Now, I'm going to refer you to
4  page PL1562 which I believe you're on.
5      A    I am.
6      Q    Right?  Will you review that page for a
7  moment, sir, and let me know when you're finished?
8      A    Okay.
9      Q    Okay.  Did you receive this document prior to
10  hiring Mr. Ashurst?
11     A    I don't recall looking at it.
12     Q    Okay.  Well, if you recalled reviewing this,
13  this is something that you would've wanted more
14  follow-up investigation on, correct?
15          MR. WILLIAMS:  Requires him to speculate.
16     A    Probably.  I mean it appears he went to the
17  state basketball tournament and maybe the supervisor got
18  a little mad because he called in late and gave him a
19  bad review.  Who knows?  You know, it's -- a lot of
20  these are subjective and internal feelings come out in
21  these and you try to be objective.
22     Q    Well, an objective way to look at this would
23  be to request any citizen complaints that were made
24  against Mr. Ashurst while he was at Hardin County,
25  right?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

1    A    Possibly, yes.
2    Q    Yeah.  And that's something that would've been
3  helpful for you to know prior to making your decision to
4  hire him, correct?
5    A    Actually the more information the better, yes.
6    Q    Yeah.  But you testified earlier that you do
7  believe that Tackett Wilson informed you that
8  Harlan County had a memo stating that they would not
9  recommend --
10    A    I don't know that he necessarily said it had a
11  memo, but they wouldn't recommend --
12    Q    But that they would not --
13    A    -- yes.
14    Q    And you considered that when you hired him,
15  correct?
16    A    Yes.
17    Q    And you decided to go the other way --
18    A    Yes.
19    Q    -- correct?  And when you decided to go the
20  other way, you had never made any personal request to
21  receive the personnel file for Mr. Ashurst at any of
22  those other law enforcement agencies, correct?
23    A    Correct.
24    Q    Okay.  Now, let's go to the next exhibit.  I
25  think it's on Laurel County.  We'll make this

Page 183

1  Exhibit number 7.  And is this one of the documents that
2  you reviewed prior to today's deposition, sir?
3        (EXHIBIT 7 MARKED FOR IDENTIFICATION)
4    A    No, sir.  Like I said, I've contacted
5  Sheriff Root.
6        MR. KELLEY:  I think he's asking --
7    A    What?
8        MR. KELLEY:  In preparation for this
9  deposition.
10    A    Oh, yes.  Yes.  I'm sorry.  Yes.  Yes.
11    Q    I know what you're getting at.  I'm sorry.  You
12  know where I'm going.
13    A    Yeah.  I kind of jumped.  I kind of jumped
14  ahead of you.  Yes.  Yes.  It is.
15    Q    So this is one of the documents you reviewed
16  for today's deposition, but this was not -- you had not
17  reviewed this personnel file for Mr. Ashurst prior to
18  making the decision to hire him, correct?
19    A    Correct.  I know John good enough that I -- I
20  wanted to talk to him personally.
21    Q    And what made you want to talk to Sheriff Root
22  personally?
23    A    Well, I just -- during the application
24  process, Mikey was up front telling me what had
25  happened, and I wanted to talk to -- to Sheriff Root and

Page 184

1  see what his -- his take was on it.
2    Q    Did -- in that conversation with Sheriff Root,
3  did you ever ask him to review Mr. Ashurst's personnel
4  file?
5    A    No.  I just, you know, wanted a general
6  consensus from him as his supervisor and sheriff.
7    Q    And is it fair to say that at the time you
8  made -- during the time of the application process for
9  Mr. Ashurst was in April -- March-April 2015; does that
10  sound right?
11    A    Yeah.
12    Q    During that time period is it fair to say that
13  there were no policies or procedures in place at the
14  Knox County Sheriff's Department related to the hiring
15  of deputies?
16    A    Correct.
17    Q    Okay.  So is it fair to say that in that time
18  you were able to make decisions based on your sort of
19  gut feeling about whether and officer would be qualified
20  to be a deputy?
21        MR. WILLIAMS:  Object to the form.
22    A    I got more than a gut feeling.  I mean it was
23  a background check and talking to departments and so
24  forth.  So...
25    Q    Sure.  But there was no specific set of

Page 185

1  standards that -- that you had to follow to hire
2  somebody, correct?
3    A    Correct.
4    Q    You could've literally not spoken to anybody
5  and hired somebody, correct?
6    A    Correct.
7    Q    Okay.  You didn't have to tall Sheriff Root,
8  right?
9    A    No.  Correct.
10    Q    Just like you didn't have to get any
11  documentation related to Mr. Ashurst at any other law
12  enforcement agency, correct?
13    A    Correct.
14    Q    In fact, since there were no policies or
15  procedures, you didn't even have to run a criminal
16  background check on him, correct?
17    A    Correct.
18    Q    Yeah.  So all right.  So I'm going to ask
19  that, you know, luckily, we've got some Bates numbers on
20  this too so I'm going to point you to a specific page.
21  It's got -- sorry, one -- one -- prior to hiring
22  Mr. Ashurst, had you ever reviewed any documentation
23  relating to other uses of force from Deputy Ashurst at
24  prior law enforcement agencies?
25        MR. WILLIAMS:  Let me just reiterate my



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 186

1    continuing objection to other incidents. With that
2    objection, though, you may answer the question.
3        A    No. I personally did not. Like I said, I
4    just directed Tackett Wilson to do a, you know,
5    investigation of the matter and on his background.
6        Q    Okay. And, again today, you have -- you don't
7    have a specific recollection of what Mr. Wilson did in
8    his investigation, correct?
9        A    I don't, sir.
10       Q    When you interviewed Deputy Ashurst for the
11   job at your agency, did you ask him whether he had ever
12   used force in any of his prior law enforcement
13   capacities?
14       A    I don't recall the specific questions but,
15   yeah, it's kind of a standard deal. I mean, I
16   would've -- I would've probably asked him that.
17       Q    Do you recall?
18       A    I don't recall, sir. That's several years
19   ago.
20       Q    Do you know if you took any notes or anything
21   on that conversation?
22       A    I didn't.
23       Q    Just sort of a casual conversation with him?
24       A    Well, it's a formal interview. I mean, you
25   know, I mean, yeah.

Page 187

1        Q    All right. In the policies and procedures
2    from your agency, the Knox County Sheriff's Department.
3    Can you take those out?
4        A    Yes.
5        Q    Is that Exhibit 3?
6        A    Uh-huh. Yes.
7        Q    Are there any policies or procedures relating
8    to the use of social media by Knox County deputies?
9        MR. KELLEY: I'm sorry. Whether they can use
10       it or whether --
11       MR. SLOSAR: Related --
12       MR. KELLEY: As part of a background check,
13       or...?
14       MR. SLOSAR: No. Just relating to the use.
15       MR. KELLEY: Okay.
16       A    Yes. There is.
17   BY MR. SLOSAR:
18       Q    And what policy and procedure is that, sir?
19       A    It's KCSO-8.
20       Q    Okay.
21       A    Agency computer uses and social networking.
22       Q    Okay. And does this policy and procedure,
23   does it govern officers both in -- on duty and off duty?
24       A    Yes.
25       Q    Okay. There's going to be some easy questions

Page 188

1    that I'm asking you.
2        A    Okay.
3        Q    I think some of those may happen here. And
4    what's the general purpose for having policies and
5    procedures relating to the use of social media?
6        A    Well, obviously, I mean it's a -- it's a large
7    network and people -- people see it, and review it, and
8    kind of get, you know, a taste of that individual and
9    the agency. You want to -- want to make sure that, you
10   know, you govern it somewhat.
11       Q    And you especially want to make sure that
12   officers of the Knox County Sheriff's Department are
13   holding themselves up in a manner that's consistent with
14   the ethical obligations of law enforcement, correct?
15       A    Correct.
16       Q    And so can you describe generally what the
17   on-duty policies and procedures would've been for
18   Knox County officers in -- as a result of this policy?
19   I'm looking at page 2.
20       MR. WILLIAMS: I would object to that form of
21       that question. If you want to ask him about a
22       particular provision of the written policies,
23       that's certainly appropriate but to ask him in
24       general what they are --
25       MR. SLOSAR: Okay. Sure.

Page 189

1        MR. WILLIAMS: -- is inappropriate.
2    BY MR. SLOSAR:
3        Q    What are the on-duty procedures according to
4    this policy? And I'm looking at section 3 on page 2.
5        A    Right. It basically investigation types --
6    when you're conducting an investigation not to put any
7    information on social medial pertaining to that.
8        Q    Does it also prohibit video, audio,
9    photographs or any other images which memorialize a law
10   enforcement-related action of the agency?
11       A    Yes. Per policy.
12       Q    Yeah. And does it also prohibit, you know,
13   pictures, audio and video that would include officers
14   and their logos, or uniforms, or badges or any other
15   symbols of the agency?
16       A    Well, not necessarily. I mean I allow them to
17   put, you know, cruisers on there, or you know, anything
18   like that. They can be pictured with their uniform.
19       Q    Does it --
20       A    It doesn't restrict them that tightly.
21       Q    Let's talk about section 4A.
22       A    Okay.
23       Q    Does this policy and procedure prohibit
24   employees of the agency who utilize social networking
25   sites, logs, Twitter, other mediums of electronic

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 190

1  communication in their off duty time to maintain
2  appropriate level of professionalism and appropriate
3  conduct so as not to broadcast in a manner which is
4  detrimental to the mission and function of the agency?
5      A   Correct.
6      Q   And who at the Knox County
7  Sheriff's Department is responsible for making sure that
8  this policy and procedure is complied with?
9          MR. WILLIAMS:  Let me just make an objection,
10         continuing objection to the use of the word,
11         responsibility.  It may have a legal connotation.
12         With that objection made, you can answer the
13         question.
14     A   It would be a supervisor.
15 BY MR. SLOSAR:
16     Q   Somebody under your command?
17     A   Yes.
18     Q   Okay.  To your knowledge, has Deputy Ashurst
19 ever been disciplined for any photographs, or comments,
20 or memes, or anything social media-related that he has
21 done or put online after his hiring in April of 2015?
22     A   Yes.  He has been verbally contacted about an
23 incident or two I think by a supervisor.
24     Q   Do you know which supervisor that was?
25     A   Everett Johnson.

Page 191

1      Q   Do you know when that --
2      A   I'm not sure what -- when it was or anything.
3  I just know that he -- Everett, Captain Johnson probably
4  had a couple of instances with him pertaining to social
5  media.
6      Q   Do you know why?
7      A   I don't have Facebook and I, you know, rely on
8  them to take care of it for me, so...
9      Q   Did Everett Johnson ever inform you as to some
10 of the stuff that Deputy Ashurst was posting online?
11     A   Well, I'm sure if he talked to him a couple of
12 instances and verbally reprimanded him, it's probably --
13 yeah, he's probably seen some things or something.  It
14 was on his social media network.
15     Q   Was any reprimand given to Deputy Ashurst in
16 written form to your knowledge?
17     A   Not to my knowledge.
18     Q   Was he ever disciplined in any way?
19     A   Just the verbal reprimand, I think.
20     Q   Have you ever personally reviewed any of the
21 social media pages or websites relating to Mr. Ashurst?
22     A   No.
23         MR. KELLEY:  He did before the deposition when
24     I interviewed with him.
25     A   Oh, as far as work, no, but yeah, I mean they

Page 192

1  were in some of the documents that we looked at.
2      Q   Okay.  I -- okay.  That's fair.  I'm going to
3  show you what we'll mark as Exhibit number 8.  You get
4  the color one.
5          (EXHIBIT 8 MARKED FOR IDENTIFICATION)
6          MR. KELLEY:  I've got one.  Okay.  Thanks.
7      Q   Sir, I'm going to forward you first to the
8  page with the Bates number of PL2108.  Let me know when
9  you get there.
10     A   Okay.
11     Q   Do you see on June 3rd where there is a
12 photograph at the bottom of an officer holding a gun to
13 the head of someone else?
14     A   I do.
15     Q   Okay.  And do you see above that where it
16 says, "Train to win"?
17     A   I do.
18         MR. KELLEY:  Is this June 3, 2017?
19         MR. SLOSAR:  This --
20         MR. KELLEY:  Because they have on the next
21     page 2017 motor vehicle.  I don't know.  No new
22     objection for that reason.
23         MR. WILLIAMS:  Let me just also note an
24     objection to the extent that as I understand the
25     contents of the complaint this line of questioning

Page 193

1  would have nothing relating to the incident
2  involving Jessie Mills or lead to information
3  discoverable information relating to the incident
4  involving Mr. Mills, but with that continuing
5  objection, you may answer questions.
6          MR. SLOSAR:  We do believe it's relevant as --
7      for a number of reasons, including Mr. Ashurst's
8      killing Jessie Mills in this case and apparently
9      stating on June 3rd that putting a gun to the head
10     of another person is training to win, but it'll be
11     an argument we deal with in court, not for today,
12     so you can answer the question.
13         MR. KELLEY:  As we sit here right now, do you
14     know whether it was -- what year it was?
15         MR. SLOSAR:  I think that this stuff was
16     produced in 2018 --
17         MR. WILLIAMS:  It references a 2017 Ford for
18     some
19         MR. SLOSAR:  -- and he was questioned about it
20     at his deposition --
21         MR. KELLEY:  Never mind.  If you don't --
22         MR. SLOSAR:  -- which was in 2018.  So I
23         MR. WILLIAMS:  Yeah.  We've made our
24     objections.
25         MR. KELLEY:  Go ahead and answer the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Mike Smith, taken on May 13, 2019

194..197

Page 194

1  BY MR. SLOSAR:
2      Q    Were you -- prior to today -- well, prior to
3  preparing for your deposition last week, sir, Sheriff,
4  were you ever made aware that Deputy Ashurst was posting
5  a photograph like this --
6      A    Yes.  I --
7      Q    -- with comments --
8      A    -- I'm pretty sure that this is the one that
9  Mr. Johnson addressed him about.
10     Q    Okay.  Yeah.  And does that photograph and
11 comment concern you -- is it concerning to you that a
12 deputy in your department would post something like that
13 on his social media account.
14     A    That's why he was talked about.  That's why he
15 was confronted with it, yes.
16     Q    And what about that comment and photograph
17 concerns you, Sheriff?
18     A    Well, I'm not -- I don't know if it looks at a
19 training site or somewhere.  I'm not sure.  It just -- I
20 mean we don't like, you know -- shouldn't put it on
21 Facebook.
22     Q    Is it concerning to you -- yeah, you know,
23 does your printout have the full comments?
24     A    Yes.
25     Q    Let me give you -- it does have the full --

Page 195

1      A    It's got -- it has comments on it, yes.
2           MR. KELLEY:  Down at the bottom, it looks like
3  it breaks off.
4      A    Oh, okay.  It's got some on the back, but --
5           MR. KELLEY:  It doesn't have as much as we
6  have.
7      Q    Let me give you a bigger picture of this.
8  Yours doesn't have --
9      A    On the next page it does.
10     Q    Let me show you --
11          MR. KELLEY:  It does if you go to the back of
12 the page.
13     Q    Yeah.  It says, "The difference" -- I'll read
14 to you what it says.  "The difference between
15 competition and combat is rules.  If there are rules,
16 it's a sport.  In a fight if you're not cheating, you're
17 not trying hard enough to win."  And that is we're going
18 to need to -- I think the Bates sort of cuts it off, but
19 we're going to need to reproduce that.  Did you ever
20 know -- did you ever become aware that Deputy Ashurst
21 posted a photograph like that with those comments?  And
22 you can read it on here if you'd like.
23     A    I knew -- yeah, Everett -- Mr. Johnson told me
24 about the one with the gun, yes.  But I didn't -- I
25 didn't know about the comments and he -- and Everett

Page 196

1  said that he addressed it with him verbally.
2      Q    Okay.
3      A    So...
4      Q    And would you agree that a picture like this
5  with comments like that -- not just the quote but Deputy
6  Ashurst's comments train to win that that's concerning
7  to you in light of the fact that he has been involved in
8  the use of deadly force prior to that?
9      A    Yeah.  I mean he obviously shouldn't put it on
10 Facebook and yeah, it would concern somewhat.  But, you
11 know, it's -- he's talking about training, you know, and
12 winning in a fight.  We don't want to lose a fight, but
13 he's training.
14     Q    Sure.  But in a fight, you would agree that
15 law enforcement officers need to follow policies and
16 procedures, correct?
17     A    As much as they can.  Yes.  Yes.  I agree.
18     Q    You would agree that law enforcement officers
19 under your command should not be killing people to win a
20 fight, correct?
21     A    Correct.
22          MR. WILLIAMS:  Object to the form.
23     A    Well, yeah, it's -- I agree, but, you know, in
24 a fight, you know, it's -- it's a lot of different
25 variables with that.

Page 197

1      Q    Sure.  But law enforcement should only resort
2  to using deadly force when it's absolutely required?
3      A    Yeah.  I think we've talked about this before.
4      Q    Yeah.
5      A    Yeah.
6      Q    It's not a -- would you agree that in 2016, a
7  reasonably trained law enforcement officer would
8  understand that shooting somebody using deadly force is
9  not appropriate unless it's absolutely required?
10     A    Right.  Unless it's necessary just like any
11 other police shooting.
12     Q    Deadly force is not appropriate to win a
13 fight, correct?
14          MR. WILLIAMS:  Objection to the form of the
15 question.  It has no context.  It's argumentative
16 and --
17     A    It depends on what kind of fight.  If it's a
18 gun fight or if it's a fight for your life.  I mean it's
19 -- it's a lot of different -- your question is kind of
20 vague to me.
21     Q    To your knowledge, Jessie Mills never had a
22 gun?
23     A    Or if you're in a fight for your life.
24     Q    And to your knowledge Jessie Mills never hit
25 Deputy Ashurst, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1    A    Never hit?  No.

2    Q    Yeah.  To your knowledge, when Deputy Ashurst

3  met with you and was going through his version of

4  events.

5    A    It was a struggle and he was trying to get --

6  he stated he was trying to get his gun.

7    Q    But did Deputy Ashurst tell you that

8  Jessie Mills was trying to get the deputy's gun when --

9    A    He was in fear of his life and he was --

10    Q    -- when he made the decision to shoot and

11  kill?

12    A    He said he was in fear of his life and he was

13  afraid he was going to get his gun.

14    Q    My question is a little bit different.

15    A    Okay.

16    Q    Did Deputy Ashurst tell you that Jessie Mills

17  was attempting to get his gun --

18    A    That's my --

19    Q    -- when he fired the shots?

20    A    My understanding, yes, I mean.

21    Q    Did he tell you that?

22    A    I -- that he was --

23    Q    I don't think --

24    A    -- an attempt to get his gun.  I can't

25  remember the exact --

Page 199

1    Q    Okay.

2    A    -- wording of it so I can't really --

3    Q    Nobody wants you to guess.

4    A    Right.  Right.  Right.

5    Q    If you don't recall you don't recall.

6    A    I don't recall.  I don't --

7    Q    But, sir, I'm going to forward you to

8  page 2137; let me know when you're there.

9    A    Okay.  Okay.

10    Q    Okay.  Do you see the March 19, 2017 post of a

11  weapon with what looks like it's on top of a t-shirt

12  that says "Black guns matter?"

13    A    I do.

14    Q    Okay.  Did you ever become aware of this

15  post --

16    A    I don't think so.

17    MR. KELLEY:  Well, note an objection as to the

18    date of it.

19    Q    Is there a different date that I'm not

20  reading?

21    A    Same marked that's --

22    MR. KELLEY:  Same objection I made earlier.

23    A    -- yeah.   Marked on page 2017 is about --

24    MR. SLOSAR:  Well this one says

25    March 19th of 2017.

Page 200

1    MR. KELLEY:  Yeah.  I'm just saying the -- I'm

2    objecting to the relevance of it.

3  BY MR. SLOSAR:

4    Q    Oh, I see.  Okay.  Did you ever become aware

5  of this post at any point in time?

6    A    I don't recall on this post.

7    Q    Okay.  Does it concern you at all that a

8  deputy at the Knox County Sheriff's Department is

9  posting a picture of an extended clip weapon on top of a

10  t-shirt that says, "Black guns matter?"

11    MR. KELLEY:  Object to the form of the

12    question requiring him to speculate.

13    Q    You can answer.

14    A    I wish he wouldn't post it on Facebook.

15    Q    Does it concern you at all, though?

16    MR. KELLEY:  Same objection.

17    A    I just wish he wouldn't post it on Facebook

18  and, I mean, it -- nobody ever complained about it to my

19  knowledge but I would have had him not do that.

20    Q    About how much after you met with Mr. Ashurst

21  did -- about how far after the shooting did you meet

22  with him to talk to him about it?

