**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION**


| | | |
|---|---|---|
| The Estate of JESSIE MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-CV-184 |
| | ) | |
| v. | ) | Hon.  ROBERT E. WIER |
| | ) | |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |


# EXHIBIT 19

July 24, 2019

Ms. Amy Staples
Loevy & Loevy
18 Village Plaza PMB 181
Shelbyville, Ky. 40065

Expert Witness for the Plaintiffs

The Estate of JESSIE J. MILLS, ex. Rel. Personal Representative, PEARLIE SUE GAMBREL, and PEARLIE SUE GAMBREL, on her on behalf.
                         (Plaintiffs)

vs.                                                    CASE NO: 17 – CV - 184

KNOX COUNTY, Knox County Sheriff's Department Officer in his Individual Capacity, MIKEY ASHURST, Knox County Constable BRANDON BOLTON, in his Individual Capacity.
                         (Defendants)

**Introduction**

1. I have been retained by the Plaintiff's Attorney Amy Staples as an expert witness in the above civil action. I am therefore submitting the following information and accompanying documents and methodology in support of my opinions.   My opinions are to a reasonable degree of professional certainty, based on the evaluation of documents and material provided to me in this case to date, as well as my training, education, experience and research in the field of law enforcement.

**BACKGROUND AND EXPERIENCE**

2. I retired on March 18, 2019 as the Chief of Police for the Dallas Independent School District (DISD) Police Department with a workforce of 220 personnel. The department included sworn officers, security officers and police dispatch. Dallas ISD is the 14th largest school district in the United States with a student population of 160,000. Additionally, there are 23,000 employees and 230 schools.   I was the Dallas ISD Chief of Police from 2011 to 2019.

3. Prior to Dallas ISD, I was employed by the Dallas Police Department and retired as Deputy Chief of the Crimes Against Persons Division (CAPERS).   In this assignment, I supervised 180 personnel with an operating budget of $18.5 million. I was responsible for all criminal investigations involving murder, robbery, sexual assaults, assaults and the CSI function for 1.3 million people.

Before I was promoted to Deputy Chief, I was the Homicide Unit Commander. I directly oversaw 750 murder investigations, 300 suicides, 75 Officer Involved Shootings (OIS), Death in Custody incidents (DIC) and murder-for-hire investigations.  As the Homicide Unit Commander, I also served as head of the Special Investigations Unit for the 9th largest police department in the United States.

4. I came to the Dallas Police Department in February 1982 after graduating from the University of Memphis with a Bachelor of Arts Degree in Criminal Justice. I worked my way through the Dallas Police Department ranks as a patrol officer, patrol sergeant, vice sergeant, patrol watch commander, narcotics unit commander, traffic division commander, bomb squad commander, and ultimately the homicide unit commander. During my first year as a sector sergeant in 1986, nine of the ten officers that I supervised were involved in Officer Involved Shootings in which either a suspect or officer was injured or killed.  In my career, I served as a patrol sergeant, patrol lieutenant (watch commander) and Deputy Chief of Police.  As a result of the many hours of experience and training I received, I have a very firm understanding of police operations from both the officer's position as well as police management.

5. I am a graduate of the Southwest Legal Foundation Command Management Supervisors Course and the Law Enforcement Management Institute of Texas through Sam Houston State University New Police Chief Course.  Additionally, I am a Master Texas Peace Officer with 37 years of experience, a TCOLE State Certified Instructor, and a Certified Analyst through Force Science Institute. I also have been a member of the International Association of Chiefs of Police (IACP), Police Executive Research Forum (PERF) and the Texas Police Chiefs Association.

I have technical, professional and other specialized knowledge that will assist in understanding the facts and issues of the incident in question. My education and extensive experience provides me a deep understanding of how law enforcement officers are trained and operate.  This knowledge is the key to reaching a reliable evaluation of law enforcement officers' conduct.  I have conferred with many other law enforcement experts regarding police operations and evaluations thereof.  The facts and data on which I base my opinions are of a type reasonably relied upon by experts in the field of law enforcement in forming opinions or inferences therefrom.

The information and accompanying documents I have provided to the Court are truthful and accurate to the best of my knowledge.

Signed _____   Date:  July 24, 2019

Craig R. Miller

6. On April 10, 2019, and dates thereafter, the Plaintiff's counsel, Amy Staples, presented me with evidentiary documents for my review in preparation for opining on this case. She requested that I prepare a concise declaration outlining my basic opinions in this case. Those findings and opinions to date have been incorporated into this document.

It should be noted that before I agreed to be retained by the Plaintiff as an expert in this case, I insisted on conducting a preliminary review of key materials – including depositions of witnesses – so that I could determine whether I could ethically offer opinions supportive of the Plaintiff. I conducted such a review and agreed to be retained by the Plaintiff.

In investigations such as this, I am aware that there may be additional documents or other evidence that might subsequently become available during the discovery process. I may be asked to review these as they may assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence I might subsequently receive.

## DOCUMENTS REVIEWED FOR THIS ANALYSIS

1. 7. The documents I have reviewed to date are listed below: [1]


2. Deposition of James Helton
3. Deposition of Mikey Ashurst
4. Deposition of Keith Barrett
5. Deposition of Melinda Smith
6. Deposition of John Pickard
7. Deposition of Ricky Hobbs
8. Deposition of Steve Owens
9. Deposition of Sheriff Michael Smith
10. Kentucky State Police (KSP) File PLI – 809 Document Production[2]
11. Laurel County S. O. Employment File for Mikey Ashurst
12. Danville Police Department Employment File for Mikey Ashurst
13. Harlan Police Department Employment File for Mikey Ashurst
14. Kentucky State Police (KSP) Pre – Employment Application for Ashurst
15. Knox County Sheriff's Policy Procedural Manual PL 1467-1502
16. Knox County Sheriff's Policy Procedural Manual 2014

---

[1] I also reviewed accompanying exhibits to the depositions listed
[2] This includes the calls and radio transmissions with dispatch, crime scene photos, witness statement, investigative reports, etc.

17. Affidavit of Brian Lee
18. Affidavit of Arvis Presley, Jr
19. Affidavit of Kendra Carver
20. Deposition of Randy Surber, Parts I and II
21. Deposition of Brandon Bolton
22. The Grand Jury Testimony
23. The PowerPoint presented at Grand Jury
24. Deposition of Daniel Smith
25. Deposition of Geneva Helton
26. Deposition of Sheriff Mike Smith
27. Deposition of Medical Examiner Meredith Frame

Note: The material reveals that there is conflicting information between witnesses. Resolving such conflicts involves assessing witness credibility and assigning weight to the given testimony and is the responsibility of the trier of the fact. Accordingly, the opinions offered in this case related to facts in dispute are based on assumptions that are identified in the basis for my opinion and the totality of my knowledge, training and experience.

## Summary of The Incident

8. On June 30, 2016 at approximately 10:50 PM, Knox County Deputy Mikey Ashurst and Constable Brandon Bolton received a police call for service regarding a child custody dispute. During this call, the officers learned that Mr. Jessie Mills had entered into the home of the child's grandparents (custodial parents) and taken his two-year-old daughter without permission and left with her in his truck. After a short distance, Mr. Mills' truck ran out of gas. He exited the vehicle and carried his daughter down the double yellow line in the center of KY 223. He was being followed on foot by Witness Helton (custodial parent) and Witness Hobbs. Several witnesses observed these individuals walking in the road and eventually traffic was stopped by a witness who waved a flashlight to warn other vehicles.

9. The first call reporting this incident was placed by the custodial parent Geneva Helton at 9:50 PM. While Deputy Ashurst and Constable Bolton were in route to the call, six other calls related to this incident were made. Deputy Ashurst and Constable Bolton arrived at 10:59 PM. According to the officers, they first observed the witness with the flashlight notifying traffic. They also observed Mr. Mills in the center of KY 223 carrying the child in his left arm. After exiting the police vehicle, Deputy Ashurst and Constable Bolton approached Mr. Mills. Deputy Ashurst was in front of Mr. Mills and Constable Bolton stood to the rear of Mr. Mills. (It is important to note that Constable Bolton was working as Deputy Ashurst's partner[3]. He was an elected county official who

---

[3] Although Constable Bolton is not a member of a law enforcement agency, he and deputy Ashurst will be referred to as "officers" collectively throughout this report for the sake of convenience.

had received no police training in use of force or in any de-escalation techniques.)  As Deputy Ashurst spoke with Mr. Mills, he directed him to put down the child and give her to the officers.  During this conversation, Mr. Mills turned away from Deputy Ashurst and began walking.  According to Deputy Ashurst, he then deployed his Taser in an attempt to stop Mills.    Witness Hobbs and Helton, however, report that instead, Deputy Ashurst struck Mr. Mills in the back of his head with a flashlight or black object. Mr. Mills fell to the ground.  Constable Bolton picked up the child and handed her to Mr. Helton.

