**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION**

| | | |
|---|---|---|
| The Estate of JESSIE MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-CV-184 |
| | ) | |
| v. | ) | Hon.  ROBERT E. WIER |
| | ) | |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

# EXHIBIT 20

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
### — COURT REPORTERS —

## NO. 17-cv-84

## AMANDA HOSKINS, ET AL.

## V.

## KNOX COUNTY, ET AL.

## DEPONENT:

## JOHN PICKARD

## DATE:

## March 22, 2018



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

PL 813

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF KENTUCKY

3                  NO. 17-cv-84

4             HON. DAVID L. BUNNING

5             HON. CANDACE J. SMITH

6

7           AMANDA HOSKINS, ET AL.,

8                 PLAINTIFFS

9

10                     V.

11

12            KNOX COUNTY, ET AL.,

13                DEFENDANTS

14

15

16

17

18

19

20

21

22

23   DEPONENT:  JOHN PICKARD

24   DATE:     MARCH 22, 2018

25   REPORTER:  JESSICA VAN TILBURG

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 814

The Deposition of JOHN DOCKERY, taken on March 23, 2018

2

```
 1                      APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:

 4   ELLIOT SLOSAR

 5   AMY ROBINSON STAPLES

 6   LOEVY & LOEVY

 7   311 NORTH ABERDEEN STREET, THIRD FLOOR

 8   CHICAGO, ILLINOIS 60607

 9   TELEPHONE NO.:  (312) 243-5900

10   E-MAIL:  ELLIOT@LOEVY.COM

11

12   ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK

13   MEFFORD, JACKIE JOSEPH, AND DALLAS EUBANKS:

14   SHAWNA VIRGIN KINCER

15   CODY WEBER

16   KENTUCKY STATE POLICE GENERAL COUNSEL

17   919 VERSAILLES ROAD

18   FRANKFORT, KENTUCKY 40601

19   TELEPHONE NO.:  (502) 573-1636

20   E-MAIL:  SHAWNA.KINCER@KY.GOV

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 815

```
 1                    APPERANCES CONTINUED

 2

 3   ON BEHALF OF THE DEFENDANTS, REUBEN YORK AND JASON

 4   BUNCH:

 5   DERRICK T. WRIGHT

 6   STURGILL, TURNER, BARKER & MOLONEY, PLLC

 7   333 WEST VINE STREET, SUITE 1500

 8   LEXINGTON, KENTUCKY 40507

 9   TELEPHONE NO.:  (859) 255-8581

10   E-MAIL:  DWRIGHT@STURGILLTURNER.COM

11

12   ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF

13   BARBOURVILLE:

14   LICHA H. FARAH, JR.

15   WARD, HOCKER & THORNTON

16   333 WEST VINE STREET, SUITE 1100

17   LEXINGTON, KENTUCKY 40507

18   TELEPHONE NO.:  (859) 422-6000

19   E-MAIL:  LFARAH@WHTLAW.COM

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 816

```
 1
 2                      APPEARANCES CONTINUED
 3
 4   ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK
 5   EUBANKS:
 6   JASON WILLIAMS
 7   JOHN F. KELLEY
 8   WILLIAMS, FARMER & TOWE
 9   303 SOUTH MAIN STREET
10   LONDON, KENTUCKY 40743
11   TELEPHONE NO.:  (606) 877-5291
12   E-MAIL:  JOHN@WFTLAW.COM
13
14
15
16
17
18
19
20
21
22
23   ALSO PRESENT:  DEREK EUBANKS, DEFENDANT; MIKE BROUGHTON,
24   DEFENDANT; AMANDA HOSKINS, PLAINTIFF; LACEE TOWNSEND,
25   VIDEOGRAPHER
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 817

The Deposition of JOHN PICKARD, taken on March 23, 2018

5

```
 1

 2

 3                            INDEX

 4                                                   Page

 5   PROCEEDINGS                                        8

 6   DIRECT EXAMINATION BY MR. SLOSAR                   9

 7   CROSS EXAMINATION BY MR. FARAH                   247

 8   EXAMINATION BY MS. KINCER                        254

 9   EXAMINATION BY MR. WRIGHT                        258

10   EXAMINATION BY MR. WILLIAMS.                     271

11   REDIRECT EXAMINATION BY MR. SLOSAR               275

12

13                          EXHIBITS

14                                                   Page

15   1      LAWSUIT COMPLAINT                          40

16   2      LAWSUIT COMPLAINT                          42

17   3      STATUS UPDATE FORM                         43

18   4      POLICY AND PROCEDURES MANUAL               54

19   5      RESPONSES TO REQUEST FOR PRODUCTION OF

20          DOCUMENTS                                  95

21   6      PL001309 STICKY NOTE FROM MIKE SIMPSON    133

22   7      PL015643-015648 CAR RENTAL RECEIPT        137

23   8      PL006455 PHOTO                            139

24   9      PL025647-025653 KYIBRS REPORT             149

25   10     KSP000362 - 000364 ARREST WARRANT         169
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 818

```
 1                    EXHIBITS (CONTINUED)

 2

 3   11      KSP00286 - CRIME SUPPLEMENT              180

 4   12      PL015867-015875 TRANSCRIPT OF

 5           KAYLA MILLS' STATEMENT                   184

 6   13      INTERROGATORIES                           15

 7   14      PL018940-018944 CRIMINAL CASE JACKET     117

 8   15      PL015103-015104 CRIME SUPPLEMENT         171

 9   16      AUDIO CLIP OF ALLEN HELTON'S INTERVIEW   206

10   17      PL015840-015854 TRANSCRIPT OF

11           ALLEN HELTON'S STATEMENT                 206

12   18      PL004844-004855 INFORMANT STATEMENT      228

13   19      PL002660 SKETCH                          187

14   20      PL005067-005074 PHOTO                    238

15   21      AUDIO CLIP OF DAVID FOX'S INTERVIEW      244

16   22      AUDIO CLIP*                               12

17   23      DEPARTMENT OF CRIMINAL JUSTICE

18           TRAINING RECORDS                          28

19   24      PL005132 UNIFORM CITATION                249

20   25      PL003221 UNIFORM CITATION                249

21

22

23    *WILL PRODUCE UPON RECEIPT

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 819

The Deposition of JOHN PICKARD, taken on March 22, 2018                7

```
 1                         STIPULATION

 2

 3

 4    THE VIDEOTAPED DEPOSITION OF JOHN PICKARD TAKEN AT THE

 5    HOLIDAY INN EXPRESS & SUITES, 506 MINTON DRIVE, LONDON,

 6    KENTUCKY 40741 ON THURSDAY, THE 22ND DAY OF MARCH, 2018

 7    AT APPROXIMATELY 9:37 A.M.; SAID VIDEOTAPED DEPOSITION

 8    WAS TAKEN PURSUANT TO THE FEDERAL RULES OF CIVIL

 9    PROCEDURE.

10    IT IS AGREED THAT JESSICA VAN TILBURG, BEING A NOTARY

11    PUBLIC AND COURT REPORTER FOR THE STATE OF KENTUCKY, MAY

12    SWEAR THE WITNESS AND THAT THE READING AND SIGNING OF

13    THE COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 820

```
 1              PROCEEDINGS
 2        VIDEOGRAPHER:  My name is Lacee Townsend.  I'm
 3   the video technician today.  Jessica Van Tilburg is
 4   the court reporter.  Today is the 21st [sic] day of
 5   March, 2018.  We are at the Holiday Inn Express
 6   located in London, Kentucky to take the deposition
 7   of John Pickard in the matter of Amanda Hoskins, et
 8   al. v. Knox County, et al., pending in the United
 9   States District Court of the Eastern District of
10   Kentucky, number 17-cv-84.  Will counsel please
11   identify themselves for the record?
12        MS. STAPLES:  Amy Robinson Staples and Elliot
13   Slosar for the plaintiffs.
14        MR. WILLIAMS:  Jason Williams, here on behalf
15   of Defendant Pickard, Derek Eubanks, and Knox
16   County.
17        MR. WRIGHT:  Derrick Wright on behalf of
18   Defendants Jason York and Jason Bunch.
19        MS. KINCER:  Shawna Kincer on behalf of
20   Defendants Mark Mefford, Dallas Eubanks, Kelly
21   Farris, Jackie Joseph, Brian Johnson.
22        MR. FARAH:  Licha Farah on behalf of Mike
23   Broughton and the City of Barbourville.
24        VIDEOGRAPHER:  Sir, will you please raise your
25   right hand to be sworn in by the reporter?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 821

```
 1                COURT REPORTER:  Do you solemnly swear or
 2       affirm the testimony you're about to give will be
 3       the truth, the whole truth, and nothing but the
 4       truth?
 5                THE WITNESS:  Yes.
 6                COURT REPORTER:  Thank you.
 7                   DIRECT EXAMINATION
 8  BY MR. SLOSAR:
 9       Q    Good morning, Mr. Pickard.
10       A    Good morning.
11       Q    I would like to go over some of the rules
12  first, before we get started.  Does that sound okay to
13  you?
14       A    That's fine.
15       Q    Okay.  Have you ever given a deposition
16  before?
17       A    One time.
18       Q    Okay.  And how long ago was that?
19       A    It was probably around 2007 or '8.
20       Q    Was it in a lawsuit?
21       A    Yes.
22       Q    Was that -- were you a party to that lawsuit?
23       A    Yes.
24       Q    What kind of case was that?
25       A    It was where two horses got taken by the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 822

1    county and I -- I kept the horses where I lived and took

2    care of them.

3        Q    And somebody filed a lawsuit about that?

4        A    Yeah.  The guy that owned the horses.

5        Q    Did that guy used to be a former officer at

6    the Knox County Sheriff's Department?

7        A    No.

8        Q    What was the person's name who filed that

9    lawsuit?

10       A    I -- I can't remember.  It's been -- it was an

11   over the road truck driver.  I don't remember his name.

12       Q    It'll -- I tend -- you've been to a couple of

13   depositions now, right?

14       A    Yes.

15       Q    Where you watched them --

16       A    Yes.

17       Q    And as you know, I'm sure, by now, I tend not

18   to ask questions perfectly.  So if I ask you a question

19   and you don't understand it, please let me know, and

20   I'll ask it a better way, okay?

21       A    Yes.

22       Q    If you answer the question, I'm going to under

23   -- I'm going to assume that you understood what I was

24   asking you.  Is that fair?

25       A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 823

```
 1        Q    Okay.  If at any point in time you want to
 2   take a break and use the restroom or consult with your
 3   lawyer, please just let me know, all right?
 4        A    Yes.
 5        Q    The only thing that I'll ask is if there's a
 6   question pending, that you answer the question before
 7   taking a break.  Is that okay?
 8        A    Yes, that's fine.
 9        Q    All right.  And you're doing a great job, but
10   just continuing answering questions verbally instead of,
11   you know, a head nod or a uh-huh, uh-uh --
12        A    Yes.
13        Q    -- you know.  Affirmative answers are helpful
14   for the court reporter, okay?
15        A    Yes.
16        Q    Okay.  Mr. Pickard, would you agree that
17   innocent people shouldn't be charged for crimes they
18   didn't commit?
19             MR. WRIGHT:  Object to form.
20             MR. WILLIAMS:  Join.
21        Q    You can answer.
22        A    Yes.
23        Q    Yeah.  And in fact, do you recall having a
24   conversation with a woman by the name of Lisa Evans,
25   before William Anderson's trial?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 824

The Deposition of JOHN MCCRACKEN, taken March 29, 2019          12

```
 1        A    Yes.
 2        Q    And I'm going to -- is it your understanding
 3   that that conversation is -- was recorded?
 4        A    Yes.
 5        Q    Okay.  I'm going to play a part of that
 6   conversation.  This will be Exhibit number 22.  It's
 7   PL29737.
 8                  (EXHIBIT 22 MARKED FOR IDENTIFICATION)
 9             MR. WILLIAMS:  Elliot, let me just make a
10        continuing objection before you start, to the
11        extent that you intend to play snippets of
12        recordings that may be just portions are taken out
13        of context, that we may ask that other portions of
14        it, in fairness, be played in order that the
15        defendant can understand the context of the
16        question.
17             MR. SLOSAR:  Sure.
18             MR. WILLIAMS:  Thank you.
19             MR. WRIGHT:  Join that objection.
20   BY MR. SLOSAR:
21        Q    Please listen to this, and I'm going to ask
22   you a few questions --
23        A    Okay.
24        Q    -- when we're done, okay?
25                  (AUDIO PLAYED)
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 825

```
 1          Q      Was that your voice on there?

 2          A      Yes.

 3          Q      Okay.  And do you agree with the statement

 4   that you said on there, that if you're guilty, you

 5   should hang, but if you're not, I don't think you should

 6   get in trouble?

 7          A      Yes.

 8          Q      Okay.  At the time of the Katherine Mills

 9   death in December of 2010, what agency were you employed

10   with?

11          A      Knox County Sheriff's Office.

12          Q      And what was your position at that time?

13          A      Knox County Sheriff.

14          Q      Is that an elected position?

15          A      Yes.

16          Q      Okay.  And Ms. Mills was found dead at her

17   home on December 20, 2010 in the City of Barbourville,

18   right?

19          A      Yes.

20          Q      And was the City of Barbourville, in 2010, a

21   part of Knox County?

22          A      Yes.

23          Q      Was Ms. Mills' residence within your sheriff's

24   department's jurisdiction?

25          A      Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 826

The Deposition of JOHN PICKARD, taken March 19, 2019                    14

```
 1        Q    Mr. Pickard, who was the lead investigator in
 2   the investigation into Katherine Mills' death?
 3        A    To best of my knowledge, it would have been
 4   Jason York.
 5        Q    And fair to say that you assisted Jason York
 6   in his investigation?
 7        A    I helped him some, locating people, yes.
 8        Q    And is it fair to -- and did you help Mr. York
 9   also interview some people, as well?
10        A    I sat in on one, I know for sure.
11        Q    Fair to say that your agency, the Knox County
12   Sheriff's Department, assisted Jason York and the
13   Kentucky State Police in the investigation into
14   Katherine Mills' death?
15        A    I -- we didn't assist in the investigation. We
16   just, you know, like I say, he was -- when he -- he had
17   some names he needed to talk, and he didn't know the
18   people and I did, and I just rode with him and helped
19   him find them.
20        Q    Was one of those people Kayla Mills?
21        A    Yes.
22        Q    Was one of those people Allen Helton?
23        A    Yes.
24        Q    Was one of those people Jonathan Taylor?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 827

```
1        Q     Was one of those people Bob Smith?

2        A     Yes.

3        Q     Mr. Pickard, I'm going to show you what we'll

4   mark as Exhibit number 13.  And this is the

5   interrogatory responses --

6              MS. STAPLES:  Is 13 correct?

7              COURT REPORTER:  It's from the previous.

8        Q     -- that you did in this case.  I'll give a

9   copy to your counsel.  Sir, do you recognize this

10  document?

11                   (EXHIBIT 13 MARKED FOR IDENTIFICATION)

12       A     Yes.

13       Q     Okay.  And did you sign this document on the

14  last page?  It might be on the back of that.  Sorry,

15  it's double-sided.

16       A     Yeah.  That's my signature.

17       Q     Okay.  Sorry, I had to travel down here.  I

18  try to double-side things, save my back.  When you

19  signed that, did you understand that the -- that your

20  answers were done under oath?

21       A     Yes.

22       Q     Okay.  Just like you're under oath here today,

23  right?

24       A     Yes.

25       Q     I'm going to ask you to turn to -- it has page
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 828

```
1    number 5 at the bottom, that's interrogatory number 6.
2    Are you there?
3         A    Yes.
4         Q    Okay.  And that question asks, "Do you contend
5    that Plaintiffs' participating -- bad question.  "Do you
6    contend that Plaintiffs' participating in killing in
7    Katherine Mills or committed any other illegal act
8    relating to the incidents in Plaintiffs' complaint." And
9    then there's a second part of that question.  Your
10   answer is, "I have no direct knowledge that either
11   Plaintiff acted in killing Katherine Mills."  Do you see
12   that, sir?
13        A    Yes.
14        Q    Okay.  Sitting here today, do you have any
15   direct knowledge that Amanda Hoskins or Jonathan Taylor
16   participated in -- participated in killing Katherine
17   Mills?
18        A    No, I don't have any direct knowledge.  No.
19        Q    Okay.  Mr. Pickard, you know Linda Taylor,
20   right?
21        A    Yes.
22        Q    Ms. Hoskins' mom, right?
23        A    Yes.
24        Q    Yeah.  And you had a conversation with Linda
25   Taylor outside of the courtroom in February of 2012; is
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 829

1   that right?

2       A   Yes.  I remember being there, yes.

3       Q   Yeah.  And at the time, Ms. Hoskins was

4   actually inside the courtroom dealing with one of her

5   criminal cases at the time?

6       A   Yes.

7       Q   In your conversation with Ms. Taylor, isn't it

8   true that you told her that two years before, you would

9   have put Ms. Hoskins under the jail, but by that time,

10   you believe that she was actually innocent of the

11   Katherine Mills' homicide?

12       A   I don't remember that conversation.

13       Q   Well, did you ever tell Ms. Taylor anything to

14   the effect that you believe that Ms. Hoskins didn't have

15   anything to do with the murder of Katherine Mills?

16       A   I don't remember saying that.

17       Q   So you're not saying that you didn't say it,

18   you just don't recall, right?

19       A   I just don't recall.

20       MR. WRIGHT:  Object to form.

21       MR. KELLEY:  I'll join.

22       Q   Mr. Pickard, is it fair to say that you didn't

23   personally charge Amanda Hoskins and Jonathan Taylor

24   with the murder of Katherine Mills?

25       A   No, I did not.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 830

1   Q And that's because in March of 2012, you

2 didn't believe that Amanda Hoskins and Jonathan Taylor

3 killed Katherine Mills, right?

4     MR. WRIGHT: Object to form.

5     MR. KELLEY: Join.

6   A At that time, I didn't know.  I mean, I -- I

7 don't know.  I didn't know who killed her.  We were just

8 trying to -- you know, like I say, I -- I helped Jason -

9 - Detective York, but I mean, he worked the case. And --

10 but I -- I don't know.

11   Q You didn't have control over Jason York

12 charging Ms. Hoskins and Mr. Taylor, correct?

13   A That's correct.

14   Q And you didn't have the power to stop Jason

15 York from initiating those charges against Ms. Hoskins

16 and Mr. Taylor, right?

17   A Right.  That was totally his case.

18   Q And in fact, you know, a few moments ago, you

19 testified that you didn't know, as of March 2012, who

20 really did the murder, right?

21   A Right.

22   Q So, fair to say that in March of 2012, you

23 didn't believe that there was probable cause to initiate

24 charges against Amanda Hoskins and Jonathan Taylor for

25 the murder of Katherine Mills?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 831

```
 1                MR. WRIGHT:  Object to form.

 2                MR. KELLEY:  Join.

 3      A    I -- I don't know what all the -- Jason worked

 4  the case.  He had all -- a lot of information I don't

 5  know about or didn't know about.

 6      Q    Based on what you knew, and what you

 7  participated in by that time, did you believe that there

 8  was probable cause to initiate charges against Amanda

 9  Hoskins and Jonathan Taylor for the murder of Katherine

10  Mills?

11                MR. WRIGHT:  I'll just object to form.

12                MR. KELLEY:  Join.

13      A    There could have been.

14      Q    Okay.  Well, you were present when Allen

15  Helton's statement was given, right?

16      A    Yes.

17      Q    Yeah.  And during that interview, Jason York

18  was telling Mr. Helton what to say, right?

19                MR. WRIGHT:  Object to form and foundation.

20                MR. KELLEY:  Join.

21      A    I don't remember telling him what to say, no.

22      Q    Okay.  We're going -- I'm going to play the

23  recording for you a little bit later, we'll listen to it

24  together, all right?

25      A    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 832

```
 1        Q    Did you -- you were present during that March
 2   8, 2012 interview with Jason York and Allen Helton,
 3   correct?
 4        A    Yes.
 5        Q    It took place in your office, right?
 6        A    Yes.
 7        Q    Okay.  Did you believe the statement that
 8   Allen Helton gave that day to Jason York?
 9             MR. KELLEY:  Object to the form.
10             MR. WRIGHT:  Join.
11        A    At the time, I did.
12        Q    You did?
13        A    Yes.
14        Q    Okay.  Even though Allen Helton -- you talked
15   to Allen Helton a number of times before taking --
16   before you and Detective York took that statement from
17   him on March 8, 2012, right?
18        A    I think I might have talked to him one time.
19        Q    Uh-huh.  And Allen Helton never told you
20   anything like what he said on March 8, 2012, correct?
21        A    Not before that, no.
22        Q    Sir, did you ever tell Detective York at any
23   time, that you believed Amanda Hoskins and Jonathan
24   Taylor did not commit the murder of Katherine Mills?
25        A    I don't ever remember saying something like
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 833

```
 1    that, no.
 2         Q    Did you -- at any point in time, did you tell
 3    Detective York that you didn't believe probable cause
 4    existed to initiate or continue charges against Amanda
 5    Hoskins or Jonathan Taylor?
 6         A    No.
 7         Q    Did you take any steps to stop the prosecution
 8    of Amanda Hoskins and Jonathan Taylor for the murder of
 9    Katherine Mills?
10              MR. KELLEY:  Object to the form of the
11         question.
12         A    No.
13         Q    Did you ever have any conversations with the
14    prosecutor, Jackie Steele, about stopping the
15    prosecution against Amanda Hoskins and Jonathan Taylor?
16              MR. WILLIAMS:  Object to the form.
17         A    No.
18         Q    Mr. Pickard, you've been to the Appalachian
19    Children's Home before, right?
20         A    Yes.
21         Q    Yeah.  And do you know a person there by the
22    name of Steve Erie (phonetic)?
23         A    Not off the top of my head, I don't.
24         Q    Do you know the owner of the children's home?
25         A    I don't, no.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 834

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 24 of 463 - Page
ID#: 5041
The Deposition of JOHN POCKROSE, taken March 20, 2019          22

```
 1        Q    During the underlying investigation into

 2   Katherine Mills' death, do you recall going to the

 3   children's home with Detective York to see if a blue car

 4   was there?

 5        A    Yes, I remember going there.

 6        Q    What do you remember about going there with

 7   Detective York?

 8        A    I know we talked to some guy, but I can't

 9   remember the name.  But I do remember -- I remember

10   being there to talk to him.  I just don't remember -- I

11   don't remember their conversation.

12        Q    Well, were you and Detective York there to see

13   if Amanda Hoskins had access to a blue vehicle?

14        A    Yes.

15        Q    Okay.  And did you have a conversation -- did

16   you and Detective York have a conversation with someone

17   at the children's home, about who was in possession of

18   the blue vehicle on the day in question?

19        A    Yes.

20        Q    Okay.  And were you and Detective York shown

21   receipts indicating that maintenance men from the

22   children's home had access to the car, the blue car, on

23   the day in question?

24             MR. WRIGHT:  I'll object to form and

25        foundation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 835

```
 1              MR. WILLIAMS:  Join.

 2      A    I remember that vaguely, but yes.

 3      Q    Just can't remember all the specifics, right?

 4      A    Right.

 5      Q    Okay.  Did you take any notes when you were

 6  learning about these maintenance men having possession

 7  of the car on December 20, 2010?

 8      A    No.

 9              MR. WRIGHT:  Object to form and foundation on

10      that.

11      Q    Did you take --

12              MR. WILLIAMS:  I'll join.

13      Q    -- any of the receipts that were show to you

14  by individuals of the children's home?

15      A    No, I didn't.

16      Q    Did Detective York?

17      A    I just -- I don't recall whether he did or

18  not.

19      Q    Okay.  Was Detective York taking any notes?

20      A    I can't remember.

21      Q    Did you and Detective York have any

22  conversation about who was going to be responsible for

23  drafting a police report based upon the information that

24  you and him learned that day?

25      A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 836

Case: 6:17-cv-00184-REW-HAI Doc #: 108-20 Filed: 02/10/20 Page: 26 of 463 - Page
ID#: 5043
The Deposition of John Pickard - taken March 19, 2019, Page 24

```
 1              MR. WILLIAMS:  Object to the form of the

 2         question and to the word "responsibility," it has a

 3         legal connotation.  Go ahead.

 4              MR. WRIGHT:  I'll join.

 5    A     No, I don't remember anything like that.

 6    Q     Prior to conducting this interview, or this

 7   investigation into who had the blue car from the

 8   children's home on December 20, 2010, did you and

 9   Detective York have a discussion about whether this

10   Interview would be recorded or not recorded?

11    A     Not that I remember, no.

12    Q     And did you make any notes about this

13   interview that you would have kept in a police file?

14    A     No, I didn't.

15    Q     And was that consistent with the training that

16   you received?

17    A     No.

18    Q     So based on the training you received, should

19   you have taken notes during that interview?

20    A     No.  It wasn't my -- it was his case.  I just

21   -- I didn't take any notes at all.

22    Q     Okay.  So the fact that you didn't take notes,

23   was that consistent with your understanding of the

24   training that you received at the Knox County Sheriff's

25   Department?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 837

1    A    Yes.

2    Q    Okay.  It seems like you're saying that if

3    it's not -- if you're not in charge of the

4    investigation, that you're not required to take notes,

5    is that what your testimony is?

6    A    I guess you could say that, yes.

7    Q    Okay.  So the fact that you participated in

8    this interview but didn't take notes, was that

9    consistent with your understanding of the policies and

10   procedures at the Knox County Sheriff's Department?

11   A    Repeat that again.

12   Q    Sure.  With you not taking notes during this

13   interview at the Appalachian Children's Home, was that

14   consistent with your understanding of the policies and

15   procedures of the Knox County Sheriff's Department?

16   A    I'm not going -- no.  I mean, I just, you

17   know, I didn't take any notes, period, through this

18   whole thing, and -- I mean, Jason did all that.  I

19   didn't do any of that.  I was just there.

20   Q    Yeah.  In all these interviews, you never took

21   a single note, right?

22   A    No.

23   Q    All these interactions that you had with Kayla

24   Mills, Bob Smith, Allen Helton, Jonathan Taylor, never

25   created a single police report, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 838

1      A    That's right.

2      Q    And is that consistent with the training that

3 you received at the Knox County Sheriff's Department?

4      A    I didn't get any training at the sheriff's

5 department. I -- I went -- I went through some classes,

6 you know, through Eastern, but that's it.

7      Q    Well, in any of the classes that you went

8 through, were you ever instructed that you were required

9 to document interviews in a homicide investigation?

10      A    I don't ever remember taking a class like

11 that.

12      Q    Okay. And I'm going to ask you some questions

13 about the -- you've seen policies and procedures at the

14 Knox County Sheriff's Department, right?

15      A    Yes.

16      Q    Okay. I saw your signature on the top of one,

17 so I assumed that you were going to say yes to that. I'm

18 going to be asking you some questions about the policies

19 and procedures. You understand what those are, correct?

20      A    Yes, I understand what you're talking about.

21      Q    Okay. And fair to say that there wasn't a

22 policy or procedure at Knox County that required you to

23 document information that you learned in a homicide

24 investigation?

25      A    I couldn't say.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 839

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 29 of 463 - Page
ID#: 5046
The Deposition of JOHN PICKARD, taken March 20, 2019          27

```
 1        Q     We're going to go through it.  But sitting
 2   here today, do you recall a single policy or procedure
 3   that gives you instructions on how to conduct a homicide
 4   investigation?
 5        A     No.
 6        Q     Okay.  Sitting here today, do you recall a
 7   single policy or procedure that gives you instructions
 8   to document interviews conducted during a homicide
 9   investigation?
10        A     I don't recall anything like that.
11        Q     Uh-huh.  We're going to go through it, so I'll
12   -- we'll get there.  Mr. Pickard, when did you graduate
13   high school?
14        A     1971.
15        Q     Okay.  And where did you go to high school?
16        A     Knox Central.
17        Q     And after high school, did you receive any
18   other additional education?
19        A     No.
20        Q     Okay.  And at some point in your career, you
21   went to EKU; is that right?
22        A     No, I didn't go there.
23        Q     You took some courses relating to law
24   enforcement there?
25        A     Not there.  It was -- it -- that's where my
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 840

```
 1    records ended up.  I didn't go there for --
 2         Q    You didn't go there.
 3         A    No.
 4         Q    Okay.  Sorry.  Let me -- where did you get
 5    some law enforcement training at?
 6         A    Most of the time, it was in Bowling Green or
 7    sometimes it was in Louisville.  And that was the
 8    sheriff's convention.  That's all I
 9         Q    And you went there for three years, right? The
10    sheriff's convention?  I think it was 2007, 2008, 2009.
11    Does that seem right?
12         A    No, I went more than that.
13         Q    You went more than that?
14         A    I went up to '13, I think.
15         Q    You think you went to 13 different
16    conventions?
17         A    No, up to 2013.
18         Q    Oh, to 2013.  Okay.
19         A    Yes.
20         Q    I see what you're saying.  I'll show you what
21    we'll mark as Exhibit number 23.  Here you go, Mr.
22    Pickard.
23         A    Thanks.
24         Q    Have you seen this before, this document?
25              (EXHIBIT 23 MARKED FOR IDENTIFICATION)
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 841

1      A    I don't think so.

2      Q    Well, I'm going to, you know, this is -- these

3  documents have been handed over during the course of

4  this litigation, and this is apparently what the

5  Department of Criminal Justice Training produced when

6  your counsel requested your training files, okay?

7      A    Okay.

8      Q    All right.  So I'm going to ask you to turn to

9  page 3 of this.  Are you there?

10     A    I think so.

11     Q    Okay.  And it's got your name at the top,

12  right, John Pickard?

13     A    Yes.

14     Q    Okay.  And according to this training history,

15  it looks like you went to the sheriff's conference in

16  2009.  Does that seem right?

17     A    Yes.

18     Q    Do you recall what you learned at the

19  sheriff's conference in 2009?

20     A    I couldn't -- I can't recall what classes I

21  took, no.

22     Q    Okay.  Do you recall what topics you were

23  trained on there?

24     A    Not right off, no.

25     Q    Okay.  If I ask you those same questions about

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 842

1    the sheriff's conference in 2008, would you answer the

2    same way?

3        A    Same way.

4        Q    Okay.  I'm going to ask you, again, would you

5    give those same answers if I asked you about what you

6    learned at the sheriff's conference in 2007?

7        A    Yes.

8        Q    Okay.  Memory's not getting better the farther

9    back we go, right?

10       A    No, it's getting worse.

11       Q    Yeah.  Me, too.  It looks like in 2005, you

12   took a mandatory training by videotape.  Do you see

13   that?

14       A    Yes.

15       Q    Okay.  What did you learn on that videotape?

16       A    I don't -- I don't recall.

17       Q    Okay.  And it looks like you completed that in

18   May of 2005; is that right?

19       A    I guess so, yes.

20       Q    Yeah.  And it looks like you took a class on

21   stress management in 2004; is that right?

22       A    That's what it says, yes.

23       Q    Can you teach me how to manage some of my

24   stress from that course?

25       A    No, I need a dose of it myself.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 843

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 33 of 463 - Page
ID#: 5050
The Deposition of JOHN PICKARD, taken March 20, 2018                    31

```
 1         Q     Do you recall what you learned there?

 2         A     No, I don't.

 3         Q     Okay.  Do you recall if it helped you manage

 4    your stress at all?

 5         A     No.

 6         Q     Okay.  Looks like you did some mandatory

 7    training by videotape in 2004.  Do you recall what you

 8    learned there?

 9         A     No.

10         Q     Okay.  Aside from the training listed here,

11    Mr. Pickard, do you recall any additional training that

12    you received prior to the investigation into the death

13    of Katherine Mills?

14         A     No.

15         Q     Mr. Pickard, have you attended any outside

16    investigation schools?

17         A     Not that I recall, no.

18         Q     You have -- for instance, have you ever

19    attended the Reid Interrogation School?

20         A     No.

21         Q     Have you ever heard of the Reid Technique?

22         A     No.

23         Q     Have you ever served in the military?

24         A     No.

25         Q     When did you first join the Knox County
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 844

```
 1    Sheriff's Department?

 2         A    January of 2003.

 3         Q    And were you hired or elected?

 4         A    Elected.

 5         Q    Okay.  Prior to being elected as the Knox

 6    County sheriff in January 2003, have you had any

 7    experience in law enforcement?

 8         A    No, sir.

 9         Q    What did you do in your prior career?

10         A    Worked for Delta Natural Gas.

11         Q    Where's that at?

12         A    It's the main office in Winchester.

13         Q    What did you do there?

14         A    I was a customer service representative.

15         Q    And how long did you work as a customer

16    service representative?

17         A    18 years.

18         Q    That's a long time.

19         A    Long time.

20         Q    What made you want to be a sheriff?

21         A    It's just something I always wanted to do.

22         Q    Were you interested in law enforcement when

23    you were a kid?

24         A    Yeah, I was interested.  Yes.

25         Q    Ever want to be a cop?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 845

```
 1        A     Yes.

 2        Q     What sort of training did you receive after

 3   being elected as the Knox County sheriff?

 4        A     I can't recall.

 5        Q     Were you sent to any outside training schools?

 6        A     I went to the sheriff's convention is all I

 7   did.

 8        Q     Okay.  And you don't remember what you learned

 9   at those conventions, right?

10        A     It was on different subjects.  No, I don't

11   remember.

12        Q     Did you ever have to take any tests there?

13        A     Yeah, I took tests.

14        Q     You took tests there.  You recall what you

15   took tests in, or on?

16        A     No, it's -- the classes they give us, at the

17   end of it, you just had a little, like, a one-page test

18   or something.

19        Q     After becoming the Knox County sheriff, were

20   you ever trained on how to interview witnesses?

21        A     No, I was never trained.

22        Q     After becoming the Knox County sheriff, were

23   you ever trained on how to document witness interviews?

24        A     No.

25        Q     After becoming Knox County sheriff, were you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 846

1    ever trained on how to interview or interrogate

2    suspects?

3         A    Not that I recall.

4         Q    After you became Knox County sheriff, were you

5    ever trained on whether you're allowed to make promises

6    of leniency to witnesses or suspects in a homicide

7    investigation?

8         A    No.

9         Q    Were you ever provided any training, after

10   becoming the Knox County sheriff, on how to prepare

11   police reports?

12        A    No.

13        Q    After becoming Knox County sheriff, were you

14   ever provided any training on what information should be

15   documented in a police report?

16        A    Not that I recall.

17        Q    After becoming Knox County sheriff, did you

18   receive any training on interrogation techniques?

19        A    Not that I recall.

20        Q    After becoming Knox County sheriff, did you

21   receive any training on how do you conduct lineups?

22        A    No.

23        Q    After becoming Knox County sheriff, did you

24   receive any training on how to conduct photo arrays?

25        A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 847

```
 1        Q     After becoming Knox County sheriff, did you
 2  receive any training on how to conduct lineups or photo
 3  arrays without doing so in an unduly suggestive manner?
 4        A     Not that I recall.
 5        Q     After becoming Knox County sheriff, did you
 6  have any training on the retention of physical evidence
 7  in a homicide investigation?
 8        A     Not that I recall.
 9        Q     Mr. Pickard, have you ever heard of a Supreme
10  Court case named Brady v. Maryland?
11        A     Not that I recall.
12        Q     After becoming Knox County sheriff, did you
13  have any training on the requirements for police
14  officers to disclose exculpatory evidence to the
15  prosecution or defense?
16        A     Not that I recall.
17        Q     Do you know what Brady v. Maryland requires
18  police officers to do?
19        A     No, I don't.
20        Q     I'm going to ask you some questions about
21  preparing for today's deposition, Mr. Pickard, but I
22  don't want to invade the sacred space that you have with
23  your counsel, Mr. Williams, or Mr. Kelley.  So please
24  don't tell me anything about the conversations you've
25  had with them, okay?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 848

The Deposition of JOHN MACKALL, taken March 19, 2019                    36

```
 1        A    Okay.
 2        Q    Okay.  What did you do to prepare for today's
 3   deposition?
 4        A    I just kind of rethought everything, looked
 5   through a few papers that I have, and just kind of went
 6   over it a little bit.
 7        Q    Do you recall what papers you looked at?
 8        A    Not really.
 9        Q    Did you read any police reports?
10        A    No.
11        Q    Did you review any of your notes?
12        A    I didn't have any notes.
13        Q    Okay.  That was a trick question, right?
14        A    Yes.
15        Q    Did listen to any audio recordings?
16        A    No.  I don't have any recordings, either.
17        Q    No.  Did you read any of Mr. York's
18   deposition?
19        A    I read some of it.
20        Q    Okay.  What parts of it did you look at?
21        A    I just kind of looked through it.  I don't --
22   no particular part.
23        Q    It was a long day, right?
24        A    It was too long.
25        Q    You think I'm being a little bit nicer to you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 849

```
 1   than I was to him?

 2       A    You seem a little nicer, yeah.

 3       Q    Okay.

 4       A    I hope you stay that way.

 5       Q    Did you meet with your lawyer to prepare?

 6       A    Yes.

 7       Q    Again, I'm not going to ask you anything about

 8   your conversations, okay?

 9       A    Okay.

10       Q    How many times did you meet with your lawyer

11   to prepare for the deposition?

12       A    I think twice.

13       Q    So how is it that you became sheriff in 2003?

14       A    I think -- I don't know, I just got a elected.

15   People wanted a change, I guess.

16       Q    Divine intervention?

17       A    I guess.  I just got lucky, I guess.  I don't

18   know.

19       Q    Who did you run against back then?

20       A    Wilbur Bingham.

21       Q    What's his name?

22       A    Wilbur Bingham.

23       Q    Wilbur, okay.  And when did you stop being

24   sheriff?

25       A    In January of 2014.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 850

```
 1        Q    Was it just election related, or where you
 2   retiring?
 3        A    I got beat.
 4        Q    Got beat.  I don't know.  Was it a close race?
 5        A    Not real close.
 6        Q    Not real close.  Were you the democratic
 7   candidate or the republican candidate?
 8        A    Republican.
 9        Q    Okay.  I know very little about Knox County
10   politics, so I know Mr. Eubanks is running and that you
11   used to be sheriff, that's the extent of it.  As sheriff
12   of Knox County in 2010, when the Mills homicide
13   investigation began back in December of 2010, what were
14   your duties as sheriff?
15             MR. WILLIAMS:  Let me just make a continuing
16        objection as where duties may have a legal
17        connotation. With that objection made and
18        continuing, you can answer the question.
19        A    To my recollection, collect taxes and work the
20   courts.
21   BY MR. SLOSAR:
22        Q    Collect taxes and work the courts?
23        A    Yes.
24        Q    What does "work the courts" mean?
25        A    It's like a bailiff for trials, court hearings
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 851

 1   or whatever, yet -- you know, where the bailiffs that do

 2   that.

 3       Q    What -- were you in charge of supervising your

 4   deputies, sheriffs?

 5       A    Yes.

 6       Q    Okay.  And in December of 2010, who were the

 7   sheriffs at the Knox County -- sheriff's department that

 8   you would have been supervising?  Do you remember who

 9   was there?

10       A    I can't -- 2010, I went through a lot of

11   deputies.  I -- I can't remember.

12       Q    Was Derek Eubanks one of the deputies that you

13   supervised during the time of the Mills homicide

14   investigation?

15       A    Yes.

16       Q    Okay.  Do you recall the names of any of the

17   other deputies?

18       A    I think Jed Wagner was one, Gary Bates.

19       Q    Did any of those officers work on the Mills'

20   homicide investigation with you?

21       A    No.

22            MR. WILLIAMS:  Object to the form of the

23       question.

24            MR. SLOSAR:  Can we go off the record real

25       quick?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 852

```
 1                VIDEOGRAPHER:  Off the record.
 2                     (OFF THE RECORD)
 3                VIDEOGRAPHER:  Back on the record.
 4    BY MR. SLOSAR:
 5         Q    Mr. Pickard, I'm going to hand you what we'll
 6    mark as Exhibit number 1.  This is a lawsuit by David
 7    Cornett v. Ronnie Sizemore, yourself, Raven Smith [sic],
 8    Knox County, Knox County Sheriff's Department, Knox
 9    County Fiscal Court, that was filed March 26, 2004. Can
10    you take a look at this complaint, sir?  Have you seen
11    this document before?
12                     (EXHIBIT 1 MARKED FOR IDENTIFICATION)
13         A    I don't recall seeing it, but I probably have.
14    I mean, I could have.
15         Q    Okay.  Well, you were -- that's one of the
16    lawsuits that you disclosed in your interrogatory
17    response, right, Mr. Pickard?
18         A    Yes.
19         Q    Okay.  And you're a defendant in that lawsuit?
20         A    Yes.
21         Q    Okay.  Do you recall what the ultimate
22    resolution of that lawsuit was?
23                MR. WILLIAMS:  And let me just enter an
24           objection to the extent of, if you know whether it
25           was a confidential settlement, Mr. Pickard, you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 853

The Deposition of JOHN MCKALIP, taken on March 20, 2019                    41

```
 1        also need to let him know that.
 2   BY MR. SLOSAR:
 3        Q     So you don't have to tell me the amount, but
 4   did the case resolve itself through a settlement?
 5        A     Yes.
 6        Q     Okay.  And were you a defendant at the time
 7   that it resolved itself in the settlement?
 8        A     Yes.
 9        Q     And was the settlement amount publicly known?
10        A     Not that I know of.  I don't know.
11        Q     Okay.  I'm going to hand you what we'll mark
12   as -- and generally, do you recall the allegations of
13   that lawsuit --
14        A     Yes.
15        Q     -- that settled?  What was it, generally?
16        A     It was over those horses I was talking about.
17        Q     This was the horse thing you were talking
18   about.
19        A     Yes.
20        Q     Okay.  All right.
21              MR. WRIGHT:  Elliot, before you move on, are
22        these documents that we don't -- not going to --
23        don't have extras?  I can just note that these are
24        Exhibits 1 and 2 to keep track of things?
25              MR. SLOSAR:  Yeah.  So this is 1, and I'll be
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 854

```
1          happy to send it to you electronically.
2                  MR. WRIGHT:  You don't have to do that.
3                  MR. SLOSAR:  Okay.
4                  MR. WRIGHT:  We can get it through a copy with
5          the court reporter.
6                  MR. SLOSAR:  Okay.
7                  MR. WRIGHT:  I just don't want to lose track.
8  BY MR. SLOSAR:
9          Q    Okay.  Yeah.  No, this is Exhibit 1.  Exhibit
10  2, I'm going to hand you right now, Mr. Pickard.  This
11  is a lawsuit, it's 04-CV-278.  Reona Bledsoe v. James
12  Meyer [sic], Ronnie Sizemore, Charles Doan, the Knox
13  County Sheriff's Department, and Sheriff John Pickard.
14  That was filed in June of 2004.  Mr. Pickard, do you
15  recognize this document?
16                  (EXHIBIT 2 MARKED FOR IDENTIFICATION)
17          A    Yes, I know about it.
18          Q    Okay.
19          A    I forgot it, but I did know about it.
20          Q    Were you a defendant in that case as well,
21  sir?
22          A    No, I don't think so.
23          Q    Okay.  At the bottom of the caption, it has
24  you, right?  Is that your name?
25          A    Oh, yeah.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 855

1    Q   Okay.  I understand -- I'm not -- I haven't

2  looked deeply into the allegations of the complaint so

3  maybe you were just sued in your official capacity as

4  sheriff --

5    A   I -- I would think so.

6    Q   -- and not individually.  Do you recall what

7  the resolution of this lawsuit was?

8    A   No, I don't.

9    Q   Okay.  One of the co-defendants there is a

10  person by the name of Ronnie Sizemore, right?

11    A   Yes.

12    Q   What relation does Ronnie Sizemore have to

13  James Otis Sizemore?

14    A   I don't think that -- they may not -- if

15  they're kin, I don't know.

16    Q   Okay.

17    A   I don't think they were.

18    Q   Do you recall the general allegations of this

19  lawsuit, Mr. Pickard?

20    A   No, I don't.

21    Q   Do you recall how it resolved itself?

22    A   No, I don't.

23    Q   Okay.  I think that I gave you -- let me make

24  sure I did.  This -- I'm going to show you what's been

25  marked as Exhibit number 3.  This is a status update

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 856

```
 1   form.  Have you seen this document before today?
 2                   (EXHIBIT 3 MARKED FOR IDENTIFICATION)
 3       A    Not that I recall, no.
 4       Q    Okay.  It looks like Sheriff Mike Smith signed
 5   this document at the bottom.  Do you see that?  The
 6   bottom of the first page?
 7       A    Yes, I see that.
 8       Q    Okay.  And according to this document, you
 9   resigned and/or were terminated, effective January 5,
10   2015, from the Knox County Sheriff's Department; is that
11   right?
12       A    Yes.
13       Q    Okay.  And why was that?  Was that because of
14   the election?
15       A    Yes.
16       Q    Sorry.  Not a trick question.  Did you have to
17   sign any documents at the time that you surrendered your
18   office to Sheriff Smith?
19       A    I'm sure I did.  I don't recall right off, no.
20       Q    When you were sheriff, was it your
21   understanding that every employee at the Knox County
22   Sheriff's Department was required to have a personnel
23   file?
24       A    Yes.
25       Q    Okay.  And while you were sheriff, did every
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 857

The Deposition of JOHN PICKARD, taken March 19, 2012

45

```
 1   employee at the Knox County Sheriff's Department have a
 2   personnel file?
 3        A    Yes.
 4        Q    Okay.  And that was in accordance with one of
 5   the policies and procedures for the Knox County
 6   Sheriff's Department, correct?
 7        A    I think so.
 8        Q    Okay.  Did you yourself have a personnel file
 9   while you were sheriff for the Knox County Sheriff's
10   Department?
11        A    Yes.
12        Q    Okay.  And did you ever look at that file?
13        A    I don't recall.
14        Q    Was it your understanding that if citizens
15   made complaints against officers of the Knox County
16   Sheriff's Department, that a copy of those complaints
17   were to be put into the personnel file?
18        A    They should have been, yes.
19        Q    Okay.  And the same would hold true for you,
20   correct?
21        A    Yes.
22        Q    Okay.  So if somebody -- and by the time of
23   the investigation into the death of Katherine Mills in
24   December of 2010, if citizens had made a -- complaints
25   against you, those complaints should have been made in
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 858

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 48 of 463 - Page
ID#: 5065
The Deposition of JOHN PICKARD, taken March 10, 2017          46

1  your -- those -- a copy of those complaints should have

2  been maintained as part of your personnel file, correct?

3      A    Yes, if they had any.

4      Q    Okay.  And by the time you left the Knox

5  County Sheriff's Department in March of 2015, is it fair

6  to say that any and all complaints that were ever made

7  against you should have been contained in the personnel

8  file?

9          MR. WILLIAMS:  Object to the form and the

10         foundation.  You can answer.

11     A    I don't remember any complaints.

12     Q    Sure.  So that's a different question.  But if

13 citizens of Knox County had made complaints against you,

14 they would have been maintained as part of your

15 personnel file, correct?

16     A    Yes.

17     Q    Okay.  And the same holds true for any other

18 of the employees at the Knox County Sheriff's Department

19 while you were sheriff, right?

20     A    Yes.

21     Q    Okay.  At the time that you left the sheriff's

22 department in March of 2015, did your personnel file

23 still exist?

24     A    I left in January --

25     Q    In January.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 859

```
 1        A    -- of '15.
 2        Q    I'm sorry.  When you left the Knox County
 3   Sheriff's Department in January of 2015, did your
 4   personnel file still exist there?
 5        A    Yes.
 6        Q    And where was it maintained at within the Knox
 7   County Sheriff's Department?
 8        A    I think it was in a filing cabinet.
 9        Q    Okay.
10        A    As far as I -- best I can remember it was.
11        Q    Do you remember a deputy by the name of Mikey
12   Ashers (phonetic)?
13        A    He wasn't a deputy for me.
14        Q    Was he employed there --
15        A    No.
16        Q    -- when you were there?
17        A    No.
18        Q    Did you hire him at all?
19        A    No.
20        Q    Okay.  Would you have hired him?
21        A    No.
22        Q    Why not?
23        A    I hear too many things about him, I didn't
24   like what I heard so
25        Q    What type of -- did you hear that he was
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 860

```
 1    involved in police misconduct in other agencies?

 2        A    No.

 3        Q    What did you hear about him?

 4             MR. WILLIAMS:  Again, if what you heard

 5        involves confidential information, just keep that

 6        in mind, but you can answer the question.

 7        A    I heard like, you know, he had problems

 8    dealing with people maybe, or something like that, but I

 9    wasn't impressed with him.

10    BY MR. SLOSAR:

11        Q    Did you ever hear that Mikey Ashers, you know,

12    let me, actually, strike the question.

13             Prior to you leaving in January of 2015, did

14    you learn that Mikey Ashers had anger management issues?

15             MR. WILLIAMS:  Object to the form, but you can

16        answer.

17        A    I wouldn't say that, no.

18        Q    Well, prior to you leaving in January of 2015,

19    did you learn that Mikey Ashers had difficulty dealing

20    with people?

21        A    I had heard that.

22        Q    And what type of difficulty have you heard

23    that he had, dealing with people?

24        A    I just heard he had problem dealing with

25    people and that's all I ever heard.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 861

```
 1        Q     Did you ever hear any incidents, prior to
 2   leaving in 2015, that involved Mikey Ashers using
 3   excessive force on people when he was employed at a
 4   different agency?
 5        A     I hadn't heard that.
 6        Q     No.  Are you aware, sitting here today, that
 7   Mikey Ashers killed somebody while he was employed at
 8   the Knox County Sheriff's Department after you left?
 9        A     Yes.
10        Q     Okay.  What have you heard about that
11   incident?
12        A     I just heard they got in a fight and he got --
13   the boy got killed.  That's all I know.
14        Q     Was there any investigation done into that, to
15   the best of your knowledge?
16        A     I have no idea.
17        Q     Okay.  So is it fair to say that you wouldn't
18   have hired -- based upon the knowledge that you have of
19   Mikey Ashers' and his background, is it fair to say that
20   you would not have hired him to be a deputy at the Knox
21   County Sheriff's Department?
22        A     He applied one time.  I didn't -- I didn't
23   hire him.
24        Q     Why is it that you didn't hire him?
25        A     I just didn't want to take a chance.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 862

The Deposition of JOHN PICKARD, taken March 19, 2019           50

```
 1      Q     And as sheriff, were you -- you realize that
 2   people working under your supervision had the -- an
 3   enormous amount of power to affect citizens' lives in
 4   Knox County, right?
 5      A     Yes.
 6            MR. WILLIAMS:  Object to the form of the
 7      question.
 8            MR. WRIGHT:  I join that.
 9   BY MR. SLOSAR:
10      Q     And were you worried that Mikey Ashers might
11   abuse that power if he was hired at the Knox County
12   Sheriff's Department?
13      A     Yes.
14      Q     I'm going to ask you a little bit about when
15   you were a -- when you were the sheriff and how you
16   interacted with some of your employees, okay?
17      A     Okay.
18      Q     Do you remember, generally, how many deputies
19   worked under your supervision around the time of the
20   Mills' homicide in December of 2010?
21      A     Probably seven or eight.
22      Q     Okay.  And how did you interact with those
23   deputies during the normal course of operating there in
24   2010?
25      A     Well, we had to answer 911 calls, that was the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 863

1  main thing, but we also did paper service, and they --

2  each day, they worked on them when they had time, if

3  they had time.

4      Q    What's paper service, like, subpoenas or

5  something?

6      A    Yes.

7      Q    Okay.  So you guys -- so the sheriff's

8  department was responsible for securing the courthouse,

9  right?

10      A    Yes.

11      Q    Okay.  And how many people did you have

12  assigned over to the Knox County Courthouse back in

13  2010?

14      A    Two.

15      Q    Okay.  And you remember their names?

16      A    In 2010, I -- I'm not sure.

17      Q    Okay.

18      A    They --

19      Q    That's fine.  I know it was a long time ago.

20      A    We replaced them a lot there.

21      Q    Okay.  And then other people under your

22  supervision were responsible for investigations --

23      A    No.

24      Q    -- out here?  No.

25      A    We didn't -- well, certain types of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 864

```
 1   investigations, burglaries, or something like that, yes.
 2       Q    What type of investigations in December of
 3   2010, would your agency re -- be responsible for
 4   investigating?
 5            MR. WILLIAMS:  I made -- already made a
 6       continuing objection to the word "responsibility,"
 7       but that continues.  Thank you.  You can answer.
 8       A    We -- they would investigate burglaries or car
 9   wrecks, things like that.
10       Q    Okay.  So smaller investigations --
11       A    Yes.
12       Q    -- is that fair to say?  Okay.  So -- and
13   we're going to get into the Mills' homicide
14   investigation in a little bit, but was it -- would you
15   agree that by December 20, 2010, it was pretty rare for
16   your agency to be involved in a homicide investigation?
17       A    Yes, it -- we didn't do it.
18       Q    Okay.  And what would happen then with the
19   homicide investigations?  Would they get referred
20   elsewhere?
21       A    Yes.
22       Q    What agencies would they get referred to?
23       A    Kentucky State Police.
24       Q    Okay.  Did you have any sort of method for
25   checking in with your officers about investigations that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 865

```
 1   they were conducting?

 2        A    I would look over paperwork from time to time.

 3        Q    Okay.  Fair to say there wasn't a daily check-

 4   in process to see how investigations were coming along?

 5        A    No, I didn't do it daily.

 6        Q    Probably had a lot of things on your plate,

 7   right?

 8        A    Yes.

 9        Q    Did you ever check in with them at the

10   beginning of their shifts to see how investigations were

11   coming along?

12        A    I have before, yes.

13        Q    Did you do that daily?

14        A    No, I wouldn't say daily.

15        Q    Okay.  And how were police reports submitted

16   in the investigations that were being conducted at the

17   Knox County Sheriff's Department in 2010?

18        A    We had a -- everything was filed and they --

19   they kind of -- each person kept up with their own, and

20   when it was -- I guess when it was finished, we -- we --

21   well, we kept the file, you know.

22        Q    Okay.  Where -- what -- like, did you look

23   over every police report?

24        A    No, I didn't.

25        Q    Okay.  That would have been a lot of police
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 866

1  reports, right?

2      A    (No verbal response.)

3      Q    Were officers under your command required to

4  give you their police reports to review?

5      A    They wasn't required to, no.

6      Q    Where were the investigation files maintained

7  at the Knox County Sheriff's Department in 2010?

8      A    We kept -- we kept some of the -- when we

9  would file them away, we kept some in the office, and

10  then after a certain period of time, we stored them in

11  an outbuilding --

12      Q    Okay.

13      A    -- to keep up with them.  We had -- I mean, we

14  had to keep them, so we store them out there.

15      Q    Is there any sort of retention policy on how

16  long you -- the Knox County Sheriff's Department was

17  required to keep investigation files back in 2010?

18      A    There is, but I -- I'm not aware of how long.

19  Everyone's different.

20      Q    Probably been a long time, right?

21      A    Yeah, it has.

22      Q    I'm going to show you what we'll mark as

23  Exhibit number 4.  These are the policies and procedures

24  that were produced to us in this litigation. Mr.

25  Pickard, if you could take a look at this.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 867

```
 1                (EXHIBIT 4 MARKED FOR IDENTIFICATION)
 2          MR. WILLIAMS:  I've got a copy of it.
 3          MR. SLOSAR:  You sure?  Well, I got an extra
 4     copy.  That's for everybody.
 5          MR. WILLIAMS:  Oh, I've got one.  I'm good,
 6     thanks.
 7  BY MR. SLOSAR:
 8       Q    Mr. Pickard, do you recognize these?
 9       A    Yes.
10       Q    Okay.  And what is this document?
11       A    It's policy and procedure.
12       Q    Okay.  And I know on the front of this
13  document, it looks like your signature is on there; is
14  that right?
15       A    Yes.
16       Q    Okay.  And when did you sign this?
17       A    Looks like 01/17/14.
18       Q    Okay.  Now, is -- still during the course of
19  the Mills' homicide investigation, correct?
20       A    Yes.
21       Q    Okay.  Before the case was dismissed, right?
22       A    Yes.
23       Q    Okay.  Now, my understanding is that although
24  these policies were revised in 2014, that these were the
25  actual policies and procedures that were in place from
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 868

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 58 of 463 - Page
ID#: 5075
The Deposition of JOHN PICKARD, taken March 19, 2019  56

1  the beginning of the Mills' homicide investigation on

2  December 20, 2010, until the case was dismissed in 2016.

3  Is that your understanding, sir?

4        MR. WILLIAMS:  Object to the form.

5        MR. WRIGHT:  I'll object to form.

6  A     Yes.

7  Q     Okay.  Sitting here today, do you recall any

8  other policies or procedures from the Knox County

9  Sheriff's Department having been in effect during the

10  course of the Mills' homicide investigation?

11  A     No.

12  Q     Okay.  And if you can, you know, just briefly

13  look through these policies or -- let me know when

14  you're done.  I just want to make sure that this is a

15  complete set of policies and procedures that were in

16  effect, and that no policies and procedures are missing

17  from this collection of documents.

18  A     I think that would be everything.

19  Q     So nothing's missing, from what you can tell,

20  correct?

21  A     Not that I can tell, no.

22  Q     Okay.

23        MR. WILLIAMS:  Oh, Elliot, in the copy that

24        I've got, I didn't see a section six, seven, or

25        eight.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 869

1       MR. SLOSAR:  I've got six.

2       MR. WILLIAMS:  Mine jumps from five to eight.

3       MR. SLOSAR:  That might be a copying issue.

4   What does yours have?

5       MR. FARAH:  Six is on the back of five.

6       MR. SLOSAR:  Six is just one line.

7       MS. STAPLES:  No, it looks like some have them

8   and some don't.  Am I --

9       MR. SLOSAR:  Does -- is yours complete?

10      MS. STAPLES:  Yeah.

11      MR. WILLIAMS:  Oh, I see six now.  Seven's

12  blank.

13      MR. SLOSAR:  Yeah, I don't see -- oh, seven --

14  but seven's blank on here, too, on your table of

15  contents.

16      MR. WILLIAMS:  You're right.

17      MR. SLOSAR:  And then it looks like 15 and 16

18  and 20 are blank, too.  And six is just one line.

19  Okay.

20      MR. WILLIAMS:  I don't see -- well, it's just

21  --

22      MR. SLOSAR:  Which one?

23      MR. WILLIAMS:  Go ahead.  Sorry.

24      MR. SLOSAR:  Is it complete to the table of

25  contents?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 870

```
 1              MR. WILLIAMS:  Well, there's --
 2              MS. STAPLES:  I think it's confusing because
 3         it doesn't list it at the top of the page, like,
 4         what's...
 5              MR. WILLIAMS:  Yeah.  I don't see traffic
 6         checkpoints.
 7              MR. SLOSAR:  Which --
 8              MR. WILLIAMS:  Looks like ten.
 9              MS. STAPLES:  I think it's --
10              MR. SLOSAR:  Oh, yeah.  Ten doesn't have a
11         number of pages.
12              MR. WILLIAMS:  Yeah.  Maybe there isn't
13         anything for that.  11, uh-huh.  Yeah, it doesn't
14         identify any pages for that section, so
15  BY MR. SLOSAR:
16       Q    All right.  So what's before you is what you
17  believe to be the complete policies and procedures that
18  were in effect at the time that the Katherine Mills'
19  homicide investigation began, and throughout the
20  investigation, correct?
21              MR. WILLIAMS:  Object to the form.
22       Q    You can answer.
23       A    Yeah, this -- I think was revised, you know,
24  since that -- some, I don't know particularly which
25  ones.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 871

```
 1        Q    Okay.  How are these policies physically
 2   stored at the Knox County Sheriff's Department?
 3        A    They would have been in a cabinet file.
 4        Q    And you know what cabinet -- do you know what
 5   cabinet that would be in?
 6        A    No, I don't right off.
 7        Q    Okay.  Who has access to the cabinet at the
 8   Knox County Sheriff's -- well, let me strike that
 9   question.
10             In 2010, who had access to the cabinet that
11   the Knox County Sheriff's Department's policies and
12   procedures would be kept in?
13        A    Probably, I'm thinking just the -- the office
14   manager.  I think we kept it in her office and it was
15   locked at night, so
16        Q    Who was the office manager back then, do you
17   remember?
18        A    My wife.
19        Q    Oh, your wife.  What was her name?
20        A    Libby.
21        Q    Libby?
22        A    Yes.
23        Q    Libby Pickard?
24        A    Yes.
25        Q    Okay.  It's a good name.  And are the policies
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 872

1    and procedures provided to employees when they're hired

2    at the Knox County Sheriff's Department?

3          A    I -- I'm not sure on that.

4          Q    When you were sheriff, were there any sort of

5    requirements that you -- that each of the employees be

6    provided with a copy of the policies and procedures in

7    effect at the time?

8          A    Not that I recall.

9          Q    Okay.  When you were sheriff, and during the

10   course of the Mills' homicide investigation, were

11   officers required to be apprised of any revisions to the

12   policies and procedures?

13              MR. WILLIAMS:  Object to the form.

14         A    Not that I recall.

15         Q    When you were sheriff, were officers at the

16   Knox County Sheriff's Department required to review the

17   Knox County Sheriff's Department's policies and

18   procedures?

19         A    I -- I -- I just don't recall what we did or

20   not.  I don't remember.

21         Q    You don't recall any specific requirement that

22   would make officers to review the policies and

23   procedures that were --

24         A    No.

25         Q    And likewise, was there any sort of mandatory

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 873

1 training to employees of the Knox County Sheriff's

2 Department on how to comply or follow the policies and

3 procedures in effect?

4      A    Not that I recall.

5      Q    You never conducted one of those trainings,

6 right?

7      A    Not that I remember, no.

8      Q    Sitting here today, you don't recall ever

9 training any deputy or employee of the Knox County

10 Sheriff's Department on the policies or procedures in

11 effect, correct?

12     A    No, not that I remember.

13     Q    And you don't have any notes or anything at

14 home that would help refresh your memory as to whether

15 any such training occurred, correct?

16     A    No.

17     Q    When you were first hired -- well, let me

18 strike that question.

19          When you were elected, did anybody re -- sit

20 you down and say that you were required to review the

21 policies and procedures?

22     A    No.

23     Q    So sitting here today, you can't recall any

24 training having taken place at the Knox County Sheriff's

25 Department on the policies or procedures that were --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 874

1    that are before you, correct?

2        A    Correct.

3        Q    Sitting here today, can you think of any

4    formal mechanisms that exist at the Knox County

5    Sheriff's Department prior to 2010, for communicating

6    the official policies and procedures of the Knox County

7    Sheriff's Department to its employees?

8        A    No.

9        Q    Fair to say that these policies and procedures

10   that are before you aren't mandatory to its employees?

11            MR. WILLIAMS:  Object to the form.

12       A    No, I wouldn't think so.

13       Q    Okay.  Fair to say, sitting here today, that

14   the policies and procedures that were in effect -- here,

15   let me strike that question.

16            At the time of the Katherine Mills' homicide

17   investigation, is it fair to say that Knox County

18   employees weren't required to review the policies and

19   procedures of the department?

20            MR. WILLIAMS:  Object to the form.

21       A    I don't -- they wasn't required to, no.

22       Q    And is it fair to say that by the time of the

23   Katherine Mills' homicide investigation, that employees

24   of Knox County weren't even required to follow the

25   policies and procedures of the Knox County Sheriff's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 875

```
 1   Department?

 2           MR. WILLIAMS:  Object to the form.

 3      A    They was required to go by them.

 4      Q    But there was no requirement -- well, let me

 5   strike that question.

 6           Sitting here today, you can't recall any

 7   training having taken place prior to the Katherine

 8   Mills' homicide investigation on the policies and

 9   procedures, correct?

10      A    I don't recall it, no.

11      Q    And sitting here today -- well, you testified

12   a few minutes ago, that employees of Knox County weren't

13   even required to review the policies and procedures when

14   they were hired, right?

15      A    Not when they was hired, no.

16      Q    By the time that the Katherine Mills' homicide

17   investigation started in December 20, 2010, were you

18   aware of any unwritten policies or procedures that

19   existed at the Knox County Sheriff's Department?

20      A    No.

21      Q    Prior to December 20, 2010, do you recall any

22   of the written policies or procedures at the Knox County

23   Sheriff's Department having ever been audited for their

24   effectiveness?

25      A    Not that I recall.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 876

1     Q   Do you recall how often the policies and

2  procedures of the Knox County Sheriff's Department were

3  revised?

4     A   No.  Derek Eubanks did that and he done all --

5  and we went over them, but it was from time to time.  I

6  can't -- no, second time.

7     Q   Fair to say that by the time that the Knox --

8  the Katherine Mills' homicide investigation began in

9  December 20, 2010, that there were no unwritten policies

10  or procedures on how to conduct witness interviews?

11           MR. WILLIAMS:  Object to the form.

12     A   None I know of.

13     Q   Fair to say that at the time that the

14  Katherine Mills' homicide investigation be -- began on

15  December 20, 2010, that there were no unwritten policies

16  or procedures on the documentation of witness interviews

17  and police reports?

18           MR. WILLIAMS:  Object to the form.

19     A   Not that I know of.

20     Q   Fair to say that by the time that the

21  Katherine Mills' homicide investigation began, there

22  were no unwritten policies or procedures on documenting

23  promises of leniency to witnesses?

24     A   No.

25     Q   Fair to say that by the time the Katherine

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 877

```
 1    Mills' homicide investigation began, that there were no
 2    unwritten policies or procedures on interview techniques
 3    with witnesses in a homicide investigation?
 4         A    No.
 5         Q    Fair to say that by the time that the
 6    Katherine Mills' homicide investigation began in
 7    December of 2010, that there were no unwritten policies
 8    or procedures on how to avoid suggestive lineups or
 9    photo arrays?
10         A    Not --
11              MR. WILLIAMS:  Object to the form.
12         A    Not that I recall.
13         Q    Fair to say that by the time the Katherine
14    Mills' homicide investigation began, that there were no
15    unwritten policies or procedures on how to conduct a
16    lineup or a photo array?
17         A    Not that I recall.
18         Q    Fair to say that by the time the Katherine
19    Mills' homicide investigation began in December of 2010,
20    that there were no unwritten policies or procedures
21    which instructed police officers not to fabricate
22    evidence?
23              MR. WILLIAMS:  Object to the form.
24         A    Not that I recall.
25         Q    Why did you sign the front page of the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 878

```
 1  policies and procedures?

 2       A    I -- I have no idea.

 3       Q    Somebody tell you to sign it?

 4       A    I guess, I don't know.  Might have been me.

 5       Q    All right.  When you signed it, were you

 6  signing it as part of your reveal -- review process?

 7       A    I re -- looked through it before I signed it,

 8  but --

 9       Q    I got a quick question.  You know, earlier you

10  asked -- I have a lot of questions, I'm sorry, but this

11  one is quick.  Earlier you said that Mikey Ashers, that

12  you did not hire him, right?

13       A    Yes.

14       Q    Okay.  And that was based upon concerns that

15  you had about him being an officer in your department,

16  correct?

17       A    Yes.

18       Q    Okay.  And Sheriff Mike Smith eventually took

19  over for you in 2015, right?

20       A    Yes.

21       Q    Okay.  When Sheriff Smith took over to you,

22  would he have had access to -- would he have had access

23  or knowledge of the fact that Mikey Ashers had applied

24  at the Knox County Sheriff's department previously and

25  was rejected?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 879

1              MR. WILLIAMS:  Requires him to speculate.

2         Q    You can answer.

3         A    That -- where he put in for it was there

4    somewhere --

5         Q    Yeah.

6         A    -- filed somewhere.  But he really wasn't

7    rejected, I just never interviewed him ever.

8         Q    Okay.  And you purposely never interviewed him

9    because you had concerns about his -- about whether he

10   would be a good police officer or not for your

11   department, right?

12        A    I guess you could say that, yes.

13        Q    Okay.  And why, again, did you have those

14   concerns?

15             MR. WILLIAMS:  Asked and answered.

16        Q    You can answer.

17        A    Well, I just -- I mean, I had heard he was

18   hard -- he had problem dealing with people, and I didn't

19   want -- I didn't want that.

20        Q    Do you remember where you heard that from?

21        A    No, I don't.  Word travels, I don't -- I don't

22   remember.

23        Q    Could it have been from another law

24   enforcement agency?

25        A    It could have been.  I don't -- I don't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 880

1   remember.

2        Q    Sir, I'm going to just -- let's -- Mr.

3   Pickard, let's go through these policies real quick,

4   okay?  It looks like the first policy and procedure is -

5   - and I'm looking at page 2.  The first policy and

6   procedure deals with personnel records, right?  It's on

7   page 2.

8        A    Yes.

9        Q    Okay.

10       Q    This policy requires a personnel file to be

11  maintained by the bookkeeper or appropriate designee for

12  each employee; is that right?

13       A    Yes.

14       Q    And it's your understanding that that would

15  include the sheriff himself, right --

16       A    Uh-huh.  Yes.

17       Q    -- or herself, if Knox County had a female

18  sheriff --

19       A    Yes.

20       Q    -- right?  And that when you were employed

21  there at the Knox County Sheriff's Department in 2015,

22  at the time that you left there in 2015, that you

23  yourself had a personnel file that existed, correct?

24       A    Yes.

25       Q    Okay.  And that was in conformance with the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 881

```
 1    first policy and procedure of Knox County which requires
 2    a personnel file to be kept for each employee, right?
 3         A    Yes.
 4         Q    Okay.  Now, let's -- the next policy and
 5    procedure deals with false credentials; is that right?
 6         A    Yes.
 7         Q    Okay.  And it's fair to say that that sort of
 8    -- if somebody lies during the application process this,
 9    you know, gives the sheriff's department a way to
10    terminate that person?
11         A    Yes.
12         Q    Okay.  And I'm going to try to skip through
13    some of this stuff, but looking at the first seven
14    pages, Mr. Pickard, is it fair to say -- well, actually,
15    I'm going to ask that you look through the first nine
16    pages, which is the first policy and procedure.  And
17    when you look through there, the question that I'm going
18    to ask is:  Would you agree that none of these policies
19    and procedures relate to criminal investigations being
20    conducted by the Knox County Sheriff's Department?
21         A    I don't see anything to that.
22         Q    Okay.  And it looks like the next policy and
23    procedure, which it goes back to change 1 -- page 1, it
24    says, Chain of command, so you're on there.  You're on
25    that same page, yep.  But you agree that the second
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 882

1    policy and procedure just relates to chain of command;

2    is that right?

3         A    Yes.

4         Q    Okay.  And again, nothing in this policy or

5    procedure provides any guidance or instruction for

6    officers on how to conduct a criminal investigation; is

7    that right?

8         A    Not that I recall, no.

9         Q    Okay.  The next policy and procedure on the

10   following page relates to discipline; is that right?

11   Sorry, it's on the back side.

12        A    Yes.

13        Q    Okay.  Did you ever discipline any officer

14   under your command, when you were sheriff, for

15   fabricating evidence?

16        A    Not that I remember, no.

17        Q    When you were sheriff, did you ever discipline

18   any officer for withholding exculpatory evidence?

19        A    No.

20        Q    When you were sheriff, did you ever discipline

21   any officer for coercing witnesses?

22        A    No.

23        Q    When you were sheriff, did you ever discipline

24   any officer for conducting a suggestive lineup or a

25   photo array?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 883

```
 1      A    No, not that I recall.
 2      Q    When you were sheriff, did you ever discipline
 3 any officer for initiating charges against an innocent
 4 person?
 5      A    No.
 6      Q    Do you recall discipline -- disciplining
 7 anyone under your command between 2005 and December 20,
 8 2010?
 9      A    Not that I recall, no.
10      Q    Do you recall disciplining anyone under your
11 command between December 20, 2010 and January of 2015
12 when you left?
13      A    Not that I recall.
14      Q    Okay.  So the next -- looks like the next
15 policy and procedure relates to the use of vehicles,
16 that's policy and procedure number 4.  Are you there?
17 Oh, you're there.  This page.
18      A    Number 4?
19      Q    Yeah.
20      A    Okay.  Yeah.
21      Q    Okay.  Would you, you know, browse through
22 this section real quick and, you know, the question that
23 I pose to you is:  Is it fair to say that nothing in
24 this policy and procedure provides any guidance or
25 instruction to officers on how to conduct a criminal
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 884

1  investigation?

2      A    I don't see anything, no.

3      Q    Okay.  I'm going to ask that you turn to the

4  next policy and procedure number 5.

5      A    Okay.

6      Q    It looks like it's the use of -- really, into

7  the use of firearms.  Are you there?

8      A    Yes.

9      Q    Okay.  At the bottom, it has some instructions

10  on the use of firearms.  Do you see that?

11      A    Uh-huh.  Yes.

12      Q    Okay.  And it says, "Officers or employees --

13  and employees authorized to handle firearms are

14  prohibited from recklessly handling any firearm, dry

15  snapping any weapon, except on the firing range, and

16  holstering or carrying a weapon in a cock position," do

17  you see that?

18      A    Yes.

19      Q    Okay.  At the time that you -- well, would you

20  agree with me that none of these policies or procedures

21  provide any guidance or instruction to officers on how

22  to conduct a criminal investigation?

23      A    Yes.

24      Q    Okay.  Mr. Pickard, we just went over some

25  pretty specific instructions with firearms.  At the time

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 885

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 75 of 463 - Page
ID#: 5092
The Deposition of JOHN PICKARD, taken on March 29, 2019       73

1   that you declined to interview and hire Mikey Ashers,

2   did you trust that he would be able to use a firearm at

3   the Knox County Sheriff's Department in conformance with

4   this policy?

5           MR. WILLIAMS:  Let me just enter an objection.

6       I'm having trouble understanding how this line of

7       questioning regarding Mr. Asher relates to this

8       lawsuit?

9   BY MR. SLOSAR:

10      Q    You can answer the question, sir.

11          MR. WILLIAMS:  Or anything discoverable about

12      it.  Just make a continuing objection to it.

13      A    I have no idea.  I didn't know him personally.

14      Q    Okay.  But you worried about how he would

15  interact with people, right?

16      A    That was my main concern, yes.

17      Q    Did you ever fear that Mr. Ashers would abuse

18  his firearm if he was hired at the Knox County Sheriff's

19  Department?

20      A    I have no idea.

21      Q    I'm going to refer you to the next policy

22  that's on use of force.  Are you there?  It's one line.

23      A    Yes.

24      Q    Okay.  Now, this policy says, "Use only force

25  necessary to effect arrest as trained," is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 886

1      A    Yes.

2      Q    Okay.  What -- by the time you left the Knox

3  County Sheriff's Department in 2015, what training was

4  provided to deputies on use of force?

5      A    They did 40 hours a week at -- you know, each

6  year, and I'm sure they've had that, but --

7      Q    Did the Knox County Sheriff's Department

8  directly train any of its employees by the time you left

9  in 2015, on use of force?

10     A    No.

11          MR. WILLIAMS:  Object to the form.

12     Q    Was there any method by which you as sheriff

13  would assess or monitor whether officers under your

14  command understood the use of force policy properly?

15     A    I think they all understood it, yes.

16     Q    Did you ever test them on it?

17     A    No, I can't say that I did.

18     Q    Were there -- was there ever any guidance

19  provided to officers under your command on escalation

20  techniques?

21     A    Not that I recall.

22          MR. WILLIAMS:  You're asking by his

23     department?

24     Q    By your department, yes.

25     A    Not that I recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 887

```
 1        Q    Okay.  You would agree that nothing in this
 2   policy and procedure provides any instruction or
 3   guidance to officers at the Knox County Sheriff's
 4   Department on how to conduct a criminal investigation,
 5   right?
 6        A    Not that I know of, I'm aware of, no.
 7        Q    Okay.  Let's look at the next policy and
 8   procedure, which is number 8.  This deals with domestic
 9   violence, correct?
10        A    Yes.
11        Q    Is it fair to say that this policy and
12   procedure only relates to domestic violence calls?
13        A    I don't know.  I'd have to read it.
14        Q    Okay.  Look it over real quick.
15        A    Looks like it's all to do with domestic
16   violence.
17        Q    Okay.  So this policy or procedure wouldn't
18   provide any guidance or instruction to officers on how
19   to handle an investigation which is unrelated to
20   domestic violence.  Is that fair to say?
21        A    Yes.
22        Q    There's no guidance or instructions in this
23   policy or procedure on how to conduct a homicide
24   investigation, right?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 888

```
 1        Q    Okay.  All right.  Let's go to the next policy
 2   and procedure, number 9.  This relates to evidence on
 3   lost property.  Sheriff Pickard, would you agree that
 4   this policy and procedure provides instructions to
 5   officers on how to handle evidence?
 6        A    Yes.
 7        Q    Okay.  And would you agree that the main focus
 8   of this policy and procedure is to assure that evidence
 9   is handled in a proper way, and that chain of custody is
10   appropriately maintained?
11        A    Yes.
12        Q    Okay.  Again, this policy or procedure doesn't
13   provide any instruction to officers on how to conduct a
14   homicide investigation, correct?
15        A    Yes.
16        Q    Let's look at the next policy or procedure,
17   number 11.  This relates to citations.  Please look over
18   this.  Let me know when you're finished, Mr. Pickard.
19        A    Okay.  I think I've got it now.
20        Q    Okay.  So what's the purpose of this policy or
21   procedure?
22        A    To how to -- I guess, how to do a citation
23   correctly and all the information you need to put on it.
24        Q    Okay.  So fair to say that this is -- the
25   purpose of this policy or procedure is to assure that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 889

 1    officers at the Knox County Sheriff's Department are

 2    filling out citations completely?

 3        A    Yes.

 4        Q    Okay.  And that in addition, that this policy

 5    or procedure provides direction to officers at the Knox

 6    County Sheriff's Department on the order that citations

 7    should be stapled and handed in?

 8              MR. WILLIAMS:  Object to the form.

 9        A    Yes.

10        Q    Okay.  Fair to say that this policy or

11    procedure does not provide any guidance or instruction

12    to officers on how to conduct a homicide investigation?

13        A    Yes.

14        Q    Okay.  Let's turn to the next policy or

15    procedure.  This is a policy or procedure named,

16    Collision Reports.  Do you see that?

17        A    Yes.

18        Q    Okay.  Again, is it fair to say that this

19    policy or procedure provides instructions to officers on

20    how to handle a car accident investigation?

21        A    Yes.

22        Q    Okay.  Fair to say that this policy or

23    procedure doesn't provide any guidance or instruction on

24    how to handle a homicide investigation?

25        A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 890

```
 1        Q    Okay.  Let's look at the next policy or
 2   procedure, number 13, dealing with case, incident, car
 3   reports.  Are you there?
 4        A    Yes, I'm there.
 5        Q    Again, is it fair to say that this policy and
 6   procedure relates to filling out a police report in a
 7   car accident case?
 8        A    Yes.
 9        Q    Okay.  Fair to say, again, this policy or
10   procedure doesn't provide any instruction or guidance to
11   officers conducting a homicide investigation?
12        A    Yes.
13        Q    Okay.  Go to the next policy or procedure. The
14   vehicle holder, wrecker list.  Would you agree that this
15   policy or procedure does not provide any guidance or
16   instructions on how to handle a homicide investigation?
17        A    Yes.
18        Q    Okay.  Let's look at number 17, Appearance and
19   Dress Code.  Would you agree that this policy and
20   procedure doesn't provide any instruction or guidance to
21   officers on how to handle a homicide investigation?
22        A    Yes.
23        Q    Okay.  And in fact, it doesn't provide any
24   instruction or guidance to officers on how to conduct an
25   investigation at all, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 891

```
 1        A    Yes.
 2        Q    Okay.  Let's look at the next one, number 18,
 3   that deals with social networking and internet postings.
 4   Would you agree that this policy or procedure does not
 5   provide any guidance or instruction to officers of the
 6   Knox County Sheriff's Department on how to conduct a
 7   criminal investigation?
 8        A    Yes.
 9        Q    Okay.  Number 19, this policy or procedure,
10   would you agree that it does not provide any instruction
11   or guidance to officers at the Knox County Sheriff's
12   Department, on how to conduct a criminal investigation?
13        A    Yes.  Yes.
14        Q    Okay.  Looking at the last one, number 21,
15   would you agree that this policy or procedure relating
16   to cell phones and computers, doesn't provide any
17   guidance or instruction to officers of the Knox County
18   Sheriff's Department on how to conduct a criminal
19   investigation?
20        A    Yes.
21        Q    Okay.
22             MR. WILLIAMS:  Elliot, can we take a break?
23             MR. SLOSAR:  For sure.  Yeah.
24             VIDEOGRAPHER:  Off the record.
25                  (OFF THE RECORD)
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 892

The Deposition of JOHN PICKARD, taken March 19, 2019     80

```
 1              VIDEOGRAPHER:  Back on the record.
 2   BY MR. SLOSAR:
 3        Q    All right.  Mr. Pickard, we went through a
 4   little bit of this earlier, and I'm just going to do it
 5   in a more specific fashion.  In 2007, was there a policy
 6   or procedure in place at the Knox County Sheriff's
 7   Department that informed officers that they should not
 8   fabricate evidence?
 9        A    I wouldn't know that for sure.
10        Q    Okay.  Sitting here today, do you recall a
11   single policy or procedure in place that informed the
12   officers that they should not fabricate evidence?
13        A    I don't recall anything like that.
14        Q    Okay.  And obviously we just went through the
15   written policies and procedures, and there wasn't a
16   single written policy or procedure in place, at least by
17   2010, that informed officers that they should not
18   fabricate evidence, correct?
19        A    Yes.
20        Q    Okay.  Well, what does it mean to fabricate
21   evidence?
22              MR. WRIGHT:  Object to form.
23              MR. WILLIAMS:  I'll join.
24        A    It means you're breaking the law.  I mean --
25        Q    Did you ever have any training sessions for
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 893

1  your employees when you were sheriff, where you gave

2  them instructions on how to not fabricate evidence?

3       A    I'm sure they had that training in Richmond.

4  No, I didn't.

5       Q    Okay.  And are you aware of any training by

6  the Knox County Sheriff's Department that instructed

7  officers not to fabricate evidence?

8       A    Not that I recall.

9       Q    Okay.  Fair to say that the Knox County

10 Sheriff's Department never instructed their officers

11 that fabricating evidence is a violation of a criminal

12 defendant's constitutional right?

13      A    I don't recall.

14      Q    Can't recall that type of training ever had

15 been done at Knox County, right?

16      A    No.

17      Q    Fair to say that by the beginning of the

18 Mills' homicide investigation, that there was no

19 mechanism in place to assure that officers did not

20 fabricate evidence?

21      A    Not -- not -- I don't recall anything.

22      Q    You testified earlier that you never penalized

23 or disciplined an officer for fabricating evidence,

24 right?

25           MR. WILLIAMS:  Object to the form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 894

```
 1        question.  Assumes facts not in evidence.

 2        Q     You can answer.

 3        A     I don't recall anything like that.

 4        Q     In 2007, were you aware of any written policy

 5   or procedure that informed officers at the Knox County

 6   Sheriff's Department, that they were required to

 7   preserve any material or information that tended to

 8   negate the guilt of the accused or reduce his or her

 9   punishment for a crime?

10             MR. WILLIAMS:  Object to the form.

11             MR. WRIGHT:  Join.

12        A     I don't recall anything.

13        Q     Okay.  And again, we went through the written

14   policies or procedures a few moments ago, and there's

15   nothing in those written policies or procedures that

16   provides any instructions to officers, that would guide

17   them and inform them that they're required to preserve

18   exculpatory evidence and disclose that evidence to the

19   prosecution or defense, correct?

20             MR. WILLIAMS:  Object to the form.

21             MR. WRIGHT:  Join.

22        A     Correct.

23        Q     And you don't ever recall the Knox County

24   Sheriff's Department providing any training to employees

25   on this issue, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 895

1        A    Not the sheriff's department, no.

2        Q    And you personally, as the Knox County

3    sheriff, prior to leaving in 2015, and since being hired

4    in 2003, you never provided any training to your

5    employees on the preservation and disclosure of

6    exculpatory evidence, correct?

7             MR. WILLIAMS:  Your question is stated -- is

8        asking internally at his department?

9             MR. SLOSAR:  Yes.

10            MR. WILLIAMS:  Because there's a difference

11       between --

12            MR. SLOSAR:  I understand.

13            MR. WILLIAMS:  -- requiring your officers to

14       attend the required training.

15            MR. SLOSAR:  I -- yes.  Different question.

16            MR. WILLIAMS:  Uh-huh.

17   BY MR. SLOSAR:

18       Q    You can answer.

19            MR. WILLIAMS:  Go ahead.

20       A    Not at the -- not through the sheriff's

21   department, no.

22       Q    Yep.  And again, you've never personally

23   provided this instruction to any of the deputies under

24   your command, correct?

25       A    Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 896

```
 1        Q    And there was no mechanism in place to assure
 2   that police officers were documenting and disclosing as
 3   exculpatory evidence, while you were sheriff between
 4   2003 and 2015, correct?
 5        A    Correct.
 6        Q    And by the time of the Mills' homicide
 7   investigation in 2010, is it fair to say that there was
 8   no policy or procedure in place at the Knox County
 9   Sheriff's Department, that required officers to document
10   interviews with witnesses during the course of a
11   criminal investigation?
12        A    Not that I'm aware of.
13        Q    And again, we went through the written
14   policies and procedures earlier.  There's nothing in
15   there that provides guidance or instruction on this
16   topic, correct?
17        A    Yes.
18        Q    And you personally, but between the years of
19   2003 and 2015, never informed or instructed your
20   officers on how to document witness interviews, during
21   the course of a criminal investigation, correct?
22        A    Correct.
23        Q    And there was no mechanism in place at the
24   Knox County Sheriff's Department between 2003 and 2015
25   to assure that officers were documenting witness
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 897

```
 1   interviews in an appropriate fashion, correct?
 2          MR. WILLIAMS:  Object to the form.
 3   A     Yes.
 4   Q     By 2010, were you aware of any written policy
 5   or procedure that existed at the Knox County Sheriff's
 6   Department, instructing officers not to coerce witnesses
 7   in a criminal investigation?
 8   A     Not that I'm aware of.
 9   Q     And again, you never personally trained or
10   instructed any of your officers not to coerce witnesses
11   in a criminal investigation, correct?
12   A     Correct.
13   Q     And there was no mechanism in place at the
14   Knox County Sheriff's Department that audited or -- let
15   me withdraw that question.
16          There was no mechanism in place between 2003
17   and 2015 at the Knox County Sheriff's Department,
18   assuring that officers did not coerce witnesses in a
19   criminal investigation, correct?
20          MR. WILLIAMS:  Object to the form.
21   A     Correct.
22   Q     And again, between 2003 and 2015, you never
23   disciplined a single officer for coercing a witness,
24   correct?
25   A     Not that I recall, no.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 898

```
 1        Q     Between 2003 and 2015, was there a policy or
 2   procedure in place at the Knox County Sheriff's
 3   Department that required officers to document any
 4   promises of consideration made to a witness in a
 5   criminal investigation?
 6        A     Not that I'm aware of.
 7        Q     And again, you didn't provide, as sheriff,
 8   between 2003 and 2015, you didn't provide any direct
 9   training or give instructions to officers, that they
10   need to document promises of consideration to a witness
11   in a criminal investigation, correct?
12        A     Correct.
13        Q     Between 2003 and 2015, who was tasked with the
14   responsibility and had the authority at the Knox County
15   Sheriff's Department, to maintain discipline of
16   officers?
17             MR. WILLIAMS:  Object to the words
18        "responsibility" and "authority."  They may have a
19        legal connotation and continuing with that
20        objection made, you can answer the question.
21        A     Myself and Derek Eubanks.
22   BY MR. SLOSAR:
23        Q     What was Derek Eubanks' position in December
24   2010 at the Knox County Sheriff's Department?
25        A     Chief deputy.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 899

1    Q    Okay.  What efforts were made between 2003 and

2    2015 when you left, to investigate officers who were

3    accused of withholding exculpatory evidence?

4              MR. WILLIAMS:  Object to the form.  Assumes

5         facts not in evidence.

6    A    None I know of.

7    Q    Between 2003 and 2015 when you were sheriff,

8    what efforts were made to investigate officers who were

9    accused of fabricating evidence?

10             MR. WILLIAMS:  Same objection.

11   A    None I know of.

12   Q    What efforts were made between 2003 and 2015

13   to investigate officers who were accused of coercing

14   witnesses?

15             MR. WILLIAMS:  Same objection.

16   A    None I know of.

17   Q    What efforts were made between 2003 and 2015

18   to identify officers who were withholding exculpatory

19   evidence?

20             MR. WILLIAMS:  Object to the form.  Assumes

21        facts not in evidence.

22   A    None I know of.

23   Q    Between 2003 and 2015, what efforts were made

24   to identify officers who were fabricating evidence?

25             MR. WILLIAMS:  Object to the form.  Assumes

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 900

1       facts not in evidence.

2     A    None I know of.

3     Q    Between 2003 and 2015, what efforts were made

4  to identify officers who were coercing witnesses?

5        MR. WILLIAMS:  Same objection.

6     A    None I know of.

7     Q    What efforts were made between 2003 and 2015

8  to prevent police officers from withholding exculpatory

9  evidence?

10     A    None I know of.

11        MR. WILLIAMS:  Same objection.

12     Q    Between 2003 and 2015, what efforts were made

13  to prevent police officers from fabricating evidence?

14        MR. WILLIAMS:  Same objection.

15     A    None I know of.

16     Q    Between 2003 and 2015, what efforts were made

17  to prevent police officers from coercing witnesses?

18        MR. WILLIAMS:  Same objection.

19     A    None I know of.

20     Q    Between 2003 and 2015, what efforts were made

21  to discipline officers for withholding exculpatory

22  evidence?

23        MR. WILLIAMS:  Same objection.

24     A    None I know of.

25     Q    Between 2003 and 2015, what efforts were made

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 901

1    to discipline officers for fabricating evidence?

2              MR. WILLIAMS:  Same objection.

3        A    None I know of.

4        Q    Between 2003 and 2015, what efforts were made

5    to discipline officers who were accused of coercing

6    witnesses?

7              MR. WILLIAMS:  Same objection.

8        A    None I know of.

9        Q    Mr. Pickard, did you know Amanda Hoskins prior

10   to December 20, 2010, when the Mills' investigation

11   began?

12       A    Yes.

13       Q    How did you know Amanda?

14       A    I knowed [sic] of her on -- where she was

15   charged with a hit-and-run.

16       Q    Okay.

17       A    That's the first that I remember.

18       Q    What do you remember about the hit-and-run

19   incident?

20       A    I didn't -- I don't remember a lot about it. I

21   just remember a kid was hit with a car and was

22   hospitalized.  I don't -- I don't know nothing about the

23   case because I didn't work it.  I didn't

24       Q    Sitting here today, do you even remember who

25   was driving the car?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 902

1      A    I doubt she was.  I don't know that to be a
2  fact, though.
3      Q    Okay.  Aside from the hit-and-run incident,
4  did you have any other run-ins with Amanda Hoskins prior
5  to December of 2010?
6           MR. WILLIAMS:  Object to the form of the
7      question.  You can answer.
8      A    Just on a couple of arrest, but you mean prior
9  to December 20th?
10     Q    Yeah.
11     A    None I remember, no.
12     Q    Okay.  Did you know Jonathan Taylor prior to
13  December 20, 2010?
14     A    No.
15     Q    Did you know William Lester prior to December
16  20, 2010?
17     A    I knowed of him, but I didn't -- I didn't know
18  him personally.
19     Q    Okay.  What'd you know of him, do you
20  remember?
21     A    Just the name.
22     Q    Did you know Mike Simpson prior to December
23  20, 2010?
24     A    Not that I remember, no.
25     Q    Did you know Allen Helton prior to December

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 903

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 93 of 463 - Page
The Deposition of JOHN DALE PICKARD, taken March 20, 2019  ID#: 5110

91

```
 1   20, 2010?
 2       A    Yes.
 3       Q    How did you know Mr. Helton?
 4       A    Where he was arrested on different things.
 5       Q    Was Mr. Helton in trouble often?
 6            MR. WRIGHT:  Object to form.
 7            MR. WILLIAMS:  I'll join.
 8       Q    Sorry, I'm just getting a highlighter.
 9            MR. WILLIAMS:  Did you understand that
10       question, Mr. Pickard?
11       A    Yeah.  He was -- he was in trouble pretty
12   regular.
13       Q    What kind of criminal cases you recall Mr.
14   Helton getting caught up in prior to the murder of Ms.
15   Mills?
16       A    Theft, mostly.
17       Q    Okay.  Fair to say that he was usually trying
18   to find ways to make money?
19       A    I guess.
20            MR. WILLIAMS:  Requires him to speculate.
21       A    I -- I don't know what his reason was.
22       Q    Okay.  Were you aware of whether Mr. Helton
23   had a pill addiction prior to Ms. Mills' death?
24            MR. WRIGHT:  Object to form.
25       A    I -- I don't really -- I don't know.  I don't
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 904

The Deposition of JOHN POCKALD, taken March 19, 2019                    92

```
 1    -- don't know what his problem was.

 2         Q    Did you know a person by the name of Robert

 3    Beach prior to December 20, 2010?

 4         A    No.

 5         Q    Did you know Amber Simpson prior to December

 6    20, 2010?

 7         A    Not her, no.

 8         Q    Did you now Christy Branson prior to December

 9    20, 2010?

10         A    Yes.

11         Q    How did you know Christy?

12         A    She had been in trouble a few times.

13         Q    Do you remember what kind of trouble?

14         A    Not right off, I don't.

15         Q    Prior to December 20, 2010 -- well, let me

16    strike that. At some point during the course of the

17    Mills' homicide investigation, were you aware that Allen

18    Helton was working as an informant?

19              MR. WRIGHT:  Object to form and foundation.

20         A    Not to my knowledge.

21              MR. WILLIAMS:  Join.

22         Q    What is UNITE?

23         A    Just a program through Hal Rogers.

24         Q    And who is Hal Rogers?

25         A    He's a congressman.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 905

```
 1        Q      Okay.  Is UNITE -- does UNITE use informants -

 2   -

 3              MR. WRIGHT:  Object to form and foundation.

 4        Q      -- do you know?

 5        A      I'm -- I'm sure they do.

 6        Q      Did you know a person by the name of Michael

 7   Crump prior to December of 2010?

 8        A      No.

 9        Q      Did you know Jessie Lawson prior to December

10   of 2010?

11        A      No.

12        Q      Did you have any opinions of Ms. Hoskins prior

13   to December 20, 2010?

14              MR. WILLIAMS:  Object to the form.

15              MR. WRIGHT:  Object and I join.

16        A      No.

17        Q      Did you know Mikey Bruner prior to December

18   20, 2010?

19        A      No.

20        Q      Did you know Joe King prior to December 20,

21   2010?

22        A      No.

23        Q      Did you know Caleb Mills prior to December 20,

24   2010?

25        A      No.  I knowed of her, but I didn't know her
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 906

```
 1    personally.
 2        Q     Do you know her mom, Donna Mills?
 3        A     Yes.
 4        Q     Do you call her by her nickname or her real
 5    name?
 6        A     Whatever hits me.  Cookie most of the time, or
 7    what's -- what everybody called her.
 8        Q     Cricket?
 9        A     Cricket, I mean, not Cookie.
10        Q     You don't think she's crooked, right?
11        A     Do what?
12        Q     You don't think she's crooked, right?
13              MS. STAPLES:  He said, "Cookie."
14        A     No.
15              MR. WILLIAMS:  I'm sorry, did you say Cricket
16        or Cookie?
17        A     Cricket.
18              MR. SLOSAR:  Oh, I thought he said crooked
19        first.
20              MS. STAPLES:  No, he said Cookie.
21              MR. WILLIAMS:  I'm pretty sure he said Cookie.
22        A     I said, "Cookie."
23        Q     Cookie.  Oh.  All right.  I got it mixed up.
24    Cricket, I think, is her nickname for the record.
25        A     I thought I was wrong, but that's right.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 907

The Deposition of JOHN ROWE PICKARD, taken March 19, 2019, Page 95

```
 1        Q    I'm going to show you what we'll mark as
 2   Exhibit number 5.  This is your request for production
 3   in this case.  Please take a look at that.  Have you
 4   seen this document before, Mr. Pickard?
 5                  (EXHIBIT 5 MARKED FOR IDENTIFICATION)
 6        A    I think so.
 7        Q    I know lawyers typically do these responses.
 8   I'm going to ask for you to turn to page 2 and look at
 9   request number 3.  Are you there?
10        A    Yes.
11        Q    So request number 3 asks for any and all
12   documents prepared in connection with the Mills' murder
13   investigation, and the investigation arrest,
14   interrogation, and charging of plaintiffs for the murder
15   of Katherine Mills, including, but not limited to, any
16   and all police reports, collected evidence, lab reports,
17   handwritten notes, crime scene photographs, photo
18   arrays, and photographs of the plaintiffs or other
19   witnesses.  The request specifically includes, but is
20   not limited to, the complete investigative file or other
21   files with respect to the Mills' murder investigation.
22   Do you see that question, sir?
23        A    Yes.
24        Q    Okay.  In response you said that you have no
25   documents regarding the investigation of the murder of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 908

1    Katherine Mills; is that right?

2        A    That's true.

3        Q    Okay.  The next request asks for all documents

4    relating to Allen Helton, Mike Simpson, Jessie Lawson,

5    William Lester, Bob Smith, Michael Crump, Christy

6    Branson, Joe King, Dr. Warren, Amber Simpson, Daniel

7    Wilson, Robert Beach, Kayla Mills, Donna Mills, and

8    Margaret Polly.  Do you see that request, sir?

9        A    Yes.

10       Q    And do you see the response that you have

11   where it says, "I have no documents regarding the

12   investigation of Katherine Mills"?

13       A    Yes.

14       Q    Is that true, sir?

15       A    Yes.

16       Q    Okay.  Looking at the next page, number 3,

17   it's request number 7.  Do you see where it says, "Any

18   documents relating to any confidential informants that

19   were used by the department during the Mills' murder

20   investigation," and you responded by saying that, "I

21   have no documents regarding the investigation and murder

22   of Katherine Mills."  Is that true?

23       A    Yes.

24       Q    Okay.  Mr. Pickard, you participated in the

25   investigation into the death of Katherine Mills,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 909

```
 1  correct?
 2         MR. WILLIAMS:  Object to the form.
 3     Q    You can answer, sir.
 4     A    I didn't -- I didn't really do any
 5  investigating, I -- I just helped locate people, I mean,
 6  that was Mr. York's case and he worked it.
 7     Q    You joined in the questioning of Allen Helton,
 8  right?
 9         MR. WRIGHT:  Object to form.
10     A    I did sit in on that, yeah.
11     Q    Okay.  And you joined in questioning Jonathan
12  Taylor at the Barbourville Police Department, right?
13     A    I sat in on it, yes.
14     Q    And you were present when photographs were
15  taken of Mr. Taylor, correct?
16     A    I don't remember that, but I mean, I don't
17  recall any pictures being made.
18     Q    Well, when you participate in questioning at
19  the Barbourville Police Department of Jonathan Taylor,
20  do you recall Detective Mike Broughton and Detective
21  Jason York being present for that?
22     A    Yes.
23         MR. WRIGHT:  I'll object to form.
24         MR. FARAH:  Object to form.
25         MR. KELLEY:  Join.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 910

BY MR. SLOSAR:

1  Q   And in fact, during that time, all three of

2  you questioned Mr. Taylor at the Barbourville Police

3  Department, correct?

4  A   I don't remember questioning him.  I was

5  there, but I don't remember asking anything.

6  Q   Okay.  Well, you were present when Mr. Taylor

7  was being questioning by those other officers, right?

8  A   Yes.

9  Q   Okay.  And whose idea was it to put

10 photographs of the crime scene on the table when Mr.

11 Taylor was being questioned?

12 A   I don't know.

13 Q   You don't recall whose idea that was?

14 A   No, I don't.  I don't recall that.

15 Q   Do you -- did you tell Detective Broughton or

16 Detective York to not put photographs on the table?

17 A   No.

18 Q   Mr. Pickard, do you know Dr. Larry Warren?

19 A   Yes.

20 Q   Yeah.  Do you have -- have you -- are you

21 aware of any evidence that exists that would corroborate

22 any allegation that Amanda Hoskins had a relationship

23 with Dr. Larry Warren?

24 A   I have no idea.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 911

The Deposition of JOHN PICKARD, taken on 9/19/12
99

```
 1        Q     You've never seen Amanda Hoskins with Dr.
 2   Warren in Knox County, right?
 3        A     No.
 4        Q     Okay.  And you don't have any -- you're
 5   unaware of any evidence that would indicate that they
 6   had anything other than a professional physician/patient
 7   relationship, correct?
 8        A     Yes.
 9        Q     Okay.  So, Mr. Pickard, I know that you said
10   you joined and you were present when some of these
11   people were questioned.  Why are you reluctant to admit
12   that you participated in the investigation into
13   Katherine Mills' death?
14             MR. WILLIAMS:  Objection to the form.
15             MR. WRIGHT:  I'll join.
16        A     I'm not -- I'm not being reluctant, I just,
17   you know, it was Detective York's call.  And the main
18   thing I did was try to help him in any way, and most of
19   that was dealing with people he didn't know.
20        Q     Fair to say you were just doing what Detective
21   York told you to do?
22        A     No.
23        Q     No.  Why not?
24        A     I was just being nice and helping, you know,
25   just trying to help him, whatever he needed.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 912

```
 1        Q    Well, he asked you to talk to Kayla Mills,
 2   right?
 3             MR. WILLIAMS:  Object to form, foundation.  Go
 4        ahead.
 5             MR. WRIGHT:  I'll join.
 6        A    I don't remember that.
 7   BY MR. SLOSAR:
 8        Q    Well, you did talk to Kayla Mills, though,
 9   during the investigation into Katherine Mills' death,
10   correct?
11        A    I was with Detective York when we went to her
12   house one time.
13        Q    Do you remember talking to Kayla during a drug
14   sting in February of 2012, where Jonathan Taylor was
15   arrested?
16             MR. WRIGHT:  Object to form.
17        Q    And Kayla Mills was arrested, and a couple of
18   other people were arrested.  Do you remember being there
19   for that?
20             MR. WILLIAMS:  I'll join.
21        A    Was that at a meth lab?
22        Q    Well, it allegedly was.
23        A    Yes, I remember that.
24        Q    Okay.  And in fact, you were there with Mr.
25   Eubanks, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 913

```
 1      A    Yes.

 2      Q    All right.  During the Katherine Mills'

 3  investigation, you spoke to -- you were present and/or

 4  participated in the questioning of a number of witnesses

 5  and suspects in the homicide; is that right?

 6           MR. WRIGHT:  Object to the form.

 7           MR. WILLIAMS:  Object to the form.

 8      A    You would have to -- it would have to be --

 9      Q    Okay.

10      A    -- somebody specific.

11      Q    Okay.

12      A    I can't --

13      Q    During the investigation into Katherine Mills'

14  death, did you speak to Allen Helton?

15      A    Yes.

16      Q    During the investigation into Katherine Mills'

17  death, did you speak to Mike Simpson?

18      A    Yes, one time.

19      Q    During the investigation into Katherine Mills'

20  death, did you speak to Jonathan Taylor?

21      A    Yes.

22      Q    During the investigation into Katherine Mills'

23  death, did you speak to Kayla Mills?

24      A    Yes.

25      Q    During the investigation into Katherine Mills'
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 914

1   death, did you speak to a witness by the name of Bob
2   Smith?
3       A    Yes.
4       Q    Mr. Pickard, just looking back at this Exhibit
5   number 5 and request number 3 where it says that you
6   have no documents regarding the investigation into the
7   murder of Katherine Mills.  Is that truthful?
8       A    Yes.
9       Q    Fair to say that you did not create a single
10  document based upon your interactions with Allen Helton,
11  during the Mills' homicide investigation?
12      A    Yes.
13      Q    Okay.  You never memorialized your
14  conversations with Mr. Helton in a police report, right?
15      A    No.
16      Q    You never took notes during any of your
17  conversations with Mr. Helton, right?
18      A    No.
19      Q    You understood at the time of your meetings
20  with Mr. Helton in 2011 and 2012, that he was a suspect
21  in the homicide of Katherine Mills, correct?
22      A    I don't recall that being so.
23      Q    Well, were you ever informed at any time
24  during your meetings of Mr. Helton in 2011 and 2012,
25  that he was a person of interest in the homicide of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 915

1    Katherine Mills?

2            MR. WRIGHT:  Object to the form.

3        A    You're saying in 2011, 2012?  No, I didn't

4    know that.

5        Q    You didn't know that?

6        A    Not that I recall.  I mean

7        Q    Okay.  Well, I'll show you some stuff later.

8    Mr. Pickard, is it fair to say that you did not create a

9    single police report regarding any of the activities you

10   took in assisting Jason York in the Mills' homicide

11   investigation?

12           MR. WRIGHT:  Object to the form.

13       A    That's true.

14       Q    Likewise, fair to say that you never created a

15   single note regarding any of the activities you

16   participated in during the underlying Mills' homicide

17   investigation?

18       A    Yes.

19           MR. WRIGHT:  Object to the form.

20       Q    And was that consistent with the training that

21   you received prior to that time?

22       A    I didn't -- I can't say I ever had training on

23   it.

24       Q    Okay.  Well, was that consistent with your

25   understanding of the policies and procedures in place at

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 916

1  the Knox County Sheriff's Department, that you weren't

2  required to create a police report or notes about

3  investigative activities you were taking in a homicide

4  investigation?

5          MR. WRIGHT:  Object to the form.

6          MR. WILLIAMS:  Object to the form.  Asked and

7      answered.  Mr. Pickard has stated on numerous times

8      that this was not his investigation.

9  BY MR. SLOSAR:

10     Q    You can answer.

11     A    We didn't investigate murders.  Had I been

12 investigating myself, yes, I -- there would have been a

13 lot different, but I just assisted Detective York.

14     Q    Well, did this -- Detective York ever tell you

15 that he was going to be creating police reports based on

16 the conversations you were having with people?

17     A    Well, I just assumed he did.  That was his

18 job.

19     Q    Okay.  So it would have been -- in your

20 opinion, it's Detective York's responsibility to

21 document the interactions that you both had with

22 witnesses?

23     A    Yes.

24          MR. WRIGHT:  Object to form.

25     Q    What about when Detective York's not present?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 917

```
 1   Whose responsibility would it be, then, to document
 2   interactions that you have with witnesses?
 3           MR. WILLIAMS:  I've made a continuing
 4      objection to the use of the word "responsibility,"
 5      but you may answer.
 6      A    I didn't investigate the murder myself.
 7   BY MR. SLOSAR:
 8      Q    All right.  I understand that.  Detective York
 9   was the lead, right?
10      A    Yes.
11           MR. WILLIAMS:  Object to the form.
12      Q    But you -- during the investigation, you spoke
13   to Kayla Mills without Detective York, right?
14      A    I remember speaking to her one time.
15      Q    Yeah.  And Detective York wasn't there, right?
16      A    Yes, but that was on a -- that was on another
17   --
18      Q    The meth lab.
19      A    -- call that I went on.
20      Q    Sure.  The meth lab thing, right?
21      A    No, it wasn't that.
22      Q    A different one?
23      A    Different one.
24      Q    Okay.  Well, when you talked to Kayla on that
25   occasion, was the -- Detective York present?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 918

```
 1              MR. WRIGHT:  Which occasion, the meth lab or
 2      the separate one, sorry?
 3              MR. SLOSAR:  The separate time.
 4              MR. WRIGHT:  Okay.  Sorry.
 5      A    I don't recall taking to her about the murder
 6  --
 7  BY MR. SLOSAR:
 8      Q    No?
 9      A    -- at the meth lab.  No.  I don't even know
10  would I even talked to her.
11      Q    Well --
12      A    I don't -- I don't remember it, if I did.
13      Q    Let me see if I can refresh your memory.  You
14  know what, let me just -- let me get there a little bit
15  later.  I'm going to ask for you to turn to your written
16  interrogatories.  I think it should be Exhibit 23,
17  maybe.
18              MR. WRIGHT:  It's -- I've got it as 13.
19      Q    13, I apologize.  I couldn't find them. Sorry.
20  Do you have your interrogatory responses in front of you
21  --
22      A    Yeah.
23      Q    -- Mr. Pickard?  Okay.  Now, looking at your
24  interrogatory response number 4, do you have that in
25  front of you?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 919

```
 1        A     Yes.
 2        Q     Okay.  Do you see where it says that you sat
 3   in on at least one interview with Jonathan Taylor?  Oh,
 4   you know what, you're going to need to go to the next
 5   page there.
 6        A     Okay.
 7        Q     Yes, I'm going to ask you about your answer --
 8   there you go.  It's going to be soon.
 9        A     Okay.
10        Q     Do you see where it says you sat in on at
11   least one interview of Jonathan Taylor?
12        A     Yes.
13        Q     Okay.  Is it possible that you sat in on more
14   than one with Mr. Taylor?
15        A     Not that I recall, no.
16        Q     Did you create any police report based on the
17   questioning of Mr. Taylor?
18        A     No.
19        Q     Okay.  And fair to say that Mr. Taylor was a
20   suspect in the homicide by that point?
21        A     Yes.
22        Q     Okay.  And in fact, you and Mr. Broughton and
23   Mr. York were interrogating Mr. Taylor about the murder,
24   correct?
25              MR. FARAH:  Object to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 920

```
 1              MR. WRIGHT:  Object to form.

 2              MR. WILLIAMS:  Object to form.  Join.

 3              MR. SLOSAR:  It's a good question.

 4      A     Mr. Broughton and Mr. York did.  I think I

 5  just -- I don't think I said a word in the whole thing

 6  that I remember.

 7  BY MR. SLOSAR:

 8      Q     Just sat there.  Okay.  Don't remember saying

 9  anything?

10      A     I don't remember anything I said.

11      Q     Well, what were Mr. Broughton and Mr. York

12  telling Mr. Taylor in that interrogation?

13      A     I can't remember.

14      Q     Fair to say that they were trying to get Mr.

15  Taylor to confess?

16              MR. WILLIAMS:  Asked and answered.  He said he

17      didn't remember.

18      A     I don't remember.  I really don't.  I don't

19  know what they --

20      Q     You don't know what they said?

21      A     They just -- you know, they interviewed him.  I

22  mean, I don't know what their intentions were.

23      Q     Well, isn't it true that Detective York and

24  Detective Broughton threatened to charge Jonathan Taylor

25  with murder during that questioning?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 921

```
 1            MR. FARAH:  Object to form.

 2            MR. WILLIAMS:  Object to form.

 3            MR. WRIGHT:  Join.

 4     A    I don't recall that statement.

 5     Q    You don't recall that?

 6     A    No.

 7     Q    Could have happened, but you don't remember,

 8  right?

 9     A    I don't remember.

10            MR. FARAH:  Object to form.

11     Q    How -- what was the interrogation room like at

12  the Barbourville Police Department when Mr. Taylor was

13  being questioned that day?

14            MR. WRIGHT:  Objection to form and foundation.

15     Go ahead.

16     A    It's just a small room with a table in it,

17  that's about it.

18     Q    Now, prior to the questioning of Jonathan

19  Taylor, were you aware that he had a limited mental

20  capacity?

21            MR. WRIGHT:  Object to form and foundation.

22            MR. WILLIAMS:  Join.

23     A    Not that I recall, no.

24     Q    Did you think he was slow at all?

25            MR. WRIGHT:  Object to form and foundation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 922

The Deposition of JOHN PICKARD, taken on 11/29/2022

110

```
 1      A    No.

 2           MR. WILLIAMS:  Same.

 3      A    I didn't see that.

 4      Q    Mr. Taylor, during this questioning, said that

 5 he was innocent, right?

 6      A    I can't recall.

 7           MR. WILLIAMS:  Object to the form.  Asked and

 8      answered.

 9      Q    So you don't recall anything that happened

10 during the questioning of Jonathan Taylor in this case?

11      A    The only thing I can really say I remember is

12 I was there.  I don't remember what was said.

13      Q    Okay.  Now, you said -- you say that there

14 should be a record of that interview, either written or

15 recorded, that would reflect what was said; is that

16 right?

17      A    Yes.

18      Q    Okay.  Did you create a record of that

19 interview?

20      A    No.

21      Q    Did you have a conversation with Detective

22 Broughton about whether he was going to record that

23 interview?

24      A    No.

25      Q    Okay.  And it was his police department,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 923

1   right?

2       A    Yes.

3       Q    Was he chief of police back in 2012?

4       A    I'm not sure.

5       Q    Okay.  Did you have a conversation with

6   Detective York about whether he was going to record that

7   interview?

8       A    No.

9       Q    Was there an agreement between you and

10  Detective York and Detective Broughton as to who was

11  going to take notes?

12      A    No.

13      Q    And the next sentence of your interrogatory,

14  you state that you spoke with Detective York about

15  locating potential witnesses in the community and try to

16  answer Detective York's question as he began his

17  investigation.  Do you see that?  Should be --

18      A    Yeah.

19      Q    Okay.  What witnesses did Detective York ask

20  you -- for you to assist in locating?

21      A    I can't remember everybody, but I remember a

22  couple, maybe.  I remember him asking me about Lynn

23  Brown, he wanted to talk to, and maybe Cleo Brown.

24      Q    And is it -- and in fact, you actually

25  assisted Mr. York in talking to one of the Browns,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 924

```
 1  right?
 2           MR. WILLIAMS:  Object to the form.
 3           MR. WRIGHT:  I'll join.
 4      A    I can't -- I can't remember who we actually
 5  talked to.
 6      Q    Do you remember on January 4, 2011, pulling
 7  Allen Helton over for a DUI stop?
 8      A    Me pulling him over?
 9      Q    Yeah.
10      A    No, I don't remember that.
11      Q    Do you remember being with Detective York and
12  talking to one of the Browns as Allen Helton drove past
13  in his Ford Ranger?
14      A    I don't recall that, no.
15      Q    Aside from the Browns, who else do you recall
16  Detective York asking you to help him locate?
17      A    I can't -- I can't recall right off.
18      Q    Did Detective York ask for your assistance in
19  locating Bob Smith?
20      A    No.
21      Q    Whose idea was it to talk to Bob Smith?
22      A    It was his, Detective York's.
23      Q    Okay.  Did Detective York as for your help in
24  locating Kayla Mills?
25      A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 925

1      Q    Did Detective York ask for your assistance in
2  locating Mike Simpson?
3      A    No.
4      Q    Did Detective York ask for your assistance in
5  locating Allen Helton?
6      A    Not that I recall.
7      Q    Now, you say in this interrogatory response
8  that you tried to answer Detective York's questions as
9  he began his investigation.  Do you see that, sir?
10     A    That I what?
11     Q    That you tried to answer Detective York's
12 questions as he began his investigation; is that right?
13     A    Yes.
14     Q    What questions do you recall Detective York
15 asking you?
16     A    I don't have any idea.
17     Q    Okay.
18     A    It's been too long.
19     Q    Do you have any notes or anything that would
20 help refresh your recollection in that regard?
21     A    No.
22     Q    Fair to say that you communicated with
23 Detective York even after Ms. Hoskins, Mr. Taylor, and
24 Mr. Lester were charged with murder?
25     A    I'm sure I seen him from time to time.  I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 926

```
 1  don't recall any of it, but --
 2      Q    And you like Jason York, right?
 3      A    Yeah.
 4      Q    Think he's a good guy --
 5      A    I think --
 6      Q    -- right?
 7      A    Yes, I think he's all right.
 8      Q    You think he was a good police officer?
 9      A    I don't have no idea.  I don't -- as far as
10  working with him, I never worked -- just around him
11  some.
12      Q    Well, you saw some of the stuff that he did in
13  this case, right?
14      A    I heard it here the other day, yes.
15      Q    You remember when Detective York came in here
16  the other day and said that he's threatened witnesses.
17  Do you remember him saying that?
18           MR. WRIGHT:  Object to form.
19      A    I don't recall that right off.
20      Q    Well --
21      A    I'm remembering -- no, I don't remember him
22  actually saying that.
23      Q    But you remember hearing him actually threaten
24  a witness during that -- an interview that took place in
25  the investigation, in a different homicide
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 927

The Deposition of JOHN PICKARD, taken on May 9, 2019                115

```
 1   investigation, right?
 2           MR. WRIGHT:  Object to form.
 3           MR. WILLIAMS:  Join.
 4      A    I remember him talking about using it as a
 5   tactic.  I remember that, but --
 6      Q    Yeah.  I think Detective York said that
 7   threatening witnesses was a tactic.  You remember him
 8   saying that?
 9           MR. WRIGHT:  Object to form.
10           MR. WILLIAMS:  Join.
11      A    Not in them words, maybe.
12      Q    Okay.  But do you ever threaten a witness as
13   part of a tactic?
14           MR. WRIGHT:  Object to form.
15           MR. WILLIAMS:  Join.
16      A    I don't ever remember doing it.
17      Q    Well, let me ask it a different way:  Do you
18   think it's appropriate to threaten a witness?  Do you
19   think that that's an appropriate law enforcement tactic?
20           MR. WRIGHT:  Object to form and foundation.
21           MR. WILLIAMS:  Join.
22      A    Repeat that one more time.
23      Q    Sure.  Mr. Pickard, do you believe that it's
24   an appropriate investigative tactic for a law
25   enforcement officer to threaten a witness?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 928

The Deposition of JOHN PICKARD, taken on 9/19/02                    116

```
 1            MR. WRIGHT:  Same objection.

 2      A    Not in some cases, no.

 3      Q    But in some cases, yes?

 4      A    Some -- every case is different.

 5      Q    Well, in your opinion, is it fair to say that

 6  in some cases, you believe it is appropriate to threaten

 7  a witness and that that's a legitimate law enforcement

 8  tactic?

 9            MR. WILLIAMS:  Objection and requires him to

10       speculate.

11            MR. WRIGHT:  Object to form and foundation.

12      A    No.

13            MR. KELLEY:  Join.

14      Q    Okay.  And in this case, would it have been

15  appropriate for a police officer to threaten a witness?

16            MR. WRIGHT:  Object to form and foundation.

17            MR. WILLIAMS:  Join.

18      A    I don't -- I don't have no comment on that.

19      Q    Well, it's -- I'm not trying to be rude, but I

20  need an answer out of you that's not a "no comment." I'm

21  going to ask it to you again.  In the investigation into

22  the death of Katherine Mills, would it have been an

23  appropriate law enforcement tactic for a police officer

24  to threaten a witness?

25            MR. WRIGHT:  Same objection.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 929

```
 1              MR. WILLIAMS:  Object to the form, foundation.

 2      A    I just don't know.

 3      Q    Why don't you know?

 4              MR. WRIGHT:  Object to form and foundation.

 5              MR. WILLIAMS:  Objection and argumentative.

 6      A    I don't -- I just don't know.  I mean,

 7  different agents works different cases.  I mean, I don't

 8  -- I don't understand really what -- what you're saying,

 9  "threatened," I mean --

10      Q    Okay.  Let me give you an example.  That --

11  that's fair.  So you're saying on January 4, 2011, you

12  don't have any recollection of participating in a pull

13  over of Allen Helton with Detective York that day?

14              MR. WILLIAMS:  Asked and answered.

15      A    I don't recall pulling him over, but Detective

16  York might.

17      Q    I'm going to show you what we'll mark as

18  Exhibit number 14.  This is PL Bates 18940 through

19  18943.  And I do have a copying issue with this one, so

20  I'm going to hand a copy to counsel for review, I only

21  have two copies, and then I'll show a copy to Mr.

22  Pickard.  Actually, let me mark this first.  Sorry.  Can

23  we go off the record?  I just --

24              (EXHIBIT 14 MARKED FOR IDENTIFICATION)

25              VIDEOGRAPHER:  Off the record.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 930

```
 1                    (OFF THE RECORD)

 2          VIDEOGRAPHER:  Back on the record.

 3   BY MR. SLOSAR:

 4       Q    Okay.  Now, Mr. Pickard, we just had a short

 5   break, right?

 6       A    Yes.

 7       Q    Let me get my -- I'm sorry.  I forgot to put

 8   this thing on.  And over that break, you had a moment to

 9   consult with your attorney; is that right?

10       A    Yes.

11       Q    Okay.  I'm not going to ask you anything about

12   the substance of those conversations.  Did you also have

13   a moment to consult with Mike Broughton as well?

14       A    We talked just a second, yeah.

15       Q    Yeah.  And you had a chance to communicate

16   with Mr. Broughton's attorney, Mr. Farah, down there at

17   the end of this table; is that right?

18       A    Yes.

19       Q    Okay.  And before we went on a break, you had

20   provided some testimony about how you were present when

21   Detective York and Detective Broughton were questioning

22   Jonathan Taylor about the Mills' homicide investigation.

23   Do you test -- do you recall testifying to that effect

24   earlier today?

25          MR. FARAH:  Object to the form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 931

The Deposition of JOHN PICKARD, taken on 09/19/2019                    119

```
 1        A     Yes.

 2              MR. WRIGHT:  Same.

 3              MR. WILLIAMS:  Object to the form.

 4        Q     All right.  Looking at Exhibit 14, do you

 5   recognize this document, Mr. Pickard?

 6        A     I don't know it, really.

 7        Q     Okay.  Well, looking at the second page of

 8   this document, do you see where it has some charges that

 9   were initiated against Allen Helton on January 4, 2011?

10        A     Yes, I see that.

11        Q     Okay.  Okay.  And it seems, from looking at

12   this document, that Allen Helton was charged on that day

13   with operating a motor vehicle under the influence,

14   failure to wear seat belts, failure to register transfer

15   of motor vehicle, and failure of owner to maintain

16   required insurance.  Does that seem right, sir?

17        A     Yes.

18        Q     Okay.  I'm going to ask you to turn to the

19   last page.  Let me know when you're there.

20        A     I'm there.

21        Q     Okay.  And this is for that same case number,

22   11-T-136 against James Allen Helton, correct?

23        A     Yes.

24        Q     Okay.  And do you see where it says, "The

25   complaining witness.'  Do you see that?  And it's right
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 932

The Deposition of JOHN W. PICKARD, taken on March 22, 2019    120

```
 1   under James Allen Helton.
 2            MR. WILLIAMS:  I think he's actually wanting
 3        you to look at this other page, Mr. Pickard.
 4        A    Oh.
 5            MR. WILLIAMS:  Yeah.  If you turn to the last
 6        page, which is actually --
 7            MR. SLOSAR:  I'm sorry.  That was --
 8            MR. WILLIAMS:  -- the one you're looking at.
 9        Right here.
10        A    Yes.
11   BY MR. SLOSAR:
12        Q    Okay.  Who is the complaining witness in this
13   citation?
14        A    Jason York.
15        Q    Okay.  From KSP, right?
16        A    Yes.
17        Q    All right.  Does that refresh your memory in
18   any regard as to participating in a traffic stop of Mr.
19   Helton on January 4, 2011 with Detective York?
20        A    I -- I just don't remember --
21        Q    Okay.
22        A    -- being with him when he was charged with
23   that.
24        Q    Okay.  So is it fair to say that you don't
25   remember anything that happened after Mr. Helton was
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 933

The Deposition of JOHN PICKARD, taken on March 22, 2018

121

```
1   pulled over on January 4, 2011?

2        A    I -- I guess.  I mean, I don't -- I just don't

3   --

4             MR. WILLIAMS:  Don't guess.  If you know, tell

5        him.

6        A    I don't remember that happening.

7        Q    Okay.  You don't remember being there for that

8   traffic stop, right?

9        A    No.

10       Q    You don't remember -- and if you don't

11  remember being there for the traffic stop, is it fair to

12  say that you don't remember anything that happened

13  between Mr. Helton and Mr. York, which would have

14  occurred at that traffic stop?

15            MR. WRIGHT:  I'll object to the form.

16       A    No, I don't.

17       Q    Okay.  Have you ever seen Detective York grab

18  Allen Helton's face and tell him that he should go down

19  the street and let the victim's family beat the fuck out

20  of him?

21            MR. WRIGHT:  Object to form.

22       A    No.

23            MR. WILLIAMS:  Object to form.  Lack of

24       foundation.

25       A    I don't remember.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 934

1              MR. WILLIAMS:  Assumes facts not in evidence.

2      Q      So you don't remember that happening?

3      A      I've never seen nothing like that.

4      Q      Never seen anything like that?

5      A      No.

6      Q      You ever seen Detective York grab Allen

7  Helton's face?

8      A      No.

9      Q      How many times have you been in the presence

10  of Detective York and Allen Helton?

11     A      Just -- all I can remember right off is the

12  one time where he interviewed him.

13     Q      And that was in your office, right?

14     A      Yes.

15     Q      And you were present for that entire --

16     A      Yes.

17     Q      -- interview, right?

18     A      Yes.

19     Q      All right.  I'm going to point you back to the

20  interrogatory, which is Exhibit number --

21             MR. WILLIAMS:  I'm sorry.  Elliot, what number

22      did you make that citation?

23     Q      This is 14.  And I'm pointing now to the

24  interrogatory that we were talking about earlier.  I

25  believe it's number 4, where you went through the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 935

1   different activities that you participated in during

2   this investigation.  Are you there?

3        A    Yes.

4        Q    Okay.  Now, it said that you tried to answer

5   Detective York's questions as he began his

6   investigation.  This is on page 4.

7        A    Okay.

8        Q    The middle of that paragraph.  Let me know if

9   you see that.

10       A    Yes.

11       Q    Okay.  Did you do your best to answer

12  Detective York's questions during the investigation into

13  the death of Katherine Mills?

14       A    Just whatever he asked me, I would have did my

15  best.

16       Q    Do you remember any questions that Mr. York

17  asked you?

18       A    Other than knowing somebody, where they lived

19  or something, no.

20       Q    Okay.  The next sentence in your interrogatory

21  responses, you spoke with Defendant Broughton at the

22  time of Plaintiff, Jonathan Taylor's, questioning, but

23  that you cannot recall any statements made at the time.

24  Do you see that?

25       A    That's true.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 936

The Deposition of JOHN PICKARD, taken on 12/19/18, 124

```
 1        Q    Okay.  And that goes back to what you were
 2   testifying to earlier where you said that you were
 3   present with Mr. Broughton -- Mr. York is -- Jonathan
 4   Taylor was being questioned at the Barbourville Police
 5   Department, right?
 6               MR. FARAH:  Object to the form.
 7               MR. WRIGHT:  Join.
 8               MR. WILLIAMS:  Join.
 9        A    I -- I was there.  I don't -- I didn't
10   participate.  I mean, I remember being there, yes.
11   BY MR. SLOSAR:
12        Q    You were actually in the interrogation room as
13   Jonathan Taylor was being questioned, correct?
14               MR. FARAH:  Object to form.
15        A    I was in the -- I was in there when it
16   started, I could have got up and left.  I don't
17   remember.
18        Q    Okay.  You don't remember anything that you
19   said, right?
20        A    I didn't say anything.
21        Q    Okay.  Well, you don't remember anything that
22   any --
23        A    I don't remember saying.
24        Q    -- other officers said, right?
25        A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 937

```
 1        Q     You don't remember anything that Jonathan
 2   Taylor said back, right?
 3        A     I don't remember.
 4        Q     Okay.  Do you know who got the photographs, to
 5   put them on the table --
 6        A     No.
 7        Q     -- in that room?  Was it you?
 8        A     No.
 9        Q     On December 20, 2010, did you go to the scene
10   where Ms. Mills' body was found?
11        A     Yes.
12        Q     And how did you first find out about the --
13   about Ms. Mills' passing away?
14        A     Originally, I think it come through 911 and my
15   deputy responded.
16        Q     Did -- was Derek Eubanks at the scene as well?
17        A     I don't think so.  Not that I remember, no.
18        Q     What did you do after you responded to the
19   scene?
20        A     I just -- I guess -- we -- they called for the
21   state police to come because we didn't work murders, and
22   they got there and did their -- started their
23   investigation.
24        Q     Did you talk to any of the witnesses at the
25   crime scene?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 938

The Deposition of JOHN PICKARD, taken on 11/19/19

126

 1      A    I probably did at some point.  I don't
 2  remember what was said.
 3      Q    Do you recall the names of any witnesses that
 4  you would have spoken to at the crime scene?
 5      A    I mean, I -- I could have spoke to any of them
 6  that was there, I just don't remember.  I don't
 7  remember.  I mean, I kind of let them do their thing.  I
 8  just was there.
 9      Q    In this interrogatory response, you say that
10  at some point, you spoke to Mark Mefford, Dallas
11  Eubanks, Jason Bunch, and Brian Johnson; was that true?
12      A    That's probably -- yeah, it's true.
13      Q    Okay.  Did you talk to each of those officers
14  at the crime scene?
15      A    Just -- I have no idea what we talked about.
16  It might not have had nothing to do with this, I don't
17  know.  I can't remember.
18      Q    But you remember you talked to each of them at
19  the scene of the crime; is that right?
20      A    I probably did.  I mean, I don't --
21      Q    Well, you have these names written down here
22  in your interrogatory response, right?
23      A    Yeah.  I mean, they was there.
24          MR. WILLIAMS:  Excuse me.  The answer says,
25      "At some point."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 939

The Deposition of JOHN PICKARD, taken on 04/10/2 , page    127

```
 1        Q    Okay.  All right.  That's fair.  So at some
 2   point in the Katherine Mills' homicide investigation,
 3   you had an opportunity to speak with Mark Mefford,
 4   Dallas Eubanks, Jason Bunch, and Brian Johnson; is that
 5   right?
 6        A    Yeah, probably.
 7        Q    Okay.  But you're not saying here today that
 8   you had the conversations with them necessarily at the
 9   crime scene, but that it was at some point throughout
10   the investigation; is that right?
11        A    True.
12        Q    Okay.  Do you recall the substance of any
13   conversation you had with Mark Mefford about the
14   investigation into Katherine Mills' death?
15        A    No.
16        Q    Do you recall the substance of any
17   conversation you had with Dallas Eubanks regarding the
18   investigation into Katherine Mills' death?
19        A    No.
20        Q    Do you recall the substance of any
21   conversation you had with Jason Bunch regarding the
22   investigation into Katherine Mills' death?
23        A    No.
24        Q    Do you recall the substance of any
25   conversation you had with Brian Johnson regarding the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 940

```
 1   investigation into Katherine Mills' death?

 2        A    No.

 3        Q    Do you have any notes or documents at home

 4   that would refresh your recollection as to the substance

 5   of any conversation you had with these officers?

 6        A    No.

 7        Q    How often did you communicate with Detective

 8   York in the investigation into Katherine Mills' death?

 9             MR. WILLIAMS:  Object to the form.

10        A    Just -- I mean, it wasn't an everyday thing,

11   just when he needed help with something, I would help

12   him if he need me.

13        Q    When did you just -- when did you first find

14   out that Detective York was going to initiate charges

15   against Amanda Hoskins, Jonathan Taylor, and William

16   Lester?

17        A    I just don't -- I don't recall.

18        Q    Did Jason tell you?

19        A    I don't remember him telling me, he could

20   have.  I don't know.

21        Q    I'm going to ask that you turn to your

22   response to interrogatory number 10.  It's on page 7.

23        A    Page 10?

24        Q    Yes.

25             MR. WILLIAMS:  Interrogatory number 10?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 941

```
 1        Q    Oh, sorry.  Page 7, interrogatory 10.  Yes,
 2   Jason.  Sorry.
 3               MR. WILLIAMS:  103.
 4               THE WITNESS: I have that, too, all of this.
 5               MR. WILLIAMS:  All right.  Okay.  He's looking
 6        for page 7.
 7        A    Page 7, 10.
 8   BY MR. SLOSAR:
 9        Q    Okay.  You have that in front of you, sir?
10        A    Yes.
11        Q    Okay.  In your response to this interrogatory
12   which requests each specific investigative task that you
13   participated in during the Mills' murder investigation,
14   you state that you assisted KSP Officer Jason York, you
15   were familiar with the area than people who lived there,
16   and helped him, being Jason York, locate persons of
17   interest, and that you were present for the interview of
18   Jonathan Taylor, and you were present when Mr. Taylor
19   was arrested by Mike Broughton; is that true?
20        A    I don't -- I don't recall an interview.  I
21   don't recall him being arrested.  I'm not saying he
22   wasn't, I don't remember that.
23        Q    Do you see where it says that you helped
24   Detective York locate persons of interest?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 942

1      Q      What persons of interest did you help
2   Detective York locate?
3      A      A while ago, I give some names that's -- and
4   there was more than that, I just don't recall them right
5   off.
6      Q      Was Allen Helton a person of interest that you
7   helped Mr. York locate?
8             MR. WILLIAMS:   Object to the form.
9      A      I don't remember talking to Allen other than
10  in my office.
11     Q      My question's a little bit different.  Did you
12  help Detective York locate Allen?
13     A      No.
14     Q      Did you assist Detective York in locating Mike
15  Simpson?
16     A      I think him and I both knowed where he lived.
17     Q      Did you assist Detective York in locating
18  Jessie Lawson?
19     A      I don't know Jessie Lawson.
20     Q      Did you assist Detective York in locating Bob
21  Smith?
22     A      We both knowed where he lived.
23     Q      Okay.  What do you recall about you and
24  Detective York meeting with -- well, let me strike that.
25  Do you now Vernon Bennett?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 943

```
 1        A    No.

 2        Q    No.  Have you ever talked to Vernon Bennett

 3   during the investigation into the death of Katherine

 4   Mills?

 5        A    Not that I'm aware of.

 6        Q    How many times did you and Detective York talk

 7   to Cleo Brown during the underlying investigation?

 8        A    I don't -- I don't remember me and him talking

 9   to her, period.  With -- I mean, seemed like we -- we

10   tried to find her one time and couldn't, but I'm not

11   going to -- I don't remember her talking to both of us,

12   no.

13        Q    Is Cleo related to your wife?

14        A    Well, probably to a -- it's according to how

15   far back you want to go.

16        Q    You know where Cleo Brown lives, though,

17   right, or you -- you know what, let me strike that.

18   In December of 2010 and early 2011, January, would you

19   have known where Cleo Brown lived?

20        A    I probably would have at the time, but I can't

21   remember.  She moves around a lot.

22        Q    Were you -- what do you recall about the

23   arrest of Jonathan Taylor by Mike Broughton?

24        A    I can't remember him being arrested by Mike

25   Broughton.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 944

```
 1        Q    Okay.  But in your interrogatory responses, do
 2   you see where it says, "I was present for the interview
 3   of Jonathan Taylor and was present when he was arrested
 4   by Mike Broughton."  Do you see that?
 5        A    Well, I see that, but --
 6        Q    Saying you just don't remember any of the
 7   details --
 8        A    I just don't.
 9        Q    -- of that arrest now?
10        A    I don't remember him being arrested, no.
11        Q    Do you remember Mike Broughton and yourself
12   picking Jonathan Taylor up to bring him to the
13   Barbourville Police Department before he was questioned?
14             MR. WRIGHT:  Object to form, foundation.
15             MR. FARAH:  Objection to form.
16        A    I -- I just don't remember that.
17        Q    Mr. Pickard, I'm going to fast forward to
18   interrogatory number 14.  It has a list of names and you
19   gave some responses in response to those names.  Are you
20   on page 9 and do you see interrogatory number 14?
21        A    Yes.
22        Q    Okay.  Mr. Pickard, on interrogatory number 14
23   you state that you and Detective York went to speak with
24   Mike Simpson during the underlying investigation into
25   the death of Katherine Mills; is that true?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 945

```
 1        A    Could you repeat that question?

 2        Q    Sure.  So the -- specifically, the number 2

 3   has Mike Simpson?

 4        A    Yes.

 5        Q    So if you go to Mike Simpson, your answer to

 6   number 2, it says that, "I was with Jason -- KSP Jason

 7   York -- and went to his home to speak with him in

 8   relation to Mike Simpson."  Is that truthful?

 9        A    Yes.

10        Q    Okay.  Did you and Detective York go to Mike

11   Simpson's home shortly after the murder was -- or let me

12   strike that question. Did you and Detective York first

13   go to Mr. Simpson's home within a week or two of Ms.

14   Mills being found dead?

15        A    I couldn't tell you when we went.  I remember

16   going, but I don't remember when.

17        Q    Okay.  When you went to Mr. Simpson's home,

18   did you see Mr. Simpson hand Detective York a post-it

19   note with the names of alibi witnesses?

20        A    I don't recall that.

21        Q    Okay.  I'm going to show you what we'll mark

22   as Exhibit number 6.  Mr. Pickard, please take a look at

23   this document.

24             (EXHIBIT 6 MARKED FOR IDENTIFICATION)

25             MR. WILLIAMS:  Oh, you got one for me?  Thank
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 946

The Deposition of JOHN PICKARD, Taken on 01/10/22, Page 134

```
 1        you.
 2             MR. WRIGHT:  Sorry, Elliot, which exhibit did
 3        you --
 4             MR. SLOSAR:  6.
 5             MR. WRIGHT:  6.
 6   BY MR. SLOSAR:
 7        Q    I think we're going in chronological order,
 8   hopefully, moving forward.  That's my goal. Mr. Pickard,
 9   is this the post-it note that Mike Simpson handed to
10   Detective York when you and him went to go speak?
11             MR. WILLIAMS:  Object to the form.  Go ahead.
12             MR. WRIGHT:  Object to form and foundation.
13        A    I don't remember him giving him a sticky note.
14        Q    You don't?  What do you recall about your
15   meeting with Mike Simpson in the presence of Detective
16   York?
17        A    I remember -- I don't remember who got the
18   information, but he had a stolen four-wheeler there and
19   I remember checking it, and I don't remember what was
20   said between them.
21        Q    Did Detective York ever give you a copy of the
22   sticky note that you have before you?
23        A    Not that I'm aware of.
24        Q    Did Detective York tell you at any point
25   during the investigation, that Mike Simpson gave him a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 947

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 137 of 463 - Page
ID#: 5154
The Deposition of JOHN PICKARD, taken on 04/29/22

135

1  sticky note with alibi witnesses without Detective York

2  even asking for it?

3       A    I don't recall that.

4       Q    Did Detective York ever -- well, let me strike

5  that. When you -- in the meeting with Mike Simpson that

6  you recall having with Detective York and this four-

7  wheeler issue, do you recall searching Mike Simp- son's

8  home at all?

9       A    No.

10      Q    Do you recall searching any of his vehicles

11 for evidence that could have been related to the Mills'

12 homicide?

13           MR. WRIGHT:  Object to form, foundation.

14           MR. WILLIAMS:  Join.

15      A    I don't even remember a vehicle being there

16 that day.

17      Q    What did Mike Simpson tell you when you met

18 with him that day?

19      A    I don't recall what -- what was said.  I don't

20 even remember talking to Mike.  I remember being there.

21      Q    Was Detective York taking the lead on talking

22 to Mike Simpson?

23      A    He was talking to him.

24      Q    Was he talking to him about the murder of

25 Katherine Mills?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 948

1      A    I have no idea what he's talking about.  I

2  don't remember.  I wasn't -- I might have been over

3  there running the four-wheeler or something, but I just

4  remember being there.

5      Q    So you don't have any recollection as to what

6  was said to Mike Simpson when you and Detective York met

7  with him; is that right?

8      A    No, I can't recall anything.

9      Q    And do you have any recollection as to any

10  statements that Mike Simpson made to you or Detective

11  York during that meeting?

12      A    No.

13      Q    Do you have any notes that would refresh your

14  recollection?

15      A    Don't have any notes.

16      Q    Was the interview recorded?

17      A    I don't think so.  I don't know, but I don't

18  remember it being recorded.

19      Q    Prior to going to speak with Mike Simpson, did

20  you learn that he was a person of interest in the

21  homicide?

22      A    I just don't recall.

23      Q    Prior to speaking with Mike Simpson, had you

24  learned that Mike Simpson, Allen Helton had gone on a

25  trip to Florida to get pills after the death of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 949

```
 1   Katherine Mills?
 2        A    I remember that they was gone.
 3        Q    Yeah.  And did Detective York tell you about
 4   that?
 5        A    Yes.
 6        Q    Okay.  And was that one of the reasons why you
 7   and Detective York were going to speak to Mr. Simpson
 8   that day?
 9             MR. WILLIAMS:  Requires him to speculate as to
10        why York went, but you can answer the question if
11        you know.
12        A    I -- I don't know.
13   BY MR. SLOSAR:
14        Q    And I'll show you what we'll mark as Exhibit
15   number 7.  Mr. Pickard, when was the first time that you
16   saw --
17             (EXHIBIT 7 MARKED FOR IDENTIFICATION)
18             MR. WILLIAMS:  Take a look at it before you
19        answer any questions, okay?
20   BY MR. SLOSAR:
21        Q    When was the first time that you saw car
22   rental records relating to Mike Simpson?
23        A    I don't remember seeing any records on Mike
24   Simpson.
25        Q    Are you saying that today is the first day
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

PL 950

```
 1    that you learned that car rental records exist from a
 2    car that Mike Simpson rented on the day that Katherine
 3    Mills was found dead?
 4         A    I had heard he did, I don't ever remember
 5    seeing a record of it.
 6         Q    Okay.  Did Detective York tell you about these
 7    records during the investigation?
 8         A    I think so.
 9         Q    And is it your recollection that Detective
10    York told you about this rental car issue and Mike
11    Simpson renting a car with cash after Ms. Mills was
12    killed?  Did he tell you about this information prior to
13    you two going over to Mike Simpson's house to speak with
14    him?
15              MR. WILLIAMS:  Objection to the form.
16         A    I don't remember when he told me, I remember
17    him telling me about it.
18         Q    He told you about these records before Amanda
19    Hoskins and Jonathan Taylor were charged with murder in
20    2012, right?
21         A    I don't remember the time.
22         Q    Did you ever search one of Mr. Simpson's
23    vehicles?
24         A    Not that I'm aware of.
25         Q    Did you ever question Mr. Simpson about his
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 951

```
 1   whereabouts on December 20, 2010?

 2       A    No, I didn't.

 3       Q    Were you ever present when Mr. Simpson was

 4   questioned about his whereabouts on December 20, 2010?

 5       A    Not that I remember.

 6       Q    I'm going to show you what we'll mark as

 7   Exhibit number 8.  Mr. Pickard, are these -- who do

 8   these photographs depict?

 9                    (EXHIBIT 8 MARKED FOR IDENTIFICATION)

10       A    Michael Simpson.

11       Q    And did you and Detective York take these

12   photographs of Mike Simpson when you were at his home?

13       A    I can't remember that, but it could have been.

14   I just don't remember him taking picture of him.

15       Q    Well, is these -- are these photographs of

16   Mike Simpson, is this an accurate reflection of what he

17   looked like around the time of Katherine Mills death?

18       A    Yeah, he's looked like that ever since I ever

19   saw him.

20       Q    Okay.

21       A    I guess.

22       Q    You don't recall exactly who took these

23   photographs?

24       A    No.

25       Q    Okay.  Well, what -- at the time -- well, did
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 952

```
1   you learn, prior to seeing Mr. Simpson with Detective

2   York, did you learn that there was an eye witness in

3   this case by the name of Michael Crump?

4        A    Yes.

5        Q    Okay.

6             MR. WRIGHT:  Object to the form.  Go ahead.

7        Q    And was it your understanding that Mr. Crump

8   says that he saw a man walk into a blue vehicle around

9   the time that Ms. Mills was found dead?

10       A    I remember him -- something like that, to that

11  effect, yeah.

12       Q    Okay.  Is it fair to say that the purpose of

13  taking the photographs of Mike Simpson was to show these

14  photographs to Mr. Crump?

15       A    I don't know.

16       Q    Okay.

17       A    I don't know what his reason was.

18       Q    Did you ever make a request that Mike Simpson

19  take a polygraph examination?

20       A    No.

21       Q    Did you ever request that Mike Simpson come

22  down to the Knox County Sheriff's Department for

23  questioning about the Mills' homicide?

24       A    No.

25       Q    Did you ever make a request that Mike
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 953

```
 1   Simpson's phone records be subpoenaed to determine
 2   whether he had conversations with Allen Helton or Jessie
 3   Lawson around the time of the murder?
 4        A    No.
 5        Q    Did you ever request to have Mike Simpson's
 6   DNA taken to compare to physical evidence obtained at
 7   the scene?
 8        A    No.
 9        Q    Did you ever request that fingerprints be
10   taken from Mike Simpson to be compared to physical
11   evidence recovered at the scene?
12        A    No.
13        Q    Was it your understanding during the Mills'
14   homicide investigation, that approximately five $100
15   bills were left at the scene next to the victim's purse?
16        A    Yes.
17        Q    Okay.  And was it your understanding that
18   during the Mills' homicide investigation, that
19   fingerprints were actually found on those bills?
20        A    I don't know anything about the fingerprints.
21        Q    Mr. Pickard, who is Vernon Bennett?
22        A    I don't know.  I don't know a Vernon Bennett.
23        Q    Are you -- is it your testimony here today
24   that you did not interview Vernon Bennett during the
25   Mills' homicide investigation?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 954

The Deposition of JOHN PICKARD, taken on 4/29/22, 142

```
 1      A    No, I didn't.
 2           MR. WILLIAMS:  Object to the form.
 3      Q    Well, were you -- did you participate in any
 4  interview of Vernon Bennett during the Mills' homicide
 5  investigation?
 6      A    Not that I know of.  I don't know him.
 7      Q    Did Vernon Bennett ever tell you that Mike
 8  Simpson called in the early morning hours of December
 9  20, 2010 and wanted to borrow $50?
10      A    No.
11      Q    Did Vernon Bennett ever tell you that when Mr.
12  Simpson arrived later that afternoon, he had a brand-new
13  car and didn't need to borrow money?
14      A    No.
15      Q    Now, was it your understanding that Mr. Crump
16  described the suspect as wearing a camouflage coat?
17      A    I can't remember what he -- what he said.
18      Q    Okay.  Did Vernon Bennett tell you that Mike
19  Simpson had a camouflage coat like the one being
20  described by Mr. Crump?
21           MR. WRIGHT:  Object to form and foundation.  Go
22      ahead.
23           MR. WILLIAMS:  Join.
24      A    I don't -- like I said, I don't know a Vernon
25  Bennett.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 955

1    Q    Did Vernon Bennett tell you that he hadn't
2    seen Mike Simpson in a -- in that camouflage coat since
3    Katherine Mills' was found dead?
4    A    No.
5         MR. WRIGHT:  Same objection.
6    Q    Did Vernon Bennett tell you that Mike Simpson
7    was driving a blue car on December 20, 2010?
8         MR. WRIGHT:  Same objection.
9         MR. WILLIAMS:  Asked and answered.  This
10        witness has already testified --
11   A    No.
12        MR. WILLIAMS:  -- repeatedly that he's not
13        familiar with a Vernon Bennett.
14        MR. SLOSAR:  I understand.  I'm just perfect-
15        ing the impeachment.
16   BY MR. SLOSAR:
17   Q    Is it fair to say that you never drafted a
18   police report in the Mills' homicide investigation
19   regarding any conversation with Vernon Bennett?
20   A    No.
21   Q    How many times did you speak with Mike Simpson
22   during the Mills' homicide investigation?
23        MR. WILLIAMS:  Object to the form.
24   A    As far as I remember, just that one time is
25   all I was there.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 956

```
 1        Q    That was at his house?

 2        A    Yes.

 3        Q    You recall where he was living back then?

 4        A    At Moore's Creek.

 5        Q    Moore's Creek.  Was anyone else --

 6             MR. WRIGHT:  It was in Morris Creek?

 7             THE WITNESS:  Moore's, M-O-O-R-E-S.

 8             MR. WRIGHT:  Thank you.

 9   BY MR. SLOSAR:

10        Q    Was anyone else present outside from yourself,

11   Mike Simpson, and Detective York?

12        A    Not that I remember, no.

13        Q    Do you consider Mike Simpson to be a person of

14   interest today in the homicide of Katherine Mills?

15        A    No.

16        Q    Why not?

17        A    I don't know, I don't know nothing about it.

18        Q    Okay.  So you don't have any information one

19   way or the other as to whether he was involved?

20        A    No.

21        Q    Was it suspicious to you back in 2011 when you

22   found out that he went on a pill run immediately after

23   the death of Katherine Mills?

24             MR. WRIGHT:  Object to form, foundation.

25             MR. WILLIAMS:  Object to the form.  Lack of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 957

```
 1        foundation.
 2   BY MR. SLOSAR:
 3        Q     You can answer.
 4        A     It did look odd, I agree.  But I -- I don't
 5   know the situation.
 6        Q     Who is Bob Smith?
 7        A     He's a drug dealer in Moore's Creek.
 8        Q     All right.  How many times did you meet with
 9   Bob Smith during the Mills' investigation?
10        A     One time, as far as I remember.
11        Q     And who else was present with you?
12        A     Detective York.
13        Q     Okay.  Whose idea was it to go meet with Bob
14   Smith?
15        A     Detective York.
16        Q     All right.  And did you and Detective York
17   meet with Bob Smith down at his home?
18        A     Yes.
19        Q     What part of Knox County was that in?
20        A     Moore's Creek.
21        Q     All right.  Why did you and Mr. York meet with
22   Bob Smith that day?
23        A     Detective York wanted -- asked to talk to him
24   about some things.
25        Q     In the conversation that you and Detective
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 958

The Deposition of JOHN PICKARD, taken on 04/29/02

146

```
1    York had with Bob Smith, did you tell Mr. Smith that
2    you'd sweetened his drug trafficking charges -- that you
3    would sweep his drug trafficking charges under the rug
4    if he told you how much money Ms. Hoskins and Mr. Lester
5    had been spending with him?
6              MR. WRIGHT:  Object to form, foundation.  Go
7         ahead.
8         A    I didn't hear the comment made.
9         Q    Did you make that comment?
10        A    No, I don't think I said a word.
11        Q    Well, did anybody in your presence tell Bob
12   Smith that they would help him out on his drug charges
13   if he gave a statement against Ms. Hoskins?
14        A    No.
15        Q    No.  How long did you and Mr. York speak to
16   Bob Smith that day?
17        A    Probably seven or eight minutes, max.
18        Q    What did you say to him?
19        A    I don't remember saying anything to him.
20        Q    What did Detective York say to him?
21        A    He told him when we first went in -- he told
22   him we was there, we wasn't there to talk to him about
23   his drug dealing, he wanted to talk to him about
24   something else.
25        Q    And why weren't you guys there to talk to him
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 959

1    about his drug dealing?

2        A    I did not know it.  Well, I knowed he done it.

3    He just --

4        Q    Got away with it?

5        A    No, he didn't get away.

6             MR. WRIGHT:  Object to form, foundation.

7             MR. WILLIAMS:  Join.

8        Q    You're saying you didn't have any evidence

9    implicating Bob Smith in drug trafficking back then?

10       A    Yeah, we had plenty evidence.

11       Q    Did you arrest him that day?

12       A    No.

13       Q    Did Mr. Smith tell you and Detective York, in

14   this conversation, that Amanda Hoskins had never

15   purchased drugs from him?

16       A    He told Jason York that.

17       Q    And did Mr. Smith tell Detective York, in your

18   presence, that he had actually never even seen or met

19   Amanda Hoskins?

20            MR. WILLIAMS:  Did you say see or met?

21            MR. SLOSAR:  Seen or met.

22            MR. WILLIAMS:  Thank you.

23       A    I'm not sure about that.

24   BY MR. SLOSAR:

25       Q    But you did hear Bob Smith tell Detective York

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 960

```
 1    that Amanda Hoskins wasn't buying drugs from him, right?

 2         A    Yes, I remember him saying that.

 3         Q    And isn't it true that Bob Smith also told

 4    Detective York that William Lester wasn't buying drugs

 5    from him either?

 6         A    Yes, he told him that.

 7         Q    Now, did Detective York write that stuff down

 8    in your presence?

 9         A    No, I don't remember --

10         Q    Okay.

11         A    -- whether he did or not.

12         Q    You didn't take any notes, right?

13         A    No.

14         Q    Okay.  You weren't recording it, right?

15         A    No.

16         Q    Do you know whether Detective York was

17    recording that?

18         A    I don't think so.

19         Q    Who's Frank Edward?

20         A    Who?

21         Q    Frank Edward.  Do you know him?

22         A    No.

23         Q    Okay.  Now, Bob Smith was later arrested for

24    drug trafficking.  Do you recall that?  After your

25    conversation with him?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 961

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 151 of 463 - Page
ID#: 5168
The Deposition of JOHN PICKARD, taken on 9/18/19 149

```
 1          MR. WRIGHT:  I'm going to object to the form
 2      and foundation.
 3          MR. WILLIAMS:  I'll join.
 4      A    I think I remember hearing about it.
 5 BY MR. SLOSAR:
 6      Q    Okay.  Were you involved in that arrest at
 7 all?
 8      A    No.
 9      Q    Do you recall what else Bob Smith told
10 Detective York while you were there?
11      A    I don't recall anything.
12      Q    Mr. Pickard, who is Kayla Mills?
13      A    Donna Mills' daughter.
14      Q    On how many occasions during the investigation
15 into Katherine Mills' death, did you speak with Kayla?
16      A    Probably two or three times.  I can't remember
17 for sure.
18      Q    On February 12, 2012, did you participate in a
19 search at 43 Full Moon Court [sic], Barbourville,
20 Kentucky?
21      A    I was there, yes.
22      Q    I'll show you what we'll mark as Exhibit
23 number 9.  Here you go, Mr. Pickard.
24              (EXHIBIT 9 MARKED FOR IDENTIFICATION)
25      A    Thank you.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 962

1    Q    Mr. Pickard, do you recognize this document?

2    A    Yeah, I mean, it's -- I think it's the first

3  time I ever saw it, but I know what -- I know what it's

4  about.

5    Q    Okay.  What's this document about?

6    A    It's where the meth lab was found.

7    Q    Okay.  And this is from a search that happened

8  on February 12, 2012 in the early morning hours; is that

9  right?

10    A    Yes.

11    Q    According to -- and you participated in that

12  search, correct, sir?

13    A    Yes.

14    Q    Okay.  According to this report, did officers

15  from the Barbourville Police Department and Kentucky

16  State Police assist your office in conducting a search?

17    A    To the best of my memory, there was some of

18  them there, yes.

19    Q    And I'm going to ask for you to go to page 4.

20  I think it will list some of those officers.  It should

21  look like this.  Yeah.  It's going to be in that

22  paragraph right there.

23    A    Yes.

24    Q    Okay.  Mr. Pickard, can you review that

25  paragraph and let me know if officers from the Kentucky

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 963

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 153 of 463 - Page
The Deposition of JOHN PICKARD, taken on 4/19/22  ID#: 5170

151

1    State Police and Barbourville Police Department assisted
2    your department in the search?
3        A    Yes, I remember.
4        Q    Okay.  Now, when this search happened, did the
5    officers involved wear any sort of mask to cover their
6    face?
7        A    Not that I'm aware of.
8        Q    From looking at this report, are you able to
9    determine which -- and I think on that first page, if
10   you turn to the first page of this report, can you
11   determine which officer initiated charges against the
12   five people inside that residence?
13       A    Derek Eubanks.
14       Q    Okay.  And going back to page 4 of that
15   paragraph, did Dallas Eubanks and Detective Randy Hunter
16   assist your department in conducting the search?
17       A    I don't know a Randy Hunter.  No, that was --
18   yeah, for the cleanup, yes.
19       Q    Okay.  And aside from yourself, did Derek
20   Hoskins -- or Derek Eubanks assist in conducting this
21   search on behalf of the Knox County Sheriff's
22   Department?
23       A    Yes.
24       Q    Okay.  And is it fair to say that on behalf of
25   the Barbourville Police Department, that Josh Lawson,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 964

```
 1    Clay Helton, and Jacob Knuckles assisted in the search

 2    on behalf of that department?

 3         A    Yes.

 4         Q    Okay.  Now, why was this search of the

 5    residence conducted; do you recall?

 6         A    I can't say for sure.

 7         Q    Okay.  I believe that this report references

 8    something about a 911 call.  Do you have any

 9    recollection of the information provided in that call?

10         A    No, I remember.  I thought somebody called it

11    in, but I wasn't positive, so

12         Q    And Jonathan Taylor was one of the people

13    inside the residence at the time, correct?

14         A    Yes.

15         Q    Okay.  Did you have any conversations with Mr.

16    Taylor while you were at the residence with him?

17         A    No, not that I can remember, no.

18         Q    All right.  And Kayla Mills was also one of

19    the individuals inside the home at the time of the

20    search, correct?

21         A    Yes.

22         Q    Okay.  And a number of other individuals were

23    arrested during the search, right?

24         A    I think so.

25         Q    Kim Helton was arrested, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 965

The Deposition of JOHN PICKARD, taken on March 22, 2018     153

```
 1        A    Yes.
 2        Q    Michael Bailey was arrested, correct?
 3        A    I think so.  I'm not --
 4        Q    And Josh Garland was arrested as well,
 5   correct?
 6        A    (No verbal response.)
 7        Q    Now, looking at the 4th page, staying on the
 8   4th page, do you see at the top where it says, "Date and
 9   time of occurrence, February 11, 2012 at 1922 hours, to
10   February 12, 2012 at 724 hours"?
11        A    Yes.
12        Q    Is it fair to say that the officers did not
13   completely leave the scene until 7:24 a.m. on February
14   12, 2012?
15             MR. WRIGHT:  Object to form and foundation.
16             MR. WILLIAMS:  Join.
17        A    That's probably true.
18             MR. WILLIAMS:  Don't guess.  If you know, Mr.
19        Pickard, tell him, but don't guess.
20        Q    Do you have any independent recollection?
21        A    No.
22        Q    Now, you stayed at the residence and had a
23   conversation with Kayla Mills on the couch; isn't that
24   right?
25             MR. WRIGHT:  Object to form and foundation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 966

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 156 of 463 - Page
ID#: 5173
The Deposition of JOHN PICKARD, taken on 12/19/22

154

```
 1        A    I don't remember talking to Kayla that night.
 2        Q    Well, is it true, sir, that you had a
 3   conversation with Kayla Mills that lasted about an hour
 4   or two --
 5             MR. WRIGHT:  Objection.
 6        Q    -- on the couch in that residence before she
 7   was arrested?
 8        A    No.
 9             MR. WRIGHT:  Object to form and foundation.
10             MR. WILLIAMS:  Join.
11        Q    Do you have any recollection?
12        A    No.
13        Q    Have you ever told Kayla to say that she was
14   passed out in the car and woke up when she saw Jonathan
15   Taylor and Amanda Hoskins coming out of the house --
16        A    No.
17        Q    -- Katherine Mills' house?
18        A    No, I've never told her that.
19        Q    Never told her that?
20        A    No.
21        Q    Do you ever tell Kayla that you believe that
22   she fell asleep in the car when Jonathan Taylor and
23   Amanda Hoskins were inside Katherine Mills' home?
24        A    No.
25        Q    Never said anything like that?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 967

```
 1        A    No.
 2        Q    Did you ever tell Kayla Mills that you knew
 3   that she wasn't involved in the murder of Katherine
 4   Mills?
 5        A    No.
 6        Q    You never told her that?
 7        A    I don't remember telling her that, no.
 8        Q    Did you believe that Kayla Mills was involved
 9   in the murder --
10        A    Yes.
11        Q    -- of Katherine Mills?
12        A    To a point.
13        Q    Based on what?
14        A    Just -- I guess, you could say, just -- I
15   mean, I don't know, I just felt like she was involved
16   some way.  She did a lot of talking.
17        Q    To who?
18        A    To other people.
19        Q    Who?
20        A    Just people in the neighborhood told you
21   things, I can't tell you a name.
22        Q    What did Kayla allegedly tell those people?
23        A    I -- I can't recall right off.  I mean --
24        Q    You have any notes at home that would refresh
25   your recollection?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 968

```
 1        A    I don't have no notes.

 2        Q    So you had a gut feeling that Kayla was

 3   involved, is that what you're saying?

 4        A    Yes.

 5        Q    Okay.  But you didn't have any evidence that

 6   actually directly implicated Kayla in murder, correct?

 7        A    No.

 8        Q    You ever tell Kayla that she'd spend the rest

 9   of her life in jail if she didn't give a statement?

10        A    No.

11        Q    Did you ever tell Kayla that you didn't want

12   her to spend the rest of her life in jail?

13        A    I don't remember saying anything.

14        Q    When you saw Kayla Mills on February 12, 2012

15   during the search, did she tell you that she was not

16   involved in the homicide of Katherine Mills?

17        A    I don't even remember talking to Kayla Mills

18   that night.

19        Q    You said earlier you had two or three

20   conversations with Kayla throughout the investigation,

21   right?

22        A    Yes.

23        Q    Did Kayla Mills, in those conversations, al-

24   ways maintain her innocence?

25        A    Two of the times I talked to Kayla Mills, it
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 969

1    wasn't nothing to do with the murder.

2         Q    What was it to do with?

3         A    We was -- she about run over me in another

4    part of the county.  I was walking, she about run over

5    me.

6         Q    So you went to go talk to her about that?

7         A    No.  By the time I got to my car, she was too

8    far gone, she was moving on.  I went -- when I got back

9    in my car, I went to Brown Springs, she almost hit me

10   head on coming out of Brown Springs.

11        Q    Did you think it was on purpose?

12        A    No.

13        Q    What did you think she did that for?

14        MR. WRIGHT:  Object to form, foundation.

15        A    I just think she just --

16        MR. WILLIAMS:  Requires him to speculate.

17   Objection.

18        A    She just drove crazy, I guess.

19        Q    Did you talk to her about that?

20        A    I told her she needed to slow down before she

21   kills somebody.

22        Q    What did she say back?

23        A    I don't recall what she said.  She was crying,

24   she didn't say much.

25        Q    Well, you spoke to her at least one time about

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 970

```
 1    the actual homicide, right?

 2        A    Yes.

 3        Q    Okay.  In that conversation with Kayla, did

 4    she maintain her innocence to you?

 5        A    Yes.

 6        Q    Kayla Mills told you, in fact, that she didn't

 7    have anything to do with the murder, correct?

 8        A    Yes, she told me that.

 9        Q    And she told you, in fact, that she didn't

10    have any information about who did the murder, right?

11        A    I think so.

12        Q    In the conversation that you had with her,

13    Kayla never told you anything about anyone ever

14    confessing to her, correct?

15        A    Yes.

16        Q    And in fact, in your opinion, did she seem

17    cooperative --

18             MR. WRIGHT:  Object to the --

19        Q    -- with your questions about the homicide?

20             MR. WRIGHT:  Object to form and foundation.

21             MR. WILLIAMS:  I'll join.

22        Q    You can answer.

23        A    I remember.  Yeah, she was always cooperative,

24    it seemed like.

25        Q    Just -- she was a pretty young girl back then,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 971

1    right?

2        A    Yeah.

3        Q    When you had this conversation with Kayla

4    about the actual homicide investigation, not when she

5    was driving her car recklessly, but when you spoke to

6    her about the actual homicide investigation, do you

7    recall where that conversation happened at?

8        A    I remember going to her house and Jason

9    talking to her.  I might have said a couple of things, I

10   didn't say much.

11       Q    Okay.  So during that time at Kayla's house,

12   she was actually talking to you and Detective York?

13       A    Yes.

14       Q    Okay.  Were any other officers there?

15       A    No.

16       Q    Do you remember if there were any other --

17   like, was her mother or father there at the house?

18       A    I don't -- no, I don't think there was anybody

19   there.

20       Q    Okay.  So in this conversation that Kayla had

21   with you and Detective York at her home, she informed

22   both of you that she didn't have any involvement in the

23   murder, correct?

24       A    Yes.

25       Q    And during this conversation at Kayla's home,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 972

```
 1    she informed both you and Detective York that she didn't

 2    have any information about who actually committed the

 3    murder of Katherine Mills, correct?

 4         A    Yes.

 5         Q    During this conversation with you and

 6    Detective York, Kayla Mills informed you that she didn't

 7    have any knowledge of anyone confessing to have done

 8    that murder, correct?

 9         A    Yes.

10         Q    Okay.  And you believed her, right?

11              MR. WRIGHT:  Object to form and foundation.

12              MR. WILLIAMS:  I'll join.

13         Q    You can answer.

14         A    To a point.

15         Q    Now --

16              MR. WILLIAMS:  Is this a good time to take a

17         break for lunch?

18              MR. SLOSAR:  Just a couple more minutes, if

19         that's okay?

20              MR. WILLIAMS:  Okay.

21    BY MR. SLOSAR:

22         Q    Is that okay, Mr. Pickard?

23         A    That's fine.

24         Q    Okay.  And did you record that conversation

25    that you had with Kayla Mills in the house with
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 973

```
 1   Detective York?

 2       A    I didn't.

 3       Q    Okay.  Did Detective York?

 4       A    I don't think he did.

 5       Q    Okay.  Did you take any notes during that

 6   conversation?

 7       A    No, sir.

 8       Q    Did you ever document the information that you

 9   learned from Kayla Mills that day in a police report?

10       A    No.

11       Q    Did Detective York make any threats to Kayla

12   Mills during that conversation?

13       A    Not that I remember, no.

14       Q    Okay.  Did he ever -- did Detective York, in

15   that conversation, ever tell Kayla that he was going to

16   charge her with murder?

17            MR. WRIGHT:  Object to form and foundation.

18       A    I don't recall.

19            MR. WILLIAMS:  I'll join.

20       Q    Did Detective York tell her that -- did

21   Detective York, in that conversation, tell Kayla that he

22   would charge her with murder unless she gave a statement

23   against somebody?

24            MR. WRIGHT:  Object to form, foundation.

25       A    I don't recall that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 974

1      Q     Not saying it didn't happen, just saying you

2   don't remember, right?

3      A     I don't remember.

4            MR. WRIGHT:  Object to form and foundation.

5      Misstates it.

6      Q     After you spoke with Kayla that day, you

7   didn't believe that she was involved in the murder of

8   Katherine Mills, right?

9            MR. WRIGHT:  Object to form, foundation.

10            MR. WILLIAMS:  I'll join.

11      Q     Is that right?

12      A     At that time, I don't -- I don't remember what

13   I thought.

14      Q     Well, if you thought that she was involved in

15   the murder, you would have -- well, if you believed that

16   Kayla Mills was involved in the murder, would you have

17   given her her Miranda warning before interviewing her?

18      A     No.  I would have had to have evidence.  I

19   didn't have nothing.  I wouldn't have done that no way,

20   that's up to Jason York.

21      Q     That's right.  Okay.  By the time you spoke to

22   Kayla Mills, you weren't aware of any evidence that

23   implicated her in the murder, correct?

24      A     Not that I recall, no.

25      Q     How often did you try to speak with Kayla

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 975

The Deposition of JOHN PICKARD, taken on 06/19/02, page 163

```
 1   Mills during the investigation?
 2        A    I don't know.
 3             MR. WILLIAMS:  Object to the form of the
 4        question.
 5        A    I don't know.  I even tell her -- a couple of
 6   time's all I remember ever talking to her.
 7             MR. SLOSAR:  You want to take a break?  That's
 8        fine.  Can we agree to do just, like, 40 minutes;
 9        is that okay?
10             MR. WILLIAMS:  40 minutes.  That's fine.
11             VIDEOGRAPHER:  Off the record.
12                  (OFF THE RECORD)
13             VIDEOGRAPHER:  Back on the record.
14   BY MR. SLOSAR:
15        Q    Mr. Pickard, before we went on a break, I was
16   asking you some questions about a girl by the name of
17   Kayla Mills.  Do you remember that?
18        A    Yes.
19        Q    Okay.  Now, at some point, you said that you
20   had one conversation with her about a homicide
21   investigation into Katherine Mills' death; is that
22   right?
23        A    I was present.
24        Q    So you were present for one conversation with
25   Kayla Mills --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 976

 1      A    Yes.

 2      Q    -- about Katherine Mills' death, right?

 3      A    Yes.

 4      Q    Okay.  Detective York was also present, right?

 5      A    Yes.

 6      Q    Okay.  In that conversation, did Kayla tell
 7   you and Detective York that she was not dating Jonathan
 8   Taylor at the time of the murder?

 9      A    I'm pretty sure, yes.

10      Q    Okay.  And in that conversation, did Kayla
11   Mills tell you and Detective York that -- let me strike
12   that.  Sorry.

13           Did you create any police report about the
14   conversation that yourself and Detective York had with
15   Kayla about the Mills' homicide?

16      A    No.

17      Q    And that's because you didn't believe you were
18   required to, right?

19      A    I didn't think anything, any kind of reports
20   or anything.

21      Q    And that was consistent with your
22   understanding of the Knox County policies and
23   procedures, right?  Not documenting an interview?

24      A    I wasn't -- I wasn't taken anything, any --
25   any kind of notes, anything.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 977

1    Q    Okay.  But that's -- that was -- you didn't

2  have -- at the time that you met with Kayla Mills, you

3  weren't aware of any policy or procedure of Knox County

4  that would have required you to take notes or draft a

5  police report based on the information you learned from

6  her, correct?

7    A    I wasn't aware of it, no.

8    Q    Okay.  Now, between December 20, 2010 and

9  April of 2012, you knew where Kayla Mills was living in

10 Barbourville, right?

11   A    Yes.

12   Q    Okay.  And isn't it true that you actually

13 helped Detective York locate her in Barbourville?

14   A    I can't say for sure.

15   Q    Do you recall that Kayla Mills, between --

16 well, let me strike that. Between December 20, 2010 and

17 April of 2012, did Kayla Mills live across the street

18 from Escoe's Market in Barbourville, Kentucky?

19   A    I don't know the dates, but that's where I

20 know she lived.

21   Q    Okay.  Sometime during that -- and at some

22 point during that range of December 20, 2010 and April

23 1, 2012, Kayla Mills live across from Escoe's, correct?

24   A    As far as I know, yes.

25   Q    Did you ever park your police vehicle in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 978

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 168 of 463 - Page
ID#: 5185
The Deposition of JOHN PICKARD, taken on 9/29/22                    166

```
 1    Escoe's Market parking lot do surveillance on Kayla
 2    Mills?
 3         A    No.
 4         Q    Did you ever park your vehicle over at the
 5    Escoe's parking lot and watch -- or wait for Kayla Mills
 6    to come home?
 7         A    No.
 8         Q    No?  Did you ever park your police vehicle
 9    over at Escoe's Market and do surveillance on any other
10    residents that was in close proximity to it?
11         A    Not in his parking lot, I didn't.
12         Q    Did you park next to Escoe's and do
13    surveillance?
14         A    Across the road, I did.
15         Q    Okay.  And was that close to Kayla's house?
16         A    Yes.
17         Q    Okay.  And when you say, "across the road,"
18    can you describe where, approximately, you parked your
19    police cruiser?
20         A    There was a apartment building across the
21    road, I sit there a lot.  It had nothing to do with
22    Kayla Mills, though.
23         Q    What did it have to do with?
24         A    Just -- I just sit there and rest and watch
25    traffic.  We have a lot of things going on there.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 979

```
 1        Q     And did you do that -- were you known to do
 2  that between December 20, 2010 and April 1, 2012?
 3        A     I'm sure I did, yes.
 4        Q     But it's your testimony that it didn't have
 5  anything to do with Kayla Mills; is that right?
 6        A     No.  It didn't have anything to do with her.
 7        Q     If you saw Kayla Mills come home, would you go
 8  talk to her sometimes?
 9        A     No.
10        Q     No?
11        A     No.
12        Q     But when you were doing this, you know, when
13  you were sitting in this parking lot, you were aware
14  that Kayla Mills was a -- let me strike that. Between
15  two -- December 20, 2010 and April 1, 2012, you were
16  aware that Detective York wanted to interview Kayla
17  Mills for the investigation into Katherine Mills' death,
18  correct?
19              MR. WRIGHT:  Object to form and foundation.
20              MR. WILLIAMS:  Requires him to speculate.
21        A     I -- I can't say that, no.
22        Q     Okay.  Okay.  Have you ever followed Kayla
23  Mills?
24        A     No.
25        Q     Who is Kayla's grandmother, do you know?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 980

The Deposition of JOHN PICKARD, taken on 11/19/02                          168

```
 1        A    I -- I think I know who her grandma was.

 2        Q    Did you ever talk to Kayla Mills' grandmother

 3   about this case?

 4        A    No.

 5        Q    Did you ever talk to Kayla Mills' grandmother

 6   about Kayla giving a statement to you or Detective York

 7   in this case?

 8        A    No.

 9        Q    You know who Stella Smith is, right?

10        A    Yeah, I know Stella.

11        Q    And you know that -- you knew that Stella

12   Smith was Kayla's aunt --

13        A    Yes.

14        Q    -- right?

15        A    Yes.

16        Q    I know that Stella has since passed away,

17   right?

18        A    Yes.

19        Q    Yeah.  Why did you and Detective York talk to

20   Stella Smith about Kayla giving a statement?

21             MR. WRIGHT:  Object to form and foundation.

22             MR. WILLIAMS:  Join.

23        A    I don't remember me and Detective York ever

24   talking to her.

25        Q    Did you talk to Stella Smith about Kayla
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 981

1   giving a statement?

2       A    Not that I can recall, no.

3       Q    Did you ever tell Stella Smith that you wanted

4   Kayla to say that she was in the car asleep and saw

5   Jonathan and Amanda walk out of the house?

6       A    No.

7       Q    Did you ever tell Stella Smith that you wanted

8   Kayla to tell a story that implicated Jonathan Taylor

9   and Amanda Hoskins in the murder?

10      A    No.

11           MR. WILLIAMS:  Object to the form.

12      Q    Did you ever tell Stella Smith that you

13  believe that Kayla was innocent and didn't have anything

14  to do with the murder?

15      A    No.

16      Q    Mr. Pickard, I'm going to ask that you look at

17  Exhibit number 10.  It's a copy of an arrest warrant for

18  Kayla Mills for the murder of Katherine Mills.  When did

19  Detective York first tell you that he was going to

20  initiate charges against Kayla Mills for the murder of

21  Katherine?

22               (EXHIBIT 10 MARKED FOR IDENTIFICATION)

23      A    I don't remember him ever telling me that.

24      Q    When was the first time that you ever saw the

25  criminal complaint that was filed on March 14, 2012

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 982

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 172 of 463 - Page
The Deposition of JOHN PICKARD, taken on March 22, 2018  ID#: 5189

170

1    against Kayla Mills for the homicide of Katherine Mills?

2             MR. WILLIAMS:  I'll object to form.

3             MR. WRIGHT:  I'll join.

4    A    This is the first time I ever saw it.

5    Q    Okay.  Was the first time you ever learned

6    about this, during Detective York's deposition a couple

7    of weeks ago?

8    A    I mean, I -- I know we arrested her, but I

9    don't -- I mean, I don't -- that's all I know.

10   Q    Did you ever -- did Detective York ever tell

11   you that he charged Kayla Mills with murder?

12   A    Not that I recall.

13   Q    That's something that you probably would

14   recall, right?

15   A    I would think so, yeah --

16   Q    Yeah.

17   A    -- but I don't.  I don't remember that.

18   Q    Sitting here today, do you -- are you aware of

19   any evidence that implicates Kayla Mills in the homicide

20   of Katherine?

21   A    Not that I'm aware of.

22   Q    And in March of 2012, were you aware of any

23   information that implicated Kayla Mills in the murder of

24   Katherine Mills?

25   A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 983

The Deposition of JOHN PICKARD, taken on March 22, 2019                    171

```
 1        Q    Are you surprised that Detective York didn't
 2   tell you that he was able to secure an arrest warrant
 3   against Kayla for the murder of Katherine Mills?
 4             MR. WRIGHT:  Object to form.
 5        A    It's not surprising to me, but there would be
 6   long periods of time I didn't see Detective York.  He
 7   worked on his own.
 8        Q    Well, you were -- you took a statement with
 9   Detective York on March 8, 2012 from Allen Helton,
10   right?
11        A    I don't remember the date, but we did do that.
12        Q    Okay.  And I'll show you this statement later
13   on.  I'll represent to you it was March 8, 2012.
14   According to this arrest warrant, this was signed March
15   14, 2012, this arrest warrant against Kayla Mills.  Do
16   you see that?
17        A    Yes.
18        Q    Okay.  So -- and you know what sir, I'll show
19   you what we'll mark as Exhibit 15, which is a statement
20   that you and Detective York obtained from Allen Helton
21   on March 8, 2012.  Here you go, Mr. Pickard.
22                  (EXHIBIT 15 MARKED FOR IDENTIFICATION)
23             MR. WILLIAMS:  Take your time to look that
24        over before you answer any questions on it, Mr.
25        Pickard.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 984

```
 1        Q    I'm only going to -- no need to read it right
 2   now, I'm only going to ask you a question about the
 3   date.  In looking at that document, can you tell the
 4   date that you and Detective York obtained the statement
 5   from Mr. Helton?
 6        A    03/08/12.
 7        Q    Okay.  And going back to the criminal
 8   complaint of -- against Kayla Mills, the other exhibit,
 9   which was done March 14, 2012, would you agree with me
10   that you then -- you would, at least, participated in an
11   interview, within six days of Mr. York initiating
12   charges against Kayla?
13        A    Repeat that question again.
14        Q    Okay.  Would you agree with me that you
15   participated in the interview of Allen Helton within six
16   days of Mr. York initiating charges against Kayla --
17        A    Yes.
18        Q    -- for the murder of Katherine Mills?
19             MR. WRIGHT:  I'll object to form.
20        Q    And --
21             MR. WILLIAMS:  I'll join.
22        Q    -- either before or after you and Detective
23   York interviewed Mr. Helton, did Detective York ever
24   tell you that he was going to initiate charges against
25   Kayla Mills --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 985

```
 1      A     Not --

 2      Q     -- for the murder of Katherine?

 3      A     Not that I recall.

 4      Q     On March 8, 2012, at any point in time, did

 5 Detective York tell you that he had evidence implicating

 6 Kayla Mills in the homicide of Katherine Mills?

 7      A     Not that I recall.

 8      Q     At any point in time on March 8, 2012, did

 9 Detective York tell you that he had probably cause to

10 initiate charges against Kayla for the murder of

11 Katherine Mills?

12      A     Not that I recall.

13      Q     Either before or after your interview with Mr.

14 Helton, did Detective York tell you that he was going to

15 initiate charges against Amanda Hoskins and Jonathan

16 Taylor for the murder of Ms. Mills?

17            MR. WILLIAMS:  Object to the form.

18      A     Not that I recall.

19      Q     On March 8, 2012, did Detective York tell you

20 whether he had probable cause to initiate charges

21 against Amanda Hoskins and Jonathan Taylor for the

22 murder of Katherine Mills?

23      A     Not that I recall, no.

24      Q     Aside from taking the statement from -- well,

25 let me withdraw that question.  Mr. Pickard, did
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 986

The Deposition of JOHN PICKARD, taken on 02/19/22, page 174

```
 1    Detective York tell you that he agreed to not pursue
 2    charges against Kayla Mills, so long as she gave a
 3    statement implicating Jonathan Taylor?
 4            MR. WILLIAMS:  Object to form.
 5       A    No.
 6       Q    Did Detective York ever tell you whether he
 7    made any promises to Kayla in exchange for her statement
 8    against John [sic]?
 9       A    No.
10       Q    What did Detective York tell you about the
11    statement he obtained from Kayla Mills?
12       A    I don't remember anything he told me.
13       Q    Did you ever ask him how he got that
14    statement?
15       A    No.
16       Q    Did you ever ask him what that statement said?
17       A    No, not that I recall, no.
18       Q    Mr. Pickard, in your career as the sheriff of
19    Knox County for 12 years, have you ever obtained an
20    arrest warrant against a witness in order to coerce that
21    witness into giving a statement against a suspect --
22       A    No.
23       Q    -- in an investigation?
24            MR. WILLIAMS:  Object to form.
25       A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 987

```
 1        Q    Would that be a legitimate investigative
 2   action if someone were to do that?
 3             MR. WRIGHT:  Object to form and foundation.
 4             MR. WILLIAMS:  I'll join.  You can answer.
 5        A    I would think so, yes.
 6        Q    You would think that that would be a
 7   legitimate thing to do?
 8        A    Oh, no.  I think it wouldn't be legitimate.  I
 9   misunderstood you.
10             MR. WRIGHT:  I'll reiterate the objection to
11        the follow-up.
12        Q    And you know, in your opinion, would it be
13   inappropriate for a police officer to charge someone
14   with a crime for the purpose of pressuring that witness
15   into giving a statement against someone else?  Would
16   that be an inappropriate law enforcement activity?
17             MR. WRIGHT:  Object to form and foundation.
18             MR. WILLIAMS:  Join.  You can answer.
19        A    In my opinion, yes.
20        Q    And that's based upon your career in law
21   enforcement; is that right?
22        A    Yes.
23             MR. WRIGHT:  Object to form and foundation.
24        Q    You were present here a few weeks ago when
25   Detective York testified in his deposition; is that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 988

The Deposition of JOHN PICKARD, taken on May 29, 2018

176

```
 1   right?

 2       A    Yes.

 3       Q    And in that deposition, Detective York said

 4   that he agreed to not pursue the murder charges against

 5   Kayla because she gave a statement against Jonathan

 6   Taylor.  Do you recall him testifying to that effect?

 7           MR. WRIGHT:  I'll object to form.

 8           MR. WILLIAMS:  Counsel, I think if you want

 9       him to review Mr. York's testimony and ask him

10       whether he recalls it as it's been stated, that's

11       fine, but I don't -- I think it's inappropriate to

12       just pick out statements that counsel recalls being

13       said and then asking about it.

14           MR. SLOSAR:  All right.  Let's go off.

15           MR. WILLIAMS:  I think he should be given the

16       statement and the context.

17           MR. SLOSAR:  Let's go off the record.

18           VIDEOGRAPHER:  Off the record.

19               (OFF THE RECORD)

20           VIDEOGRAPHER:  We're back on the record.

21   BY MR. SLOSAR:

22       Q    Sir, I'm going to read this to you that you

23   can follow along.  This is from the deposition

24   transcript of Jason York on February 13, 2018. Beginning

25   at 1:62, line 4.  Question, "So was your understanding
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 989

1   that Kayla Mills implicated Jonathan Taylor in the

2   murder of Katherine Mills, that you would not proceed

3   forward with the charges against her for the murder,

4   correct?"  Answer, "Say that very first part again."

5   "Okay.  So there was an understanding between you and

6   Kayla Mills and her counsel, that if she gave a

7   statement implicating Jonathan Taylor in the murder of

8   Katherine Mills but not implicating herself, that you

9   would not proceed forward with the arrest warrant and a

10  citation against her for the murder of Ms. Mills,

11  correct?"  Objection by Mr. Wright.  Answer, "Yeah.

12  That's what the understanding of myself and her attorney

13  had." Question, "Okay.  Did you document that

14  understanding in any police report?"  Answer, "No."  See

15  those questions and answers, Mr. Pickard?

16      A    Yeah.

17      Q    Okay.  You were present for Detective York's

18  deposition, right?

19      A    Yes.

20      Q    It was a long day, right?

21      A    Oh, it was.

22      Q    And at that deposition, as we just went over,

23  Detective York testified that he had an agreement with

24  Kayla Mills and her attorney that if she gave a

25  statement implicating Jonathan Taylor in the murder of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 990

The Deposition of JOHN PICKARD, taken on March 22, 2018                178

```
 1    Katherine Mills, that he would not proceed forward with

 2    the arrest warrant that he had initiated against her for

 3    the murder.  Okay?

 4        A    Uh-huh.  Yes.

 5        Q    Was that your recollection of Mr. York's

 6    testimony?

 7             MR. WRIGHT:  I'll object to form.

 8        A    I read it there, I couldn't remember.

 9        Q    Speaks for itself, right?

10        A    Yes.

11        Q    Okay.  Did Detective York ever tell you that

12    he had reached that agreement with Kayla Mills?

13             MR. WRIGHT:  I'll object to form.

14        A    Not that I recall, no.

15        Q    Do you believe that it was appropriate for

16    Detective York to charge Kayla Mills with murder in

17    order to elicit a statement from her implicating

18    Jonathan Taylor?

19             MR. WRIGHT:  Object to form and foundation.

20             MR. WILLIAMS:  I'll join the objection.  You

21        can answer.

22        A    I don't really know.  I don't know why he

23    arrested her.  I mean, that was -- I don't know what

24    evidence he had or anything.

25        Q    And is it in your experience, do police
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 991

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 181 of 463 - Page
ID#: 5198
The Deposition of JOHN PICKARD, taken on 02/19/22, Page 179

```
 1   officers who initiate charges against somebody for a

 2   crime, are they usually supposed to make a factual basis

 3   for probable cause in the warrant for an arrest?

 4            MR. WRIGHT:  Object to form.

 5   A    As far as I understand it, yeah.

 6   Q    Can you look at the Exhibit number 10, which

 7   is the arrest warrant against Kayla Mills?

 8   A    Yes.

 9   Q    Looking at this arrest warrant, and there is

10   an opening where normally there would be a factual

11   predicate to the charges, right, Mr. Pickard?

12   A    Yes.

13            MR. WRIGHT:  Object to form.

14   Q    Looking in the part of this form where there

15   would normally be a factual predicate to the charges, is

16   there any factual basis listed there by Detective York

17   as to how he formed probable cause against Kayla for the

18   murder of Katherine Mills?

19            MR. WRIGHT:  Object to form.

20            MR. WILLIAMS:  I have to object to the form of

21       the question, but you can answer.

22   A    I don't see it on this form, no.

23   Q    I'm going to now ask for you to -- well, did

24   Detective York ever tell you about his plan to arrest

25   Kayla Mills for murder unless she came to the police
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 992

```
 1    station on March 16, 2012 to give a statement?

 2              MR. WRIGHT:  Object to form.

 3       A     I don't recall that, no.

 4       Q     Did Detective York ever tell you that he

 5    received a statement from Kayla Mills on March 16, 2012?

 6       A     I don't remember that.

 7       Q     Did he ever tell you any of the details of the

 8    statement he received from Ms. Mills on March 16, 2012?

 9       A     Not that I recall.

10       Q     Sir, I'm going to ask you to look at Exhibit

11    number 11.  It's the March 16, 2012 police report of

12    Kayla Mills.  Do you have that in front of you?

13                   (EXHIBIT 11 MARKED FOR IDENTIFICATION)

14       A     Yes.

15       Q     You ever seen this police report before today?

16       A     No.

17       Q     Okay.  Now, you testified earlier that between

18    the time that Katherine Mills was found dead and the

19    time when Kayla gave a statement in March of 2012, that

20    you had a few run-ins with her; is that right?

21       A     Yes.

22       Q     Okay.  And that in fact, you and Detective

23    York actually interviewed Kayla at her home on one

24    occasion about the murder of Katherine Mills, correct?

25       A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 993

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 183 of 463 - Page ID#: 5200
The Deposition of JOHN PICKARD, taken on March 9, 2012

181

1    Q    Okay.  Sir, I'm going to ask for you to look

2  at this report.  Have you ever seen this report prior to

3  today?

4    A    No.

5    Q    Did you ever review this report during the

6  underlying homicide investigation?

7    A    No.

8         MR. WILLIAMS:  Object to the form.

9    Q    Did Detective York ever provide you with this

10 report during the homicide investigation?

11   A    No.

12   Q    Looking at the second paragraph, do you see

13 where it says, "Kayla Mills stated that she dated

14 Jonathan Taylor.  I asked Kayla to tell me about all the

15 times Jonathan talked about killing Katherine Mills."

16 You see that?

17   A    Yes.

18   Q    Okay.  Now, prior to March 16, 2012, Kayla had

19 actually told you and Detective York, in a separate

20 interview, that she was not dating Jonathan Taylor

21 around the time of the murder, correct?

22        MR. WRIGHT:  I'll object to the form.

23   A    I can't remember her saying that.

24   Q    Okay.  Well, when you and Detective York --

25 I'll -- here's something I'm going to ask that you do.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 994

```
 1    Can you read to yourself the second paragraph of this

 2    report and let me know when you're finished?

 3         A    Okay.  Okay.

 4         Q    Now, you had a moment to read through this.

 5         A    (Coughs.)

 6         Q    You okay?

 7         A    I'm fine.

 8         Q    Okay.  You interviewed Kayla Mills prior to

 9    March 16, 2012 when Detective York took this statement,

10    correct?

11         A    I talked to her.  I can't remember the dates.

12         Q    Sure.  Sure.  But it was sometime before

13    Detective York got this statement, right?

14         A    Yeah.  I'm about pretty sure it was.

15         Q    Yeah.  And in your conversation with you, and

16    Detective York, and Kayla, she never told you that she

17    knew that Jonathan Taylor had it in him to kill

18    somebody, correct?

19         A    I don't recall her saying that, no.

20         Q    Kayla never told you that she broke up with

21    Jonathan Taylor because he had it in him to kill

22    somebody, correct?

23         A    I don't recall.

24              MR. WRIGHT:  I'll object to form.

25         Q    Kayla Mills never told you that Jonathan
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 995

```
1    Taylor confessed to her that he killed Katherine,
2    correct?
3         A    Not that I recall, no.
4         Q    Kayla Mills never told you that Jonathan
5    Taylor said he left one lying up on the creek and didn't
6    care to leave another, correct?
7         A    Correct.
8         Q    Kayla never told you that Jonathan brought up
9    Amanda Hoskins and William Lester, and money being taken
10   from Ms. Mills, correct?
11        A    I don't recall that.
12        Q    Yeah.  In fact, earlier here, you testified
13   that Kayla told you and Detective York when she met with
14   you-all, that she didn't have any knowledge or
15   participation in the murder of Katherine Mills, correct?
16        A    Yes.
17        Q    Would you agree that the information that
18   Kayla -- that is attributed to Kayla in this statement
19   is the opposite of what she told you and Detective York
20   when you interviewed here -- her before?
21             MR. WRIGHT:  Object to form.
22             MR. WILLIAMS:  Object to the form.
23        Q    You can answer.
24             MR. WILLIAMS:  You can answer.
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 996

1    Q    Now, Mr. Pickard, have you ever, as the

2  sheriff in Knox County, have you ever recorded

3  interviews with a witness?

4    A    No.

5    Q    No.  Okay.  You never have?

6    A    Not that I can remember, no.

7    Q    You ever trained any of your officers on

8  recording interviews?

9    A    No.

10    Q    In your opinion, would it be appropriate for a

11  law enforcement officer to stop a recorded interview for

12  the purpose of telling that witness what to say?

13         MR. WRIGHT:  Object to form and foundation.

14    A    No.

15    Q    Would that be against the training that you

16  received?

17         MR. WRIGHT:  Object to form and foundation.

18    Q    Well, let me strike the question.  I'm going

19  to hand you what we'll mark as Exhibit number 12, Mr.

20  Pickard.  Actually, I've already handed it to you. I

21  apologize.  This is the -- it's a transcription of the

22  statement that Kayla gave.

23            (EXHIBIT 12 MARKED FOR IDENTIFICATION)

24    A    Oh.

25    Q    So it's this last one.  Mr. Pickard, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 997

1   weren't present when Detective York obtained a statement

2   from Kayla Mills on March 16, 2012, correct?

3           MR. WILLIAMS:  Take as much time as you need

4       to read it over before you answer questions.

5   A   No, I wasn't there.

6   Q   Prior to today, have you ever seen the

7   transcribed statement from Kayla Mills from

8   March 16, 2012?

9   A   No.

10  Q   Did Detective York ever talk to you about the

11  transcribed statement he got from Kayla Mills?

12  A   No.

13  Q   Okay.  Sir, how many times did you meet with

14  Michael Crump during the underlying investigation into

15  Katherine Mills death?

16  A   I don't ever remember talking to him but one

17  time.  And I didn't talk to him, I was there.

18  Q   Who else was there?

19  A   Detective York --

20  Q   Okay.

21  A   -- was talking to him.

22  Q   And do you recall where that conversation took

23  place?

24  A   At Ms. Mills' residence.

25  Q   Was -- how close in time to the murder was it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 998

The Deposition of JOHN PICKARD, taken on March 8, 2018 186

```
 1   that Detective York was interviewing Mr. Crump in your
 2   presence?
 3        A    I'm not sure, it was a -- I'm not sure.
 4        Q    Do you vaguely remember when Amanda Hoskins,
 5   and Jonathan Taylor, and William Lester were charged
 6   with murder in March of 2012?
 7        A    Yes.
 8        Q    Okay.  Was the conversation that Detective
 9   York had in your presence with Mr. Crump prior to the
10   plaintiffs being charged with murder?
11        A    Yes.
12        Q    Okay.  What do you remember about this
13   conversation with Mr. Crump that took place at Katherine
14   Mills' residence?
15        A    I just -- I don't remember a lot, I just
16   remember he was talking about he saw a guy with a coat
17   on and walking toward the car.  And he said something
18   about a female, but I couldn't tell you.  I don't
19   remember what that was.
20        Q    Was anybody else there aside from you
21   yourself, Detective York, and Mr. Crump?
22        A    I don't remember.
23        Q    Do you recall how long that conversation
24   lasted?
25        A    It wasn't very long.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 999

```
 1        Q      Did Mister -- did Detective York show Mr.
 2   Crump photographs of Jonathan Taylor in that
 3   conversation?
 4        A      Not that I remember.
 5        Q      I'm going to show you what we'll mark as
 6   Exhibit number 19.
 7                    (EXHIBIT 19 MARKED FOR IDENTIFICATION)
 8             MR. WILLIAMS:  You made Kayla Mills' statement
 9        number 12; is that right?
10             MR. SLOSAR:  Yeah.  I'm bouncing.  Sorry.
11             MR. WILLIAMS:  That's all right.  Just trying
12        to keep up.
13   BY MR. SLOSAR:
14        Q      Mr. Pickard, here's Exhibit number 19. Please,
15   take a look at this.  When was the first time you saw
16   this sketch?
17        A      I don't remember.  I remember seeing it, but I
18   don't remember when.
19        Q      Well, when you saw it, was it your
20   understanding that this was a sketch based upon the
21   description that Michael Crump gave to officers in this
22   case?
23        A      Yes.
24        Q      Is it fair to say that you and Detective York
25   were looking for suspects in this investigation based --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1000

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 190 of 463 - Page
ID#: 5207
The Deposition of JOHN PICKARD, taken on 05/19/12, page 188

```
 1    that would have matched the physical description of this
 2    sketch?
 3                 MR. WILLIAMS:  Object to the form.
 4         A    Not that I recall.
 5         Q    Well, let me ask it a different way.  Did he
 6    use this sketch in the investigation to try to find the
 7    real killer?
 8                 MR. WILLIAMS:  Object to the form.
 9                 MR. WRIGHT:  Yeah.  I'll object to the form of
10         that, too.
11         A    I don't -- don't recall that.
12    BY MR. SLOSAR:
13         Q    Well, did Detective York use this sketch to
14    try to identify a suspect?
15         A    I don't -- I don't know.
16         Q    But you saw the sketch and you were aware that
17    it came from Michael Crump's description, right?
18         A    Yes.
19         Q    Did you request that a polygraph examination
20    be conducted of Allen Helton in January of 2011?
21         A    No.
22         Q    Do you know who did that?
23         A    No, I don't.
24         Q    Did Detective York ever tell you that he
25    requested a polygraph examination of Allen Helton in
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1001

1   January of 2011?

2        A    Not that I recall.

3        Q    When did you first learn that Allen Helton

4   failed the polygraph examination in this case?

5             MR. WILLIAMS:  Objection.  Lack of foundation.

6        A    I have no idea, date wise.

7        Q    Okay.  But prior -- sorry.  Prior to Ms.

8   Hoskins and Mr. Taylor being charged with murder, did

9   you learn that Allen Helton and Jessie Lawson had failed

10  polygraph examinations?

11       A    I heard at some point in time that they did,

12  but I can't tell you when -- when I was told that.

13       Q    And was it your understanding that Allen

14  Helton, Jessie Lawson, failed polygraph examinations

15  directly about whether they were involved in killing Ms.

16  Mills?

17            MR. WRIGHT:  Object to form.

18       A    I don't remember being told what it was about.

19       Q    You just knew that they failed their

20  polygraphs, right?

21       A    Yes.

22       Q    Do you know who told you?

23       A    Detective York.

24       Q    Did you ever conduct any follow-up

25  investigation into Allen Helton, Jessie Lawson, or Mike

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1002

1    Simpson, after you found out about the failed polygraph
2    examinations?
3        A    No.
4        Q    Did Detective York ever request your
5    assistance in follow-up investigations into Allen
6    Helton, Jessie Lawson, or Mike Simpson, after you
7    learned of the failed polygraph examinations?
8            MR. WRIGHT:  Object to form.
9        A    Not that I recall.
10           MR. WILLIAMS:  Join.
11       Q    Now, Mr. Pickard, how did you come into
12   contact with Allen Helton on March 7, 2012?
13       A    I -- I don't remember that date.
14       Q    Did I give you -- do you have an Exhibit
15   number 15, the statement from Allen Helton?  Yeah, it's
16   right there.  Did I not put a sticker on it?  I should
17   have.
18       A    There ain't no sticker on it.
19       Q    Oh, wait, here it is.
20       A    Oh, at the top.  Yeah, okay.  I got you.
21       Q    Okay.
22           MR. WILLIAMS:  Make sure you've had time to
23       review it before you answer any questions about it.
24       Q    So this is a statement that you and Detective
25   York obtained from Allen Helton on March 8, 2012; is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1003

```
1    that right?

2         A    Yes.

3         Q    Okay.  And you came into contact with Allen

4    Helton the day before he gave this statement to you and

5    Detective York, correct?

6         A    This -- no.  This was all the same day.

7         Q    It was all the same day?

8         A    Yes.

9         Q    How did you come into contact with Mr. Helton

10   that day?

11        A    The jail contacted me and said he wanted to

12   talk to me about the murder.

13        Q    Do you recall what jail it was?

14        A    Knox County Jail, but I don't recall who

15   called me.

16        Q    What did you do after you got the phone call?

17        A    I had somebody go over and bring him over to

18   the sheriff's office.

19        Q    Do you remember who that was?

20        A    No, I don't.

21        Q    And prior to that day, have you talked to

22   Allen Helton previously about the Mills' homicide

23   investigation?

24        A    Not that I remember, no.

25        Q    Have you been present when any other officer
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1004

```
 1    talked to Allen Helton previously about the Katherine

 2    Mills' homicide investigation?

 3         A    Not that I remember, no.

 4         Q    Okay.  You don't have any notes or reports at

 5    home that would refresh your recollection, right?

 6         A    No.

 7         Q    That's because you didn't take any notes or

 8    recorded statements during this case, right?

 9         A    That's right.

10         Q    So what happens when Mister -- well, I believe

11    you said you got a phone call from the jail saying that

12    Mr. Helton wanted to talk about the murder, right?

13         A    Yes.

14         Q    Okay.  And at that point, you made a request

15    to retrieve Mr. Helton, correct?

16         A    Yes.

17         Q    Did he make any phone calls to any other

18    officers to join you in the interview of Mr. Helton that

19    day?

20         A    Not that I recall.

21         Q    Okay.  Well, how did Jason York end up in your

22    office on March 8, 2012?

23         A    I called him.

24         Q    Okay.  And how did you get ahold of Mr. York?

25         A    I'm sure I called his cell phone.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1005

The Deposition of JOHN PICKARD, taken on March 22, 2018

193

```
 1        Q     Okay.  So you had his cell phone number at the
 2   time?
 3        A     Yes.
 4        Q     Did you tell him that Mr. Helton wanted to
 5   talk?
 6        A     I told him what Mr. Helton told me and he
 7   wanted to tell him.
 8        Q     So you had a conversation with Mr. Helton
 9   prior to calling Detective York?
10        A     Yes.  I mean, I didn't -- I just let him tell
11   me what he had on his mind.
12        Q     All right.  Was anybody else present when you
13   spoke to Mr. Helton?
14        A     There was somebody with me, but I can't tell
15   you who he was, I don't remember.
16        Q     Was it Derek Eubanks?
17        A     No.
18        Q     Do you know who else it could have been?
19        A     It just -- probably one of the deputies, I
20   don't remember.
21        Q     Mr. Helton was incarcerated at the time,
22   right?
23        A     Yes.
24        Q     He was charged with crimes; is that right?
25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1006

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 196 of 463 - Page
ID#: 5213
The Deposition of JOHN PICKARD, taken on 9/29/17                    194

1    Q    You remember what crimes he was charged with?

2    A    Theft.

3    Q    Now, did you talk to Mr. Helton about the trip

4  he took to Florida?

5    A    No.

6    Q    Did you talk to Mr. Helton about Mike Simpson

7  having money after Katherine Mills was found dead?

8    A    No.

9    Q    Did you talk to Mr. Helton about the rental

10 car that was paid for with cash on the day of Ms. Mills'

11 death?

12   A    No.

13   Q    Did you talk to Mr. Helton about how he got

14 money to go on a pill run to Florida?

15   A    No.

16   Q    Did you talk to Mr. Helton about how Mike

17 Simpson got money to go on a pill run to Florida?

18   A    No.

19   Q    Did you ask him about any of that stuff?

20   A    No.

21   Q    All right.  Now, prior to March 8, 2012, Allen

22 Helton never told you that he saw Amanda Hoskins and

23 William Lester at Escoe's Market the day before

24 Katherine Mills was found dead, right?

25   A    He did tell me that, but I don't know on the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1007

```
 1   dates.
 2        Q    Well -- and I'm asking, prior to the -- well,
 3   the statement that you have in front of you, the
 4   statement that you and Detective York got from Allen
 5   Helton, he had never provided you with any of that
 6   information prior to March 8, 2012, correct?
 7        A    No.
 8        Q    Okay.
 9        A    So prior to March 8, 2012, Mr. Helton never
10   told you that Amanda Hoskins informed him that she was
11   going to tie up an old woman when she came out of the
12   bathroom, right?
13        A    Right.
14        Q    Prior to March 8, 2012, Allen Helton never
15   told you that he saw Amanda Hoskins after Ms. Mills'
16   death, and that she had thousands of dollars folded up
17   in a big wad, right?
18        A    Prior to 8th?
19        Q    Yes.
20        A    No.
21        Q    Prior to March 8, 2012, Allen Helton never
22   told you that Mike Simpson knew that Mr. Lester and Ms.
23   Hoskins were going to rob Katherine Mills, correct?
24        A    Correct.
25        Q    Now, this conversation that you had with Mr.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1008

```
 1   Helton on March 8, 2012, where did that conversation
 2   take place?
 3        A    At the sheriff's office.
 4        Q    And when Mr. Helton came into the room, was he
 5   wearing handcuffs?
 6        A    I can't remember, but I'm sure he was, we
 7   always did cuff them.
 8        Q    Did any of the jail guards stay with him?
 9        A    I'm sure they waited outside, but I'm not
10   positive.  I can't remember.
11        Q    Do you recall whether your door was open or
12   closed?
13        A    Closed.
14        Q    And who else was present when you first talked
15   to Mr. Helton that day?
16        A    I don't remember who was in there with me.
17        Q    Now, the report that you have in front of you,
18   who drafted that report?  Was it you or Detective York?
19        A    Detective York.  It wasn't me.
20        Q    Okay.  Did you ever review that report to make
21   sure it was accurate?
22        A    I never looked at it before.  I just kind of
23   glanced through it now.
24        Q    Before today, have you ever seen this report?
25        A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1009

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 199 of 463 - Page
ID#: 5216
The Deposition of JOHN PICKARD, taken on 4/26/18  197

```
 1        Q    Okay.  Did you and Detective York have a
 2   conversation about who was going to draft this report?
 3        A    No.
 4        Q    How long did you speak to Allen Helton prior
 5   to calling Detective York?
 6        A    Probably six or seven minutes.
 7        Q    And in the six or seven minutes, what promises
 8   did you make to Mr. Helton?
 9             MR. WRIGHT:  Object to form.
10        A    I didn't make no promise.  I did tell him I
11   would try to help him on these other charges if he was
12   telling the truth.
13        Q    Well, what were the charges that you were
14   referring to?
15        A    He was charged with stealing metal and it had
16   like -- I know one of them was a felony, but it worked
17   itself out.
18        Q    Allen Helton was in jail at the time, right?
19        A    Yes.
20        Q    And you promised that if he gave a statement,
21   that he would get out of jail that day on a bond, right?
22             MR. WRIGHT:  Object to form.
23             MR. WILLIAMS:  Object to the form.  Asked and
24        answered.
25        A    I didn't promise that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1010

The Deposition of JOHN PICKARD, taken on March 22, 2017          198

```
 1   BY MR. SLOSAR:
 2        Q    Well, did you tell him you would see what you
 3   could do?
 4        A    I told him I can see what I do about the
 5   charges.
 6        Q    After Allen Helton gave a statement to
 7   yourself and Detective York on March 8, 2012, was he
 8   released that same day from the Knox County Jail?
 9        A    I couldn't say.  I don't remember that.
10        Q    Do you have any reason to dispute that?
11             MR. WRIGHT:  Object to form.
12        A    No, I don't.
13        Q    Did you contact anybody to see if Allen Helton
14   could get bonded out that day after he gave a statement
15   to you and Detective York?
16        A    No.  Not that I remember, no.
17        Q    Did Detective York tell you that he was going
18   to contact somebody to see if Allen Helton could get
19   bonded out that day?
20        A    I don't recall that.
21        Q    Do you recall having a conversation with Allen
22   Helton about getting him released?
23             MR. WRIGHT:  Object to form.
24             MR. WILLIAMS:  I'll join.
25        A    I don't recall that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1011

```
 1        Q     So you're not saying it didn't happen, you're
 2   saying you don't remember, right?
 3              MR. WRIGHT:  Object.
 4        A     I'm saying I don't remember it happening, no.
 5        Q     You told him you could see what you could do
 6   on the charges, but you don't remember anything about
 7   trying to get him released that day --
 8        A     No.
 9        Q     -- is that your testimony?
10        A     No.  Yes, I don't remember.
11        Q     What did you tell Allen Helton when he came
12   into the room with his handcuffs?
13              MR. WILLIAMS:  I'm sorry, what?  Who did --
14        who are you speaking about?  I'm sorry.
15        Q     Well, did -- Mr. Pickard, when Allen Helton
16   was brought over from the jail in handcuffs, the door
17   was closed, and the jail guard was outside.  What did
18   you first say to Mr. Helton?
19              MR. WRIGHT:  I'll object to form.
20        A     I just asked him what he wanted, to start
21   with.
22        Q     And did Allen Helton tell you that he wanted
23   help out on his criminal charges?
24        A     No.  Not in the beginning, no.
25        Q     Well, who first brought that up, you or him?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1012

```
 1      A    He did.

 2      Q    What did he say?

 3      A    He told him that if I would help him on the

 4  charges he had against him, that he would tell about the

 5  murder.  He knowed some -- had some information on it.

 6      Q    And you didn't have any -- you said that you

 7  made that agreement as long as Allen was telling the

 8  truth, is that what you said?

 9      A    Yes.

10           MR. WRIGHT:  Object to the form.

11           MR. WILLIAMS:  Object to the form.  Go ahead.

12      Q    What investigation did you do to determine

13  whether the statement that you and Detective York got

14  from Allen Helton on March 8, 2012, what investigation

15  did you do to determine whether it was truthful or not?

16      A    I didn't do anything.

17      Q    Part of your agreement with him was that you

18  would see what you could do on his criminal charges as

19  long and he told you the truth, right?

20      A    Yes.

21           MR. WRIGHT:  Object to form.

22      Q    But you didn't do any --

23           MR. WILLIAMS:  Join.

24      Q    -- investigation to determine whether he told

25  you the truth; is that right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1013

```
 1       A     No, I didn't.

 2       Q     Was it you or did Detective York, who told Mr.

 3  Helton that he would be released on bond if he gave a

 4  statement implicating Ms. Hoskins and Mr. Taylor?

 5             MR. WRIGHT:  Object to form and foundation.

 6             MR. WILLIAMS:  Object to formation and

 7       foundation.

 8       A     That wasn't me.

 9       Q     Did Detective York make that promise to him?

10       A     I don't remember that.

11       Q     Was it you or Detective York who told Mr.

12  Helton that he would not be charged with murder, so long

13  as he gave a statement against Mr. Taylor and Ms.

14  Hoskins?

15             MR. WILLIAMS:  Object to the form.  Assumes

16       facts not in evidence.

17             MR. WRIGHT:  And I'll join.

18       A     It wasn't me.

19  BY MR. SLOSAR:

20       Q     Do you recall whether Detective York made that

21  statement to Mr. Helton?

22       A     I don't --

23             MR. WRIGHT:  Same objection.

24       A     I don't remember him making that statement.

25       Q     Not saying it didn't happen, you just don't
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1014

```
 1   remember, right?

 2        A    Right.

 3             MR. WRIGHT:  Object to the form of that.

 4        Q    What did Mr. Helton tell you in the six or

 5   seven minutes that you talked to him before you called

 6   Detective York?

 7        A    He just -- he told me, you know, to -- who

 8   killed Katherine Mills.  And he wanted to give a

 9   statement on it and I'm -- I told him that anyone that'd

10   help on them -- those charges, I told him that was

11   Detective York's case, I would contact him, and if he

12   wanted to tell him, you know, I said as long as you're

13   telling me the truth.  If you want to tell Jason -- Mr.

14   York that, you can.  And I called Jason and it seemed

15   like it was a short time thereafter, he came down and --

16   and talked to him.

17        Q    Mr. York did?

18        A    Yes.

19        Q    And when Detective York came down there, did

20   he come into your sheriff's office?

21        A    Yes.

22        Q    Okay.  And was that at the Knox County

23   Sheriff's Department?

24        A    Yes.

25        Q    What floor was that on?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1015

The Deposition of JOHN PICKARD, taken on 9/19/2019

203

```
 1         A     It ain't but one floor.

 2         Q     One floor?  I'm sorry.  That how you know I'm

 3    not from here.  Did you talk to Detective York outside

 4    of Mr. Helton's presence at all?

 5         A     I don't think so, I talked to him in there

 6    when he come in.  I just told him what he had.

 7         Q     And by that time, is it fair to say that Mr.

 8    Helton didn't give you any of the specifics that he

 9    knew?

10               MR. WRIGHT:  Object to form.

11         A     No.

12         Q     He just told you generally that he was ready

13    to give a statement, right?

14         A     That -- concerning the --

15         Q     The murder.

16         A     -- the murder of her.

17         Q     Yeah.  But he didn't give you any of the

18    details of what he knew prior to Detective York getting

19    there?

20         A     Not that I recall, no.

21         Q     Okay.  So he said that he wanted to give a

22    statement on the murder, he wanted some help with his

23    pending charges, is that fair to say?

24         A     Yes.

25         Q     And you said, "I'm not the lead guy on this
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1016

```
 1   case, I got to get Detective York over here," right?

 2      A     Yes.

 3      Q     Did you do any further questioning of Mr.

 4   Helton after you called Detective York, but before

 5   Detective York got there?

 6      A     No.

 7      Q     That's because you were waiting for the lead

 8   investigator to come into that room, right?

 9      A     Yes, I let him do it.

10      Q     Let him do his thing?

11      A     Yes.

12      Q     All right.  Did you record any of the first

13   part of that interview?

14      A     No.

15      Q     Okay.  Now, when Mr. York -- when Detective

16   York came into the room, did he have a conversation with

17   Mr. Helton in your presence?

18      A     Yes.

19      Q     How long was that?

20      A     I don't recall.  It wasn't very long --

21      Q     Okay.

22      A     -- but I can't recall exactly.

23      Q     Did Mr. Helton tell Detective York that he

24   would give a statement as long as he got some help out

25   on those pending charges?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1017

The Deposition of JOHN POE KARR, taken on 12/19/18  205

```
 1              MR. WRIGHT:  Object to form.
 2        A     I don't recall.
 3        Q     Did Mr. Helton make any requests of Detective
 4    York that he wanted help on his pending cases?
 5        A     I don't recall how that was brought about.
 6        Q     But at some point prior to taking this
 7    statement, or finishing the statement from Allen Helton,
 8    Detective York knew that Allen Helton wanted help on his
 9    pending charges in exchange for giving a statement; is
10    that right?
11              MR. WRIGHT:  Object to form and foundation.
12              MR. WILLIAMS:  Object to form.
13        A     Yes.
14        Q     And in fact, wouldn't you have told Detective
15    York about the request that Allen Helton made to have
16    help on his pending cases in exchange for giving a
17    statement?
18              MR. WRIGHT:  Object to form.
19              MR. WILLIAMS:  Object to the form.
20        A     I'm pretty sure I told him what he wanted.
21        Q     That's not something that you would have
22    hidden from Detective York, right?
23        A     No.
24        Q     That's an important fact in the case, right?
25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1018

```
 1        Q    Is it fair to say that Detective York led

 2   Allen Helton's questioning during his recorded

 3   statement?

 4        A    Yes.

 5             MR. WRIGHT:  Now, object to form on that.

 6        Q    Well, was Detective York asking questions to

 7   Allen Helton on March 8, 2012, in your office?

 8        A    Yes.

 9        Q    Were you present when Detective York was

10   asking those questions?

11        A    Yes.

12        Q    Did you ever leave the room when Detective

13   York asked those questions?

14        A    No.

15        Q    You were present the whole time, right?

16        A    Yes.

17        Q    Okay.  Did you ever make any attempts to stop

18   Detective York's questioning of Allen Helton on March 8,

19   2012 in your office?

20        A    No.

21        Q    So Exhibit 16 is an audio file.  The Bates

22   number is PL25962.  It's the audio recorded statement of

23   Allen Helton.  I'm going to hand Mr. Pickard Exhibit 17,

24   which is the transcript of the Allen Helton recording,

25   PL15840 through 15854.  Is that what you were going to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1019

```
 1   get?
 2                   (EXHIBIT 16 MARKED FOR IDENTIFICATION)
 3                   (EXHIBIT 17 MARKED FOR IDENTIFICATION)
 4        MR. SLOSAR:  Is that what you were going to
 5   get?
 6        MR. WRIGHT:  Yeah.  Do you have an extra one?
 7        MR. SLOSAR:  Yeah.
 8        MR. WRIGHT:  Okay.
 9        MR. SLOSAR:  I figured that's --
10        MR. WILLIAMS:  Take the time to read that over
11   before you answer questions on it.
12   BY MR. SLOSAR:
13        Q    I'm not going to -- we're going to go through
14   this bit by bit, Mr. Pickard.  Mr. Pickard, have you
15   ever seen this transcribed statement from Allen Helton
16   besides today?
17        A    No.
18        Q    First time you've seen this?
19        A    First time I've saw it.
20        Q    Okay.  Mr. Pickard, is it fair to say that the
21   March 8, 2012 statement from Mr. Helton implicates
22   Amanda Hoskins and Jonathan Taylor in the murder of
23   Katherine Mills?
24        A    I need to read some of it first.
25        Q    If you want, the police report is -- you can
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1020

1  certainly read through this, but the police report,

2  also, Exhibit 15, is a summary of the transcript.

3           MR. WRIGHT:  Why don't we take a minute to go

4     off the record --

5           MR. SLOSAR:  Sure.

6           MR. WRIGHT:  -- to let him read it.

7           MR. SLOSAR:  That's fine.

8           MR. WRIGHT:  Okay?

9           MR. WILLIAMS:  Thank you.

10          MR. SLOSAR:  Yep.

11          VIDEOGRAPHER:  Off the record.

12               (OFF THE RECORD)

13          VIDEOGRAPHER:  Back on the record.

14  BY MR. SLOSAR:

15     Q    Mr. Pickard, do you have Exhibit number 15 in

16  front of you?

17     A    Yes.

18     Q    Okay.  Now, would you agree that -- so this is

19  the police report that Detective York drafted based upon

20  the conversation that you and he had with Allen Helton

21  on March 8, 2012, right?

22     A    Yes.

23     Q    Okay.  Fair to say that the statement from

24  Mister -- obtained from Mr. Helton on March 8, 2012,

25  implicates Amanda Hoskins and Jonathan Taylor in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1021

The Deposition of JOHN PICKARD, taken on March 22, 2019                  209

```
 1    murder of Katherine Mills?

 2        A    Yes.

 3        Q    Mr. Pickard, would you agree that Mister --

 4    Detective York provided information to Allen Helton

 5    during his recorded statement on March 8, 2012?

 6            MR. WRIGHT:  Object to form --

 7            MR. WILLIAMS:  Object to form.

 8            MR. WRIGHT:  -- and foundation.

 9    BY MR. SLOSAR:

10        Q    You can answer.

11        A    Yes.

12        Q    And I'm going to go through these paragraphs

13    with you real quick, okay?  So I'm going to start at the

14    second paragraph of the police report.  Yep.  Do you see

15    where it says in the second paragraph that, "Allen

16    stated."  So this would be the second -- "Allen stated

17    Amanda asked him if he wanted to make some money, and

18    told him how."  Do you see that?

19        A    Yes.

20        Q    Prior to that sentence, it says that this

21    conversation happened on Sunday, December 19, 2010 when

22    Allen Helton was pumping gas at Escoe's Market, Dewitt,

23    right?

24        A    Yes.

25        Q    Okay.  Now, according to the report Allen
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1022

```
 1   Helton, provided that information to yourself and
 2   Detective York on March 8, 2012, right?
 3        A    Yes.
 4        Q    Now, did Detective York provide that
 5   information to Mr. Helton on March 8, 2012?
 6             MR. WRIGHT:  Object to form.
 7             MR. WILLIAMS:  Requires him to speculate.
 8        A    Not that I recall, no.
 9        Q    Okay.  Do you see in the report where it says,
10   "Amanda told him about tying an old woman up when she
11   came out to tie her in the bathroom --
12        A    Yes.
13        Q    -- when she came out to the bathroom."  Do you
14   see that?
15        A    Yes.
16        Q    It's the third sentence in that second
17   paragraph, right?
18        A    Yes.
19        Q    Okay.  And according to this report -- well,
20   let me ask you it this way:  Did Detective York tell
21   Allen Helton this information --
22             MR. WRIGHT:  Object to form.
23        Q    -- during the March 8, 2012 interview?
24        A    I don't recall that, no.
25        Q    So you're not saying it didn't happen, you're
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1023

```
 1   saying you don't recall, right?

 2        A    I just don't -- no, I don't recall.

 3        Q    Okay.  But according to this report, Allen

 4   Helton is the one that's supposedly is providing this

 5   information, right?

 6        A    Yes.

 7        Q    All right.  Now, I'm going to go a little bit

 8   farther in this paragraph.  Do you see where it says, "I

 9   asked Allen if he wanted to be a part of it, he said no.

10   Allen also stated Amanda told him that Katherine had

11   $15,000."

12        A    Yes.

13        Q    Do you see that?

14        A    Yes.

15        Q    Okay.  Did Detective York provide that

16   information to Allen Helton on March 8, 2012?

17        A    I'm not aware of that.

18        Q    Not saying it didn't happen, just saying you

19   don't recall, right?

20        A    I don't recall.

21        Q    Okay.  Would you agree that according to this

22   report, it's supposed to be Allen Helton providing this

23   information.  That's the way it reads, right?

24             MR. WRIGHT:  Object to form.

25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1024

The Deposition of JOHN PICKARD, taken on March 9, 2012                                                   212

```
 1         Q    Okay.  I'm going to go to the last paragraph
 2    on this first page.  It says -- about half way down, and
 3    it says, "I asked Allen if they have the money that they
 4    had stolen from Katherine?  He stated, 'Yes.'  Allen
 5    then stated -- or Allen stated Amanda had approximately
 6    $4,000 on her.  Allen stated Amanda Hoskins had the
 7    money folded up, like, he would put a rubber band on
 8    it."  Do you see that, sir?
 9         A    Yes.
10         Q    Okay.  Did Detective York provide that
11    information to Allen Helton on March 8, 2012?
12              MR. WRIGHT:  Object to form.
13         A    Not that I'm aware of.
14         Q    Do you recall one way or the other?
15         A    No.
16         Q    According to this report, though, this is
17    supposed to be Allen Helton providing the information to
18    York, not the other way around, right?
19         A    Yes.
20         Q    Now, turning to the second page, do you see
21    where it says, "Allen stated it was true that Mike
22    Simpson knew William and Amanda was going to rob
23    Katherine, but did not -- they were going to kill her."
24    I think it's supposed to say, but they did not know --
25    but did not know they were going to kill her.  You see
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1025

1    that, sir?

2        A    Yes.

3        Q    Okay.  And then it says, "Then Mike found out

4    and started crying when Jessie called and told him they

5    were in Florida."  Do you see that?

6        A    Yes.

7        Q    Okay.  Did Detective York provide that

8    information to Allen Helton in the March 8, 2012

9    interview?

10       A    Not that I'm aware of.

11       Q    Do you recall one way or the other?

12       A    No.

13       Q    Okay.  According to this report, though, this

14   is Allen Helton volunteering this information, right?

15       A    Yes.

16            MR. WRIGHT:  Object to the form.

17       Q    Okay.  And again, after you spoke to -- when

18   you spoke to Allen Helton, he didn't give you any

19   substantive information about the knowledge that he was

20   going -- well, let me withdraw that question.  Prior to

21   calling Detective York, Allen Helton basically told you

22   that he had information about the Mills' homicide and

23   that he wanted a deal; is that right?

24       A    Yes.

25       Q    Okay.  You didn't have any substantive

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1026

```
 1   conversations with him about the specific details that
 2   he was going to say, right?
 3            MR. WRIGHT:  Object to the form.
 4            MR. WILLIAMS:  Join.  You can answer.
 5   A    No.
 6   Q    Okay.  And in fact, you waited for Detective
 7   York to get there for the questioning to really begin,
 8   right?
 9   A    Yes.
10   Q    Okay.  And I believe you testified earlier,
11   that Detective York spoke very briefly to Allen Helton
12   prior to turning on the recorder, right?
13            MR. WRIGHT:  Object to form, foundation.
14   A    I don't recall how -- it wasn't very long.
15   Q    Okay.  Fair to say that Allen Helton didn't
16   get into all the details with Jason York before the
17   recorder was turned on?
18   A    Yes.
19   Q    Okay.  So when the recorder was turned on,
20   that was the first time that Mr. Helton was able to tell
21   whatever information he knew about the murder of
22   Katherine Mills, right?
23   A    Yes.
24   Q    Okay.
25            MR. WILLIAMS: To Mr. Pickard?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1027

The Deposition of JOHN PICKARD, taken on March 22, 2018                                                                215

```
 1            MR. SLOSAR:  To Mr. Pickard -- well, let me --
 2       I'll go into that.
 3            MR. WILLIAMS:  Okay.
 4  BY MR. SLOSAR:
 5       Q    Prior to the recorder being turned on, Mr.
 6  Helton didn't give you any specific details that he knew
 7  about the homicide of Katherine Mills, correct?
 8       A    No.
 9       Q    Okay.  Prior to the recorder being turned on,
10  Mr. Helton didn't give any specific details about the
11  murder of Katherine Mills to Detective York, correct?
12       A    Correct.
13            MR. WILLIAMS:  At the time of the interview.
14            MR. SLOSAR:  On March 8, 2012.
15            MR. WILLIAMS:  Thank you.
16  BY MR. SLOSAR:
17       Q    Okay.  And at no time prior to March 8, 2012
18  did you and Detective York question Allen Helton about
19  the homicide of Katherine Mills together, right?
20       A    Not that I'm aware of.
21       Q    Okay.  So the first time on March 8, 2012, in
22  your office, that Allen Helton would have provided
23  information in specific details about the murder of
24  Katherine Mills, would have been when the recorder was
25  turned on; is that right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1028

```
 1        A    Yes.

 2        Q    And was the recorder ever turned off during

 3   the middle of the interview that Detective York and

 4   yourself were conducting of Allen Helton in your office?

 5        A    Not that I recall, no.

 6        Q    Okay.  You don't have any notes to refresh

 7   your memory, right?

 8        A    No.

 9        Q    All right.  Sir, I am going to play some Audio

10   and I'm just going to ask for you to listen.  I'm going

11   to ask you some questions after each audio clip, okay?

12        A    Okay.

13        Q    This is all from -- this is Exhibit number --

14   I want to say 16, and this is from the audio recorded

15   March 8, 2012 interview of Allen Helton.  It's PL25962.

16             MR. WILLIAMS:  There's a transcript right

17        there.

18             MR. SLOSAR:  This time stamp is one minute 25

19        seconds through one minute 48 seconds.  And, Mr.

20        Pickard, I don't have a page number for you to

21        follow along.  You certainly are welcome to.  I'll

22        represent to you that this is going to be on page

23        2, this first one.  But I want you more to listen

24        than read, okay?

25             MR. WILLIAMS:  We can locate it after you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1029

```
 1         listen to it.
 2         Q    Sure.  All right.  So listen to this clip and
 3    I'm going to ask you some questions after, all right?
 4                   (AUDIO PLAYED)
 5         Q    Sir, is that audio from the March 8, 2012
 6    recorded statement that yourself and Detective York took
 7    of Allen Helton?
 8         A    Yes.
 9         Q    And would you agree -- well, was the person
10    doing most of the talking in that recording, in that
11    clip, Detective York?
12         A    Yes.
13         Q    Okay.  And the other voice was Allen Helton,
14    right?
15         A    Yes.
16         Q    Do you agree that in the recording we just
17    listened to, that Detective York told Mr. Helton that he
18    saw Ms. Hoskins and Mr. Lester at Escoe's Market while
19    he was pumping gas, the day before Katherine was dead?
20         A    Yes.
21         Q    In that recorded statement, Mr. Helton did not
22    provide that information to yourself and Detective York,
23    correct?
24         A    Correct.
25         Q    Mr. Helton just agreed with the information
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1030

1    that Detective York provided to him, correct?

2            MR. WRIGHT:  Object to form.

3        A    Yes.

4        Q    And, Mr. Pickard, did you take any steps to

5    stop that process from happening?

6        A    No.

7            MR. WRIGHT:  Object to form.

8            MR. WILLIAMS:  Object to the form.  Lack of

9        foundation.

10       Q    All right.  I'm going to play the next clip.

11   It's from three minutes and six seconds to three minutes

12   and 55 seconds.  The same interview.

13           MR. WRIGHT:  Do you know what page this is on?

14       Q    Please listen to this, I may ask you some

15   questions.

16           MR. SLOSAR:  I don't.

17               (AUDIO PLAYED)

18       Q    One moment.  Okay.  Sir, is that audio from

19   the recorded statement that yourself and Detective York

20   took of Allen Helton on March 8, 2012?

21           MR. WRIGHT:  Object to the form.

22       A    (No verbal response.)

23       Q    Would you agree that in the recording that we

24   just listened to, that Detective York told Mr. Helton

25   that Mr. Lester heard everything that was said by Ms.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1031

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 221 of 463 - Page
ID#: 5238
The Deposition of JOHN PICKARD, taken on 12/19/17

219

1    Hoskins?

2            MR. WRIGHT:  Object.

3       A    Yes.

4       Q    Would you agree that in the recording we just

5    listed to, that Detective York told Mr. Helton that Ms.

6    Hoskins said, "Do you want to make some money? Williams

7    ex-mother-in-law has 15,000."

8       A    Yes.

9       Q    Would you agree that in the recording we just

10   listened to, that Detective York told Mr. Helton that

11   she goes out every morning to use the bathroom?

12      A    Yes.

13      Q    Will you agree that in the recording we just

14   listened to, that Detective York told Mr. Helton that

15   they were either going to tie her up or just lock her

16   in?

17      A    Yes.

18           MR. WRIGHT:  Object to form.

19      Q    Would you agree that in the recording we just

20   listened to, that Detective York told Mr. Helton that he

21   didn't want to talk to them no more that day?

22           MR. WRIGHT:  Object to form.

23      A    Could you repeat that question?

24      Q    Sure.  Would you agree that in the recording

25   we just listened to, that Detective York told Allen

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1032

```
 1  Helton that Helton didn't want to talk to them no more
 2  that day?
 3        A    Yes.
 4             MR. WRIGHT:  Same objection.
 5        Q    And there were -- in the recorded statement
 6  and the part of the recording that we just listened to,
 7  is it fair to say that Mr. Helton did not provide that
 8  information to you and Detective York?
 9             MR. WRIGHT:  I'll object to the form.
10             MR. WILLIAMS:  Object to the form of the
11        question.
12             MR. WRIGHT:  Foundation.
13             MR. WILLIAMS:  He can only answer as to what
14        information that Mr. Helton provided to him.
15        Requires him to speculate in what he provided to
16        Mr. York.
17  BY MR. SLOSAR:
18        Q    You can answer.
19        A    Yes.
20        Q    Fair to say that Mr. Helton just agreed with
21  the information that Detective York was providing to him
22  in your office on March 8, 2012?
23             MR. WRIGHT:  Object to form.  Foundation.
24             MR. WILLIAMS:  Join.
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1033

Case: 6:17-cv-00184-REW-HAI Doc #: 108-20 Filed: 02/10/20 Page: 223 of 463 - Page
The Deposition of JOHN PICKARD, taken on March 22, 2012
ID#: 5240                                                                    221

    Q    All right.  I'm going to play another clip.
This is six minutes and 20 seconds through six minutes
and 52 seconds.  Please listen and I'm going to ask a
question, okay?
                    (AUDIO PLAYED)
    Q    Sir, is that audio from the recorded statement
that yourself and Detective York took from Allen Helton
on March 8, 2012?
    A    Yes.
    Q    Would you agree that in the recording we just
listened to, that Detective York told Allen Helton that
Amanda Hoskins had a big wad of money?
         MR. WRIGHT:  Object to form.
    A    Yes.
    Q    Would you agree --
         MR. WILLIAMS:  I'll join.
    Q    -- that in the recording we just listened to,
that Detective York told Allen Helton that Amanda
Hoskins' wad of money was either flat or folded over?
         MR. WRIGHT:  I'm going to object to the form
    of that, too.
    A    Yes.
    Q    Would you agree that the recording we just
listened to, that Detective York told Allen Helton that
Amanda Hoskins told him that the money was from the job?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1034

```
 1        A    Yes

 2        Q    In that recorded statement, Mr. Helton did not

 3   provide that information to yourself and Detective York,

 4   correct?

 5             MR. WRIGHT:  Object to form.

 6             MR. WILLIAMS:  Same objection I made

 7        previously.  He can testify as to what Mr. Helton

 8        said to him.

 9        A    Yes.

10        Q    And in fact, Mr. Helton, on March 8, 2012 in

11   your office, which was agreeing with the information

12   that Detective York was providing to him, correct?

13             MR. WRIGHT:  Object to form.

14             MR. WILLIAMS:  Object.  I'll join.

15        A    (No verbal response.)

16        Q    I'm going to play eight minutes and 20 seconds

17   through nine minute [sic], three seconds.  Please

18   listen.  I'm going to ask you some questions.

19                  (AUDIO PLAYED)

20        Q    Sir, is that audio from the recorded statement

21   that you and Detective York took from Allen Helton on

22   May 8 -- or March 8, 2012?

23        A    Yes.

24        Q    Okay.  Would you agree then that in the

25   recording we just listened to, that Detective York told
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1035

The Deposition of JOHN PICKARD, taken on 3/16/17    223

```
 1   Allen Helton, "Jessie's testified that Mike started
 2   crying about Katherine, and you were in the car with him
 3   when he started crying about Katherine, right?"
 4            MR. WRIGHT:  Object to the form.
 5            MR. WILLIAMS:  Object to the form, too.
 6            MR. WRIGHT:  Join.
 7       Q    Would you agree that Detective York told Mr.
 8   Helton, "He knew that they were going to rob her
 9   beforehand, but he didn't know they was going to.  They
10   weren't supposed to kill her, right?"
11            MR. WILLIAMS:  Same objection.
12            MR. WRIGHT:  Same objection.  Join.
13       A    Yes.
14       Q    In that recorded statement, Mr. Helton did not
15   provide that information to yourself and Detective York,
16   correct?
17            MR. WILLIAMS:  Same objection.
18            MR. WRIGHT:  Join.
19            MR. WILLIAMS:  He can testify as to what Mr.
20       Helton said to him.
21       A    (No verbal response.)
22   BY MR. SLOSAR:
23       Q    And Mr. Helton just agreed with the
24   information on March 8, 2012 in your office that
25   Detective York was providing to him, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1036

The Deposition of JOHN PICKARD, taken on 05/10/12                                     224

```
 1        A    Correct.
 2             MR. WRIGHT:  Object to form.
 3        Q    I'm going to play nine minutes and 37 seconds
 4   through nine minutes and 53 seconds.  Please listen.
 5   I'll ask you some questions.
 6                    (AUDIO PLAYED)
 7        Q    Sir, is that audio from the recorded statement
 8   that yourself and Detective York took of Allen Helton on
 9   March 8, 2012?
10        A    Yes.
11        Q    Would you agree that in the recording we just
12   listened to, Detective York told Mr. Helton that Mike
13   started crying and he asked Mike what's up, and Mike
14   turned to him and said, "They killed her"?
15        A    Yes.
16             MR. WRIGHT:  Object to form.
17             MR. WILLIAMS:  I'll join.
18        Q    On March 8, 2012 in your office, Mr. Helton
19   did not provide that information to yourself and to
20   Detective York, correct?
21             MR. WRIGHT:  Object to form.
22             MR. WILLIAMS:  Same objection.  He can testify
23        as to what Mr. Helton said to him.
24   BY MR. SLOSAR:
25        Q    You can answer.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1037

The Deposition of JOHN PICKARD, taken on March 22, 2018                    225

```
 1        A    Correct.
 2        Q    And in fact, Mr. Helton was just agreeing with
 3   the information that Detective York was providing to
 4   him, correct?
 5             MR. WRIGHT:  Object to form.
 6             MR. WILLIAMS:  Requires him to speculate of
 7        what Helton was doing.
 8        A    Correct.
 9        Q    And you were present when that was happening,
10   correct?
11        A    Correct.
12        Q    You didn't take any steps to stop that from
13   happening, correct?
14             MR. WRIGHT:  Object to form.
15             MR. WILLIAMS:  Objection.  Lack of foundation.
16        Assumes facts not in evidence.
17   BY MR. SLOSAR:
18        Q    Is that correct, sir?
19        A    Correct.
20        Q    After listening to the recording, would you
21   agree that Detective York provided information for Allen
22   Helton to repeat during his March 8, 2012 statement?
23             MR. WRIGHT:  Object to form.
24             MR. WILLIAMS:  Requires him to speculate.
25        Q    You can answer.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1038

The Deposition of JOHN PICKARD, taken on May 19, 2017          226

```
 1        A     Yes.

 2        Q     And in fact, Detective York provided

 3  information to Allen Helton on March 8, 2012 that

 4  implicated Amanda Hoskins and Jonathan Taylor in the

 5  murder of Katherine Mills, correct?

 6              MR. WRIGHT:  Object to form.

 7        A     Correct.

 8        Q     And when Detective York's report states that

 9  Mr. Helton provided that information to him first,

10  that's not correct, right?

11              MR. WRIGHT:  Object to form.

12              MR. WILLIAMS:  Requires him to speculate.

13        A     Could you repeat that?

14        Q     Sure.  When Detective York says in his police

15  report that Allen Helton provided that information to

16  Detective York and yourself, when he says that in his

17  report, that's not accurate, right?

18              MR. WRIGHT:  Same objection.

19              MR. WILLIAMS:  Requires him to speculate.  He

20        can testify as to what Mr. Helton told him.

21        A     Correct.

22  BY MR. SLOSAR:

23        Q     Now, I know you -- we talked earlier about the

24  discussion with Mr. Helton about helping him out on his

25  pending charges.  Do you remember that?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1039

```
 1        A     Yes.
 2        Q     Okay.  Did you ever take any steps to help Mr.
 3   Helton with those charges?
 4        A     No.
 5        Q     Do you remember whether Jason York took any
 6   steps -- did -- well, let me ask it a different way. Did
 7   Jason York ever tell you that he took any steps to help
 8   Mr. Helton with those charges?
 9        A     No.
10        Q     Okay.  And you know, earlier we talked at
11   length about the conversations that happened before the
12   recorder got turned on on March 8, 2012; is that right?
13        A     Yes.
14        Q     Okay.  Is it fair to say that none of the
15   specific facts that are in this report, none of those
16   facts were revealed by Allen Helton, Detective York
17   [sic], in your presence prior to the recorder being
18   turned on on March 8, 2012, right?
19              MR. WRIGHT:  Object to form.
20        A     Yes.
21        Q     Mr. Pickard, you never made any threats to
22   Allen Helton before that statement was recorded, right?
23        A     No.
24        Q     And after that statement was recorded, you
25   didn't make any threats to Allen Helton, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1040

1      A    No.

2      Q    Did Detective York ever tell Allen Helton in

3  your presence on March 8, 2012, that he didn't need to

4  talk to any members of the defense team?

5           MR. WRIGHT:  Object to form, foundation.

6      A    Not that I'm aware of.

7      Q    Sir, I'm going to show you what we'll mark as

8           Exhibit number 18.  We're almost done.  Before

9  we get there, Mr. Pickard, let me ask you a couple of

10  questions.  The first one is:  Do you know Jackie

11  Steele?

12               (EXHIBIT 18 MARKED FOR IDENTIFICATION)

13      A    Yes.

14      Q    Okay.  Did you now Jackie Steele back in April

15  of 2012?

16      A    Yes.

17      Q    Okay.  Did you ever tell Jackie Steele that

18  Detective York was feeding Allen Helton information

19  during his March 8, 2012 statement?

20           MR. WRIGHT:  Object to form, foundation.

21      A    No.

22      Q    Did you ever tell Jackie Steele that --

23           MR. WILLIAMS:  I'll join in that objection.

24      Q    -- Detective York -- well, sorry.  Today was

25  the first time -- is -- was today the first time you saw

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1041

1    Detective York's report relating to the March 8, 2012

2    interview of Allen Helton?

3        A    Yes.

4        Q    Okay.  So you weren't then -- if you read the

5    report and noticed that things were false inside of it -

6    - well, let me strike that question.

7             You wouldn't have had an opportunity to inform

8    Jackie Steele that parts of the police report were false

9    because you didn't have an opportunity to review it

10   while the case -- the criminal case was still pending;

11   is that right?

12            MR.  WRIGHT:  I'm going to object to the form

13       and foundation.

14            MR. WILLIAMS:  Assumes facts not in evidence.

15       A    Yes, I never seen the form before.

16   BY MR. SLOSAR:

17       Q    You were there when the statement was taken,

18   but you didn't see what Detective York wrote up after

19   that; is that right?

20       A    Right.

21       Q    Okay.  Sir, do you recognize this document?

22       A    I've never seen it before, but I'm familiar

23   with it.

24       Q    All right.  Well, you wrote this letter,

25   right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1042

The Deposition of JOHN PICKARD, taken on March 22, 2012                    230

```
 1      A     That's just -- that's when he brought him over
 2    to talk to me.
 3      Q     And I know it says March 27, 2012.  Is that --
 4    that's probably a wrong date, right?
 5      A     Yeah.
 6            MR. WRIGHT:  Object to form.
 7      A     It would have to be.
 8      Q     Because you remember talking to Allen Helton
 9    on the same day that he was -- that he gave a statement,
10    right?
11      A     Yes.
12      Q     Is it possible that you talked to Allen Helton
13    on March 7, 2012, and not March 8th?
14      A     It's possible, but I don't know.
15      Q     Okay.  I know it's been a long time.  I
16    thought that maybe the two in here might have been a
17    typo and that maybe you talked to him the day before.
18      A     No.
19            MR. WRIGHT:  I'm going to object to the form,
20      foundation.
21      Q     You don't recall, though, right?
22      A     No, I don't recall.
23      Q     Okay.  So it says that Deputy Gambrel,
24    according to your letter, that Deputy Gambrel arrested
25    Mr. Helton on a warrant for receiving stolen property;
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1043

1    is that right?

2        A    Yes.

3        Q    Okay.  And then Deputy Gambrel brought Mr.

4    Helton to the sheriff's office to speak with you; is

5    that right?

6        A    Yes.

7        Q    And when Mr. Helton got there, he told you

8    that he would help -- if you had helped him with the

9    receiving stolen property charges, that he would get a

10   lot of information on the Mills' murder; is that right?

11       A    Yes.

12       Q    And you told Mr. Helton that if this was true,

13   that you would see what you could be done with getting

14   him a deal on the stolen property charges; is that

15   right?

16       A    Yes.

17            MR. WILLIAMS:  Object to the form of the

18       question.

19            MR. WRIGHT:  I join that.

20   BY MR. SLOSAR:

21       Q    And after that, you contacted Detective York

22   to come and interview Mr. Helton; is that right?

23       A    Yes.

24       Q    All right.  Now, according to this letter, you

25   didn't actually assist Mr. Helton with his charges like

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1044

```
 1    you had told him that you would, right?
 2             MR. WRIGHT:  Object to form.
 3       A    I didn't have to.
 4       Q    And why was that?
 5       A    It took care of itself.
 6       Q    Took care -- what do you mean by that?
 7             MR. WRIGHT:  Object to form.
 8       A    The very next day or two, he went to court on
 9    it and they settled it in court that morning.
10       Q    Okay.  So you didn't have a chance to even
11    help him?
12       A    Right.
13       Q    I understand.  Okay.  Looking at the following
14    page, it's going to be the back side because I got these
15    double-sided, again.
16             MR. WILLIAMS:  Did you mark this, Mr. Slosar?
17             MR. SLOSAR:  Yeah.  This is marked as 18.
18             MR. WILLIAMS:  Number 18.
19    BY MR. SLOSAR:
20       Q    According to the back side of this, was Allen
21    Helton a confidential informant for the Cumberland Tax
22    Force, UNITE?
23       A    I have no idea.
24       Q    Okay.  Well, will you review these documents
25    and let me know if he was or not?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1045

The Deposition of JOHN PICKARD, taken on March 22, 2018                     233

```
1              MR. WILLIAMS:  Counsel, I will let him answer

2         these questions to the best of his ability, but can

3         we agree that as far as it relates to confidential

4         informants and how they're handled, that we'll keep

5         that portion of the transcript sealed to the

6         public?

7              MR. SLOSAR:  I think, you know, I wouldn't --

8         I don't have an objection to putting this under the

9         protective order, but we actually -- our complaint

10        alleges that he was an informant --

11             MR. WILLIAMS:  Okay.

12             MR. SLOSAR:  -- so I don't -- I don't have an

13        objection to putting this under seal.  I can't, you

14        know, I think it's pretty public that he was.

15             MR. WILLIAMS:  Well, if Mr. Helton's disclosed

16        the fact of it to you himself, then I guess the

17        confidentiality is waived.

18             MR. SLOSAR:  Sure.  Sure.  He has.

19        A    Pretty obvious that he was.

20   BY MR. SLOSAR:

21        Q    All right.  Well, let me ask you the question

22   and we'll move forward, okay?

23        A    Okay.

24        Q    All right.  So based upon your review of these

25   documents, prior to Allen Helton -- prior to March 8,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1046

```
 1  2012 when yourself and Mr. York got a statement from

 2  Allen Helton, was he a confidential informant for the

 3  Cumberland Task Force UNITE unit?

 4          MR. WRIGHT:  Object to form, foundation.

 5    A    I don't -- I wouldn't have no way of knowing

 6  that.

 7    Q    All right.  Well, based upon these documents,

 8  was it -- is it your belief that Allen Helton was a

 9  confidential informant?

10          MR. WRIGHT:  Object to form, foundation.

11    A    Yes.

12    Q    Okay.  All right.  And, Mr. Pickard, you

13  participated in questioning Jonathan Taylor during the

14  underlying investigation into Katherine Mills' death; is

15  that right?

16    A    I think I was there, I didn't question him.

17    Q    I appreciate the distinction.  But that

18  questioning that you were present for happened at the

19  Barbourville Police Department, right?

20    A    Yes.

21          MR. WRIGHT:  I'm going to the form,

22      foundation.

23    Q    And was Detective Broughton and Detective York

24  present for Jonathan Taylor's questioning?

25          MR. FARAH:  Object to the form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1047

The Deposition of JOHN PICKARD, taken on May 19, 2011                    235

```
 1              MR. WRIGHT:  Join.
 2      A    Yes.
 3      Q    Okay.  And were they the ones primarily
 4  responsible for questioning Mr. Taylor at the
 5  Barbourville Police Department sometime in 2011 or 2012?
 6              MR. FARAH:  Object to form.
 7              MR. WRIGHT:  Join.
 8      A    I'm not familiar with that.
 9      Q    You just don't recall exactly who was doing
10  the questioning?
11              MR. WRIGHT:  Object to form, foundation.
12      A    I don't remember dates.
13      Q    Okay.
14      A    I remember being there.
15      Q    Okay.  And you were there with Detectives
16  Broughton and York, too, right?
17      A    Yes.
18      Q    And they were questioning Mr. Taylor, right?
19              MR. FARAH:  Object.
20              MR. WRIGHT:  Object to form, foundation.
21      A    I remember us being there and I remember them
22  asking some questions, but --
23      Q    And during that time, Jonathan Taylor is being
24  questioned about the murder of Katherine Mills, correct?
25              MR. WRIGHT:  Object to form and foundation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1048

The Deposition of JOHN PICKARD, Taken on 04/19/2012            236

```
 1       Asked and answered.
 2       A    Yes.
 3       Q    And I know that you don't recall any of the
 4   specific questions that were posed to Mr. Taylor.  Is
 5   that fair?
 6       A    No.
 7       Q    Was the interview or questioning recorded?
 8       A    I have no idea.
 9       Q    Were you taking notes?
10       A    No.
11       Q    Were any of your colleagues taking notes?
12       A    Not that I'm aware of.
13       Q    And by "colleagues," I'm referring to Mr.
14   Broughton and Mr. York.  Were they taking notes that you
15   can recall?
16       A    Not that I know of.
17       Q    Do you remember whose idea it was to put
18   photographs of the crime scene on the table during the
19   questioning of Jonathan Taylor?
20            MR. WILLIAMS:  Asked and answered.
21            MR. WRIGHT:  Objection to form and foundation.
22       Q    You can answer.
23       A    No, I don't.
24       Q    Do you recall who the first person was during
25   that interview to threaten Mr. Taylor that he would be
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1049

```
 1   charged with murder?

 2           MR. WILLIAMS:  Object to the form.

 3           MR. WRIGHT:  Objection.  Join.

 4      A    I don't --

 5           MR. WILLIAMS:  Assumes facts not in evidence.

 6   BY MR. SLOSAR:

 7      Q    Did Mr. Taylor continue maintaining his

 8   innocence throughout that questioning?

 9           MR. WRIGHT:  Object to form, foundation.

10      A    I don't recall.

11      Q    Now, prior to participating in the -- well,

12   let me withdraw the question.  Prior to being present at

13   the questioning of Jonathan Taylor at the Barbourville

14   Police Department, you were familiar with the sketch by

15   Michael Crump, it's Exhibit 19 --

16      A    Yes.

17      Q    -- is that right?

18           MR. WRIGHT:  Objection to form, foundation.

19      Q    Okay.  And sometime after this questioning,

20   yourself and Detectives York and Broughton participated

21   in taking photographs of Mr. Taylor; is that right?

22           MR. WRIGHT:  Object to the form.

23      A    I don't remember that.

24      Q    But you were present when photographs of Mr.

25   Taylor were done, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1050

The Deposition of JOHN PICKARD, taken on 04/18/2017  238

```
 1        A    I was -- I was there, but I don't remember
 2   anybody taking any pictures.
 3        Q    You don't?
 4        A    I just don't, no.
 5        Q    Okay.
 6        A    I very well could have been outside at that
 7   time, I don't know, I don't remember.
 8        Q    I'm going to show you what we'll mark as
 9   Exhibit number 20.  Okay.  Please take a look at this,
10   Mr. Pickard.
11             MR. SLOSAR:  Can you pass that back?
12        Q    Now, will you take a look at these
13   photographs, Mr. Pickard?  Do you recall -- well, whose
14   idea was it to give Jonathan Taylor a hoodie to put on
15   for these photographs?
16                  (EXHIBIT 20 MARKED FOR IDENTIFICATION)
17        A    I can't answer that, I don't know.
18        Q    Were you there when Mr. Taylor was instructed
19   to put a hoodie on?
20        A    I don't remember that, no.
21        Q    Were you present when Mr. Taylor was
22   instructed to put the hoodie over his head?
23        A    No, I don't remember that.
24             MR. WRIGHT:  Object to form, foundation.
25        Q    And it's your testimony that you don't recall
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1051

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 241 of 463 - Page
ID#: 5258
The Deposition of JOHN PICKARD, taken on 04/19/17                    239

1    anything about these photographs being taken; is that

2    right?

3         A    Right.

4         Q    Did you have a conversation with Detectives

5    Broughton and York where someone said something to the

6    effect of, "Wait till these pictures make it so that we

7    can charge him with murder"?

8              MR. WRIGHT:  Objection to form and foundation.

9              MR. FARAH:  Form.

10        A    No.

11        Q    Did you have any conversation with Detectives

12   York and Broughton about sending photographs of Jonathan

13   Taylor to Michael Crump in Oklahoma?

14        A    No.

15        Q    No.  Anybody ever tell you that photographs

16   were sent of Jonathan Taylor to Oklahoma for Michael

17   Crump to view?

18        A    No, not that I recall.

19        Q    When was the first time you learned that

20   Michael Crump looked at photographs of Jonathan Taylor

21   and did not identify him?

22             MR. WRIGHT:  Object to form and foundation.

23        A    I don't know that I've ever heard that, I

24   don't.

25        Q    Will you look at Exhibit number 19 which is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1052

```
 1   the sketch of Michael Crump?  And will you pull out the
 2   Exhibit number 8, which are the photographs of Mike
 3   Simpson?  Not Jonathan Taylor, I'm sorry. Mr. Pickard,
 4   does the photographs before you of Exhibit number 8, the
 5   picture of Mike Simpson, does he look similar to the
 6   sketch from Michael Crump?
 7            MR. WRIGHT:  Object to form.
 8            MR. WILLIAMS:  I'll join.
 9   A    There might be some similarity there.
10   Q    Okay.
11   A    I don't know.
12   Q    His -- the front of his hair looks similar,
13   right?
14            MR. WRIGHT:  Object to form.
15   Q    The sketch, how it's sticking out of the
16   hoodie, he's got -- Mike Simpson has a male version of
17   bangs; is that right?
18   A    Yes.
19   Q    And the sketch has a mustache, which is
20   similar to the one that appears on Mike Simpson's face;
21   is that right?
22            MR. WRIGHT:  Object to form.
23   A    Yes.
24   Q    And the profile of their -- of Mike Simpson's
25   face looks similar to that in the sketch, which stems
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1053

The Deposition of JOHN PICKARD, Taken on 04/09/19

241

```
 1   from Michael Crump's description; is that right?
 2            MR. WRIGHT:  Object to form.
 3            MR. WILLIAMS:  I'll join.
 4       A    Yes.
 5       Q    Sheriff Pickard, I'm going to ask you some
 6   general questions, okay?  Have you ever lied to a
 7   witness in a criminal investigation?
 8       A    No.
 9       Q    Based upon the -- your knowledge of what a law
10   enforcement officer is supposed to do, would it be
11   appropriate for an officer to lie to a witness during a
12   criminal investigation?
13            MR. WRIGHT:  Object to form and foundation.
14            MR. WILLIAMS:  I'll join.
15       A    I think sometimes you can do that if you're --
16   you're working an investigation and I've -- I've let
17   people -- I've led them to believe I knowed something I
18   didn't.  I don't know whether you call that lying or
19   not, but --
20       Q    Well, would you ever tell a witness that you
21   would do something for them when you had no intention of
22   doing so?
23       A    No.
24            MR. WRIGHT:  Object to form and foundation.
25       Q    Would you ever tell a witness that you were
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1054

1   going to charge them with a crime knowing that you

2   didn't have probable cause to do so?

3          MR. WRIGHT:  Object to form, foundation.

4      A    No.

5      Q    Mr. Pickard, have you ever yelled at a witness

6   while questioning them in a criminal investigation?

7      A    No.

8          MR. WRIGHT:  Object to form, foundation.

9      Q    Is that something that you would have accepted

10  your deputies at the Knox County Sheriff's Department to

11  do?

12         MR. WRIGHT:  Object to form.

13         MR. WILLIAMS:  Requires him to speculate, but

14     he can answer.

15     A    I don't have a problem with yelling, as long

16  as that's as far as it goes.

17     Q    Have you ever threatened a witness in a

18  criminal investigation while questioning them?

19     A    No.

20     Q    Would that be acceptable of law enforcement

21  activity?

22         MR. WRIGHT:  Object to form, foundation.

23     A    To an extent, yeah.

24     Q    You think that that is acceptable for police

25  officers to yell at witnesses while they're

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1055

```
 1   investigating?

 2            MR. WRIGHT:  Object to form, foundation.

 3            MR. WILLIAMS:  Object to the form.

 4        A    No.

 5        Q    Have you ever swore at a witness while

 6   interviewing them in a criminal investigation?

 7        A    No.

 8        Q    Is that acceptable behavior from law

 9   enforcement officers?

10            MR. WRIGHT:  Object to form, foundation.

11        A    I'm really not sure.

12        Q    Have you ever told a witness that you were

13   going to put them in prison unless they told you the

14   story that you wanted them to tell?

15        A    Not that I recall.

16        Q    Is that acceptable behavior in 2010 of a law

17   enforcement officer?

18            MR. WRIGHT:  Object to form, foundation.

19        A    I'm not sure.

20        Q    Have you ever told the witness, "Fuck you,

21   fuck you, fuck you," while questioning them?

22        A    No.

23            MR. WILLIAMS:  Asked and answered.

24        Q    Would that be appropriate investigation

25   technique in 2012?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1056

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 246 of 463 - Page
ID#: 5263
The Deposition of JOHN PICKARD, Taken on 3/29/2012
244

1              MR. WRIGHT:  Object to form, foundation.

2     A    Not to me.

3     Q    Have you ever physically assaulted a witness

4   while questioning them?

5     A    No.

6     Q    Would that be acceptable behavior in 2012?

7     A    No.

8     Q    Have you ever thrown a chair while questioning

9   a witness in a criminal investigation?

10    A    No.

11    Q    Would that be acceptable behavior?

12    A    No.

13             MR. WRIGHT:  Object to form, foundation.

14    Q    Mr. Pickard, I'm going to play what's Exhibit

15  number 21.  It's PL27706.  It's a clip.  Please listen.

16  I'm going to ask you some questions.

17                  (EXHIBIT 21 IS MARKED FOR

18                  IDENTIFICATION)

19                  (AUDIO PLAYED)

20    Q    Mr. Pickard, that was an audio recording of

21  Detective York and Detective -- Deputy Derek Eubanks

22  interviewing Dave Fox in December 3, 2011 during an

23  investigation that your department was conducting with

24  the Kentucky State Police into the death of Bobby

25  Wiggins.  Was that the first time you heard that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1057

```
 1   recording?

 2       A    No.

 3       Q    You heard that recording at Detective York's

 4   deposition as well, right?

 5       A    Yes.

 6       Q    Had you heard that recording before then?

 7       A    No.

 8       Q    At the time that Deputy Eubanks was

 9   questioning Dave Fox, were you his supervisor?

10       A    Yes.

11       Q    And you heard Detective York's voice in there,

12   right?

13       A    Yes.

14       Q    You believe that Detective York is a good law

15   enforcement officer?

16           MR. WRIGHT:  Object to form, foundation.

17       A    Yes.

18       Q    The conduct that you just heard in that clip,

19   is that something that you would have accepted to happen

20   under your supervision at Knox County Sheriff's

21   Department?

22           MR. WILLIAMS:  Are you talking --

23           MR. WRIGHT:  Object to form and foundation.

24           MR. WILLIAMS:  -- about Detective York's

25       conduct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1058

The Deposition of JOHN PICKARD, taken on 1/18/02, Page 246

```
 1              MR. SLOSAR:  Yes.
 2              MR. WILLIAMS:  Thank you.
 3              MR. WRIGHT:  Same objection.
 4     A    I wouldn't allow that personally, but
 5  BY MR. SLOSAR:
 6     Q    Why not?
 7              MR. WRIGHT:  Objection.
 8     A    I'm just not that way.
 9     Q    So you don't coerce witnesses, right?
10              MR. WRIGHT:  Object to form, foundation.
11     A    Well, I don't -- I just don't use foul
12  language.
13     Q    Well, did you hear Detective York throw a
14  chair in there?
15              MR. WRIGHT:  Object to form, foundation.
16              MR. WILLIAMS:  Requires him to speculate.
17     Wasn't present.
18  BY MR. SLOSAR:
19     Q    Detective -- were you here a couple weeks ago
20  when Detective York claims that the noise you heard in
21  there was not him actually hitting a witness, but
22  instead him throwing a chair.  Were you here when you
23  testified to that Effect?
24              MR. WRIGHT:  Object to form --
25     A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1059

Case: 6:17-cv-00184-REW-HAI  Doc #: 108-20  Filed: 02/10/20  Page: 249 of 463 - Page
ID#: 5266
The Deposition of JOHN PICKARD, taken on 9/19/22       247

```
 1              MR. WRIGHT:  -- and foundation.
 2      Q    Is that a credible explanation to you?
 3              MR. WRIGHT:  Object to form, foundation.
 4      A    I -- I wouldn't do that, but everybody's
 5  different.
 6      Q    What would you have done if you were in a room
 7  with Detective York?  Would you have stopped him there?
 8              MR. WRIGHT:  Object to form.
 9      A    I'm not sure what I'd have done.
10      Q    Did you ever stop Detective York at any point
11  in the investigation into the death of Katherine Mills?
12      A    No.
13              MR. SLOSAR:  Let's take a break.
14              VIDEOGRAPHER:  Off the record.
15                  (OFF THE RECORD)
16              VIDEOGRAPHER:  Back on the record.
17              MR. SLOSAR:  Plaintiff has no further
18      questions.  Thank you, Mr. Pickard.
19              THE WITNESS:  Thank you.
20                  CROSS EXAMINATION
21  BY MR. FARAH:
22      Q    Sheriff Pickard, I represent Mike Broughton
23  and the City of Barbourville.  I just have a couple
24  follow-up clarification questions.  Do you have your
25  discovery answers in front of you, Exhibit number 13?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1060

```
 1              MR. WILLIAMS:  I'll help you get them here.
 2        Q    I'll direct you to page 7.  Interrogatory
 3    number 10.  You there?
 4        A    Yes.
 5        Q    And I think you clarified this earlier, but I
 6    just want to make sure we're clear on this.  At the end
 7    of that answer, you indicated you were present for the
 8    interview of Jonathan Taylor.  And then when Mr. Slosar
 9    asked you were you -- in the discovery answer it says
10    you were present when Mr. Taylor was arrested by Mike
11    Broughton, but you testified earlier you don't believe
12    that's true; is that correct?
13              MR. SLOSAR:  Objection to form.  Misstates his
14         testimony.
15        Q    Go ahead.
16        A    I didn't have any knowledge that Mike arrested
17    him.
18        Q    Okay.  And I think you're right.  Let me show
19    you PL5132.  And I don't have copies.  Elliot, you're
20    welcome to give that back to him, to the witness.
21              MR. SLOSAR:  Sure.  Is this going to be an
22         exhibit?
23        Q    Yeah.  We'll make it Exhibit --
24              MR. SLOSAR:  24.
25        Q    -- 24.  Sir, I would just ask you, would you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1061

```
 1    identify what this document is?  Thank you, Elliot.
 2                    (EXHIBIT 24 MARKED FOR IDENTIFICATION)
 3        A    It's an arrest warrant.
 4        Q    Okay.  And this -- is this the arrest warrant
 5    issued to Jonathan Taylor for murder and robbery in the
 6    Katherine Mills' investigation?
 7        A    Yes.
 8        Q    Okay.  And is that -- is this a Kentucky State
 9    Police as the agency on this citation?  At the very top.
10        A    Yes.
11        Q    And at the bottom, was this executed by
12    Detective Jason York?
13        A    Yes.
14        Q    Okay.  Did that help refresh your recollection
15    that it was actually Detective York that arrested
16    Jonathan Taylor?
17        A    Yes.
18        Q    Okay.  And likewise, I'm going to mark this
19    next one as Exhibit 25, just to make sure we're clear on
20    this.  I know that Mr. Taylor was also arrested on the -
21    - for manufacturing meth about a month earlier. I'm
22    going to hand you what we'll mark -- sorry, this is
23    PL3221.
24             MR. SLOSAR:  Isn't that part of the group
25        exhibit that I --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1062

```
 1        Q     It might be.  I'm not sure if you had
 2  introduced it or not.  But let me go on and introduce as
 3  Exhibit 25.  Can you take a look at that and tell me if
 4  you recognize what this document is?
 5                    (EXHIBIT 25 MARKED FOR IDENTIFICATION)
 6        A     Yes.
 7        Q     And tell -- will you tell the jury what that
 8  is.
 9              MR. SLOSAR:  Objection to form.
10        Q     Go ahead.
11              MR. SLOSAR:  There's no jury.
12        Q     Go ahead.
13        A     It's an arrest warrant on Jonathan Taylor.
14        Q     And this is for what charge?
15        A     Manufacturing.
16        Q     And was this issued by the Knox County
17  Sheriff's Department?
18        A     Yes.
19        Q     And who was the arresting officer who arrested
20  Mr. Taylor on this charge?
21        A     Derek Eubanks.
22        Q     Okay.  Thank you.  We'll mark that as Exhibit
23  25.  Thank you, Elliot.  So clearly, your discovery
24  answer was incorrect, Mike Broughton was not involved in
25  the arrest of Jonathan Taylor; is that correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1063

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 253 of 463 - Page
ID#: 5270
The Deposition of JOHN PICKARD, taken on March 22, 2018          251

```
 1            (EXHIBIT 25 IS MARKED FOR IDENTIFICATION)
 2            MR. SLOSAR:  objection to form.
 3      A     To my knowledge.
 4      Q     Okay.  Thank you.  Now, go to interrogatory --
 5   on that same Exhibit 13, number 4.
 6      A     Yes.
 7      Q     You got that number on page 4?
 8      A     Yes.
 9      Q     This is the part of the deposition where you
10   explained or talked about that Detective -- or
11   Defendant, Broughton may have been present during
12   questioning of Jonathan Taylor at the Barbourville
13   Police Department.
14      A     Yes.
15      Q     Okay.  Now, let me go through this with you.
16   My understanding was, is that Jonathan Taylor was
17   brought to the Barbourville Police Department that day,
18   correct?  Whatever date it was for questioning.
19      A     The best I remember, yes.
20      Q     Okay.  And I understand that Detective
21   Broughton may have been present at the police department
22   that day.  Were you actually in the room when questions
23   were asked of Mr. Taylor?
24            MR. SLOSAR:  Objection to form.  Asked and
25            answered.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1064

1     Q     Go ahead.  I'm unclear what your testimony was

2  earlier.  Were you actually present when questions were

3  asked?

4          MR. SLOSAR:  Objection to form.  Asked and

5      answered.

6     Q     You can answer.

7     A     I was present, but I don't know about the

8  whole time.  I could have got up and went out, I don't

9  know.  I did that a lot.

10    Q     Okay.  Do you know for certain if Detective

11 Broughton asked any questions of Mr. Taylor on that day?

12         MR. SLOSAR:  Objection to form.  Asked and

13     answered.

14    Q     Go ahead.

15    A     I don't recall.

16    Q     And you've been asked today a lot of questions

17 about different people that you participated in

18 interviews with along with Detective York, you know,

19 you've mentioned Allen Helton, Mike Simpson, Jessie

20 Lawson, I think Bob Smith, Michael Crump, Kayla Mills.

21 When those interviews were conducted, Detective

22 Broughton wasn't present on any of those, was he?

23         MR. SLOSAR:  objection to form.

24    Q     Go ahead.

25         MR. SLOSAR:  Misstates his prior testimony.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1065

1      A    I wasn't in interviews with all of them.

2      Q    Okay.  But Detective Broughton certainly

3  wasn't present, was he?

4      A    No.

5           MR. SLOSAR:  Objection to form.

6      Q    Are you aware of any other interviews of any

7  witnesses, of any witnesses, other than Amanda Hoskins,

8  who I think you recall from a prior deposition, that

9  Detective Broughton was present or participated in.  Are

10  you aware of any interviews of any witness, suspect,

11  anybody involved in the investigation into the Katherine

12  Mills' murder, that Detective Broughton was involved in?

13      A    Not to my knowledge.

14      Q    Did you ever have any discussions with

15  Detective Broughton about the investigation or about any

16  witnesses or anything concerning the investigation into

17  the murder of Katherine Mills?

18      A    Not that I recall.

19      Q    Do you recall ever sending Detective Broughton

20  out or asking him to go interview any witnesses or

21  examine any crime scenes or collect any evidence into

22  the investigation into the murder of Katherine Mills?

23      A    No.

24      Q    Now, I think you testified to this earlier. In

25  your mind, in your understanding, this was a Kentucky

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1066

```
 1    State Police investigation into the murder of Katherine
 2    Mills, correct?
 3                 MR. SLOSAR:  Objection to form.
 4         Q    And the lead investigator in this was Jason
 5    York, correct?
 6         A    Yes.
 7                 MR. FARAH:  That's all the questions I have.
 8         Thank you, sir.
 9                     EXAMINATION
10    BY MS. KINCER:
11         Q    Mr. Pickard, I'm Shawna Kincer, and I
12    represent the bulk of the KSP defendants that are
13    charged today.  My questions are basically the same as
14    his, except that, do you know Mark Mefford?
15         A    Yes.
16         Q    Do you work with him often?
17         A    No.
18         Q    Okay.  Have you worked with him closely on any
19    case?
20         A    One -- one case.
21         Q    Which case was that?
22         A    It was a -- where a body was missing --
23         Q    Okay.
24         A    -- for like 11 months, I worked with him a
25    couple of days on that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1067

```
 1        Q     Just assisting?

 2        A     We was actually all just searching for a body

 3   in a creek, He was there.

 4        Q     Okay.  Was that before this Katherine Mills

 5   murder or after, do you know?

 6        A     I'm pretty sure it was before.

 7        Q     In this investigation Of Katherine Mills, did

 8   you work at all with Mark Mefford on this case?  Assist,

 9   help?

10        A     Not that I recall.  We was just both there at

11   the house.

12        Q     At Katherine Mills' house?

13        A     Yes.

14        Q     On the night of?

15        A     Yes.

16        Q     Okay.  Were you present with him during any

17   interviews?

18        A     Not that I recall, no.

19        Q     Okay.  Let's move on to Brian Johnson.  Do you

20   know him?

21        A     Yes.

22        Q     Okay.  Have you worked with him before?

23        A     Very little, if any.  I just don't -- don't

24   remember anything working with him.

25        Q     Okay.  Specifically, anything on this case
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1068

The Deposition of JOHN PICKARD, taken on March 22, 2019                    256

```
 1   with Katherine Mills?
 2        A     No.
 3        Q     Was he present the night of -- when you went
 4   to the crime, the scene of the crime?
 5        A     Best I recall, he was.
 6        Q     He was.  Okay.
 7        A     He was there.
 8        Q     And Jackie Joseph, do you know her?
 9        A     Yes.
10        Q     Okay.  Do you work with her very often?
11        A     No.
12        Q     Okay.  Did you work with her on this
13   particular case?
14        A     She was just up there.  I didn't work -- at
15   the house.
16        Q     She was at the house?
17        A     Yes.
18        Q     Okay.  And Kelly Farris, you know him?
19        A     Yes.
20        Q     Okay.  How often do you work with him?
21        A     He actually worked for me for a while.
22        Q     All right.  As a deputy in Knox County?
23        A     Yes.
24        Q     After he retired from KSP?
25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1069

```
 1        Q    Okay.  And was he involved in any way in this
 2   case with you?
 3        A    No.
 4        Q    Okay.  Was he at the scene?
 5        A    He was there.  That's all I remember.
 6        Q    Okay.  And Dallas Eubanks, do you know him?
 7        A    Yes.
 8        Q    Okay.  Do you work with him often?
 9        A    No.
10        Q    Okay.  Did you work with him in any way,
11   shape, form, or fashion in this particular case?
12        A    He was there at the house.
13        Q    So the people that I've named, your memory is
14   them just being present at the house initially?
15        A    Yes.
16        Q    Okay.  Did you have any involvement at all
17   with any of them after, that you can remember?
18        A    There was another case that Johnson was on
19   that I was involved with us some, somewhat.
20        Q    Anderson?
21        A    Yes.
22        Q    Okay.
23        A    Other than that, no.
24             MS. KINSER:  Okay.  That's all I have.
25                  EXAMINATION
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1070

```
 1   BY MR. WRIGHT:
 2        Q    Sheriff Pickard, my name is Derek Wright.  I'm
 3   the counsel for Defendant, Jason York and Defendant,
 4   Jason Bunch.  I'll start with Jason Bunch.  Do you know
 5   Trooper Jason Bunch?
 6        A    Yes.
 7        Q    Did you work with him at all in the
 8   investigation into the murder of Katherine Mills?
 9        A    Not with him, no.
10        Q    Okay.
11        A    That I remember.
12        Q    You mentioned earlier in your testimony, that
13   day, you spoke to Lisa Evans.  Do you recall testifying
14   to that?
15        A    Yes.
16        Q    When was that?
17        A    I'm not sure.
18        Q    Was it before or after the charges against the
19   plaintiffs in this case were dismissed; do you know?
20        A    I think it was in October of '15, but I'm not
21   really sure.
22        Q    Okay.  How did she identify herself to you?
23        A    To be honest, I don't even remember.
24        Q    Did she tell you she was an investigator for
25   one of the -- for either Ms. Hoskins or Mr. Taylor?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1071

1    A    She said that, but I don't remember saying

2  that.

3    Q    **You don't remember whether she said that or**

4  **not?**

5    A    I can't remember her saying that, no.  She

6  could have.  I'm not -- excuse me, but I don't remember.

7    Q    **Okay.  Did she identify if she worked for any**

8  **sort of agency?**

9    A    I -- I remember something like her saying

10  about public defender.  That's all I remember.

11    Q    **Was anybody with her?**

12    A    Yeah.

13    Q    **Do you know who that was?**

14    A    I don't know her name.

15    Q    **Did you ask who it was at the time?**

16    A    She told me who she was, but I can't remember.

17    Q    **And to your knowledge, was that conversation**

18  **recorded?**

19    A    It was, I didn't know it at the time.

20    Q    **When did you find out it was recorded?**

21    A    Right before we went to trial.

22    Q    **Right before what went to trial?**

23    A    On the Anderson case.

24    Q    **Was that some of the questioning about the**

25  **Anderson case?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1072

```
 1       A    Yes.

 2       Q    Did she indicate she was an investigator for

 3   one of the defendants in that case, criminal defendants,

 4   that is?

 5       A    I don't remember.

 6            MR. SLOSAR:  There's only one defendant.

 7            MR. WRIGHT:  Okay.  I'm sorry.

 8       Q    Your interrogatories, Exhibit number 13,

 9   interrogatory number 6 on page 5; do you see that?

10       A    Yes.

11       Q    You indicate you have no direct knowledge

12   about either plaintiff acting in the killing of Ms.

13   Mills; do you see that?

14       A    Yes.

15       Q    Are you referring to the personal knowledge?

16   What do you mean by direct knowledge?

17       A    I have no personal knowledge, no.

18       Q    When you filled out this interrogatory, had

19   you read the criminal investigation file that Detective

20   York had compiled?

21       A    I don't think so.

22       Q    Okay.  There was some testimony about whether

23   you went to a children's home, do you recall that

24   testimony?

25       A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1073

 1      Q    And there was reference to receipts, I believe
 2  --
 3      A    Yeah.
 4      Q    -- do you recall that?  Do you remember what
 5  the dates of those receipts were?
 6      A    No, I don't.
 7      Q    You mentioned you knew Ms. Hoskins through a
 8  prior hit-and-run investigation; is that true?
 9      A    Yes.
10      Q    But were you the sheriff at the time?
11      A    Yes.
12      Q    Do you recall whether there was any evidence
13  that the driver was under the influence when that
14  happened, under the influence, being controlled
15  substances or alcohol?
16      A    I'm not really sure.
17      Q    Okay.  There was testimony regarding Dr. Larry
18  Warren.  Do you recall that?
19      A    Yes.
20      Q    Do you know of Dr. Larry Warren?
21      A    I know him.
22      Q    All right.  You were asked whether you had any
23  knowledge of a relationship between him and Ms. Hoskins.
24  Do you recall that?
25      A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1074

The Deposition of JOHN PICKARD, taken on May 10, 2019     262

```
 1        Q    Were you present with any interviews of Joe
 2   King when he advised that Ms. Hoskins was having an
 3   affair with Dr. Warren?
 4             MR. SLOSAR:  Objection to form.  You can
 5        answer.
 6        A    No.
 7        Q    Were you ever in an interview of Joe King with
 8   Detective York?
 9        A    No.
10        Q    There was testimony earlier, questions asked
11   about you being present when Jonathan Taylor was with
12   you, Detective Broughton of the Barbourville Police
13   Department, and Detective York.  Do you recall that
14   testimony?
15        A    Yes.
16        Q    Okay.  And am I correct, that you don't recall
17   what questions, if any, were asked?
18        A    No, I don't.
19        Q    Okay.  If Jonathan Taylor -- do you recall if
20   Jonathan Taylor declined to answer any questions?
21        A    I don't remember.
22        Q    Okay.  You talked about an encounter with
23   Kayla Mills when she was driving recklessly.  Is that --
24   do you recall that testimony?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1075

The Deposition of JOHN PICKARD, taken on May 10, 2012                        263

```
 1        Q    Do you remember what -- when that was?

 2        A    It was after the murder sometime.  I don't

 3   know how long.

 4        Q    Do you remember what car she was driving?

 5        A    She was driving a little blue, just a small

 6   blue car.  I can't remember.

 7        Q    Can't remember the make and model?

 8        A    Not really.

 9        Q    But you recall it being blue?

10        A    Yeah.

11        Q    Do you recall any information from Michael

12   Crump, that he saw a blue car at the house of Katherine

13   Mills on the day she was found dead?

14             MR. SLOSAR:  Objection to form, foundation.

15        A    I've heard that statement before.

16        Q    Do you know whether Kayla Mills was driving

17   that same blue car in the December 2010 time period?

18             MR. SLOSAR:  Objection to form.  Calls for

19        speculation.

20        A    I don't know.

21        Q    Don't know?

22        A    No.

23        Q    There was testimony about Kayla Mills'

24   grandmother.  Do you recall that?

25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1076

The Deposition of JOHN PICKARD, taken on 04/29/22                    264

```
 1        Q    I don't believe there was ever a name
 2   mentioned.  Who is her grandmother?  And I know she
 3   would have more than one, but --
 4        A    She was a Bingham.  I'm trying to think of her
 5   first name.  Sylvia.
 6        Q    And was that who you were referring to in your
 7   testimony, Sylvia Bingham?
 8        A    Yeah.  That's her grandma.  The only grandma I
 9   know.
10        Q    Okay.  That's what I was getting at.  Could
11   you look at Exhibit number 19?
12        A    It's here somewhere.  Yeah.  There it is.
13   Thank you.
14        Q    Exhibit number 19, to your understanding, is
15   that the sketch based on the information provided by
16   Michael Crump?
17        A    To my understanding, yeah.
18        Q    And I believe you testified that you saw some
19   similarity between him and Michael Simpson.  Is that how
20   you testified earlier?
21        A    Some, yes.
22        Q    Would you also agree that there's some
23   similarity between him and Jonathan Taylor?
24        A    Yes.
25             MR. SLOSAR:  Objection to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1077

```
 1        Q     Could you turn to Exhibit number 15.

 2        A     What is that?

 3        Q     That's the report.

 4        A     Allen Helton report?

 5        Q     Allen Helton report.  He's got it.  Before I

 6   ask that, let me clarify my last question.  Do you find

 7   any similarity between the sketch on Exhibit 19 and

 8   Jonathan Taylor?

 9              MR. SLOSAR:  Objection to form, foundation.

10        Thank you.

11        Q     The sketch, going back to -- I'm sorry, I

12   wanted to go back to that one question.

13        A     They -- they both could --

14        Q     Fit the --

15        A     -- resemble that to a point.

16        Q     Okay.  Now, going to Exhibit number 15, at the

17   end of that, does it say that the report is a summary of

18   Allen Helton's statement that -- on the back page?

19              MR. SLOSAR:  It's the last line of the last

20        paragraph.

21        A     Yes.

22        Q     And isn't it true that it also says that

23   there's a CD for the entire statement?

24        A     Yes.

25        Q     Okay.  So if somebody wanted to confirm what
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1078

1    was in this report, there was a CD of it, correct?

2            MR. SLOSAR:  Objection to form.  Calls for

3        speculation.

4        A    I'm sure, yeah.  Detective York would have

5    that.

6        Q    And you were in on that interview -- you were

7    present for the interview, correct?

8        A    Yes.

9        Q    And to your memory, was it recorded?

10       A    Yes.

11       Q    So the reference in this report to, "A CD of

12   entire statement," is that consistent with your memory

13   that the interview was recorded?

14       A    Yes.

15           MR. SLOSAR:  Objection to form.

16       Q    Now, Exhibit number 17 on page 2, marked line

17   25.  It has Detective York referencing, "Earlier, you

18   stated to me."  Do you see that?

19       A    Yes.

20       Q    Was there statements by Allen Helton to

21   Detective York prior to the recording?

22           MR. SLOSAR:  Objection to form.  Asked and

23       answered.

24       A    Not that I recall.

25       Q    You don't remember any discussion between

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1079

```
1   Detective York and Allen Helton before the recording was

2   turned on?

3            MR. SLOSAR:  Objection to form.  Asked and

4       answered.

5    A    They talked just a little bit before he

6   actually started recording, but I don't remember.

7    Q    The details.

8    A    I don't remember the details or how much of it

9   there was.

10   Q    So that question where he makes that reference

11  he says, "You were pumping gas at Escoe's Market."  Do

12  you see that?

13   A    What number you on?

14   Q    Line 26 of page 2.

15   A    Yes, I see it now.

16   Q    So you don't have a memory if that was

17  something Allen Helton told Detective York before the

18  recorder came on?

19            MR. SLOSAR:  Objection.

20   A    No.

21            MR. SLOSAR:  Objection to form.  Asked and

22       answered.

23   Q    It may have been asked.  You just -- it may

24  have been something spoken, you just don't remember it?

25            MR. SLOSAR:  Objection to form.  It misstates
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1080

The Deposition of JOHN PICKARD, Taken on March 22, 2017                                    268

```
 1        his testimony.  He just answered that question.

 2    Q    You can go ahead.

 3        MR. SLOSAR:  He just answered it earlier.

 4    A    I don't recall it, but --

 5    Q    Okay.  On that same page, do you see in line

 6  30 and 31 -- on line 30 where Detective York's -- York

 7  asks what the conversation that says curtailed -- I

 8  think it was meant to be entailed -- do you see that on

 9  line 30?

10    A    Yes.

11    Q    And what does Helton answer?

12    A    "She asked me did I want to make money and --

13  I -- and told me how."

14    Q    And then what did Detective York do?

15    A    He said, "And how was what [sic]."

16    Q    How was that?

17    A    Yeah.

18    Q    And then isn't it true that according to the

19  transcript, Allen Helton says, "By tying this old lady

20  up," is that what the next line says?

21    A    Yes.

22    Q    And isn't it true that Detective York did not

23  provide that information to Allen Helton beforehand?

24        MR. SLOSAR:  Objection to form.

25    A    Not that I'm aware of.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1081

The Deposition of JOHN PICKARD, Taken on 12/19/19

269

```
 1            MR. WRIGHT:  Let's go off the record for just
 2        one second.  I'm almost done.
 3            VIDEOGRAPHER:  Off the record.
 4                 (OFF THE RECORD)
 5            VIDEOGRAPHER:  Back on the record.
 6   BY MR. WRIGHT:
 7        Q    Yeah.  I have a few more questions.  We're
 8   back on the record.  Looking -- continuing to look at
 9   this Exhibit number 17.  Do you see on -- if you turn to
10   page 4, line 65.  Detective York, the transcript,
11   reflects him saying, "She said, do you want to make some
12   money."  Do you see that?
13        A    Yes.
14        Q    If you flip back to page 2 of the transcript
15   on line 31, isn't it true that Helton is saying that she
16   said, "I want to make some money," do you see that?
17        A    Yes.
18            MR. SLOSAR:  Objection to form.
19        Q    So by the time that Detective York makes that
20   statement on page 4, that information had already been
21   provided to him by Allen Helton, hadn't it?
22            MR. SLOSAR:  Objection to form.
23        A    Yes.
24            MR. SLOSAR:  Calls for speculation.
25        Q    According to the transcript?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1082

```
 1        A    Yes.

 2        Q    On page 4, line 73, Detective York says,

 3   "Because earlier you said, 'tie her up.'"  You see that?

 4        A    Yes.

 5        Q    If you flip back to page 2, line 33, the

 6   transcript reflects Allen Helton explaining, By going in

 7   and tying this old lady up, do you see that on line 33?

 8        A    Yes.

 9        Q    So by the time that Detective York said that

10   on page 4, isn't it true that Allen Helton had already

11   provided that information to him, correct?

12             MR. SLOSAR:  Objection to form.

13        A    Yes.

14        Q    If you go to page 8 of the transcript, line

15   45, Detective York asks Mr. Helton if it was a big wad

16   of money.  Do you see that?

17        A    Yes.

18        Q    Line 47 he asks, "Was it flat or folded over?"

19   Do you see that?

20        A    Yes

21        Q    Prior to those questionings -- questions on

22   the same page, isn't it true that Allen Helton said,

23   "She had money on her."  Do you see that on line 42?

24        A    Yes.

25        Q    And Detective York then asks, How much, on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1083

1    line 43.  Do you see that?

2        A    Yes.

3        Q    Allen Helton describes four-, three-, 35-,

4    four grand.  Do you see that on line 44?

5        A    Yes.

6        Q    So before he asked if he saw a big wad of

7    money or if it was flat or folded over, isn't it true

8    that Allen Helton had already told Detective York that

9    he had seen 35- to four grand, correct?

10           MR. SLOSAR:  Objection to form.

11       A    Yes.

12       Q    And were you present for any other interviews

13   between Detective York and Allen Helton?

14       A    No.

15       Q    When you testified earlier that Detective York

16   was leaving the interview, were you meaning he was

17   leaving the interview as between you and him?

18       A    Yes.

19       Q    That he was the one asking the questions?

20       A    Yes.

21           MR. WRIGHT:  Okay.  That's all I have.

22                    EXAMINATION

23   BY MR. WILLIAMS.

24       Q    Mr. Pickard, I just have a few questions I

25   want to talk with you about.  It's been a long

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1084

1  deposition and I don't want to keep you any longer than

2  need be, but you were asked some questions about your

3  training and deputy sheriff's training.  To your

4  knowledge, are the qualifications for a sheriff in

5  Kentucky found within the Constitution of Kentucky?

6      A    Yes.

7      Q    And it sets out the qualifications for a

8  sheriff?

9      A    Yes.

10     Q    As it relates to deputy sheriffs, are you

11  familiar with Kentucky having laws which require that

12  sheriff's deputies undergo training?

13     A    Each year, yes.

14     Q    And is that training conducted at the

15  Department of Criminal Justice Training in Richmond,

16  Kentucky?

17     A    Yes.

18     Q    And deputy sheriffs, after they've worked over

19  a certain period of time, have to go through that

20  training and complete it, correct?

21     A    Yes.

22     Q    And become certified?

23     A    Yes.

24     Q    And in fact, even before they are sent to

25  Richmond for training, they have to undergo a background

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1085

1   check and what's called POP certification --

2        A    Yes.

3        Q    -- is that fair?

4        A    Yes.

5        Q    Now, to your knowledge, does the State of

6   Kentucky or the Commonwealth of Kentucky, also require

7   that deputy sheriffs undergo yearly freshening or

8   continuing education?

9        A    Yes.

10       Q    And while you were sheriff, did your deputies

11  complete that training as required by the Commonwealth?

12       A    Yes.

13       Q    In fact, one of the questions you were asked

14  relating to your own training had an attachment of the

15  record of training of Derek Eubanks, would you agree

16  with that?

17       A    Yes.

18       Q    In one of the recordings that you were asked

19  to comment about or statement that you made, and I'm

20  just going to paraphrase because I can't remember the

21  exact statement, but you reference someone hanging if

22  they're guilty, or if they're found to be guilty.  Did

23  you literally mean hang from the gallows?

24       A    No.

25       Q    Were you referring to if they're guilty, they

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1086

1    need to face justice?

2       A    Yes.

3       Q    Mr. Pickard, you were asked some questions

4    about your encounter with Allen Helton at your office, I

5    think, on March 8th --

6       A    Yes.

7       Q    -- of 2012.  And you've been asked some

8    questions about this, but as I understood your

9    testimony, after -- after Mr. York arrived at the

10   sheriff's department, there was a period of time that he

11   spoke with Mr. Helton before the recording began.  Is

12   that fair?

13            MR. SLOSAR:  Objection to form.

14      A    He talked to him.  I don't remember how long,

15   but he did talk to him.

16      Q    As we sit here today, do you remember for how

17   long and what was said in that conversation?

18      A    No.

19            MR. SLOSAR:  Objection to form.

20      A    I don't remember.

21      Q    Do you know whether Detective York would have

22   spoke with Allen Helton before March 8th of 2012?

23      A    Not that I know of.

24      Q    Okay.  You don't know whether he did or

25   didn't?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1087

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 277 of 463 - Page
ID#: 5294
The Deposition of JOHN PICKARD, taken on May 9, 2019   275

```
 1        A    No, I don't.

 2        Q    And you were asked by counsel -- and again,

 3   I'm paraphrasing questions best as I can recall -- as it

 4   relates to the interview of Detective York by -- I'm

 5   sorry, the interview of Mr. Helton by Detective York,

 6   why you didn't stop it, or you didn't stop it.  Did you

 7   see any reason to stop Detective York's interview of Mr.

 8   Helton?

 9        A    No.

10             MR. WILLIAMS:  Thank you.

11                  REDIRECT EXAMINATION

12   BY MR. SLOSAR:

13        Q    Mr. Pickard, just a couple questions.  During

14   the time of the Katherine Mills' homicide, December of

15   2010 through your retirement in 2015, did the Knox

16   County Sheriff's Department monitor outside training for

17   their employees?

18        A    From what date now?  From the time I retired?

19        Q    2010 to the time you retired.

20        A    I have no idea what they did.

21        Q    Okay.  So you didn't take any actions as

22   sheriff to monitor any outside training that your

23   employees were receiving, correct?

24        A    No.

25        Q    And would that be the same prior, between 2003
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1088

```
 1   and 2010 as well, that you weren't doing any monitoring
 2   of outside training that your deputies or employees were
 3   receiving?
 4        A    Derek Eubanks took care of that.
 5        Q    Okay.
 6        A    I didn't, he did.
 7        Q    Did -- were you aware of any evaluations done
 8   at the Knox County Sheriff's Department as to outside
 9   training that employees received?
10        A    No.
11        Q    Okay.  Mr. Pickard, I know it's been a long
12   day.  You participated in an interview of Allen Helton
13   on March 8, 2012, right?
14        A    Yes.
15        Q    Testified about that a lot today, right?
16        A    Yes.
17        Q    Now, Allen Helton had been arrested a number
18   of times before March 8, 2012, right?
19        A    Yes.
20             MR. WRIGHT:  Object to form, foundation.
21        Q    You had experiences with Allen Helton being
22   arrested prior to that date, right?
23        A    Yes.
24        Q    You knew that he was a thief, right?
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1089

1   Q    You knew that he wasn't a very credible

2   person, right?

3        MR. WRIGHT:  Object to form, foundation.

4   A    Yes.

5   Q    Do you know that prior to March 8, 2012, did

6   you know that Allen Helton was addicted to pills?

7        MR. WRIGHT:  Object to form, foundation.

8   A    Yes.

9   Q    Prior to March 8, 2012, did you know that

10  Allen Helton was dealing pills in the Knox County area?

11       MR. WRIGHT:  Object to form, foundation.

12  A    I don't know that he was dealing.

13  Q    Well, by the time you took his statement on

14  March 8, 2012, you knew that Allen Helton and Mike

15  Simpson were going on runs to Florida to go buy massive

16  amounts of pills, right?

17  A    Yes.

18  Q    Okay.

19       MR. WILLIAMS:  Object to the form.

20       MR. WRIGHT:  I agree, yeah.  I join that.

21  Q    At the time that Detective York took Mr.

22  Helton's statement on March 8, 2012, did you believe

23  that Allen Helton was a very credible person?

24       MR. WRIGHT:  Object to form, foundation.

25  A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1090

```
 1        Q    Did you believe what came out of his mouth
 2   that day?
 3             MR. WRIGHT:  Object to form, foundation.
 4        A    I'm not sure.
 5        Q    Did you do any investigation after March 8,
 6   2012, to see whether anything that Allen Helton told
 7   Detective York was actually true?
 8        A    No, I didn't.
 9        Q    Did -- to your knowledge, did Detective York
10   do any investigation into the statements that Allen
11   Helton provided, to determine whether they were true or
12   not?
13        A    I'm not aware of anything.
14        Q    Sitting here today, are you aware of any
15   evidence that implicates Amanda Hoskins and Jonathan
16   Taylor in the murder of Katherine Mills?
17             MR. WRIGHT:  Object to form.
18        A    No.
19             MR. SLOSAR:  I don't have anything further.
20   Thank you, Mr. Pickard.
21             THE WITNESS:  Thank you.
22             VIDEOGRAPHER:  Off the record.
23                  (DEPOSITION CONCLUDED AT 4:43 P.M.)
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1091

```
 1                  CERTIFICATE OF REPORTER

 2            COMMONWEALTH OF KENTUCKY AT LARGE

 3

 4   I do hereby certify that the witness in the foregoing

 5   transcript was taken on the date, and at the time and

 6   place set out on the Title page here of by me after

 7   first being duly sworn to testify the truth, the whole

 8   truth, and nothing but the truth; and that the said

 9   matter was recorded stenographically and mechanically by

10   me and then reduced to typwritten form under my

11   direction, and constitutes a true record of the

12   transcript as taken, all to the best of my skill and

13   ability.  I certify that I am not a relative or employee

14   of either counsel, and that I am in no way interested

15   financially, directly or indirectly, in this action.

16

17

18                  Jessica Van Tilburg

19

20

21

22   JESSICA VAN-TILBURG,

23   COURT REPORTER/NOTARY

24   COMMISSION EXPIRES:  06/28/2020

25   SUBMITTED ON:  04/03/2018
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1092

**Exhibits**

**EXHIBIT 1**
40:6,12 42:9

**EXHIBIT 2**
42:9,10,16

**EXHIBIT 3**
43:25 44:2

**EXHIBIT 4**
54:23 55:1

**EXHIBIT 5**
95:2,5 102:4,5

**EXHIBIT 6**
133:22,24

**EXHIBIT 7**
137:14,15,17

**EXHIBIT 8**
139:7,9 240:2,4

**EXHIBIT 9**
149:22,23,24

**EXHIBIT 10**
169:17,22
179:6

**EXHIBIT 11**
180:10,11,13

**EXHIBIT 12**
184:19,23

**EXHIBIT 13**
15:4,11 247:25
251:5 260:8

**EXHIBIT 14**
117:18,24
119:4

**EXHIBIT 15**
171:19,22
190:14,15
208:2,15 265:1,
16

**EXHIBIT 17**
206:23 207:3
266:16 269:9

**EXHIBIT 18**
228:8,12

**EXHIBIT 19**
187:6,7,14
237:15 239:25

264:11,14
265:7

**EXHIBIT 20**
238:9,16

**EXHIBIT 23**
28:21,25
106:16

**EXHIBIT 24**
249:2

**EXHIBIT 25**
249:19 250:3,5,
22,23 251:1

**$**

**$100** 141:14

**$15,000** 211:11

**$4,000** 212:6

**$50** 142:9

**0**

**01/17/14** 55:17

**03/08/12** 172:6

**04-CV-278**
42:11

**1**

**1** 40:6,12 41:24,
25 42:9 69:23
165:23 167:2,
15

**10** 128:22,23,25
129:1,7 169:17,
22 179:6 248:3

**103** 129:3

**11** 58:13 76:17
153:9 180:11,
13 254:24

**11-T-136**
119:22

**12** 149:18 150:8
153:10,14
156:14 174:19
184:19,23

187:9

**13** 15:4,6,11
28:14,15 78:2
106:18,19
176:24 247:25
251:5 260:8

**14** 117:18,24
119:4 122:23
132:18,20,22
169:25 171:15
172:9

**15** 47:1 57:17
171:19,22
190:15 208:2,
15 258:20
265:1,16

**15,000** 219:7

**15854** 206:25

**16** 57:17 180:1,
5,8,11 181:18
182:9 185:2,8
206:21 207:2
216:14

**17** 78:18 206:23
207:3 266:16
269:9

**17-cv-84** 8:10

**18** 32:17 79:2
228:8,12
232:17,18

**18940** 117:18

**18943** 117:19

**19** 79:9 187:6,7,
14 209:21
237:15 239:25
264:11,14
265:7

**1922** 153:9

**1971** 27:14

**1:62** 176:25

**2**

**2** 41:24 42:10,
16 68:5,7 95:8
133:2,6 216:23
266:16 267:14

269:14 270:5

**20** 13:17 23:7
24:8 52:15 56:2
57:18 63:17,21
64:9,15 71:7,11
89:10 90:13,16,
23 91:1 92:3,6,
9,15 93:13,18,
20,23 125:9
139:1,4 142:9
143:7 165:8,16,
22 167:2,15
221:2 222:16
238:9,16

**2003** 32:2,6
37:13 83:4
84:4,19,24
85:16,22 86:1,
8,13 87:1,7,12,
17,23 88:3,7,
12,16,20,25
89:4 275:25

**2004** 30:21
31:7 40:9 42:14

**2005** 30:11,18
71:7

**2007** 9:19
28:10 30:6 80:5
82:4

**2008** 28:10
30:1

**2009** 28:10
29:16,19

**2010** 13:9,17,
20 23:7 24:8
38:12,13 39:6,
10 45:24 50:20,
24 51:13,16
52:3,15 53:17
54:7,17 56:2
59:10 62:5
63:17,21 64:9,
15 65:7,19
71:8,11 80:17
84:7 85:4 86:24
89:10 90:5,13,
16,23 91:1
92:3,6,9,15
93:7,10,13,18,
21,24 125:9
131:18 139:1,4
142:9 143:7

165:8,16,22
167:2,15
209:21 243:16
263:17 275:15,
19 276:1

**2011** 102:20,24
103:3 112:6
117:11 119:9
120:19 121:1
131:18 144:21
188:20 189:1
235:5 244:22

**2012** 16:25
18:1,19,22
20:2,17,20
100:14 102:20,
24 103:3 111:3
138:20 149:18
150:8 153:9,10,
14 156:14
165:9,17,23
167:2,15
169:25 170:22
171:9,13,15,21
172:9 173:4,8,
19 180:1,5,8,
11,19 181:18
182:9 185:2,8
186:6 190:12,
25 192:22
194:21 195:6,9,
14,21 196:1
198:7 200:14
206:7,19
207:21 208:21,
24 209:5 210:2,
5,23 211:16
212:11 213:8
215:14,17,21
216:15 217:5
218:20 220:22
221:8 222:10,
22 223:24
224:9,18
225:22 226:3
227:12,18
228:3,15,19
229:1 230:3,13
234:1 235:5
243:25 244:6
274:7,22
276:13,18
277:5,9,14,22
278:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1093

**2013** 28:17,18

**2014** 37:25 55:24

**2015** 44:10 46:5,22 47:3 48:13,18 49:2 66:19 68:21,22 71:11 74:3,9 83:3 84:4,19,24 85:17,22 86:1, 8,13 87:2,7,12, 17,23 88:3,7, 12,16,20,25 89:4 275:15

**2016** 56:2

**2018** 8:5 176:24

**20th** 90:9

**21** 79:14 244:15,17

**21st** 8:4

**22** 12:6,8

**23** 28:21,25 106:16

**24** 248:24,25 249:2

**25** 216:18 249:19 250:3,5, 23 251:1 266:17

**26** 40:9 267:14

**27** 230:3

_____

**3**

**3** 29:9 43:25 44:2 95:9,11 96:16 102:5 244:22

**30** 268:6,9

**31** 268:6 269:15

**33** 270:5,7

**35-** 271:3,9

**37** 224:3

_____

**4**

**4** 54:23 55:1 71:16,18 106:24 112:6 117:11 119:9 120:19 121:1 122:25 123:6 150:19 151:14 176:25 251:5,7 269:10,20 270:2,10

**40** 74:5 163:8, 10

**42** 270:23

**43** 149:19 271:1

**44** 271:4

**45** 270:15

**47** 270:18

**48** 216:19

**4:43** 278:23

**4th** 153:7,8

_____

**5**

**5** 16:1 44:9 72:4 95:2,5 102:5 260:9

**52** 221:3

**53** 224:4

**55** 218:12

_____

**6**

**6** 16:1 133:22, 24 134:4,5 260:9

**65** 269:10

_____

**7**

**7** 96:17 128:22 129:1,6,7 137:15,17 190:12 230:13

248:2

**724** 153:10

**73** 270:2

**7:24** 153:13

_____

**8**

**8** 9:19 20:2,17, 20 75:8 139:7,9 171:9,13,21 173:4,8,19 190:25 192:22 194:21 195:6,9, 14,21 196:1 198:7 200:14 206:7,18 207:21 208:21, 24 209:5 210:2, 5,23 211:16 212:11 213:8 215:14,17,21 216:15 217:5 218:20 220:22 221:8 222:10, 22 223:24 224:9,18 225:22 226:3 227:12,18 228:3,19 229:1 233:25 240:2,4 270:14 276:13, 18 277:5,9,14, 22 278:5

**8th** 195:18 230:13 274:5, 22

_____

**9**

**9** 76:2 132:20 149:23,24

**911** 50:25 125:14 152:8

_____

**A**

**a.m.** 153:13

**ability** 233:2

**abuse** 50:11 73:17

**acceptable** 242:20,24 243:8,16 244:6, 11

**accepted** 242:9 245:19

**access** 22:13, 22 59:7,10 66:22

**accident** 77:20 78:7

**accordance** 45:4

**accurate** 139:16 196:21 226:17

**accused** 82:8 87:3,9,13 89:5

**act** 16:7

**acted** 16:11

**acting** 260:12

**action** 175:2

**actions** 275:21

**activities** 103:9,15 104:3 123:1

**activity** 175:16 242:21

**actual** 55:25 158:1 159:4,6

**addicted** 277:6

**addiction** 91:23

**addition** 77:4

**additional** 27:18 31:11

**admit** 99:11

**advised** 262:2

**affair** 262:3

**affect** 50:3

**affirm** 9:2

**Affirmative** 11:13

**afternoon** 142:12

**agencies** 48:1 52:22

**agency** 13:9 14:11 49:4 52:3,16 67:24 249:9 259:8

**agents** 117:7

**agree** 11:16 13:3 52:15 69:18,25 72:20 75:1 76:3,7 78:14,19 79:4, 10,15 145:4 163:8 172:9,14 183:17 208:18 209:3 211:21 217:9,16 218:23 219:4,9, 13,19,24 221:10,15,23 222:24 223:7 224:11 225:21 233:3 264:22 273:15 277:20

**agreed** 174:1 176:4 217:25 220:20 223:23

**agreeing** 222:11 225:2

**agreement** 111:9 177:23 178:12 200:7, 17

**ahead** 24:3 57:23 83:19 100:4 109:15 134:11 140:6 142:22 146:7 200:11 248:15 250:10,12 252:1,14,24 268:2

**ahold** 192:24

**al-** 156:23

**alcohol** 261:15

**alibi** 133:19 135:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1094

allegation
98:23

allegations
41:12 43:2,18

allegedly
100:22 155:22

alleges 233:10

Allen 14:22
19:14 20:2,8,
14,15,19 25:24
90:25 92:17
96:4 97:7
101:14 102:10
112:7,12 113:5
117:13 119:9,
12,22 120:1
121:18 122:6,
10 130:6,9,12
136:24 141:2
171:9,20
172:15 188:20,
25 189:3,9,13,
25 190:5,12,15,
25 191:3,22
192:1 194:21
195:4,14,21
197:4,18 198:6,
13,18,21
199:11,15,22
200:7,14 205:7,
8,15 206:2,7,
18,23,24
207:15 208:20
209:4,15,16,22,
25 210:21
211:3,9,10,16,
22 212:3,4,5,6,
11,17,21 213:8,
14,18,21
214:11,15
215:18,22
216:4,15 217:7,
13 218:20
219:25 221:7,
11,18,24
222:21 223:1
224:8 225:21
226:3,15
227:16,22,25
228:2,18 229:2
230:8,12
232:20 233:25
234:2,8 252:19
265:4,5,18

266:20 267:1,
17 268:19,23
269:21 270:6,
10,22 271:3,8,
13 274:4,22
276:12,17,21
277:6,10,14,23
278:6,10

allowed 34:5

Amanda 8:7
16:15 17:23
18:2,24 19:8
20:23 21:4,8,15
22:13 89:9,13
90:4 98:23 99:1
128:15 138:18
147:14,19
148:1 154:15,
23 169:5,9
173:15,21
183:9 186:4
194:22 195:10,
15 207:22
208:25 209:17
210:10 211:10
212:5,6,22
221:12,18,25
226:4 253:7
278:15

Amber 92:5
96:6

amount 41:3,9
50:3

amounts
277:16

Amy 8:12

and/or 44:9
101:3

Anderson
257:20 259:23,
25

Anderson's
11:25

anger 48:14

answering
11:10

answers 11:13
15:20 30:5
177:15 247:25

apartment
166:20

apologize
106:19 184:21

Appalachian
21:18 25:13

apparently
29:4

Appearance
78:18

appears
240:20

application
69:8

applied 49:22
66:23

apprised
60:11

appropriately
76:10

approximately
141:14 166:18
212:5

April 165:9,17,
22 167:2,15
228:14

area 129:15
277:10

argumentative
117:5

array 65:16
70:25

arrays 34:24
35:3 65:9 95:18

arrest 73:25
90:8 95:13
131:23 132:9
147:11 149:6
169:17 171:2,
14,15 174:20
177:9 178:2
179:3,7,9,24
249:3,4 250:13,
25

arrested 91:4
100:15,17,18
129:19,21

131:24 132:3,
10 148:23
152:23,25
153:2,4 154:7
170:8 178:23
230:24 248:10,
16 249:15,20
250:19 276:17,
22

arresting
250:19

arrived 142:12
274:9

Asher 73:7

Ashers 47:12
48:11,14,19
49:2,7 50:10
66:11,23 73:1,
17

Ashers' 49:19

asks 16:4
95:11 96:3
268:7 270:15,
18,25

asleep 154:22
169:4

assaulted
244:3

assess 74:13

assigned
51:12

assist 14:15
111:20 130:14,
17,20 150:16
151:16,20
231:25 255:8

assistance
112:18 113:1,4
190:5

assisted 14:5,
12 104:13
111:25 129:14
151:1 152:1

assisting
103:10 255:1

assume 10:23

assumed

26:17 104:17

Assumes 82:1
87:4,20,25
122:1 201:15
225:16 229:14
237:5

assure 76:8,25
81:19 84:1,25

assuring
85:18

attachment
273:14

attempts
206:17

attend 83:14

attended
31:15,19

attorney
118:9,16
177:12,24

attributed
183:18

audio 12:25
36:15 206:21,
22 216:9,11,14
217:4,5 218:17,
18 221:5,6
222:19,20
224:6,7 244:19,
20

audited 63:23
85:14

aunt 168:12

authority
86:14,18

authorized
72:13

avoid 65:8

aware 49:6
54:18 63:18
75:6 81:5 82:4
84:12 85:4,8
86:6 91:22
92:17 98:22
109:19 131:5
134:23 138:24
151:7 162:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1095

165:3,7 167:13,
16 170:18,21,
22 188:16
211:17 212:13
213:10 215:20
228:6 236:12
253:6,10
268:25 276:7
278:13,14

**B**

**back** 15:14,18
30:9 37:19
38:13 40:3
51:12 54:17
57:5 59:16
69:23 70:11
80:1 102:4
111:3 118:2
122:19 124:1
125:2 131:15
144:3,21 147:9
151:14 157:8,
22 158:25
163:13 172:7
176:20 208:13
228:14 232:14,
20 238:11
247:16 248:20
265:11,12,18
269:5,8,14
270:5

**background**
49:19 272:25

**bad** 16:5

**Bailey** 153:2

**bailiff** 38:25

**bailiffs** 39:1

**band** 212:7

**bangs** 240:17

**Barbourville**
8:23 13:17,20
97:12,19 98:3
109:12 124:4
132:13 149:19
150:15 151:1,
25 165:10,13,
18 234:19
235:5 237:13
247:23 251:12,

17 262:12

**based** 19:6
23:23 24:18
49:18 66:14
102:10 104:15
107:16 155:13
165:5 175:20
187:20,25
208:19 233:24
234:7 241:9
264:15

**basically**
213:21 254:13

**basis** 179:2,16

**Bates** 39:18
117:18 206:21

**bathroom**
195:12 210:11,
13 219:11

**Beach** 92:3
96:7

**beat** 38:3,4
121:19

**began** 38:13
58:19 64:8,14,
21 65:1,6,14,19
89:11 111:16
113:9,12 123:5
274:11

**begin** 214:7

**beginning**
53:10 56:1
81:17 176:24
199:24

**behalf** 8:14,17,
19,22 151:21,
24 152:2

**behavior**
243:8,16 244:6,
11

**belief** 234:8

**believed** 20:23
160:10 162:15

**belts** 119:14

**Bennett**
130:25 131:2
141:21,22,24

142:4,7,11,18,
25 143:1,6,13,
19

**big** 195:17
221:12 270:15
271:6

**bills** 141:15,19

**Bingham**
37:20,22 264:4,
7

**bit** 19:23 36:6,
25 50:14 52:14
80:4 106:14
130:11 207:14
211:7 267:5

**blank** 57:12,14,
18

**Bledsoe** 42:11

**blue** 22:3,13,
18,22 24:7
140:8 143:7
263:5,6,9,12,17

**Bob** 15:1 25:24
96:5 102:1
112:19,21
130:20 145:6,9,
13,17,22 146:1,
11,16 147:9,25
148:3,23 149:9
252:20

**Bobby** 244:24

**body** 125:10
254:22 255:2

**bond** 197:21
201:3

**bonded**
198:14,19

**bookkeeper**
68:11

**borrow** 142:9,
13

**bottom** 16:1
42:23 44:5,6
72:9 249:11

**bouncing**
187:10

**Bowling** 28:6

**boy** 49:13

**Brady** 35:10,17

**brand-new**
142:12

**Branson** 92:8
96:6

**break** 11:2,7
79:22 118:5,8,
19 160:17
163:7,15
247:13

**breaking**
80:24

**Brian** 8:21
126:11 127:4,
25 255:19

**briefly** 56:12
214:11

**bring** 132:12
191:17

**broke** 182:20

**brought** 183:8
199:16,25
205:5 230:1
231:3 251:17

**Broughton**
8:23 97:20
98:16 107:22
108:4,11,24
110:22 111:10
118:13,21
123:21 124:3
129:19 131:23,
25 132:4,11
234:23 235:16
236:14 237:20
239:5,12
247:22 248:11
250:24 251:11,
21 252:11,22
253:2,9,12,15,
19 262:12

**Broughton's**
118:16

**Brown** 111:23
131:7,16,19
157:9,10

**Bowling** 28:6

**Browns** 111:25
112:12,15

**browse** 71:21

**Bruner** 93:17

**building**
166:20

**bulk** 254:12

**Bunch** 8:18
126:11 127:4,
21 258:4,5

**burglaries**
52:1,8

**buy** 277:15

**buying** 148:1,4

**C**

**cabinet** 47:8
59:3,4,5,7,10

**Caleb** 93:23

**call** 94:4 99:17
105:19 152:8,9
191:16 192:11
241:18

**called** 94:7
125:20 142:8
152:10 191:15
192:23,25
202:5,14 204:4
213:4 273:1

**calling** 193:9
197:5 213:21

**calls** 50:25
75:12 192:17
263:18 266:2
269:24

**camouflage**
142:16,19
143:2

**candidate** 38:7

**capacity** 43:3
109:20

**caption** 42:23

**car** 22:3,22
23:7 24:7 52:8
77:20 78:2,7



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1096

89:21,25
137:21 138:1,2,
10,11 142:13
143:7 154:14,
22 157:7,9
159:5 169:4
186:17 194:10
223:2 263:4,6,
12,17

**care** 10:2 183:6
232:5,6 276:4

**career** 27:20
32:9 174:18
175:20

**carrying** 72:16

**case** 9:24 15:8
18:9,17 19:4
24:20 35:10
41:4 42:20
55:21 56:2
78:2,7 89:23
95:3 97:6
110:10 114:13
116:4,14
119:21 140:3
168:3,7 187:22
189:4 192:8
202:11 204:1
205:24 229:10
254:19,20,21
255:8,25
256:13 257:2,
11,18 258:19
259:23,25
260:3

**cases** 17:5
91:13 116:2,3,6
117:7 205:4,16

**cash** 138:11
194:10

**caught** 91:14

**CD** 265:23
266:1,11

**cell** 79:16
192:25 193:1

**Central** 27:16

**certification**
273:1

**certified**

272:22

**chain** 69:24
70:1 76:9

**chair** 244:8
246:14,22

**chance** 49:25
118:15 232:10

**change** 37:15
69:23

**charge** 17:23
25:3 39:3
108:24 161:16,
22 175:13
178:16 239:7
242:1 250:14,
20

**charged** 11:17
89:15 113:24
119:12 120:22
138:19 170:11
186:5,10 189:8
193:24 194:1
197:15 201:12
237:1 254:13

**charges** 18:15,
24 19:8 21:4
71:3 119:8
128:14 146:2,3,
12 151:11
169:20 172:12,
16,24 173:10,
15,20 174:2
176:4 177:3
179:1,11,15
197:11,13
198:5 199:6,23
200:4,18
202:10 203:23
204:25 205:9
226:25 227:3,8
231:9,14,25
258:18

**charging**
18:12 95:14

**Charles** 42:12

**check** 53:9
273:1

**check-** 53:3

**checking**

52:25 134:19

**checkpoints**
58:6

**chief** 86:25
111:3

**children's**
21:19,24 22:3,
17,22 23:14
24:8 25:13
260:23

**Christy** 92:8,
11 96:5

**chronological**
134:7

**citation** 76:22
120:13 122:22
177:10 249:9

**citations** 76:17
77:2,6

**citizens** 45:14,
24 46:13

**citizens'** 50:3

**City** 8:23 13:17,
20 247:23

**claims** 246:20

**clarification**
247:24

**clarified** 248:5

**clarify** 265:6

**class** 26:10
30:20

**classes** 26:5,7
29:20 33:16

**Clay** 152:1

**cleanup**
151:18

**clear** 248:6
249:19

**Cleo** 111:23
131:7,13,16,19

**clip** 216:11
217:2,11
218:10 221:1
244:15 245:18

**close** 38:4,5,6
166:10,15
185:25

**closed** 196:12,
13 199:17

**closely** 254:18

**co-defendants**
43:9

**coat** 142:16,19
143:2 186:16

**cock** 72:16

**Code** 78:19

**coerce** 85:6,
10,18 174:20
246:9

**coercing**
70:21 85:23
87:13 88:4,17
89:5

**colleagues**
236:11,13

**collect** 38:19,
22 253:21

**collected**
95:16

**collection**
56:17

**Collision**
77:16

**command**
54:3 69:24
70:1,14 71:7,11
74:14,19 83:24

**comment**
116:18,20
146:8,9 273:19

**commit** 11:18
20:24

**committed**
16:7 160:2

**Commonwealt
h** 273:6,11

**communicate**
118:15 128:7

**communicate
d** 113:22

**communicatin
g** 62:5

**community**
111:15

**compare**
141:6

**compared**
141:10

**compiled**
260:20

**complaining**
119:25 120:12

**complaint**
16:8 40:10 43:2
169:25 172:8
233:9

**complaints**
45:15,16,24,25
46:1,6,11,13

**complete**
56:15 57:9,24
58:17 95:20
272:20 273:11

**completed**
30:17

**completely**
77:2 153:13

**comply** 61:2

**computers**
79:16

**concern** 73:16

**concerns**
66:14 67:9,14

**CONCLUDED**
278:23

**conduct** 27:3
34:21,24 35:2
64:10 65:15
70:6 71:25
72:22 75:4,23
76:13 77:12
78:24 79:6,12,
18 189:24
245:18,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1097

**conducted**
27:8 53:16 61:5
69:20 152:5
188:20 252:21
272:14

**conducting**
24:6 53:1 70:24
78:11 150:16
151:16,20
216:4 244:23

**conference**
29:15,19 30:1,6

**confess**
108:15

**confessed**
183:1

**confessing**
158:14 160:7

**confidential**
40:25 48:5
96:18 232:21
233:3 234:2,9

**confidentiality**
233:17

**confirm** 265:25

**conformance**
68:25 73:3

**confusing**
58:2

**congressman**
92:25

**connection**
95:12

**connotation**
24:3 38:17
86:19

**consideration**
86:4,10

**consistent**
24:15,23 25:9,
14 26:2 103:20,
24 164:21
266:12

**Constitution**
272:5

**constitutional**
81:12

**consult** 11:2
118:9,13

**contact** 190:12
191:3,9 198:13,
18 202:11

**contacted**
191:11 231:21

**contained**
46:7

**contend** 16:4,6

**contents**
57:15,25

**context** 12:13,
15 176:16

**continue** 21:4
237:7

**continues**
52:7

**continuing**
11:10 12:10
38:15,18 52:6
73:12 86:19
105:3 269:8
273:8

**control** 18:11

**controlled**
261:14

**convention**
28:8,10 33:6

**conventions**
28:16 33:9

**conversation**
11:24 12:3,6
16:24 17:7,12
22:11,15,16
23:22 110:21
111:5 127:13,
17,21,25 128:5
143:19 145:25
147:14 148:25
153:23 154:3
158:3,12 159:3,
7,20,25 160:5,
24 161:6,12,15,
21 163:20,24
164:6,10,14
182:15 185:22
186:8,13,23

187:3 193:8
195:25 196:1
197:2 198:21
204:16 208:20
209:21 239:4,
11 259:17
268:7 274:17

**conversations**
21:13 35:24
37:8 102:14,17
104:16 118:12
127:8 141:2
152:15 156:20,
23 214:1
227:11

**Cookie** 94:6,9,
13,16,20,21,22,
23

**cooperative**
158:17,23

**cop** 32:25

**copies** 117:21
248:19

**copy** 15:9 42:4
45:16 46:1
55:2,4 56:23
60:6 117:20,21
134:21 169:17

**copying** 57:3
117:19

**Cornett** 40:7

**correct** 15:6
18:12,13 20:3,
20 26:19 45:6,
20 46:2,15
55:19 56:20
58:20 61:11,15
62:1,2 63:9
66:16 68:23
75:9 76:14
80:18 82:19,22,
25 83:6,24,25
84:4,5,16,21,22
85:1,11,12,19,
21,24 86:11,12
97:1,15 98:4
99:7 100:10
102:21 107:24
119:22 124:13
150:12 152:13,
20,25 153:2,5

156:6 158:7,14
159:23 160:3,8
162:23 165:6,
23 167:18
177:4,11
180:24 181:21
182:10,18,22
183:2,6,7,10,15
185:2 191:5
192:15 195:6,
23,24 215:7,11,
12 217:23,24
218:1 222:4,12
223:16,25
224:1,20 225:1,
4,8,10,11,13,
18,19 226:5,7,
10,21 235:24
248:12 250:25
251:18 254:2,5
262:16 266:1,7
270:11 271:9
272:20 275:23

**correctly**
76:23

**corroborate**
98:22

**couch** 153:23
154:6

**Coughs** 182:5

**counsel** 8:10
15:9 29:6 35:23
117:20 176:8,
12 177:6 233:1
258:3 275:2

**county** 8:8,16
10:1,6 13:11,
13,21 14:11
24:24 25:10,15
26:3,14,22
31:25 32:6
33:3,19,22,25
34:4,10,13,17,
20,23 35:1,5,12
38:9,12 39:7
40:8,9 42:13
44:10,21 45:1,
5,9,15 46:5,13,
18 47:2,7 49:8,
21 50:4,11
51:12 53:17
54:7,16 56:8
59:2,8,11 60:2,

16,17 61:1,9,24
62:4,6,17,24,25
63:12,19,22
64:2 66:24
68:17,21 69:1,
20 73:3,18
74:3,7 75:3
77:1,6 79:6,11,
17 80:6 81:6,9,
15 82:5,23 83:2
84:8,24 85:5,
14,17 86:2,14,
24 99:2 104:1
140:22 145:19
151:21 157:4
164:22 165:3
174:19 184:2
191:14 198:8
202:22 242:10
245:20 250:16
256:22 275:16
276:8 277:10

**couple** 10:12
90:8 100:17
111:22 159:9
160:18 163:5
170:6 228:9
246:19 247:23
254:25 275:13

**courses** 27:23

**court** 8:4,9 9:1,
6 11:14 15:7
35:10 38:25
40:9 42:5
149:19 232:8,9

**courthouse**
51:8,12

**courtroom**
16:25 17:4

**courts** 38:20,
22,24

**cover** 151:5

**crazy** 157:18

**create** 102:9
103:8 104:2
107:16 110:18
164:13

**created** 25:25
103:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1098

creating
104:15

credentials
69:5

credible 247:2
277:1,23

creek 144:4,5,6
145:7,20 183:5
255:3

Cricket 94:8,9,
15,17,24

crime 82:9
95:17 98:11
125:25 126:4,
14,19 127:9
175:14 179:2
236:18 242:1
253:21 256:4

crimes 11:17
193:24 194:1

criminal 17:5
29:5 69:19 70:6
71:25 72:22
75:4 79:7,12,18
81:11 84:11,21
85:7,11,19
86:5,11 91:13
169:25 172:7
199:23 200:18
229:10 241:7,
12 242:6,18
243:6 244:9
260:3,19
272:15

crooked 94:10,
12,18

CROSS 247:20

cruiser 166:19

Crump 93:7
96:5 140:3,7,14
142:15,20
185:14 186:1,9,
13,21 187:2,21
237:15 239:13,
17,20 240:1,6
252:20 263:12
264:16

Crump's
188:17 241:1

crying 157:23
213:4 223:2,3
224:13

cuff 196:7

Cumberland
232:21 234:3

curtailed
268:7

custody 76:9

customer
32:14,15

———————

**D**

daily 53:3,5,13,
14

Dallas 8:20
126:10 127:4,
17 151:15
257:6

Daniel 96:6

date 153:8
171:11 172:3,4
189:6 190:13
230:4 251:18
275:18 276:22

dated 181:13

dates 165:19
182:11 195:1
235:12 261:5

dating 164:7
181:20

daughter
149:13

Dave 244:22
245:9

David 40:6

day 8:4 20:8
22:18,23 23:24
36:23 51:2
109:13 114:14,
16 117:13
119:12 135:16,
18 137:8,25
138:2 145:22
146:16 147:11
161:9 162:6

177:20 191:4,6,
7,10,21 192:19
194:10,23
196:15 197:21
198:8,14,19
199:7 217:19
219:21 220:2
230:9,17 232:8
251:17,22
252:11 258:13
263:13 276:12
278:2

days 172:11,16
254:25

dead 13:16
133:14 138:3
140:9 143:3
180:18 194:7,
24 217:19
263:13

deal 213:23
231:14

dealer 145:7

dealing 17:4
48:8,19,23,24
67:18 78:2
99:19 146:23
147:1 277:10,
12

deals 68:6 69:5
75:8 79:3

death 13:9
14:2,14 22:2
31:12 45:23
91:23 96:25
99:13 100:9
101:14,17,20,
23 102:1
116:22 123:13
127:14,18,22
128:1,8 131:3
132:25 136:25
139:17 144:23
149:15 163:21
164:2 167:17
185:15 194:11
195:16 234:14
244:24 247:11

December
13:9,17 23:7
24:8 38:13 39:6
45:24 50:20

52:2,15 56:2
63:17,21 64:9,
15 65:7,19
71:7,11 86:23
89:10 90:5,9,
13,15,22,25
92:3,5,8,15
93:7,9,13,17,
20,23 125:9
131:18 139:1,4
142:8 143:7
165:8,16,22
167:2,15
209:21 244:22
263:17 275:14

declined 73:1
262:20

deeply 43:2

defendant
8:15 12:15
40:19 41:6
42:20 123:21
251:11 258:3
260:6

defendant's
81:12

defendants
8:18,20 254:12
260:3

defender
259:10

defense 35:15
82:19 228:4

Delta 32:10

democratic
38:6

department
10:6 14:12
24:25 25:10,15
26:3,5,14 29:5
32:1 39:7 40:8
42:13 44:10,22
45:1,6,10,16
46:5,18,22
47:3,7 49:8,21
50:12 51:8
53:17 54:7,16
56:9 59:2 60:2,
16 61:2,10,25
62:5,7,19 63:1,

19,23 64:2
66:15,24 67:11
68:21 69:9,20
73:3,19 74:3,7,
23,24 75:4
77:1,6 79:6,12,
18 80:7 81:6,10
82:6,24 83:1,8,
21 84:9,24
85:6,14,17
86:3,15,24
96:19 97:12,19
98:4 104:1
109:12 110:25
124:5 132:13
140:22 150:15
151:1,2,16,22,
25 152:2
202:23 234:19
235:5 237:14
242:10 244:23
245:21 250:17
251:13,17,21
262:13 272:15
274:10 275:16
276:8

department's
13:24 59:11
60:17

depict 139:8

deposition 8:6
9:15 35:21
36:3,18 37:11
170:6 175:25
176:3,23
177:18,22
245:4 251:9
253:8 272:1
278:23

depositions
10:13

deputies 39:4,
11,12,17 50:18,
23 74:4 83:23
193:19 242:10
272:12 273:10
276:2

deputy 47:11,
13 49:20 61:9
86:25 125:15
230:23,24
231:3 244:21
245:8 256:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1099

272:3,10,18
273:7

**Derek**  8:15
39:12 64:4
86:21,23
125:16 151:13,
19,20 193:16
244:21 250:21
258:2 273:15
276:4

**Derrick**  8:17

**describe**
166:18

**describes**
271:3

**description**
187:21 188:1,
17 241:1

**designee**
68:11

**details**  132:7
180:7 203:18
214:1,16 215:6,
10,23 267:7,8

**Detective**  18:9
20:16,22 21:3
22:3,7,12,16,20
23:16,19,21
24:9 97:20
98:16,17 99:17,
20 100:11
104:13,14,20,
25 105:8,13,15,
25 108:23,24
110:21 111:6,
10,14,16,19
112:11,16,18,
22,23 113:1,4,
8,11,14,23
114:15 115:6
117:13,15
118:21 120:19
121:17 122:6,
10 123:5,12
128:7,14
129:24 130:2,
12,14,17,20,24
131:6 132:23
133:10,12,18
134:10,15,21,
24 135:1,4,6,21
136:6,10 137:3,

7 138:6,9
139:11 140:1
144:11 145:12,
15,16,23,25
146:20 147:13,
17,25 148:4,7,
16 149:10
151:15 159:12,
21 160:1,6
161:1,3,11,14,
20,21 164:4,7,
11,14 165:13
167:16 168:6,
19,23 169:19
170:6,10 171:1,
6,9,20 172:4,
22,23 173:5,9,
14,19 174:1,6,
10 175:25
176:3 177:17,
23 178:11,16
179:16,24
180:4,22 181:9,
19,24 182:9,13,
16 183:13,19
185:1,10,19
186:1,8,21
187:1,24
188:13,24
189:23 190:4,
24 191:5 193:9
195:4 196:18,
19 197:1,5
198:7,15,17
200:13 201:2,9,
11,20 202:6,11,
19 203:3,18
204:1,4,5,15,23
205:3,8,14,22
206:1,6,9,12,18
208:19 209:4
210:2,4,20
211:15 212:10
213:7,21 214:6,
11 215:11,18
216:3 217:6,11,
17,22 218:1,19,
24 219:5,10,14,
20,25 220:8,21
221:7,11,18,24
222:3,12,21,25
223:7,15,25
224:8,12,20
225:3,21 226:2,
8,14,16 227:16
228:2,18,24

229:1,18
231:21 234:23
244:21 245:3,
11,14,24
246:13,19,20
247:7,10
249:12,15
251:10,20
252:10,18,21
253:2,9,12,15,
19 260:19
262:8,12,13
266:4,17,21
267:1,17 268:6,
14,22 269:10,
19 270:2,9,15,
25 271:8,13,15
274:21 275:4,5,
7 277:21 278:7,
9

**Detectives**
235:15 237:20
239:4,11

**determine**
141:1 151:9,11
200:12,15,24
278:11

**Dewitt**  209:22

**difference**
83:10

**difficulty**
48:19,22

**direct**  9:7
16:10,15,18
86:8 248:2
260:11,16

**direction**  77:5

**directly**  74:8
156:6 189:15

**discipline**
70:10,13,17,20,
23 71:2,6 86:15
88:21 89:1,5

**disciplined**
81:23 85:23

**disciplining**
71:6,10

**disclose**  35:14
82:18

**disclosed**
40:16 233:15

**disclosing**
84:2

**disclosure**
83:5

**discoverable**
73:11

**discovery**
247:25 248:9
250:23

**discussion**
24:9 226:24
266:25

**discussions**
253:14

**dismissed**
55:21 56:2
258:19

**dispute**  198:10

**distinction**
234:17

**District**  8:9

**Divine**  37:16

**DNA**  141:6

**Doan**  42:12

**document**
15:10,13 26:9,
23 27:8 28:24
33:23 40:11
42:15 44:1,5,8
55:10,13 84:9,
20 86:3,10 95:4
102:10 104:21
105:1 119:5,8,
12 133:23
150:1,5 161:8
172:3 177:13
229:21 249:1
250:4

**documentatio
n**  64:16

**documented**
34:15

**documenting**
64:22 84:2,25
164:23

**disclosed**
**documents**
29:3 41:22
44:17 56:17
95:12,25 96:3,
11,18,21 102:6
128:3 232:24
233:25 234:7

**dollars**  195:16

**domestic**  75:8,
12,15,20

**Donna**  94:2
96:7 149:13

**door**  196:11
199:16

**dose**  30:25

**double-side**
15:18

**double-sided**
15:15 232:15

**doubt**  90:1

**draft**  165:4
197:2

**drafted**  143:17
196:18 208:19

**drafting**  23:23

**Dress**  78:19

**driver**  10:11
261:13

**driving**  89:25
143:7 159:5
262:23 263:4,5,
16

**drove**  112:12
157:18

**drug**  100:13
145:7 146:2,3,
12,23 147:1,9
148:24

**drugs**  147:15
148:1,4

**dry**  72:14

**DUI**  112:7

**duties**  38:14,
16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

PL 1100

## E

earlier 66:9,11
80:4 81:22
84:14 118:24
122:24 124:2
156:19 180:17
183:12 214:10
226:23 227:10
248:5,11
249:21 252:2
253:24 258:12
262:10 264:20
266:17 268:3
270:3 271:15

early 131:18
142:8 150:8

Eastern 8:9
26:6

education
27:18 273:8

Edward
148:19,21

effect 17:14
56:9,16 58:18
60:7 61:3,11
62:14 73:25
118:23 140:11
176:6 239:6
246:23

effective 44:9

effectiveness
63:24

efforts 87:1,8,
12,17,23 88:3,
7,12,16,20,25
89:4

EKU 27:21

elected 13:14
32:3,4,5 33:3
37:14 61:19

election 38:1
44:14

electronically
42:1

elicit 178:17

Elliot 8:12 12:9

41:21 56:23
79:22 122:21
134:2 248:19
249:1 250:23

employed 13:9
47:14 49:3,7
68:20

employee
44:21 45:1 61:9
68:12 69:2

employees
46:18 50:16
60:1,5 61:1
62:7,10,18,23
63:12 72:12,13
74:8 81:1 82:24
83:5 275:17,23
276:2,9

encounter
262:22 274:4

end 33:17
118:17 192:21
248:6 265:17

ended 28:1

enforcement
27:24 28:5
32:7,22 67:24
115:19,25
116:7,23
175:16,21
184:11 241:10
242:20 243:9,
17 245:15

enormous
50:3

entailed 268:8

enter 40:23
73:5

entire 122:15
265:23 266:12

Erie 21:22

escalation
74:19

Escoe's
165:18,23
166:1,5,9,12
194:23 209:22
217:18 267:11

et al 8:8

Eubanks 8:15,
20 38:10 39:12
64:4 86:21
100:25 125:16
126:11 127:4,
17 151:13,15,
20 193:16
244:21 245:8
250:21 257:6
273:15 276:4

Eubanks'
86:23

evaluations
276:7

Evans 11:24
258:13

eventually
66:18

everybody's
247:4

everyday
128:10

Everyone's
54:19

evidence 35:6,
14 65:22 70:15,
18 76:2,5,8
80:8,12,18,21
81:2,7,11,20,23
82:1,18 83:6
84:3 87:3,5,9,
19,21,24 88:1,
9,13,22 89:1
95:16 98:22
99:5 122:1
135:11 141:6,
11 147:8,10
156:5 162:18,
22 170:19
173:5 178:24
201:16 225:16
229:14 237:5
253:21 261:12
278:15

ex-mother-in-
law 219:7

exact 273:21

examination

9:7 140:19
188:19,25
189:4 247:20
254:9 257:25
271:22 275:11

examinations
189:10,14
190:2,7

examine
253:21

excessive
49:3

exchange
174:7 205:9,16

exculpatory
35:14 70:18
82:18 83:6 84:3
87:3,18 88:8,21

excuse 126:24
259:6

executed
249:11

exhibit 12:6,8
15:4,11 28:21,
25 40:6,12
42:9,16 43:25
44:2 54:23 55:1
95:2,5 102:4
106:16 117:18,
24 119:4
122:20 133:22,
24 134:2
137:14,17
139:7,9 149:22,
24 169:17,22
171:19,22
172:8 179:6
180:10,13
184:19,23
187:6,7,14
190:14 206:21,
23 207:2,3
208:2,15
216:13 228:8,
12 237:15
239:25 240:2,4
244:14,17
247:25 248:22,
23 249:2,19,25
250:3,5,22
251:1,5 260:8

264:11,14
265:1,7,16
266:16 269:9

Exhibits 41:24

exist 46:23
47:4 62:4 138:1

existed 21:4
63:19 68:23
85:5

exists 98:22

experience
32:7 178:25

experiences
276:21

explained
251:10

explaining
270:6

explanation
247:2

Express 8:5

extent 12:11
38:11 40:24
242:23

extra 55:3
207:6

extras 41:23

eye 140:2

## F

fabricate
65:21 80:8,12,
18,20 81:2,7,20

fabricating
70:15 81:11,23
87:9,24 88:13
89:1

face 121:18
122:7 151:6
240:20,25
274:1

fact 11:23
18:18 24:22
25:7 66:23
78:23 90:2 98:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1101

100:24 107:22
111:24 158:6,9,
16 180:22
183:12 205:14,
24 214:6
222:10 225:2
226:2 233:16
272:24 273:13

**facts** 82:1 87:5,
21 88:1 122:1
201:16 225:16
227:15,16
229:14 237:5

**factual** 179:2,
10,15,16

**failed** 189:4,9,
14,19 190:1,7

**failure** 119:14,
15

**fair** 10:24 14:5,
8,11 17:22
18:22 26:21
46:5 49:17,19
52:12 53:3
62:9,13,17,22
64:7,13,20,25
65:5,13,18
69:7,14 71:23
75:11,20 76:24
77:10,18,22
78:5,9 81:9,17
84:7 91:17
99:20 102:9
103:8,14
107:19 108:14
113:22 116:5
117:11 120:24
121:11 127:1
140:12 143:17
151:24 153:12
187:24 203:7,
23 206:1
207:20 208:23
214:15 220:7,
20 227:14
236:5 273:3
274:12

**fairness** 12:14

**false** 69:5
229:5,8

**familiar** 129:15
143:13 229:22

235:8 237:14
272:11

**family** 121:19

**Farah** 8:22
57:5 97:24
107:25 109:1,
10 118:16,25
124:6,14
132:15 234:25
235:6,19 239:9
247:21 254:7

**Farris** 8:21
256:18

**farther** 30:8
211:8

**fashion** 80:5
85:1 257:11

**fast** 132:17

**father** 159:17

**fear** 73:17

**February**
16:25 100:14
149:18 150:8
153:9,10,13
156:14 176:24

**feeding** 228:18

**feeling** 156:2

**fell** 154:22

**felony** 197:16

**felt** 155:15

**female** 68:17
186:18

**fight** 49:12

**figured** 207:9

**file** 24:13 44:23
45:2,8,12,17
46:2,8,15,22
47:4 53:21 54:9
59:3 68:10,23
69:2 95:20
206:21 260:19

**filed** 10:3,8
40:9 42:14
53:18 67:6
169:25

**files** 29:6 54:6,
17 95:21

**filing** 47:8

**filled** 260:18

**filling** 77:2
78:6

**find** 14:19
91:18 106:19
125:12 128:13
131:10 188:6
259:20 265:6

**fine** 9:14 11:8
51:19 160:23
163:8,10
176:11 182:7
208:7

**fingerprints**
141:9,19,20

**finished** 53:20
76:18 182:2

**finishing** 205:7

**firearm** 72:14
73:2,18

**firearms** 72:7,
10,13,25

**firing** 72:15

**Fiscal** 40:9

**Fit** 265:14

**flat** 221:19
270:18 271:7

**flip** 269:14
270:5

**floor** 202:25
203:1,2

**Florida** 136:25
194:4,14,17
213:5 277:15

**focus** 76:7

**folded** 195:16
212:7 221:19
270:18 271:7

**follow** 61:2
62:24 176:23
216:21

**follow-up**
175:11 189:24
190:5 247:24

**force** 49:3
73:22,24 74:4,
9,14 232:22
234:3

**Ford** 112:13

**forgot** 42:19
118:7

**form** 11:19
17:20 18:4
19:1,11,19 20:9
21:10,16 22:24
23:9 24:1 39:22
44:1 46:9 48:15
50:6 56:4,5
58:21 60:13
62:11,20 63:2
64:11,18 65:11,
23 74:11 77:8
80:22 81:25
82:10,20 85:2,
20 87:4,20,25
90:6 91:6,24
92:19 93:3,14
97:2,9,23,24
99:14 100:3,16
101:6,7 103:2,
12,19 104:5,6,
24 105:11
107:25 108:1,2
109:1,2,10,14,
21,25 110:7
112:2 114:18
115:2,9,14,20
116:11,16
117:1,4 118:25
119:3 121:15,
21,23 124:6,14
128:9 130:8
132:14,15
134:11,12
135:13 138:15
140:6 142:2,21
143:23 144:24,
25 146:6 147:6
149:1 153:15,
25 154:9
157:14 158:20
160:11 161:17,
24 162:4,9
163:3 167:19
168:21 169:11

170:2 171:4
172:19 173:17
174:4,24 175:3,
17,23 176:7
178:7,13,19
179:4,13,14,19,
20,22 180:2
181:8,22
182:24 183:21,
22 184:13,17
188:3,8,9
189:17 190:8
197:9,22,23
198:11,23
199:19 200:10,
11,21 201:5,15
202:3 203:10
205:1,11,12,18,
19 206:5 209:6,
7 210:6,22
211:24 212:12
213:16 214:3,
13 218:2,7,8,21
219:18,22
220:9,10,23
221:13,20
222:5,13 223:4,
5 224:2,16,21
225:5,14,23
226:6,11
227:19 228:5,
20 229:12,15
230:6,19
231:17 232:2,7
234:4,10,21,25
235:6,11,20,25
236:21 237:2,9,
18,22 238:24
239:8,9,22
240:7,14,22
241:2,13,24
242:3,8,12,22
243:2,3,10,18
244:1,13
245:16,23
246:10,15,24
247:3,8 248:13
250:9 251:2,24
252:4,12,23
253:5 254:3
257:11 262:4
263:14,18
264:25 265:9
266:2,15,22
267:3,21,25
268:24 269:18,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1102

22 270:12
271:10 274:13,
19 276:20
277:3,7,11,19,
24 278:3,17

**formal** 62:4

**formation**
201:6

**formed** 179:17

**forward** 132:17
134:8 177:3,9
178:1 233:22

**foul** 246:11

**found** 13:16
125:10 133:14
138:3 140:9
141:19 143:3
144:22 150:6
180:18 190:1
194:7,24 213:3
263:13 272:5
273:22

**foundation**
19:19 22:25
23:9 46:10
92:19 93:3
100:3 109:14,
21,25 115:20
116:11,16
117:1,4 121:24
132:14 134:12
135:13 142:21
144:24 145:1
146:6 147:6
149:2 153:15,
25 154:9
157:14 158:20
160:11 161:17,
24 162:4,9
167:19 168:21
175:3,17,23
178:19 184:13,
17 189:5 201:5,
7 205:11 209:8
214:13 218:9
220:12,23
225:15 228:5,
20 229:13
230:20 234:4,
10,22 235:11,
20,25 236:21
237:9,18

238:24 239:8,
22 241:13,24
242:3,8,22
243:2,10,18
244:1,13
245:16,23
246:10,15
247:1,3 263:14
265:9 276:20
277:3,7,11,24
278:3

**four-** 135:6
271:3

**four-wheeler**
134:18 136:3

**Fox** 244:22
245:9

**Frank** 148:19,
21

**freshening**
273:7

**front** 55:12
65:25 106:20,
25 129:9
180:12 195:3
196:17 208:16
240:12 247:25

**fuck** 121:19
243:20,21

**Full** 149:19

——— G ———

**gallows**
273:23

**Gambrel**
230:23,24
231:3

**Garland** 153:4

**Gary** 39:18

**gas** 32:10
209:22 217:19
267:11

**gave** 20:8
43:23 81:1
132:19 134:25
146:13 161:22
174:2 176:5

177:6,24
180:19 184:22
187:21 191:4
197:20 198:6,
14 201:3,13
230:9

**general** 43:18
241:6

**generally**
41:12,15 50:18
203:12

**girl** 158:25
163:16

**give** 9:2 15:8
30:5 33:16 54:4
86:9 117:10
130:3 134:21
156:9 180:1
190:14 202:8
203:8,13,17,21
204:24 213:18
215:6,10
238:14 248:20

**giving** 134:13
168:6,20 169:1
174:21 175:15
205:9,16

**glanced**
196:23

**goal** 134:8

**good** 9:9,10
55:5 59:25
67:10 108:3
114:4,8 160:16
245:14

**grab** 121:17
122:6

**graduate**
27:12

**grand** 271:4,9

**grandma**
168:1 264:8

**grandmother**
167:25 168:2,5
263:24 264:2

**great** 11:9

**Green** 28:6

**group** 249:24

**guard** 199:17

**guards** 196:8

**guess** 25:6
30:19 37:15,17
53:20 66:4
67:12 76:22
91:19 121:2,4
125:20 139:21
153:18,19
155:14 157:18
233:16

**guidance** 70:5
71:24 72:21
74:18 75:3,18,
22 77:11,23
78:10,15,20,24
79:5,11,17
84:15

**guide** 82:16

**guilt** 82:8

**guilty** 13:4
273:22,25

**gut** 156:2

**guy** 10:4,5 22:8
114:4 186:16
203:25

**guys** 51:7
146:25

——— H ———

**hair** 240:12

**Hal** 92:23,24

**half** 212:2

**hand** 8:25 40:5
41:11 42:10
117:20 133:18
184:19 206:23
249:22

**handcuffs**
196:5 199:12,
16

**handed** 29:3
77:7 134:9
184:20

**handle** 72:13
75:19 76:5
77:20,24 78:16,
21

**handled** 76:9
233:4

**handling** 72:14

**handwritten**
95:17

**hang** 13:5
273:23

**hanging**
273:21

**happen** 52:18
162:1 199:1
201:25 210:25
211:18 245:19

**happened**
109:7 110:9
120:25 121:12
150:7 151:4
159:7 209:21
227:11 234:18
261:14

**happening**
121:6 122:2
199:4 218:5
225:9,13

**happy** 42:1

**hard** 67:18

**head** 11:11
21:23 157:10
238:22

**hear** 47:23,25
48:3,11 49:1
146:8 147:25
246:13

**heard** 31:21
35:9 47:24
48:4,7,21,22,
24,25 49:5,10,
12 67:17,20
114:14 138:4
189:11 218:25
239:23 244:25
245:3,6,11,18
246:20 263:15

**hearing** 114:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1103

149:4

**hearings**
38:25

**helped** 14:7,18
18:8 31:3 97:5
129:16,23
130:7 165:13
231:8

**helpful** 11:13

**helping** 99:24
226:24

**Helton** 14:22
19:18 20:2,8,
14,15,19 25:24
90:25 91:3,5,
14,22 92:18
96:4 97:7
101:14 102:10,
14,17,20,24
112:7,12 113:5
117:13 119:9,
12,22 120:1,19,
25 121:13
122:10 130:6
136:24 141:2
152:1,25 171:9,
20 172:5,15,23
173:14 188:20,
25 189:3,9,14,
25 190:6,12,15,
25 191:4,9,22
192:1,12,15,18
193:4,6,8,13,21
194:3,6,9,13,
16,22 195:5,9,
14,21 196:1,4,
15 197:4,8,18
198:6,13,18,22
199:11,15,18,
22 200:14
201:3,12,21
202:4 203:8
204:4,17,23
205:3,7,8,15
206:7,18,23,24
207:15,21
208:20,24
209:4,22 210:1,
5,21 211:4,16,
22 212:11,17
213:8,14,18,21
214:11,15,20
215:6,10,18,22

216:4,15 217:7,
13,17,21,25
218:20,24
219:5,10,14,20
220:1,7,14,20
221:7,11,18,24
222:2,7,10,21
223:1,8,14,20,
23 224:8,12,18,
23 225:2,7,22
226:3,9,15,20,
24 227:3,8,16,
22,25 228:2,18
229:2 230:8,12,
25 231:4,7,12,
22,25 232:21
233:25 234:2,8
252:19 265:4,5
266:20 267:1,
17 268:11,19,
23 269:15,21
270:6,10,15,22
271:3,8,13
274:4,11,22
275:5,8 276:12,
17,21 277:6,10,
14,23 278:6,11

**Helton's** 19:15
121:18 122:7
203:4 206:2
233:15 265:18
277:22

**hidden** 205:22

**high** 27:13,15,
17

**highlighter**
91:8

**hire** 47:18
49:23,24 66:12
73:1

**hired** 32:3
47:20 49:18,20
50:11 60:1
61:17 63:14,15
73:18 83:3

**history** 29:14

**hit** 89:21 157:9

**hit-and-run**
89:15,18 90:3
261:8

**hits** 94:6

**hitting** 246:21

**hold** 45:19

**holder** 78:14

**holds** 46:17

**Holiday** 8:5

**holstering**
72:16

**home** 13:7
21:19,24 22:3,
17,22 23:14
24:8 25:13
61:14 128:3
133:7,11,13,17
135:8 139:12
145:17 152:19
154:23 155:24
159:21,25
166:6 167:7
180:23 192:5
260:23

**homicide**
17:11 26:9,23
27:3,8 34:6
35:7 38:12
39:13,20 50:20
52:13,16,19
55:19 56:1,10
58:19 60:10
62:16,23 63:8,
16 64:8,14,21
65:1,3,6,14,19
75:23 76:14
77:12,24 78:11,
16,21 81:18
84:6 92:17
101:5 102:11,
21,25 103:10,
16 104:3
107:20 114:25
118:22 127:2
135:12 136:21
140:23 141:14,
18,25 142:4
143:18,22
144:14 156:16
158:1,19 159:4,
6 163:20
164:15 170:1,
19 173:6 181:6,
10 191:22
192:2 213:22

215:7,19
275:14

**honest** 258:23

**hoodie** 238:14,
19,22 240:16

**hope** 37:4

**horse** 41:17

**horses** 9:25
10:1,4 41:16

**Hoskins** 8:7
16:15 17:3,9,
14,23 18:2,12,
15,24 19:9
20:23 21:5,8,15
22:13 89:9 90:4
93:12 98:23
99:1 113:23
128:15 138:19
146:4,13
147:14,19
148:1 151:20
154:15,23
169:9 173:15,
21 183:9 186:4
189:8 194:22
195:10,15,23
201:4,14
207:22 208:25
212:6 217:18
219:1,6 221:12,
25 226:4 253:7
258:25 261:7,
23 262:2
278:15

**Hoskins'**
16:22 221:19

**hospitalized**
89:22

**hour** 154:3

**hours** 74:5
142:8 150:8
153:9,10

**house** 100:12
138:13 144:1
154:15,17
159:8,11,17
160:25 166:15
169:5 255:11,
12 256:15,16
257:12,14

263:12

**Hunter** 151:15,
17

**I**

**idea** 49:16 66:2
73:13,20 98:10,
14,25 112:11
113:16 114:9
126:15 136:1
145:13 189:6
232:23 236:8,
17 238:14
275:20

**IDENTIFICATI
ON** 12:8 15:11
28:25 40:12
42:16 44:2 55:1
95:5 117:24
133:24 137:17
139:9 149:24
169:22 171:22
180:13 184:23
187:7 207:2,3
228:12 238:16
244:18 249:2
250:5 251:1

**identify** 8:11
58:14 87:18,24
88:4 188:14
239:21 249:1
258:22 259:7

**illegal** 16:7

**immediately**
144:22

**impeachment**
143:15

**implicated**
156:6 162:23
169:8 170:23
177:1 226:4

**implicates**
170:19 207:21
208:25 278:15

**implicating**
147:9 173:5
174:3 177:7,8,
25 178:17
201:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1104

important 205:24

impressed 48:9

inappropriate 175:13,16 176:11

incarcerated 193:21

incident 49:11 78:2 89:19 90:3

incidents 16:8 49:1

include 68:15

includes 95:19

including 95:15

incorrect 250:24

independent 153:20

indicating 22:21

individually 43:6

individuals 23:14 152:19, 22

influence 119:13 261:13, 14

inform 82:17 229:7

informant 92:18 232:21 233:10 234:2,9

informants 93:1 96:18 233:4

information 19:4 23:23 26:23 34:14 48:5 76:23 82:7 134:18 138:12 144:18 152:9 158:10 160:2

161:8 165:5 170:23 183:17 195:6 200:5 209:4 210:1,5, 21 211:5,16,23 212:11,17 213:8,14,19,22 214:21 215:23 217:22,25 220:8,14,21 222:3,11 223:15,24 224:19 225:3, 21 226:3,9,15 228:18 231:10 263:11 264:15 268:23 269:20 270:11

informed 80:7, 11,17 82:5 84:19 102:23 159:21 160:1,6 195:10

ing 143:15

initially 257:14

initiate 18:23 19:8 21:4 128:14 169:20 172:24 173:10, 15,20 179:1

initiated 119:9 151:11 178:2

initiating 18:15 71:3 172:11,16

lnn 8:5

innocence 156:24 158:4 237:8

innocent 11:17 17:10 71:3 110:5 169:13

inside 17:4 151:12 152:13, 19 154:23 229:5

instance 31:18

instructed 26:8 65:21 81:6,10 84:19

85:10 238:18, 22

instructing 85:6

instruction 70:5 71:25 72:21 75:2,18 76:13 77:11,23 78:10,20,24 79:5,10,17 83:23 84:15

instructions 27:3,7 72:9,25 75:22 76:4 77:19 78:16 81:2 82:16 86:9

insurance 119:16

intend 12:11

intention 241:21

intentions 108:22

interact 50:22 73:15

interacted 50:16

interactions 25:23 102:10 104:21 105:2

interest 102:25 129:17,24 130:1,6 136:20 144:14

interested 32:22,24

internally 83:8

internet 79:3

interrogate 34:1

interrogating 107:23

interrogation 31:19 34:18 95:14 108:12 109:11 124:12

interrogatorie s 106:16 260:8

interrogatory 15:5 16:1 40:16 106:20,24 111:13 113:7 122:20,24 123:20 126:9, 22 128:22,25 129:1,11 132:1, 18,20,22 248:2 251:4 260:9,18

intervention 37:16

interview 14:9 19:17 20:2 24:6,10,13,19 25:8,13 33:20 34:1 65:2 73:1 107:3,11 110:14,19,23 111:7 114:24 122:17 129:17, 20 132:2 136:16 141:24 142:4 164:23 167:16 172:11, 15 173:13 181:20 184:11 192:18 204:13 210:23 213:9 215:13 216:3, 15 218:12 229:2 231:22 236:7,25 248:8 253:20 262:7 266:6,7,13 271:16,17 275:4,5,7 276:12

interviewed 67:7,8 108:21 122:12 172:23 180:23 182:8 183:20

interviewing 162:17 186:1 243:6 244:22

interviews 25:20 26:9 27:8 33:23 64:10,16 84:10,20 85:1

184:3,8 252:18, 21 253:1,6,10 255:17 262:1 271:12

introduce 250:2

introduced 250:2

invade 35:22

investigate 52:8 87:2,8,13 104:11 105:6

investigating 52:4 97:5 104:12 243:1

investigation 14:2,6,13,15 22:1 24:7 25:4 26:9,24 27:4,9 31:12,16 34:7 35:7 38:13 39:14,20 45:23 49:14 52:14,16 54:6,17 55:19 56:1,10 58:19, 20 60:10 62:17, 23 63:8,17 64:8,14,21 65:1,3,6,14,19 70:6 72:1,22 75:4,19,24 76:14 77:12,20, 24 78:11,16,21, 25 79:7,12,19 81:18 84:7,11, 21 85:7,11,19 86:5,11 89:10 92:17 95:13,21, 25 96:12,20,21, 25 99:12 100:9 101:3,13,16,19, 22,25 102:6,11 103:11,17 104:4,8 105:12 111:17 113:9, 12 114:25 115:1 116:21 118:22 123:2,6, 12 125:23 127:2,10,14,18, 22 128:1,8 129:13 131:3,7 132:24 134:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1105

138:7 141:14,
18,25 142:5
143:18,22
145:9 149:14
156:20 159:4,6
163:1,21
167:17 174:23
181:6,10
185:14 187:25
188:6 189:25
191:23 192:2
200:12,14,24
234:14 241:7,
12,16 242:6,18
243:6,24 244:9,
23 247:11
249:6 253:11,
15,16,22 254:1
255:7 258:8
260:19 261:8
278:5,10

**investigations**
51:22 52:1,2,
10,19,25 53:4,
10,16 69:19
190:5

**investigative**
95:20 104:3
115:24 129:12
175:1

**investigator**
14:1 204:8
254:4 258:24
260:2

**involved** 48:1
49:2 52:16
144:19 149:6
151:5 155:3,8,
15 156:3,16
162:7,14,16
189:15 250:24
253:11,12
257:1,19

**involvement**
159:22 257:16

**involves** 48:5

**issue** 57:3
82:25 117:19
135:7 138:10

**issued** 249:5
250:16

**issues** 48:14

---

**J**

---

**Jackie** 8:21
21:14 228:10,
14,17,22 229:8
256:8

**Jacob** 152:1

**jail** 17:9 156:9,
12 191:11,13,
14 192:11
196:8 197:18,
21 198:8
199:16,17

**James** 42:11
43:13 119:22
120:1

**January** 32:2,6
37:25 44:9
46:24,25 47:3
48:13,18 71:11
112:6 117:11
119:9 120:19
121:1 131:18
188:20 189:1

**Jason** 8:14,18
14:4,5,12 18:8,
11,14 19:3,17
20:2,8 25:18
97:21 103:10
114:2 120:14
126:11 127:4,
21 128:18
129:2,14,16
133:6 147:16
159:8 162:20
176:24 192:21
202:13,14
214:16 227:5,7
249:12 254:4
258:3,4,5

**Jed** 39:18

**Jessica** 8:3

**Jessie** 93:9
96:4 130:18,19
141:2 189:9,14,
25 190:6 213:4
252:19

**Jessie's** 223:1

---

**job** 11:9 104:18
221:25

**Joe** 93:20 96:6
262:1,7

**John** 8:7 29:12
42:13 174:8

**Johnson** 8:21
126:11 127:4,
25 255:19
257:18

**join** 11:20
12:19 17:21
18:5 19:2,12,20
20:10 23:1,12
24:4 31:25 50:8
80:23 82:11,21
91:7 92:21
93:15 97:25
99:15 100:5,20
108:2 109:3,22
112:3 115:3,10,
15,21 116:13,
17 124:7,8
135:14 142:23
147:7 149:3
153:16 154:10
158:21 160:12
161:19 162:10
168:22 170:3
172:21 175:4,
18 178:20
190:10 192:18
198:24 200:23
201:17 214:4
220:24 221:16
222:14 223:6,
12,18 224:17
228:23 231:19
235:1,7 237:3
240:8 241:3,14
277:20

**joined** 97:7,11
99:10

**Jonathan**
14:24 16:15
17:23 18:2,24
19:9 20:23
21:5,8,15 25:24
90:12 97:11,19
100:14 101:20
107:3,11
108:24 109:18
110:10 118:22

---

123:22 124:3,
13 125:1
128:15 129:18
131:23 132:3,
12 138:19
152:12 154:14,
22 164:7 169:5,
8 173:15,21
174:3 176:5
177:1,7,25
178:18 181:14,
15,20 182:17,
21,25 183:4,8
186:5 187:2
207:22 208:25
226:4 234:13,
24 235:23
236:19 237:13
238:14 239:12,
16,20 240:3
248:8 249:5,16
250:13,25
251:12,16
262:11,19,20
264:23 265:8
278:15

**Joseph** 8:21
256:8

**Josh** 151:25
153:4

**jumps** 57:2

**June** 42:14

**jurisdiction**
13:24

**jury** 250:7,11

**justice** 29:5
272:15 274:1

---

**K**

---

**Katherine** 13:8
14:2,14 16:7,
11,16 17:11,15,
24 18:3,25 19:9
20:24 21:9 22:2
31:13 45:23
58:18 62:16,23
63:7,16 64:8,
14,21,25 65:6,
13,18 95:15
96:1,12,22,25

---

99:13 100:9
101:2,13,16,19,
22,25 102:7,21
103:1 116:22
123:13 127:2,
14,18,22 128:1,
8 131:3 132:25
135:25 137:1
138:2 139:17
143:3 144:14,
23 149:15
154:17,23
155:3,11
156:16 160:3
162:8 163:21
164:2 167:17
169:18,21
170:1,20,24
171:3 172:18
173:2,6,11,22
177:2,8 178:1
179:18 180:18,
24 181:15
183:1,15
185:15 186:13
192:1 194:7,24
195:23 202:8
207:23 209:1
211:10 212:4,
23 214:22
215:7,11,19,24
217:19 223:2,3
226:5 234:14
235:24 247:11
249:6 253:11,
17,22 254:1
255:4,7,12
256:1 258:8
263:12 275:14
278:16

**Kayla** 14:20
25:23 96:7
100:1,8,13,17
101:23 105:13,
24 112:24
149:12,15
152:18 153:23
154:1,3,13,21
155:2,8,22
156:2,6,8,11,
14,17,20,23,25
158:3,6,13
159:3,20 160:6,
25 161:9,11,15,
21 162:6,16,22,

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1106

Case: 6:17-cv-00184-REW-HAI Doc #: 108-20 Filed: 02/10/20 Page: 296 of 463 - Page ID#: 5313
THE DEPOSITION OF JOHN McCRACKEN, taken on March 22, 2018
294

25 163:17,25
164:6,10,15
165:2,9,15,17,
23 166:1,5,22
167:5,7,14,16,
22 168:2,5,6,
20,25 169:4,8,
13,18,20 170:1,
11,19,23 171:3,
15 172:8,12,16,
25 173:6,10
174:2,7,11
176:5 177:1,6,
24 178:12,16
179:7,17,25
180:5,12,19,23
181:13,14,18
182:8,16,20,25
183:4,8,13,18
184:22 185:2,7,
11 187:8
252:20 262:23
263:16,23

**Kayla's**
159:11,25
166:15 167:25
168:12

**Kelley** 17:21
18:5 19:2,12,20
20:9 21:10
35:23 97:25
116:13

**Kelly** 8:20
256:18

**Kentucky** 8:6,
10 14:13 52:23
149:20 150:15,
25 165:18
244:24 249:8
253:25 272:5,
11,16 273:6

**kid** 32:23 89:21

**kill** 182:17,21
212:23,25
223:10

**killed** 18:3,7
49:7,13 138:12
183:1 202:8
224:14

**killer** 188:7

**killing** 16:6,11,

16 181:15
189:15 260:12

**kills** 157:21

**Kim** 152:25

**kin** 43:15

**Kincer** 8:19
254:10,11

**kind** 9:24 36:4,
5,21 53:19
91:13 92:13
126:7 164:19,
25 196:22

**King** 93:20
96:6 262:2,7

**KINSER**
257:24

**knew** 19:6
155:2 165:9
168:11 182:17
189:19 195:22
203:9,18 205:8
212:22 214:21
215:6 223:8
261:7 276:24
277:1,14

**knowed** 89:14
90:17 93:25
130:16,22
147:2 200:5
241:17

**knowing**
123:18 234:5
242:1

**knowledge**
14:3 16:10,15,
18 49:15,18
66:23 92:20
160:7 183:14
213:19 241:9
248:16 251:3
253:13 259:17
260:11,15,16,
17 261:23
272:4 273:5
278:9

**Knox** 8:8,15
10:6 13:11,13,
21 14:11 24:24
25:10,15 26:3,

14,22 27:16
31:25 32:5
33:3,19,22,25
34:4,10,13,17,
20,23 35:1,5,12
38:9,12 39:7
40:8 42:12
44:10,21 45:1,
5,9,15 46:4,13,
18 47:2,6 49:8,
20 50:4,11
51:12 53:17
54:7,16 56:8
59:2,8,11 60:2,
16,17 61:1,9,24
62:4,6,17,24,25
63:12,19,22
64:2,7 66:24
68:17,21 69:1,
20 73:3,18
74:2,7 75:3
77:1,5 79:6,11,
17 80:6 81:6,9,
15 82:5,23 83:2
84:8,24 85:5,
14,17 86:2,14,
24 99:2 104:1
140:22 145:19
151:21 164:22
165:3 174:19
184:2 191:14
198:8 202:22
242:10 245:20
250:16 256:22
275:15 276:8
277:10

**Knuckles**
152:1

**KSP** 120:15
129:14 133:6
254:12 256:24

———

**L**

**lab** 95:16
100:21 105:18,
20 106:1,9
150:6

**Lacee** 8:2

**Lack** 121:23
144:25 189:5
218:8 225:15

**lady** 268:19
270:7

**language**
246:12

**Larry** 98:19,24
261:17,20

**lasted** 154:3
186:24

**law** 27:23 28:5
32:7,22 67:23
80:24 115:19,
24 116:7,23
175:16,20
184:11 241:9
242:20 243:8,
16 245:14

**laws** 272:11

**Lawson** 93:9
96:4 130:18,19
141:3 151:25
189:9,14,25
190:6 252:20

**lawsuit** 9:20,22
10:3,9 40:6,19,
22 41:13 42:11
43:7,19 73:8

**lawsuits** 40:16

**lawyer** 11:3
37:5,10

**lawyers** 95:7

**lead** 14:1 105:9
135:21 203:25
204:7 254:4

**learn** 30:15
48:14,19
136:20 140:1,2
189:3,9

**learned** 23:24
26:23 29:18
30:6 31:1,8
33:8 136:24
138:1 161:9
165:5 170:5
190:7 239:19

**learning** 23:6

**leave** 153:13
183:6 206:12

**leaving** 48:13,
18 49:2 83:3
271:16,17

**led** 206:1
241:17

**left** 46:4,21,24
47:2 49:8 68:22
71:12 74:2,8
87:2 124:16
141:15 183:5

**legal** 24:3
38:16 86:19

**legitimate**
116:7 175:1,7,8

**length** 227:11

**leniency** 34:6
64:23

**Lester** 90:15
96:5 113:24
128:16 146:4
148:4 183:9
186:5 194:23
195:22 217:18
218:25

**letter** 229:24
230:24 231:24

**Libby** 59:20,
21,23

**Licha** 8:22

**lie** 241:11

**lied** 241:6

**lies** 69:8

**life** 156:9,12

**likewise** 60:25
103:14 249:18

**limited** 95:15,
20 109:19

**Linda** 16:19,24

**lineup** 65:16
70:24

**lineups** 34:21
35:2 65:8

**Lisa** 11:24
258:13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1107

**list** 58:3 78:14
132:18 150:20

**listed** 31:10
179:16 219:5

**listen** 12:21
19:23 36:15
216:10,23
217:1,2 218:14
221:3 222:18
224:4 244:15

**listened**
217:17 218:24
219:10,14,20,
25 220:6
221:11,17,24
222:25 224:12

**listening**
225:20

**literally** 273:23

**litigation** 29:4
54:24

**live** 165:17,23

**lived** 10:1
123:18 129:15
130:16,22
131:19 165:20

**lives** 50:3
131:16

**living** 144:3
165:9

**locate** 97:5
112:16 129:16,
24 130:2,7,12
165:13 216:25

**located** 8:6

**locating** 14:7
111:15,20
112:19,24
113:2,5 130:14,
17,20

**lock** 219:15

**locked** 59:15

**London** 8:6

**long** 9:18
32:15,18,19
36:23,24 51:19
54:16,18,20

**113:18** 146:15
171:6 174:2
177:20 186:23,
25 197:4 200:7,
19 201:12
202:12 204:19,
20,24 214:14
230:15 242:15
263:3 271:25
274:14,17
276:11

**longer** 272:1

**looked** 36:4,7,
21 43:2 66:7
139:17,18
196:22 239:20

**lose** 42:7

**lost** 76:3

**lot** 19:4 39:10
51:20 53:6,25
66:10 89:20
104:13 131:21
155:16 166:1,5,
11,21,25
167:13 186:15
231:10 252:9,
16 276:15

**Louisville** 28:7

**lucky** 37:17

**lunch** 160:17

**lying** 183:5
241:18

**Lynn** 111:22

—————

—————

**M**

**M-O-O-R-E-S**
144:7

**made** 32:20
38:17 45:15,24,
25 46:6,13 52:5
86:4,20 87:1,8,
12,17,23 88:3,
7,12,16,20,25
89:4 97:17
105:3 123:23
136:10 146:8
174:7 187:8
192:14 200:7

**201:20** 205:15
222:6 227:21
273:19

**main** 32:12
51:1 73:16 76:7
99:17

**maintain** 86:15
119:15 156:24
158:4

**maintained**
46:2,14 47:6
54:6 68:11
76:10

**maintaining**
237:7

**maintenance**
22:21 23:6

**make** 12:9
24:12 34:5
38:15 43:23
56:14 60:22
73:12 91:18
122:22 140:18,
25 146:9
161:11 179:2
190:22 192:17
196:20 197:8,
10 201:9 205:3
206:17 209:17
219:6 227:25
239:6 248:6,23
249:19 263:7
268:12 269:11,
16

**makes** 267:10
269:19

**making** 201:24

**male** 240:16

**man** 140:8

**manage** 30:23
31:3

**management**
30:21 48:14

**manager**
59:14,16

**mandatory**
30:12 31:6
60:25 62:10

**manner** 35:3

**manufacturing**
249:21 250:15

**March** 8:5
18:1,19,22
20:1,17,20 40:9
46:5,22 169:25
170:22 171:9,
13,14,21 172:9
173:4,8,19
180:1,5,8,11,19
181:18 182:9
185:2,8 186:6
190:12,25
192:22 194:21
195:6,9,14,21
196:1 198:7
200:14 206:7,
18 207:21
208:21,24
209:5 210:2,5,
23 211:16
212:11 213:8
215:14,17,21
216:15 217:5
218:20 220:22
221:8 222:10,
22 223:24
224:9,18
225:22 226:3
227:12,18
228:3,19 229:1
230:3,13
233:25 274:5,
22 276:13,18
277:5,9,14,22
278:5

**Margaret** 96:8

**mark** 8:20 15:4
28:21 40:6
41:11 54:22
95:1 117:17,22
126:10 127:3,
13 133:21
137:14 139:6
149:22 171:19
184:19 187:5
228:7 232:16
238:8 249:18,
22 250:22
254:14 255:8

**marked** 12:8
15:11 28:25

**40:12** 42:16
43:25 44:2 55:1
95:5 117:24
133:24 137:17
139:9 149:24
169:22 171:22
180:13 184:23
187:7 207:2,3
228:12 232:17
238:16 244:17
249:2 250:5
251:1 266:16

**Market** 165:18
166:1,9 194:23
209:22 217:18
267:11

**Maryland**
35:10,17

**mask** 151:5

**massive**
277:15

**matched** 188:1

**material** 82:7

**matter** 8:7

**max** 146:17

**meaning**
271:16

**means** 80:24

**meant** 268:8

**mechanism**
81:19 84:1,23
85:13,16

**mechanisms**
62:4

**meet** 37:5,10
145:8,13,17,21
185:13

**meeting**
130:24 134:15
135:5 136:11

**meetings**
102:19,24

**Mefford** 8:20
126:10 127:3,
13 254:14
255:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1108

members 228:4

memorialized 102:13

memory 61:14 106:13 120:17 150:17 216:7 257:13 266:9, 12 267:16

Memory's 30:8

men 22:21 23:6

mental 109:19

mentioned 252:19 258:12 261:7 264:2

met 135:17 136:6 147:18, 20,21 165:2 183:13

metal 197:15

meth 100:21 105:18,20 106:1,9 150:6 249:21

method 52:24 74:12

Meyer 42:12

Michael 93:6 96:5 139:10 140:3 153:2 185:14 187:21 188:17 237:15 239:13,16,20 240:1,6 241:1 252:20 263:11 264:16,19

middle 123:8 216:3

Mike 8:22 44:4 66:18 90:22 96:4 97:20 101:17 113:2 118:13 129:19 130:14 131:23, 24 132:4,11,24 133:3,5,8,10 134:9,15,25 135:5,7,17,20,

22 136:6,10,19, 23,24 137:22, 23 138:2,10,13 139:12,16 140:13,18,21, 25 141:5,10 142:7,18 143:2, 6,21 144:11,13 189:25 190:6 194:6,16 195:22 212:21 213:3 223:1 224:12,13 240:2,5,16,20, 24 247:22 248:10,16 250:24 252:19 277:14

Mikey 47:11 48:11,14,19 49:2,7,19 50:10 66:11,23 73:1 93:17

military 31:23

Mills 13:8,16 14:20 16:7,11, 17 17:15,24 18:3,25 19:10 20:24 21:9 25:24 31:13 38:12 39:13 45:23 91:15 93:23 94:2 95:15 96:1,7, 12,22,25 100:1, 8,17 101:23 102:7,21 103:1 105:13 112:24 116:22 123:13 131:4 132:25 133:14 135:25 137:1 138:3,11 139:17 140:9 144:14,23 149:12 152:18 153:23 154:3 155:2,4,8,11 156:14,16,17, 23,25 158:6 160:3,6,25 161:9,12 162:8, 16,22 163:1,17, 25 164:11 165:2,9,15,17,

23 166:2,5,22 167:5,7,14,17, 23 169:18,20 170:1,11,19,23, 24 171:3,15 172:8,18,25 173:6,11,16,22 174:2,11 177:1, 2,6,8,10,24 178:1,12,16 179:7,18,25 180:5,8,12,18, 24 181:13,15 182:8,25 183:4, 10,15 185:2,7, 11,15 189:16 194:7,24 195:23 202:8 207:23 209:1 214:22 215:7, 11,19,24 226:5 235:24 247:11 252:20 253:17, 22 254:2 255:4, 7 256:1 258:8 260:13 262:23 263:13,16 278:16

Mills' 13:23 14:2,14 17:11 22:2 39:19 50:20 52:13 55:19 56:1,10 58:18 60:10 62:16,23 63:8, 16 64:8,14,21 65:1,6,14,19 81:18 84:6 89:10 91:23 92:17 95:12,21 96:19 99:13 100:9 101:2,13, 16,19,22,25 102:11 103:10, 16 118:22 125:10,13 127:2,14,18,22 128:1,8 129:13 135:11 140:23 141:13,18,25 142:4 143:3,18, 22 145:9 149:13,15 154:17,23 163:21 164:2,

15 167:17 168:2,5 185:24 186:14 187:8 191:22 192:2 194:10 195:15 213:22 231:10 234:14 249:6 253:12 255:12 263:23 275:14

mind 48:6 193:11 253:25

Mine 57:2

minute 208:3 216:18,19 222:17

minutes 63:12 146:17 160:18 163:8,10 197:6, 7 202:5 218:11 221:2 222:16 224:3,4

Miranda 162:17

misconduct 48:1

missing 56:16, 19 254:22

misstates 162:5 248:13 252:25 267:25

Mister 187:1 192:10 208:24 209:3

misunderstood 175:9

mixed 94:23

model 263:7

mom 16:22 94:2

moment 118:8, 13 182:4 218:18

moments 18:18 82:14

money 91:18 142:13 146:4 183:9 194:7,14,

17 209:17 212:3,7 219:6 221:12,19,25 268:12 269:12, 16 270:16,23 271:7

monitor 74:13 275:16,22

monitoring 276:1

month 249:21

months 254:24

Moon 149:19

Moore's 144:4, 5,7 145:7,20

morning 9:9, 10 142:8 150:8 219:11 232:9

Morris 144:6

mother 159:17

motor 119:13, 15

mouth 278:1

move 41:21 233:22 255:19

moves 131:21

moving 134:8 157:8

murder 17:15, 24 18:20,25 19:9 20:24 21:8 91:14 95:12,14, 21,25 96:19,21 102:7 105:6 106:5 107:23 108:25 113:24 129:13 133:11 135:24 138:19 141:3 155:3,9 156:6 157:1 158:7,10 159:23 160:3,8 161:16,22 162:7,15,16,23 164:8 169:9,14, 18,20 170:11, 23 171:3 172:18 173:2,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1109

10,16,22 176:4
177:2,3,7,10,25
178:3,16
179:18,25
180:24 181:21
183:15 185:25
186:6,10 189:8
191:12 192:12
200:5 201:12
203:15,16,22
207:22 209:1
214:21 215:11,
23 226:5
231:10 235:24
237:1 239:7
249:5 253:12,
17,22 254:1
255:5 258:8
263:2 278:16

**murders**
104:11 125:21

**mustache**
240:19

---

**N**

---

**named** 35:10
77:15 257:13

**names** 14:17
39:16 51:15
126:3,21 130:3
132:18,19
133:19

**Natural** 32:10

**necessarily**
127:8

**needed** 14:17
99:25 128:11
157:20

**negate** 82:8

**neighborhood**
155:20

**networking**
79:3

**nice** 99:24

**nicer** 36:25
37:2

**nickname**
94:4,24

**night** 59:15
154:1 156:18
255:14 256:3

**nod** 11:11

**noise** 246:20

**normal** 50:23

**note** 25:21
41:23 103:15
133:19 134:9,
13,22 135:1

**notes** 23:5,19
24:12,19,21,22
25:4,8,12,17
36:11,12 61:13
95:17 102:16
104:2 111:11
113:19 128:3
136:13,15
148:12 155:24
156:1 161:5
164:25 165:4
192:4,7 216:6
236:9,11,14

**nothing's**
56:19

**noticed** 229:5

**number** 8:10
12:6 15:4 16:1
20:15 28:21
40:6 43:25
54:23 58:11
71:16,18 72:4
75:8 76:2,17
78:2,18 79:2,9,
14 95:2,9,11
96:16,17 101:4
102:5 106:24
117:18 119:21
122:20,21,25
128:22,25
132:18,20,22
133:2,6,22
137:15 139:7
149:23 152:22
169:17 179:6
180:11 184:19
187:6,9,14
190:15 193:1
206:22 208:15
216:13,20
228:8 232:18
238:9 239:25

240:2,4 244:15
247:25 248:3
251:5,7 260:8,9
264:11,14
265:1,16
266:16 267:13
269:9 276:17

**numerous**
104:7

---

**O**

---

**oath** 15:20,22

**object** 11:19
17:20 18:4
19:1,11,19 20:9
21:10,16 22:24
23:9 24:1 39:22
46:9 48:15 50:6
56:4,5 58:21
60:13 62:11,20
63:2 64:11,18
65:11,23 74:11
77:8 80:22
81:25 82:10,20
85:2,20 86:17
87:4,20,25 90:6
91:6,24 92:19
93:3,14,15
97:2,9,23,24
100:3,16 101:6,
7 103:2,12,19
104:5,6,24
105:11 107:25
108:1,2 109:1,
2,10,21,25
110:7 112:2
114:18 115:2,9,
14,20 116:11,
16 117:1,4
118:25 119:3
121:15,21,23
124:6,14 128:9
130:8 132:14
134:11,12
135:13 140:6
142:2,21
143:23 144:24,
25 146:6 147:6
149:1 153:15,
25 154:9
157:14 158:18,
20 160:11
161:17,24

162:4,9 163:3
167:19 168:21
169:11 170:2
171:4 172:19
173:17 174:4,
24 175:3,17,23
176:7 178:7,13,
19 179:4,13,19,
20 180:2 181:8,
22 182:24
183:21,22
184:13,17
188:3,8,9
189:17 190:8
197:9,22,23
198:11,23
199:3,19
200:10,11,21
201:5,6,15
202:3 203:10
205:1,11,12,18,
19 206:5 209:6,
7 210:6,22
211:24 212:12
213:16 214:3,
13 218:2,7,8,21
219:2,18,22
220:9,10,23
221:13,20
222:5,13,14
223:4,5 224:2,
16,21 225:5,14,
23 226:6,11
227:19 228:5,
20 229:12
230:6,19
231:17 232:2,7
234:4,10,25
235:6,11,19,20,
25 237:2,9,22
238:24 239:22
240:7,14,22
241:2,13,24
242:3,8,12,22
243:2,3,10,18
244:1,13
245:16,23
246:10,15,24
247:3,8 276:20
277:3,7,11,19,
24 278:3,17

**objection**
12:10,19 38:16,
17 40:24 52:6
73:5,12 86:20

87:10,15 88:5,
11,14,18,23
89:2,7 99:14
105:4 109:14
116:1,9,25
117:5 132:15
138:15 143:5,8
154:5 157:17
175:10 177:11
178:20 189:5
201:23 220:4
222:6 223:11,
12,17 224:22
225:15 226:18
228:23 233:8,
13 236:21
237:3,18 239:8
246:3,7 248:13
250:9 251:2,24
252:4,12,23
253:5 254:3
262:4 263:14,
18 264:25
265:9 266:2,15,
22 267:3,19,21,
25 268:24
269:18,22
270:12 271:10
274:13,19

**obtained** 141:6
171:20 172:4
174:11,19
185:1 190:25
208:24

**obvious**
233:19

**occasion**
105:25 106:1
180:24

**occasions**
149:14

**occurred**
61:15 121:14

**occurrence**
153:9

**October**
258:20

**odd** 145:4

**office** 13:11
20:5 32:12
44:18 54:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1110

59:13,14,16
122:13 130:10
150:16 191:18
192:22 196:3
202:20 206:7,
19 215:22
216:4 220:22
222:11 223:24
224:18 231:4
274:4

**officer** 10:5
66:15 67:10
70:13,18,21,24
71:3 81:23
85:23 114:8
115:25 116:15,
23 129:14
151:11 175:13
184:11 191:25
241:10,11
243:17 245:15
250:19

**officers** 35:14,
18 39:19 45:15
52:25 54:3
60:11,15,22
65:21 70:6
71:25 72:12,21
74:13,19 75:3,
18 76:5,13
77:1,5,12,19
78:11,21,24
79:5,11,17
80:7,12,17
81:7,10,19
82:5,16 83:13
84:2,9,20,25
85:6,10,18
86:3,9,16 87:2,
8,13,18,24
88:4,8,13,17,21
89:1,5 98:8
124:24 126:13
128:5 150:14,
20,25 151:5
153:12 159:14
179:1 184:7
187:21 192:18
242:25 243:9

**official** 43:3
62:6

**Oklahoma**
239:13,16

**one-page**
33:17

**open** 196:11

**opening**
179:10

**operating**
50:23 119:13

**opinion** 104:20
116:5 158:16
175:12,19
184:10

**opinions** 93:12

**opportunity**
127:3 229:7,9

**opposite**
183:19

**order** 12:14
77:6 134:7
174:20 178:17
233:9

**Originally**
125:14

**Otis** 43:13

**outbuilding**
54:11

**owned** 10:4

**owner** 21:24
119:15

———————

**P**

**P.M.** 278:23

**pages** 58:11,14
69:14,16

**paid** 194:10

**paper** 51:1,4

**papers** 36:5,7

**paperwork**
53:2

**paragraph**
123:8 150:22,
25 151:15
181:12 182:1
209:14,15
210:17 211:8

212:1 265:20

**paragraphs**
209:12

**paraphrase**
273:20

**paraphrasing**
275:3

**park** 165:25
166:4,8,12

**parked** 166:18

**parking** 166:1,
5,11 167:13

**part** 12:5 13:21
16:9 36:22
46:2,14 66:6
115:13 145:19
157:4 177:4
179:14 200:17
204:13 211:9
220:6 249:24
251:9

**participate**
97:18 124:10
142:3 149:18

**participated**
16:16 19:7 25:7
96:24 99:12
101:4 103:16
123:1 129:13
150:11 172:10,
15 234:13
237:20 252:17
253:9 276:12

**participating**
16:5,6 117:12
120:18 237:11

**participation**
183:15

**parts** 36:20
229:8

**party** 9:22

**pass** 238:11

**passed** 154:14
168:16

**passing**
125:13

**past** 112:12

**penalized**
81:22

**pending** 8:8
11:6 203:23
204:25 205:4,9,
16 226:25
229:10

**people** 11:17
14:7,9,18,20,
22,24 15:1
37:15 48:8,20,
23,25 49:3 50:2
51:11,21 67:18
73:15 97:5
99:11,19
100:18 104:16
129:15 151:12
152:12 155:18,
20,22 241:17
252:17 257:13

**perfect-** 143:14

**perfectly**
10:18

**period** 25:17
54:10 131:9
263:17 272:19
274:10

**periods** 171:6

**person** 21:21
43:10 53:19
69:10 71:4 92:2
93:6 102:25
130:6 136:20
144:13 217:9
236:24 277:2,
23

**person's** 10:8

**personal**
260:15,17

**personally**
17:23 73:13
83:2,22 84:18
85:9 90:18 94:1
246:4

**personnel**
44:22 45:2,8,17
46:2,7,15,22
47:4 68:6,10,23

69:2

**persons**
129:16,24
130:1

**phone** 141:1
191:16 192:11,
17,25 193:1

**phones** 79:16

**phonetic** 21:22
47:12

**photo** 34:24
35:2 65:9,16
70:25 95:17

**photographs**
95:17,18 97:14
98:11,17 125:4
139:8,12,15,23
140:13,14
187:2 236:18
237:21,24
238:13,15
239:1,12,15,20
240:2,4

**physical** 35:6
141:6,10 188:1

**physically**
59:1 244:3

**physician/
patient** 99:6

**pick** 176:12

**Pickard** 8:7,15
9:9 11:16 14:1
15:3 16:19
17:22 21:18
27:12 28:22
29:12 31:11,15
35:9,21 40:5,
17,25 42:10,13,
14 43:19 54:25
55:8 59:23 68:3
69:14 72:24
76:3,18 80:3
89:9 91:10 95:4
96:24 98:19
99:9 102:4
103:8 104:7
106:23 115:23
117:22 118:4
119:5 120:3
132:17,22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1111

133:22 134:8
137:15 139:7
141:21 149:12,
23 150:1,24
153:19 160:22
163:15 169:16
171:21,25
173:25 174:18
177:15 179:11
184:1,20,25
187:14 190:11
199:15 206:23
207:14,20
208:15 209:3
214:25 215:1
216:20 218:4
227:21 228:9
234:12 238:10,
13 240:3 241:5
242:5 244:14,
20 247:18,22
254:11 258:2
271:24 274:3
275:13 276:11
278:20

**picking** 132:12

**picture** 139:14
240:5

**pictures** 97:17
238:2 239:6

**pill** 91:23
144:22 194:14,
17

**pills** 136:25
277:6,10,16

**PL** 117:18

**PL15840**
206:25

**PL25962**
206:22 216:15

**PL27706**
244:15

**PL29737** 12:7

**PL3221** 249:23

**PL5132** 248:19

**place** 20:5
55:25 61:24
63:7 80:6,11,16
81:19 84:1,8,23

85:13,16 86:2
103:25 114:24
185:23 186:13
196:2

**plaintiff** 16:11
123:22 247:17
260:12

**plaintiffs** 8:13
95:14,18
186:10 258:19

**Plaintiffs'**
16:5,6,8

**plan** 179:24

**plate** 53:6

**play** 12:5,11
19:22 216:9
218:10 221:1
222:16 224:3
244:14

**played** 12:14,
25 217:4
218:17 221:5
222:19 224:6
244:19

**plenty** 147:10

**point** 11:1 21:2
27:20 92:16
107:20 122:19
126:1,10,25
127:2,9 134:24
155:12 160:14
163:19 165:22
173:4,8 189:11
192:14 205:6
247:10 265:15

**pointing**
122:23

**police** 14:13
23:23 24:13
25:25 34:11,15
35:13,18 36:9
48:1 52:23
53:15,23,25
54:4 64:17
65:21 67:10
78:6 84:2 88:8,
13,17 95:16
97:12,19 98:3
102:14 103:9
104:2,15

107:16 109:12
110:25 111:3
114:8 116:15,
23 124:4
125:21 132:13
143:18 150:15,
16 151:1,25
161:9 164:13
165:5,25 166:8,
19 175:13
177:14 178:25
179:25 180:11,
15 207:25
208:1,19
209:14 226:14
229:8 234:19
235:5 237:14
242:24 244:24
249:9 251:13,
17,21 254:1
262:12

**policies** 25:9,
14 26:13,18
45:5 54:23
55:24,25 56:8,
13,15,16 58:17
59:1,11,25
60:6,12,17,22
61:2,10,21,25
62:6,9,14,18,25
63:8,13,18,22
64:1,9,15,22
65:2,7,15,20
66:1 68:3 69:18
72:20 80:15
82:14,15 84:14
103:25 164:22

**policy** 26:22
27:2,7 54:15
55:11 68:4,5,10
69:1,4,16,22
70:1,4,9 71:15,
16,24 72:4
73:4,21,24
74:14 75:2,7,
11,17,23 76:1,
4,8,12,16,20,25
77:4,10,14,15,
19,22 78:1,5,9,
13,15,19 79:4,
9,15 80:5,11,16
82:4 84:8 85:4
86:1 165:3

**politics** 38:10

**Polly** 96:8

**polygraph**
140:19 188:19,
25 189:4,10,14
190:1,7

**polygraphs**
189:20

**POP** 273:1

**portion** 233:5

**portions**
12:12,13

**pose** 71:23

**posed** 236:4

**position** 13:12,
14 72:16 86:23

**positive**
152:11 196:10

**possession**
22:17 23:6

**post-it** 133:18
134:9

**postings** 79:3

**potential**
111:15

**power** 18:14
50:3,11

**predicate**
179:11,15

**prepare** 34:10
36:2 37:5,11

**prepared**
95:12

**preparing**
35:21

**presence**
122:9 134:15
146:11 147:18
148:8 186:2,9
203:4 204:17
227:17 228:3

**present** 19:14
20:1 97:14,21
98:7 99:10
101:3 104:25
105:25 118:20

122:15 124:3
129:17,18
132:2,3 139:3
144:10 145:11
163:23,24
164:4 175:24
177:17 185:1
191:25 193:12
196:14 206:9,
15 225:9
234:18,24
237:12,24
238:21 246:17
248:7,10
251:11,21
252:2,7,22
253:3,9 255:16
256:3 257:14
262:1,11 266:7
271:12

**preservation**
83:5

**preserve** 82:7,
17

**pressuring**
175:14

**pretty** 52:15
72:25 91:11
94:21 158:25
164:9 182:14
205:20 233:14,
19 255:6

**prevent** 88:8,
13,17

**previous** 15:7

**previously**
66:24 191:22
192:1 222:7

**primarily**
235:3

**prior** 24:6
31:12 32:5,9
48:13,18 49:1
62:5 63:7,21
83:3 89:9 90:4,
8,12,15,22,25
91:14,23 92:3,
5,8,15 93:7,9,
12,17,20,23
103:21 109:18
136:19,23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1112

138:12 140:1
181:2,18 182:8
185:6 186:9
189:7 191:21
193:9 194:21
195:2,6,9,14,
18,21 197:4
203:18 205:6
209:20 213:20
214:12 215:5,9,
17 227:17
233:25 237:11,
12 252:25
253:8 261:8
266:21 270:21
275:25 276:22
277:5,9

**prison** 243:13

**probable**
18:23 19:8 21:3
173:20 179:3,
17 242:2

**problem** 48:24
67:18 92:1
242:15

**problems** 48:7

**procedure**
26:22 27:2,7
55:11 68:4,6
69:1,5,16,23
70:1,5,9 71:15,
16,24 72:4
75:2,8,12,17,23
76:2,4,8,12,16,
21,25 77:5,11,
15,19,23 78:2,
6,10,13,15,20
79:4,9,15 80:6,
11,16 82:5 84:8
85:5 86:2 165:3

**procedures**
25:10,15 26:13,
19 45:5 54:23
55:25 56:8,15,
16 58:17 59:12
60:1,6,12,18,23
61:3,10,21,25
62:6,9,14,19,25
63:9,13,18,22
64:2,10,16,22
65:2,8,15,20
66:1 69:19
72:20 80:15

82:14,15 84:14
103:25 164:23

**proceed** 177:2,
9 178:1

**PROCEEDING
S** 8:1

**process** 53:4
66:6 69:8 218:5

**produced** 29:5
54:24

**production**
95:2

**professional**
99:6

**profile** 240:24

**program** 92:23

**prohibited**
72:14

**promise**
197:10,25
201:9

**promised**
197:20

**promises** 34:5
64:23 86:4,10
174:7 197:7

**proper** 76:9

**properly** 74:14

**property** 76:3
230:25 231:9,
14

**prosecution**
21:7,15 35:15
82:19

**prosecutor**
21:14

**protective**
233:9

**provide** 72:21
75:18 76:13
77:11,23 78:10,
15,20,23 79:5,
10,16 86:7,8
181:9 210:4
211:15 212:10
213:7 217:22

220:7 222:3
223:15 224:19
268:23

**provided** 34:9,
14 60:1,6 74:4,
19 83:4,23
118:20 152:9
195:5 209:4
210:1 215:22
218:1 220:14,
15 225:21
226:2,9,15
264:15 269:21
270:11 278:11

**providing**
82:24 211:4,22
212:17 220:21
222:12 223:25
225:3

**proximity**
166:10

**public** 233:6,
14 259:10

**publicly** 41:9

**pull** 117:12
240:1

**pulled** 121:1

**pulling** 112:6,8
117:15

**pumping**
209:22 217:19
267:11

**punishment**
82:9

**purchased**
147:15

**purpose**
76:20,25
140:12 157:11
175:14 184:12

**purposely**
67:8

**purse** 141:15

**pursue** 174:1
176:4

**put** 17:9 45:17
67:3 76:23

98:10,17 118:7
125:5 190:16
212:7 236:17
238:14,19,22
243:13

**putting** 233:8,
13

— Q —

**qualifications**
272:4,7

**question**
10:18,22 11:6
12:16 16:4,5,9
21:11 22:18,23
24:2 36:13
38:18 39:23
44:16 46:12
48:6,12 50:7
59:9 61:18
62:15 63:5 66:9
69:17 71:22
73:10 82:1
83:7,15 85:15
86:20 90:7
91:10 95:22
108:3 111:16
133:1,12
137:10 138:25
163:4 172:2,13
173:25 176:25
177:13 179:21
184:18 213:20
215:18 219:23
220:11 221:4
229:6 231:18
233:21 234:16
237:12 265:6,
12 267:10
268:1

**question's**
130:11

**questioned**
98:3,12 99:11
109:13 124:4,
13 132:13
139:4 235:24

**questioning**
73:7 97:7,11,18
98:5,8 101:4
107:17 108:25

109:18 110:4,
10 118:21
123:22 140:23
204:3 206:2,18
214:7 234:13,
18,24 235:4,10,
18 236:7,19
237:8,13,19
242:6,18
243:21 244:4,8
245:9 251:12,
18 259:24

**questionings**
270:21

**questions**
10:18 11:10
12:22 26:12,18
29:25 35:20
66:10 113:8,12,
14 123:5,12,16
137:19 158:19
163:16 171:24
177:15 185:4
190:23 206:6,
10,13 207:11
216:11 217:3
218:15 222:18
224:5 228:10
233:2 235:22
236:4 241:6
244:16 247:18,
24 251:22
252:2,11,16
254:7,13
262:10,17,20
269:7 270:21
271:19,24
272:2 273:13
274:3,8 275:3,
13

**quick** 39:25
66:9,11 68:3
71:22 75:14
209:13

— R —

**race** 38:4

**raise** 8:24

**Randy** 151:15,
17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1113

**range** 72:15
165:22

**Ranger** 112:13

**rare** 52:15

**Raven** 40:7

**reached**
178:12

**read** 36:9,17,19
75:13 172:1
176:22 178:8
182:1,4 185:4
207:10,24
208:1,6 216:24
229:4 260:19

**reads** 211:23

**ready** 203:12

**real** 38:5,6
39:24 68:3
71:22 75:14
94:4 188:7
209:13

**realize** 50:1

**reason** 91:21
140:17 198:10
275:7

**reasons** 137:6

**recall** 11:23
17:18,19 22:2
23:17 27:2,6,10
29:18,20,22
30:16 31:1,3,7,
11,17 33:4,14
34:3,16,19
35:4,8,11,16
36:7 39:16
40:13,21 41:12
43:6,18,21
44:3,19 45:13
56:7 60:8,14,
19,21 61:4,8,23
63:6,10,21,25
64:1 65:12,17,
24 70:8 71:1,6,
9,10,13 74:21,
25 80:10,13
81:8,13,14,21
82:3,12,23
85:25 91:13
97:17,20 98:14,

15 102:22
103:6 106:5
107:15 109:4,5,
23 110:6,9
112:14,15,17
113:6,14 114:1,
19 117:15
118:23 123:23
126:3 127:12,
16,20,24
128:17 129:20,
21 130:4,23
131:22 133:20
134:14 135:3,6,
7,10,19 136:8,
22 139:22
144:3 148:24
149:9,11 152:5
155:23 157:23
159:7 161:18,
25 162:24
165:15 169:2
170:12,14
173:3,7,12,18,
23 174:17
176:6 178:14
180:3,9 182:19,
23 183:3,11
185:22 186:23
188:4,11 189:2
190:9 191:13,
14 192:20
196:11 198:20,
21,25 201:20
203:20 204:20,
22 205:2,5
210:8,24 211:1,
2,19,20 212:14
213:11 214:14
216:5 230:21,
22 235:9 236:3,
15,24 237:10
238:13,25
239:18 243:15
252:15 253:8,
18,19 255:10,
18 256:5
258:13 260:23
261:4,12,18,24
262:13,16,19,
24 263:9,11,24
266:24 268:4
275:3

**recalls** 176:10,
12

**receipts** 22:21
23:13 261:1,5

**receive** 27:17
33:2 34:18,21,
24 35:2

**received**
24:16,18,24
26:3 31:12
103:21 180:5,8
184:16 276:9

**receiving**
230:25 231:9
275:23 276:3

**recklessly**
72:14 159:5
262:23

**recognize** 15:9
42:15 55:8
119:5 150:1
229:21 250:4

**recollection**
38:19 113:20
117:12 128:4
136:5,9,14
138:9 152:9
153:20 154:11
155:25 178:5
192:5 249:14

**record** 8:11
39:24 40:1,2,3
79:24,25 80:1
94:24 110:14,
18,22 111:6
117:23,25
118:1,2 138:5
160:24 163:11,
12,13 176:17,
18,19,20
204:12 208:4,
11,12,13
247:14,15,16
269:1,3,4,5,8
273:15 278:22

**recorded** 12:3
24:10 110:15
136:16,18
184:2,11 192:8
206:2,22 209:5
216:14 217:6,
21 218:19
220:5 221:6
222:2,20

223:14 224:7
227:22,24
236:7 259:18,
20 266:9,13

**recorder**
214:12,17,19
215:5,9,24
216:2 227:12,
17 267:18

**recording**
19:23 148:14,
17 184:8
206:24 217:10,
16 218:23
219:4,9,13,19,
24 220:6
221:10,17,23
222:25 224:11
225:20 244:20
245:1,3,6
266:21 267:1,6
274:11

**recordings**
12:12 36:15,16
273:18

**records** 28:1
68:6 137:22,23
138:1,7,18
141:1

**recovered**
141:11

**REDIRECT**
275:11

**reduce** 82:8

**refer** 73:21

**reference**
261:1 266:11
267:10 273:21

**references**
152:7

**referencing**
266:17

**referred** 52:19,
22

**referring**
197:14 236:13
260:15 264:6
273:25

**reflect** 110:15

**reflection**
139:16

**reflects** 269:11
270:6

**refresh** 61:14
106:13 113:20
120:17 128:4
136:13 155:24
192:5 216:6
249:14

**regard** 113:20
120:18

**register**
119:14

**regular** 91:12

**Reid** 31:19,21

**reiterate**
175:10

**rejected** 66:25
67:7

**relate** 69:19

**related** 38:1
131:13 135:11

**relates** 70:1,10
71:15 73:7
75:12 76:2,17
78:6 233:3
272:10 275:4

**relating** 16:8
27:23 79:15
96:4,18 137:22
229:1 273:14

**relation** 43:12
133:8

**relationship**
98:23 99:7
261:23

**released**
198:8,22 199:7
201:3

**reluctant**
99:11,16

**remember**
10:10,11 17:2,
12,16 19:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1114

20:25 22:5,6,9,
10,11 23:2,3,20
24:5,11 26:10
33:8,11 39:8,11
46:11 47:10,11
50:18 51:15
59:17 60:20
61:7,12 67:20,
22 68:1 70:16
89:17,18,20,21,
24 90:11,20,24
92:13 97:16
98:5,6 100:6,
13,18,23
105:14 106:12
108:6,8,10,13,
17,18 109:7,9
110:11,12
111:21,22
112:4,6,10,11
114:15,17,21,
23 115:4,5,7,16
120:20,25
121:6,7,10,11,
12,25 122:2,11
123:16 124:10,
17,18,21,23
125:1,3,17
126:2,6,7,17,18
128:19 129:22
130:9 131:8,11,
21,24 132:6,10,
11,16 133:15,
16 134:13,17,
19 135:15,20
136:2,4,18
137:2,23 138:4,
16,21 139:5,13,
14 140:10
142:17 143:24
144:12 145:10
146:19 148:2,9
149:4,16 151:3
152:10,17
154:1 155:7
156:13,17
158:23 159:8,
16 161:13
162:2,3,12
163:6,17
168:23 169:23
170:17 171:11
174:12 178:8
180:6 181:23
182:11 184:6
185:16 186:4,

12,15,16,19,22
187:4,17,18
189:18 190:13
191:19,24
192:3 193:15,
20 194:1 196:6,
10,16 198:9,16
199:2,4,6,10
201:10,24
202:1 226:25
227:5 230:8
235:12,14,21
236:17 237:23
238:1,7,20,23
251:19 255:24
257:5,17
258:11,23
259:1,3,5,6,9,
10,16 260:5
261:4 262:21
263:1,4,6,7
266:25 267:6,8,
24 273:20
274:14,16,20

**remembering**
114:21

**rental** 137:22
138:1,10 194:9

**rented** 138:2

**renting** 138:11

**Reona** 42:11

**repeat** 25:11
115:22 133:1
172:13 219:23
225:22 226:13

**repeatedly**
143:12

**replaced** 51:20

**report** 23:23
25:25 34:15
53:23 78:6
102:14 103:9
104:2 107:16
143:18 150:14
151:8,10 152:7
161:9 164:13
165:5 177:14
180:11,15
181:2,5,10
182:2 196:17,
18,20,24 197:2

207:25 208:1,
19 209:14,25
210:9,19 211:3,
22 212:16
213:13 226:8,
15,17 227:15
229:1,5,8
265:3,4,5,17
266:1,11

**reporter** 8:4,25
9:1,6 11:14
15:7 42:5

**reports** 34:11
36:9 53:15
54:1,4 64:17
77:16 78:3
95:16 104:15
164:19 192:4

**represent**
171:13 216:22
247:22 254:12

**representative**
32:14,16

**republican**
38:7,8

**request** 95:2,9,
11,19 96:3,8,17
102:5 140:18,
21,25 141:5,9
188:19 190:4
192:14 205:15

**requested**
29:6 188:25

**requests**
129:12 205:3

**require** 272:11
273:6

**required** 25:4
26:8,22 44:22
54:3,5,17
60:11,16 61:20
62:18,21,24
63:3,13 82:6,17
83:14 84:9 86:3
104:2 119:16
164:18 165:4
273:11

**requirement**
60:21 63:4

**requirements**
35:13 60:5

**requires** 35:17
67:1 68:10 69:1
91:20 116:9
137:9 157:16
167:20 210:7
220:15 225:6,
24 226:12,19
242:13 246:16

**requiring**
83:13

**resemble**
265:15

**residence**
13:23 151:12
152:5,13,16
153:22 154:6
185:24 186:14

**residents**
166:10

**resigned** 44:9

**resolution**
40:22 43:7

**resolve** 41:4

**resolved** 41:7
43:21

**respect** 95:21

**responded**
96:20 125:15,
18

**response**
40:17 54:2
95:24 96:10
106:24 113:7
126:9,22
128:22 129:11
132:19 153:6
218:22 222:15
223:21

**responses**
15:5 95:7
106:20 123:21
132:1,19

**responsibility**
24:2 52:6
86:14,18
104:20 105:1,4

**responsible**
23:22 51:8,22
52:3 235:4

**rest** 156:8,12
166:24

**restroom** 11:2

**retention** 35:6
54:15

**rethought** 36:4

**retired** 256:24
275:18,19

**retirement**
275:15

**retiring** 38:2

**retrieve** 192:15

**reveal** 66:6

**revealed**
227:16

**review** 36:11
54:4 60:16,22
61:20 62:18
63:13 66:6
117:20 150:24
176:9 181:5
190:23 196:20
229:9 232:24
233:24

**revised** 55:24
58:23 64:3

**revisions**
60:11

**Richmond**
81:3 272:15,25

**road** 10:11
166:14,17,21

**rob** 195:23
212:22 223:8

**robbery** 249:5

**Robert** 92:2
96:7

**Robinson** 8:12

**rode** 14:18

**Rogers** 92:23,
24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1115

**Ronnie** 40:7 42:12 43:10,12

**room** 109:11, 16 124:12 125:7 196:4 199:12 204:8, 16 206:12 247:6 251:22

**rubber** 212:7

**rude** 116:19

**rug** 146:3

**rules** 9:11

**run** 37:19 144:22 157:3,4 194:14,17

**run-ins** 90:4 180:20

**running** 38:10 136:3

**runs** 277:15

— **S** —

**sacred** 35:22

**sat** 14:10 97:13 107:2,10,13 108:8

**save** 15:18

**scene** 95:17 98:11 125:9,16, 19,25 126:4,14, 19 127:9 141:7, 11,15 153:13 236:18 256:4 257:4

**scenes** 253:21

**school** 27:13, 15,17 31:19

**schools** 31:16 33:5

**seal** 233:13

**sealed** 233:5

**search** 138:22 149:19 150:7, 12,16 151:2,4, 16,21 152:1,4,

20,23 156:15

**searching** 135:7,10 255:2

**seat** 119:14

**seconds** 216:19 218:11, 12 221:2,3 222:16,17 224:3,4

**section** 56:24 58:14 71:22

**secure** 171:2

**securing** 51:8

**send** 42:1

**sending** 239:12 253:19

**sentence** 111:13 123:20 209:20 210:16

**separate** 106:2,3 181:19

**served** 31:23

**service** 32:14, 16 51:1,4

**sessions** 80:25

**set** 56:15

**sets** 272:7

**settled** 41:15 232:9

**settlement** 40:25 41:4,7,9

**seven's** 57:11, 14

**shape** 257:11

**Shawna** 8:19 254:11

**she'd** 156:8

**sheriff** 13:13 32:6,20 33:3, 19,22,25 34:4, 10,13,17,20,23 35:1,5,12 37:13,24 38:11,

14 42:13 43:4 44:4,18,20,25 45:9 46:19 50:1,15 60:4,9, 15 66:18,21 68:15,18 70:14, 17,20,23 71:2 74:12 76:3 81:1 83:3 84:3 86:7 87:7 174:18 184:2 241:5 247:22 258:2 261:10 272:4,8 273:10 275:22

**sheriff's** 10:6 13:11,23 14:12 24:24 25:10,15 26:3,4,14 28:8, 10 29:15,19 30:1,6 32:1 33:6 39:7 40:8 42:13 44:10,22 45:1,6,9,16 46:5,18,21 47:3,7 49:8,21 50:12 51:7 53:17 54:7,16 56:9 59:2,8,11 60:2,16,17 61:1,10,24 62:5,7,25 63:19,23 64:2 66:24 68:21 69:9,20 73:3,18 74:3,7 75:3 77:1,6 79:6,11, 18 80:6 81:6,10 82:6,24 83:1,20 84:9,24 85:5, 14,17 86:2,15, 24 104:1 140:22 151:21 191:18 196:3 202:20,23 231:4 242:10 245:20 250:17 272:3,12 274:10 275:16 276:8

**sheriffs** 39:4,7 272:10,18 273:7

**shifts** 53:10

**short** 118:4 202:15

**shortly** 133:11

**show** 15:3 23:13 28:20 43:24 54:22 95:1 103:7 117:17,21 133:21 137:14 139:6 140:13 149:22 171:12, 18 187:1,5 228:7 238:8 248:18

**shown** 22:20

**sic** 8:4 40:7 42:12 89:14 149:19 174:8 222:17 227:17

**sic]** 268:15

**side** 70:11 232:14,20

**sign** 15:13 44:17 55:16 65:25 66:3

**signature** 15:16 26:16 55:13

**signed** 15:19 44:4 66:5,7 171:14

**signing** 66:6

**similar** 240:5, 12,20,25

**similarity** 240:9 264:19, 23 265:7

**Simp-** 135:7

**Simpson** 90:22 92:5 96:4,6 101:17 113:2 130:15 132:24 133:3,5, 8,18 134:9,15, 25 135:5,17,22 136:6,10,19,23, 24 137:7,22,24 138:2,11,25

139:3,10,12,16 140:1,13,18,21 141:10 142:8, 12,19 143:2,6, 21 144:11,13 190:1,6 194:6, 17 195:22 212:22 240:3,5, 16 252:19 264:19 277:15

**Simpson's** 133:11,13,17 138:13,22 141:1,5 240:20, 24

**single** 25:21,25 27:2,7 80:11,16 85:23 102:9 103:9,15

**sir** 8:24 15:9 16:12 20:22 32:8 40:10 42:21 56:3 68:2 73:10 95:22 96:8,14 97:3 113:9 119:16 129:9 150:12 154:2 161:7 171:18 176:22 180:10 181:1 185:13 212:8 213:1 216:9 217:5 218:18 221:6 222:20 224:7 225:18 228:7 229:21 248:25 254:8

**sit** 61:19 97:10 166:21,24 274:16

**sitting** 16:14 27:1,6 49:6 56:7 61:8,23 62:3,13 63:6,11 80:10 89:24 167:13 170:18 278:14

**situation** 145:5

**Sizemore** 40:7 42:12 43:10,12, 13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1116

**sketch** 187:16, 20 188:2,6,13, 16 237:14 240:1,6,15,19, 25 264:15 265:7,11

**skip** 69:12

**Slosar** 8:13 9:8 12:17,20 38:21 39:24 40:4 41:2,25 42:3,6, 8 48:10 50:9 55:3,7 57:1,3,6, 9,13,17,22,24 58:7,10,15 73:9 79:23 80:2 83:9,12,15,17 86:22 94:18 98:1 100:7 104:9 105:7 106:3,7 108:3,7 118:3 120:7,11 124:11 129:8 134:4,6 137:13, 20 143:14,16 144:9 145:2 147:21,24 149:5 160:18, 21 163:7,14 176:14,17,21 187:10,13 188:12 198:1 201:19 207:4,7, 9,12 208:5,7, 10,14 209:9 215:1,4,14,16 216:18 218:16 220:17 223:22 224:24 225:17 226:22 229:16 231:20 232:16, 17,19 233:7,12, 18,20 237:6 238:11 246:1,5, 18 247:13,17 248:8,13,21,24 249:24 250:9, 11 251:2,24 252:4,12,23,25 253:5 254:3 260:6 262:4 263:14,18 264:25 265:9, 19 266:2,15,22 267:3,19,21,25

**slow** 109:24 157:20

**small** 109:16 263:5

**smaller** 52:10

**Smith** 15:1 25:24 40:7 44:4,18 66:18, 21 96:5 102:2 112:19,21 130:21 145:6,9, 14,17,22 146:1, 12,16 147:9,13, 17,25 148:3,23 149:9 168:9,12, 20,25 169:3,7, 12 252:20

**snapping** 72:15

**snippets** 12:11

**social** 79:3

**solemnly** 9:1

**son's** 135:7

**sort** 33:2 52:24 54:15 60:4,25 69:7 151:5 259:8

**sound** 9:12

**space** 35:22

**speak** 101:14, 17,20,23 102:1 127:3 132:23 133:7 134:10 136:19 137:7 138:13 143:21 146:15 149:15 162:25 197:4 231:4

**speaking** 105:14 136:23 199:14

**Speaks** 178:9

**specific** 60:21 72:25 80:5 101:10 129:12 214:1 215:6,10, 23 227:15 236:4

**specifically** 95:19 133:2 255:25

**specifics** 23:3 203:8

**speculate** 67:1 91:20 116:10 137:9 157:16 167:20 210:7 220:15 225:6, 24 226:12,19 242:13 246:16

**speculation** 263:19 266:3 269:24

**spend** 156:8, 12

**spending** 146:5

**spoke** 101:3 105:12 111:14 123:21 126:5, 10 157:25 159:5 162:6,21 193:13 213:17, 18 214:11 258:13 274:11, 22

**spoken** 126:4 267:24

**Springs** 157:9, 10

**stamp** 216:18

**stapled** 77:7

**Staples** 8:12 15:6 57:7,10 58:2,9 94:13,20

**start** 12:10 199:20 209:13 258:4

**started** 9:12 63:17 124:16

125:22 213:4 223:1,3 224:13 267:6

**state** 14:13 52:23 111:14 125:21 129:14 132:23 150:16 151:1 244:24 249:8 254:1 273:5

**stated** 83:7 104:7 176:10 181:13 209:16 211:10 212:4,5, 6,21 266:18

**statement** 13:3 19:15 20:7,16 109:4 146:13 156:9 161:22 168:6, 20 169:1 171:8, 12,19 172:4 173:24 174:3,7, 11,14,16,21 175:15 176:5, 16 177:7,25 178:17 180:1,5, 8,19 182:9,13 183:18 184:22 185:1,7,11 187:8 190:15, 24 191:4 195:3, 4 197:20 198:6, 14 200:13 201:4,13,21,24 202:9 203:13, 22 204:24 205:7,9,17 206:3,22 207:15,21 208:23 209:5 217:6,21 218:19 220:5 221:6 222:2,20 223:14 224:7 225:22 227:22, 24 228:19 229:17 230:9 234:1 263:15 265:18,23 266:12 269:20 273:19,21 277:13,22

**statements** 123:23 136:10 176:12 192:8 266:20 278:10

**states** 8:9 226:8

**station** 180:1

**status** 43:25

**stay** 37:4 196:8

**stayed** 153:22

**staying** 153:7

**stealing** 197:15

**Steele** 21:14 228:11,14,17, 22 229:8

**Stella** 168:9, 10,11,16,20,25 169:3,7,12

**stems** 240:25

**steps** 21:7 218:4 225:12 227:2,6,7

**Steve** 21:22

**sticker** 190:16, 18

**sticking** 240:15

**sticky** 134:13, 22 135:1

**sting** 100:14

**stolen** 134:18 212:4 230:25 231:9,14

**stop** 18:14 21:7 37:23 112:7 120:18 121:8, 11,14 184:11 206:17 218:5 225:12 247:10 275:6,7

**stopped** 247:7

**stopping** 21:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1117

store 54:14

stored 54:10 59:2

story 169:8 243:14

street 121:19 165:17

stress 30:21, 24 31:4

strike 48:12 59:8 61:18 62:15 63:5 92:16 130:24 131:17 133:12 135:4 164:11 165:16 167:14 184:18 229:6

stuff 69:13 103:7 114:12 148:7 194:19

subjects 33:10

submitted 53:15

subpoenaed 141:1

subpoenas 51:4

substance 118:12 127:12, 16,20,24 128:4

substances 261:15

substantive 213:19,25

sued 43:3

suggestive 35:3 65:8 70:24

summary 208:2 265:17

Sunday 209:21

supervised 39:13

supervising 39:3,8

supervision

50:2,19 51:22 245:20

supervisor 245:9

supposed 179:2 211:22 212:17,24 223:10 241:10

supposedly 211:4

Supreme 35:9

surprised 171:1

surprising 171:5

surrendered 44:17

surveillance 166:1,9,13

suspect 102:20 107:20 142:16 174:21 188:14 253:10

suspects 34:2, 6 101:5 187:25

suspicious 144:21

swear 9:1

sweep 146:3

sweetened 146:2

swore 243:5

sworn 8:25

Sylvia 264:5,7

T

table 57:14,24 98:11,17 109:16 118:17 125:5 236:18

tactic 115:5,7, 13,19,24 116:8, 23

taking 11:7

20:15 23:19 25:12 26:10 104:3 106:5 135:21 139:14 140:13 173:24 205:6 236:9,11, 14 237:21 238:2

talk 14:17 22:10 100:1,8 111:23 112:21 125:24 126:13 131:6 145:23 146:22,23,25 157:6,19 167:8 168:2,5,19,25 185:10,17 191:12 192:12 193:5 194:3,6, 9,13,16 203:3 219:21 220:1 228:4 230:2 271:25 274:15

talked 20:14,18 22:8 105:24 106:10 112:5 118:14 126:15, 18 131:2 156:25 181:15 182:11 191:21 192:1 196:14 202:5,16 203:5 226:23 227:10 230:12,17 251:10 262:22 267:5 274:14

talking 26:20 41:16,17 100:13 111:25 112:12 115:4 122:24 130:9 131:8,11 135:20,21,23, 24 136:1 154:1 155:16 156:17 159:9,12 163:6 168:24 185:16, 21 186:16 217:10 230:8 245:22

task 129:12 234:3

tasked 86:13

Tax 232:21

taxes 38:19,22

Taylor 14:24 16:15,19,25 17:7,13,23 18:2,12,16,24 19:9 20:24 21:5,8,15 25:24 90:12 97:12,15, 19 98:3,7,12 100:14 101:20 107:3,11,14,17, 19,23 108:12, 15,24 109:12, 19 110:4,10 113:23 118:22 124:4,13 125:2 128:15 129:18 131:23 132:3, 12 138:19 152:12,16 154:15,22 164:8 169:8 173:16,21 174:3 176:6 177:1,7,25 178:18 181:14, 20 182:17,21 183:1,5 186:5 187:2 189:8 201:4,13 207:22 208:25 226:4 234:13 235:4,18,23 236:4,19,25 237:7,13,21,25 238:14,18,21 239:13,16,20 240:3 248:8,10 249:5,16,20 250:13,20,25 251:12,16,23 252:11 258:25 262:11,19,20 264:23 265:8 278:16

Taylor's 123:22 234:24

teach 30:23

team 228:4

technician 8:3

technique

31:21 243:25

techniques 34:18 65:2 74:20

telling 19:18, 21 108:12 128:19 138:17 155:7 169:23 184:12 197:12 200:7 202:13

ten 58:8,10

tend 10:12,17

tended 82:7

terminate 69:10

terminated 44:9

test 33:17 74:16 118:23

testified 18:19 63:11 81:22 143:10 175:25 177:23 180:17 183:12 214:10 223:1 246:23 248:11 253:24 264:18,20 271:15 276:15

testify 222:7 223:19 224:22 226:20

testifying 118:23 124:2 176:6 258:13

testimony 9:2 25:5 118:20 141:23 167:4 176:9 178:6 199:9 238:25 248:14 252:1, 25 258:12 260:22,24 261:17 262:10, 14,24 263:23 264:7 268:1 274:9

tests 33:12,13, 14,15



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1118

that'd 202:9

Theft 91:16
194:2

thief 276:24

thing 11:5
25:18 41:17
51:1 99:18
105:20 108:5
110:11 118:8
126:7 128:10
175:7 204:10

things 15:18
41:24 47:23
52:9 53:6 91:4
145:24 155:21
159:9 166:25
229:5

thinking 59:13

thought 94:18,
25 152:10
162:13,14
230:16

thousands
195:16

threaten
114:23 115:12,
18,25 116:6,15,
24 236:25

threatened
108:24 114:16
117:9 242:17

threatening
115:7

threats 161:11
227:21,25

three- 271:3

throw 246:13

throwing
246:22

thrown 244:8

tie 195:11
210:11 219:15
270:3

Tilburg 8:3

till 239:6

time 9:17 11:1
13:8,12 17:3,5,
9 18:6 19:7
20:11,18,23
21:2 28:6
32:18,19 39:13
41:6 44:17
45:22 46:4,21
49:22 50:19
51:2,3,19 53:2
54:10,20 58:18
60:7 62:16,22
63:16 64:5,6,7,
13,20,25 65:5,
13,18 68:22
72:19,25 74:2,8
84:6 94:6 98:2
100:12 101:18
102:19,23
103:21 105:14
106:3 113:25
115:22 122:12
123:22,23
131:10,20
137:15,21
138:21 139:17,
25 140:9 141:3
143:24 145:10
150:3 152:13,
19 153:9 157:7,
25 159:11
160:16 162:12,
21 164:8 165:2
169:24 170:4,5
171:6,23 173:4,
8 180:18,19
181:21 185:3,
17,25 187:15
189:11 190:22
193:2,21
197:18 202:15
203:7 206:15
207:10,18,19
214:20 215:13,
17,21 216:18
228:25 230:15
235:23 238:7
239:19 244:25
245:8 252:8
259:15,19
261:10 263:17
269:19 270:9
272:19 274:10
275:14,18,19
277:13,21

time's 163:6

times 20:15
37:10 92:12
104:7 122:9
131:6 143:21
145:8 149:16
156:25 181:15
185:13 276:18

today 8:3,4
15:22 16:14
27:2,6 44:1
49:6 56:7 61:8,
23 62:3,13
63:6,11 80:10
89:24 118:24
127:7 137:25
141:23 144:14
170:18 180:15
181:3 185:6
196:24 207:16
228:24,25
252:16 254:13
274:16 276:15
278:14

today's 35:21
36:2

told 17:8 20:19
99:21 138:10,
16,18 146:4,21
147:16 148:3,6
149:9 154:13,
18,19 155:6,20
157:20 158:6,8,
9,13 174:12
181:19 182:16,
20,25 183:4,8,
13,19 189:12,
18,22 193:6
194:22 195:10,
15,22 198:4
199:5 200:3,19,
24 201:2,11
202:7,9,10
203:6,12
205:14,20
209:18 210:10
211:10 213:4,
21 217:17
218:24 219:5,
10,14,20,25
221:11,18,24,
25 222:25
223:7 224:12
226:20 231:7,

12 232:1
243:12,13,20
259:16 267:17
268:13 271:8
278:6

top 21:23 26:16
29:11 58:3
153:8 190:20
249:9

topic 84:16

topics 29:22

totally 18:17

Townsend 8:2

track 41:24
42:7

traffic 58:5
120:18 121:8,
11,14 166:25

trafficking
146:2,3 147:9
148:24

train 74:8

trained 29:23
33:20,21,23
34:1,5 73:25
85:9 184:7

training 24:15,
18,24 26:2,4
28:5 29:5,6,14
30:12 31:7,10,
11 33:2,5 34:9,
14,18,21,24
35:2,6,13 61:1,
9,15,24 63:7
74:3 80:25
81:3,5,14 82:24
83:4,14 86:9
103:20,22
184:15 272:3,
12,14,15,20,25
273:11,14,15
275:16,22
276:2,9

trainings 61:5

transcribed
185:7,11
207:15

transcript

176:24 206:24
208:2 216:16
233:5 268:19
269:10,14,25
270:6,14

transcription
184:21

transfer
119:14

travel 15:17

travels 67:21

trial 11:25
259:21,22

trials 38:25

trick 36:13
44:16

trip 136:25
194:3

Trooper 258:5

trouble 13:6
73:6 91:5,11
92:12,13

truck 10:11

true 17:8 45:19
46:17 96:2,14,
22 103:13
108:23 123:25
126:11,12
127:11 129:19
132:25 148:3
153:17 154:2
165:12 212:21
231:12 248:12
261:8 265:22
268:18,22
269:15 270:10,
22 271:7 278:7,
11

trust 73:2

truth 9:3,4
197:12 200:8,
19,25 202:13

truthful 102:7
133:8 200:15

turn 15:25 29:8
72:3 77:14 95:8
106:15 119:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1119

120:5 128:21
151:10 265:1
269:9

**turned** 214:17,
19 215:5,9,25
216:2 224:14
227:12,18
267:2

**turning** 212:20
214:12

**tying** 210:10
268:19 270:7

**type** 47:25
48:22 52:2
81:14

**types** 51:25

**typically** 95:7

**typo** 230:17

———

**U**

**uh-huh** 11:11
20:19 27:11
58:13 68:16
72:11 83:16
178:4

**uh-uh** 11:11

**ultimate** 40:21

**unaware** 99:5

**unclear** 252:1

**undergo**
272:12,25
273:7

**underlying**
22:1 103:16
131:7 132:24
181:6 185:14
234:14

**understand**
10:19 12:15
15:19 26:19,20
43:1 83:12 91:9
105:8 117:8
143:14 179:5
232:13 251:20

**understanding**
12:2 24:23

25:9,14 44:21
45:14 55:23
56:3 68:14 73:6
103:25 140:7
141:13,17
142:15 164:22
176:25 177:5,
12,14 187:20
189:13 251:16
253:25 264:14,
17

**understood**
10:23 74:14,15
102:19 274:8

**unduly** 35:3

**unit** 234:3

**UNITE** 92:22
93:1 232:22
234:3

**United** 8:8

**unrelated**
75:19

**unwritten**
63:18 64:9,15,
22 65:2,7,15,20

**up.'** 270:3

**update** 43:25

———

**V**

**vaguely** 23:2
186:4

**Van** 8:3

**vehicle** 22:13,
18 78:14
119:13,15
135:15 140:8
165:25 166:4,8

**vehicles** 71:15
135:10 138:23

**verbal** 54:2
153:6 218:22
222:15 223:21

**verbally** 11:10

**Vernon** 130:25
131:2 141:21,
22,24 142:4,7,

11,18,24 143:1,
6,13,19

**version** 240:16

**victim's**
121:19 141:15

**video** 8:3

**videotape**
30:12,15 31:7

**view** 239:17

**violation** 81:11

**violence** 75:9,
12,16,20

**voice** 13:1
217:13 245:11

**volunteering**
213:14

———

**W**

**wad** 195:17
221:12,19
270:15 271:6

**Wagner** 39:18

**wait** 166:5
190:19 239:6

**waited** 196:9
214:6

**waiting** 204:7

**waived** 233:17

**walk** 140:8
169:5

**walking** 157:4
186:17

**wanted** 32:21
37:15 111:23
142:9 145:23
146:23 167:16
169:3,7 191:11
192:12 193:4,7
199:20,22
202:8,12
203:21,22
205:4,8,20
209:17 211:9
213:23 243:14
265:12,25

**wanting** 120:2

**warning**
162:17

**warrant** 169:17
171:2,14,15
174:20 177:9
178:2 179:3,7,9
230:25 249:3,4
250:13

**Warren** 96:6
98:19,24 99:2
261:18,20
262:3

**watch** 166:5,24

**watched** 10:15

**ways** 91:18
156:24

**weapon** 72:15,
16

**wear** 119:14
151:5

**wearing**
142:16 196:5

**week** 74:5
133:13

**weeks** 170:7
175:24 246:19

**What'd** 90:19

**wheeler** 135:7

**whereabouts**
139:1,4

**wife** 59:18,19
131:13

**Wiggins**
244:25

**Wilbur** 37:20,
22,23

**William** 11:25
90:15 96:5
128:15 148:4
183:9 186:5
194:23 212:22

**Williams** 8:14
11:20 12:9,18
21:16 23:1,12
24:1 35:23

38:15 39:22
40:23 46:9
48:4,15 50:6
52:5 55:2,5
56:4,23 57:2,
11,16,20,23
58:1,5,8,12,21
60:13 62:11,20
63:2 64:11,18
65:11,23 67:1,
15 73:5,11
74:11,22 77:8
79:22 80:23
81:25 82:10,20
83:7,10,13,16,
19 85:2,20
86:17 87:4,10,
15,20,25 88:5,
11,14,18,23
89:2,7 90:6
91:7,9,20 92:21
93:14 94:15,21
97:2 99:14
100:3,20 101:7
104:6 105:3,11
108:2,16 109:2,
22 110:2,7
112:2 115:3,10,
15,21 116:9,17
117:1,5,14
119:3 120:2,5,8
121:4,23 122:1,
21 124:8
126:24 128:9,
25 129:3,5
130:8 133:25
134:11 135:14
137:9,18
138:15 142:2,
23 143:9,12,23
144:25 147:7,
20,22 149:3
153:16,18
154:10 157:16
158:21 160:12,
16,20 161:19
162:10 163:3,
10 167:20
168:22 169:11
170:2 171:23
172:21 173:17
174:4,24 175:4,
18 176:8,15
178:20 179:20
181:8 183:22,
24 185:3 187:8,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1120

11 188:3,8
189:5 190:10,
22 197:23
198:24 199:13
200:11,23
201:6,15
205:12,19
207:10 208:9
209:7 210:7
214:4,25 215:3,
13,15 216:16,
25 218:8 219:6
220:10,13,24
221:16 222:6,
14 223:5,11,17,
19 224:17,22
225:6,15,24
226:12,19
228:23 229:14
231:17 232:16,
18 233:1,11,15
236:20 237:2,5
240:8 241:3,14
242:13 243:3,
23 245:22,24
246:2,16 248:1
271:23 275:10
277:19

**Wilson** 96:7

**Winchester**
32:12

**wise** 189:6

**withdraw**
85:15 173:25
213:20 237:12

**withholding**
70:18 87:3,18
88:8,21

**witness.'**
119:25

**witnesses**
33:20 34:6
64:23 65:3
70:21 84:10
85:6,10,18
87:14 88:4,17
89:6 95:19
101:4 104:22
105:2 111:15,
19 114:16
115:7 125:24
126:3 133:19

135:1 242:25
246:9 253:7,16,
20

**woke** 154:14

**woman** 11:24
195:11 210:10

**word** 24:2 52:6
67:21 105:4
108:5 146:10

**words** 86:17
115:11

**work** 32:15
38:19,22,24
39:19 89:23
125:21 254:16
255:8 256:10,
12,14,20 257:8,
10 258:7

**worked** 18:9
19:3 32:10
50:19 51:2 97:6
114:10 171:7
197:16 254:18,
24 255:22
256:21 259:7
272:18

**working** 50:2
92:18 114:10
241:16 255:24

**works** 117:7

**worried** 50:10
73:14

**worse** 30:10

**wrecker** 78:14

**wrecks** 52:9

**Wright** 8:17
11:19 12:19
17:20 18:4
19:1,11,19
20:10 22:24
23:9 24:4 41:21
42:2,4,7 50:8
56:5 80:22
82:11,21 91:6,
24 92:19 93:3,
15 97:9,23
99:15 100:5,16
101:6 103:2,12,
19 104:5,24

106:1,4,18
108:1 109:3,14,
21,25 112:3
114:18 115:2,9,
14,20 116:1,11,
16,25 117:4
119:2 121:15,
21 124:7
132:14 134:2,5,
12 135:13
140:6 142:21
143:5,8 144:6,
8,24 146:6
147:6 149:1
153:15,25
154:5,9 157:14
158:18,20
160:11 161:17,
24 162:4,9
167:19 168:21
170:3 171:4
172:19 175:3,
10,17,23 176:7
177:11 178:7,
13,19 179:4,13,
19 180:2
181:22 182:24
183:21 184:13,
17 188:9
189:17 190:8
197:9,22
198:11,23
199:3,19
200:10,21
201:5,17,23
202:3 203:10
205:1,11,18
206:5 207:6,8
208:3,6,8
209:6,8 210:6,
22 211:24
212:12 213:16
214:3,13 218:2,
7,13,21 219:2,
18,22 220:4,9,
12,23 221:13,
20 222:5,13
223:4,6,12,18
224:2,16,21
225:5,14,23
226:6,11,18
227:19 228:5,
20 229:12
230:6,19
231:19 232:2,7
234:4,10,21

235:1,7,11,20,
25 236:21
237:3,9,18,22
238:24 239:8,
22 240:7,14,22
241:2,13,24
242:3,8,12,22
243:2,10,18
244:1,13
245:16,23
246:3,7,10,15,
24 247:1,3,8
258:1,2 260:7
269:1,6 271:21
276:20 277:3,7,
11,20,24 278:3,
17

**write** 148:7

**written** 63:22
80:15,16 82:4,
13,15 84:13
85:4 106:15
110:14 126:21

**wrong** 94:25
230:4

**wrote** 229:18,
24

___

**Y**

**year** 74:6
272:13

**yearly** 273:7

**years** 17:8 28:9
32:17 84:18
174:19

**yell** 242:25

**yelled** 242:5

**yelling** 242:15

**York** 8:18 14:4,
5,8,12 18:9,11,
15 19:17 20:2,
8,16,22 21:3
22:3,7,12,16,20
23:16,19,21
24:9 97:21
98:17 99:21
100:11 103:10
104:13,14
105:8,13,15,25

107:23 108:4,
11,23 111:6,10,
14,19,25
112:11,16,18,
23 113:1,4,14,
23 114:2,15
115:6 117:13,
16 118:21
120:14,19
121:13,17
122:6,10
123:16 124:3
128:8,14
129:14,16,24
130:2,7,12,14,
17,20,24 131:6
132:23 133:7,
10,12,18
134:10,16,21,
24 135:1,4,6,21
136:6,11 137:3,
7,10 138:6,10
139:11 140:2
144:11 145:12,
15,16,21,23
146:1,15,20
147:13,16,17,
25 148:4,7,16
149:10 159:12,
21 160:1,6
161:1,3,11,14,
20,21 162:20
164:4,7,11,14
165:13 167:16
168:6,19,23
169:19 170:10
171:1,6,9,20
172:4,11,16,23
173:5,9,14,19
174:1,6,10
175:25 176:3,
24 177:23
178:11,16
179:16,24
180:4,23 181:9,
19,24 182:9,13,
16 183:13,19
185:1,10,19
186:1,9,21
187:1,24
188:13,24
189:23 190:4,
25 191:5
192:21,24
193:9 195:4
196:18,19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PL 1121

197:1,5 198:7,
15,17 200:13
201:2,9,11,20
202:6,14,17,19
203:3,18 204:1,
4,5,15,16,23
205:4,8,15,22
206:1,6,9,13
208:19 209:4
210:2,4,20
211:15 212:10,
18 213:7,21
214:7,11,16
215:11,18
216:3 217:6,11,
17,22 218:1,19,
24 219:5,10,14,
20,25 220:8,16,
21 221:7,11,18,
24 222:3,12,21,
25 223:7,15,25
224:8,12,20
225:3,21 226:2,
14,16 227:5,7,
16 228:2,18,24
229:18 231:21
234:1,23
235:16 236:14
237:20 239:5,
12 244:21
245:14 246:13,
20 247:7,10
249:12,15
252:18 254:5
258:3 260:20
262:8,13 266:4,
17,21 267:1,17
268:6,14,22
269:10,19
270:2,9,15,25
271:8,13,15
274:9,21 275:4,
5 277:21 278:7,
9

**York's** 36:17
97:6 99:17
104:20,25
111:16 112:22
113:8,11 123:5,
12 170:6 176:9
177:17 178:5
202:11 206:18
226:8 229:1
245:3,11,24
268:6 275:7

**you-all** 183:14

**young** 158:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

PL 1122

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

Eastern District of Kentucky
FILED

MAR 26 2004

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

DAVID KEITH CORNETT )

    PLAINTIFF )
     )
V. )
     )
     )
RONNIE SIZEMORE, JOHN PICKARD )
RAYMOND C. SMITH, COUNTY OF )
KNOX, KNOX COUNTY SHERIFF )
DEPARTMENT and KNOX FISCAL )
COURT )
     )
    DEFENDANTS )

CIVIL ACTION NO: 04-130-KKC

Serve: Knox County Judge Executive:
    Raymond C. Smith
    P. O. Box 173
    Barbourville, Kentucky 40906
    **(For Defendants, COUNTY OF KNOX, KNOX COUNTY**
    **SHERIFF'S DEPARTMENT and KNOX FISCAL COURT)**

    Knox County Attorney,
    Hon. Charlie Green Dixon
    P. O. Box 1809
    Barbourville, Kentucky 40906
    **(For Defendants, COUNTY OF KNOX, KNOX COUNTY**
    **SHERIFF'S DEPARTMENT and KNOX FISCAL COURT)**

    Sheriff JOHN PICKARD
    105 Courthouse
    Barbourville, Kentucky 40906

    Deputy Sheriff and former Animal Control Officer RONNIE SIZEMORE
    105 Courthouse
    Barbourville, Kentucky 40906

Date 3/21/18
KENTUCKIANA Reporter JVT Exhibit # 1
Case 17-CV-84
Deponent John Pickard

PL 1123

## COMPLAINT

MAY IT PLEASE THE COURT:

Comes now the Plaintiff, DAVID KEITH CORNETT, by counsel, and for his cause of action herein, states as follows:

### I. Preliminary Statement

1.      This is a civil action seeking money damages under 42 U.S.C. § 1983, 1985 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution and state law against Defendant, RONNIE SIZEMORE, the former Knox County Animal Control Officer and employee of the KNOX FISCAL COURT, also acting as an employee of the KNOX COUNTY SHERIFF DEPARTMENT and COUNTY OF KNOX in the capacity and employment of Knox County Sheriff's Deputy; Defendant JOHN PICKARD, in his capacity and employment by the COUNTY OF KNOX as Sheriff of Knox County; Defendant, RAYMOND C. SMITH, in the employment of the KNOX FISCAL COURT as County Judge Executive of Knox County; the COUNTY OF KNOX and the KNOX FISCAL COURT, stemming from acts they committed under color of law, which deprived the Plaintiff of rights secured under the Constitution and laws of the United States, for refusing or neglecting to prevent such deprivations and denials to the Plaintiff, for intentional infliction of emotional distress, and for defamation committed by the Defendants. The Plaintiff alleges that the Defendants SIZEMORE and SMITH unlawfully seized property belonging to the Plaintiff, and unlawfully filed a false criminal charge against the Plaintiff; and then the Defendants SIZEMORE and PICKARD unlawfully arrested, jailed and prosecuted of the Plaintiff, a former citizen of Knox County, thereby violating the Plaintiff's right to be free from unreasonable search

PL 1124

and seizure, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.   The Plaintiff further alleges that the Defendants acted negligently, recklessly and wantonly, and within the course and scope of employment or in the alternative acted intentionally, thereby violating the Plaintiff's rights under Kentucky Tort Law when they unlawfully committed the acts of intentionally inflicted emotional distress, and acted so as to defame the Plaintiff.  The Plaintiff alleges further that the KNOX FISCAL COURT and COUNTY OF KNOX failed to exercise due diligence and were deliberately indifferent to the need to train, supervise, instruct, control and discipline Defendant SIZEMORE, its Animal Control Officer, and that the COUNTY OF KNOX and the KNOX COUNTY SHERIFF'S DEPARTMENT failed to exercise due diligence and was deliberately indifferent to the need to train, supervise, instruct, control and discipline Defendants SIZEMORE and PICKARD; and that said failures were the result of policy, or custom, practice and usage of the KNOX FISCAL COURT, the KNOX COUNTY SHERIFF'S DEPARTMENT and the COUNTY OF KNOX, and that the policymakers of the KNOX FISCAL COURT and the COUNTY OF KNOX were deliberately indifferent to the rights of the inhabitants of the COUNTY OF KNOX, and that said conduct caused the deprivation of the Plaintiff's rights secured under the United States Constitution, the laws of the United States, and the laws of the Commonwealth of Kentucky.

### II.  Jurisdiction and Venue

2.      Jurisdiction is conferred upon the Court by 28 U.S.C. § 1331 which provides for original district court jurisdiction over cases presenting federal questions, and by 28 U.S.C. § 1343.

Page 3 of 15

PL 1125

Case: 6:17-cv-00184-REW-HAI   Doc #: 108-20   Filed: 02/10/20   Page: 315 of 463 - Page
ID#: 5332
Case: 6:04-cv-00130-KKC   Doc #: 1   Filed: 03/26/04   Page: 4 of 15 - Page ID#: 4

3.      Jurisdiction over the state law claims is conferred upon this Court by 28 U.S.C. § 1367, which provides for supplemental jurisdiction over state law claims that are so related to the federal law claims that they form one case or controversy for Article III purposes.

4.      Venue in this district is proper pursuant to 28 U.S.C. § 1391.

### III. Parties

5.      The Plaintiff, DAVID KEITH CORNETT, was a citizen of the Knox County, Kentucky at the time of the alleged incident.

6.      The Defendant, RONNIE SIZEMORE ("Animal Control Officer SIZEMORE" or "SIZEMORE"), in his individual capacity was at the time of the alleged incident an employee of the KNOX FISCAL COURT, acting in the capacity of Animal Control Officer.

7.      The Defendant, RONNIE SIZEMORE ("Deputy SIZEMORE" or "SIZEMORE"), in his individual capacity was at the time of the alleged incident, and still today, an employee of the COUNTY OF KNOX and KNOX COUNTY SHERIFF'S DEPARTMENT, acting as law enforcement official with the title Deputy Sheriff.

8.      The Defendant, JOHN PICKARD ("PICKARD"), in his individual capacity was at the time of the alleged incident, and still today, an employee and law enforcement official of the KNOX SHERIFF'S DEPARTMENT and the COUNTY OF KNOX, acting as Sheriff of the COUNTY OF KNOX.

9.      The Defendant, RAYMOND C. SMITH ("SMITH"), in his individual capacity, was at the time of the alleged incident, and still today, an employee and official of the KNOX FISCAL COUT, holding the title of Knox County Judge Executive.

PL 1126

10.   The Defendant, COUNTY OF KNOX (the "KNOX COUNTY") is a county within the Commonwealth of Kentucky.

11.   The Defendant, KNOX FISCAL COURT (the "FISCAL COURT") is the governing body for the COUNTY OF KNOX, duly organized under the laws of the Commonwealth of Kentucky.

12.   The Defendant, KNOX COUNTY SHERIFF'S DEPARTMENT (the "SHERIFF'S DEPARTMENT") is and was at all times, a political body created by the laws of the Commonwealth of Kentucky and existing therein for the general purposes of law enforcement.

### IV. Factual Allegations

13.   At all times relevant, the Defendants acted under color of law.  In addition, at all times relevant, Animal Control Officer and Deputy Sheriff SIZEMORE, Sheriff PICKARD, and Judge SMITH acted within the course and scope of their duties as employees and officials of the COUNTY OF KNOX, KNOX COUNTY SHERIFF'S DEPARTMENT and the KNOX FISCAL COURT.

14.   Prior to the alleged incident, the Plaintiff had rescued a pair of horses who where ill, maltreated and in danger of starving to death.  Within days of the Plaintiff's rescue, one of the animals died.  However, the Plaintiff was able to save the other, a mare, and at the time of the alleged incident was nursing the animal back to health.

15.   On March 15, 2003, the Plaintiff made arrangements with a friend whereby the Plaintiff moved his horses, a sound red gelding and the rescued mare, who was recovering but still underweight, to the farm of the friend so that the animals could graze on the friends pasture along with the other man's own horse.  Likewise, the Plaintiff

PL 1127

made arrangements with the owner of the farm and another individual where the two individuals would feed, administer medication, and generally care for the Plaintiff's horses for the next five days during which time the Plaintiff was required to be out of town related to his employment.

16.    On March 18, 2003, Defendant SIZEMORE, in his capacity as Animal Control Officer and at the request of the COUNTY JUDGE EXECUTIVE, DEFENDANT SMITH, drove to the farm located at Route 6, Smokey, Knox County, Kentucky,  where the horses were pastured.   The Defendants, SIZEMORE and PICKARD, seized both the healthy and the underweight horses belonging to the Plaintiff, while leaving the farm owner's horse.  These Defendants also went to the Plaintiff's home, which was only yards from where the horses were pastured, and where the Plaintiff had some 300 pounds of horse feed stacked on the porch, and left word that the Plaintiff should come to the Sheriff's office when he got back into town to discuss the seizure of his property.

17.    The Defendant SIZEMORE, conspired with the Defendant, PICKARD, and the two took the animals to the personal residence of Defendant PICKARD, where they were confined in pens.

18.    At the time of the unlawful seizure, Defendant SIZEMORE had in his possession a camera, and requested that an individual take photographs of him seizing the animals.  Defendant SIZEMORE then, for the sake of publicity, personally took the photographs of himself to the local newspaper, The Barbourville Mountain Advocate, and requested that the photographs be printed in the paper.

PL 1128

19.    On March 22, 2003, when the Plaintiff returned to Knox County he received the message, and proceeded immediately to the Knox County Sheriff's office where the Animal Control Officer Defendant SIZEMORE was also serving a dual role as Sheriff's Deputy SIZEMORE.  Upon arrival, the Plaintiff was immediately charged with Cruelty to Animals, a misdemeanor under Kentucky law KRS 525.130.  The Plaintiff was arrested and jailed for some three (3) days.   The Plaintiff was never questioned nor given the opportunity to explain the circumstances of the underweight horse's condition, but was immediately jailed and deprived of his civil rights.

20.    While in the jail the Plaintiff witnessed several drug transactions between inmates and others at the jail, and was subjected to filth and deplorable conditions.  When inmates from other cells complained of itching and rashes, welts and infestation acquired from a source inside their cells, they were removed and placed with the Plaintiff in his cell.  During the Plaintiff's unlawful confinement, he was subjected to great emotional distress, as he feared for his physical health and for his very life.

21.    The Plaintiff was prosecuted for Cruelty to Animals, with the charges against the Plaintiff was dismissed, and the DEFENDANTS appealing.  The case was remanded and tried by a jury on February 11, 2004.  The Plaintiff was found not guilty of any wrongdoing.

22.    On May 20, 2003, an order was entered by the KNOX CIRCUIT COURT ordering the Defendants to return the Plaintiff's horses to him.  However, after the order had been entered, and the Plaintiff requested the return of the animals, the Defendants, PICKARD and SIZEMORE refused to obey the order and delayed in returning the animals.  The Defendants PICKARD and SIZEMORE demanded that upon the return of

PL 1129

the animals the Plaintiff pay them a "boarding fee" of some FIFTY ($50.00) dollars per day, for each day between the day the horses were seized on March 19, 2003, until they were returned on August 30, 2003.

23.     When the Defendants finally agreed to return the horses, the Plaintiff was directed to go to the Defendant PICKARD'S personal residence and retrieve them. However, when the Plaintiff arrived with employees of the stable that he had hired to transport the horses, he was met by Defendant SIZEMORE, several other Deputy Sheriff's, and a police K-9 unit. Defendant SIZEMORE proceeded toward the Plaintiff, gun holster unbuckled, with his hand on his weapon partially unsheathed, shouting, cursed and yelling profanities at the Plaintiff. And while the animals were being loaded into the horse van, Defendant SIZEMORE continued to lung toward the animals and their handlers, yelling and waving his arms in an attempt to frighten the horses.

24.     Due to KNOX COUNTY'S unlawful arrest, prosecution and related delays, continuances and subsequent appeal, the Plaintiff was required to miss a considerable amount of work, and eventually was forced to enter into an agreement with his employer where he would surrender his job, rather than be fired. And, as a result, the Plaintiff lost not only his job, but his medical insurance as well.

25.     Upon information and belief, neither Defendant's SIZEMORE nor PICKARD have not been trained in animal husbandry, or in the proper identification, care or treatment of animal health, or in his conduct in dealing with the animals belonging to the Plaintiff, and the unlawful arrest and prosecution of the Plaintiff was the direct result of this lack of training.

PL 1130

26.     Upon information and belief, the Defendant DEPUTY SIZEMORE had not been properly trained in effective ways to interact, communicate, or investigate and his conduct in dealing with the Plaintiff resulted directly from this lack of training.

27.     Upon information and belief, policies and procedures of the KNOX FISCAL COURT in employing the Defendant SIZEMORE as Animal Control Officer, and the policies and procedures of the COUNTY OF KNOX in employing the Defendant SIZEMORE as Sheriff's Deputy were incorrect and improper as Deputy SIZEMORE was incapable of objectively investigating the complaint that he had himself lodged against the Plaintiff in his capacity as Animal Control Officer and complaining witness.

28.     The Defendants unlawful and unwarranted arrest, confinement, and prosecution of the Plaintiff were either intentionally, or with deliberate indifference to the Plaintiff's civil rights, or were negligent, reckless or wanton.  The Defendants actions were without probable cause or adequate justification and were so willful, wanton and malicious that no reasonable Animal Control Officer, Deputy or Sheriff could have thought their actions lawful.  The acts constituted such an utter disregard or callous indifference for the Plaintiff's rights as to warrant the imposition of punitive damages.

## COUNT I
### FALSE ARREST AND IMPRISONMENT BY DEFENDANTS
### SIZEMORE AND PICKARD COGNIZABLE UNDER 42 U.S.C. § 1983

29.     The Plaintiff adopts and incorporates each and every allegation contained in numerical paragraphs one through twenty-eight as if set forth fully herein.

30.     The Defendants deprived the Plaintiff of his liberty without his consent and against his will.

PL 1131

31.     The Defendants exercised direct restraint of the Plaintiff by use of words, acts, gestures and force.

32.     The Defendants knew or should have knows through reasonable investigation that the Plaintiff was not guilty of the crime charged.

33.     As a direct and proximate result of the Defendants' violations of the Plaintiff's civil rights as stated above, the Plaintiff incurred consequential damages.

34.     The false arrest and false imprisonment of the Plaintiff was a substantial factor in causing the Plaintiff great humiliation, pain, embarrassment, damage to his reputation, the impairment of his ability to earn income, and the loss of medical benefits.

35.     The Defendants acted with reckless disregard or callous indifference to the rights of the Plaintiff and are liable for punitive damages.

**COUNT II**
**INTENTIONAL INFLICTION OF EMPTIONAL DISTRESS COGNIZABLE UNDER 42 U.S.C. § 1983**

36.     The Plaintiff adopts and incorporates all allegations contained in paragraphs one through thirty-five as if fully set forth herein.

37.     Defendants acted intentionally or recklessly when they committed the acts enumerated above.

38.     The aforementioned conduct of the Defendants was outrageous and intolerable in that it offends against the generally acceptable standards of decency and morality.

39.     The aforementioned conduct was a substantial factor in causing the Plaintiff's severe emotional distress, embarrassment, humiliation, and defamation.

PL 1132

40.     The Defendants acted with reckless disregard or callous indifference to the rights of the Plaintiff and are liable for punitive damages.

## COUNT III
## CONSPIRACY TO VIOLATE THE PLAINTIFF'S CIVIL RIGHTS BY DEFENDANTS SIZEMORE, PICKARD AND SMITH COGNIZABLE UNDER 42 U.S.C. § 1983 and 1985

41.     The Plaintiff adopts and incorporates each and every allegation contained in numerical paragraphs one through forty as if fully set forth herein.

42.     The Defendants, SIZEMORE and PICKARD, acting in their individual capacities and under color of law, conspired together and with others, reached a mutual understanding and acted to undertake a course of conduct that violated the Plaintiff's civil rights to wit:

a.     The Defendants agreed and acted to intentionally arrest and imprison the Plaintiff as described above.

b.     The Defendants agreed and acted to intentionally fabricate and contrive the charges against the Plaintiff as described above.

c.     The Defendants agreed and acted to seize the Plaintiff's personal property and then agreed and acted in an attempt to extort money from the Plaintiff in exchange for the return of his property as described above.

d.     The Defendants agreed and acted to intentionally submit false information and testimony to support and corroborate the fabricated charges lodged against the Plaintiff.

e.     The Defendants agreed and acted so as to intimidate, frighten and provoke the Plaintiff and to cause his severe stress, emotional distress and harm.

f.     The Defendants agreed and acted so as to prolong the Plaintiff's prosecution and to thereby cause him to lose his job and medical benefits.

g.     The Defendants agreed and acted so as to defame the Plaintiff and to cause him great embarrassment and public humiliation.

h.     As a direct and proximate result of the above described conspiracy between the Defendants SIZEMORE, PICKARD and others, Plaintiff has

PL 1133

been deprived of his right to be secure in his person, against unreasonable seizure of his person and property, in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

43.     As a direct and proximate result of the Defendants' conspiracy the Plaintiff incurred consequential damages.

44.     The conspiracy that the Defendants entered into was a substantial factor in causing the Plaintiff great humiliation, pain, embarrassment, damage to his reputation and the impairment of his ability to earn income.

45.     The Defendants acted with reckless disregard or callous indifference to the rights of the Plaintiff and are liable for punitive damages.

**COUNT IV**
**FAILURE TO INSTRUCT, SUPERVISE, TRAIN, CONTROL AND DISCIPLINE DIRECTED AGAINST THE KNOX FISCAL COURT, THE KNOX COUNTY SHERIFF'S DEPARTMENT AND THE COUNTY OF KNOX, COGNIZABLE UNDER 42 U.S.C. § 1983**

46.     The Plaintiff incorporates each and every allegation contained in numerical paragraphs 1 through forty-five as if fully set forth herein.

47.     Acting under color of law, by and through the policy-makes of the KNOX FISCAL COURT, THE KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX and pursuant to official policy or custom and practice, the KNOX FISCAL COURT, THE KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX intentionally, knowingly, recklessly, or with deliberate indifference to the rights of the inhabitants of the COUNTY OF KNOX failed to instruct, supervise, train, control, and/or discipline, on a continuing basis, Defendants SIZEMORE and PICKARD, in the performance of their duties as employees of the KNOX FISCAL COURT, THE KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX to refrain from:

Page 12 of 15

PL 1134

a. Unlawfully and maliciously seize the property of the Plaintiff,

b. Unlawfully fabricated criminal allegations against a citizen for the purpose of shielding himself from criminal or civil liability for violating the citizen's civil rights.

c. Unlawfully and maliciously placed false statements and misleading photographs in the local newspaper defaming the Plaintiff and damaging his reputation in the community.

d. Conspiring to violate the rights, privileges and immunities guaranteed the Plaintiff by the Constitution and the laws of the United States and the laws of the Commonwealth of Kentucky.

e. Otherwise deprive citizens of their constitutional and statutory rights, privileges, and immunities.

48. They, the KNOX FISCAL COURT, THE KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX has knowledge of or, had they diligently exercised their duties to instruct, supervise, train, control and discipline on a continuing basis, should have had knowledge that the wrongs that were done, as heretofore alleged, or other unlawful or unconstitutional acts were going to be committed.  Defendants, KNOX FISCAL COURT, KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX had the power to prevent or to aid in preventing the commission of said wrongs, could have done so and intentionally, knowingly or with deliberate indifference to the rights of the inhabitants of the COUNTY OF KNOX failed or refused to do so.

49. The KNOX FISCAL COURT, THE KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless and wanton conduct of the Defendants, SIZEMORE and PICKARD.

PL 1135

50.    As a direct and proximate result of the Defendants KNOX FISCAL COURT, KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX'S failure to instruct, train, control, supervise, and discipline, the Plaintiff's civil rights have been violated, he has been falsely arrested and imprisoned, defamed, humiliated, embarrassed, caused to suffer emotional distress and pain, and deprived of the ability to earn income and medical benefits, and as a result has incurred consequential damages.

51.    The Defendants, KNOX FISCAL COURT, KNOX COUNTY SHERIFF'S DEPARTMENT and COUNTY OF KNOX acted with reckless disregard or callous indifference to the rights of the Plaintiff and are liable for punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, DAVID KEITH CORNETT, demands judgment against the Defendants, RONNIE SIZEMORE, JOHN PICKARD, RAYMOND SMITH, COUNTY OF KNOX, KNOX COUNTY SHERIFF'S DEPARTMENT and KNOX FISCAL COURT, jointly and severally, for compensatory damages in the amount in excess of the jurisdictional limits, and against the Defendants, RONNIE SIZEMORE, JOHN PICKARD, RAYMOND SMITH, COUNTY OF KNOX, KNOX COUNTY SHERIFF'S DEPARTMENT and KNOX FISCAL COURT, jointly and severally for punitive damages in the amount in excess of the jurisdictional limits for the following:

1.    False arrest and imprisonment;

2.    Violation of any and all other civil rights as outlined herein;

3.    Mental and emotional pain, suffering and humiliation;

4.    Defamation;

5.    Impairment of the Plaintiff's ability to earn income;

PL 1136

6.      Reimbursement for medical expenses that the Plaintiff incurred that would have otherwise been covered by his insurance carrier;

7.      Reimbursement for fees and other consequential expenses;

8.      Punitive damages;

9.      Reasonable attorney fees pursuant to 42 U.S.C. § 1988;

10.     Costs incurred herein;

11.     Trial by jury on all issues so triable; and

12.     Any and all other relief to which the Plaintiff may be entitled.


Respectfully submitted,

HON. SANDRA J. REEVES
The Reeves Law Office, PLLC
211 South Main Street
P.O. Box 1341
Corbin, Kentucky 40702-1341
(606) 528-4376

COUNSEL FOR PLAINTIFF
DAVID KEITH CORNETT

PL 1137

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

Eastern District of Kentucky
FILED

JUN 18 2004

CIVIL ACTION FILE NO. 04- _278 - DCR_

AT LONDON
LESLIE G WHITMER
CLERK U.S. DISTRICT COURT

| | |
|---|---|
| REONA BLEDSOE | ) |
|                **PLAINTIFF** | ) |
| | ) |
| **V.** | ) |
| | ) |
| **DEPUTY SHERIFF JAMES MYERS** | ) |
| **and** | ) |
| **DEPUTY SHERIFF RONNIE SIZEMORE,** | ) |
| **and** | ) |
| **DEPUTY SHERIFF CHARLES DOAN** | ) |
| **and** | ) |
| **THE KNOX COUNTY SHERIFF'S DEPT.,** | ) |
|     **SHERIFF JOHN PICKARD** | ) |
|              **DEFENDANTS** | ) |

<u>COMPLAINT</u>

\*\*\* \*\*\* \*\*\*

## INTRODUCTION

    1.     This is an action for money damages brought pursuant to 42 U.S.C. §§1983 and 1988, and the Fourth and Fourteenth Amendment to the United States Constitution, and §10 of the Kentucky Constitution and the common law of the Commonwealth of Kentucky, against the Knox County Sheriff's Department, and against Deputy Sheriff James Myers, Deputy Sheriff Ronnie Sizemore and Deputy Sheriff Charles Doan in their individual and/or official capacities. Jurisdiction is based upon 28 U.S.C. §§1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law.

KENTUCKIANA Reporter JVT   Date 3/21/18   Exhibit # 7
Case 17-CV-84
Deponent John Pickard

PL 1138

2.　　It is alleged that the individual deputy sheriffs Defendants Deputy Sheriff James Myers, Deputy Sheriff Ronnie Sizemore and Deputy Sheriff Charles Doan made an unreasonable seizure of the person of Plaintiff, Reona Bledsoe, violating her rights under the Fourth and Fourteenth Amendments to the United States Constitution, and §10 of the Kentucky Constitution, and that these defendants assaulted and battered Reona Bledsoe.  It is further alleged that these violations and torts were committed as a result of policies and/or customs of the Knox County Sheriff's Department.

PARTIES

3.　　Plaintiff, Reona Bledsoe, hereinafter "Plaintiff", was at all material times a resident of the Commonwealth of Kentucky and of full age.

4.　　Defendants Deputy Sheriff James Myers, Deputy Sheriff Ronnie Sizemore and Deputy Sheriff Charles Doan, hereinafter "Defendant Deputy Sheriffs", were at all times relevant to this Complaint duly appointed and acting deputy sheriffs of the Knox County Sheriff's Department, acting under color of law, to wit, under color of statutes, ordinances, regulations, policies and customs and usages of the Commonwealth of Kentucky and/or the Knox County Sheriff's Department.

5.　　Defendant, Knox County Sheriff's Department, Barbourville, Kentucky, hereinafter "Defendant Sheriff's Dept." is the public employer of said deputy sheriffs and is managed by Sheriff John Pickard, an elected official individually acting under color of law, to wit, under color of statutes, ordinances, regulations, policies and customs and usages of the Commonwealth of Kentucky..

PL 1139

## COUNT I

6.     On or about June 21, 2003, Defendant Deputy Sheriffs entered an apartment occupied by Plaintiff within the city limits of Barbourville, Kentucky.

7.     Plaintiff, who was six (6) months pregnant, had returned home and had discovered that the doors to her apartment were unlocked and that the apartment had been burglarized.

8.     Plaintiff was upset and disturbed and begin talking loudly and quarreling with others in the apartment.

9.     Defendant Deputy Sheriffs were four (4) doors down searching for an escapee.

10.     The Plaintiff's door was opened but the screen door to her apartment was closed.

11.     Although the Plaintiff told the Defendant Deputy Sheriffs not to enter the premises, they bolted through the door.

12..     The Defendant Deputy Sheriffs grabbed her arms and grabbed her around her stomach; at which time the Plaintiff informed the Defendant Deputy Sheriffs that she was six (6) months pregnant.

13.     The Defendant Deputy Sheriffs slammed her face down on the love seat and then slammed her over to couch and generally proceeded to manhandle her bruising her body in several places and endangering her unborn child.

14.     The Defendant Deputy Sheriffs sprayed the Plaintiff in the eyes with mace and used derogatory language in reference to the Plaintiff, a black female, and called her racist names such as "Monkey".

PL 1140

15.    The force used against Plaintiff was unnecessary, unreasonable and excessive.

16.    At no time during the events described above, was Plaintiff intoxicated, incapacitated or a threat to the safety of herself or others.  She had not committed any criminal offense.

17.    The Defendant Deputy Sheriffs had no warrant for the arrest of the Plaintiff, no probable cause for the arrest of the Plaintiff and no jurisdiction, legal cause or excuse to seize the person of the Plaintiff.

18.    As a direct and proximate result of the said acts of the Defendant Deputy Sheriffs, the Plaintiff suffered the following injuries and damage:

   a.    Violation of her constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution and §10 of the Kentucky Constitution to be free from unreasonable search and seizure of her person;

   b.    Loss of physical liberty;

   c.    Physical pain and suffering and emotional trauma and suffering, requiring medical treatment.

19.    The actions of the Defendant Deputy Sheriffs violated the following clearly established and well settled federal and state constitutional rights of the Plaintiff:

   a.    Freedom from unreasonable seizure of person;

   b.    Freedom from use of excessive, unreasonable and unjustified force against her person.

4

PL 1141

<u>COUNT II</u>

20.     Paragraphs 1 through 19 are incorporated herein by reference as though fully set forth.

21.     The Defendant Deputy Sheriffs assaulted and battered the Plaintiff, Reona Bledsoe.

22.     As a result of this assault and battery, the Plaintiff suffered damages as aforesaid.

<u>COUNT III</u>

23.     Paragraphs 1 through 22 are incorporated herein by reference as though fully set forth.

24.     Prior to June 21, 2003, Defendant Knox County Sheriff's Dept., developed and maintained policies or customs exhibiting deliberate indifference to the constitutional and civil rights of persons in Knox County, which caused the violation of the Plaintiff's rights.

25.     It was the policy and/or custom of the Defendant Knox County Sheriff's Dept. to inadequately and improperly investigate citizen complaints of deputy sheriff misconduct, and acts of misconduct were instead tolerated by the Defendant Knox County Sheriff's Dept.. and its management.

25.     It was the policy and/or custom of the Defendant Knox County Sheriff's Dept. to inadequately supervise and train its deputy sheriffs, including Defendant Deputy Sheriff James Myers, Defendant Deputy Sheriff Ronnie Sizemore and Defendant Deputy Sheriff Charles Doan, thereby failing to adequately discourage further constitutional and civil rights violations on the part of its deputy sheriffs.  The Defendant Knox County

5

PL 1142

Sheriff's Dept. did not require appropriate in-service training or re-training of its deputy sheriff supervisory personnel and/or its deputy sheriffs who were known to have engaged in misconduct.

26.     As a result of the above described policies and/or customs, deputy sheriffs of the Defendant Knox County Sheriff's Dept., including Defendant Deputy Sheriff James Myers, Defendant Deputy Sheriff Ronnie Sizemore and Defendant Deputy Sheriff Charles Doan, believed that their actions would not be properly monitored by supervisory personnel and that misconduct would be tolerated.

27.     The above described policies and/or customs demonstrated a deliberate indifference on the part of policymakers and management of the Knox County Sheriff's Dept to the constitutional and civil rights of persons within Knox County, and were the cause of the violations of the Plaintiff's rights alleged herein.

WHEREFORE, the Plaintiff, Reona Bledsoe, requests that this Court:

1.     Award compensatory damages to her against the Defendants, James Myers, Ronnie Sizemore, Charles Doan, and the Knox County Sheriff's Department, jointly and severally;

2.     Award punitive damages to her against Defendants, James Myers, Ronnie Sizemore, and Charles Doan, for conduct so outrageous it shocks the very conscience of society.

4.     Award costs of this action to the Plaintiff;

5.     Award reasonable attorney's fees and costs to the Plaintiff on Counts I and II of the Complaint; and

6

PL 1143

6.       Award such other and further relief as this Court deems appropriate;


The Plaintiff demands a jury trial.




*L. J. West*
LINDA J. WEST  PLLC
Attorney-at-Law
313 Cumberland Ave.
P.O. Box 1239
Barbourville, KY 40906
(606) 546-8894
ATTORNEY FOR PLAINTIFF

7

PL 1144

| **Form F** | **Kentucky Law Enforcement Council** | Office Use Only |
|---|---|---|
| *Form Must Be Typed* | *STATUS UPDATE* | |

| **Mail:** Kentucky Law Enforcement Council<br>Funderburk Building<br>521 Lancaster Rd.<br>Richmond, KY 40475-3102<br><br>**Phone:** 859-622-6218   **Fax:** 859-622-5943<br>**E-Mail:** docjt.klec@ky.gov | **Agency Name:** Knox County Sheriff Office<br>**Agency Phone:** 606 - 546 - 3181<br>**Agency Fax:** 606 - 546 - 3196<br>**Contact Person:** Tackett Wilson<br>**Contact Email:** twilson@knoxcosheriff.org |

## WHY ARE YOU SUBMITTING THIS FORM?

### PERSONAL INFORMATION

SSN: ___   Name:  Pickard        John        D
                          *Last*       *First*  *MI*  *Suffix*     *Maiden*

Drivers License No.: _____   DOB: _____   Gender: M   Race: White

Educational Level: ☐GED  ☐HS Diploma  ☐ Associates  ☐Bachelors  ☐Masters  ☐Doctorate

Job Title / Rank: ___Sheriff___

☐ LINK/NCIC Criminal History Checked

### ACTION

☐ The above named individual is a **NEW HIRE** at our agency beginning _____
                                                      *Date*

***A completed Form D or Form D1 must be submitted with this form for all POPS and CCSO new hires/transfers.***

The above named individual has **SEPARATED** from our agency effective 01-05-15___, for the following reason:
                                                       *date*

☒ Resignation   ☐ Retirement   ☒ Termination   ☐ Death   ☐ Killed in the Line of Duty
☐ Resignation Pending Charges

### OTHER PERSONNEL ACTION

☐ Changing from PT to FT effective _____   ☐ Changing from FT to PT effective _____
                          *date*                                       *date*

☐ Military Leave _____   ☐ Military Return _____   ☐ Other _____
             *date*                           *date*               *date*

Is this person employed as a peace officer, court security officer or telecommunicator at another agency in addition to your agency?  ☐ Yes  ☐ No   If yes, where? _____

*The above listed individual is/was employed by this agency as a:*

☒ Full-Time     ☐ Part-Time     ****************     ☒ Sworn     ☐ Non-Sworn

  ☒ Peace Officer (KRS 15.382)     ☐ Auxiliary (KRS15.382)     ☐ Special Deputy (KRS 70.045)
  ☐ Court Security Officer (KRS 15.3971)  ☐ Telecommunicator (KRS 15.530)  ☐ Other *(See Job Title/Rank above)*

*I hereby verify that the above information is true and accurate.  Signed this*  9th *day of*  March  20 15

*Signature of Agency Executive or Designee*       Sheriff       Mike Smith
                                          *Title*         *Printed Name of Agency Executive or Designee*

KENTUCKIANA   Date 3/21/18  Reporter JVT  Exhibit # 3
Case 17-CV-84
Deponent John Pickard

Revised January 2011

PL 1145

## Form F – Page 2

### Kentucky Law Enforcement Foundation Program Fund

*KLEFPF Participants Only*

**Instructions:** This form must be completed for full time officers at KLEFPF participating agencies whenever the following personnel action occur: Employment, transfer from full-time to part-time or part-time to full-time, separation, leave without pay or suspension without pay.

### OFFICER INFORMATION

SSN: _____   Name: Pickard    John    D

| Last | First | MI | Suffix | Maiden |

### RETIREMENT SYSTEM
### (*required for all new hires*)

Is this officer eligible to participate in a retirement system? ☐ Yes  ☐ No

If yes, what date is he/she eligible to participate? _____

Officer will be participating in the retirement system listed below:

☐ CERS Hazardous   ☐ KERS Hazardous   ☐ CERS Non - Hazardous   ☐ KERS Non - Hazardous

☐ Other _____

### DEPARTURE

☐ Resignation   ☐ Retirement   ☐ Termination   _____

*Effective Date*

Number of regular, vacation, sick and holiday paid hours through effective date: _____
*(DO NOT INCLUDE OVERTIME HOURS)*

### OTHER ACTION

☐ Suspension without Pay____Hours   ☐ Sick Leave without Pay____Hours   ☐ Leave without Pay____Hours

☐ Military Leave____Hours   ☐ Worker's Comp   ☐ Other _____

_____ IF END DATE IS UNDETERMINED RESUBMIT FORM F UPON RETURN   ☐ Return from Leave
*Start Date – End Date*

### AGENCY CERTIFICATION

*I hearby verify that the above information is true and accurate.* Signed this 15 day of *March*

Signature of Law Enforcement Agency Executive    *Knox Co Sheriff's office*
*Name of Agency*

*Mike Smith*, Mike Smith    606-546-3181

Printed Name of Signer    *Agency Phone Number*

*I hearby verify that the above information is true and accurate.* Signed this ___ day of _____

Signature of Mayor/Fiscal Officer/City Clerk    Name of Agency

_____    _____

Printed Name of Signer    *Agency Phone Number*

**Revised January 2011**

PL 1146

TABLE OF CONTENTS.doc



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES MANUAL

## TABLE OF CONTENTS

| SECTION | ITEM | REVISION DATE | TOTAL NUMBER OF PAGES |
|---|---|---|---|
| 1 | GENERAL PROVISIONS | 01/12/2014 | 9 |
| 2 | CHAIN OF COMMAND | 01/12/2014 | 1 |
| 3 | DISCIPLINARY ACTION | 01/12/2014 | 2 |
| 4 | VEHICLES | 01/12/2014 | 3 |
| 5 | FIREARMS | 01/12/2014 | 1 |
| 6 | USE OF FORCE | 01/12/2014 | 1 |
| 7 | | | |
| 8 | DOMESTIC VIOLENCE | 01/12/2014 | 1 |
| 9 | EVIDENCE – LOST PROPERTY | 01/12/2014 | 1 |
| 10 | TRAFFIC CHECK POINTS | | |
| 11 | CITATIONS | 01/12/2014 | 1 |
| 12 | COLLISION REPORTS | 01/12/2014 | 2 |
| 13 | CASE – INCIDENT REPORT | 01/12/2014 | 1 |
| 14 | VEHICLE HOLDER | 01/12/2014 | 2 |
| 15 | | | |
| 16 | | | |
| 17 | APPEARANCE & DRESS CODE | 01/12/2014 | 4 |
| 18 | Social Networking/Internet Postings | 01/12/2014 | 2 |
| 19 | RACIAL PROFILING | 01/12/2014 | 1 |
| 20 | | | |
| 21 | CELL PHONES – COMPUTERS | 01/12/2014 | 1 |

*John D. Pickard*
1-17-14

KENTUCKIANA
COURT REPORTERS
Date 3/21/18   Reporter JVT   Exhibit # 4
Case 17-CV-84
Deponent John Pickard

PL 1147

GENERAL PROVISIONS - 1



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 1

## GENERAL PROVISIONS

### Knox County Sheriff Office
### Employment At-will Statement

A.  It is this policy of the Knox County Sheriff Office that all employees who do not have a written contract for a specific, fixed term of employment are employed at-the-will of the sheriff for an indefinite period.

B.  Employees who do not have a written contract approved by the Knox County Sheriff as may be permitted by law, are employed at- will and may be terminated at any time, for any reason, with or without cause or notice.  Conversely, employees may terminate their employment at any time and for any reason.

C.  This policy may not be changed by any individual representative of the Sheriff Office or by any agreement, oral or written in the interviewing or recruiting of prospective employees.

D.  This policy may not be modified by any statements contained in this Policy and Procedures Manual or any other employee handbook, employment applications, or any other materials provided to applicants and employees in connection with their employment.  None of these documents, either singly or combined, create and express or imply a contract concerning any terms or conditions of employment for a definite period, or express or imply a contract concerning any terms or conditions of employment. Similarly, the Sheriff's policies and practices with respect to any matter are not to be considered as creating any contractual obligation on the Sheriff's part or stating in any way that termination will occur only for "just cause."  Statements of specific grounds for termination set forth in this Policy and Procedures Manual or in any other Sheriff documents are examples only, not all-inclusive lists, and are not intended to restrict the Sheriff's right to terminate at-will.

PL 1148

GENERAL PROVISIONS - 1

## Personnel Records

A.  Immediately, on the first day of employment, all new employees shall report to the Sheriff Office Bookkeeper or appropriate designee to supply any information needed to complete personnel records, execute payroll withholding authorization and enroll in the applicable employee benefit programs.

B.  A personnel file to be maintained by the Bookkeeper or appropriate designee shall be created for each employee. All relevant information, including application forms, resume, evaluation forms, disciplinary or commendation memoranda and any other material deemed relevant to the employee's permanent record will be kept in the file which shall be accessible to each respective employee. The file shall contain:

>  1. The employee's name, address and telephone number where the employee may be reached;
>  2. Position title;
>  3. Hiring date;
>  4. Application;
>  5. Salary;
>  6. All changes in status as a employee;
>  7. Documented compliance with labor standards, EEO-4, I-9 requirements;
>  8. Performance appraisals and evaluations;
>  9. Commendations and disciplinary memoranda; and
>  10. Whatever additional information this ordinance, other governing laws, or the sheriff requires.

C.  It shall be the obligation of the employee to maintain current information in the personnel file by notifying the Bookkeeper or appropriate designee of all changes in personal or family status, home address, home telephone number or any other changes which would affect payroll withholding or employee benefits.

D.  Every change in the status of the employee shall be recorded in the personnel file.

E.  A separate file on equal employment opportunity data shall be maintained.

F.  Employee medical records of a confidential nature shall be maintained separately from other employee files.

G.  Personnel records of the Sheriff's Office shall be public records as defined and controlled by the appropriate Kentucky Revised Statutes. They will be retained in accordance with the retention schedules adopted by the State Archives and Records Commission.

## False Credentials

If it should come to the attention of the Sheriff, either during their introductory period or thereafter, that an employee was hired on the basis of false credentials, said employee will be subject to immediate demotion or dismissal.

PL 1149

GENERAL PROVISIONS - 1

## Equal Opportunity

The Sheriff's Office seeks to provide equal opportunity to all of its employees and applicants for employment and to prohibit discrimination based on race, color, sex, religion, national origin, disability, age or because the individual is a smoker or nonsmoker. The Sheriff's Office promotes equal opportunity in matters of hiring, promotion, transfer, compensation, benefits and other conditions of employment.

## Hours of Work

A. Employees shall be at their places of work in accordance with prescribed schedules.

B. All employees will be allowed two (2) rest periods of fifteen (15) minutes each per day, one in the morning and one in the afternoon. Lunch and rest periods may not be used to shorten working hours, alter time of arrival or departure, accrue vacation, or count as overtime if not taken. An hourly employee who works more than four (4) consecutive hours is entitled to one fifteen (15) minute break; hourly employees working less than four (4) consecutive hours are not entitled to a break.

C. All employees are subject to be called out to work. All employees called out who work shall be compensated for hours actually worked.

## Lunch Break

All employees are entitled to a Thirty (30) minute break during their work schedule. All employees that choose to work thru lunch break are paid during this time. It should be noted that while on a lunch break they are subject to calls. Every effort is made to allow them a lunch break without interruption.

## Overtime

A. An employee will receive overtime pay for hours worked in excess of forty (40) hours per week. Employees shall receive overtime pay at the rate of one and one-half (1.5) times the hourly wages for actual hours worked in excess of Forty (40) hours in any work week.

B. Time off with pay (including vacation leave, sick leave, holidays, jury duty, funeral leave. etc.) may not be considered as hours worked for overtime pay purposes.

C. Holidays for which employees are paid, but which are not worked, cannot be used for computing overtime.

D. All employees shall notify the Sheriff or Chief Deputy the same day that an excess of eight hours is worked.

PL 1150

GENERAL PROVISIONS - 1

E.  All employees that are subpoenaed to court and are not scheduled to work shall notify the Sheriff or Chief Deputy the same day of court and advise them of the hours in court. All employees shall attach there subpoena with time in court and outcome in court to there time sheet.

## Compensatory Time
## COMPENSATORY TIME SUSPEND AS OF 01-01-2010

The purpose of this order is to establish the guidelines concerning compensatory time.

It shall be the policy of the Knox County Sheriff's Office that compensatory time will be paid for approved overtime in lieu of cash payment for said overtime as defined in KRS 337.285:

1.  Each employee can receive payment of approved overtime by compensatory time in lieu of cash payment according to KRS 337.285, or at the pleasure of the sheriff, payment in cash for any overtime hours worked during any pay period.  Departmental policy is that each employee (excluding supervisors) is only allowed to accrue 40 hours of compensation time. Supervisors are allowed to accrue 200 hours of compensation time.

2.  Compensatory time off requests are granted as long as it does not unduly disrupt the minimum staff level that is attempted to be maintained at all times.

3.  It shall be the responsibility of each individual supervisor to monitor all overtime.  A supervisor must approve all overtime.

4.  All deputies working full time, and all other full time office personnel, including clerical employees, shall earn compensatory time after 40 work hours, at a rate of one and one-half hours per hour overtime according to KRS 337.285.

## Holidays

A.  The following days are declared paid holidays at the regular rate of pay for all Sheriff's Office employees.

1.  The First day of January (New Year's Day),
2.  Martin Luther King, Jr. Birthday,
3   Good Friday (Friday before Easter),
4.  The last Monday in May (Memorial Day),
5.  The 4th day of July (Independence Day),
6.  The 1st Monday in September (Labor Day),
7.  The 11th Day of November (Veteran's Day),
8.  The 4th Thursday in November (Thanksgiving Day),
9.  The Day after Thanksgiving Day,
10. The 24th of December (Christmas Eve Day),
11. The 25th of December (Christmas Day),

PL 1151

GENERAL PROVISIONS - 1

      12.  The 31st of December (New Year's Eve).

When any holiday listed above falls on Saturday, the preceding Friday will be observed.  If the holiday falls on Sunday, the following Monday shall be considered a holiday.

B.     When it is essential for an employee to work on a declared holiday, he/she shall be compensated for actual hours worked at regular rate.  In no case will compensatory time be given to any employee who, by virtue of their work schedule, does not work on an official Sheriff's Office holiday.

C.     In order for an employee to be paid for a holiday, he/she must work the last scheduled day before and the first scheduled day after the holiday.

A.  If an employee is absent on the day before or after a holiday, holiday pay shall be forfeited.

## Vacation

A.     <u>All full-time employees shall be entitled to vacation leave at the following rates:</u>

| <u>Years of Service</u> | <u>Days Per Year Vacation Time</u> |
|---|---|
| All Years - Starting after 12 months of employment. | (Five (5) Days Total) |

B.     Vacation requests must be approved in writing eight weeks in advance by the Sheriff and or Chief Deputy.

C.     Absences on account of sickness, injury or disability in excess of that authorized for such purposes may, at the request of the employee in writing, be covered by vacation time.

G.     Vacation time is annually, All vacation time must be taken annually, (Months Allowed for vacation January 1st- November 15th)

B.  F.  Employees are not entitled to receive pay for vacation leave on termination of employment. vacation leave shall not be carried over from year to year

## Sick – Personal Leave

A.  All full-time employees shall be entitled to sick or Personal leave credit with pay at the rate as presented below: Maximum of 5 days per year combined.

| <u>Years of Service</u> | <u>Days Per Year</u> |
|---|---|
| All Years – Sick Starting after 90 Days | |
| Personal Starting after 12 months of employment. | (Five (5) Days Total) |

Confidential             Page 5             01/12/2014

PL 1152

GENERAL PROVISIONS - 1

B. Sick leave may be utilized by employees when they are incapacitated from the performance of duties due to sickness or injury or when they are quarantined. Absence shall require a certificate from a medical doctor giving information as to the circumstances involved to receive sick pay for days absent.

C. An employee on sick leave shall inform the Sheriff or Chief Deputy via phone of the fact and the reason as soon as possible; failure to do so six hours before scheduled work time, on the first day of illness may be cause for denial of sick leave without pay for the period of absence.

D. Absence for part of a day that is chargeable to sick leave shall be charged proportionately on a quarterly basis per the following i.e., 2 hours and no less than 1/4 day.

E. Personal leave requests maybe used in lieu sick days for the following purposes and shall be approved in writing in advance by the Sheriff and or Chief Deputy.

F. An employee may use sick leave days in the event of serious illness or any other medical reason in the employee's immediate family. The immediate family for these purposes shall be deemed to include the employee's parents, grandparents, spouse, children, brothers, sisters and immediate in-laws.  24 Hour notice required, Maximum 2 days consecutive per request.

G. Personal leave requests maybe used in lieu sick days for the following purposes and shall be approved in writing in advance by the Sheriff and or Chief Deputy.

H. An employee may use personal days for any other purpose. 15 day notice required, Maximum 1 day consecutive per request. Personal days for this purpose maybe denied in the event ample coverage of schedule is not available.

I. Personal days may not be used in conjunction with vacation or holidays.

J. Sick or Personal Days are annually, (Months Allowed for personal days January 1st - November 15th)

K. Employees are not entitled to receive pay for sick or personal leave on termination of employment. Sick or personal leave shall not be carried over from year to year

## ADMINSTRATIVE LEAVE

The Sheriff may place an employee on administrative leave with or without pay for disciplinary and or employee involved incidents that are pending further investigation, for a period not to exceed ten (10) working days in any calendar month.

## DISABILITY LEAVE

Any employee who suffers injury or illness as a result of service connected accident or illness shall be compensated at the negotiated rate with the workers compensation insurance company.

Employees shall continue to receive sick leave and vacation leave while on disability leave due to service connected accident or illness for a period of three months after the accident or illness.

PL 1153

GENERAL PROVISIONS - 1
No other benefits are implied.

# MATERINTY LEAVE

Maternity leave may be granted for full-time employees with temporary disability due to pregnancy, childbirth, or any impairment thereof, and miscarriage for a period not to exceed three calendar months without pay.  An additional period, not to exceed sixty days, may be granted, if required by a medical doctor, without pay.

# BEREAVEMENT (FUNERAL) LEAVE

Employees working full-time may be granted up to two working days off without loss of pay in case of death in the immediate family, including parents, grandparents, spouse, brother, sister, children, and immediate in-laws.

# SPECIAL LEAVE

In addition to authorized leaves, the Sheriff may authorize an employee to be absent without pay for personal reasons for a period or periods not to exceed ten (10) working days in any calendar year.

# MILITARY LEAVE

Any employee occupying a full-time position with the Sheriff's office who is a member of the National Guard or any reserve component of the Armed Forces of the United States, or the Reserve Corps of the United States Public Health Service, shall be entitled to leave of absence without pay for a period not exceeding fifteen calendar days in any one year for the purpose of attending annual mandatory training.

If additional time is needed, the employee may use vacation leave.

# JURY DUTY

When an employee is required to serve on a jury, he/she shall be compensated at the normal rate of pay while serving on jury duty.  All employees serving on jury duty shall be absent from work only during the times required by the courts.

Employees dismissed from jury duty must report to their respective work station with the Sheriff's Office.

Employees summoned as a plaintiff or defendant in a proceeding involving or arising from outside employment or personal business shall not be entitled to leave with pay, but may use accrued vacation leave during the absence.

# TIME OFF TO VOTE

All employees entitled to vote in any election shall be given up to one hour off on Election Day to vote, without pay.

# HEALTH INSURANCE

PL 1154

GENERAL PROVISIONS - 1

The Sheriff's Office pays for individual health insurance. In the event an employee is out of work due to illness, regardless of cause, the Sheriff's Office limits the payment of the health insurance premium for a period not exceeding three months.

Employees are covered under COBRA. In summary, COBRA provides that each qualified beneficiary who would loose coverage under the group health plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan at their expense for a limited time.

## RETIREMENT

The Knox County Sheriff Office does not have a mandatory retirement age.

## RETIREMENT BENEFITS

Sheriff Office employees contribute amounts at the rate determined by Congress to Social Security.

The Sheriff Office employees contribute to the non-hazardous County Employees Retirement System.

## UNEMPLOYMENT INSURANCE

The Sheriff's Office pays the full amount for Unemployment Insurance for the Sheriff's Office employees.

## WORKERS COMPENSATION

The Sheriff's Office pays for the full amount for Worker's Compensation Insurance for the Sheriff's Office employees.

## POLITICAL ACTIVITY

No employee, as a condition of employment or continued employment, shall be required to contribute to or campaign for any candidate for political office.

No employee of the Sheriff Office shall engage in political activity during his/her assigned duty hours.

If an employee wishes to announce as a candidate and seek election to a public office or public board, such employee's resignation from employment is deemed to be automatic and the employment ends when the person files to be a candidate for public office or public board. Employee must choose between the position of employment and the desire to be elected to public office or public board.

## LAY OFF

The Sheriff may layoff an employee because of lack of work or funds.

## HARASSMENT

The Sheriff Office is committed to maintaining a work environment free of discrimination and harassment.

Harassment on the basis of race, color, religion, gender, national origin, age or disability constitutes discrimination in the terms, conditions and privileges of employment. Harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual.

PL 1155

GENERAL PROVISIONS - 1

Harassing conduct includes, but is not limited to the following:

1. Epithets, slurs, negative stereotyping, threatening, or intimidating acts, that relate to race, color, religion, gender, national origin, age or disability.
2. Written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of race, color, religion, gender, national origin, age or disability and that is placed on walls, bulletin boards, or elsewhere on the employer's premise, or circulated in the workplace.

Employees encountering harassment should tell the offending person that their actions are inappropriate and offensive. The employee shall document in wiring to the Sheriff as soon as possible all incidents of harassment in order to provide the fullest basis for investigation and to protect the employee for further harassment.

Sexual harassment deserves special mention. Inappropriate sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct based on sex constitute sexual harassment.

Sexual harassment may include explicit sexual propositions, sexual innuendo, suggestive comments, sexual orientated "kidding" or "teasing", "practical jokes", jokes about gender-specific traits, foul or obscene language or gestures, displays of foul or obscene printed or visual material, and physical contact, such as patting, or pinching another's body.

All employees are responsible for helping assure we avoid harassment. If you feel that you have experienced or witnessed harassment, you are to notify the Sheriff. Written reports are to be made as soon as practicable, preferably within 24 hours.

The Knox County Sheriff policy is to investigate all such complaints. To the fullest extent practicable, the Sheriff will keep complaints and the terms of their resolution confidential. If an investigation confirms that harassment has occurred, the Sheriff will take corrective actions in accordance with the nature and extent of the offense.

The Sheriff recognizes that false accusations of harassment and sexual harassment can have serious effect on innocent men and women. Individuals falsely accusing another of harassment or sexual harassment will be disciplined in accordance with the nature and extent of his or her false accusation.

The Sheriff encourages any employee to raise questions he or she may have regarding the harassment policy or sexual harassment with the Sheriff.

## PUBLIC APPEARANCE AND STATEMENTS

Officers shall not publicly criticize or ridicule the Sheriff's Office, it's policies, or other officers by speech, writing, or other expressions, where such speech, writing or other expressions is defamatory, obscene, unlawful, tends to undermine the effectiveness of the agencies, interferes with the maintenance of discipline, or is made with reckless disregard for truth or falsity. Officers shall not address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondence to a newspaper or a periodical, release or divulge investigative information, or any other matters of the Sheriff's Office without pre-approval from the Sheriff or Chief Deputy.

## DRUG POLICY

The Knox County Sheriff's Office will adhere to the Knox County Fiscal Court Drug Policy and testing.

PL 1156

CHAIN OF COMMAND-2.doc



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 2

## CHAIN OF COMMAND

**ALL EMPLOYEES**

1. SHERIFF
2. CHIEF DEPUTY

**OFFICE CLERKS**
1. SHERIFF
2. CHIEF DEPUTY
3. OFFICE MANAGER

**ROAD DEPUTIES**
1. SHERIFF
2. CHIEF DEPUTY

**BAILIFFS (CSO)**
1. SHERIFF
2. CHIEF DEPUTY

PL 1157

DISCIPLINARY ACTION - 3



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 3

### DISCIPLINARY ACTION

All employees of the Knox County Sheriff are employed at- will and may be terminated at any time, for any reason, with or without cause or notice.

1. The Following disciplinary actions may be taken at the Sheriff's discretion.
   a. Time off with pay
   b. Time off without pay
   c. Reduction in pay
   d. Loss of take home cruiser
   e. Termination of employment

PL 1158

DISCIPLINARY ACTION - 3



## KNOX COUNTY SHERIFF'S OFFICE
### SHERIFF JOHN D PICKARD
### 234 COURT SQUARE
### BARBOURVILLE KY 40906
### PH: 606-546-3181 FAX: 606-546-3196

### Discipline Documentation Form

**Employee Information**

Name of Employee: _____

Employee's Job Title: _____

**Incident Information**

Date/Time Incident: _____

Location of Incident: _____

Description of Incident: _____

_____

_____

_____

Witnesses to Incident: _____

Was this incident in violation of a policy?          **Yes**          **No**

If yes, specify which policy and how the incident violated it. _____

_____

_____

**Action Taken**

What action will be taken against the employee? _____

_____

_____

Has the impropriety of the employee's actions been explained to the employee?     **Yes**          **No**

Did the employee offer any explanation for the conduct?  **YES**     **NO**   If so, attach employee memo:

Signature of person preparing report: _____ Date: _____

Signature of employee: _____ Date: _____

Confidential                    Page 2                    1/12/2014

PL 1159

VEHICLES – 4



# KNOX COUNTY SHERIFF OFFICE
# SHERIFF JOHN D PICKARD
## 401 COURT SQUARE, SUITE 105
## BARBOURVILLE KY 40906
## PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 4

## VEHICLES

## USE VEHICLE

Officers assigned a vehicle will be allowed use of the vehicle to go to and from home or any other assignments, training, ect… Approved by the Sheriff or Chief Deputy. The use of the Police vehicle while off duty is a privilege and not an automatic fringe benefit or employment right. This privilege is subject to revocation at any time. Use of take home vehicles shall be conditioned upon the following general rules and regulations. Vehicles must be kept clean at officer's expense.

## PARKING

Officers shall not park police vehicles in business parking lots unless official sheriff business or they are patronizing the business.

Officers shall not park any police vehicle in prohibited parking areas unless required to do so in response to a dispatched call or emergency.

Prohibited parking areas are yellow, curbs, loading zones, expired parking meters, stops, within 20 feet of fire hydrant, spaces reserved for vehicles other than police vehicles, ect.

## OPERATION OF SHERIFF'S OFFICE OWNED VEHICLES:

Employees are required to operate Sheriff's Office owned vehicles in a careful and prudent manner.

Employees are required to obey all laws of the state, Knox County, all Sheriff's Office directives and policy pertaining to such operation.

Employee's operating Sheriff's Office owned vehicles are required to have a valid operator's license in their possession.

Employees are required to report the loss of a driving license to the Sheriff or Chief Deputy immediately.

Employees are required to obtain permission from the Sheriff or Chief Deputy to utilize any Sheriff's Office vehicle not personally assigned to them.

PL 1160

VEHICLES – 4

Officers are prohibited from allowing unauthorized persons (NON SHERIFF'S OFFICE EMPLOYEE) to ride in any Sheriff's Office vehicle.

## PROHIBITED IN THE USE OF VEHICLE:

Officers are prohibited from consuming ANY alcohol prior to and while operating a Sheriff's Office owned vehicle.

While operating a Sheriff's Office owned vehicle, shall an employee have occasion to be tested for alcohol content, he shall register no more than 0.00.

Officers on light duty status for an extended period, or those who are restricted or under suspension will not operate Sheriff's Office owned vehicle.

When any officer goes on vacation or any type of leave, if he is leaving the county for a period of longer than one (1) week, he shall park his vehicle at Sheriff's Office for emergency use if necessary. He shall do so either on the first day of his vacation or on the day preceding same. Both vehicles and keys are to be turned in at the Sheriff's Office unless approved by the Sheriff or Chief Deputy other wise.

Under no circumstances will an officer leave any weapon in an unlocked vehicle. If an officer must leave a weapon in a vehicle, the weapon should be locked in the trunk.

## RESTRICTIONS RELATING TO OUT-OF-COUNTY USE

Any request for out-of-county-use of a Sheriff's Office owned vehicle must be approved by the Sheriff or Chief Deputy, except in the performance of official duties or an actual emergency with which the permission of the Sheriff or Chief Deputy is not required, but the Sheriff or Chief Deputy must be notified ASAP.

Employees living out side of Knox County maybe authorized to have a take home vehicle upon approval by the Sheriff.

## MAINTENANCE:

Employees requiring maintenance of their assigned vehicle shall specify in writing to the Chief Deputy the problem or type of work needed and after receiving a Purchase Order shall schedule during employees off duty time with the approved vender an agreed time to the approved maintenance to be preformed.

1. Oil Change minimum every 3000 miles.
2. Tire rotation minimum every 6000 miles.
3. All other items as required by manufacture

## MAINTENANCE AND CARE RESPONSIBILITIES:

All employees using a Sheriff's Office owned vehicle shall exercise good judgment in utilizing it, and shall not drive or use the vehicle so as to cause unfavorable comment or reflect discredit on the Sheriff's Office.

Each employee assigned a take home vehicle shall be fully responsible for the proper care and general maintenance of the vehicle.

Unattended vehicles of off-duty employees must be locked at all times.

Only authorized personnel (Sheriff's Office employees) are permitted to operate the Sheriff's Office owned vehicles.

PL 1161

VEHICLES – 4

Each Employee assigned a take home vehicle shall complete the approved automotive form on or before the fifth of each month for the preceding month and turn in to the Chief Deputy.

## OFF-DUTY USE:

While using a take home Sheriff's Office owned vehicle while off duty, the radio will be turned on and kept on the appropriate frequency. The officer will not be required to go in and out of service, but must advise the dispatcher if near an emergency call and whether or not he has passengers.

An off-duty officer will be required to respond to any emergency call in his area.

If responding to calls involving a felony while off duty, the officer may be required to handle the call in order to protect life and property and to best preserve and handle evidence.

In minor cases encountered off duty, the officer may summons an on duty unit to handle the call and stand by and assist until the on duty unit arrives, unless immediate action is necessary: then the officer will handle the situation.

Includes self-initiated traffic stops, motorist assists, information transmitted concerning hazardous traffic conditions, ect.

A record of off-duty activity shall be kept by communications, and a monthly report of same shall be forwarded to the Sheriff.

## OFFICERS AND PASSENGER'S RESPONSIBILITIES:

Proper and suitable attire shall be worn by officers at all times during off duty use of a home fleet vehicle.

The following are examples of clothing not to be worn while in the home-fleet vehicle on off-duty basis.

    Short Shorts
    Bathing suits
    Extremely revealing clothing
    When slogans, pictures, or patches are worn, they should be of neutral or appropriate image for a police officer.
    All clothing work shall be clean and well maintained.

All occupants (on or off duty) are required to utilize seat belts while driving or riding in Sheriff's Office owned vehicles.

Any violation of this directive may result in the loss of privilege for a take home vehicle of employee. It may well result in disciplinary action against the employee.

PL 1162

FIREARMS - 5



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 5

## FIREARMS

**ISSUED FIREARMS:**

1. GLOCK 22C or 22 WITH THREE MAGAZINES (CLIPS)
2. REMINGTON MODEL 870 12GA. SHOTGUN

**CARRYING FIREARMS:** Officers are required to be suitable armed with an approved weapon and extra ammo at all times while on duty, or at any time in a Sheriff's Office owned vehicle, unless authority dictates the contrary due to the nature of an investigation.

Officers are required to be armed while off duty and in a Sheriff's Office owned vehicle, officers may be armed while off duty providing all laws governing the officers location are obeyed.

Ammunition carried on or off duty must be factory loaded. Hand loaded or reloaded ammunition will not be acceptable.

Officers and employees issued Glock 22C or 22 are required to have a round in the chamber and a full magazine (clip), at all times during authorization to carry, providing all laws governing the officers or employees location are obeyed.

Carrying of firearms on duty or in a Sheriff's Office owned vehicle, that is not issued by the Sheriff's Office is prohibited unless pre-approved by the Sheriff or Chief Deputy in writing.

**USE OF FIREARMS:** All sworn personnel of the Sheriff's Office are required to re-qualify with the weapon they regularly carry on duty, a minimum of one time a year.

Officers and employees (authorized to handle firearms) are required to handle any and all firearms in a safe manner.

Officers and employees (authorized to handle firearms) are prohibited from:

Recklessly handling any firearm

Dry-snapping any weapon except on the firing range.

Holstering or carrying a weapon in a cocked position.

PL 1163

VEHICLE PURSUITS



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 6
## USE OF FORCE

1.  USE ONLY FORCE NECESSARY TO EFFECT ARREST AS TRAINED

PL 1164

Domestic Violence - 8



# KNOX COUNTY SHERIFF'S OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## DOMESTIC VIOLENCE POLICY SECTION 8

### I. INTRODUCTION

Domestic violence is a serious crime against the individual and the community. The failure of any law enforcement officer to properly respond and handle a domestic call, no matter how frequent, will expose individuals and the community to danger up to and including death. Because domestic violence can and does result in the death of individuals, every response to a domestic call, no matter how often, shall be treated the same as any other crime against a person.

Every response to a domestic call shall include a substantive investigation of the incident which shall involve the gathering of background information, the gathering of physical evidence including pictures, clothing, and statements from direct and indirect witnesses including children and neighbors.

Every response to a domestic call, no matter how frequent, requires that every step possible be taken to insure the safety of the victim including providing a safety plan to the victim and, if necessary, transporting the victim and children, if appropriate, to another site for safekeeping.

### II. PURPOSE

This domestic violence policy is designed to provide officers and support personnel with clear definitions, direction, and guidelines for providing and promoting a consistent, effective response to a domestic violence crime in order to accomplish the following goals:

1. Respond and Report (JC3) to all Domestic Violence calls verbal and or assault.
2. Make an arrest for any violation of an Emergency Protective Order (EPO), any violation of a Domestic Violence Order (DVO), any violation of a Foreign Protective Order (FPO) or any violation of a condition of release or bond when authorized by state law;
3. Reduce the incidence and severity of domestic violence crime;
4. Afford maximum protection and support to adult and child victims of domestic violence through coordinated services of law enforcement and victim assistance; and
5. Reduce the risk of civil liability for officers, supervisors and administrators, and the employing unit of government.

Confidential

01/12/2014

PL 1165

Evidence – Lost Property



# KNOX COUNTY SHERIFF OFFICE
# SHERIFF JOHN D PICKARD
## 401 COURT SQUARE, SUITE 105
## BARBOURVILLE KY 40906
## PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 9
## EVIDENCE – LOST PROPERTY

1. ALL EVIDENCE AND OR LOST PROPERTY SHALL BE PROPERLY BAGGED IN APPROPRIATE EVIDENCE BAG, GUNS OR LARGER ITEMS SHALL BE TAGGED

2. ALL EVIDENCE AND OR LOST PROPERTY SHALL BE LOGGED ON KSP-41

3. A. SEPARATE KSP-41'S FOR THE FOLLOWING LIST
   A.  GUNS
   B.  CASH
   C.  VEHICLE'S HELD FOR EVIDENCE ONLY ALSO MUST COMPLETE KCSO VEHICLE HOLDER FORM AND TURN IN, IN REASON TOWED = EVIDENCE, CONDITION OF RELEASE = CLOSE OF CASE CONTACT OFFICER (VEHICLES WITH LIENS SHALL HAVE SHERIFF OR CHIEF DEPUTY APPROVAL TO SEIZE FOR FORFEITURES)
   D.  ANY AND ALL ITEMS GOING TO KSP CRIME LABS, ALSO KSP-26 MUST BE ATTACHED
   E.  CELL PHONES
   F.  ALL OTHER ITEMS MANY BE PUT TOGETHER ON KSP-41

4. EACH EVIDENCE BAG OR ITEMS TAGGED SHALL HAVE THE FOLLOWING ITEMS CLEARLY MARKED
   A.  AGENCY = KCSO
   B.  CASE/CITATION #
   C.  ITEM #
   D.  OFFENSE/CHARGES
   E.  CASE OFFICER NAME/UNIT #
   F.  DATE COLLECTED
   G.  TIME COLLECTED

5. ALL EVIDENCE, LOST PROPERTY AND KSP-41 SHALL BE TURNED IN WITH-IN 3 DAYS WITH CASE.

6. EVIDENCE AND OR LOST PROPERTY SHALL BE TURNED INTO THE SHERIFF OR CHIEF DEPUTY IN PERSON ONLY

PL 1166

Evidence – Lost Property

7. CHAIN OF CUSTODY
   A.    ITEM # = ITEM #'S
   B.    DAT/TIME = DATE AND TIME RELINQUISHING ITEMS
   C.    RELINQUISHED BY = OFFICER SIGNATURE
   D.    RECEIVED BY = PERSON SIGNATURE RECEIVING ITEMS (DO NOT SIGN FOR ANOTHER PERSON)
   E.    PURPOSE FOR RELEASE = SELF EXPLANATORY

PL 1167

CITATION-11.doc



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 11
## CITATIONS

1. DUE IN OFFICE DATE OF ISSUE.
2. <u>PRESS FIRMLY AND PRINT LEGIBLE IN ALL UPPER CASE LETTERS</u>, EXCEPT OFFICER SIGNATURE THIS MUST BE SIGNED
3. ALL CITATIONS MUST HAVE PHONE NUMBER OR EMERGENCY PHONE NUMBER FILLED IN.
4. FILL IN ALL APPLICABLE FIELDS CORRECTLY. (PAY ATTENTION)
    A. ADDRESS MUST BE A CURRENT PHYSICAL 911 ADDRESS (MINIMUM OF ROAD NAME) YOU MAY ALSO ADD P.O. BOX #.
    B. DOB AND SSN REQUIRED
5. FOR LOCATION OF VIOLATION/ARREST USE CLOSEST CITY, CODFS AND SECTOR # (ASK SUPERVISOR FOR CITY CODE LIST IF NEEDED)
6. POST ARREST COMPLAINT AREA
    A. LIST EACH DESCRIPTION OF CHARGE OR VIOLATION ON A SEPARATE LINE.
    B. GIVE SYNOPSES OF PROBABLE CAUSE FOR CHARGES OR VIOLATION.
7. IN THE ASSIGNMENT FIELD PUT KNOX-SO
8. CITATION FOR ARREST WARRANTS & CRIMINAL SUMMONS
    A. TURN IN AND STAPLE IN THE FOLLOWING ORDER TOP TO BOTTOM (COURT 2 POLICE – AGENCY – COPY OF WARRANT/SUMMONS)
    B. VIOLATION DATE AND TIME NOT REQUIRED ONLY ARREST DATE AND TIME.
9. CITATION FOR WARRANT LESS ARREST
    A. TURN IN AND STAPLE IN THE FOLLOWING ORDER TOP TO BOTTOM (COURT 2 POLICE – AGENCY)
    B. VIOLATION AND ARREST DATES AND TIMES REQUIRED.
10. VIOLATION TYPE CITATIONS TURN IN ALL PAGES TO OFFICE EXCEPT VIOLATOR COPY.
    A. SEPARATE AND STAPLE IN THE FOLLOWING ORDER TOP TO BOTTOM (COURT 2 POLICE – AGENCY)
    B. VIOLATION DATE AND TIME REQUIRED.

PL 1168

COLLISION REPORTS-12.doc



# KNOX COUNTY SHERIFF OFFICE
# SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 12
## COLLISION REPORTS

1. USE E-CRASH ONLY NO HAND WRITTEN COLLISION REPORTS.
    A. SPELL CHECK WORKS AS LONG AS YOU DO NOT TYPE IN ALL CAPS.
2. DUE IN OFFICE AND TRANSMITTED WITH IN 3 DAYS OF COLLISION DATE.
3. REPORT READY FOR PARTIES IN COLLISION TO PICKUP AT OFFICE 5 DAYS FROM COLLISION DATE.
4. GIVE TO EACH DRIVER A KCSO BUSINESS CARD (FURNISHED BY SUPERVISOR) WRITE YOUR NAME ON THE FRONT AND ON THE BACK WRITE THE COLLISION DATE AND DATE THAT REPORT MY BE PICKED UP AT OFFICE. (SEE # 2)
5. ISSUE CITATION FOR ANY VIOLATIONS. (NO INSURANCE, NO PROOF OF INSURANCE ETC...)
    A. TOW IF REQUIRED
    B. FOLLOW KCSO TOWING POLICY AND PROCEDURES.
    C. IF TOWED FILE OUT AND TURN IN AT END OF SHIFT KCSO VEHICLE HOLDER/RELEASE FORM.
6. IN THE FIELD LOCAL CODE PUT DATE AND TIME OF COLLISION IN THIS FORMAT 0524072125 (EXAMPLE IS FOR COLLISION THAT OCCURRED ON May 24, 2007 AT 9:25PM).
7. USE CLOSEST CITY, CODES SECTOR # (ASK SUPERVISOR FOR CITY CODE LIST IF NEEDED)
8. NARRATIVE
    A. 1ST FROM YOUR INVESTIGATION GIVE DETAILED PRE-COLLISION, COLLISION AND POST COLLISION EVENTS.
    B. 2ND PUT EACH DRIVERS LISTED AS UNIT 1, UNIT 2 ETC... STATEMENT.
    C. 3RD PUT ANY WITNESS STATEMENTS.
9. PHOTOS
    A. REQUIRED ON ALL ACCIDENTS.
    B. DEPUTIES WITH 3 YEARS OF SERVICE
        B1. REQUIRED ON ALL ACCIDENTS WITH INJURY AND OR PROPERTY DAMAGE
        B2. NOT REQUIRED ON NON INJURY ACCIDENTS.
    C. ATTACH CD OF PHOTOS WITH REPORT
10. STATEMENTS
    A. REQUIRED ON ALL ACCIDENTS
    B. TALK TO ALL DRIVERS INVOLVED IN COLLISION AND ANY WITNESS.
    C. TAKE RECORD OR WRITTEN STATEMENTS FROM ALL DRIVERS AND WITNESS.

PL 1169

COLLISION REPORTS-12.doc

       D.  DEPUTIES WITH 3 YEARS OR > OF SERVICE (C) REQUIRED ON ALL ACCIDENTS WITH INJURY AND OR PROPERTY DAMAGE, (C) NOT REQUIRED ON NON INJURY ACCIDENTS.

       E. ATTACH CD OF RECORDED STATEMENTS AND OR WRITTEN STATEMENTS WITH REPORT.

PL 1170

CASE – IR – CAR REPORTS - 13



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 13
## CASE – INCIDENT – CAR REPORTS

**CASE**
1. USE E-NIBRS ONLY, NO E-CRIMES OR HAND WRITTEN UOR REPORTS.
A. SPELL CHECKER WORKS AS LONG AS YOU DO NOT TYPE IN ALL CAPS.
2. DUE IN OFFICE AND TRANSMITTED WITH IN 3 DAYS OF REPORT DATE.
3. REPORT READY FOR VICTIM TO PICKUP AT OFFICE 5 DAYS FROM REPORT DATE.
4. GIVE TO VICTIM A BUSINESS CARD WITH YOUR NAME ON THE FRONT AND ON THE BACK WRITE THE REPORT DATE AND DATE THAT REPORT MY BE PICKED UP AT OFFICE. (SEE # 2)
5. CASES INVESTIGATION MUST BE MORE THOROUGH: (WHO – WHAT – WHERE –WHEN – HOW) DO NOT JUST TAKE A STATEMENT FROM VICTIM, DO AN INVESTIGATION.

**INCIDENT REPORT - COUNTY ATTORNEY REFERRAL:**
1. DUE IN OFFICE WITH IN SAME OF REPORT.
2. FAX COUNTY ATTORNEY REFERRAL TO COUNTY ATTORNEY OFFICE
3. IR REPORT READY FOR VICTIM TO PICKUP AT OFFICE NEXT DAY FROM REPORT DATE.
4. GIVE TO VICTIM A BUSINESS CARD WITH YOUR NAME ON THE FRONT AND ON THE BACK WRITE THE REPORT DATE AND DATE THAT REPORT MY BE PICKED UP AT OFFICE. (SEE # 2)
5. INCIDENT REPORT IS USED WHEN OFFICER IS UNABLE TO PROVE A CASE (MISDEMEANOR ONLY SOME FELONY WITH APPROVAL) . DO A THOROUGH INVESTIGATION AND YOU WILL BE ABLE TO DETERMINE WHICH TO USE CASE OR INCIDENT. (WHO – WHAT – WHERE –WHEN – HOW) DO NOT JUST TAKE A STATEMENT FROM VICTIM, DO AN INVESTIGATION.

PL 1171

VEHICLE HOLDER - 14



# KNOX COUNTY SHERIFF OFFICE
# SHERIFF JOHN D PICKARD
## 401 COURT SQUARE, SUITE 105
## BARBOURVILLE KY 40906
## PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 14

## VEHICLE HOLDER – WRECKER LIST

1. Vehicle Holder Form is to be used on any and all vehicles towed/seized.
2. Vehicle Holder Form shall be turned into office at end of deputies shift no exceptions

PL 1172

VEHICLE HOLDER - 14



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

# *VEHICLE HOLDER – RELEASE FORM*

**OWNER'S NAME:** _____

**DRIVERS NAME:** _____

**MAKE** _____ **MODEL** _____ **COLOR** _____

**STATE AND TAG #** _____

**VIN #** _____

**DATE TOWED:** _____ **OFFICER ID:** _____

**TOWING SERVICE:** _____

**LOCATION TOWED FROM:** _____

**REASON TOWED:** _____

**CONDITION OF RELEASE:** _____

_____

_____

**RELEASED BY:** _____ **DATE:** _____

PL 1173

APPEARANCE & DRESS CODE



# KNOX COUNTY SHERIFF OFFICE
# SHERIFF JOHN D PICKARD
## 401 COURT SQUARE, SUITE 105
## BARBOURVILLE KY 40906
## PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 17

### APPEARANCE & DRESS CODE

**APPEARANCE RULES:**  All Road Deputies are required to wear the Class A uniform.

No portion of the uniforms may be worn in combination with civilian attire.

**WEARING AND MAINTENANCE OF THE UNIFORM:** Officers wearing the uniform are required to maintain it in a neat, clean and orderly manner.

Employees are prohibited from wearing the uniform while engaged in off-duty employment or to engage in any activity for personal gain.

Employees are prohibited from wearing ball caps, skull caps or other accessories while in uniform unless issue.

**DRESS CODE FOR NON-UNIFORM EMPLOYEES:**  Clothing shall consist of conservative dress in good taste, acceptable to the policies of the department.

**PERSONAL GROOMING:**  Employees are required to maintain a high degree of personal cleanliness.

Employees are required to maintain clean, well groomed hairstyles.

Employees required to wear Class A Uniform shall be clean shaved, no facial hair is permitted.

Wigs or hairpieces, when worn, must conform to hair regulations.

Hairstyles of any unusual or unique nature are prohibited (e.g. Mohawks, cornrows, pigtails, dogears, ponytails, or pompadours).

### APPEARANCE & DRESS CODE

**CLASSIFICATION OF UNIFORMS & UNIFORM OF THE DAY**
**April and October are optional months (CLASS A SUMMER or WINTER)**
**CLASS A SUMMER UNIFORM:** Campaign hat, short sleeve shirt, and summer trousers. (Worn May 1 through September 30)

**CLASS A WINTER UNIFORM:** Campaign hat, long sleeve shirt, winter trousers, and tie tucked in between second and third button (duty jacket discretionary).  (Worn November 1 through March 31)

PL 1174

APPEARANCE & DRESS CODE

## MAINTENANCE & WEARING OF UNIFORMS

Uniforms and accessories shall fit properly and shall be free of holes, frayed edges, missing buttons, and faded colors. Shirts shall be neatly pressed with military creases. Any variance from theses requirements will be remedied as quickly as reasonably possible. Issued uniform shoes shall be worn by officers while in uniform. A white crewneck T-Shirt shall be worn with the Class A uniform and shall fit snugly around the base of the wearer's neck; not loose or wrinkled. Plain black or navy socks shall be worn while in uniform. A highly-polished luster shall be maintained on leather accessories, brass buckles and snaps. Items such as collar pins and badges should be cleaned with soap and water, and dried with a soft cloth or towel.

Only uniform equipment issued, shall be worn. No part of the uniform or issued accessories shall be worn off duty except the service weapon or handcuffs.

Uniform alterations (i.e., hemming the trousers, tapering the shirt, ect.) may be made when necessary. Excessive alterations that detract from the authorized fit or appearance of the uniform may result in replacement of the uniform at the officer's expense.

## PERSONAL ACCESSORIES WORN WHILE IN UNIFORM & NON-ISSUED UNIFORM CLOTHING REQUIREMENTS

Additional clothing may be worn under the uniforms providing the clothing is not exposed and does not present a bulging appearance. Lodge or fraternal emblems shall not be worn on the uniform at any time and any personal accessories worn shall be concealed from view at all times. Earrings, necklaces, scarves, large watch bands, rings, bracelets and other items that distract from the uniform shall not be worn.

## UNIFORMED OFFICERS: COURT APPEARANCE CLOTHING STANDARDS

Uniformed officers appearing in court shall have the option of wearing the issued uniform or professional attire..

## WEARING OF UNIFORM HAT

The uniform hat is part of each Deputy's uniform and shall be worn as such. In any event, personnel to whom uniforms are issued shall wear the uniform of the day including hat, as prescribed by the Sheriff at all times while on duty unless authorized otherwise. The only exceptions are while inside a building, while in a vehicle, and during prayer.

The uniform hat, when worn, shall not be tipped backwards, worn to the side of the head, rolled up, or rolled down, but shall be worn straight away or slightly forward. While on duty in uniform, the hat shall be worn at all times unless authorized otherwise. The only exceptions are while inside a building, while in a vehicle, and during prayer.

## HAT ACCESSORIES

1. Hat Medallion- The hat medallion shall be worn on the front of the hat, attached through the hole in an upright squared away position.
2. Hat cord- Hat cords shall be worn. The hat cord shall be tied in front with half hitch on each side and the cord ring shall be centered directly below the hat medallion. The outside end of the acorns shall be approximately one-fourth inch from the brim when fully extended.

PL 1175

## APPEARANCE & DRESS CODE
## CHIN STRAP

The chin strap shall be worn attached to the hat cord through the holes in the hat provided for such attachment. The buckle shall be worn on the right side of the head and the chin strap shall be worn to the rear no lower than one inch below the inside edge of the brim.

## LEATHER PISTOL BELT

The leather pistol belt shall be worn with the uniform while performing official duties. The waist belt shall be adjusted to fit the wearer snugly with the buckle centered at the wearer's front.

## HANDCUFF CASE

The handcuff case shall be worn on the opposite side from the holster just to the rear of the stripe on the uniform trousers.

## AMMUNITION POUCHES

The positioning of the ammunition pouch is optional and may be worn on either side of the leather pistol belt to the front of the stripe on the uniform trousers and toward the belt buckle. The overlap of the belt shall be worn on the side opposite the ammunition pouch.

## HOLSTER

The holster shall be worn on the strong hand side of the officer approximately in line with the uniform stripe of the trousers. It shall not be worn pushed back on the hip or pushed forward.

## TASER

The taser shall be worn on the week hand side of the officer

## RADIO AND BATON CARRIERS

Radio and baton carriers shall be placed on the belt in positions which are most convenient for the individual officers.

## CREWNECK T-SHIRT

When the class A uniform is worn, a white crewneck t-shirt shall be worn. The t-shirt should fit snugly around the base of the wearer's neck and should not present a loose or wrinkled effect.

## UNIFORM SOCKS AND SHOES

Uniform issued shoes shall be worn by officers in uniform. Uniform socks shall be black or navy blue in color with no design.

## OVERSHOES

Overshoes may be worn as approved Sheriff or Chief Deputy in writing.

PL 1176

## APPEARANCE & DRESS CODE
## UNIFORM BOOTS

Boots issued or approved by the Sheriff or Chief Deputy in writing may be worn as part of any uniform and only as specified. They are to be shined and fully laced. The trouser legs of the utility uniform and the jumpsuit (when worn with boots) shall be bloused. The trouser legs of any other uniforms shall not be bloused. Wearing boots with class A uniform is prohibited unless immaculate weather and pre-approved by the Sheriff or Chief Deputy.


## UTILITY UNIFORM

The utility uniform shall bear the insignia sewn on it when issued. The cap issued for use with the utility uniform shall be worn with the utility uniform. Standard black web belt and issued equipment shall be worn as part of the utility uniform. Boots shall be worn with the utility uniform and shall be bloused in the standard military fashion. A black crewneck t-shirt shall be worn under the shirt and the shirt shall be tucked into the trousers. Standard issue jackets may be worn over the utility uniform, depending upon weather conditions. The utility uniform and other related equipment are issued as special purpose garments and do not replace prescribed attire. The utility uniform shall not be worn off duty. Authorization for the wearing of the utility uniform must be obtained from the Sheriff or Chief Deputy. The utility uniform may be worn in the following instances to, from, and during firing range activities, field search details, clean up of messy accident scenes, and other pre-authorized activities. In any event, personnel to whom uniforms are issued shall wear the uniform of the day as prescribed by the Sheriff or Chief Deputy at all times while on duty unless authorized otherwise.

## RAINCOAT

The raincoat shall be worn without accessories or rank insignia.

## INSIGNIAS OF RANK

The insignia of rank for ranking officers shall be as follows:

1. Sheriff – GOLD SHERIFF (worn on collar)
2. Chief Deputy- CHIEF DEPUTY (worn on collar)

## PINS AND METAL INSIGNIAS

The collar pins and rank insignias shall be worn on the collar of the uniform shirt. The collar pins and rank insignias shall be centered on the collar of the shirt three-fourths of an inch below the fold of the collar and three-fourths of an inch from the front of the collar.

## NAME PLATE AND SERVICE BAR

The name plate and service bar shall be worn as a combination centered one-half inch below the top of the left pocked flap.

## BADGE

The badge shall be worn on the left side of the uniform, centered above the left pocket. The badge shall be worn so that the bottom edge of the badge does not touch the top edge of the pocket.

PL 1177

APPEARANCE & DRESS CODE
## MARKSMANSHIP AWARD

The appropriate Marksmanship Award shall be centered one-half inch below the top of the right pocket flap.

## WHISTLE AND CHAIN

The whistle shall be carried in the right shirt pocket and the whistle chain shall be hooked under the shoulder epaulet.

PL 1178

Social Networking/Internet Postings



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 18

### Social Networking/Internet Postings

I. **Purpose:** The purpose of this policy is to direct the employees of the Knox County Sheriff Office with respect to the use of the internet, the world-wide web, and social networking as a medium of communication impacting this office.

II. **Policy:** The internet, blogs, twitter, the world-wide web, social networking sites and any other medium of electronic communication shall not be used in a manner which is detrimental to the mission and function of the Sheriff Office.

It is essential for every employee of the Sheriff Office to recognize that the proper functioning of any law enforcement/public safety agency relies upon the public's confidence and trust in the individual employees and the Sheriff Office to carry out the law enforcement and public safety functions.  Therefore, any matter which brings individual employees or the agency into disrepute has the corresponding effect of reducing public confidence and trust in our office, thus, impeding our ability to work with and serve the public. Professionalism is the most significant factor in high level performance which in turns builds the public confidence and trust. While employees have the right to use personal/social networking pages or sites, as employees of the Sheriff Office, they are public servants who are held to a higher standard that the general public with regard to standards of conduct and ethics.   As such, the policy of the Sheriff Office is to maintain a level of professionalism in both on-duty and off-duty conduct that fulfills the mission of our office. Any publication, through any medium which is potentially adverse to the operation, morale, or efficiency of the Sheriff Office will be deemed a violation of this policy.

III. **On Duty Procedures:**

A. Employees of the Sheriff Office are prohibited from using agency computers for any unauthorized purpose including surfing the internet or participating in social networking sites.

B. Employees of the Sheriff Office are prohibited from posting, or in any other way broadcasting, without prior Sheriff's approval, information on the internet, or other medium of communication, the business of the Sheriff Office to include but not limited to:

a. Photographs/images relating to any investigation of the Sheriff Office or any other law enforcement agency.

Confidential                              Page 1                              1/12/2014

PL 1179

Social Networking/Internet Postings

   **b.** Video or audio files related to any investigation of the Sheriff Office or any other law enforcement agency.

   **c.** Video, audio, photographs, or any other images etc. which memorialize a law enforcement related action of the Sheriff Office or any other law enforcement agency.

   **d.** Logos/Uniforms/Badges or other items which are symbols associated with the Sheriff Office or any other law enforcement agency.

   **e.** Any other item or material which is identifiable to the Sheriff Office or any other law enforcement agency.

## IV. Off Duty Procedures:

   **A.** Employees of the Sheriff Office who utilize social networking sites, blogs, twitter or other mediums of electronic communication in their off-duty time shall maintain an appropriate level of professionalism and appropriate conduct so as not to broadcast in a manner which is detrimental to the mission and function of the Sheriff Office.

      **a.** Employees shall not use references in these social networking sites or other mediums of communication that in any way represent themselves as a employee of the Sheriff Office without prior Sheriff's approval. This shall include but not be limited to:

         **i.** Text which identifies the Sheriff Office.

         **ii.** Photos that depict the logos, patches, badge or other identifying symbol of the Sheriff Office.

         **iii.** Accounts of events which occur within the Sheriff Office.

         **iv.** Any other material, text, audio, video, photograph, or image which would be identifiable to the Sheriff Office.

      **b.** Employees shall not use a social networking site or other medium of internet communication to post any materials of a sexually graphic nature.

      **c.** Employees shall not use a social networking site or other medium of internet communication to post any materials which promote violence or weaponry.

      **d.** Employees shall not use a social networking site or other medium of communication to post or broadcast any materials which would be detrimental to the mission and function of the Sheriff Office.

   **B.** Employees of the Sheriff Office are prohibited from using their title as well as any reference to the Sheriff Office in any correspondence to include emails, postings, blogs, twitter, social network sites such as Facebook, unless the communication is of an official nature and is serving the mission of the Sheriff Office. This prohibition also includes signature lines in personal email accounts. An employee may seek Sheriff's approval for such use.

   **C.** Applicants: All candidates seeking employment with the Sheriff Office shall be required to complete an affidavit indicating their participation in any social networking sites. This affidavit shall include the name of the sites. The candidate shall provide the Sheriff's Office with access to their site as part of any background examination.

   **D.** Employees shall be required to report to the Sheriff their participation in any social networking sites. The report shall include the name of the sites; and will provide access to the Sheriff upon request.

PL 1180

RACIAL PROFILING -19



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 19

## PROHIBITING RACIAL PROFILING
### Pursuant to KRS 15A.195

<u>POLICY</u>:  The protection of, and the preservation of the constitutional and civil rights of individuals remains one of the paramount concerns of government, and law enforcement in particular.  To safeguard these rights, law enforcement personnel shall not engage in any behavior or activity that constitutes racial profiling.  The decision of an officer to make a stop or detain an individual, or conduct a search shall not be solely motivated by consideration of race, color, or ethnicity.  Stops, detentions, or searches shall be based on reasonable suspicions, observed violations of law or probable cause, and shall comply with accepted constitutional and legal provisions, and with the Code and Cannon of Ethics adopted by the Kentucky Law Enforcement Council through Peace Officer Professional Standards.

<u>DEFINITIONS</u>:  For purposes of this policy:
"Racial Profiling" means a process that motivates the initiation of a stop, detention, or search with is solely motivated b consideration of an individual's actual or perceived race, color, or ethnicity, or making discretionary decisions during the execution of law enforcement duties based on the above stated considerations.  Nothing shall preclude an officer from relying on an individual's actual or perceived race, color, or ethnicity as an element in the identification of a suspect or in the investigation of a crime, a possible crime or violation of law or statute.

<u>DISCIPLINE</u>:  An officer who violates a provision of this policy shall be subject to the agency's disciplinary procedures, which shall be consistent with other penalties imposed for similar officer misconduct.

Confidential                               Page I                               01/12/2014

PL 1181

CELL PHONE – COMPUTERS -21



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 401 COURT SQUARE, SUITE 105
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

## POLICY AND PROCEDURES SECTION 21
## CELL PHONE – COMPUTERS

CELL PHONE
1. Issued cell phones are for official Sheriff Office use only.
2. Personal use of cell phone forbidden. Cell bills will be reviewed and any personal usage will be  deducted from employee pay
3. Cell phones usage:
   2a. voice unlimited
   2b. text unlimited
   2c. data 300mb per month, overage will be deducted from employee pay.
4. Purchase or installing of apps shall have written approval from Chief Deputy and purchased at employees expense after approval is granted.
5. Employee shall have issued cell phone on his person during scheduled work times.
6. Employee shall check issued cell phone frequently during off hours to check for messages from supervisor or office.
7. Use of personal cell phone for official Sheriff Office business other than communicating with supervisors or office will result in personal cell phone being seized as evidence for court.

COMPUTER
1. Issued computer are for official Sheriff Office use only.
2. Personal use of issued computer is forbidden.
3. Purchase or installing of apps/software shall have written approval from Chief Deputy before installation.
4. Any repair cost to computer due to employee neglect or abuse will be deducted from employee pay.

Confidential                    Page 1                    01/12/2014

PL 1182

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION at LONDON**
**CASE NO: 6:17-CV-00084-DLB**

AMANDA HOSKINS and
JONATHAN TAYLOR,                                                  PLAINTIFFS,

V.

KNOX COUNTY, et al,                                               DEFENDANTS.

---

**DEFENDANT JOHN PICKARD RESPONSES TO REQUEST FOR**
**PRODUCTION OF DOCUMENTS PROPOUNDED BY PLAINTIFFS**

---

Comes now the Defendant John Pickard, by and through counsel, for his Responses to Request for Production of Documents propounded by Plaintiffs, Amanda Hoskins and Jonathan Taylor.

### REQUEST FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:**    Any and all Documents that relate to, support, or rebut any of the allegations or claims in Plaintiffs' Complaint.

**RESPONSE:**   I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 2:**    All Documents relating to or supporting Defendants' Affirmative Defenses and Answer to the Complaint, including all documents upon which Defendants may rely at trial.

**RESPONSE:**   I have no documents regarding the investigation of the murder of Katherine Mills.

1

Date 3/21/18
KENTUCKIANA Reporter JVT   Exhibit # 5
Case 17·CV·84
Deponent John Pickard

PL 1183

**REQUEST NO. 3:**   Any and all Documents prepared in connection with the Mills murder investigation and the investigation, arrest, interrogation, and charging of Plaintiffs for the murder of Katherine Mills, including but not limited to any and all police reports, collected evidence, lab reports, handwritten notes, crime scene photographs, photo arrays, and photographs of the Plaintiffs, or other witnesses. The request specifically includes but is not limited to the complete Investigative File or other files with respect to the Mills murder investigation.

**RESPONSE:** I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 4:**   All Documents relating to Allen Helton; Mike Simpson; Jesse Lawson; William Lester; Bob Smith; Michael Crump; Christy Branson; Joe King; Dr. Warren; Amber Simpson; Daniel Wilson; Robert Beach; Kayla Mills; Donna Mills, and Margaret Polly.

**RESPONSE:** I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 5:**   Any photographs of Plaintiffs or any other persons that were shown to any witnesses during the Mills murder investigation.

**RESPONSE:** I have no photographs regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 6:**  All photographs depicting line-ups that were viewed by any witnesses during the Mills murder investigation.

**RESPONSE:** I have no photographs regarding the investigation of the murder of Katherine Mills.

2

PL 1184

**REQUEST NO. 7:**   Any Documents relating to any confidential informants that were used by the Department during the Mills murder investigation.

**RESPONSE:**  I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 8:**   Any and all Documents relating to Plaintiffs interrogation(s) for the Mills murder investigation.

**RESPONSE:**   I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 9:**    All Documents, including any and all attachments and investigator notes, relating to any internal investigation undertaken by the Department in connection with the events described in Plaintiffs' Complaint.

**RESPONSE:**  I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 10:**   All Documents, including personal files and notes, which were not included in the Investigative File and that summarize, reflect or describe any police actions related to Mills murder investigation.

**RESPONSE:**  I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 11:**   All Documents, general progress reports, supplementary reports and/or notes that reflect or describe the photo arrays, line-ups and/or witness interviews conducted during the Mills murder investigation.

3

PL 1185

**RESPONSE:**     I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 12:**     All Documents relating to whether the Plaintiffs committed any illegal act in relation to the incident described in the Complaint.

**RESPONSE:** I have no documents regarding the Plaintiffs criminal history.

**REQUEST NO. 13:**     Any and all Documents related to any Complaint of any person against any of the individual Defendant Officers at any time. This request specifically seeks the complete Department file for each Complaint; a print-out of the disciplinary histories of each of the Defendant Officers with information sufficient to determine the date of any Complaint, the type of Complaint, and the result of any investigation or disciplinary proceeding with respect to each such Complaint.

**RESPONSE:**     I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 14:**     All files relating to each Defendant Officer maintained by the Department, including complete personnel files, internal affairs files, and training records.

**RESPONSE:**     I have no responsive documents regarding the Defendants in this case.  The responsive documents would have to be requested from the Defendants Supervisor or the Knox County Sheriff's Department in which the Defendant was affiliated with at the time of the allegations contained in the Complaint.

**REQUEST NO. 15:**     Any insurance contracts or indemnification agreements that may cover the liability of any of the Defendant Officers or the City for the claims Plaintiffs make in this case.

4

PL 1186

**RESPONSE:**  Knox County is a member of Kentucky Association of Counties All Lines Fund.  Defense is under a Reservation of Rights.  KALF's policy is attached.

**REQUEST NO. 16:**    All Documents in Defendants' possession relating to the Plaintiffs. This request includes Documents obtained prior to, during and after the Mills murder investigation.

**RESPONSE:**  I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 17:**    All Documents that support or relate to any of your responses to any of Plaintiffs' Interrogatories or Requests for Admission in this case.

**RESPONSE:**    I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 18:**   All Documents comprising, containing, or memorializing Communications of any kind relating to this case, including but not limited to memos, letters, faxes, e-mails, reports, notes, etc. This Request includes but is not limited to (a) all Communications between the Defendants and Plaintiffs; (b) all Communications between the Defendants and the witnesses in this case; (c) all Communications with any other law enforcement agencies, including but not limited to, the Kentucky State Police and Barbourville Police Department; (d) all Communications with employees of the Knox County Commonwealth Attorney's Office; (e) all Communications between or among any person within the Department; and (f) all Communications between any of the Defendants. This request also includes any such Communications that are not included in the Investigative File for the Mills murder investigation.

5

PL 1187

**RESPONSE:** I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 19:** All transcripts, tape recordings, and radio transmissions (or Documents memorializing the same) relating to the subjects described in Plaintiffs' Complaint.

**RESPONSE:** I have no responsive items.

**REQUEST NO. 20:** Any witness statements relating to any of the events described in Plaintiffs' Complaint in this action.

**RESPONSE:** I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 21:** All Documents obtained from third parties (including but not limited to via third party subpoena in this litigation), including but not limited to employment records, medical records, prison/jail records, or any other records.

**RESPONSE:** Please see attached KSP investigative file which was provided to my attorney after the filing of this ligation.

**REQUEST NO. 22:** All Documents obtained via FOIA or other means that relate to, support, or rebut any of the allegations or claims in Plaintiffs' Complaint.

**RESPONSE:** I have no documents no responsive to this request.

**REQUEST NO. 23:** Any and all "demonstrative" aids or exhibits which may be used at trial of this cause. To the extent responsive Documents become available prior to the close of the discovery period, please seasonably supplement your Responses.

PL 1188

**RESPONSE:**   As discovery has just begun, I have not chosen any exhibits at this time but will supplement this answer in compliance with any Court Order requiring identification of exhibits.

**REQUEST NO. 24:**   All Documents Relating to any Rule 26 expert witnesses retained by Defendants in this matter, including but not limited to: (a) all Communications to/from said expert(s) which are not otherwise protected as work product under Rule 26; (b) all Documents provided to and relied upon by said expert(s); (c) all notes, reports, and analysis by said expert(s); (d) all bills or statements of the hours and compensation paid to or billed by the witness for work on this matter; and (e) any transcripts of prior testimony or Rule 26 reports of said expert(s). To the extent responsive Documents become available as the litigation proceeds, please seasonably supplement your Responses.

**RESPONSE:** As discovery has just begun, I have not chosen any expert witnesses at this time but will supplement this answer in compliance with any Court Order requiring identification of expert witnesses.

**REQUEST NO. 25:**   All policies, procedures, general orders, special orders, and/or employee manuals relating to how to conduct a felony crime investigation and a homicide investigation.

**RESPONSE:**   I have no responsive documents.  This request would need to be made to the particular law enforcement agency in which Plaintiff is seeking the information.

**REQUEST NO. 26:**   All Documents relating to any General Orders, Special Orders or other Department communication relating to: (a) interrogating witnesses and

7

PL 1189

suspects; (b) eyewitness identification procedures (both in-person and photographic); (c) disclosing evidence to the Commonwealth and/or State's Attorney's Office; (d) memorializing information about a criminal investigation in police documents, including but not limited to supplementary reports and General Progress Reports; (e) personal files or personal notes; and (f) maintaining the Investigative File, Investigative File Case Folder and any associated inventories, logs or control cards; (f) interactions with confidential informants; (g) promises of consideration to confidential informants, informants, or any other witnesses.

**RESPONSE:**  See response to Request No. 26 above.

**REQUEST NO. 27:**    All Documents relating to any training conducted on the following topics: (a) interrogating witnesses and suspects; (b) eyewitness identification procedures (both in-person and photographic); (c) disclosing evidence to the Commonwealth and/or State's Attorney's Office; (d) memorializing information about a criminal investigation in police documents, including but not limited to supplementary reports and General Progress Reports; (e) personal files or personal notes; and (f) maintaining the Investigative File, Investigative File Case Folder and any associated inventories, logs or control cards; (f) interactions with confidential informants; (g) promises of consideration to confidential informants, informants, or any other witnesses.

**RESPONSE:**   See response to Request No. 26 above.   Also the requested documents can be obtained from the KY DOCJT.

**REQUEST NO. 28:**    All physical evidence relating to any of the allegations in Plaintiffs' Complaint or Defendants' defenses thereto.

PL 1190

**RESPONSE:**  I have no physical evidence regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 29:**  Any and all Documents relating to: (a) any consideration provided to witnesses involved in the Mills murder investigation; (b) any re-investigation into the Mills murder after Plaintiffs chargers were dismissed; (c) any internal investigation relating to the Knox County Sheriff's Department; (d) any audits of the Department, and in particular, wrongful convictions, eyewitness identifications, corruption, interrogations, and consideration; (e) any Knox County officer that has been charged with corruption; (f) the Mills homicide.

**RESPONSE:**  I have no documents regarding the investigation of the murder of Katherine Mills.

**REQUEST NO. 30:**  All Documents relating to your total financial net worth, including your three most recent tax returns.

**RESPONSE:**  Objection, this information is not discoverable pre-judgment.  See answer to Interrogatory No. 8.

Jason E. Williams, Esq.

**REQUEST NO. 31:**  Any and all Documents relating to any psychological testing or screening of any kind performed on each Defendant Officer (a) before you were hired by the Department; and (b) during your employment with the Department.

**RESPONSE:**  I have no responsive documents regarding the other Defendants in this ligation.  The requested documents would need to be made to the specific law enforcement agency of the Defendant or the KY DOCJT.

9

**REQUEST NO. 32:**    All Documents that support a defense by you in this litigation that an award of punitive damages would cause a financial hardship.

**RESPONSE:**    This information may be supplemented if any when the Judge indicates a punitive damages instruction will be given.

**REQUEST NO. 33:**    Any and all Documents relating to any psychological testing or screening of any kind performed on each Defendant Officer (a) before you were hired by the Department; and (b) during your employment with the Department.

**RESPONSE:** See response to Request No. 31 above.

**REQUEST NO. 34:**    All physical evidence relating to any of the allegations in Plaintiffs' Complaint or Defendants' defenses thereto.

**RESPONSE:**  I have no responsive evidence.


Respectfully Submitted,


Jason E. Williams, Esq.
Williams Farmer & Towe Law Group
303 S. Main Street
P.O. Box 3199
London, Kentucky 40743
Telephone (606) 877-5291


By:

Jason E. Williams, Esq.
Counsel for Knox County, Kentucky; John Pickard and Derek Eubanks


10

PL 1192

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2017, a true and correct copy of the foregoing was served by mailing same, first class postage prepaid, to:

**ORGINIAL TO:**

Kept in file per Federal Rule, LR 26.1

**COPIES TO:**

Arthur Loevy, Esq.
Jon Loevy, Esq.
Michael Kanovitz, Esq.
Elliot Slosar, Esq.
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607

Christian Matthew Feltner, Esq.
Caldwell & Feltner, PLLC
PO Box 3073
London, Kentucky 40743

Licah H. Farah, Jr., Esq.
Nicole L. Antolic, Esq.
Ward, Hocker & Thornton
333 West Vine Street, Suite 1100
Lexington, Kentucky 40507

Morgan Todd Osterloh, Esq.
Charles David Cole, Esq.
Derrick T. Wright, Esq.
Lyndol Scott Miller, Esq.
Sturgill, Turner, Barker & Moloney, PLLC
333 W. Vine Street, Suite 1500
Lexington, Kentucky 40507

Matthew J. Johnson, Esq.
Shawna Virgin Kincer, Esq.
Cody Weber, Esq.
Kentucky State Police Legal Office
919 Versailles Road, Room 300
Frankfort, Kentucky 40601

Jason E. Williams, Esq.
Counsel for Knox County, Kentucky; John
Pickard and Derek Eubanks

11

PL 1193

Lisa Evans
606 337-1257

10-10-1058

Sticky Note From Mike Simpson
for his Alibi.



*CASH EXPRESS*
888-858-8888

Bill Mills, Williams
hiter company, Shirley &
Branden. Bob smith,
Derrick, Kelly Canfield
Veron Renner, Dickie
Brown

Loans                    Checks Cashed

Date 3/21/18
KENTUCKIANA Reporter JVT Exhibit # 6
Case 17·CV·84
Deponent John Pickard

10-10-1058 1.2

PL001309

PL 1194

# enterprise

589KYSPR10 PAGE 1 of 4

| | | |
|---|---|---|
| MO 8:00 AM - 5:00 PM | TU 8:00 AM - 5:00 PM | WE 8:00 AM - 5:00 PM |
| TH 8:00 AM - 5:00 PM | FR 8:00 AM - 5:00 PM | SA CLOSED |
| | SU CLOSED | |

OWNER OF VEHICLE: ENTERPRISE RENT-A-CAR COMPANY OF KY, LLC
BRANCH ADDRESS: 300 N 12TH ST STE 1, MIDDLESBORO, KY, 40965113 (606) 248-8866

891011

| RENTAL TYPE | RETAIL | SOURCE # NATRES## | TO # 000 | RENTAL AGREEMENT NO. | BOXFDY |
|---|---|---|---|---|---|

12/20/2010   2:06 PM
START CHARGES IF DIFFERENT

DAY = 24 HOUR PERIOD

RENTER
SIMPSON              MICHAEL

ORIGINAL VEHICLE

HOME PHONE (606) 622-1780   VEHICLE $15.67/HOUR
                                          $46.99/DAY

ADDRESS
1894 MOORES CR RD
CITY                    STATE   ZIP      OFFICE PHONE
FOURMILE               KY     40939    (606) 622-2084

| COLOR | LICENSE NO | DOB | EMPLOYER |
|---|---|---|---|
| BLUE | BSB7454 | 05/25/1965 | N/A |

| MODEL | DRIVERS LICENSE NO. | STATE | EXPIRES |
|---|---|---|---|
| BEET | YYYYY1159 | KY | 04/25/2014 |

| MILE-AGE | IN | 18576 |
| | OUT | 15744 |

BILL TO     COMPANY
ATTN                    PHONE        EXT.

NO CHARGE MILEAGE

DRIVEN

REFERENCE NUMBER:

No Gasoline Refunds

ADDITIONAL AUTHORIZED DRIVER(S) - EXCEPT AS REQUIRED BY LAW, NONE PERMITTED WITHOUT OWNER'S WRITTEN APPROVAL.
I REQUEST OWNER'S PERMISSION TO ALLOW NO OTHER DRIVERS PERMITTED
AGE          DRIVERS LICENSE NO            STATE         EXP

WHO IS UNDER MY CONTROL AND DIRECTION TO DRIVE VEHICLE FOR ME AND ON MY BEHALF. I AM RESPONSIBLE FOR THEIR ACTS WHILE THEY ARE DRIVING, AND FOR FULFILLING TERMS AND CONDITIONS OF THIS RENTAL AGREEMENT (AGREEMENT). USE OF VEHICLE BY AN UNAUTHORIZED DRIVER WILL AFFECT LIABILITY AND RIGHTS UNDER THIS AGREEMENT.

RENTER: X _Michael Simpson_

PERMISSION GRANTED TO OPERATE VEHICLE ONLY IN THE STATE OF RENTAL AND THE FOLLOWING STATE(S)

OPERATION IN ANY OTHER STATE OR COUNTRY WILL AFFECT YOUR LIABILITY AND RIGHTS UNDER THIS AGREEMENT.

**OPTIONAL PRODUCTS NOTICE:** WE OFFER FOR AN ADDITIONAL CHARGE THE FOLLOWING OPTIONAL PRODUCTS: DAMAGE WAIVER; PERSONAL ACCIDENT INSURANCE; ROADSIDE ASSISTANCE PROTECTION AND SUPPLEMENTAL LIABILITY PROTECTION. BEFORE DECIDING WHETHER TO PURCHASE ANY OF THESE OPTIONAL PRODUCTS, YOU MAY WISH TO DETERMINE WHETHER YOUR PERSONAL INSURANCE OR CREDIT CARD PROVIDES THE COVERAGE DURING THE RENTAL PERIOD. THE PURCHASE OF ANY OF THESE OPTIONAL PRODUCTS IS NOT REQUIRED TO RENT VEHICLE.

| RENTER DECLINES OPTIONAL DAMAGE WAIVER (DW) AND ASSUMES DAMAGE RESPONSIBILITY, PAR 2, PARAGRAPH 6 | RENTER ACCEPTS OPTIONAL DAMAGE WAIVER (DW) AT FEE SHOWN IN COLUMN TO RIGHT. SEE OPTIONAL PRODUCTS NOTICE TO LEFT AND PAGE 3, PARAGRAPH 16 DW IS NOT INSURANCE. RENTER: X | $14.99/DAY |
|---|---|---|
| RENTER: X   Declines DW | Accepts DW/MS | |
| RENTER DECLINES OPTIONAL PERSONAL ACCIDENT INSURANCE (PAI), SEE PAGE 3, PARAGRAPH 8 | RENTER ACCEPTS OPTIONAL PERSONAL ACCIDENT INSURANCE (PAI) AT FEE SHOWN IN COLUMN TO RIGHT. SEE OPTIONAL PRODUCTS NOTICE TO LEFT AND PAGE 3, PARAGRAPH 18   RENTER: X | $3.00/DAY |
| RENTER: X   Declines PAI | Accepts PAI/MS | |
| RENTER DECLINES OPTIONAL SUPPLEMENTAL LIABILITY PROTECTION (SLP) SEE PAGE 3, PARAGRAPH 7 | RENTER ACCEPTS OPTIONAL SUPPLEMENTAL LIABILITY PROTECTION (SLP) AT FEE SHOWN IN COLUMN TO RIGHT SEE OPTIONAL PRODUCTS NOTICE TO LEFT AND PAGE 3, PARAGRAPH 17.   RENTER: X | $10.99/DAY |
| RENTER: X   Declines SLP | Accepts SLP/MS | |

**ACKNOWLEDGMENT OF THE ENTIRE AGREEMENT, WHICH CONSISTS OF PAGES 1 THROUGH 4**
I HAVE READ AND AGREE TO THE TERMS AND CONDITIONS ON PAGES 1 THROUGH 4 OF THIS AGREEMENT AND BY MY SIGNATURE BELOW I AM THE 'RENTER' UNDER THIS AGREEMENT. BY SIGNING BELOW, I AM AUTHORIZING OWNER TO PROCESS CHARGES ON MY CREDIT CARD(S) AND/OR DEBIT CARD(S) FOR ADVANCE DEPOSITS, INCREMENTAL AUTHORIZATIONS OF DEPOSITS, AND CHARGES INCURRED, AS WELL AS PAYMENTS REFUSED BY A THIRD PARTY TO WHOM BILLING WAS DIRECTED. I CERTIFY THAT THE DRIVERS LICENSE(S) PRESENTED IS CURRENTLY VALID AND IS NOT SUSPENDED, EXPIRED, REVOKED, CANCELLED OR SURRENDERED.

FUEL CHARGE $3.46/GALLON
RAP $3.99/DAY   MS

REPLACEMENT VEHICLE

| RENTER: X _Michael Simpson_ | DATE 12/20/2010 |
| OWNER REP X | EMPL # E5695S |

KY U-DRIVE-IT TAX 6.00%
VLC RECOV $0.74/DAY

| COLOR | LICENSE NO |
|---|---|

| MODEL | ECAR# |
|---|---|

I WILL RETURN CAR BY:
| DATE | TIME | DEPOSIT(S): AMOUNT | PAID BY |
|---|---|---|---|
| 12/23/2010 | 2:00 PM | $400.62   CHECK/CASH | 12/20/2010 |

| MILE-AGE | IN | |
| | OUT | |

ADDITIONAL INFORMATION

DRIVEN

No Gasoline Refunds

KENTUCKIANA   Date 3/21/18   Reporter JVT   Exhibit # 7
Case 17-CV-84
Deponent John Pickard

| TOTAL CHARGES | |
|---|---|
| DEPOSITS | |
| REFUNDS | |
| **AMOUNT DUE** | |
| CLOSED BY | |

| PAID BY | CASH | CHECK | CHARGE |
|---|---|---|---|
| RECEIPT OF CASH REFUND | DATE | AMOUNT | RECEIVED BY |

OWNER IS AN AFFILIATE OF ENTERPRISE HOLDINGS INC. WHICH OWNS ALL RIGHTS TO ENTERPRISE NAMES AND MARKS.

© ENTERPRISE RENT-A-CAR COMPANY OF KY, LLC, 20

250.62   163.68

PL 015643

PL 1195

## Renter Information

Reservation Detail

### SIMPSON, MICHAEL

**Phone Numbers**

Home: (606) 622-1780

Work: (606) 622-2084    **Ext:**

Employer: N/A

Other Phone:

Type:

**Home Address**

1894 MOORES CR RD

FOURMILE KY 40939

USA

Email Address:

**Driver's License**

License Number: xxxxx3115

Expiration Date: 06/25/2014

State Issued: KY

Issuing Country: USA

Date of Birth: 05/25/1966

### Cash Qualification

**Residence**

How long at the current address?   5 Years

   0 Months

Ownership:   own

**Employment Verification**

| Employer: | Position: | How long: | 0 Years |
| N/A | | | 0 Months |

Supervisor Name:    Spoke to Whom:

### Rental Information

Reasons for renting:

   Car in Shop    Rented Previously:

   Weekend    No

   Vacation    if so, when?

   x Other

Do you own a car?   Yes

**Reference**

| First Name | Last Name | Phone Number | Relationship |
| --- | --- | --- | --- |
| 1: ALAN | HELTON | 6068222084 | COUSIN |
| 2: RANDY | MERDIE | 6065420311 | FRIEND |

PL 015644

PL 1196

3: SUSIE          HELTON              6066220318       AUNT

**Verification**

| | Verified By: | Verified On: |
|---|---|---|
| Renter Information: | COREY REEVES | 12/20/2010 |
| Utility Bills: | COREY REEVES | 12/20/2010 |
| Credit Check: | | |

**Dates/Units Rented**

| | | | |
|---|---|---|---|
| Pickup Date/Time: | 12/20/2010 2:06 PM | Return Date/Time: | 12/24/2010 2:00 PM |
| Pickup Method: | PICKUP | Return Method: | BRANCH |
| Pickup Comment: | | Return Comment: | L/M 2 CONFIRM RETURN |
| | | Return Location Comment: | 5888 |
| Driving Directions: | | | |
| Ref Source: | NATRES | Ref Source Name: | NATRES** |
| Rate Source: | RETAIL | Rate Source Name: | STANDARD |
| Billing Cycle: | 24 Hour | Rate Plan: | DO NOT USE |
| Prepaid Fuel: | N | Rental Type: | RETAIL |
| Car Class Reserved: | ECAR | Airport Rental? | N |

**Special Rates and Mileage**

| | | |
|---|---|---|
| Special Rate Start Date: | | Preferences: |
| Special Rate End Date: | | Out of State? | N |

| Unit 1: | Start/End Dates: | 12/20/2010 2:06 PM  -  12/24/2010 2:00 PM | |
|---|---|---|---|
| Unit Num: 7DQD06 | | Out | In |
| Lic Num: 826BOA | | Mileage: 15,744 | Mileage: 18,336 |
| Vehicle: 2010 VOLK BEET | Series: 2DR | Fuel: 1/8 | Fuel: 1/4 |
| VIN: 3VWPG3AG1AM016193 | | | |
| Grp Car Class: SXAR | Corp Car Class: SXAR | | |

**Rates**

PL 015645

PL 1197

| Rate Segment 1 | | | | | Start/End Dates: | 12/20/2010 2:06 PM - 12/24/2010 2:00 PM |

| | Daily | Weekly | Monthly | Hourly |
|---|---|---|---|---|
| Rate | $46.99 | | | $15.67 |
| Mileage | | | | |

Car Class Charged: SXAR
Mileage Type: NO CHARGE
Charge:
Cap:

## Charges

| Charge Description | Date | Quantity | Per | Rate | Total |
|---|---|---|---|---|---|
| TIME & DISTANCE | 12/20 - 12/24 | 4 | DAY | $46.99 | $187.96 |
| DW | 12/20 - 12/24 | 4 | DAY | $14.99 | $59.96 |
| PAI | 12/20 - 12/24 | 4 | DAY | $3.00 | $12.00 |
| SLP | 12/20 - 12/24 | 4 | DAY | $10.99 | $43.96 |
| ROADSIDE ASSISTANCE PROTECTION | 12/20 - 12/24 | 4 | DAY | $3.99 | $15.96 |
| KY U-DRIVE-IT TAX | 12/20 - 12/24 | | | 6.0% | $11.28 |
| VEHICLE LICENSE COST RECOVERY | 12/20 - 12/24 | 4 | DAY | $0.76 | * $3.04 |
| | | | | Total Charges | $334.16 |

| Bill To | | | | | |
|---|---|---|---|---|---|
| | Charge Description | | Date | | Total |
| | | | | Subtotal | |

| Renter | | | | | |
|---|---|---|---|---|---|
| Charge Description | | Date | Quantity | Per | Rate | Total |
| | | | | Deposits | |

## Payments

| Location | Date/Time | Pmt Mthd | Amount | Trans Type | Employee Name | Card | Auth ID |
|---|---|---|---|---|---|---|---|
| MIDDLESBORO 5888 | 12/20/2010 2:13.58 PM | CASH | $400.62 | PAYMENT | COREY REEVES | | |
| MIDDLESBORO 5888 | 12/27/2010 9:26.00 AM | CHECK | $66.46 | REFUND | COREY REEVES | | |

## Callbacks/Notes

| Date/Time | Note | Status | Type | Created By | Reminder |
|---|---|---|---|---|---|
| 12/20/2010 2:14 PM | RENTER UTILITY BILLS VERIFIED | CALLBACK | SYSTEM | COREY REEVES | |
| 12/20/2010 2:14 PM | RENTER INFORMATION VERIFIED | CALLBACK | SYSTEM | COREY REEVES | |
| 12/20/2010 2:14 PM | TICKET CREATED. | CALLBACK | SYSTEM | COREY REEVES | |
| 12/23/2010 12:51 PM | CALLED CUST & L/M ON V/M 2 CONFIRM RETURN TIME OF OUR CAR FOR TODAY. | CALLBACK | MANUAL | LOYD CUSHMAN | |
| 12/23/2010 12:52 PM | RETURN METHOD [BLANK] WAS CHANGED TO BRANCH. | CALLBACK | SYSTEM | LOYD CUSHMAN | |
| 12/23/2010 12:52 PM | COMMENT [BLANK] WAS CHANGED TO L/M 2 CONFIRM RETURN. | CALLBACK | SYSTEM | LOYD CUSHMAN | |

| Date/Time | Note | Status | Type | Created By | Reminder |
|---|---|---|---|---|---|
| 12/23/2010 12:55 PM | CUST CALLED AND EXT RENTAL THRU TOMORROW 12-24-10 @ 2PM. HE DOES NOT HAVE ANYWAY TO GET TO ANY OF OUR BRANCHES TO PAY ADDL DAY, SO I TOLD HIM WE WOULD MAKE A 1-TIME EXCEPTION AND TAKE THE ADDL CHARGES FROM HIS DEPOSIT AND REFUND $66.44 TO HIM BY CHECK. | CALLBACK | MANUAL | LOYD CUSHMAN | |
| 12/23/2010 12:56 PM | RETURN DATE 12/23/2010 WAS CHANGED TO 12/24/2010. | CALLBACK | SYSTEM | LOYD CUSHMAN | |
| 12/27/2010 9:27 AM | TICKET WAS CLOSED. | CALLBACK | SYSTEM | COREY REEVES | |

Go To Customer Receipt

PL 015647

PL 1199

# enterprise

589KYSPR10 PAGE 1 of 4

| | MO 8:00 AM – 5:00 PM | TU 8:00 AM – 5:00 PM | WE 8:00 AM – 5:00 PM |
|---|---|---|---|
| | TH 8:00 AM – 5:00 PM | FR 8:00 AM – 5:00 PM | SA CLOSED |
| | | SU CLOSED | |

**OWNER OF VEHICLE:** ENTERPRISE RENT-A-CAR COMPANY OF KY, LLC
**BRANCH ADDRESS:** 300 N 12TH ST STE 1, MIDDLESBORO, KY, 40965113 (606) 248-8B66

891011

RENTAL AGREEMENT NO.

RENTAL TYPE RETAIL   SOURCE# NATRES##   ID# 000   BOXEDY

RENTER: SIMPSON   MICHAEL
12/20/2010   2:04 PM
START CHARGES IF DIFFERENT

DAY = 24 HOUR PERIOD

ADDRESS 1894 MOORES CR RD   HOME PHONE (606) 622-1780   VEHICLE $15.62/HOUR
CITY FOURMILE   STATE KY   ZIP 40939   OFFICE PHONE (606) 622-2084   $46.99/DAY
DOB 05/25/1966   EMPLOYER N/A

## ORIGINAL VEHICLE

COLOR BLUE   LICENSE NO 898T456
MODEL ECARB
FLEET 20000A
MILE/AGE IN 18276 OUT 15794
DRIVEN 195

DRIVERS LICENSE NO. YXXXL1150   STATE KY   EXPIRES 06/25/2014

BILL TO   COMPANY

NO CHARGE MILEAGE

**No Gasoline Refunds**
DAMAGE / NO DAMAGE

RENTER: X Michael Simpson

**OPTIONAL PRODUCTS NOTICE:** ... $14.99/DAY Accepts DW/MS
$3.00/DAY Accepts PAI/MS
$10.99/DAY Accepts SLP/MS

RENTER: X Michael Simpson   DATE 12/20/2010
OWNER REP X   EMPL. E5695S

FUEL CHARGE $3.46/GALLON RAP $3.99/DAY M.S

## REPLACEMENT VEHICLE

I WILL RETURN CAR BY: DATE 12/23/2010 TIME 2:00 PM
DEPOSIT(S) AMOUNT $400.62 PAID BY CHECK/CASH 12/20/2010

KY U-DRIVE-IT TAX 6.00%
VLC RECOV $0.76/DAY

TOTAL CHARGES
DEPOSITS
REFUNDS
AMOUNT DUE

250.62   163.68

PL 015648
PL 1200







Date 3/21/18
KENTUCKIANA Reporter JVT Exhibit # 8
Case 17·CV·84
Deponent John Pickard

PL006455

PL 1201

From:    12/30/2014 00:02    #639 P.006/022

# DRAFT  KYIBRS REPORT
## COMMONWEALTH OF KENTUCKY

KSP RECORDS

| AGENCY ORI/NAME | 0610000 KNOX COUNTY SHERIFF DEPARTMENT | | INCIDENT NUMBER | KY 1261DE1000 | |
|---|---|---|---|---|---|

**ADMINISTRATIVE**

| INCIDENT DATE/TIME | EXACT/ESTIMATE | REPORT DATE | RECEIVED | DISPATCHED | ARRIVED | CLEARED |
|---|---|---|---|---|---|---|
| 02/11/2012 19:22 TO 02/12/2012 07:24 | ESTIMATE | 02/11/2012 | 19:22 | 01:26 | 01:26 | 07:24 |

REPORTED BY: UNKNOWN, UNKNOWN

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | HOW REPORTED |
|---|---|---|
| | | PHONE |

ADDRESS:

| CITY: | STATE: KY | ZIP CODE: | PHONE NUMBER: |
|---|---|---|---|

| EXACT LOCATION OF OFFENSE | FULL MOON CT | | | | SECTOR NO: |
|---|---|---|---|---|---|
| | ADDRESS: 28 FULL MOON CT | | | | |
| | CITY: BARBOURVILLE | | | | |
| | COUNTY: KNOX | STATE: KY | ZIP CODE: 40906 | | |

| | | LATITUDE | 36 DEG | 52.192 MIN | LONGITUDE | 83 DEG | 50.722 MIN |
|---|---|---|---|---|---|---|---|

**OFFENSE DATA**

| SEQUENCE # | 1 OF 1 | LOCATION TYPE: RESIDENCE/HOME | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|---|

OFFENSE DESCRIPTION: MANUFACTURING METHAMPHETAMINE, 1ST OFF

| OFFENSE CODE: 42299 | ASCF CODE: 0 | KRS CODE: 218A.1432 | CLASS: B | DEGREE: F | COUNTS: 1 | I-CULTIVATING/MANUFACTURING/PUB |
|---|---|---|---|---|---|---|

| BIAS MOTIVATION: NONE (NO BIAS) | METHOD ENTRY: | NUMBER PREMISES: |
|---|---|---|

| SCHOOL NAME: | SCHOOL TYPE: | CAMPUS? |
|---|---|---|

OFFENDER SUSPECTED OF USING: DRUGS/NARCOTICS

| SEQUENCE # | OF | LOCATION TYPE: | COURT ORDER TYPE: |
|---|---|---|---|

OFFENSE DESCRIPTION:

| OFFENSE CODE: | ASCF CODE: | KRS CODE: | CLASS: | DEGREE: | COUNTS: |
|---|---|---|---|---|---|

| BIAS MOTIVATION: | METHOD ENTRY: | NUMBER PREMISES: |
|---|---|---|

| SCHOOL NAME: | SCHOOL TYPE: | CAMPUS? |
|---|---|---|

OFFENDER SUSPECTED OF USING: | COURT ORDER TYPE:

| SEQUENCE # | OF | LOCATION TYPE: | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|---|

OFFENSE DESCRIPTION:

| OFFENSE CODE: | ASCF CODE: | KRS CODE: | CLASS: | DEGREE: | COUNTS: |
|---|---|---|---|---|---|

| BIAS MOTIVATION: | METHOD ENTRY: | NUMBER PREMISES: |
|---|---|---|

| SCHOOL NAME: | SCHOOL TYPE: | CAMPUS? |
|---|---|---|

OFFENDER SUSPECTED OF USING: | COURT ORDER TYPE:

**PROPERTY DATA**

**DRUGS**

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DATE RECOVERED |
|---|---|---|---|---|---|---|
| 1 | | NONE | | | | |

| DRUG TYPE | Methamphetamine |
|---|---|

DRUG TYPE OTHER

| QUANTITY/MEASUREMENT | | OWNER Offender 1 |
|---|---|---|

**GENERAL**

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DATE RECOVERED |
|---|---|---|---|---|---|---|

PROPERTY DESCRIPTION

| OWNER APPLIED NUMBER | | SERIAL NUMBER | |
|---|---|---|---|

| MAKE | | MODEL | OWNER |
|---|---|---|---|

**STATUS**

| TOTAL STOLEN VALUE: | $0.00 | TOTAL RECOVERED VALUE: | $0.00 | TOTAL VEHICLES STOLEN: | 0 | TOTAL VEHICLES RECOVERED: | 0 |
|---|---|---|---|---|---|---|---|

| IDENT STATUS | CLOSED DATE | CLEARANCE TYPE | CLEARED EXCEPTIONALLY | EX. CLEARANCE DATE | UCR REPORTING FOR OTHER AGENCY |
|---|---|---|---|---|---|
| CLOSED | 12/22/2014 | CLEARED BY ARREST | | | YES ☐ |

| SUBMITTING OFFICER | INVESTIGATING OFFICER | UNIT/BADGE # | REVIEWED BY | TIME SPENT |
|---|---|---|---|---|
| D EUBANKS | D EUBANKS | KCSO-10 | | 8 hrs |

Page 1 of 5

KENTUCKIANA  Date 3/21/18  Reporter JVT  Exhibit # 9
Case 11·CV·84
Deponent John Pickard

Agency ORI: 0610000    Badge #: KCSO-10

PL 025647

PL 1202

From:                                              12/30/2014 00:02   #639 P.007/022

## KYIBRS REPORT
### COMMONWEALTH OF KENTUCKY

**DRAFT**                                          KSP RECORDS

### VICTIM DATA

| VICTIM SEQUENCE | VICTIM NAME | PHONE |
|---|---|---|
| 1 of 1 | COMMONWEALTH OF KENTUCKY | |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | |
|---|---|---|

| Address Unknown ☐ ADDRESS: | | VICTIM TYPE: SOCIETY |
|---|---|---|

| CITY: | STATE: | ZIP CODE: | KY RESIDENT: |
|---|---|---|---|

| DATE OF BIRTH | SSN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|

| GENDER | RACE | ETHNIC ORIGIN | PEACE OFFICER? |
|---|---|---|---|
| | | | YES ☐ |

| NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | INJURY TYPE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| VICTIM OF OFFENSE(S) | AGG ASSAULT/HOMICIDE CIRC | ADDTL JUSTIFIABLE HOMICIDE CIRC |
|---|---|---|
| 42299 | | |

| LEOKA ASSIGNMENT | LEOKA ACTIVITY |
|---|---|
| | |

### SUSPECT/ARRESTEE DATA

| SUSPECT SEQ # | NAME: TAYLOR, JONATHON | ARRESTED? | ARREST DATE |
|---|---|---|---|
| 1 of 5 | ALIAS: | YES ☑ | 02/12/2012 |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | |
|---|---|---|

| ADDRESS 61 MEADOWS TRAIL | | DATE OF BIRTH: | PHONE: | KY RESIDENT: |
|---|---|---|---|---|
| CITY: BARBOURVILLE | STATE: KY | ZIP CODE: 40906 | 11/22/1987 | | RESIDENT |

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|---|---|
| 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 | MALE | WHITE | NOT HISPANIC | 6' 04" | 215 lbs | HAZEL | BROWN |

| ARRESTEE SEQ # | MULTIPLE ARREST IND. | ARREST TYPE | | RELATED CITATION NUMBERS | | |
|---|---|---|---|---|---|---|
| 1 of 5 | NOT APPLICABLE | WARRANTLESS ARREST | 1 KB56099 | 4 | | 6 |
| | ARRESTEE ARMED WITH | | 2 | 5 | | 7 |
| UNARMED | | | 3 | 6 | | 9 |

| SUSPECT SEQ # | NAME: GARLAND, JOSHUA J | ARRESTED? | ARREST DATE |
|---|---|---|---|
| 2 of 5 | ALIAS: | YES ☑ | 02/12/2012 |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | |
|---|---|---|

| ADDRESS 43 FULL MOON COURT | | DATE OF BIRTH: | PHONE: | KY RESIDENT: |
|---|---|---|---|---|
| CITY: BARBOURVILLE | STATE: KY | ZIP CODE: 40906 | 07/15/1984 | | RESIDENT |

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|---|---|
| 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 | MALE | WHITE | NOT HISPANIC | 5' 10" | 190 lbs | BLUE | BLUE |

| ARRESTEE SEQ # | MULTIPLE ARREST IND. | ARREST TYPE | | RELATED CITATION NUMBERS | | |
|---|---|---|---|---|---|---|
| 2 of 5 | NOT APPLICABLE | WARRANTLESS ARREST | 1 K856084 | 4 | | 7 |
| | ARRESTEE ARMED WITH | | 2 | 5 | | 8 |
| UNARMED | | | 3 | 6 | | 9 |

### WITNESS DATA

| WITNESS SEQUENCE | WITNESS NAME | PHONE |
|---|---|---|
| of | | |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | |
|---|---|---|

| ADDRESS: | | DATE OF BIRTH |
|---|---|---|

| CITY: | STATE: | ZIP CODE: | SSN: |
|---|---|---|---|

PL_025648

PL 1203

From:                                      12/30/2014 00:03   #639 P.008/022

## KYIBRS REPORT: OFFENDER SUPPLEMENT
### COMMONWEALTH OF KENTUCKY

**DRAFT**

KSP RECORDS

| SUSPECT SEQ. # | NAME: MILLS, KAYLA | | | | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|---|---|---|
| 3 of 5 | ALIAS: | | | | | YES ☑ | 02/12/2012 |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | | | | |
|---|---|---|---|---|---|

| ADDRESS 2795 KY HWY 223 | | | | | | |
|---|---|---|---|---|---|---|
| CITY: FLAT LICK | | STATE: KY | ZIP CODE: 40935 | DATE OF BIRTH: 09/27/1991 | PHONE: | KY RESIDENT: |

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | RESIDENT |
|---|---|---|---|---|---|---|---|
| | | | | | | | HAIR COLOR |
| 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 | FEMALE | WHITE | NOT HISPANIC | 5' 05" | 130 lbs | BLUE | BLOND OR STRAWBERRY |

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | | RELATED CITATION NUMBERS | | | |
|---|---|---|---|---|---|---|---|
| 3 of 5 | NOT APPLICABLE | WARRANTLESS ARREST | 1 | K856098 | 4 | | 8 |
| ARRESTEE ARMED WITH | | | 2 | | 5 | | 7 |
| UNARMED | | | 3 | | 6 | | 9 |

| SUSPECT SEQ. # | NAME: BAILEY, MICHAEL C | | | | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|---|---|---|
| 4 of 5 | ALIAS: | | | | | YES ☑ | 12/02/2012 |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | | | | |
|---|---|---|---|---|---|

| ADDRESS 1403 CLIFF WHITE RD | | | | | | |
|---|---|---|---|---|---|---|
| CITY: COLUMBIA | | STATE: OH | ZIP CODE: 38401 | DATE OF BIRTH: 04/03/1989 | PHONE: | KY RESIDENT: |

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | NON-RESIDENT |
|---|---|---|---|---|---|---|---|
| | | | | | | | HAIR COLOR |
| 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 | MALE | WHITE | NOT HISPANIC | 5' 08" | 180 lbs | BROWN | BLACK |

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | | RELATED CITATION NUMBERS | | | |
|---|---|---|---|---|---|---|---|
| 4 of 5 | NOT APPLICABLE | WARRANTLESS ARREST | 1 | K856100 | 4 | | 7 |
| ARRESTEE ARMED WITH | | | 2 | | 5 | | 8 |
| UNARMED | | | 3 | | 6 | | 9 |

| SUSPECT SEQ. # | NAME: HELTON, KIM | | | | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|---|---|---|
| 5 of 5 | ALIAS: | | | | | YES ☑ | 02/12/2012 |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | | | | |
|---|---|---|---|---|---|

| ADDRESS 109 LAY ST | | | | | | |
|---|---|---|---|---|---|---|
| CITY: BARBOURVILLE | | STATE: KY | ZIP CODE: 40906 | DATE OF BIRTH: 09/21/1985 | PHONE: | KY RESIDENT: |

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | RESIDENT |
|---|---|---|---|---|---|---|---|
| | | | | | | | HAIR COLOR |
| 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 | FEMALE | WHITE | NOT HISPANIC | 5' 05" | 190 lbs | BLUE | BLACK |

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | | RELATED CITATION NUMBERS | | | |
|---|---|---|---|---|---|---|---|
| 5 of 5 | NOT APPLICABLE | WARRANTLESS ARREST | 1 | K856097 | 4 | | 8 |
| ARRESTEE ARMED WITH | | | 2 | | 5 | | 7 |
| UNARMED | | | 3 | | 6 | | 9 |

| SUSPECT SEQ. # | NAME: | | | | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|---|---|---|
| of | ALIAS: | | | | | YES ☐ | |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | | | | |
|---|---|---|---|---|---|

| ADDRESS | | | | | | |
|---|---|---|---|---|---|---|
| CITY: | | STATE: | ZIP CODE: | DATE OF BIRTH: | PHONE: | KY RESIDENT: |

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | | RELATED CITATION NUMBERS | | | |
|---|---|---|---|---|---|---|---|
| of | | | 1 | | 4 | | 7 |
| ARRESTEE ARMED WITH | | | 2 | | 5 | | 8 |
| | | | 3 | | 6 | | 9 |

*SUSPECT/ARRESTEE DATA* (vertical left margin)

PL 025649

PL 1204

From:                                                          12/30/2014 00:03     #639 P.009/022

## KYIBRS REPORT: UOR2 SUPPLEMENT



**DRAFT**

**COMMONWEALTH OF KENTUCKY**

KSP RECORDS

*SYNOPSIS:*

*MODUS OPERANDI:*

*DATE & TIME OF OCCURRENCE:*
02-11-2012 1922hrs to 02-12-2012 0724hrs

*ACCUSED:*
See Attached Uniform Citations
K856099, K856084, K856098, K856100 and K856097

*SUSPECTS:*

*STOLEN PROPERTY:*

*OTHER PROPERTY:*

*EVIDENCE & HOW MARKED:*
SEE KSP-41

*EVIDENCE DISPOSITION:*

*INVESTIGATION:*
On 02-12-2012 @ approximately 0126hrs Deputy Derek R Eubanks was dispatched to Full Moon Court in reference to a call received on 02-11-2012 @ 1922hrs from unknown caller reporting smelling meth cooking.
Upon officers arrival BPD officer Jake Knuckles located a one step meth lab and generator in a grill on the porch of apartment 28 and could hear and see silhouettes of subjects moving in the residence. Upon entry into the apartment Kayla Mills was located in the living room next to the back door that lead to the patio. Kim Helton, Joshua Garland and Michael Bailey was located in bedrooms upstairs and Jonathan Taylor was located in the attic. All subjects were arrested and charged with manufacturing methamphetamine. Officers present on scene: Sheriff John D Pickard, Chief Deputy Derek R Eubanks, BPD officers Jake Knukles, Josh Lawson, Clay Helton, KSP Trooper Dallas B Eubanks. KSP DESI Clean up Crew: Tom Underwood, Randy Hunter also attached is clean up Report # 33-12-0114. All arrestees refused to give any statements.

BPD Officer Jake Knuckles ran a meth check on a arrestees and advised his findings to Deputy Eubanks
Kim Helton 2 Purchases last one 10-2-2011
Kayla Mills 3 purchases last one 12-13-2011
Michael Bailey None
Jonathan Taylor None
Joshua Garland 6 purchases last one 01-28-2012

See KSP-41 of items seized from subjects and at scene

Deputy Eubanks contacted County Attorney Charley G Dixon in reference to the case, Mr Dixon advised Deputy Eubanks with the location of the meth lab being on the outside at an apartment complex and no items seized on the subjects or in the apartment that is used to manufacture meth that it would be a tough case to prosecute.

PL 025650
PL 1205

From:

12/30/2014 00:03    #639 P.010/022

## KYIBRS REPORT: UOR2 SUPPLEMENT
### COMMONWEALTH OF KENTUCKY

**DRAFT**

KSP RECORDS

Deputy Eubanks contacted Commonwealth Attorney Jackie Steele in Nov 2014 and discussed the case for presentation to the grand jury and was advised not to present prosecution denied.

*STATUS OF CASE:*
CLOSED

*ATTACHMENT*

PL 025651

PL 1206

From:

12/30/2014 00:03   #639 P.011/022

## CONTINUATION PAGE/SUPPLEMENTARY
## UNIFORM OFFENSE REPORT

ORI KYKSP33

Case Number 33-12-0114

Title of Investigation: Manufacturing Methamphetamine

Violation Code 42299

| | |
|---|---|
| **SYNOPSIS:** | On February 12, 2012 at approximately 0615 hrs Det. Randy Hunter and I arrived at 43 Full Moon Court, Barbourville, Ky 40906. We were called there to assist the Knox County Sheriff's office with the processing and disposal of items used in the production of Methamphetamine. |
| **MODUS OPERANDI:** | Manufacturing Methamphetamine. |
| **DATE & TIME OF OCCURRENCE:** | February 12, 2012, approximately 0230 hrs. |
| **ACCUSED:** | NA |
| **SUSPECTS:** | NA |
| **WITNESSES:** | 1) Det. Randy Hunter, KSP DE/SI East, 2) Chief Deputy Derek Eubanks, KCSO, 3) Knox County Sheriff John Pickard, 4) Officer Jacob Knuckles, BPD. Deputy Eubanks advised us Trooper Dallas Eubanks, KSP Post 10, Officer Clay Helton BPD, and Officer Josh Lawson BPD, were also on scene prior to our arrival and had left. |
| **STOLEN PROPERTY:** | NA |
| **OTHER PROPERTY:** | NA |
| **EVIDENCE AND HOW MARKED:** | NA |
| **EVIDENCE DISPOSITION:** | NA |
| **INVESTIGATION:** | On February 12, 2012 at approximately 0615 hrs Det. Randy Hunter and I arrived at 43 Full Moon Court, Barbourville, Ky 40906. We were called there to assist the Knox County Sheriff's office with the processing and disposal of items used in the production of Methamphetamine. |
| | Upon our arrival at the residence we spoke with Chief Deputy Sheriff Derek Eubanks. Chief Deputy Eubanks then took us to the rear of the apartment, onto the rear deck, which was accessed through the back door of the apartment. He then showed us a gas |

| Det. Tom Underwood | 504 | 8 hrs | 02-12-12 | |
|---|---|---|---|---|
| Officer Making Report | Badge No. | Time Spent | Date | Reviewed By |

33-12-0114

PL 025652
PL 1207

## CONTINUATION PAGE/SUPPLEMENTARY UNIFORM OFFENSE REPORT

ORI <u>KYKSP33</u>

Case Number <u>33-12-0114</u>

Title of Investigation: <u>Manufacturing Methamphetamine</u>

Violation Code <u>42299</u>

grill that upon opening the door had two twenty ounce bottles inside.

One of the bottles was a 20 ounce clear plastic cola bottle with a green lid, the bottle was approximately ½ full of an unknown clear liquid with a white and gray mixture solid in it. This item was removed from the grill and a sample was taken, Ph 10, the sample (#1) was provided to Chief Deputy Eubanks on scene. The remaining liquid and solid were removed and packaged as hazardous waste, see KSP 41.

The second bottle was a green 20 ounce plastic cola bottle with a white lid, the lid had a hole drilled in it and plastic tubing was coming out of the lid approximately 6" to 8". The bottle was approximately ¼ full of an unknown white solid. The bottle and contents were removed and packaged as hazardous waste, see KSP 41.

Photographs were taken of all items. A copy of this case, and CD-R containing photographs was mailed to Chief Deputy Eubanks at 234 Court Square, Barbourville, Ky 40906 on 2-21-12.

STATUS OF CASE:     Open

ATTACHMENTS:       1) CD-R containing photographs.

| <u>Det. Tom Underwood</u> | <u>504</u> | <u>8 hrs</u> | <u>02-12-12</u> | |
|---|---|---|---|---|
| Officer Making Report | Badge No. | Time Spent | Date | Reviewed By |

33-12-0114

PL 1208
PL 025653

AOC-315
Rev. 9-02
Page 1 of 2

Doc. Code: CWS
03/14/2012 11:52 am
Ver. 1.01

Commonwealth of Kentucky
Court of Justice   www.kycourts.net
RCr 2.06; RCr 4

CRIMINAL COMPLAINT AND
☑ ARREST WARRANT OR
☐ SUMMONS

Case No. _____
Court _____ District
County ___Knox___

**COMMONWEALTH OF KENTUCKY**                                      **PLAINTIFF**
VS.

**DEFENDANT**

*Name:*   KAYLA                              MILLS

*Address:*   2795 KY 223

FLAT LICK              Kentucky          40935
*Telephone No.*

| Sex | Race | Birthdate | Hair | Eyes | Height | Weight | Operator License No. | Licensing State |
|-----|------|-----------|------|------|--------|--------|----------------------|-----------------|
| F | W | | | | | | SS# 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 | |

☐ Armed or Dangerous    ☐ Felony    ☐ Misdemeanor

**CRIMINAL COMPLAINT**

Affiant says that on __12-20__ , 2 _010_ , in _____ County, Kentucky, Defendant unlawfully:

COMMITTED THE OFFENSE OF MURDER  AND ROBBERY 1ST BY TAKING THE LIFE OF KATHERINE MILLS AND BY TAKING APPROXIMATELY $12,280.00 FROM HER RESIDENCE

KENTUCKIANA   Date 3/21/18
Reporter JYT   Exhibit # 10
Case 17-CV-84
Deponent John Pickard

Affiant's Name (*type or print*):  DET. JASON YORK, KSP
Affiant's Address:
_____POST # 10_____
_____HARLAN_____Kentucky_____40834____
Affiant's Phone No.: _____

Date: __3-14__ , 20 _12_ .        Det. Jason York  41856
                                      **Affiant's Signature**

Subscribed and sworn to before me on ___3-14___ , 2012 . If a Notary, my commission expires:
_____, 2 ____     Donna K Smith  AP
                                   Name and Title        KSP 000362

PL 1209

AOC-315
Rev. 9-02
Page 2 of 2

Defendant's Name: MILLS

Case No.:

## ✓ WARRANT OF ARREST

**TO ALL PEACE OFFICERS IN THE COMMONWEALTH OF KENTUCKY:**

You are commanded to arrest Defendant and bring him/her forthwith before the judge of the District Court of Knox _____ County, Kentucky, *(or, if he/she be absent or unable to act, before the nearest available magistrate)* to answer a complaint made by DET. JASON YORK, KSP _____, charging him/her with the offense(s) of MURDER AND ROBBERY 1ST. DEGREE _____

_____

Defendant may give bail in the amount of $ one million _ secured by cash _____

Bail in accordance with the Uniform Schedule of Bail is denied because:

☐ The amount stated therein is not commensurate with the nature of the offense charged; ☐ Defendant has heretofore failed to appear pursuant to citations, evidencing that release under the uniform schedule will inadequately guarantee his /her appearance; ☐ Other _____

_____

## ☐ SUMMONS

**TO THE DEFENDANT:**

You are summonsed to appear before the judge of the District Court of Knox _____ County, Kentucky, on _____, 2____, at _____ ☐ a.m. ☐ p.m at *(location)* _____

_____

to answer charge(s) of _____

_____

_____ in response to a complaint filed by

DET. JASON YORK, KSP

**Failure to appear at the stated time and place, will subject you to contempt of Court.**

ISSUED AT _____, Knox County, Kentucky.

Date: 3-14 , 2012.                                    Judge

_____ Knox Circuit _____            Court

### SHERIFF'S RETURN

[ ]   Served on Defendant named herein this _____ day of _____, 2____.

[ ]   Not served because: _____

_____

_____
Officer

KSP 000364

PL 1210



## CRIME SUPPLEMENT
### COMMONWEALTH OF KENTUCKY

**KSP RECORDS**

| | | | |
|---|---|---|---|
| CASE/INCIDENT NUMBER  KY 10-10-1058 | | REPORT DATE | 3/16/2012 |
| REPORTING AGENCY ORI/NAME   KSP1000 KY STATE POLICE, POST 10 | | | |
| PRIMARY INVESTIGATING AGENCY ORI/NAME   KSP1000 KY STATE POLICE, POST 10 | | | |
| REPORTING OFFICER NAME  J YORK | | REPORTING OFFICER UNIT BADGE ID   0856 | |
| PRIMARY OFFICER UNIT BADGE ID   0856 | | | |
| REVIEWED BY | | | |

| WITNESS SEQUENCE | WITNESS NAME | | PHONE |
|---|---|---|---|
| of | | | |
| ADDRESS | | | DATE OF BIRTH |
| CITY | STATE | ZIP CODE | SSN | |
| WITNESS SEQUENCE | WITNESS NAME | | PHONE |
| of | | | |
| ADDRESS | | | DATE OF BIRTH |
| CITY | STATE | ZIP CODE | SSN | |

### NARRATIVE

On 03-16-12 at approximately 1449 hrs Kayla Mills gave me a recorded statement at the Barbourville Police Department.  Present at the interview was Kayla Mills attorney Ken Boggs, Cricket Mills, and Scott Mills.  Kayla Mills gave a date of birth of 09-27-1991 and phone number of 606-542-0779.  This is a summary of statement see CD for entire statement

Kayla Mills stated that she dated Jonathan Taylor, I asked Kayla to tell me about all the times Jonathan talked about killing Katherine Mills.  She stated she knew he had it in him to kill somebody and that was the reason she broke up with him.  Kayla stated she was afraid Jonathan Taylor was going to kill her.  Kayla Mills stated Jonathan Taylor confessed to killing Katherine Mills a lot to her.  She stated he would say I done left one lying up on the creek and I don't care to leave another one.  Kayla stated Jonathan never went in details on how he killed her but that he felt guilty because of it.  Kayla stated that Jonathan brought up Amanda Hoskins and William Lester and the money that was taken from Katherine Mills.

Kayla went on to describe how William Lester told Jonathan that Law Enforcement was going around to all the drug dealers and asking if they had spent a lot of money.  Kayla stated William was really worried about the police asking questions.

This unit will supplement case when more information is obtained.

Date 3/21/18
KENTUCKIANA Reporter JVT  Exhibit # 11
Case 17-CV-84
Deponent John Pickard

KSP 000286

COMMONWEALTH OF KENTUCKY
27TH JUDICIAL CIRCUIT
KNOX CIRCUIT COURT
INDICTMENT NUMBER: **12-CR-070-2**

COMMONWEALTH OF
KENTUCKY

| | PLAINTIFF |
|---|---|

VS.

STATEMENT OF:
Kayla Mills

DATE: 03-16-12

| JONATHON TAYLOR | |
|---|---|
| AMANDA HOSKINS | DEFENDANTS |
| WILLIAM LESTER | |

TRANSCRIBED BY:

Lisa Castel
LC Transcription Service
411 Valley Brook Drive
Milford, OH  45150
513-833-1705



KENTUCKIANA Reporter _JVT_ Exhibit # _12_
Date _3/21/18_
Case _17-CV-84_
Deponent _John Pickard_

PL 015867

PL 1212

HOSKINS/KNOX 12-CR-070-2      STATEMENT: KAYLA MILLS      DATE: 03/16/12

1   DET. YORK:   Detective Jason [York] with the Kentucky State Police.  The date is March

2   16, 2012.  Time is 14:49 hours.  I'm at the Barbourville Police Department

3   with Kayla Mills, her attorney Ken Boggs.  Scott Mills is present.  And

4   Cricket Mills...(Donna Mills, corrected by others present), Donna Mills is

5   present also in the room.  Kayla, state your full name.

6   K. MILLS:   Kayla Shinay Mills.

7   DET. YORK:   And what's your date of birth.

8   K. MILLS:   September 27th, '91

9   DET. YORK:   And what's an address for you?

10   K. MILLS:   2795 Highway 223, Flat Lick, 40935

11   DET. YORK:   And do you have a phone number that you can be reached at?

12   K. MILLS:   542-0771

13   DET. YORK:   We're here today to talk about the death of Katherine Mills.  She was killed a

14   couple of Christmas' ago at Flat Lick.  And your boy...ex-boyfriend, Jonathon

15   Taylor, has been charged with murder in this case.  So at this point I'm asking

16   you to tell me all the times that Jonathon told you about killing him and any

17   details involved.  So I'll just let you start talking.

18   K. MILLS:   Okay, well, first of all, he has it in him, I know that, to kills somebody.  That's

19   why I broke up with him.  Because I thought he was going to kill me.  And

20   (Inaudible 01:23) and I was all about that.  And him is charged with it and

PL 1213

HOSKINS/KNOX 12-CR-070-2     STATEMENT: KAYLA MILLS     DATE: 03/16/12

| | | |
|---|---|---|
| 21 | | stuff. Or I got charged with it against him. He's...he's confessed to doing it, |
| 22 | | a lot to me. But it's like he would say, he's said, "I won't leave another one |
| 23 | | laying up on the creek." Or, "I don't left one laying." And, "I don't care to |
| 24 | | leave another one too." |
| 25 | DET. YORK: | I need you to specify. Did he say he killed Katherine Mills? |
| 26 | K. MILLS: | I don't remember if he said her name. I don't guess he did. |
| 27 | DET. YORK: | Well why, how do you know then that he was talking about Katherine Mills? |
| 28 | K. MILLS: | Well, he never would say Katherine Mills. He said "the old woman" or "the |
| 29 | | woman (inaudible 02:08) is what he would say. |
| 30 | DET. YORK: | But I... |
| 31 | K. MILLS: | That Katherine Mills... |
| 32 | DET. YORK: | What I'm saying...had did you know he was talking about Katherine Mills by |
| 33 | | the way he was talking...or the way he was talking? |
| 34 | K. MILLS: | I know it...I know that's what he was talking about. |
| 35 | DET. YORK: | But how though? Explain to me how you knew. I mean because there could |
| 36 | | be several ladies. I think your attorney will agree with me. It's important |
| 37 | | that... |
| 38 | K. MILLS: | Well she's the only one that got killed that he's supposed be...that he killed. |
| 39 | DET. YORK: | Well, I understand that. So he said, "I killed the old lady up Stinking Creek?" |
| 40 | | Right? Or you tell me what he said. |

<u>HOSKINS/KNOX 12-CR-070-2</u>     <u>STATEMENT: KAYLA MILLS</u>     <u>DATE: 03/16/12</u>

| | | |
|---|---|---|
| 41 | K. MILLS: | Well you tell me all the different (inaudible 02:50).  He said different stuff. |
| 42 | | Like all the...one time he said...uhm..."How was it?  What happened?"  He |
| 43 | | was like, "I know" or he just come right out and said, "I know everything that |
| 44 | | happened" and....to her that night.  And what went on and all that.  I stopped |
| 45 | | and I sit down and I said, "What Jonathon?"  I was like, "What are you talking |
| 46 | | about?"  And he said, "Up on the creek."  And I said, "What happened?"  He |
| 47 | | smiled at me real big...and he wanted to tell me...confess it.  He felt guilty |
| 48 | | about it.  Wanted to tell me.  But he just never did tell me, never said it. |
| 49 | DET. YORK: | Okay.  I need you to think hard about this.  You're telling me that he said that |
| 50 | | he implied that he killed Katherine Mills.  Or did he...because the situation |
| 51 | | and what we came here for is that you had knowledge of direct contact with |
| 52 | | Jonathon that he killed Katherine.  Am I right or wrong on that? |
| 53 | (MALE VOICE:) | That's right, yeah. |
| 54 | DET. YORK: | What is that? |
| 55 | K. BOGGS: | I don't know when to (inaudible 04:12) and I believe she already said that he |
| 56 | | never really mentioned Katherine by name.  But he *did* say that he killed that |
| 57 | | old woman.  And, I don't know.  I think that kind of follows up to what you |
| 58 | | were... |
| 59 | DET. YORK: | Yeah |
| 60 | K. BOGGS: | Asking her about... |
| 61 | K. MILLS: | I can say he said Katherine Mills because we knew what we were talking |
| 62 | | about.  So yeah.  We were talking about Katherine Mills. |

PL 1215

<u>HOSKINS/KNOX 12-CR-070-2</u>   <u>STATEMENT: KAYLA MILLS</u>   <u>DATE: 03/16/12</u>

| | | |
|---|---|---|
| 63 | DET. YORK: | Did he say who was with him? |
| 64 | K. MILLS: | He never mentioned who was with (inaudible 04:40). I would never ask him. |
| 65 | | I didn't want to try and (inaudible 04:45) for it. I just wanted him to come out |
| 66 | | and tell me, trust me. Trust to tell me. Because I was trying to figure it out. |
| 67 | | Like, I wanted him to tell me. |
| 68 | DET. YORK: | The morning... |
| 69 | K. MILLS: | Because I don't want to get in trouble. |
| 70 | DET. YORK: | Alright. The morning it happened, which would have been December the |
| 71 | | 20th, 2010. Over by...do you remember that day, by any chance, that she was |
| 72 | | killed? |
| 73 | K. MILLS: | I know where I was that day... |
| 74 | DET. YORK: | Okay, and that's fine. I'm not...and what I'm getting at, the question I'm going |
| 75 | | with...Did you see Jonathon that day? |
| 76 | K. MILLS: | No. |
| 77 | DET. YORK: | You did not. |
| 78 | K. MILLS: | No. |
| 79 | DET. YORK: | Did you ever see Jonathon with a large sum of money during that time? |
| 80 | K. MILLS: | No. I wasn't talking to Jonathon during that time. At all. |
| 81 | DET. YORK: | Okay. How many different times did he talk about it to you? Approximately. |
| 82 | | And when was the last time? |

HOSKINS/KNOX 12-CR-070-2     STATEMENT: KAYLA MILLS     DATE: 03/16/12

| 83 | K. MILLS: | When he lost his apartment over here...what month do you think it was? Do |
| 84 | | you know?  It was like in the summer.  Probably like...uh...May or June. |
| 85 | DET. YORK: | Okay. |
| 86 | K. MILLS: | He didn't have that apartment long but while he had it I was around probably |
| 87 | | for a whole month.  And I stayed with him like every night and...and just tried |
| 88 | | to really get that out of him.  Because John Pickard told me, "I wouldn't lie to |
| 89 | | you."  He was like, "You're going to get charged with this.  They're going to |
| 90 | | be figuring out what happened."  And I think he knows that.  That they were, |
| 91 | | you know, he was scared to tell me because I would tell if he did tell me. |
| 92 | | That's why he went and...but uhm...I can tell everything that happened.  But |
| 93 | | yeah, I was at my Mam-ma's that morning. |
| 94 | DET. YORK: | So the...you believe, and we'll end it on this, he told you on several occasions |
| 95 | | that he killed the old lady up the creek... |
| 96 | K. MILLS: | He brought it up all the time.  Just out of (inaudible 06:38) about every day he |
| 97 | | would bring it up. |
| 98 | DET. YORK: | Telling about the old lady, and *you* knew he was talking about Katherine |
| 99 | | Mills, right? |
| 100 | K. MILLS: | Yeah. |
| 101 | DET. YORK: | Okay.  And you never did mention who else was with him? |
| 102 | K. MILLS: | No. |

PL 015872

PL 1217

HOSKINS/KNOX 12-CR-070-2    STATEMENT: KAYLA MILLS    DATE: 03/16/12

| 103 | DET. YORK: | Or did he ever tell you why they had done it?  Or what they stole from her? |
| 104 | K. MILLS: | No.  he's told me like...uhm...stuff ...I don't really remember about Amanda |
| 105 | | and Will and he don't really say, "yeah that's what happened."  But...I don't |
| 106 | | know... |
| 107 | DET. YORK: | What stuff did he say about Amanda and Will? |
| 108 | K. MILLS: | He just like brought it up about like uhm you all know stuff that they'd done |
| 109 | | about the money.  I don't really remember what he said, exactly, but he said it |
| 110 | | like it's ...they know stuff.  But you all know where they spent that money at |
| 111 | | or how much it was (inaudible 07:26)  know. |
| 112 | DET. YORK: | When he's talking about "you all" you talking about like the police? |
| 113 | K. MILLS: | Yeah. |
| 114 | DET. YORK: | So Jonathon told you that the police knew where Will and Amanda spent the |
| 115 | | money that they took from Katherine. |
| 116 | K. MILLS: | Mmm-hmm.  Will's talked about it a lot too. |
| 117 | DET. YORK: | Tell me what Will said. |
| 118 | K. MILLS: | Talking to Jonathon...like I never talked to Will.  Him and Jonathon would |
| 119 | | (inaudible 07:50).  He's talking about yeah we was going to (inaudible 07:53) |
| 120 | | dealer's.  And seeing if they spent a lot of money and I can't just be worried |
| 121 | | about it and stuff. |
| 122 | DET. YORK: | Jonathon or William was worried about it? |
| 123 | K. MILLS: | Will. |

<u>**HOSKINS/KNOX 12-CR-070-2**</u>   <u>**STATEMENT: KAYLA MILLS**</u>   <u>**DATE: 03/16/12**</u>

124   DET. YORK:   Will was worried about us going to all these drug dealers?

125   K. MILLS:   Mmm-hmm.  Yeah.

126   DET. YORK:   Anything else that you can remember.

127   K. MILLS:   I won't talk to Amanda.  I've never heard...she's never said nothing to me.

128   Because I don't talk to her.  I don't like her.

129   DET. YORK:   Alright.  Okay.  Well I appreciate you coming in.  And at this...let me just go

130   ahead...(recording ends at this point at 08:37).

TRANSCRIPTION CERTIFICATION

I hereby certify that the foregoing transcript is a true and accurate transcription, to the best of my ability, of the statement of Kayla Mills on 03-16-12 in the case of Commonwealth of Kentucky vs. Jonathon Taylor, Amanda Hoskins, and William Lester, indictment number 12-CR070-2.

This is the 6th day of December, 2012.

Lisa Castel
411 Valley Brook Drive
Milford, OH 45150
513-833-1705

PL 015875

PL 1220

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN  DIVISION at LONDON
CASE NO: 6:17-CV-00084-DLB

AMANDA HOSKINS and
JONATHAN TAYLOR,                                                PLAINTIFFS,

V.

KNOX COUNTY, et al,                                            DEFENDANTS.

---

### DEFENDANT JOHN PICKARD ANSWERS TO INTERROGATORIES PROPOUNDED BY PLAINTIFFS

---

Comes now the Defendant John Pickard, by and through counsel, for his Answers

to Interrogatories propounded by Plaintiffs, Amanda Hoskins and Jonathan Taylor.

### INTERROGATORIES

**INTERROGATORY NO. 1:**          Please identify by name and address all

Persons who, to the best of your understanding, have knowledge of facts that relate to any

of the claims or defenses in this action, including but not limited to all Persons who are

not listed in the Defendants' Rule 26 Initial Disclosures. For each Person with knowledge

responsive to this interrogatory, please describe with particularity any categories of facts

known by each such Person, including all categories of facts about which the Person may

be competent to testify at trial. If this Interrogatory is answered by incorporating

Documents, please state under oath whether there are any categories of facts known to

any witness relating to the claims or defenses in this action that are not reflected in the

documents upon which you rely; in the event you fail to do so, Plaintiffs will assume the

1



Date 3|21|18
KENTUCKIANA Reporter JVT  Exhibit # 13
Case 17-CV-84
Deponent John Pickard

PL 1224

substance of the witnesses' testimony is strictly limited to what is contained in such documents.

**ANSWER:**   Please see Rule 26 Disclosures regarding all person(s) who may have knowledge of the allegations contained in the Plaintiffs Complaint.

**INTERROGATORY NO. 2:**   For any Document requested in Plaintiffs' discovery requests which has been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed; the circumstances and manner in which it was lost, discarded or destroyed, including the identities of all persons involved; the reasons for disposing of the Document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it.

**ANSWER:**   To my knowledge the Knox County Sheriff's Department did not have any documents regarding the murder investigation of Katherine Mills and therefore no documents could have been lost, discarded or destroyed.

**INTERROGATORY NO. 3:**   Under oath, please identify all Complaints that have ever been made against you relating to your role as a law enforcement official (including Plaintiffs' Complaint or any Complaints which presently remain pending), including but not limited to any and all internal affairs intra- or inter-departmental, and citizen complaints alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive methods on suspects, arrestees, or witnesses, use of excessive force, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, and lawsuits or administrative complaints filed in state or federal courts or agencies alleging

2

PL 1222

police misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If you do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**ANSWER:**   I have been named in a litigation filed by William Anderson v Knox County, et al, US District Court, Civil Action No: 6:17-CV-00133-KKC; Smith v Knox County, et al, US District Court, Civil Action No: 6:03-CV-00334-KKC; Bledsoe v Myers, et al, US District Court, Civil Action No: 6:04-CV-00278-DCR; Honeycutt v Smith, et al, US District Court, Civil Action No: 6:02-CV-00631-DCR; Britton v Knox County Jail, et al, US District Court, Civil Action No: 6:05-CV-00502-KKC; Cornett v Sizemore, et al, US District Court, Civil Action No: 6:04-CV-00130-KKC; Girdner Mining Company, Inc. v Alden Resources, LLC, et al, Knox Circuit Court, Civil Action No.: 12-CI-00090.

**INTERROGATORY NO. 4:**   Under oath, please identify every Communication that you have had with any Person, including but not limited to Plaintiffs and any of the Individual Defendants, about any of the allegations, events, or circumstances described in Plaintiffs' Complaint. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when and with whom the Communications occurred; and (c) provide the date of the Communication. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total

3

PL 1223

of your Communications responsive to this Interrogatory are contained in the Documents that you reference.

**ANSWER:**   I sat in on at least one (1) interview with Plaintiff Jonathan Taylor. There should be a record of that interview either written or recorded that would most accurately reflect what was said.   I spoke with Defendant Jason York about locating potential witnesses in the community and tried to answer Detective York's questions as he began his investigation.   I spoke with Defendant Broughton at the time of Plaintiff Jonathan Taylor's questioning.   I cannot recall any statements made at the time.   I don't recall any conversations with Plaintiff Hoskins about this case, but she was the subject of another case, an alleged hit-and-run injury case.

Several KSP Officers were at the scene of the murder after it was reported.   At some point I spoke to Mark Mefford, Dallas Eubanks, Jason Bunch and Brian Johnson but I do not recall the conversations.

**INTERROGATORY NO. 5:**   Please identify any and all criminal convictions of any party or witness with knowledge relating to any of the claims or defenses of this action. For each such responsive conviction, identify: (a) the witness who has been convicted and the nature of the conviction and (b) the complete factual basis as to why the conviction qualifies as admissible under FRE 609.   Please be advised that your duty to supplement your answer to this Interrogatory remains ongoing as discovery progresses, and that Plaintiffs intend to move in limine to bar any references to convictions not identified in the manner requested.

4

**ANSWER:**   I do not have any information regarding criminal convictions of the parties or witnesses in this action.   The requested documents are public record and the Plaintiffs can request the information.  I have no criminal convictions.

**INTERROGATORY NO. 6:**   Do you contend that Plaintiffs participating in killing Katherine Mills, or committed any other illegal act relating to the incidents in Plaintiffs' Complaint? If so, please describe each alleged illegal act that you contend was committed by Plaintiffs and provide the complete factual basis for your contention, and identify all evidence and witnesses upon which you may rely to support your contention.

**ANSWER:**   I have no direct knowledge that either Plaintiff acted in killing Katherine Mills.  I reserve the right to establish their involvement, if any, depending on what facts and evidence discloses through discovery.  I am aware that the Grand Jury indicted them.

**INTERROGATORY NO. 7:**   For any affirmative defenses that you have asserted or will assert in this matter, please describe the entire factual basis supporting each such defense and specifically identify any witnesses or physical, documentary, or testimonial evidence that supports each such defense. The information sought by this interrogatory is not a mere recitation of the statutory sections, case law, or common law invoked in the defense. Plaintiffs request that you provide a detailed description of every fact and legal basis on which the affirmative defense is asserted so that Plaintiff may have the opportunity to investigate by way of additional discovery requests. For example, if you intend at any point in this litigation to assert an immunity defense, please state all facts, evidence, and legal bases for such a defense, identifying any witnesses or physical, documentary, or testimonial evidence relating to the immunity defense.

5

**ANSWER:**   I am not a lawyer and I have no opinions regarding affirmative defenses asserted by my lawyer.   I acted in good faith and without malice.   My involvement was minimal and in compliance with my training and experience.

**INTERROGATORY NO. 8:**   For punitive damages purposes, please estimate your net financial worth. Please describe how that net worth has been calculated by providing a balance sheet of all assets greater than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate, etc.) and including all liabilities. Please also provide an income statement for the five years prior to the filing of this complaint, including your annual salary and any income from any other source for those years.

**ANSWER:**   Objection, this information is not subject to discovery pre-judgment. See <u>Sand Hill Energy v Smith</u>, 142 S.W.3d 153 (2004)

Jason E. Williams, Esq.

**INTERROGATORY NO. 9:**   Given the sum total of your personal knowledge of the policies, customs, and practices of the Knox County Sherriff's Department as you understand them (formal or informal, written or unwritten), please state whether you, or to your knowledge, any of the other Defendants acted inconsistently with any of those policies, customs, or practices at any time during the entire encounter or interaction with Plaintiffs as described in the Complaint. If the answer is in the affirmative, please: (a) identify any particular policy, custom, or practice which, to your knowledge was violated; (b) describe the circumstances and manner in which said policy,

PL 1226

custom, or practice was violated; and (c) state whether any discipline resulted from that violation.

**ANSWER:**   The Knox County Sheriff's Department policies, practices and customs would not relate to the other Defendants in this action except for Derek Eubanks and he was not involved in the investigation of the murder of Katherine Mills. I acted in conformity with the policies.

**INTERROGATORY NO. 10:**   Please state with specificity each activity and investigative task that you participated in during the Mills murder investigation. For each activity and task, please describe the Person who assigned you each task and the Person to whom you reported for each task. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from 2010 up to and including the present day. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your participation in the Mills murder investigation is described in the Documents that you reference.

**ANSWER:**   I assisted KSP Officer Jason York. I was familiar with the area and the people who lived there and helped him locate person(s) of interest. I was present for the interview of Jonathan Taylor and was present when he was arrested by Mike Broughton.

**INTERROGATORY NO. 11:**   Did any Investigator in the Mills murder investigation (including yourself) conduct or participate in any formal or informal witness interviews or have any Communications with witnesses that were not memorialized in a police report or audio/video recording? If the answer to this question is anything other than an unqualified "no," please list the dates and locations of all such

7

PL 1227

interviews or Communications, the names of each person involved in each interview or Communication, and the content of any such interview or Communication.

**ANSWER:**   Allen Helton contacted me regarding the murder of Katherine Mills. I called KSP Jason York and advised him about Mr. Helton. KSP Jason York came to my office and took Mr. Helton to another location to be interviewed and I was not present during that interview. I don't recall my conversation verbatim with Mr. Helton but I do recall that he implicated to a degree Plaintiffs Hoskins and Taylor.

**INTERROGATORY NO. 12:**   Did you provide or promise any Consideration to any witness relating to the Mills murder investigation?  If so, please state with specificity (a) who provided/promised the Consideration; (b) when the Consideration was provided/promised; (c) to whom the Consideration was given/promised; and (d) what Consideration was given/promised.

**ANSWER:**   I made no promises, but I told Allen Helton, who was already in trouble with another incident, that I would see what I could do to help him in that other prosecution.  This situation resolved itself before I was able to speak with anyone regarding the case.

**INTERROGATORY NO. 13:**   Have you, or has anyone on your behalf, ever been bribed and/or accepted money (or other forms of payment) from any individual, including but not limited to Jeffrey Gray, in exchange for not investigating that individual for crimes they may or may not have committed?  If the answer to this question is anything other than an unqualified no, please state with specificity: (1) the name of the individual(s) who provided payment; (2) the name of the individual(s) who accepted payment; (3) who the payment was accepted on behalf of; (4) the type of

8

compensation(s) made; (5) when the compensation was made; (6) what the purpose of the compensation was for; (7) the amount of compensation made; (8) the number of times compensation was accepted; (9) the amount of money accepted; (10) the alleged crime(s) that were not investigated and/or charged as a result of each compensation; and (11) whether the payment(s) was reported on your income taxes.

**ANSWER:**   No.

**INTERROGATORY NO. 14:**   Please describe in detail each and every contact that you had with any of the following witnesses during the investigation into the murder of Katherine Mills.   (1) Allen Helton; (2) Mike Simpson; (3) Jesse Lawson; (4) William Lester; (5) Bob Smith; (6) Michael Crump; (7) Christy Branson; (8) Joe King; (9) Dr. Warren; (10) Amber Simpson; (11) Daniel Wilson; (12) Robert Beach; (13) Kayla Mills; (14) Donna Mills, and (15) Margaret Polly.  For each contact, please identify (a) when you made such contact(s) with that witness; (b) who you contacted that witness with; (c) what information was provided by any party during that contact (including from the officer(s) involved); (d) whether any documentation from that contact was created; (e) whether any documentation exists today from that contact; and (f) why that individual was contacted.

**ANSWER:**   (1) No; (2) I was with KSP Jason York and went to his home to speak with him; (3) No; (4) No; (5) I was with KSP Jason York when he spoke with him; (6) No; (7) No; (8) No; (9) No; (10) No; (11) No; (12) No; (13) I was with KSP Jason York when he spoke with Kayla Mills approximately two to three (2-3) times; (14) No; (15) No.  I have no documentation, KSP or York may have.

9

**INTERROGATORY NO. 15:**    Please describe in detail each and every investigatory step you took to determine whether Allen Helton and Mike Simpson were involved in the death of Katherine Mills.  For each activity and task, please describe the Person who assigned you each task, who you consulted with, and the Person to whom you reported for each task. In addition, please provide any information learned from each such investigatory step taken.  Please note that the scope of this Interrogatory includes any investigation undertaken at any time from 2010 up to and including the present day. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your participation in the Mills murder investigation is described in the Documents that you reference.

**ANSWER:**    Objection to the terms "investigative steps".  Without waiving said objection, I did not take any investigative steps regarding the involvement of Allen Helton or Mike Simpson. I did speak with Allen Helton at his request as identified above. KSP Jason York was in charge of the murder investigation.

Jason E. Williams, Esq.

Respectfully Submitted,

Jason E. Williams, Esq.
Williams Farmer & Towe Law Group
303 S. Main Street
P.O. Box 3199
London, Kentucky 40743
Telephone (606) 877-5291

By:

Jason E. Williams, Esq.
Counsel for Knox County, Kentucky; John Pickard and Derek Eubanks

10

PL 1230

## CERTIFICATE OF SERVICE

I hereby certify that on the _14th_ day of September, 2017, a true and correct copy of the foregoing was served by mailing same, first class postage prepaid, to:

**ORIGINAL TO:**

Kept in file, pursuant to Federal Rule, LR 26.1

**COPIES TO:**

Arthur Loevy, Esq.
Jon Loevy, Esq.
Michael Kanovitz, Esq.
Elliot Slosar, Esq.
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607

Christian Matthew Feltner, Esq.
Caldwell & Feltner, PLLC
PO Box 3073
London, Kentucky 40743

Licah H. Farah, Jr., Esq.
Nicole L. Antolic, Esq.
Ward, Hocker & Thornton
333 West Vine Street, Suite 1100
Lexington, Kentucky 40507

Morgan Todd Osterloh, Esq.
Charles David Cole, Esq.
Derrick T. Wright, Esq.
Lyndol Scott Miller, Esq.
Sturgill, Turner, Barker & Moloney, PLLC
333 W. Vine Street, Suite 1500
Lexington, Kentucky 40507

Matthew J. Johnson, Esq.
Shawna Virgin Kincer, Esq.
Cody Weber, Esq.
Kentucky State Police Legal Office
919 Versailles Road, Room 300
Frankfort, Kentucky 40601

Jason E. Williams, Esq.
Counsel for Knox County, Kentucky; John Pickard and Derek Eubanks

11

PL 1231

## VERIFICATION

COMMONWEALTH OF KENTUCKY          )
                                  )
COUNTY OF Laurel                  )


I have read the foregoing Answers to Interrogatories and verify that the factual

information contained therein is true and correct to the best of my knowledge.

Defendant John Pickard


Subscribed and sworn to before me by John Pickard, on this the 5th day of

September , 2017.


NOTARY PUBLIC
My Commission Expires: 8|24|2019
My Notary ID: 540678

12

PL 1232





Date 3/21/18
Reporter JVT  Exhibit # 14
Case 17 · CV · 84
Deponent John Pickard

I, hereby certify the foregoing
to be a true copy as filed in the
office of Knox Co. Circuit Clerk
witness my hand and seal this
14th day of January 2019
Clerk, Knox Circuit and District
Court
By: Veronica S. Patterson D.C.

PL 018940

PL 1233

| | 09:30 AM | DI | | KNOX | Run Date: 04/12/2011  3:44:10PM | DocketList.Rpt |
|---|---|---|---|---|---|---|
| Court | 1 | DISTRICT COURTROOM | | | Prep Info @00000033382 | 04/12/2011  3:44:10PM |
| Judge | | HON. W. L. "Skip" HAMMONS JR. | | | | 04/14/2011 Court Docket |

Page 6 of 12

**8      DI   11-T-00136      COMMONWEALTH VS. HELTON, JAMES ALLEN**
( ) Costs Waived due to indigence      ( ) Installment / Deferred Payment

| 1 | 01/04/2011 | 1I3441203-1 | 0021120 | 189A0105c | Operate MV under/Influence Alcohol/Drugs, .08, 3rd Offense ( M ) ( A ) *FTA Eligible* |
|---|---|---|---|---|---|

MCA D   - BT w/in TPL - Rx for Med.

| 2 | 01/04/2011 | 1I3441203-2 | 0004990 | 189125(6) | FAILURE TO WEAR SEAT BELTS ( V ) ( X ) *FTA Eligible* |
|---|---|---|---|---|---|

MCA D

| 3 | 01/04/2011 | 1I3441203-3 | 0004320 | 186190 | FAILURE TO REGISTER TRANSFER OF MOTOR VEHICLE ( M ) ( A ) |
|---|---|---|---|---|---|

| 4 | 01/04/2011 | 1I3441203-4 | 0004800 | 30439080 | FAILURE OF OWNER TO MAINTAIN REQUIRED INSURANCE/SECURITY 1ST ( M ) ( B ) *FTA Eligible* |
|---|---|---|---|---|---|

6 $500 Susp -

Set over hend cc Red Balance

**9      DI   10-M-00794      COMMONWEALTH VS. LECROY, PENNY SHARON**

☐ LECROY, PENNY SHARON

| 1951 | F   W | ***-**-9857 | **016340 | |
|---|---|---|---|---|

☐ CUMBERLAND VALLEY RECC,                    COMPLAINING WITNESS
☐ HOME TOWN IGA,                              COMPLAINING WITNESS
☐ PARKWAY SERVICE CENTER,                     COMPLAINING WITNESS
☐ T & L PAWN SHOP,                            COMPLAINING WITNESS
☐ LECROY, PENNY SHARON                        DEFENDANT / RESPONDENT

Bail Set: 08/30/2010 CA $250.00          Posted:09/01/2010

ENTERED
GREG HELTON
APR 14 2011
KNOX CIRCUIT/DISTRICT COURT
BY_____ D.C.

JURY TRIAL

Cont 7/7,
Issue ct notice -

( ) Costs Waived due to indigence      ( ) Installment / Deferred Payment

| 1 | 12/16/2009 | 0J0838412-1 | 0011120 | 514040 | *OBS* THEFT BY DECEPTION-INCL COLD CHECKS UNDER $300 ( M ) ( A ) |
|---|---|---|---|---|---|

| 2 | 12/16/2009 | 0J0838412-1 | 0011120 | 514040 | *OBS* THEFT BY DECEPTION-INCL COLD CHECKS UNDER $300 ( M ) ( A ) |
|---|---|---|---|---|---|

| 04/14/2011 | 1 | 09:30 AM | Page 6 of 12 | Judge Signature: | |
|---|---|---|---|---|---|

PL 018941

PL 1234

09:30 AM    DI                      KNOX                Run Date: 01/31/2011  3:22
Court    1       DISTRICT COURTROOM                                Prep Info @00000032412   01/31/20
Judge    HON. W. L. "Skip" HAMMONS JR.                                                      02/01/2

6          DI   11-T-00136    COMMONWEALTH VS. HELTON, JAMES ALLEN

( ) Costs Waived due to indigence      ( ) Installment / Deferred Payment

1    01/04/2011    1I3441203-1    0021120    189A0105c  Operate MV under/Influence Alcohol/Dru
                                                        Offense ( M ) ( A ) *FTA Eligible*

2    01/04/2011    1I3441203-2    0004990    189125(6)  FAILURE TO WEAR SEAT BELTS ( V )
                                                        Eligible*

3    01/04/2011    1I3441203-3    0004320    186190     FAILURE TO REGISTER TRANSFER (
                                                        VEHICLE ( M ) ( A )

4    01/04/2011    1I3441203-4    0004800    30439080   FAILURE OF OWNER TO MAINTAIN
                                                        INSURANCE/SECURITY 1ST ( M ) ( B )

JT.    3/3

7          DI   10-T-03140    COMMONWEALTH VS. HELTON, SANDRA ANN

☐ HELTON, SANDRA ANN

1975       F       W    ***-**-2846    **214855
☐ BROWN, ROBERT (BPD),                 COMPLAINING WITNESS              BPD:
☐ HELTON, SANDRA ANN                   DEFENDANT / RESPONDENT

Bail Set:                          Posted:

REVIEW
Sch Memo:   **RESTITUTION**    Proof Shown —

( ) Costs Waived due to indigence      ( ) Installment / Deferred Payment

8          DI   10-F-00555    COMMONWEALTH VS. HINKLE, ANITA KAY

PL 018942

PL 1235

09:00 AM        DI

Court   1                                              KNOX

Judge      DISTRICT COURTROOM                                    • Run Date: 01/06/2011   8:49:

HON. W. L. "Skip" HAMMONS JR.                      Prep Info @00000032074   01/06/20

01/06/2

5          DI   11-F-00005        COMMONWEALTH VS. HARRISON, RANDY E

1    12/30/2010    0J0726472-1    0421130    218A1412    Trafficking controlled substance, 1st deg/
                                                         F) ( C )

---

6          DI   11-T-00136        COMMONWEALTH VS. HELTON, JAMES ALLEN

☐ HELTON, JAMES ALLEN

☐ 1980        M    ****  ***.-**-1887    **861532
☐ YORK, JASON (KSP),                        COMPLAINING WITNESS
☐ HELTON, JAMES ALLEN                        DEFENDANT / RESPONDENT                KSP

Bail Set: 01/05/2011 CA  $2,500.00        Posted:01/05/2011

ARRAIGNMENT

N|G   PTC  2|1

( ) Costs Waived due to indigence        ( ) Installment / Deferred Payment

1    01/04/2011    1I3441203-1    0021120    189A0105c   Operate MV under/Influence Alcohol/Drug
                                                         Offense ( M ) ( A ) *FTA Eligible*

2    01/04/2011    1I3441203-2    0004990    189125(6)   FAILURE TO WEAR SEAT BELTS ( V ) (
                                                         Eligible*

3    01/04/2011    1I3441203-3    0004320    186190      FAILURE TO REGISTER TRANSFER OI
                                                         VEHICLE ( M ) ( A )              E
                                                                                         GRE

                                                                                  JAN

4    01/04/2011    1I3441203-4    0004800    30439080    FAILURE OF OWNER TO MAINTAIN R
                                                         KNOX CIRCUI
                                                         INSURANCE/SECURITY 1ST ( M ) ( B ) *I

---

7          DI   11-F-00007        COMMONWEALTH VS. JONES, BRIAN ADAM

PL 018943

PL 1236

C-365 Rev. 5-09

Defendant's Name: _James Helton_

Defendant's Address: _113 Houston Broughton Ln, Dewitt_  _KY-40930_

Citation No.: _I 344120_

Defendant's Occupation _____

Date: _1-5-11_

_DisT_ Court

_Knox_ County

_1-14-80_
Defendant's Date of Birth

Defendant's Telephone Number

Case No. _11-T-1_

Citation No.: _I 344_

Charge: _____

Defendants Drivers Licer

## YOU ARE HEREBY RELEASED FROM CUSTODY ON THE CONDITIONS INDICATED BELOW:

**PERSONAL PROMISE** ☐ — PERSONAL RECOGNIZANCE. Your personal recognizance, provided that you promise to appear at all scheduled hearings, trials, or otherwise as required by the Court.

**MONEY BOND OF** _2,500.00_

amount in accordance with uniform schedule of bail

☐ UNSECURED BAIL BOND OR SURETY BOND. An unsecured appearance bond from you or your surety to be should you fail to appear as required by the Court.

☐ GUARANTEED ARREST BOND CERTIFICATE.

☐ PARTIALLY SECURED BOND. Cash bail secured by cash deposit of $_____. If the amount o equal to 10% of the total bond, 10% of the deposit (but not less than $5) will be retained if you are foun the court determines you have performed the conditions of your release. The entire cash bond will should you fail to appear as required by the Court.

☒ CASH BAIL BOND. Full amount of bail paid into the court, to be forfeited if you fail to appear as requi

☐ STOCKS AND BONDS, PROPERTY BOND. Property is offered to secure the bail bond. If you fail to appear by the Court, the state will foreclose on the property used as security.

☐ RELEASED PURSUANT TO KRS 222.204

CONDITIONS: _no further violations_

FILED
JAN - 5 20
KNOX CIRCUIT/DISTRIC
BY ___

**BAIL BOND** _James Helton_ _____ being admitted to bail in the sum of $ _2,500.00_ , I unde that he/she will appear and be amenable to the orders and process of this and any other court in which this proceeding may be pending for an all purposes and at all stages (including, in the event of indictment, proceedings thereafter) in accordance with RCr 4.54. By entering into this obligation, I submit to the jurisdiction of the courts of Kentucky in which any forfeiture proceeding arising out of my bail obligation may be pen and do further irrevocably appoint the clerk of such court as my agent upon whom any process affecting my liability on such bond may be se such clerk to forthwith mail copies to me at the address below. AFFIDAVIT OF SURETY: (unless posts full cash bond) I affirm I am a reside owner of real estate in Kentucky, and intend to secure this bond with the following stocks, bonds or real property: _____

_James Helton_
Signature of Defendant

_Randy Merida_
Printed Name of Surety(ies)

_Randy merida_
Signature of Surety(ies)

BAIL BOND TAKEN BY _RMris_ _____ FROM

☐ Defendant   ☒ SURETY(IES)

Subscribed and sworn to before me by _____ this _____ day of _____, 2_____

_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_
Social Security Number of Surety(ies)

_11/10/68_
Date of Birth & Occupation of Surety(ies)

_____
Drivers License # of Surety(ies)

_____
Address of Surety(ies)
*Only required on bonds where more than $10,000 Cash is collect

_____
Clerk/Authorized Public Officer/Notary Pu

**Violation of Conditions and/or Failure to Appear:**
You are warned that failure to comply with the above provisions will be deemed a violation of the terms and conditions of your release f ant will be immediately issued for your arrest; you may be detained, the release privilege will be revoked, and any bail bond posted may b lure to Appear: For any failure to appear as required before a judge or other judicial officer, you shall be subject to the following pena
(IF FELONY CHARGE) A fine of no more than $10,000 and imprisonment for no less than 1 and no more than 5 yea
(IF MISDEMEANOR CHARGE) A fine of no more than $500 and imprisonment for no more than 1 year.

**NEXT COURT DATE:** in courtroom _DisT_ at _9:011_ a.m./p.m. on _1-6-11_ _____ or when i and you shall appear at all subsequent continued dates. You shall also appear _____

**DEFENDANT'S SIGNATURE** ⇨ _James Helton_

I understand the penalties which may be imposed o _____ willful failure to appear or for violation of any condition of and I agree to comply with the conditions of my release and to appear as required. I have rece copy of this order and any bail bond.

☐ REPORT TO YOUR LOCAL PRETRIAL SERVICES OFFICE

LOCATED AT _Courthouse_
TELEPHONE _606-7772_

PL 018944

PL 1237

KENTUCKIANA

Date 3/21/18
Case Reporter JVI
17-CV-84   Exhibit # 15
Deponent John Pickard

( CRIME SUPPLEMENT
COMMONWEALTH OF KENTUCKY

KSP RECORDS

CASE/INCIDENT NUMBER:   KY 10-10-1058

REPORT DATE: 3/8/2012

REPORTING AGENCY ORI/NAME:   KSP1000 KY STATE POLICE, POST 10

PRIMARY INVESTIGATING AGENCY ORI/NAME:   KSP1000 KY STATE POLICE, POST 10

REPORTING OFFICER NAME: J YORK

PRIMARY OFFICER UNIT BADGE ID:   0856

REPORTING OFFICER UNIT BADGE ID:   0856

REVIEWED BY:

| WITNESS SEQUENCE of | WITNESS NAME | | | | PHONE |
| ADDRESS: | | | | | |
| CITY: | STATE: | ZIP CODE: | SSN: | | DATE OF BIRTH |
| WITNESS SEQUENCE of | WITNESS NAME | | | | PHONE |
| ADDRESS: | | | | | |
| CITY: | STATE: | ZIP CODE: | SSN: | | DATE OF BIRTH |

NARRATIVE

On 03-08-12 at approximately 1513 hrs I took a recorded statement from Allen Helton, DOB 01-14-80, reference the murder of Katherine Mills.  Present at the interview was Sheriff John Pickard.  In an earlier conversation with Allen he stated he knew who was involved with the murder of Katherine Mills and saw some of the money the individuals had stolen.

Allen stated that on Sunday, 12-19-10, he was pumping gas at Escoes Market in Dewitt, when Amanda Hoskins and William Lester approached him.  Allen stated Amanda asked him if he wanted to make some money, and told him how.  I then asked him to explain how, Amanda told him about tying an old woman up when she came out to the bathroom.  I then asked him if she stated which old woman he was and he replied Katherine.  He went on to state Amanda described her as Williams Lester ex-mother-in-law.  I asked Allen how did they know Katherine came out to the bathroom every morning and he stated William knew.  I asked Allen if he wanted to be a part of it and he stated he said no.  Allen also stated Amanda told him Katherine had $15,000.00 dollars.  Again I asked him about the details of tying her up, he said the plan was to lock her in the outhouse, that was what he meant by tying her up.

Allen stated the next morning, 12-20-10, he was going to see his father at Larry Smiths when he saw Williams Lester car traveling on KY 223.  This would be less than one half mile from Katherine Mill's residence.  Allen stated that was between 0815 hrs and 0830 hrs.  I asked him how he knew it was Williams Lester car and he stated he knew it because of the place on the hood.  He was referring to William's Chevy Camaro.  Allen stated after he left seeing his dad he went to Mike Simpson house on Moore's Creek.  Allen stated he did not drive by Katherine house because he knew what was going on and figure the law would be coming there.  I then asked him he knew they was robbing lady, Katherine, and he stated yes.

Allen stated around 1200 hrs he saw William Lester and Amanda Hoskins at Mike Simpson's residence at Moores Creek.  I asked him if they told him they had done it.  He stated Amanda Hoskins told him they got the job done, referring to robbing Katherine Mills.  Allen stated at that time he did not know they had tied her up, he thought they tied her up and took her money.  I asked Allen if they had the money they had stolen from Katherine and he stated yes. Allen stated Amanda had approximately four thousand dollars on her.  Allen stated Amanda Hoskins had the money folded up like you would put a rubber band on it.

Page  1  of  2        Incident Number:  10-10-1058        Agency ORI:  KSP1000        Badge #:    0856

PL 015103

PL 1238

Allen stated Amanda told him the money came from the job, robbing Katherine Mills. He stated Amanda put in order to him and Mike to buy dr  in Florida. Allen stated it was tru  at Mike Simpson knew William and Amanda was going to rob Katherine but did not they were going to kill her. He stated Mike found out and started crying when Jesse called and told him when they were in Florida.

Allen stated he heard Jonathan Taylor helped Amanda rob and kill Katherine Mills but Amanda never told him that.   This is a summary of the statement SEE CD for entire statement.

PL 1239

COMMONWEALTH OF KENTUCKY
27TH JUDICIAL CIRCUIT
KNOX CIRCUIT COURT
INDICTMENT NUMBER: **12-CR-070-2**

---

| COMMONWEALTH OF KENTUCKY | PLAINTIFF |
|---|---|

VS.

STATEMENT OF:
Allen Helton

DATE: 03-8-12

| | |
|---|---|
| JONATHON TAYLOR | |
| AMANDA HOSKINS | DEFENDANTS |
| WILLIAM LESTER | |

---

TRANSCRIBED BY:

Lisa Castel
LC Transcription Service
411 Valley Brook Drive
Milford, OH 45150
513-833-1705



KENTUCKIANA   Date 3|21|18   Reporter JVT   Exhibit # 17
Case 17-CV-84
Deponent John Pickard

PL 015840

PL 1240

<u>HOSKINS/KNOX 12-CR-070-2</u>   <u>STATEMENT: ALLEN HELTON</u>   <u>DATE: 03/08/12</u>

| | | |
|---|---|---|
| 1 | DET. YORK: | Detective Jason York. Kentucky State Police. The date is Thursday, March |
| 2 | | 8, 2012. Time is 15:13 hours. I'm here at the Sheriff's office in Knox |
| 3 | | County. Present with me is Sheriff John Pickard and Allen Helton. Allen |
| 4 | | will you state your full name for me? |
| 5 | J. HELTON: | James Allen Helton |
| 6 | DET. YORK: | And your date of birth? |
| 7 | J. HELTON: | (Inaudible 00:21 February?) 14, 1990. |
| 8 | DET. YORK: | And you got a phone number? |
| 9 | J. HELTON: | Yeah. |
| 10 | DET. YORK: | What is it? |
| 11 | J. HELTON: | 595-8217 |
| 12 | DET. YORK: | Ok. And you still up Houston Rock Road? |
| 13 | J. HELTON: | Yeah. |
| 14 | DET. YORK: | We for about the past year...over a year now...me and you has had a lot of |
| 15 | | conversations and we've talked a lot about Katherine Mills and her being |
| 16 | | murdered and robbed. And you came forward now and is wanting to do the |
| 17 | | right thing. You took a polygraph for me and there's a couple of things you |
| 18 | | lied about. And that you didn't do so well on it. But just to clarify you |
| 19 | | didn't, wasn't a person involved in killing Katherine Mills, right? |

HOSKINS/KNOX 12-CR-070-2     STATEMENT: ALLEN HELTON     DATE: 03/08/12

| 20 | J. HELTON: | Right. |
|----|-----------|--------|
| 21 | DET. YORK: | But you just...you know who was and you've seen the money that was stolen |
| 22 | | from her and is that the reason why you had trouble with the polygraph? |
| 23 | J. HELTON: | Yeah. |
| 24 | DET. YORK: | Okay. Fair enough. I appreciate you doing the right thing. So let's start out. |
| 25 | | Earlier you stated to me that the day before Katherine passed away, which |
| 26 | | would have been a Sunday, you were pumping gas at Escoe's Market? |
| 27 | J. HELTON: | Right. |
| 28 | DET. YORK: | And William Lester and Amanda Hoskins pulled up to the gas station. |
| 29 | J. HELTON: | Right. |
| 30 | DET. YORK: | Alright. And what did...what hap...what did the conversation curtail? |
| 31 | J. HELTON: | She asked me, did I want to make some money. And told me how. |
| 32 | DET. YORK: | And how was that? |
| 33 | J. HELTON: | By going in and tying this old woman up when she come out to the |
| 34 | | bathroom. |
| 35 | DET. YORK: | Did she say which old woman it was? |
| 36 | J. HELTON: | Yeah. Katherine. |
| 37 | DET. YORK: | She called Katherine Mills by her name? |
| 38 | J. HELTON: | William's ex-mom-in-law. |

PL 015842

PL 1242

<u>HOSKINS/KNOX 12-CR-070-2</u>     <u>STATEMENT: ALLEN HELTON</u>     <u>DATE: 03/08/12</u>

| 39 | DET. YORK: | I mean, what did Amanda say?  How did you know...? |
| 40 | J. HELTON: | William's ex-mom-in-law. |
| 41 | DET. YORK: | That's how she said it? |
| 42 | J. HELTON: | Mmm-hmm. |
| 43 44 | DET. YORK: | And what was the plan?  I mean, the bathroom.  Tell me how she knew about the bathroom. |
| 45 | J. HELTON: | William knew. |
| 46 | DET. YORK: | William knew what? |
| 47 | J. HELTON: | What she done.  What she done every morning. |
| 48 | DET. YORK: | Which was? |
| 49 | J. HELTON: | Come out to the bathroom. |
| 50 | DET. YORK: | So did you say you wanted to be a part of that? |
| 51 | J. HELTON: | No. |
| 52 53 | DET. YORK: | Ok.  When you told her that did she quit talking to you about it or did she keep wanting you to try and go. |
| 54 | J. HELTON: | No, she quit talking to me then. |
| 55 56 | DET. YORK: | So before she quit talking to you was that the first time that William or Amanda ever talked to you about that? |
| 57 | J. HELTON: | Yeah. |

HOSKINS/KNOX 12-CR-070-2    STATEMENT: ALLEN HELTON    DATE: 03/08/12

| 58 | DET. YORK: | Okay. And this was all Sunday? |
|---|---|---|
| 59 | J. HELTON: | Mmm-hmm. |
| 60 61 | DET. YORK: | Okay. So they pull up. They see you there. Amanda and William approaches you. |
| 62 | J. HELTON: | Mmm-hmm. |
| 63 | DET. YORK: | So William heard everything that Amanda said to you. |
| 64 | J. HELTON: | Yeah. |
| 65 66 | DET. YORK: | And she said, "Do you want to make some money? William's ex-mother-in-law has got $15,000." Is that right? |
| 67 | J. HELTON: | Right. |
| 68 69 | DET. YORK: | She goes out every morning to use the bathroom. Was they going to tie her up or what? Or just lock her in? |
| 70 | J. HELTON: | Lock her in the... |
| 71 | DET. YORK: | Tie her...you mean |
| 72 | J. HELTON: | Yeah. |
| 73 | DET. YORK: | Because earlier you said tie her up. |
| 74 | J. HELTON: | Lock her in the...tie her in the...in the outhouse. |
| 75 | DET. YORK: | Okay. So you didn't talk to them no more that day? |
| 76 | J. HELTON: | No. |

PL 015844

PL 1244

HOSKINS/KNOX 12-CR-070-2     STATEMENT: ALLEN HELTON     DATE: 03/08/12

| 77 | DET. YORK: | When is the next time you saw them? |
| 78 | J. HELTON: | Monday...well, I seen William's car around 8:30 that morning. Eight-fifteen, |
| 79 | | 8:30. |
| 80 | DET. YORK: | Where at? |
| 81 | J. HELTON: | Leonard Smith's. |
| 82 | DET. YORK: | That's where your father works? |
| 83 | J. HELTON: | Yeah.  He works at Larry Smith's.  I pass him at Leonard Smith's house. |
| 84 | DET. YORK: | Okay. |
| 85 | J. HELTON: | Old house. |
| 86 | DET. YORK: | And just for the record, the saw...Larry Smith's sawmill is...you can actually |
| 87 | | see it from Katherine Mills' house. |
| 88 | J. HELTON: | Yeah. |
| 89 | DET. YORK: | So, around 8:00 that morning, 8:15, you seen William Lester? |
| 90 | J. HELTON: | Car. |
| 91 | DET. YORK: | Was it driving or parked? |
| 92 | J. HELTON: | Driving. |
| 93 | DET. YORK: | All right.  How do you know it was William Lester's car? |
| 94 | J. HELTON: | I know his car.  It's got a place on the hood and there's some paint. |
| 95 | DET. YORK: | Was it the same car you seen the day before? |

PL 013845

PL 1245

HOSKINS/KNOX 12-CR-070-2     STATEMENT: ALLEN HELTON     DATE: 03/08/12

| 96 | J. HELTON: | Yeah. |
| 97 | DET. YORK: | With him driving...him and Amanda? |
| 98 | J. HELTON: | He wasn't driving it the day that he asked me. He was driving a Ford |
| 99 | | Ranger. |
| 100 | DET. YORK: | So the day at Escoe's Market he was driving his Ford Ranger. |
| 101 | J. HELTON: | Mmm-hmm. |
| 102 | DET. YORK: | Did you see his Camaro up there that morning? |
| 103 | J. HELTON: | That morning. |
| 104 | DET. YORK: | Alright. So when you went by Katherine's house did you see anybody there? |
| 105 | J. HELTON: | I didn't go by her house. |
| 106 | DET. YORK: | Oh you went back to your house. |
| 107 | J. HELTON: | I went back around to Mike's house. |
| 108 | DET. YORK: | What do you mean? Mike Simpson's house? |
| 109 | J. HELTON: | Yeah. |
| 110 | DET. YORK: | From Larry Smith's to get to Mike Simpson's house you had to go by |
| 111 | | Katherine's house. |
| 112 | J. HELTON: | I went back around the other way. |
| 113 | DET. YORK: | Oh you did? |
| 114 | J. HELTON: | Yeah. |

PL 015846

PL 1246

HOSKINS/KNOX 12-CR-070-2     STATEMENT: ALLEN HELTON     DATE: 03/08/12

| 115 | DET. YORK: | Why did you take the long way? |
|---|---|---|
| 116 | J. HELTON: | Because I knew what was going on and I figured the law would be coming. |
| 117 118 | DET. YORK: | Oh. So you...when you saw them, you knew that they were robbing that lady. That's the reason why you went around. |
| 119 | J. HELTON: | Yeah. |
| 120 121 | DET. YORK: | So you seen William's car that morning.  When was the next time you seen them? |
| 122 | J. HELTON: | Around 12:00. |
| 123 | DET. YORK: | And where did you see them out? |
| 124 | J. HELTON: | Mike Simpson's. |
| 125 | DET. YORK: | Okay.  Did they tell you that they had done it? |
| 126 | J. HELTON: | No.  They never actually told me that they had done it. |
| 127 | DET. YORK: | What did they say? |
| 128 | J. HELTON: | They said, "We got the job done." |
| 129 | DET. YORK: | Who said that? |
| 130 | J. HELTON: | She did. |
| 131 | DET. YORK: | Amanda Hoskins? |
| 132 | J. HELTON: | Yes. |
| 133 | DET. YORK: | But you know that she was talking about robbing Katherine? |

PL 1247

HOSKINS/KNOX 12-CR-070-2    STATEMENT: ALLEN HELTON    DATE: 03/08/12

| 134 | J. HELTON: | Yes. |
|---|---|---|
| 135 | DET. YORK: | At that time...at 12:00, did you know that they had killed her? |
| 136 | J. HELTON: | No. |
| 137 | DET. YORK: | You thought that they had... |
| 138 | J. HELTON: | Tied her up. |
| 139 | DET. YORK: | Took her money? |
| 140 | J. HELTON: | Yes. |
| 141 | DET. YORK: | Did they have the money on them? |
| 142 | J. HELTON: | Yeah.  She had money on her. |
| 143 | DET. YORK: | How much money did she..I mean... |
| 144 | J. HELTON: | She probably had four, three, thirty-five, four grand. |
| 145 | DET. YORK: | So was it like a big wad of money? |
| 146 | J. HELTON: | Not a big wad.  A stack. |
| 147 | DET. YORK: | Was it flat or folded over? |
| 148 | J. HELTON: | She had it folded over. |
| 149 | DET. YORK: | Like you would fold on and put it in a rubber band. |
| 150 | J. HELTON: | Yes. |
| 151 | DET. YORK: | And she told you that money was from the job? |
| 152 | J. HELTON: | Yeah. |

*LC TRANSCRIPTION SERVICE*   8

<u>HOSKINS/KNOX 12-CR-070-2</u>     STATEMENT: ALLEN **HELTON**     <u>DATE: 03/08/12</u>

| 153 | DET. YORK: | And did she give any of that money to Mike or you? |
|---|---|---|
| 154 | J. HELTON: | No. |
| 155 | DET. YORK: | She just put it in a holder? |
| 156 | J. HELTON: | Mmm-hmm. |
| 157 | DET. YORK: | Alright. That's it. I don't care about the dope. Obviously. But she just told |
| 158 | | you all when you went to Florida she wanted so much...(stuttering/ inaudible |
| 159 | | 07:14-07:18). That was Monday. That was before you went to Florida. Did |
| 160 | | you all. Did you see her anymore that day? |
| 161 | J. HELTON: | No. |
| 162 | DET. YORK: | Well *since* then has Amanda ever talked to you about doing that? |
| 163 | J. HELTON: | No. |
| 164 | DET. YORK: | She never said she was sorry for doing that? |
| 165 | J. HELTON: | The first time I seen her was that or nothing. |
| 166 | DET. YORK: | And she didn't mention it. |
| 167 | J. HELTON: | No. |
| 168 | DET. YORK: | Has William ever mentioned it to you and said he was sorry for doing it? |
| 169 | J. HELTON: | No. |
| 170 | DET. YORK: | When Mike got back and you...did Mike give her the share of the pills? |
| 171 | J. HELTON: | No. |

PL 015849

PL 1249

HOSKINS/KNOX 12-CR-070-2     STATEMENT: ALLEN HELTON     DATE: 03/08/12

| 172 | DET. YORK: | She didn't get her order of pills? |
|---|---|---|
| 173 | J. HELTON: | No.  They were...They were...half of them was Randy's and what I did under |
| 174 | | (inaudible 07:59 - 08:00) after I left Mike's house, I don't know.  He had his |
| 175 | | own pills, but what he was sent with was (inaudible 08:06 - 08:08). |
| 176 | DET. YORK: | The pills that Mike had...you don't know whether or not if he sold them to |
| 177 | | Amanda or not?  You can only say the stuff you had did not go to Amanda. |
| 178 | J. HELTON: | Right. |
| 179 | DET. YORK: | Alright.  So, once Mike found out, cause you know we've all talked about it. |
| 180 | | Jesse's testified that Mike started crying about Katherine and you were in the |
| 181 | | car with him when he started crying about Katherine, right? |
| 182 | J. HELTON: | Mmm-hmm. |
| 183 | DET. YORK: | Why do you think it affected him so bad?  He's got that big of a heart or ...? |
| 184 | J. HELTON: | I don't know.  Because he knew...Mike knew that they were going to do the |
| 185 | | job too. |
| 186 | DET. YORK: | (Inaudible/ stuttering 08:52 - 08:53).  He was like you. |
| 187 | J. HELTON: | Right. |
| 188 | DET. YORK: | He knew that they were going to rob her beforehand, but he didn't know they |
| 189 | | was going to...they weren't supposed to kill her, right? |
| 190 | J. HELTON: | Right. |

PL 015850

PL 1250

| 191 | DET. YORK: | So at 12:00 that day, when they were up there and she was saying that she |
| 192 | | got the job done and this was part of the money from killing |
| 193 | | Katherine...uh...he didn't know that she was dead either. |
| 194 | J. HELTON: | Right. |
| 195 | DET. YORK: | And am I correct in saying that he found out when Jesse called you all while |
| 196 | | you was in Florida? |
| 197 | J. HELTON: | Correct. |
| 198 | DET. YORK: | And that's when he found out that Katherine was dead and that's when he |
| 199 | | started crying? |
| 200 | J. HELTON: | Yeah. |
| 201 | DET. YORK: | And when he started crying did you ask him, "what's up?" Did he turn to |
| 202 | | you and say, "They killed her." |
| 203 | J. HELTON: | (Mumble/ incomprehensible 09:46) |
| 204 | DET. YORK: | Is that what happened? I mean what was his exact words? |
| 205 | J. HELTON: | Yeah. That's what happened. I said, "What's going on?" He said, "They |
| 206 | | killed that old lady." |
| 207 | DET. YORK: | Since then anything...well let's just get it out of the way. You know, me and |
| 208 | | you have talked a long, long time. Why, I mean...you're telling me this now |
| 209 | | because I don't have you arrested for anything like that. Why are you telling |
| 210 | | me this now? |
| 211 | J. HELTON: | Because it's the truth. |

PL 015851

PL 1251

<u>HOSKINS/KNOX 12-CR-070-2</u>     STATEMENT: ALLEN HELTON     <u>DATE: 03/08/12</u>

| 212 | DET. YORK: | Alright. I believe you. Has anybody else ever said anything to you about |
| 213 | | this. I mean, besides, obviously, law enforcement. Has, uh, you don't know |
| 214 | | Kayla? Or you don't know Jonathon? |
| 215 | J. HELTON: | (Mumble/ incomprehensible 10:44) |
| 216 | DET. YORK: | Who told you or have you heard of, about Jonathon and Kayla being there |
| 217 | | with William and Amanda? How did that come about? |
| 218 | J. HELTON: | Well, John really. I don't really know the people all that well, but I mean |
| 219 | | rumor was that the boy, uh, Jonathon helped Amanda do it. |
| 220 | DET. YORK: | I mean, of course you can't testify that to be true. |
| 221 | J. HELTON: | Right. |
| 222 | DET. YORK: | All you can testify for a fact is that Amanda and William came to you and |
| 223 | | tried to get you to rob this lady. |
| 224 | J. HELTON: | Yeah. |
| 225 | DET. YORK: | And afterwards Amanda looked at you and said that "the job is done" and |
| 226 | | she had the money from it. |
| 227 | J. HELTON: | Correct. |
| 228 | DET. YORK: | Alright. So Amanda never did talk about Jonathon or Kayla? |
| 229 | J. HELTON: | No. |
| 230 | DET. YORK: | Okay. Can you think of anything else Sheriff? |

PL 015852

PL 1252

<u>HOSKINS/KNOX 12-CR-070-2     STATEMENT: ALLEN HELTON     DATE: 03/08/12</u>

| 231 | SHERIFF PICKARD | Jonathon and her are first cousins, ain't they? |
| 232 | DET. YORK: | Jonathon and Amanda are first cousins.  And you said that William and |
| 233 | | Amanda are still talking? |
| 234 | J. HELTON: | Mmm. |
| 235 | DET. YORK: | At this time we end the statement. |

PL 015853

PL 1253

TRANSCRIPTION CERTIFICATION

I hereby certify that the foregoing transcript is a true and accurate transcription, to the best of my ability, of the statement of Allen Helton on 03-08-12 in the case of Commonwealth of Kentucky vs. Jonathon Taylor, Amanda Hoskins, and William Lester, indictment number 12-CR070-2.

This is the 6th day of December, 2012.

Lisa Castel
411 Valley Brook Drive
Milford, OH  45150
513-833-1705

PL 015854

PL 1254



# KNOX COUNTY SHERIFF OFFICE
## SHERIFF JOHN D PICKARD
### 234 COURT SQUARE
### BARBOURVILLE KY 40906
### PH: 606-546-3181  FAX: 606-546-3196

TO: Jackie Steele

Reference: James Allen Helton

On 03-27-2012 former Deputy Roy Gambrel arrested James Allen Helton on a warrant for receiving stolen property U/$10,000.00. Former Deputy Roy Gambrel then brought James Allen Helton to the Sheriffs' Office to speak with me; James Allen Helton told me that if I would help him with the receiving stolen property charges that he could give a lot of information on the Mills ladies murder. I told James Allen Helton that if his information was true I would see what could be done on the receiving stolen property charges. I then contacted Detective Jason York and Det. York came to Sheriffs' Office and interviewed James Allen Helton. I was never contacted or made contact with anyone to assist James Allen Helton with his charges, according to court net and former deputies Roy Gambrel and Adam Townsley the victim in the receiving stolen property case wanted restitution in the amount of $550. James Allen Helton plead to receiving stolen property u/$500 and ordered to pay restitution in the amount of $300 codefendant Michael Simpson took same plea and ordered to pay restitution in the amount of $250.

Knox County Sheriff

John D Pickard

John D Pickard

KENTUCKIANA   Date 3|21|18   Reporter JVT   Exhibit # 12
Case 17-CV-84
Deponent John Pickard

03/12/2014 WED 11:14  FAX                                                         Ø001/004

# PERSONAL HISTORY AND CONDUCT OF CONFIDENTIAL WITNESS
### (PRINT OR TYPE ALL INFORMATION EXCEPT SIGNATURES)

CONTROL SUPERVISOR: _____   DATE: _____   CONTROL OFFICER: _____

INTERVIEW SUPERVISOR: _____   DATE: _____

SUPERVISOR:  ACCEPTED AS WITNESS ☐  NOT ACCEPTED AS WITNESS ☐  INFORMANT INACTIV

| | |
|---|---|
| NAME/ALIAS: James Allen Helton | STREET ADDRESS: PO Box 9 |
| HOME PHONE #: Cell;  OTHER PHONE #: Home  622-3830           622-2084 | CITY/STATE/ZIP CODE: fourmile Ky  40939 |
| DATE OF BIRTH: 02/14/1980 | HEIGHT: 5'9"   WEIGHT: 160 |
| PLACE OF BIRTH: Kentucky | EYE COLOR: Brown |
| S. S. NUMBER: 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 | HAIR COLOR: Black |
| GENDER: M ☒ F ☐  RACE (B/W/H/A/I): | BUILD: Small |

SCARS, MARKS, DEFECTS, TATTOOS, PERSONAL IDENTIFIERS (ATTACH NECESSARY DOCUMENTS)

NAME/ADDRESS OF PHYSICIAN/DENTIST(S):

| | |
|---|---|
| OCCUPATION/SKILLS: Unemployed | DRIVER LICENSE # /STATE: |
| PLACE OF EMPLOYMENT: | AUTO LICENSE NUMBER/VEHICLE DESCRIPTION: |

| CRIMINAL ARRESTS: | CONVICTION? | CRIMINAL ARRESTS: | CONVICTION |
|---|---|---|---|
| 1. See Attached Court not | YES ☐ NO ☐ | 3. | YES ☐ NO ☐ |
| 2. | YES ☐ NO ☐ | 4. | YES ☐ NO ☐ |

| | |
|---|---|
| FAMILY / ASSOCIATES / RELATIONSHIP & ADDRESS. Sandy Helton  2. Teresa Helton  More evers  3. Shirley Scott | PAROLE/PROBATION STATUS: PAROLE/PROBATION CONTACTED?  YES ☐ NO ☒ WRITTEN APPROVAL OBTAINED?  YES ☐ NO ☒ PAROLE/PROBATION OFFICIAL'S NAME/PHONE:  WILL THE WITNESS TESTIFY IN COURT? YES ☒ NO ☐ |

ATTACH PHOTOGRAPH OF WITNESS

1

UNITE 005B
Revised 12/200?

PL004852

PL 1256

03/12/2014 WED 11:14  FAX

## WITNESS INSTRUCTIONS, GUIDELINES AND RESTICTIONS

1. I understand I am not an investigator, agent, or police officer and agree not to represent myself as such.

2. I understand all investigations that may require information from me are confidential, and that I can not to discuss or reveal said investigations or information unless I am instructed to do so by my control officer. I will not undertake any publication or dissemination of any information or materials that result from this investigation without the prior express authorization of UNITE, except by proper judicial or order or as part of a judicial proceeding.

3. I will not participate in the arrest or search of any suspect, nor shall I participate in the search of any property.

4. I understand and agree that I may be searched by a police officer at any time while I am cooperating with UNITE.

5. I understand that I am cooperating with UNITE of my own free will and accord. I understand the nature and extent of my cooperation will be reported to prosecutorial authorities. No other promise or prediction has been made concerning any pending case or prosecution.

6. I understand any violations of these instructions, guidelines and restrictions may constitute a crime. I understand that any violations will be investigated and presented for prosecution.

7. I will not carry, conceal, or possess any weapon upon my person or in any vehicle while involved in a UNITE investigation or under the direction of a UNITE investigator.

8. I understand no promises or representations have been made to me regarding my alien status and/or my right to enter or remain in the United States.

9. I will not obtain illegal or legal drugs of abuse at any time, from any person, except as instructed by my control officer. Additionally, if my personal physician prescribes any medication for my personal consumption, I will advise my UNITE control officer as soon as possible.

10. I will relinquish all drugs purchased, and information gathered, by me to my control officer or a UNITE supervisor. I will not abuse or use any drugs, including alcohol, during my period of cooperation. I may use lawfully prescribed medication with prior notification to my control officer. I will not traffic in, or conspire to traffic in, any drug without the approval of my control officer.

11. I will not participate in any activity that may constitute a crime without notification to, and approval of, my control officer. I will not initiate any plans to commit a criminal activity.

12. I will not induce any individual to commit a crime he is not predisposed to commit. I will not use my gender to induce, persuade, arrange or accomplish the sale of any drug or consummate any criminal activity.

13. I will allow UNITE or other associated law enforcement agencies to place transmitters and/or other recording devices on or about my person and on specified telephones, and to record conversations using said device.

14. My authority and consent is also given to UNITE to make full use of anything heard and/or recorded over said equipment in any criminal prosecution under the laws of either the Federal or State Government.

I, _James Helton_, have agreed to fully cooperate with personnel of UNITE during the investigation of illegal activities in the Commonwealth of Kentucky. In order to fulfill my part of this agreement, I have read each of the instructions, guidelines and restrictions above, or have had these instructions, guidelines and restrictions read to me. I understand and agree to each, and will fully observe each instruction, guidelines, and restrictions. I will not violate any Federal, State, or local laws (except as described above) while assisting UNITE in any criminal investigation.

I have not been threatened or coerced in any manner by any member of UNITE.

_James Helton_ _____     __12-3-2009__
WITNESS SIGNATURE                         DATE

_____
CONTROL OFFICER                          INTERVIEWING SUPERVISOR

                                         UNITE 005B
                                         09 2004

PL004853

PL 1257

03/12/2014 WED 11:14  FAX

CASE # _____

## UNITE

### AUTHORITY & CONSENT FORM

This is to certify that I do hereby give authority and consent to UNITE to attach or install electronic and/or mechanical listening, recording and/or transmitting device to my person/telephone (s) for the duration of my cooperation with UNITE from the date of this authorization, and to listen to and/or record all conversations heard over said equipment to which I am a party. My authority and consent is also given to UNITE to make full use of anything heard and/or recorded over said equipment in any criminal prosecution under the laws of either the Federal or State Government.

This authorization is given freely and voluntarily by me with out coercion, duress, or threats of any kind.

Dated this _____3_____ day of _____Dec_____ 20 09

Signature _James Helton_

Witness: _Sam Johns_          Signature _____          _12-3-09_
Name (Type or Print)                                           Date

Witness: _Ryan McTegel_          Signature _____          _12-3-09_
Name (Type or Print)                                           Date

UNITE 005A
Rev. 03/2002

PL004854

PL 1258

03/12/2014 WED 11:14  FAX

## Cumberland Task Force
### UNITE

Confidential Informant Number  CVI-O9-OO5

| Date | Case Number | Agent | Amount | Comments |
|------|-------------|-------|--------|----------|
| 12-03-2009 | CV-09-190 | 55Jwon | $100.00 | Tim Jordan |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

PL004855

PL 1259



P277

Date 3/21/18
KENTUCKIANA Reporter JVI Exhibit # 19
Case 17·CV·84
Deponent John Pickard

Det U.Q.Burch V/1E10
KSP P-10 2/2/11 1600 HRS

michael 5.8% +0;

Pamela K.A
Pe
2

Description
Provided By
Michael M.G.Crump : 2-2-11
on 2/2/11    Carola Peters

49

Michael Crump Page 2





Date 3·21·18
KENTUCKIANA Reporter JVT Exhibit # 20
Case 11·CV·84
Deponent John Pickard

PL005067

PL 1261

PL005068

PL005069

PL 1263

PL005070

PL 1264

PL005071

PL 1265

PL005072

PL 1266

PL005073

PL 1267



PL005074

PL 1268



Matthew G. Bevin / Governor
John C. Tilley / Secretary
Mark Filburn / Commissioner

Funderburk Building
521 Lancaster Avenue • Richmond, KY 40475-3102
(859) 622-1328 • https://docjt.ky.gov

*An Equal Opportunity Employer M-F-D*

February 28, 2018

Jason E. Williams
Williams, Farmer & Towe
303 S. Main St.
London, KY 40743

Dear Mr. Williams:

This will acknowledge receipt of your request for public records.  You requested copies of:

    1.  Training records for John Pickard and Derek Eubanks

Attached to this email are the training records for John D. Pickard and Derek R. Eubanks.

Please let me know if I can be of any further assistance.

Sincerely,

Brandi J. Robinson
Records & Registration Section Supervisor

Date 3/21/18
KENTUCKIANA Reporter JVT Exhibit # 15
Case 11-CV-84
Deponent John Pickard





PL 1269

Kentucky Justice & Public Safety Cabinet

# Department of Criminal Justice Training

### Certification of Copies of Official Government Records
### Pursuant to KRE 902, KRE 1003 and CR 44.01

Jason E Williams

Address:

| 303 S. Main St. | London | KY | 40743 |
|---|---|---|---|
| Street/P. O. Box | City | State | Zip Code |

**Official Document Description:**

- John D. Pickard training record
- Derek R. Eubanks training record

The copies of the foregoing identified agency records for which this certification is made are true and complete reproductions of the original or microfilmed original records that are housed in the *Department of Criminal Justice Training*.

The original records were made or kept in the regular course of business or activity, of this agency, and it was the regular course of business of the *Department of Criminal Justice Training*, to keep, record, or cause to be recorded in a timely manner such records of the act, transaction, occurrence or event reflected therein. These records were made or otherwise created by a technician trained or employed by the *Department of Criminal Justice Training*. This certification is given pursuant to KRE 902, KRE 1003 and CR 44.01 by the custodian of the records for the above named government agency in lieu of my personal appearance.

_____
*Official Custodian of Records*

**State of Kentucky**

**County of**  Madison

Subscribed and sworn to and acknowledged before me this 27ᵗʰ day of February .
20 18 .

_____
*Notary Public, State at Large*

My commission expires:   1/4/22



**Training History**
Department of Criminal Justice Training

For: **Pickard, John D.**

Academy ID: **6299-0549**

| Course/Title | Training Dates | | Status | Hours | Date of Completion |
|---|---|---|---|---|---|
| 1453-09J - Sheriff'S Conference - 2009 8514 | 9/14/2009 | 9/18/2009 | Graduated | 40 | 9/18/2009 |
| 1453-08J - Sheriff'S Conference - 2008 7555 | 9/8/2008 | 9/12/2008 | Graduated | 40 | 9/12/2008 |
| 1453-07J - Sheriff'S Conference - 2007 8102 | 9/10/2007 | 9/14/2007 | Graduated | 40 | 9/14/2007 |
| 032S-050 - Mandatory Training By Video Tape - 2005 - NTC -13706 | 5/24/2005 | 5/24/2005 | Graduated | 8 | 5/24/2005 |
| 1220-040 - Stress Management 5186 | 12/6/2004 | 12/7/2004 | Graduated | 16 | 12/7/2004 |
| 032S-040 - Mandatory Training By Video Tape - 2004 - Knox Co. - NTC-12233 | 7/17/2004 | 7/17/2004 | Graduated | 8 | 7/17/2004 |

152

PL 1271



**Training History**
Department of Criminal Justice Training

For:   Eubanks, Derek R.

Academy ID:   0757-7386

| Course/Title | Training Dates | | Status | Hours | Date of Completion |
|---|---|---|---|---|---|
| 2120-17J - Property & Evidence Room Management 13405 | 12/4/2017 | 12/8/2017 | Graduated | 40 | 12/8/2017 |
| 2057-16J - Current Issues For Patrol Officers 12842 | 3/21/2016 | 3/25/2016 | Graduated | 40 | 3/25/2016 |
| 1441-13A - Crisis Intervention Team Training For Ky Len 12063 | 9/21/2015 | 9/25/2015 | Graduated | 40 | 9/25/2015 |
| 1466-13J - Human Trafficking & Hate Crimes Investigation 11705 | 12/8/2014 | 12/12/2014 | Graduated | 40 | 12/12/2014 |
| 1453-13J - Sheriff'S Conference - 2013 11109 | 9/9/2013 | 9/13/2013 | Graduated | 40 | 9/13/2013 |
| 1453-12J - Sheriff'S Conference - 2012 10398 | 9/17/2012 | 9/21/2012 | Graduated | 40 | 9/21/2012 |
| 1453-11J - Sheriff'S Conference - 2011 9583 | 9/19/2011 | 9/23/2011 | Graduated | 40 | 9/23/2011 |
| 1384-09K - Hazardous Materials Technician/Meth Lab Investigations - London - NTC-17494 | 5/6/2011 | 5/6/2011 | Graduated | 40 | 5/6/2011 |
| 1453-10J - Sheriff'S Conference - 2010 9395 | 12/6/2010 | 12/10/2010 | Graduated | 40 | 12/10/2010 |
| 1453-09J - Sheriff'S Conference - 2009 8514 | 9/14/2009 | 9/18/2009 | Graduated | 40 | 9/18/2009 |
| 1453-08J - Sheriff'S Conference - 2008 7555 | 9/8/2008 | 9/12/2008 | Graduated | 40 | 9/12/2008 |
| 1453-07J - Sheriff'S Conference - 2007 8102 | 9/10/2007 | 9/14/2007 | Graduated | 40 | 9/14/2007 |
| 1349-06J - Kentucky Homeland Security 6526 | 12/11/2006 | 12/15/2006 | Graduated | 40 | 12/15/2006 |
| 0293A-05C - Breath Test Operator Recertification 6591 | 4/6/2006 | 4/6/2006 | Graduated | 4 | 4/6/2006 |
| 1267-050 - Patrol Officer Response To Major Crimes 5814 | 10/25/2005 | 10/28/2005 | Graduated | 32 | 10/28/2005 |
| 032S-050 - Mandatory Training By Video Tape - 2005 - NTC -13714 | 6/1/2005 | 6/1/2005 | Graduated | 8 | 6/1/2005 |
| 1217-040 - Patrol/Traffic Skills Revisited 4719 | 11/2/2004 | 11/5/2004 | Graduated | 32 | 11/5/2004 |
| 032S-040 - Mandatory Training By Video Tape - 2004 - NTC -12232 | 7/17/2004 | 7/17/2004 | Graduated | 8 | 7/17/2004 |
| 0472-03C - Basic Breath Test Operator 4220 | 12/15/2003 | 12/19/2003 | Graduated | 40 | 12/19/2003 |
| 032S-030 - Mandatory Training By Video Tape - 2003 - NTC -11480 | 8/15/2003 | 8/15/2003 | Graduated | 8 | 8/15/2003 |
| 032S-020 - Mandatory Training By Video Tape - 2002 - NTC -10861 | 11/2/2002 | 11/2/2002 | Graduated | 8 | 11/2/2002 |
| 1000-020 - Grant Writing For The Practitioner 3525 | 9/3/2002 | 9/4/2002 | Graduated | 16 | 9/4/2002 |
| 0998-020 - Child Abuse Investigation II 3370 | 5/30/2002 | 5/31/2002 | Graduated | 16 | 5/31/2002 |
| 032S-010 - Mandatory Training By Video Tape - 2001 - NTC -10418 | 10/15/2001 | 10/15/2001 | Graduated | 8 | 10/15/2001 |
| 0798-990 - Court Security Procedures 2990 | 8/21/2001 | 8/24/2001 | Graduated | 32 | 8/24/2001 |
| 0783-990 - Child Abuse Investigation 2552 | 6/7/2001 | 6/8/2001 | Graduated | 16 | 6/8/2001 |
| 0780-990 - Gangs 2992 | 4/24/2001 | 4/25/2001 | Graduated | 16 | 4/25/2001 |
| 032S-000 - Mandatory Training By Video Tape - 2000 - NTC -5991 | 11/20/2000 | 11/20/2000 | Graduated | 8 | 11/20/2000 |
| 0782-990 - Basic Officer Skills 1490 | 5/22/2000 | 5/26/2000 | Graduated | 40 | 5/26/2000 |
| 032S-990 - Mandatory Training By Video Tape - 1999 - NTC -423 | 3/1/1999 | 3/1/1999 | Graduated | 8 | 3/1/1999 |

820

PL 1272

☐ JUVENILE OFFENDER

P262

COMMONWEALTH OF KENTUCKY
U. FORM CITATION

KSP 206 (REV 2/1/06)

COURT 2 POLICE

| AGENCY Kentucky State Police | ORI KY KSP1U |
|---|---|

| NAME (L-F-M)   SKIP A SPACE BETWEEN NAMES   Taylor   Jonathan | ATTN: ☐ | HOME PHONE |
|---|---|---|

| ALIAS | EMERGENCY PHONE |
|---|---|

| ADDRESS (RED/STREET/APT. NO., ETC.) 55 Jagaz Cl | KENTUCKY RESIDENT STATUS F.☐ FULL TIME  P.☐ PART TIME  N.☐ NON RESIDENT |
|---|---|

| CITY Baxterville | STATE KY | ZIP 40906 | MARITAL STATUS |
|---|---|---|---|

| I.D. TYPE/STATE | I.D. NUMBER | S.S. NUMBER 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 | VICTIM'S RELATIONSHIP TO OFFENDER |
|---|---|---|---|

| DATE OF BIRTH 17 21 87 | SEX ☒ MALE ☐ FEMALE | RACE ☐ WHITE ☒ BLACK ☐ AM. INDIAN OR ALASKAN ☐ ASIAN | ETHNIC ORIGIN |
|---|---|---|---|

| PLACE OF EMPLOYMENT / OCCUPATION | CITY | STATE | ☐ HISPANIC  ☐ NON HISPANIC |
|---|---|---|---|
| | | | HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR |

| VEH. MAKE | VEH. TYPE | VEH. YEAR | COLOR TOP/BOTTOM | ALCOHOL/DRUG INVOLVEMENT (SPECIFY) ☐ NO  ☐ YES  ☐ UNK |
|---|---|---|---|---|

| REG. STATE | REG. YEAR | REGISTRATION NO | VEHICLE IDENTIFIERS | MPH | IN MPH ZONE | VOL. KEY |
|---|---|---|---|---|---|---|

| VIOLATION DATE 03 15 12 | VIOLATION TIME 1200 | EXACT LOCATION OF VIOLATION / ARREST Whitley County Detention Center | B.A. RESULTS |
|---|---|---|---|

| DATE OF ARREST 03 15 12 | TIME OF ARREST 1205 | MILES At | DIRECTION | CITY Williamsburg | COUNTY OF VIOLATION Knox | SECTOR |
|---|---|---|---|---|---|---|

| VIOLATION CODE | ASCF | STATUTE / ORD. | CHARGES | # | PLEA | FIND-ING | FINAL VIOLATION CODE | DISPN. CODE | FINE | COSTS | FEE | JAIL / PRISON | PROB. TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09150 | | 507.020 | Murder | 1 | | | | | | | | | |
| 12002 | | 515.020 | Robbery | 2 | | | | | | | | | |
| | | | | 3 | | | | | | | | | |
| | | | | 4 | | | | | | | | | |

| COURT DATE ARRESTED | COURT TIME ☐ AM ☒ PM | PAYABLE ☐ ☒ COURT | COURT LOCATION Knox District | COURT CASE NO. | DISPN. DATE | TRIAL ☐ B ☐ J ☐ N | CLERK'S INITIALS |
|---|---|---|---|---|---|---|---|

POST-ARREST COMPLAINT
1) Murder
2) Robbery 1st

Executed Warrant.

KENTUCKIANA Reporter
Date 8/21/18
Case 17-CV-84   JVT   Exhibit # 74
Deponent John Pickard

| CDL LICENSE ☐ No ☐ Yes | PLACARDED HAZARDOUS VEHICLE ☐ No ☐ Yes | YEAR 1 |
|---|---|---|

| COMMERCIAL VEHICLE ☐ No ☐ Yes | CDL CLASS ☐ A ☐ B ☐ C | M177061 |
|---|---|---|

| NAME OF WITNESS | ADDRESS CITY/STATE | CONTROL NUMBER |
|---|---|---|
| NAME OF WITNESS | ADDRESS | |

| CASE NO. | 1 | 2 | 3 | 4 |
|---|---|---|---|---|

| CARRIED FOR UCR BY CONTRIBUTOR: ☒ | ☐ IN-CAR VIDEO | ☐ FINGER PRINTS | EVIDENCE HELD |
|---|---|---|---|
| OTHER AGENCY: ☐ SPECIFY | | ☐ PHOTOS | |

| OFFICER'S SIGNATURE X | BADGE / I.D. NUMBER 4180 | ASSIGNMENT 10 | 4 |
|---|---|---|---|

PL005132

PL 1273

From:                                          12/30/2014 00:05    #639 P.018/022

# UNIFORM CITATION

KSP 206 (REV 2/1/06)

**COURT**

| AGENCY Knox County Sheriff office | | ORI KY 06/000 |
|---|---|---|

**OFFENDER / VIOLATOR**

NAME (L-F-M)  SKIP A SPACE BETWEEN NAMES   TAYLOR, Johathon    ATTN. ☐   HOME PHONE 670-9527

ALIAS                                            EMERGENCY PHONE 261-5934

ADDRESS (RFD/STREET/APT. NO. ETC.) 61 meadows trail stew Trace + 28 fullmoon court   KENTUCKY RESIDENT STATUS  F ☑FULL TIME  P ☐ PART TIME  N ☐ NON RESIDENT

CITY BARBOURVILLE    STATE KY   ZIP 40906    MARITAL STATUS

I.D. TYPE/STATE   I.D. NUMBER    S.S. NUMBER 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    VICTIM'S RELATIONSHIP TO OFFENDER

| DATE OF BIRTH 12 21 87 | SEX ☑MALE ☐FEMALE | RACE ☑WHITE ☐BLACK  ☐AM. INDIAN OR ALASKAN ☐ASIAN | ETHNIC ORIGIN ☐HISPANIC ☑NON HISPANIC |
|---|---|---|---|

PLACE OF EMPLOYMENT / OCCUPATION      CITY      STATE    HEIGHT 6'11  WEIGHT 215  HAIR COLOR BRN  EYE COLOR HaZ

**VEHICLE**

| VEH. MAKE | VEH. TYPE | VEH. YEAR | COLOR TOP/BOTTOM | ALCOHOL/DRUG INVOLVEMENT (SPECIFY) ☐NO ☑YES ☐UNK |
|---|---|---|---|---|
| REG. STATE | REG. YEAR | REGISTRATION NO. | VEHICLE IDENTIFIERS | MPH   IN MPH ZONE  VOL. KEY |

**DATE / TIME**

| VIOLATION DATE 02 12 12 | VIOLATION TIME 0126 HRS | EXACT LOCATION OF VIOLATION / ARREST  28 fullmoon court | B.A. RESULTS |
|---|---|---|---|
| DATE OF ARREST 02 12 12 | TIME OF ARREST 0130 HRS | MILES 2 | DIRECTION N E | CITY 0610? BARBOURVILLE | COUNTY OF VIOLATION 061 KNOX | SECTOR 26 |

**CHARGE(S)**

| VIOLATION CODE | ASCF | STATUTE / ORD | CHARGES | # | PLEA | FIND-ING | FINAL VIOLATION CODE | DISPN CODE | FINE | COSTS | FEE | JAIL / PRISON | PROB. TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 42299 | | 218A.1432 | ① | 1 | | | | | | | | | |
| | | | | 2 | | | | | | | | | |
| | | | | 3 | | | | | | | | | |
| | | | | 4 | | | | | | | | | |

**COURT**

| COURT DATE ARREST CB | COURT TIME ☐AM ☐PM | PAYABLE ☐ COURT | COURT LOCATION KNOX District | COURT CASE NO | DISPN. DATE | TRIAL ☐B ☐J ☐N | CLERK'S INITIALS |
|---|---|---|---|---|---|---|---|

**POST-ARREST COMPLAINT**

#1 MANUFACTURING METHAMPHETAMINE 1st

Received complaint of meth Lab at 28 fullmoon court
upon officers knocking on front Door of apartment officers so real of
Department located an active 1 step meth Lab and one Generator in the front
of Apt 28 and viewed silhouettes and heard subjects moving in Apt
upon entry into Apt 1 subject was located in Downstairs Living Rm
3 in upstairs Bedroom and 1 in attic of Apt

Date 3/21/18   Reporter JVT   Exhibit # 25
Case 17-CV-84
Deponent John Pickard

**KENTUCKIANA** COURT REPORTERS

**CDL**

| CDL LICENS | PLACARDED HAZARDOUS VEHICLE ☐No ☐Yes | YEAR 12 |
|---|---|---|
| COMMERCIA | CDL CLASS ☐A ☐B ☐C | |

| NAME OF WITNESS | ADDRESS CITY/STATE | |
|---|---|---|
| NAME OF WITNESS | ADDRESS | |
| CASE NO. | 1 | 2 | 3 | 4 |

CARRIED FOR UCR BY CONTRIBUTOR ☐   ☐ IN-CAR VIDEO   ☐ FINGERPRINTS  EVIDENCE HELD
OTHER AGENCY ☐ SPECIFY                    ☐ PHOTOS

OFFICER'S SIGNATURE X _____   BADGE / I.D. NUMBER 50-10   ASSIGNMENT KNOX-50

**CONTROL NUMBER K856099**   **TYPE**

**Press hard • ball-point pen • all copies legible!**

PL003221

PL 1274