UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| PEARLIE SUE GAMBREL, *Personal Representative of the Estate of Jessie J. Mills*, | ) ) ) ) | |
| | ) | No. 6:17-CV-184-REW-HAI |
| Plaintiff, | ) ) | |
| v. | ) ) | OPINION & ORDER |
| KNOX COUNTY, et al., | ) ) | |
| Defendants. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

## I.    BACKGROUND

A late-night kidnapping, a struggle with police in the middle of a country road, two gunshots. This regrettable sequence of events describes the final hours of Jessie Mills's life, which ended on June 29, 2016.

Earlier that evening, Mills had arrived at the home of James and Geneva Helton, Mills's in-laws and the legal custodians of Mills's four children. *See* DE 64 (PL 594 James Helton Audio); DE 68 at 5 (Geneva Helton Dep.). The Commonwealth had removed Mills's children and given custody to the mother's parents because of substance abuse and domestic violence issues. *See* DE 85-1 ¶ 6 (finding Jessie and Whitney Mills "not fit and proper" custodians "due to a history of domestic violence and substance abuse. . . . [They] are unable to provide a safe and proper home for the children"). According to Geneva, sometime around 10:00 p.m., she woke to the sound of Mills knocking on the door. DE 68 at 9–10. Geneva let Mills inside and noticed his unusual behavior: Mills got himself a drink without saying a word to her, and he tried (unsuccessfully) to dress some of his (newly awakened) children. *See id.* at 9–11. Geneva did not believe that Mills

was sober at the time. *Id.* at 11. The older children refused to go with their father. *See* DE 64 (James Helton Audio); DE 70 at 5–6 (James Helton Dep.).[1]

Mills then picked up his two-year-old daughter—who was crying—and went out the porch door. *See* DE 64 (James Helton Audio). Mills, with utterly no right to take the child, began to drive away in a Ford Explorer with his daughter in his arms. *See* DE 70 at 15. The Heltons yelled after Mills and attempted to stop him from leaving with the child. *See* DE 64 (James Helton Audio); DE 68 at 12. Both James and Geneva recall having to jump out of vehicle's path as Mills left their home. *See* DE 64 (James Helton Audio); DE 68 at 12. James followed Mills by car; Geneva stayed with Mills's other children and called 911. *See* DE 64 (James Helton Audio); DE 68 at 14.

When James caught up with Mills, he found him walking in the road, carrying his daughter. *See* DE 64 (James Helton Audio). Sitting in the road was the (apparently inoperable) Explorer Mills had been driving. *See* DE 64 (James Helton Audio); *id.* (PL 598 Ricky Hobbs Audio); DE 69 (Ricky Hobbs Dep.) at 4–5. Ricky Hobbs, one of James's friends who lived nearby, noticed the scene and had approached Mills. *See* DE 64 (Hobbs Audio). Mills asked Hobbs for a ride; Hobbs refused. *See id.*; DE 69 at 5. James told Hobbs that Mills had stolen the child and that the police had already been called. *See* DE 69 at 5. James and Hobbs then walked together—trailing behind Mills and his daughter—in an attempt to prevent unsuspecting drivers from hitting them as Mills walked in the middle of the dark road. *See* DE 64 (James Helton Audio); DE 69 at 7.

Knox County Sheriff's Deputy Mikey Ashurst and Knox County Constable Brandon Bolton,[2] riding together in Ashurst's vehicle, responded to the calls for service just before 11:00

---

[1] The Court generally cites to the CM/ECF deposition page but makes pinpoint designations to internal pagination where indicated.

[2] For brevity, the Court throughout refers to the men collectively as "the officers," despite recognition that their proper titles are deputy and constable.

p.m. *See* DE 85-2 (KSP Investigation Report); DE 108-2 (CAD Report); DE 65 (Brandon Bolton Dep.) at 5–6; DE 80 (John Michael Ashurst Dep., Vol. I) at 104–05. By the time Ashurst and Bolton arrived, at 10:57 per the CAD Report, Mills had made it to Kentucky Route 223, a two-lane road with a double yellow line down the middle. *See* DE 69 at 29; DE 80 at 90. At this point, Mills was still walking in the middle of the road, carrying his young daughter, and James and Hobbs were still on foot, following the pair. *See* DE 65 at 7; DE 69 at 30; DE 80 at 90; DE 81 (John Michael Ashurst Dep., Vol. II) at 14.

The parties offer competing versions of what unfolded in the 5-6 minutes between the initial encounter with law enforcement and the fatal gunshots. But they do not dispute at least this much:

Mills's behavior on the evening in question was, at a minimum, very erratic. *See* DE 65 at 26 (Bolton recalling Mills's unpredictable behavior and surprising strength); DE 69 at 23 (Hobbs describing Mills as "out of his head" and relating that Mills flexed his arm muscle at the officers); DE 81 at 77 (Ashurst explaining Mills's "1,000 yard stare"). The KSP investigative file reflects that the officers believed Mills to be "under the influence of some kind of drug." DE 85-2 at 1. In his deposition, Hobbs testified that he told the officers about Mills's drug use. *See* DE 69 at 34.[3] To phrase it as depicted by Hobbs, the central source relied on by Plaintiff: "He was just out of it

---

[3] The toxicology screening conducted after Mills's autopsy tested his blood and urine for various substances, including "amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, Fentanyl, methadone, other opiates," as well as "ethanol, other stimulant drugs." *See* DE 75 (Meredith Frame Dep., Vol. I) at 66–67. The panel showed that Mills did not have any of the tested substances in his blood at the time of his death, but his urine tested positive for methamphetamine. *See id.* at 71; DE 76 (Meredith Frame Dep., Vol. II) at 1. The medical examiner testified in her deposition that the panel would not necessarily test accurately for the presence of synthetic drugs, such as Flakka, which the coroner had mentioned in the narrative submitted to the medical examiner. *See* DE 75 at 30, 67–69.

. . . He was out of his mind. He wouldn't listen to nobody." Hobbs Dep., internal pp. 88–89. Also, "The methamphetamine's started it when it got him out of his mind." *Id.* at internal p. 128.

Upon arrival, Ashurst and Bolton got out of the vehicle and approached Mills, attempting to get his attention. *See* DE 65 at 7; DE 69 at 8; DE 81 at 17–19. The officers recall, and no witness appears to explicitly refute, that Mills verbally refused to relinquish his daughter. *See* DE 65 at 7 ("She's got my blood. You'll have to beat me in the face with them flashlights before I give her up."); DE 81 at 31 ("The only way you'll get this baby is if you pry her out of my cold, dead hands."). Mills evaded the officers' efforts to secure the child, so they used force (a Taser or strike) to take Mills to the ground and to remove her from Mills's arms. *See* DE 65 at 8; DE 69 at 8, 30–31; DE 70 at 10; DE 81 at 30–31, 36–39. Bolton brought the child to her grandfather James, a short distance away from where the officers encountered Mills. *See* DE 70 at 10–11. She remained with James for the duration of the incident.