23    MR. KELLEY:  Asked and answered.

24    A    I don't --

25    Q    I think you said it earlier --

Page 201

1    A    -- a date -- it was during the -- when he was

2  off.

3    Q    Do you remember how long he was off?

4    A    It was approx -- maybe two or three weeks.

5    Q    Okay.  But pretty quick.  But fairly quickly.

6    A    Yeah.

7    Q    Is that right?

8    A    Yes, pretty quick.  Yeah.

9    Q    Now, when you met with Deputy Ashurst do you

10  recall approximately how long that meeting was?

11    A    I don't recall.

12    Q    And during that meeting Deputy Ashurst talked

13  to you a little bit about what happened; is that right?

14    A    Yeah.  A little bit.

15    Q    Was Constable Bolton there?

16    A    No.

17    Q    Did you ever talk to Constable Bolton about

18  what happened?

19    A    Not really.  No.

20    Q    After the Jessie Mills incident did you ever

21  request that Constable Bolton review any of the written

22  policies or procedure of the Knox County Sheriff's

23  Department?

24    A    No.

25    Q    Did you ever take any steps after the shooting

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  of Jessie Mills to determine whether Constable Bolton
2  received any use of force training?
3      A    I think after that he attended -- may have
4  attended our next range.  I think.
5      Q    But you're not sure.
6      A    I'm not sure.
7      Q    Prior to that you don't recall
8  Constable Bolton ever participating in the range,
9  correct?
10     A    Correct.
11     Q    And prior to that I'm referring to the
12  shooting of --
13     A    Right.
14     Q    -- of Jessie Mills.
15     A    I understand.
16     Q    Great.  Okay.  Oh yeah.  Sir, I'm going to
17  refer you to page 2141; do you see that?  Oh, sorry.
18  I'm --
19     A    Yes, I --
20     Q    Please tell me when you're there.
21     A    I'm -- yeah.  I'm trying to be quick, man.
22  Yes, --
23     Q    Now, you're there.
24     A    -- I've got it.
25     Q    Do you see the July 8, 2016 post?

Page 203

1      A    July 8th -- yes, I do.
2      Q    Okay.  And that's about ten days -- within
3  ten days of the shooting of Jessie Mills; would you
4  agree with that, approximately?
5      A    Yes.
6      Q    Okay.  And in this post Mr. Ashurst posts
7  something that says something to the effect, "I will
8  never apologize for defending this line," and then it's
9  got a blue line; do you see that?
10     A    I do.
11     Q    Yeah.  Prior to preparing for your deposition
12  were you aware that Mr. Ashurst was on social media
13  within a week-and-a-half of the shooting posting
14  something to this effect?
15     A    I wasn't aware of this.
16     Q    And does that raise any concerns for you that
17  he is openly discussing defending the blue line while --
18     A    Again, he shouldn't have posted it on social
19  media.
20     Q    Would you agree that that --
21     A    A problem.
22     Q    -- was inappropriate for him to post
23  especially in light of the administrator that you --
24     A    I wouldn't have done it.
25     Q    Should somebody under your command have done

Page 204

1  it?
2      A    I would wish they wouldn't have.
3      Q    And at this time, Mr. Ashurst was still being
4  investigated criminally, correct?
5      A    Correct.
6      Q    And at this time he was on administrative
7  leave form the force, correct?
8      A    Yes.
9      Q    Now, I'm going to ask for you to turn to
10  page 2202; that's a post from December 25, 2012.  I
11  believe that might have been Christmas.
12     A    The taser picture?
13     Q    Yes.
14     A    Okay.  I got it.
15     Q    Prior to preparing for the deposition were you
16  ever made aware that Mikey Ashurst has posted a meme of
17  an officer tasing someone with the sentence under it,
18  "Taser from badass to crying P-word in .5 seconds?"
19     A    No, sir.
20     Q    Were you aware that when posting this
21  Mikey Ashurst wrote "Hilarious LOL?"
22     A    I wasn't.
23          MR. KELLEY:  Same objection to questions of
24     things.
25     Q    Is this something that you find to be

Page 205

1  concerning as a law enforcement officer --
2      A    Again, I wouldn't post that on there, you
3  know, myself.
4      Q    It this something that you would have liked to
5  have known prior to going through the hiring process
6  with Mr. Ashurst?
7      A    Obviously the more knowledge the better but,
8  you know, I would have like to have known.
9      Q    Would you agree that, as a law enforcement
10  officer with nearly three decades of experience that
11  using force on someone such as a taser would never be
12  considered hilarious?
13     A    Right.  I agree.  It's not hilarious.
14     Q    Would you agree that that type of force would
15  only need to be used on somebody when the use of force
16  continuum requires it?
17     A    Yes.
18     Q    And to use that type of force on somebody,
19  would you agree as a law -- experienced law enforcement
20  officer such as yourself, that it would have been a
21  pretty serious situation?
22     A    Sure.
23          MR. KELLEY:  Object to the form.
24     Q    If you had seen a Facebook post such as that
25  prior to hiring Mr. Ashurst would that have caused you

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-17  Filed: 02/10/20  Page: 55 of 86 - Page
ID#: 4914
The Deposition of DEWAYNE BRANCH, taken on July 13, 2018
206..209

Page 206

1   to change your mind and not offer him a job?
2               MR. KELLEY:  Requires him to speculate.
3       A   Are you asking if -- again, the time --
4               MR. KELLEY:  He hires him 2016.  This is a
5   2012 picture.
6       A   Yeah.  Not necessarily.
7       Q   That's something you would have taken into
8   consideration with that?
9       A   I would have taken into consideration.  Yeah.
10      Q   But you didn't have any of this social media
11  stuff at your disposal when you went through the hiring
12  process, correct?
13      A   No again -- and again, I'm not sure if Tackett
14  reviewed the social media or not but I personally
15  didn't.
16      Q   I'm going to show you what we'll mark as --
17  this is really just one exhibit.  Prior to today's --
18  I'm going to mark the KSP applications for Mikey Ashurst
19  as Exhibit number 9.  Have you reviewed those
20  applications prior to today's deposition, sir?
21              (EXHIBIT 9 MARKED FOR IDENTIFICATION)
22      A   The KSP applications?
23      Q   Yes.
24      A   No, sir.
25      Q   Okay.  But you were made aware at some point

Page 207

1   that Mr. Ashurst unsuccessfully applied twice to be a
2   member of the Kentucky State Police; is that right?
3       A   Yes.  Yes.
4       Q   And again, your agency did not -- has never
5   been provided with any of the documents relating to that
6   application process, correct?
7       A   No, sir.
8       Q   So if Mr. Ashurst admitted to drug use to KSP
9   officers you would have no knowledge of that, correct?
10      A   Correct.  Correct.
11      Q   If Mr. Ashurst made other types of admissions
12  to KSP you would have no knowledge of that, correct?
13      A   That's correct.
14      Q   Okay.  Now, prior to today were you aware that
15  Mr. Ashurst, between 2004 and 2010, accumulated 17 total
16  charges involving eight different traffic stops?
17      A   I knew he had some traffic citations and
18  violations.
19      Q   How has he been as a Knox County deputy?  Does
20  he still drive fast?
21              MR. KELLEY:  Object to the form.  Assumes
22  facts not in evidence.
23      A   I haven't had any complaints on him.
24      Q   Okay.  Now, I'm going to refer you to
25  page 1633, sir.

Page 208

1       A   Okay.  Okay.
2       Q   Were you aware and do you see below where it
3   says, "Are the applicant's posts and pictures presenting
4   him or herself in a manner reflective of a potential
5   Trooper," and it says, "No."
6       A   I see that.
7       Q   Okay.  Do you see the explanation?
8       A   Mr. Ashurst's name on Facebook.  Okay.  I do.
9       Q   And in that explanation do you see where
10  Mr. Ashurst admits to posting a picture and the text
11  that says "Taser from badass to P-word in .5 seconds?"
12      A   I do.
13      Q   Okay.  And when confronted with this do you
14  see where Mr. Ashurst -- actually, I withdraw that.  I
15  withdraw that.  And again, that's something that you did
16  not learn prior to making a decision to hire him,
17  correct?
18      A   Correct.
19      Q   Okay.  After Mr. Ashurst informed you that he
20  was not hired by the Kentucky State Police, did you ever
21  ask him why?
22      A   Not really, I don't think.  I think may have
23  speculated.
24      Q   Do you remember what he said, or?
25      A   No, not really.  I really don't know.  I

Page 209

1   didn't get into that.  That's not my agency so I didn't
2   really.
3       Q   Did you make any attempts to determine why
4   Mr. Ashurst was not hired?
5       A   I don't think so.
6       Q   Did --
7       A   There have been a few -- I know a couple of
8   other guys that applied for the KSP and didn't get
9   accepted.
10      Q   Did you make any attempts to attain any of the
11  documentation relating to any of Mr. Ashurst's attempts
12  for employment at the Kentucky State Police?
13      A   No.
14      Q   Did you ever learn that in -- well let me
15  withdraw that question.  I'm going to ask for you to
16  turn to page 1720.  The bottom right should be marking.
17      A   Okay.
18      Q   Do you recall an incident -- this would have
19  been about -- your best guess was that Deputy Ashurst
20  was on administrative leave for about two or three
21  weeks, right, after the Mills shooting?
22      A   Yeah.
23      Q   Okay.  Do you recall an incident about a week
24  after Ashurst came back to the force where there was a
25  call about a juvenile who went missing?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 210

1    A    Yes.
2    Q    What do you generally recall about that?
3    A    Captain Johnson had briefly told me about it
4  and he had contacted Mikey about it.
5    Q    And when he contacted Mr. Ashurst about it did
6  Mr. Ashurst agree to go looking for the juvenile?
7            MR. KELLEY:  Let me just --
8    A    I can't --
9            MR. KELLEY:  -- object to this other incident.
10   A    I don't know what had happened at that point.
11           COURT REPORTER:  Hold on.
12           MR. KELLEY:  -- as unrelated and my knowledge
13   not involving use of force.  But with that
14   objection -- continued objection made you may
15   answer questions.
16   A    I'm not recall -- I don't recall what
17   Mr. Johnson -- what was decided or what happened.
18   Q    Well according to this report -- I'm looking
19   at the last paragraph.
20   A    Uh-huh.
21   Q    After dispatch requested Deputy Ashurst's
22   assistance, Deputy Ashurst responded to dispatch, "I'm
23   not fucking with that shit.  Buster will be 10-8 in
24   20 minutes and I just pulled in my driveway."  Do you
25   recall learning what Deputy Ashurst informed dispatch in

Page 211

1  relation to the missing juvenile?
2    A    I don't recall.
3    Q    Did you ultimately come to find out that the
4  juvenile was found murdered --
5            MR. KELLEY:  No.
6    Q    -- within two days?
7            MR. KELLEY:  I object to what it says here.
8            THE WITNESS:  Found deceased.
9            MR. KELLEY:  Found deceased a few days later
10   of a drug overdose.
11   BY MR. SLOSAR:
12   Q    I will withdraw that question.  Did you come
13   to find out that the --
14   A    Yes.
15   Q    -- juvenile was found dead?
16   A    I think so.  I think Edward had told me that
17   she was found deceased.
18   Q    And did you ever question Deputy Ashurst about
19   his --
20   A    Yes.
21   Q    -- refusal --
22   A    I had Mr. Johnson talk to him about it.
23   Q    And why did you do that, sir?
24   A    You know, obviously concerned over the call.
25   Q    I'm going to ask you to turn to 1747, sir.

Page 212

1    A    Okay.
2    Q    Okay.  I'm looking at the third and fourth
3  paragraphs.  It looks like this juvenile was named K.L.;
4  does that sound right to you, looking at the fourth
5  paragraph?
6    A    Let's see.  On 1747, is that?
7    Q    Yeah.
8    A    Fourth paragraph?
9    Q    Yeah.
10   A    Yes.
11   Q    Okay.  And K.L. apparently was found dead on
12   July 29th; is that right according to this?
13   A    Yes.
14   Q    Did you ever talk to Buster Liford about
15   Deputy Ashurst's refusal to go look for the missing
16   juvenile?
17   A    I'm sure Mr. Johnson did.
18   Q    Was any sort of written discipline ever given
19   to Mr. Ashurst for his refusal to assist in --
20   A    I'm not sure if I ever done a written
21   reprimand on him or not.
22   Q    How many written reprimands do you recall
23   doing in your time as sheriff?
24   A    A few, not many.
25   Q    Do you recall the name of any officer that

Page 213

1  you've ever given a written discipline to?
2    A    I've actually fired one.
3    Q    Who?
4    A    Hunter Luttrell.
5    Q    And when did you do that?
6    A    A couple -- was trying to think.  In '17 -- or
7  '18.
8    Q    What'd you fire him for?
9    A    He'd -- it was a social media deal where he
10   had took a picture of a lady that he had arrested for
11   overdose and made fun of her on an investigation that he
12   was working.
13   Q    Would -- if a written reprimand was done,
14   would that always be maintained as part of that
15   officer's personnel file?
16   A    Yes.  It would be in their personnel file.
17   Q    So if Deputy Ashurst has ever been written --
18   got -- received a written reprimand that would be
19   maintained as part of the personnel file, correct?
20   A    Yes.  Yes, it would.
21   Q    We went through his personnel file earlier and
22   there were no such written reprimands in there, correct?
23   A    Right.
24   Q    Now, earlier -- have you ever done any personal
25   personal

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1  --
2           MR. KELLEY:  Leave those exhibits with me,
3  please.
4           MR. SLOSAR:  Here, you want to go off -- let's
5  go off the record for a moment.  Is that okay?
6           VIDEOGRAPHER:  The time is 4:20. We are off
7  the record.
8                    (OFF THE RECORD)
9           VIDEOGRAPHER:  Okay.  The time is 4:23. We are
10  on the record.
11  BY MR. SLOSAR:
12      Q   Sir, the -- it's your recollection that
13  Mr. Ashurst started back at the Knox County Sheriff's
14  Department about two to three weeks after the shooting
15  incident of Jessie Mills; is that right?
16      A   Yes.
17      Q   And is it fair to say that prior to
18  Mr. Ashurst -- well, let me withdraw that.  Did you
19  decide to allow Mr. Ashurst to continue back at the
20  Knox County Sheriff's Department after the Knox County
21  Commonwealth attorney declined to initiate any charges?
22      A   Yes.
23      Q   Okay.  Fair to say that you didn't review any
24  of the testimony before the grand jury before allowing
25  Mr. Ashurst back on the force?

Page 215

1      A   He showed me a PowerPoint presentation, the
2  investigator, and that was pretty much all that I
3  reviewed.
4      Q   How long did the meeting last between you and
5  the KSP investigator?
6      A   As long as the PowerPoint was.  I'm not sure.
7  It wasn't very long.
8      Q   Was anybody else present?
9      A   Yes.  I think Edward Johnson was there with me
10  and William Stewart.
11      Q   Did you review any of the witness statements
12  yourself?
13      A   He kind of paraphrased them to me.
14      Q   So you just --
15      A   Yeah.
16      Q   -- relied on the KSP investigator's --
17      A   The investigator.
18      Q   -- representations?
19      A   I did.
20      Q   Okay.  You never listened to the recordings,
21  right?
22      A   No.
23      Q   Never viewed any of the reports, correct?
24      A   Correct.
25      Q   Okay.  So aside from sitting in on that

Page 216

1  PowerPoint, whatever information you got would have been
2  representations made to you by the KSP investigator.
3      A   Yes, sir.
4      Q   Okay.  Sheriff Smith, thank you.  I do not
5  have any further questions.
6      A   Thank you.
7      Q   Sorry about that.
8      A   That's all right.
9                    CROSS-EXAMINATION
10  BY MR. KELLEY:
11      Q   Sheriff Smith, I know it's been a long day and
12  we just got back from a break so --
13      A   Yes, sir.
14      Q   -- do you need to take another break --
15      A   No.
16      Q   -- before I ask you a few --
17      A   No.
18      Q   -- questions?  Okay.
19      A   No, I'm good.
20      Q   You were asked a number of questions about
21  your policy document that I believe was dated
22  January 1, 2016, correct?
23      A   I was.
24      Q   And I'm paraphrasing counsel here by I think
25  at one point he asked you are there any unwritten

Page 217

1  policies or practices of the department, so I wanted to
2  ask you some questions about that because --
3      A   Okay.
4      Q   -- I understood your initial answer to that
5  question to be no.
6      A   It was.
7      Q   So for example, after being asked and
8  answering that question you later said that you had made
9  a decision to refer the Jessie Mills incident
10  investigation to KSP, correct?
11      A   Correct.
12      Q   And your own policy document indicates that
13  use of force incidents would be investigated internally,
14  correct?
15      A   Correct.
16           MR. SLOSAR:  Objection to form.
17      Q   Or by members of your department.
18           MR. SLOSAR:  Objection to form.
19      Q   In fact, though, in this case you made a
20  discretionary decision to refer the investigation to
21  KSP.
22      A   I did.
23      Q   Correct?
24      A   Correct.
25      Q   And you've testified at length as to why you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 218

1  did that, correct?

2      A    Correct.

3          MR. SLOSAR:  Objection to form.

4      Q    Would that be an example of one of the

5  discretionary decisions you made as Sheriff to do

6  something different than your policy directed?

7      A    Right.

8      Q    I think one of the other things you testified

9  to was that you were asked about when a new individual

10 comes onto the department they might be given a copy of

11 their -- your policy manual.

12     A    Yes.

13     Q    Is that correct?

14     A    That's correct.

15     Q    And so there was some discussion about what

16 training your deputies would have had -- in department

17 training about the use of force; do you recall those

18 questions?

19     A    I do.  Yes.

20     Q    And again, we've touched on some of this at

21 length but as I recall you mentioned a couple of things

22 that might have applied to use of force by your own

23 department, other than the supply of the policy

24 document.  One was there's training out at the range --

25 firearm training out at the range.

Page 219

1          MR. SLOSAR:  Objection to form.

2      Q    Is that correct?

3      A    That's correct.

4      Q    And I understood you to say that use of force

5  might be discussed at that range training.

6      A    Correct.

7          MR. SLOSAR:  Objection to form.

8      Q    Is that correct or incorrect?

9      A    That's correct.

10     Q    So there's some argument between counsel about

11 whether that involved just discussion of the KRS

12 statutes or the use of force policy; is that --

13     A    That's correct.

14         MR. SLOSAR:  Objection to form.

15     Q    Do you -- as we sit here today do you have any

16 recollection as to whether the use of force that was

17 discussed went beyond the KRS or did it touch upon your

18 policy document any?

19         MR. SLOSAR:  Objection to form.

20     A    It would be a policy document and KRS.

21     Q    Okay.  And as I understood your testimony you

22 weren't sure about whether or not that training at the

23 range occurred before or after the Jessie Mills

24 incident; is that fair?

25     A    That's fair.

Page 220

1      Q    Okay.  Regardless of whether the training at

2  the range occurred before the Jessie Mills incident,

3  your policy involving use of force went into effect

4  before the Jessie Mills incident, correct?

5      A    Correct.

6      Q    And as I understood it, when the use -- or

7  when the policy document went into effect in

8  January of 2016 all officers would have been given a

9  copy of it.

10         MR. SLOSAR:  Objection to form.  Calls --

11     A    Correct.

12         MR. SLOSAR:  -- for speculation.

13     Q    Is that correct?

14     A    That's correct.

15     Q    At least you testified you would have your

16 supervising officers make sure that they had a copy.

17         MR. SLOSAR:  Objection to form.

18     Q    Is that correct?

19     A    Correct.

20     Q    All right.  The other use of force training --

21 or you -- training that might involve discussion of use

22 of force as I understand it was a simulator involving

23 use of force situations that your officers would have

24 participated in.

25     A    Correct.

Page 221

1      Q    Is that correct?

2      A    Correct.

3      Q    And if I understood your testimony, you also

4  can't say whether or not that simulator occurred

5  before --

6      A    Right.

7      Q    -- the Jessie Mills incident.

8      A    That's correct.  True.

9      Q    But it could have.

10     A    It possible.

11         MR. SLOSAR:  Objection to form.

12     Q    Is it possible that any records might be

13 maintained or kept regarding when the simulator was

14 used?

15     A    Yes.  It's possible through TekCo.

16     Q    Okay.  And is it also possible that some

17 record might have been kept about when the range

18 training occurred?

19     A    Yes.  Possibly.

20     Q    Okay.  Now, you were asked some questions

21 about various -- well, you were asked some questions

22 about prior applications that Mr. Ashurst had made to

23 various agencies.