10. According to the officers, during the first five second Taser cycle, Deputy Ashurst commanded Mr. Mills to stay on the ground and put his hands behind his back. After the first five second Taser cycle the officers report that Mr. Mills refused to comply with the Deputy Ashurst's commands, so Deputy Ashurst elected to tase him again. This time it was ineffective, and according to the officers Mr. Mills continued to resist arrest. By this point Constable Bolton returned from dropping off the child and engaged in a hands-on, physical altercation with Mr. Mills.  Witness Hobbs, however testified that Mr. Mills was not engaging the officers in the altercation, but instead was laying on the ground while the officers struck him in the head and body with their flashlights and batons.  Additionally, Witness Hobbs reports that the officers were kicking Mr. Mills as he lay on the ground.

11. As the altercation continued, Constable Bolton said he felt Mr. Mills biting the top of his boot.  Constable Bolton stated he had several things running through his mind and "he was scared and feared for his life."[4]   Deputy Ashurst attempted unsuccessfully to tase Mr. Mills a second time.  The Taser proved unsuccessful, and so Deputy Ashurst and Constable Bolton repeatedly struck Mr. Mills in the head and neck with their metal flashlights and asps. Deputy Ashurst then used his Taser in the drive stun mode on Mr. Mills.  This caused Mills to let go of Constable Bolton.   The officers state that Mr. Mills continued to resist, and he knocked the taser out of Deputy Ashurst's hand.  Without any prior Taser training, Constable Bolton picked up the Taser still in the drive stun mode and placed it on Mr. Mills' neck. Deputy Ashurst delivered several knee strikes to Mr. Mills' face and drew his ASP baton. Ashurst struck Mr. Mills multiple times with this baton.

12. Deputy Ashurst states that he drew his gun and pointed it at Mr. Mills as he gave him more commands to stop.  Ashurst then holstered his gun and he and Constable Bolton continued to strike Mr. Mills in the head with their metal flashlights. According to the officers as they officers were striking Mr. Mills, he stood up off the ground. Deputy Ashurst drew his gun again and instructed Mr. Mills to get on the ground or he would shoot him.  Mr. Mills had no weapon of any kind, but according to the officers, he moved in the direction of Deputy Ashurst. Witness Barrett testified that

---

[4] KYKSP 1000 Lt. Randy Surber Report

Mr. Mills never threatened the officers and was walking in the middle of the road.[5] Regardless, Deputy Ashurst fired two shots that struck Mr. Mills, and Mr. Mills fell down to the ground.  Moments after the shooting, backup officers from the State Police and city police arrived to assist with the scene.  EMS responded to the scene and attempted to treat Mr. Mills, however, he died at the scene.

Deputy Ashurst and Constable Bolton were both examined by EMS and released at the scene.   During this violent altercation with Mr. Mills, neither Deputy Ashurst nor Constable Bolton received any injuries.

**EXPERT'S OPINIONS & FINDINGS**

13. The principles of excessive force/deadly force are thoroughly documented by several different law enforcement organizations.  The names of these organizations that I draw my opinions from include the Federal Bureau of Investigation (FBI), the International Association of Chiefs of Police, the Texas Police Chiefs Recognition Program, Force Science Research Center and the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA).   All of these organizations help to establish guidelines for law enforcement standards and specify the "Use of Force" to be used in controlling arrest situations.

14. In reviewing this case, I used these basic law enforcement standards when I looked at the force used by Knox County Deputy Ashurst and Constable Bolton.

15.  While researching Best Practices, the one common theme is that there is no standard that all law enforcement agencies must follow. The one central question that must be answered in any situation is "What would a reasonable officer do given the same circumstances?"

16. It is my customary practice to evaluate the appropriateness of police conduct and procedure of each individual case. My evaluation of Deputy Ashurst and Constable Bolton's actions involving Mr. Mills was executed pursuant to how law enforcement officers are trained.  After training officers can reasonably be expected to respond in similar situations.   My objective analysis involved evaluating how any well trained police officer, not just Deputy Ashurst and Constable Bolton, could reasonably be expected to respond when faced with the same or similar circumstances involving the actions of Mr. Mills.

**OPINION #1 (The Level of Force Used by Deputy Ashurst and Constable Bolton Was Inappropriate and Excessive)**

**A. The Officers Made No Attempt to De-escalate the Situation Before Resorting to Excessive Force**

---

[5] Keith Barrett Deposition at 27-28, 30.

17. In the landmark case *Graham v Connor*, the Graham Court cautioned that "(t)he 'reasonableness' of a particular use of force must be judged from the perspective of the reasonable officer on the scene, rather than with 20/20 vision of hindsight.  It also reinforced that, '(a)s in other fourth amendment contexts…
the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to underlying intent or motivation."[6]

18. It is my professional opinion that the use of deadly force applied by Deputy Ashurst and the use of excessive force employed by Constable Bolton against Mr. Mills in this arrest situation was unreasonable and unnecessary.  I have been a police officer for 37 years, and during those years I have responded to many child-custody disputes that resulted in erratic behavior from someone involved. In responding to those calls I found they were most effectively controlled through de-escalation techniques, techniques that the officers failed to employ here.

19. Police officers are instructed that responding to calls involving upset parents or people under the influence of drugs or alcohol or experiencing a mental-health crisis, is within the scope of their law enforcement duties.

20. In 21st century police work, one of the primary forms of instruction every police officer receives is learning to use de-escalation techniques.  No law enforcement group has studied this issue more than the Police Executive Research Forum (PERF).  In 2016, PERF released the results of police use of force incidents through their paper titled "*PERF, Guiding Principles on Use of Force*", March 2016. On Page 23 It states the following:

"When officers can keep their distance from a person holding a knife or throwing rocks and attempt to defuse the situation through communication and other de-escalation strategies, they can avoid ever reaching that point where there is a significant threat of death or serious physical injury to anyone including themselves. "

21. This type of approach equates to the concept of proportionality, found in Guiding Principle 33 of the PERF report, which lies at the heart of the Critical Decision–Making Model of PERF.  Proportionality considers whether a particular police use of force is proportional to the threat faced by the officers and whether it is appropriate given the totality of the circumstances. Proportionality requires officers to consider if they are using only the level of force necessary to mitigate the threat and whether or not there is another less injurious option available that will safely and effectively achieve the same objective."[7]

---

[6] Graham v Connor, 490 U.S. 386, 396-97 (1989)
[7] PERF Guiding Principles on use of force, March 2016

22. In this incident, it is my opinion that arresting Mr. Mills was the correct response for Deputy Ashurst and Constable Bolton.  However, this entire incident could have been resolved with no injury to Mr. Mills if they had merely used the rule of proportionality.  Mr. Mills was not in possession of any weapon while walking in the roadway with his child in his arms.

The road was closed to through traffic, and Witness Helton and Witness Hobbs were walking with him when the officers arrived.  Further, the officers were able to safely retrieve the child from Mr. Mills quickly after arriving at the scene.  Witness Hobbs testified about the child:

> Q: "Was she crying hysterically or...?
> A: No. she cried a couple of times just like a normal kid, you know, how a normal kid going along, if something ain't their way or right or something, they'll ball a little bit (sound effect). That's how a kid is.
>
> Q: And so she would cry a little bit and stop—
> A: Yeah
>
> Q: -- Is that correct?
> A: Yeah. He would talk to her and sing to her
>
> Q: Were you afraid that Jessie was going to hurt her as he was walking down the road?
> A: No. not—not really"[8]

Based upon the statement of Witness Hobbs and Witness Helton it did not appear that the child was in distress or imminent danger. It was Deputy Ashurst and Constable Bolton who escalated the situation.