For much of the rest of the interaction, Mills was lying in the road, where he received numerous strikes or force expressions from the officers as they endeavored to arrest him. Ashurst effectively deployed his Taser at least once (with the prongs making contact with Mills's back), and each officer later tried to or did use the Taser in drive-stun mode. *See* DE 65 at 10–11; DE 81 at 48–54. Bolton further admits to hitting Mills with his flashlight, and Ashurst struck Mills with his knees, flashlight, and ASP (a metal baton). *See* DE 65 at 11; DE 81 at 62–64, 70–73, 79–80.[4] During this time, Ashurst was yelling commands at Mills to stop resisting and to roll onto his stomach. *See* DE 65 at 10–11 ("The whole entire time Mr. Ashurst is yelling at him to stop resisting."); DE 67 (Daniel Smith Dep.) at 23 ("I don't remember exact words, but, you know, I

---

[4] Contrary to Plaintiff's assertion, the officers do not, in the cited deposition excerpts, admit to beating Mills with their fists or kicking him. *See* DE 108 ¶ 38.

4

remember them telling him to—to lay down on the ground."); DE 69 at 24 (agreeing that the officers gave Mills instructions); DE 72 (Shannon Burdine Dep.) at 64 (quoting commands as "Stop being combative," and "Just put your hands behind your back."); DE 81 at 76. *But see* DE 69 at 11 (Hobbs claiming that, while the officers were striking Mills, Hobbs "never hear[d] him [presumably, one of the officers] saying nothing."). Mills was significantly larger than both officers: Mills was about two inches shy of six feet tall and weighed approximately 210 pounds; Ashurst was 5'8" and 145 pounds; the diminutive Bolton was 5'7" and 120 pounds. *See* DE 85-2 at 1–2; DE 75 (Meredith Frame Dep., Vol. I) at 33. Neither Ashurst nor Bolton recalled noticing a weapon on Mills's person. *See* DE 65 at 9; DE 81 at 82.

While on the ground, Mills never rolled onto his stomach or put his arms behind his back, despite Ashurst's commands to do so. *See* DE 69 at 23, 32; DE 81 at 54, 58. Instead, after numerous strikes by the officers, Mills got to his feet, which prompted Ashurst again to order Mills to lie down and submit to arrest. *See* DE 65 at 26; DE 69 at 32–33; DE 81 at 84. At this time, Ashurst warned Mills that he would shoot. *See* DE 69 at 33; DE 81 at 85. Mills still proceeded in Ashurst's direction, with his hand or arm extended, when Ashurst pulled the trigger. *See* DE 69 at 24, 33, 35; DE 81 at 85. Neither Ashurst nor Bolton rendered aid to the mortally wounded Mills. *See* DE 81 at 90. After the altercation, both officers had blood on them—Mills's, apparently, as neither officer had suffered any lacerations. *See* DE 65 at 15–16; DE 69 at 8; DE 80 at 34; DE 82 at 62. Bolton recalled sore muscles, and Ashurst had a knot on his knee. *See* DE 65 at 15; DE 82 at 62.

Now, the disputed events: Plaintiff's version, drawn almost entirely from Hobbs's (sworn and unsworn)[5] statements, adds detail to the above narrative. According to Hobbs and James, when the officers first encountered Mills with his daughter, they tried unsuccessfully to grab the child from his arms. *See* DE 69 at 8; DE 70 at 9–10. When Mills turned and moved away from the officers, Hobbs saw the uniformed officer (presumably Ashurst) hit Mills in the back of the head with a flashlight. *See* DE 69 at 7–8. James recalled both officers striking Mills in the head with an unidentified black object. *See* DE 70 at 9–10. Using Hobbs's words: "Well, he ducked around, swing, something like that and gets loose from them. And he takes off running." Hobbs Dep., internal p. 23. These blows caused Mills to fall to the ground and release his daughter. Per Hobbs, in the altercation that ensued, Mills did not fight with the officers; Ashurst and Bolton attacked Mills unprovoked. *See* DE 69 at 9, 23. Hobbs described a beating that involved the use of the officers' hands, feet, elbows, and knees. *See id.* at 8–9, 32–33. Mills's lone act of resistance was a "little mule kick" in response to the officers kicking Mills. *See id.* at 23, 33. Hobbs claimed that "they had every opportunity in the world to handcuff him and to save his life instead of brutally killing him. Even I could have handcuffed him." *See id.* at 34. When Mills rose to his feet and moved in Ashurst's direction, his hand was extended, but he was not looking at Ashurst. *See id.* at 24, 33. Hobbs confirmed in his deposition that Mills had never threatened to hurt anyone on the evening in question. *See id.* at 36.

Defendants paint a different picture. When they first approached Mills, he was carrying his daughter in his left arm and swinging his right fist. *See* DE 65 at 7; DE 81 at 15. Ashurst put his

---

[5] There are three separate sources for Hobbs's recollection of the incident. First, a KSP detective took Hobbs's recorded statement in the early morning hours immediately following the shooting. *See* DE 64 (Hobbs Audio). Approximately a month later, Hobbs gave another (in some key ways, divergent) statement to a private investigator. *See* DE 109 (Ex. 16, PL 810 Hobbs Audio). Finally, Hobbs was deposed in this matter. *See* DE 69.

hands on Mills try to get him to stop. DE 81 at 30–31. Mills then attempted to strike Ashurst in the face before turning and running away with the child still in his arms. *See* DE 65 at 7. In response, Ashurst successfully deployed his Taser, which caused Mills to fall to the ground. *See* DE 81 at 36–39. Once Bolton had returned the child to her guardian, Ashurst and Bolton tried to take Mills into custody. Mills did not relent or respond to any of their commands, instead kicking the officers, attempting to bite Bolton, and knocking at least one of Ashurst's weapons (his Taser) out of his hand. *See* DE 65 at 9–14; DE 81 at 52, 64–65. At some point, Ashurst also lost control of his flashlight. *See* DE 65 at 11; DE 81 at 64–65. Neither officer could get in a position to handcuff Mills, who remained on the ground, kicking, punching, rolling, and twisting. *See* DE 65 at 12–13; DE 81 at 46, 58, 65; DE 82 at 57. Mills then verbally threatened the officers, stood, and advanced quickly toward Ashurst, who was backing away with his weapon drawn and issuing commands. *See* DE 65 at 13–14 (per Bolton's memory, Mills said, "I'm going to hurt you both."); DE 81 at 83 (Ashurst quoting Mills as having said, "I'm going to hurt you."). Moments later, Ashurst fired the fatal shots.

* * * * *

Plaintiff filed suit against Ashurst, Bolton, and Knox County, asserting federal constitutional claims under § 1983 and related state-law torts. *See* DE 4. After resolution of Defendants' earlier Rule 12 motion (DE 12), the following claims persist: Count One (§ 1983 excessive force), Count Three (assault and battery), Count Four (wrongful death), and Count Five (*Monell*). *See* DE 18 at 30 (dismissing Counts Two, Six, Seven, and Eight).

Defendants now jointly move for summary judgment. DE 84 (Motion); DE 85 (Memorandum). Plaintiff responded in opposition. DE 108. Defendants replied. DE 117. The matter is ripe for consideration.

Every force case, particularly one involving use of deadly force, requires solemnity and care. Ashurst, cloaked with state power, made the irrevocable decision to take Jessie Mills's life on June 29, 2016. But the Court must decide this civil action on the legal standards and the established record, not on hyperbole or rhetoric from either side. Further, the Court must discuss and critique the evidence with dutiful adherence to its role in this context, which is not to act as factfinder. With respect for the rights of Mills, the value of his life, the difficult job of police, and the contextual gravity, the Court turns to the framework for analysis.