24     A    Yes.

25     Q    And based upon anything you learned from your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 222

1  review of those prior documents before he worked for
2  your department, anything you've learned from those
3  documents, would it lead you to terminate Mr. Ashurst as
4  we sit here today?
5      A    No.
6      Q    And anything that you've learned today as it
7  relates to the KSP applications that you were asked
8  questions about -- any of those things change any
9  opinions you have about Mr. Ashurst?
10     A    No, sir.
11     Q    Or whether you'd let him maintain a position
12 on your department?
13     A    No, sir.
14     Q    As I understood, you said you hadn't received
15 any complaints from the public or the community about
16 any Facebook post that Mr. Ashurst had made --
17     A    I didn't.
18     Q    -- personally.
19     A    I personally have not.
20     Q    Okay.  I think that's all the questions I
21 have. Thank you.
22     A    Thank you.
23          MR. SLOSAR:  Nothing fast.  Sir, thank you.
24          THE WITNESS:  Oh, thank you.
25          MR. SLOSAR:  Thank you.

Page 223

1          THE WITNESS:  Thank you-all.
2          VIDEOGRAPHER:  It is 4:32; this concludes the
3  deposition.
4          (DEPOSITION CONCLUDED AT 4:32 P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 224

1          CERTIFICATE OF REPORTER
2          STATE OF INDIANA
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded by me and then reduced to typewritten form
10 under my direction, and constitutes a true record of the
11 transcript as taken, all to the best of my skills and
12 ability. I certify that I am not a relative or employee
13 of either counsel, and that I am in no way interested
14 financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22 LACEE TOWNSEND,
23 COURT REPORTER / NOTARY
24 COMMISSION EXPIRES ON: 06/19/2024
25 SUBMITTED ON:  07/18/2019

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MIKE SMITH, taken on July 18, 2019                                    225

## Exhibits

**EXHIBIT 1** 9:3, 7

**EXHIBIT 2** 79:3,10,11 116:23

**EXHIBIT 3** 117:3 118:22 119:4 146:6 187:5

**EXHIBIT 5** 164:10,12

**EXHIBIT 6** 177:20,21

**EXHIBIT 7** 183:1,3

**EXHIBIT 8** 192:3,5

**EXHIBIT 9** 206:19,21

___

### 1

**1** 9:3,7 117:14, 19 118:17,20 119:7,12 121:20 122:6, 15 145:10 146:13 153:15 157:16,21 158:20 216:22

**1-1-2016** 146:5

**10-8** 210:23

**11** 33:6,7

**11:10** 6:5

**11:56** 44:10

**11:57** 44:13

**12** 121:9

**12:29** 71:4

**12:42** 71:7

**12A** 121:10,11, 12

**14** 38:25 118:25

**15** 33:25 35:24 38:24 59:22 141:17 144:8

**1515** 167:13

**1557** 175:5

**1558** 176:17

**15th** 6:4

**16** 141:16 143:24 144:1

**1633** 207:25

**17** 207:15 213:6

**1720** 209:16

**1747** 211:25 212:6

**18** 55:17 213:7

**19** 199:10

**1988** 32:5

**1994** 32:18

**1997** 32:21

**19th** 199:25

**1:00** 84:21

**1:17** 84:24

**1A** 121:21

___

### 2

**2** 79:3,10,11 116:23 122:19 168:1 188:19 189:4

**20** 210:24

**2004** 207:15

**2006** 9:19

**2010** 207:15

**2012** 33:21 34:20 176:3 204:10 206:5

**2013** 35:10 176:3 179:15

**2014** 81:4 83:25

**2015** 10:2 11:3 12:24 13:6,7, 14,17 15:13 18:1 23:22 25:20 26:16 28:19 33:23 34:20 39:24 43:25 44:21 47:12 56:20 57:11,23 58:3 59:3,6,8,14,22, 23 60:7,8,13, 20,25 62:22 63:1,8,9 64:1, 10 74:24 82:10 86:16,25 90:23 99:25 101:24 105:8 112:25 140:20 141:25 142:6,13,16 143:7,22,25 147:3,17 156:6 175:14 184:9 190:21

**2016** 9:19 52:18 53:3,22 59:21 72:3 74:23 75:9,24 76:3,10,16,20 77:5 89:8 92:19,21 93:1, 14 97:12 99:12, 15 100:7,12,14, 24 101:20 102:1 103:13 104:11 113:21 114:3,9,15,22 115:2,7,10 116:7,21 117:14,19 118:17,20 119:7,12 120:25 122:6, 15 124:13,15 132:16 133:9 134:22 137:15 138:4,10 139:3, 9,11,22 140:7 141:13 144:1, 16 145:5,10,19 146:13,20 153:15,16 156:6,17 157:4, 8,16,17,21,22 158:20,21

**173**:2 174:6 176:5 178:5,15 197:6 202:25 206:4 216:22 220:8

**2017** 176:5 192:18,21 193:17 199:10, 23,25

**2018** 193:16,22

**2019** 6:5 42:22 96:2

**2137** 199:8

**2141** 202:17

**22** 179:15

**2202** 204:10

**225** 133:3

**24** 34:6 37:16 48:24 54:17 55:17 83:25 88:2 94:8 106:3

**25** 204:10

**29** 99:15 100:12,14,24 101:20 102:1 103:13 104:11 115:10 116:7 132:16 134:22 139:22 140:7 141:13 144:16 145:5,19 146:20 153:16 156:6,17 157:4, 8,17,22 158:21 174:6 178:5,15

**29,2016** 149:24

**29th** 212:12

**2:39** 149:12

**2:55** 149:15

___

### 3

**3** 116:24,25 117:3 118:22 119:4 146:6 153:5 187:5 189:4 192:18

**30(b)** 14:3

**30(b)6** 9:3 10:3 13:15 81:2,6 82:11,16 116:21 160:11

**3rd** 192:11 193:9

___

### 4

**4** 161:23 162:17,19

**40** 50:17 63:14, 17

**404** 17:10

**4:20** 214:6

**4:23** 214:9

**4:32** 223:2,4

**4A** 189:21

___

### 5

**5** 164:10,12 204:18 208:11

___

### 6

**6** 14:3 72:3 83:12,14,15,16 177:20,21

**6:17-CV-00184** 6:10

___

### 7

**7** 183:1,3

___

### 8

**8** 192:3,5 202:25

**8th** 203:1

___

### 9

**9** 206:19,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**95** 32:18,19

**A**

**a.m.** 6:5

**abiding** 49:10

**ability** 89:16

**absolutely**
61:15 62:17
197:2,9

**academy** 32:6
38:7 50:13,16
86:21 91:5
156:24 157:1

**accepted**
107:2 209:9

**accommodate**
70:14

**accordance**
153:1

**account**
134:18 171:16
194:13

**accumulated**
207:15

**accurate** 51:15
69:24 71:20
99:1

**accurately**
89:16,20,24

**accused**
123:5,15

**acting** 33:9,12

**action** 6:18
151:24 189:10

**actions** 46:7

**actively** 140:8
178:18

**activities** 49:4

**acts** 17:15

**actual** 68:12
149:18 171:9

**added** 77:24
85:16,18 86:2

150:17

**addition** 64:23
107:2

**additional**
148:11

**address**
140:15

**addressed**
140:4 156:24
194:9 196:1

**addressing**
12:2,15 15:7,24
139:14

**adequate**
172:6,12

**administration**
41:14 48:1
57:9,13 61:18,
25 80:15,17,24
82:21 104:18
112:4 146:3
147:2

**administrative**
40:19 48:17
49:16 92:22
131:1,3,9
134:24 204:6
209:20

**administrator**
85:19 203:23

**admissions**
207:11

**admits** 208:10

**admitted** 207:8

**adopt** 58:11

**adopted** 78:14
147:23

**advice** 84:9

**affair** 111:11

**affairs** 45:21

**affect** 15:12
137:24

**affirm** 6:23

**afraid** 198:13

**afterward**
13:25

**agencies** 31:3
58:10 69:16
86:17 106:22
107:5,18 108:9
149:7 169:24
172:6,12
182:22 185:24
221:23

**agency** 48:14
90:20 91:23
106:21 109:21
111:25 125:25
129:14 152:11
154:15 169:18
180:24 185:12
186:11 187:2,
21 188:9
189:10,15,24
190:4 207:4
209:1

**aggressive**
170:12,22
171:14,21

**agree** 26:23
52:17 53:3,6,
21,23 54:7 58:6
72:21 73:4 80:8
85:22 86:3,7,16
87:19 103:2,6
107:20 110:5
133:21 137:21
138:3,9 152:5,
10,14 155:24
156:3 157:13
163:19,24
166:3,7,12,15,
22 167:4 172:5,
11 173:17
196:4,14,17,18,
23 197:6 203:4,
20 205:9,13,14,
19 210:6

**agreed** 179:20

**ahead** 21:20
46:24 48:4,5,8
62:12 132:23
148:5 163:4
183:14 193:25

**alcohol** 12:5,
18 15:10 16:3

**allegation**
42:14 44:18
45:5,10 73:22
108:22

**allegations**
11:9 43:20
44:3,17,22
45:23 121:3

**alleged** 43:10,
12 44:25

**allowing**
214:24

**altercation**
50:5 128:8,14

**ambulance**
126:17,20
130:1

**amend** 82:23

**amount** 51:22
52:1

**Amy** 6:13

**analysts** 49:16

**and/or** 152:1
157:12

**Andrew** 41:21

**annual** 50:16
64:24 88:4,5,6,
8,20,22 91:18
139:23,25
141:21

**annually**
174:14

**answering**
8:10 19:24
217:8

**answers** 8:9
20:22

**anticipation**
19:24 20:17

**apologize**
59:25 167:3
203:8

**apparently**
154:19 193:8
212:11

**appears**
181:16

**applicant's**
208:3

**applicants**
39:1

**application**
37:22 38:1,14
41:4 90:9,10
106:15 111:6
163:20,23
164:21 169:19
175:21 183:23
184:8 207:6

**applications**
22:12,21 38:10
105:7,9 206:18,
20,22 221:22
222:7

**applied** 33:13
36:12 38:17,24
40:25 41:2
104:17,21
105:10,13
107:1 176:2
207:1 209:8
218:22

**applies** 105:4

**apply** 36:4

**applying** 23:5
36:1 106:21
108:10

**approach**
170:13,22
171:14

**approx** 201:4

**approximate**
55:16,24
133:14

**approximately**
19:12 32:8
33:4,10,18 34:4
42:21 55:7 56:8
70:13 126:9
201:10 203:4

**April** 23:22
25:20 26:16
28:19 99:25
101:24 184:9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

190:21

**area** 33:6,13 34:18

**argument** 193:11 219:10

**argumentative** 197:15

**arms** 175:18

**arranged** 13:15

**arrest** 51:23 52:2,24 80:11 87:15,25 128:19 129:9 135:22

**arrested** 213:10

**arrived** 126:10

**arriving** 130:12

**Artemis** 133:3

**ascertain** 24:10 90:13 104:13

**Asher** 89:10

**Asher's** 89:16 97:11

**Ashland** 34:17

**Ashurst** 6:16 21:22,24 22:2, 6,9,13,24 23:18,19,24 24:6,18,24 25:1,13,19 26:2,16,18,24 27:5 28:4,8,13, 18,22 29:2 30:7,9 31:2,7, 17 35:25 36:3, 6,14,18,24 37:3,5 65:4,16 66:11 67:17,23 68:13 70:4,17 71:11,17 72:2 73:25 77:14 89:18,23 91:25 99:17,23 100:6, 11,15 101:2,17,

22 102:3 103:14 104:2,6, 13,17,21 105:12,23 108:11,16,23 109:6,13,20 110:6 111:13, 19 112:1,21 113:3,11,14 114:8,12,17,24 115:3,11,18,23 116:4,9 124:16 125:4 126:15, 19 127:4,15,19, 21 128:3,7 131:8,16 132:2, 12,15 133:9,15, 16 134:4,8,13, 23 135:8,15 136:3,9,11,15, 18 137:2,6,16 138:21 140:9 141:11 157:25 158:13 161:16 163:9,21 164:3, 18 165:6,10,18 167:17,23 168:5,6,11,19 169:9,14,16,18, 23 170:12,21 175:12,17 176:1,4,7,18, 19,22 177:8,11 179:9,16 180:4, 24 181:10,24 182:21 183:17 184:9 185:11, 22,23 186:10 190:18 191:10, 15,21 194:4 195:20 197:25 198:2,7,16 200:20 201:9, 12 203:6,12 204:3,16,21 205:6,25 206:18 207:1,8, 11,15 208:10, 14,19 209:4,19, 24 210:5,6,22, 25 211:18 212:19 213:17 214:13,18,19, 25 221:22 222:3,9,16

**Ashurst'** 99:12

**Ashurst's** 23:11 25:21 26:25 28:5 29:3 30:14,20 31:9 111:3 136:8 161:19 163:17 164:6,21 166:4, 9,13 167:6 179:23 180:13 184:3 193:7 196:6 208:8 209:11 210:21 212:15

**assault** 43:11 44:25

**assigned** 32:7 33:15 40:8

**assist** 45:13 54:21 66:1 73:17 212:19

**assistance** 65:23 210:22

**assistant** 40:19 92:22 150:14

**assisted** 109:20

**assume** 8:3 27:6 66:21,22 68:3 71:21,24 102:15 118:15

**assumed** 99:4 103:22

**Assumes** 207:21

**assuring** 95:20

**atmosphere** 129:12

**attacking** 73:18

**attain** 209:10

**attempt** 22:13 34:1 198:24

**attempted** 17:5 18:2

135:22

**attempting** 198:17

**attempts** 22:24 209:3,10,11

**attended** 65:4 202:3,4

**attention** 105:2

**attitude** 168:7, 13 180:4

**attorney** 19:21 214:21

**attorneys** 8:14 172:2

**audio** 189:8,13

**aware** 22:23 23:3,4 28:2 47:23 48:2 57:23 59:6 60:13,18,25 61:7,24 62:20, 25 63:2,6 74:25 77:4,8,13 113:22 145:2 174:6 175:11 178:4,7,15 179:18 194:4 195:20 199:14 200:4 203:12, 15 204:16,20 206:25 207:14 208:2

___

**B**
___

**baby** 135:20

**bachelor's** 39:21

**back** 9:5 15:12, 17 20:6 23:21 30:25 33:5 38:23 47:3,12 70:2 71:23 81:7,12 83:18, 19 84:14 91:8 93:14 101:4 107:19 117:21 122:1 126:16,

20 143:2 167:3 195:4,11 209:24 214:13, 19,25 216:12

**background** 25:23 31:25 38:16 39:6 41:7 48:6 90:11,12 111:21 163:25 170:1,7 184:23 185:16 186:5 187:12

**backup** 178:8, 18

**bad** 28:24 181:19

**badass** 204:18 208:11

**badges** 189:14

**bailiffs** 40:11

**band** 176:9

**banned** 42:21, 24

**barbed** 176:15

**barely** 127:9

**based** 10:21 11:9 13:3,17 20:9 39:5 48:6 61:19 62:20 70:12 83:25 84:7 85:10 90:9 91:5 114:3 132:6 156:8 184:18 221:25

**basic** 21:16 86:7 102:15,22 157:1

**basically** 24:15 51:25 131:23 189:5

**basis** 19:19 55:11 81:24 82:15 88:22

**basketball** 181:17

**Bates** 185:19 192:8 195:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

baton 52:7,11

bear 161:20

bears 110:6

began 33:23
40:23 57:2
119:7

begin 48:5,9

beginning
11:3 32:4 81:4

behalf 6:16
9:16 11:25
12:12 15:4,22
99:5 125:23

behavior
180:4

beings 110:24

believed
136:16

believes
146:10 151:24

belt 138:9,10

bid 34:24

bigger 195:7

binding 9:15
11:24 12:11
13:9 15:3,21
16:12,25 17:23

birthdays
162:2

bit 8:23 24:3
25:5 75:16
105:21 116:1
117:2 131:20
132:7 142:5
149:9 152:16
160:1 198:14
201:13,14

black 135:20
199:12 200:10

Bless 177:16

blood 34:9

blue 203:9,17

blunt 73:18

bluntly 111:10

board 101:18

Bolton 6:17
74:11,14,16
75:1,10,24
76:3,12,17,21
77:4,8,13
129:24 130:3,7
134:4 137:9,12
174:2,7,13,17,
22 175:1
177:25 178:7,
16 201:15,17,
21 202:1,8

Bolton's 137:7

book 116:18

bookkeeper
41:18

boring 8:23

borrow 69:16

boss 174:25
175:1

bottom 167:11
192:12 195:2
209:16

box 157:1

Brandon 6:17

break 7:13,16
34:21,22 70:25
149:10 216:12,
14

breaks 195:3

briefly 7:10
127:5,9,10
210:3

bring 41:11

brings 82:8

broadcast
190:3

brought 14:18
40:19,23 41:15,
16 45:10 48:4
69:14 70:19
98:12,18 101:3
105:1 131:16

bruises
126:22,25

127:4

business
37:19

Buster 210:23
212:14

busy 116:17

___

**C**

CAD 126:11

call 46:21
64:11 84:15
111:23 209:25
211:24

called 98:20
99:5 123:21
181:18

calling 99:5

calls 170:12
220:10

campaign
34:25 35:1

candidate
39:17

capacities
186:13

capacity 33:18
45:16 55:22
72:23

captain 33:8,9
40:24 46:16
92:5,21 93:12,
15,21 100:2
101:9,12,16,21
102:2 122:17
124:23 191:3
210:3

car 155:14
178:12

care 191:8

career 35:11
37:18 39:16
48:19 55:1,4

Carl 92:14,15,
16 124:17,19

carried 77:5

carry 53:15
55:21

carrying 81:4

case 6:10 9:5
10:15 14:16
30:4 47:8 79:6,
7 80:17,18
81:21 83:5
118:2,24 123:3
133:21 174:2
193:8 217:19

casual 186:23

catalog 88:24
116:19 140:3

caused 39:11,
16 205:25

caveat 153:25
157:10

century 171:19

certified 63:23
65:6,11 66:8
71:11 91:3,10
102:11,22

certify 71:23

cetera 162:3

Chad 41:21

chance 18:22

change 10:10
12:18 16:3
206:1 222:8

changed
78:12,13 171:3

chaotic 127:6

character
36:18

charge 44:25
45:1 54:6,9

charged
176:24

charges 47:3
90:12 131:16
207:16 214:21

charging
136:14,24,25

cheated
109:13

cheating 111:9
195:16

check 26:6
69:17 70:19
90:12,14 100:1
101:5 111:21
142:9 168:5,12,
20 184:23
185:16 187:12

checked
126:17 179:13

checking
29:10 133:1
135:4

checks 111:22

chief 25:22
26:9,17 30:22
35:2,20 40:17,
24 179:15

chiefs 92:8

child 43:10,18
45:3 74:3,4

chose 43:7

Christmas
204:11

circumstance
s 152:1

citations
207:17

cite 152:8

cites 153:2

citizen 17:6
45:17 50:6
53:25 180:3
181:23

citizens 12:2,
3,15,16 15:7,8,
25 16:1 50:12
59:17 60:9 63:4
139:14 140:16

City 176:24

civilian 17:3,25
18:3 38:9 49:15
55:21 106:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

147:12

**civilians** 11:11,13

**claim** 82:4

**claims** 81:9

**clarification** 180:19

**clarified** 154:2

**clarify** 54:24 115:6 154:1

**classes** 88:24 140:3,4

**Claude** 41:20, 22 46:6 47:18 97:23

**Clay** 128:19

**clear** 10:1 47:5

**client** 19:21 82:9,18

**clip** 200:9

**close** 53:24 54:1 136:12

**Cold** 34:18

**collection** 40:13

**collections** 41:17

**college** 39:18, 19

**colonel** 40:20 48:4

**color** 192:4

**combat** 195:15

**combative** 135:21

**comfortable** 48:7 72:7

**command** 10:7 27:5 30:18 55:13 145:15 147:19 148:10 165:17 173:3 174:8,17 178:9 190:16 196:19

203:25

**commander** 33:3,10,12,15 34:2,15 38:9,11 49:8,13

**commanders** 33:14

**comment** 194:11,16

**comments** 190:19 194:7, 23 195:1,21,25 196:5,6

**Commonwealt h** 214:21

**communicate** 76:11,16

**communicatio n** 103:13 190:1

**communicatio ns** 169:8

**community** 222:15

**compel** 81:12

**competition** 195:15

**complained** 200:18

**complaining** 126:23

**complaint** 11:16 43:10 192:25

**complaints** 180:3 181:23 207:23 222:15

**complete** 46:1 78:23 176:3

**completed** 71:11 72:2 81:22,23 118:17

**completely** 83:4

**completes**

169:9

**completing** 169:11

**complied** 190:8

**computer** 187:21

**concern** 129:21 194:11 196:10 200:7, 15

**concerned** 211:24

**concerns** 14:9 39:13 194:17 203:16

**conclude** 47:2

**CONCLUDED** 223:4

**concludes** 223:2

**conclusion** 154:7

**conditions** 12:3,16 15:8 16:1 60:10 63:5 139:15 140:16

**conduct** 90:11 125:10,15,25 141:24 170:2 176:25 177:2 190:3

**conducted** 45:21 46:6 134:3 164:2 165:5

**conducting** 123:22 131:25 132:1,11 189:6

**confidential** 18:14 19:22

**confidentiality** 77:25

**conflicted** 46:7

**conflicts**

170:13,23

**confronted** 194:15 208:13

**connotation** 150:10 190:11

**consecutive** 106:3

**consensus** 184:6

**consideration** 171:1 206:8,9

**considered** 110:4 168:21 182:14 205:12

**consist** 65:3

**consisted** 49:14

**consistent** 188:13

**constable** 6:17 74:11,14,16 75:1,7,10,24 76:3,12,17,21, 23 77:4,8,13 129:24 130:3,7 134:4 137:7,9 173:22 174:2,7, 13,17,22 175:1 177:25 178:7, 16 201:15,17, 21 202:1,8