### B. The Officers Did Not Respond to Mr. Mills, Whom They Believed to Be Under the Influence of Drugs, as Reasonably Trained Officers Should

23. Eastern Kentucky is known for having a number of people in the community impacted by methamphetamine (meth) drugs.[9]   In an article from the American Addiction Center last updated on June 10, 2019, "Side Effects of Crystal Meth Use and Abuse", it states the following: "So how can you tell if someone you care about is using crystal meth?  Telltale signs of crystal meth include:

- Increased physical activity
- Elevated body temperature

---

[8] Ricky Hobbs Deposition, page 15
[9] Numerous witnesses testified to the drug crisis in Eastern Kentucky

- *Dilated pupils*
- Heavy sweating
- Sleeplessness
- *Paranoia or irritability* "[10]

24. Reasonably trained officers are expected to look for these signs and respond accordingly. All trained law enforcement officers learn in the academy and through continuing education to not aggressively approach people experiencing these symptoms. Experience has taught officers that approaching people who may be in distress in a calm and rationale manner will yield much better success rather than rushing the subject and escalating the situation. In fact, Deputy Ashurst testifies that he received training from the Kentucky Department of Criminal Justice Training (KDOCJT) on identifying individuals who are under the influence of drugs or experiencing a mental disability.[11] According to Deputy Ashurst, however, there is no modification to the use-of-force continuum on persons who are mentally incapacitated or under the influence of drugs or alcohol.[12]

25. In the incident involving Mr. Mills, witnesses reported to the officers that he was under the influence of meth when they encountered him. [13] Deputy Ashurst said the following about Mr. Mills in his taped interview with KSP. "I looked face to face with him and I noticed that his pupils were huge and they are dilated. This is an indication or sign that a person is impaired or under the influence."[14] (PL 595 at 7:18)

26. It is my professional opinion that Deputy Ashurst believed witnesses who said that Mr. Mills was on meth. As noted above, he stated that he concluded from the look in Mills' eyes that he was under the influence of a substance. Having worked in this community and dealt with people on meth, a reasonably trained officer should have been well aware of the signs listed in the article. In particular, Deputy Ashurst should have known that those under the influence of drugs like meth have dilated pupils, and are also paranoid and irritable. Rather than take an approach to use de-escalation in a controlled environment where the traffic was stopped, however, Deputy Ashurst chose to immediately tase Mr. Mills in the back and/or strike Mr. Mills in the head with a flashlight as he turned away.

### C. The Immediate Use of the Taser Was Excessive and Escalated the Situation

---

[10] American Addiction Center "Side Effects of Crystal Meth Use and Abuse", editorial Staff Last Updated June 10, 2019

[11] Ashurst Deposition at 71-73.

[12] Ashurst Deposition at 73.

[13] Toxicology reports indicate that no drugs were found in Mr. Mills' blood, only in his urine. As such I make no opinion as to whether Mr. Mills was actually under the influence of an illegal drug or was experiencing some other type of medical or mental health issue at the time of his encounter with the officers

[14] KSP PL 595 25:13 taped interview

27. The first response by Deputy Ashurst , according to the officers was for Deputy Ashurst to use his Taser to stop Mr. Mills from and walking away from him.[15]  An article from the *OSS Academy* – Law Enforcement & Corrections Training, it references the court case Armstrong v Pinehurst (January 2016) regarding Taser use.  "In other words, taser use is unreasonable force in response to resistance that does not raise a risk of immediate danger".  The court concluded: "At bottom, physical resistance is not synonymous with risk of immediate danger."  On the same note: "Even noncompliance with police directives and non-violent physical resistance do not necessarily create a continuing threat to the officer's safety."[16]

28. It is my professional opinion, offered to a reasonable degree of professional certainty that when Mr. Mills initially turned away from Deputy Ashurst that neither Deputy Ashurst, Constable Bolton, the child, or the bystanders were in any imminent danger.  According to witnesses, Mr. Mills was not harming the child; he was simply carrying the child down the road, which had been blocked off to traffic.  Instead, it is my professional opinion that he used Taser as he had many times previously while employed by the Laurel County Sheriff's Department, as a form of compliance and not because of an immediate threat to him, Constable Bolton or the child.  The Taser was never designed to be used as a form to combat noncompliance in an arrest situation. As mentioned above, the officer or another person must be in immediate danger in order to deploy the Taser to control a suspect.

### D. Deputy Ashurst Has a Documented History of Using the Taser as a Form of Noncompliance

29.   The use of the Taser with a noncompliant suspect was well documented in Deputy Ashurst's past performance at the Laurel County S.O.  and are indicative of the excessive force he uses in his position as a law enforcement officer.

A. In a Laurel County S. O. Use of Force Report from April 15, 2013 Deputy Ashurst used his Taser on Ms. Kenda Carver during the following family violence incident:

"As the daughter was being taken into custody, she pulled away and began to struggle with officers by pinching myself and kicking Dep. Ashurst.  Dep. Ashurst deployed his TAZER in drive stun mode to offenders back in order to gain compliance."[17] In this incident Deputy Ashurst did not receive any injuries.

---

[15] Other witnesses report that Deputy Ashurst first struck Mr. Mills in the back of the head with a flashlight.  This, too would violate the technique of de-escalation and equate to excessive force as striking suspects above the neck is not taught in law enforcement training courses.

[16] OSS Academy – Law Enforcement & Corrections Training, *Armstrong v Pinehurst – Critical Policy Consideration, February, 2016*

[17] Laurel County S.O. Use of Force Report, 4-15-13

B. In a Laurel County S.O. Use of Force Report from June 14, 2013 Deputy Ashurst used his Taser on Tommy Robinson during a foot pursuit incident:

"After a short chase the driver pulled in behind the Speedy Mart and attempted to flee on foot.  Deputy Ashurst U/1138 chased the male suspect later identified as Tommy L Robinson.  Deputy Ashurst was forced to deploy his Department issued Tazer to stop this suspect from fleeing and struggling.  No further force was used to arrest this subject.  The prongs were removed on scene by Deputy Ashurst."[18] In this incident Deputy Ashurst did not receive any injuries.

C. In a Laurel County S. O. Use of Force Report from January 18, 2015 Deputy Ashurst used his Taser on Donald Fox at the conclusion of a foot pursuit:

"Subject fled on foot.  Myself and other officers were able to catch subject, but then he became combative and resisted arrest.  Subject failed to comply with several officer's commands to stay down on the ground and place his hands behind his back.  Subject continued attempts to get up from the ground and run again.  I used issued taser to gain compliance and allowed Deputy to handcuff subject under power.  Subject is carrying other felony charges."[19]

D. Four days later, in a Laurel County S. O. Use of Force Report from January 22, 2015 Deputy Ashurst used his Taser on Sammy Harrell while responding to a prowler call:

"Deputy Ashurst was the first on the scene and spotted the suspect leaving the out building.  When the subject seen deputy Ashurst he fled on foot into a wooded area.  Deputy Ashurst gave chase and when the subject fell he deployed his taser hitting the suspect on the back.  The suspect had on a black thick  jacket and refused to show his hands and had to be physically restrained."[20] In this incident Deputy Ashurst did not receive any injuries.

**E.  The Officers Failed to Employ Less Lethal Means to effectuate the Arrest**

30. The Knox County General Order KCSO-12 – RESPONSE TO RESISTANCE,[21] states:

---

[18] Laurel County S.O. Use of Force Report, 6-14-13

[19] Laurel County S. O. Use of force Report, January 18, 2015

[20] Laurel County S. O. Use of Force Report, 1-22-15

[21] These policies did not go into effect until January of 2106. At his deposition, Deputy Ashurst testified that he was operating under the policies in effect at the time of hire. Ashurst Deposition at 69-70. Those were the policies that went into effect in January of 2014. The policy on "Use of Force" states simply: "1. USE ONLY FORCE NECESSARY TO EFFECT ARREST AS TRAINED." PL 001484. Sheriff Smith also testified that Deputy Ashurst would have been given the policies that were in place at the time he was hired. Sheriff Smith Deposition at 93, 96-97.

USE OF NON-DEADLY AND DEADLY FORCE IN RESPONSE TO RESISTANCE

A.  "The general use of non-deadly and/or deadly force may be used by agency officers in responding to subject(s) resisting arrest as defined in KRS 520.090. Subject in this instance shall be subsequently charged with resisting arrest in accordance with KRS 520.090.

B.  An officer may use deadly force only when the officer believes that the action is in   defense of human life, or in defense of any person in imminent danger of serious physical injury and/or under the circumstances as justified in KRS 503.050 & 503.070."[22]

31. Further, the "Definitions" include:

B. Less Lethal Weapons or Techniques:  Weapons and/or techniques in which officers are trained to use, and have qualified for, as a form of less lethal response to resistance.  The weapons include, but are not limited to, agency-issued Tasers, chemical agents and Armament Systems and Procedures (ASP). Less lethal techniques also include weaponless response to resistance, which includes pain compliance techniques and other techniques that can be utilized to gain control of resistive behavior, such as blocking, striking, distracting, shoulder pin, kicking, dodging , weaving, redirecting or avoiding – all followed by appropriate control techniques."[23]

32.  At his deposition, Deputy Ashurst testified regarding the force continuum and particularly his stance on the use of pepper spray as a method to control a suspect who is resisting arrest:

"Q:  You forgot.  Now tell us, sir, if you were trained to use pepper spray?
A: When you felt you needed it

Q: Okay. And under what circumstances were you trained to use pepper spray in the continuum were you trained to use pepper spray before striking someone, for example with a flashlight or an ASP
A: It's still classified as intermediate

Q: Did you ever take out your pepper spray that night?
A: No Sir

Q: Why not?