## II.    STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*,

106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

In *Matsushita*, 106 S. Ct. at 1356, the Supreme Court "authorized an inquiry on summary judgment into the implausibility of inferences from circumstantial evidence, not an inquiry into the credibility of direct evidence." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994) (internal quotation marks and alterations omitted) (interpreting *Matsushita*). Put differently, it is "error for

[a] district court to resolve credibility issues against the nonmovant[.]" *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).

## III.   ANALYSIS

### A.  Federal Claims

#### 1.  § 1983 Excessive Force (Count One)

Defendants argue that the use of force by Ashurst and Bolton was justified, pointing to the nature of the call (kidnapping), Mills's initial refusal to relinquish his daughter and subsequent failure to submit to arrest, his evident use of methamphetamine, and his behavior during the incident and in the moments immediately preceding the gunshots. *See* DE 85 at 16–24. Defendants describe Mills standing up, advancing toward a retreating Ashurst, and ignoring Ashurst's warnings and commands. *Id.* at 21–23. In response, Plaintiff highlights the various types of force used by Ashurst and Bolton—flashlight, ASP, Taser, fists, feet, and knees—and contends that Mills was not fighting with the officers but rather trying to comply. *See* DE 108 at 36. Per Plaintiff, there is a triable issue on this claim for various reasons: Mills's daughter was not in danger at the time Ashurst and Bolton used force against Mills; the officers could have easily handcuffed Mills at any point; backup was on the way; Mills was unarmed; Mills was at least three or four feet from Ashurst at the time of the shooting; bystanders were not fearful and spoke to Mills during the altercation; and Ashurst and Bolton recalled no physical injuries to themselves as a result of this encounter. *See id.* at 37–39. Plaintiff goes on to discredit bystander accounts that suggest Mills actively resisted arrest. *See id.* at 39–40.

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 105 S. Ct. 1694, 1699 (1985). When "the officer has probable cause to believe that the suspect poses a threat of serious physical harm,

either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* at 1701.

> There are certain facts and circumstances that have been held to be important when evaluating whether an officer has probable cause to believe deadly force necessary. The most common considerations are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (quoting *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989)).[6] Other relevant factors include "the number of lives at risk" and "the 'relative culpability' of those at risk," as well as the suspect's demeanor and "the size and stature of the parties involved." *Id.* (internal quotations omitted). A court may further consider whether the suspect "was intoxicated and noncompliant." *Id.*

However, these "factors do not constitute an exhaustive list; the ultimate question is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 109 S. Ct. at 1872.[7] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

---

[6] The Court views all claims of excessive force—lethal or not—through the Fourth Amendment lens as informed by *Graham*. The inquiry centers on whether the challenged use of force was objectively reasonable, under the totality of the circumstances and in light of the three non-exhaustive *Graham* factors. *See Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007). "In excessive force cases, the threat factor is 'a minimum requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015).

[7] The officers' particular knowledge at the time force is applied provides the specific context. "Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 121 S. Ct. 2151, 2159 (2001).

necessary in a particular situation." *Smith v. Freland*, 954 F.2d 343, 346–47 (6th Cir. 1992). Moreover, "this assessment is based on a 'segmented analysis' of the totality of the circumstances facing the [officers] at the time they made their split-second judgments immediately prior to using deadly force." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009).

Some matters involving claims of deadly force proceed to trial "when a factual dispute surround[s] the shooting [or other use of deadly force]." *See Yates v. Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991). Critically, at summary judgment, the factual dispute must be genuine and must relate to a material fact. *See Chappell*, 585 F.3d at 913. The "duty to afford the nonmoving party the benefit of reasonable inferences [does not] require[] [the Court] to find a genuine fact issue based on an unsupported hypothetical." *Id.*

For example, in *Yates*, the reasonableness of the deadly use of force by an officer presented a jury question, based on a factual dispute between the parties. *See Yates*, 941 F.2d at 447–48. Two officers responded to a late-night call involving a disturbance in the street and "heard shouting and threatening language coming from inside the house" when they arrived. *Id.* at 445. While one officer called for backup, the other (Currie) entered "the poorly lit hallway." *Id.* Currie claimed to have been attacked by the occupants and pushed back through the door; in this vulnerable position, he fired his weapon in self-defense. *Id.* However, per Yates, he and his brothers rushed toward whom they believed was an intruder but froze once they realized it was an officer; the officer tripped on a floorboard as he moved backwards and fired after Yates put his hands up and said, "Don't shoot." *Id.* Despite the officer's contrary account, he admitted to having "enter[ed] a dark hallway in the entrance of a private residence in the middle of the night, and fail[ing] to give any indication of his identity." *Id.* at 447. The Sixth Circuit affirmed the denial of qualified immunity "because Officer Currie's actions preceding the shooting were not those of an objectively

12

reasonable police officer." *Id.* ("It was not 'objectively reasonable' for Currie to enter the dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing his hat.").

In contrast, in *Chappell*, the Sixth Circuit found no genuine dispute of material fact when officers fatally shot a fifteen-year-old boy who "continued moving toward them with the knife held up while ignoring their commands to drop the knife." *Chappell*, 585 F.3d at 910. The officers "believed he was trying to attack them and, at a distance of less than seven feet, posed an imminent threat of serious bodily harm." *Id.* Much of the officers' account was undisputed, and none of the critical facts were "refuted by physical or circumstantial evidence." *Id.* There were "no other witnesses who could testify to the circumstances facing the detectives in the bedroom immediately before they fired their weapons." *Id.* "Immediately before" the shooting, per *Chappell*, is the relevant time frame; prior unreasonable conduct by an officer does not necessarily speak to the reasonableness of the subsequent use of deadly force. *Id.* at 914 (collecting cases). And, though the plaintiff suggested various factual disputes, the Sixth Circuit did not view any as determinative, noting that "the putative dispute as to whether the detectives identified themselves as they conducted the sweep is not a dispute of material fact and represents no grounds for denying defendants qualified immunity." *Id.* at 916. The panel noted that testimony from witnesses who did not hear the officers announce their presence did not refute the officers' claim that they did so; "it establishes only that the witnesses didn't hear the announcements." *Id.* at 914. *Chappell* also rejected the plaintiff's "grounds for speculation that defendants misread her grandson's innocent intentions when he came out of the closet and advanced toward them with knife in hand." *Id.*

First, because of his centrality, a word about the Court's approach to and treatment of Hobbs.[8] The KSP recorded his statement mere hours after Mills died. In that statement (PL 598), Hobbs depicted Mills as violently resistant and noncompliant throughout and assigned no blame to the police. At his later deposition (and partly, in an intervening interview by a private attorney), Hobbs significantly hedged. There, he denied that Mills fought the police. He claimed to have partly fabricated or lied in parts of the KSP statement. His motivation? Alleged fear of the interviewing officer. Hobbs Dep., internal pp. 40–42. The defense invites the Court to assess Hobbs's credibility. The Court rejects that invitation.

Hobbs's story(ies) are rife with inconsistency and credibility questions. He testified to having been asleep when the KSP came, yet plainly set a different scene on the tape. He testified to extreme fear and a desire to say only what the KSP wanted and then to "hurry" the Trooper out the door. The tape shows a very cooperative and loquacious witness under no stress. Hobbs, a felon and admitted liar, would surely be the target of vigorous impeachment at trial.[9] However, that exercise is not a Rule 56 endeavor. The Court, as with all the evidence, here takes Hobbs's testimony in the light most favorable to and affords all reasonable inferences to Plaintiff. The Court does not analyze based on patent questions over Hobbs's (indeed, any witness's) inconsistency or veracity.