**constitutional** 82:8 175:4

**constitutionall y** 74:21

**constructed** 119:15

**consult** 114:21

**contact** 25:22 26:20 45:15 46:15 70:11 91:7 125:6 168:14

**contacted** 24:2,9,10 46:17 111:14 126:6 183:4 190:22

210:4,5

**contents** 80:15 192:25

**context** 197:15

**continual** 51:3

**continue** 8:10 214:19

**continued** 17:9 132:16 210:14

**continuing** 42:2 54:15 72:11 80:13 85:25 150:11 186:1 190:10 193:4

**continuum** 51:9,14 52:15 53:1 59:11 60:16 85:24 86:6 135:25 136:20 137:22 138:5 156:2,5, 14,20 157:8 173:11,12,15 205:16

**control** 136:5 137:1 171:13, 15

**controlled** 52:14 81:19 129:22

**conversation** 24:17,21 25:9 27:11,15,17,21 28:1,15 29:12, 18 30:5 46:22 108:12,14 111:16,18 116:16 130:2 135:1,6,10 136:19 165:2,5 184:2 186:21, 23

**conversations** 19:1 99:16 100:5,10,15 101:21 102:2 103:19 104:12 114:23 115:3,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11,18,22 116:4,
8 168:9

**convey** 96:3
114:16

**copier** 119:18

**copy** 21:6
46:18 91:15
93:10 96:15
174:18 218:10
220:9,16

**Corbin** 36:21

**cordial** 58:17

**correct** 13:7
20:13 23:17,19,
23 28:10,11,14,
20 29:3 30:5,6,
10,11,15,21,24
31:7,8 39:5,6
40:1 46:3,4,9
52:2,21 54:23
57:4,5,10,14,15
67:20,24 68:25
70:17 71:20
73:7,12 74:2
77:2,5,10,11,
15,16 78:21
79:10,12 87:2,
3,7,9,13 89:16,
20,25 99:25
100:1 103:5,23
104:4,9,10,14,
15 106:11
108:12 112:1,
18,23 113:5,12,
13,17,18,22,25
114:9,10,14
116:5,6 119:5,
8,9,14 120:3
124:5,11
132:17,20,21
133:24 138:21,
22 139:9,10,22,
23 140:5,6,12,
17,18,22
144:24,25
145:17,18,23
146:12,20,21
147:3,4,8
148:16,17,20,
21,24 150:1,4,5
151:18,21
153:12 155:23
156:11,12,15,

16,20 158:2,16,
17,18,23 159:4,
15,16 163:9,10,
17 165:4,7,21,
25 166:25
167:8,9,24,25
169:5,6 172:24
173:7,23 174:4,
8,9 177:9
178:2,13,14,19,
20,24 179:10,
11 180:10,14,
15,25 181:14
182:4,15,19,22,
23 183:18,19
184:16 185:2,3,
5,6,9,12,13,16,
17 186:8
188:14,15
190:5 196:16,
20,21 197:13,
25 202:9,10
204:4,5,7
206:12 207:6,9,
10,12,13
208:17,18
213:19,22
215:23,24
216:22 217:10,
11,14,15,23,24
218:1,2,13,14
219:2,3,6,8,9,
13 220:4,5,11,
13,14,18,19,25
221:1,2,8

**could've** 61:16
185:4

**counsel** 6:10
8:9 15:11 21:1,
9 84:9 216:24
219:10

**count** 56:2

**county** 6:8,17
9:4,15,22 11:6,
7,11,12,24
12:11 15:3,5,21
16:11,14,24
17:1,4,22,24
18:23 21:25
22:2,6 23:11,
12,16 24:1,14,
24 25:3,4,16,21
27:18 30:9,14
32:1,8 33:22

34:8,12 36:1,4,
12 41:12 42:21,
24 43:3,4 45:4,
12,17,20 46:8
47:3,25 52:18
53:3,22 54:22
57:3,7,18 58:2,
4 59:3,9,15,21
60:2,8,14,19,25
62:22 63:2,10
64:1,7 70:8
72:8 74:17,20,
23 76:4,12
77:10,18 78:11,
19 79:15 81:10
82:6 84:4 85:7,
23 86:5,18
87:2,6,12,18
88:15,19 90:8,
22 91:1,13,22
92:1,20 93:18
94:23 95:19
96:14 97:3,14
98:7 99:18
100:17 102:7,
17 103:15
104:17,21
105:5 106:6
108:6,7 110:14
112:5 113:4,21
117:6 118:8,20
119:10 120:2,
25 121:15
122:10,14
125:10,14
128:19 130:23
132:3,17
133:22 134:3
137:17 138:24
139:3,4,13,21
140:14 141:22
144:13 145:5,
16,22 146:17
147:11 148:12,
15 149:2,25
150:7 156:1,19,
21,22 157:6,24
158:20 163:19
166:1,9,14,21,
23 173:5
174:18 175:3
177:23 178:1,
12 179:12,24
180:5,20
181:24 182:8,
25 184:14

187:2,8 188:12,
18 190:6 200:8
201:22 207:19
214:13,20

**county's** 9:16
11:25 12:12
15:4,22 158:14

**couple** 20:5
81:13 154:10
162:11 191:4,
11 209:7 213:6
218:21

**court** 6:4,9,22
7:2 8:11 40:11
46:17 81:13
82:9 84:16
143:1 193:11
210:11

**cover** 86:23

**covered** 158:8

**crash** 133:4

**create** 48:5
82:23

**created** 20:20
146:3,16
164:21 166:24

**creating** 54:21
57:2

**crime** 33:17

**crimes** 49:13
111:21

**criminal** 42:13
43:8 46:3 47:1
50:2 63:15,22
64:25 66:4
68:22 81:20
86:22 88:17
89:4 90:12
91:7,19 102:12,
19,25 131:15,
24 177:1
185:15

**criminally**
204:4

**critique** 80:19

**CROSS-
EXAMINATIO
N** 216:9

**cruisers**
189:17

**crying** 204:18

**current** 41:14
91:18

**curriculum**
68:22,24 90:2,3

**customs** 9:18
11:2

**cuts** 195:18

———

**D**

**daily** 48:25
49:4 55:11

**danger** 57:20
59:5 136:1
151:25

**Danville** 22:9
23:12 36:25
162:22 163:8
166:1,5 167:3,
7,18 168:10
170:21 175:13

**dark** 135:20

**database** 89:3,
7

**databases**
89:9

**date** 45:20
112:8 117:16
124:10 153:15
157:12 199:18,
19 201:1

**dated** 216:21

**dates** 153:24
157:14

**dating** 15:12,
17

**daughter**
108:25 109:1,7
111:12

**daughter's**
109:8

**day** 6:4 22:16
55:1 62:4 75:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 6:17-cv-00184-REW-HAI Doc #: 108-17 Filed: 02/10/20 Page: 66 of 86 - Page ID#: 4925
The Deposition of MIKE SMITH, taken on July 12, 2019
231

79:19 216:11

**days** 46:12
203:2,3 211:6,9

**DCJOT** 139:24

**de-escalation**
59:16 61:2

**dead** 211:15
212:11

**deadly** 16:16
52:19 55:13
56:10 57:19
59:5 60:22
63:12 72:22
87:12,19,20
136:20 142:3
151:16,23
155:15 156:2
173:20 196:8
197:2,8,12

**deal** 86:13
173:25 186:15
193:11 213:9

**dealing** 74:5

**death** 71:13
73:22 75:8,23
76:2,10,15,19
77:7,12 124:25
125:11 130:21
131:17 133:24
134:9

**Debarment**
92:1

**decades**
205:10

**deceased**
211:8,9,17

**December**
204:10

**decide** 214:19

**decided** 33:21
34:13,23
136:10,20
182:17,19
210:17

**decides** 73:2

**decision** 26:8
29:1 39:4 72:22

125:18 163:8
169:3,14
175:14 180:17
182:3 183:18
198:10 208:16
217:9,20

**decisions**
90:17,21
184:18 218:5

**declined**
214:21

**declining**
84:10

**deescalate**
51:1

**defendant** 9:4,
15 11:6,24
12:11 15:3,21
16:11

**defendants**
6:18

**defending**
203:8,17

**defense**
151:24,25

**defensive**
50:15

**defer** 112:13

**definition**
155:7,16,20

**definitions**
151:11,14
158:5

**definitively**
153:24

**degree** 39:21

**deleted** 150:16

**delirium** 12:5

**department**
10:10 11:8 13:4
15:5 17:2 18:23
22:9 23:12,16
25:17 26:4,6,19
27:2 29:1 30:8,
10 36:1,12,25
41:12 45:4,21
46:9 47:4,25

52:18 53:4,22
54:23 57:3,8,18
60:15,19 63:10,
15,22 64:2,7,25
65:7 66:4 68:1,
22 71:20 72:8,
12 74:17,21
76:5,12 77:10,
19 78:12,19
79:15 81:10,17,
20 84:4 86:18,
22 87:2 88:15,
17,19 89:4,11
90:8,18,22
91:1,7,14,19
92:4,7,11,20
93:4,18 94:24
95:20 96:14
97:3 99:19
100:17 102:7,
11,18,19,20,25
105:6 106:6
107:2 112:5
113:5,21 118:9
119:11 121:1,
15 125:10,15
130:23 132:4,
17 133:23
134:3,5 135:7
137:17 138:24
139:3,13,21
141:22 144:14
145:6,11,17,22
146:18 147:11
148:16 150:8
157:7,24 163:8,
20 164:8 166:6,
10,14,23 167:7,
18 168:10
170:22 174:4,
19 175:13
178:2 180:5
184:14 187:2
188:12 190:7
194:12 200:8
201:23 214:14,
20 217:1,17
218:10,16,23
222:2,12

**Department's**
117:6

**departments**
21:23 65:24
90:15 103:5
108:4 167:2

184:23

**depend** 87:24

**depends** 52:8
138:1 150:15
197:17

**depose** 13:16

**deposition** 6:7
7:21 9:3 13:15,
19 18:11,21
20:17,18 21:15
23:13 31:11,21
79:8 82:25
104:23 105:2
147:6 154:8
161:15 162:8
167:15 179:2
183:2,9,16
191:23 193:20
194:3 203:11
204:15 206:20
223:3,4

**depositions**
160:22

**depth** 132:5

**deputies** 14:18
17:24 40:9,17
41:14,19 47:14
56:16 61:14,17
63:11 70:11,22
71:23 76:8 77:9
80:1 85:7,24
86:5,8,10,20
87:6 88:6,16,
22,23,25 89:19
91:14 92:25
95:25 96:12,17,
23 97:5 105:19
110:14 112:7,
11 119:5,19
120:2 137:15
138:15 140:15,
21 141:6,19
142:15 143:23
144:15 145:7,
16 148:10,19
152:10 156:1,
19 157:7,25
173:5 174:8
178:1,12,17
184:15 187:8
218:16

**deputies'**
122:10

**deputy** 6:16
21:22 24:10
25:1,22 26:10,
17 30:23 35:2,
20 40:24 41:20,
21 42:15,17
43:6,21 44:4,23
45:5,23 46:14,
20 47:1,14
65:4,16 67:17,
23 70:4 73:25
77:14 79:23
81:18 87:18,20
89:10 91:21,25
95:20 96:14
97:11 99:12
100:11,15
101:2 103:14
104:13,17,18,
21 105:12
107:22 108:23
109:6,13 110:6
111:3 112:1,15,
21 113:11,14
114:8,12,17,24
115:11,18,23
118:20 119:10
122:14,19,20
125:23 126:15,
19 128:7
133:15,16,20
134:4,8,13,23
136:3,9,15,18
137:6 138:21
140:9 141:11
147:19 148:12
170:21 184:20
185:23 186:10
190:18 191:10,
15 194:4,12
195:20 196:5
197:25 198:2,7,
16 200:8 201:9,
12 207:19
209:19 210:21,
22,25 211:18
212:15 213:17

**deputy's** 87:24
89:6 198:8

**describe** 92:19
188:16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**describes** 171:9

**designated** 9:14 11:6,24 12:11 15:3,21 16:11,24 17:22 122:20

**designee** 122:23

**desk** 55:2

**detail** 86:14 109:11 169:10

**detailed** 85:21

**details** 179:25

**detect** 32:9

**detective** 32:10 55:8 176:20

**determine** 46:7 89:9 131:15 132:2,6, 12 164:17 169:18 202:1 209:3

**determines** 123:2

**determining** 107:22

**detrimental** 190:4

**develop** 58:8

**developing** 65:25

**deviate** 172:19

**dialogue** 58:16

**difference** 195:13,14

**differently** 160:4,11 161:22 172:4

**direct** 7:3 30:18 68:13,15 80:22 84:7 86:25 89:24 114:7 158:10, 11

**directed** 85:9 186:4 218:6

**direction** 81:1 125:5

**directly** 45:7 82:7 108:21

**disagree** 161:7

**disciplinary** 11:14 139:6

**discipline** 11:11 17:4 139:4 212:18 213:1

**disciplined** 138:25 190:19 191:18

**disclose** 36:5

**disclosed** 25:1 37:7

**discoverable** 193:3

**discovery** 154:5,7

**discretion** 95:16

**discretionary** 217:20 218:5

**discuss** 13:18, 20,24 14:3,13,15 51:6,12

**discussed** 51:8 160:8,9 165:2 179:19 219:5,17

**discussing** 203:17

**discussion** 148:23 159:7, 14 218:15 219:11 220:21

**discussions** 85:11 100:2

**disorderly** 176:24 177:2

**dispatch** 210:21,22,25

**dispatcher** 126:6

**display** 168:6

**disposal** 206:11

**distance** 136:14

**District** 6:9 84:16

**DOCJCT** 102:24

**DOCJT** 148:14 156:23 158:12

**doctors** 172:2

**document** 9:5 20:23 94:24 117:5 165:9,17 181:9 216:21 217:12 218:24 219:18,20 220:7

**documentation** 21:21 27:20, 25 28:3,17,25 29:8,9 70:2,21 72:4 93:17,23 94:14 95:3,17 96:18 97:4 107:21 112:4, 10 120:1 122:2 125:3 154:4 167:5,6 169:17 185:11,22 209:11

**documented** 28:14 29:17,24 70:7

**documents** 19:13,15,16 20:6,7,16 21:14,16 22:13 26:24 28:7 30:13,19 31:10, 17 72:1 82:24 89:1 94:9 144:24 161:14 164:14,16 166:4,8,13,22 167:10 177:8 183:1,15 192:1

**dispatcher** 207:5 222:1,3

**domestic** 64:22

**don't'** 115:15

**draft** 117:9 154:19

**drafted** 78:18 117:22 119:15, 17 149:21

**drafting** 79:1 117:24 150:3

**drafts** 150:14

**drawing** 16:16

**drive** 207:20

**driveway** 210:24

**drug** 207:8 211:10

**drugs** 12:4,17 15:9 16:2

**due** 180:4

**duties** 40:7

**duty** 16:17 17:6 18:3 187:23 190:1

— — —

**E**

**earlier** 78:16 80:1 89:14 97:21 98:12 140:23 144:17 153:19 159:12 163:6 165:2 177:24 182:6 199:22 200:25 213:21,24

**easier** 117:2

**eastern** 33:16 34:15,16 39:20

**easy** 151:4,5 187:25

**eat** 7:15

**Eckert** 104:22

**Edward** 97:13, 22 98:3 211:16 215:9

**effect** 9:18 11:3 48:25 51:23 52:23 80:11 81:3,5 82:18 87:15,25 114:5,25 117:17 120:6 124:13 145:11 157:20 158:22 203:7,14 220:3, 7

**effective** 34:11 43:6 117:14 153:15

**effectuate** 52:2

**efficient** 42:6

**effort** 169:18

**EKU** 102:15

**elected** 12:25 33:22 35:4 37:18 54:23 74:22 76:23 174:9,24

**election** 33:25 58:15

**electronic** 189:25

**Elliot** 6:12 44:6 70:23 144:17 153:18

**eluded** 104:23 105:3

**emergency** 42:15,18,20 46:18

**eminent** 151:25

**emotions** 168:5,12,20

**employed** 49:6 50:19 74:16,18, 20 91:12 132:16 175:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**employee** 49:3
75:13 76:6
174:5

**employees**
103:23 189:24

**employment**
21:22,24 26:7,
21 27:8,14
48:22 110:12
112:24 167:17
179:24 209:12

**EMS** 123:19,21

**encounter**
130:10 135:21

**encourage**
120:18

**end** 20:25 55:4

**enforcement**
9:17 31:3 32:2
34:10,11 36:22,
24 37:18 39:16,
21 40:22 41:7,8
48:23 54:20
55:22 58:7
72:23 73:1,5
86:17 103:2
105:5 106:20,
22 107:5,18
110:11,25
111:25 169:17,
24 172:6,12
174:9 180:24
182:22 185:12,
24 186:12
188:14 196:15,
18 197:1,7
205:1,9,19

**enforcement's**
34:9 58:10

**enforcement-
related** 189:10

**enforcements**
69:16

**engaged** 77:9

**ensure** 93:25
112:14,15
119:22

**ensuring**
91:11 95:24

**Enter** 132:23

**entire** 37:17
43:4 143:10
156:14

**entrust** 97:10

**environment**
129:22

**EPO** 43:17
46:12

**escalates** 51:3

**ESO** 118:25

**et al** 6:9

**ethical** 188:14

**Eubanks**
79:23

**evaluation**
167:17

**events** 198:4

**Everett** 46:15,
22 98:11 99:5,
11,16 101:1,3,
17 124:23,24
190:25 191:3,9
195:23,25

**everybody's**
171:23

**evidence**
17:10 49:10
207:22

**evolved** 158:6

**exact** 126:1
198:25

**EXAMINATIO
N** 7:3

**exception**
103:7 118:24

**excessive**
11:10,12 121:3
139:5

**excited** 12:5

**Excuse** 177:17

**exhibit** 9:3,7
79:3,10,11
116:23 117:3

118:22 119:4
146:6 161:23
162:17,19
164:10,12
177:20,21
182:24 183:1,3
187:5 192:3,5
206:17,19,21

**exhibiting**
12:2 15:7,25
60:10 63:4
139:15 140:16

**exhibits**
162:20 214:2

**existed** 80:22

**existence**
120:22

**exists** 120:1

**expected**
145:14 165:16

**expensive**
69:15

**experience**
11:1,20 12:8
13:9 14:24
15:16 16:6,21
17:18 18:6 32:3
41:7 54:20 58:8
84:1 88:3
171:18 205:10

**experienced**
205:19

**experiencing**
12:5

**explain** 93:22
136:3

**explained**
136:21 140:23

**explanation**
208:7,9

**Express** 6:6

**extended**
200:9

**extensive** 41:6
48:15

**extent** 13:12
25:24 102:6

192:24

**Extra-marital**
111:11

**extremely**
73:3,4 86:12

---

F

---

**F-R-I-T-H**
124:21

**Facebook**
191:7 194:21
196:10 200:14,
17 205:24
208:8 222:16

**fact** 23:18
29:22 30:4
55:20 64:6
77:12 87:10
105:24 108:5,8
124:1 154:7
185:14 196:7
217:19

**facts** 108:7
126:1 207:22

**factual** 20:10

**failed** 22:24

**fair** 7:18,25 8:1,
4 48:14 56:6
57:16 58:3,19
64:6 72:6 76:20
78:22 96:23
102:14 103:11
104:6 106:13
108:17 113:19
114:2 116:7
117:12 118:2,
19 119:1
131:13,25
132:10 139:11
144:13 145:19
157:4,22 184:7,
12,17 192:2
214:17,23
219:24,25