---

[22] Knox County General Orders
[23] Knox County General Orders

A: Because when you are in an altercation with pepper spray you have the fear of getting pepper spray in your eyes or another unit's eyes, which could result in you getting hurt.

Q: And for that reason you never use pepper spray?
A: Correct

Q: Even if you are outside?
A: No Sir

Q: Okay and did anyone ever tell you in the department, Knox County Sheriff's Police, it's okay to never use pepper spray?
A: No Sir

Q: Okay go ahead
A: No Sir

Q: Okay. You just sort of figured that out on your own
A: Yes, Sir

Q: All right.  Were you trained to never use pepper spray outdoors?
A: No Sir"[24]

33. It is my professional opinion that when trained sworn police officers say they will never use a part of the force continuum (pepper spray) they are not responding as a reasonable officer should.  The whole intent of the force continuum is to provide officers with options to prevent them from having to use deadly force.

34. Further, I have not seen any statements in Deputy Ashurst's deposition that indicate that he attempted to gain control of Mr. Mills by blocking, shoulder pinning, dodging, kicking, weaving, or redirecting him.  As for Constable Bolton, that brings up an entirely different concern, discussed further below.  By his own admission, he was merely an elected official and had never received any training in police arrest tactics or defensive hands-on training.

35.  Because of the custody complaint received by Deputy Ashurst and Constable Bolton, it was proper for them to arrest Mr. Mills.  However, it is my professional opinion that rather than rushing to control Mr. Mills with a Taser and/or hitting him in the back of the head with a flashlight, and not even considering the use of pepper spray, they did not respond as a reasonable officer would – especially after retrieving the child. PERF and the IACP have developed a protocol where de-escalation is the prescribed methodology for dealing with individuals under the influence of drugs in a controlled

---

[24] Deputy Ashurst Deposition at 101

environment, and it is my opinion to a reasonable degree of professional certainty that would have been appropriate under these circumstances. The officers did not act as reasonably trained officers should and did not follow standard police practices.

### B. Deputy Ashurst's Use of Lethal Force was Unreasonable

36. As noted above, the force used against Mr. Mills by the officers continued to escalate after the initial tase and after the child was removed from his grasp. Both the witnesses at the scene and the officers themselves report Deputy Ashurst and Constable Bolton struck Mr. Mills repeatedly with their fists, flashlights and metal batons about his head and body. In police training on a national level it is the recommended practice to not strike a suspect in the area above their neck and into the head area with any weapon. This should be the last resort and only used in a true life or death situation. In this case witnesses state the first thing Deputy Ashurst did was to strike Mr. Mills in the back of his head with his metal flashlight. Then, Deputy Ashurst continued to strike Mr. Mills in the head with his flashlight as he was allegedly biting the top of Constable Bolton's boot. They also kicked him repeatedly and employed drive stuns against him. Witnesses report Mr. Mills being tazed from the "violent" beating. Both the officers and witnesses report the officers being covered in Mr. Mills' blood from the assault, yet, the officers reported receiving no physical injuries themselves.

37. At the time Deputy Ashurst drew his weapon and shot Mr. Mills, Mr. Mills was unarmed and had just undergone multiple strikes to his head and torso with flashlights, batons, fists and feet – many received while lying on the ground. Mr. Mills was bleeding, bruised and dazed. He had no weapon and simply stood up from the road and took one to two steps in the direction of Deputy Ashurst. The child had long since been handed over to her grandfather, and back up from multiple agencies was on the way to and within a few minutes of the scene. In this scenario, it is my opinion, to a reasonable degree of certainty, that a reasonable officer under the same circumstances would not have been in fear of his life or in fear of others. It is my opinion that the use of lethal force was excessive, was not necessary to control Mr. Mills. The actions of deputy Ashurst and Constable Bolton were against standard police practices, and were in violation of what a a reasonably officer should do.[25]

### OPINION #2 (The Knox County Sheriff's Department Does Not Effectively Train Its Officers to Utilize Appropriate Use of Force)

### A. Deputy Ashurst's Lack of training

---

[25] At one point during the struggle, Deputy Ashurst can be heard telling dispatch that the subject is restrained. PL 30. And witnesses Hobbs and Daniel Smith testified that they were permitted to walk right up to Mr. Mills and speak with him as he lay on the ground while the officers took a break in the assault. Hobbs deposition at 31-32; D. Smith deposition at 65-66. Deputy Ashurst testified that his radio transmission had cut out and that he had actually said the subject was not restrained. Ashurst Deposition at 204. This further calls into question the decision to use deadly force.

38. In reviewing the documents provided to me related to this case it is my professional opinion to a reasonable degree of professional certainty that the Knox County Sheriff's Department does not supply adequate training to its officers in use of force.

39. In a *PoliceOne.com* article from 2006 titled Legal Corner: "Departmental Liability for Failure-to-Train", it states the following:

"Nothing is as important as making sure law enforcement officers receive proper training. Not only does it increase their chances for winning confrontations, the lack of such puts the department at risk of being held liable, according to guidelines set in the 1989 US Supreme Court ruling, City of Canton Ohio v, Geraldine Harris.  Since Canton, one legal scholar estimated that in the 1990's law enforcement agencies faced approximately 30,000 lawsuits per year.  The court made it clear in Canton that training police personnel is a crucial managerial responsibility and is not viewed as a luxury.  Administrators may be held liable if inadequate or improper training causes injury or violates a citizen's constitutional rights.  The Court also made it clear that the basic police academy emphasizes law and discipline such training alone is not enough." [26]

40. Sheriff Smith testified that the only training the Knox County Sheriff's Office directly provided to the employees of the department was that of firearm's training – at the range and with a simulator.[27] In reviewing the Kentucky Department of Criminal Justice Training log for Deputy Ashurst, I do not observe any Critical Incident Training, de-escalation training, Use of Force Training, or Reality Based training listed on his transcript.   Instead, the training he has received since his graduation from the academy according to his training records, is limited to the following:

| | |
|---|---|
| LEN MDT Certification | 2012 |
| Rapid deployment | 2012 |
| Breath Test Operator Certification | 2013 |
| Defensive Driving | 2013 |
| Mandatory Training – On Line | 2013 |
| Patrol Rifle | 2014 |
| LEN Incident Preparation | 2015 |
| & Response to Mitigation | |
| Heroin Update | 2015 |
| Firearms Instructor | 2016 |

**B. Constable Bolton's Lack of Training**

---

[26] *PoliceOne.com,* Departmental Liability for Failure-to-Train, 2006 Matthew McNamara
[27] Sheriff Smith Deposition at 64, 144.

41. And Deputy Ashurst testified that the only training he received was when he first joined the Knox County Sheriff's Office came in the form of riding along with a field training officer for two weeks – "getting familiar with the roads and how they do their paperwork."[28] Later, the Knox County Sheriff's Office sent him to firearms training but provided him with no use –of-force-training. [29] His supervisors never talked to him about use of force and the KCSO's never provided him with training on how to deal with individuals experiencing mental health problems.[30] Although Deputy Ashurst stated that the received training on dealing with mentally-incapacitated people from the Department of Criminal Justice training, that training is not reflected on the above log.[31] Additionally, the last training he received was on the proper use of the taser  was in 2011 from the Danville Police Department.[32]  He never received any specific training on how to use his flashlight to effectuate an arrest, and the only training he received on using his ASP to effectuate an arrest was at DOCJT.[33] He did testify, however, that he was advised that one had to be careful with the use of an ASP and flashlight because they could kill an individual.[34]

42. Constable Brandon Bolton was elected to the political office of Constable three and half years before this incident occurred.  According to the officers' testimony, during this period, Constable Bolton worked on a regular basis as a partner of deputy Ashurst – with the permission of Sheriff Smith.[35]  Deputy Ashurst and Sheriff Smith were both aware that Constable Bolton had never received any basic training as a law enforcement officer and had no prior law enforcement experience. [36] Further, Sheriff Smith never requested that Constable Bolton receive any training relating to the use of force and never communicated any policies, procedures or practices of the Knox County Sheriff's Office to him regarding this use of force.[37] This training would have included arrest techniques, de-escalation training, ground fighting techniques, and proper use of the ASP Baton and Taser.  He would have been taught that subjects should not be struck above the neck with a baton or flashlight.  As Bolton testified,

"Q: What training have you received in your role as Constable?
A: None, ma'am

Q: None:

---

[28] Ashurst Deposition at 63
[29] Ashurst Deposition 70-71
[30] Ashurst Deposition at 71.
[31] Ashurst Deposition at 71-72
[32] Ashurst Deposition at 74-76
[33] Ashurst Deposition at 96
[34] Ashurst Deposition at 100
[35] Sheriff Smith Deposition at 77.
[36] Sheriff Smith Deposition at 76-77.
[37] Sheriff Smith Deposition at 75 -76.