This case is no *Yates*. Although Hobbs—at least, in one or two iterations of his narrative— disagrees with parts of the officers' recollections, the undisputed facts and circumstances show

---

[8] The Court has read all of the depositions and audited all of the statements. Other than witness Barrett, the Court can conclude only that all witnesses corroborate (at a minimum, do not conflict with) the direct accounts of Bolton and Ashurst. Barrett, as the Court later notes, does not impact the analysis based on the particulars of what Barrett did and did not see and his temporal perspective.

[9] The prior statements, to the extent inconsistent with his testimony, likely would have only an impeachment, not substantive, role under Fed. R. Evid. 801(d)(1).

that Ashurst and Bolton "[had] probable cause to believe that [Mills] pose[d] a threat of serious physical harm." *See Garner*, 105 S. Ct. at 1701. The Court conducts the "segmented analysis" as precedent dictates and applies the *Graham* factors. *See Graham*, 109 S. Ct. at 1872; *Chappell*, 585 F.3d at 909. The inquiry proceeds by dividing the night's events into three segments: the kidnapping and initial contact with law enforcement; the struggle in the middle of the road; and the moments immediately preceding the gunshots. The segments are not rigid; the entire event lasted 6 minutes. Thus, it was truly one intensive interaction, and no segment occurred in a vacuum. The totality modifies all, but the Court sequentially scrutinizes each episode of force application.[10]

First, the undisputed genesis of this incident: At 10 p.m. on June 29, Ashurst and Bolton received a call concerning the kidnapping[11] of Mills's two-year-old daughter. Mills had taken her from her custodial grandparents' home and was carrying her in his arms as he walked down the middle of a remote, two-lane road. Kidnapping is undoubtedly a grave offense, and Mills's conduct immediately afterward—walking on the yellow lines in the road at night—posed a serious risk of injury or death to himself and his daughter. Further, Mills demonstrated early noncompliance; he made no effort to return the child to her grandfather, who was following behind Mills, requesting the child's safe return. Later, by his conduct and words, Mills refused to surrender the child to Ashurst and Bolton. He also appeared to be impaired and under the influence of drugs. This initial resistance to a lawful order prompted the officers' first use of force, which no reasonable juror

---

[10] "This approach requires [a reviewing court] to evaluate the use of force by focusing on the split-second judgment made immediately before the officer used allegedly excessive force, not on the poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quotation marks and citation omitted).

[11] Mills had no right to the daughter, and he took her without the custodians' consent. This fits easily within kidnapping (at minimum, a Class B felony) under Kentucky law. *See* KRS 509.040.

could deem objectively unreasonable under the circumstances. The situation required forceful intervention to rescue the child.

Then, the struggle. According to Plaintiff, it was one-sided; Ashurst and Bolton used various means of force against Mills, despite Mills's minimal resistance (the one "little mule kick"). But, all agree that Mills was not behaving normally at the time of this encounter. Witnesses suspected, or even voiced (in Hobbs's case), Mills's supposed drug use. And, though the officers outnumbered Mills two-to-one, Mills was much larger than either of them. *See Davenport*, 521 F.3d at 551 (recognizing size and stature as a proper consideration). There is no real question that Ashurst and Bolton, despite their admitted efforts, failed to subdue and handcuff Mills and that Ashurst repeatedly instructed Mills to roll onto his stomach and place his hands behind his back. Mills never did so. Additionally, no witness disputes that Ashurst lost both his Taser and his flashlight during this part of the incident. Even if Mills did not intentionally knock the Taser out of Ashurst's hand, an objectively reasonable officer under the circumstances, upon finding himself suddenly disarmed, may have believed that Mills was to blame, as Ashurst did. Ashurst Dep., internal p. 157.

Hobbs's suggestion that he (an untrained bystander) could have easily handcuffed Mills does not reasonably support the inference that Ashurst and Bolton brutalized a peaceful and compliant accused kidnapper. Despite not having a clear view of the nature of the fight, all witnesses could hear the sounds of struggle and the officers' apparently fruitless commands.[12] Nor

---

[12] In his deposition, Hobbs appears to have contradicted himself on this point. He first denied having heard commands—at least from one unidentified officer—while Ashurst and Bolton were beating Mills. *See* DE 69 at 11. But later, Hobbs quoted the officers as having said, "Roll over, get down on your belly and roll over, put your hands behind your back." *See* DE 69 at 24. Hobbs's equivocal tale does not reasonably refute the otherwise consistent testimony that Ashurst gave commands continuously.

could a reasonable juror conclude, as Plaintiff argues, that Mills's movements on the ground were involuntary responses to the beating inflicted by Ashurst and Bolton; there is no witness to testify to that effect. *See Chappell*, 585 F.3d at 916 (rejecting hypothetical innocent explanation that lacked support in the record). Taking Hobbs at his word, at a minimum, Mills kicked the officers and failed to comply with their orders to submit to arrest.

The Court has assessed the full record as to the middle-event segment—between when police first Tased Mills to drop him and separate Mills from the child and when Mills again took his feet. Every witness confirms that the officers were trying to gain control over Mills, that the interaction involved a significant physical struggle, and that the officers issued repeated commands to Mills aiming to get him on his stomach and cuffed. Not a single soul describes Mills as compliant at any point. Even Plaintiff's expert believes that "a fight between Mills and the officers" occurred. DE 66 (Miller Dep.) internal pp. 175–76.

Hobbs is the lynchpin for Plaintiff. He testified in essence that Mills never fought or resisted in any way. Plaintiff builds on this to describe Ashurst and Bolton as inflicting on Mills a gratuitous (and obviously excessive) beating. Yet, even Hobbs's testimonial version validates the officers' decisions. Hobbs inarguably described Mills as "out of his mind" on meth and unwilling to listen to anyone. He said that Mills had torn away from the officers, still carrying his daughter, and tried to run away. Then, he confirmed that police had never managed to control Mills or get him to roll over and submit to arrest. At his deposition, after describing how Mills flexed his arm and made a fist at the officers, Hobbs confirmed that Mills was noncompliant. This excerpt is telling:

> Q: When you see somebody holding their arm up . . . with a clenched fist, is that a sign to you that the person was going to cooperate?
>
> . . . .

17

> A: I guess not. He was out of his head. He wouldn't -- he wouldn't cooperate with me or James. And he wouldn't cooperate with them. They was trying to make him lay on the ground on his belly and put his hands behind his back. And him out of his mind. Like I told that officer, the very minute they got through beating on him I said, "I will hold his legs. And you handcuff him."

Hobbs Dep., internal p. 85. This, from Plaintiff's key witness, confirms that Mills would not listen or cooperate, would not submit to arrest, and was out of control. It confirms that officers were trying to get him to submit but that Mills would not. One wonders, logically, why Hobbs would feel the need to offer to hold Mills's legs if he were so easily subject to arrest. Plaintiff gets all reasonable inferences but not unreasonable ones. Hobbs assigns but one "mule kick" by Mills against the arresting officers, but even that act of violent resistance squares with the view that Mills refused, including via direct physical act, to allow himself to be arrested.