**fairly** 136:12
201:5

**familiar** 63:13
64:4 75:5 91:22
106:14

**family** 37:5
108:19,20

**farm** 156:7

**farm's** 157:14

**farms** 158:7

**fast** 64:11
207:20 222:23

**fear** 52:13,20,
23 53:4,19 54:2
73:10 136:6
198:9,12

**federal** 17:10
82:8 160:20

**feel** 10:25
11:19 12:7 13:8
14:23 15:15
16:5,20 17:17
18:5 159:25

**feeling** 184:19,
22

**feelings**
181:20

**felt** 25:2 34:10
136:1

**fight** 52:10
53:12 128:25
137:4 195:16
196:12,14,20,
24 197:13,17,
18,23

**fighting** 136:25

**file** 23:25 24:7,
13,14,16,24
25:16,21 26:3,
6,18,25 27:5,23
28:5,6,10,20,23
29:3 30:2,9,14,
20 47:8 70:8
71:25 79:20,22
82:13 89:2,7
94:16,17 95:4,
8,9 105:8,9
161:20 163:17,
22 164:4,6,17,
20 166:4,5,9,13
167:4,7 177:23
178:25 179:8
180:13,20
182:21 183:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of MIKE SMITH, taken on July 12, 2019

234

184:4 213:15, 16,19,21

**files** 22:1,5,8, 11,17,19,20 23:11,15 31:2, 7,10,12,16 79:16,25 95:11, 13,15 107:17 120:8 161:24 179:1 180:23

**final** 150:17 169:3

**finalized** 118:3

**find** 204:25 211:3,13

**fine** 20:24 81:11 131:10 162:12

**finished** 181:7

**fire** 56:18 73:6 213:8

**firearm** 52:19 89:22 218:25

**firearms** 51:11 64:18 65:3,6, 11,17 66:7,24 69:6 70:4 71:12,22 73:8 89:13,15 144:18,25 158:12

**fired** 24:19 74:2 133:4 198:19 213:2

**firing** 73:11

**fix** 146:24

**flags** 106:14,23

**focus** 18:1

**focusing** 10:5 13:5

**folks** 62:8

**follow** 50:1,9 185:1 196:15

**follow-up** 181:14

**force** 11:10,12 16:15,16 17:5 18:2 50:12,19 51:2,7,9,12,14, 22 52:2,19 55:13 56:10 57:19 58:5 59:5,11 60:4, 16,22 62:1,24 63:12 64:3,9 65:2,23 68:9,14 72:9,22 73:19 75:2,11,25 76:13,17,22 78:3,12 80:10, 11 83:7 84:2,5 85:8,24 86:6, 10,20,24 87:6, 12,19,21,25 88:9,11 100:11, 18 102:3 104:13 115:4, 12 116:5,10 121:3,14,25 122:10,14 125:4,16 132:20 133:8, 16 135:23,25 136:2,4,19,20 137:22 138:5, 12,16,20,25 139:5 140:21 141:5 142:3 144:15 145:7, 12 147:16,19, 21 148:4,11 151:16,23 152:24 154:11 155:10,15,22 156:2,15,20 157:8 158:1,5, 23 159:9 160:8 169:11,19,23 172:9 173:11, 12,14,20 174:3 185:23 186:12 196:8 197:2,8, 12 202:2 204:7 205:11,14,15, 18 209:24 210:13 214:25 217:13 218:17, 22 219:4,12,16 220:3,20,22,23

**Ford** 193:17

**forgetting** 110:1

**forgot** 98:11

**form** 29:5 36:7 53:7 54:4 73:14 84:6 86:19 87:8,14,23 95:23 100:19 106:16 107:6 109:9,16 110:7, 19 111:4 113:6 114:19 118:17 128:10,16,18 138:6 139:16 141:14 145:24 150:9 158:3 160:18 161:2,4 171:25 172:21 173:8,21 178:21 184:21 188:20 191:16 196:22 197:14 200:11 204:7 205:23 207:21 217:16,18 218:3 219:1,7, 14,19 220:10, 17 221:11

**formal** 86:19 95:19 114:15 186:24

**forming** 118:11

**forward** 17:11 192:7 199:7

**forwarded** 165:20

**fought** 136:12, 13

**found** 27:13 211:4,8,9,15,17 212:11

**Foundation** 161:4

**fourth** 176:18 212:2,4,8

**frame** 71:14

**Frankfort** 33:4

**frequently** 7:24

**friend** 35:15,16 37:4,7

**friends** 36:11 109:8

**friendship** 36:6 37:8

**Frith** 92:14 124:17,19 125:2

**front** 83:8,20, 22 85:3 87:4,11 120:14 160:21 183:24

**fucking** 210:23

**full** 194:23,25

**fun** 213:11

**function** 190:4

_____

**G**

**gain** 136:14

**Gambrel** 6:8

**Gary** 33:9

**gather** 127:13

**gave** 58:5 59:10 60:15 156:19 157:7 181:18

**general** 91:23 95:15 103:16 112:9 154:15 184:5 188:4,24

**generally** 58:21 115:14 188:16 210:2

**gentleman** 40:21

**get all** 58:11

**girl** 135:19

**give** 6:23 21:6 27:25 31:25 32:2 38:19 42:3 55:16 68:4 74:4

82:15 91:15 93:11,12 113:10,16 117:1 135:15 145:15 170:3,4 194:25 195:7

**giving** 173:24

**glad** 14:19

**good** 7:5,6,8,9 34:12 40:22 41:8,9 49:3 58:12 70:24 105:16,24 107:20 129:8 149:11 173:1,3 183:19 216:19

**goodness** 71:1

**govern** 49:4 187:23 188:10

**graduated** 32:6

**grand** 214:24

**granted** 33:2

**grateful** 152:15,19

**great** 166:16 179:6 202:16

**grounds** 42:1

**guess** 38:21 39:1,17 65:23 68:20 69:22 77:24 94:2 95:11 103:7 126:22 128:5 175:3 199:3 209:19

**guessing** 68:19 105:21

**guesstimate** 56:4 144:8

**guidance** 58:5 59:10 60:15,21 64:3 74:25 84:3 85:7,23 86:5, 10,14 87:5,11, 20 140:21 156:1,19 157:7,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

25 158:13
170:4 173:9

**guiding** 160:11

**gun** 53:19 73:2,
6 133:9 136:7,8
192:12 193:9
195:24 197:18,
22 198:6,8,13,
17,24

**guns** 199:12
200:10

**gut** 184:19,22

**guy** 40:22 41:8
135:19 136:23

**guys** 127:7
129:10 209:8

———————

**H**

———————

**half** 33:16
34:16 106:7

**hand** 6:20 9:2
83:11 96:7,8
107:25 116:22

**handed** 79:5

**handgun**
16:16

**handing**
174:17

**handling** 173:6

**hands** 52:11

**happen** 27:15
110:9 135:6
142:8,19
172:24 188:3

**happened**
13:5 46:12,17
103:22 109:3
110:10 126:14
134:21 135:5,7
183:25 201:13,
18 210:10,17

**happy** 7:15
13:24

**hard** 49:2
55:14 179:6
195:17

**Hardin** 181:24

**Harlan** 21:25
22:6 23:12
25:21,23 26:3,
19 27:2,5 32:7,
11,23 166:1,9
176:24 177:23
179:12,24
180:5,20 182:8

**hat** 92:14

**hate** 56:13

**head** 56:5
192:13 193:9

**health** 12:3,4,
15,16 15:8,9,25
16:1 60:10 63:4
139:15 140:16

**helped** 36:23
117:9

**helpful** 167:12
182:3

**hesitate** 45:15

**hierarchy**
92:19

**high** 38:22

**hilarious**
204:21 205:12,
13

**hip** 53:18

**hire** 25:4 26:8
29:1 38:6,12,16
39:4 40:10
47:3,14 107:6,
12 163:9
169:14 171:3
179:21 182:4
183:18 185:1
208:16

**hired** 22:13,24
23:8,19,21
27:16 30:8 32:5
36:14,20 37:3
38:6,17 40:18
41:1 50:14
90:5,25 91:3
93:9,14 99:25
103:16 104:3
105:16,25

107:23 108:11
109:14,20
113:15 118:20
119:10,11,16
165:6 169:4
182:14 185:5
208:20 209:4

**hires** 27:24
206:4

**hiring** 23:24
24:6,9,11
25:12,19 26:2,
16,23 28:8,13,
19,23 30:15,20
37:11 90:7,17,
21 96:25 97:1
99:20 101:23
104:9 106:5,10
119:5,14 164:3
165:11 167:8,
23 168:11,21
169:16 170:20
175:13 176:22
177:8,12 179:9
180:13,25
181:10 184:14
185:21 190:21
205:5,25
206:11

**history** 21:24
26:7,21 27:8
177:1

**hit** 197:24
198:1

**hits** 40:5

**Hold** 210:11

**holding** 56:10
188:13 192:12

**Holiday** 6:6

**home** 33:5
116:12

**honest** 126:23

**honestly** 56:12

**hope** 62:6

**Hoskins** 79:6

**hostile** 51:1
168:7,13

**hour** 19:12
142:14,16
161:13

**hour-and-a-
half** 70:24

**hours** 50:17
63:14,17

**house** 45:11
50:23 64:2,8

**how'd** 35:5

**Hudson** 41:20,
22 42:15,17
43:9,21 44:4,23
45:5,23 46:6,14
47:18 97:23
98:20 99:2,5

**Hudson's** 47:1

**human** 110:24
151:24

**Hunter** 213:4

**husband**
109:8,13,20

**hypothetical**
173:24

**hypotheticals**
174:1

———————

**I**

———————

**idea** 96:2 113:2
140:1

**ideal** 138:13

**IDENTIFICATI
ON** 9:7 79:11
117:3 162:17
164:12 177:21
183:3 192:5
206:21

**identified**
62:8,9

**identify** 6:11

**images** 189:9

**immediately**
117:23 122:16

**implement**

72:16,18

**implemented**
17:1 147:11,20

**implicit** 14:16

**implied** 102:7

**important**
72:22,24,25
73:3,4 86:12
93:22 107:4
172:6,11

**improprieties**
39:5

**improve**
170:12

**in-house**
140:14,20
144:15 145:20
146:18 153:13
157:7,14

**in-service**
63:14,18 87:1
88:16

**in-services**
86:23 88:12
91:9

**inappropriate**
81:1 109:2,6
189:1 203:22

**incident** 11:15
12:24 19:25
62:9 65:9 115:8
122:24 124:10
128:12,15
129:2,6,8
133:16 134:18
146:20 150:6
176:23 190:23
193:1,3 201:20
209:18,23
210:9 214:15
217:9 219:24
220:2,4 221:7

**incidents**
11:10 20:1,10
108:19 121:3
132:20,24
133:8 186:1
217:13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

include 164:20 189:13

included 43:17 118:5 150:22 165:12,15

including 11:10,13 74:11 193:7

income 162:9

incoming 72:17

inconsistent 81:6

incorporated 153:10

incorporates 152:7

incorrect 219:8

incumbent 58:15

independent 27:10 36:21 45:25 125:7,21, 24 143:21 144:9 169:21

Indians 92:8

individual 17:15 53:13 61:5 70:21 73:18 80:16 82:22 90:11 103:5 117:22 137:10 188:8 218:9

individually 75:7 143:3,4 172:3

individuals 52:25 78:1 80:5 137:24

ineffective 46:20

inform 37:4 109:1,5,12 136:15 168:16 179:14 191:9

information 19:22 25:1 28:12 29:6,17 39:10 78:1 107:25 108:15 110:3,5 114:17 162:13 164:4 165:10,17,21 168:16 169:13 177:12 182:5 189:7 193:2,3 216:1

informed 24:18 42:12,17 110:2 111:2 129:14 168:19 182:7 208:19 210:25

ingesting 12:4,17 15:9 16:2

initial 78:14 99:20 112:24 118:17 151:22 217:4

initialed 95:2

initially 117:13 118:11 137:19

initials 151:20

initiate 214:21

initiated 135:1, 20

initiation 47:2

injure 73:11

injuries 126:18,21 127:11 130:8

injury 152:1

Inn 6:6

input 58:11

instance 49:7 133:3 147:24

instances 17:9 39:8 42:2 54:13 56:9 72:13 115:13 137:25 191:4,12

instruct 81:2, 11 82:16 96:9 102:21 170:1

instructed 26:20 48:4,8 119:21 181:1

instructing 57:19 59:4

instructor 65:3,6,12 66:7, 24 71:12,22 142:1 143:3,7 158:7

instructor's 89:15

instructors 89:13

instructs 96:21

insufficient 80:9

integrity 110:6,15,21

interact 60:9 63:4 140:15

interacting 12:1,14 15:6,24 139:14

interested 162:12

interfere 128:2 130:19

internal 11:8 45:21,22 60:3 62:23 78:7 121:2,14,24 122:9 125:11 138:19 149:1 156:5 181:20

internally 156:23 217:13

interpersonal 168:2

interpret 80:20

interpretation 87:24

interpretations 158:4

interpreted 102:6

interrogatories 20:23

intervention 154:14 155:5,6, 7

interview 37:21 38:22 105:12,15,17, 18,25 121:18 122:23 123:5, 10,14,19 130:15 134:1 176:17 186:24

interviewed 134:17 186:10 191:24

interviewing 105:23

interviews 123:22 134:2

introduce 17:8

investigate 49:13 56:14,15, 19 169:22 170:5

investigated 204:4 217:13

investigates 122:18

investigating 49:23 122:22 123:23 124:2 127:25 131:15 133:22

investigation 25:23 28:18,25 38:15 42:14 43:9 44:24 45:22,25 46:1, 2,3,6 47:2,10 50:3 97:23 98:1,8 99:2 111:19,21 121:24 122:10 124:4 125:3,7,

11,15,23,25 130:15,20,25 131:14,18,24 132:2,12 134:25 138:20 164:2 170:2 179:23 180:3 181:14 186:5,8 189:5,6 213:11 217:10,20

investigations 11:9 60:3 62:24 78:8 121:2,14

investigative 32:22,24

investigator 215:2,5,17 216:2

investigator's 215:16

investigatory 11:14

investing 123:23

involve 14:16 220:21

involved 14:18 45:2 53:14,17 56:15,16 62:9, 10 67:8 97:22 106:9 122:20 123:5 132:19 133:9 150:2 155:6 176:23 196:7 219:11

involvement 137:7

involving 108:19 115:8 142:3 193:2,4 207:16 210:13 220:3,22

issue 10:4 86:12

issued 42:16, 19 137:16,20 158:24

issues 12:4,17 15:9 16:2 39:15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**J**

**January** 15:13
33:23 39:24
40:13 57:11
58:3 59:3 60:8,
13,20,25 63:8,9
64:1 86:25
90:23 117:14,
19 118:17,20
119:7,12 122:6,
15 124:13
140:20 146:13
153:15 157:16,
21 158:20
216:22 220:8

**Jason** 6:15
42:11 62:3
66:17 80:25
81:24 160:6,10

**Jason's** 42:5

**Jessie** 73:22
75:9,23 76:2,
10,15,19 77:8,
13 80:17 89:8
100:7 103:12
124:25 125:12,
16 126:4
127:19 128:8,
17 131:17
133:24 134:9,
13,19 135:16
136:4,16
138:21 141:12
193:2,8 197:21,
24 198:8,16
201:20 202:1,
14 203:3
214:15 217:9
219:23 220:2,4
221:7

**job** 36:24
111:13 172:4
186:11 206:1

**John** 6:15
19:20 176:18
183:19

**Johnson**
46:15,22 93:21
97:13,14,16,22
98:3,11,19

99:11,16 100:2,
5,10,15 101:1,
17 124:23,24
125:2 190:25
191:3,9 194:9
195:23 210:3,
17 211:22
212:17 215:9

**journal** 116:15

**judge** 43:2
160:20

**judgment**
82:13

**July** 6:4 202:25
203:1 212:12

**jumped** 183:13

**June** 97:12
99:12,15 100:7,
12,14,24
101:20 102:1
103:13 104:11
113:21 114:3,9,
15,22 115:2,7,
10 116:7
120:25 124:15
132:16 133:9
134:22 137:15
139:9,11,22
140:7 141:13
144:16 145:5,
10,19 146:20
149:24 153:16
156:6,17 157:4,
8,17,22 158:21
174:6 178:5,15
192:11,18
193:9

**jury** 160:21
214:24

**justice** 63:15,
23 64:25 66:4
68:22 81:20
86:22 88:17
89:5 91:7,19
102:12,19,25

**justifiable**
153:1

**justified** 152:2

**juvenile** 177:3,
6 209:25 210:6

211:1,4,15
212:3,16

**K**

**K.L.** 212:3,11

**KACO** 58:10
64:15 69:13
70:19

**KCSO-8**
187:19

**KCSO12**
149:19

**KCSO12A**
121:6

**keeping** 105:6
140:8 168:20

**Kelley** 6:15
9:21 10:14
12:19 13:18,22
14:2,11 18:13
19:7,8,17,21
21:20 22:19
54:4 67:13
74:19 75:3
154:17 155:1,3,
6,12,14 156:21
162:2,7,9,15
171:8 177:3
183:6,8 187:9,
12,15 191:23
192:6,18,20
193:13,21,25
195:2,5,11
199:17,22
200:1,11,16,23
204:23 205:23
206:2,4 207:21
210:7,9,12
211:5,7,9 214:2
216:10

**Kentucky** 6:6
22:14,18,21,25
23:6 32:6,23
33:3,14,17
34:18 35:8,9
36:15 37:14,23
38:14,18 39:3,
20 40:21 42:13
45:7,24 46:2,5
47:8 48:13,21,

24 49:24 50:8,
11,19,22,24
54:12,18,21
65:22 66:5
68:8,10 81:16,
19,20 84:1 88:3
91:4 94:4,6,12
97:25 102:22
103:8 106:2,10
125:6,24 127:1
131:14 132:1,
11 133:3 151:2,
10 171:18
175:19 207:2
208:20 209:12

**key** 52:1

**kill** 73:7 133:6
136:8 198:11

**killed** 82:19

**killing** 141:12
193:8 196:19

**kills** 65:17

**kind** 34:24 40:4
64:16 68:23
91:23 95:15
108:4 127:6
142:2 144:18
159:25 183:13
186:15 188:8
197:17,19
215:13

**knew** 41:6
61:20 66:15
127:25 195:23
207:17

**knock** 110:12

**knowing** 140:5
148:19

**knowledge**
10:9,21 11:1,20
12:8 13:3,9
14:24 15:16
16:6,21 17:18
18:1,6 20:7,9
26:21,22 27:4
30:17,18 39:4
59:2,9,12,15,20
60:5 62:21 63:2
68:4,12,13,15
76:21 87:1 88:6

89:24 94:13
97:4 98:5
100:16 102:16
104:19 105:10
112:20 114:7
120:7 133:25
147:10 148:7
156:4 158:10,
11 163:11
167:6 174:3
175:2 190:18
191:16,17
197:21,24
198:2 200:19
205:7 207:9,12
210:12

**knowledgeabl
e** 40:22 41:8

**Knox** 6:8,17
9:4,15,16,22
11:6,7,11,12,24
12:11 15:3,5,21
16:11,14,24
17:1,4,22,24
18:23 23:16
24:14 25:4
27:18 32:1,8
33:22 34:8,12
36:1,4,12 41:12
42:21,24 43:3
45:4,12,17,20
46:8 47:3,25
52:18 53:3,22
54:22 57:3,7,18
58:2,4 59:3,9,
15,21 60:2,8,
14,19,25 62:22
63:2,10 64:1,7
70:8 72:8
74:16,20,23
76:4,12 77:10,
18 78:11,19
79:15 81:10
82:6 84:4 85:7,
23 86:5,18
87:2,6,12,18
88:15,19 90:8,
22 91:1,13
92:1,20 93:18
94:23 95:19
96:14 97:3,14
98:7 99:18
100:17 102:7,
17 103:15
104:17,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

105:5 106:6
110:14 112:5
113:4,21 117:6
118:8,20
119:10 120:2,
25 121:15
122:10,14
125:10,14
130:23 132:3,
17 133:22
134:3 137:17
138:24 139:3,4,
13,21 140:14
141:22 144:13
145:5,16,22
146:17 147:11
148:12,15
149:2,25 150:7
156:1,19,21,22
157:6,24
158:14,20
163:19 173:5
174:18 178:1,
12 184:14
187:2,8 188:12,
18 190:6 200:8
201:22 207:19
214:13,20

**KRS** 65:22
68:8,14 141:5
142:3 143:22
150:24 151:7,
12 152:2,7
153:2,9 159:14,
21 160:9
219:11,17,20

**KSP** 32:11
33:6,7,20 34:2
35:12,13,22
36:18 37:25
39:11 40:7 41:5
44:24 49:11
55:12 67:10,11,
12 97:15 99:6
107:1 127:7,25
130:13 131:2
134:25 154:23
176:2 206:18,
22 207:8,12
209:8 215:5,16
216:2 217:10,
21 222:7