A; No training

Q: You've never been to the Criminal Justice Academy?
A: No, ma'am

Q: When Sheriff Smith gave you permission to ride along with Deputy Ashurst, was he aware of the fact that you have no training?

Mr. Williams: Requires him to speculate, but you may answer.
A: He's aware that I'm an elected official.

Q: Was he aware that you had no training?
A: I'm not sure ma'am"[38]

"Q: Have you ever worked in law enforcement prior to becoming a Constable?
A: No ma'am.

Q: Did you ever apply to any law enforcement agency?
A: No, ma'am.

Q: And that would include city, county, state – no law enforcement?
A: No, ma'am.

Q: Okay, I think you said you became a Constable three and half years ago; Is that correct?
A: Yes, ma'am."[39]

### C. Knox County Treated Constable Bolton as a Law-Enforcement Official, Despite his Lack of Training

43.   In this case involving the death of Mr. Mills, it is very clear that Deputy Ashurst and Constable Bolton were acting as a Two-Man unit when dispatched to the Child Custody complaint they received, and that Sheriff Smith was well aware of this arrangement.[40]   According to Sheriff Smith, Constable Bolton was not just doing ride alongs with deputies but was actively serving as backup if the situation required it.[41] Deputy Ashurst also testified to his reliance on Constable Bolton as backup:

Q: "How long did it take you to arrive on scene?
A: I can't approach a time

---

[38] Bolton Deposition at 86
[39] Constable Bolton Deposition at 74
[40] Sheriff Smith Deposition at 178.
[41] Sheriff Smith Deposition at 178.

Q: You can't approach the time?
A: I am not sure how long it took

Q: You can't even estimate the time?
A: Give or take 20 minutes

Q: Did you have the capacity, if you chose to, to ask for assistance from any police agency?
A: Yes, Sir

Q: And what departments—or how would you go about that?
A: I would have to request assistance through dispatch from a city police department to see if their supervisor would release a field unit to us for use in the county.

Q: And did you do that?
A: No, Sir

Q: And the reason you didn't do that would be what?
A: *I had Constable Bolton with me*."[42]

44. In Constable Bolton's deposition he described his relationship to Deputy Ashurst and the Knox County S.O:

"Q: Did the two of you ride together quite often?
A: Whenever I was able to ride, I rode with Mr. Ashurst

Q: And how many days per week were you usually able to ride?
A: One to two one week, maybe three next weeks. It just depends on my schedule.

Q: And was that for the entire three and a half years that you've been a Constable?
A: No, ma'am. That was just -- it – there's been months where I haven't been able to ride before.

Q: At the time of this incident in June of 2016 were you riding with Deputy Ashurst pretty regularly?

A: I am sorry can you repeat your question.

---

[42] Deputy Ashurst's Deposition at 104.

A: I think I had rode with him the night before and I might have rode with him one or two times the week before."[43]

45. It is very clear from the above listed deposition transcripts and testimony that Constable Bolton had worked for three and half years with Deputy Ashurst on a regular basis. During this period, they worked between 1 – 3 days each week. Also, it is very clear that Sheriff Smith was aware of this relationship and knew that when the two of them were working together they responded to calls. [44] In fact, in Mr. Ashurst's deposition, he said he did not request any other officers for assistance in this case, because he had Constable Bolton with him.

46. Once the complaint was received by Deputy Ashurst and Constable Bolton another six calls about Mr. Mills were made to 911 while they were in route to the call and dispatch regularly updated Ashurst about the status of the situation while he was in route.[45] It is my professional opinion that these additional calls should have warranted Deputy Ashurst to request additional assistance as he responded. We know from the deposition of Barbourville Detective Steve Owens that when he received the call from dispatch requesting assistance, he was in downtown Barbourville 7-8 miles away and that he and KSP officer both arrived at the scene only one minute after the shooting. In Det. Owens deposition he stated the following:

Q: So based on your memory of that night and the fact that it's listing several officers arriving there, your testimony is that you arrived at the scene earlier than 2310?
A: I would believe so, yes.

Q: And approximately how many minutes do you think it took you to get to the scene?
A: I would think seven or eight because I would have been that many miles away. However, once you turned off 25, it would have been impossible to continue to travel at any excessive speed."[46]

**D. A Reasonably Trained Law-Enforcement Official Would Have De-escalated the Situation and Employed Means of Less Lethal Force.**

47. It is my professional opinion that if Deputy Ashurst had asked for additional assistance while in route to the call that he would have had several certified police officers to assist him in diffusing the situation and arresting Mr. Mills. However, Deputy Ashurst elected instead to handle the call with Constable Bolton as his backup officer, an

---

[43] Constable Bolton's Deposition at page 15
[44] Sheriff Smith Deposition at 174, 178.
[45] Deputy Ashurst Deposition at page 88-89
[46] Barbourville Det. Steve Owens Deposition

individual who had never received any law enforcement training, was not a member of a law-enforcement agency, but who held himself out to be a law-enforcement officer.

> "Q: So do you have any affiliation formally with the Knox County Sheriff's Office?
> A: No ma'am.
>
> Q: Do you have any formal affiliation with the Knox County Sheriff's Office? Are you considered an employee of the Knox County Sheriff's Office?
> A: No ma'am, I am not
>
> Q: Okay do you have a radio where you can dispatch into 911 or dispatch?
> A: I do now, but I didn't at the time.
>
> Q: Okay and is that something you purchased for yourself?
> A: Yes, ma'am.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

> Q: Okay. So do you have that specific uniform that you wore as a constable?
> A: No ma'am.
>
> Q: What kind of gear did you have on your body?
> A: I had a nylon belt with a holster and a Glock 23 pistol.  I had a handcuff case, handcuffs inside.  I had an ASP holder with an ASP inside.  I had a Maglite ring to hold my Maglite in it.
>
> Q: As a Constable was that gear issued to you from someone?
> A: No ma'am. I bought that.
>
> Q: You purchased everything that you've jus—
> A: Yes, ma'am."[47]

48. According to deposition testimony, Knox county Sheriff Michael Smith knew that Constable Bolton was acting as partner of Deputy Ashurst as he responded to police calls for service and allowed it.[48]  Said Constable Bolton:

> "Q: Did you have to get permission from the Sheriff to ride with Deputy Ashurst?
> A: I don't think I had to get permission, but I asked for permission.
>
> Q: And who did you ask for permission?
> A: Mr. Mike Smith"[49]

---

[47] Constable Bolton Deposition
[48] Sheriff Smith Deposition at 178.
[49] Constable Bolton's Deposition

49. Sheriff Smith and Deputy Ashurst knew Constable Bolton was an elected official who had no law enforcement training.[50] Sheriff Smith was aware that Constable Bolton carried a Glock 23 along with an Asp Baton and a Maglite that he purchased for himself.[51] (Those were not issued by the Knox County Sheriff Department). He was aware that Constable Bolton did not have any training in the use of any other less lethal equipment such as a Taser or pepper spray. And yet, he permitted Constable Bolton to ride along with Deputy Ashurst regularly as if he was a member of the Knox County Sheriff's Department.[52] As a result, Deputy Ashurst did not ask for assistance initially on the call involving Mr. Mills because he had Constable Bolton riding with him, even though there were certified law enforcement officers in the area who could have assisted if Deputy Ashurst had requested it.

50. Deputy Ashurst was not trained in de-escalation and had not received any use of force training since his graduation from the academy. Constable Bolton had received no law-enforcement training whatsoever. It is my opinion, which I hold to a reasonable degree of professional certainty that Sheriff Smith and the Knox County Sheriff's Department exhibited deliberate indifference in failing to adequately train Deputy Ashurst allowing an untrained Constable Bolton to serve as a partner of Deputy Ashurst when responding to the call in which Mr. Mills was killed – the need of both which were obvious to the Sheriff and Knox County.