Ashurst and Bolton obviously had probable cause to arrest Mills that night. He had kidnapped a child. Even when they arrived and directly contacted him, he attempted to flee with the girl. He was impaired and carrying her in the middle of a caliginous two-lane road. The officers were legally entitled to use the force reasonably necessary to effectuate the arrest. No evidence in the record contradicts the officers' testimony that Mills continued to refuse to relent and submit himself to arrest as Ashurst and Bolton moved through a force continuum, all the while directing Mills to simply roll over and yield his hands. Hobbs Dep., internal pp. 121–22 ("They hollered, 'Roll over on your belly and put your hands behind your back.' They just kept saying that."); *id.* (saying that police ordered Mills to submit "Several times . . . It was several times[.]").

The Court[13] notes that use of force (*e.g.*, a Taser, even multiple times) is not excessive where reasonably employed against a person actively resisting. The Sixth Circuit advises: Active

---

[13] Plaintiff attempts a facile argument suggesting, based on CAD verbiage, that Mills was at one point restrained. Nothing in the record from any person with knowledge supports this reading; no one testified that police managed to cuff or subdue Mills prior to the shots.

resistance includes "physically struggling with, threatening, or disobeying officers . . . And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff v. Gillespie*, 791 F.3d 638, 641–42 (6th Cir. 2015); *Williams v. Sandel*, 433 F. App'x. 353, 362–63 (6th Cir. 2011) (noting that arrestee "repeatedly refused to allow himself to be secured" and upholding use of force involving "thirty-six ECD activations [and multiple] baton strikes . . . [because suspect] remained unsecured and unwilling to comply with the officers' attempts to secure him. . . . As a result, his interests do not outweigh the government's"). Here, Ashurst and Bolton repeatedly directed Mills to roll over and submit his hands for arrest. Mills, "out of his head" and "out of his mind" on meth was wholly uncooperative, would not move or act as directed and, at a minimum, kicked the officers as they endeavored to arrest him. The officers did not impose a gratuitous beating; they, unable to manhandle Mills because of relative stature and Mills's condition, used force to try to bring him under control. They did not succeed, but under the *Graham* factors in this context, a reasonable juror would not find the force excessive during the middle segment of the interaction. Police dealt with an out of control, recalcitrant kidnapper, in the middle of a dark, country road. *See* <u>*Williams*</u>, 433 F. App'x at 361 ("Once [plaintiff] began resisting [an officer's] attempts to secure him in handcuffs, the risk dramatically increased for all involved: Williams, the officers, and the passing motorists."). They had a compelling, objective need to secure Mills, who thwarted that aim by active resistance.[14]

---

[14] *See Siders v. City of Eastpointe*, --- F. App'x ---, No. 19-1331, 2020 WL 4250984, at *6 (6th Cir. July 24, 2020) (Officer was entitled to qualified immunity both for force applied in removing recalcitrant plaintiff from vehicle where he "had reason to suspect that [plaintiff] had committed a crime, likely a violent domestic assault, that she was attempting to avoid or resist his investigation, and that she might pose a safety threat to the officers, herself, or the children in the car" and for force used after removal while plaintiff "thrashed on the street refusing to comply with [officer's] repeated orders to put her hands behind her back for cuffing." Plaintiff "was actively noncompliant and resisting until and even after [the officer] tased her.").

Finally, the shots. When Ashurst decided to use deadly force against Mills, he plainly faced a dangerous situation. He and Bolton were the first—and at the relevant time, only—responders to a sort of ongoing domestic dispute in the middle of a dark country road. To that point, the officers had, by force, facilitated the removal of the reportedly kidnapped child from Mills's arms. But, neither Ashurst nor Bolton had managed to handcuff the suspect, who was much larger than them. Even applying the most Plaintiff-friendly view supported by the record, Mills's behavior could not be described as compliant. He had failed to submit to arrest as directed and then risen to his feet—really, the opposite of rolling onto his stomach and putting his hands behind his back. He then advanced toward Ashurst while Ashurst moved backward and ordered Mills to stop. Even if Mills was walking (not running), and even if he was five or six feet (rather than two or three feet) away from Ashurst at the time of the first shot, these factors are not indispensable ingredients in some rigid risk assessment. Surely proximity and speed inform a reasonable officer's risk analysis, but the calculation does not involve an on-off switch; risk is a spectrum. Under the totality of the circumstances, faced with this split-second judgment, an objectively reasonable officer would have concluded that deadly force was appropriate to protect himself and others. No reasonable juror could conclude otherwise.

Plaintiff suggests all danger ended when police separated Mills from his daughter. That hardly seems a reasonable take on the situation, from the perspective of a reasonable officer on the scene. Again, taking the full record in Mills's favor must include the following observations.

Ashurst and Bolton were dealing with a person obviously impaired, unpredictable, and volatile. Hobbs called him "out of his mind." Ashurst said Mills was unreachable, having a "1000 yard stare." Ashurst Dep., internal pp. 182–83 (ascribing to intoxication). Bolton said Mills was not coherent; he said, squaring with Hobbs, that Mills was "speaking in tongues" when officers

20

arrived. Bolton Dep., internal pp. 18–20. Mills had removed his daughter from the custodial residence without right or permission. He would not yield to the grandfather or Hobbs. He would not yield to police, who forcibly took the girl from Mills. Mills had even broken free from (and perhaps swung at Ashurst), running away with the girl. This was an effort to continue the kidnapping in the very presence of authorities.

Then, Mills had resisted on the ground, producing a several minute struggle. At no point did Mills surrender his hands or submit to the two officers. His actions included active resistance and at least one kick against the officers.

The tragic denouement then followed. Both Ashurst and Bolton claim that Mills threatened them while still on the ground. Ashurst Dep., internal p.185 ("When I get up from here, I'm going to hurt you."); Bolton Dep., internal p. 42 ("[w]hen I get up from here, I'm going to hurt you both."). The record does not refute this threat. Hobbs denies that Mills made any threat of violence, but he was 20 feet away and concedes that in the final moments he could only hear Mills "mumbling."[15] "Mumbling words I don't know what he was saying. He was mumbling." Hobbs Dep., internal p. 90.

The officers and other witnesses consistently describe Mills as rising and advancing toward a retreating Ashurst, as Ashurst commanded Mills to stop and yield his hands or get shot. Ashurst Dep., internal pp. 185–190; Bolton Dep., internal pp. 44–48. Again, even Hobbs's version is corroborative at its core. He describes Mills rising to his feet. He describes Ashurst immediately ordering him to the ground and onto his stomach. Hobbs Dep., internal pp. 33–34 ("He gets up. The cop said, 'Lay down . . . Lay down on your belly. Put your hand behind your back. Or I'm

---

[15] Thus, Hobbs's denial is not direct evidence that Mills issued no threat. The Court undertakes no credibility assessment in declining to accept Hobbs's take on the content of statements that he concedes he could not discern.

going to shoot you.'"). He describes Mills advancing toward Ashurst. *Id.* at internal p. 115; *id.* at p. 90 ("He was coming . . . He [Mills] was walking towards him [with his hand out.]"). He even expressly testifies that it appeared that Mills was reaching for Ashurst's weapon and was mere feet away: "It looked like he was reaching for his gun." *Id.* at internal p. 91; *see also id.* at p. 88 ("It looked that way [that Jessie was trying to get ahold of that gun]. Yes, it did."); *id.* at p. 91 ("and it looked like this. He was reaching for that gun."); *id.* (suggesting gap as 6-8 feet); id. ("I said two feet. It was in that. But it was more than that.").[16]

True, Hobbs suggests that police kicked Mills to get him on his feet.[17] That opinion is directly contrary to the entire course of the encounter, as Ashurst and Bolton consistently tried to get Mills onto his stomach with his hands behind his back. Hobbs concedes that Ashurst gave the same command immediately when Mills got to his feet. It is not plausible, is not a reasonable inference, to think Ashurst kicked Mills to get up so he could tell him to get down. The Court rejects Hobbs's strained and unreasonable interpretation, as would any reasonable juror.