---

**L**

**lab** 33:16 34:15

**labeled** 149:19
161:21

**laboratories**
49:8,17

**laboratory**
33:15 34:17
49:14 55:2,19

**labs** 33:17

**Lacee** 6:3
161:23 179:6

**lack** 81:9 82:5

**lady** 213:10

**laid** 14:1 126:1

**large** 188:6

**Larry** 26:12

**late** 181:18

**Laurel** 21:25
22:2 23:11
24:1,24 25:3,16
30:9,14 166:1,
14,21,23
182:25

**law** 9:17 31:3
32:2 34:9,10,11
36:21,24 37:17
39:16,21 40:22
41:7,8 48:23
54:20 55:22
58:7,9 69:16
72:22 73:1,5
81:16,23 86:17
103:2 105:4
106:20,22
107:5,17
110:11,25
111:25 169:17,
24 172:6,12
174:9 180:24
182:22 185:11,
24 186:12
188:14 189:9
196:15,18
197:1,7 205:1,
9,19

**laws** 68:8
73:16

**lawsuit** 62:10
145:2 147:7

**lawyer** 152:17

**lawyers** 7:14
18:22 19:3,4
69:21 152:11

**layout** 91:22

**lead** 193:2
222:3

**leading** 84:2

**learn** 35:25
108:1 126:3
128:7,13
169:13 170:20
176:23 208:16
209:14

**learned** 28:12
29:17 43:20,24
44:17,22 61:16
65:16 66:12
67:23 71:17,19
89:25 94:3
104:17,20
129:2,5 165:10,
17 168:11,24
169:5 221:25
222:2,6

**learning**
210:25

**leave** 97:14
130:24 131:2,3,
9 134:24 204:7
209:20 214:2

**led** 82:7

**left** 50:24 101:4
108:9 154:19

**legal** 20:19
150:10 154:14
155:4,7 190:11

**legitimate**
82:15

**length** 217:25
218:21

**lengthier**
171:9

**laws** etc.

**lethal** 16:18
17:5 18:2
136:2,4 138:12,
16 141:5
152:24 155:16

**letter** 36:14
153:5

**level** 67:1
190:2

**lieutenant**
32:21,22,25
33:1,2,7 38:5
55:9 56:15

**life** 52:13,20,23
53:5,12,20
57:20 59:5
72:24 73:9,11
136:1,6 151:25
197:18,23
198:9,12

**Liford** 212:14

**light** 196:7
203:23

**likewise** 166:8

**limited** 163:1

**lines** 113:14

**list** 21:8

**listed** 90:14

**listened**
215:20

**lists** 155:20

**litany** 61:12

**literally** 13:25
185:4

**litigate** 62:18

**litigation** 79:6
154:5

**live** 45:11

**lively** 129:11

**logos** 189:14

**logs** 189:25

**LOL** 204:21

**London** 6:6
33:6,7,8,12

34:17 56:17

**long** 19:11
35:14,22 36:20
37:15 62:7 71:2
78:25 101:1
116:18 127:15
142:12 144:4
201:3,10 215:4,
6,7 216:11

**long-term**
37:4,7

**longer** 137:4

**looked** 21:9
22:4 27:7 30:23
92:20 171:2
179:20 192:1

**lose** 52:20
196:12

**lot** 8:23 40:5,
14,15 52:3,9,16
55:2 58:16
86:13,23 92:17
106:25 120:12,
16,21 129:11
138:2 181:19
196:24 197:19

**lottery** 21:8

**luckily** 185:19

**Luttrell** 213:4

---

**M**

**machine** 64:11
69:14,15,17
70:19

**machines**
64:16

**mad** 181:18

**made** 12:21
13:14 17:11
22:24 28:4 30:1
34:7 47:6 48:2,
3 54:14 62:15
72:13 90:21
92:13 96:8
102:8 117:9
119:18,19
130:13 150:11
163:16,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

175:13 180:3
181:23 182:20
183:21 184:8
190:12 193:23
194:4 198:10
199:22 204:16
206:25 207:11
210:14 213:11
216:2 217:8,19
218:5 221:22
222:16

**magistrate**
84:15

**maintain** 89:21
190:1 222:11

**maintained**
23:15,25 24:7
28:8,20 29:2
89:1 94:15,19
120:8 213:14,
19 221:13

**make** 8:8,19
9:10 20:4 25:20
26:2 27:20
35:19 40:11
42:2 49:18
58:12 67:14
70:11 72:11,23
80:13 91:16,17
102:12 104:2
112:18 127:7
146:24 160:17,
20,24 161:2
162:25 179:18
182:25 184:18
188:9,11 190:9
209:3,10
220:16

**maker** 150:7

**makes** 90:16
180:16

**making** 8:19
26:8 91:11
129:22 163:8
169:14 182:3
183:18 190:7
208:16

**man** 116:17
202:21

**manner** 160:24
188:13 190:3

208:4

**manual** 48:10
81:17 91:16
93:11,19 94:7,
14,20,21 96:4,
9,10,15,19,21,
25 102:21
103:17 104:4
117:7 139:6
140:24 158:24
218:11

**manuals** 48:15
119:19

**March** 179:15
199:10,25

**March-april**
184:9

**mark** 79:2
116:22 161:22
164:10 177:19
192:3 206:16,
18

**marked** 9:2,7
79:11 117:3
162:17 164:12
177:21 183:3
192:5 199:21,
23 206:21

**marking**
209:16

**marksman**
51:15

**marksmanshi**
**p** 65:19,20,21
66:23 67:5,24
71:18

**married** 109:2,
7 111:12

**materials**
163:20

**matter** 6:8
53:12 55:20
122:18 125:7
131:19 134:25
186:5 199:12
200:10

**max** 38:24

**meaningful**

87:5

**means** 52:23
100:3 171:14

**mechanism**
95:19 105:6
114:16

**media** 187:8
188:5 191:5,14,
21 194:13
203:12,19
206:10,14
213:9

**media-related**
190:20

**medial** 189:7

**medical**
123:14

**mediums**
189:25

**meet** 18:22
19:4,7,11 35:5
200:21

**meeting** 19:14
201:10,12
215:4

**member**
108:19 129:14
207:2

**members**
108:20 111:25
170:21 217:17

**meme** 204:16

**memes** 190:20

**memo** 182:8,
11

**memorandum**
20:19 164:20
165:1 166:24
179:15

**memorialize**
30:4 189:9

**memory** 20:12,
14 116:13
144:24 180:10

**mental** 12:2,3,
15,16 15:7,8,25

16:1 60:10 63:4
139:15 140:16

**mention** 37:1

**mentioned**
98:3,6,14
104:25 143:8
159:19,22
218:21

**mentioning**
179:11

**met** 167:20
198:3 200:20
201:9

**middle** 40:13

**might've** 64:5

**Mike** 6:7,16

**Mikey** 25:13
28:22 29:2 31:7
36:3,24 37:5
77:14 101:22
105:1 107:3
136:25 169:16
175:17 179:23
180:24 183:24
204:16,21
206:18 210:4

**Mikey's** 104:25

**Mills** 73:22
75:9,23 76:2,
10,15,19 77:8,
13 80:17 89:8
100:7 103:12
115:9,17
124:25 125:12,
16 126:4
127:19 128:8,
17 131:17
132:15 133:24
134:9,13,19
135:16,22
136:4,8,9,16
138:21 141:12
157:21 193:2,4,
8 197:21,24
198:8,16
201:20 202:1,
14 203:3
209:21 214:15
217:9 219:23
220:2,4 221:7

**mind** 193:21
206:1

**Mine** 125:19

**minute** 71:3

**minutes** 42:9
56:24 144:8
210:24

**misconduct**
43:20 44:3,17,
20

**misled** 128:24

**missing**
209:25 211:1
212:15

**mission** 118:5,
8 139:7 190:4

**misstates**
159:11

**misunderstan**
**d** 97:24

**misunderstoo**
**d** 149:5

**modified** 78:14

**moment**
161:20 162:24
181:7 214:5

**money** 41:17

**mono** 81:9
82:4

**monopoly**
17:15

**month** 71:16
142:8

**months** 33:11
65:9 71:12,16
77:20,23 78:3,6

**Morals** 110:21

**morning** 7:5,6

**mother** 43:16,
18 45:3

**motion** 81:12

**motor** 155:7
192:21



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

murder 82:9

murdered 211:4

---

**N**

Nalley 6:2

named 35:2 212:3

names 21:13 101:13

nature 36:5 43:8 160:18

necessarily 20:11 44:18 73:17 108:8 110:8 114:20 163:18 182:10 189:16 206:6

needed 24:19 49:18 52:2 65:24 82:2 86:18 102:22

needing 46:23

negatively 29:20

network 188:7 191:14

networking 187:21 189:24

night 129:1

nitpick 159:23 160:3

non-lethal 16:18

nondeadly 151:16 152:23

nonlethal 155:21 156:15

nonspeaking 160:19,24

northern 34:18

note 12:19 24:12 87:22 148:5 192:23 199:17

notes 18:12 95:7 98:23 116:12 120:5 180:9 186:20

notice 9:3 10:3 14:3 81:6 82:12 116:21

notification 121:17

notified 125:6

notify 121:17 122:1,16 123:25

novice 142:21

number 6:10 9:3 11:17 15:1, 20 16:8,23 55:16 79:3,10 82:20,22 116:23 118:25 121:7 151:19 155:21 161:23 162:19 164:10 168:1 177:20 183:1 192:3,8 193:7 206:19 216:20

numbers 83:17 162:3 167:11 185:19

---

**O**

oath 69:22

object 19:17 29:5 36:7 42:8 53:7 54:13 73:14 84:6 87:8,14,22 95:23 100:19 102:5 106:16 109:9 110:7,19 111:4 113:6 114:19 132:24 138:6 139:16 141:14 145:24 150:9 158:3 171:8,25 173:8, 21 178:21 184:21 188:20 196:22 200:11

205:23 207:21 210:9 211:7

objecting 200:2

objection 8:19,20 12:19 13:2 17:9,11 19:20 42:1,3 47:6 53:10 54:4,14,15 66:14 72:12,13 74:19 75:3 80:14,25 81:14, 25 84:7 85:11, 12,25 87:22 102:8 109:16 128:10,16,18, 21,22 132:23 147:22 148:5 150:11 161:2,4 172:21 186:1,2 190:9,10,12 192:22,24 193:5 197:14 199:17,22 200:16 204:23 210:14 217:16, 18 218:3 219:1, 7,14,19 220:10, 17 221:11

objections 8:14 160:18,21, 24 193:24

objective 52:3 181:21,22

obligations 188:14

observe 127:10 130:9

observed 130:7

obtain 25:15, 21 26:3,17 90:2

obtained 134:17

occasion 8:15 147:19

occasionally 143:1 171:12, 23

occasions 23:6,7 94:11

occurred 66:15 80:18 82:6 87:1 153:20,21,24 157:11 219:23 220:2 221:4,18

occurs 148:15, 24

offended 7:23

offer 206:1

offering 45:12

office 10:2 27:19 36:4 41:15 45:8 46:21,24 59:19 75:6 85:6 91:24 95:11 99:8 105:8 117:24 135:11 156:22 173:20 175:4

officer 34:11 48:23 49:23 53:3,21,24,25 54:2,12,21 63:14,24 72:23 73:2 74:22 81:21 88:12 91:10 102:11, 23 105:5 106:20 110:11 121:15 125:9, 14 130:24 138:4,11,24 151:23,24 152:25 154:15 168:5,6 169:9, 23 170:9,12 173:10,15,19 174:10 184:19 192:12 197:7 204:17 205:1, 10,20 212:25

officer's 120:8 148:4 213:15

officers 9:17 11:11,12 15:6 16:15 17:4,15 52:17 55:12,23 56:9 57:19 58:5

59:4,10 60:9, 15,21 64:3,8,20 73:5 78:1 80:11,18 84:3 87:12 91:3 103:2 110:25 123:10 126:12 137:15 139:4 156:14 165:16 171:20 172:18 173:2,4,7,9,11, 17 178:8,11 187:23 188:12, 18 189:13 196:15,18 207:9 220:8,16, 23

official 134:1,2

older 40:21

OMB15A 154:16,22

on-duty 188:17 189:3

online 89:4,5 190:21 191:10

opening 62:17

openly 203:17

operated 48:19

operating 13:4 49:7,19

operational 48:18

operations 32:25 33:2,7

opinion 24:11 111:15 170:3 171:3

opinions 106:18 222:9

opportunity 10:15 14:10 38:1

opposed 61:25

oral 29:12 38:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**order** 42:16,18, 20 43:13,17 46:18 54:1 154:16

**ordered** 43:2

**ordinarily** 20:18

**outline** 68:23

**over-redacting** 162:13

**overcoming** 152:25

**overdose** 211:10 213:11

**overpower** 53:19

**overrules** 81:13

**oversight** 49:15

**overwhelming** 135:23

---

**P**

**P-WORD** 204:18 208:11

**P.M.** 84:21 223:4

**pages** 153:10 191:21

**paid** 131:11

**paperwork** 169:11

**paragraph** 171:9 176:18, 19 210:19 212:5,8

**paragraphs** 212:3

**paraphrased** 215:13

**paraphrasing** 216:24

**parents'** 45:11

**part** 18:13 28:4, 10,20 29:2 30:1 38:1 41:11 65:11,18,20 67:5,16,22 68:5,7 70:7 89:2,3 94:15 138:4 143:13, 15,19 163:16, 21 164:4 187:12 213:14, 19

**participated** 220:24

**participating** 202:8

**participation** 91:9

**parties** 74:10

**parts** 20:10 161:23

**party** 73:23 74:6 108:6

**pass** 65:8 66:25

**passed** 65:5

**past** 78:6

**patient** 160:23

**Peal** 176:20

**Pearlie** 6:8

**pending** 6:9 7:17

**people** 41:9 45:3 67:23,25 69:10 89:19 90:4 92:9 93:5, 18,23 94:25 106:5,14 108:5 175:3 188:7 196:19

**pepper** 133:17 137:16,18,20, 21,23,25 138:4

**perfect** 7:21 52:14

**performance** 167:16

**perimeter** 130:14

**period** 12:20 27:16 82:7 91:6 184:12

**person** 9:14 11:6,23 12:10 15:2,20 16:10, 24 17:22 53:11, 23 56:10 109:14 111:13 113:15 119:17 133:6 151:25 153:1 171:22 193:10

**personal** 26:5 95:11 106:18 112:20 182:20 213:25

**personally** 27:3 30:16,19 31:6 96:5,8 105:12 111:23, 24 113:10 119:20 120:4 141:21 163:6, 10,12 165:13 168:14 169:20 174:16 183:20, 22 186:3 191:20 206:14 222:18,19

**personnel** 22:1,5,8,11 23:11,25 24:7, 24 25:16,21 26:3,5,18,25 27:5,7,8,24 28:5,10,20,23 29:3 30:2,9,14, 20 31:2,6,9,12, 16 38:3,10 40:10 48:9 49:15,16 55:21 65:21 70:8 71:25 79:15,19, 22,25 89:2 91:16 94:16,17 95:4 106:12 107:17 120:8 123:14,19 161:20,24 163:7,17,21

**164:4,6,17 166:4,5,9,13 167:4,7 178:25 179:1,8 180:13, 20,23 182:21 183:17 184:3 213:15,16,19, 21**

**persons** 168:7, 13

**perspective** 38:2 45:14

**pertaining** 65:22 68:9 141:5 189:7 191:4

**pertains** 151:1

**pertinent** 123:2

**phone** 46:23 84:19 165:2

**phonetic** 176:20

**photograph** 192:12 194:5, 10,16 195:21

**photographed** 127:2

**photographs** 189:9 190:19

**phrase** 146:15

**physical** 130:8 135:23 152:1, 24

**physically** 136:22 137:3 142:6

**pick** 140:2

**Pickard** 13:16 79:20 147:2

**Pickard's** 10:1 12:21 57:13

**picture** 195:7 196:4 200:9 204:12 206:5 208:10 213:10

**pictured** 189:18

**pictures** 189:13 208:3

**Piercey** 33:9

**pitch** 135:20

**PL1562** 181:4

**PL2108** 192:8

**place** 16:14 27:17 47:24 50:25 57:8,18, 24 58:4 60:14, 19 61:17 62:23 70:24 72:8 73:1 81:9 85:6 86:19,20 91:2 92:25 95:19 97:8 99:13,25 100:16 102:17 104:8 109:15 112:5 113:16, 20,25 114:3,18 122:6,15 130:25 131:5 135:10,16 139:3,9 147:2 157:6,23 158:20 172:13 184:13

**plaintiff** 6:12, 14

**plaintiff's** 9:2 11:16 17:14 154:5

**plausible** 61:15

**point** 7:13 32:24 40:5,20, 23 41:13 42:15 43:5 46:10,13, 21 48:12 49:13 58:17 63:16 92:24 106:1 110:12 121:12 126:2 127:24 145:4,9 154:8 157:15 185:20 200:5 206:25 210:10 216:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**police** 17:2
22:9,14,21
23:2,6,12 26:4,
19 27:2 32:6,7,
23 33:3,14
35:8,9,10
36:15,25 37:14,
23 38:15,18
39:3 40:21
42:13 44:3
45:7,24 46:2,5
47:9 48:14,21,
24 49:24 50:8,
12,20,22,24
54:12,18,21
56:17 63:24
84:1 88:3 91:3,
10 94:4,6,12
97:25 102:11,
23 103:8 106:2,
10 123:10
125:6,24 127:2
131:14 132:1,
11 138:3,11
163:8 166:5,10,
14 167:2,7,18
168:10 170:21
171:19 175:13,
19 176:24
179:15 180:5
197:11 207:2
208:20 209:12

**polices** 48:7

**policies** 8:24
9:18 11:2,7,14,
25 12:13 13:13
16:13 46:8
47:24 48:5,15,
20,25 49:5,11
50:2,8,25 51:5
54:22 57:2,7,
12,17,23 58:4,
9,10,12,22
59:4,9,15 60:2,
8,14,18 61:1,5,
16,20,24 62:22
63:3 67:8 72:5
74:24 76:4,7,11
77:18,22 78:7,
11,18 79:1,4,9
80:15,20,23
81:3,5 82:5,17,
20 93:10,24
94:7,14 96:1,
15,24 97:8

99:18,24 100:6,
16 101:23
102:17 103:4,
15 104:8 112:3,
22 113:4,16,20,
24 114:4,18,20,
25 117:8,13,17
118:1,3,16,21
119:3,13 120:3,
13,17,22 121:1
124:1 130:22
131:4 132:3,13
139:2,6,12
145:10,15,21,
25 146:2,11,17,
19 147:1,6,10,
20 148:3
149:20 150:3,
15,24 152:21
153:14 156:18
157:5,20,23
158:14,22
159:7,9 172:13,
16,18 173:5,19
174:18 184:13
185:14 187:1,7
188:4,17,22
196:15 201:22
217:1

**policing**
171:11

**policy** 14:18
48:9 51:7 62:2
65:2,23,25
77:25 78:2,14
80:9,10 81:17,
18 83:3,7,22
84:2 85:2,5,22
86:4,11 87:4,
10,17 91:16
95:21 96:3,8,18
103:17 104:3
108:4 112:9,14,
15,16 113:11
117:6 119:16
121:5,13,23
122:4,5,9,13
124:6,12 139:7,
8 140:24 142:3
144:6 149:18
150:7,18,23
151:15 152:5
153:11 154:11,
19,23 155:24
159:19 187:18,

22 188:18
189:4,11,23
190:8 216:21
217:12 218:6,
11,23 219:12,
18,20 220:3,7

**political** 108:6

**position** 10:25
11:19 12:7 13:8
14:23 15:15
16:5,20 17:17
18:5 33:14
56:23 75:7,12,
18 178:8
222:11

**positive** 29:23
76:25 129:15

**possession**
95:12

**possibility**
113:9 157:11
178:10

**possibly**
163:18 174:1
182:1 221:19

**post** 32:7,11,
12,15,23 33:6,
7,8,10,12 38:6
55:2,9,23 56:17
194:12 199:10,
15 200:5,6,14,
17 202:25
203:6,22
204:10 205:2,
24 222:16