In the *PoliceOne.com* article from 2006 titled Legal Corner: "Departmental Liability for Failure-to-Train", it states the following:

> "The deliberate choice can be shown where the need for more or different training is so obvious and is so likely to result in the violation of constitutional rights that policy-makers were deliberately indifferent to the need. The Supreme Court explained that inadequate training meets the deliberate indifference standard only when the need for more or different training is obvious and the failure to implement such training is likely to result in constitutional violations."[53]

**OPINION #3 (The Knox County Sheriff's Department Did Not Complete an Administrative Investigation Showing Deliberate Indifference to Standard Police Practices)**

51. It is the standard investigative process following an Officer Involved Shooting (OIS) that two investigations take place. The first investigation is the criminal investigation, which in this case was conducted by the Kentucky State Police. The

---

[50] Sheriff Smith Deposition at 174.
[51] Sheriff Smith Deposition at 77
[52] Sheriff Smith Deposition at 177-178.
[53] *PoliceOne.com*, Departmental Liability for Failure-to-Train, 2006 Matthew McNamara

second investigation that takes place is the administrative review to determine if any administrative violations took place in the OIS. In this OIS in which Mr. Mills was killed by Deputy Ashurst, no administrative investigation was completed by the Knox County Sheriff's office to review the actions of Deputy Ashurst or Constable Bolton.[54]

The International Association of Chiefs of Police (IACP) wrote a document titled "*Officer Involved Shootings, A Guide for Law Enforcement Leaders*" in 2016.  In this document it discusses administrative investigations and why they are important:

> "Administrative Investigations
>
> Unlike a criminal investigation, an administrative investigation intends to determine whether the involved officer's actions were justified, in accordance with agency policy, procedures, rules and training.  Investigators or a force review board may use this information to make recommendations for changes in these areas.  While an administrative investigation may lead to disciplinary charges based on breaches of LEA policies, it does not intend to delve into potential criminal behavior.  Questions in an administrative investigation are specifically addressed to an officer's actions based on the agency's administrative rules and regulations.
>
> 52. The Guide also discusses the "appropriateness of the use of force."

As noted above, in determining the appropriateness of a shooting, both criminal and administrative investigations should explore situational factors.  These factors include the following:

- The conduct and behavior of the subject at the time of the incident
- The relative age, size, strength and physical capability of the officer compared to the subject
- Any opportunities for, and attempts by, the officer to de-escalate the situation
- Force options available
- The experience of the involved officer, including years of service, types of assignments and training
- Number of officer's present
- Presence (or likely presence) of drugs or alcohol used by the subject
- Mental status of the subject and threats of violence (if any) made by the subject
- Seriousness of crimes suspected to have been committed by the subject
- Subject's criminal history if known"[55]

---

[54] Sheriff Smith's Deposition at 125.
[55] IACP Officer Involved Shooting, A Guide for Law Enforcement Leaders, 2016

53. This article outlines exactly how important it is to conduct an administrative review following an OIS. It is my professional opinion, to a degree of professional certainty that allowing the Kentucky State Police to conduct the criminal investigation was the proper course of action.  However, it is also my opinion to a reasonable degree of professional certainty that the Knox County Sheriff's Office's failure to conduct and administrative review into Deputy Ashurst's and Constable Bolton's actions in the Officer Involved Shooting shows a complete deliberate indifference.  To not review and assess the actions of these officers is a complete failure on the part of Sheriff Smith and the  Knox County Sheriff's Department.  Based on factors listed in the above IACP article Sheriff Smith should have determined if:

- If there were opportunities to de-escalate the situation
- Why did Deputy Ashurst not use his department issued pepper spray?
- Why were additional officers not requested, if six additional calls on this incident came in while Deputy Ashurst was in route?
- Why did Constable Bolton not have a radio?

54. These are all important issues that should have been reviewed by Sheriff Smith to determine if any discipline was warranted in this incident.  His failure to do so constitutes deliberate indifference to the standard police practices.

**OPINION #4 (The Knox County Sheriff Was on Notice, or Should Have Been on Notice, of Deputy Mikey Ashurst's Prior Misconduct)**

55. Deputy Mikey Ashurst graduated from the police academy in 2011 and started his career at the Danville Police Department. He stayed for two years until 2012. While with the Danville PD, his sergeant graded him a 2 out of 5 in the area of Professionalism and Interpersonal Skills on his 2012 Performance Evaluation.  In the comments section he wrote the following:

> "Officer Ashurst takes direction and supervision well and is well liked by his peers. At times Officer Ashurst needs to keep his emotions in check, when he doesn't Officer Ashurst can display a more hostile attitude toward persons of the public."[56]

Sheriff  Smith  did  not  personally  obtain  Deputy Ashurst's  personnel  file  from Danville Police Department and did not review it prior to hiring him.[57]

56. In his next police assignment, he worked for the Harlan Police Department for just six months.  In his March 22, 2013 reference letter, Police Chief Michael Thomas said the following regarding Mikey Ashurst:

---

[56] Danville 2012, Performance Evaluation"
[57] Sheriff Smith Deposition at 163, 167-171

3-22-13

 "To Whom It May Concern:

While Mike Ashurst was employed at HPD, he showed great team work and was a good unit.  However, he did show signs of being unhappy.  He began searching for other employment.

Once he gained other employment, notice was given.  I received numerous citizen complaints on his attitude and behavior.  He also called in to the state basketball tournament even after knowing we were short handed.  He continued to call in several times for several shifts prior to his final day.

The decision was made to get his equipment and wish him well.

Therefore, I would not recommend him for rehire."[58]

Sheriff Smith did not obtain Deputy Ashurst's personnel file from the Harlan department and had not personally reviewed any documents contained therein.[59]

57. In his next assignment, Mikey Ashurst went to work for the Laurel County Sheriff's Department where he stayed from 2013-2015.  In this assignment, Mikey Ashurst was involved in several use of force incidents which are documented below:

- In a Laurel County S. O. Use of Force Report from April 15, 2013 Deputy Ashurst used his Taser on Ms. Kenda Carver during the following family violence incident:

  "As the daughter was being taken into custody, she pulled away and began to struggle with officers by pinching myself and kicking Dep. Ashurst.  Dep. Ashurst deployed his TAZER in drive stun mode to offenders back in order to gain compliance."[60] Deputy Ashurst did not receive any injuries in this incident.

In a June 2019 Sworn Affidavit, Ms. Carver wrote a different version of the incident than was reported by Deputy Ashurst:

- "On April 15, 2013, I was arrested by Deputy Mikey Ashurst, then employed with the Laurel County Sheriff's Department.
- On that night, my mother called dispatch requesting a welfare check because I had drunk alcohol after taking antidepressants and was very lethargic.

---

[58] Harlan PD Reference Letter from Chief Michael Thomas
[59] Sheriff Smith Deposition at 26-27.
[60] Laurel County S.O. Use of Force Report, 4-15-13

-   Although my mother expected emergency medical services personnel to come to our home, several law enforcement officers arrived instead.
-   I was in my bedroom when Deputy Ashurst and the other law enforcement officers arrived. Upon entering my bedroom, Deputy Ashurst and the others immediately handcuffed me and walked me to the front door of our home.
-   When I asked what was going on and why I was being detained, I was immediately tackled to the ground by law enforcement.  While I laid on the ground on my stomach, I was tassered in the back.
-   Later, a deputy held the taser directly to my chest. According to the paperwork I have seen from law enforcement, the officer who tasserred me was Deputy Ashurst.
-   At no time was I fighting or resisting arrest."[61]

In a Laurel County S.O. Use of Force Report from June 14, 2013 Deputy Ashurst used his Taser on Tommy Robinson during a foot pursuit incident:

"After a short chase the driver pulled in behind the Speedy Mart and attempted to flee on foot.  Deputy Ashurst U/1138 chased the male suspect later identified as Tommy L Robinson.  Deputy Ashurst was forced to deploy his Department issued Taser to stop this suspect from fleeing and struggling.  No further force was used to arrest this subject.  The prongs were removed on scene by Deputy Ashurst."[62]  Deputy Ashurst did not receive any injuries, in this incident.

In a Laurel County S. O. Use of Force Report from January 18, 2015 Deputy Ashurst used his Taser on Donald Fox at the conclusion of a foot pursuit:

"Subject fled on foot.  Myself and other officers were able to catch subject, but then he became combative and resisted arrest.  Subject failed to comply with several officer's commands to stay down on the ground and place his hands behind his back.  Subject continued attempts to get up from the ground and run again.  I used issued taser to gain compliance and allowed Deputy to handcuff subject under power.  Deputy is carrying other felony charges."[63]

Four days later, in a Laurel County S. O. Use of Force Report from January 22, 2015 Deputy Ashurst used his Taser on Sammy Harrell while responding to a prowler call:

"Deputy Ashurst was the first on the scene and spotted the suspect leaving the out building.  When the subject seen deputy Ashurst he fled on foot into a wooded area. Deputy Ashurst gave chase and when the subject fell he deployed his taser hitting the suspect on the back.  The suspect had on a black thick  jacket and refused to

---

[61] Kendra Carver Affidavit, June 2019
[62] Laurel County S.O. Use of Force Report, 6-14-13
[63]  Laurel County S. O. Use of force Report, January 18, 2015

show his hands and had to be physically restrained."[64]   Deputy Ashurst did not receive any injuries, in this incident.