---

[16] Hobbs did not believe, as a matter of opinion, that Mills actually was reaching for the gun. Hobbs Dep., internal p. 133. The view of a reasonable officer controls, and Hobbs concedes many times that Mills seemed to be approaching Mills and reaching for his weapon. "In *Hightower v. City of Columbus*, a plaintiff argued that he raised his hands between himself and an officer not to attack the officer, but to protect himself from being attacked. No. 13-4437, slip op. at 2 (6th Cir. Oct. 3, 2014). We noted that the plaintiff's actions, '*whether intentional or not*, could have led a reasonable officer to believe that [the plaintiff] was actively resisting arrest,' and held that the officer's comrade acted reasonably when he used his taser on the plaintiff. *Id.* at 7 (emphasis added). Regardless of the plaintiff's 'subjective intent,' the crucial question was how 'a reasonable officer in the heat of the moment' could have construed the plaintiff's behavior. *Ibid.*" *Kelly v. Sines*, 647 F. App'x 572, 576 (6th Cir. 2016).

[17] Hobbs does not characterize his view regarding the officers' purpose as anything other than his subjective opinion. That is, he does not claim that Ashurst, in kicking the downed Mills, voiced a desire for Mills to regain his feet. [Indeed, Hobbs's recall of Ashurst's oral commands indicate just the opposite.] Hobbs's opinion of the officers' internal objective is not direct evidence of intent. *Cf. Alexander v. Youngstown Bd. of Ed.*, 675 F.2d 787, 791 (6th Cir. 1982) ("As a practical matter, intent can only be proven circumstantially."). Thus, the Court rejects Hobbs's take not as in*credible* but as, on this record, im*plausible*.

Mills continued as a significant danger throughout the interaction. His physical size and compromised state exacerbated the risk, one Mills voiced, to the officers. They had been through the full non-lethal force continuum and could not (despite being two v. one) get control of Mills. Then, he popped to his feet (contrary to commands) and advanced (contrary to commands). Ashurst backpedaled and attempted to stop Mills by further orders. This, like all other orders or entreaties to Mills that night—from the beginning at the Helton home through the fatal shots—did not reach or deter Mills, who advanced. Ashurst, facing a tense, uncertain, and rapidly evolving moment, defensibly used deadly force, and no reasonable juror would find to the contrary on this record under apt standards.[18]

### a. Qualified Immunity

In Defendants' view, Plaintiff has failed to show that Ashurst and Bolton are not entitled to qualified immunity on this claim. *See* DE 85 at 24–29. Defendants observe that the clearly established right may not be defined at a high level of generality—"the right not to be shot"—and that Plaintiff has failed to cite a case factually similar to this one. *See id.* at 29 (noting Mills's

---

[18] The Court carefully screened the Barrett interview and read the Barrett deposition. He saw none of the interaction between Mills and the officers in the segments prior to the fatal interlude. Indeed, he purportedly arrived before Mills took his feet, though he could see (and saw) no officers actually on the scene or in the frame of view. DE 71 (Barrett Dep.) internal pp. 23–24. Ultimately, he claims to have seen Mills jump up, *id.* at p. 25, and run in circles, yelling or "squalling" for 5-6 minutes while police ordered him to "settle down" before the shots occurred. Several observations obtain: For an event that objectively took 6 minutes, per the CAD report, Barrett claims to have watched Mills sit in the road for 8-10 minutes and then run in circles for 5-6 minutes. Further, Barrett could not see where the officers stood—thus, he could not possibly say whether, as Mills moved upon standing, he headed toward any officer. Finally, Barrett heard the officers' commands to Mills but could not discern at any point what Mills was saying: "I couldn't understand a word he was saying." *Id.* at internal p. 52; *see id.* at p. 35.

The contribution from Barrett does not appreciably affect the analysis. Although he perceived Mills as potentially "on something," Barrett had no knowledge of the events prior to his arrival. He had a restricted view of the events and could not hear discernible details, at least in terms of what Mills may have said or yelled. The Barrett proof does not, other than in its unreasonably elastic timeline, contradict the proof from the officers.

suspected use of methamphetamine, commission of serious crimes including kidnapping, and walking toward Ashurst after repeated instructions and warnings). Defendants maintain that the officers acted in an objectively reasonable manner under the circumstances. *See id.* at 30–33. However, according to Plaintiff, a reasonable juror could find a constitutional violation under the circumstances. *See* DE 108 at 42–43. On the second qualified immunity prong, Plaintiff cites the Court's earlier ruling on Defendants' Rule 12 motion and notes that individuals have a clearly established right not to be shot unless they pose a safety risk. *See id.* at 43–44.

"Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz*, 641 F.3d at 750. Qualified immunity involves a two-part inquiry: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see Pearson*, 129 S. Ct. at 818 (holding that courts may address the two questions in either order).

"The right must have been 'clearly established' not just in an abstract sense, but in a 'particularized' sense." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997). A plaintiff must show, "on a fact-specific, case-by-case basis . . . [that] a reasonable official in the defendants' position could [not] have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray v. City of Sandusky*, 49 F.3d 1154, 1157–58 (6th Cir. 1995). "In other words, existing law must have placed the constitutionality of the officer's conduct

24

beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations removed).

Here, because no reasonable juror could conclude that Ashurst and Bolton were objectively unreasonable in their use of force, the qualified immunity analysis need proceed no further; Plaintiff's showing fails on the first prong. But even if the officers' conduct rose to the level of a Fourth Amendment violation, Plaintiff impermissibly relies on a generalized expression of the "clearly established" right. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("[C]learly established law" should not be defined "at a high level of generality.") (internal quotation omitted).

No one could seriously dispute "that individuals have a right not be shot unless they are perceived as posing a threat to officers or others." *See King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012). But this statement, as applied to this case, assumes an uncorroborated conclusion—that Mills posed no threat to Ashurst, Bolton, or anyone else. In contrast, *King* considered a record-supported version of the facts in which the officer had used deadly force "while [King] was lying on his couch and not pointing a gun at the officers." *Id.* In this case, the Court has already determined that no genuine issue of material fact exists as to whether the circumstances would lead an objectively reasonable officer to conclude that deadly force was appropriate. Plaintiff points to no factually similar case "plac[ing] the constitutionality of the officer[s'] conduct beyond debate." *See Wesby*, 138 S. Ct. at 589.

Nor can Plaintiff rely on the Court's earlier qualified immunity analysis, which referenced the "clearly established" right as defined by *King*; at that stage, the Court was applying a different standard and relying, by rule, exclusively on the allegations in the Complaint. *See* DE 18 at 10–11 ("The Sixth Circuit . . . has clarified that only truly 'insubstantial claims against government

officials should be resolved … prior to broad discovery,' . . . and has cautioned that 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.'") (internal citation and quotation omitted).