**posted** 195:21
203:18 204:16

**posting** 191:10
194:4 200:9
203:13 204:20
208:10

**posts** 203:6
208:3

**potential** 39:15
208:4

**Powerpoint**
215:1,6 216:1

**practice** 16:12
96:13 97:2

103:16 107:21
165:9

**practices** 9:18
11:2,7,14 12:1,
14 13:13 16:13,
25 76:16 91:23
114:2,8,12
115:12 116:5,9
217:1

**predate** 13:14

**prefer** 87:16

**preferably**
91:21

**preparation**
19:5 183:8

**prepare** 18:10
20:17 21:15
31:1,10,17
82:23

**prepared**
10:12 15:12

**preparing** 22:2
167:15 179:2
194:3 203:11
204:15

**present** 14:5
66:9 123:11,15
135:12 142:6
143:22 215:8

**presentation**
215:1

**presenting**
208:3

**preserve**
85:12 122:20

**pretty** 24:15
46:12 48:20
50:23 55:20
66:16 69:15
86:7 194:8
201:5,8 205:21
215:2

**prevented**
175:18

**previous**
21:21

**Previously**

85:9

**printout**
194:23

**prior** 10:10,21
13:4,16 18:21
20:1 22:23
23:12,18,24
24:6,9 25:12,19
26:2,8,16,23
28:7,18 30:7,20
37:2 47:25 57:8
59:2,6 61:25
65:9,10 68:24
71:16 72:12,18
75:8,23 76:2,9,
15,19,24 77:12
80:14,23 82:21,
25 84:7 85:11
86:25 87:18
88:6 89:8 91:12
98:17 99:15
100:4,6,8,9,11,
14,22,23,24
101:17,20
102:1 103:12
104:11,20
105:9 106:9,22
108:11 111:2
116:3,7 117:16,
18 119:11,17
128:8,17,19
129:6 130:18
139:21 140:7
141:12 144:15
145:5,19
146:19 147:1
150:2 152:21
153:15 156:6,
17 157:3,8,12
161:15 162:20
163:8 164:3
165:6,10 167:8,
15,19,20,23
168:10 169:16,
19 170:20
176:7,22 177:8
178:4,15 179:9
180:13,24
181:9 182:3
183:2,17
185:21,24
186:12 194:2
196:8 202:7,11
203:11 204:15
205:5,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00184-REW-HAI Doc #: 108-17 Filed: 02/10/20 Page: 78 of 86 - Page
ID#: 4937
The Deposition of MIKE SMITH, taken on July 12, 2019 243

206:17,20
207:14 208:16
214:17 221:22
222:1

**privilege** 19:21

**privileged**
20:18

**problem**
203:21

**problems**
168:20

**procedure**
48:10 51:7 78:7
80:9,10 83:22
84:2 85:2,5,23
86:4,11 87:4,
10,17 95:21
96:4,19,25
103:17 104:3
113:11 117:7
121:13,23
122:5,9,14
124:2,12 139:7,
8 140:24
151:15 152:6,
23 153:11
154:24 155:25
187:18,22
189:23 190:8
201:22

**procedures**
8:24 11:7,15
13:13 16:12,13,
25 46:8 47:24
48:16,20,25
49:5,11 50:2,9,
25 51:5 54:22
57:3,7,13,17,24
58:4,22 59:4,
10,16 60:3,9,
14,19 61:1,17,
21 62:23 63:3
67:8 72:5 74:24
76:4,7,11
77:18,22 78:11,
19 79:4,5,9
81:3,5 82:6,17,
21 93:10,24
94:7,14 96:15
97:8 99:18,24
100:6,16
101:23 102:17
103:4,15 104:8

112:3,22 113:4,
16,20,24 114:4,
18,25 117:9,13,
17 118:1,4,16,
22 119:4,13
120:3,14,17,22
121:1 130:22
131:5 132:3,13
139:2,12
145:11,16,21
146:1,17,19
147:1,6,10,21
148:3 150:3
153:14 156:18
157:6,20,23
158:15,22
172:13,18
173:5,19
174:18 184:13
185:15 187:1,7
188:5,17 189:3
196:16

**proceed** 62:10
90:10 160:22

**PROCEEDING
S** 6:1

**process** 28:13
34:25 37:11,22
38:1,14 41:4
52:5 73:1
78:22,24,25
90:7 91:11
105:15 106:10,
15 111:7 156:3
164:22 175:21,
22 177:12
183:24 184:8
205:5 206:12
207:6

**produced** 72:1
82:11 118:1
145:2 154:4
193:16

**Professional**
168:2

**professionalis
m** 190:2

**proficiency**
89:21

**program** 63:11
64:2,8

**prohibit** 189:8,
12,23

**promise** 31:22

**promoted**
32:9,21 92:6,
12,16

**promotion**
92:14

**proper** 87:20

**properly** 49:21

**proposition**
72:21

**protect** 52:12,
24 73:25

**protected** 19:3

**protection**
43:12

**protective**
42:16,18,20
46:18

**protocols** 17:1

**provide** 9:15
11:1,20,24
12:8,11 13:9
14:24 15:3,16,
21 16:6,11,21,
24 17:18,22
18:6 74:25 76:7
85:23 86:5,18
87:5,11 91:14
124:3 125:2
144:14 145:6
155:25 161:14
162:5

**provided**
17:23 60:20
61:7,8 63:11
76:3,8,9 85:7
87:18,20 96:24
99:17,24 100:6
101:22 103:3
108:15 112:6,
11,21 118:21
119:5,12
140:21 148:10
158:13 207:5

**providing** 64:2

**provision**
188:22

**provisions**
150:22

**proximity**
54:3,5 136:12

**public** 168:7,
13 222:15

**pull** 150:23

**pulled** 210:24

**purpose** 188:4

**pursuant**
154:15

**pursuit** 133:3,4

**put** 27:22,23
28:6 33:1 54:1
89:6 92:14
96:9,10 111:9
131:1,2,8
189:6,17
190:21 194:20
196:9

**putting** 193:9

---

**Q**

**qualification**
13:14 14:4
15:11 51:12
91:10

**qualifications**
51:11 91:8

**qualified**
184:19

**qualify** 10:20
67:1

**quarrel** 161:9

**quarter** 171:19

**question** 7:17,
18,22 8:2,16
14:10 17:12
19:18 21:5
24:3,22 25:12
26:9 28:24 36:8
54:15 63:9
73:15 75:22
84:7,10 85:10,

13 86:3 102:6
106:17 107:15,
20 109:10,17
110:20 111:5
115:5,7 127:3
131:20 132:7
138:7 142:5
149:6 150:10,
12 157:18
161:2 172:1
178:22 186:2
188:21 190:13
193:12,25
197:15,19
198:14 200:12
209:15 211:12,
18 217:5,8

**question's**
25:5 75:14

**questioned**
193:19

**questioning**
20:25 61:23
62:7 82:10
192:25

**questions**
7:21 9:25 10:8,
23 13:3 18:18
19:25 20:5 21:1
56:20 57:22
61:6,12 62:5,13
79:13 80:14,23
81:2 82:17
103:20 120:12,
16,21 127:21
147:9 151:3
154:10 160:3
163:1 186:14
187:25 193:5
204:23 210:15
216:5,18,20
217:2 218:18
221:20,21
222:8,20

**quick** 31:21,22
46:11 201:5,8
202:21

**quickly** 52:12
201:5

**quote** 196:5



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**R**

**raise** 6:20 45:4 106:23 203:16

**ramped** 136:24

**range** 51:10,11 65:1,2 68:1 140:23,25 141:1,6,9,12, 15,16,19,21 142:1,12,16 143:3,22,25 144:1,12 145:4 148:24 149:1 153:20 159:6,8, 13 160:7 174:14 202:4,8 218:24,25 219:5,23 220:2 221:17

**Raps** 33:16

**rating** 38:23 170:16

**reach** 52:12

**reaction** 64:18

**read** 80:21 93:19,25 142:2 143:22 195:13, 22

**reading** 199:20

**ready** 163:3

**realize** 99:6

**reason** 12:18 16:3 81:7 118:7 120:10 165:12 192:22

**reasonable** 53:4 54:2 161:13

**reasons** 38:19 193:7

**recall** 21:13,14, 23 24:13 31:18, 19 35:22 37:21 41:2 50:21 77:21 78:15 80:3,7 94:8

99:23 100:13 101:25 104:12 108:22,24 113:8,9 114:23 115:1,2,10,13 116:3,8,11 118:2 126:9,21 127:15 129:5, 13 133:15,20 143:6 148:7 159:13 164:3 174:16,20 176:13 177:13 179:11 180:6 181:11 186:14, 17,18 199:5,6 200:6 201:10, 11 202:7 209:18,23 210:2,16,25 211:2 212:22, 25 218:17,21

**recalled** 181:12

**receive** 51:8 75:10,24 88:6, 20 96:18 102:20 107:21 120:2 163:6 173:4 179:9 181:9 182:21

**received** 28:7 29:1 76:21 88:5 89:10 100:11 102:3 103:14 104:7,14 113:3 139:23 148:19 163:12,16 167:8,23 173:18 177:7 180:23 202:2 213:18 222:14

**recent** 44:24

**recently** 41:22 77:20 93:20 175:24 176:4

**recognize** 117:5 140:15

**recognizing** 12:1,14 15:6,24 139:14

**recollection** 27:10 71:11 105:22 143:18, 21 144:10 165:24 169:21 180:7 186:7 214:12 219:16

**recommend** 25:3 179:16 182:9,11

**recommendati on** 27:9 29:20, 23 30:23 36:14 37:13 111:17

**recommended** 27:14 109:14

**record** 6:11 44:7,11,12,14 71:5,6,8 82:3 84:18,22,23,25 149:13,14,16 151:9 154:3 159:12 161:9 180:20 214:5,7, 8,10 221:17

**recordings** 215:20

**records** 33:4 38:9 69:18 101:5 124:7 163:7,12,16 221:12

**recount** 160:15 161:5

**recruitment** 38:7

**red** 106:14

**redacted** 161:25 162:5

**refer** 149:18 167:10 181:3 202:17 207:24 217:9,20

**reference** 36:18 111:22 154:18,23 155:2 166:21 175:8,12

**references** 90:14 193:17

**referring** 39:8 51:14 95:13 96:11 115:8 141:1,2 202:11

**refers** 153:9 154:14

**reflect** 112:11 120:1

**reflecting** 24:13 93:23 94:9

**reflective** 208:4

**refresh** 116:13 144:24 180:10

**refusal** 211:21 212:15,19

**refuse** 38:16

**regard** 115:12 139:20 154:7 156:15 168:17

**regularly** 77:9, 14 174:7 177:25

**rehire** 179:17

**reign** 10:2

**reiterate** 185:25

**relate** 88:8 103:4 122:9 139:4 155:9

**related** 22:12 28:4 81:8 134:19 184:14 185:11 187:11

**relates** 62:17 72:9 121:13,24 151:15 152:6 158:14,22 169:7,23 222:7

**relating** 11:2,8 12:1,14 15:6,23 22:5 28:12,23 48:15 59:16 61:1 62:23

**relation** 43:13 80:16 108:23 115:6 211:1

**relationship** 108:24 109:2,7 111:10

**relevance** 42:2 200:2

**relevant** 12:23 17:14 193:6

**relied** 27:9 46:1 103:25 114:11 215:16

**rely** 20:7,9 88:1 112:17 191:7

**remain** 63:23

**remained** 41:19 47:16

**remaining** 41:14 119:3

**remains** 18:14

**remember** 7:20 21:17,18 29:15 31:21 45:9 50:22 115:15 129:17 133:19 135:13 156:10 198:25 201:3 208:24

**removed** 176:5,8

**repeat** 57:21 121:7

**replace** 162:5

**report** 126:1,11 132:5,6 210:18

67:20 73:21 75:10,25 76:13, 16,22 78:3,7,12 80:9 100:17 115:4 116:5,10 121:2 125:3 133:8,23 139:13 147:21 161:15 185:23 187:7,14 188:5 191:21 193:1,3 207:5 209:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

245

reported 45:6

reporter 6:4, 21,22 7:2 8:11 210:11

reports 169:9 215:23

represent 145:1

representations 215:18 216:2

represented 107:6

representing 18:22

reprimand 191:15,19 212:21 213:13, 18

reprimanded 191:12

reprimands 212:22 213:22

reproduce 195:19

request 24:7 25:15 26:3,5,17 30:8 33:1 75:9, 24 76:1 125:8 150:15 154:6 181:23 182:20 201:21

requested 130:14 210:21

requests 25:20

require 76:24 120:11 130:23

required 67:17 81:23 102:8 122:20,23 123:4,10,13,18, 23 131:5 178:19 197:2,9

requirement 81:16

requires 124:6 168:25 169:10

171:5 172:21 181:15 205:16 206:2

requiring 61:4 123:9 200:12

resign 24:19 41:24 43:7 46:14,25

resigned 41:22 44:19 46:10,13

resigning 98:21

resistance 50:6 86:24 121:4,17 122:2 124:3 141:3 149:19 150:19 151:16 152:25

resolve 61:23 170:13,23

resort 197:1

resource 88:12

respect 11:15 73:9

respectful 125:25

respond 82:2 131:8

responded 210:22

responding 122:25 123:1,4, 9,13,18

response 61:13 82:11 86:3,24 121:4, 16 122:2 124:3 141:3 149:19 150:19 151:16 153:25 154:5

responses 173:12

responsibility 75:20 122:3 190:11

responsible 95:24 190:7

restrain 135:22 136:23 137:14

restrict 189:20

result 27:21 148:4 188:18

retain 163:23, 25

retained 47:15 80:2 124:9 163:20

retaining 164:3

retention 49:11

retire 33:20

retired 33:9,19 34:2 35:9 40:20 41:5 48:3

returned 56:18

revert 138:17

review 19:13, 16 20:20 21:25 22:4,8,11 24:23 30:13 31:10 47:7 58:7 60:23 65:1 82:24 91:17 93:3,20 96:1,22 144:6 150:15 172:16 177:10 179:8 181:6,19 184:3 188:7 201:21 214:23 215:11 222:1

reviewed 18:12 19:15 20:2,6,11,14, 16,22,25 21:2, 15,16,21,24 22:1,5,16 23:10,25 26:24 27:5 31:1,6,16 46:19 89:9 93:24 94:1,9,13 95:2,21 97:7 112:15 161:15

162:20 163:1 167:16,23 177:1,8 179:2 183:2,15,17 185:22 191:20 206:14,19 215:3

reviewing 21:19 30:19 31:18 107:17 150:4 181:12

reviews 11:9 121:2

revise 118:8

revised 65:22 68:8,10 117:23 118:25 145:15, 21,25 146:14 148:3 151:2,10

revision 96:7 112:8 146:5,23

revisions 78:2, 7 112:6,12,22 113:3,12

Richmond 66:5 81:21

ride-a-longs 77:9,14

ride-along 91:20

ride-alongs 174:7 178:1,17

rigid 48:20

ring 92:15

road 32:7,9 55:1,6 92:9 135:20

Robinson-staples 6:13 152:18 177:15, 17

Root 24:2,10, 17,22,23,25 25:10 28:16 29:13,23 30:5 108:12,14,23 109:1,5,12,19 110:2 111:2,14,

23 165:3,6,13 166:18 183:5, 21,25 184:2 185:7

rough 56:4

routine 48:25

rule 17:10 142:2

rule-spaced 129:13

rules 7:11 195:15

run 33:22,24 34:7,13,23 171:12,23 185:15

run-in 128:17

running 34:14

rush 54:6,10

S

safe 118:15

safety 74:5 170:9

Sargent 70:9

save 84:13

scenario 64:19 156:8

scenarios 64:12,21

scene 122:21 126:7,10,12 127:6,8,14 128:14 129:21 130:12,16 173:13

schedule 88:23,25

scheduled 89:12

schedules 70:14

scheduling 70:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

school 36:21
88:12

score 38:21

scored 38:22,
25

scraped
126:22

scrapes
126:25 127:4

screen 64:12
157:15

season 40:13

seconds
127:17 204:18
208:11

section 33:4
38:4,7,9 83:12
169:7,8 189:4,
21

securing
127:8

Security
161:25 162:3

seeking 19:22

seizure 171:22

sending 69:9

sentence
204:17

separate 38:4

separating
167:1

sergeant
32:10 35:8 38:5
55:8 91:21,25
92:5,13,24
122:17 124:17,
19 175:9,11,17

sergeants
92:10

series 64:21

serve 178:8

served 33:18
34:5 36:17

service 9:22

92:17

services 50:16

serving 33:23
178:18

set 48:15 70:13
117:25 118:3,
21 119:4
184:25

setting 52:14

sexual 43:11
111:10

shaken 128:5,
6

sheriff 6:7 7:5
9:22 10:9,13
11:3,21 12:21
13:12,16,17
14:6,17,19 15:5
17:19 18:8,10
20:20 24:2,10,
17,22,23,25
25:5,10 28:16
29:13,23 30:5
32:1,3 33:22,
23,24 34:8,13,
23,24 39:24
40:3,6,8 43:19,
22 56:25 57:13,
17 58:2 59:8,
14,21 60:7,12,
24 61:16 62:21
63:1,7,9,25
69:12 70:3
72:6,17 74:23
78:20 79:8,14,
20 80:2,4 82:10
83:2 85:2,13
86:17 88:19
92:23 96:2
102:14 104:16,
22 108:12,14,
16,23 109:1,5,
12,19 110:2
111:2,14,23
115:17 117:6,
10 124:4 132:8
133:15 138:19,
23 140:13,19
147:17,18
148:9 149:24
153:19 154:12
156:1,6 157:4

159:6 161:12
165:3,6,13
166:18 167:11
172:23 183:5,
21,25 184:2,6
185:7 194:3,17
212:23 216:4,
11 218:5

sheriff's 11:8
17:2 18:23
23:16 25:16
27:19 30:10
36:1,4,12 41:12
45:4,20 46:9
47:4,25 52:18
53:4,22 54:23
56:23 57:3,8,18
60:15,19 62:8
63:10 64:1,7
72:8 74:17,21
75:6 76:5,12
77:10,18 78:11,
19 79:15 81:10,
17 84:4 86:18
87:2 88:15,19
90:8,22 91:1,14
92:1,20 93:18
94:24 95:20
96:14 97:3
99:18 100:17
102:7,18 105:6
106:6 108:4
111:12 112:5
113:5,21 118:9
119:11 121:1,
15 125:10,15
130:23 132:4,
17 133:22
134:3 135:7
137:17 138:24
139:3,13,21
140:14 141:22
144:14 145:6,
16,22 146:18
147:11 148:16
150:8 156:22
157:6,24
163:20 166:23
167:2 174:19
178:1 184:14
187:2 188:12
190:7 200:8
201:22 214:13,
20

sheriffs 81:18
127:1

shifts 70:12

shit 210:23

shoot 64:19
73:2 89:16,19,
24 136:10
198:10

shooters
71:20

shooting 17:2,
24 56:15 64:23
67:20 71:12
73:7,22 75:8,23
76:2,10,15,19
77:7,12 89:8
99:13 100:7
103:12 104:11
115:17 116:3
124:24 125:11
126:4,5 130:21,
24 131:17
133:24 134:9,
13,21,22
147:12,16
149:23,24
150:6 157:21
197:8,11
200:21 201:25
202:12 203:3,
13 209:21
214:14

shootings
11:10,13

short 42:17
149:10

shortly 126:13

shot 54:11,16
56:17 82:18
127:19 132:15

shots 198:19

should've
163:16

show 71:25
79:2 164:6
177:19 192:3
195:10 206:16

showed
143:13 215:1

sign 93:19,21
94:21,25 96:17
97:5

signed 93:23
94:13,15

signing 94:8

signs 12:2,15
15:7,25 63:4
139:15 140:16

similar 10:8
173:6,12

simply 12:19

simulated
64:11,18,22,23
69:6 70:4

simulator
144:18,19,20
145:5 153:21
156:7,13
157:11 220:22
221:4,13

single 133:15

single-sided
117:1

sir 9:6 14:24
21:11 22:1,22
23:10 27:15
29:7 30:7 31:3
33:20 34:22
38:21 41:24
43:14 48:2,17
50:21 54:18,19
55:14 57:21
59:19 62:20,25
65:9 66:7,10
67:21 69:18
71:10 79:3,7,
21,24 83:7,23
84:10,11 85:18
87:3 88:5,10
90:1 92:2 96:6
97:25 101:19
104:5 111:1
112:2,19
113:13,19
114:1,6 117:5
119:6 120:9
121:5,12
125:13,17
128:13 129:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

133:10 140:10
143:20 144:11,
25 145:8
149:18,21
152:3 153:3,11
155:18 159:12
162:19 163:5
164:11,14,19
167:11 168:18
169:15 174:15
175:7 177:10,
24 179:2
180:11 181:7
183:2,4 186:9,
18 187:18
192:7 194:3
199:7 202:16
204:19 206:20,
24 207:7,25
211:23,25
214:12 216:3,
13 222:10,13,
23