In another incident involving Deputy Ashurst while he was with Laurel County Sheriff's department, Mr. Arvis Presley Jr wrote the following in a sworn affidavit:

- On August 23, 2014, I was arrested by Deputy Mikey Ashurst, then employed with the Laurel County Sheriff's Department
- On that night, I had been drinking with a couple of my friends at my residence and hanging out in my garage.
- As I was exiting my garage, Deputy Ashurst pulled into the driveway driving in a crazy manner.  Two or three other police cars pulled in behind him.
- Ashurst was in the car alone, exited the vehicle, and approached me in the yard.  It appeared that Ashurst was looking for a fight as soon as he got out of the car.
- When he approached me.  Deputy Ashurst demanded that I open the garage door.  I told him he was not going into the garage without a search warrant.
- Deputy Ashurst then got in my face and grabbed me.  When he did that, I jerked back away from him, he then began to beat me.
- I didn't fight back because I knew several other officers were already there, and there was no use in doing so.
- I was tackled to the ground and placed in handcuffs.  As I being put into a police vehicle, Deputy Ashurst sprayed me in the face with pepper spray.
- While we were in route to the sheriff's office, Deputy Ashurst kept yelling at me.  He said things like. I like to whoop mother fuckers like you; I eat guys like you for breakfast; and I would like to get you on a dirt road to kick your ass – if there wasn't another cop behind me."[65]

58. All of the above-cited incidents occurred in the brief two-year period that Deputy Ashurst was employed with the Laurel County Sheriff's Department.[66] All of these incidents were available to Knox County Sheriff Michael Smith before he hired Deputy Ashurst, yet he chose not to obtain Deputy Ashurst's personnel file.[67]  And, Sheriff Smith asked Deputy Ashurst nothing about these incidents before hiring him.  On the other hand, Sheriff Smith Sheriff Smith's predecessor, Sheriff Pickard, refused to hire Deputy Ashurst due to his reputation in the community.  As Sheriff Pickard testified:

---

[64] Laurel County S. O. Use of Force Report, 1-22-15
[65] Arvis Pressley Sworn Deposition June 2019
[66] Deputy Ashurst and Sheriff Smith testified that Deputy Ashurst resigned from the Laurel County Sheriff's Office upon the request of the Laurel County Sheriff, with whose married daughter Deputy Ashurst was having a sexual affair. Ashurst at 206. Sheriff Smith was aware of the reasons behind Ashurst's resignation and agreed that Knox County Sheriff's Deputies should have morals, integrity, and values.
[67] Sheriff Smith Deposition at 23-25, 30.

Q: "Do you remember a deputy by the name Ashers (phonetic)?
A: He wasn't a deputy for me.

Q: Was he employed there?
A: No

Q: Did you hire him at all?
A: No

Q: Okay, would you have hired him?
A: No

Q: Why not
A: I hear too many things about him, I did not like what I heard

Q: Did you hear he was involved in police misconduct?
A: No

Q: What did you hear about him?
A: I heard like, you know, he had problems dealing with people maybe, or
   something like that, but I wasn't impressed with him.

Q: Okay so is it fair to say that you wouldn't have hired—based upon the
   knowledge that you have of Mikey Ashers' and his background, is it fair to
say
   that you would not have hired him to be a deputy at the Knox County
Sheriff's
   department?
A: He applied one time. I didn't—I didn't hire him.

Q: Why is it you didn't hire him?
A: I just didn't want to take a chance."[68]

59. After being employed by Knox County, and Sheriff Smith, Deputy Ashurst was involved not only in the shooting death of Mr. Mills, but he was involved in another serious use of force situation that occurred on August 29, 2018.  In a sworn affidavit from Mr. Brian Lee he stated the following:

-   "On August 29, 2018, I was arrested by members of the Knox County Sheriff's Office.

---

[68] John Pickard Deposition

- On that night. I was a passenger in a vehicle driven and owned by my-then girlfriend, Crystal Meadows.
- At some point, we passed law enforcement officers parked in two different vehicles on the side of the road.  Once we drove past them, the officers pulled behind us and turned on their flashing lights.
- Ms. Meadows immediately became scared, stating that she was going to jail because she had drugs and a handgun in her possession.  Instead of stopping Ms. Meadows kept driving.
- As she was driving, Ms. Meadows made a phone call to a Kentucky State Police officer she knew asking for help.
- As we continued down the road, I saw another law enforcement vehicle approaching us.  I could tell immediately that the car was going to hit our vehicle so I yelled at Ms. Meadows to stop and reached over and threw the truck in park.
- I grabbed Ms. Meadows and pushed her into the floorboard of the truck.  A bullet struck me in the elbow as I did so. I then exited the truck through the window and ran into a field adjacent to the vehicles.
- As I ran toward the field, the officer(s) fired several shots towards me.  I immediately laid down in the field, seeking cover.
- Once the shots subsided, I rose to my knees with my hands behind my head.  I then saw Deputy Ashurst running towards me.  Once he approached me, Deputy Ashurst hit me forcefully in the back of the head.
- Once Deputy Ashurst struck me in the head.  I fell forward onto the ground landing on my stomach and face.  I was then tased twice and physically beaten by the officer(s).
- After I was handcuffed, the officers began dragging me away from the police vehicle out further in the field.  They told me they were taking me to the creek 'to kill' me.
- Shortly thereafter, Kentucky State Police officer arrived on the scene.  When KSP officer hollered that he had arrived, the other officers ceased assaulting me and took me back to the roadway.  In doing so, they threw me over a barbed wired fence, causing further injuries.
- Once we got back to the law enforcement vehicle, the officer slammed me into the car and searched my person.  I had no drugs nor weapons on my person.  Ultimately, I was transported via ambulance due to the injuries the officers caused.
- Due to the assault by deputy Ashurst and the other officers, I suffered injuries to my face, head and elbow.  I was hit so forcefully in my head and face that I still hear ringing in my ears."[69]

60. In November 2016, Deputy Mikey Ashurst made application to work for the Kentucky State Police Department.  In reviewing the application, it is important to note

---

[69] Brian Lee Sworn Affidavit, June 2019

that Deputy Ashurst was not recommended for employment because of several things in his career that have been noted in this report. Two other incidents also occurred of note.   The first incident stemmed from an altercation that occurred at a High School basketball game where Deputy Ashurst referred to a retired KSP Lieutenant as a "dick". In the investigator's notes he stated the following:

> "I believe it shows a lack of maturity to refer to a KSP Lt. as a Dick."[70]

61. Another major incident that KSP reviewed was a call for service from July 26, 2016, less than one month after the shooting death of Mr. Mills.  In this incident, 24 minutes before the end of Deputy Ashurst' shift, he received a juvenile complaint call. He instructed dispatch to hold the call for the next shift.  In the KSP investigator's notes he stated the following regarding the call:

> "The applicant tells dispatch I am not fucking with this shit; Buster will be 10-8 in twenty minutes & I just pulled into my driveway.  The dispatcher confirms the applicant wants to hold the call for the day shift unit & they both agree it is a B.S. call.  The Applicant did not go to the complaint & the female was not located.  Unfortunately, the female was found deceased three days later of a drug overdose."[71]

> Sheriff Smith never reviewed the two KSP applications or documents related thereto. [72]

62. To all information and belief, Knox County Sheriff Michael Smith does not appear to have an Early Intervention System (EIS) in place to deal with deputies like Mikey Ashurst.  The purpose of an EIS is to identify officers who are not performing effectively as they receive numerous citizen complaints or are involved in multiple use of force incidents.  In an article from the US Department of Justice through the COPS Office title "Early Intervention Systems, A Guide for Law Enforcement Executives "it states the following:

> "The law enforcement officers who serve our communities are given great responsibility, are asked to face significant dangers, and are expected to conduct themselves in an ethical and respectful manner.  Every day the vast majority of law enforcement officers fulfill their duties with the utmost professionalism and dedication.  Yet, experience has shown that there are a small number of officers who unfortunately engage in behaviors detrimental to the community, the department or themselves.  Law enforcement agencies strive to identify these

---

[70] Deputy Ashurst KSP Application Notes

[71] Deputy Ashurst KSP Application Notes

[72] Sheriff Smith Deposition at 22.

officers at the earliest opportunity to avoid potentially dangerous or harmful behaviors in the future."[73]

63.   It is my professional opinion that Deputy Mikey Ashurst was correctly identified as a problem officer as early as 2012 at Danville PD when his sergeant graded him a 2 out of 5 in the area of Professionalism and Interpersonal Skills (as noted above). Since this evaluation in his second year of police work, his actions against the public have only escalated throughout his career.