Here, the Court finds no triable issue as to any of the uses of force. Mills had committed a kidnapping, behaved very erratically, refused all commands, and resisted the officers. The officers appropriately used force to save the child, appropriately used force in a failed but well-warranted endeavor to arrest Mills, and then used deadly force to stop the advancing Mills, who continued to refuse direct commands and warnings and who had just made a threat. Sad though the ending was, Ashurst, who already had learned that two armed officers employing non-lethal force could not subdue Mills, had no real choice in stopping Mills as he approached in a menacing way. Ashurst and Bolton did not violate Mills's Fourth Amendment (clearly established or otherwise) rights.

### 2. *Monell* (Count Five)

Per Defendants, Knox County can have no liability because Plaintiff has failed to demonstrate a constitutional violation by Ashurst or Bolton. *See* DE 85 at 42. Alternatively, addressing the *Monell* theory on the merits, Defendants claim that Ashurst was adequately trained in accordance with Kentucky law and that Bolton was a constitutionally elected official, not an employee of the Knox County Sheriff's Department. *See id.* at 42–45. Moreover, at the time of the shooting, Knox County had an acceptable use-of-force policy, and Ashurst was sufficiently trained in this regard. *See id.* at 45–46. Defendants conclude by highlighting the culpability and causal link required for § 1983 municipal liability. *See id.* at 46–48. In opposition, Plaintiff claims that a jury question exists on both asserted *Monell* variants: failure to train and failure to supervise. *See* DE 108 at 47. Plaintiff argues that Knox County was deliberately indifferent in both regards. *See id.* at 50–54.

There can be no § 1983 municipal liability without an underlying constitutional violation. *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Here, having found no constitutional violation by Ashurst or Bolton, Knox County can have no § 1983 liability. But, even if the officers used excessive force during the incident in question, Plaintiff has failed in other ways to make the requisite showing for *Monell* liability.

To begin, respondeat superior is not a basis for county liability under § 1983. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" *Id.* (internal quotation omitted). There are four ways to make this showing: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (internal citation omitted). After the earlier ruling at the Rule 12 stage, only the third theory remains viable. *See* DE 18 at 22.

To bring a claim for inadequate training or supervision, a plaintiff must show "that: 1) the [municipality's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Ciminillo*, 434 F.3d at 469. Deliberate indifference may be shown by "either (1) 'prior instances of unconstitutional conduct demonstrating that the [municipality] had notice that the training was deficient and likely to cause injury but ignored it' or (2) 'evidence of a single violation of federal rights, accompanied by a showing that the [municipality] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Jackson*, 925 F.3d at 836. "Deliberate

27

indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the Cty. Comm'rs v. Brown*, 117 S. Ct. 1382, 1392 (1997).

The Court considers Plaintiff's *Monell* claims as to each individual Defendant in turn, addressing the training theory first. Plaintiff contends that Ashurst's use-of-force training was inadequate because Knox County required only that Ashurst ride along for two weeks with a field training officer to get familiar with the roads and learn how to complete paperwork. *See* DE 108 at 50. However, this misleading advocacy ignores that Ashurst was a certified law enforcement officer, meaning he had received prior training as mandated by Kentucky law. *See* KRS 15.380(1)(c) (requiring deputy sheriffs to be certified); KRS 15.404 (provision entitled "Basic training and in-service training for peace officers"); DE 117-3 (Ashurst's Certificate of Completion from the Department of Criminal Justice Training, showing successful completion of firearms instructor training course). There is no indication that Knox County implemented a separate training program, but Plaintiff does not suggest, or cite any authority for, the proposition that Kentucky's state academy, through the Department of Criminal Justice Training, is constitutionally inadequate or that Knox County unreasonably relied on that program. *See* KRS 15.402 (providing that agencies *may* impose requirements in excess of what is required by Kentucky law).

Instead, Plaintiff merely notes that Knox County had not trained Ashurst on using his flashlight to effect arrest or refreshed his training on the use of his ASP.[19] *See* DE 108 at 50–51. Plaintiff further highlights an admittedly bare-bones use-of-force policy once used by Knox

---

[19] Kentucky law does require forty hours of annual in-service training, but it does not dictate the topics. *See* KRS 15.404(2)(a).

County (though not in effect at the time of the shooting). *See id.* at 51. These supposed deficiencies need not have made it plainly obvious to Knox County that Ashurst would unconstitutionally use force during arrests. Ashurst completed an eighteen-week, state-sanctioned training academy where he received instruction on the use-of-force continuum, and, again, Plaintiff has not demonstrated that this program was inadequate. Plaintiff points to no "*prior instances of unconstitutional conduct*" indicating deficient training or a *single constitutional violation* paired with inadequate training in light of "recurring situations presenting an obvious potential for such a violation." *See Jackson*, 925 F.3d at 836 (emphasis added). Put simply, Plaintiff's showing as to Ashurst is a far cry from deliberate indifference, which is required for Knox County liability.

As to Bolton, Plaintiff's presentation is likewise incomplete; she highlights Bolton's lack of training but omits important facts about Kentucky constables. For example, Plaintiff notes that "Sheriff Smith never requested that Bolton receive training," despite his awareness that Bolton was untrained. *See* DE 108 at 51. Kentucky constables hold an elected office created by the Kentucky constitution. Ky. Const. § 99.[20] Kentucky law empowers constables to "execute warrants, summons, subpoenas, attachments, notices, rules and orders of court in all criminal, penal and civil cases." *See* KRS 70.350.[21] Though constables are peace officers, they are statutorily

---

[20] Plaintiff suggests that the Court has already determined Knox County may be held liable for constitutional violations by its constable. *See* DE 108 at 51 n.3. Not exactly. Rather, the Court earlier explained why Knox County, rather than the Knox County Sheriff's Department, was a proper entity Defendant. *See* DE 18 at 16 n.7. Also, the Court noted that county liability for a constable's actions is possible, as long as the constable is a municipal policymaker whose challenged conduct represents official policy. *Id.* (quoting *Pembaur v. City of Cincinnati*, 106 S. Ct. 1292, 1298 (1986)). Plaintiff has not proven Bolton was a County policymaker or that, by his conduct, he was making official policy on the night in question. More importantly, no violation occurred.

[21] There is no indication that, by riding along with Ashurst, Bolton acted outside the scope of his statutory authority.

exempt from state-law certification requirements (including training). *See* KRS 15.380(5)(c); KRS 15.404; KRS 446.010(31).