**sit** 193:13
219:15 222:4

**site** 194:19

**sites** 189:25

**sitting** 21:13
70:16 71:10
88:2 119:25
142:10 144:23
148:18 157:16
165:24 215:25

**situation** 51:1
52:8,14 64:22
108:5 121:18
128:6 138:1,18
155:22 171:13,
15 173:16
178:19 179:19
205:21

**situation's**
52:9

**situations**
55:10 56:11
64:23 138:18
171:12 173:6
178:16 220:23

**skewed** 155:22

**skills** 65:17,20,
21 66:23 67:18,

20 102:22
135:24 168:2

**Slosar** 6:12 7:4
9:23 10:16,17
13:1,24 14:3,
14,21,22 17:13,
16 18:15,16
19:19 20:3,16
21:3,10 42:5,
11,23 44:8,15
61:10,14 62:3,
11,14,16,19
66:16,20 67:2
71:1,9 72:20
74:12,13 80:25
81:24 82:4
83:6,13,17,21
84:18 85:1,14,
17 98:9,25 99:3
107:13,16
108:2 128:23
129:4 146:2,7,
9,13,15,22
149:9,17
153:22 154:2,9
158:9 159:8,10,
21,25 160:6,9,
14,17 161:4,6,
11,18 162:4,8,
11,16,18
171:17 177:18
180:21,22
187:11,14,17
188:25 189:2
190:15 192:19
193:6,15,19,22
194:1 199:24
200:3 211:11
214:4,11
217:16,18
218:3 219:1,7,
14,19 220:10,
12,17 221:11
222:23,25

**small** 92:4,7
93:8

**small-
structured**
137:9

**smarter**
152:16

**Smith** 6:7,19
13:12,17 14:6,

17 20:20
138:19 216:4,
11

**Sneezes**
177:15

**social** 161:25
162:3 187:8,21
188:5 189:7,24
190:20 191:4,
14,21 194:13
203:12,18
206:10,14
213:9

**solemnly** 6:22

**sort** 20:19 50:6
95:13 96:17
130:24 160:10
174:22 184:18
186:23 195:18
212:18

**sought** 169:17

**sound** 93:5
184:10 212:4

**sounded**
135:24

**sounds** 101:13

**Southeastern**
34:17

**span** 106:22

**speak** 27:6
134:23 163:13

**speaking**
24:23,25 80:25
127:15

**specific** 58:24
75:16 103:18
105:20,22
115:13,16
120:23 143:18
144:9 152:23
153:14 157:17
170:7 184:25
185:20 186:7,
14

**specifically**
9:25 25:15
66:17 69:4
105:22 158:21

159:18 170:24

**specifics**
106:1

**spectrum**
147:16 158:1,4,
6

**speculate** 47:5
61:4 168:25
171:5 172:22
181:15 200:12
206:2

**speculated**
208:23

**speculating**
63:17

**speculation**
129:20 220:12

**speed** 91:8

**spell** 124:20

**spelled** 139:7

**spent** 54:17

**spoke** 27:12
127:9,10
133:23 134:14,
16

**spoken** 134:8,
12 185:4

**sport** 195:16

**spray** 133:17
137:16,18,20,
21,23,25 138:4

**Springs** 34:18

**staff** 38:8 41:15
173:7

**stamp** 146:5

**stand** 73:19

**standard** 72:7
111:20 148:13
186:15

**standards**
185:1

**standing**
129:25

**STAPLES** 6:13

98:19,23
116:24

**start** 32:4
38:13 69:9
116:20 143:25
147:17 161:18,
19

**started** 7:10
9:1 34:23,24,25
35:1 40:17 58:2
59:8 61:7,12
63:9 78:25 80:4
117:23 147:3
156:11 214:13

**starts** 176:19

**state** 22:14,21
23:2,6 32:6,7,
23 33:3,14,17
34:16 35:8,9,10
36:15 37:14,23
38:14,18 39:3
40:21 42:13
45:7,24 46:2,5
47:8 48:13,21,
24 49:24 50:8,
11,19,22,24
54:12,18,21
56:17 73:16
84:1 88:3 91:4
94:4,6,12 97:25
103:8 106:2,10
125:6,24 127:1
131:14 132:1,
11 171:18
175:19 181:17
207:2 208:20
209:12

**stated** 198:6

**statement**
53:6 54:7,25
118:5,8 166:17

**statements**
62:15 215:11

**states** 6:9
151:22

**stating** 179:16
182:8 193:9

**Statute** 65:22
68:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

statutes 68:10,
14 81:19 151:2,
10,12 152:2,7
153:2,10
159:14,22
160:9 219:12

statutory
150:22

stay 36:19 43:2
49:6

stayed 61:15,
18 130:13

step 53:1
107:19 156:3

Stephanie 6:2

steps 136:19
201:25

Steward 48:3

Stewart 40:18
41:10 56:25
78:17,18,23
92:23 215:10

stick 10:19

sticking 13:25

stop 174:11

stops 207:16

straight 39:18

strategies
19:23,24

stray 21:4

strong 135:21

struggle 198:5

stuff 40:5 65:14
74:6 127:8
162:1,9 191:10
193:15 206:11

subject 12:12

subjective
173:15 181:20

subjects 9:16
16:15

submit 38:10
90:9 124:4

substance
19:1

subtopic 62:1

successfully
65:5 175:18

Sue 6:8

sufficient 84:3
102:16

sufficiently
85:6

Suites 6:6

summary
82:13

supervise
16:14

supervising
220:16

supervision
15:5,23 17:4
27:8 56:9 82:5
163:12 169:22
178:18

supervisor
54:25 91:21,25
95:1,16 96:20
97:10,11 99:12
101:2,17 120:5
121:17,18
122:1,2,16,17,
23,25 123:4,10,
13,18,23 124:2,
16 133:22
174:21 181:17
184:6 190:14,
23,24

supervisor's
95:7,8,9

supervisors
89:5 95:24 96:3
103:14,19,25
104:12 112:13,
18 114:11,16,
24 115:3,11,20
116:4 119:22
133:2 145:15

supplemental
20:23

supply 218:23

supposed
124:2

suspected
12:4,17 15:9
16:2

swayed 169:2

swear 6:22

switched
32:25

sworn 6:20
38:3 55:23
63:14

symbols
189:15

system 33:15
36:21 38:23
40:12 46:18
49:14 55:3,19
64:18 69:7
70:5,12,22

systems 16:14

———————

T

t-shirt 199:11
200:10

Tackett 26:11,
13,14 27:6,11,
21,25 35:2,4,5,
7,14,23 36:2,5,
13,19,23 37:2,3
40:25 41:1,11
92:22 93:15,16
99:22 101:4,8,
9,11 163:13,15
168:15 169:25
175:8,9,11
179:11,14,19,
22 181:1 182:7
186:4 206:13

Tackett's
37:12

tactics 50:15
52:8 171:21

takes 73:1 91:2
112:5

taking 10:21
13:5 59:2 84:9
101:18 140:9
175:22

talk 7:14 8:23
14:19 21:7
46:16,23 71:13
74:14 90:4
108:21 111:24
130:5,16 137:6
154:11 183:20,
21,25 189:21
200:22 201:17
211:22 212:14

talked 18:13
27:7,13 31:13
40:25 103:8
104:24,25
134:10 154:17
155:4 165:13,
22 166:18
191:11 194:14
197:3 201:12

talking 51:13
83:9 128:1
146:4 148:23,
25 157:1
184:23 196:11

tall 185:7

tase 136:23

taser 16:17
52:7,11 133:11
135:24 156:7
173:20 204:12,
18 205:11
208:11

Tasers 133:2,
12

tasing 204:17

taste 188:8

tattoos 175:17,
20 176:4,7

tax 40:13 41:17

taxes 40:12

teach 36:20

teaching 36:21

technique
154:15 156:9

techniques
59:16 61:2
152:25 155:17,
21

Tekco 221:15

telephone
29:11 126:6

telling 69:23
108:23 169:22
183:24

ten 9:24,25
10:3 12:13 14:7
15:10,23 17:3,
25 32:12,15,23
33:6 81:8 93:5
147:12 203:2,3

tendered 79:6

tenure 10:13
12:21

term 95:15

terminate
222:3

tested 67:17
89:15

testified 56:24
61:6 66:16
67:7,14,16
78:15 79:7 80:1
82:22 83:1
89:14 97:22
144:13,17
146:9 153:19
160:5,12 161:8,
14 163:5,6
177:25 182:6
217:25 218:8
220:15

testify 9:11
10:12 13:13
14:6 15:12 20:8
66:14 83:3
160:1,4,11,16
161:6

testifying
80:16 128:20

testimony
6:23 9:15 10:4
11:1,21,25
12:8,12 13:10,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

17 14:24 15:4,
17,22 16:6,12,
21,25 17:18,23
18:6 53:23
82:25 95:18
98:13 122:4,8,
22 146:25
159:6,12
214:24 219:21
221:3

**text** 208:10

**that'll** 10:1

**Theoretically**
138:13

**thing** 7:16 8:18
40:2 49:2 51:3
63:13 69:22
146:23 174:23

**things** 20:1
21:2,8 34:12
40:15,16 82:14
108:1 138:2
153:24 162:12
191:13 204:24
218:8,21 222:8

**thinking** 37:12
93:2,3 128:25

**thought** 97:21
136:7

**thoughts**
19:23

**three-year**
106:22

**throwed** 41:4

**tightly** 189:20

**time** 6:5 12:20,
23,24 25:22
31:5 33:8 35:3
37:15 38:20,24
40:9,13 42:18
43:19,22 44:2,
10,13,16,22
46:5 57:6 71:4,
7,14 72:16
77:7,17 78:10
84:13,21,24
92:16 96:25
97:1 98:6
101:23 104:8,

16 113:17
114:13 119:13
122:15 125:9,
14 126:9
127:13 128:15
137:19 141:18
142:18,20,24
143:5,11 147:2,
5 149:12,15,23
150:2,6 152:21
157:19,21
161:9 171:20
173:16 177:3
184:7,8,12,17
190:1 200:5
204:3,6 206:3
212:23 214:6,9

**times** 18:18
19:4 38:13
52:4,9,16 54:11
55:2 60:10
134:12 141:11
142:19 168:4,
12 169:10

**tire** 137:5

**tired** 136:13
137:1,2

**titled** 150:19

**today** 6:3,4
7:7,13 8:8,14
9:6 19:5 20:8
21:13 22:23
31:1,17 64:6
68:24 69:22
70:16 71:10,13
81:7 82:25 83:1
88:2 90:17 91:1
93:9 100:4,9,23
104:20 119:25
134:8 142:10
144:23 146:25
148:18 150:4
157:16 160:23
162:21 165:24
179:2 186:6
193:11 194:2
207:14 219:15
222:4,6

**today's** 8:22
18:11,21 21:15
23:13 31:11
106:25 161:15
183:2,16

206:17,20

**told** 23:5 36:2,
11 46:19 70:10
136:17,21
137:2 170:2
176:20 195:23
210:3 211:16

**tool** 138:9

**tools** 138:10,12

**top** 56:5 112:8
155:17 199:11
200:9

**topic** 9:10,13
11:16 15:1,19
16:8,23 17:21
62:1

**topics** 10:19,
23 14:1,6,7
57:25 58:25
88:10,13
116:21 120:23
170:5

**tort** 82:8

**total** 207:15

**touch** 219:17

**touched**
218:20

**tournament**
181:17

**Townsend** 6:3

**track** 30:25
88:16 105:7
114:12 140:8
141:8

**traffic** 207:16,
17

**train** 16:14
52:7 65:21
67:23 71:19,23
88:14 89:19
192:16 196:6

**trained** 50:23
52:6 73:5,8
80:12 88:1
89:18 138:3,11
140:1 142:15
173:10 197:7

**training** 9:17
15:4,23 17:23
50:11,15,18,23
51:8,13,17
63:10,11,15,23
64:2,8,18,25
65:4 66:4 67:25
68:14,23 69:7
70:4 72:7
75:10,25 76:21,
25 81:9,18,21,
22 82:5 86:19,
22 87:1 88:1,4,
5,6,7,8,17,20,
24,25 89:5,10,
13 91:2,7,13,
18,19 100:10
102:2,10,12,15,
16,20 103:1,3
104:14 115:4
116:9 139:20,
24,25 140:8,14,
20 141:22,25
142:6,12,23
144:12,15
145:6,20
146:19 147:21
148:11,13,19
149:2 153:14,
20,21 156:5,18
157:3,5,14,15,
17 158:8,12,19
172:7,12,17
173:4,18 174:3,
14 193:10
194:19 196:11,
13 202:2
218:16,17,24,
25 219:5,22
220:1,20,21
221:18

**trainings** 65:3
88:16 89:7

**transfer**
106:25 107:3

**transgression
s** 111:3,8

**treat** 173:1,3

**trial** 160:22

**tribal** 176:9

**trooper** 32:8
55:7 56:15

208:5

**true** 175:25
176:1 221:8

**trust** 35:17,20
41:16 108:16,
18

**trusted** 37:12
41:9

**truth** 6:24,25

**turn** 149:20
167:13 176:16
204:9 209:16
211:25

**TV** 64:12

**Twitter** 189:25

**two-and-a-half**
33:5

**type** 21:2 24:10
25:23 37:8 39:6
40:19,24 51:2,3
64:19,22,23
65:14 76:24
77:25 86:23,24
91:1,13 179:7
205:14,18

**types** 21:14
160:21 189:5
207:11

**typically** 91:20

---

**U**

**Uh-huh** 8:5
16:9 18:9,20
19:2 23:23 24:5
25:14 26:1,15
29:14 30:6
31:15 44:1,8,20
47:17 49:9,25
50:7 56:22 57:1
65:13 67:9,19
69:8 70:6 74:15
75:15 90:6
97:20 121:22
124:5,8 125:1
151:13 154:13
172:14 179:3
187:6 210:20



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**ultimately**
44:19 211:3

**unable** 13:12
53:14

**unaware** 57:7,
17 58:3 77:2,3
83:3 113:19
157:17,22

**understand**
7:23 9:10,14
11:5,23 12:10
13:2 14:8,11
15:1,2,10,19,20
16:10,23 17:13,
21,25 25:9
46:17 51:18
58:14 61:8
62:3,18 67:3
68:2 75:14,18
82:13 84:4
142:22 146:15
153:22 154:8
159:21 192:24
197:8 202:15
220:22

**understanding**
71:18 74:4
104:7 114:17,
24 127:19
131:13,23
132:10,14
152:6,7 198:20

**understood**
8:3 9:21 131:22
217:4 219:4,21
220:6 221:3
222:14

**unemployed**
91:6

**uniform**
189:18

**uniforms**
189:14

**unique** 108:5

**United** 6:9

**University**
39:20

**unrelated** 83:4
210:12

**unsuccessfull**
**y** 207:1

**unwritten**
60:13,18 61:1,
5,16,20,24
62:22 63:3
76:11 113:20
216:25

**updated** 77:19,
23 112:4,14,16
117:20

**updates** 81:23
88:20 94:7,10
95:21,25 96:3

**utilize** 136:1
156:8 189:24

**utilized** 123:20

———————

**V**

**vague** 197:20

**values** 110:17,
21

**variables**
196:25

**varied** 41:7
141:20

**varies** 88:13

**vehicle** 133:4,5
192:21

**vehicles** 155:8

**verbal** 8:9
29:8,9 51:3
135:24 191:19

**verbally** 8:11
29:11 165:22
179:20 190:22
191:12 196:1

**verify** 90:3

**verifying** 97:7

**version** 135:15
162:5 198:3

**versus** 6:8

**vetted** 39:1

**victim** 43:15,16

**video** 189:8,13

**viewed** 215:23

**violated**
108:16,18
132:3,13

**violation** 42:19
43:12,17 46:12

**violations**
207:18

**visible** 126:18
127:11

**volleys** 142:14

**volunteer**
177:11

———————

**W**

**Wagner** 41:21
47:18

**waive** 14:9

**walking**
135:20

**wanted** 7:10
37:10 58:8,11
72:16,18 86:9
90:10 95:17
108:21 111:23
125:21,23
138:14 154:11
170:5,22
181:13 183:20,
25 184:5 217:1

**warrant** 128:19

**washroom**
7:14

**ways** 171:10

**weapon** 51:21
53:2,13,14,16,
24,25 54:1
56:10 73:11,19
74:2 77:5 131:2
136:16 156:8
199:11 200:9

**weaponless**
152:24

**weapons**
16:17,18 53:15
55:22 142:23
152:24 155:17

**websites**
191:21

**week** 21:15
31:5,14 66:1
70:13 167:16,
20 194:3
209:23

**week-and-a-**
**half** 203:13

**weeks** 81:13
201:4 209:21
214:14

**well-trained**
125:24

**What'd** 213:8

**Where'd** 39:19

**whirlwind** 40:4

**who'd** 19:7

**wife** 41:16

**wild** 94:2

**William** 40:18
78:17,18 92:23
215:10

**Williams** 6:15
9:20 10:12
13:20 14:15
17:8 19:9 20:21
21:4 29:5 30:12
36:7 42:1,8
44:6,9 47:5
48:3 53:7,9
54:13 61:4,11,
22 62:6,12,15
66:14 70:23
72:11 73:14
74:10 78:16
80:13 81:15
82:2,20 83:9,
12,14,16,18
84:6,17,20
85:9,15,25
87:8,14,22
95:23 98:4,7,16
100:19 101:10
102:5 106:16

107:11 109:9,
16,25 110:7,19
111:4 113:6
114:19 115:5
121:7,11
128:10,16,18,
22,24 129:8
132:23 134:16
138:6 139:16
141:14 144:17
145:24 146:4,8,
12,14 147:22
148:5,22 149:5,
8,11 150:9
153:18,23
157:9 158:3
159:5,9,18,23
160:2,7,13,15
161:1,5,7
168:25 171:5,
25 172:21
173:8,21
177:16 178:21
180:19 181:15
184:21 185:25
188:20 189:1
190:9 192:23
193:17,23
196:22 197:14

**Wilson** 26:13,
14 35:4,6 37:3
41:21 47:19
92:22 101:10,
11,12,16,21
102:2 163:13,
15 168:15,16
169:25 170:4
175:9,12,16,17
179:22 180:2
182:7 186:4,7

**win** 192:16
193:10 195:17
196:6,19
197:12

**wind** 155:14

**winning**
196:12

**wire** 176:15

**withdraw**
24:22 26:9
28:24 63:8 76:9
97:3 107:19
122:21 152:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

157:18 167:5 208:14,15 209:15 211:12 214:18

**withhold** 39:10

**witnesses** 121:19 122:24 130:16 133:23

**woman** 109:12

**woman's** 109:19

**won** 58:15,16

**word** 29:6 129:8 190:10

**wording** 199:2

**work** 10:18 25:3 43:7 49:2, 5 52:4 70:13 97:15 108:6 129:10 130:14 162:4,16 191:25

**worked** 32:8, 24 33:2,3,6 35:12 37:14,17 48:7 90:15 106:2 108:8 112:1 179:12 222:1

**working** 35:22 92:9 213:12

**world** 106:25

**would've** 27:18 28:4,8, 13,19 29:19,20, 21,23 30:1 31:5 37:10 39:16 44:5 66:12 67:7,17,23 70:9 71:19 77:22 157:24 165:16 168:21 169:4 170:25 171:2, 16 176:3 177:1, 4,5 181:13 182:2 186:16 188:17

**Wow** 40:4

**wrist** 176:14

**writing** 24:13 27:22 116:15

**written** 29:8 57:2,12 58:22 59:3 61:24 76:4 77:17,22 78:10 79:3,9 81:5 84:2 85:22 86:4,11 87:4, 10,17 96:15 97:8 98:11 99:17 103:15 104:8 107:6 112:22 113:4, 11,16,25 114:4, 18,20,25 117:16 118:16, 21 119:4,13 120:2,17,22 121:23 124:1,3, 7 130:22 131:4 139:2,8,12 145:10,21 146:16 147:1,5, 24 150:3 155:24 156:18 157:5,20,23 158:14,21 161:8 166:17 169:10 172:13, 18 173:4 174:17 188:22 191:16 201:21 212:18,20,22 213:1,13,17,18, 22

**wrong** 56:13

**wrote** 36:13 179:15 204:21

---

**Y**

---

**year** 32:24 42:21 50:17 55:6 63:18 65:3 69:9 78:23 82:18 88:14 89:12 91:6,12, 18 119:1 141:7, 18 144:21 156:10 159:13 193:14

**years** 9:24,25 10:3 12:13 14:7 15:10,23 17:3, 25 32:8 33:5,19 34:4 35:13,24 37:16,24 48:24 54:17 55:7,17 81:8 82:7 83:25 88:2 92:17 94:8 106:3,7 124:9 133:14 147:13 158:6 186:18

**you-all** 162:4, 16 174:14 223:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com