64. It is my opinion to a reasonable degree of professional certainty that Deputy Mikey Ashurst should not have been hired by Sheriff Smith and after being hired, should have been placed in an EIS at the Knox County Sheriff's Office because of his documented performance history in law enforcement.  It is my experience that the majority of police officers do not change departments multiple times within a few years and doing so may be indicative of performance problems.  The Harlan Police Chief said that Mikey Ashurst was not eligible for re-hire.  Former Knox County Sheriff Pickard said he would not have hired Mikey Ashurst because of things he had heard about him in the past.  The Kentucky State Police, after a lengthy applicant process, did not hire him because of his lack of maturity and his previous law enforcement incidents.

**OPINION #5 (The Kentucky State Police did not Complete a Thorough Investigation in the Shooting Death of Jessie Mills)**

65. It is my opinion to a reasonable degree of professional certainty that the KSP investigation of the Jessie Mills shooting death is incomplete and inaccurate. that the KSP investigation of the Jessie Mills shooting death is not complete and accurate.   In reviewing the KSP investigation completed by Lt Randy Surber several critical areas appear to not have been completely investigated.  The most important concern is the distance that Mr. Mills was from Deputy Ashurst at the moment that Deputy Ashurst shot and killed him.  In reviewing Surber's second deposition it states the following:

"Q: … Did you do any investigation to determine how far away Mr. Mills was from deputy Ashurst when deputy Ashurst shot him?

A: Just witness statements

****

Q: …would it have been important to know the distance Mr. Mills was away from deputy Ashurst when deputy Ashurst shot him?
A: I went by what the witnesses said

---

[73] Early Intervention Systems, A Guide for Law Enforcement Executives, USDOJ COPS

Q: And what witnesses were you able to give you information on how close Mr. Mills was to deputy Ashurst when deputy Ashurst shot –
A: I'm not sure which one but one said he almost grabbed the gun. But I don't know who – who did.  So with that being said one."[74]

66. In a 2006 article, *Practical Pathology of Gunshot Wounds* by Dr. Scott Denton it states the following concerning close contact wounds:

"The principal indicator of close range fire is stippling, that is, a pattern of tiny, punctuate abrasions in the skin surrounding the entrance wound.
Stippling is caused by unburned particles of gunpowder striking the skin.  In contrast to other substances that may be deposited on the skin, such as soot, stippling cannot be washed away."[75]

The above information was verified by the Medical Examiner Meredith Frame when she testified to the same and stated she found no stippling or soot on Mr. Mills when conducting the autopsy.[76]  Therefore, it is my opinion to a reasonable degree of professional certainty that if Mr. Mills was as close to Deputy Ashurst as Lt. Surber suggested, that he would have had stippling on his body. Further, it appears that Lt. Surber disregarded the statement of witness Keith Barrett.  Mr. Barrett said that Mr. Mills was walking in the road and "squawking to himself" and not fighting with Deputy Ashurst when Ashurst fired two shots at him from 10-15 feet away.[77]

Additionally, it is my opinion to a reasonable degree of professional certainty that it is a common police standard that if you are going to record interviews with witnesses that they should not be briefed about the questions they are going to be asked before you start the recordings.  It is an acceptable practice to inform the witness they are going to be recorded. However, to go through the questions with the witnesses before you record them is not the recommended practice.

67. Further, once an Officer Involved Shooting (OIS) takes place the officers should give a brief statement to arriving supervisors to let them know where the shots were fired in order to make sure no one else is injured.  Thereafter officers should immediately be separated from one another to ensure their statements are not contaminated by speaking with each other.  In this case in which KSP was in charge of the investigation it took Lt. Surber longer than one hour to arrive at the scene.  Once he arrived at the scene he states the following:

"Q: Were he and Deputy Ashurst talking with each other when you –

---

[74] Surber 2nd Deposition
[75] Article by Dr. Scott Denton, Practical Pathology of Gunshot Wounds, 2006
[76] Deposition of Meredith Frame at 36.
[77] Deposition of Keith Barrett

A: When I approached them

Q: -- When you approached them?
A: Yes

Q: They were?
A: Yeah.  They were – All, they were together.  I'm sure they were talking.  I – I'm
--- I' Can't' guarantee it, but"[78]

To allow the officers involved in a OIS, talk with each another, one hour after the OIS is not following the best practices.  Deputy Ashurst and Constable Bolton should have immediately been separated from one another.  In fact, as the lead investigative agency for the investigation, Lt. Surber and his team should have established this before they arrived at the scene.

68. Mr. Hobbs is a key witness to this shooting incident as he spoke with Mr. Mills immediately before the shooting and was present when the shooting took place. In Mr. Hobb's deposition he stated that he went home following the shooting where he drank 2-3 beers before he went to sleep.  At approximately 3:00 AM, Mr. Hobbs was awoken by KSP investigators, who reasonably should have known that Mr. Hobbs had been asleep and had been drinking when he questioned him.  It is my opinion that Mr. Hobbs should have been interviewed later in the morning after he had slept and was clear headed.

69. Finally, although the KSP post is approximately 1.5 hours away from where Deputy Ashurst and Constable Bolton work. It is my professional opinion that they should have been interviewed at separate dates and times and should have instructed the officers not to speak with each other until the investigation was complete.  Instead, the officers were permitted to travel to the interview together.  Lt. Surber did not question the officers as to whether they had spoken to each other about what happened that night and never questioned the officers about whether they jointly prepared, spoke about, or in any way communicated about the written statement provided to them by Constable Bolton. Considering how very similar their statements were providing details that no other witness at the scene ever provided, it is quite possible there was collusion existed and did not question the officers about that possibility – bringing into question the credibility of the investigation.

**CONCLUSION**

70. It is my opinion provided to a reasonable degree of professional certainty that it would have been proper for authorities to arrest Mr. Mills for taking his child from her custodial parents without permission.  However, it is also my professional

---

[78] Surber 2nd Deposition

opinion that the use of force employed by the officers – both before and at the time of employing lethal force – was wholly inappropriate and against standard police practices. Between the time Deputy Ashurst and Constable Bolton were originally dispatched to the scene, they received numerous updates from dispatch about what was happening, yet Deputy Ashurst requested no additional officers to respond for assistance. Deputy Ashurst felt that Constable Bolton, an untrained elected official, could handle the call with him without further assistance. When they arrived at the scene, traffic had been stopped and Mr. Mills was walking in the road with witnesses walking behind him. Deputy Ashurst and Constable Bolton should have used time and distance to their advantage and responded with de-escalation techniques.

Instead they escalated the situation when Mr. Mills turned away and they tased him, and/or hit him in the back of the head with a flashlight, even though he was not an imminent threat to either officer or others.  After Mr. Mills, he fell to the ground, and the child had been returned returned unharmed and safe to her grandfather, Deputy Ashurst and Constable Bolton beat Mr. Mills with Asp batons, metal flashlights, their fists and feet.  When Mr. Mills got to his feet and took one or two steps in the direction of Deputy Ashurst, he shot and killed Mr. Mills – even though Mr. Mills had no weapon and was in a daze after the violent assault, bleeding and bruised. A reasonable officer in similar circumstances would not have been fear of his life, but instead, would have used other means available to him to de-escalate the situation. Deputy Ashurst failed to consider other force options as a reasonably trained officer would have done as outlined in the Knox County General Order KCSO – 12.  Instead he elected to use deadly force and shot an unarmed Jessie Mills who died at the scene.

At the conclusion of what Deputy Ashurst and Constable Bolton described as a violent confrontation with Mr. Mills neither officer sustained any injuries.

71. As a result It is my professional opinion to a reasonable degree of professional certainty that the actions of Deputy Ashurst and Constable Bolton were unreasonable, inappropriate, and inconsistent with nationally accepted standards under these circumstances.

- **COMPENSATION**

Compensation for my expert witness services is $300 per hour. This is a preliminary report and may have to be supplemented when more information is available.

- **Resume – Attached**

- **List of cases in which I have been retained - Attached**

Submitted by,

Craig R. Miller