Plaintiff does not explain how Knox County can have § 1983 liability for failing to train Bolton, who was not a county employee, when the Kentucky General Assembly saw fit to exempt Bolton and all other constables from such a program. Importantly, *Monell* liability cannot attach absent "a deliberate choice to follow a course of action [ ] made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 106 S. Ct. at 1300. When it comes to training Bolton, Plaintiff presents no alternative consistent with the unchallenged statutory scheme. In any event, the General Assembly, not the County, is the entity responsible for the decision to exempt constables from certification and training.[22]

Finally, the second part of Plaintiff's *Monell* argument focuses on Knox County's failure to supervise Ashurst.[23] In support of this theory, Plaintiff gathers excerpts from Ashurst's personnel file and relies on the impressions of some of Ashurst's former employers. *See* DE 108 at 52–54. According to Plaintiff, Ashurst's history of using force and "hostile attitude toward persons of the public" show that Knox County ignored a "plainly obvious danger" by hiring Ashurst and then failing to train and supervise him. *See id.* at 53–54. However, the failure-to-supervise theory "must meet the 'rigorous standards of culpability and causation' that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of

---

[22] A warning, though, to the County: Bolton conceded he had utterly no training. The County, if allowing its deputies to insert constables directly into situations of this type, is inviting significant potential exposure from the conduct of such parallel law enforcement personnel. *See Stanley v. Smith*, No. 6:16-CV-264-REW-HAI, 2019 WL 4786053, at *18 n.14 (E.D. Ky. Sept. 30, 2019).

[23] Though Bolton's name appears in the subheading, the discussion section is silent as to Knox County's supposedly inadequate supervision of the constable. *See* DE 108 at 52–53.

federal rights." *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010) (quoting *Brown*, 117 S. Ct. at 1391). In *Brown*, the Supreme Court held these standards were not met even when a deputy's record reflected misdemeanors including assault and battery and when the deputy was later accused of using excessive force. *Id.* at 1392–94. In this case, at most, Plaintiff's proof suggests that Ashurst may have sometimes demonstrated immaturity or a poor attitude. That Knox County hired Ashurst without putting him on probation or otherwise acting on his purportedly troubled history does not rise to the level of deliberate indifference.

### B. State Claims

As to the state-law claims, the Court, having found all federal claims deficient on Rule 56 review, finds dismissal, without prejudice, of the remaining claims appropriate. Given the common factual field, the Court, under 28 U.S.C. § 1367(a), has supplemental jurisdiction over the Kentucky claims. However, after a "district court has dismissed all claims over which it has original jurisdiction" the exercise of supplemental jurisdiction is not mandatory. 28 U.S.C. § 1367(c). The Court's discretion in this area is broad, but "bounded by constitutional and prudential limits on the use of federal judicial power." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (hereinafter *Musson*); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). Specifically, the Court must account for "judicial economy, convenience, fairness, and comity" concerns. *Carnegie-Mellon Univ. v. Cohill*, 108 S. Ct. 614, 619 (1988). "Depending on a host of factors, then—including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims—district courts may decline to exercise jurisdiction over supplemental

31

state law claims." *City of Chicago v. Int'l Coll. of Surgeons*, 118 S. Ct. 523, 534 (1997). If all federal claims are dismissed pretrial, "the balance of considerations usually will point to dismissing" or remanding state claims. *Musson*, 89 F.3d at 1254–55.

The Court sees nothing, on this record, to overcome the general dismissal presumption. First, the parties devote little more than a half-dozen leaves of their 127-pages of summary judgment briefing to argument on the state-law claims. *See* DE 85 at 35–41; DE 108 at 44–47; DE 117 at 20–22. Second, the potential for material light between the KRS 503.090 justification analysis and the federal excessive force framework suggests, to this Court, that a "state court should have the [first] opportunity to consider the merits of the Plaintiff's state law claim[s]." *Aquilina v. Wriggelsworth*, 759 F. App'x 340, 348 (6th Cir. 2018) (quotation marks omitted); *see Pertz v. Edward J. DeBartolo Corp.*, 188 F.3d 508 (Table), 1999 WL 644339 at *5 n.5 (6th Cir. 1999) (noting "the interest of preventing federal courts from needlessly deciding state law issues"); *cf. Runkle v. Fleming*, 435 F. App'x 483, 486 (6th Cir. 2011) (affirming declination of supplemental jurisdiction where "the pendent claims presented complex state statute of limitations and negligence issues"). Third, Kentucky's recognition of the difficulties inherent in parsing the state's qualified official immunity jurisprudence and the "subjective aspect" inherent in the Commonwealth's doctrine—but absent from the federal qualified immunity rubric—provide additional comity-based dismissal drivers. *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001); *see Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014) ("The question of when a task

is ministerial versus discretionary has long plagued litigants and the courts.").[24] Fourth, § 1367(d) "supplies a tolling rule" for statutes of limitation that state courts "must" apply. *Artis v. District of Columbia*, 138 S. Ct. 594, 599 (2018). Thus, the Court foresees no limitations-based difficulties that would favor retaining jurisdiction federally. *See id.* at 605 ("In § 1367(d), Congress [provided] for tolling not only while the claim is pending in federal court, but also for 30 days thereafter. . . . [T]he added days give the plaintiff breathing space to refile in state court."). Given the presumption and these factors, the Court declines to exercise jurisdiction over the remaining state-law claims. *See Frodge v. City of Newport*, 501 F. App'x 519, 534 (6th Cir. 2012) (affirming district court's dismissal of state law claims after granting defendants summary judgment on "[p]laintiffs' § 1983 claims for false arrest, excessive force, and supervisory and municipal liability").

## VI.    CONCLUSION

The loss of life here is, without question, a sad and rueful result. Hindsight always offers a stress-free environment to construct hypothetical changes in approach or tactic that could potentially have avoided a fatality. On June 26, 2019, Ashurst and Bolton faced a real-world tense, uncertain, and rapidly evolving scene. Mills was volatile and unpredictable. He had stolen his child from the child's legal custodians. He had refused all overtures—private and public—to cease and yield. He tried to run away again with the child in the presence of police. When authorities

---

[24] *See also Blaha v. Hetfield*, 127 F.3d 1102 (table) (6th Cir. 1997) ("We are unable to say with assurance that Michigan courts would analyze Michigan law as did the district court[.] . . . In light of the unsettled Michigan case law, the district court improperly exercised jurisdiction over the state law trespass claim[.] . . . The court would have been better advised to dismiss that claim without prejudice."). Notably, the fact that a "claim raises a novel or complex issue of State law" is, itself, a sufficient—*i.e.*, not dependent on dismissal of the claims providing original jurisdiction—basis to decline supplemental jurisdiction. 28 U.S.C. § 1367(c)(1).

endeavored to arrest him, he resisted to the end,[25] ultimately rising and charging toward Ashurst as Ashurst desperately tried to induce Mills to stop and get on the ground. The officers may not have proceeded with operational perfection. That is not the constitutional standard.

For all these reasons and on the stated terms, the Court **ORDERS** as follows:

1. The Court **GRANTS** DE 84 on terms;

2. The Court **DISMISSES** Plaintiff's federal claims **WITH PREJUDICE**;

3. The Court **DISMISSES** Plaintiff's state-law claims **WITHOUT PREJUDICE**;

4. Given the Court's declination of supplemental jurisdiction (and dismissal of all claims) the Court **DENIES** DE 94, DE 96, and DE 97 **WITHOUT PREJUDICE**; and

5. The Court will enter a separate judgment.

This the 5th day of August, 2020.

Signed By:

_Robert E. Wier_

**United States District Judge**

---

[25] "Although Plaintiff insists that he no longer posed a risk of harm . . . after being taken to the ground, there is no dispute that Plaintiff continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back." *Caie v. West Bloomfield Twnsp.*, 485 F. App'x. 92, 97–98 (6th Cir. 2012); *id.* (endorsing police use of force against "a highly intoxicated, volatile, and uncooperative subject [ ] neutralizing what a reasonable officer could perceive as a dangerous situation").